**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION a Texas reciprocal inter-insurance exchange, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 2:18-CV-245 JURY TRIAL DEMANDED |
| WELLS FARGO BANK, N.A., a national banking association, | ) ) ) | |
| Defendant. | ) | |

---

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

---

Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), by and through its undersigned counsel, responds to the allegations of Plaintiff's Complaint as follows:

The first paragraph of the Complaint is an introductory paragraph that does not require a response by Wells Fargo.  To the extent that this introductory paragraph requires a response, Wells Fargo admits that the Complaint purports to have been filed by United Services Automobile Association ("USAA"), a Texas reciprocal inter-insurance exchange, by and through its undersigned counsel of Irell & Manella LLP and Parker, Bunt & Ainsworth, P.C.

1.      Wells Fargo expressly denies any allegation it has committed acts of patent infringement.  Wells Fargo admits that USAA has obtained "multiple patents issued by the United States Patent and Trademark Office."  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 1 of the Complaint and, on that basis, denies all such allegations.

## I.    THE PARTIES

2.      Wells Fargo admits that "USAA is a reciprocal interinsurance exchange and unincorporated association organized under the laws of the State of Texas having its principal place of business at 9800 Fredericksburg Road, San Antonio, Texas 78288."  Wells Fargo further admits that the USAA family of companies provides insurance, banking, investments, retirement products and services to members of the military and their eligible family members.  Wells Fargo further admits that USAA "does business in this judicial district, and through its website at www.usaa.com and USAA Mobile smartphone applications."  Unless specifically admitted, Wells Fargo is without knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 2 of the Complaint and, on that basis, denies all such allegations.

3.      Wells Fargo admits the allegations of paragraph 3 of the Complaint.

## II.    JURISDICTION AND VENUE

4.      Wells Fargo admits that this Court has subject matter jurisdiction over this action.

5.      Wells Fargo admits it is registered to do business in Texas and maintains an agent authorized to receive service of process within Texas.  Wells Fargo further admits that it operates bank branches and ATMs in the state of Texas and in this judicial district.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 5 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement within this judicial district, the State of Texas, or elsewhere in the United States.

6.      While Wells Fargo does not contest that venue is proper in this judicial district, venue is not convenient for Wells Fargo and its witnesses, and Wells Fargo reserves the right to seek transfer pursuant to 28 U.S.C. § 1404.  Wells Fargo denies that it has committed any act of

infringement within this judicial district, the State of Texas, or elsewhere in the United States that would render venue proper under 28 U.S.C. § 1400(b).

### III.   FACTUAL ALLEGATIONS

**USAA's [Alleged] Pioneering Remote Check Deposit Innovations**

7.     Wells Fargo admits USAA has been issued patents.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 7 of the Complaint.

8.     Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8 of the Complaint and, on that basis, denies all such allegations.

9.     Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9 of the Complaint and, on that basis, denies all such allegations.

10.     Wells Fargo denies the allegations of paragraph 10 of the Complaint.

11.     Wells Fargo denies the allegation that "[f]or the first time, Deposit@Mobile® allowed customers to deposit checks anytime, anywhere by taking photographs with a mobile phone's digital camera."  Unless specifically admitted, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 11 of the Complaint and, on that basis, denies all such allegations.

12.     Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12 of the Complaint and, on that basis, denies all such allegations.

**The USAA Patents-in-Suit**

13.     Wells Fargo admits that the '719, '517, '090, and '571 Patents list USAA as the assignee.  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13 of the Complaint and, on that basis, denies all such allegations.

<u>The '779 and '517 Patents</u>

14.     Wells Fargo admits that the '779 and '517 Patents are entitled "Systems and methods for alignment of check during mobile deposit" and indicate on their face that Bharat Prasad, Minya Liang, and Reynaldo Medina are inventors.  Wells Fargo further admits that paragraph 14 of the Complaint includes a figure from the '779 and '517 patents.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 14 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement, and any allegation that the '779 and '517 patents are directed to any improvements over the prior art.

15.     Wells Fargo admits that the '779 and '517 Patents state, "[a]n alignment guide may be provided in the field of view of a camera associated with a mobile device used to capture an image of a check."  Wells Fargo further admits that the '779 and '517 Patents state, "[t]he alignment guide may be adjustable at the mobile device."   Wells Fargo further admits that the '779 and '517 Patents state, "[i]n an implementation, an image may be captured when the image of the check is detected to be within the alignment guide."   Wells Fargo further admits that the '779 and '517 Patents state, "[i]n an implementation, the image capture may be performed automatically by the camera or the mobile device as soon as the image of the check is determined to be within the alignment guide."  Unless specifically admitted, Wells Fargo denies the remaining

allegations of paragraph 15 of the Complaint, including (but not limited to) any allegation that the '779 and '517 Patents were "new, novel, and useful," provide any improvements over the prior art, or "solve discrete, technological problems associated with computing systems."

The '090 and '571 Patents

16.     Wells Fargo admits that the '090 and '571 Patents indicate on their face that Michael Patrick Bueche, Jr., Bharat Presad, Minya Liang, Reynaldo Medina, and Charles Lee Oakes III are inventors.  Wells Fargo further admits that paragraph 16 of the Complaint includes a figure from the '090 and '571 Patents.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 16 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement, and any allegation that the '090 '571 Patents are directed to any improvements over the prior art.

17.     Wells Fargo admits that the '090 and '571 Patents state, "[w]hen the image of the check in the field of view passes monitoring criteria, an image may be taken by the camera and provided from the mobile device to a financial institution."  Wells Fargo admits that the '090 and '571 Patents state, "[t]he image capture may be performed automatically as soon as the image of the check is determined to pass the monitoring criteria."  Wells Fargo admits that the '090 and '571 Patents state, "[f]eedback may be provided to the user of the camera regarding the image of the check in the field of view."   Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 17 of the Complaint, including (but not limited to) any allegation that the '779 and 517' Patents were "new, novel, and useful," provide any improvements over the prior art, or "solve discrete, technological problems associated with computing systems."

**Wells Fargo's [Alleged] Infringement**

18.     Wells Fargo admits the allegations of paragraph 18 of the Complaint.

19.     Wells Fargo expressly denies any allegation it committed acts of patent infringement.  Wells Fargo admits that USAA collectively refers to Wells Fargo's remote deposit capture systems as "Wells Fargo Mobile Deposit" in the Complaint.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 19 of the Complaint.

20.     Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 20 of the Complaint and, on that basis, denies all such allegations.

21.     Wells Fargo admits that on June 26, 2012, a Wells Fargo representative— identified as Brian Pearce—is quoted as stating about mobile deposit that "[i]t's the service our mobile customers request most often," and that "[t]here's a lot of demand for this service." Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 21 of the Complaint.

22.     Wells Fargo admits the allegations of paragraph 22 of the Complaint.

23.     Wells Fargo admits the allegations of paragraph 23 of the Complaint.

24.     Wells Fargo admits that Mobile Deposit is incorporated into the "Wells Fargo Mobile" iPhone and Android applications, where it is highlighted as a feature in the applications' descriptions.  Wells Fargo further admits that "[a]ccording to the Google Play Store, Wells Fargo Mobile has been downloaded over 10 million times on Android devices."  Wells Fargo further admits that (as of the date of the Complaint) "Wells Fargo Mobile for iPhone" has a "ranking [of] #8 on the iTunes App Store's Finance category."  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 24 of the Complaint.

25.     Wells Fargo admits that "Wells Fargo Mobile Deposit allows customers to deposit checks remotely," and that this process may include the steps of "identifying an account

for deposit, [and] entering the dollar amount of the deposit." Wells Fargo further admits that sequence of screenshots in paragraph 25 of the Complaint could be found on Wells Fargo's website as of the filing of this Answer. Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 24 of the Complaint.

26.     Wells Fargo denies the allegations of paragraph 26 of the Complaint.

27.     Wells Fargo denies the allegations of paragraph 27 of the Complaint.

28.     Wells Fargo admits that USAA approached Wells Fargo in August 2017 to discuss USAA's Remote Deposit Capture (RDC) patents. Wells Fargo denies any allegation that Wells Fargo has committed any act of infringement. Unless specifically admitted, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 28 of the Complaint and, on that basis, denies all such allegations.

## IV.     FIRST CLAIM FOR RELIEF – '779 PATENT

29.     Paragraph 29 does not require a response by Wells Fargo.

30.     Wells Fargo admits that the '779 Patent is entitled "Systems and methods for alignment of check during mobile deposit" and indicates on its face that it issued on April 15, 2014. Wells Fargo admits that Exhibit 1 to the Complaint purports to be a copy of the '779 Patent. Wells Fargo denies that the '779 Patent was duly and lawfully issued. Any remaining allegations are denied.

31.     Wells Fargo admits that the '779 Patent lists USAA as the assignee. Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 31 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement (whether literal or under the doctrine of equivalents).

32.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 32 of the Complaint are denied.

33.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 33 of the Complaint are denied.

34.     Wells Fargo admits that the version of Wells Fargo Mobile Deposit depicted in paragraph 34 of the Complaint instructs the user to indicate the amount to be deposited and the account into which the check is to be deposited.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 34 of the Complaint.

35.     Wells Fargo denies the allegations of paragraph 35 of the Complaint.

36.     Wells Fargo admits that the version of the Wells Fargo Mobile Deposit depicted in paragraph 35 of the Complaint states, "Center check and hold steady.  Or tap the camera button." Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 36 of the Complaint.

37.     Wells Fargo denies the allegations of paragraph 37 of the Complaint.

38.     Wells Fargo denies the allegations of paragraph 38 of the Complaint.

39.     Wells Fargo admits that USAA has approached Wells Fargo regarding licensing of USAA's mobile deposit patents.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 39 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement.

40.     Wells Fargo denies the allegations of paragraph 40 of the Complaint.

41.     Wells Fargo denies the allegations of paragraph 41 of the Complaint.

42.     Wells Fargo denies the allegations of paragraph 42 of the Complaint.

43.     Wells Fargo denies the allegations of paragraph 43 of the Complaint.

44.     Wells Fargo denies the allegations of paragraph 44 of the Complaint.

45.     Wells Fargo denies the allegations of paragraph 45 of the Complaint.

## V.     SECOND CLAIM FOR RELIEF – '517 PATENT

46.     Paragraph 46 does not require a response by Wells Fargo.

47.     Wells Fargo admits that the '517 Patent is entitled "Systems and methods for alignment of check during mobile deposit," and indicates on its face that it issued on May 10, 2016.  Wells Fargo admits that Exhibit 2 to the Complaint purports to be a copy of the '517 patent. Wells Fargo denies that the '517 patent was duly and lawfully issued.  Any remaining allegations are denied.

48.     Wells Fargo admits that the '517 Patent lists USAA as the assignee.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 48 of the Complaint.

49.     Wells Fargo denies the allegations of paragraph 49 of the Complaint.

50.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 50 of the Complaint are denied.

51.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 51 of the Complaint are denied.

52.     Wells Fargo admits that the version of Wells Fargo Mobile Deposit depicted in paragraph 52 of the Complaint instructs the user to indicate the amount to be deposited and the account into which the check is to be deposited.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 52 of the Complaint.

53.     Wells Fargo denies the allegations of paragraph 53 of the Complaint.

54.     Wells Fargo admits that the version of the Wells Fargo Mobile Deposit depicted in paragraph 53 of the Complaint states, "Center check and hold steady.  Or tap the camera button." Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 54 of the Complaint.

55.     Wells Fargo denies the allegations of paragraph 55 of the Complaint.

56.     Wells Fargo denies the allegations of paragraph 56 of the Complaint.

57.     Wells Fargo admits that USAA has approached Wells Fargo regarding licensing of USAA's mobile deposit patents.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 57 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement.

58.     Wells Fargo denies the allegations of paragraph 58 of the Complaint.

59.     Wells Fargo denies the allegations of paragraph 59 of the Complaint.

60.     Wells Fargo denies the allegations of paragraph 60 of the Complaint.

61.     Wells Fargo denies the allegations of paragraph 61 of the Complaint.

62.     Wells Fargo denies the allegations of paragraph 62 of the Complaint.

63.     Wells Fargo denies the allegations of paragraph 63 of the Complaint.

64.     Wells Fargo denies the allegations of paragraph 64 of the Complaint.

## VI.     THIRD CLAIM FOR RELIEF – '090 PATENT

65.     Paragraph 65 does not require a response by Wells Fargo.

66.     Wells Fargo admits that Exhibit 3 to the Complaint purports to be a copy of the '090 patent.  Wells Fargo denies that the '090 patent was duly and lawfully issued.  Any remaining allegations are denied.

67.     Wells Fargo admits that the '090 Patent lists USAA as the assignee.   Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 67 of the Complaint, including (but not limited to) any allegations that Wells Fargo has committed any act of infringement either literally and/or under the doctrine of equivalents.

68.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 68 of the Complaint are denied.

69.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 69 of the Complaint are denied.

70.     Wells Fargo admits that the version of Wells Fargo Mobile Deposit depicted in paragraph 70 of the Complaint instructs the user to indicate the amount to be deposited and the account into which the check is to be deposited.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 70 of the Complaint.

71.     Wells Fargo denies the allegations of paragraph 71 of the Complaint.

72.     Wells Fargo admits that the version of the Wells Fargo Mobile Deposit depicted in paragraph 71 of the Complaint states, "Center check and hold steady.  Or tap the camera button." Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 72 of the Complaint.

73.     Wells Fargo denies the allegations of paragraph 73 of the Complaint.

74.     Wells Fargo denies the allegations of paragraph 74 of the Complaint.

75.     Wells Fargo denies the allegations of paragraph 75 of the Complaint.

76.     Wells Fargo admits that USAA has approached Wells Fargo regarding licensing of USAA's mobile deposit patents.   Unless specifically admitted, Wells Fargo denies the

remaining allegations of paragraph 76 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement.

77.     Wells Fargo denies the allegations of paragraph 77 of the Complaint.

78.     Wells Fargo denies the allegations of paragraph 78 of the Complaint.

79.     Wells Fargo denies the allegations of paragraph 79 of the Complaint.

80.     Wells Fargo denies the allegations of paragraph 80 of the Complaint.

81.     Wells Fargo denies the allegations of paragraph 81 of the Complaint.

82.     Wells Fargo denies the allegations of paragraph 82 of the Complaint.

83.     Wells Fargo denies the allegations of paragraph 83 of the Complaint.

### VII.   FOURTH CLAIM FOR RELIEF – '571 PATENT

84.     Paragraph 84 does not require a response by Wells Fargo.

85.     Wells Fargo admits that the '571 Patent is entitled "Systems and methods for image monitoring of check during mobile deposit" and indicates on its face that it issued on March 10, 2015.  Wells Fargo admits that Exhibit 4 to the Complaint purports to be a copy of the '571 patent. Wells Fargo denies that the '571 patent was duly and lawfully issued. Any remaining allegations are denied.

86.     Wells Fargo admits that the '571 Patent lists USAA as the assignee.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 86 of the Complaint

87.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 87 of the Complaint are denied.

88.     Wells Fargo admits that Wells Fargo Mobile Deposit is accessible from Android or iPhone smartphones.  Any remaining allegations of paragraph 88 of the Complaint are denied.

89.     Wells Fargo admits that the version of Wells Fargo Mobile Deposit depicted in paragraph 89 of the Complaint instructs the user to indicate the amount to be deposited and the account into which the check is to be deposited.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 89 of the Complaint.

90.     Wells Fargo denies the allegations of paragraph 90 of the Complaint.

91.     Wells Fargo admits that the version of the Wells Fargo Mobile Deposit depicted in paragraph 90 of the Complaint states, "Center check and hold steady.  Or tap the camera button." Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 91 of the Complaint.

92.     Wells Fargo denies the allegations of paragraph 92 of the Complaint.

93.     Wells Fargo denies the allegations of paragraph 93 of the Complaint.

94.     Wells Fargo denies the allegations of paragraph 94 of the Complaint.

95.     Wells Fargo admits that USAA has approached Wells Fargo regarding licensing of USAA's mobile deposit patents.  Unless specifically admitted, Wells Fargo denies the remaining allegations of paragraph 95 of the Complaint, including (but not limited to) any allegation that Wells Fargo has committed any act of infringement.

96.     Wells Fargo denies the allegations of paragraph 96 of the Complaint.

97.     Wells Fargo denies the allegations of paragraph 97 of the Complaint.

98.     Wells Fargo denies the allegations of paragraph 98 of the Complaint.

99.     Wells Fargo denies the allegations of paragraph 99 of the Complaint.

100.    Wells Fargo denies the allegations of paragraph 100 of the Complaint.

101.    Wells Fargo denies the allegations of paragraph 101 of the Complaint.

102.    Wells Fargo denies the allegations of paragraph 102 of the Complaint.

## VIII.   PRAYER FOR RELIEF

Wells Fargo denies that USAA is entitled to any relief from Wells Fargo and denies all of the allegations contained paragraphs "A." through "H." of USAA's Prayer for Relief.

## IX.   DEMAND FOR JURY TRIAL

103.   Wells Fargo admits that the Complaint sets forth a request for trial by jury.

## AFFIRMATIVE DEFENSES

Wells Fargo's Affirmative Defenses are listed below.  Wells Fargo reserves the right to amend its Answer to add additional affirmative defenses, including allegations of inequitable conduct, consistent with the facts discovered in this case.

### FIRST DEFENSE
### (Non-Infringement)

1.      Wells Fargo does not infringe and has not infringed, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement)), and/or under the doctrine of equivalents, any valid, enforceable claim of the Asserted Patents.

### SECOND DEFENSE
### (Invalidity)

2.      Each asserted claim of the Asserted Patents is invalid for failure to comply with one or more requirements of United States Code, Title 35, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

### THIRD DEFENSE
### (Limitation on Damages)

3.      To the extent that USAA failed to properly mark any of its relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that Wells Fargo's actions allegedly infringed the Asserted Patents, Wells Fargo is not liable to USAA for the acts alleged to have been performed before it received actual notice that it was allegedly infringing the Asserted Patents. Accordingly, upon information and belief, USAA's claims for recovery of alleged damages may be limited by 35 U.S.C. § 287.  In addition, upon information and belief, USAA's claims for recovery of alleged damages are limited by 35 U.S.C. § 286, and USAA is barred from recovering costs in connection with this action under 35 U.S.C. § 288.

**FOURTH DEFENSE**
**(Lack of Knowledge)**

4.      To the extent that USAA asserts that Wells Fargo indirectly infringes, either by contributory infringement or inducement of infringement, Wells Fargo is not liable to USAA for the acts alleged to have been performed before Wells Fargo knew that its actions would allegedly cause indirect infringement.

**FIFTH DEFENSE**
**(Prosecution History Estoppel/Disclaimer)**

5.      USAA's claims are barred, in whole or in part, based on prosecution history estoppel and/or prosecution history disclaimer.

**SIXTH DEFENSE**
**(Equitable Defenses)**

6.      On information and belief, USAA's claims are barred, in whole or in part, by equitable doctrines including the doctrines of waiver, laches, acquiescence, unclean hands, and/or equitable estoppel.

**SEVENTH DEFENSE**
**(License)**

7.      On information and belief, USAA's claims are barred, at least in part, by the existence of licenses or releases between USAA and other third-parties.  For example, USAA sued Mitek Systems, Inc., the leading technology company for mobile check deposit, in March 2012 in the United States District Court for the Western District of Texas in connection with Mitek Systems' Mobile Deposit product and its patents related to mobile check deposit technology (with a provisional application filed as early as January 18, 2008).  On information and belief, at least by July 2014, 2500 banks, including all of the top ten retail banks, had chosen to use Mitek Systems' Mobile Deposit product.  Wells Fargo was one such bank.  In September 2014, USAA and Mitek Systems reached a full settlement of all claims and issues between the parties, and in

connection therewith, USAA dismissed with prejudice its claims and counterclaims of misappropriation of trade secrets, breach of contract, reimbursement, fraud and fraudulent inducement, correction of inventorship, and invalidity of Mitek Systems' patents asserted in that litigation.  Accordingly, USAA's claims alleged in this case against Wells Fargo are barred by license or release.

## PRAYER FOR RELIEF ON PLAINTIFF'S COMPLAINT

WHEREFORE, Wells Fargo asks this Court to enter judgment in Wells Fargo's favor and against USAA by granting the following relief:

a)      Dismissal of all claims in USAA's Complaint with prejudice and a complete denial of USAA's request for a judgment of infringement, validity, enforceability, damages, interest, costs, and any other form of relief; and

b)      An award to Wells Fargo of its reasonable attorneys' fees, costs, and all interest (including without limitation any attorney fee awards based upon 35 U.S.C. § 285) and any such other and further relief as the Court finds just and proper.

## COUNTERCLAIMS

1.      For its Counterclaims against Counterclaim Defendant United Services Automobile Association ("USAA"), Counterclaim Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo"), based on personal knowledge as to all acts or events that it has undertaken or witnessed, and upon information and belief as to all others, alleges the following.  Wells Fargo reserves the right to amend its Counterclaims further to add additional counts, including allegations of inequitable conduct, consistent with the facts discovered in this case.

## NATURE OF THE ACTION

2.      This is an action by Defendant and Counterclaim Plaintiff Wells Fargo pursuant to Rule 13 of the Federal Rules of Civil Procedure for declarations of non-infringement and invalidity of U.S. Patent Nos. 8,699,779 ("'779 Patent); 9,336,517 ("'517 Patent"); 9,818,090 (the "'090 Patent"); and 8,977,571 (the "'571 Patent") (the "Asserted Patents").  Counterclaim Plaintiff Wells Fargo strongly denies any claims of patent infringement. Taking and processing check images using a digital camera or mobile device was well-understood, routine, and conventional prior to the Asserted Patents. Counterclaim Plaintiff Wells Fargo prioritizes providing its customers with a simple, easy-to-use, and customer-driven mobile banking experience.

## PARTIES

3.      Counterclaim Plaintiff Wells Fargo is a national banking association, with its principal place of business at 101 North Phillips Avenue, One Wachovia Center, Sioux Falls, SD 57104.

4.      On information and belief, and based on paragraph 2 of the Complaint as pled by USAA, Counterclaim Defendant USAA is an unincorporated association organized under the laws of the State of Texas, with a principal place of business at 9800 Fredericksburg Road, San Antonio, Texas 78288.

## JURISDICTION

5.      These counterclaims arise under the patent laws of the United States, Title 35, United States Code, or are so related to claims arising under Title 35, United States Code, as to form part of the same case or controversy under Article III of the United States Constitution.  The jurisdiction of this Court is proper under at least 35 U.S.C. § 271 *et seq.*, and 28 U.S.C. §§ 1331, 1338, 1367, and 2201-02.

6.      Counterclaim Defendant USAA, based on averments in USAA's Complaint, claims to own all rights, title, and interest in and to the Asserted Patents and claims to possess all rights of recovery.  Counterclaim Defendant USAA has also claimed in its Complaint that Wells Fargo has infringed the Asserted Patents, which Wells Fargo expressly denies.

7.      Counterclaim Defendant USAA has consented to personal jurisdiction by commencing its action for patent infringement in this judicial district, as set forth in its Complaint.

8.      Counterclaim Defendant USAA has claimed that venue is proper in this judicial district under 28 U.S.C. § 1400(b), but venue is not convenient for Wells Fargo and Wells Fargo's witnesses and Wells Fargo reserves the right to seek transfer pursuant to 28 U.S.C. § 1404.  To the extent this action remains in this district, venue is appropriate for Wells Fargo's counterclaims because USAA has consented to venue in this Court by filing its claims for alleged patent infringement in this district.

## **FACTUAL ALLEGATIONS**

9.      The '779 Patent and the '517 Patent share the same August 28, 2009 priority date.

10.     The '571 Patent and the '090 Patent share the same August 21, 2009 priority date.

**Prior Art Viewfinders and Live Preview**

11.     A viewfinder is a device on a camera that shows the photographer the area of the subject to be included in a photograph.[1]  There are multiple variations of viewfinders, including optical viewfinders and electronic viewfinders.[2]  A camera which features an optical viewfinder utilizes one or more mirrors to project the image captured through the lens into the viewfinder.[3]  An electronic viewfinder, on the other hand, does not use mirrors.  Rather, the image captured through the lens is electronically reproduced on a screen, such as a liquid crystal display ("LCD") screen.[4]  Both types of viewfinders have been featured in cameras since before 2009.

12.     Both optical viewfinders and electronic viewfinders have been featured in cameras since before the priority dates of the Asserted Patents.

13.     The "Ensign Ful-Vue" camera was released in the 1930's.  It was a box camera which featured a viewfinder located on the top of the camera body.[5]

14.     A representative image of the "Ensign Ful-Vue" camera is below:

---

[1] https://www.britannica.com/technology/viewfinder.

[2] https://www.canon.com.au/explore/glossary/viewfinder.  *See also* https://www.slrlounge.com/glossary/viewfinder-photography-definition/.

[3] https://www.slrlounge.com/glossary/viewfinder-photography-definition/.

[4] https://www.slrlounge.com/glossary/viewfinder-photography-definition/.

[5] http://www.ensign.demon.co.uk/ful-vue.htm.



6

15.     An updated version of the "Ensign Ful-Vue" camera—the "Barnet Ensign Ful-Vue" camera—was released in the 1940's.  Like the "Ensign Ful-Vue" camera, the "Barnet Ensign Ful-Vue" camera also featured a viewfinder located at the top of the camera body.[7]

16.     A representative image of the "Barnet Ensign Ful-Vue," camera, identifying the viewfinder, is below:

---

[6] http://www.classiccameratrials.com/EN03fulvue.htm.

[7] http://www.ensign.demon.co.uk/ful-vue.htm.



17.    The "Brownie No. 2" camera was a camera produced by Eastman Kodak in the first half of the Twentieth Century.  Like the "Ensign Ful-Vue" and the "Barnet Ensign Ful-Vue" it also featured a viewfinder—it was located on the top and side of the camera. [9]

18.    An image of the "Brownie No. 2" camera, demonstrating inclusion of the viewfinders, is below:

---

[8] http://www.ensign.demon.co.uk/ful-vue.htm.

[9] http://www.brownie-camera.com/; http://www.brownie-camera.com/53.shtml.



19.     As technology progressed, box cameras, and the placement of the viewfinder on the top of box cameras, became less commonplace.

20.     In the late 1940's and early 1950's, Canon produced a camera—the "Canon IIB"—which also featured a viewfinder.  This optical viewfinder was at eye level, rather than being located on the top of the camera body.[11]

21.     A representative image of the "Canon IIB" is below:

---

[10] https://www.fi.edu/history-resources/kodak-brownie-camera.

[11] http://collection.sciencemuseum.org.uk/objects/co8085467/canon-iib-camera-35mm-camera-single-lens-reflex-camera.



22.     Even in 2018, many cameras still feature optical viewfinders.

23.     Another variant of the viewfinder is the electronic viewfinder.

24.     In 1975, an engineer at Eastman Kodak produced the first electronic camera.[13]

25.     In 1992, the United States Patent and Trademark Office issued U.S Patent No. 5,164,833, titled "Electronic Viewfinder."  The abstract of the '833 Patent provides: "[a] display apparatus for an electronic image having an image memory for storing video image data of a number of fields or a number of frames, which are obtained by processing with a signal processing circuit, a video image signal from an image detecting element on which reflected light from a subject is imaged through an optical system and displaying video image data stored in the image memory to form a picture having the desired field or frame on a display unit."[14]

26.     An example of a camera featuring an electronic viewfinder is the Minolta Dimage A1.  The Minolta Dimage A1 was introduced in 2003.[15]

27.     Below is an image of a Minolta Dimage A1:

---

[12] http://collection.sciencemuseum.org.uk/objects/co8085467/canon-iib-camera-35mm-camera-single-lens-reflex-camera.

[13] https://lens.blogs.nytimes.com/2015/08/12/kodaks-first-digital-moment/.

[14] U.S. Patent No. 5,164,833 (attached as Exhibit 1)

[15] https://www.dpreview.com/reviews/minoltadimagea1.



16

28.     Another example of a camera featuring an electronic viewfinder it the Sony Cyber-shot DSC-H1, which was released in 2005.[17]

29.     An image of the Sony Cyber-shot DSC-H1 is below:

---

[16] https://www.dpreview.com/reviews/minoltadimagea1/2.

[17] https://www.dpreview.com/reviews/sonydsch1.



30.    To this day, viewfinders—both optical and electronic—are still featured in cameras.

31.    The use of viewfinders, including electronic viewfinders, in cameras predates the priority dates of the Asserted Patents.

32.    Viewfinders, including electronic viewfinders, were featured in hundreds of cameras prior to the priority date of the Asserted Patents.

33.    The use of viewfinders, including electronic viewfinders, in cameras was well-understood, routine, and conventional prior to the priority dates of the Asserted Patents.

34.    "Live Preview" is a functionality whereby a digital camera's display screen can be used as a viewfinder to frame and shoot pictures.[19]

---

[18] https://www.dpreview.com/reviews/sonydsch1/3.

[19] https://www.pcmag.com/encyclopedia/term/59014/live-preview.

35.     In the mid-1990's, Casio introduced the QV-10 camera, which featured an LCD screen complete with Live Preview functionality.  Unlike many other cameras, the QV-10 did not feature a viewfinder.[20]

36.     An image of the back of the Casio QV-10, demonstrating the LCD screen, is below:



[21]

37.     The Canon PowerShot G1, released in 2000, is another example of a camera which featured an LCD screen and Live Preview functionality.[22]

38.     An image showing the Canon PowerShot G1, including its LCD screen, is below:

---

[20] https://petapixel.com/2012/09/05/casio-qv-10-the-first-digital-camera-that-offered-an-lcd-screen-and-live-view/.

[21] https://petapixel.com/2012/09/05/casio-qv-10-the-first-digital-camera-that-offered-an-lcd-screen-and-live-view/.

[22] https://www.dpreview.com/reviews/canong1/3; https://www.dpreview.com/reviews/canong1/7.



23

39.      The Olympus E-10, also released in 2000, is another example of a camera featuring

Live Preview functionality on an LCD screen.[24]

40.      An image of the Olympus E-10, showing the LCD screen, is below:

---

[23] http://www.dpreview.com/files/p/articles/4088819590/Images/allroundview.jpeg.

[24] https://www.dpreview.com/reviews/olympuse10; https://www.dpreview.com/reviews/olympuse10/8.



25

41.     In 2003, Leica announced the Digilux 2 digital camera, which featured an LCD screen, Live Preview, and a setting allowing for grid lines to be projected on to the image displayed on the LCD screen.[26]

42.     Below are images demonstrating the Leica Digilux 2's LCD screen and grid lines projected on to the LCD screen:

---

[25] https://www.dpreview.com/files/p/articles/8366437308/images/allroundview.jpeg.

[26] https://www.dpreview.com/reviews/leicadigilux2; https://www.dpreview.com/reviews/leicadigilux2/7; http://www.overgaard.dk/pdf/d2_manual.pdf (attached as Exhibit 2).



27



28

43.    In 2005, Sony released the Cyber-shot DSC-R1, which featured an LCD screen, Live Preview, and settings allowing for grid lines and brackets to be projected on to the image displayed on the LCD screen.[29]

44.    Below are images demonstrating the Sony Cyber-shot DSC-R1's LCD screen, grid lines, and brackets projected on to the LCD screen:

---

[27] https://www.dpreview.com/files/p/articles/3498176754/Images/allroundview.jpeg.

[28] https://www.dpreview.com/reviews/leicadigilux2/7.

[29] https://www.dpreview.com/reviews/sonydscr1; https://www.dpreview.com/reviews/sonydscr1/7; https://www.sony.co.uk/electronics/support/res/manuals/2654/26544941M.pdf (attached as Exhibit 3).


30


31

---

30 https://www.dpreview.com/files/p/articles/2103331250/Images/lcdmonitor02.jpeg.

31 https://www.dpreview.com/reviews/sonydscr1/7.



45.     The user manual for the Sony Cyber-shot DSC-R1 provides "Shooting techniques" instructions, which explain to the user how to use the grid lines to align the desired image on the camera's screen, as demonstrated below.[33]



46.     In 2006, Panasonic announced the DMC-L1 camera, which featured an LCD screen, Live Preview, and various settings allowing for certain on-screen overlays and grid lines to be projected on to the image displayed on the LCD screen.[35]

47.     Images demonstrating the Panasonic DMC-L1's LCD screen, grid lines, and other on-screen overlays projected on to the LCD screen are below:

---

[32] https://www.dpreview.com/reviews/sonydscr1/7.

[33] https://www.sony.co.uk/electronics/support/res/manuals/2654/26544941M.pdf.

[34] *Id*.

[35] https://www.dpreview.com/reviews/panasonicdmcl1; https://www.dpreview.com/reviews/panasonicdmcl1/7;



36



37

---

36 https://www.dpreview.com/files/p/articles/5945591128/Images/allroundview.jpeg.

37 https://www.dpreview.com/reviews/panasonicdmcl1/7.



38



39

48.    The Panasonic DMC-L1's user manual included "Tips for taking good pictures with Live View," which explained how to use the grid lines to align the desired image on the camera's screen, as demonstrated below.[40]

---

[38] https://www.dpreview.com/reviews/panasonicdmcl1/7.

[39] https://www.dpreview.com/reviews/panasonicdmcl1/7.

[40] https://www.panasonic.com/content/dam/Panasonic/support_manual/Digital_Still_Camera/English_01-vqt0-vqt2/vqt0w95_L1_oi.pdf (attached as Exhibit 4).



■ **Recording guide lines display**
When you align the subject on the horizontal and vertical guide lines or the cross point of these lines, you can take pictures with well-designed composition by viewing the size, the slope and the balance of the subject.

Guide line 1

41

49.     The Nikon D300 was released in August of 2007.  It featured an LCD screen, Live Preview, and various settings allowing for grid lines and brackets to be projected on to the image displayed on the LCD screen.[42]

50.     Images demonstrating the grid lines and brackets projected on to the Nikon D300's LCD screen are below:

---

[41] *Id.*

[42] https://www.dpreview.com/reviews/nikond300; https://www.dpreview.com/reviews/nikond300/9; http://download.nikonimglib.com/archive2/iBuJv00Aj97i01y8BrK49XX0Ts69/D300_EU(En)04.pdf (excerpts attached as Exhibit 5).



43



44

---

[43] https://en.wikipedia.org/wiki/Live_preview#/media/File:D300liveview.jpg.

[44] https://paulstamatiou.com/first-impressions-nikon-d300-dslr-camera/.



45



46

51.     In 2007, Canon released the EOS 40D, which featured an LCD screen, Live Preview, and a setting which featured grid lines projected on to the image displayed on the LCD screen.[47]

52.     Images demonstrating the Canon EOS 40D's LCD screen and grid lines projected on to the LCD screen are below:

---

[45] https://www.dpreview.com/reviews/nikond300/9.

[46] https://www.dpreview.com/reviews/nikond300/9.

[47] https://www.dpreview.com/reviews/canoneos40d; https://www.dpreview.com/reviews/canoneos40d/10.



48



49

53.    The Canon EOS 40D's user manual explained that the grid display setting "make[s] it easier to align the horizontal or vertical shot."[50]

---

[48] https://www.dpreview.com/files/p/articles/0865616433/Images/allroundview.jpeg.

[49] https://www.dpreview.com/reviews/canoneos40d/10.

[50] http://gdlp01.c-wss.com/gds/6/0900008236/01/EOS40D_HG_EN.pdf (excerpts attached as Exhibit 6).

54.     In 2008, Nikon released the D90, which featured an LCD screen, Live Preview, and a setting which featured grid lines projected on to the image displayed on the LCD screen.[51]

55.     Images demonstrating the grid lines projected on to the Nikon D90's LCD screen are below:



52



53

---

[51] https://www.dpreview.com/reviews/nikond90/9; https://www.dpreview.com/reviews/nikond90/10;

[52] https://en.wikipedia.org/wiki/Live_preview#/media/File:DSLR_Liveview.jpg.

[53] https://www.dpreview.com/reviews/nikond90/10.

56.    The Nikon D90's grid lines enable users to ensure the alignment of objects in the desired photograph.[54]

57.    Nikon also introduced the D700 in 2008, which featured an LCD screen, Live Preview, and settings allowing for grid lines and other on screen guides to be projected on to the image displayed on the LCD screen.[55]

58.    Images of the Nikon D700's LCD screen, grid lines, and other guides projected on to the LCD screen are below:



56

---

[54] Julie Adair King, Nikon D90 for Dummies (2009). (accessible via the following link: https://books.google.com/books?id=X-7YHAbVlrEC&pg=PT46&lpg=PT46&dq=nikon+d90+align+grid+lines&source=bl&ots=0HwEE8_lTF&sig=Hxd WbnAjl-QXorrdGXu-SRKKrp0&hl=en&sa=X&ved=0ahUKEwii1szomLncAhUOI6wKHf-ND5QQ6AEIdjAI#v=onepage&q=nikon%20d90%20align%20grid%20lines&f=false).

[55] https://www.dpreview.com/reviews/nikond700; https://www.dpreview.com/reviews/nikond700/9.

[56] http://www.dpreview.com/files/p/articles/4435013201/images/allroundview.jpeg.



57



58



59

---

[57] https://www.dpreview.com/reviews/nikond700/9.

[58] https://www.dpreview.com/reviews/nikond700/9.

[59] https://www.dpreview.com/reviews/nikond700/9.

59.     Also in 2008, Olympus introduced the E-30, which featured an LCD screen, Live Preview, and settings allowing for grid lines and other on screen guides to be projected on to the image displayed on the LCD screen.[60]

60.     Images of the Olympus E-30's LCD screen, grid lines, and other guides projected on to the LCD screen are below:



61

[62]

[63]

61.    Live Preview predates the priority dates of the Asserted Patents.

62.    Live Preview was featured in dozens of cameras prior to the priority dates of the Asserted Patents.

63.    Live Preview was well-understood, routine, and conventional prior to the priority dates of the Asserted Patents.

64.    Grid lines and other on screen displays, which allowed users to align a desired image on a camera's LCD screen, existed prior to the priority dates of the Asserted Patents.

---

[62] https://www.dpreview.com/reviews/olympuse30/8.

[63] https://www.dpreview.com/reviews/olympuse30/8.

65. Grid lines and other on screen displays, which allowed users to align a desired image on a camera's LCD screen, existed in dozens of cameras prior to the priority dates of the Asserted Patents.

66. Grid lines and other on screen displays, which allowed users to align a desired image on a camera's LCD screen, were well-understood, routine, and conventional prior to the priority dates of the Asserted Patents.

67. In 2000, Sharp introduced the J-SH04 J-Phone, which featured a built-in camera. The J-SH04 J-Phone allowed users to take pictures using the phone's LCD screen.[64]

68. An image of the J-SH04 is below:



65

69. In 2002, the first U.S. camera phone was released: the Sanyo SCP-5300. It featured a built-in camera and an LCD display.[66]

---

[64] http://news.bbc.co.uk/2/hi/science/nature/1550622.stm; https://www.digitaltrends.com/mobile/camera-phone-history/.

[65] https://www.digitaltrends.com/mobile/camera-phone-history/.

[66] http://www.ign.com/articles/2003/05/06/sanyo-scp-5300-review; https://www.telegraph.co.uk/technology/0/evolution-mobile-phone-pictures/sanyo-scp-5300/.

70.     An image of a Sanyo SCP-5300 is below:



67

71.     In 2006, Motorola announced the RAZR MAXX V6 cellphone, which featured an LCD screen, a built-in camera, and a "focus point" displayed on the screen.[68]

72.     An excerpt from the Motorola RAZR MAXX V6's user manual, demonstrating the screen and "focus point," is below:

---



73.     On the Motorola RAZR MAXX V6, a user could take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

74.     Motorola also announced the RAZR V3xx cellphone in 2006, which similarly featured an LCD screen, a built-in camera, and a "focus point" displayed on the screen.[70]

75.     An excerpt from the Motorola RAZR V3xx's user manual, demonstrating the screen and "focus point," is below:

---

[69] Motorola RAZR MAXX V6 User Manual at 39.

[70] https://www.gsmarena.com/motorola_razr_v3xx-1648.php;



76.     On the Motorola RAZR MAXX V3xx, a user could take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

77.     In 2007, Nokia released the N95 cellphone.  It featured a built-in camera and an LCD screen.[72]  As indicated by the user manual, below, the camera feature included a guide projected on to the image displayed on the screen.[73]

## Still image camera indicators

The still image camera viewfinder displays the following:



---

[71] https://www.cellphones.ca/downloads/phones/manuals/motorola-razr-v3xx-manual.pdf (excerpts attached as Exhibit 8).

[72] https://www.gsmarena.com/nokia_n95-1716.php.

[73] https://www.nokia.com/en_int/phones/sites/default/files/user-guides/Nokia_N95_8GB_Extended_UG_en.pdf (excerpts attached as Exhibit 9).

78.     On the Nokia N95, a user could take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

79.     In 2007, Apple released the first iPhone.  It featured a built-in camera and an LCD screen.[74]  On the first generation iPhone, a user could take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

80.     Also in 2007, the Helio Ocean cellphone was released.[75]  It featured a built-in camera and an LCD screen.[76]  As the manual below indicates, a user could take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

---

[74] https://www.gsmarena.com/apple_iphone-1827.php.

[75] https://www.cnet.com/products/helio-ocean/review/.

[76] https://standupwireless.com/wp-content/uploads/2017/04/Manual_PAN-TECH_OCEAN.pdf (attached as Exhibit 10).



■ **CAMERA**

Taking pictures with your handset's built-in camera is as simple as choosing a subject, pointing the lens, and pressing a button. You can activate the Camera Mode and take pictures when the handset is open.

**TAKING A PHOTO THROUGH THE MENU**

❶ Press [MENU].

❷ Point the camera lens at your subject. You can check the photo framing through the main display screen.

❸ Press [SNAP] or the side camera button to take the photo.

❹ To save the picture, press [SAVE].
The picture will be saved in "Photo Album".
To go back to idle mode without saving the picture, press.
To send the picture to someone, press [SEND].

❺ Press [MENU] to access the taken picture's other options.

77

81.    In 2008, HTC released the Touch Diamond cellphone.  It featured a built-in camera and an LCD screen.[78]  As indicated by the user manual, below, the camera feature included an auto-focus function, which projected brackets on to the image displayed on the screen.[79]

## Camera controls

The camera comes with an auto-focus function to let you capture sharp and crisp photos and videos of your subjects. Depending on the **Shoot Option** you have chosen, you will need to either touch or press the ENTER button to activate auto-focus. When auto-focus is activated, it is indicated by a flashing white bracket (■). When focus is set, the bracket changes to a steady green bracket (■).

---

[77] https://standupwireless.com/wp-content/uploads/2017/04/Manual_PAN-TECH_OCEAN.pdf.

[78] https://www.gsmarena.com/htc_touch_diamond-2368.php.

[79] HTC Touch Diamond Manual at 166 (attached as Exhibit 11).



82.     On the HTC Touch Diamond, a user could take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

83.     In 2008, Apple released the iPhone 3G, which also featured an LCD screen and built-in camera.[80]  Like the first generation iPhone, the iPhone 3G allowed users to take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

84.     Apple introduced the iPhone 3GS on June 8, 2009, which, like its predecessors, featured a built-in camera and an LCD screen.[81]   Also like its predecessors, the iPhone 3GS allowed users to take pictures using the Live Preview functionality with the phone's on screen display by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

---

[80] https://www.gsmarena.com/apple_iphone_3g-2424.php.

[81] https://www.gsmarena.com/apple_iphone_3gs-2826.php.

85.     The use of LCD screens on camera phones, coupled with Live Preview, existed prior to the priority date of the Asserted Patents.

86.     The use of LCD screens on camera phones, coupled with Live Preview, existed in dozens of camera phones prior to the priority date of the Asserted Patents.

87.     The use of LCD screens on camera phones, coupled with Live Preview, allows camera phone users to take pictures by framing the desired image on the LCD screen, adjusting the camera angle as desired, and capturing the image.

88.     The use of LCD screens on camera phones, coupled with Live Preview, was well-understood, routine, and conventional prior to the priority date of the Asserted Patents.

89.     The use of LCD screens on camera phones featuring on-screen guides to aid in the taking of pictures existed prior to the priority dates of the Asserted Patents.

90.     The use of LCD screens on camera phones featuring on-screen guides to aid in the taking of pictures existed in dozens of camera phones prior to the priority dates of the Asserted Patents.

91.     The use of LCD screens on camera phones featuring on-screen guides to aid in the taking of pictures was well-understood, routine, and conventional prior to the priority dates of the Asserted Patents.

**Prior Art Electronic Check Processing**

92.     Electronic processing of financial transactions has a long history, dating back decades before the claimed priority dates of the Asserted Patents.

93.     For example, in the 1970s, Automated Clearing House (ACH) was created and allowed for electronic financial transactions such as direct deposit or direct debit.[82]

94.     ACH was used to convert checks into electronic payments.

95.     For example, ACH could be used in a point of purchase (POP) conversion, since September 1999, to convert checks into an electronic transaction at a cash register while the customer is present.  Point of purchase transactions convert checks at a cash register to an electronic transaction, void the check, and return it to a customer.[83]

96.     As another example, ACH could be used in an accounts receivable conversion (ARC), since March 2002, to convert checks mailed or deposited to a drop box to pay a customer's bill.[84]

97.     As yet another example, ACH could be used in a back office conversion (BOC), since March 16, 2007, to convert checks at a "back office" location after a customer has completed their transaction and left the store.[85]

98.     Additionally, the Federal Reserve in the 1990s attempted to shift away from paper via electronic check presentment (ECP).  In electronic check presentment, the MICR line and the amount of the check were electronically transmitted and a paper check or truncated check

---

[82] *Automated Clearing Houses* (ACHs), Federal Reserve Bank of New York (May 2000) (attached as Exhibit 12), available at https://www.newyorkfed.org/aboutthefed/fedpoint/fed31.html.

[83] *POP, ARC and BOC—A Comparison*, Federal Reserve Banks, at 1(Jan. 7, 2009) (attached as Exhibit 13), available at https://web.archive.org/web/20090107101808/https://www.frbservices.org/files/eventseducation/pdf/pop_arc_boc_comparison.pdf.

[84] *Id.*

[85] *Id.*

(substitute electronic check) would be transmitted later.  By 2002, 25% of checks deposited at Federal Reserve Bank offices were deposited using electronic check presentment.[86]

99.    Prior to the claimed priority date of the Asserted Patents, it was known that a check reader could read the MICR code on a paper check.

100.    For example, U.S. Patent No. 5,237,620, issued on August 17, 1993, disclosed a check reader that "detects a MICR code on a check and generates electrical signals representative of the MICR code."[87]

101.    Additionally, U.S. Patent No. 5,444,616, issued on August 22, 1995, disclose a MICR reader that contains a "read head . . . that reads the account number from the magnetic ink characters 25 printed along the bottom edge of the check."[88]

102.    Another example is found in U.S. Patent No. 6,059,185, issued on May 9, 2000, which discloses a "MICR reader 200 to read the checking account information pre-printed on the check."[89]

103.    As yet another example, U.S. Patent No. 6,351,735, issued on February 26, 2002, discloses that "check reader 119 automatically scans the magnetic ink character recognition (MICR) data printed along the bottom edge of the customer's check."[90]

104.    Accordingly, Electronic check presentment existed prior to the priority date of the Asserted Patents.

---

[86] David B. Humphrey & Robert Hunt, *Getting Rid of Paper: Savings From Check 21*, Working Paper No. 12-12, Research Department, Federal Reserve Bank of Philadelphia, at 9 (May 2012) (attached as Exhibit 14), available at https://philadelphiafed.org/-/media/research-and-data/publications/working-papers/2012/wp12-12.pdf.

[87] U.S. Patent No. 5,237,620 at Abstract (attached as Exhibit 15).

[88] U.S. Patent No. 5,444,616 at 9:55-57 (attached as Exhibit 16).

[89] U.S. Patent No. 6,059,185 at 3:49-50 (attached as Exhibit 17).

[90] U.S. Patent No. 6,351,735 at 10:60-63 (attached as Exhibit 18).

105.     Electronic check presentment, using MICR character recognition, existed prior to the priority date of the Asserted Patents.

106.     Electronic check presentment was well-understood, routine, and conventional prior to the priority date of the Asserted Patents.

107.     Electronic check presentment, using MICR character recognition, was well-understood, routine, and conventional prior to the priority date of the Asserted Patents.

### Check 21 and Prior Art Check Imaging

108.     Check float accounts for the value of checks in process of transportation and/or collection, and represents the amount credited to the depositing bank before the value had been debited from the paying bank.  After planes were grounded in response to September 11, 2001, check float rose significantly to $47 billion, well in excess of the daily average of $766 million for the first eight months of 2001. [91]

109.     In response to concerns about check float after September 11, 2001, the Federal Reserve asked Congress to change the law to allow substitute images of checks to be legally the same as the original check.[92]

110.     In 2003, Congress passed the Check Clearing for the 21st Century Act, which has come to be more commonly known as "Check 21."  12 U.S.C. § 5001 *et seq.*

111.     Check 21 took effect in 2004 and allowed banks to take images of the front and back of a paper check, electronically transfer that, and print a substitute check (paper reproduction

---

[91] Jeffrey M. Lacker, *Payment System Disruptions and the Federal Reserve Following September 11, 2001*, The Federal Reserve Bank of Richmond, at 10 (Dec. 23, 2003) (attached as Exhibit 19).

[92] Humphrey, *Getting Rid of Paper*, at 2.

of the front and back of the original check) for delivery to banks that would not accept checks electronically.[93]

112.   Check 21 was recognized as having significant effects, as admitted by USAA in a patent application filed on October 31, 2007, almost two years before the earliest claimed priority date of the Asserted Patents:

> Upon the passage of the Check Clearing for the 21st Century Act (Check 21), the use of digital images for check presentment has increased dramatically, as the process typically reduces the time necessary for a check to clear and the cost associated with moving paper checks from location to location. In lieu of using a physical check to clear the check clearinghouse, a scanned image is used in the process. A person, such as a bank teller, scans the physical check upon presentment by a customer at a bank. The scan creates a digital image of the check. The digital image, along with other electronic information such as amount and account holder, is submitted electronically to the federal check clearinghouse system. The system processes the digital image of the check rather than processing the physical check itself.[94]

113.   Others also recognized the purpose and benefits of Check 21 in fostering innovation and improving efficiency by allowing for electronic processing of check images, for example in U.S. Patent No. 7,539,646, filed on October 10, 2007 and issued on May 26, 2009:

> The Check Clearing for the 21st Century Act (Check 21) became effective on Oct. 28, 2004. Check 21 was designed to foster innovation in the payments system and to enhance efficiency by reducing some of the legal impediments to check truncation (eliminating a paper check by converting it into a digital image and destroying the original paper item). The law facilitates check truncation by creating a new negotiable instrument called a substitute check, which permits banks to truncate original paper checks, to process check information electronically via exchange of check image files, and to deliver substitute checks to banks that want to continue receiving paper checks.[95]

---

[93] Check Clearing for the 21st Century Act Foundation for Check 21 Compliance Training, Federal Financial Institutions Examination Council, (Oct. 16, 2004) (attached as Exhibit 20), available at https://web.archive.org/web/20041016100648/https://www.ffiec.gov/exam/check21/check21foundationdoc.htm

[94] U.S. Patent No. 8,320,657 at 1:31-44 (attached as Exhibit 21).

[95] U.S. Patent No. 7,539,646 at 2:28-39 (attached as Exhibit 22).

114.     One method for processing check images under Check 21 is to take front and back images of a check and then process those images via optical character recognition to determine the financial data (account number and routing number) for further processing of the check.

115.     Prior to the claimed priority date of the Asserted Patents, it was known that one could process images via optical character recognition ("OCR") to identify the text present in those images.

116.     For example, U.S. Patent No. 5,077,805, issued on May 7, 1990, discloses a system for optical character recognition using both "feature-based character recognition" and "template matching character recognition."[96]

117.     Additionally, U.S. Patent No. 5,091,968, issued on December 28, 1990, discloses an "optical scanner" that scans a document and compares to "predetermined character-identification patterns (templates)" to identify the characters in a document.[97]

118.     In another example, U.S. Patent No. 5,455,875, issued on August 3, 1993, discloses "optical character recognition logic" that processes "electronically stored document images" to identify the characters in the document.[98]

119.     In yet another example, U.S. Patent No. 6,148,102, issued on May 29, 1997, discloses a system for using optical character recognition and "recognizing text in a multicolor image."[99]

---

[96] U.S. Patent No. 5,077,805 at Abstract (attached as Exhibit 23).

[97] U.S. Patent No. 5,091,968 at Abstract (attached as Exhibit 24).

[98] U.S. Patent No. 5,455,875 at Abstract (attached as Exhibit 25).

[99] U.S. Patent No. 6,148,102 at Abstract (attached as Exhibit 26).

120.    In yet another example, the well-known document display and processing software suite, Adobe Acrobat, offered "Optical Character Recognition in 16 languages" with "legal, medical, scientific, and large user-defined dictionaries" as early as 2000 in its Adobe Acrobat Capture 3.0 release.[100]

121.    In addition, prior to the claimed priority date of the Asserted Patents, it was known that one could take images of a check and then process those images via optical character recognition ("OCR").

122.    For example, U.S. Patent No. 5,345,090, issued on March 8, 1993, discloses a check reader with an "optical reader."  This patent explained that a signal "trigger[s] the optical detector circuitry to begin capturing image data for the purposes of capturing MICR line data for decoding. In this particular embodiment, the optical detector chip and associate circuity and software utilizes a neural network technology."[101]

123.    Additionally, U.S. Patent No. 6,181,837, issued on January 30, 2001, discloses a check image system in which "checks 1 are then conveyed along the track 220 sequentially to digital imager 204 . . . .  The check images made by the imager are passed to the Optical Character Recognition device (OCR) 206."  The patent explains that the OCR device "through optical character recognition, decodes the MICR characters optically from the image."[102]

124.    As another example, U.S. Patent No. 6,473,519, issued on October 29, 2002, discloses an "imaging assembly [for] imaging the dollar amount line of a check [that] may be, for example, a full width imaging assembly having optics for imaging the full width of a check."[103]

---

[100] *Big Red Book*, Adobe Systems Incorporated (2000) at 10 (attached as Exhibit 27).

[101] U.S. Patent No. 5,345,090 at Abstract and 7:8-12 (attached as Exhibit 28).

[102] U.S. Patent No. 6,181,837 at 14:20-25, and 14:61-63 (attached as Exhibit 29).

[103] U.S. Patent No. 6,473,519 at 16:32-35 (attached as Exhibit 30).

125.    In yet another example, U.S. Patent App. Pub. No. 2009/0076921, published on March 19, 2009, discloses imaging checks via scanners, cameras, and other imaging devices: "The POS device may scan an image of the check, using a contact image scanner (CIS), a lens reduction scanner, a camera, or another kind of imaging device."   The publication also disclosed the processing of those images via OCR, stating that the "POS device may perform optical character recognition (OCR) in order to interpret the characters."[104]

126.    Finally, prior to the claimed priority date of the Asserted Patents, it was known that one could take images of a check using a camera.

127.    For example, U.S. Patent App. Pub. No. 2007/0076941, published on April 5, 2007, discloses using two cameras to image a check: "a first color imaging camera 5 a and a second color imaging camera 5 b for capturing a color image of each side of a check (front and rear)."[105]

128.    Similarly, U.S. Patent App. Pub. No. 2007/0138255, published on June 21, 2007, discloses using two cameras to image a check: "an upper 74a and lower 74b imaging camera for capturing an image of each side of a check (front and rear)."[106]

129.    As another example, U.S. Patent No. 7,447,347, issued on November 4, 2008, discloses using a digital camera to image a check: "a digital camera for recording or generating electronic images 114 of the checks . . . .   The example digital camera may record an electronic check image 114 of the front and back of each check in black and white, grayscale, and/or color."[107]

---

[104] U.S. Patent App. Pub. No. 2009/0076921 at [0022] (attached as Exhibit 31).

[105] U.S. Patent App. Pub. No. 2007/0076941 at [0017] (attached as Exhibit 32).

[106] U.S. Patent App. Pub. No. 2007/0138255 at [0017] (attached as Exhibit 33).

[107] U.S. Patent No. 7,447,347 at 4:30-34 (attached as Exhibit 34).

130.    Indeed, USAA itself filed a patent, on October 31, 2007, nearly two years before the claimed priority date of the Asserted Patents, disclosing using a digital camera, including a camera on a phone, to image a check:

> Digital camera 402 may be a standalone digital camera or may be integrated with other electronic equipment, such as a personal data assistant, a web camera, or a cellular phone. FIG. 4 b is an exemplary illustration of a system using the digital camera of a cellular phone to capture digital images. As in FIG. 4 a, account owner (not shown) has account 460 with bank 430. Account owner uses computer 410 to establish communication pathway 420 with bank 430 in anticipation of depositing check 414 into account 460. Account owner uses the digital camera of cellular phone 405 to capture a digital image of check 414. The digital image is stored in cellular phone 405 after capture.[108]

131.    In yet another example, U.S. Patent App. Pub. No. 2009/0114716, published on May 7, 2009, discloses using a phone camera to image a check: "a check image can also be received or captured into a user's hand-held device via a camera built into the hand-held device (e.g., phone or videophone)."[109]

132.    In sum, processing images via OCR to identify the text present in those images existed prior to the priority date of the Asserted Patents.

133.    Moreover, taking images of a check and then processing those images via OCR, existed prior to the priority date of the Asserted Patents.

134.    Finally, taking images of a check using a digital camera, including a camera on a phone, to image a check existed prior to the priority date of the Asserted Patents

135.    Processing images via OCR to identify the text present in those images was well-understood, routine, and conventional prior to the priority date of the Asserted Patents.

---

[108] U.S. Patent No. 8,320,657 at 12:16-27 (previously attached as Exhibit 21).

[109] U.S. Patent App. Pub. No. 2009/0114716 at [0169] (attached as Exhibit 35).

136.     Taking check images and then processing those images via OCR, was well-understood, routine, and conventional prior to the priority date of the Asserted Patents.

137.     Taking check images using a digital camera, including a camera on a phone was well-understood, routine, and conventional prior to the priority date of the Asserted Patents.

## COUNT I (DECLARATION REGARDING NON-INFRINGEMENT)

138.     Wells Fargo incorporates and realleges the foregoing paragraphs of these counterclaims.

139.     Based on USAA's filing of this lawsuit and Wells Fargo's First and Fourth Defenses above, an actual controversy has arisen and now exists between the parties as to whether Wells Fargo infringes the Asserted Patents.

140.     Wells Fargo does not infringe and has not infringed, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement)), and/or under the doctrine of equivalents, any valid, enforceable claim of the Asserted Patents.

141.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Wells Fargo requests a declaration by the Court that it does not infringe and has not infringed, under any theory of infringement (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)), any valid, enforceable claim of the Asserted Patents.

## COUNT II (DECLARATION REGARDING INVALIDITY)

142.     Wells Fargo incorporates and realleges the foregoing paragraphs of these counterclaims.

143.     Based on USAA's filing of this action and Wells Fargo's Second Defense above, an actual controversy has arisen and now exists between the parties as to the validity of the claims of the Asserted Patents.

144.    One or more claims of the Asserted Patents are invalid under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

145.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and 35 U.S.C. § 100 *et seq.*, Wells Fargo requests a declaration by the Court that the claims of the Asserted Patents are invalid under Title 35 of the United States Code for failing to satisfy the requirements of, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

## JURY DEMAND

146.    Wells Fargo hereby demands trial by jury on all issues.

## PRAYER FOR RELIEF ON WELLS FARGO'S COUNTERCLAIMS

WHEREFORE, Wells Fargo asks this Court to enter judgment in Wells Fargo's favor and against USAA by granting the following relief:

a)   a declaration that Wells Fargo does not infringe and has not infringed, under any theory of infringement (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)), any valid, enforceable claim of the Asserted Patents;

b)   a declaration by the Court that the claims of the Asserted Patents are invalid under Title 35 of the United States Code for failing to satisfy the requirements of, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112;

c)   a permanent injunction restraining USAA, and their respective officers, agents, servants, employees, attorneys, and any other persons acting on their behalf or in concert with them, from charging or threatening, orally or in writing, that the Asserted Patents have been infringed by Wells Fargo under any subsection of 35 U.S.C. § 271; and

d)  an award to Wells Fargo of its reasonable attorneys' fees, costs, and all interest (including without limitation any attorney fee awards based upon 35 U.S.C. § 285) and any such other and further relief as the Court finds just and proper.

August 14, 2018.

Respectfully submitted,

**WINSTON & STRAWN LLP**

By:   /s/ Thomas M. Melsheimer
_____
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com
**Michael A. Bittner**
Texas Bar No. 00790975
mbittner@winston.com
**James T. Underwood**
Texas Bar No. 24102587
tunderwood@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201

**E. Danielle T. Williams**
North Carolina Bar No. 23283
dwilliams@winston.com
**Winston & Strawn LLP**
300 S. Tryon Street, 16th Floor
Charlotte, NC 28202

**Matthew R. McCullough**
California Bar No. 301330
mrmcculough@winston.com
**Winston & Strawn LLP**
275 Middlefield Road, Suite 205
Menlo Park, CA 94025

*Counsel for Defendant*
Wells Fargo Bank, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2018, a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.  Any other counsel of record will be served via electronic mail.

<u>/s/ *Thomas M. Melsheimer*</u>
Thomas M. Melsheimer