**FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION a Texas reciprocal inter-insurance exchange, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2:16-CV-245 |
| v. | ) ) | JURY TRIAL DEMANDED |
| WELLS FARGO BANK, N.A., a national banking association, | ) ) ) | |
| Defendant. | ) | |

---

## USAA'S OPENING CLAIM CONSTRUCTION BRIEF

---

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     LEVEL OF ORDINARY SKILL IN THE ART ............................................1

III.    U.S. PATENT NOS. 8,977,571 AND 9,818,090 – DISPUTED TERMS .........................2

IV.     U.S. PATENT NOS. 8,699,779 AND 9,336,517 – DISPUTED TERMS .......................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Eaton Corp. v. Rockwell Intern. Corp.,*
   323 F.3d 1332 (Fed. Cir. 2003)..............................................................................................3, 22

*Envtl. Designs, Ltd. v. Union Oil Co. of California,*
   713 F.2d 693 (Fed. Cir. 1983)..................................................................................................16

*Poly-Am., LP v. GSE Lining Tech., Inc.,*
   383 F.3d 1303 (Fed. Cir. 2004)..................................................................................................5

*Proveris Scientific Corp. v. Innovasystems, Inc.,*
   739 F.3d 1367 (Fed. Cir. 2014)........................................................................................4, 5, 22

*V-Formation, Inc. v. Benetton Group SpA,*
   401 F.3d 1307 (Fed. Cir. 2005)................................................................................................26

**Statutes**

UCC Section 3-501 .........................................................................................................................8

**Other Authorities**

Federal Reserve Board Image Cash Letter Customer Documentation, Version 1.8
   (October 1, 2008) ....................................................................................................................13

## I.      INTRODUCTION

United States Automobile Association ("USAA") respectfully requests that the Court enter the claim constructions as set out below. A background on the mobile remote check deposit technology at issue in the case is provided in paragraphs 31-50 of the concurrently submitted Declaration of Matt Calman.  Ex. 5.  Mr. Calman oversaw the implementation of the mobile check deposit system used by Bank of America, a system that was implemented after USAA introduced remote check deposit to the industry.   As one prominent commentator observed, "*USAA represents the bleeding edge of mobile banking technology*."  Ex. 15, at 2-3.[1]

The patents at issue in this case reflect critical improvements that USAA made to its first-generation mobile deposit system that introduce what the industry now calls "auto-capture." As Wells Fargo's ("Wells'") claim construction expert testified, "the patents at suit in this case claim what's generally described in the industry as auto capture[.]" Ex. 10 (Saffici Tr.), 47:22-48:1. Mitek – the vendor who provides image capture software for mobile devices to Wells – openly touts the importance of auto-capture: it "eliminates user error by providing real-time feedback until a suitable image is detected, at which point it automatically captures the image." Ex. 16, at 2. Auto-capture has become essential to a commercially-viable mobile check deposit system.  "[t]he major impediment to mobile deposit is the inability to get a clear picture of the check. This problem is especially critical among smaller [financial institutions]. . . . Automatic image capture alleviates this obstacle. Because auto-capture is so important to consumers, mid-market fintech vendors must now fast-track the capability . . . ." Ex. 17, at 17.

## II.     LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the field ("POSA") would be someone with at least one year of experience developing applications on mobile devices for imaging.  Ex. 5 (Calman Decl.), ¶¶ 16-22.

---

[1] All emphases in the brief are added unless otherwise noted.

Wells' claim construction expert has opined that a POSA would have had "at least two years of prior experience with image scanning technology involving transfer to and processing of image data at a server." Ex. 7 (Saffici Decl.), at ¶ 13. USAA's proposed constructions would still be correct even if the Court were to adopt Wells Fargo's proposed level of skill.

## III.     U.S. PATENT NOS. 8,977,571 AND 9,818,090 – DISPUTED TERMS

The '571 Patent generally describes a mobile-first approach to check deposit. The '571 Patent claims describe a combination of functions implemented on the processor of a mobile phone, including monitoring the camera view according to specific criteria and capturing the image with the mobile phone camera after the mobile device's processor autonomously determines that the criteria are satisfied. In dependent claims, it adds corrective feedback, provided to the user based on the monitoring criteria, to improve the quality of the image being captured. This combination of features effectively transforms the user's mobile phone – which is primarily a communication and entertainment device – into an autonomous mobile check scanner capable of accurately and effectively capturing negotiable images that comply with the numerous technical image quality requirements governing electronic check deposit.

The '090 Patent generally describes a system, and a method of using that system, for capturing images of documents with minimal user input required. In all of the claims of the '090 Patent, a mobile device processor monitors a target document in the field of view of the device's camera with respect to a monitoring criterion and, based on that monitoring, controls a "presentation device" to present corrective feedback information to the user describing an instruction for satisfying the monitoring criterion. '090 Pat., cls. 1, 11. For example, if the monitoring indicates that the user has the camera positioned too far from the check, the user may be presented with an instruction to "go closer," or if the user has not aligned the camera properly with respect to the check, the user may be instructed to correct the error by, for example, "mov[ing] the

check to the right" or "tilt[ing] the camera down." '090 Pat., 7:36-44. After the user corrects the image, following these instructions, and the monitoring criterion is satisfied, the processor automatically captures the image of the document. '090 Pat., cls. 1, 11. As with the '571 Patent, this combination of features effectively transforms the user's mobile phone – which is primarily a communication and entertainment device – into a mobile document scanner capable of accurately and effectively capturing images for processing.

| Term | A non-transitory computer-readable medium comprising [computer-readable] instructions for depositing a check<br>['571 Pat., claims 1, 9][2]; ['090 Pat., claim 20] |
|---|---|
| USAA | The preamble is limiting. |
| Wells | No construction necessary and the preamble is not limiting.<br>Alternatively, should the preamble be limiting, the scope of the term "depositing a check" should be construed as follows: provide a check image and/or check information to a depository (such as a bank) for money to be credited to an account. |

The phrase "a non-transitory computer-readable medium comprising [computer-readable] instructions for depositing a check" appears in the preambles of claims 1 and 9 of the '571 Patent and claim 20 of the '090 Patent.  "In general, a preamble limits the [claimed] invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).  For example, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."  *Id.*  Here, "depositing a check" is an essential component of the claims.  The element "a check" is first recited in the preamble and provides antecedent basis for several other claim limitations in the body of the claim, *e.g.*, "monitor an image of ***the check*** in a field of view of a camera," "capture the image of ***the***

---

[2] Where a claim term is present in both independent and dependent claims in a set of claims, only the independent claim is listed, for convenience.

- 3 -

*check* with the camera," "provide the image of *the check* from the camera to a depository." '571 Pat., cl. 1; *see also* '571 Pat., cl. 9 ("monitor an image of the check . . . capture the image of the check . . . transmit the image of the check from a mobile device to a deposit system configured to clear the check and deposit funds of the check").  Moreover, as USAA's expert Mr. Calman explains, a POSA would understand the preamble language to be important to the claims as a system or process for "depositing a check" involves different considerations as compared to a system or process that captures images for non-check deposit purposes.  Ex. 5, ¶ 57.

The patent specification places great emphasis on the importance of successful check deposit to the invention, further indicating that the recitation of "depositing a check" in the claim pre-ambles was intended to be limiting.  *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014) ("[T]he preamble may be construed as limiting when it recites particular structure or steps that are highlighted as important by the specification.").  In *Proveris*, the specification "identifie[d] the invention as producing a 'sequential set of images'" – a feature that was recited in the preamble of one of the claims, which the court found limiting.  *Id.*, 1373.  Here, the title of the '571 patent is "Systems and methods for image monitoring of **check** during **mobile deposit**," and the specification repeatedly emphasizes the importance of check depositing to the claimed features.  *See, e.g.*, '571 Pat., 4:18-22 ("By ensuring that the image of the check passes monitoring criteria during pre-image capture monitoring, the number of non-conforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing."), 7:52-57 ("In an implementation, corner detection itself may be a monitoring criterion, such that if corner detection of the check 108 in the image 230 is achieved, then it may be concluded that the image 230 may be properly processed and cleared by a depository (i.e., the image 230 passes the monitoring criteria)."), 15:43-49 ("[T]he results of the monitoring may indicate that the camera and/or the check should be repositioned . . . in order to capture an image of the check that may be

processed properly, e.g., to have the data from the check obtained without error from the image, so that the check can be cleared."). As in *Proveris*, "depositing a check" is a focus of the specification and should thus be limiting. *See also Poly-Am., LP v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (construing preamble as limiting where it disclosed a "fundamental characteristic of the claimed invention").

Wells has taken the position that the pre-amble references to depositing a check are limiting in its Covered Business Method ("CBM") review of the '571 and '090 Patents. In that context, Wells argues that "depositing a check" is "require[d]" by the claims of the '571 Patent and '090 Patent that recite the step in the preamble. *See, e.g.*, Ex. 8 (CBM2019-00004, Petition), at 13 ("That claim 1 ***requires*** computer instructions for 'depositing a check,' demonstrates that claim 1 is directed to activities that are used in the practice, administration, and management of a financial product or service.") (emphasis added); Ex. 9 (CBM2019-00002, Petition), at 13 ("That claim 20 [of the '090 Patent] ***requires*** computer instructions for 'depositing a check' demonstrates that claim 20 is directed to activities that are used in the practice, administration, and management of a financial product or service.") (emphasis added). As its own expert Mr. Saffici admitted, "Claim 1 recites as one of its ***elements*** depositing a check." Ex. 10, 28:9-12.

| Term | (1) depositing a check ['571 Pat., claims 1, 9, 14]; ['090 Pat., claim 20]<br><br>(2) deposit system ['571 Pat., claims 9, 14]<br><br>(3) depository ['571 Pat., claim 1] |
|------|---|
| USAA | No additional construction necessary. Alternatively,<br><br>(1) provide a check image to a depository for presentment and clearing in order for money to be credited to an account.<br><br>(2) a system that allows for providing a check image for presentment and clearing in order for money to be credited to an account.<br><br>(3) a bank or other entity that provides check image deposit functionality to a plurality of users. Check image deposit is the act of providing a check image to a depository for |

- 5 -

| | presentment and clearing in order for money to be credited to an account |
|---|---|
| Wells | No additional construction necessary.  Alternatively,<br><br>(1) provide a check image and/or check information to a depository (such as a bank) for money to be credited to an account.<br><br>(2) a system for providing a check image and/or check information to a depository (such as a bank) for money to be credited to an account.<br><br>(3) provide a check, check image, and/or check information to a depository (such as a bank) for money to be credited to an account. |

In the United States at the time of the patent and currently check image deposit is a relatively involved technical process.  Mr. Calman discusses this at paragraphs 55-67 of his declaration. Wells' expert in the CBM proceedings Mr. Alexander, who had extensive industry experience in check image deposit, testified that "as of the late 1990s ACH had created a standard system for processing and exchange of check images by banks." Ex. 14 at 38:17-21.  Given the nature of the process, the term is not amenable to a short construction, but instead best explained to the jury via expert testimony.   It appears that both parties recognize this because their initial position is that no additional construction should occur.  But during the meet and confer process it became apparent to USAA that Wells was intending to treat the term as effectively meaningless.  It is for this reason that USAA presents the underlying dispute for the Court.  Depositing a check is a meaningful act that has requirements in the United States.

The intrinsic record makes clear that deposit of a check is an event that occurs after processing by the bank.  "As described further herein, a digital image of a check or other negotiable instrument may be provided from a user to a financial institution, and the digital image *may be processed* and funds associated with the check or negotiable instrument in the digital image *may be deposited* in a user's bank account."  '571 Pat., 3:37-42; 18:2-6 ("At 980, when the institution has received the digital images (e.g., of the front and back sides of the check), the institution *may process the digital images* to obtain an image of the check and *to deposit the*

*funds* of the check in the user's account, as described herein".). Figs. 8 and 9 are defined as a "method that may be used for deposit of a check using image monitoring of the check," the subject matter of the claims. *Id.*, 2:23-28. The final block 870 in Fig. 8 states "[r]eceive image; *process* image; *process* check; *deposit* funds into account." The final block 980 in Fig. 9 states "[i]nstitution receives digital image and *processes* digital image; processes check; *deposits* funds into account." The specification makes clear that processing and determining the validity of the check are essential elements of deposit: "If the financial information is *determined to be valid*, the electronic data representation *may be processed* by the depository, *thereby depositing* the money in the user's account." *Id.*, 16:51-54.

The specification teaches that processing involves the steps of presentment and clearing: "an image of the check 108 will be captured and presented for clearing of the check[.]" *Id.*, 3:59-61. It also states the inventions ensure that "the number of non-conforming images of checks [is] reduced during *presentment* of the images to a financial institution for *processing and clearing*." *Id.*, 4:17-22. The specification makes clear that in the patents deposit is the step that occurs after check processing. "As described further herein, a digital image of a check or other negotiable instrument may be provided from a user to a financial institution, and the digital image *may be processed* and funds associated with the check or negotiable instrument in the digital image *may be deposited* in a user's bank account." *Id.*, 3:37-42.

Wells argues that the following passage from the specification draws a distinction between deposit and processing/clearing: "The user 102 may deposit a check 108 or other negotiable instrument in the account 160 either electronically or physically. The financial institution 130 may process and/or clear the check 108 or other negotiable instrument." *Id.*, 3:9-12. But this interpretation would contradict the express teaching of Figs. 8 and 9, as well as the

repeated teaching in the specification that deposit occurs after processing: "the digital image may be *processed* and funds associated with the check or negotiable instrument in the digital image may be *deposited* in a user's bank account." *Id.*, 3:47-54.

Wells' claim construction expert admitted at deposition that clearing and presentment are part of the processing that occurs on a check image at a depository bank. Ex. 10, 18:16-21 ("Part of the processing that occurs in a check image in the United States is presentment and clearing, correct? A. Yes. Clearing and presentment technically.") Wells claims that presentment and clearing do not occur when a check is presented for deposit at a bank that holds the account of the check writer. But this is a semantic argument, because in this situation Mr. Saffici admits that the equivalent of presentment and clearing occurs. Ex. 10, 19:14-19 (discussing presentment)[3]; 19:20-20:5 (the components of presentment occur when the check is presented at the same bank as the account of the check writer); 20:6-21:3 (discussing clearing); 21:5-21 (the components of clearing occur when the check is presented at the same bank as the account of the check writer). For example, Mr. Saffici describes a process where a bank "will take money from the drawee account and transfer it to the drawer account" and that when this occurs with checks that are not from an account at a depository "that's called clearing." Ex. 10, 21:5-21.

Wells claims that presentment and clearing occur after deposit. *See* Ex. 7, ¶ 19. First, the patents teaches that the act of transferring money into the account results in deposit. *See, e.g.,* '571 Pat., 3:47-54 ("the digital image may be *processed* and funds associated with the check or negotiable instrument in the digital image may be *deposited* in a user's bank account"). Block

---

[3] Mr. Saffici defines presentment with reference to the UCC: "Presentment" means a demand made by or on behalf of a person entitled to enforce an instrument. . . to accept a draft made to the drawee [the check writer]." UCC Section 3-501.

- 8 -

870 of Fig. 8 and block 970 of Fig. 9 of the patent, the graphical description of the steps in deposit, lists as the last step "***deposits*** funds into account." These methods are defined as one that result in "deposit of a check using image monitoring of the check,"    Mr. Calman discusses the elements of deposit of check images at length in his declaration at paragraphs 55-67. Second, the specification makes clear that presentment occurs before processing and that clearing is coincident with processing: "By ensuring that the image of the check passes monitoring criteria during pre-image capture monitoring, the number of non-conforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing." '571 patent, 4:18-22.

Wells' alternative proposed construction strongly suggests that it intends to argue to the jury that depositing a check has no real limiting force – it simply involves showing an image to a bank. But not a single one of Wells' witnesses supported this position at deposition. Wells' lead engineer noted that "the check image needs to be of a certain quality to pass the industry standard" and that "there are some technical criterias which needs to be satisfied." Ex. 6 (Usapkar Tr.), 40:10-24.

The USAA inventors recognized this as well, specifically referencing the Check 21 and ANSI (which published the DSTU technical standards that, at the time of the invention, established technical criteria for electronic check image exchange). *See* '571 Pat., 12:19-15 ("The Check Clearing for the 21st Century Act (or Check 21 Act) is a United States federal law that allows the recipient of a paper check to create a digital version, thereby eliminating the need for further handling of the physical document. The Check 21 ***standard*** for electronic exchange is defined in the standard DSTU X9.37-2003 ('X9.37'). It is a binary interchange format."). As one of Wells' executives admitted, she is "familiar with ANSI guidelines you're familiar that there are standard specifications have to be met to deposit a check in the United States." Ex. 11 (Knight Tr.), 34:16-20; 34:25-37:10.

Wells' claim construction expert, Mr. Saffici, conceded as much at his deposition:

Q. I'm marking as Exhibit 6 a passage from the Code of Federal Regulations, Subpart D, Substitute Checks. You understand that when Check 21 came into effect the United States government specified certain minimum requirements for what could constitute a substitute check image, fair?

A. Yes. […]

Q. The [Check 21] standard is that the image accurately represent[s] all the information in the front and back of the check, correct?

A. That's correct. […]

Q. Persons of skill would understand that that was a requirement for the use of check images for deposit, fair?

A. Yes.

Ex. 10, 39:2-40:13 (emphasis added); *see also id.* at 43:25-44:10, 46:16-47:9 ("Q. The ANSI guidelines are the U.S. standards for electronic exchange of check images, correct? A. There are a group of ANSI standards that relate to check processing and image processing. . . . Q. Do you know of anyone anywhere in the United States who doesn't -- doesn't comply with the minimum technical requirements as set out in ANSI in the Check 21 regulations that we read before the bank?  A. I don't know of anyone.").

| Term | mobile [computing] device. ['571 Pat., claims 1, 9, 14]; ['090 Pat., claim 11] |
|------|---------------------------------------------------------------------------------|
| USAA | a user's mobile phone, personal digital assistant, or handheld computing device, in all cases controlled by a mobile operating system. |
| Wells' | A device capable of being moved |

All of the claims of the '571 and '090 Patents recite functionality implemented on a "mobile device" or "mobile computing device."  The specification states: "The mobile device 106 may be a mobile phone (also known as a wireless phone or a cellular phone), a personal digital assistant (PDA), or any handheld computing device." '571 Pat., 3:48-53. The specification teaches that the invention involves creating an application that can run on the mobile device. *Id.*, 6:13-17 ("In an implementation, prior to an image in the field of view of the camera 207 being captured by the

camera 207, the image may be monitored with respect to monitoring criteria, e.g., using a software application running on the mobile device 106."). Of course, for an application to run there must be a background operating system that can execute the application.  It is for this reason that the specification explains that the mobile devices of the patents are controlled by operating systems: "A mobile operating system, also known as a mobile platform or a handheld operating system, is the operating system that controls a mobile device." *Id.*, 11:16-20. Wells' claim construction expert testified that "this passage [at 11:16-20] is describing that the mobile devices are controlled by a mobile operating system." Ex. 10, 31:23-32:1.

Mr. Calman explains that a POSA would understand from the specification that the invention involves placing a software layer on top of the pre-existing mobile phone operating system to allow it to perform specialized tasks.  Ex. 5, ¶ 69.

USAA's proposed construction is consistent with usage in the industry. Katie Knight, one of the leaders involved in Wells' development of mobile check deposit for wholesale customers between 2009 and 2011, agreed that "[w]hen we're speaking in this industry, when we speak about mobile devices, we're referring to smartphones, tablets, handhelds that operate the traditional mobile operating systems." Ex. 11, 8:17-24.

Wells' proposed construction would encompass virtually any computing device, including large desktop computers, working with specialized scanning devices, such as a Panini [desktop] scanner, all of which are "capable of being moved."  This is inconsistent with the specification, which teaches that "mobile devices" are small, hand-held devices similar to a smartphone ('571 Pat., 3:48-53), contain cameras ('571 Pat., cls. 1, 9, & 6:3-5), and are "typically limited in computational power" ('571 Pat., 12:31-33).  Wells' lead engineer for its first mobile deposit system similarly testified that "there's a distinction between the challenges that are faced" when using a "Panini [desktop] scanner" to acquire an image vs. a "mobile device." Ex. 6 (Usapkar Tr.), 51:23-52:14 ("Q.

. . . [Y]ou agree that there's a distinction between the challenges that are faced when you're using a Panini scanner to acquire an image and desktop Internet interface on the one hand, and we're using a mobile app and a mobile device to acquire an image on the other; fair? A. Yes, definitely they are two different sets of circumstances.  So you have to account for the differences.").

Wells' proposed construction would lump these very different mobile and desktop systems together as "mobile devices" simply because they are physically "capable of being moved"; this interpretation is inconsistent with how a POSA, including Wells' own employees working in this field around the time of the invention, think of mobile devices in the context of mobile check deposit. Ex. 5, ¶¶ 70-71.  As a leader in Wells' mobile deposit program noted, she "would segregate the mobile deposit is specific to using a phone, tablet, versus the desktop deposit uses a traditional check scanner."  Ex. 11, 6:13-20.

| Term | monitoring criterion ['571 Pat., claims 1, 9, 14]; ['090 Pat., claims 1, 11, 20] |
|------|------|
| USAA | one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection |
| Wells | No construction necessary. <br><br> Alternatively, the scope of the term should be construed as follows: one or more standards, including things perceptible to the human eye, such as for identifying edges ("edge detection") or corners ("corner detection") |

The specification defines "monitoring criterion" by providing a list of the criteria that may be used. '571 Pat., 4:3-8 ("The monitoring criteria may be based on one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection, as described further herein.").  Wells' claim construction expert agreed that this portion of the specification (col. 4, lns. 3-8) "is the definition the patent gives of monitoring criteria."  Ex. 10,

38:13-20 (Q. You recognize that Column 4, Lines 5 through 8 is the definition the patent gives of monitoring criteria, fair?  A. Yes.).

A POSA would understand the criteria listed in the specification to be the relevant monitoring criteria in the context of the invention because they reflect the various factors that influenced check image acceptance in the industry at the time of the invention.  Ex. 5, ¶¶ 72-73.  *See* Ex. 12 (Federal Reserve Board Image Cash Letter Customer Documentation, Version 1.8 (October 1, 2008)), at 19 (listing "Missing / torn corners," "Document length," "Document height," "Document skew," "Image brightness," and "Noisy image" as image quality metrics); *see also* Ex. 18 (Financial Services Technology Consortium's report on Image Quality and Usability Assurance (July 23, 2004)), at 2 (listing "undersize image," "excessive document skew," "oversize image," "image too light," "image too dark" as relevant to image quality analysis).

Wells' proposed construction is inconsistent with the patent specification and fails to express the meaning of the term "monitoring criteria" to a POSA in the context of the patents.

First, Wells' proposed construction of "one or more standards" is simply a synonym for "one or more criteria"; it does not actually explain what "monitoring criteria" means in the context of the patented inventions.

Second, nothing in the specification suggests that it is important for "monitoring criteria" to include "things perceptible to the human eye."  In fact, the specification suggests the opposite: that even characteristics that may appear "well known" to users, such as the "flatness" of a document, cannot actually be reliably assessed by humans.  '571 Pat., 14:11-17 ("While 'flat' is a fairly well known term to users, each user's appreciation of flat with respect to the camera lens of the camera 207 associated with the mobile device 106 may result in a problem with needing to align the check image programmatically or risk rejecting a large number of check images.").  To that end, the claims recite that the "monitoring criterion" is "monitored" by the mobile device's "processor," ***not*** a

human user.  *See, e.g.*, '571 Pat., cls. 1, 9 ("computer-readable instructions for depositing a check that, when executed by a processor, ***cause the processor to***: monitor an image of the check . . . with respect to a monitoring criterion") (emphasis added); '090 Pat., cl. 1 ("the ***processor configured to***: monitor a target document . . . with respect to a monitoring criterion").  Indeed, the specification expressly describes "edge detection" and "corner detection" – the two examples identified in Wells' proposed construction as "perceptible to the human eye" – as being performed by ***processors***, not the "human eye."  *See, e.g.*, '571 Pat., 7:41-51 ("[M]easurements . . . made by a processor in the camera 207, the mobile device 106, or a computing device at the financial institution to determine the check's position with respect to the alignment guide.  The measurements may be compared to predetermined measurements or values to determine whether the check's positions in the image 230 is proper or sufficient for further processing of the image.  Edge detection and/or corner detection may be used in such measurements (e.g., in measuring the distance from the check 108 in the image 230 to the alignment guide).").  Wells' expert in the CBM proceedings, Mr. Alexander acknowledged: "there are technical challenges associated with capturing sufficient quality images such that they could be recognized by a machine." Ex. 14, at 9:20-10:3.

| Term | capture . . . when the image of the check passes the monitoring criterion ['571 Pat., claims 1, 9] |
|---|---|
| USAA | No additional construction necessary |
| Wells | Capture an image of the check automatically (without human intervention) at the time when the monitored criterion is satisfied. |

| Term | when the monitoring criterion is determined to be satisfied, control[ling] the image capture device to capture an image depicting the target document in the field of view of the image capture device ['090 Pat., claims 1, 11, 20]

configured to control the image capture device to capture the image automatically upon determining the monitoring criterion is satisfied ['090 Pat., claims 7, 17] |

| | capture the image of the check [with/using] the camera when the image of the check passes the monitoring criterion ['571 Pat., claims 1, 9]<br><br>capturing the image of the check is performed automatically without user intervention when the image of the check passes the monitoring criterion ['571 Pat., claim 6]<br><br>create a digital image of the check when the image passes the monitoring criterion ['571 Pat., claim 14] |
|---|---|
| USAA | All variations: the processor controls the capture of an image of the [target document/check] automatically when the processor determines that the monitoring criteria are satisfied |
| Wells | Capture an image of the check automatically (without human intervention) at the time when the monitored criterion is satisfied. |

The '571 and '090 Patent claims recite, in various forms, the processor capturing an image of a check or document "when the image of the [check/document] passes the monitoring criterion." *See, e.g.*, '571 Pat., cls. 1, 6, 9, 14; '090 Pat., cls. 1, 7, 11, 17, 20. In each case, it would be apparent to a POSA that the ***processor*** of the mobile device controls the process of "capturing" the image automatically when the ***processor*** has determined that the monitoring criteria are satisfied.

For example, '571 Patent claim 1 recites "computer-readable instructions for depositing a check that, when executed by a processor, cause the ***processor to***: [1] monitor an image of the check . . . with respect to a monitoring criterion . . . [and] [2] capture the image of the check with the camera when the image of the check passes the monitoring criterion." '571 Pat., cl. 1. The '090 Patent claims similarly recite a "***processor configured to:*** [1] monitor a target document . . . with respect to a monitoring criterion . . . [and] [2] when the monitoring criterion is determined to be satisfied, control the image capture device to capture an image depicting the target document. '090 Pat., cl. 1.

The specification explains how the processor controls the automatic image capture process in various embodiments. Ex. 5, ¶¶ 78-79. For example, "[w]hen the image 230 passes the monitoring criteria . . . the image 230 may be captured automatically (e.g., by the camera or the

mobile device under direction of an application running on the camera 207 or the mobile device 106 or the financial institution," '571 Pat., 10:23-33, and "[t]he check processing module 454 may be configured . . . to cause the image monitoring and capture module to monitor an image of at least one side of a check provided in a field of view of the camera 207 and then capture the image after it passes monitoring criteria," *id.* at 13:34-44.  In each embodiment, the mobile device's processor (and the software executing thereon) controls the image capture process and obtains the desired image of the check or document when the processor determines that the monitoring criteria have been satisfied.

In Wells' proposed construction, each of the terms would mean "capture an image of the check automatically (without human intervention) at the time when the monitored criterion is satisfied."  Wells' proposal is incorrect for several reasons.

First, Wells' proposed construction does not specify what part of the system "capture[s] an image of the check automatically."  As discussed above, a POSA would understand from the claims and specification that this capture process is controlled by the device's processor.

Second, Wells' proposed construction imports the limitation "without human intervention" from the dependent claims of the '571 Patent.  *See, e.g.*, '571 Pat., cl. 6 ("The non-transitory computer-readable medium of claim 1, wherein capturing the image of the check is performed automatically without user intervention when the image of the check passes the monitoring criterion."), cl. 18 ("The system of claim 14, wherein creating the digital image of the check when the image passes the monitoring criterion is performed without user intervention.").  In general, "[i]t is improper for courts to read into an independent claim a limitation explicitly set forth in another claim."  *Envtl. Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 699 (Fed. Cir. 1983).  Here, a POSA would not interpret the independent claims in terms of human "intervention" (or lack thereof); rather, as discussed above, a POSA would understand from the claims and specification

- 16 -

that the automatic capture process is controlled by the device's processor based on its assessment of monitoring criteria.  Ex. 5, ¶ 82.  But a human may still take a step, such as positioning the check and/or camera responsive to feedback.  '571 Pat., 1:53-55 ("The user may reposition the check and/or the camera, for example, responsive to the feedback"), 4:24-26.

Third, Wells' proposed construction incorporates a completely arbitrary timing requirement; specifically, it apparently requires that the capture of the image that is to be transmitted in the last element of the claim occur simultaneously with the determination that the monitoring criteria are met.  There is no simultaneous monitoring and capturing requirement in the patent. For example, the capture can occur after the monitoring criteria are determined to be satisfied.  '571 Pat., 13:34-44 ("The check processing module 454 may be configured, in one example, to cause the image monitoring and capture module 456 to monitor an image of at least one side of a check provided in a field of view of the camera 207 and then capture the image after it passes monitoring criteria."); Ex. 5, ¶ 83.

Wells contends that its proposed construction is supported by prosecution history where the applicant explained that "claim 1 recites 'when' (e.g., a time) an image of check is captured, specifically capturing of the image monitored in a field of view in a camera when the image of the check passes a monitoring criterion."  Dkt. 76-4, at 6-7.  However, the applicant's discussion does nothing more than recite the claims limitations.[4]  USAA agrees that the "capture" step occurs "when" the monitoring criteria are determined to be satisfied; however, unlike Wells' proposal, USAA's proposed construction correctly reflects that the capture need not occur exactly simultaneously with the monitoring—it can occur, for example, "after," as stated in the

---

[4] Wells also relies on prosecution history of the '779 Patent, see Dkt. 76-4, at 7.  In that discussion the applicant simply pointed to the "automatic" nature of the capture in the invention, as compared to a prior art reference that relied on the user to manually capture images.

specification.   '571 Pat., 13:34-44.   "[A] time" as stated in the prosecution does not mean "simultaneously."

| Term | feedback / feedback information ['090 Pat., claims 1, 11, 20] ['571 Pat., claims 2, 10] |
|------|------------------------------------------------------------------------------------------|
| USAA | instructions to the user regarding actions to take in order to satisfy one or more monitoring criteria based on analysis of the monitoring criteria by the system |
| Wells | No construction necessary.<br><br>Alternatively, the scope of this term should be construed as follows: information or an instruction relating to an attempt to capture an image of the check. |

Certain claims of the '571 and '090 Patents recite the provision of "feedback" or "feedback information" that provide the user with instructions on how to capture an image that satisfies the monitoring criteria based on the processor's assessment as to why the monitoring criteria are not satisfied.   For example, in claim 1 of the '090 Patent, the processor "monitor[s] a target document . . . with respect to a monitoring criterion," "determine[s] whether the monitoring criteria is satisfied," and "control[s] the presentation device to present feedback information ***describing an instruction for satisfying the monitoring criterion***."   '090 Pat., cl. 1 (emphasis added).   The instruction provided relates to satisfying "the monitoring criterion," the antecedent basis for which is the monitoring criterion that the processor analyzed for compliance in an earlier element.   Similarly, in '571 Patent claim 2, the claimed software "comprise[s] instructions that provide feedback, via the mobile device to a user of the mobile device, regarding the image of the check ***with respect to the monitoring criterion*** prior to capturing the image of the check."   '571 Pat., cl. 2 (emphasis added).   USAA's proposed construction correctly captures this relationship between the "feedback" / "feedback information" provided to the user and the analysis of the one or more monitoring criteria that the feedback is instructing the user how to satisfy.

The patent specification confirms the relationship between the feedback/feedback information and the analysis of the monitoring criteria.   For example, in Figure 8, steps 830 and 840

are connected together by an arrow on the left-hand side of the figure to make clear the connection between the assessment of the "monitoring" criteria analyzed by the processor and "feedback" steps, respectively.  The user receives feedback based on the monitoring criteria, adjusts the image in the field of view based on the feedback, which is monitored again with respect to the monitoring criteria in order to either (1) provide further feedback, repeating the loop or (2) automatically capture the image, if the criteria have been satisfied (step 850).  *Id.*; Ex. 5, ¶¶ 86-88.  The specification explains that this monitoring/feedback loop helps the user take an effective check image.  '571 Pat., 6:17-22 ("Feedback based on the monitoring of the image may be provided to the user 102 to assist the user 102 in positioning the check 108 so that the image of the check 108 may be captured in such a manner that it may be more easily processed and cleared during subsequent operations, such as those involving one or more financial institutions.")

The specification describes how this monitoring/feedback loop works in connection with various monitoring criteria.  For example, one monitoring criterion is "skewing" of the image.  The specification explains that "[if] skewing is present in the image 230, feedback may be generated and provided to the user 102 with instructions for moving the check 108 or the camera 207 in order to properly align 108 in the field of view with respect to the horizontal."  '571 Pat., 8:16-20.  In other words, "[f]eedback may be provided to the user 102 as to *how to move or adjust the camera*, lighting, etc. in order to get a good image for subsequent processing (*i.e., how to get an image that passes the monitoring criteria*)."  '571 Pat., 9:39-43.  The specification repeatedly emphasizes that "[f]eedback *pertaining to the image with respect to the monitoring criteria* may be generated and provided to the user" and, *e.g.*, "[b]ased on the feedback, the user may adjust the position of the camera and/or the check . . . to pass the monitoring criteria."  '571 Pat., 17:40-46; *see also* Ex. 5, ¶ 89 (identifying other similar discussion in the specification).  A POSA reading the claims and specification would understand that the recited "feedback" / "feedback information" refers to

instructions to the user regarding actions to take in order to satisfy one or more monitoring criteria based on analysis of the monitoring criteria by the system.  Ex. 5, ¶ 90.

Wells' proposed construction, "information or an instruction relating to an attempt to capture an image of the check," is inconsistent with the patent disclosure and the express language of the claims in several ways.

First, Wells' proposed construction would appear to include any "information" that "relates" to an attempt to capture a check image, whether or not the information is related to the "monitoring criteria" in any way.  This would contradict the express language of the claims, which recite that the "feedback" or "feedback information" is "an instruction *for satisfying the monitoring criterion*" or "feedback . . . *with respect to the monitoring criterion*."  *See* '571 Pat., cl. 2, '090 Pat., cls. 1, 9 (emphasis added).

Second, Wells' proposed construction would appear to include "information" or "instructions" that are provided separately from the image capture process (such as an error message or confirmation provided to the user after a check image is captured).  This would again contradict the express language of the claims, which recite that the feedback "describ[es] an instruction *for satisfying* the monitoring criterion." '090 Pat., cls. 1, 11 (emphasis added); Ex. 5,, ¶ 93.  Similarly, as discussed above, Figure 8 of the specification makes clear that the "feedback" step occurs before the image passing the monitoring criteria is captured.  '571 Pat., Fig. 8; Ex. 5, ¶¶ 86-87, 93.  This is how a POSA would understand the claims; not, as Wells proposes, to include any information provided at any time that is somehow "related" to image capturing.  Indeed, Wells' own lead engineer admitted that there is a significant difference between "tell[ing] the user successfully how to correct [an image problem]," as described in the feedback claims, versus simply "inform[ing] a user that there is an image quality problem."  Ex. 6 (Usapkar Tr.), 88:19-89:3.

Ultimately, Wells' own claim construction expert admitted that the feedback described in the patent is not just any instruction as Wells proposes. Instead, the "feedback that's described in the patent is corrective instruction telling the user why the monitoring criteria have not been satisfied and what they can do to satisfy them." Ex. 10, 33:24-34:5. He testified that "feedback, the provision of corrective instructions" is "one of the insights of the patent" and that in "the dependent claims, the added insight is the provision of corrective information of feedback." Ex. 10, 35:13-22. Wells' expert in the CBM proceedings Mr. Alexander acknowledged that: "in addition to inform a user that the image criteria have not been satisfied", "you can also inform a user what needs to occur in order for the image criteria to be satisfied." Ex. 14, at 23:3-11.

## IV.    U.S. PATENT NOS. 8,699,779 AND 9,336,517 – DISPUTED TERMS

The '779 and '517 Patents are, generally speaking, directed to autonomous systems and methods for mobile check deposit, and in particular describe the use of an "alignment guide" and related features to improve the quality of check images obtained for deposit. The '779 Patent generally describes how an "alignment guide" may be projected in the field of view of a camera display of a mobile device, which uses a processor to monitor the image of the check in view of the camera and control the capture of the check image when the processor determines that the check is aligned. The dependent claims recite various strategies for optimizing the performance and design of the alignment guides.

| Term | A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check / A system for depositing a check ['779 Pat., claims 1, 10, 19] |
|------|------|
| USAA | The preambles are limiting. |
| Wells | No construction necessary and the preamble is not limiting.<br><br>Alternatively, should the preamble be limiting, the scope of the term "depositing a check" should be construed as follows: provide a check image and/or check information to a depository (such as a bank) for money to be credited to an account. |

Claims 1, 10, and 19 of the '779 Patent each recite, in the preamble of the claims, either "a system for depositing a check" or "instructions for depositing a check."  As with the similar preambles of the '571 and '090 Patents, a POSA would understand that these preambles including the phrase "for depositing a check" are limiting and a part of their respective claims.  *See* Section III above.  Here, "depositing a check" is similarly an essential component of the claims that provides antecedent basis for several other claim limitations recited in the body of the claims.  *See, e.g.,* '779 Pat., cl. 1 ("monitor an image of **the check** . . . determine whether the image of **the check** aligns with the alignment guide . . . automatically capture the image of **the check** . . . transmit the captured image of **the check** from the camera to **a depository**"), cl. 10 ("monitor an image of **the check** . . . determine whether the image of **the check** aligns with the alignment guide . . . automatically capture the image of **the check** . . . transmit the captured image of **the check** from the camera to **a deposit system**") (emphasis added); *Eaton*, 323 F.3d at 1339; Ex. 5, ¶ 99.

The patent specification places great emphasis on the importance of successful check deposit to the invention, further indicating that the recitation of "depositing a check" in the claim pre-ambles was intended to be limiting.  *See Proveris*. 739 F.3d at 1372  [T]he preamble may be construed as limiting when it recites particular structure or steps that are highlighted as important by the specification.").  Here, the title of the '779 patent is "Systems and methods for alignment of check during mobile deposit" and the specification repeatedly emphasizes the importance of check depositing to the claimed features, such as determining whether the check image aligns with an alignment guide and automatically capturing the check image.. *See, e.g.,* '779 Pat., 3:66-4:2 ("The alignment guide may provide a pre-image capture quality check that helps reduce the number of nonconforming images of checks during presentment of the images to a financial institution for processing and clearing."), 10:16-17 ("The alignment guide is intended to ensure that the image of the check is suitable for one or more processing tasks."), 4:51-52 ("Upon receipt and approval of the

digital image, financial institution 130 may credit the funds to account 160."), 5:55-58 ("The depository 204, in an implementation, after receiving the image(s) of the check 108 from the user 102, may use a clearinghouse 210 to perform the check clearing operations."), 13:44-48 ("At 870, the depository may receive the image of the check (along with financial information pertaining to the account for depositing funds, for example) and may process the image. Processing of the digital image may include retrieving financial information regarding the check."), 14:7-10 ("If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account.").

| Term | (1)  depositing a check ['779 Pat., claims 1, 10, 19] (2)  deposit system ['779 Pat., claims 10, 19] (3)  depository ['779 Pat., claim 1] |
|---|---|
| USAA | No additional construction necessary.  Alternatively, (1)  provide a check image to a depository for presentment and clearing in order for money to be credited to an account (2)  a system that allows for providing a check image for presentment and clearing in order for money to be credited to an account (3)  a bank or other entity that provides check image deposit functionality to a plurality of users.  Check image deposit is the act of providing a check image to a depository for presentment and clearing in order for money to be credited to an account |
| Wells | No additional construction necessary.  Alternatively, (1)  provide a check image and/or check information to a depository (such as a bank) for money to be credited to an account. (2)  a system for providing a check image and/or check information to a depository (such as a bank) for money to be credited to an account. (3)  the scope of this term should be construed as follows: provide a check, check image, and/or check information to a depository (such as a bank) for money to be credited to an account. |

Both parties agree "depositing a check" (and related terms) in the '779 Patent has the same meaning as in the '571 Patent family. *See* discussion above in Section III. The '779 Patent is not in the same family as the '571 Patent, but it shares a very similar specification. This specification makes clear that deposit occurs after processing ('779 Pat., Fig. 8 "Receive image; process image; process check; deposit funds into account"; block 870; Fig. 9, block 980 "Institution receives digital image(s) and processes digital images; processes check; deposits funds into account"; 2:24-29; 3:38-42; 14:3-6), that a validation process occurs before deposit, (*Id.*, 14:7-10 "If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account"), and that this processing result in a settlement (i.e., the money being transferred to the depositors account). *See, e.g.*, '779 Pat., 3:55-58; 3:65-4:2.

Like the '571 patent, the '779 patent points to the technical standard defined by Check 21 and ANSI (which adopts the DTSU standard referenced in the specification) that must be satisfied for deposit. '779 Pat., 8:61-9:4 ("[T]he image transmitted to the server 322 may be in any format, such as JPEG or TIFF, insofar as the server software has the ability to convert that image into a Check 21 compliant format. … The Check 21 standard for electronic exchange is defined in the standard DSTU X9.37-2003 ("X9.37"). It is a binary interchange format."); 11:44-51.

| Term | mobile [computing] device ['779 Pat., claims 1, 10, 19] ['517 Pat., claims 1, 10] |
|------|-----------------------------------------------------------------------------------|
| USAA | a user's mobile phone, personal digital assistant, or handheld computing device, in all cases controlled by a mobile operating system. |
| Wells | A device capable of being moved |

Both parties agree the term "mobile [computing] device" in the '779 and '517 Patents has the same meaning as the same term in the '571 Patent and '090 Patent. *See* discussion above in Section III. While the '779/'517 Patents are not in the same family as the '571/'090 Patents, the claims are similarly implemented via mobile devices, such as mobile phones or similar handheld devices, with

- 24 -

processors executing software instructions through a mobile operating system and the specifications define mobile devices in the same way. *Compare, e.g.*, '571 Pat., 3:48-53, 6:3-5, 6:13-17 *with* '779 Pat., 3:49-54, 5:30-32, 4:40-48. The specifications in both families similarly describe the mobile device as being controlled by a mobile operating system. *Compare, e.g.*, '571 Pat., 11:16-20 *with* '779 Pat., 7:65-8:2 ("A mobile operating system, also known as a mobile platform or handheld operating system, is the operating system that controls a mobile device."). It is the presence of the mobile operating system that allows the inventive software application to take control of the device.

| Term | identification information pertaining to the instrument ['517 Pat., claim 5] |
|------|------|
| USAA | information pertaining to the identification of corners of the instrument |
| Wells | No construction necessary. |

'517 Patent claim 5 depends from claim 1 and adds the limitation "wherein the processor is further configured to transmit *identification information pertaining to the instrument*." '517 Pat., cl. 5. The '779 Patent contains a similar claim, reciting "provid[ing] corner identification information pertaining to the image of the check." '779 Pat., cl. 5. While claim 5 of the '517 Patent does not use the word "corner," it is apparent from the disclosure that the patentee was referring to information pertaining to the identification of corners of the instrument; this is exactly how it describes "identification information." *See* '779 Pat., 13:49-56; Ex. 5, ¶ 115.

| Term | indicia ['517 Pat., claims 9, 18] |
|------|------|
| USAA | routing or account number |
| Wells | No construction necessary. |

Claims 9 and 18 of the '517 Patent depend from independent claims 1 and 10, respectively, and add the limitation "wherein the instrument includes indicia." '517 Pat., cls. 9, 18. The term "indicia" is not defined in the patent's specification, and both parties' experts agree that there is no

accepted definition of the term "indicia" in the field of the invention.  *See* Ex. 5, ¶ 120; Ex. 10, 79:4-7 ("Q. Does the word indicia have an ordinary meaning in the check industry?  A. Not that I have ever heard of in my vast years of experience.   Q. Do the patents in suit provide a definition of indicia?  A. No.").   In such cases, the meaning of the claim term in the context of the patents must be resolved by looking to other intrinsic evidence, such as "prior art cited in a patent or cited in the prosecution history of the patent."  *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).   Here, the patentee cited to U.S. Pat. Pub. No. 2007/0217669 ("Swift"), which appears on the face of the '517 Patent.   Swift describes "indicia" as the "magnetic ink character recognition (MICR) characters" printed on the front of a check, which includes the bank account number and routing number.   *See* Ex. 13 (Swift), at ¶ [0027] ("In addition, paper checks include magnetic ink character recognition (MICR) characters or indicia that may be read electronically. The MICR characters typically include the drawer's account number, the drawee bank's transit or routing number, and the check sequence number.").   A POSA reading the '517 Patent and its intrinsic record (*i.e.*, including the Swift reference) would thus understand that the patentee was using the term "indicia" to refer to the account number and routing number printed at the bottom of a check; that is, the magnetic "indicia" described in Swift.  Ex. 5, ¶¶ 117-119.

| Term | instrument ['517 Pat., claims 1, 10] |
|---|---|
| USAA | No additional construction necessary |
| Wells | A document that defines rights, duties, entitlements, or liabilities, such as a negotiable instrument, a credit instrument, a debit instrument, a financial document, a vehicle accident document, or an insurance document |

In the '517 Patent, the claims recite capturing information of an "instrument."  *See, e.g.*, '517 Pat., cls. 1, 10.  Particular examples of instruments (including non-financial documents) are provided in dependent claim 2, "wherein the instrument further comprises at least a portion of a negotiable

instrument, a credit instrument, a debit instrument, a financial document, a vehicle accident document, or an insurance document." '517 Pat., cl. 2. However, the umbrella term "instrument," as it appears in the independent claims, is not specially defined in the specification and is simply used in its ordinary sense, which is broader than financial documents, as Wells' expert agreed at deposition. *See* Ex. 10 29:23-30:4 ("Q. Do you have an understanding of what the term instrument means? A. It's a general term that would be applied to a document of some sort.  Q. Is it limited to financial documents?  A. Does not have to be.").

| Term | (1) automatically capture the image of the check when the image of the check is determined to align ['779 Pat., claims 1, 11] |
|---|---|
| | (2) automatically capture information of the instrument when the at least one feature aligns with the alignment guide ['517 Pat., claims 1, 10] |
| | (3) the mobile device is adapted to capture information of the instrument ['517 Pat., claims 1, 10] |
| USAA | (1)-(2) The processor controls the camera to capture an image of the check automatically when the processor determines that the check aligns with the alignment guide. <br> (3) No additional construction necessary. |
| Wells | (1)-(3) Capture an image of the check automatically (without human intervention) at the time when the check aligns with the alignment guide. |

As in the '571 and '090 Patents, the systems described in the '779 and '517 Patents capture images of checks/instrument automatically under the control of the mobile device's processor. *See* discussion above in Section III.  The only relevant difference is that here, rather than automatically capturing the image when the processor determines that the monitoring criteria are satisfied, the processor controls the capture of the image of the check/instrument when the processor determines that the check/instrument aligns with the alignment guide. *See, e.g.*, '779 Pat., cls. 1, 11; '517 Pat., cls. 1, 10.  The specification similarly describes the mobile device processor as controlling the automatic capture process.  *See, e.g.*, '779 Pat., 6:21-31 ("When the check image 247 is within the alignment guide 235 . . . the check image 247 and the background image 250 (if any) that are within the

alignment guide may be captured either automatically (e.g., by the camera or the mobile device under direction of an application running on the camera 207 or the mobile device 106 or the financial institution).").

Wells has proposed a similar construction here as for the corresponding claim terms in the '571 and '090 Patents, and its proposed construction is flawed for the same reasons discussed previously in Section III.  There is also a separate problem with Wells' construction for the terms in the '517 Patent.   The relevant claims in the '517 Patent recite "capture *information of* the instrument."  Wells has altered this language to recite "information *from* the instrument."  The specification at '517 Pat, 13:41-46 teaches that information includes the image plus additional data associated with the image: "corner identification information may be provided to the depository along with the image of the check."  As Wells' claim construction expert commented "this is describing capturing not just the image but also information associated with the image."  Ex. 10, 24:23-25:1.  The specification gives as an example of information associated with an image "corner identification information" which is for example "information about the quality of the corner images you could be sending." Ex. 10, 24:20-25:22.  According to the claim construction expert the patent "talks about transmitting as an example information *on* the check," "but it also talks about collecting information and sending on information *about* the check such as whether the corners are high quality." Ex. 10, 26:12-21.   To the extent Wells' redrafting of the claim term "information of the instrument" to "information from the instrument" is a strategy for limiting the claim to only "information *on* the check" and excludes 'information *about* the check" this is improper and contradicts the intrinsic record.

| Term | alignment guide ['779 Pat., claims 1, 10, 19] ['517 Pat., claims 1, 10]<br>an alignment guide adapted to align with an instrument ['517 Pat., claims 1, 10] |
|---|---|
| USAA | No additional construction necessary |

| Wells | Any shape or indicator relating to alignment of a check [instrument] |
|---|---|

The claims of the '779 and '517 Patents explain that an "alignment guide" is a guide "project[ed] . . . in the display of the mobile device" and used to align the "check" (in the '779 Patent) or the "instrument" (in the '517 Patent). *See, e.g.*, '779 Pat., cls. 1, 10, '517 Pat., cls. 1, 10. The system determines whether the check/instrument aligns with the alignment guide, for example, by evaluating information about the positioning of the check/instrument (*see, e.g.*, '779 Pat., 13:1-3, 14:55-67) or its corners (*see, e.g.*, '779 Pat., 13:31-4, Ex. 10, 84:1-85:1).

Wells' construction does not clarify the meaning of the common words "alignment" and "guide", it simply redrafts the claim language by inserting the concept of "relating to," without clarifying the meaning of this modification. Ex. 5, ¶ 130.

Dated:  April 11, 2019

Respectfully submitted,

**PARKER, BUNT & AINSWORTH, P.C.**

*/s/ Robert Christopher Bunt*
Robert Christopher Bunt  (TX #00787165)
Charles Ainsworth (TX #00783521)
100 E. Ferguson, Suite 418
Tyler, Texas 75702
Tel. (903) 531-3535
charley@pbatyler.com
rcbunt@pbatyler.com

**IRELL & MANELLA LLP**

Jason Sheasby (CA #205455), *pro hac vice*
Anthony Rowles (CA #301209), *pro hac vice*
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199
jsheasby@irell.com
trowles@irell.com

**Attorneys for Plaintiff United Services
Automobile Association (USAA)**

## CERTIFICATE OF SERVICE

I hereby certify that, on April 11, 2019, a true and correct copy of the foregoing was served to all counsel of record via CM/ECF.

/s/ Robert Christopher Bunt
ROBERT CHRISTOPHER BUNT

10666323.1 02

- 30 -