## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION, a Texas reciprocal inter-insurance exchange,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A., a national banking association,<br><br>Defendant. | Civil Action No. 2:16-CV-245<br><br>JURY TRIAL DEMANDED |

## USAA'S REPLY CLAIM CONSTRUCTION BRIEF

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Facebook, Inc. v. Pragmatus AV*, LLC,

    582 F. App'x 864 (Fed. Cir. 2014) ..................................................................................................4

*FlatWorld Interactives LLC v. Samsung Electronics Co., Ltd.*,

    No. 12-804-LPS, 2014 WL 7464143 (D. Del. Dec. 31, 2014) ............................................3

*Lugus IP, LLC v. Volvo Car Corp.*,

    No. 12-2906, 2014 WL 2094086 (D.N.J. May 20, 2014) ....................................................3

*PC Connector Solutions LLC v. SmartDisk Corp.*,

    406 F.3d 1359 (Fed. Cir. 2005) ..........................................................................................7

*Poly-Am., L.P. v. API Indus., Inc.*,

    839 F.3d 1131 (Fed. Cir. 2016) ..........................................................................................4

*Rowe v. Dror*,

    112 F.3d 473 (Fed. Cir. 1997) ............................................................................................5

*TomTom, Inc. v. Adolph*,

    790 F.3d 1315 (Fed. Cir. 2015) ...................................................................................... 4, 5

# **EXHIBITS**

| | | |
|---|---|---|
| Exhibit 1 | – | Excerpts from 12/545,127 Prosecution History ('571 Patent) |
| Exhibit 2 | – | Excerpts from 12/549,443 Prosecution History ('779 Patent) |
| Exhibit 3 | – | CBM2019-00004 '571 Petition for Covered Business Method Review of Claims 1-20 of U.S. Patent No. 8,977,571 |
| Exhibit 4 | – | U.S. Patent 6,356,836 |
| Exhibit 5 | – | Calman Deposition, taken 3/28/2019 |
| Exhibit 6 | – | Saffici Deposition, taken 3/29/2019 |
| Exhibit 7 | – | Liang Deposition, taken 3/27/2019 |

**I. "CAPTURE TERMS"**[1]: The parties agree that "the Asserted Patents in this case are directed to automatically capturing a check image." Opp., 18. The prosecution history makes clear that automatic capture means the processor controls capture of the image when the processor determines the monitoring criteria are satisfied/the check aligns with the alignment guide. Ex. 1, 15 ("Claim 1 also recites . . . instructions that cause the processor to capture the image . . . when the image of the check passes the monitoring criterion."). '571 patent claim 8 was also amended to clarify that "computer-readable instructions" "cause the processor" to "capture the image." Ex. 1, 10. Wells responds that '090 patent claim 11 "does not recite 'a processor.'" Opp., 24. But claim 11 still recites that a "mobile computing device" performs the capturing. The specifications make clear that processors control computing devices. '571, 18:56-59 (processor "controls the operation of the entire computer").

**Arbitrary Timing Limits**: Wells admits that its construction asks the court to construe "when" or "upon" to mean "as soon as." Opp., 21. This is improper.

*First,* the claims make clear that various events can occur in between the determination that the monitoring criterion is satisfied and the capture. For example, '571 patent claim 9 recites "capture the image . . . **when** the image . . . passes the monitoring criterion." (All emphasis in brief added unless noted). Claim 10 adds "providing feedback . . . when the image of the check in the field of view passes the monitoring criterion . . . prior to capturing the image. . . ." Wells' construction is inconsistent with these claims, which recite a step of providing feedback that occurs in the time between the determination that the monitoring criterion is satisfied and the capturing of the image.

*Second*, the specifications make clear that capturing "as soon as" criteria are satisfied is only one embodiment of the invention. Indeed, the specifications repeatedly make clear that in embodiments the capture need only be "after" the monitoring criteria are satisfied. '090, 18:18-31 (capture

---

[1] Wells notes that USAA has statutorily disclaimed certain asserted claims. Opp., 4 n.1. However, the statutory disclaimers have not yet been accepted by the PTO and, until then, remain in effect.

occurs "*after* image has been determined to pass the monitoring criteria"); 13:64-14:1 ("monitor an image of at least one side of a check provided in a field of view of the camera 207 and then capture the image *after* it passes monitoring criteria"); 11:54-58 ("an image of the front of the check 108 has been captured *after* passing the monitoring criteria."); '779, 15:15-20 ("*after* the alignment guide has been adjusted . . . a digital image of the check may be created . . . .").

    *Third,* the prosecution history does not support Wells. For example, in the '779 patent prosecution history, the patent owner told the PTO that a claim reciting "automatically capture the image of the check *when* the image of the check is determined" means that the capture occurs "after" – not "as soon as" – the monitoring criterion determination is made. Ex. 2, 18 ("claim 1 recites that the image of the check is automatically captured *after* the processor determines that the image . . . .").

    Wells relies on another prosecution history statement from 2012 relating to only one of the patents – the '571 patent. Opp., 22. But that statement merely observed "when (e.g., a time)" – "a time" is open-ended and is not limited to "as soon as." To the contrary, the use of "a" suggests that there are multiple times "after" the monitoring criterion is satisfied when capture could occur. "After" is an example of "a time." Moreover, the claims were subsequently broadened to replace "as soon as" with "when." Ex. 1, 10. This was not a narrowing amendment to overcome prior art or § 112.

    *Fourth*, Wells argues that Mr. Calman agreed that the "plain and ordinary meaning of the 'when' terms is clear." Opp., 21. But Mr. Calman testified that "when" means "at the same time *or after*." *See, e.g.,* Ex. 5, 50:15-19. Wells has presented no contrary evidence. Notably, in the Joint Claim Construction Statement, Wells claimed that its expert would support its construction of this term. Dkt. 76-4, 7-9, 19-24. But Wells' expert testified he had no knowledge on this issue. Ex. 6, 9:9-11.

    *Fifth*, *Muzak* and *Reinshaw* – the cases relied on by Wells – are not on point, as the patents in those cases had other disclosure indicating the importance of two actions occurring at the same time. *See Info-Hold, Inc. v. Muzak LLC* 783 F.3d 1365, 1374 (Fed. Cir. 2015) (specification described actions

occurring at the moment the user was "placed" on hold); *Renishaw PLC v. Marposs Societa' per Azioni* 158 F.3d 1243, 1252 (Fed. Cir. 1998) (specification referred to detecting the "instant of contact"). By contrast, in more analogous cases, courts have construed "when" to mean "in view of the fact that; in the event that; if," reflecting the satisfaction of a condition. *See FlatWorld Interactives LLC v. Samsung Electronics Co., Ltd.*, No. 12-804-LPS, 2014 WL 7464143, at *7-8 (D. Del. Dec. 31, 2014); *Lugus IP, LLC v. Volvo Car Corp.*, No. 12-2906, 2014 WL 2094086, at *8 (D.N.J. May 20, 2014) (accord).

**Human Intervention**. USAA's construction already properly excludes manual capture. Wells' attempt to exclude other, unspecified "human intervention" is improper.

***First***, the specifications disclose various human interventions that may occur throughout the claimed process. '090, 17:64-18:2, 8:40-44; 16:16-26; '517, 15:7-18, 10:6-9. The contemplated human interventions do not simply occur pre-satisfaction of the monitoring criterion. For example, the specifications teach that "[o]nce the images of one or both sides of the check 108 are captured . . . the image file may be operated on . . . . These operations may include . . . having the user 102 manually identify the corners/edges of the check . . . ."). '517, 8:23-31; 13:49-54. As another example, the specifications teach performing cropping on the image prior to the image being captured but after it has been framed within the alignment guide. '517, 7:21-30. As another example, the specifications teach that during the middle of the capture process after the image of the first side of the check has been collected, the check must be manually flipped over so that the opposite side image can be collected. '090, 11:54-58 ("flipping the check 108 over ***after*** an image of the front of the check 108 has been captured after passing the monitoring criteria."); '517, 8:17-20 (same).

***Second***, Wells points to embodiments in the specification where capture occurs without "***further*** user intervention." Opp., 19. But this disclosure actually teaches human intervention – including adjusting the alignment guide and positioning the checks. '779, 15:13-20.

**Third**, Wells argues there can be no "human intervention" because USAA distinguished the Windle reference (which "relies on the user to initiate" capture) during prosecution of the '779 patent. Opp., 20. But in doing so, USAA simply distinguished the claims from the manual capture process disclosed in Windle. USAA did not disclaim all "human intervention." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention . . . does not include a particular feature"). The parties agree that in the patents in suit it is the processor (or at least the mobile device) that determines that the monitoring criterion are satisfied and automatically captures. But the suggestion that the Patent Owner abandoned all human interventions in the '779 patent makes no sense. The '779 patent claims cropping of the image. *See* '779 cls. 11, 23. The '779 patent specification teaches that "the user 102 may perform cropping of the image prior to the image being captured by the camera." '779, 7:14-16.

**II. PREAMBLES ARE LIMITING.** Before the PTAB Wells took the position that "claim 1 [of the '571 patent] **requires** computer instructions for 'depositing a check.'" Ex. 3, 26. That claim only recites "depositing a check" in the preamble. Wells did not say that only the term "check" was limiting, as it argues here. In the CBM, Wells applied the "broadest reasonable interpretation" (BRI). Ex. 3, 25. This Court applies the **narrower** *Phillips* standard. *Facebook, Inc. v. Pragmatus AV*, LLC, 582 F. App'x 864, 869 (Fed. Cir. 2014). If under BRI the preamble "requires . . . instructions for 'depositing a check'," then as a matter of law this must also be required under the *Phillips* standard.

*TomTom* is of no help to Wells. The Federal Circuit held that while only the term "mobile unit" appeared in both the preamble and the body of the claim, the entire phrase containing it — "destination tracking system of at least one mobile unit" — was limiting. *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) ("The district court correctly concluded—and the parties do not seem to dispute—the phrase 'destination tracking system of at least one mobile unit' is limiting.") The dispute in *TomTom* was about whether the unconnected "generating language" ("*A method for generating*

*and updating data* for use in a destination tracking system of at least one mobile unit") – which provided no antecedent basis and was duplicative of the body of the claim – was limiting. *Id.*, 1323-1324.[2] To lop off a "mobile unit" from its use as a "destination tracking system" would have meant that the claims were not directed at the life of the invention, which was an improvement over prior art destination tracking systems based on mobile devices. Ex. 4, Abstract, 3:26-45.

The claims of the patents in suit likewise recite novel inventive elements that are added to the known system of "depositing a check" via image. "[D]epositing a check" via an image is a technical process that was known in the art. Wells' expert, executive, and lead engineers all admit that the art defined a standard for achieving this. *See, e.g.,* Ex. 6, 39:2-40:13; Dkt. 81-11, 34:16-20; Dkt. 81-6, 40:10-24. Removing the requirement for "depositing" strips away the life and meaning of the invention, which was to improve mobile device check deposit systems. '571, 4:17-22 ("By ensuring that the image of the check passes monitoring criteria during pre-image capture monitoring, the number of non-conforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing."). The specifications do not discuss deposit as an unconnected goal; they teach how the capture of the mobile devices directly interfaces with bank processing functions to achieve increased success. *Compare* '517, 13:1-33 *and* 13:56-14:30.

Wells reference to other, unrelated USAA patent families (i.e., the '227 patent) with different specifications has no bearing on the claims here. *TomTom*, 790 F.3d at 1323 ("[W]hether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'"). USAA's original families introduced the first systems that created mobile check image deposit. The patents in suit build on these earlier techniques. A POSA approaches the patents in suit with this background knowledge.

---

[2] Similarly, in *Rowe*, the only other authority cited by Wells, the term in the preamble did not provide antecedent basis and "appears only in the claim preamble." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).

**III. MEANING OF "DEPOSIT".** Wells argues that deposit means nothing more than handing an image to a bank. There is no support for this in the intrinsic or extrinsic record.

***First***, Wells asserts that "depositing" only "refers to a person submitting a check to their bank." Opp., 7. The specifications draws a distinction between providing an image to the bank and depositing. '779, 6:32-35 ("The digital image thus captured ***may be provided*** from the mobile device 106 to a financial institution. The ***check 108 may be deposited in a user's bank account*** based on the digital image."); *Id.*, 2:59-61; 3:38-42.

The patents make clear what it means to deposit a check. '779 patent Fig. 8 "is an operational flow of an implementation of a method that may be used for ***deposit of a check*** using alignment of the check." *Id.*, 12:26-28. Sending the check image occurs at step 860, but this is not called deposit. *Id.*, 13:28-29 ("At 860, the cleaned image may be transmitted to the depository."). Depositing is at step 870, after transmitting and processing, where the system "deposit[s] funds into account." *Id.*, Fig. 8; 14:7-10 ("If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account."); *Id.*, 14:30-33 ("the electronic data representation of the financial information may be processed by the depository, ***thereby depositing the check in the user's account***").

Similarly, the process depicted in Figure 9 is described as a method for the "deposit of a check." *Id.*, 14:36-37. The image is uploaded to the institution at step 970. *Id.*, 15:24-33. It is only in Step 980, after the "[i]nstitution receives digital image(s) and processes digital image; processes check" that the act of "deposit[ing] funds into an account" occurs. *See* Fig. 9, Block 980.

Wells argues that "USAA's citations are irrelevant to the construction of the 'depositing' terms in the claims, because the claims address depositing a "check," and not depositing funds." Opp., 8. Not So. Figures 8 and 9 describe "deposit of a ***check***." The specification treats depositing a check and depositing of funds the same way, referring to depositing a check in the users account. '779,

Abstract ("***The check may be deposited in a user's bank account*** based on the image."); *Id.*, 14:30-33 ("processed by the depository, ***thereby depositing the check in the user's account***").

**Second**, Wells argues that "processing" is not recited in the claims. Opp., 8. But the claims recite "deposit," and the specification discloses "deposit" requires "processing." As discussed above, Figure 8 describes "deposit of a check." Depositing occurs ***after*** the image is sent: "If the financial information is determined to be valid, ***the electronic [check image] may be processed by the depository***, ***thereby depositing*** the money in the user's account." '779, 13:28-14:10; 15:24-40.

**Third,** Wells' distorts Ms. Liang's testimony to suggest she supports Wells' construction. Opp., 9 (citing Ex. 7, 49:4-8). But Wells' block quote omits the rest of her answer: "I believe check presentment and check clearing ***are part of*** check deposit." Ex. 7, 49:12-13. Presentment/clearing are not the same as deposit but are part of deposit, as USAA's construction reflects. Likewise, Mr. Calman testified "the deposit process is that end-to-end series of tasks, series of processes that go from the negotiable instrument to then resulting in good funds in that account." Ex. 5, 63:11-14.

**Fourth**, Wells' argument that a POSA would not recognize deposit as a technical act because the ANSI standards are not referenced in the claim is incorrect. The claims recite depositing a check image. There is a standard set of requirements for depositing a check image. Plaintiffs' witnesses admitted this and the ANSI standards are referenced in the specifications. *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("meaning must be interpreted as of [the] effective filing date"). This Court previously ruled that a POSA would look to the USB specification to understand the meaning of the term "USB" in claim terms. Case No. 2:17-cv-145-JRG-RSP, Dkt. 140, 14. USAA is not asking for anything to be "imported" into the claims. The ANSI standards make clear, however, that depositing a check image is a technical act.

**IV. MOBILE DEVICE.** The claims at issue all recite a mobile device that (1) has a camera (*e.g.* '779 cl. 1 ("a mobile device having a camera"); '090 cl. 11 ("wherein the image capture device is

included in the mobile computing device")) and (2) runs a software application to perform a series of functions (*e.g.* '571 cl. 9 (processor "initialize[s] a software object on a mobile device operated by a user")). These claims reference a specific embodiment. '571, 6:3-22 ("In an implementation, the mobile device 106 may comprise a camera 207, such as a digital camera . . . "). The fact that there are other embodiments that do not involve mobile devices with cameras is irrelevant.

The specification teaches that a "mobile operating system … controls a mobile device." *Id.*, 11:16-20. This declarative statement is made at the end of a passage discussing options of how to design the "application" that runs on the device, including embodiments involving "wholly self-contained application" versus an "application programming interface." *Id.*, 10:48-11:21. The specification makes clear that there are options in terms of how the application is designed, but the specification never suggests an operating system is optional. Wells offers no explanation how a mobile device can operate a software application to perform the claimed functionality without having an operating system. In its JCCS, Wells represented to the court that its claim construction expert would support its theory that mobile devices that need to run software don't need to have operating systems. Dkt. 76-4, 4-6, 14-16. Wells' expert ignored this argument in his declaration and at deposition. Ex. 6, 9:1-4; Dkt. 81-7, ¶ 12. USAA's technical expert made clear that mobile device act with operating systems and this is crucial to the specification invention in the patents. '571, 11:17-20.

Wells points to embodiments related to servers and mainframe computers to support its position. Opp., 12. ("The specifications ... describe aspects of an *example* mobile device in Figure 10 … including '**personal computers (PCs), server computers, handheld laptop devices**'.") (emphasis original); *see also* '571, 19:64-66 ("mainframe computers are examples of other possible configurations of the computer 1010.") But Figure 10 is "an example ***computing environment***" that is used by a financial institution to process images, not an example of a "mobile device." '571, 18:4-12, 21-22.

Wells argues that USAA "attempts to substitute a modern, 2019 understanding of the term 'mobile device' for the understanding of a POSITA at the time the Asserted Patents were filed ten years ago." Opp., 13. But neither Wells' expert Mr. Saffici nor any of Wells' other witnesses have suggested that the meaning of the term changed significantly between 2009 and today. Mobile devices running Windows operating systems were available at least as early as 2002, and as Wells argues in its CBM petitions, the first iPhone running the iOS platform was released in 2007. *See, e.g.,* Ex. 3, 18.

Ms. Knight did not testify "that she understood the term '***mobile*** RDC product' to include 'a device that you capture checks, a traditional scanner, and that would have been for desktop deposit.'" Opp., 13. She testified the opposite: "***I would segregate the mobile deposit is specific to using a phone, tablet, versus the desktop deposit uses a traditional check scanner.***" Dkt. 81-11, 6:18-20. Wells' reference to two patents that name Mr. Calman as an inventor is a *non-sequitur*. Opp., 14-15. As Mr. Calman explained at his deposition, the patents Wells cites relate to very different technologies. *See* Ex. 5, 74:22-76:12. Notably, Wells' own expert does not mention these patents at all.

**V. MONITORING CRITERION.** Wells is confusing two separate issues: (1) Is there a definition of "monitoring criteria" in the specification? and (2) Does the definition exhaustively catalogue every single technical feature of an image that could satisfy the definition of monitoring criteria? The answer to question (1) is yes, as Wells' own expert has admitted. Ex. 6, 38:13-20. The patent specification defines monitoring criteria without "exemplary" language. '571, 4:3–8. Wells places great emphasis on the word "may" in the definition, but this simply indicates that one may employ one or more of the listed categories of monitoring criteria, as opposed to all of them.

The answer to question (2) is that the definition in the specification at '571, 4:3-8 does not catalogue every single technical feature that fits within the categories referenced in the definition: that is why it provides categories. One of the inventors, Ms. Liang, explained this at her deposition. She noted that "edge detection" is not expressly catalogued in the specification's definition of "monitoring

criteria" but is discussed later in the specification. This does not make the definition of monitoring criteria at 4:3-8 incomplete. To the contrary, edge detection is a technical feature that is used to determine if the categories of monitoring criteria set out in the definition are met. Ex. 7, 51:16-52:11 ("So based on this list of monitoring criteria, edge detection is implied. Because without edge detection, you would not be able to monitor, for example, the positioning of the image, the dimensions, the skewing, the warping, as well as the corner."); '571, 3:58–4:8, 7:30–33, 7:48–57, 8:40–41; '090, 4:10–27. Wells' claim that the definition of the categories that make up monitoring criteria in the specification is not an "exhaustive list" of the features monitored is tantamount to criticizing a definition of cat simply because it does not literally list every species of cat.

**VI. FEEDBACK.** USAA's construction is consistent with '571 claim 10. In that claim, the feedback is provided when the monitoring criterion are satisfied, and thus the system instructs the user to take no further action in order to satisfy the monitoring criterion. An example of this instruction would be to maintain the current position of the check in the field of view. '571, 7:33-37 ("If the dimensions are within a certain acceptable tolerance, then it may be determined that the check 108 is properly positioned. Such feedback may be generated and provided to the user 102.").

**VII. ALIGNMENT GUIDE.** The specification teaches that an "alignment guide" is a guide that assists the user in positioning the check so that the captured image is suitable for processing and clearing. '779, 5:42-48 ("The alignment guide may be provided during image capture to assist the user 102 in positioning the check 108 so that the image of the check 108 may be captured in such a manner that it may be more easily processed and cleared during subsequent operations, such as those involving one or more financial institutions."). Wells' construction relies on cherry-picked parts of one embodiment, and even excludes an exemplary alignment guide disclosed in the very same sentence: a "self-crop tool." '779, 6:1-10.

Dated:  May 2, 2019

Respectfully submitted,

**PARKER, BUNT & AINSWORTH, P.C.**

*/s/ Robert Christopher Bunt*
Robert Christopher Bunt  (TX #00787165)
Charles Ainsworth (TX #00783521)
100 E. Ferguson, Suite 418
Tyler, Texas 75702
Tel. (903) 531-3535
charley@pbatyler.com
rcbunt@pbatyler.com

**IRELL & MANELLA LLP**

Jason Sheasby (CA #205455), *pro hac vice*
Anthony Rowles (CA #301209), *pro hac vice*
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199
jsheasby@irell.com
trowles@irell.com

**Attorneys for Plaintiff United Services Automobile Association (USAA)**

## **CERTIFICATE OF SERVICE**

  I hereby certify that, on May 2, 2019, a true and correct copy of the foregoing was served to all counsel of record via CM/ECF.

                */s/ Robert Christopher Bunt*
                ROBERT CHRISTOPHER BUNT