**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNITED STATES AUTOMOBILE ASSOCIATION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § § | Case No. 2:18-cv-00245-JRG |
| WELLS FARGO BANK, N.A., | § § § | |
| *Defendant.* | § § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of United States Automobile Association ("Plaintiff") (Dkt. No. 81, filed on April 11, 2019),[1] the response of Wells Fargo Bank, N.A. ("Defendant") (Dkt. No. 84, filed on April 25, 2019), and Plaintiff's Reply (Dkt. No. 85, filed on May 2, 2019). The Court held a hearing on claim construction on May 23, 2019, after first providing the parties with a list of preliminary constructions of the disputed terms. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.      **BACKGROUND** .......................................................................................... **3**

II.      **LEGAL PRINCIPLES** .............................................................................. **4**

     A.      Claim Construction ................................................................... 4

     B.      Departing from the Ordinary Meaning of a Claim Term ........................................ 7

III.      **CONSTRUCTION OF DISPUTED TERMS** .................................................... **9**

     A.      The Deposit Terms ................................................................... 9

     B.      "mobile device" and "mobile computing device" ................................ 18

     C.      "monitoring criterion" ................................................................ 23

     D.      The Capture Terms .................................................................. 28

     E.      "feedback" and "feedback information" .......................................... 37

     F.      "identification information pertaining to the instrument" ........................ 39

     G.      "indicia" ............................................................................... 41

     H.      "instrument" .......................................................................... 44

     I.      "alignment guide" ................................................................... 46

IV.      **CONCLUSION** ...................................................................................... **47**

# I.    BACKGROUND

Plaintiff alleges infringement of four U.S. Patents: No. 8,699,779 (the "'779 Patent"), No. 8,977,571 (the "'571 Patent"), No. 9,366,517 (the "'517 Patent"), and No. 9,818,090 (the "'090 Patent") (collectively, the "Asserted Patents"). The '779 and '517 Patents (the "'779 Patent Family") are related through continuation applications and thus share a substantially identical specification (outside the claim sets). The '571 and '090 Patents (the "'571 Patent Family") are related through continuation applications and thus share a substantially identical specification (outside the claim sets). The '779 Patent Family lists an effective filing date of August 28, 2009. The '571 Patent Family lists an effective filing date of August 21, 2009.

In general, the Asserted Patents are directed to technology for capturing images of checks or other instruments or documents in a form suitable to serve the purpose of the document in place of the document. The disclosures of the patents are directed primarily to mobile check deposit and thus are directed to systems and methods for capturing check images that are suitable for the check-deposit process. The primary difference between the '571 Patent Family and the '779 Patent Family is in the quality-control aspect of the image capture: the '571 Patent Family focuses on monitoring criteria to ensure quality images, while the '779 Patent Family focuses on an alignment guide to ensure quality images.

The abstracts of the '571 Patent Family are identical and provide:

> An image of a check that is in the field of view of a camera is monitored prior to the image of the check being captured. The camera is associated with a mobile device. When the image of the check in the field of view passes monitoring criteria, an image may be taken by the camera and provided from the mobile device to a financial institution. The image capture may be performed automatically as soon as the image of the check is determined to pass the monitoring criteria. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used. Feedback may be provided to the user of the camera regarding the image of the check in the field of view.

The abstracts of the '779 Patent Family are identical and provide:

3

An alignment guide may be provided in the field of view of a camera associated with a mobile device used to capture an image of a check. When the image of the check is within the alignment guide in the field of view, an image may be taken by the camera and provided from the mobile device to a financial institution. The alignment guide may be adjustable at the mobile device. The image capture may be performed automatically by the camera or the mobile device as soon as the image of the check is determined to be within the alignment guide. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

Claim 1 of the '571 Patent and Claim 9 of the '779 Patent, exemplary monitoring-criterion and alignment-guide claims respectively, recite as follows:

> **'571 Patent 1**. A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check that, when executed by a processor, cause the processor to:
>> monitor an image of the check in a field of view of a camera of a mobile device with respect to a monitoring criterion using an image monitoring and capture module of the mobile device;
>> capture the image of the check with the camera when the image of the check passes the monitoring criterion; and
>> provide the image of the check from the camera to a depository via a communication pathway between the mobile device and the depository.

> **'779 Patent 10**. A non-transitory computer-readable medium comprising instructions for depositing a check, said instructions being executed by a processor of a mobile device to:
>> project an alignment guide in a display of the mobile device, the display of the mobile device displaying a field of view of a camera of the mobile device;
>> monitor an image of the check that is within the field of view of the camera;
>> determine whether the image of the check aligns with the alignment guide;
>> automatically capture the image of the check when the image of the check is determined to align with the alignment guide; and
>> transmit the image of the check from the mobile device to a deposit system.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by

considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he

specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court

understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

### B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## III.    CONSTRUCTION OF DISPUTED TERMS

### A.    The Deposit Terms

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "A non-transitory computer-readable medium comprising [computer-readable] instructions for depositing a check"<br><br>• '779 Patent Claim 10<br>• '571 Patent Claims 1, 9 | The preamble is limiting. | The preamble is not limiting. |
| "A system for depositing a check"<br><br>• '779 Patent Claim 1 | The preamble is limiting. | The preamble is not limiting. |
| "depositing a check"<br><br>• '779 Patent Claims 1, 10<br>• '571 Patent Claims 1, 9 | No additional construction necessary.<br><br>Alternatively:<br>• provide a check image to a depository for presentment and clearing in order for money to be credited to an account | No construction necessary.<br><br>Alternatively:<br>• provide a check image and/or check information to a depository (such as a bank) for money to be credited to an account |
| "deposit system"<br><br>• '779 Patent Claim 10<br>• '571 Patent Claim 9 | No additional construction necessary.<br><br>Alternatively:<br>• a system that allows for providing a check image for presentment and clearing in order for money to be credited to an account | No construction necessary.<br><br>Alternatively:<br>• a system for providing a check image and/or check information to a depository (such as a bank) for money to be credited to an account |

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the Parties' P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 88) are listed.

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "depository"<br><br>• '779 Patent Claim 1<br>• '571 Patent Claim 1 | No additional construction necessary.<br><br>Alternatively:<br>• a bank or other entity that provides check image deposit functionality to a plurality of users. Check image deposit is the act of providing a check image to a depository for presentment and clearing in order for money to be credited to an account | No construction necessary.<br><br>Alternatively:<br>• the entity (such as a bank) to whom a user provides a check image and/or check information for money to be credited to an account |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The preambles of Claims 1 and 9 of the '571 Patent, Claim 20 of the '090 Patent, and Claims 1, 10, and 19 of the '779 Patent are limiting because they provide antecedent basis for terms in the bodies of the claims and because they recite key features of the inventions of the patents. The deposit terms, namely, "depositing a check," "deposit system," and "depository," refer to a check deposit that inherently includes presentment and clearing of the check. It is only after the check is processed via presentment and clearing, and the funds credited to the appropriate account, that the check is deposited. For check-image deposits, this image must meet certain standards in order to be processed through the deposit of funds. Thus, depositing a check image is a "relatively involved technical process" that is "not amenable to a short construction, but instead best explained to the jury via expert testimony." Dkt. No. 81 at 6–13, 24–27.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '779 Patent figs.8, 9, col.2 ll.24–29, col.3 ll.38–42, col.3 ll.55–58, col.3 l.65 – col.4 l.2, col.4 ll.51–52, col.5 ll.55–58, col.8 l.61 – col.9 l.4, col.10 ll.16–17, col.11 ll.44–51, col.13 ll.44–48, col.14 ll.3–10; '571 Patent figs. 8, 9, col.2 ll.23–28, col.3 ll.9–12, col.3 ll.37–42, col.3 ll.47–54, col.3 ll.59–61, col.4 ll.17–22, col.7 ll.52–57, col.12 ll.19–25, col.15 ll.43–49, col.16 ll.51–54, col.18 ll.2–6; '571 Patent File Wrapper November 8, 2018 Petition for Covered Business Method Review at 13, CBM2019-00004 (Plaintiff's Ex. 8, Dkt. No. 81-8 at 25); '090 Patent File Wrapper November 8, 2018 Petition for Covered Business Method Review at 13, CBM2019-00002 (Plaintiff's Ex. 9, Dkt. No. 81-9 at 25). **Extrinsic evidence**: Calman Decl.[4] ¶¶ 55–67, 99 (Plaintiff's Ex. 5, Dkt. No. 81-5); Usapkar Dep.[5] at 40:10–24 (Plaintiff's Ex. 6, Dkt. No. 81-6); Saffici Decl.[6] at ¶ 19 (Plaintiff's Ex. 7, Dkt. No. 81-7); Saffici Dep.[7] at 18:16–21, 19:14 – 21:3, 21:5–21, 28:9–12, 39:2 – 40:13, 43:25 – 44:10, 46:16 – 47:9 (Plaintiff's Ex. 10, Dkt. No. 81-10); Knight Dep.[8] at 34:16–20, 34:25 – 37:10 (Plaintiff's Ex. 11, Dkt. No. 81-11); Alexander Dep.[9] at 38:17–21 (Plaintiff's Ex. 14, Dkt. No. 81-14).

Defendant responds: The preambles of Claims 1 and 9 of the '571 Patent, and Claims 1 and 10 of the '779 Patent are not limiting because the claim bodies are structurally complete without reference to the preambles. (Defendant notes that Claims 14–20 of the '571 Patent, Claim 20 of the '090 Patent, Claims 19–23 of the '779 Patent, and Claims 2–4, 11, 15, and 16 of the '517 Patent have been statutorily disclaimed and need not be construed.) Even if the preambles provide antecedent basis for some terms, the rest of the preambles are not thereby limiting. Specifically,

---

[4] February 28, 2019 Declaration of Matthew A. Calman. (Plaintiff's litigation expert.)
[5] November 20, 2018 Deposition of Nishant Usapkar. (Defendant's employee.)
[6] March 5, 2019 Declaration of William L. Saffici Regarding Claim Construction. (Defendant's litigation expert.)
[7] March 29, 2019 Deposition of William L. Saffici.
[8] February 8, 2019 Deposition of Katie Night. (Defendant's employee.)
[9] January 23, 2019 Deposition of Peter Alexander, Ph.D. (Defendant's patent-office expert.)

even if "check" in the preambles is limiting, the "deposit" aspect of the preambles is not. As used in the Asserted Patents, "deposit" is distinct from presentment and clearing. "Deposit" is something that can be done by a user of mobile device. "Presentment" and "clearing" are performed by a financial institution. The check "deposit" is simply "a person submitting the check to their bank" and is distinct from deposit of funds that may result from a check deposit. Dkt. No. 84 at 9–15.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '779 Patent col.3 ll.9–13, col.5 ll.4–6, col.8 l.61 – col.9 l.4; '571 Patent figs.8, 9, col.3 ll.8–12, col.3 ll.37–42, col.4 ll.18–22, col.5 ll.27–29, col.12 ll.19–25, col.15 ll.43–49, col.16 ll.51–56, col.18 ll.2–6. **Extrinsic evidence**: Saffici Decl. at ¶¶ 17–19 (Defendant's Ex. C, Dkt. No. 84-3); Calman Dep.[10] at 62:16–18, 63:25 – 64:11, 66:10– 23 (Defendant's Ex. E, Dkt. No. 84-5); Liang Dep.[11] at 38:10–15, 48:20 – 49:8 (Defendant's Ex. F, Dkt. No. 84-6); Calman Decl. ¶ 58 (Plaintiff's Ex. 5, Dkt. No. 81-5); Saffici Dep. at 18:16–21 (Plaintiff's Ex. 10, Dkt. No. 81-10); U.S. Patent No. 8,708,227.

Plaintiff replies: Depositing a check is key to the invention and references to "depositing a check" in the preambles should therefore be given limiting effect. Further, "depositing a check" is specifically described in the patents as distinct from simply submitting a check to a bank. It requires the deposit of funds into an account. Dkt. No. 85 at 7–12.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '779 Patent, at [57] Abstract, col.2 ll.59–61, col.6 ll.32–35, col.12 ll.26–28, col.13 l.28 – col.14 l.10, col.14 ll.30–33, col.14 ll.36–37, col.15 ll.24–40; '517 Patent col.13 ll.1–33, col.13 l.56 – col.14 l.30; '571 File Wrapper November 8, 2018 Petition for Covered Business Method

---

[10] March 29, 2019 Deposition of Matt Calman.
[11] March 27, 2019 Deposition Minya Liang. (Named inventor.)

Review at 12–13, CBM2019-00004 (Plaintiff's Reply Ex. 3, Dkt. No. 85-3 at 25–26). **Extrinsic evidence**: U.S. Patent No. 6,356,836, at [57] Abstract, col.3 ll.26–45 (Plaintiff's Reply Ex. 4, Dkt. No. 85-4); Calman Dep. at 63:11–14 (Plaintiff's Reply Ex. 5, Dkt. No. 85-5); Saffici Dep. at 39:2 – 40:13 (Plaintiff's Reply Ex. 6, Dkt. No. 85-6); Liang Dep. at 49:12–13 (Plaintiff's Reply Ex. 7, Dkt. No. 86).

At the hearing, the parties argued the effect of Plaintiff's statutory disclaimer of certain claims of the patents. Defendant argued that Plaintiff's proposed construction of the Deposit Terms threatens to improperly recapture the claim scope disclaimed by the Plaintiff, citing *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379 (Fed. Cir. 1998). Plaintiff argued that the disclaimed claims can have no effect on claim construction and that its construction is a narrowing construction of retained claims and therefore is not an attempt to recapture disclaimed subject matter.

### Analysis

The dispute distills to two issues. First, whether the preambles of Claim 9 of the '571 Patent and Claims 1 and 10 of the '779 Patent are limiting. They are. Second, whether "depositing a check" necessarily includes or follows presentment and clearing. It does not, though it is not simply submitting a check image or information to a depository.

On the record before the Court, the Court declines to determine whether Plaintiff's advocated claim construction, or the Court's adopted construction, improperly recaptures the subject matter disclaimed by the Plaintiff. Doing so would require construction of the disclaimed claims without the benefit of argument or evidence on the issues specific to those claims. Further, the Federal Circuit has suggested that a recapture analysis is not properly part of claim construction. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1331–32 (Fed. Cir. 2007). *MBO Labs.* found error in a district court's application of the recapture rule in a claim-construction proceeding.

*Id.* Specifically, the district court narrowly construed claims that were broadened through reissuance of the patent-at-issue in light of disclaimers made in prosecuting the original application. *Id.* The Federal Circuit held this approach to be error, stating that "[w]hether those broadened claims are invalidated by the recapture rule is an issue separate from construction." *Id.* The Federal Circuit's predecessor court, the Court of Claims, also provides guidance on this issue. In *Soundscriber Corp. v. United States*, the court instructed: "The construction of a patent, after a disclaimer has been properly entered, must be the same that it would have been if the matter so disclaimed had never been claimed." 360 F.2d 954, 961 (Ct. Cl. 1966). Thus, "structures defined by a claim which has been disclaimed may be covered by other claims not disclaimed." *Id.* *Soundscriber* is precedential through the Federal Circuit's adoption of the "body of law represented by the holdings of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982." *S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (*en banc*). With this guidance from the Federal Circuit, the Court construes the claim terms at issue here without regard to whether the proper construction of the claims somehow violates the recapture rule.

It is not necessarily improper to consult the disclaimed claims in construing the Deposit Terms. In *Vectra*, the Federal Circuit held that in a broadening-reissue context, statutorily disclaimed claims are treated as if they "never existed." 162 F.3d at 1383–84. This does not mean, however, that the disclaimed claims are erased entirely from the intrinsic record. Indeed, *Vectra* instructs that "[t]he public is entitled to rely upon the public record of a patent in determining the scope of the patent's claims." *Id.* at 1383. This "public record," i.e., the intrinsic evidence, includes the disclaimed claims. *Id.* at 1383–84. As previously held by this Court, "the prosecution history presenting [disclaimed] claims is still available, despite the disclaimer, as evidence that can be

consulted by the Court during claim construction." *Allergan Sales, LLC v. Sandoz, Inc.*, No. 2:12-CV-00207-JRG, 2013 U.S. Dist. LEXIS 126418, at *22 (E.D. Tex. Sep. 4, 2013). Thus, the Court considers the disclaimed claims as part of the intrinsic record that may be consulted in construing the claims.

The preambles of Claim 9 of the '571 Patent and Claims 1 and 10 of the '779 Patent are limiting. Each of these preambles is "necessary to give life, meaning, and vitality to the claim." *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005). For example, the "non-transitory computer-readable medium" claims are all directed to instructions for configuring a processor to perform certain functions. Without reference to the preamble it is not clear whether the claim covers the medium holding the instructions for the processor or performance of the functions irrespective of a processor. It is only in the context of the preamble that the claim is properly understood to cover the structure dictated by processor performance. Similarly, the preambles provide antecedent basis for "check" and "mobile device" limitations found in the bodies of the claims. And the Court agrees with Plaintiff that the "depositing a check" aspect of the preamble also provides important context for understanding the claims. The "check" of the preamble is subject to a series of quality-control functions that must be met to submit the check to a "depository." These are properly understood in the context of depositing a check. Thus, the preambles provide life, meaning, and vitality to the claims and are therefore limiting.[12]

"Depositing a check" is used in the Asserted Patents to describe the process of providing a check to a depository in a form suitable to allow funds to be deposited into an account. For example, the patents explain:

---

[12] The Patent Trial and Appeal Board ("PTAB") recently determined that the preamble of Claim 1 of the '571 Patent is limiting. Decision, *Wells Fargo Bank, N.A. v. United Services Automobile Association*, CBM2019-00004, paper 22 at 10–14 (PTAB May 15, 2019), Dkt. No. 89-1 at 11–15.

Once the check has been signed, it is usually deemed negotiable, meaning the check may be validly transferred to the payee upon delivery. By signing and transferring the check to the payee, the payor authorizes funds to be withdrawn from the payor's account on behalf of the payee.

While a check may provide a payor with a convenient and secure form of payment, receiving a check may put certain burdens on the payee, such as the time and effort required to deposit the check. For example, depositing a check typically involves going to a local bank branch and physically presenting the check to a bank teller. To reduce such burdens for the payee, systems and methods have been developed to enable the remote deposit of checks. For example, the payee may capture a digital image of a check using a mobile device. The financial institution may then receive from the payee the digital image of the check. The financial institution may then use the digital image to credit funds to the payee. However, such a technique requires the efficient and accurate detection and extraction of the information pertaining to a check in the digital image.

'571 Patent col.1 ll.13–33; '779 Patent col.1 ll.13–33. This suggests that depositing a check is more than just providing it to the institution, it involves providing it in a form to enable actual crediting of funds to the deposit account. The patents elsewhere refer to the deposit process as depositing the check into an account: "The user 102 may deposit a check 108 or other negotiable instrument in the account 160 either electronically or physically." '571 Patent col.3 ll.8–10; '779 Patent col.3 ll.9–11. "The user 102 may deposit the check 108 into account 160 by making a digital image of the check 108 and sending the image file containing the digital image to financial institution 130." '571 Patent col.3 ll.42–45; '779 Patent col.3 ll.43–46. Again, this suggests that while presenting a check to an institution is part of "depositing a check" it is not all of it, the check must be in a suitable form. "[T]he digital image may be processed and funds associated with the check or negotiable instrument in the digital image may be deposited in a user's bank account." '571 Patent col.3 ll.39–42; '779 Patent col.3 ll.40–43. This is depicted in Figures 8 and 9 of the patents (which differ slightly between the '571 Patent Family and the '779 Patent Family). These figures depict implementations of check-deposit methods, each culminating in "deposit funds into account." '571 Patent fig.8 (item 870), fig.9 (item 980), col.15 ll.10–12, col.17 ll.13–15; '779

Patent fig.8 (item 870), fig.9 (item 980), col.12 ll.26–28, col.14 ll.36–38. This suggests that depositing a check can include the deposit of the associated funds. Indeed, Claim 19 of the '779 Patent, directed to processor-executable instructions for "depositing a check," includes a distinct step of "deposit funds of the check into an account." '779 Patent col.20 ll.26–27. Claim 10 of that patent, also directed to processor-executable instructions for "depositing a check," does not. This suggests that while check deposit may include deposit of funds, it does not necessarily require deposit of funds. Ultimately, depositing a check requires provision of the check in a form suitable to allow the funds associated with the check to be deposited into the deposit account, whether or not the funds are actually deposited.

Depositing a check does not necessarily require or follow presentment and clearing. The patents are clear that presentment and clearing may, but do not necessarily, precede the transfer of funds to the deposit account. For example, the patents provide:

> The depository 204, in an implementation, after receiving the image(s) of the check 108 from the user 102, may use a clearinghouse 210 to perform the check clearing operations. As described with respect to the system 100 of FIG. 1, check clearing operations are used by banks to do the final settlement of the check 108, such as removing funds from the account of the payor and transferring those funds to the user's bank. ***The user's bank may choose to make the funds available to the user 102 immediately*** and take on the risk that the check 108 does not clear. However, for various reasons, ***the bank may only make those funds available to the user 102 after the check 108 finally clears***.

'571 Patent col.6 ll.29–41; '779 Patent col.5 ll.55–67 (emphasis added). That is, the funds associated with the check may be available in the deposit account without clearing or they may be available only after clearing. With respect to "presentment," the Court understands that the parties are using the term to refer to the demand made by a depository institution (e.g., the check-casher's bank) to a paying institution (e.g., the check-writer's bank) to demand the funds. *See* Dkt. No. 81 at 11–12; Dkt. No. 84 at 14. With this understanding, and in light of the patents' disclosure that

17

the "user's bank may choose to make the funds available to the user 102 immediately," a check may be deposited without "presentment."

Other than the meaning of "depositing a check," there is not an actual dispute regarding the meaning of "depository." Accordingly, the Court determines that, subject to the construction of the other Deposit Terms, "depository" does not need to be construed and construes the other Deposit Terms as follows:

- The preambles of Claims 1 and 9 of the '571 Patent and Claims 1 and 10 of the '779 Patent are limiting;

- "depositing a check" means "providing a check to a depository in a form sufficient to allow money to be credited to an account"; and

- "deposit system" means "a system for providing a check to a depository in a form sufficient to allow money to be credited to an account."

### B.    "mobile device" and "mobile computing device"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "mobile device"<br><br>• '779 Patent Claims 1, 10<br>• '571 Patent Claims 1, 9<br>• '517 Patent Claims 1, 10 | a user's mobile phone, personal digital assistant, or handheld computing device, in all cases controlled by a mobile operating system | a device capable of being moved |
| "mobile computing device"<br><br>• '090 Patent Claim 11 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: The "mobile device"/ "mobile computing device" of the Asserted Patents is the same mobile device understood in the industry. It includes mobile devices with mobile

operating systems. But a "mobile device"/ "mobile computing device" does not encompass desktop computers operating dedicated check-scanning devices, regardless that such equipment is capable of being moved. Dkt. No. 81 at 13–15, 27–28.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.3 ll.48–53, col.6 ll.3–5, col.6 ll.13–17, col.11 ll.16–20, col.12 ll.31–33; '779 Patent col.3 ll.49–54, col.4 ll.40–48, col.5 ll.30–32, col.7 l.65 – col.8 l.2. **Extrinsic evidence**: Calman Decl. ¶¶ 69–71 (Plaintiff's Ex. 5, Dkt. No. 81-5); Usapkar Dep. at 51:23 – 52:14 (Plaintiff's Ex. 6, Dkt. No. 81-6); Saffici Dep. at 31:23 – 32:1 (Plaintiff's Ex. 10, Dkt. No. 81-10); Knight Dep. at 6:13–20, 8:17–24 (Plaintiff's Ex. 11, Dkt. No. 81-11).

Defendant responds: The "mobile device"/ "mobile computing device" of the Asserted Patents is not necessarily limited to a device running a mobile operating system. Rather, the patents teach that a variety of devices, such as PCs, servers, and laptops, with the appropriate imaging hardware, may implement the inventions. And at the priority date of the Asserted Patents (~2009) "mobile device" was used in the industry to broadly denote devices that did not necessarily run mobile operating systems, such as laptops. Dkt. No. 84 at 15–19.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.3 ll.48–53, col.5 ll.45–61, col.6 ll.13–17, col.11 l.6, col.18 ll.21–35; '090 Patent col.4 ll.1–5, col.5 l.66 – col.6 l.15, col.18 l.65 – col.19 l.8; '779 Patent col.3 ll.49–54, col.15 ll.55–64; '517 Patent col.3 ll.60–65, col.16 ll.1–10. **Extrinsic evidence**: Usapkar Dep. at 51:23 – 52:14 (Plaintiff's Ex. 6, Dkt. No. 81-6); Saffici Dep. at 31:23 – 32:1 (Plaintiff's Ex. 10, Dkt. No. 81-10); Knight Dep. at 5:23 – 6:6, 8:1–24 (Plaintiff's Ex. 11, Dkt. No. 81-11); Usapkar Dep. at 52:15 – 53:3 (Defendant's Ex. M, Dkt. No.

84-13); U.S. Patent No. 8,295,898 at col.2 ll.51–56 (Defendant's Ex. G, Dkt. No. 84-7); U.S. Patent Application Publication No. 2012/0232966 ¶ 50 (Defendant's Ex. H, Dkt. No. 84-8).

Plaintiff replies: The use of a "mobile operating system" is critical to implementation of the inventions on a mobile device. The other devices, such a PCs, servers, and laptops, mentioned in the patents are described in the context of a financial institution's computing environment for processing check images, not of a mobile device. Dkt. No. 85 at 10–12.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.10 l.48 – col.11 l.21, col.18 ll.4–12, col.18 ll.21–22, col.19 ll.64–66; '571 File Wrapper November 8, 2018 Petition for Covered Business Method Review at 5, CBM2019-00004 (Plaintiff's Reply Ex. 3, Dkt. No. 85-3 at 18). **Extrinsic evidence**: Saffici Dep. at 9:1–4 (Plaintiff's Reply Ex. 6, Dkt. No. 85-6); Saffici Decl. at ¶ 12 (Plaintiff's Ex. 7, Dkt. No. 81-7); Calman Dep. at 74:22 – 76:12 (Plaintiff's Reply Ex. 5, Dkt. No. 85-5).

### <u>Analysis</u>

There are three issues in dispute. First, whether a mobile device is necessarily a "mobile phone, personal digital assistant, or handheld computing device." It is not. Second, whether a mobile device is simply "a device capable of being moved." It is not. Third, whether a "mobile device" is necessarily controlled by a "mobile operating system." It is.

The Court declines to limit "mobile device" to "a mobile phone, personal digital assistant, or handheld computing device." While these are exemplary mobile devices, the Asserted Patents do not define these as the entire universe of mobile devices. Indeed, the patents describe them as exemplary: "The mobile device 106 may be a mobile phone (also known as a wireless phone or a cellular phone), a personal digital assistant (PDA), or any handheld computing device, ***for***

*example*." '571 Patent col.3 ll.48–51; '779 Patent col.3 ll.59–52 (emphasis added). The terms "mobile device" and "mobile computing device" are not as narrow as Plaintiff contends.

While the "mobile device" of the patents is necessarily mobile (it is capable of being easily moved, like a mobile phone, PDA, or handheld), the patents clarify that it is distinct from other potentially movable systems, like camcorders, personal computers, and laptop computers. Defendant relies on several passages from the patents in its argument to equate "mobile device" with any movable device. Dkt. No. 84 at 16 (citing, inter alia, '571 Patent col.5 ll.45–61, col.18 ll.26–35). The Court is not persuaded. For example, in one passage, the '571 Patent explains that a mobile device may include a video camera to obtain a video of the check. '571 Patent col.5 ll.45–61. But the patents do not suggest that any video source is a mobile device. Indeed, the patents explain that a camera may be "contained within the mobile device" or "detachably coupled to the mobile device." '571 Patent col.13 ll.1–6; '779 Patent col.9 ll.46–51. A camera, video or otherwise, may be used as part of the mobile device but is not necessarily itself a mobile device. In another passage, the patents explain that a variety of computing environments may be used to implement the invention, such as "personal computers (PCs), server computers, handheld or laptop devices, multiprocessor systems, microprocessor-based systems, network PCs, minicomputers, mainframe computers, embedded systems, distributed computing environments that include any of the above systems or devices, and the like." '571 Patent col.18 ll.26–35. But the Court does not interpret this passage to mean that some or all of the items in this list qualify as a "mobile device." Indeed, these are expressly described as "other" computing system environments, suggesting that these are other than mobile devices. *Id.* at col.18 ll.23–26. And it stretches the meaning of "mobile" to interpret some of these items, such as "mainframe computers," as mobile devices. The terms "mobile device" and "mobile computing device" are not as broad as Defendant contends.

One distinction between the mobile device of the patents and the other potentially movable systems is the operating system: "A mobile operating system, also known as a mobile platform or a handheld operating system, is the operating system that controls a mobile device. Other mobiles OSs include Symbian OS, iPhone OS, Palm OS, BlackBerry OS, and Android." '571 Patent col.11 ll.17–21; '779 Patent col.7 l.65 – col.8 l.2. In the context of the surrounding disclosure, this statement suggests that a mobile device inherently is controlled by an operating system and that the operating system is a "mobile operating system." '571 Patent col.10 ll.37–42; '779 Patent col.7 ll.22–27. For example, the statement is made in the context of describing an exemplary embodiment with an "example of the mobile device." But instead of referring to the operating system that controls *the* mobile device (which would refer to the exemplary mobile device specifically), the patents refer to the operating system that controls *a* mobile device (which refers to mobile devices generically). Similarly, the statement does not refer to *an* operating system *that may control* a mobile device (which would refer to a generic and optional operating system) but rather refers to *the* operating system *that controls* a mobile device (which refers to a specific and necessary operating system). In the patents, a "mobile device" is controlled by a "mobile operating system."

Accordingly, the Court construes "mobile device" and "mobile computing device" as follows:

- "mobile device" means "computing device capable of being easily moved and that is controlled by a mobile operating system"; and

- "mobile computing device" means "computing device capable of being easily moved and that is controlled by a mobile operating system."

### C. "monitoring criterion"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "monitoring criterion" <br> • '571 Patent Claims 1, 9 <br> • '090 Patent Claims 1, 11 | one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection | No construction necessary. <br><br> Alternatively: <br> • one or more standards, including things perceptible to the human eye, such as for identifying edges ("edge detection") or corners ("corner detection") |

### The Parties' Positions

Plaintiff submits: The '571 and '090 Patents define monitoring criterion by providing a list of criteria at, e.g., '571 Patent col.4 ll.3–8: "The monitoring criteria may be based on one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection, as described further herein." These were the check-imaging criteria recognized in the industry at the time of the invention. And as these criteria are monitored by a processor, they are not necessarily perceptible to the human eye. Dkt. No. 81 at 15–17.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.4 ll.3–8, col.7 ll.41–51, col.14 ll.11–17. **Extrinsic evidence**: Calman Decl. ¶¶ 72–73 (Plaintiff's Ex. 5, Dkt. No. 81-5); Saffici Dep. at 38:13–20 (Plaintiff's Ex. 10, Dkt. No. 81-10); Federal Reserve Financial Services, *Image Cash Letter Customer Documentation* at 19 (Version 1.8, Oct. 1, 2008) (Plaintiff's Ex. 12, Dkt. No. 81-12 at 19); Alexander Dep. at 9:20 – 10:3 (Plaintiff's Ex. 14, Dkt. No. 81-14); Financial Service Technology Consortium, *Image Quality and Usability Assurance: Phase I Project* at 2 (Version 1.0.0, July 23, 2004) (Plaintiff's Ex. 18, Dkt. No. 81-18 at 3).

Defendant responds: The list of criteria provided in the patents is not limiting. Rather, it states that the monitoring criteria "may be based on" the various listed attributes. Other monitoring criteria are described in the patents, such as dimensions, positioning, edge detection, and detectability or readability of a MICR line. That is, the listed criteria are exemplary, not definitional. And such criteria may be perceptible to the human eye, even though they need not be perceptible to the human eye. They are not necessarily imperceptible to the human eye. Dkt. No. 84 at 19–21.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.3 l.58 – col.4 l.8, col.7 ll.30–33, col.7 ll.48–57, col.8 ll.40–41; '090 Patent col.4 ll.10–27, col.7 ll.52–57, col.8 ll.4–14, col.8 ll.66–67 **Extrinsic evidence**: Calman Dep. at 69:20–23 (Defendant's Ex. E, Dkt. No. 84-5).

Plaintiff replies: The list of monitoring criteria is both definitional and not exhaustive. The list defines the categories of features that may be monitoring criteria, but does not define, or mention, every technical feature of the defined categories. That is, every monitoring criterion fits within the listed categories but not every criterion is listed. And that a criterion "may be" of the list indicates that monitoring may be based on one or more of the categories, but not necessarily all the categories. Dkt. No. 85 at 12–13.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.3 l.58 – col.4 l.8, col.7 ll.30–33, col.7 ll.48–57, col.8 ll.40–41; '090 Patent col.4 ll.10–27. **Extrinsic evidence**: Saffici Dep. at 38:13–20 (Plaintiff's Reply Ex. 6, Dkt. No. 85-6); Liang Dep. at 51:16 – 52:11 (Plaintiff's Reply Ex. 7, Dkt. No. 86).

<u>**Analysis**</u>

There are two issues in dispute. First, whether "monitoring criterion" is defined in the patents as Plaintiff contends. It is not. Second, whether a "monitoring criterion" is necessarily imperceptible to the human eye. It is not.

The monitoring criteria of the '571 and '090 Patents are not limited as Plaintiff contends. The list of criteria is expressly exemplary. For example, item 830 of Figure 8 of the '571 Patent provides: "Monitor image in field of view of camera with respect to monitoring criteria (***e.g.***, light contrast, light brightness, positioning, dimensions, tolerances, character spacing, skewing, warping, corner detection, MICR line detection, ***etc***.)" (emphasis added). This is both exemplary ("e.g.") and non-exhaustive ("etc."). This expressly exemplary language cuts against Plaintiff's proposed interpretation of the passage at '571 Patent col.4 ll.3–8: "The monitoring criteria may be based on one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection." Given the express exemplary nature of the substantially identical language in Figure 8, the "may be based on" language in the description is best understood to denote that the entire list is exemplary rather than that a particular criterion is based on at least one of the items in the list but not necessarily on all items in the list or that not every item in the list must be used to monitor.

The "monitoring criteria" of the patents are features of an image that are used as part of the quality-control process. "To increase the likelihood of capturing a digital image of the check 108 that may be readable and processed such that the check 108 can be cleared, the image is monitored for compliance with one or more monitoring criteria, prior to the image of the check 108 being captured." '571 Patent col.3 ll.54–58. Various monitoring criteria are disclosed, but the common

characteristic is that each criterion is related to the suitability of the image to fulfill the purpose of the imaged check ('571 Patent) or target document ('090 Patent). *See, e.g.*, '571 Patent col.3 ll.61–64 ("An application may monitor whether the check 108 is sufficiently within the frame of the camera and has a high enough quality for subsequent processing."); col.4 ll.17–22 ("By ensuring that the image of the check passes monitoring criteria during pre-image capture monitoring, the number of nonconforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing."); col.7 ll.52–57 ("In an implementation, corner detection itself may be a monitoring criterion, such that if corner detection of the check 108 in the image 230 is achieved, then it may be concluded that the image 230 may be properly processed and cleared by a depository (i.e., the image 230 passes the monitoring criteria)."); col.13 ll.38–40 ("Compliance with the monitoring criteria is intended to ensure that the image of the check is suitable for one or more processing tasks."); col.16 ll.5–13 ("The user may initiate the capture of the image … or the image may be captured automatically … as soon as the image in the field of view is determined to have passed the monitoring criteria. In this manner, the occurrence of nonconforming images downstream … is reduced, and there is a high confidence that the image will be properly processed downstream.").

The monitoring criterion neither requires nor excludes a feature that is perceptible to the human eye. The monitoring of the monitoring criteria is repeatedly described and claimed as performed by a device rather than a human. *See, e.g.*, '571 Patent col.1 ll.40–43 ("The monitoring may be performed by the camera, the mobile device, and/or a financial institution that is in communication with the mobile device."); col.8 ll.40–45 ("In an implementation, a monitoring criterion may be whether the MICR line can be detected and/or read. Any known MICR line detection technique( s) may be used by the camera 207, the mobile device 106, and/or the financial

institution ( e.g., using an image processor, for example) to detect the MICR line on the check 108 in the image 230."). There is nothing in the patents that suggests that a human may perform the monitoring and the Court does not here hold that human monitoring is encompassed by any claim. But there is also nothing in the patents to suggest that a monitoring criterion is necessarily imperceptible to the human eye. Indeed, many of the criteria appear to encompass features that could be perceptible to a human, such as light contrast, light brightness, positioning, and dimensions. *See id.* at col.4 ll.3–8.

Accordingly, and giving effect to the different contexts the claims of the '571 Patent (which are directed to "check" imaging) [13] and those of the '090 Patent (which are directed to "document" imaging") the Court construes "monitoring criterion" as follows:

- '571 Patent: "monitoring criterion" means "one or more features of a check image that provide information about the suitability of the image to represent the check"; and

- '090 Patent: "monitoring criterion" means "one or more features of a document image that provide information about the suitability of the image to represent the document."

---

[13] The PTAB recently determined that "monitoring criterion" of Claim 1 of the '571 Patent "can include 'one or more' features of an image of a check that can affect whether check data can be electronically obtained from the check, such as [a list of example monitoring criteria]." Decision, *Wells Fargo Bank, N.A. v. United Services Automobile Association*, CBM2019-00004, paper 22 at 17–21 (PTAB May 15, 2019), Dkt. No. 89-1 at 18–22. The Court understands the PTAB language to reflect that the criteria include "information about the suitability of the image to represent the check."

### D. The Capture Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "automatically capture the image of the check when the image of the check is determined to align"<br><br>• '779 Patent Claims 1, 10 | the processor controls capture of an image of the check automatically when the processor determines that the check aligns with the alignment guide | capture an image of the check automatically (without human intervention) at the time when the check aligns with the alignment guide |
| "automatically capture information of the instrument when the at least one feature aligns with the alignment guide"<br><br>• '517 Patent Claim 1 | the processor controls capture of information of the instrument automatically when the processor determines that the at least one feature aligns with the alignment guide | capture information from the instrument automatically (without human intervention) at the time when the check aligns with the alignment guide |
| "automatically capture the information of the instrument when the at least one feature is determined to align with the alignment guide"<br><br>• '517 Patent Claim 10[14] | the processor controls capture of information of the instrument automatically when the processor determines that the at least one feature aligns with the alignment guide | capture information from the instrument automatically (without human intervention) at the time when the check aligns with the alignment guide |
| "capture the image of the check [with/using] the camera when the image of the check [in the field of view] passes the monitoring criterion"<br><br>• '571 Patent Claims 1, 9 | All variations: the processor controls the capture of an image of the [target document/check] automatically when | capture an image of the [target document/check] automatically (without human intervention) at the time when the |

[14] In the Parties' P.R. 4-5(d) Joint Claim Construction Chart, the parties mistakenly represent the capture language of Claim 10 of the '517 Patent as identical to the capture language of Claim 1 of the '517 Patent. Dkt. No. 88-1 at 20 (term no. 18). The correct language is listed here.

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "capturing the image of the check is performed automatically without user intervention when the image of the check passes the monitoring criterion"<br><br>• '571 Patent Claim 6 | the processor determines that the monitoring criteria are satisfied | monitored criterion is satisfied |
| "when the monitoring criterion is determined to be satisfied, control[ing] the image capture device to capture an image depicting the target document in the field of view of the image capture device"<br><br>• '090 Patent Claims 1, 11 | | |
| "configured to control the image capture device to capture the image automatically upon determining the monitoring criterion is satisfied"<br><br>• '090 Patent Claim 7 | | |
| "controlling the image capture device to capture the image depicting the target document comprises automatically capturing the image depicting the target document upon determining the monitoring criterion is satisfied"<br><br>• '090 Patent Claim 17[15] | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: The capture process is controlled by the processor and the process is not necessarily "without human intervention." As described in the Asserted Patents, a user may, for

---

[15] In the Parties' P.R. 4-5(d) Joint Claim Construction Chart, the parties mistakenly represent the capture language of Claim 17 of the '090 Patent as identical to the capture language of Claim 7 of the '090 Patent. Dkt. No. 88-1 at 8 (term no. 7). The correct language is listed here.

example, reposition the check as part of the capture process. And some claims expressly recite "without user intervention" while others do not. The capture process is not necessarily "at the time" the image is determined to satisfy the monitoring criterion/alignment. That is, the capture does not necessarily occur simultaneously with determining the monitoring criterion/alignment is satisfied, the capture may occur after. With respect to the '517 Patent, the information captured is "of" the instrument, not merely "from" the instrument. This encompasses information about the instrument, such as corner identification, and is not limited to information on the instrument. Dkt. No. 81 at 17–21, 30–31.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.1 ll.53–55, col.4 ll.24–26, col.10 ll.23–33, col.13 ll.34–44; '779 Patent col.6 ll.21–31; '517 Patent col.13 ll.41–46. **Extrinsic evidence**: Calman Decl. ¶¶ 78–79, 82–83 (Plaintiff's Ex. 5, Dkt. No. 81-5); Saffici Dep. at 24:20 – 25:22, 26:12–21 (Plaintiff's Ex. 10, Dkt. No. 81-10).

Defendant responds: The capture process proceeds automatically, meaning it proceeds "without human intervention." This is the plain meaning of "automatically" and it is how the term is used in the patents and during prosecution. And there is no suggestion in the patents that the user will reposition the check after the monitoring criterion/alignment requirements are met. The capture process proceeds when (or upon) the monitoring criterion/alignment requirements are met, meaning that as soon as the requirements are met, the capture occurs. This is not a simultaneity requirement but rather allows for the physical limitations of the monitoring/capturing components. Finally, the capture does not necessarily require a processor. Some claims recite a processor while others, such as Claim 11 of the '090 Patent, do not. Dkt. No. 84 at 21–28.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent, at [57] Abstract, col.1 ll.48–51, col.4 ll.27–30, col. 13 ll.34–44, col.16 ll.5–10, col.17 ll.53–56; '090 Patent, at [57] Abstract, col.1 ll.62–65, col.4 ll.47–50, col.16 ll.38–43; '779 Patent, at [57] Abstract, col.1 ll.53–56, col.4 ll.3–6, col.15 ll.10–20; '517 Patent, at [57] Abstract, col.1 ll.64–67, col.4 ll.14–17, col.15 ll.21–33; '571 Patent File Wrapper November 6, 2012 Appeal Brief at 8 (Defendant's Ex. K, Dkt. No. 84-11 at 9), January 17, 2013 Notice of Allowance (Defendant's Ex. L, Dkt. No. 84-12); '779 Patent File Wrapper August 28, 2012 Amendment at 9 (Defendant's Ex. I, Dkt. No. 84-9 at 10), November 8, 2012 Notice of Allowance (Defendant's Ex. J, Dkt. No. 84-10). **Extrinsic evidence**: Calman Dep. at 49:21 – 50:5 (Defendant's Ex. E, Dkt. No. 84-5); Calman Decl. ¶ 83 (Plaintiff's Ex. 5, Dkt. No. 81-5).

Plaintiff replies: The patents expressly allow for steps between satisfaction of the monitoring/alignment requirements and the image/information capture. For example, Claim 10 of the '571 Patent provides feedback to the user when the monitoring criterion is satisfied and "prior to capturing the image." As described in the patents, the capture occurs "after" the monitoring/alignment requirements are met, but not necessarily "as soon as" they are met. And as described, the user may perform steps after the requirements are met but before the capture. For example, the user may crop the image after the requirements are met but before the capture. Similarly, the user may flip a check after one side is captured in order to capture the other side. Dkt. No. 85 at 4–7.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.18 ll.56–59; '090 Patent col.8 ll.40–44, col.11 ll.54–58, col.13 l.64 – col.14 l.1, col.16 ll.16–26, col.17 l.64 – col.18 l.2, col.18 ll.18–31; '779 Patent col.7 ll.14–16,

col.15 ll.13–20; '517 Patent col.7 ll.21–30, col.8 ll.17–20, col.8 ll.23–31, col.10 ll.6–9, col.13 ll.49–54, col.15 ll.7–18; '571 Patent File Wrapper February 10, 2014 Amendment and Response at 3, 8 (Plaintiff's Reply Ex. 1, Dkt No. 85-1 at 10, 15); '779 Patent File Wrapper August 28, 2012 Amendment at 9 (Plaintiff's Reply Ex. 2, Dkt. No. 85-2 at 18). **Extrinsic evidence**: Calman Dep. at 50:15–19 (Plaintiff's Reply Ex. 5, Dkt. No. 85-5); Saffici Dep. at 9:9–11 (Plaintiff's Reply Ex. 6, Dkt. No. 85-6).

## Analysis

There are three issues in dispute. First, whether capturing an image or information "automatically" necessarily means without human intervention. It does, in the sense that the user does not intervene to control the capture (it is not a manual capture). Second, whether capturing an image or information "when" certain criteria are met means capturing it as soon as the criteria are met. It does not. Third, whether the image/information capture is necessarily controlled by a processor. It is not. As set forth below, the Court also declines to interpret all the Capture Terms to require automatic capture.

The Asserted Patent describe two modes of capturing an image: automatic capture and manual capture. For example, the '571 Patent provides:

> In an implementation, the image capture may be performed ***automatically*** by the camera, the mobile device 106, and/or the financial institution as soon as the image of the check 108 is determined to pass the monitoring criteria. Alternatively, the user 102 may ***manually instruct*** the camera to perform the image capture (e.g., by pressing a button the camera or the mobile device 106) after the user 102 receives an indication or other feedback that the image passes the monitoring criteria.

'571 Patent col.4 ll.27–34 (emphasis added). The '779 Patent similarly provides:

> When the check image 247 is within the alignment guide 235 (e.g., the edges 245 of the check image 247 are aligned with respect to the alignment guide 235, such as parallel to the associated portion of the alignment guide 235), the check image 247 and the background image 250 (if any) that are within the alignment guide may be captured either ***automatically*** (e.g., ***by the camera or the mobile device under direction of an application*** running on the camera 207 or the mobile device 106 or

the financial institution) or ***manually*** (e.g., by the user 102 pressing a button or making a selection on the camera 207 or the mobile device 106).

'779 Patent col.6 ll.21–31 (emphasis added).

The automatic-vs-manual distinction appears in the claims. For example, Claim 1 of the '571 Patent recites "capture the image of the check with the camera when the image of the check passes the monitoring criterion" while Claim 6, which depends from Claim 1, recites "wherein capturing the image of the check is performed automatically without user intervention when the image of the check passes the monitoring criterion." Claim 9 recites "capture the image of the check using the camera when the image of the check in the field of view passes the monitoring criterion" while Claim 11, which depends from Claim 9 through Claim 10 recites: "wherein the feedback comprises instructions to the user to capture the image of the check." Here the "feedback" is defined in Claim 10: "instructions that provide feedback, via the mobile device to the user, when the image of the check in the field of view passes the monitoring criterion, prior to capturing the image of the check." The contrast here between capturing automatically (Claim 6) and manually by the user (Claim 11) suggests that the capturing of the patents is neither inherently automatic nor inherently manual. This comports with the description of the inventions, as set forth above. Thus, the Court does not accept the parties' contentions that the claim language at issue is necessarily directed to automatic capture. *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (The Court "has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties.").

The automatic capture is distinct from the manual capture in that the manual capture requires the user to control the capture by, e.g., "pressing a button or making a selection on the camera … on the mobile device." '779 Patent col.6 ll.29–31. The automatic capture proceeds without this user intervention. *Id.* at col.6 ll.21–31.

The timing of the capture is not necessarily "as soon as" or, as Defendant phrases it, "at the time when," the monitoring or alignment criteria are met. The patents describe both capturing "as soon as" the criteria are met and "after" the criteria are met. For example, the '571 Patent describes that "the front of the check 108 has been captured after passing the monitoring criteria." '571 Patent col.11 ll.27–29; *see also, id.* at col.13 ll.34–38 ("The check processing module 454 may be configured, in one example, to cause the image monitoring and capture module 456 to monitor an image of at least one side of a check provided in a field of view of the camera 207 and then capture the image after it passes monitoring criteria."). The patent also describes that "the image capture may be performed automatically by the camera, the mobile device, and/or the financial institution as soon as the image of the check is determined to pass the monitoring criteria." *Id.* at col.1 ll.48–51. And, as set forth above, Claims 9 through 11 of the '571 Patent recite steps taken between the satisfaction of the monitoring criterion and capture of the image. That is, the capture may proceed at or after the moment the criterion is met.

Finally, the capture is not necessarily controlled by a processor, as Plaintiff contends. The patents describe that automatic capture may proceed "by the camera or the mobile device under direction of an application running on the camera 207 or the mobile device 106 or the financial institution." '571 Patent col.10 ll.23–31; '779 Patent col.6 ll.21–31. The Court understands such a capture to be controlled by the processor. But the patents also allow that the user may control the capture by, e.g., "the user 102 pressing a button or making a selection on the camera 207 or the mobile device 106." '571 Patent col.10 ll.21–31; '779 Patent col.6 ll.21–31. The Court understands that this capture is controlled by the user, not the processor. *See also* '571 Patent Claim 11 ("wherein the feedback [that the monitoring criterion has been satisfied] comprises instructions to *the **user** to capture the image of the check*" (emphasis added)).

Accordingly, the Court construes the Capture Terms (with surrounding claim language in some instances) as follows:

- "automatically capture the image of the check when the image of the check is determined to align with the alignment guide" means "capture an image of the check automatically, without the user instructing the device to perform the image capture, at or after the moment the check is determined to align with the alignment guide";

- "automatically capture information of the instrument when the at least one feature aligns with the alignment guide" means "capture information of the instrument automatically, without the user instructing the device to perform the image capture, at or after the moment the at least one feature aligns with the alignment guide";

- "automatically capture the information of the instrument when the at least one feature is determined to align with the alignment guide" means "capture information of the instrument automatically, without the user instructing the device to perform the image capture, at or after the moment the at least one feature is determined to align with the alignment guide";

- "capture the image of the check [with/using] the camera when the image of the check [in the field of view] passes the monitoring criterion" means "capture the image of the check [with/using] the camera at or after the moment the image of the check [in the field of view] passes the monitoring criterion";

- "capturing the image of the check is performed automatically without user intervention when the image of the check passes the monitoring criterion" means "capturing the image of the check is performed automatically without user

intervention at or after the moment the image of the check passes the monitoring criterion";

- "when the monitoring criterion is determined to be satisfied, control[ing] the image capture device to capture an image depicting the target document in the field of view of the image capture device" means "at or after the moment the monitoring criterion is determined to be satisfied, control[ing] the image capture device to capture an image depicting the target document in the field of view of the image capture device";

- "configured to control the image capture device to capture the image automatically upon determining the monitoring criterion is satisfied" means "configured to control the image capture device to capture the image automatically, without the user instructing the device to perform the image capture, at or after the moment the monitoring criterion is determined to be satisfied"; and

- "controlling the image capture device to capture the image depicting the target document comprises automatically capturing the image depicting the target document upon determining the monitoring criterion is satisfied" means "controlling the image capture device to capture the image depicting the target document comprises automatically capturing the image, without the user instructing the device to perform the image capture, depicting the target document at or after the moment the monitoring criterion is determined to be satisfied."

### E. "feedback" and "feedback information"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- | --- |
| "feedback"<br><br>• '571 Patent Claims 2, 10<br><br>"feedback information"<br><br>• '090 Patent Claims 1, 11 | instructions to the user regarding actions to take in order to satisfy one or more monitoring criteria based on analysis of the monitoring criteria by the system | No construction necessary<br><br>Alternatively:<br>• information or an instruction relating to an attempt to capture an image of the check |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The claims link feedback to instructions for satisfying the monitoring criteria. This is how feedback is described in the patents, information to assist the user to meet the monitoring criteria. This is more specific than just any information related to the capture process, as proposed by Defendant. Dkt. No. 81 at 21–24.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent fig.8, col.6 ll.17–22, col.8 ll.16–20, col.9 ll.39–43, col.17 ll.40–46. **Extrinsic evidence**: Calman Decl. ¶¶ 86–90, 93 (Plaintiff's Ex. 5, Dkt. No. 81-5); Usapkar Dep. at 88:19 – 89:3 (Plaintiff's Ex. 6, Dkt. No. 81-6); Saffici Dep. at 33:24 –34:5, 35:13–22 (Plaintiff's Ex. 10, Dkt. No. 81-10); Alexander Dep. at 23:3–11 (Plaintiff's Ex. 14, Dkt. No. 81-14).

Defendant responds: The term "feedback" is used in the Asserted Patents according to its common meaning and therefore does not need to be construed. Under this meaning, and as described in the patents, "feedback" may include, but is not limited to, instructions to a user to satisfy a monitoring criterion. For example, the '571 Patent provides that "feedback may also

advise the user … when the image … passes the one or more monitoring criterion." Dkt. No. 84 at 28–30. The term is used precisely this way in the claims. For example, Claim 10 of the '571 Patent recites providing feedback "when the image … passes the monitoring criterion."

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '571 Patent col.7 ll.13–28; '090 Patent col.7 ll.36–51. **Extrinsic evidence**: Calman Decl. ¶ 85 (Plaintiff's Ex. 5, Dkt. No. 81-5).

Plaintiff replies: In Claim 10 of the '571 Patent, the feedback is an instruction to take no further action. Dkt. No. 85 at 13.

Plaintiff cites further **intrinsic evidence** to support its position: '571 Patent col.7 ll.33–37.

### Analysis

The issue in dispute distills to whether "feedback" and "feedback information" are necessarily limited to instructions regarding actions to take in order to satisfy the monitoring criterion. They are not.

The feedback of the Asserted Patent relates to the image-capture process, but is not necessarily limited to instructions regarding how to satisfy the monitoring criteria. For example, the '571 Patent provides: "In an implementation, feedback may be provided to the user of the camera regarding the image of the check in the field of view. The user may reposition the check and/or the camera, for example, responsive to the feedback. Alternatively, the user may capture an image of the check responsive to the feedback." '571 Patent col.1 ll.51–56; *see also, id.* at col.4 ll.22–26 ("In an implementation, feedback may be provided to the user 102 regarding the image of the check in the field of view. Based on the feedback, the user 102 may reposition the check 108 and/or the camera, for example, or may capture an image of the check 108."), col.7 ll.26–28 ("The feedback may also advise the user 102 when the image 230 passes the one or more monitoring

criteria and to capture the image of the check 108."). The feedback to capture the image when the monitoring criterion is met is claimed in Claim 11: "wherein the feedback [that the monitoring criterion has been satisfied] comprises instructions to the user to capture the image of the check." That is, the patents expressly contemplate—and claim—feedback that is other than "instructions to the user regarding actions to take in order to satisfy one or more monitoring criteria based on analysis of the monitoring criteria by the system."

The feedback of the claims is defined in the claims. For example, Claim 2 of the '571 Patent states "instructions that provide feedback … regarding the image of the check with respect to the monitoring criterion prior to capturing the image of the check." Claim 10 recites: "instructions that provide feedback … when the image of the check in the field of view passes the monitoring criterion, prior to capturing the image of the check." And Claims 1 and 11 of the '090 Patent provide: "present feedback information describing an instruction for satisfying the monitoring criterion." In the context of the surrounding claim language, the meaning of "feedback" and "feedback information" is clear without construction.

Accordingly, the Court rejects Plaintiff's proposed construction and determines that "feedback" and "feedback information" each have their plain and ordinary meaning without the need for further construction.

### F. "identification information pertaining to the instrument"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "identification information pertaining to the instrument" <br><br> • '517 Patent Claim 5 | information pertaining to the identification of corners of the instrument | No construction necessary. |

Plaintiff submits: "Identification information" is used in the '517 Patent to refer to identification of the corners of the instruments. Dkt. No. 81 at 28.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '779 Patent col.13 ll.49–56. **Extrinsic evidence**: Calman Decl. ¶ 115 (Plaintiff's Ex. 5, Dkt. No. 81 5).

Defendant responds: The '517 Patent explains that "identification information" may include information other than corner identification, such as characteristics of MICR encoding. Dkt. No. 84 at 30.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '517 Patent col.8 ll.32–42.

**Analysis**

The issues in dispute distill to whether "identification information" is synonymous with "corner identification data." It is not.

The '779 Patent (and thus the '517 Patent) describe using information for a variety of identification purposes. For example, "the nine digit routing number located on the bottom left hand corner of the check" may be used to identify the paying bank. '779 Patent col.4 l.64 – col.5 l.2. This information may be extracted by "optically recogniz[ing] the characters on the MICR line." *Id*. at col.8 ll.21–31. In another example, "the corners and/or edges of the check" may be identified. *Id*. at col.8 ll.12–20. This can be used, for example, to crop the check. *Id*. Importantly, certain identification information is specifically denoted as "corner identification information" while other identification information is not. For example, the patents provide:

> In an implementation, coordinate data of the alignment guide may be provided to
> the depository. Such coordinate data may correspond to the coordinates of the

alignment guide in the field of view of the camera or in the image generated by the camera. Alternatively or additionally, the user can identify on the display of the captured image where each of the corners of the check is and the coordinate data (e.g., pertaining to the identified corners) and/or ***corner identification information*** may be provided to the depository along with the image of the check. The depository may use the coordinate data and/or corner identification information during subsequent processing such as cropping, edge detection, etc.

*Id.* at col.13 ll.36–43 (emphasis added). This suggests that "identification information" is not inherently "corner identification information." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (noting that the use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel").

Accordingly, the Court rejects Plaintiff's proposed construction and determines that "identification information pertaining to the instrument" has its plain and ordinary meaning without the need for further construction.

### G. "indicia"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "indicia"<br><br>• '517 Patent Claims 9, 18 | routing or account number | No construction necessary. |

**The Parties' Positions**

Plaintiff submits: The term is not defined in the '517 Patent and it does not have an accepted definition in the art, and therefore it should be given the meaning "magnetic indicia" carries in a prior-art reference ("*Swift*") cited on the face of the patent. Dkt. No. 81 at 28–29.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: U.S. Patent Application Publication No. 2007/0217669 at ¶ [0027] (Plaintiff's Ex. 13, Dkt. No. 81-13) ("*Swift*"). **Extrinsic evidence**:

Calman Decl. ¶¶ 117–120 (Plaintiff's Ex. 5, Dkt. No. 81-5); Saffici Dep. at 79:4–7 (Plaintiff's Ex. 10, Dkt. No. 81-10).

Defendant responds: The '517 Patent explains that an instrument (of the "instrument includes indicia" language at issue) is not necessarily a document that would have a routing or account number and thus it would be improper to limit "indicia" to a routing or account number. Moreover, the indicia described in the *Swift* reference is a specific indicia, a "MICR indicia," and it includes more than just account and routing numbers. Dkt. No. 84 at 31–32.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: U.S. Patent Application Publication No. 2007/0217669 at ¶ [0005] (Plaintiff's Ex. 13, Dkt. No. 81-13). **Extrinsic evidence**: Saffici Decl. at ¶¶ 25–29 (Defendant's Ex. C, Dkt. No. 84-3); Liang Dep. at 33:21 – 34:1, 38:1–5 (Defendant's Ex. F, Dkt. No. 84-6); Calman Decl. ¶ 120 (Plaintiff's Ex. 5, Dkt. No. 81-5); Calman Dep. at 54:17 – 55:15, 61:8–20 (Defendant's Ex. E, Dkt. No. 84-5).

## Analysis

The issue in dispute is essentially whether "indicia" should be narrowly interpreted as "MICR indicia" as that term is used in one of well over 1,000 references cited on the face of the '517 Patent. It should not.

The '779 Patent (and thus the '517 Patent) does not describe any particular marks or indications on an instrument as "indicia." The patent does, however, note that the user may "indicate an account number on the check 108 for depositing the funds." '779 Patent col.3 ll.27–29. This suggests that the scope of "indicia" should at least encompass such an indicator. The patent further discloses that an instrument may be processed to detect information that indicates relevant information on an instrument: "The detection operations may include any of the

following, for example: optically read the MICR line, courtesy amount recognition (CAR), legal amount recognition (LAR), signature block, and payee." *Id.* at col.13 ll.16–19. This suggests that all these instrument markings indicate something of interest and should be included within the scope of "indicia." Simply, "indicia" is a broad term and it is entitled to its broad meaning. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

The Court does not share Plaintiff's understand of the holding in *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307 (Fed. Cir. 2005). *V-Formation* states that it is proper to look to all the intrinsic evidence to understand patent-claim terms, including prior-art references cited on the face of a patent. *Id.* at 1311. The *V-Formation* issue was whether the scope of "releasably attached" encompassed parts attached with rivets. *Id.* at 1310. A prior-art reference cited on the face of the patent explained that parts attached with rivets are "permanently attached." *Id.* at 1311–12. This was properly "evidence that rivets are considered by persons of ordinary skill to be permanent fasteners." *Id.* That is, it was evidence of the specific meaning of a term in the art.

*V-Formation* does not, however, stand for the proposition that prior-art references must be consulted to interpret a term having an ordinary meaning if that term does not also have a specific meaning in the art. Plaintiff suggests that *V-Formation* mandates examining cited prior-art references for some kind of implicit patentee lexicography of lay terms as other than their lay meaning. Such an interpretation of *V-Formation* conflicts with well-established precedent stating that the standard for patentee lexicography is "exacting." *See, e.g., GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). It also improperly limits the base comprehension of the person of ordinary skill in the art, as if the lexicon of such a person is limited

to technical terms and the person is left grasping when terms with ordinary lay meanings are used in a patent. The Court rejects Plaintiff's suggestion that the person of skill in the art is so limited and presumes that such a person has a working knowledge of the English language.

Even when consulting the *Swift* reference, one cannot conclude that "indicia" is limited as Plaintiff proposes. Rather, "indicia" is used in its ordinary sense and is modified by "magnetic" or "MICR" to refer to specific indicia. *See, e.g., Swift* at ¶ [0003] ("The present invention relates to processing magnetic indicia"), ¶ [0005] ("In addition, the MICR indicia can include the drawee bank's transit or routing number, and the check sequence number."). This suggests that "indicia" is not inherently "magnetic indicia" or "MICR indicia." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (noting that the use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel"). Indeed, *Swift* explicitly states that MICR indicia is not necessarily limited to the "transit or routing number." Swift at ¶ [0005]. So even if *Swift* mandated that "indicia" in the '517 Patent means "MICR indicia"—and it does not—"MICR indicia" is not limited as Plaintiff contends.

Accordingly, the Court rejects Plaintiff's proposed construction and determines that "indicia" has its plain and ordinary meaning without the need for further construction.

### H.    "instrument"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "instrument"<br><br>• '517 Patent Claims 1, 10 | No additional construction necessary. | a document that defines rights, duties, entitlements, or liabilities, such as a negotiable instrument, a credit instrument, a debit instrument, a financial document, a vehicle accident document, or an insurance document |

<u>**The Parties' Positions**</u>

Plaintiff submits: The term "instrument" is used in the '517 Patent according to its ordinary sense to refer to documents of various sorts, but is not limited to financial documents. Dkt. No. 81 at 29–30.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Saffici Dep. at 29:23 – 30:4 (Plaintiff's Ex. 10, Dkt. No. 81-10).

Defendant responds: The "instrument" of the patent refers to documents of a certain character; namely, documents that define rights, duties, entitlements, or liabilities. It is a narrower term than "document" or "legal document." Dkt. No. 84 at 32–33.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '517 Patent col.2 l.65 – col.3 l.15, col.3 ll.41–47.

<u>**Analysis**</u>

The issue in dispute appears to be whether an "instrument" is just any sort of document. It is not.

The term "instrument" is used in the '779 Patent (and thus the '517 Patent) in the context of a "negotiable instrument." *See, e.g.*, '779 Patent col.2 l.54 – col.3 l.4. This "negotiable instrument" is distinguished from just "any form or document whose image may be captured with a camera." *Id*. at col.3 ll.30–37. From this, it appears that "instrument" is used in its customary sense to denote a document of some legal import. *See, e.g.*, *Morgan v. Huntington Ingalls*, 879 F.3d 602, 609 n.19 (5th Cir. 2018) ("An instrument is '[a] written document; a formal or legal document in writing, such as a contract, deed, will, bond or lease. … A document or writing which gives formal expression to a legal act or agreement for the purpose of creating, securing, modifying, or terminating a right.]'" (quoting *Black's Law Dictionary* 941 (4th ed. 1951))); *Murphy v. Verizon*

*Communs., Inc.*, 587 F. App'x 140, 144 (5th Cir. 2014) ("[T]he plain meaning of the term 'instrument,' [is a] 'written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate.'" (quoting *Black's Law Dictionary* 918 (10th ed. 2014))).

Accordingly, the Court construes "instrument" as follows:

- "instrument" means "document that defines rights, duties, entitlements, or liabilities."

### I. "alignment guide"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "alignment guide"<br><br>• '779 Patent Claims 1, 10<br>• '517 Patent Claims 1, 10 | No additional construction necessary. | any shape or indicator relating to alignment of a check [instrument] |

**The Parties' Positions**

Plaintiff submits: The "alignment guide" of the claims is used to align the "check" or "instrument." It is a guide for alignment. Dkt. No. 81 at 31–33.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '779 Patent col.13 ll.1–3, col.13 ll.31–34, col.14 ll.55–67. **Extrinsic evidence**: Calman Decl. ¶ 130 (Plaintiff's Ex. 5, Dkt. No. 81-5); Saffici Dep. at 84:1 – 85:1 (Plaintiff's Ex. 10, Dkt. No. 81-10).

Defendant responds: The '779 and '517 Patents explain that "any shape(s) or indicator(s) may be used" as the alignment guide. Dkt. No. 84 at 34.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '779 Patent col.6 ll.5–10; '517 Patent col.6 ll.14–21.

Plaintiff replies: Defendant's proposed construction excludes "self-crop tool," an exemplary alignment guide disclosed in the patents. Dkt. No. 85 at 13.

Plaintiff cites further **intrinsic evidence** to support its position: '779 Patent col.5 ll.42–48, col.6 ll.1–10.

<u>**Analysis**</u>

The issue in dispute appears to be whether the "alignment guide" may be "any shape or indicator." It may.

There appears to be no actual dispute over whether "alignment guide" refers to something used to guide alignment of the instrument. Indeed, there could not be an actual dispute since the aligning use is expressed in the claims. *See, e.g.*, '779 Patent Claim 1 ("determine whether the image of the check aligns with the alignment guide"). So, the dispute appears to be over what may act as the alignment guide. The patents answer that: "The alignment guide 235 is provided in FIG. 3 as a three sided bounding box (e.g., a rectangle in which one of the line segments or sides is removed), ***but any shape(s) or indicator(s) may be used***, such as vertical bars, parallel lines, a circle, a square, a bounding rectangle, or a self-crop tool, for example." '779 Patent col.6 ll.5–10. Thus, any shape or indicator may serve as an alignment guide. This expressly includes the "self-crop tool" within "any shape(s) or indicator(s)." Thus, Defendant's proposed construction does not exclude "self-crop tool" from the scope of "alignment guide."

Accordingly, the Court construes "alignment guide" as follows:

- "alignment guide" means "any shape(s) or indicator(s) for guiding alignment."

# IV.    CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed

in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 13th day of June, 2019.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE