# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION a Texas reciprocal inter-insurance exchange, | § § § § | |
| Plaintiff, | § § | Civil Action No. 2:18-CV-245-JRG |
| v. | § § | **JURY TRIAL DEMANDED** |
| WELLS FARGO BANK, N.A., a national banking association, | § § § § | **FILED UNDER SEAL** |
| Defendant. | § § § | |

# UNITED SERVICES AUTOMOBILE ASSOCIATION'S RESPONSE TO WELLS FARGO'S *DAUBERT* MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF ROY WEINSTEIN

10731213

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................................................................................................1

II. BACKGROUND.....................................................................................................1

III. ARGUMENT ..........................................................................................................3

    A. Mr. Weinstein Properly Apportions to Determine a Royalty Base ......................3

    B. Mr. Weinstein's Two Alternative Incremental Profits Analyses Are Both Proper........................................................................................................4

    C. Mr. Weinstein Did Not Violate The Convoyed Sales Standard ...........................7

    D. Mr. Weinstein's Analysis of Total Profits Attributable to MRDC is Proper...................................................................................................................8

    E. Mr. Weinstein Properly Relies On USAA Business Records Evidencing Marking Of The Asserted Patents ....................................................12

    F. Mr. Weinstein's Report Properly Includes Discussion of CBM Petitions and USAA's Patent Portfolio ................................................................13

IV. CONCLUSION .....................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ...................................................................................................3

*Bmc Software, Inc. v. Servicenow, Inc.*,
  No. 2:14-CV-903-JRG, 2016 WL 379620 (E.D. Tex. Feb. 1, 2016) .................................. 10, 11

*Carnegie Mellon University v. Marvell Technology Group*,
  No. 09–290, 2012 WL 3679564 (W.D. Pa. Aug. 24, 2012) .........................................................9

*Ericsson Inc. v. D-Link Sys., Inc.*,
  No. 6:10-CV-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013), *aff'd in
  relevant part*, 773 F.3d 1201 (Fed. Cir. 2014) ........................................................................8, 9

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  No. 13-CV-03999-BLF, 2015 WL 4129193 (N.D. Cal. June 8, 2015) .......................................9

*LaserDynamics, Inc. v. Quanta Comput. Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) .....................................................................................................10

*Mobile Telecommunications Techs., LLC v. Sprint Nextel Corp.*,
  No. 2:12-CV-832-JRG-RSP, 2014 WL 6997508 (E.D. Tex. Dec. 11, 2014) ............................3

*PACT XPP Techs., AG v. Xilinx, Inc.*,
  No. 2:07–CV–563–RSP, 2012 WL 1666390 (E.D. Tex. May 11, 2012) ....................................9

*Personal Audio, LLC v. Apple*,
  No. 9:09CV111, 2011 WL 13135065 (E.D. Tex. Aug. 19, 2011) ...................................... 11, 12

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011) .................................................................................................10

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) .....................................................................................................7

*TVIIM, LLC v. McAfee, Inc.*,
  No. 13-CV-04545-HSG, 2015 WL 4448022 (N.D. Cal. July 19, 2015) .....................................9

**Rules**

Fed. R. Evid. 602 ............................................................................................................................12

Fed. R. Evid. 702 ..............................................................................................................................3

Fed. R. Evid. 702(b) .........................................................................................................................3

|  | **Page** |
|---|---:|
| Fed. R. Evid. 703 | 3 |
| Fed. R. Evid. 901(b)(1) | 12 |

## I.   INTRODUCTION

Wells Fargo's motion to strike certain sections of Mr. Weinstein's report should be denied. Whether intentional or not, the motion is premised on an inaccurate characterization of the methodology used in the report. At base, there is a factual dispute. On one side are Wells Fargo's witnesses who actually understand the technology at issue in this case. And on the other side are Wells Fargo's attorneys and their damages expert who want to blink out of existence the facts of this case. Both Wells Fargo's validity expert in this case, as well as its corporate representative have acknowledged under oath the critical nature of auto-capture MRDC, the infringing functionality at issue in this case:

- Validity expert:  Ex. 1 (Saffici Dep. I), 92:23-93:8.

- Corporate representative: Ex. 2 (Ajami Dep.), 62:1-8.

## II.   BACKGROUND

The accused instrumentality in this case is Wells Fargo's mobile banking system which includes auto-capture mobile remote deposit capture system – MRDC. At trial USAA will establish that auto-capture MRDC is a functional part of the checking account product offered by Wells Fargo's consumer banking division as well as a functional part of the Wells Fargo's mobile application. According to Wells Fargo's validity expert,

███████████████████████████████████████████

███████████████████████████████ Ex. 1 (Saffici Dep. I), 92:23-93:8.

The Weinstein Report does not use the entire market value of either Wells Fargo's checking account product or MRDC as the royalty base. Instead, the report uses as a royalty base the apportioned contribution of auto-capture to the value of MRDC as the royalty base ("auto-capture value"). In particular, the report the calculates the incremental value of MRDC to Wells Fargo based on processing cost savings, capital cost savings, incremental profits from deposit growth, and ecosystem benefits. Ex. 3 (Weinstein Report), ¶ 151. The report then apportions this number based on the contribution of auto-capture to the value of MDRC, a factor derived from a detailed technical analysis by the technologist would built Bank of America's MRDC system. *Id.*, ¶¶ 152-153, 166; Ex. 4 (Calman Report), ¶¶ 392-522. The report then concludes that in a hypothetical negotiation Wells Fargo would claim ████████████████████████████

██████████████████████████████ Ex. 3 (Weinstein Report), ¶ 169.

Unsurprisingly, Wells Fargo's expert Mr. Gerardi advocates for a smaller damages number than the Weinstein Report, but a number of Mr. Geradi's conclusions are relevant. First, like the Weinstein Report, Mr. Gerardi attempts to quantify the value of MRDC as his starting point. He concludes that the only benefit is processing cost savings and therefore calculates the costs that would have to be expended if another more costly route of check deposit (i.e., teller or ATM) was used in lieu of MRDC. Schedule 5. He then apportions 6% of these cost-savings to auto-capture. Ex. 5 (Gerardi Report), ¶¶ 139, 152, Schedule 1. Mr. Gerardi concludes that USAA would receive 100% of the cost savings achieved by the auto-capture systems. ████████████████

███████████████████████████████████████████

████████████████████████████████████ Ex. 6 (Gerardi Depo.), 174:16-21. This is in contrast to the more conservative 86.8% number that Mr. Weinstein uses.

### III. ARGUMENT

#### A. Mr. Weinstein Properly Apportions to Determine a Royalty Base

Wells Fargo contends that "the Court should strike Mr. Weinstein's Report" because Mr. Weinstein's testimony "runs afoul of the longstanding requirement that he apportion his damages model." Mot. at 5. This argument directly contradicts Wells Fargo's assertions just pages later that Mr. Weinstein **does apportion** the value of MRDC related to the patented features. Mot. at 10

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████ *Id.* at 2 ████████████████████████████████████████

█████████████████████████████████████████████████████████████

Mr. Weinstein derives the apportionment factor from the analysis of USAA's expert Mr. Matthew Calman. Mr. Calman's apportionment analysis separates the value of the infringing features from the value of all other features. Ex. 4 (Calman Rept.) at ¶ 519 ███████

█████████████████████████████████████████████████████████████████████████████

████████████████/████████████████████████████████████████████████████████████

█████████████████████████████████████████████████/ (emphasis added).

Mr. Weinstein's reliance on Mr. Calman's opinion is proper. Fed. R. Evid. 702(b) (an expert may testify in the form of an opinion if "the testimony is based on sufficient facts or data."); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("The term 'data' is intended to encompass the reliable opinions of other experts."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device."); *Mobile Telecomms. Techs., LLC v. Sprint Nextel Corp.*, No. 2:12-CV-832-JR'G-RSP, 2014 WL 6997508, at *2 (E.D. Tex. Dec.

11, 2014) ("[Defendant] also briefly challenges [Plaintiff's damages expert's] reliance on [Plaintiff's technical expert]. (Mot. at 9.) But it is undisputed that [Plaintiff's damages expert's] is not a technical expert, and the Court observes that his reliance on a technical expert is both ***routine and unobjectionable*** given that [Defendant] had the opportunity to depose both [Plaintiff's damages and technical experts].") (emphasis added).

Wells Fargo's contention that "Mr. Weinstein did not conduct, rely on, or cite any market-based studies, surveys, or empirical data that the patented feature alone drives consumer demand for MRDC" (Mot. at 5) is both irrelevant and incorrect. It is irrelevant because Mr. Weinstein does not apply the entire market value rule. And it is incorrect because Mr. Weinstein cites surveys sponsored by the supplier of part of Wells Fargo's software, Mitek, which emphasizes the critical nature of auto-capture. Ex. 3 (Weinstein Report), ¶¶ 31, 100, 109-110. As a practical reality, it is only Wells Fargo's attorneys and damages expert who dispute the essentiality of auto-capture. As noted above, Wells Fargo's validity expert acknowledges this, Ex. 1 (Saffici Dep. I), 92:23-93:8, as does its corporate representative, who admitted he had ████████████████ ████████████████████████████████████████████ ██████████████████████ Ex. 2 (Ajami Dep.), 62:1-8.

**B.     Mr. Weinstein's Two Alternative Incremental Profits Analyses Are Both Proper**

There are substantial facts in the record establishing that a higher performing MRDC systems does not just save costs by shifting away from less efficient modes of deposit, it actually increases the amount of money deposited with the bank, through a combination of blocking of customer departure, attraction of new customers, and increasing account usage. Ex. 3 (Weinstein Report), ¶¶ 91, 123-124, 149. Internal Wells Fargo documents projected ████████ ████████████ Ex. 7 (WFB_00083189-203) at 193; Ex. 8 (WFB_00094425-439) at 429. As a result, USAA requested 30(b)(6) testimony on the profits Wells Fargo achieves from

checking account customers. The corporate witness admitted this data existed but had not collected it. Ex. 9 (Lockwood-Stein Dep.), 66:22-67:2. This deposition occurred on June 13, 2019 and since that point USAA repeatedly requested that Wells Fargo provide the information. See, e.g., Ex. 10 (7/11/19 Email to D. Williams).

At the time of Mr. Weinstein's report Wells Fargo still had not produced the actual data. The only facts available was a survey conducted by Wells Fargo that reported ▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. 3 (Weinstein Report), ¶¶ 93, 83; Ex. 11 (WFB_00051289). To ensure that this profit was only connected to profits from the checking account, as opposed to ancillary services purchased by the MRDC customer, ▮▮▮▮▮▮ ▮▮▮▮▮▮. Although not perfect, this was the best tool available to ensure that non-checking revenue was excluded. Mr. ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. 3 (Weinstein Report), ¶¶ 90-95. Ultimately, after apportionment down to the level of auto-capture, this resulted in an incremental profit of ▮▮▮▮▮▮ Ex. 23 (Weinstein, Exhibit 10C). Wells Fargo does not seek to strike this methodology.

On August 9, 2019, 20 days after the exchange of opening expert reports, Wells Fargo sent an email that, without any documentation, purported to represent what Wells Fargo claims it earns per checking account. Ex. 12 (8/9/19 Email From D. Williams). If correct, these data are of higher quality because they isolate out the earnings solely attributed to the checking account, as opposed to ancillary services that may be purchased by the checking account user. Mr. Weinstein explains that because of this, it was not necessary to apply the 20% apportionment factor he applied to the original survey data, which included profits other than from the checking account: ▮▮▮▮▮▮

██████████████████████████████████████████████████████████████

██████████████ Ex. 13 (Weinstein Supp. Report), n. 3. ████████████████ apportionment factor reflecting the percentage of MRDC customer deposits that are via MRDC to obtain the incremental profits attributable to MRDC. Ultimately, after apportionment down to the level of auto-capture, ████████████████████████████████████████ *Id.*, ¶ 3. It bears noting that Wells Fargo produced data indicated that profits from MRDC customers were 45% higher than non-MRDC customers, but Mr. Weinstein still used the general data across all customers produced on August 9. *Id.*, n. 1.

Wells Fargo apparently believes that the survey Mr. Weinstein relied on in his original report is an estimate of profits per checking account, just like its August 9 data and therefore Mr. Weinstein should have continued to apply the original 20% factor to isolate out profits solely attributable to the checking account. This is incorrect as the original survey makes clear:



Ex. 11. The original survey was simply annualized profit per "customer" who may buy many services from Wells Fargo; this is why it was substantially higher ████████ than the per checking account profits reported on August 9 ████████████████████████████████. Compare Ex. 12 (8/9/19 Email From D. Williams) and Ex. 11 (WFB_00051289). ████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is close to the average checking account profit reported in the August 9 email.

The new methodology is rigorous. First, it is basing profits solely on the checking account which is functionally connected to MRDC as required by case law. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995). Second, contrary to Wells Fargo's claim, Mr. Weinstein does not double count because: (1) for costs savings he continues to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ deposited checks that would have been deposited through another route but for MRDC; (2) for the incremental profits analysis, he only applies it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ an MRDC customer that are via MRDC to identify profits attributable to MRDC.

### C. Mr. Weinstein Did Not Violate The Convoyed Sales Standard

Mr. Weinstein's damages analysis does not include in its royalty base "sales" from anything other than the profit attributable to Wells Fargo checking accounts. See Section III.B above. Mr. Weinstein noted that there was substantial evidence that a high performing MRDC system increased sales of other products (such as credit cards and loans). Ex. 3 (Weinstein Report), ¶¶ 78-81. He did not include the profits from non-checking account products in his base for his profits analysis.

What Mr. Weinstein refers to as the "ecosystem" benefit of MRDC is not the profits from other services. Instead, it reflects the value of MRDC as a form of advertising and customer engagement. Mr. Weinstein is explicit that he is focusing solely on the advertising and customer engagement value: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3 (Weinstein Report), ¶150.

Wells Fargo's corporate representative repeatedly admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2 (Ajami Dep.), 80:19-81:4; 147:12-149:12. Indeed, Wells

Fargo lists "Brand Positioning/Reputation" as one of the three ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14 (Ajami Ex. 2), at 11, 13. Mr. Weinstein attempts to quantify these benefits. He relies on how much banks, such as USAA, pay to offer Zelle, an electronic payment system that replaces giving an individual cash or a check and also drives customers to the banks mobile application. Ex. 3 (Weinstein Report), ¶¶ 137-144. He lays a foundation for technological comparability. *Id.*, ¶¶ 131-141. Wells Fargo appear to dispute technological comparability but this is a fact question for the jury. It bears noting, however, that once again there is a gap between what Wells Fargo argues and what its witnesses admit. Wells Fargo's damages expert identified MRDC and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6 (Gerardi Depo.), 56:14-22. He then admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.,* 167:23-168:2. Wells Fargo's infringement expert admits ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 15 (Villasenor Depo.), 106:16-20.

**D.      Mr. Weinstein's Analysis of Total Profits Attributable to MRDC is Proper**

As part of Mr. Weinstein's damages analysis, he first calculates the benefit to Wells Fargo of MRDC during the infringement period, and then apportions from this the value of the patented auto-capture system to use as his royalty base. Ex. 3 (Weinstein Report), ¶¶ 151-153, 166.

Mr. Weinstein is not going to tell the jury that USAA is entitled to all of the benefits attributed to MRDC. But Wells Fargo wants to prevent Mr. Weinstein from explaining his methodology in a clear fashion. Mot. at 10. Without at least briefly disclosing the value he attributed to MRDC, he cannot explain his apportionment process.

The law plainly allows an expert to use the value of the infringing product as a starting point in an apportionment analysis. For example, in *Ericsson*, the Federal Circuit affirmed the district court's admission of expert testimony that started with the whole product price but

properly apportioned down to the "market value of the contribution of the asserted patents to the end products." *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, at *15 (E.D. Tex. Aug. 6, 2013), *aff'd in relevant part*, 773 F.3d 1201 (Fed. Cir. 2014). Similarly, in *Carnegie Mellon University v. Marvell Technology Group*, No. 09–290 (Civil), 2012 WL 3679564, at *4 (W.D. Pa. Aug. 24, 2012), the found plaintiff's expert "has not applied the entire market value rule simply by referencing [defendant's] total operating profit on a per unit-basis. Instead she has used the average operating profit as a starting point for her apportionment analysis." *See also PACT XPP Techs., AG v. Xilinx, Inc.*, No. 2:07–CV–563–RSP, 2012 WL 1666390, at *2 (E.D. Tex. May 11, 2012) (finding that although the plaintiff's expert started with the whole product price, the expert "apportioned the average sales prices of the accused products to account for the contribution of the unpatented features to the accused products' value, and therefore did not invoke the entire market value rule"); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 4129193, at *4 (N.D. Cal. June 8, 2015) (noting that "total revenues for the accused products . . . is relevant and probative if properly apportioned" and permitting patentee to use such revenues "as a starting point for a properly apportioned royalty base.").

Wells Fargo's attempt to hamstring Mr. Weinstein from presenting clear testimony on his calculations of a royalty base should be rejected. Wells Fargo ignores that "[t]estimony regarding the starting point of [an] apportionment analysis is highly relevant and necessary to permit the jury to evaluate the basis for and reasonableness of [the] apportionment approach: without it, [the] opinion would be subject to persuasive attack as untethered to any objective measure of the value of the accused feature." *TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-04545-HSG, 2015 WL 4448022, at *2 (N.D. Cal. July 19, 2015). As the court explained in *Carnegie Mellon*, "an apportionment analysis needs to start somewhere, and simply starting with the total operating profit does not inherently invoke the entire market value rule." *Carnegie Mellon,* 2012 WL 3679564, at *4.

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) is on point. In that case the patent covered a saw guard. The expert was allowed to testify to the jury regarding the per unit cost of replacing the saw that was used with the infringing guard ("8,500 per unit"), and the per year amounts Home Depot paid for saw injuries. *Id.* at 1239, 1240. Simply put, the benefits of the saw enabled with the guard were the starting point presented to the jury.

None of the cases cited by Wells Fargo support excluding testimony by Mr. Weinstein about how he arrived at his royalty base calculations, by quantifying MRDC benefits and then apportioning down to the benefits attributed to auto-capture.

In *LaserDynamics*, the Federal Circuit concluded that the plaintiff's expert "unquestionably advanced an entire market rule value theory" when he brought a 6% royalty rate on an entire laptop down to a 2% royalty rate for just the accused disk drive using a method that "appear[ed] to have been plucked out of thin air." *LaserDynamics, Inc. v. Quanta Comput. Inc.*, 694 F.3d 51, 68-69 (Fed. Cir. 2012). The court therefore did not have occasion to address an appropriate starting point for an apportionment analysis, given that the expert did not properly apportion the royalty base at all, but instead applied an entire market value rule theory.

Auto-capture MRDC is a functional component of Wells Fargo's checking accounts as well as a functional component of its mobile application, which has other services besides MRDC. Mr. Weinstein is not attempting to testify as to the aggregate profits associated with checking accounts or with Wells Fargo's mobile application generally. He is simply going to explain to the jury briefly the total value of auto-capture MRDC so that he can then perform an apportionment to arrive at his royalty base for the hypothetical negotiation. The cases cited by Wells Fargo are not on point.

In *Bmc Software*, this Court made two rulings. First, although the royalty base of total revenues as to the accused products was the appropriate starting point, the apportionment factor the expert applied was flawed. *Bmc Software, Inc. v. Servicenow, Inc.*, No. 2:14-CV-903-JRG, 2016 WL

379620, at *3 (E.D. Tex. Feb. 1, 2016). Second, if the apportionment problem was corrected, the expert could testify "that what has heretofore been identified within [the expert's] reports (and those opinions of others he relied upon) as 50% of [Defendant's] total revenue for the accused products is simply the total monetary amount identified at issue in this case." *Id.*, at 4. This case is off point for two reasons. First, it actually allowed the expert to identify the starting royalty base number. Second, Mr. Weinstein is not starting with the total revenue from checking accounts (a component of which is MRDC) or the mobile application (a component of which is MRDC) unlike the multi-component product in *Bm*c. Mr. Weinstein is starting from the smaller auto-capture MRDC.

In *Content Guard Holdings, Inc. v. Amazon.com, In*c., the expert was instructed not to testify to the **total revenue** or **total profits** of the defendants (Apple, Google, Huawei, HTC, Motorola, and Samsung). The court said nothing about the expert testifying about the revenues generated **by the accused infringing products**. No. 2:13-CV-1112-JRG, 2015 WL 11089749, at *4 (E.D. Tex. Aug. 6, 2015).

In *Personal Audio*, the accused functionality was the ability to download playlists from iTunes onto an iPod. The court rejected the argument that an expert "improperly relied on the entire market value rule by 'testif[ying] as one of the checks in his analysis that his damages number would be 3 percent of the total iPod profits.'" *Personal Audio, LLC v. Apple*, Inc., No. 9:09CV111, 2011 WL 13135065, at *22 (E.D. Tex. Aug. 19, 2011); at *24 ("The court does not find that Mr. Nawrocki's statement that he apportioned approximately ninety-seven percent of Apple's per unit profit to Apple and three percent to the patented features 'skewed the damages horizon' for the jury or taints the jury's damages award.") That the court did not allow the expert to testify as to all profits from the iPod is not relevant here. Mr. Weinstein does not intend to testify as to all profits to Wells Fargo checking accounts, of the Wells Fargo mobile app. Mr. Weinstein's calculations as to the value of MRDC are already apportioned to exclude general

profits from checking accounts and the mobile app, and are more akin to the profits related directly to iTunes in the *Personal Audio* case.

### E. Mr. Weinstein Properly Relies On USAA Business Records Evidencing Marking Of The Asserted Patents

Wells Fargo argues that Mr. Weinstein cannot rely on a document when defining applicable marking date of the asserted patents because he cannot meet Rule 602's requirements for a fact witnesses. Mot., at 11. This is a strawman argument. Numerous fact witnesses will be competent to authenticate the printouts from the code systems for USAA's Deposit@Mobile that Mr. Weinstein relies on to define the beginning date of marking the extent Wells Fargo contests its authenticity. Ex. 3 (Weinstein Report), ¶ 50 (citing Exs. 20, 21); Fed. R. Evid. 901(b)(1). An expert is allowed to base their opinion on an underlying fact without personal knowledge.

To be clear, this is not a situation in which Mr. Weinstein is attempting to rely on a piece of inexplicable source code. The printout is clear on its face and includes the marking disclosure, with the lists of patents, in clear language:

```
Component Fields
disclosure      USAA's Deposit@Mobile and Deposit@Home products, including the corresponding
                portions of this website or application, may be covered by one or more of the
                following United States Patents. Additional patents are pending.

                Patent 8,708,227
                Patent 8,732,081
                Patent 9,224,136
                Patent 8,699,779
                Patent 8,977,571
                Patent 8,949,033
                Patent 7,962,411
Metadata Fields
metadata_tags effective_date     12/5/2016 12:00:00 AM
              release_date       1/1/1999 12:00:00 AM
```

Wells Fargo suggestion that it has been sandbagged regarding the marking information has no basis in fact. USAA's August 28, 2018 P.R. 3-1(f) disclosures (nearly a year before the close of fact discovery) disclosed that it was planning to contend that Deposit@Mobile practices the patents in suit. Ex. 16, 16. At the same time USAA offered to allow inspection of its code,

consistent with the protective order, on August 27 and again on August 28, 2018. *Id.*; Ex. 22. Because of its sensitivity, the protective order specifies in person review as opposed to physical production of code. No inspection request was made by Wells Fargo. Mr. Weinstein requested that the relevant portions of the code be printed out so that he could use the printouts for his expert report, and these printouts were produced **before** the close of fact discovery. Indeed, on the same day USAA produced these pages Wells Fargo produced over 60 files, totaling more than 300 pages and made major, substantive changes to its interrogatory responses. Engineers who were knowledgeable as to how Deposit@Mobile works were deposed after the source code was made available for inspection and Wells Fargo actually discussed whether the Deposit@Mobile practices the patents with these engineers.[1] USAA in its interrogatory response made clear that it believed the issue of marking was something that should be dealt with in expert reports. Ex. 18 at 32-33. In its opening reports, USAA presented expert testimony from Mr. Calman that Deposit@mobile practices the patents in suit (and therefore marking was required) and from Mr. Weinstein that the marking began on the date specified in the code made available for inspection nearly a year before the close of fact discovery. The fact that Wells Fargo chose not to inspect the code, chose not to dispute USAA's position that marking was the realm of experts, and chose not to present expert testimony challenging that Deposit@Mobile practiced the patents or challenging the authenticity of the code or what it shows is a strategic choice it made.

    F.    **Mr. Weinstein's Report Properly Includes Discussion of CBM Petitions and USAA's Patent Portfolio**

Wells Fargo objects to any discussion of the CBM denials involving the patents in suit. USAA only intends to introduce the CBM denials if Wells Fargo opens the door. There are two areas of concern. First, if Wells Fargo argues that art or arguments that were before the PTAB in the CBM proceedings were not before the PTO. And, second, if Wells Fargo argues that others

---

[1] Ex. 17 (Prasad Dep.), 72:17-75:7.

in the community questioned the validity of USAA's patents. In particular, Mr. Gerardi notes that certain third-party financial institutions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ before the CBM decisions issued as part of licensing negotiations. Ex. 5 (Gerardi Report), ¶ 72. Mr. Weinstein explains that publicly available statistics show the PTAB institutes CBM reviews a majority of the time and that the vast majority of patents are completely invalidated in CBM trials. *Id.* He also cites the testimony of Nathan McKinley, who was personally involved in USAA's licensing program and testified that the specter of Wells Fargo's then-pending CBM petitions had a direct impact on USAA's licensing efforts and the offers USAA was making to smaller banks. Ex. 19 (McKinley Depo.), 105:4-106:9. Wells Fargo cannot have it both ways. If it wants to rely on random hearsay comments from third parties that are not even specially directed to the patents in suit, USAA should have the right to put those discussions in context.

Wells Fargo's request to strike Mr. Weinstein's reference to USAA's "remote deposit capture" patent portfolio also makes little sense because Mr. Weinstein references this portfolio only once in his report, when describing the details of the license proposals made by USAA to Dollar Bank and Suncoast. Ex. 3 (Weinstein Report), ¶ 53. This will only become relevant if Wells Fargo opens the door. In particular, Mr. Gerardi, references in his report the Dollar Bank and Suncoast negotiations. Ex. 5 (Gerardi Report), ¶¶ 74-75. USAA believes these negotiations are not comparable and seeks to exclude them from the trial. If this motion is granted, Weinstein Paragraph 53 becomes irrelevant.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to exclude the opinions and testimony of USAA's expert Roy Weinstein.

|  |  |
|---|---|
| DATED: September 6, 2019 | Respectfully submitted, |

By: */s/ Robert C. Bunt*
Jason Sheasby - *Pro Hac Vice*
Lead Attorney
Lisa Glasser – *Pro Hac Vice*
Anthony Rowles - *Pro Hac Vice*
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Robert C. Bunt
TX Bar No. 00787165
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 418
Tyler, Texas 75702
Telephone: (903) 531-3535

**Attorneys for Plaintiff United Services Automobile Association (USAA)**

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2019 I caused a copy of the foregoing document to be served by electronic mail on Defendant's counsel of record.

*/s/ Benjamin Manzin-Monnin*
Benjamin Manzin-Monnin

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7, counsel for USAA met and conferred with counsel for Wells Fargo on August 20, 2019. The parties were unable to reach agreement and have reached an impasse, leaving an open issue for the court to resolve. This motion is opposed by Wells Fargo.

*/s/ Robert C. Bunt*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned hereby certifies that, under L.R. CV-5(a)(7)(B), the foregoing document is filed under seal pursuant to the Court's Protective Order entered in this matter (Dkt. No. 40).

*/s/ Robert C. Bunt*
