01:00:21

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                 MARSHALL DIVISION

3   UNITED STATES AUTOMOBILE      )(
    ASSOCIATION
4                                 )(    CIVIL ACTION NO.

5   VS.                           )(    2:18-CV-245-JRG

6                                 )(    MARSHALL, TEXAS
                                        OCTOBER 30, 2019
7   WELLS FARGO BANK, N.A.        )(    1:22 P.M.

8

9                    TRANSCRIPT OF JURY TRIAL

10                    AFTERNOON SESSION

11      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15  FOR THE PLAINTIFF:

16
    JASON SHEASBY
17  ANTHONY ROWLES
    LISA GLASSER
18  IRELL & MANELLA
    1800 Avenue of the Stars
19  Suite 900
    Los Angeles, CA 90067-4276
20

21
    ROBERT CHRISTOPHER BUNT
22  PARKER, BUNT & AINSWORTH, PC
    100 East Ferguson
23  Suite 418
    Tyler, TX 75702
24

25

```
 1   FOR THE DEFENDANT:

 2

 3   THOMAS M. MELSHEIMER
     M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

     E. DANIELLE T. WILLIAMS
 8   WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas   75670
22                        (903) 923-7464

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
           1              P R O C E E D I N G S
01:22:56   2         (Jury out.)
01:22:56   3         COURT SECURITY OFFICER:  All rise.
01:22:57   4         THE COURT:  Be seated, please.
01:23:03   5         Counsel, yesterday sometime, Plaintiffs filed a
01:23:57   6   third amended notice of narrowing claims, Document 291.
01:24:04   7   Anything either side files in this case from now until the
01:24:08   8   time we accept a verdict, I want a courtesy copy furnished
01:24:15   9   to the Court.  We had no idea it had been filed.  I don't
01:24:18  10   have the resources to be scouring the docket 24/7.
01:24:23  11         So if either side files something, make sure a
01:24:27  12   courtesy copy is delivered to the chambers.
01:24:30  13         All right.  Is there anything Plaintiff or
01:24:33  14   Defendant is aware of that should be taken up outside the
01:24:34  15   presence of the jury before I bring them in and give them
01:24:37  16   my preliminary instructions?
01:24:39  17         MR. SHEASBY:  Nothing for Plaintiff, Your Honor.
01:24:40  18         MR. MELSHEIMER:  Nothing for the Defendant, Your
01:24:41  19   Honor.
01:24:41  20         THE COURT:  All right.  Let's bring in the jury,
01:24:43  21   please, Mr. Johnston.
01:25:24  22         COURT SECURITY OFFICER:  All rise.
01:25:26  23         (Jury in.)
01:25:28  24         THE COURT:  Please be seated.
01:25:38  25         Welcome back, ladies and gentlemen.  We're going
```

01:25:48  1  to try to keep the case moving on a schedule I told you

01:25:51  2  about after jury selection.  But I have some preliminary

01:25:55  3  instructions that I want to give you before we start with

01:25:59  4  the opening statements from the lawyers and then get on to

01:26:02  5  the evidence.

01:26:02  6       You've now been sworn as the jurors in this case,

01:26:09  7  and, as the jury, you are the sole judges of the facts.

01:26:13  8  And, as such, you will decide and determine all the facts

01:26:16  9  in this case.

01:26:17  10      As the Judge, I'll give you instructions on the

01:26:20  11  law, decide questions of law that arise during the trial,

01:26:25  12  handle matters of evidence and procedure, oversee the flow

01:26:28  13  of the evidence during the trial, and maintain the decorum

01:26:32  14  of the courtroom.

01:26:32  15      At the end of the evidence, I'll give you detailed

01:26:36  16  instructions about the law to apply in deciding this case.

01:26:41  17  And I'll give you a list of questions that you are then to

01:26:44  18  answer.  This list of questions is called the verdict form,

01:26:49  19  and your answers to the questions will need to be

01:26:54  20  unanimous, and those answers to those questions will

01:26:57  21  constitute the jury's verdict in this case.

01:27:04  22      Now, I want to briefly tell you what this case is

01:27:06  23  about.

01:27:07  24      This case involves a dispute regarding certain

01:27:12  25  United States patents.  Now, I know that you've seen the

01:27:15  1   patent video film produced by the Federal Judicial Center,

01:27:20  2   but I want to give you some instructions here and on the

01:27:22  3   record about a patent and how one is obtained.

01:27:25  4        Patents are granted or denied by the United States

01:27:27  5   Patent and Trademark Office, sometimes simply called for

01:27:31  6   short, the PTO.

01:27:32  7        A United States patent gives the patentholder the

01:27:38  8   right for up to 20 years from the date the patent

01:27:44  9   application is filed to prevent others from making, using,

01:27:47  10  offering to sell, or selling the patented invention within

01:27:54  11  the United States or from importing it into the United

01:27:57  12  States without the patentholder's permission.

01:27:59  13        A patent is a form of property called intellectual

01:28:01  14  property.  And like other forms of property, a patent can

01:28:05  15  be bought or sold.

01:28:05  16        A violation of a patentholder's rights is called

01:28:12  17  infringement.  A patentholder may try to enforce a patent

01:28:16  18  against persons it believes to be infringers by filing a

01:28:21  19  lawsuit in federal court, and that's what we have before us

01:28:23  20  in this case.

01:28:24  21        The process of obtaining a patent is called patent

01:28:29  22  prosecution.  To obtain a patent, one must first file an

01:28:33  23  application with the United States Patent and Trademark

01:28:40  24  Office, or the PTO.

01:28:41  25        The PTO, ladies and gentlemen, is an agency of the

01:28:44  1  United States Government and employs trained examiners who

01:28:47  2  review patent applications.  The application submitted to

01:28:50  3  the PTO includes within it what is called a specification.

01:28:57  4       The specification contains a written description

01:29:00  5  of the claimed invention telling what the invention is, how

01:29:03  6  it works, how to make it, and how to use it.  The

01:29:07  7  specification concludes, or ends, with one or more numbered

01:29:12  8  sentences.  These numbered sentences are called the patent

01:29:16  9  claims.

01:29:17  10      When a patent is granted by the PTO, it's the

01:29:21  11  claims, ladies and gentlemen, that define the boundaries of

01:29:25  12  the patent's protection and give notice to the public of

01:29:29  13  those boundaries.

01:29:30  14      Patent claims may exist in two forms referred to

01:29:36  15  as independent claims and dependent claims.

01:29:42  16      An independent claim does not refer to any other

01:29:44  17  claim in the patent.  It is independent.  It's not

01:29:48  18  necessary to look at any other claim to determine what an

01:29:52  19  independent claim covers.

01:29:53  20      On the other hand, a dependent claim refers to at

01:29:58  21  least one other claim in the patent.  A dependent claim

01:30:03  22  includes each and every element or limitation of that other

01:30:07  23  claim or claims to which it refers or, as we sometimes say,

01:30:11  24  from which it depends, as well as the additional

01:30:17  25  limitations or elements recited within the dependent claim

01:30:20   1   itself.

01:30:20   2          Accordingly, to determine what a dependent claim

01:30:24   3   covers, it's necessary to look at both the dependent claim

01:30:28   4   itself and the independent claim or claims from which it

01:30:32   5   refers or from which it depends.

01:30:34   6          The claims of the patents-in-suit use the word

01:30:39   7   comprising.  Comprising means including or containing.  A

01:30:45   8   claim that includes the word comprising is not limited to

01:30:48   9   the methods or devices having only the elements that are

01:30:52  10   recited in the claim but also covers methods or devices

01:30:59  11   that add additional elements.

01:31:00  12          Take, for example, a claim that covers a table.

01:31:06  13   If a claim that covers a table recites a table comprising a

01:31:11  14   tabletop, legs, and nails, the claim will cover any table

01:31:15  15   that contains these structures even if the table also

01:31:19  16   contains other structures, such as leaves to go in the

01:31:25  17   tabletop or wheels to go on the ends of the legs.

01:31:28  18          Now, that's a very simple example using the word

01:31:31  19   comprising and what it means.  In other words, it can have

01:31:34  20   other features in addition to those that are covered by the

01:31:38  21   patent.

01:31:38  22          Now, to help you follow the evidence, I'll give

01:31:45  23   you a brief summary of the positions of the parties.  As

01:31:49  24   you all know, the party that brings a lawsuit is called the

01:31:52  25   Plaintiff.  The Plaintiff and the patent owner in this case

01:31:54   1   is United Services Automobile Association, which the

01:31:59   2   parties and I may simply refer to throughout the trial for

01:32:03   3   convenience as USAA.

01:32:04   4        And as you also know, the party against whom a

01:32:13   5   lawsuit is filed or brought is the Defendant, and in this

01:32:17   6   case, the Defendant is Wells Fargo Bank, N.A., which the

01:32:19   7   parties and I may simply refer to throughout the trial for

01:32:22   8   convenience as Wells Fargo.

01:32:22   9        We may also call them the Defendant.  And with

01:32:27   10  regard to USAA, we may also call it the Plaintiff.

01:32:30   11       Now, as I told you during jury selection, this is

01:32:33   12  a case of alleged patent infringement.  As I may have

01:32:37   13  already mentioned, there are two patents at issue in this

01:32:40   14  case.

01:32:43   15       The first is United States Patent 8,977,571.  And

01:32:49   16  you should know, ladies and gentlemen, that patents are

01:32:52   17  commonly referred to by their last three digits, so I will

01:32:56   18  refer to this patent and the parties will refer to this

01:32:58   19  patent simply as the '571 or the '571 patent.

01:33:02   20       The second U.S. patent at issue in this case is

01:33:06   21  United States Patent No. 9,818,090, which you will hear

01:33:12   22  referred to simply as the '090 or the '090, or some

01:33:18   23  variation thereof, patent.

01:33:20   24       These patents may be referred to at various

01:33:23   25  times -- these two patents -- as the patents-in-suit or the

01:33:26  1   asserted patents.  And these patents generally relate to

01:33:30  2   systems and methods for capturing an image of a check for

01:33:35  3   deposit using a mobile device.

01:33:36  4        You're going to have a complete copy of both of

01:33:42  5   these asserted patents in your juror notebooks, and you'll

01:33:44  6   be given your juror notebooks in a few minutes.

01:33:47  7        The Plaintiff in this case, USAA, claims that the

01:33:51  8   Defendant, Wells Fargo, is infringing Claims 1 through 6,

01:33:57  9   9, 12, and 13 of the '571 patent, as well as Claims 1

01:34:02  10  through 4, 7 and 10 of the '090 patent.

01:34:07  11       And you'll hear these claims referred to at times

01:34:11  12  throughout the trial collectively as the asserted claims.

01:34:17  13       USAA contends that Wells Fargo is infringing the

01:34:20  14  asserted claims by manufacturing, selling, offering to

01:34:24  15  sell, and importing into the United States, Wells Fargo

01:34:30  16  Mobile Deposit System.  USAA contends that this

01:34:33  17  infringement was willful.  USAA also contends that it's

01:34:40  18  entitled to money damages as a result of this infringement.

01:34:43  19       The Defendant, however, Wells Fargo, denies that

01:34:46  20  it is infringing any of the asserted claims of the

01:34:50  21  patents-in-suit.  Wells Fargo contends that -- that even if

01:34:55  22  they do infringe the asserted claims, any damages award to

01:35:00  23  USAA should be limited because USAA failed to properly mark

01:35:06  24  its products with notice of the asserted patents as

01:35:09  25  required by the patent laws.

01:35:10  1          Now, I know, ladies and gentlemen, that there are
01:35:15  2   a lot of new words and concepts that have been thrown at
01:35:18  3   you today.
01:35:23  4          I'm going to define a lot of those words and
01:35:25  5   concepts for you as we go through these instructions.
01:35:27  6          The attorneys for both of the parties are going to
01:35:30  7   discuss them in their opening statements.
01:35:32  8          The witnesses are also going to help you through
01:35:35  9   their testimony to understand these words and concepts.
01:35:38 10          So please do not feel overwhelmed at this point.
01:35:42 11   I promise you, it will all come together as we go through
01:35:47 12   the trial.
01:35:47 13          One of your jobs in this case is to decide whether
01:35:50 14   or not the asserted claims have been infringed.  If you
01:35:53 15   decide that any of the asserted claims have been infringed
01:36:00 16   by the Defendant, then you'll need to decide what amount of
01:36:03 17   money damages should be awarded to the Plaintiff as
01:36:05 18   compensation for that infringement.
01:36:09 19          The two primary issues that you are asked to
01:36:13 20   decide in this trial are whether the asserted claims have
01:36:16 21   been infringed and, if so, what amount of money damages
01:36:19 22   would fairly compensate Plaintiff for that infringement.
01:36:22 23          Now, in the patent film, which was shown to you
01:36:25 24   earlier today, you heard references to the issue of patent
01:36:29 25   validity.  That is not an issue that you will be asked to

01:36:32   1   decide in this trial.  And you should draw no inference one

01:36:35   2   way or another from the fact that you're not going to be

01:36:37   3   asked to decide issues of patent validity in this

01:36:42   4   particular case.

01:36:42   5        Again, the main issues that you will be asked to

01:36:45   6   decide in this case are whether or not any of the asserted

01:36:50   7   claims have been infringed and, if so, what would be a

01:36:52   8   proper damage award.

01:36:54   9        Now, my job in this case is to tell you what the

01:37:00   10   law is, to handle rulings on evidence and procedure, and to

01:37:03   11   oversee the trial, and maintain the decorum of the

01:37:06   12   courtroom.

01:37:06   13        In determining the law, it is specifically my job

01:37:11   14   to determine the meanings of any claim language from within

01:37:14   15   the asserted patents that needs construction or

01:37:17   16   interpretation.  I have already determined the meanings of

01:37:21   17   the claims in the patents-in-suit, and you must accept the

01:37:28   18   meanings and definitions that I give you and use those

01:37:30   19   meanings when you decide whether the asserted claims have

01:37:32   20   or have not been infringed.

01:37:34   21        Now, you're going to be given a document in a few

01:37:38   22   moments as a part of your juror notebooks that reflects

01:37:41   23   these meanings that I have already determined.  For any

01:37:44   24   claim term for which I have not provided you with a

01:37:48   25   definition or a meaning, you should apply the plain and

01:37:53  1   ordinary meaning.  If I provided you with a definition,

01:37:56  2   however, you are to apply my definition to those terms

01:37:59  3   throughout the case.

01:38:02  4        However, my interpretation of the language of the

01:38:04  5   claims should not be taken by you as an indication that I

01:38:08  6   have a personal opinion or any opinion at all regarding

01:38:12  7   issues, such as infringement.  Those issues are yours alone

01:38:16  8   to decide, ladies and gentlemen.

01:38:17  9        Now, I'll provide you with more detailed

01:38:23  10  instructions on the meaning of the claims before you retire

01:38:26  11  to deliberate and reach your verdict.  In deciding issues

01:38:29  12  that are before you, you'll be asked to consider specific

01:38:32  13  legal rules, and I'll give you an overview of those rules

01:38:36  14  now, and then at the conclusion of the case, I'll give you

01:38:39  15  much more detailed instructions.

01:38:40  16       The first issue that you're asked to decide is

01:38:43  17  whether the Defendant, Wells Fargo, has infringed the

01:38:46  18  asserted claims.  And USAA, the Plaintiff, must show you by

01:38:52  19  a preponderance of the evidence that the asserted claims

01:38:55  20  have been infringed.

01:38:59  21       Now, there are a few different ways that a patent

01:39:01  22  can be infringed.  I'll explain the requirements of each of

01:39:03  23  these types of infringement to you in detail at the

01:39:06  24  conclusion of the case, but, in general, a Defendant may

01:39:12  25  infringe an asserted patent by making, using, selling, or

01:39:15   1   offering for sale in the United States or importing into

01:39:17   2   the United States a product meeting all of the requirements

01:39:24   3   of a claim of the asserted patent or product that practices

01:39:28   4   the methods or processes covered by the asserted patent.

01:39:31   5        One way a patent can be infringed is by what is

01:39:33   6   called literal infringement.  Literal infringement occurs

01:39:40   7   when each and every element of an asserted claim is present

01:39:44   8   in an accused product.

01:39:46   9        However, even if an accused patent does not

01:39:49  10   literally infringe, it may still infringe in another way by

01:39:53  11   what is called the Doctrine of Equivalents.  Infringement

01:40:01  12   by the Doctrine of Equivalents occurs when one or more of

01:40:03  13   the elements of the claim is not literally met by being

01:40:07  14   found within the accused product, but the accused product,

01:40:11  15   nevertheless, performs substantially the same function as

01:40:14  16   the missing element in substantially the same way to

01:40:17  17   achieve substantially the same results.

01:40:19  18        Now, going back to an earlier example that I gave

01:40:23  19   you about a patent claim that recites a table comprising as

01:40:29  20   its elements a tabletop, legs, and nails, a table that, in

01:40:37  21   fact, contains a tabletop, legs, and nails would literally

01:40:40  22   infringe the patent claim.

01:40:41  23        However, a table that instead contained a

01:40:44  24   tabletop, legs, and screws instead of nails, might still

01:40:48  25   infringe the same claim under the Doctrine of Equivalents

01:40:51  1  if the screws, when used, perform substantially the same

01:40:56  2  function as the nails in substantially the same way to

01:40:59  3  achieve substantially the same result.

01:41:00  4       This is an example illustrating the Doctrine of

01:41:05  5  Equivalents.

01:41:05  6       I'll provide you with more detailed instructions

01:41:08  7  on the requirements for infringement at the conclusion of

01:41:12  8  the case.

01:41:12  9       If you find that the asserted claims are

01:41:19  10  infringed, you also then need to decide what amount of

01:41:22  11  money damages should be awarded to the Plaintiff, USAA, to

01:41:25  12  compensate it for that infringement.

01:41:30  13       A damage award, ladies and gentlemen, must be

01:41:33  14  adequate to compensate the patentholder for the

01:41:34  15  infringement.  Damages may not be less than -- than what

01:41:37  16  the patentholder would have received if it had been paid a

01:41:42  17  reasonable royalty for the use of its patent.

01:41:46  18       However, any damages that you award are meant to

01:41:48  19  compensate the patentholder and are not meant to punish the

01:41:52  20  Defendant.  You may not include in a damages award any

01:41:56  21  additional amount as a fine or a penalty above what is

01:42:00  22  necessary to fully compensate the patentholder for the

01:42:04  23  infringement.

01:42:05  24       Additionally, damages cannot be speculative.  And

01:42:09  25  the Plaintiff, USAA, must prove the amount of its damages

01:42:14  1  for the alleged infringement by a preponderance of the

01:42:16  2  evidence.

01:42:19  3       Now, under the patent laws of the United States,

01:42:21  4  USAA is required to mark its own products that practice the

01:42:25  5  patents-in-suit in order to give notice to others of those

01:42:30  6  patents.

01:42:30  7       If you find that at some prior time USAA failed to

01:42:35  8  properly mark its products as required, then USAA may only

01:42:40  9  recover damages for infringement that occurred after the

01:42:44  10  date USAA gave notice to Wells Fargo that USAA believed

01:42:49  11  Wells Fargo was infringing the patents-in-suit.  It will be

01:42:53  12  up to you to determine when such notice occurred.

01:42:56  13       I'll give you more detailed instructions on the

01:43:01  14  calculation of damages for the Defendant's alleged

01:43:05  15  infringement of the patents-in-suit at the conclusion of

01:43:08  16  the evidence, including by giving you specific instructions

01:43:11  17  regarding the calculation of a reasonable royalty.

01:43:20  18       However, ladies and gentlemen, the fact that I'm

01:43:22  19  instructing you on damages does not mean that USAA is or is

01:43:26  20  not entitled to recover damages.

01:43:32  21       Now, over the course of the trial, you're going to

01:43:34  22  be hearing from a number of witnesses in this case, and I

01:43:36  23  want you to keep an open mind while you're listening to the

01:43:38  24  evidence and not decide any of the facts until you have

01:43:41  25  heard all of the evidence.

01:43:47    1            This is important.  While the witnesses are

01:43:49    2    testifying, remember, ladies and gentlemen, that you will

01:43:50    3    have to decide and judge the degree of credibility and

01:43:54    4    believability to allocate to the witnesses and their

01:43:58    5    evidence.

01:43:59    6            So while the witnesses are testifying, you should

01:44:03    7    be asking yourselves things like this:  Does the witness

01:44:06    8    impress you as being truthful?  Does he or she have a

01:44:09    9    reason not to tell the truth?  Does he or she have any

01:44:13   10    personal interest in the outcome of the case?  Does the

01:44:16   11    witness seem to have a good memory?  Did he or she have an

01:44:20   12    opportunity and ability to observe accurately the things

01:44:24   13    that they testified about?  Did the witness appear to

01:44:27   14    understand the questions clearly and answer them directly?

01:44:33   15    And, of course, does the witness's testimony differ from

01:44:36   16    the testimony of other witnesses?  And if it does, how does

01:44:40   17    it differ?

01:44:40   18            These are some of the things that you should be

01:44:42   19    thinking about while you're listening to each and every

01:44:45   20    witness.

01:44:45   21            Also, I want to talk to you briefly, ladies and

01:44:52   22    gentlemen, about expert witnesses.  When knowledge of a

01:44:54   23    technical subject may be helpful to you, the jury, a person

01:44:58   24    who has special training and experience in that particular

01:45:01   25    field -- we refer to them as an expert witness -- is

01:45:07  1   permitted to testify to you about his or her opinions on

01:45:10  2   those technical matters.

01:45:14  3          However, you're not required to accept an expert

01:45:16  4   witness's or any other witness's opinions at all.  It's up

01:45:22  5   to you, the jury, to decide whether you believe an expert

01:45:25  6   witness, or any witness for that matter, and whether you

01:45:27  7   believe they're correct or incorrect or whether or not you

01:45:29  8   want to believe what they say.

01:45:31  9          Now, I anticipate that there will be expert

01:45:34  10  witnesses testifying in support of each of the parties in

01:45:37  11  this case.  But when they are called to testify, it will be

01:45:41  12  up to you to listen to their qualifications, and when they

01:45:45  13  give an opinion and explain the basis for it, you will have

01:45:48  14  to evaluate what they say and whether you believe it and

01:45:52  15  what degree, if any, that you want to give it weight.

01:45:55  16         Remember, ladies and gentlemen, judging and

01:45:59  17  evaluating the credibility and the believability of each

01:46:03  18  and every witness is an important part of your job as

01:46:09  19  jurors.

01:46:09  20         Now, during the trial, it's possible that there

01:46:14  21  will be testimony from one or more witnesses that are going

01:46:16  22  to be presented to you through what's called a deposition.

01:46:21  23  In trials such as this, it's difficult to get every witness

01:46:24  24  here in person at the same time.

01:46:28  25         So lawyers for each of the parties, prior to the

01:46:30  1  trial, take the depositions of the witnesses.  In a

01:46:34  2  deposition, the witness is present and placed under oath, a

01:46:38  3  court reporter is present, just as if the witness were in

01:46:42  4  open court.  The parties, through their counsel, ask the

01:46:45  5  witness questions, the witness answers them, and those

01:46:49  6  questions and answers are recorded.

01:46:50  7          Portions of those recordings -- some of them are

01:46:56  8  video recordings -- of the questions and the answers that

01:46:59  9  have previously been asked under oath to the witness, can

01:47:01  10  be played back to you during this trial as a part of the

01:47:05  11  evidence so that you can see the witness and hear their

01:47:08  12  testimony.

01:47:08  13          That kind of deposition testimony is entitled to

01:47:15  14  the same consideration, insofar as possible, and is to be

01:47:18  15  judged as to the credibility, weight, and otherwise

01:47:22  16  considered by you, the jury, in the same way as if the

01:47:25  17  witness had been physically present and given their

01:47:27  18  testimony from the witness stand in open court.

01:47:30  19          Now, during the trial of this case, it's possible

01:47:36  20  that the lawyers for each of the sides will make certain

01:47:39  21  objections.  And when they do, I will rule on those

01:47:41  22  objections.

01:47:41  23          It's the duty of an attorney for each side in the

01:47:44  24  case to object when the other side offers testimony or

01:47:47  25  other evidence that the attorney believes is not proper

01:47:51  1   under the rules of the Court, the Rules of Civil Procedure,

01:47:55  2   and the Rules of Evidence.

01:47:55  3         Upon allowing the testimony or other evidence to

01:47:59  4   be introduced over an objection of an attorney, the Court

01:48:03  5   does not, unless expressly stated, indicate any opinion as

01:48:07  6   to the weight or effect of such evidence.

01:48:11  7         As I've said before, you, the jury, are the sole

01:48:14  8   judges of the credibility and believability of all the

01:48:18  9   witnesses and the weight and effect to give to all of the

01:48:21  10  evidence.

01:48:22  11        Now, I want to compliment the parties in this

01:48:27  12  case, particularly their counsel, because prior to today,

01:48:30  13  they have worked with the Court very diligently to go

01:48:34  14  through and address the admissibility of many, many

01:48:38  15  exhibits that are going to be available through this trial.

01:48:42  16        Through pre-trial procedures that took place out

01:48:44  17  of your presence, the Court has already considered all the

01:48:48  18  disputes regarding possible exhibits in this case, and the

01:48:51  19  Court has ruled on those issues.

01:48:53  20        You may not understand this, but that has saved

01:48:57  21  you hours and hours of time that you do not have to sit and

01:49:01  22  listen to those arguments, as I did before you were

01:49:04  23  selected, and that has made it so that we can try this case

01:49:08  24  without the -- those disruptions and without those delays

01:49:13  25  in the process.

01:49:14  1        And counsel for both sides are to be thanked and

01:49:16  2  credited for working with the Court to cover all those

01:49:22  3  exhibit disputes prior to the time that trial began.

01:49:25  4        What this means, ladies and gentlemen, in addition

01:49:27  5  to saving you a lot of time, is that during the trial, when

01:49:32  6  a party shows you an exhibit, it means that I have already

01:49:35  7  ruled on that exhibit and its admissibility.  And if I had

01:49:38  8  not permitted it, it would not be shown to you.

01:49:41  9        This also means that counsel will not have to

01:49:43  10  present a formal offering, there will not be argument on

01:49:46  11  it, but it is already available to be used in the ordinary

01:49:51  12  presentation of each side's case as they deem appropriate.

01:49:54  13  They can present it to you and put it in the proper

01:49:56  14  context.

01:49:56  15        As I say, you may not fully understand this, but

01:50:01  16  this has saved hours and hours of your time, by the Court

01:50:04  17  taking these up with the parties and their counsel outside

01:50:08  18  of your presence.  And they're both to be commended for

01:50:11  19  working with the Court to get that done in advance.

01:50:14  20        But I want to let you know that all the sides have

01:50:18  21  worked -- both sides have worked hard to streamline that

01:50:21  22  issue.  And I promise you, that saved you a lot of time.

01:50:23  23        However, that notwithstanding, it is still

01:50:26  24  possible that over the course of the trial, objections will

01:50:28  25  arise during the case -- during the trial of the case.

01:50:32  1          If I should sustain an objection to a question

01:50:37  2    addressed to a witness, then you must disregard the

01:50:40  3    question entirely and draw no inference from it or its

01:50:43  4    wording or speculate about what the witness might have said

01:50:46  5    if I had allowed them to answer the question.

01:50:50  6          On the other hand, if I overrule an objection to a

01:50:53  7    question addressed to a witness, then you should consider

01:50:56  8    the question and the answer just as if no objection had

01:51:00  9    been made.

01:51:00  10          Now, you should understand, ladies and gentlemen,

01:51:06  11    that the law of the United States permits a United States

01:51:08  12    District Judge to comment to the jury regarding the

01:51:12  13    evidence in a case, but such comments from the Judge on the

01:51:16  14    evidence are only an expression of the Judge's opinion as

01:51:20  15    to that evidence, and the jury is free to disregard those

01:51:25  16    comments in their entirety because, as I've told you, you,

01:51:28  17    the jury, are the sole judges of the facts in this case.

01:51:31  18    You are the sole judges of the credibility and

01:51:34  19    believability of all the witnesses, and you are the sole

01:51:36  20    judges of what amount of weight, if any, to give to the

01:51:40  21    testimony and evidence.

01:51:40  22          I want you also to understand that even though the

01:51:43  23    law permits me to comment to you on the evidence, as I

01:51:48  24    indicated to you earlier during jury selection, it's my

01:51:50  25    intention to try very hard not to comment to you about any

01:51:55   1   of the evidence in this case because, as I've said,

01:52:01   2   deciding the facts from the evidence is your job.  It is

01:52:03   3   not my job in this trial.

01:52:06   4          Now, the court reporter in front of me,

01:52:08   5   Ms. Holmes, is taking down everything that is said by

01:52:11   6   anybody in this courtroom throughout the trial.  But the

01:52:13   7   transcript -- the written version of what is taken down is

01:52:17   8   not going to be available to you to take back to the jury

01:52:20   9   room and consider when you deliberate in this case.

01:52:24   10          That means, ladies and gentlemen, you're going to

01:52:27   11   have to rely on your memories of the evidence and the

01:52:30   12   testimony presented throughout the trial.

01:52:32   13          Now, in a moment, as I mentioned earlier, you're

01:52:36   14   going to be given a juror notebook.  In the back of this

01:52:38   15   notebook, you're going to find a brand-new legal pad that

01:52:41   16   you can use to take notes on throughout the trial if you

01:52:44   17   choose to take notes.

01:52:46   18          It's up to each of you to decide whether or not

01:52:49   19   you want to take notes during the course of the trial, and

01:52:52   20   if you do, how detailed you want your notes to be.

01:52:56   21          But, remember, any notes that you take are for

01:53:00   22   your own personal use.  You have to rely on your memory of

01:53:03   23   the evidence presented during the course of the trial, and

01:53:06   24   that's why you should be paying close attention to the

01:53:09   25   testimony of each and every witness.

01:53:11  1      You should not abandon your own recollection

01:53:15  2  because somebody else's notes indicate something different.

01:53:19  3  Your notes are to refresh your recollection, and that's the

01:53:22  4  only reason you should be keeping them, if you decide to

01:53:26  5  take them in the first place.  Again, that is up to you.

01:53:30  6      Now, I'm going to ask our Court Security Officer

01:53:33  7  at this time, Mr. Johnston, to pass out these juror

01:53:36  8  notebooks to each of the members of the jury.

01:54:22  9      Thank you.

01:54:22 10      In these notebooks, ladies and gentlemen, you'll

01:54:24 11  see that you each have a copy of the two asserted patents

01:54:27 12  that we've talked about.

01:54:29 13      Also, you'll find in these notebooks that there's

01:54:31 14  a section for witness pages where you should find a

01:54:34 15  separate page for each witness that might be called to

01:54:36 16  testify in this case.

01:54:38 17      And on that page for each appropriate witness, you

01:54:42 18  should find a picture of the witness, a head-and-shoulders

01:54:46 19  photograph, and their name.  The remainder of those pages

01:54:49 20  are left for you to take notes on if you choose to.

01:54:52 21      You'll also find that you have a claim

01:54:54 22  construction chart in there.  Those are the terms that the

01:54:58 23  Court has already defined, or construed, for you.  And

01:55:02 24  directly across from those terms are the definitions or

01:55:05 25  constructions that the Court has adopted.

01:55:09  1          You are required to use my constructions and

01:55:11  2    definitions of that language in the claims as you do your

01:55:16  3    job to determine whether or not there's infringement, and

01:55:19  4    if there is, what amount of damages would be proper.

01:55:24  5          Now, you'll also find in the very back a new legal

01:55:28  6    pad for additional note taking, and you should find a pen

01:55:30  7    in the front pocket of each of those notebooks, as well.

01:55:33  8          These notebooks, ladies and gentlemen, should be

01:55:34  9    with you throughout the trial.  They should either be in

01:55:37  10   your possession in the courtroom, or when you're not in the

01:55:40  11   courtroom, they should be in the jury room with you.  When

01:55:45  12   you leave each day, you should leave them closed on the

01:55:46  13   jury table in the jury room.

01:55:48  14         Now, there may be times during the trial that

01:55:54  15   we'll take a short recess, and I'll say to you, ladies and

01:55:57  16   gentlemen, you can simply close and leave your juror

01:55:59  17   notebooks in your chairs.  I'll do that when you're not

01:56:02  18   going to be out of the courtroom very long.

01:56:04  19         If you're going to be out of the courtroom for any

01:56:06  20   length of time, I'll ask you to take those notebooks with

01:56:08  21   you to the jury room.  But by and large, they should be in

01:56:12  22   your care and your possession and not left outside of your

01:56:16  23   own possession throughout the trial.

01:56:17  24         Also, in a minute, you're going to hear opening

01:56:21  25   statements from the lawyers in this case.  The opening

01:56:26  1   statements from the lawyers are designed to give you a

01:56:28  2   roadmap of what each side expects that the evidence will be

01:56:31  3   in this case.  Opening statements are not evidence.  Again,

01:56:36  4   they are an outline or roadmap to you about what each side

01:56:40  5   believes the evidence will be as it's put on later in the

01:56:44  6   trial.

01:56:45  7        And you should remember, ladies and gentlemen,

01:56:51  8   throughout this case, that what the lawyers tell you is not

01:56:53  9   evidence.  The evidence is the sworn testimony presented by

01:56:55  10  the witnesses either by deposition or live from the witness

01:56:59  11  stand where they're subject to being cross-examined.

01:57:04  12       Also, the evidence includes those documents and

01:57:07  13  other exhibits that the Court has previously admitted into

01:57:11  14  evidence after I've reviewed them under the Rules of

01:57:14  15  Evidence for their admissibility.  Those two things are all

01:57:16  16  of the evidence in this case; the testimony of the

01:57:19  17  witnesses and the admitted exhibits.

01:57:24  18       Now, what the lawyers tell you, as I've said, is

01:57:27  19  not evidence, but it's their impression of what they hope

01:57:32  20  the evidence will be.  And they have a duty to try and

01:57:34  21  point out to you what they believe the evidence will be.

01:57:36  22  But, again, what they tell you is not evidence.

01:57:40  23       Now, after each side, through its counsel, has

01:57:42  24  presented its opening statement, the Plaintiff will then

01:57:46  25  have an opportunity to call its witnesses and put on its

01:57:49  1   evidence.  This is called the Plaintiff's case-in-chief.

01:57:54  2          After the Plaintiff has called its witnesses and

01:57:56  3   put on its evidence, then it will rest its case-in-chief,

01:57:59  4   and then the Defendant will have an opportunity to call its

01:58:05  5   witnesses and put on its evidence as what's called the

01:58:08  6   Defendant's case-in-chief.

01:58:09  7          When the Defendant has completed that, they will

01:58:11  8   rest the Defendant's case-in-chief.  And when the Defendant

01:58:14  9   rests, then the Plaintiff will have an opportunity, if it

01:58:18  10  chooses to, to put on what's called rebuttal evidence to

01:58:22  11  rebut the evidence put on by the Defendants.

01:58:25  12         When the Plaintiff's rebuttal case is finished, if

01:58:31  13  they call rebuttal witnesses, and that is their option,

01:58:34  14  when that's done, then you will have heard all the evidence

01:58:36  15  in this case.

01:58:36  16         After you've heard all the evidence in this case,

01:58:40  17  I will give you written instructions, and I'll give them to

01:58:44  18  you both in writing and orally on the law that we've talked

01:58:48  19  about and the law that you are to apply in answering the

01:58:54  20  questions in the verdict form.

01:58:56  21         And, as I say, you're going to have these both

01:58:58  22  orally and in writing because I'm going to send back to you

01:59:01  23  when you retire to the jury room to deliberate, an

01:59:04  24  individual hard copy of my instructions to you in written

01:59:07  25  form that you can take with you.  I will give them to you

01:59:11  1  orally in the courtroom, and you'll have a written copy to

01:59:14  2  take with you when you retire to the jury room to

01:59:17  3  deliberate.

01:59:17  4       These instructions from me to you after all the

01:59:22  5  evidence is completed on the law that you are to apply is

01:59:25  6  called the Court's charge to the jury.

01:59:27  7       After I've given you my instructions, my charge to

01:59:32  8  the jury, then the lawyers for each side will present their

01:59:36  9  closing arguments, which are designed to point out to you

01:59:41  10  what they believe the parties have proved through the

01:59:43  11  evidence that they put on over the course of the trial.

01:59:47  12       After the lawyers have presented their closing

01:59:49  13  arguments to you, then I will instruct you to retire to the

01:59:53  14  jury room to take the written copy of the instructions I've

01:59:58  15  given, with you and to take a verdict form, which I will

02:00:00  16  have prepared, with you to the jury room, and then to

02:00:04  17  discuss among yourselves the evidence you've heard over the

02:00:07  18  course of the trial and arrive at unanimous answers to the

02:00:11  19  questions that are set forth in the verdict form.

02:00:13  20       Let me remind you of my earlier instruction.  You

02:00:18  21  are not to discuss this case among yourselves at all in any

02:00:23  22  way or with anyone else, but at the time that I instruct

02:00:27  23  you to retire to the jury room after you've heard the

02:00:31  24  lawyers' closing arguments, after you've heard my final

02:00:36  25  instructions on the law, called the Court's charge to the

02:00:38  1  jury, at that time, when I instruct you to retire to the

02:00:40  2  jury room, then you must discuss the evidence among

02:00:44  3  yourselves and discuss the case among yourselves in

02:00:47  4  attempting to arrive at unanimous answers to the questions

02:00:50  5  in the verdict form.

02:00:51  6       Let me also remind you again, that over the course

02:00:55  7  of the trial during the next week or so, when you pass one

02:00:59  8  or more of the lawyers or their associates or their

02:01:02  9  witnesses or anyone else related with either side of this

02:01:06  10  case in and about the courthouse, they're not going to

02:01:11  11  speak, they're not going to engage in conversation, they're

02:01:13  12  not going to be friendly and upbeat with you.  They're

02:01:16  13  going to ignore you.  They're going to ignore you because

02:01:19  14  I've instructed them to ignore you.  Don't take that

02:01:22  15  conduct on their part as being rude or unfriendly.

02:01:25  16  Understand that they're complying with what the Court has

02:01:28  17  instructed them to do.

02:01:29  18       With that, we will now hear opening statements

02:01:31  19  from the lawyers for both Plaintiff and Defendant.  We'll

02:01:35  20  begin with opening statements from the Plaintiff.

02:01:37  21       Mr. Sheasby, you may present Plaintiff's opening

02:01:39  22  statement at this time.

02:01:41  23       Would you like a warning on your time?

02:01:43  24       MR. SHEASBY:  With the Court's permission, I would

02:01:45  25  like a 15-minute warning and a 5-minute warning.

02:01:48  1          THE COURT:  All right.  You may proceed with your

02:01:54  2   opening statement.

02:01:54  3          MR. SHEASBY:  Good afternoon, ladies and gentlemen

02:01:56  4   of the jury.  My name is Jason Sheasby, and I've been asked

02:01:58  5   to speak on behalf of USAA.

02:02:03  6          I want to start by thanking you for your service.

02:02:06  7   I know this is an extraordinary burden, an extraordinary

02:02:09  8   burden, but I'd also like you to understand how incredibly

02:02:13  9   important of a case this is to USAA and its members.

02:02:16  10         I'd like to introduce myself.  I'm married.  I was

02:02:21  11  born and I spent my whole life in California.  My wife and

02:02:25  12  I have two young girls, and we also raise a niece and

02:02:30  13  nephew.

02:02:31  14         I want to amplify something that Judge Gilstrap

02:02:36  15  said when he talked about the constitutional foundation of

02:02:41  16  the jury system.  And I think what's important or -- at

02:02:46  17  least it's important to me -- is our founders when they

02:02:49  18  wrote the Constitution, they placed the power in the hands

02:02:52  19  of the people to decide.  The people decide.

02:02:55  20         And when people think about a right to a jury,

02:02:59  21  they think about USAA's right to a jury.  But I also want

02:03:03  22  you to think about it as your right as citizens.  This is

02:03:07  23  an incredibly important case, and the power the

02:03:14  24  Constitution places in your hand is absolute.  And it's a

02:03:18  25  profound honor and also a burden.

| | | |
|---|---|---|
| 02:03:22 | 1 | Just as the Constitution sets out the jury system, |
| 02:03:28 | 2 | the Constitution also created the patent system.  So think |
| 02:03:33 | 3 | about the -- the wisdom of our founders.  Hundreds of years |
| 02:03:39 | 4 | ago, our founders realized that, as a country, we're going |
| 02:03:44 | 5 | to be defined by and advance only if technology is |
| 02:03:50 | 6 | protected and respected.  And because of that, founders |
| 02:03:54 | 7 | created patent rights through the Constitution. |
| 02:03:57 | 8 | Patent rights are a constitutional right.  They're |
| 02:03:59 | 9 | a property right.  And because they're a property right, |
| 02:04:03 | 10 | the obligation to either cease using a patent or ask and |
| 02:04:08 | 11 | receive permission to use a patent, which is called a |
| 02:04:11 | 12 | license, is absolute. |
| 02:04:14 | 13 | And what I mean by that is, it doesn't matter if |
| 02:04:17 | 14 | it was an accident, it doesn't matter if you wound up |
| 02:04:19 | 15 | camping on someone's land and the next morning you realize |
| 02:04:22 | 16 | it's their land.  If it's their land, you must either |
| 02:04:26 | 17 | vacate the land or you must seek permission.  Those are the |
| 02:04:29 | 18 | only two options.  It doesn't matter if it was an accident. |
| 02:04:32 | 19 | It doesn't matter if it was unintentional.  Those are your |
| 02:04:37 | 20 | only two options. |
| 02:04:37 | 21 | Now, I want to introduce USAA for a moment.  USAA |
| 02:04:41 | 22 | was founded in 1923 by 25 United States Army officers in |
| 02:04:50 | 23 | San Antonio, Texas.  And they pooled their money together |
| 02:04:54 | 24 | to create a mutual. |
| 02:04:55 | 25 | And what a mutual is, is they insure each other. |

02:05:01  1   They protect each other.  And over the years this mutual

02:05:05  2   group of members has grown and grown and grown.  But

02:05:08  3   there's one thing that defines this measurement --

02:05:11  4   membership today just as it did in 1920s -- in the 1920s,

02:05:17  5   and that is that the membership of USAA is open to armed

02:05:23  6   service members, those who have been honorably retired from

02:05:27  7   the armed services, and their families.  And that makes up

02:05:28  8   the membership of USAA.

02:05:33  9          Now, there's two patents at issue in this case.

02:05:35  10  There's the '571 patent and the '090 patent.  And we're

02:05:39  11  going to refer to them by the last three digits.  And

02:05:41  12  you'll see they're owned by USAA.

02:05:44  13         And the technology at issue in this case relates

02:05:48  14  to something called mobile remote deposit capture.  And

02:05:50  15  some of you folks may have used it, some may have heard of

02:05:53  16  it.  It was mentioned earlier today.  And, basically, it

02:05:55  17  allows you to take a check -- take -- capture an image of a

02:05:59  18  check and deposit it through a bank.

02:06:01  19         Now, for a human, this is a relatively easy

02:06:06  20  process to take a picture of a check that you can read.

02:06:08  21  But there's a paradox.  What's easy for humans is

02:06:13  22  incredibly hard for machines, and what's easy for machines,

02:06:17  23  like calculating a thousand digits, is incredibly hard for

02:06:21  24  humans.  Although all of our checks are read by machines,

02:06:25  25  it's incredibly difficult to create an image of sufficient

02:06:28   1   quality that the machines can efficiently read the checks.

02:06:31   2        So what looks easy to us, I take a picture, oh,

02:06:35   3   this is fine, it can actually cause hundreds of millions of

02:06:38   4   dollars in costs to banks when they actually process the

02:06:41   5   check if the image is not captured correctly.

02:06:44   6        Now, you may be asking yourself the question what

02:06:47   7   is a -- a mutual based in San Antonio doing creating high

02:06:54   8   technology around mobile check deposit?  Well, there's an

02:06:59   9   answer to that question.  USAA has no branches, none.  Even

02:07:03   10  though it's grown to be one of the larger banks in the

02:07:06   11  United States, it has no branches.

02:07:07   12       And the reason why it has no branches is because

02:07:10   13  its members are deployed throughout the world.  So very

02:07:12   14  early on, USAA made a deep commitment to research and

02:07:18   15  development for the purposes of connecting themselves to

02:07:22   16  their members in the armed services spread throughout the

02:07:25   17  world.

02:07:25   18       And they didn't just make a commitment in the

02:07:29   19  sense of thinking about it, they actually put together an

02:07:33   20  elite group of applied researchers whose sole focus, sole

02:07:37   21  focus was to develop next generation technology.

02:07:41   22       And USAA was the first commercial bank anywhere in

02:07:46   23  the United States to ever implement MRDC technology.  And

02:07:49   24  the evidence will show that Wells Fargo was aware that USAA

02:07:55   25  was first.

02:07:59    1          In fact, the evidence will show, through the

02:08:01    2    corporate representative of Wells Fargo who was designated

02:08:04    3    to speak on behalf of the entire company, that they knew

02:08:08    4    that USAA was first in mobile remote deposit capture.

02:08:12    5          Now, although USAA was first with mobile remote

02:08:18    6    deposit capture, it didn't stop with just creating this

02:08:22    7    system.  It realized that because this paradox, what's easy

02:08:26    8    for machines, is hard for humans, and what's hard for

02:08:31    9    humans is easy for machines, they would need to develop a

02:08:34   10    system that would be able to ensure that check images that,

02:08:41   11    to us, look perfectly normal but to a bank -- to a machine

02:08:44   12    are indecipherable, can be avoided.

02:08:49   13          And so what they did is they created a system in

02:08:51   14    which a very complex software program, extremely complex

02:08:55   15    software program runs up through your mobile phone, through

02:08:57   16    that little app you press, this extremely complex system

02:09:02   17    allows the processor to autonomously monitor the check

02:09:08   18    images on its own without human intervention to determine

02:09:12   19    when the image is sufficient for a machine to read, which

02:09:15   20    is a very complex problem.

02:09:17   21          The process -- the bank can actually instruct the

02:09:20   22    user how to provide corrective feedback to -- to provide

02:09:25   23    feed -- gives the user corrective feedback so the user is

02:09:28   24    able to adjust the image.  Once again, not for their

02:09:32   25    benefit but for the machine's benefit.  And then the

02:09:36  1  processor automatically decides when to capture the image.

02:09:39  2      And this system is called auto capture.

02:09:42  3      Now, one of the witnesses that you will hear

02:09:46  4  from -- in fact, you'll hear from him this afternoon - is

02:09:53  5  Mr. William Saffici.  William Saffici is an expert that was

02:09:58  6  retained by Wells Fargo.  He's worked for a long period of

02:10:01  7  this case on behalf of Wells Fargo.

02:10:02  8      And you will hear in his testimony today that he

02:10:05  9  concedes that the patents-in-suit introduce autonomous

02:10:12  10  monitoring and corrective feedback techniques, and that is

02:10:15  11  referred to in the industry as auto capture.

02:10:18  12      Wells Fargo's own expert, who they retained early

02:10:20  13  in this case, has admitted that the patents cover what the

02:10:25  14  industry describes as auto capture.

02:10:26  15      Now, I want to just for a moment create a timeline

02:10:32  16  for you of the major events in USAA's research program.

02:10:38  17      So in 2006, USAA discovered that it could, with

02:10:44  18  careful effort, capture an image of a check with a digital

02:10:48  19  camera and allow that image to be fully machine processed

02:10:54  20  successfully for deposit.

02:10:54  21      In 2009, USAA filed the patents that are at issue

02:10:58  22  in this case.  Think about the -- think about the -- the

02:11:01  23  forward-looking nature of USAA.

02:11:04  24      So many years ago, they had predicted that

02:11:08  25  processors and smartphones would have the capability for

02:11:12  1   this autonomous monitoring that's used today.  In fact,

02:11:16  2   they launched the first generation system of MRDC at the

02:11:22  3   same time they were already creating the second generation

02:11:27  4   auto capture system.  The auto capture system is the system

02:11:30  5   that's at issue in this case.

02:11:31  6        In 2013, USAA actually launched its own auto

02:11:37  7   capture mobile remote deposit capture system.  In 2013,

02:11:39  8   USAA launched a system that was protected by the patents

02:11:43  9   that are at issue in this case.

02:11:45  10        And Wells Fargo has agreed that the USAA system

02:11:51  11   practices and is protected by the patents that are at issue

02:11:56  12   in this case.

02:11:57  13        And then in 2015, the United States Patent Office

02:12:05  14   formally granted patent rights to USAA on auto capture.

02:12:10  15        At that point, our property right came into

02:12:12  16   existence.  It's a constitutional property right, and it

02:12:15  17   cannot be violated.

02:12:17  18        Now, when USAA introduced auto capture to the

02:12:23  19   industry, it became extraordinarily important.  In fact,

02:12:27  20   Mr. Saffici, Wells Fargo's expert, will testify that auto

02:12:32  21   capture is widely acknowledged as the foundation for

02:12:37  22   successful mobile check deposit.  Those are the words of

02:12:40  23   Wells Fargo's own expert witness.

02:12:42  24        Now, we've spoken about USAA.  And now I want to

02:12:48  25   speak to you briefly about what Wells Fargo was doing.

02:12:51   1          Well, if you remember, USAA had successfully

02:12:56   2   deposited check images through a digital camera in 2006,

02:13:01   3   and it created the first MRDC system in 2009.

02:13:04   4          Well, where was Wells Fargo?  Well, Wells Fargo,

02:13:13   5   the evidence will show, was nowhere.  It was not until

02:13:15   6   2011, and you see this document from 2011, and I just want

02:13:17   7   to pause for a moment.  Do you see this yellow box that

02:13:20   8   says PX-0007?

02:13:23   9          That is an exhibit number.  You can write down an

02:13:30  10   exhibit number if you think it's important because you can

02:13:32  11   look at it during your deliberations.

02:13:35  12          And so what I'm going to try very hard to do is to

02:13:38  13   make sure that you always have exhibit numbers associated

02:13:42  14   with the statements I'm making.  Because as Judge Gilstrap

02:13:45  15   said, my statements are not evidence, but what is evidence

02:13:52  16   is what's marked with the orange sticker.

02:13:54  17          Now, just as Wells Fargo knew that it was behind,

02:14:00  18   it also knew something else.  This is from May of 2011.

02:14:04  19   This is what Wells Fargo told its executives candidly, they

02:14:10  20   said, if they were going to build a system on their own, it

02:14:13  21   would take them between nine or 18 months, and they said

02:14:17  22   something very important.  They said:  Technology could get

02:14:19  23   outdated since we would not have focused R&D.

02:14:23  24          Contrast this with USAA which had a dedicated

02:14:26  25   Applied Research Division.  Wells Fargo did not have

02:14:30   1   applied research.  It was going to need to do something

02:14:31   2   else if it was going to create an MRDC system to compete.

02:14:39   3        Well, Wells Fargo introduced the first generation

02:14:42   4   MRDC system that used manual capture.  They introduced that

02:14:46   5   system about three years after USAA.

02:14:49   6        And then after USAA had filed for its patents on

02:14:53   7   its auto capture system, had launched its patented auto

02:14:57   8   capture system, Wells Fargo then launched its own auto

02:15:03   9   capture system.

02:15:04  10        Now, this is sworn testimony from Mr. Paul Rosati.

02:15:10  11   He's a Wells Fargo manager.  He's actually responsible for

02:15:13  12   the -- for the mobile remote deposit capture system at

02:15:18  13   Wells Fargo.  And he said something very important.  He

02:15:20  14   says:  In Phase 2, the project involved the implementation

02:15:25  15   of what is commonly known in the industry as auto capture.

02:15:33  16        So this is Wells Fargo's own witness under oath

02:15:35  17   testifying that Wells Fargo adopted the industry standard

02:15:38  18   auto capture.

02:15:41  19        Now, if you remember a few slides ago, Mr. William

02:15:44  20   Saffici, Wells Fargo's expert, acknowledged that USAA's

02:15:51  21   patents cover what the industry describes as auto capture.

02:15:54  22   Mr. Saffici acknowledged USAA's patents cover auto

02:16:00  23   capture -- industry auto capture, and Mr. Rosati

02:16:03  24   acknowledged under oath that USAA used auto capture.

02:16:07  25        Now, counsel for Wells Fargo -- and I wrote down

02:16:09   1   what they said -- they're -- they're doing a narrow single

02:16:14   2   or narrow different way of doing auto capture, that we

02:16:19   3   cover just one small minor way of doing auto capture, and

02:16:22   4   there's many, many other ways to do it.

02:16:23   5        But that's not what Mr. William Saffici said under

02:16:27   6   oath.  And it's not what Mr. Paul Rosati said under oath.

02:16:32   7   We -- our patent is on the industry standard system, and

02:16:35   8   Wells Fargo uses that system.

02:16:36   9        So now just as we put up a timeline for USAA, we

02:16:40  10   can put up a timeline for Wells Fargo -- for Wells Fargo.

02:16:44  11        In 2012, three years after us, they launched their

02:16:48  12   first generation MRDC system.

02:16:50  13        In May of 2014, a year after us, they launched

02:16:54  14   their auto capture system.

02:16:58  15        Now, one of the things that's striking about their

02:17:01  16   conduct since May of 2014, the evidence will show this, is

02:17:04  17   that they didn't just release one infringing system.

02:17:08  18        THE COURT:  You've used 15 minutes.

02:17:09  19        MR. SHEASBY:  Thank you, Your Honor.

02:17:10  20        They actually repeatedly, again and again and

02:17:14  21   again, released infringing versions of the system.

02:17:18  22        Now, you'll notice that they started in 5/2014.

02:17:23  23   That was long after we filed our patent, but it was before

02:17:26  24   our patent was granted.

02:17:28  25        So from 5/2014 to 3/2015, we did not have our

02:17:33   1   constitutional property right.  We're not seeking any

02:17:37   2   damages for their conduct for that period of time.  It's a

02:17:40   3   bargain with the Patent Office that until we got our

02:17:43   4   constitutional right, we could not ask people to vacate our

02:17:47   5   land or agree to take -- or to vacate our land.

02:17:52   6        But once our constitutional right came into place

02:17:55   7   in 3/2015, they had an absolute obligation to vacate our

02:17:59   8   land.

02:17:59   9        What did they do?  After the patent was granted,

02:18:04  10   they issued 14 infringing versions of the application.

02:18:09  11        Well, in 2016 -- you'll hear Judge Gilstrap

02:18:15  12   mention the word "marking."  We formally marked our own

02:18:20  13   product with the '571 patent number, and we did that so

02:18:24  14   there would be no excuses, no confusion, no buts about it.

02:18:31  15   Our system is protected, and you may not use the system

02:18:34  16   without permission.

02:18:35  17        And, in fact, we are only seeking damages for the

02:18:39  18   period of when we marked on December 2016 forward.

02:18:43  19        What was Wells Fargo's response since we marked?

02:18:47  20   They -- they released six infringing -- six infringing

02:18:52  21   versions of the system.

02:18:53  22        Now, what is the next part of the timeline?  Well,

02:19:00  23   the next part of the timeline is that in August 2007, we

02:19:04  24   actually reached out to Wells Fargo, the evidence will

02:19:06  25   show, and we asked them:  We have RDC patents, remote

02:19:13  1  deposit capture patents.  You need to take a license to

02:19:15  2  them.

02:19:16  3          No license was taken.

02:19:18  4          In February of 2018, we presented them with a

02:19:22  5  formal claim chart.  What's a claim chart?  Well, what

02:19:26  6  you'll see in this case is we took the -- the language of

02:19:30  7  the claims of our patents, and we actually compared them

02:19:33  8  side-by-side to Wells Fargo's system.  And we sent that

02:19:36  9  document to them.

02:19:38  10         What is their response?  Their response was to --

02:19:44  11  was to release three additional infringing versions of the

02:19:49  12  system after we filed suit against them in June of 2018.

02:19:54  13         Now, you're going to hear that there are three

02:19:59  14  questions that you have to answer.  One is about

02:20:04  15  infringement, one is about willful infringement, and one is

02:20:06  16  about damages.  And I want to remind you that the standard

02:20:10  17  of proof that we must show is preponderance of the evidence

02:20:14  18  as to each of these questions.

02:20:16  19         So if the scale tips slightly in our favor -- just

02:20:20  20  ever so slightly in our favor, we have satisfied our burden

02:20:23  21  under the law, and we prevail.  And that is what's required

02:20:27  22  by the law, and that's what's required by the Constitution.

02:20:30  23         So the first question you'll hear -- hear about is

02:20:34  24  infringement.  Do they use our patent?  We've actually

02:20:37  25  asked Professor Tom Conte --

| | | |
|---|---|---|
| 02:20:39 | 1 | Professor Conte, would you please stand? |
| 02:20:41 | 2 | Professor Tom Conte is a professor at the Georgia |
| 02:20:48 | 3 | Institute of Technology.  And as you may imagine, this case |
| 02:20:52 | 4 | involves source code.  Professor Conte taught me how to |
| 02:20:57 | 5 | read source code, and he's actually going to teach you to |
| 02:20:58 | 6 | read source code, as well. |
| 02:20:59 | 7 | Thank you. |
| 02:21:00 | 8 | So what are the issues in infringement?  Well, |
| 02:21:02 | 9 | first off, let's talk about what infringement is. |
| 02:21:05 | 10 | Infringement exists if a company manufactures or uses, for |
| 02:21:11 | 11 | example, a system without the permission of the patent |
| 02:21:13 | 12 | owner. |
| 02:21:14 | 13 | So as you can imagine, when you are a large bank |
| 02:21:17 | 14 | without an R&D capability, like Wells Fargo, you may go to |
| 02:21:23 | 15 | lots of different outside vendors, and you may piece |
| 02:21:26 | 16 | together a system because you don't have the ability to |
| 02:21:28 | 17 | build one yourself. |
| 02:21:29 | 18 | And what the law says, that if you do that, if you |
| 02:21:32 | 19 | don't have an R&D capability and you piece together a |
| 02:21:35 | 20 | system from lots of different places but then you use that |
| 02:21:37 | 21 | system as a company, you are responsible for and you are |
| 02:21:42 | 22 | liable for the system that you construct and use.  And that |
| 02:21:46 | 23 | is what the Congress of the United States has said.  And |
| 02:21:48 | 24 | that's the standard that Wells Fargo must be held to. |
| 02:21:52 | 25 | Now, a couple of things about patent rights. |

02:21:55   1   We've talked about it previously.  Patent rights are

02:21:59   2   property rights.  There's no intent or knowledge or

02:22:02   3   recklessness required.  None.

02:22:06   4         The sole question is whether they infringe.

02:22:09   5   Excuses, mistakes, it does not matter.  If they meet the

02:22:14   6   claims, they are liable.

02:22:16   7         Now, two other things about patent rights, which

02:22:20   8   is, there's literal infringement.  It's where you meet --

02:22:24   9   it's where -- where you meet every single limitation of a

02:22:27  10   claim, but there's also an alternative type of

02:22:32  11   infringement, which is Doctrine of Equivalents.

02:22:34  12         If a change that is made to their system is only

02:22:37  13   insubstantially different from our patent claim, they are

02:22:41  14   still liable.  And the Congress and the Courts have created

02:22:45  15   that system, Doctrine of Equivalents, to protect patent

02:22:48  16   owners.

02:22:49  17         Now, here's an example of a claim, and we're going

02:22:53  18   to -- we're going to compare that claim to Wells Fargo's

02:22:55  19   app.  And I'm going to actually show you some claim

02:22:58  20   language.

02:22:58  21         So this is Claim 1 from the '571 patent.  It talks

02:23:01  22   about depositing a check with a processor, exactly what I

02:23:04  23   had previously told you.  This is about autonomous

02:23:08  24   decision-making by the processor running a powerful

02:23:12  25   program.  It's not about human decision-making.

02:23:15  1          The next thing that's done is that an image of the

02:23:17  2  check is monitoring with respect to monitoring criteria.

02:23:20  3  That is a phrase that's discussed extensively in the

02:23:23  4  patent.  And what it refers to is a very important set of

02:23:27  5  criteria that will help determine whether or not a check

02:23:30  6  can be machine-read, not human-read.

02:23:33  7          And then after that, you capture the image when it

02:23:36  8  passes the monitor criteria.  And you see that that phrase:

02:23:41  9  Capture the image when the image of the check passes the

02:23:45  10  monitoring criteria.  And that has actually been construed

02:23:47  11  by the Court as capturing the image of the check on or

02:23:50  12  after the monitoring criteria are satisfied.

02:23:54  13          Capturing the image of the check on or after the

02:23:58  14  processor makes the decision that the image is going to be

02:24:01  15  able to be read by a machine.

02:24:03  16          Well, how does Wells Fargo's system work?  Well,

02:24:08  17  the evidence will show, and I do believe it will be

02:24:10  18  undisputed, that Wells Fargo obtains preview frames from

02:24:14  19  real-time video.  And I think we all know what preview

02:24:18  20  frames from a real-time video is.

02:24:20  21          It's when you have your camera up and you're

02:24:24  22  through the -- through the viewfinder, and you see the --

02:24:26  23  you see the image moving, and then you press the shutter

02:24:30  24  button.  Well, before you press the shutter button, what

02:24:33  25  you're seeing is thousands upon thousands of preview images

02:24:37  1   flashing across the screen -- screen.

02:24:39  2        And what USAA's system does and what Wells Fargo

02:24:41  3   does is they obtain those images, they rapidly monitor them

02:24:47  4   to determine if they satisfy the criteria for machine

02:24:50  5   reading, and then they create a JPEG file when the frame

02:24:54  6   passes.  They create a JPEG file when the frame passes.

02:24:59  7   Preview frames, monitor, and then create a JPEG file.

02:25:04  8   That's what USAA says is infringing.  It's also what

02:25:08  9   Mr. William Saffici, Wells Fargo's expert, said in his

02:25:13 10   deposition were infringing.

02:25:14 11        Question:  You believe live video feeds are

02:25:17 12   covered by the claims of the patent-in-suit?

02:25:19 13        Answer:  Yes.

02:25:20 14        Question:  In the patent, there's a difference

02:25:23 15   between obtaining a frame from the video stream so the

02:25:26 16   image quality analysis can occur, and then once the

02:25:31 17   monitoring criteria have been satisfied, capturing that

02:25:33 18   image, fair?

02:25:34 19        Yes.

02:25:35 20        Now, Wells Fargo, their position is the exact

02:25:39 21   opposite of what William Saffici said under oath during his

02:25:44 22   deposition.  This was Wells Fargo's longest serving expert.

02:25:48 23        Wells Fargo has called a new expert to testify on

02:25:52 24   their behalf.  His name is John Villasenor.  He's a

02:25:55 25   professor at UCLA.  And John Villasenor is going to say the

02:26:00  1   exact opposite of what William Saffici said.

02:26:03  2         John Villasenor is going to say, oh, no, you know

02:26:07  3   those preview frames that you see?  Oh, we capture there.

02:26:10  4   The preview frames, they're going to argue, are captured.

02:26:14  5   They have a different witness testifying to you -- to you

02:26:18  6   later in the week taking that position, the opposite of

02:26:22  7   what Mr. Saffici said under oath.

02:26:24  8         So I mentioned source code to you.  And

02:26:29  9   Professor Conte is actually going to walk you through the

02:26:32  10  lines of source code, and he's going to show you exactly

02:26:34  11  what I said to you.  Source code is -- when I first saw it,

02:26:38  12  was incredibly complex.  But you can learn to read it.

02:26:42  13        And what source code is, is it's a line of

02:26:44  14  instructions that starts at top and goes down in order.

02:26:48  15  And so at Line 232 [sic] it talks about analyzing the

02:26:55  16  frame, remember the preview images, and then at 2481, it

02:27:01  17  says capture the results, and that capture is the JPEG.

02:27:03  18        THE COURT:  Five minutes remaining.

02:27:04  19        MR. SHEASBY:  So the actual source code shows

02:27:06  20  this.

02:27:06  21        Now, the next issue we're going to be speaking

02:27:09  22  about is willful infringement.  Willful infringement is

02:27:11  23  whether there was intentionality in what Wells Fargo did.

02:27:15  24  It's not necessarily for a finding of infringement, but it

02:27:18  25  is absolutely necessary for a finding of willfulness.

02:27:24   1          And we will submit to you there is compelling

02:27:26   2   evidence of willfulness.  This is an internal Wells Fargo

02:27:30   3   document that we had access to during the discovery period

02:27:32   4   in this case.  They don't let the public see this, but we

02:27:35   5   got to see it.  And it shows them instructing their

02:27:39   6   engineers to go to USAA's mobile application and to access

02:27:43   7   it.

02:27:43   8          We have Mr. Paul Rosati admitting under oath that

02:27:47   9   his group examined Wells Fargo's auto -- USAA's auto

02:27:53  10   capture system.  Under oath he said that.

02:27:56  11          We have the reach-out to Wells Fargo again and

02:27:59  12   again by USAA.  This is the formal chart we sent them in

02:28:03  13   February of 2018 telling them they must take a license.

02:28:06  14   That's PX-162.

02:28:07  15          And this is one of the most significant things we

02:28:12  16   found in their records.  What is this document?  This is a

02:28:16  17   document, PX-1181 [sic] that was from Wells Fargo's

02:28:21  18   confidential databases that shows them experimenting with

02:28:25  19   the Wells Fargo application, even after we put them on

02:28:30  20   notice of the patent, even after we put them on notice of

02:28:34  21   the patent.  Of course, that makes sense because they

02:28:37  22   continued to release infringing systems.

02:28:38  23          The last issue you'll be asked to decide is

02:28:42  24   damages.  We will present two damages experts, Mr. Matt

02:28:46  25   Calman and Roy Weinstein.  They're experts in the field.

02:28:48   1   And there's going to be a lot of conversation about what is

02:28:52   2   the value of auto capture.  And I would submit to you

02:28:54   3   there's an easy answer to that.

02:28:56   4        There is a code in Wells Fargo's program that

02:29:01   5   allows them to deactivate auto capture whenever they want,

02:29:06   6   whenever they want.  They've never switched the code to

02:29:10   7   turn it off.  Why?  Because the records will show solely

02:29:15   8   during the infringement period, Wells Fargo has achieved

02:29:18   9   $932 million from the use of the infringing auto capture

02:29:24   10  system.  And USAA will ask that it be awarded 299 million

02:29:30   11  of those profits and cost savings.

02:29:33   12       Ladies and gentlemen of the jury, thank you for

02:29:36   13  your time.

02:29:38   14       MR. MELSHEIMER:  May we approach, Your Honor,

02:29:41   15  briefly?

02:29:41   16       THE COURT:  Approach the bench, counsel.

02:29:48   17       (Bench conference.)

02:30:01   18       THE COURT:  Why don't you come around right here.

02:30:08   19       MR. MELSHEIMER:  Your Honor, counsel for USAA has

02:30:10   20  done something grossly improper in his opening, and I ought

02:30:13   21  to be able to respond to it.  He suggested to the jury that

02:30:17   22  Mr. Saffici was our infringement expert and when we didn't

02:30:20   23  like his opinion, we got a, quote, new expert in the form

02:30:23   24  of Dr. Villasenor to give us better testimony.

02:30:27   25       That is, of course, not what happened.

02:30:30  1   Mr. Saffici was our invalidity expert.  He's made the

02:30:32  2   impression that they were basically hired to give the same

02:30:35  3   opinion and analysis.  That's not right.  It's improper.

02:30:38  4   We're entitled to drop our invalidity -- our invalidity

02:30:42  5   defenses.  We did.  And they're entitled to place

02:30:45  6   testimony.  But what they're not entitled to do is suggest

02:30:49  7   to the jury that we didn't like that testimony, and then we

02:30:52  8   went and got somebody else.  That's inappropriate, and I

02:30:55  9   should be able to respond to it in my opening.

02:30:57  10          THE COURT:  What's your response, Mr. Sheasby?

02:30:59  11          MR. SHEASBY:  Your Honor, I disagree on two

02:31:02  12  levels.  One, I never said Mr. Saffici was their

02:31:05  13  infringement expert.  I said he provided an opinion in his

02:31:09  14  deposition that was contradictory to Mr. Villasenor.

02:31:13  15          The second point I would make is the jury is

02:31:16  16  allowed to draw whatever inferences it chooses from the

02:31:19  17  fact that Mr. Saffici gave a different opinion than

02:31:23  18  Mr. Villasenor.  I never once suggested he was the

02:31:25  19  infringement expert.  Never once.

02:31:26  20          MR. MELSHEIMER:  He suggested that we went out and

02:31:30  21  got a, quote, new expert.  That was the word that he used.

02:31:33  22  He said that Mr. Saffici was our old expert, our longest

02:31:38  23  serving expert, and then he said we got a new expert, Your

02:31:41  24  Honor.

02:31:41  25          THE COURT:  Let me ask you this, Mr. Melsheimer:

02:31:43   1   How do you propose to address this in your opening?

02:31:45   2           MR. MELSHEIMER:  Well, Your Honor, I've just now

02:31:47   3   heard it.  So I'm thinking about it, but, to me, I ought to

02:31:52   4   be able to tell the jury that what he told you about

02:31:54   5   Mr. Saffici simply was inaccurate, that there's no

02:31:56   6   inconsistency in the opinion.  Dr. Villasenor was hired to

02:32:00   7   look at the code and he did that, and his opinions are

02:32:03   8   totally consistent with Wells Fargo's positions throughout

02:32:07   9   this entire case, and that the suggestion that there was a

02:32:09  10   witness dropped or changed was improper and shouldn't have

02:32:11  11   been made.  That's what I ought to be able to say.

02:32:15  12           THE COURT:  Well --

02:32:17  13           MR. MELSHEIMER:  Or the Court should instruct the

02:32:18  14   jury along those lines.

02:32:19  15           THE COURT:  I'll allow the Defendant to say in

02:32:24  16   opening that there was no inconsistency in Wells Fargo's

02:32:36  17   mind between Mr. Saffici and any other expert that you

02:32:38  18   retained.

02:32:39  19           And I will allow the Defendant to say that any

02:32:42  20   implication that Wells Fargo disagrees with any implication

02:32:46  21   raised by the Plaintiff that Mr. Saffici was dropped as an

02:32:51  22   expert because he didn't give Wells Fargo the opinion they

02:32:53  23   wanted, but that's the extent that I'll let you address it.

02:32:57  24           MR. MELSHEIMER:  Thank you, Your Honor.

02:32:58  25           THE COURT:  Stay within those narrow lines.

| | | |
|---|---|---|
| 02:33:00 | 1 | MR. MELSHEIMER:  I will do so, Your Honor. |
| 02:33:02 | 2 | THE COURT:  Let's proceed. |
| 02:33:04 | 3 | MR. SHEASBY:  Thank you. |
| 02:33:05 | 4 | (Bench conference concluded.) |
| 02:33:05 | 5 | THE COURT:  All right.  Defendant may now present |
| 02:33:08 | 6 | its opening statement to the jury. |
| 02:33:10 | 7 | Mr. Melsheimer, would you like a warning on your |
| 02:33:12 | 8 | time? |
| 02:33:13 | 9 | MR. MELSHEIMER:  May it please the Court.  Five |
| 02:33:15 | 10 | minutes, Your Honor. |
| 02:33:20 | 11 | THE COURT:  All right.  I'll give you a |
| 02:33:22 | 12 | five-minute warning when you have five minutes remaining. |
| 02:33:24 | 13 | You may proceed with opening statement. |
| 02:33:26 | 14 | MR. MELSHEIMER:  May it please the Court, Your |
| 02:33:34 | 15 | Honor. |
| 02:33:34 | 16 | Good afternoon, I'm the only person that hadn't |
| 02:33:36 | 17 | been introduced.  I'm Tom Melsheimer.  I was born and |
| 02:33:40 | 18 | raised in Texas.  I married my high school sweetheart.  We |
| 02:33:44 | 19 | have three kids.  They're all out of the house except one |
| 02:33:48 | 20 | that's come back to live with us for a while.  But my |
| 02:33:51 | 21 | daughter is in college.  My son is in law school.  And my |
| 02:33:54 | 22 | oldest boy works as a membership director for the YMCA. |
| 02:33:59 | 23 | And I'm pleased and proud to represent Wells Fargo in this |
| 02:34:03 | 24 | patent trial that we're going to have. |
| 02:34:04 | 25 | Now, there are certain things that we all learned |

02:34:06   1   when we were very young; put your socks on before your

02:34:14   2   shoes, wash your hands before dinner, say please before

02:34:18   3   asking for something.  All these examples illustrate a

02:34:23   4   simple fact of life.  The timing or the order in which we

02:34:29   5   do things matters.  We all know the phrase timing is

02:34:34   6   everything.

02:34:34   7          That's true in life, and it's true in this

02:34:41   8   lawsuit.  The narrow and specific patent claims in this

02:34:44   9   case require the steps to be taken in a specific and

02:34:51  10   definite order, and because timing is everything in these

02:34:55  11   patents, Wells Fargo doesn't infringe either of the patents

02:35:00  12   in this case, doesn't trespass on anyone's property, and

02:35:04  13   doesn't owe USAA any money in damages.

02:35:07  14          So in the time I have with you this afternoon, I

02:35:11  15   want to try to do three separate things.  First, I want to

02:35:15  16   discuss with you what the Plaintiff has invented in this

02:35:19  17   case and, importantly, what they didn't -- what they didn't

02:35:24  18   invent.

02:35:24  19          What they did invent is a very specific way of

02:35:30  20   automatically taking a picture of a check for deposit at a

02:35:33  21   bank using a specific set of steps.  That's it.

02:35:38  22          What you'll learn in the next few days from the

02:35:40  23   evidence is that the Plaintiff is trying to expand the

02:35:43  24   boundaries of its invention.  It's trying to move its fence

02:35:49  25   and claim property that it does not own.  And the patent

02:35:53  1   law will not allow that.

02:35:54  2          Secondly, I want to talk to you about the Wells

02:36:00  3   Fargo system for mobile deposit and how it works.  We began

02:36:04  4   offering it in May of 2012.  Wells Fargo purchased this

02:36:09  5   software that runs mobile deposit on a cell phone from a

02:36:14  6   company called Mitek in California.

02:36:17  7          Now, we'll talk about Mitek's auto capture feature

02:36:22  8   and how it is different from what Wells Fargo does.  The

02:36:24  9   evidence will be that Wells Fargo didn't take anyone's

02:36:29  10  technology.  We paid Mitek for the mobile deposit

02:36:33  11  technology we use.  The software we get from Mitek works

02:36:38  12  differently than what USAA says they invented.  And that's

02:36:43  13  really the whole case right there.

02:36:45  14         They have a narrow limited invention with certain

02:36:49  15  steps in a specific order.  We don't do that.  And that's

02:36:53  16  why the evidence will show we don't infringe.

02:36:55  17         And then, finally, the third thing, I want to talk

02:36:58  18  to you a little about some of the other evidence that you

02:37:01  19  may hear in the case.  And as we move through the evidence,

02:37:07  20  we'll be working with a timeline of events.

02:37:10  21         And I think these events are largely undisputed,

02:37:13  22  and I'll refer to this off and on as we move forward, but

02:37:16  23  this just gives you some idea of some of the dates that

02:37:19  24  we'll be talking about in the case as we move along.

02:37:22  25         So before we get into the three things I want to

02:37:27  1  talk to you about, I want to emphasize some things you

02:37:30  2  heard from the judge in the patent video this morning.

02:37:32  3         Remember that 15-minute-or-so video that you saw

02:37:36  4  first thing?  That's a video that's shown specifically for

02:37:39  5  patent cases, and it makes some important points.

02:37:41  6         So to prove patent infringement, you're going to

02:37:46  7  hear from the judge that the Plaintiff must prove every

02:37:49  8  element of the claim is present in what the Defendant is

02:37:53  9  doing, not 90 percent of the elements, not 95 percent of

02:37:58  10  the elements.  It's got to be a hundred percent.  It's

02:38:02  11  either -- there's two grades in a patent case, basically.

02:38:05  12  You either get a hundred percent or you get zero.  And put

02:38:09  13  another way, at school, 90 percent is an A, but in patent

02:38:15  14  infringement, it's an F.  And that's an important

02:38:19  15  principle.  So you have to meet all -- they have to meet

02:38:21  16  all the elements.

02:38:22  17         Now, the video you saw also told you this, that a

02:38:26  18  patent represents a bargain made between the government and

02:38:32  19  the inventor.  That bargain between the government and the

02:38:35  20  inventor is to get an invention that is limited to the

02:38:40  21  claims in the patent.  You don't get to come back later and

02:38:44  22  broaden it or say it's bigger than what you bargained for.

02:38:48  23         The patent system works -- this is a quote you've

02:38:52  24  heard in the video -- because the inventor is required to

02:38:56  25  describe the invention in clear, specific terms so that the

02:39:01 1   public knows what the boundaries are.  The public knows

02:39:04 2   where the fence is.

02:39:05 3        Once a patent is issued, anyone can go look at it,

02:39:09 4   and that way anyone can learn what the fence around the

02:39:13 5   invention is.  The claims are what give the public notice

02:39:17 6   of the invention.

02:39:19 7        So the claims are the fence.  And you can't move

02:39:21 8   it.  You can't come in later and move the fence.

02:39:24 9        And during this case, we're going to ask you to

02:39:28 10  hold the Plaintiff to the bargain they made with the Patent

02:39:32 11  Office, to hold them to the fence that they got in these

02:39:35 12  specific claims, not the different ideas that you may have

02:39:39 13  heard about in the opening statement, but the actual

02:39:43 14  invention as described in the claims of the patent.

02:39:46 15       So let's start with what the Plaintiffs in this --

02:39:51 16  the patents in this case don't cover, because there may be

02:39:54 17  some confusion about that.

02:39:55 18       The Plaintiff, of course, did not invent checks.

02:39:58 19  I think we all know that.  The Plaintiff didn't invent

02:40:01 20  using a computer to process checks.  That's been going on

02:40:04 21  since the 1970s.

02:40:06 22       These patents don't cover the idea of using check

02:40:11 23  images in place of checks.  President Bush and Congress

02:40:19 24  decided to fix that after 9/11 when all the planes got

02:40:24 25  grounded and the physical checks couldn't move around.

02:40:24  1   People said, wait a minute, we need to have a better way of

02:40:26  2   moving checks around, so that's check imaging.

02:40:29  3        USAA didn't invent that in these patents.  These

02:40:32  4   patents don't cover the standards that check images must

02:40:37  5   meet in order to be processed by banks; what information

02:40:40  6   has to be visible, how clear the image has to be, what

02:40:45  7   information has to be on the image.  Dozens of major banks,

02:40:49  8   including Wells Fargo, and the Federal Reserve, they put

02:40:52  9   those rules together in the early 2000s.

02:40:57  10       USAA, they weren't involved in that process at

02:40:59  11  all.

02:41:00  12       These patents don't cover online banking or the

02:41:05  13  ability to pay your bills online.  They don't cover mobile

02:41:09  14  banking features like checking your balance on your phone

02:41:13  15  or moving money from one account to another, which some

02:41:19  16  mobile apps allow you to do.

02:41:20  17       These patents don't cover other aspects of mobile

02:41:23  18  banking that you may have heard about, like the secure ways

02:41:27  19  you can access your account, such as with a facial

02:41:31  20  recognition or a fingerprint.  They didn't do that either.

02:41:35  21       USAA wasn't even the first company to announce the

02:41:40  22  capability to do mobile deposit.  Mitek was the first

02:41:46  23  company to announce that in -- on a smartphone in 2008.

02:41:52  24       So these patents don't cover a new camera.  They

02:41:54  25  don't cover a new kind of computer.  They don't cover a new

02:41:59   1   server.  They don't cover a new kind of network to transfer

02:42:02   2   images.  All of that is not part of these patents.

02:42:04   3          Finally, these patents don't cover all the

02:42:08   4   different ways of doing mobile deposit.  They don't cover

02:42:11   5   the notion that you pull out your phone, turn on the

02:42:15   6   camera, put your camera on top of the check, look for the

02:42:19   7   image, and push the button.  These patents didn't invent

02:42:24   8   that either.

02:42:25   9          So what did they invent?  What do these patent

02:42:30  10   claims invent?  Well, we have to look at the claims.  And

02:42:32  11   notice, you didn't hear the claims for about 15 minutes in

02:42:37  12   the Plaintiff's opening.  They're right here, and they're

02:42:39  13   important.

02:42:40  14          Let -- this is what they told the Patent Office

02:42:43  15   they invented.  In order to get a patent, they told the

02:42:47  16   Patent Office that they invented a specific method for

02:42:50  17   automatically capturing an image that involved first

02:42:54  18   monitoring the image, monitoring it, and then capturing the

02:43:02  19   image with the camera.

02:43:04  20          So, remember, the patent system works, and we

02:43:07  21   agree it's a wonderful system because these claims tell

02:43:13  22   everybody what the invention is, not what you wish it was,

02:43:15  23   not what you might argue it is later, but what it actually

02:43:20  24   is in the words of the claims.

02:43:21  25          The very first mobile deposit systems that were

02:43:26   1   announced in 2008, before the Plaintiff's invention in this

02:43:30   2   case, were done with manual capture.  That's what I showed

02:43:34   3   you a moment ago.  You or I would position our smartphone

02:43:38   4   with the camera over the check, and we'd push the button.

02:43:41   5       Here's what they wanted to get rid of.  They

02:43:43   6   wanted to get rid of that.  They wanted to get rid of that,

02:43:50   7   pushing the button on the camera, and that's what's called

02:43:54   8   auto capture.

02:43:54   9       Now, they obtained a patent doing what is

02:44:02   10  described here on the screen in Claim 1.  That's one

02:44:05   11  example.  And they did that with all the words in this

02:44:10   12  patent claim.  But I want to focus you on one that I

02:44:13   13  believe the evidence will show is very important, and

02:44:15   14  that's the word "when" -- "when."

02:44:20   15      The Court has construed this phrase to mean that

02:44:25   16  the capture must occur at or after.

02:44:27   17      Now, counsel for USAA actually said this wrong.

02:44:30   18  He said it was on or after.  The Court has told you, and

02:44:34   19  it's in your jury notebook, it's at or after.  And that's

02:44:37   20  key, because the capture must occur at or after, not before

02:44:42   21  the time when the check is analyzed.

02:44:44   22      In these patents, first the check must be analyzed

02:44:48   23  to determine whether it meets this monitoring criterion,

02:44:53   24  and only at or after that moment, not before, the image is

02:44:59   25  captured.

02:45:00    1          So the key -- and this is important -- the key to
02:45:02    2    what the Plaintiff claims to have invented in these patent
02:45:06    3    claims is not simply automatically capturing an image.
02:45:09    4    That's not what they invented.  They invented capturing the
02:45:14    5    image when -- when and only when the image has passed or
02:45:20    6    met certain monitoring criterion.
02:45:23    7          That, ladies and gentlemen, is the thing they
02:45:25    8    bargained for with the Patent Office, and that's the fence
02:45:30    9    that they're entitled to have.  Nothing narrower, nothing
02:45:35   10    broader than that.
02:45:36   11          Put another way, these patents have a timing
02:45:42   12    condition -- a timing condition.  I don't think anyone will
02:45:44   13    dispute that.  That's the word "when."  And that's why I
02:45:49   14    said at the very beginning, in this case timing is
02:45:55   15    everything.
02:45:55   16          So that leads me to the second thing I want to
02:45:57   17    talk to you about, which is Wells Fargo and what it's done
02:46:01   18    in this area and how its system works differently.
02:46:04   19          Wells Fargo dates back to the 1850s, and it
02:46:08   20    started out with stagecoaches.  But by the 2000s, things
02:46:11   21    were a heck of a lot different.
02:46:13   22          Now, Wells Fargo was one of the first banks to
02:46:15   23    offer online banking.  In 2007, think back, in 2007, the
02:46:21   24    iPhone came out.  And the very first smartphone hadn't even
02:46:26   25    been released yet from Samsung.  Over time, as we've

02:46:29   1   learned, these smartphones have gotten better, faster,

02:46:33   2   smarter, and they're able to do a lot more things.  So

02:46:37   3   Wells Fargo started offering mobile banking way back in

02:46:41   4   2007.

02:46:42   5        Now, later, they decided to offer mobile deposit.

02:46:50   6   What did we do?  We went to this company called Mitek in

02:46:54   7   San Diego.

02:46:55   8        Now, why did we go to Mitek?  Well, Mitek held

02:46:59   9   itself out as an industry leader.  They held itself out as

02:47:04  10   the industry leader for the mobile deposit software that

02:47:07  11   could work these applications.  And, in fact, they still do

02:47:10  12   today.

02:47:11  13        We went to Mitek to help create Wells Fargo's

02:47:15  14   Mobile Deposit app.

02:47:15  15        Now, let's be clear, some of this is Mitek's

02:47:18  16   software, but there's a lot of Wells Fargo's software in

02:47:20  17   there, as well, because, remember, the mobile application

02:47:23  18   is -- has a lot of different features.  Some of it is auto

02:47:27  19   capture -- a piece of it is auto capture, but there's many

02:47:30  20   other pieces to it, as well, such as making sure the check

02:47:33  21   gets in the right account, making sure it's the right

02:47:36  22   amount.

02:47:37  23        So Wells Fargo launched its Mobile Deposit feature

02:47:41  24   in May of 2012.

02:47:45  25        Now, that's on our timeline, and it's three years

02:47:48   1   before -- three years before the patents in this case

02:47:52   2   issued.

02:47:53   3        With Mitek's help, we offered our customers manual

02:47:58   4   capture.  The customer touched the screen of the phone, the

02:48:02   5   little button, to take the picture of the front and the

02:48:05   6   back of the check.

02:48:06   7        In January of 2014, and that's on the timeline, as

02:48:12   8   well -- or can you see it there January, 2014, it -- Mitek

02:48:19   9   said:  We now have MiSnap, which is this auto capture

02:48:25   10  feature.  MiSnap was Mitek's version of auto capture.

02:48:30   11       And in May of 2014 -- May of 2014, that's when

02:48:36   12  Wells Fargo decided to add auto capture to its Mobile

02:48:43   13  Deposit app.

02:48:44   14       So this is very important.  You're going to learn

02:48:47   15  in the evidence that there are multiple ways to do auto

02:48:50   16  capture.  The Plaintiff has a specific invention they got

02:48:56   17  dealing with auto capture, but that's not the only way to

02:48:59   18  do it.

02:48:59   19       It turns out that Mitek wrote its software and

02:49:05   20  changed it over the years because technology changed.  We

02:49:08   21  all know that cell phones have gotten better in so many

02:49:13   22  different ways since they were first released -- the

02:49:17   23  smartphone concept was first released in 2007.  Can't --

02:49:21   24  processors have gotten faster, the cameras have gotten a

02:49:25   25  lot better.

02:49:25   1          So Mitek made certain changes in its software as

02:49:29   2   it went along, and one important change that you'll hear

02:49:32   3   about occurred in late 2014.

02:49:38   4          Now, you'll hear in this case that Mitek did its

02:49:40   5   own work, developed its own product, and came up with a

02:49:43   6   different way of doing things.

02:49:45   7          Now, that's work that Mitek did, not Wells Fargo,

02:49:47   8   and that's why we're going to bring you witnesses from

02:49:52   9   Mitek to come to speak with you in person.

02:49:54  10          You'll hear about the programmers who actually

02:49:57  11   wrote the software that go into the applications that are

02:50:02  12   on these mobile phones.  And you'll -- they'll explain to

02:50:05  13   you why the Mitek and Wells Fargo auto capture function

02:50:10  14   works differently than what USAA says it invented.

02:50:15  15          So you can understand how it actually works,

02:50:18  16   you're going to hear from a Mitek engineer, and that's

02:50:21  17   Mr. Andrew Wood.  He is knowledgeable of the Mitek source

02:50:29  18   code, and he will come to testify to you in person about

02:50:32  19   how the Mitek source code works.

02:50:35  20          Now, some of y'all have heard about source code.

02:50:37  21   You've heard about it from the Plaintiff.  It's simply

02:50:39  22   instructions that human beings can read to talk to

02:50:41  23   computers on how to operate.

02:50:43  24          Now, it's very valuable.  Because source code can

02:50:47  25   be read by experts, companies keep their source code pretty

02:50:51   1   secret.   And Mitek is no exception, because source code is

02:50:56   2   the crown jewel of any technology company.

02:50:58   3           So when Wells Fargo was sued in this case, we went

02:51:03   4   to Mitek and said, hey, these folks at USAA are saying that

02:51:08   5   you're -- the software you're giving us is infringing these

02:51:12   6   patents, so we need to see the source code because -- why

02:51:18   7   do you need to see the source code?  Because the source

02:51:21   8   code is the only legitimate proof of how the computer

02:51:24   9   works.

02:51:25   10          Source code is like DNA.  A computer can only do

02:51:30   11   what the source code says it can do.

02:51:32   12          And Mr. Wood -- Mr. Andrew Wood will be the first

02:51:36   13   person to walk you through that.

02:51:38   14          You'll also hear from Dr. John Villa -- John

02:51:42   15   Villasenor, and he's a computer expert from UCLA.

02:51:44   16          Now, you may have heard a suggestion that somehow

02:51:48   17   Dr. Villasenor replaced another expert that we had in this

02:51:51   18   case because he gave us a different opinion.  We completely

02:51:55   19   dispute that.  Dr. Villasenor is the only Wells Fargo

02:52:00   20   expert who has looked at all the code in this case and

02:52:03   21   compared it to the claims in the patent.

02:52:08   22          And when you hear from Mr. Wood and you hear from

02:52:11   23   Dr. Villasenor, you'll see that the Wells Fargo product

02:52:17   24   works differently.

02:52:18   25          Now, he's going to take you -- Dr. Villasenor is

02:52:21  1   going to take you through the code.  But let me preview

02:52:24  2   this for you, and you'll see this in the evidence.  This is

02:52:27  3   another one of those exhibits that you'll see, Defendant's

02:52:29  4   Exhibit 611.

02:52:34  5        So source code, again, is the DNA of computers.

02:52:36  6   It tells the computer what to do.

02:52:40  7        And what Mitek's source code tells the computer to

02:52:43  8   do is to first capture and then analyze.  Remember, as you

02:52:50  9   heard in the Plaintiff's opening, you start the source code

02:52:53  10  and you read it from top to bottom.  So you want to know

02:52:57  11  what's done first, you look at the top.  The Mitek code

02:53:01  12  tells the phone to capture an image.

02:53:04  13       After the image is captured, that image is

02:53:08  14  analyzed by the processor to see if it meets certain

02:53:11  15  criteria.  Is the image in focus?  Is the account number

02:53:15  16  readable?

02:53:17  17       Now, why did Mitek do it this way?  Why did Mitek

02:53:22  18  do capture first and then analyze?  Well, you're going to

02:53:26  19  hear why.  Mr. Wood's going to explain to you that as cell

02:53:32  20  phone cameras improved and those video feeds improved from

02:53:36  21  2007 and 2008 when the pictures weren't really very good,

02:53:40  22  by the time 2014 came around, the cell phone video cameras

02:53:44  23  and the cameras generally were a lot better.

02:53:46  24       So it made more sense to capture first because you

02:53:50  25  could be assured, generally speaking, of getting a pretty

02:53:53   1   good image, and then you'd analyze it.  And he's going to

02:53:58   2   explain to you that's why they did it.

02:53:59   3          But regardless of why they did it, this is the

02:54:04   4   exact opposite of what the patents in this case require.

02:54:07   5   Remember, when -- the timing condition is when.  These

02:54:13   6   patents require capture -- these patents require analysis

02:54:18   7   first.  You analyze first, then you capture.

02:54:23   8          The Mitek version of auto capture captures first

02:54:26   9   and then analyzes.  And that's why -- that's really --

02:54:29  10   although there's going to be a lot of complex testimony in

02:54:32  11   this case and there's going to be some hard issues to

02:54:34  12   analyze, the fact of the matter is, it's just that simple.

02:54:38  13   We don't infringe these patents because the software we use

02:54:41  14   with Mitek captures first, then analyzes.

02:54:46  15          Their patent is you analyze first and then

02:54:49  16   capture.  That's the bargain they struck with the Patent

02:54:51  17   Office.

02:54:51  18          Now, let me talk a little bit about some of the

02:54:57  19   other evidence that you may hear about.  You heard, for

02:55:03  20   example, that USAA is -- was founded by members of the

02:55:05  21   military, and they serve the military.  But, folks, I'm

02:55:08  22   here to tell you that that's not going to play any role in

02:55:11  23   this case.  There's nothing about the military or the not

02:55:14  24   military that's going to affect your analysis of the

02:55:16  25   specific patent claims they got.

02:55:19  1          And, in fact, it turns out our military doesn't
02:55:23  2   really need mobile deposit more than anyone else because
02:55:25  3   you'll learn that under the law, our troops have to get
02:55:29  4   their checks direct deposited.  So they aren't going around
02:55:34  5   taking pictures of their pay checks for deposit.  They,
02:55:37  6   like many of us, have direct deposit of our pay checks.
02:55:41  7   That's actually mandated by the law.
02:55:43  8          Now, you may hear evidence, and you've already
02:55:46  9   heard some evidence or suggestion of the evidence, that
02:55:50  10  showing you how the USAA mobile app somehow looks similar
02:55:53  11  to the Wells Fargo application or that we were looking --
02:55:58  12  that Wells Fargo was looking at the USAA mobile app in some
02:56:03  13  way.
02:56:04  14         Well, folks I'm here to tell you and the evidence
02:56:06  15  will show that these patents do not -- do not -- do not
02:56:12  16  cover what these programs look like.  They do not cover
02:56:15  17  what the -- what the user interface is, what it looks like,
02:56:19  18  where the screens are, what the buttons are, what they're
02:56:24  19  not.  That's not what this -- these patents are about.
02:56:26  20  These patents are about what's inside the phone, how the
02:56:30  21  code works, and the order in which steps are done in the
02:56:36  22  source code.
02:56:37  23         Their patent is analyze, capture.
02:56:40  24         Our system is capture, analyze.  They're
02:56:43  25  different, and that's why we don't infringe these patents.

02:56:45  1       Now, their -- their theory of infringement -- and
02:56:50  2  you just heard it, and you're going to have to evaluate
02:56:55  3  whether it makes sense to you, but what they're going to
02:56:58  4  say is, they're going to bring in this expert, Mr. Conte,
02:57:02  5  he stood up, and they're going to say that the capture of
02:57:06  6  the image occurs not when the camera takes the picture --
02:57:12  7  let me say that again.

02:57:13  8       They're going to say that the capture is not when
02:57:18  9  the camera takes the picture but only capture -- according
02:57:23  10  to Dr. Conte, only occurs when the picture's taken, it's
02:57:28  11  compressed into a different format, and then it's
02:57:32  12  transmitted somewhere else to a server hundreds or maybe
02:57:38  13  even thousands of miles away.

02:57:40  14       Now, why would they say that?  Why would they
02:57:43  15  have to describe something like that?  Well, because if
02:57:45  16  they don't describe it that way, what we do is not within
02:57:50  17  the fence of their patent claims.  And that's why they're
02:57:53  18  going to offer you, what I believe the evidence will show,
02:57:55  19  is a twisted interpretation.

02:57:58  20       We will always bring you back to the claims, the
02:58:02  21  language of the claims, which the Court will tell you is
02:58:07  22  the beginning, middle, and end of what you need to look at.
02:58:10  23  And you will see that the language is capture the image of
02:58:12  24  the check with the camera.  That's not technical.  That's
02:58:17  25  not complicated.  It means taking a picture.

02:58:22  1        Now, think of it this way, do you capture an image

02:58:28  2  of your granddaughter, your favorite dog, your -- your

02:58:32  3  brother, your holiday photos, do you capture that image

02:58:36  4  when you take the picture, or is it not captured until you

02:58:44  5  compress it and send it to someone in an email or a text

02:58:49  6  message?

02:58:50  7        THE COURT:  Five minutes remaining.

02:58:51  8        MR. MELSHEIMER:  USAA wants you to believe that

02:58:54  9  it's not captured until it's compressed and transmitted to

02:58:57  10  someone, and I think you'll learn that that simply makes no

02:59:01  11  sense.

02:59:02  12        Now, throughout this trial, we're going to bring

02:59:04  13  you back to the language of the claims, and I'm going to

02:59:07  14  ask you to remember that that's what the Plaintiff

02:59:10  15  bargained for.  That's not some technicality that we're

02:59:13  16  offering.

02:59:14  17        As you heard from the judge, you go to the Patent

02:59:18  18  Office and you submit your invention.  There might be some

02:59:20  19  back-and-forth about it, but the point is, what you end up

02:59:23  20  with is the patent claims that you got, and you can't come

02:59:27  21  back later and try to rewrite them.

02:59:29  22        Now, you'll hear some other things in the evidence

02:59:31  23  that won't relate to the claims.  For example, I believe

02:59:35  24  you're going to hear about some Mitek manuals that USAA

02:59:39  25  says will describe the patents in the -- describe the

02:59:43  1   software in the way they say it works.  Well, you're going

02:59:46  2   to hear from Mr. Wood, who's going to tell you how the code

02:59:50  3   actually works.  The manuals are not the code.  The code is

02:59:55  4   the DNA.  The code is what makes something work.

02:59:59  5         Now, I want to talk about the damages claims.

03:00:02  6         They are going to argue, and you heard this in

03:00:07  7   voir dire, that they're entitled to $300 million, and we

03:00:10  8   don't think they're entitled to anything because we don't

03:00:13  9   use their property.  We're outside their fence.

03:00:17  10        But the way they get to that big number is they

03:00:20  11  argue, and you're going to hear from them later tomorrow

03:00:24  12  probably, and say that this auto capture feature is 40

03:00:27  13  percent -- ought to be worth 40 percent of all the mobile

03:00:31  14  deposit.

03:00:31  15        So think about that for a second, they're going to

03:00:36  16  say that in manual capture, even though it's the same

03:00:39  17  checks, the same accounting systems, the same internal bank

03:00:44  18  procedures, the same computers inside the bank, they're

03:00:47  19  going to say that the not pushing the button, that that's

03:00:51  20  somehow worth 40 percent of all of our mobile deposit

03:00:54  21  value.

03:00:54  22        That simply makes no sense.  And one of the

03:00:57  23  reasons it makes no sense is something we talked about in

03:01:00  24  voir dire.  Not true for all of us, but for many of us,

03:01:04  25  paper checks are becoming less important.  Why is that?

03:01:08  1  Well, because we have so many other different ways of

03:01:11  2  paying for things now than we used to; debit cards, prepaid

03:01:16  3  cards, credit card billing, online banking, mobile bill

03:01:21  4  pay -- automatic bill pay, all kinds of things that don't

03:01:24  5  involve getting a paper check from someone, taking a

03:01:27  6  picture of it, and depositing it at the bank.  Some people

03:01:30  7  still do that.  We're not saying it's not important.

03:01:33  8       But remember what their invention is.  Their

03:01:35  9  invention is not auto capture.  Their invention is auto

03:01:38  10 capture using a specific set of steps.  And even if -- even

03:01:42  11 if you don't use auto capture, they admit that manual

03:01:45  12 capture, manual capture has nothing to do with their patent

03:01:49  13 claims.

03:01:49  14      So their damages claim is, we believe the evidence

03:01:54  15 will show, is outrageous.  And in any event, Mitek, you'll

03:02:00  16 hear from the Mitek people, that many other banks also

03:02:03  17 purchase the mobile deposit technology that we use.

03:02:06  18      So thank you for your time.  I -- as I started out

03:02:15  19 at saying, timing is everything.  It's everything in these

03:02:24  20 patents, and it's why we don't infringe their narrow and

03:02:28  21 specific claims.

03:02:29  22      But we also know that timing in a different sense

03:02:33  23 is important to you, and it's important to His Honor.  We

03:02:36  24 know you're here in public service in a civic duty, and we

03:02:41  25 appreciate that.  We're -- we trust you to make these

03:02:44  1   judgments.  But we are going to be very respectful of your

03:02:47  2   time because we know timing is something big for you, as

03:02:50  3   well.

03:02:50  4         So we will move as quickly as we can.  We will not

03:02:55  5   skip over important details, but we will not waste your

03:02:59  6   time because we appreciate you being here.  We'll do this

03:03:03  7   as quickly as we can.

03:03:05  8         And we'll ask you to return a verdict that simply

03:03:08  9   says Wells Fargo and the Mitek app does not infringe the

03:03:13  10  claims of these very narrow and specific patents and do not

03:03:17  11  let the Plaintiff in this case move the fence or break the

03:03:23  12  deal that they made with the Patent Office.

03:03:27  13        Thank you very much.

03:03:28  14        Thank you, Your Honor.

03:03:29  15        THE COURT:  All right.  You'll need to take that

03:03:31  16  demonstrative down, Mr. Melsheimer.

03:03:34  17        MR. MELSHEIMER:  Yes, Your Honor.

03:03:36  18        THE COURT:  Counsel, does either party wish to

03:03:38  19  invoke the Rule?

03:03:40  20        MR. SHEASBY:  Your Honor, both parties have agreed

03:03:42  21  to invoke the Rule.

03:03:44  22        THE COURT:  All right.  And does that agreement

03:03:46  23  include excluding experts from the Rule?

03:03:48  24        MR. SHEASBY:  Yes, Your Honor.

03:03:49  25        THE COURT:  Then the Rule has been invoked,

| | | |
|---|---|---|
| 03:03:51 | 1 | excluding experts, which means, ladies and gentlemen in the |
| 03:03:55 | 2 | gallery, if you are here as a fact witness, you will have |
| 03:03:58 | 3 | to remain outside the courtroom until you are called to |
| 03:04:01 | 4 | come and testify as a fact witness.  If you are designated |
| 03:04:04 | 5 | as an expert witness, you may remain in the courtroom and |
| 03:04:08 | 6 | outside of the Rule, as well as corporate representatives |
| 03:04:11 | 7 | of the two parties. |
| 03:04:12 | 8 | Ladies and gentlemen of the jury, before the |
| 03:04:15 | 9 | Plaintiff calls their first witness, we're going to take a |
| 03:04:19 | 10 | very short recess.  This is one of those times I'm going to |
| 03:04:22 | 11 | ask you simply to close your notebooks and leave them in |
| 03:04:24 | 12 | your chairs.  Follow all the instructions I've given you, |
| 03:04:27 | 13 | including not to discuss the case among each other, and |
| 03:04:29 | 14 | we'll have you back in here shortly to continue with the |
| 03:04:32 | 15 | Plaintiff's first witness. |
| 03:04:33 | 16 | The jury is excused at this time. |
| 03:04:36 | 17 | COURT SECURITY OFFICER:  All rise. |
| 03:04:59 | 18 | (Jury out.) |
| 03:05:02 | 19 | THE COURT:  The Court stands in recess for a short |
| 03:05:04 | 20 | recess time. |
| 03:05:05 | 21 | COURT SECURITY OFFICER:  All rise. |
| 03:05:06 | 22 | (Recess.) |
| 03:05:07 | 23 | (Jury out.) |
| 03:05:07 | 24 | COURT SECURITY OFFICER:  All rise. |
| 03:17:22 | 25 | THE COURT:  Be seated, please. |

03:17:23   1          Plaintiff, are you prepared to call your first

03:17:26   2   witness?

03:17:26   3          MR. SHEASBY:  We are, Your Honor.

03:17:28   4          THE COURT:  Before I bring the jury back in,

03:17:29   5   counsel, one housekeeping matter.  If either side intends

03:17:33   6   to use easels or anything other than what's going to be on

03:17:37   7   the document camera or the screens, I want to know about it

03:17:40   8   before it pops up in the courtroom, at least have an idea

03:17:44   9   of where it's going to be and how it's going to be used,

03:17:46   10  okay?

03:17:47   11         All right.  Let's bring in the jury, please.

03:17:58   12         COURT SECURITY OFFICER:  All rise.

03:18:00   13         (Jury in.)

03:18:00   14         THE COURT:  Please be seated.

03:18:16   15         Plaintiff, call your first witness.

03:18:22   16         MR. SHEASBY:  Your Honor, Plaintiffs call Michael

03:18:25   17  Bueche.

03:18:26   18         THE COURT:  All right.  If you'll come forward,

03:18:31   19  Mr. Bueche, and be sworn by our courtroom deputy.

03:18:40   20         (Witness sworn.)

03:18:41   21         THE COURT:  Please come around, sir, have a seat

03:18:52   22  on the witness stand.

03:18:53   23         MR. SHEASBY:  Your Honor, may I approach with

03:18:54   24  notebooks?

03:18:55   25         THE COURT:  You may.

03:18:56  1          MR. SHEASBY:  Thank you, Your Honor.

03:18:57  2          THE COURT:  All right.  Counsel, you may proceed

03:19:15  3   with your direct examination of the witness.

03:19:15  4       MICHAEL PATRICK BUECHE, PLAINTIFF'S WITNESS, SWORN

03:19:15  5                    DIRECT EXAMINATION

03:19:17  6   BY MR. SHEASBY:

03:19:17  7   Q.  Good afternoon, sir.  Can you introduce yourself to the

03:19:20  8   jury and the Judge?

03:19:22  9   A.  Good afternoon.  My name is Michael Patrick Bueche, Jr.

03:19:27  10  Q.  Mr. Bueche, why are you testifying today?

03:19:29  11  A.  I am a named inventor on two of the patents that are --

03:19:34  12  Wells Fargo's accused of infringing.

03:19:37  13  Q.  Can you turn to PX-002 and PX-004 in your binder?

03:19:42  14  They're also on your screen, Mr. Bueche, if that's easier.

03:19:46  15          What are these documents?

03:19:48  16  A.  These are two of my patents that are at issue in this

03:19:51  17  case.

03:19:52  18  Q.  And can you point out your name on the patents?

03:19:54  19  A.  Yes, sir.  My name appears on both patents under the

03:20:00  20  inventor's section on the first page.

03:20:02  21          THE COURT:  Mr. Bueche, if you want to pull that

03:20:04  22  microphone closer, you won't have to lean forward every

03:20:06  23  time you answer.

03:20:08  24          THE WITNESS:  Thank you, sir.

03:20:09  25          THE COURT:  Thank you.

| | | |
|---|---|---|
| 03:20:10 | 1 | Go ahead. |
| 03:20:10 | 2 | Q.  (By Mr. Sheasby)  Mr. Bueche, can you tell us a little |
| 03:20:13 | 3 | bit about yourself? |
| 03:20:14 | 4 | A.  Yes, sir.  I was born and raised in San Antonio, Texas. |
| 03:20:18 | 5 | Lived there just about my entire life.  I met my wife in a |
| 03:20:22 | 6 | nearby town, New Braunfels.  We've been married for about |
| 03:20:24 | 7 | 25 years, and we have two daughters; Makayla, who is 24, |
| 03:20:28 | 8 | and Mya, who is 15. |
| 03:20:30 | 9 | Q.  Are you employed by USAA? |
| 03:20:32 | 10 | A.  I am an assistant vice president in our Information |
| 03:20:36 | 11 | Technology Department at USAA. |
| 03:20:37 | 12 | Q.  Sir, is that an executive level position at USAA? |
| 03:20:41 | 13 | A.  That is an executive level position. |
| 03:20:43 | 14 | Q.  What leadership roles have you held at USAA? |
| 03:20:45 | 15 | A.  In my 12 years for USAA, I've held a number of |
| 03:20:51 | 16 | leadership positions, but the two that are most important |
| 03:20:54 | 17 | today were the time I spent as the head of Applied Research |
| 03:20:58 | 18 | where I led a team of about 120 research engineers, as well |
| 03:21:02 | 19 | as my current role where I lead teams of software |
| 03:21:07 | 20 | developers that develop software applications for auto and |
| 03:21:09 | 21 | property insurance business. |
| 03:21:11 | 22 | Q.  Before becoming an executive, did you have a technical |
| 03:21:14 | 23 | role at the company? |
| 03:21:15 | 24 | A.  I'm a software developer by trade myself.  So my early |
| 03:21:21 | 25 | roles at USAA were as a software developer where I rose to |

03:21:24  1  the title of technical fellow.

03:21:26  2  Q.  Is there a significance of a technical fellow position?

03:21:31  3  A.  A technical fellow is the highest designation an

03:21:35  4  engineer can receive at USAA.

03:21:36  5  Q.  Can you give me an idea about how many technical

03:21:39  6  fellows there were at USAA?

03:21:40  7  A.  At the time USAA had about 4,000 engineers, and there

03:21:45  8  were only nine technical fellows.

03:21:46  9  Q.  As the head of Applied Research at USAA, did you

03:21:50  10  develop an understanding of the history of mobile remote

03:21:54  11  deposit capture?

03:21:54  12  A.  MRDC, or mobile remote deposit capture, was our biggest

03:22:00  13  success at USAA, so I became very familiar with its

03:22:03  14  history.

03:22:03  15  Q.  At a basic level, what is MRDC?

03:22:06  16  A.  At a basic level, MRDC allows a banking customer to

03:22:11  17  take -- to deposit a check directly into their bank account

03:22:14  18  using their smartphone and sophisticated applications

03:22:18  19  developed by the bank.

03:22:20  20  Q.  What is your educational background?

03:22:23  21  A.  I have a Bachelor's degree in mechanical engineering

03:22:25  22  from the University of Texas in San Antonio, and a Master's

03:22:28  23  degree in business from the Massachusetts Institute of

03:22:35  24  Technology.

03:22:35  25  Q.  Have you been awarded any patents beyond those at issue

| | | |
|---|---|---|
| 03:22:38 | 1 | in this case? |
| 03:22:38 | 2 | A.  I've been awarded a total of 38 patents. |
| 03:22:41 | 3 | Q.  For how long have you been developing software? |
| 03:22:43 | 4 | A.  I wrote my first program when I was about 16 for my |
| 03:22:49 | 5 | dad's trophy business, and I've been in and around |
| 03:22:53 | 6 | technology for 25 years. |
| 03:22:54 | 7 | Q.  Can you describe the history of USAA? |
| 03:22:56 | 8 | A.  USAA was founded in 1922 by 25 Army officers.  At the |
| 03:23:03 | 9 | time the military would move around a lot, and so insurance |
| 03:23:07 | 10 | was only provided locally by a local insurance provider. |
| 03:23:10 | 11 | So every time they had to move, they had to re-establish |
| 03:23:13 | 12 | insurance. |
| 03:23:13 | 13 | And because they were new in town, they were |
| 03:23:17 | 14 | strangers, they didn't always get the best rates.  So they |
| 03:23:21 | 15 | decided to combine their money together and form what is |
| 03:23:24 | 16 | known today as the United Services Automobile Association. |
| 03:23:26 | 17 | And we currently allow membership to any active duty |
| 03:23:30 | 18 | military, anybody who's been honorably discharged, the |
| 03:23:35 | 19 | spouses, the children, and then the employees of USAA. |
| 03:23:38 | 20 | Q.  Who owns USAA? |
| 03:23:40 | 21 | A.  USAA is a mutual company, meaning that we're owned by |
| 03:23:45 | 22 | the members.  And I think that this is significant because |
| 03:23:49 | 23 | we operate very differently.  We don't answer to Wall |
| 03:23:53 | 24 | Street.  We don't have to satisfy shareholders.  And so all |
| 03:23:58 | 25 | of the decisions that we make are on behalf of our members. |

03:24:01   1          And so, for example, we don't charge the fees that

03:24:04   2 other banks charge.  All of our checking accounts are free.

03:24:07   3 We don't require minimum balances.  And, in fact, if our

03:24:11   4 members go in and use, say, the ATM at a Wells Fargo, we'll

03:24:19   5 rebate those fees back to our members.  That's the type of

03:24:23   6 services that we provide.

03:24:24   7 Q.  Do you have a financial interest in the outcome of this

03:24:26   8 lawsuit?

03:24:26   9 A.  Directly I don't.  But as a member, we get back a

03:24:28 10 conservative portion of the profits that USAA makes every

03:24:30 11 year.

03:24:30 12 Q.  How many members does USAA have?

03:24:36 13 A.  USAA currently has 12.4 million members.

03:24:39 14 Q.  And how many employees does USAA have and where are

03:24:42 15 they located?

03:24:43 16 A.  USAA has over 32,000 employees.  About half of those

03:24:51 17 employees are located here in Texas, and the other half are

03:24:54 18 near military bases in six states in the United States, as

03:24:58 19 well as two locations in Europe; in London and Frankfurt.

03:25:04 20 Q.  You said that USAA was founded by Army officers as an

03:25:04 21 insurance mutual.  Did you USAA decide to create a bank at

03:25:06 22 some point in time?

03:25:08 23 A.  USAA's mission is to -- is to facilitate the financial

03:25:13 24 security of our members.  And so in 1982, we decided to

03:25:16 25 start the USAA Bank because our members were asking us for

03:25:20  1   low-cost, reliable banking.

03:25:23  2         And so fast forward 35 years, and we're one of the

03:25:27  3   larger banks in the United States.  We've actually grown at

03:25:30  4   about 8 percent, which is double the industry standard.

03:25:34  5         And, in fact, we've actually had to slow the

03:25:37  6   growth of our bank so that we could continue to provide

03:25:40  7   quality service to our members while we grow.

03:25:42  8   Q.  What group did you join at USAA in 2007?

03:25:47  9   A.  In 2007, I joined the Applied Research Group as a lead

03:25:52  10  research engineer.

03:25:53  11  Q.  Can you describe the skill of research at USAA when you

03:25:57  12  joined it in 2007?

03:26:00  13  A.  In 2007, USAA had a software budget of about $380

03:26:05  14  million for our programs and projects, and so research was

03:26:11  15  really everywhere within USAA.  But, specifically, we had

03:26:14  16  the Applied Research Group where engineers were tasked with

03:26:18  17  applying advanced technology towards our member and our

03:26:21  18  business problems.

03:26:22  19        There were about 40 of us within the Applied

03:26:25  20  Research Group, and we were led by one of my co-inventors

03:26:28  21  on these patents, Chuck Oakes, who was the director of

03:26:32  22  research.

03:26:33  23  Q.  When you left Applied Research in 2014, how large was

03:26:36  24  the research effort?

03:26:37  25  A.  When I left, we had roughly 120 software engineers in

03:26:42  1  Applied Research.

03:26:42  2  Q.  What were you asked to work on when you joined the

03:26:48  3  Applied Research Group?

03:26:49  4  A.  When I joined Applied Research, I was asked to join an

03:26:54  5  ongoing effort where we were testing the processing of

03:26:57  6  check images taken from digital cameras through our

03:27:00  7  existing remote deposit capture infrastructure.

03:27:04  8  Q.  Was there a general name for this project?

03:27:07  9  A.  We called it mobile remote deposit capture.

03:27:09  10  Q.  Now, I don't want to have it put on the screen, but I'd

03:27:12  11  like you to turn to PX-0036.3?

03:27:18  12  A.  Could you repeat that again, sir?

03:27:20  13  Q.  Yes.  Can you turn to PX-0036, Page 3?

03:27:26  14  A.  Yes, sir.

03:27:31  15  Q.  This is a document from Chuck Oakes; is that correct?

03:27:36  16  A.  Yes, dated October 25th, 2006.

03:27:37  17  Q.  So I want to ask you some questions.  Was Chuck

03:27:38  18  Oakes -- did he have a management role related to MRDC at

03:27:41  19  this time?

03:27:41  20  A.  At the time, Chuck was the director of Applied

03:27:46  21  Research, which was the group that built and maintained our

03:27:51  22  mobile remote deposit capture programs.

03:27:53  23  Q.  Mr. Oakes was the director -- Oakes was the director of

03:27:55  24  Applied Research?

03:27:56  25  A.  Yes, sir, director of Applied Research.

03:27:58  1  Q.  And would he have knowledge about the performance of

03:28:01  2  mobile remote deposit capture as it was being used by

03:28:03  3  members?

03:28:03  4  A.  Well, at the time, it would have been remote deposit

03:28:06  5  capture, but, yes, since we built and maintained these

03:28:10  6  systems, we had to monitor them on an ongoing basis.  And

03:28:13  7  so reports were brought to the leadership, Chuck Oakes, to

03:28:17  8  ensure those systems were running properly.

03:28:19  9  Q.  And would it be a common part of Mr. Oakes's practice

03:28:22  10  to report to other members of his team on events that were

03:28:26  11  relating to remote deposit capture?

03:28:28  12  A.  Yes.  If anything significant happened in that

03:28:31  13  infrastructure, it was standard to let the executive

03:28:33  14  leadership team know of any -- any issues with the system.

03:28:36  15  Q.  Is PX-0036.3 one of those type of reports that

03:28:43  16  Mr. Oakes would provide?

03:28:44  17  A.  Yes, sir.  This -- this was an email chain between

03:28:48  18  Chuck Oakes and the leadership team at the time at USAA.

03:28:50  19          MR. SHEASBY:  Your Honor, with your permission,

03:28:52  20  may I publish?

03:28:54  21          THE COURT:  Is there objection?

03:28:55  22          MR. HILL:  There is objection, Your Honor.  This

03:28:57  23  email chain is from before a time when Mr. Bueche joined

03:29:00  24  the company.  The fact that he reads it and recites the

03:29:03  25  facts doesn't establish his personal knowledge of its

03:29:07  1   contents, so we were --

03:29:08  2         THE COURT:  My understanding, this is being

03:29:11  3   offered as a business record of the company; is that

03:29:13  4   correct?

03:29:13  5         MR. SHEASBY:  That's correct, Your Honor.

03:29:14  6         THE COURT:  I'll overrule the objection.

03:29:16  7         You may publish it.

03:29:17  8         MR. SHEASBY:  Thank you, Your Honor.

03:29:17  9   Q.  (By Mr. Sheasby)  So let's pull this email up.

03:29:19  10        Now, Mr. Bueche, do you recognize this email?

03:29:24  11  A.  It's actually quite a famous email in Applied Research

03:29:30  12  because this was the first time we successfully processed a

03:29:34  13  digital check image through our remote deposit capture

03:29:39  14  system.

03:29:39  15  Q.  And can you -- can you look at the phrase "the use of a

03:29:43  16  camera to capture the check image and process" -- "process

03:29:46  17  it through can be a huge competitive advantage over and

03:29:52  18  above."

03:29:52  19        Do you see that, sir?

03:29:53  20  A.  Yes, sir.

03:29:54  21  Q.  Can you describe what that is referring to?

03:29:57  22  A.  This was Chuck's message to our leadership to urge them

03:30:04  23  to start making significant investments in the ability to

03:30:09  24  deposit checks using digital cameras, and it actually

03:30:11  25  served as the spark to do so.

03:30:13   1          THE COURT:  Mr. Bueche, if you would, let's refer

03:30:15   2   to him as Mr. Oakes.  Let's don't refer to him by first

03:30:19   3   name only.

03:30:20   4          THE WITNESS:  Yes, sir.  My apologies.

03:30:22   5          THE COURT:  Let's continue.

03:30:23   6   Q.  (By Mr. Sheasby)  Where did the program go from this

03:30:24   7   email?

03:30:25   8   A.  Well, this showed that we could successfully process

03:30:31   9   one check image, but in order to do it successfully

03:30:35   10   repeatedly, there was a lot of work that had to be done.

03:30:38   11          So in order to be able to capture the image, we

03:30:42   12   had to be able to compensate for the fact that a user could

03:30:45   13   be holding the camera at different angles, which could skew

03:30:48   14   the check.  It could be put on a variety of different

03:30:52   15   backgrounds, like glass or wood or granite.

03:30:55   16          And so we got to work on image enhancement

03:30:59   17   algorithms that would allow us to separate the check from

03:31:01   18   the background successfully, things like binarization,

03:31:06   19   segmentation, edge detection, image extraction, et cetera.

03:31:09   20   Q.  Thank you.

03:31:11   21          I'd now like you to look at PX-0044, but let's not

03:31:16   22   publish it.

03:31:18   23          And does reviewing this document refresh your

03:31:25   24   recollection regarding the state of research in April of

03:31:29   25   2007?

03:31:30  1   A.  Yes, it does.

03:31:32  2   Q.  What was the state of research on MRDC in 2007 -- April

03:31:39  3   2007?

03:31:39  4   A.  In April 9th of 2007, it was at a Level 3 research

03:31:49  5   effort, which we typically do a Level 1, Level 2, Level 3,

03:31:53  6   so this would have been actually working on software that

03:31:57  7   could -- working end-to-end.

03:31:58  8   Q.  Do you know when you had a fully working system that

03:32:00  9   could work on a mobile device to capture the image and

03:32:02  10  submit it for deposit with consistent success?

03:32:05  11  A.  Minya Liang, one of the co-inventors on this patent,

03:32:12  12  and myself had a fully operational mobile application that

03:32:14  13  could capture the check and submit it, in early 2008.

03:32:17  14  Q.  Do you recognize PX-0151?

03:32:23  15  A.  Yes, sir.

03:32:24  16  Q.  What is this document?

03:32:25  17  A.  This is a presentation to our senior leadership team

03:32:32  18  from the Applied Research team about the results of our

03:32:36  19  Deposit@Mobile research.

03:32:37  20  Q.  I'd like you to turn to Page 27 of this document.

03:32:45  21  A.  Yes, sir.

03:32:46  22  Q.  What does Page 27 depict?

03:32:50  23  A.  So this is the output of several iterations of testing

03:32:56  24  that we did with the current generations of the iPhone,

03:32:59  25  which is the iPhone 2G and the iPhone 3G.  And I'll call

03:33:05    1    your attention to in the table Iteration 2 and Iteration 3.

03:33:09    2            In the second -- I'm sorry, in the third column,

03:33:11    3    we were showing success rates greater than 90 percent,

03:33:17    4    which was the criteria that our business had set to say

03:33:21    5    whether we had a product that were ready for integration

03:33:24    6    into a commercially available app.

03:33:27    7    Q.   Is simply being able to deposit one or two checks

03:33:30    8    sufficient to announce a production ready system?

03:33:33    9    A.   No.  At the end of the day, these checks have to be

03:33:35   10    read by a bank of computers.  There are very stringent

03:33:41   11    guidelines, and the check itself is actually a very

03:33:44   12    complicated document in the sense that it has on the

03:33:47   13    bottom, the little magnetic ink line, there's character

03:33:52   14    spacing that's required, there's handwritten signatures as

03:33:56   15    well as CAR amounts, printed texts, we have to get the

03:33:59   16    front of the check and the back of the check.  And so a lot

03:34:01   17    of work has to go into creating these algorithms that can

03:34:05   18    appropriately extract that check information.

03:34:08   19    Q.   Did USAA have a name for its first mobile remote

03:34:15   20    deposit capture system?

03:34:15   21    A.   We called it Deposit@Mobile.

03:34:17   22    Q.   Did you know when Deposit@Mobile was made available to

03:34:21   23    USAA's members?

03:34:21   24    A.   So an early version of Deposit@Mobile was available in

03:34:24   25    a pilot in June of 2009, but it was made generally

| | | |
|---|---|---|
| 03:34:28 | 1 | available to all of our members in August of 2009. |
| 03:34:31 | 2 | Q.  Why did USAA develop -- well, let me withdraw that |
| 03:34:34 | 3 | question. |
| 03:34:34 | 4 |      Were you in the courtroom today when counsel for |
| 03:34:37 | 5 | Wells Fargo suggested that mobile remote deposit capture |
| 03:34:41 | 6 | was irrelevant for the military? |
| 03:34:43 | 7 | A.  Yes, sir. |
| 03:34:44 | 8 | Q.  Why did USAA develop mobile remote deposit capture for |
| 03:34:51 | 9 | its members? |
| 03:34:52 | 10 | A.  Well, our members are incredibly mobile.  They're all |
| 03:34:55 | 11 | over the world as they get stationed in the military.  And |
| 03:34:58 | 12 | so they really need access to reliable banking.  Even |
| 03:35:03 | 13 | though the military are paid through direct deposit, about |
| 03:35:08 | 14 | 50 percent of our service men -- enlisted service men and |
| 03:35:12 | 15 | women work paycheck to paycheck. |
| 03:35:14 | 16 |      So it's very common for them to have side jobs, |
| 03:35:17 | 17 | as well as their spouses typically have jobs, as well as |
| 03:35:20 | 18 | their kids, who all have needs to be able to deposit the |
| 03:35:24 | 19 | checks. |
| 03:35:24 | 20 | Q.  Do you agree or disagree with Mr. Melsheimer's |
| 03:35:26 | 21 | representation to the jury that mobile remote deposit |
| 03:35:29 | 22 | capture is irrelevant to the military? |
| 03:35:30 | 23 | A.  I disagree. |
| 03:35:32 | 24 | Q.  Now, were you in the courtroom when Mr. Melsheimer |
| 03:35:41 | 25 | referred to a company called Mitek? |

03:35:43  1   A.  Yes, sir.

03:35:43  2   Q.  Did you -- does USAA know about Mitek?

03:35:45  3   A.  We used a small library of Mitek's in our early system

03:35:52  4   to do the -- what's called the courtesy amount readings on

03:35:55  5   our backend systems.

03:35:57  6   Q.  Did that have anything to do with the mobile remote

03:35:59  7   deposit capture inventions?

03:36:01  8   A.  Not in anything we built for our mobile app, no, sir.

03:36:05  9   Q.  It had nothing to do with the auto capture system?

03:36:08  10  A.  Absolutely not, nothing to do with auto capture.

03:36:10  11  Q.  At the time that auto capture MRDC was introduced, was

03:36:13  12  USAA still using any Mitek software?

03:36:17  13  A.  We were not using any Mitek software when auto capture

03:36:21  14  launched.

03:36:22  15  Q.  Did Mitek at some time approach you regarding MRDC?

03:36:28  16  A.  Mitek approached us in 2008 with an idea that they had

03:36:35  17  for processing check images from digital cameras.  They --

03:36:42  18  we met with them, and they demonstrated to us that they

03:36:46  19  were working on this concept.

03:36:49  20  Q.  I have a couple -- how far along were you in mobile

03:36:53  21  remote deposit capture when Mitek came and approached you

03:36:54  22  in 2008?

03:36:55  23  A.  We actually had a working system end-to-end that could

03:36:59  24  process, as we saw in the results, in the 90 percentile.

03:37:03  25  Q.  Did Mitek tell you anything about the state of

03:37:05   1   operability of their product?

03:37:08   2   A.   Yes.   One of the things that they -- we talked about

03:37:12   3   was the fact that their system was only able to take images

03:37:15   4   of checks that were on a black background and that really

03:37:19   5   they wanted to partner with us to help develop that

03:37:22   6   technology.

03:37:22   7   Q.   Did you have a view about how far behind Mitek was,

03:37:26   8   USAA?

03:37:27   9   A.   My best guesstimation, they were two years behind us in

03:37:30   10   terms of capabilities.

03:37:31   11   Q.   Did anything strike you as odd about the interaction

03:37:34   12   you had with Mitek?

03:37:36   13   A.   It did.   They were asking a lot of probing questions

03:37:42   14   about how our systems worked.

03:37:44   15           MR. HILL:   Objection, Your Honor. May we approach?

03:37:46   16           THE COURT:   Approach the bench, counsel.

03:37:47   17           (Bench conference.)

03:38:00   18           THE COURT:   What's the objection, Mr. Hill?

03:38:01   19           MR. HILL:   Your Honor, my objection is this runs

03:38:03   20   right into the limine issue of the Mitek dispute.   He's

03:38:06   21   about to lay out that they think that Mitek copied them.

03:38:10   22   That was the basis of why they ended up in litigation with

03:38:13   23   Mitek.

03:38:13   24           And I know he hasn't said litigation, but this

03:38:16   25   nibbling around the edges and suggesting it to the jury

03:38:18  1   that somehow Mitek -- you know, their interaction with us

03:38:22  2   was curious and, you know, thinking that they would have

03:38:26  3   done something nefarious, has nothing to do with the facts

03:38:30  4   this jury has to decide.

03:38:32  5          And so we object to the relevance of it, and we

03:38:34  6   also object we think it's treading awfully close to the

03:38:37  7   motion in limine issue surrounding Mitek litigation.

03:38:42  8          THE COURT:  Mr. Sheasby?

03:38:42  9          MR. SHEASBY:  I'm happy to respond.  One, the

03:38:43  10  Mitek litigation had actually nothing to do with copying of

03:38:45  11  MRDC, and related to copying of backend systems.

03:38:50  12         Two, Mr. Hill -- Mr. Melsheimer in his direct

03:38:52  13  expressly said that Mitek independently developed this on

03:38:55  14  their own.  He's put this exact issue -- he's put this

03:38:59  15  exact thing at issue.

03:39:01  16         THE COURT:  In his direct?  I assume you mean in

03:39:03  17  his opening statement.

03:39:04  18         MR. SHEASBY:  In his opening.  I'm sorry, Your

03:39:05  19  Honor.  And so he said Mitek developed this on their own,

03:39:09  20  and he also said -- and we're allowed to lay a foundation

03:39:12  21  that Mitek was looking at USAA's system.

03:39:14  22         This has nothing to do with litigation, we're not

03:39:17  23  going to bring up the litigation at all.  The litigation

03:39:20  24  was about trade secret theft.  This is not about it -- from

03:39:22  25  an earlier period of time.

03:39:24   1        THE COURT:  Well, I'm going to overrule the

03:39:26   2   relevance objection.  If there's a clear violation of an

03:39:30   3   order in limine, then that objection needs to be raised at

03:39:33   4   the time, all right?

03:39:33   5        MR. HILL:  All right.

03:39:34   6        (Bench conference concluded.)

03:39:41   7   Q.  (By Mr. Sheasby)  Mr. Bueche, was there anything that

03:39:43   8   struck you as odd about your interaction with Mitek in

03:39:46   9   2008?

03:39:46  10   A.  As I mentioned, they were asking some very probing

03:39:51  11   questions about how our systems worked.  And so we were

03:39:57  12   also instructed by Chuck Oakes, the director of Applied

03:40:01  13   Research at the time, not to share any information about

03:40:04  14   how our systems worked, as we realized we didn't think

03:40:09  15   Mitek were our friends.

03:40:11  16        MR. SHEASBY:  Okay.  May I have the ELMO machine,

03:40:13  17   please?

03:40:13  18   Q.  (By Mr. Sheasby)  So this is a timeline that was shown

03:40:19  19   by Wells Fargo in their opening.  And I want to point your

03:40:22  20   attention to the January 2008 date when he represented that

03:40:28  21   Mitek announces the first mobile deposit app.  In your

03:40:33  22   conversations with Mitek, did they have a mobile deposit

03:40:37  23   application in January 2008?

03:40:39  24   A.  No, they did not have a complete working system.  Only

03:40:44  25   pieces and parts.  They wanted us to help them develop it.

03:40:47  1   Q.  Sir, would you consider the representation on this

03:40:50  2   slide that Mitek had a first mobile deposit app in January

03:40:55  3   of 2008 accurate or inaccurate?

03:40:57  4   A.  I would say the word "announces" is correct.  They

03:41:01  5   announced it, but they did not deliver.

03:41:06  6   Q.  Now, turning to the patents, can you describe the

03:41:15  7   problem with MRDC addressed by the patents at issue in this

03:41:19  8   case?

03:41:19  9   A.  Absolutely.  So early on, what we found was that as we

03:41:32  10  developed our mobile remote deposit capture capability, we

03:41:36  11  were highly dependent upon the member actually taking a

03:41:40  12  good photograph.

03:41:41  13       And so if -- if they weren't able to get the

03:41:48  14  entire -- so, for example, if they took a reflective

03:41:52  15  background or if they -- the picture was blurry or if they

03:41:55  16  were holding it at too extreme of an angle, there was only

03:41:59  17  so much we could do to enhance the image on the backend,

03:42:02  18  and so we really needed to provide some capability or some

03:42:07  19  instruction to the user to be able to take a better photo

03:42:10  20  so that we could process it on the backend.

03:42:14  21  Q.  Why is it so important to get an image that could be

03:42:17  22  read by computers?

03:42:19  23  A.  If the image can't be read by a computer, it gets

03:42:22  24  rejected.  And a rejected image, in order to correct that,

03:42:26  25  we have to do something called a replacement check, which

03:42:29  1   is a very manually intensive process.  And we also get

03:42:33  2   charged by the company that clears our checks, for every

03:42:36  3   replacement image.

03:42:37  4   Q.  How did the original MRDC system address the issue of

03:42:43  5   machine reading challenges?

03:42:44  6   A.  So we did everything we could as -- to enhance the

03:42:49  7   backend with the image enhancement.  We tried to repair the

03:42:52  8   image as much as we could.  But, essentially, as I

03:42:55  9   mentioned, we found that the way the user takes a picture

03:42:58  10  has a profound impact on our ability to process it.  So we

03:43:02  11  reached kind of a theoretical limit.

03:43:04  12  Q.  What do you mean by you reached a theoretical limit?

03:43:07  13  A.  We couldn't enhance it anymore.  We needed a better

03:43:10  14  check image to start with.

03:43:12  15  Q.  Now, the experiment you previously showed an exhibit of

03:43:16  16  showed a 90 percent success rate with manual.  Why wasn't

03:43:19  17  that good enough?

03:43:20  18  A.  So, first off, these were only taken with two different

03:43:24  19  types of phones, the iPhone 2G and the iPhone 3G.  There

03:43:27  20  were a lot of other smartphones available on the market

03:43:30  21  that we haven't tested for.

03:43:32  22       The second, these were taken under optimal

03:43:35  23  conditions.  What I mean by that is these images were taken

03:43:38  24  by our research engineers who knew exactly how our system

03:43:43  25  worked.  They were very tech savvy, and they knew how to

03:43:47   1   capture an image.  But if you get these in front of people
03:43:50   2   like my dad, he's going to struggle to be able to take a
03:43:52   3   good image of a check.
03:43:52   4   Q.  Now, at some point in time, did you introduce the auto
03:43:55   5   capture patented system into Deposit@Mobile?
03:43:57   6   A.  We did implement a fully working version of the mobile
03:44:03   7   application that implements the ideas in our patent.
03:44:06   8   Q.  Before you introduced your inventions in
03:44:08   9   Deposit@Mobile, you're still showing increasing acceptance
03:44:13  10   rates?
03:44:13  11   A.  We did for a period of time as we enhanced those
03:44:15  12   repairing image algorithms, but we reached a limit where we
03:44:19  13   couldn't get any better.
03:44:21  14   Q.  Do rejections or failures impact USAA's business?
03:44:24  15   A.  Absolutely.  As I mentioned, for every failed check, we
03:44:29  16   have to process that manually.  And USAA's check deposits
03:44:34  17   were growing significantly throughout the years, and so the
03:44:38  18   more checks that we had to replace, it started to become
03:44:41  19   cost-prohibitive.
03:44:42  20         The best we could say is it would cost about three
03:44:46  21   times to repair a check than it did to just have a teller
03:44:51  22   take a check from our members.
03:44:52  23   Q.  And how much was the processing fee that had to be paid
03:44:55  24   each time?
03:44:56  25   A.  We paid $4.00 per check to our check clearing, plus the

03:45:01   1   labor for the person to do the replacement image.

03:45:03   2   Q.  And by "we," that's USAA, not its members?

03:45:06   3   A.  That's correct, USAA.

03:45:07   4   Q.  Did you prepare a demonstrative to describe the

03:45:10   5   elements of your patents?

03:45:11   6   A.  Yes, sir, I did.

03:45:15   7        MR. SHEASBY:  Mr. Huynh, can we have that?

03:45:19   8   A.  So the first part of our patent is about analyzing

03:45:22   9   preview frames based on our monitoring criteria.  So what

03:45:26  10   we're really after at the end of the day is we want to know

03:45:29  11   when a valid check image is in view of the camera because

03:45:33  12   that will give us the best chance for success to submit

03:45:36  13   that image and do a deposit.

03:45:38  14        So I'll call your attention to on PX-0002 in

03:45:42  15   Column 4, Lines 3 through 15.  And so you can see here on

03:45:50  16   the first line, the monitoring criteria may be based on one

03:45:55  17   or more, and it talks about the light contrast of the

03:45:57  18   image, the brightness, positioning, dimensions, tolerances,

03:46:05  19   MICR character spacing, etc.  Those were the criteria that

03:46:09  20   we looked for to make sure there was a valid check image

03:46:14  21   underneath the camera.

03:46:15  22   Q.  (By Mr. Sheasby)  How did USAA discover that those were

03:46:17  23   going to be the relevant tools for mobile remote deposit

03:46:19  24   capture?

03:46:19  25   A.  So this was a lot of experimentation looking at

03:46:22  1  different factors until we got the right combination of

03:46:26  2  monitoring criteria to have high confidence that that was

03:46:29  3  the check that was good enough.

03:46:30  4  Q.  What's the next element of your invention?

03:46:32  5  A.  So the next element of the invention is around -- when

03:46:36  6  we aren't able to read a valid check image, we want to be

03:46:41  7  able to provide the user with real-time corrective feedback

03:46:45  8  so that they can make an adjustment by either moving the

03:46:48  9  camera or repositioning the check, maybe even on a

03:46:51  10 different background.  We want to give them that feedback

03:46:53  11 so that they know exactly what to do to get a successful

03:46:56  12 capture.

03:46:57  13         And so I'll call your attention to the same

03:46:59  14 patent, Column 8, Lines 58 through 67.

03:47:03  15         And so in here, I'll -- this passage talks

03:47:11  16 about -- you see here the character -- sorry, on the fourth

03:47:15  17 to last line.

03:47:17  18 Q.  Then it may be determined, is that --

03:47:19  19 A.  Then it may be determined that the image may not be

03:47:23  20 processed.

03:47:24  21         And so if the -- if the spacing between the

03:47:26  22 characters on the MICR line are not exactly according to

03:47:31  23 the spec -- the standard, we can't process the check.

03:47:34  24         So we'll look at that, and I'll call your

03:47:37  25 attention to the last line that says:  In such a case,

03:47:40   1   feedback may be generated and provided to the user, such as

03:47:43   2   repositioning the check or the camera.

03:47:45   3            So we didn't just tell them something was wrong;

03:47:47   4   we told them how to fix it.

03:47:49   5   Q.   And that's described as corrective feedback, sir?

03:47:51   6   A.   Yes, sir.

03:47:52   7   Q.   What's the next element of the invention?

03:47:53   8   A.   So Part 3 is really about -- if we're monitoring the

03:47:59   9   image that's under the camera and we know that it meets all

03:48:03   10  of our monitoring criteria, we don't have to have the user

03:48:06   11  click the button anymore.  And, in fact, we prefer to do it

03:48:09   12  automatically with the smartphone processor because we know

03:48:13   13  that it's a valid check image.  Something can happen when

03:48:16   14  they press that button.

03:48:18   15           We also had users that did very strange things

03:48:20   16  like take pictures of plants and cats.  So we were trying

03:48:24   17  to help them do a better job.

03:48:26   18           But I'll call your attention to Column 1 on

03:48:31   19  Line 48 and -- through 57.  So, specifically, where we talk

03:48:35   20  about:  The image capture may be performed automatically by

03:48:38   21  the camera, the mobile device, or the financial

03:48:41   22  institution, as soon as the check image of the check is

03:48:44   23  determined to pass the monitoring criteria.

03:48:47   24  Q.   In the bottom of that passage, it refers to the user

03:48:52   25  may capture that image.  Do you see that, sir?

03:48:54   1    A.  Yes, sir.

03:48:54   2    Q.  Why did you contemplate that the user may capture the

03:48:57   3    image?

03:48:57   4    A.  Well, we -- we contemplated that there might be an

03:49:01   5    instance where the user wants to actually capture the image

03:49:04   6    themselves.  In fact, in our mobile app, if the automatic

03:49:07   7    capture is not working for some reason, we do actually

03:49:10   8    present the option to the user to capture manually.

03:49:13   9    Q.  Is there a phrase in your experience that has been used

03:49:17   10   by the industry to describe USAA's invention?

03:49:21   11   A.  This was well-known in the industry as auto capture.

03:49:24   12   Q.  Do you have a view on the necessity of auto capture in

03:49:28   13   banking?

03:49:30   14   A.  So auto capture, in my mind, is an essential component

03:49:35   15   to be able to use mobile remote deposit at scale.  I liken

03:49:41   16   it to the steering wheel or the braking system in a car.

03:49:44   17   It's required for -- for -- to operate at scale.

03:49:47   18   Q.  And what do you mean by operate at scale?

03:49:49   19   A.  So USAA deposits about 90,000 checks per day.  And so

03:49:57   20   you can imagine every failed check, those numbers get very,

03:50:01   21   very large.  And so it -- as we take that many deposits,

03:50:05   22   our success rate, if it's very low, means we've got to

03:50:09   23   process a lot of those replacement checks.  It becomes cost

03:50:13   24   probative.

03:50:13   25   Q.  Do you have any experience with what happens when auto

| | |
|---|---|
| 03:50:15 | 1 |
| 03:50:19 | 2 |
| 03:50:23 | 3 |
| 03:50:26 | 4 |
| 03:50:31 | 5 |
| 03:50:33 | 6 |
| 03:50:36 | 7 |
| 03:50:39 | 8 |
| 03:50:44 | 9 |
| 03:50:47 | 10 |
| 03:50:49 | 11 |
| 03:50:51 | 12 |
| 03:50:55 | 13 |
| 03:50:58 | 14 |
| 03:51:00 | 15 |
| 03:51:04 | 16 |
| 03:51:08 | 17 |
| 03:51:14 | 18 |
| 03:51:16 | 19 |
| 03:51:23 | 20 |
| 03:51:26 | 21 |
| 03:51:29 | 22 |
| 03:51:32 | 23 |
| 03:51:37 | 24 |
| 03:51:41 | 25 |

capture is not available when there's deposit at scale?

A.  Yes.  Actually in November of 2014, it was a little over a year after we launched auto capture, Apple changed one of their libraries in their new version of iOS.  And it actually broke auto capture.

And our iOS success rates prior to that were about 8 percent.  And while auto capture was broken, our -- our -- sorry, our failure rate was 8 percent.  Our failure rate jumped to 19 percent for those three weeks until we could get it repaired.

Q.  Is auto capture the same as auto focus?

A.  No.  Auto focus is completely different.  It's -- auto focus is about trying to get -- to prevent a blurry image or get an image that's in focus.

Auto capture is about using monitoring criteria in terms of when to take a good picture of the check image.

Q.  I want you to turn to PX-0199.

Do you recognize this class of document?

A.  This is what we call an innovation evaluation form.  This is the form that we fill out when we want to start the process of protecting intellectual property at USAA.

Q.  And if you could turn to Page 2 of that document.

I'm going to pull up the description section.

Do you recognize this description?

A.  This is a description of the ideas that are captured in

03:51:44  1   our '571 and '090 patents.  And I'll call your attention

03:51:50  2   specifically to the third to last line that says:  This

03:51:54  3   innovation is best enabled through a video stream where the

03:51:57  4   user does not press any button to capture the image, but

03:52:00  5   the software determines when to capture the image.

03:52:03  6   Q.  Now, I want you to turn to -- back to Page 1 of this

03:52:10  7   document, Exhibit 199.

03:52:11  8        And it says:  Date invention was first conceived,

03:52:16  9   July 1st, 2008.

03:52:17  10        Do you see that?

03:52:19  11  A.  Yes, sir.

03:52:19  12  Q.  What does that date refer to?

03:52:21  13  A.  That is the date where we came up with the ideas that

03:52:25  14  are captured in the '571 and '090 patents.

03:52:28  15  Q.  And if you turn to Page 2, can you look at the passage

03:52:32  16  that says:  Date invention was/will be reduced to practice?

03:52:37  17  A.  Yes.  On October 1st of 2008, that is when we had a

03:52:45  18  working beta version of the ideas that are described in the

03:52:51  19  '571 and '090 patents.

03:52:53  20  Q.  And what do you mean -- actually I withdraw the

03:52:56  21  question.

03:52:56  22        What is the relationship between the '571 and '090

03:53:00  23  patents?

03:53:00  24  A.  '571 and '090 patents are kind of like grandparent and

03:53:05  25  grandchild in the sense that the specification parts of the

03:53:09  1  patent are exactly the same.  The Patent Office allows you

03:53:13  2  to make different claims against the specification --

03:53:16  3       MR. HILL:  Objection, Your Honor.  This witness

03:53:17  4  cannot testify to Patent Office procedure.  He's a fact

03:53:20  5  witness.

03:53:20  6       THE COURT:  What's your response, Mr. Sheasby?

03:53:22  7       MR. SHEASBY:  I think he has personal knowledge of

03:53:26  8  the relationship between his grandchild and child

03:53:30  9  application.  I think that's what he was just saying.

03:53:32  10       MR. HILL:  Your Honor, it's both personal

03:53:34  11  knowledge objection and also an objection that it treads

03:53:37  12  into issues of procedure which someone would have to have a

03:53:40  13  legal background to sponsor.  This witness lacks that.

03:53:45  14       THE COURT:  Well, he's the inventor of the

03:53:46  15  patents-in-suit.  He can testify about his knowledge of how

03:53:48  16  that process took place at the Patent Office.

03:53:50  17       MR. HILL:  My understanding is he's giving general

03:53:53  18  procedure, Your Honor, not something specific to his

03:53:56  19  patents.

03:53:57  20       THE COURT:  Well, I'll direct counsel to rephrase

03:54:00  21  the questions that address this witness's personal

03:54:03  22  knowledge of how the Patent Office worked with him on these

03:54:06  23  patents.

03:54:07  24  Q.  (By Mr. Sheasby)  Mr. Bueche, can you describe your

03:54:11  25  understanding of the relationship specifically between the

03:54:14  1    '571 patent and the '090 patent?

03:54:14  2    A.  So as I mentioned, kind of the grandparent/grandchild,

03:54:20  3    but, essentially, we wanted to make different claims

03:54:23  4    against the same specification.

03:54:24  5    Q.  And the specification is what?

03:54:26  6    A.  Is the description of the ideas captured in the patent.

03:54:32  7    Q.  Can you tell us a little about your co-inventors?

03:54:35  8    A.  There were five of us, including myself.  There was

03:54:40  9    Chuck Oakes, who is our director of Applied Research, as

03:54:45  10   well as Minya Liang, Bharat Prasad, and Rey Medina, who

03:54:49  11   were all research engineers that worked together on this.

03:54:53  12   Q.  Between the five of you, how many years of engineering

03:54:56  13   experience existed at the time of the invention?

03:54:58  14   A.  We had a pretty amazing team.  We had about 90 years of

03:55:03  15   engineering experience amongst us.

03:55:05  16   Q.  Between the five of you, how many patents have you

03:55:07  17   folks been awarded?

03:55:08  18   A.  We've been awarded a total of 205 patents between us.

03:55:14  19   Q.  And between us, you mean the five --

03:55:16  20          MR. HILL:  Objection, Your Honor.  May we

03:55:17  21   approach?

03:55:17  22          THE COURT:  Approach the bench.

03:55:18  23          (Bench conference.)

03:55:27  24          THE COURT:  What's the objection?

03:55:27  25          MR. HILL:  Your Honor, we have a specific motion

03:55:30  1   in limine of no reference to USAA's other patents.  He just

03:55:33  2   introduced the team of inventors that works for USAA on

03:55:35  3   this project field and said they have 205 patented

03:55:38  4   inventions between them.  That's a direct injection of

03:55:41  5   USAA's other patents into the case.  Violation of the

03:55:45  6   motion in limine.

03:55:46  7          THE COURT:  What's your response, Mr. Sheasby?

03:55:47  8          MR. SHEASBY:  One, I disagree.  Earlier, he

03:55:50  9   already said he had 47 patents.  There was no objection

03:55:53  10  whatsoever to that.

03:55:54  11         Second, the motion in limine said there could be

03:55:57  12  not reference to specific USAA patents.  There was no --

03:56:00  13  nothing that would prevent a -- preventing a witness from

03:56:05  14  describing his expertise.  I'm sure every witness will do

03:56:08  15  it today.

03:56:08  16         Third, Mr. Bueche did not say all those inventors.

03:56:12  17  Those were specifically USAA patents.  And all of them

03:56:15  18  worked at other companies, and they were not specifically

03:56:18  19  USAA patents.

03:56:19  20         THE COURT:  Well, we do not need to focus this

03:56:22  21  lawsuit on unasserted patents.  I don't think that the

03:56:25  22  question and answer you've asked goes too far afield, but

03:56:28  23  I'm going to instruct you not to inquire further as to

03:56:31  24  other patents.

03:56:31  25         MR. SHEASBY:  I will not do so, Your Honor.

03:56:33  1        THE COURT:  All right.  Let's proceed.

03:56:34  2        MR. SHEASBY:  Thank you.

03:56:34  3        (Bench conference concluded.)

03:56:41  4        THE COURT:  Let's proceed.

03:56:42  5   Q.  (By Mr. Sheasby)  Did USAA -- did USAA implement the

03:56:50  6   patented auto capture system?

03:56:52  7   A.  Yes.  USAA implemented the ideas in this patent in our

03:56:58  8   Deposit@Mobile application, which opens a video stream.  It

03:57:02  9   obtains individual frames from the video stream.  It

03:57:05  10  monitors those.  And then upon successful monitoring,

03:57:09  11  captures those and submits them for deposit.

03:57:12  12  Q.  Could a user tell when you had switched from a manual

03:57:16  13  capture system to an auto capture system, in your

03:57:19  14  experience?

03:57:19  15  A.  Absolutely.  It's palpable.  You really just have to

03:57:26  16  hold the phone over the check.  It's almost like magic.  It

03:57:29  17  does it all by itself.

03:57:30  18  Q.  Is there a demonstrative of the system, that you've

03:57:33  19  prepared?

03:57:33  20  A.  Yes, sir.

03:57:41  21  Q.  And let me actually withdraw the question and say it

03:57:44  22  differently.

03:57:44  23        Is there a demonstrative of the system that has

03:57:47  24  been prepared?

03:57:48  25  A.  Yes, sir.  So you can see here, they open up the USAA

03:57:55  1  mobile app.  They'll select that they want to do a deposit.

03:58:01  2  Here's where they pick the bank account they want to go,

03:58:04  3  and it immediately turns on the live video feed.

03:58:06  4       And you notice all he has to do is hold the check,

03:58:09  5  and it determines on its own when a valid check image is in

03:58:14  6  purview of the camera.  And it captures that, both for the

03:58:17  7  front and back.  So you can see that little box is giving

03:58:20  8  the user real-time feedback around what they need to do

03:58:23  9  with the camera.

03:58:25  10  Q.  Before the picture is taken and you see that live view,

03:58:28  11  what's going on underneath in that system?

03:58:31  12  A.  So that -- that video that you see that's going on in

03:58:34  13  the background, that's the live video stream.  And so what

03:58:37  14  we're doing is -- live video is anywhere from 24 to 120

03:58:41  15  frames per second.

03:58:42  16       So we're grabbing -- we're obtaining the frames

03:58:46  17  from that video stream.  And then, like I said, those

03:58:48  18  things that we talked about earlier, looking at the MICR

03:58:50  19  number, looking to see if we could separate the edges from

03:58:54  20  the background, if -- if the image is bright enough, all of

03:58:57  21  that is happening in real-time in the background.

03:59:00  22       And then once we pass all those monitoring

03:59:03  23  criteria, then we take that frame that we analyzed.  We

03:59:08  24  create a JPEG image out of it.  That's where it becomes

03:59:13  25  permanent.  And we commit that image so that we can later

03:59:16  1  send that for deposit.

03:59:17  2  Q.  And can you describe in greater detail exactly how auto

03:59:22  3  capture works in Deposit@Mobile?

03:59:23  4  A.  Exactly what I said.  It's the opening of video stream.

03:59:26  5  It's obtaining those individual frames, analyzing those for

03:59:32  6  monitoring criteria, and then once we find that the check

03:59:35  7  image is good, we'll take that video frame, create a JPEG

03:59:40  8  out of it, and send it on.

03:59:43  9  Q.  Do you have an understanding -- let me withdraw that

03:59:45  10  question.

03:59:45  11       Did you have an understanding at the time of your

03:59:47  12  work about how the auto capture system works in relation to

03:59:53  13  when someone presses the shutter button on a digital camera

03:59:58  14  phone?

03:59:58  15  A.  Are you talking about like when you use the normal

04:00:02  16  camera app or --

04:00:03  17  Q.  Yes, sir.

04:00:04  18  A.  Okay.  When you, you know, bring out your phone and

04:00:08  19  you're holding it up, you're seeing that live feed, but a

04:00:10  20  capture doesn't actually occur until you press the button,

04:00:13  21  and that's a manual capture.  What's happening behind the

04:00:16  22  scenes is that's when it creates an image and stores it on

04:00:19  23  your device permanently.

04:00:20  24  Q.  What -- what type of format is it standard for the

04:00:23  25  image to be created in?

04:00:25  1   A.  The standard format is JPEG.

04:00:28  2   Q.  And that's the same format that's used at the end of

04:00:32  3   the Deposit@Mobile USAA system?

04:00:34  4   A.  Yes, sir.  We -- we have to create an industry standard

04:00:37  5   recognizable image format.  JPEG is the most common.

04:00:42  6   Q.  In your patents, do you discuss the relationship

04:00:44  7   between cameras and video cameras?

04:00:45  8   A.  Yes, sir, we do.  In fact, I'll refer you back to

04:00:51  9   PX-0002, and Section -- just a second, let me get there.

04:01:02  10          On Section 5 on Lines 45 through 49, I'll call out

04:01:08  11  a video source such as a video camera, a web camera, or a

04:01:13  12  video-enabled phone -- on the first three lines -- for

04:01:17  13  example, to obtain the video of the check.

04:01:24  14  Q.  Is the concept of obtaining preview frames from a live

04:01:28  15  video stream and then capturing the frame once it satisfies

04:01:32  16  the monitoring criteria described in the patent

04:01:35  17  specification?

04:01:36  18  A.  Yes, sir, it's continued on in the next line.  A frame

04:01:39  19  of the video may be obtained and monitored with respect to

04:01:44  20  the monitoring criteria as described further herein.

04:01:47  21  Q.  So your patent is describing the concept of obtaining

04:01:52  22  frames from a video stream?

04:01:54  23  A.  Yes, sir.

04:01:55  24  Q.  And then assessing them using monitoring criteria; is

04:01:59  25  that correct?

04:01:59   1   A.  Yes, sir.

04:02:00   2   Q.  In the specification, is there a teaching as to whether

04:02:03   3   you capture the same image you monitor?

04:02:05   4   A.  Well, that's the image that we want because that's the

04:02:10   5   image that we just analyzed.  If we did anything after

04:02:16   6   that, we wouldn't have the confidence that we have a good

04:02:19   7   check image.  So we want the frame that we analyzed.

04:02:21   8   Q.  Is there an example of this concept in your patent

04:02:24   9   specification?

04:02:24  10   A.  Yes.  Just a second.

04:02:27  11   Q.  And by this concept, I mean the concept of capturing

04:02:30  12   the same image that you're analyzing?

04:02:33  13   A.  Yes, sir, just a second.

04:02:39  14        THE COURT:  Let me ask both of you gentlemen to

04:02:40  15   speak up a little bit.  I want to make sure everybody,

04:02:43  16   including the jury, hears everything you have to say.

04:02:46  17        MR. SHEASBY:  Yes, Your Honor.

04:02:47  18        THE WITNESS:  Yes, sir.

04:02:48  19   A.  If you go to Column 1, Lines 49 -- I'm sorry, 50.

04:02:59  20        So what we say is the image may be captured

04:03:02  21   automatically without user intervention as soon as the

04:03:06  22   image is in field of view.  So it's --

04:03:09  23   Q.  (By Mr. Sheasby)  And what -- and why do you want to

04:03:12  24   capture it as soon as it's in the field of view?

04:03:14  25   A.  Because we -- that gives us the highest confidence that

| | | |
|---|---|---|
| 04:03:17 | 1 | we're going to be able to take a valid check image. |
| 04:03:20 | 2 | Q.  All right.  Let me -- let me turn to 16, 5 through 14. |
| 04:03:32 | 3 | MR. SHEASBY:  Column 16, 5 through 14. |
| 04:03:39 | 4 | Q.  (By Mr. Sheasby)  And when it says the occurrence of |
| 04:03:42 | 5 | non-conforming images downstream is reduced, what does that |
| 04:03:47 | 6 | mean? |
| 04:03:47 | 7 | A.  So when we have those images that can't be read by the |
| 04:03:49 | 8 | bank computers, that's called a non-conforming image.  So |
| 04:03:54 | 9 | auto capture, the whole point of it, is to reduce |
| 04:03:56 | 10 | non-conforming images in our backend process. |
| 04:03:59 | 11 | Q.  How does the description in the patent relate to the |
| 04:04:03 | 12 | original version of auto capture that was built at USAA? |
| 04:04:08 | 13 | A.  We -- we went to implement auto capture as written in |
| 04:04:11 | 14 | the patent.  The Android system at the time was capable of |
| 04:04:17 | 15 | handling it as designed in the patent.  Unfortunately Apple |
| 04:04:21 | 16 | devices weren't ready, and so we had to create a workaround |
| 04:04:24 | 17 | initially.  But then we implemented it in the Apple devices |
| 04:04:27 | 18 | as intended, as soon as it was available from Apple. |
| 04:04:30 | 19 | Q.  And by implemented it, you meant obtaining video |
| 04:04:34 | 20 | frames, monitoring those frames, and then creating a JPEG? |
| 04:04:37 | 21 | A.  Yes, exactly. |
| 04:04:38 | 22 | Q.  When did USAA launch an auto capture system on |
| 04:04:42 | 23 | Deposit@Mobile to individuals outside of the company? |
| 04:04:44 | 24 | A.  We launched auto capture in May of 2013. |
| 04:04:53 | 25 | Q.  Why did it take until May of 2013? |

04:04:56   1   A.  Well -- well, first of all, in 2009, when we conceived

04:05:03   2   this idea -- I'm sorry, 2008, when we conceived this idea,

04:05:06   3   the ability to monitor a live video stream didn't actually

04:05:11   4   exist.

04:05:12   5        We went and met on multiple occasions with both

04:05:15   6   Apple and Google, who provide those platforms, asking them

04:05:21   7   to provide this capability so that we could build it as

04:05:23   8   described in the patent.  And it didn't take -- we didn't

04:05:26   9   get it, unfortunately, until the 2011/2012 time frame.

04:05:34   10        MR. SHEASBY:  If I could have the ELMO again.

04:05:36   11   Q.  (By Mr. Sheasby)  Do you see on this demonstrative that

04:05:39   12   was shown by Wells Fargo how it notes that the iPhone app

04:05:44   13   was launched in June 2007 -- I'm sorry, the iPhone was

04:05:50   14   launched in June 2007?

04:05:51   15   A.  Yes, sir, I do see that.

04:05:52   16   Q.  And do you see how it indicates that app for the iPhone

04:05:55   17   was launched in July 2007?

04:05:56   18   A.  Yes, sir.

04:05:57   19   Q.  Is that possible?

04:05:59   20   A.  I don't think that's possible because Apple didn't

04:06:03   21   allow anyone to release apps to their phone until June of

04:06:08   22   2008.

04:06:09   23   Q.   Do you see the -- were you in the courtroom when

04:06:20   24   Wells Fargo made reference to the fact that they had to go

04:06:23   25   to their vendor, Mitek, to understand how their system

04:06:27   1   works?   Do you remember that?

04:06:28   2   A.   Yes, sir, I recall the conversation.

04:06:30   3   Q.   As part of your professional role as an executive at

04:06:33   4   USAA, do you work with vendors?

04:06:35   5   A.   We work with vendors all the time to integrate their

04:06:38   6   software into our platform.

04:06:40   7   Q.   Do you need source code to understand how vendors'

04:06:45   8   software works in your system?

04:06:45   9   A.   In the 12 years I've worked at USAA, I've never seen a

04:06:49   10   vendor's source code, but we have to understand how their

04:06:52   11   systems work because we take on responsibility when we

04:06:56   12   release that to our members.   And so we -- we have to

04:07:00   13   understand.

04:07:00   14          We do that through technical due diligence, we've

04:07:03   15   got an entire legal team that reviews, as well as we've got

04:07:07   16   our -- what's called our third-party risk management team.

04:07:10   17   So we do an exhaustive analysis of any vendor that we

04:07:15   18   integrate into our platforms.

04:07:17   19   Q.   In your experience, do you know of any bank that

04:07:19   20   doesn't know how the software systems they're running

04:07:22   21   works?

04:07:22   22   A.   Not to my knowledge.   I think that --

04:07:25   23          MR. HILL:   Objection, Your Honor.   Calls for

04:07:26   24   speculation about the knowledge of other banks.

04:07:28   25          THE COURT:   Sustained.

| | | |
|---|---|---|
| 04:07:29 | 1 | Q.  (By Mr. Sheasby)  When did the United States Patent |
| 04:07:37 | 2 | Office grant the first of the patents in this case? |
| 04:07:39 | 3 | A.  The '571 patent was issued in March of 2015. |
| 04:07:50 | 4 | Q.  After the '571 patent was granted by the United States |
| 04:07:52 | 5 | Patent and Trademark Office, did USAA announce that the |
| 04:07:54 | 6 | Deposit@Mobile uses the patented technology? |
| 04:07:56 | 7 | A.  We did announce it in our mobile app in 2016. |
| 04:08:03 | 8 | Q.  Can you turn to PX-1062?  And I want to pull up the |
| 04:08:14 | 9 | disclosure section of this document. |
| 04:08:16 | 10 | Do you know what PX-1062 is? |
| 04:08:21 | 11 | A.  Yes.  This is a document that we got from our web |
| 04:08:26 | 12 | content management team.  They're the ones that control all |
| 04:08:29 | 13 | the messages that go out to any of our USAA applications. |
| 04:08:34 | 14 | And this is an entry that was put into our web content |
| 04:08:38 | 15 | management system showing that we were disclosing our |
| 04:08:41 | 16 | patents.  And I'll call attention to the patent number |
| 04:08:45 | 17 | there, '571, which is the patent we're talking about today. |
| 04:08:48 | 18 | Q.  Would this text appear on the actual USAA application |
| 04:08:52 | 19 | when it is being used by members? |
| 04:08:54 | 20 | A.  Yes, there was a link for them to click that would show |
| 04:08:57 | 21 | this text. |
| 04:08:58 | 22 | MR. SHEASBY:  And let's pull up PX-1061. |
| 04:09:03 | 23 | Q.  (By Mr. Sheasby)  And I want to direct your attention |
| 04:09:11 | 24 | to the promote -- Promotion_GMTS date of 15 December, |
| 04:09:21 | 25 | 2016 -- 2015.  Do you see that, sir?  2016. |

| | | |
|---|---|---|
| 04:09:21 | 1 | A.  Yes, sir. |
| 04:09:22 | 2 | Q.  Sorry, what does that relate to? |
| 04:09:24 | 3 | A.  This is a -- actually what we call adaptive web |
| 04:09:27 | 4 | parameter.  Essentially, what it does is it goes into that |
| 04:09:30 | 5 | database we just showed you, pulls out that information, |
| 04:09:33 | 6 | and then presents it to the user in the application.  And |
| 04:09:35 | 7 | the promotion date represents the day that that would have |
| 04:09:39 | 8 | been live and visible by our members, of December 15th, |
| 04:09:43 | 9 | 2016. |
| 04:09:43 | 10 | Q.  So after December 15th, 2016, anyone using the USAA |
| 04:09:47 | 11 | application would know about the patents? |
| 04:09:48 | 12 | A.  Yes, sir. |
| 04:09:49 | 13 | Q.  Now, were you in the courtroom when Wells Fargo's |
| 04:09:53 | 14 | counsel suggested that checks were not that important? |
| 04:09:56 | 15 | A.  Yes, sir. |
| 04:09:58 | 16 | Q.  Do you have an understanding of the impact of mobile |
| 04:10:04 | 17 | remote deposit capture and auto capture, in specific, on |
| 04:10:07 | 18 | USAA's banking business? |
| 04:10:09 | 19 | A.  Our bank, since the release of auto capture in 2013, |
| 04:10:14 | 20 | has doubled in size, and so has the number of deposits that |
| 04:10:18 | 21 | we take via check.  So it's had a profound impact. |
| 04:10:22 | 22 | Q.  Since -- it's doubled in size since 2009; is that |
| 04:10:27 | 23 | correct, sir? |
| 04:10:27 | 24 | A.  The number of deposits we've taken has doubled since |
| 04:10:31 | 25 | 2013, but the bank has doubled in size since 2009, so... |

04:10:35  1    Q.  Thank you, Mr. Bueche.

04:10:37  2            MR. SHEASBY:  Your Honor, I pass the witness.

04:10:40  3            THE COURT:  Cross-examination by the Defendant.

04:10:47  4            MR. HILL:  Thank you, Your Honor.

04:11:04  5            THE COURT:  You may proceed, Mr. Hill.

04:11:07  6            MR. HILL:  Thank you, Your Honor.

04:11:07  7                      CROSS-EXAMINATION

04:11:08  8    BY MR. HILL:

04:11:08  9    Q.  Good afternoon, Mr. Bueche.  How are you?

04:11:10  10   A.  Good afternoon, sir.

04:11:11  11   Q.  It's good to talk to you.  I've got a few things I want

04:11:11  12   to ask you about.  Now, is this the first time that you've

04:11:12  13   attended a patent trial?

04:11:13  14   A.  Yes, sir.

04:11:14  15   Q.  First time you've testified in one?

04:11:16  16   A.  Yes, sir.

04:11:16  17   Q.  All right.  Well, one of the things you're going to

04:11:18  18   hear, I think, Mr. Bueche, in the course of a patent

04:11:21  19   infringement trial are the rules the jury has to follow to

04:11:25  20   decide the factual questions of whether there's

04:11:28  21   infringement or non-infringement.  You understand?

04:11:31  22   A.  Yes, sir.

04:11:32  23   Q.  You probably heard some of that earlier today.  Were

04:11:34  24   you here in court while the Judge went over the preliminary

04:11:40  25   instructions?

| | | |
|---|---|---|
| 04:11:41 | 1 | A.  Yes, sir. |
| 04:11:41 | 2 | Q.  All right.  That's what we call -- what you'll also |
| 04:11:44 | 3 | hear is the instructions that the Judge will give, that's |
| 04:11:47 | 4 | what we call the law, right?  You understand that? |
| 04:11:50 | 5 | A.  Yes, sir. |
| 04:11:50 | 6 | Q.  And one key element of the law in every patent case, |
| 04:11:53 | 7 | Mr. Bueche, is that to prove infringement of the patent |
| 04:11:56 | 8 | that's asserted, the Plaintiff has the burden to prove that |
| 04:12:01 | 9 | each and every claim element of the patent is met.  Did you |
| 04:12:04 | 10 | know that? |
| 04:12:05 | 11 | MR. SHEASBY:  Your Honor, I object, this is |
| 04:12:06 | 12 | outside of the scope of the direct.  It's simply |
| 04:12:09 | 13 | argumentative. |
| 04:12:13 | 14 | THE COURT:  This is clearly not somebody that has |
| 04:12:15 | 15 | any experience in testifying in patent cases, and you're |
| 04:12:17 | 16 | asking him questions that he probably has no way to know, |
| 04:12:20 | 17 | Mr. Hill. |
| 04:12:21 | 18 | MR. HILL:  Well -- and, Your Honor, my point will |
| 04:12:23 | 19 | lead directly back to his testimony that he's given in this |
| 04:12:26 | 20 | case. |
| 04:12:26 | 21 | THE COURT:  Well, let's get there in -- in a |
| 04:12:28 | 22 | hurry. |
| 04:12:28 | 23 | MR. HILL:  All right. |
| 04:12:29 | 24 | Q.  (By Mr. Hill)  And, Mr. Bueche, you understand that you |
| 04:12:31 | 25 | were testifying earlier about different parts of your |

04:12:33  1  patent, correct?

04:12:34  2  A.  Yes, sir.

04:12:34  3  Q.  And you -- I heard you talk in several places about

04:12:39  4  different things that were stated in the specification of

04:12:41  5  the patent.  Did I hear that correctly?

04:12:43  6  A.  Yes, sir.

04:12:43  7  Q.  And you understand the difference in a patent between

04:12:46  8  patent claims and a patent specification, don't you, sir?

04:12:50  9  A.  Yes, sir.

04:12:51  10  Q.  All right.  And so the patent specification, if we were

04:12:55  11  to look at the '571 patent, for example, that's in the

04:12:59  12  juror notebooks, the patent specification is basically

04:13:02  13  everything that's in that patent until we get up to

04:13:07  14  Column 21 where it says what is claimed.  You agree with

04:13:14  15  that, sir?

04:13:15  16  A.  Yes, sir.

04:13:15  17  Q.  And correct me if I was wrong, Mr. Bueche, but I didn't

04:13:19  18  hear you talk about the claims during the course of your

04:13:21  19  testimony, did you?

04:13:22  20  A.  The information I provided came from the

04:13:33  21  specifications.

04:13:34  22  Q.  All right.  And so you understand that the

04:13:37  23  specification is not the metes and bounds of the invention

04:13:39  24  that lays out the invention that is embodied in that

04:13:43  25  patent, correct?

04:13:45    1    A.  I would disagree with that, sir.

04:13:47    2    Q.  Okay.  So you think the specification is what defines

04:13:50    3    the scope of the invention and not the claims?

04:13:53    4    A.  With my limited understanding, I believe it's a

04:13:56    5    description of the idea.

04:13:59    6    Q.  Well -- I'm sorry, Mr. Bueche, I didn't mean to cut you

04:14:02    7    off.

04:14:02    8    A.  No, sir.

04:14:03    9    Q.  Were you finished?

04:14:05    10   A.  Yes, sir.

04:14:06    11   Q.  Now, Mr. Bueche, won't you agree, there are things in

04:14:10    12   the specification that did end up in the claims, right?

04:14:12    13   A.  Could you give me an example?

04:14:15    14   Q.  Well, the specification goes on for a number of pages,

04:14:20    15   20-some pages, and the claims take up about maybe

04:14:24    16   three-quarters of a page.  Agree?

04:14:26    17   A.  Yes, sir.

04:14:27    18   Q.  So it's fair to say that everything that's in that

04:14:30    19   specification likely not in all those claims, agree?

04:14:34    20   A.  I would say that the specification is required to

04:14:38    21   explain the terms that are used in the claim, would be my

04:14:42    22   interpretation.

04:14:43    23        THE COURT:  Wait a minute.  Mr. Bueche, I'm going

04:14:45    24   to ask you to speak up again.

04:14:48    25        Mr. Hill's clearly loud enough for everybody to

04:14:50   1   hear him, and you're whispering over there, and it's

04:14:54   2   important that both sides of this exchange get heard, so

04:14:58   3   please speak up.

04:14:59   4            THE WITNESS:  I'm sorry.

04:15:01   5            MR. HILL:  If you're telling me I'm too loud, Your

04:15:04   6   Honor, I'll --

04:15:04   7            THE COURT:  No, no.  It's a stark contrast.

04:15:07   8            MR. HILL:  Okay.  I apologize.  I don't want to

04:15:09   9   blast you out, Your Honor.

04:15:10  10            THE COURT:  No.

04:15:10  11   Q.  (By Mr. Hill)  Now, Mr. Bueche, I think you'll be the

04:15:10  12   first to admit, won't you, that you're not qualified to

04:15:15  13   interpret claims, are you?

04:15:15  14   A.  I am not a patent attorney.  I don't believe I'm

04:15:17  15   qualified to interpret claims.

04:15:18  16   Q.  You can't say whether it's clear what the claims are

04:15:22  17   talking about or not, can you?

04:15:23  18   A.  I believe that I can draw inferences between the claims

04:15:28  19   and what's called out in the specification.

04:15:31  20   Q.  Okay.  Mr. Bueche, do you think you can say whether

04:15:33  21   it's clear what the claims are talking about?

04:15:36  22   A.  I don't believe that I'm qualified to do that, no, sir.

04:15:40  23   Q.  Okay.  In fact, you can't say what these claims convey

04:15:44  24   to you because you don't believe you're qualified to

04:15:48  25   interpret these claims, can you, Mr. Bueche?

| | | |
|---|---|---|
| 04:15:51 | 1 | A.  Correct, sir. |
| 04:15:51 | 2 | Q.  And even for the most basic part of these claims, |
| 04:15:55 | 3 | issues about does X occur, does X when Y occur, when the |
| 04:16:01 | 4 | claims say you do X when Y occurs, talking about |
| 04:16:06 | 5 | sequencing, you don't think you're qualified to interpret |
| 04:16:12 | 6 | what that means in the context of these claims, do you? |
| 04:16:13 | 7 | A.  I'm very familiar with the sequencing described in the |
| 04:16:17 | 8 | specification at the time, yes. |
| 04:16:17 | 9 | Q.  But do you think you're qualified to interpret what |
| 04:16:19 | 10 | that sequencing means in the claims? |
| 04:16:25 | 11 | A.  No, sir. |
| 04:16:29 | 12 | Q.  And you're a fact witness in this case, correct, |
| 04:16:32 | 13 | Mr. Bueche? |
| 04:16:32 | 14 | A.  Yes, sir. |
| 04:16:33 | 15 | Q.  Here to testify about your personal knowledge about |
| 04:16:35 | 16 | things? |
| 04:16:37 | 17 | A.  About the patents, yes, sir. |
| 04:16:38 | 18 | Q.  Okay.  And you understand that you haven't been |
| 04:16:40 | 19 | qualified by the Court as an expert who gets to render |
| 04:16:44 | 20 | opinions about things in the case, true? |
| 04:16:48 | 21 | A.  I'm learning as I go, but, yes, sir. |
| 04:16:53 | 22 | Q.  Well, Mr. Bueche, let's just be clear about that. |
| 04:16:58 | 23 | You're not an expert witness in this case that's been |
| 04:17:00 | 24 | qualified by the Court, are you? |
| 04:17:03 | 25 | A.  No, sir. |

```
04:17:05   1   Q.  Now, Mr. Bueche, the auto capture feature that you
04:17:10   2   described that's contained in your patents, that is
04:17:13   3   implemented in the source code, correct?
04:17:16   4   A.  In USAA's source code, I know that for sure, yes.
04:17:20   5   Q.  All right.  And, in fact, if we -- if we look at the
04:17:23   6   patent, it talks in spots about a non-transitory
04:17:29   7   computer-readable memory -- or medium comprising
04:17:32   8   computer-readable instructions.  That's talking about
04:17:34   9   source code, isn't it?
04:17:35  10   A.  Yes, sir.
04:17:35  11   Q.  All right.  And those computer-readable instructions, a
04:17:39  12   processor is the computer inside the source -- inside the
04:17:42  13   smartphone that actually has to run that source code,
04:17:46  14   correct?
04:17:46  15   A.  A processor is required to run source code, yes, sir.
04:17:49  16   Q.  And so the USAA patents require source code to perform
04:17:57  17   its version of auto capture; would you agree?
04:18:03  18   A.  I'm sorry, could you restate the question?  I'm not
04:18:06  19   sure I understand.
04:18:06  20   Q.  Yes, sir.  So the USAA patents, they require source
04:18:09  21   code to perform its version of auto capture?
04:18:13  22   A.  Yes, sir, it requires a software which is built from
04:18:16  23   source code.
04:18:17  24   Q.  And then you would need to look at that source code to
04:18:19  25   see how the auto capture functionality is actually
```

04:18:23   1   performed, wouldn't you, sir?

04:18:25   2   A.   No, sir.   I believe it's possible to describe how the

04:18:28   3   program works without looking at the source code.

04:18:30   4   Q.   Okay.   You can figure out the details of how auto

04:18:34   5   capture works just from looking at screenshots or websites

04:18:37   6   about an app?

04:18:38   7   A.   Well, you can actually -- so let's take auto capture as

04:18:45   8   an example.

04:18:46   9          When we give corrective feedback to the user, we

04:18:49  10   tell them things like the image is too dark.   So that would

04:18:54  11   tell somebody who's looking at our application that we must

04:18:56  12   be looking at brightness of the image or potentially

04:19:00  13   contrast.

04:19:00  14          So it is possible to determine what's happening in

04:19:02  15   the software app without seeing the source code.

04:19:04  16   Q.   But you can't actually tell what the code is directing

04:19:07  17   and the sequence of the code is directing things to happen,

04:19:10  18   can you?

04:19:10  19   A.   I say that it depends on the scenario.   It is possible.

04:19:14  20   Q.   Now, you actually looked at the website for the

04:19:16  21   Wells Fargo app, didn't you, sir?

04:19:18  22   A.   I looked specifically at the deposit capability on the

04:19:26  23   Wells Fargo app, yes, sir.

04:19:27  24   Q.   All right.   And just as an aside, there was nothing

04:19:29  25   wrong with you looking at that, was it, sir?

04:19:31  1  A.  Because it was part of research for this case, I don't

04:19:34  2  think there was anything wrong.

04:19:35  3  Q.  Okay.  Do you think there would be anything wrong for

04:19:38  4  you as a business at USAA, you'd want to know how your

04:19:41  5  competitors are operating in competition with you, to look

04:19:45  6  at their app to see what they're doing?

04:19:46  7  A.  I think it depends on intent, sir.

04:19:48  8  Q.  Okay.  Well, that is not an unusual business practice

04:19:51  9  for USAA, sir, is it, to look at competing products to see

04:19:55  10  what's in the marketplace?

04:19:56  11  A.  If the intent is normal ethical business competitive

04:19:59  12  practices, there's something wrong with looking.

04:20:02  13  Q.  And is that something that goes on at USAA when you're

04:20:06  14  interested in what your competitors in the market are

04:20:09  15  doing?

04:20:09  16  A.  What I described, yes, sir.

04:20:11  17  Q.  All right.  And if you're looking at other companies'

04:20:14  18  products in the market as part of market research, that is

04:20:17  19  entirely proper conduct, isn't it, Mr. Bueche?

04:20:20  20  A.  Again, I believe it depends on intent.

04:20:24  21  Q.  Now, even though you looked at the Wells Fargo website,

04:20:27  22  it gave you no understanding of the technical operation of

04:20:30  23  the application, did it?

04:20:33  24  A.  I was able to see that it implemented a form of auto

04:20:37  25  capture that looked familiar or very similar, almost

| | | |
|---|---|---|
| 04:20:40 | 1 | exactly like USAA. |
| 04:20:41 | 2 | Q.  Do you feel like that the website gave you an |
| 04:20:44 | 3 | understanding of the technical operation of the Wells Fargo |
| 04:20:47 | 4 | product, sir? |
| 04:20:47 | 5 | A.  Limited -- say limited information. |
| 04:20:52 | 6 | Q.  But you're saying that the website gave you information |
| 04:20:54 | 7 | about the operation of the Wells Fargo product? |
| 04:20:58 | 8 | A.  It described how auto capture worked, yes, sir. |
| 04:21:02 | 9 | Q.  Mr. Bueche, have you ever answered that question |
| 04:21:04 | 10 | differently? |
| 04:21:07 | 11 | A.  In my deposition, I answered the question that I was |
| 04:21:12 | 12 | not able to determine complete operation of the Wells Fargo |
| 04:21:16 | 13 | app from their website. |
| 04:21:19 | 14 | MR. HILL:  Your Honor, may I approach the witness |
| 04:21:20 | 15 | and hand him a copy of his deposition? |
| 04:21:23 | 16 | THE COURT:  You may. |
| 04:21:23 | 17 | MR. HILL:  Thank you. |
| 04:21:44 | 18 | And, for the record, Your Honor, at this point I'd |
| 04:21:46 | 19 | like to play Bueche -- Bueche Clip 13.  This is |
| 04:21:50 | 20 | Mr. Bueche's deposition transcript at Pages 69, 19 through |
| 04:21:53 | 21 | 23. |
| 04:21:57 | 22 | THE COURT:  Go ahead. |
| 04:21:58 | 23 | (Videoclip played.) |
| 04:21:59 | 24 | QUESTION:  Do you feel like that the website gave |
| 04:22:00 | 25 | you an understanding of the technical operation of the |

04:22:02  1  Wells Fargo product?

04:22:03  2       ANSWER:  It had no insight into -- the technical

04:22:06  3  operation of the application.

04:22:08  4       (Videoclip ends.)

04:22:11  5  Q.  (By Mr. Hill)  So, Mr. Bueche, even though you looked

04:22:12  6  at Wells Fargo's website, you don't know how Wells Fargo's

04:22:15  7  app operates, do you?

04:22:17  8  A.  No, sir.

04:22:17  9  Q.  And you don't know if Wells Fargo's app is similar or

04:22:24  10  different from USAA's application at the technical level,

04:22:27  11  do you, sir?

04:22:28  12  A.  No, sir.

04:22:28  13  Q.  So, Mr. Bueche, looking at the public information about

04:22:32  14  Wells Fargo's app wasn't enough to tell you how the Wells

04:22:37  15  Fargo app did auto capture, was it, sir?

04:22:40  16  A.  No, sir.

04:22:40  17  Q.  And the same can be said of the USAA app, as well,

04:22:45  18  can't it, Mr. Bueche?  I can't look at that app and derive

04:22:49  19  from just looking at it the technical operation of the

04:22:51  20  product, can I?

04:22:52  21  A.  From the website, no.  From the actual application,

04:22:57  22  yes.

04:22:57  23  Q.  And let's just be clear for the record here,

04:23:03  24  Mr. Bueche.  You're not alleging and USAA is not alleging

04:23:05  25  in this case that Wells Fargo copied USAA's source code,

04:23:10  1    are you, sir?

04:23:11  2           MR. SHEASBY:  Your Honor, I object.  The question

04:23:14  3    can be asked of Mr. Bueche personally.  I don't think it's

04:23:16  4    appropriate to ask him about USAA's position in the

04:23:18  5    litigation.

04:23:20  6           THE COURT:  He's not here as the corporate

04:23:22  7    representative?

04:23:22  8           MR. SHEASBY:  He's not, Your Honor.

04:23:24  9           THE COURT:  So let's clarify, Mr. Hill.  Are you

04:23:31  10   asking him as a personal matter, or are you asking him on

04:23:33  11   behalf of USAA?

04:23:34  12          MR. HILL:  Your Honor, I was asking him on behalf

04:23:36  13   of both.  Based on his testimony about the company history,

04:23:39  14   I assumed he would be able to answer.

04:23:42  15          THE COURT:  I'll -- I'll allow the question to him

04:23:43  16   as a personal matter, but he's not here to speak on behalf

04:23:46  17   of the company.

04:23:46  18          MR. HILL:  All right.

04:23:47  19   Q.  (By Mr. Hill)  Mr. Bueche, let me ask:  You personally

04:23:50  20   are not alleging that Wells Fargo copied USAA's source code

04:23:53  21   in this case, are you?

04:23:54  22   A.  I am not alleging copy of source code, no, sir.

04:24:09  23          THE COURT:  And I'm going to ask you to speak up,

04:24:11  24   Mr. Bueche.

04:24:12  25          THE WITNESS:  Yes, sir.  I'll be mindful.  Thank

04:24:14   1   you.

04:24:14   2   Q.  (By Mr. Hill)  And you understand that, for the auto

04:24:16   3   capture functionality, Mr. Bueche, from what you've seen

04:24:19   4   here in court today, that the auto capture functionality in

04:24:23   5   the Wells Fargo product is from a company called Mitek,

04:24:27   6   correct?

04:24:27   7   A.  Yes, sir.

04:24:28   8   Q.  And by the same token, you haven't seen Mitek's source

04:24:32   9   code for auto capture, have you?

04:24:34  10   A.  No, sir.

04:24:34  11   Q.  And so you have no basis personally to allege that

04:24:38  12   Mitek has copied source code from USAA, have you, sir?

04:24:41  13   A.  I have no knowledge of that.

04:24:44  14   Q.  Now, Mr. Bueche, let's talk a little bit about your

04:24:53  15   '571 and '090 patents specifically if we can.

04:24:55  16          These patents aren't the invention of check

04:25:00  17   deposit, are they, sir?

04:25:01  18   A.  No, sir.

04:25:02  19   Q.  Check deposit has been around for a long time, right?

04:25:05  20   A.  Yes, sir.

04:25:05  21   Q.  Okay.  These patents aren't the invention of mobile

04:25:09  22   deposit that existed before these patents issued, is it?

04:25:13  23   A.  They are not the patents for manually captured MRDC,

04:25:18  24   no, sir.

04:25:19  25   Q.  So these patents don't claim to have invented the field

| | | |
|---|---|---|
| 04:25:22 | 1 | of mobile deposit, do they, sir? |
| 04:25:25 | 2 | A.  Via manual capture, no, sir. |
| 04:25:27 | 3 | Q.  And these patents aren't any invention of new -- any |
| 04:25:31 | 4 | new sort of processor, right? |
| 04:25:32 | 5 | A.  Could you explain what you mean by processor, sir? |
| 04:25:36 | 6 | Q.  In terms of these patents don't claim to have invented |
| 04:25:40 | 7 | a new piece of computer hardware? |
| 04:25:42 | 8 | A.  No, sir, we did not invent new hardware. |
| 04:25:44 | 9 | Q.  And these -- these new patents aren't any type of new |
| 04:25:48 | 10 | display, for instance, right? |
| 04:25:52 | 11 | A.  Could you clarify what you mean by display? |
| 04:25:56 | 12 | Q.  A visual display, be it an LCD screen or some other |
| 04:26:02 | 13 | type of visual display, these patents don't claim the |
| 04:26:04 | 14 | invention of a new type of display, do they? |
| 04:26:06 | 15 | A.  Like a physical screen; is that what you're referring |
| 04:26:08 | 16 | to? |
| 04:26:09 | 17 | Q.  Yes, sir. |
| 04:26:10 | 18 | A.  No, sir, they don't claim that. |
| 04:26:11 | 19 | Q.  In fact, Mr. Bueche, the patents say that the |
| 04:26:14 | 20 | displays -- displays in general were well-known in the art. |
| 04:26:17 | 21 | You would agree with that, wouldn't you? |
| 04:26:19 | 22 | A.  Yes, sir. |
| 04:26:19 | 23 | Q.  All right.  These inventions aren't the invention of |
| 04:26:21 | 24 | any new type of camera, right? |
| 04:26:24 | 25 | A.  No, sir. |

04:26:25  1   Q.  These patents aren't the invention of any new type of

04:26:29  2   mobile device; would you agree?

04:26:31  3   A.  I agree.

04:26:33  4   Q.  All right.  These patents aren't the invention of any

04:26:35  5   new type of hardware at all.  Can we agree on that, sir?

04:26:39  6   A.  Yes, sir.

04:26:40  7   Q.  Your invention, Mr. Bueche, that's in these patents was

04:26:45  8   using an existing smartphone, like an iPhone or an Android

04:26:49  9   phone, which came out -- iPhone, 2007, other types of

04:26:54  10  phones at different times, came out before these patents

04:26:57  11  were issued, correct?

04:27:00  12  A.  Yes, some devices were available before this was filed

04:27:04  13  and issued.

04:27:04  14  Q.  And, Mr. Bueche, you would agree that -- that

04:27:08  15  cameras -- cell phone cameras over the years improved with

04:27:11  16  time?

04:27:11  17  A.  Cameras have improved, yes, sir.

04:27:13  18  Q.  In fact, pretty drastically, wouldn't you say, from the

04:27:17  19  2007 time frame to the type of cell phone cameras that we

04:27:20  20  have today?

04:27:21  21  A.  Yes, sir.

04:27:23  22  Q.  Now, the patents don't claim any new invention of a --

04:27:28  23  of a new type of logging into your bank account, correct?

04:27:31  24  A.  Correct.

04:27:32  25  Q.  They don't claim the invention of fingerprint or face

04:27:36  1   ID systems that we see on smartphones today?

04:27:39  2   A.  Correct.

04:27:39  3   Q.  These patents aren't the invention of the concept of

04:27:42  4   image analysis either, are they, sir?

04:27:49  5   A.  I would say that depends.

04:27:51  6   Q.  So you believe that these patents invented for the

04:27:55  7   first time the concept of image analysis?

04:27:58  8   A.  What I'm saying is the combination of different image

04:28:03  9   analysis techniques to determine if there's a valid check

04:28:06  10  image, you might consider that an analysis in itself, so I

04:28:11  11  believe that's met.

04:28:12  12  Q.  That image analysis techniques existed in manual

04:28:16  13  capture, didn't they?

04:28:17  14  A.  Not on the mobile device in real-time.

04:28:19  15  Q.  And, specifically, USAA, and you personally, didn't

04:28:24  16  invent the criteria that are used to analyze the checks --

04:28:29  17  check images in these patents; isn't that right?

04:28:32  18  A.  Could you be more specific?

04:28:33  19  Q.  Sure.

04:28:34  20  A.  Meaning, develop, can you give me an example, please?

04:28:38  21  Q.  Sure.  So my question is, you didn't invent the

04:28:42  22  criteria that are used to analyze check images that are

04:28:45  23  discussed in these patents, right?

04:28:47  24  A.  So I'm still trying to understand your question.  So

04:28:54  25  are you asking, for example, when we do MICR detection, did

```
04:28:57   1   we invent MICR detection, is that your --

04:29:00   2   Q.  That's one example, yes, sir.

04:29:02   3   A.  No, we did not.  In fact, it's called out in the patent

04:29:05   4   that we can use existing techniques.

04:29:08   5   Q.  In fact, Mr. Bueche, the Check 21 specification that

04:29:12   6   you talked about with the criteria for images, that was

04:29:15   7   created years before these patents.  Agreed?

04:29:17   8   A.  I believe the first version of Check 21 was in 2004.

04:29:21   9   Q.  2004?

04:29:22  10   A.  Yes, sir.

04:29:22  11   Q.  These patent -- the '571 patent issued in 2015; is that

04:29:28  12   right?

04:29:28  13   A.  Filed in 2009, issued in '15.

04:29:31  14   Q.  Now, your patents admit that there were known

04:29:38  15   techniques, pre-existing, for edge detection and for corner

04:29:42  16   detection, two other monitoring criteria, right?

04:29:45  17   A.  I do call those out in the patent specifications, yes,

04:29:48  18   sir.

04:29:48  19   Q.  And the patents also admit that there were known

04:29:52  20   measuring and image processing techniques that could be

04:29:55  21   used to detect information on the check.  Agreed?

04:30:01  22   A.  Yes, sir.  We had that in our remote deposit capture

04:30:04  23   system prior to auto capture.

04:30:05  24   Q.  Now, something else that already existed at the time of

04:30:20  25   these patents, Mr. Bueche, is a processor for completing
```

04:30:24  1   the deposit transactions that were used with manual

04:30:27  2   capture; wouldn't you agree?

04:30:29  3   A.   Manual capture existed before auto capture, yes, sir.

04:30:32  4   Q.   And these patents do not claim manual capture, do they,

04:30:36  5   sir?

04:30:36  6   A.   These two patents do not claim manual capture.

04:30:42  7   Q.   Both of these patents require a form of what's called

04:30:47  8   auto capture, agree?

04:30:50  9   A.   Yes, sir, industry refers to this as auto capture.

04:30:53  10  Q.   And the check images captured by auto capture are

04:30:58  11  processed by the bank exactly the same way as the check

04:31:02  12  images captured by manual capture, aren't they, sir?

04:31:04  13  A.   No, sir.   In talking to some of the folks that worked

04:31:08  14  on the backend, they said that if we have to go to manual

04:31:12  15  capture, additional steps do take place on the server end,

04:31:16  16  and it also impacts our cache operations, which means we

04:31:19  17  have to process more manual checks.

04:31:21  18  Q.   But you understand that the bank processing steps that

04:31:24  19  I'm referring to in terms of what the bank has to do to

04:31:27  20  clear these checks from a banking standpoint regardless --

04:31:30  21  A.   Understood.

04:31:30  22  Q.   -- regardless of the capture method you use, all of

04:31:34  23  that still has to go on just the same, doesn't it, sir?

04:31:37  24  A.   Yes, sir.

04:31:37  25  Q.   Now, Mr. Bueche, if we have to segregate the value of

| | | |
|---|---|---|
| 04:31:47 | 1 | your auto capture invention, that means we have to try to |
| 04:31:51 | 2 | take out the value of all those other things we just listed |
| 04:31:54 | 3 | that these patents didn't invent, don't we, sir? |
| 04:32:00 | 4 | A.  In terms of value? |
| 04:32:02 | 5 | Q.  Yes, sir. |
| 04:32:07 | 6 | A.  So auto capture, in my opinion, is a required component |
| 04:32:11 | 7 | to be able to do MRDC at scale.  And so when you say the |
| 04:32:17 | 8 | value, I don't know how you determine the value if a bank |
| 04:32:21 | 9 | needs it to be able to provide it at scale. |
| 04:32:24 | 10 | Q.  So -- |
| 04:32:25 | 11 | A.  It's critical. |
| 04:32:26 | 12 | Q.  Mr. Bueche, you understand there are a lot of banks in |
| 04:32:28 | 13 | this country that have auto -- have manual -- auto -- or, |
| 04:32:33 | 14 | excuse me, have manual mobile deposit capture apps; do you |
| 04:32:37 | 15 | understand that? |
| 04:32:39 | 16 | A.  Yes, sir, I understand. |
| 04:32:40 | 17 | Q.  There are -- I mean, that's just a fact of life.  There |
| 04:32:43 | 18 | are banks that use manual capture only, correct? |
| 04:32:47 | 19 | A.  I'm not aware of those exact banks.  So -- but I can |
| 04:32:52 | 20 | make the assumption that there's probably some, yes, sir. |
| 04:32:55 | 21 | Q.  And those banks have to process checks, don't they? |
| 04:32:57 | 22 | A.  Yes, sir. |
| 04:32:58 | 23 | Q.  And they seem to make it work every day, don't they, |
| 04:33:02 | 24 | Mr. Bueche? |
| 04:33:02 | 25 | A.  I would challenge if any of those banks were at -- at |

04:33:06  1   the scale of a USAA or Wells Fargo, because I would -- I

04:33:10  2   don't know of any large banks that do manual capture.

04:33:13  3   Q.   Would it be unfair, Mr. Bueche, for USAA to come to

04:33:18  4   court and try to get money for things these patents didn't

04:33:21  5   invent?

04:33:28  6             MR. SHEASBY:   Your Honor, can I get the question

04:33:30  7   back one more time?  I didn't hear it.  I apologize.

04:33:53  8             THE COURT:   Let me ask the court reporter to read

04:33:53  9   the question back, please.

04:33:53  10            (The question was read back by the Court.

04:33:53  11            Reporter.)

04:33:53  12            THE COURT:   All right.  Answer to the question,

04:33:55  13   please?

04:33:55  14   A.   If you -- if USAA didn't invent it, then it would be

04:33:58  15   unfair.

04:34:03  16            THE COURT:   Next question, Mr. Hill.

04:34:05  17            MR. HILL:   Yes, sir, Your Honor.

04:34:10  18   Q.   (By Mr. Hill)   Now, you brought up the point about the

04:34:15  19   military and direct deposit during your direct examination,

04:34:18  20   Mr. Bueche?

04:34:19  21   A.   Yes, sir.

04:34:19  22   Q.   Couple things about that.  You understand the military

04:34:22  23   gets direct deposit for their -- for their paychecks,

04:34:26  24   right?

04:34:26  25   A.   Active duty military gets direct deposit, yes, sir.

04:34:30  1   Q.  And you mentioned that they could have second jobs, but

04:34:34  2   we don't know whether second jobs may pay by direct

04:34:37  3   deposit, too, in some instances, do we?

04:34:39  4   A.  In some instances, it could be direct deposit.  I don't

04:34:40  5   think it's customary for part-time work to get direct

04:34:44  6   deposit, though.

04:34:44  7   Q.  And you understand that other banks have military

04:34:47  8   customers, too?

04:34:47  9   A.  Of course.

04:34:49  10  Q.  And they have customers all over the world as well?

04:34:52  11  A.  Yes, sir.

04:34:52  12  Q.  And so needing to serve a diverse customer base all

04:34:58  13  over the world is not a problem unique to USAA as much as

04:35:02  14  it's just a problem unique to banking; wouldn't you agree?

04:35:04  15  A.  I would argue it's unique to USAA because we don't have

04:35:07  16  any physical branches, and so it's a unique problem for us.

04:35:11  17  Q.  So there, for instance, USAA makes a business choice to

04:35:14  18  serve its customer base by not having physical branches and

04:35:19  19  by trying to do other things to accommodate them despite

04:35:23  20  the absence of those physical branches, right?

04:35:26  21  A.  Yes, sir.

04:35:26  22  Q.  For instance, you mentioned ATMs, USAA doesn't have its

04:35:31  23  own network of ATMs out there in the world, does it?

04:35:33  24  A.  Yes, sir, we do.

04:35:34  25  Q.  You do?

04:35:35  1   A.  Yes, sir, through CVS we have about 20,000 ATMs, as

04:35:41  2   well as USAA-branded ATMs in select locations around

04:35:44  3   military bases.

04:35:44  4   Q.  But those aren't USAA-owned ATMs, are they?  Those are,

04:35:51  5   for instance, Allpoint ATMs in those CVSs that USAA has

04:35:55  6   purchased the right to use?

04:35:56  7   A.  We also have our own that we have leased, as well,

04:35:59  8   around military bases where there are large concentrations

04:36:01  9   of our membership.

04:36:02  10          THE COURT:  Counsel, approach the bench, please?

04:36:04  11          (Bench conference.)

04:36:11  12          THE COURT:  What's the relevance of whether

04:36:12  13  military people get a paper check or get direct deposit for

04:36:16  14  their part-time jobs?  What's the relevance of ATMs?  I

04:36:20  15  don't see where the relevance of any of this is, Mr. Hill.

04:36:22  16          MR. HILL:  Your Honor, the relevance is, is

04:36:25  17  they're talking about the way they choose to serve their

04:36:27  18  customer base, and in contrast with a diverse way that we

04:36:31  19  choose to serve our customer base, but they both still have

04:36:34  20  the same incentive to use remote deposit technologies.

04:36:39  21  That's where I was going with this, Your Honor.

04:36:40  22          THE COURT:  Let's see if we can move along, okay?

04:36:43  23          MR. HILL:  Okay.

04:36:43  24          (Bench conference concluded.)

04:36:45  25          THE COURT:  Let's proceed.

04:36:46   1          MR. HILL:   Thank you, Your Honor.

04:36:47   2   Q.  (By Mr. Hill)  Now, Mr. Bueche, I want to talk to you

04:36:50   3   about one other thing that you mentioned during the course

04:36:52   4   of your direct examination, and that was this issue of

04:36:55   5   marking.  Do you recall that?

04:36:58   6   A.  Marking?

04:37:00   7   Q.  Patent marking.  Do you know what that -- what I'm

04:37:04   8   referring to?  Well, let me show you, for instance,

04:37:07   9   Mr. Bueche, you displayed Plaintiff's Exhibit 1062.

04:37:10  10          MR. HILL:   Mr. Barnes, can we get Plaintiff's

04:37:13  11   Exhibit 1062?

04:37:15  12   Q.  (By Mr. Hill)  And do you recall this document, sir?

04:37:22  13   A.  Yes, sir.

04:37:22  14   Q.  And you recall being shown this during your direct

04:37:25  15   examination?

04:37:26  16   A.  Yes, sir.

04:37:27  17   Q.  Mr. Bueche, this was the only evidence of patent

04:37:30  18   marking that you showed the jury during the course of their

04:37:33  19   testimony, correct?  This page and one other page, agreed?

04:37:37  20   A.  Yes, sir.

04:37:38  21   Q.  And just to be clear, this document that we're looking

04:37:41  22   at on the screen --

04:37:42  23          MR. HILL:   Can we see the whole thing in context,

04:37:45  24   Mr. Barnes?

04:37:47  25   Q.  (By Mr. Hill)  Plaintiff's Exhibit 1062, this document

04:37:49   1   isn't actually part of the USAA app, is it?

04:37:52   2   A.  This is an externalized system where we keep content

04:37:58   3   that's pulled in from the app.

04:38:01   4   Q.  Okay.  So --

04:38:02   5   A.  Not a part of the app -- it's -- I mean, it's linked to

04:38:05   6   the app.

04:38:05   7   Q.  This page that we're looking at on the screen as proof

04:38:08   8   of marking by USAA is not a document that actually appears

04:38:13   9   on the app, is it?

04:38:15  10   A.  Well, we don't present a document.  We pull information

04:38:20  11   from a database and then display it on the screen.  This is

04:38:23  12   a record of the database entry where the data exists.  So

04:38:27  13   it's not an actual document.  It's information from a

04:38:30  14   database.  Does that make sense?

04:38:32  15        MR. HILL:  Objection, non-responsive, Your Honor.

04:38:36  16        THE COURT:  Overruled.  I think he's trying to

04:38:38  17   respond to your question.  I think you need to ask a better

04:38:40  18   question.

04:38:40  19        MR. HILL:  Thank you.

04:38:42  20   Q.  (By Mr. Hill)  Mr. Bueche, the physical exhibit that

04:38:45  21   we're looking at on the screen does not appear in -- on

04:38:48  22   your app, does it?

04:38:52  23   A.  No, sir.  This is a printout from the database.

04:38:54  24   Q.  Yes, sir.  So this is a printout of a private database

04:38:59  25   at USAA, correct?

04:39:01  1    A.  Yes, sir.

04:39:01  2    Q.  This database itself is not some public facing system

04:39:05  3    or document, agree?

04:39:07  4    A.  The information in this database is presented to the

04:39:12  5    member when they click on the link in our application.  So

04:39:15  6    there's a retrieval process to get the information and to

04:39:18  7    display it.

04:39:19  8    Q.  Well, let's take a look at this document here.

04:39:22  9          If I click on the app and I go to a certain page,

04:39:27  10   I don't see what we see on this screen, do I?

04:39:30  11   A.  You see the data that's stored in the disclosure field.

04:39:34  12   That's what gets retrieved from the database and displayed

04:39:36  13   on the screen.

04:39:37  14   Q.  Okay.  And my point, Mr. Bueche, is I'm not going to

04:39:39  15   see what we have here on the screen on my app, am I?

04:39:42  16   A.  No, sir.  This is a printout from our -- our internal

04:39:47  17   database.

04:39:47  18   Q.  All right.  And if we look here on this document, it

04:39:50  19   refers to -- do you know who put this in the database, by

04:39:52  20   the way?

04:39:53  21   A.  No, I wasn't a part of that.

04:39:57  22   Q.  Do you know what the procedure is at USAA for putting

04:40:00  23   documents like this in the database?

04:40:02  24   A.  Yes, sir.  So they take this information, they submit

04:40:07  25   it to our web content management team.  They're the ones

04:40:11  1   that put it into -- we have three databases, a development,

04:40:15  2   test, and production environment.  It gets placed into the

04:40:19  3   development environment and tested against the application.

04:40:21  4         Once that's successful, it gets promoted to our

04:40:24  5   production environment where it's available to our members.

04:40:26  6   Q.  Do you see the release date that's stated on the screen

04:40:30  7   there on Document 1062?

04:40:31  8   A.  Yes, sir.

04:40:32  9   Q.  Do you have an understanding of what that is?

04:40:35  10  A.  That is the default value that's put in that field

04:40:38  11  because we don't use it.

04:40:39  12  Q.  And there's no debate that the auto capture system at

04:40:45  13  USAA didn't exist in 1999, is there?

04:40:47  14  A.  No, sir, it did not exist in 1999.

04:40:51  15  Q.  All right.  Now, Mr. Bueche, I just want to ask again,

04:40:59  16  these patents that we've discussed, it is not your

04:41:03  17  testimony that these invented mobile remote deposit

04:41:08  18  capture, is it, sir?

04:41:11  19  A.  I believe that these patents -- we invented a part of a

04:41:15  20  commercially available mobile remote deposit capture

04:41:18  21  solution.

04:41:20  22         MR. HILL:  I pass the witness, Your Honor.

04:41:22  23         THE COURT:  Redirect from the Plaintiff?

04:41:23  24         MR. SHEASBY:  Your Honor, may I approach the

04:41:30  25  witness briefly to hand up a demonstrative?

| | | |
|---|---|---|
| 04:41:32 | 1 | THE COURT:  You may. |
| 04:41:32 | 2 | REDIRECT EXAMINATION |
| 04:41:43 | 3 | BY MR. SHEASBY: |
| 04:41:43 | 4 | Q.  Mr. Bueche, I've handed you a phone with a web |
| 04:41:46 | 5 | application open on it.  Do you recognize that web |
| 04:41:49 | 6 | application? |
| 04:41:49 | 7 | A.  Yes, this is USAA's Deposit@Mobile application. |
| 04:41:52 | 8 | Q.  And does that Deposit@Mobile application contain the |
| 04:41:56 | 9 | marking language, if you present it to the jury? |
| 04:41:59 | 10 | A.  Yes, it does, including the '571 patent that we're |
| 04:42:02 | 11 | discussing today. |
| 04:42:03 | 12 | MR. HILL:  Objection, Your Honor.  May we |
| 04:42:04 | 13 | approach? |
| 04:42:04 | 14 | THE COURT:  Approach the bench. |
| 04:42:11 | 15 | (Bench conference.) |
| 04:42:12 | 16 | MR. HILL:  Your Honor, a phone -- sorry. |
| 04:42:15 | 17 | Your Honor, there's been no disclosure of a phone |
| 04:42:18 | 18 | running a live app as a physical demonstrative to be used |
| 04:42:21 | 19 | with a witness -- |
| 04:42:23 | 20 | THE COURT:  I understand. |
| 04:42:25 | 21 | Mr. Sheasby, this was represented to be a |
| 04:42:27 | 22 | demonstrative which would aid the witness in giving his |
| 04:42:31 | 23 | testimony.  You're asking him to testify as to a fact from |
| 04:42:35 | 24 | observing a phone that's not visible by the jury, the |
| 04:42:39 | 25 | Court, or opposing counsel? |

04:42:39   1         MR. SHEASBY:  I'll --

04:42:41   2         THE COURT:  That's a problem.

04:42:42   3         MR. SHEASBY:  So, Your Honor, first, we did

04:42:43   4 actually list the phone with the mobile app on our exhibit

04:42:46   5 list, and it was not objected to.

04:42:48   6         THE COURT:  Is it a pre-admitted exhibit?

04:42:50   7         MR. SHEASBY:  It was -- it was not objected to,

04:42:51   8 so, yes.

04:42:52   9         THE COURT:  If it's a pre-admitted exhibit, you

04:42:54 10 can put the phone on the ELMO and you can ask the question

04:42:56 11 of the witness.

04:42:57 12         MR. SHEASBY:  I can't do that because it shows the

04:42:58 13 other patents.  That's why I did it this way.  And you

04:43:01 14 can't -- it would be impossible for me to -- I can't redact

04:43:05 15 the other patents.

04:43:09 16         I can withdraw the question, and we can do it

04:43:11 17 later with another witness in redirect if it's too messy at

04:43:14 18 this point -- at rebuttal if it's too messy at this point.

04:43:17 19         THE COURT:  Well, if this is a pre-admitted

04:43:19 20 exhibit, I'm not going to keep you from using it.  You

04:43:21 21 represented it was a demonstrative when you walked up to

04:43:25 22 give it to the witness.

04:43:25 23         MR. SHEASBY:  I misspoke.  My understanding is

04:43:26 24 that the USAA apps and the Wells Fargo apps running on the

04:43:29 25 system are both exhibits.

| | | |
|---|---|---|
| 04:43:30 | 1 | THE COURT:  Bottom line, gentlemen, Plaintiff is |
| 04:43:31 | 2 | not going to pull a surprise on the Defendant with |
| 04:43:34 | 3 | something they can't see, that they haven't seen before, |
| 04:43:36 | 4 | but if we've got a pre-admitted exhibit, the Defendant |
| 04:43:39 | 5 | knows what it is.  I don't expect an objection if this has |
| 04:43:42 | 6 | already been disclosed and talked about and pre-admitted. |
| 04:43:45 | 7 | MR. HILL:  Your Honor, one of the things -- |
| 04:43:46 | 8 | THE COURT:  And right now I can't tell which it |
| 04:43:49 | 9 | is. |
| 04:43:49 | 10 | MR. HILL:  Well, I think we can clear it up this |
| 04:43:49 | 11 | way, Your Honor.  One of the things that the disclosures in |
| 04:43:52 | 12 | the case require is that each night we're to be given a |
| 04:43:55 | 13 | copy of any exhibit -- pre-admitted exhibit that they're |
| 04:43:57 | 14 | going to use with a witness on direct.  This is a direct |
| 04:43:59 | 15 | witness of theirs.  They're trying to use a pre-admitted |
| 04:44:02 | 16 | exhibit that they've never disclosed to us previously.  We |
| 04:44:04 | 17 | haven't had a chance to see if this is, in fact, a |
| 04:44:07 | 18 | pre-admitted exhibit. |
| 04:44:08 | 19 | I want to vet this issue like you normally would. |
| 04:44:11 | 20 | So because of that, we think it's improper at this point. |
| 04:44:15 | 21 | And we would also -- he's answered the question in part. |
| 04:44:15 | 22 | We would ask that the jury be told to disregard.  So we |
| 04:44:20 | 23 | move to strike the testimony that's come out thus far. |
| 04:44:23 | 24 | THE COURT:  It should have been disclosed, |
| 04:44:26 | 25 | Mr. Sheasby.  That way the Plaintiff -- the Defendant would |

04:44:27   1   at least know what it was.

04:44:28   2          MR. SHEASBY:  Well, I believe it was disclosed

04:44:30   3   through the exhibit list.  And this is obviously -- this is

04:44:32   4   not direct examination.  This is rebuttal.  It's impossible

04:44:35   5   to disclose rebuttal examinations.

04:44:37   6          They opened the door to this by questioning

04:44:40   7   whether the app was -- was available.  I don't know how I

04:44:43   8   can -- we had evidence.  They challenged the evidence.  I

04:44:46   9   can't anticipate what rebuttal exhibits are going to be

04:44:48  10   used.

04:44:49  11          THE COURT:  Well, it's a part of your direct case

04:44:54  12   with this witness.  It's redirect.

04:45:00  13          MR. SHEASBY:  I'll just withdraw the question,

04:45:02  14   Your Honor.

04:45:02  15          THE COURT:  All right.  Let's move on.

04:45:05  16          MR. HILL:  Your Honor, can we -- with regard to

04:45:07  17   the motion to strike, will you tell the jury to disregard

04:45:10  18   this line of questioning?

04:45:11  19          MR. SHEASBY:  Your Honor, I'm concerned that -- I

04:45:14  20   think it's something that we need to address after we -- we

04:45:17  21   look at the exhibit list.  I believe this exhibit --

04:45:19  22          THE COURT:  I'll carry that request.  I'm not

04:45:22  23   going to instruct them right now.

04:45:23  24          MR. HILL:  Thank you.

04:45:24  25          (Bench conference concluded.)

04:45:26   1          THE COURT:  Let's proceed.

04:45:27   2   Q.  (By Mr. Sheasby)  Mr. Bueche, counsel asked you about

04:45:30   3   why it was important not to invent -- about the fact that

04:45:36   4   you did not invent any new hardware.

04:45:38   5   A.  That's correct.

04:45:39   6   Q.  Why -- was that important to USAA that it didn't need

04:45:44   7   new hardware?

04:45:45   8   A.  No, we would use whatever devices are available.  I

04:45:54   9   don't quite understand the question.

04:45:55  10   Q.  Is there a value to not needing new hardware for your

04:45:58  11   system?

04:46:00  12   A.  Absolutely because then that means that the member

04:46:03  13   doesn't have to go and buy something new.  It can use what

04:46:06  14   they've got.

04:46:08  15   Q.  And how many mobile remote deposits are achieved each

04:46:14  16   year by USAA?

04:46:15  17   A.  Well, we do between 50 and 70 million deposits per year

04:46:20  18   at USAA.

04:46:21  19          MR. SHEASBY:  Thank you, Your Honor.

04:46:25  20          THE COURT:  You pass the witness, counsel?

04:46:26  21          MR. SHEASBY:  I pass the witness, Your Honor.

04:46:28  22          THE COURT:  All right.  Is there additional cross,

04:46:29  23   Mr. Hill?

04:46:30  24          MR. HILL:  No, Your Honor.

04:46:31  25          THE COURT:  Then you may step down, Mr. Bueche.

| | | |
|---|---|---|
| 04:46:34 | 1 | Plaintiff, call your next witness. |
| 04:46:43 | 2 | MR. SHEASBY:  Your Honor, the Plaintiffs call |
| 04:46:46 | 3 | Mr. William Saffici by deposition -- deposition video play. |
| 04:46:51 | 4 | THE COURT:  All right.  Present the witness by |
| 04:46:52 | 5 | deposition.  You may introduce him for the record before |
| 04:46:55 | 6 | you play the video. |
| 04:46:56 | 7 | MR. SHEASBY:  Thank you, Your Honor. |
| 04:46:57 | 8 | Mr. William Saffici is an expert that has been |
| 04:47:01 | 9 | retained by Wells Fargo in this matter. |
| 04:47:09 | 10 | THE COURT:  All right.  Let's proceed with the |
| 04:47:10 | 11 | witness by video deposition. |
| 04:47:12 | 12 | (Videoclip played.) |
| 04:47:13 | 13 | QUESTION:  Good morning, sir.  Can you state your |
| 04:47:15 | 14 | full name for the record? |
| 04:47:15 | 15 | ANSWER:  It's William L. Saffici.  Louis -- L is |
| 04:47:21 | 16 | for Louis, L-o-u-i-s. |
| 04:47:23 | 17 | QUESTION:  And when were you hired to work on this |
| 04:47:26 | 18 | case by Wells Fargo? |
| 04:47:28 | 19 | ANSWER:  I was contacted on February the 1st of |
| 04:47:34 | 20 | 2019. |
| 04:47:34 | 21 | QUESTION:  You understand that the patents in this |
| 04:47:37 | 22 | case recite cameras, correct? |
| 04:47:40 | 23 | ANSWER:  Yes. |
| 04:47:42 | 24 | QUESTION:  You understand that cameras can be |
| 04:47:45 | 25 | video cameras, correct? |

| | | |
|---|---|---|
| 04:47:46 | 1 | ANSWER:  Yes. |
| 04:47:51 | 2 | QUESTION:  Now, what are the processing steps that |
| 04:47:55 | 3 | banks perform on check images once they receive them? |
| 04:47:59 | 4 | ANSWER:  Can you clarify what you mean by once -- |
| 04:48:04 | 5 | receive them from where, I guess? |
| 04:48:07 | 6 | QUESTION:  From a depository. |
| 04:48:09 | 7 | ANSWER:  Okay.  So there's multiple channels that |
| 04:48:13 | 8 | a financial institution receives deposits through.  Mobile |
| 04:48:19 | 9 | is one.  Corporates have the ability to submit deposits |
| 04:48:24 | 10 | through image.  The branches create images.  ATMs create |
| 04:48:32 | 11 | images. |
| 04:48:33 | 12 | QUESTION:  Sure. |
| 04:48:33 | 13 | ANSWER:  Okay.  Each of those channels has its own |
| 04:48:37 | 14 | hardware and software, but they all share a lot of |
| 04:48:46 | 15 | commonality.  They also each have their own respective |
| 04:48:53 | 16 | server that collects the images from that channel. |
| 04:48:58 | 17 | Those servers feed what's known as an item |
| 04:49:04 | 18 | processing system because there needs to be an aggregation |
| 04:49:09 | 19 | of images and data from all the sources.  One particular |
| 04:49:13 | 20 | reason is that each item must have a unique item sequence |
| 04:49:19 | 21 | number on them. |
| 04:49:23 | 22 | Each source channel applies an item sequence |
| 04:49:26 | 23 | number, but they can be duplicative.  So the purpose of the |
| 04:49:29 | 24 | item process -- one of the purposes of the item processing |
| 04:49:33 | 25 | system is managing the uniqueness of the item sequence |

04:49:37  1  number, particularly for when it feeds the archive.

04:49:39  2        It also does data completion, data correction,

04:49:44  3  image quality, image integrity analysis, duplicate

04:49:49  4  detection, and balancing.  And then it feeds respective

04:49:57  5  outputs.  One of the outputs being a deposit system, which

04:50:02  6  only is fed data and not an image.

04:50:06  7        And then it also feeds its clearing application,

04:50:11  8  which is to send those checks drawn on other financial

04:50:16  9  institutions onward to the paying bank, whether it be

04:50:19  10 through an intermediary or directly with the paying bank.

04:50:24  11       QUESTION:  You agree that the patents-in-suit

04:50:28  12 introduce autonomous monitoring and corrective feedback

04:50:31  13 techniques, fair?

04:50:32  14       ANSWER:  Yes.

04:50:33  15       QUESTION:  You agree that those are referred to in

04:50:38  16 the industry as auto capture, fair?

04:50:39  17       ANSWER:  Yes.

04:50:39  18       QUESTION:  You don't dispute that auto capture is

04:50:47  19 widely acknowledged as the foundation for a successful

04:50:50  20 mobile check deposit, fair?

04:50:52  21       ANSWER:  I would agree with that.

04:50:54  22       QUESTION:  The patents are claiming a technique to

04:50:59  23 obtain an image of sufficient quality that deposit will be

04:51:04  24 successful, fair?

04:51:15  25       ANSWER:  Yes.

04:51:15   1           QUESTION:  Good morning, sir.  Can you state your

04:51:17   2    full name for the record?

04:51:18   3           ANSWER: William Louis Saffici, Louis being spelled

04:51:23   4    L-o-u-i-s.

04:51:23   5           QUESTION:  Sir, you have been retained as an

04:51:25   6    expert on behalf of Wells Fargo; is that correct?

04:51:26   7           ANSWER:  That is correct.

04:51:27   8           QUESTION:  Now, sir, you have some experience with

04:51:37   9    remote deposit capture, fair?

04:51:38   10          ANSWER:  That's correct.

04:51:40   11          QUESTION:  You consider yourself an expert in the

04:51:42   12   field of remote deposit capture, correct?

04:51:44   13          ANSWER:  Yes.

04:51:44   14          QUESTION:  You've worked professionally in that

04:51:47   15   field for many years, correct?

04:51:49   16          ANSWER:  Yes.

04:51:49   17          QUESTION:  And you applied claim constructions in

04:51:51   18   this case, correct?

04:51:52   19          ANSWER:  Yes.

04:51:52   20          QUESTION:  And for terms that have been construed

04:51:58   21   by the Court, you applied the Court's construction,

04:52:02   22   correct?

04:52:02   23          ANSWER:  That's correct.

04:52:02   24          QUESTION:  And for the other terms, I noticed that

04:52:04   25   you applied what you described as, quote, the plain and

04:52:10  1  ordinary meaning to a POSITA of those terms, correct?

04:52:13  2          ANSWER:  For these that the Court did not define.

04:52:16  3          QUESTION:  You believe live video feeds are

04:52:19  4  covered by the claims of the patents-in-suit, correct?

04:52:21  5          ANSWER:  Yes.

04:52:21  6          QUESTION:  The live video feed shows previews of

04:52:24  7  the images, correct?

04:52:25  8          ANSWER:  Yes.

04:52:25  9          QUESTION:  And you believe that's covered by the

04:52:26  10 claims of the patent, correct, analyzing preview frames,

04:52:30  11 making decisions as to when the preview frames satisfy the

04:52:34  12 criteria, and then taking that frame that satisfies the

04:52:38  13 criteria, correct?

04:52:40  14         ANSWER:  Yes.  The alignment, the monitoring, and

04:52:43  15 the auto capture.

04:52:43  16         QUESTION:  The answer to my question is yes;

04:52:43  17 correct?

04:52:46  18         ANSWER:  I believe that'd be correct, yes.

04:52:48  19         QUESTION:  The patents-in-suit use the phrase

04:52:50  20 camera, correct?

04:52:51  21         ANSWER:  Yes.

04:52:51  22         QUESTION:  They use the phrase camera in the

04:52:53  23 claims, correct?

04:52:53  24         ANSWER:  Yes.

04:52:54  25         QUESTION:  You understand that a camera in its

04:52:57  1   plain meaning includes a video camera, correct?

04:52:59  2          ANSWER:  Yes.

04:52:59  3          QUESTION:  You applied the plain meaning of the

04:53:07  4   term camera to your interpretation and meaning of the

04:53:10  5   claims of the patents-in-suit, correct?

04:53:12  6          ANSWER:  Yes.  That was a part of the claim

04:53:14  7   construction.

04:53:14  8          QUESTION:  Now, what's the meaning of the term

04:53:17  9   capture that you applied?

04:53:19  10          ANSWER:  Capture would be the acquisition, in this

04:53:24  11   case, of an image.

04:53:26  12          QUESTION:  What does it mean to acquire an image?

04:53:32  13          ANSWER:  Another layman's way, I guess, was -- or

04:53:36  14   another way of saying it would be taking a picture.

04:53:39  15          QUESTION:  Do you know how a video -- a camera --

04:53:42  16   a video camera, quote, takes a picture?

04:53:44  17          ANSWER:  Yeah, my understanding is it's taking

04:53:47  18   multiple frames continuously.

04:53:49  19          QUESTION:  Is acquisition of a frame of a video

04:53:54  20   feed the same as capturing that frame?

04:53:59  21          ANSWER:  No, I think capture would relate to --

04:54:03  22   oh, to one frame?  Yeah, I guess I would attribute that to

04:54:07  23   that.

04:54:08  24          QUESTION:  So it says, in an implementation, the

04:54:12  25   mobile device may comprise a video source, such as a video

04:54:15  1  camera, web camera, or video-enabled phone, for example, to

04:54:20  2  obtain a video of a check.  A frame of the video may be

04:54:23  3  obtained and monitored with respect to monitoring criterion

04:54:27  4  such as described herein.  Do you see that, sir?

04:54:29  5        ANSWER:  Yes.

04:54:30  6        QUESTION:  And you agree that that's one of the

04:54:34  7  embodiments that are covered by the claims of the patent,

04:54:38  8  correct?

04:54:38  9        ANSWER:  Yeah, I believe that aligns with the

04:54:41  10  claims.

04:54:42  11        QUESTION:  Okay.  Now, let me ask you a next

04:54:44  12  question.

04:54:45  13        It says a frame of the video may be obtained and

04:54:49  14  then monitored, correct?

04:54:50  15        ANSWER:  Yes.

04:54:51  16        QUESTION:  So in the specification, obtaining is

04:54:53  17  something that occurs before monitoring, correct?

04:54:55  18        ANSWER:  Yes.

04:54:56  19        QUESTION:  And --

04:54:57  20        ANSWER:  I guess there'd be a sequential step

04:55:00  21  there.

04:55:01  22        QUESTION:  Okay.  And then in the claim -- and

04:55:04  23  then in the specification after the monitoring criterion

04:55:06  24  are satisfied then capture occurs, correct?

04:55:09  25        ANSWER:  Yes.

04:55:09  1        QUESTION:  In the patent?

04:55:10  2        ANSWER:  Yes.

04:55:10  3        QUESTION:  So the patent talks about obtaining

04:55:12  4   frames from the video, then monitoring, and then in the

04:55:17  5   monitoring criteria are satisfied, then capturing, fair?

04:55:20  6        ANSWER:  Yeah.  Right here capturing the image of

04:55:23  7   a check when the image passes monitoring, yes.

04:55:26  8        QUESTION:  The patent -- there's a difference

04:55:28  9   between obtaining a frame from the video stream so that

04:55:32  10  image quality analysis can occur, and then once the

04:55:35  11  monitoring criteria have been satisfied, capturing that

04:55:38  12  image.  Fair?

04:55:39  13       ANSWER:  Yes.

04:55:39  14       QUESTION:  Why don't you go ahead and read Column

04:55:41  15  17, 47 through 63?

04:55:47  16       So in this passage, it's talking about the same

04:55:50  17  image being monitored that's captured, correct?

04:55:53  18       ANSWER:  The same image that's being monitored is

04:55:58  19  captured?

04:55:59  20       QUESTION:  Yes, sir.

04:56:05  21       ANSWER:  Yeah, I would -- I would agree with that.

04:56:07  22       QUESTION:  Column 17, Lines 47 through 63

04:56:14  23  describes an embodiment of the patent -- embodiment in the

04:56:20  24  claims in which you're monitoring an image, and then as

04:56:23  25  soon as you determine that that image satisfies the

04:56:28   1   monitoring criteria, you capture that exact same image

04:56:32   2   you've been monitoring.  Fair?

04:56:32   3          ANSWER:  I would agree with that.

04:56:33   4          QUESTION:  Now, you cite to Exhibit 21, which is a

04:56:37   5   2017 Mobile Deposit Benchmark Report, correct?

04:56:40   6          ANSWER:  Right.

04:56:40   7          QUESTION:  You believe that's a reliable document,

04:56:43   8   fair?

04:56:43   9          ANSWER:  This is where I'd like to give you my

04:56:47  10   opinion.

04:56:49  11          QUESTION:  Okay.  So we'll do it in pieces.

04:56:51  12          In your expert report, do you make any statement

04:56:57  13   that the mobile benchmark report is not a reliable

04:57:02  14   document?

04:57:02  15          ANSWER:  No, I don't say that.

04:57:04  16          QUESTION:  In fact, you cite the Mobile Deposit

04:57:07  17   Benchmark Report, correct?

04:57:09  18          ANSWER:  That's correct.

04:57:09  19          QUESTION:  You want to make a statement about the

04:57:12  20   mobile benchmark report?

04:57:13  21          ANSWER:  Yeah, that, yeah, as it applies

04:57:16  22   specifically and then even more generally.  When you have a

04:57:19  23   report that's commissioned by a vendor -- or sponsored, I

04:57:23  24   think was the term in that case, there's always a bit of

04:57:29  25   marketing fluff that's added to it.  I've worked for

04:57:32  1  multiple vendors over the years.  I've been in marketing

04:57:35  2  positions.  We all know, I think, how that works.

04:57:40  3        So some -- I'm not saying any of this is

04:57:43  4  exaggerated, okay?  But some of the very subjective words

04:57:47  5  that get used in there, okay, are because of the source.

04:57:50  6        QUESTION:  I'm listening.

04:57:51  7        ANSWER:  That's my statement.

04:57:55  8        QUESTION:  You don't identify a single statement

04:57:59  9  in the Futurion Mobile Deposit Benchmark Report that you

04:58:06  10  believe is puffery or fluffy or not inaccurate, correct?

04:58:10  11        ANSWER:  I did not point one out, no.

04:58:13  12        QUESTION:  And you understand is -- that the place

04:58:18  13  for you to give your opinions on the mobile deposit

04:58:20  14  report -- benchmark report was your report, fair?

04:58:23  15        ANSWER:  I understand.

04:58:26  16        QUESTION:  And, in fact, you cite the mobile

04:58:30  17  benchmark report in your report to support an assertion

04:58:36  18  you're making, fair?

04:58:37  19        ANSWER:  Where I felt it was factual.

04:58:45  20        QUESTION:  And you reviewed the mobile deposit

04:58:50  21  benchmark report in preparing your report in this case,

04:58:52  22  correct?

04:58:52  23        ANSWER:  That's correct.

04:58:53  24        (Videoclip ends.)

04:58:55  25        THE COURT:  Does that complete the witness by

04:58:57  1   deposition?

04:58:58  2          MR. SHEASBY:  It does, Your Honor.

04:59:00  3          THE COURT:  All right.  Ladies and gentlemen of

04:59:04  4   the jury, we're going to take a short recess at this time.

04:59:07  5          I'm going to ask you simply to close your

04:59:10  6   notebooks and leave them in your chairs.  I'm going to

04:59:13  7   remind you to follow all the instructions I've given you,

04:59:16  8   including not to discuss the case among yourselves.  We'll

04:59:19  9   try to make this short and have you back in here quickly,

04:59:22 10   so we can continue with the next witness.

04:59:23 11          But the jury is excused for recess at this time.

04:59:27 12          COURT SECURITY OFFICER:  All rise.

04:59:27 13          (Jury out.)

04:59:54 14          THE COURT:  All right.  Be seated, please.

04:59:55 15          I'm not sure where it's coming from, but I have

05:00:02 16   regularly heard various tones and noises from devices

05:00:05 17   somewhere in this room.  Whoever is the owner of such

05:00:10 18   devices, I want to make sure they're completely silent.

05:00:13 19          If I continue to hear them, I will stop things and

05:00:16 20   find out where it's coming from and deal with it in a more

05:00:19 21   direct way.

05:00:20 22          Also, counsel, unless there's an emergency or you

05:00:23 23   have leave of the Court, I don't want counsel getting up

05:00:27 24   from counsel table and walking in and out of the courtroom

05:00:29 25   in the back of the room.

05:00:30   1          I sit here until we have a recess.  You need to
05:00:33   2   sit there until we have a recess.
05:00:35   3          Unless there's -- if there's an emergency,
05:00:37   4   approach the bench and take it up with me, and we'll
05:00:39   5   certainly make an accommodation.  But that kind of movement
05:00:42   6   distracts from the presentation of the evidence to the
05:00:45   7   witness, even if it's your own co-counsel at the podium at
05:00:49   8   the time.
05:00:49   9          All right.  Who is next the witness for the
05:00:52   10  Plaintiff?
05:00:52   11         MR. SHEASBY:  Professor Tom Conte, Your Honor.
05:00:55   12         THE COURT:  All right.  And what's your expected
05:00:57   13  time for direct examination -- your best guess?
05:01:00   14         MR. ROWLES:  I would say about an hour and a half,
05:01:02   15  Your Honor.
05:01:02   16         THE COURT:  All right.  We'll take a short recess,
05:01:04   17  and then we'll continue.
05:01:06   18         Mr. Melsheimer.
05:01:06   19         MR. MELSHEIMER:  Your Honor, can I raise one issue
05:01:08   20  with the Court --
05:01:08   21         THE COURT:  Briefly.
05:01:09   22         MR. MELSHEIMER:  -- just a housekeeping matter?
05:01:10   23         THE COURT:  Briefly.
05:01:11   24         MR. MELSHEIMER:  I wonder if the Court might
05:01:13   25  consider giving the jury an instruction about playing of

05:01:15  1  depositions, that both sides have contributed to the

05:01:18  2  playing.

05:01:19  3          In other words, unlike a witness when there's an

05:01:22  4  obvious direct and cross, that submission to the jury was

05:01:25  5  what they wanted to play and what we wanted to play.  And I

05:01:28  6  just think it would be helpful for the jury to hear that

05:01:33  7  from the Court, and that would be my request.

05:01:35  8          THE COURT:  Is there an objection from the

05:01:36  9  Plaintiff to that?

05:01:37  10         MR. SHEASBY:  Your Honor, I don't think there was

05:01:38  11  any implication that it was one side's testimony or the

05:01:42  12  other.

05:01:42  13         THE COURT:  I don't -- I don't take

05:01:44  14  Mr. Melsheimer's suggestion that there was a negative

05:01:46  15  implication, just --

05:01:48  16         MR. MELSHEIMER:  I wasn't suggesting that at all,

05:01:50  17  Your Honor.  Just as a housekeeping matter, that they

05:01:52  18  realize it's not like they play their part and then we hit

05:01:56  19  stop and we play our part.  They're all played in one.  And

05:01:59  20  I just think it would be instructive to the jury to hear

05:02:02  21  that from the Court.

05:02:03  22         THE COURT:  Well, I don't really have a problem

05:02:05  23  with that.  Of course, the jury is never going to know

05:02:07  24  which was contributed by which party and which was

05:02:10  25  contributed by the other.  But I don't mind telling them

05:02:13  1   that both sides have an opportunity to contribute to the

05:02:15  2   pre-recorded questions and answers from any deposition

05:02:18  3   witness.

05:02:19  4           MR. MELSHEIMER:  Thank you, Your Honor.

05:02:19  5           THE COURT:  And I'll do that.  All right.

05:02:21  6           MR. SHEASBY:  And one other thing, Your Honor.

05:02:22  7           I did just check.  The applications did drop off

05:02:25  8   the exhibit list.  Mr. Hill was entitled to his

05:02:28  9   instruction.

05:02:31 10           THE COURT:  Why don't you two meet and confer

05:02:32 11   about exactly what a proper instruction would be over the

05:02:35 12   recess, and then let me know what you've come up with

05:02:38 13   before I bring the jury back in?

05:02:39 14           MR. SHEASBY:  Thank you, Your Honor.

05:02:40 15           THE COURT:  All right.  The Court stands in

05:02:41 16   recess.

05:02:41 17           COURT SECURITY OFFICER:  All rise.

05:02:42 18           (Recess.)

05:02:45 19           (Jury out.)

05:11:01 20           COURT SECURITY OFFICER:  All rise.

05:11:05 21           THE COURT:  All right.  Be seated, please.

05:11:07 22           Mr. Hill, Mr. Sheasby, did you come to some agreed

05:11:29 23   instruction on Mr. Bueche?

05:11:30 24           MR. SHEASBY:  We did, but then we found out that

05:11:32 25   we believe the USAA marking page is on the screenshots from

05:11:37  1  Wells Fargo's -- Wells Fargo's evidence of them looking at

05:11:40  2  our web app, and so we're going to have to check it real

05:11:44  3  quick before we come to the -- a resolution on -- we think

05:11:47  4  it may be in evidence via Wells Fargo's evidence, and there

05:11:51  5  are pictures of our app.

05:11:52  6          MR. HILL:  Your Honor, we don't think that changes

05:11:54  7  the issue.  The witness was presented something not in

05:11:56  8  evidence and asked to read it.  He read it.  The jury

05:11:59  9  should be instructed to disregard that.  If that's in

05:12:00  10  evidence in some other form that they want to offer through

05:12:03  11  some other witness to actually testify about it, we also,

05:12:07  12  again, may have issue with whether that is, in fact, the

05:12:10  13  truth.  Not suggesting it's deception.  I'm just --

05:12:13  14          THE COURT:  I want an answer as to whether the

05:12:17  15  image he was looking at is covered by any of the

05:12:19  16  pre-admitted exhibits, and I'm going to carry the request

05:12:22  17  until we get an answer to that question.

05:12:24  18          MR. SHEASBY:  Thank you, Your Honor.

05:12:25  19          THE COURT:  All right.  All right.  Let's bring in

05:12:36  20  the jury.

05:12:37  21          COURT SECURITY OFFICER:  All rise.

05:12:43  22          (Jury in.)

05:13:00  23          THE COURT:  Welcome back, ladies and gentlemen.

05:13:07  24          Please be seated.

05:13:07  25          Ladies and gentlemen, before the Plaintiff calls

05:13:14  1   their next witness, I do have one thing I want to mention

05:13:18  2   to you.

05:13:18  3       We just saw a witness presented, Mr. William

05:13:22  4   Saffici.  We've seen him presented by deposition.

05:13:27  5       I want the jury to be aware that when a witness is

05:13:29  6   presented by deposition, both Plaintiff and Defendant have

05:13:32  7   an opportunity to pick and choose portions of the recorded

05:13:35  8   questions and answers and include them in what's shown to

05:13:38  9   the jury.

05:13:38  10      I want you to at least know that.

05:13:41  11      All right.  Plaintiff, call your next witness.

05:13:43  12      MR. ROWLES:  Your Honor, USAA calls Professor

05:13:47  13  Thomas Conte.

05:13:49  14      THE COURT:  All right.  If you'll come forward and

05:13:50  15  be sworn, sir.

05:14:03  16      (Witness sworn.)

05:14:04  17      THE COURT:  Please come around, sir.  Have a seat

05:14:06  18  on the witness stand.

05:14:19  19      All right.  Mr. Rowles, you may proceed with your

05:14:22  20  direct examination.

05:14:22  21      MR. ROWLES:  Thank you, Your Honor.

05:14:22  22      THOMAS CONTE, PLAINTIFF'S WITNESS, SWORN

05:14:22  23              DIRECT EXAMINATION

05:14:23  24  BY MR. ROWLES:

05:14:23  25  Q.  Good afternoon, Professor.  Can you please introduce

05:14:27   1   yourself?

05:14:27   2   A.  I'm Tom Conte.  I'm a professor of computer science and

05:14:34   3   computer engineering at Georgia Tech.  I have a wife, two

05:14:36   4   grown kids, and three dogs.  And the kids are still living

05:14:41   5   at home, regrettably.

05:14:43   6   Q.  Professor Conte, what is your role in this case?

05:14:46   7   A.  I was called on to look at the patents that you've

05:14:49   8   heard about and also look at the Wells Fargo system and

05:14:51   9   then determine, as you heard earlier, whether or not each

05:14:57   10  and every element of the claims of the patent are present

05:15:01   11  in that system.

05:15:03   12  Q.  Are you being compensated for your time working on this

05:15:05   13  case?

05:15:05   14  A.  Yes, I am.  I'm being compensated at my standard rate

05:15:09   15  of $600.00 per actual hour worked.

05:15:13   16  Q.  And is your payment dependent in any way on the outcome

05:15:16   17  of the case or the substance of the testimony you'll give

05:15:18   18  today?

05:15:19   19  A.  No, none at all.

05:15:22   20  Q.  Professor Conte, did you prepare some slides to help

05:15:24   21  the jury with your testimony today?

05:15:26   22  A.  Yes, I did.

05:15:30   23        MR. ROWLES:  Thank you, Mr. Huynh.

05:15:38   24  Q.  (By Mr. Rowles)  What is your educational background?

05:15:39   25  A.  I grew up in Delaware.  And after I graduated high

05:15:40   1   school, I went to the University of Delaware where I get my

05:15:41   2   engineering degree.  Then I got admitted to the University

05:15:44   3   of Illinois, so that's where I got my Master's of Science

05:15:47   4   and Engineering and ultimately my Doctorate of Engineering

05:15:51   5   in '92.

05:15:52   6   Q.  And what is it your professional experience?

05:15:55   7   A.  Right after I got my Ph.D., I got a job at the

05:15:58   8   University of South Carolina in Columbia, South Carolina.

05:16:02   9   That's where I met my future wife.  And then we moved to

05:16:06  10   Raleigh, North Carolina where I was at NC State University

05:16:11  11   for 13 years.  And then in 2008, we packed up the family

05:16:15  12   and moved to Georgia to teach at Georgia Tech.

05:16:18  13   Q.  Have you done any work in industry?

05:16:20  14   A.  Yes, I have.  Quite a bit.  For example, I worked for a

05:16:25  15   company called Billions of Operation Per Second, Inc.,

05:16:30  16   which is a mouthful, so we called it BOPS.  BOPS built DSP

05:16:38  17   processors, special purpose processors that you use for

05:16:40  18   voice or image analysis or things like this.  Our goal was

05:16:45  19   to have something that would work off of a battery.

05:16:48  20   Q.  And do you have any experience with mobile technology?

05:16:51  21   A.  Oh, yes, I do.  I -- I teach students how to do mobile

05:16:56  22   technology.  In fact, I've recently advised a group of

05:16:59  23   students who built a mobile app, and now they're taking it

05:17:02  24   into a startup company.

05:17:04  25   Q.  Have you ever actually worked to build a mobile

05:17:07  1  processor?

05:17:07  2  A.  Yes, I have.  I also consulted for Qualcomm in their

05:17:12  3  division that was the first -- the division that built the

05:17:15  4  first -- they called it Snapdragon processor.  The

05:17:21  5  Snapdragon is in a lot of -- I think the vast majority of

05:17:25  6  Android phones.

05:17:26  7  Q.  Have you received any recognitions for your work?

05:17:28  8  A.  Yeah.  I was elevated to fellow of the IEEE in 2005 for

05:17:35  9  contributions to microarchitecture.  That's our name for

05:17:39  10  processor design and computer -- computer performance

05:17:42  11  evaluation.  I was elected president of the IEEE Computer

05:17:48  12  Society and served that role in 2015.

05:17:50  13       I'm the named inventor on 40 U.S. patents.  And I

05:17:56  14  have over 100 peer-reviewed technical publications.

05:17:59  15  Q.  And what is the IEEE?

05:18:01  16  A.  That's the Institute of Electrical and Electronics

05:18:06  17  Engineers.  That's the people who standardize things like

05:18:09  18  WiFi.  It is the largest and most prolific engineering

05:18:13  19  society in the world.  And I've been a member since 1984.

05:18:19  20  Q.  How did you become a fellow of the IEEE?

05:18:22  21  A.  Well, the way this works is you get nominated by other

05:18:27  22  fellows, and then there's a select committee of fellows

05:18:30  23  that looks at your nomination.

05:18:32  24       There's a rule that only 0.1 percent of the

05:18:35  25  membership at any one time can be a fellow.  And then the

05:18:39   1    nomination goes on to the board of directors of the IEEE

05:18:43   2    that ultimately votes up or down.

05:18:46   3            MR. ROWLES:  Your Honor, at this time I tender

05:18:48   4    Professor Conte as an expert in the fields of computer

05:18:51   5    science and mobile device technology.

05:18:53   6            THE COURT:  Is there objection?

05:18:54   7            MR. MELSHEIMER:  There is not, Your Honor.

05:18:55   8            THE COURT:  All right.  Then, without objection,

05:18:57   9    the Court recognizes the witness as an expert in the

05:19:00   10   designated fields.

05:19:01   11           Continue, counsel.

05:19:02   12   Q.  (By Mr. Rowles)  Professor Conte, could you summarize

05:19:05   13   the opinions that you reached in the course of your expert

05:19:08   14   analysis in this case?

05:19:08   15   A.  Yes, I can summarize.  And I want to indicate, I'm

05:19:13   16   going to go through them in detail after this.  But I

05:19:16   17   analyzed the '571 and the '090 patents in light of the

05:19:20   18   Court's claim construction that are the definitions that

05:19:23   19   the Court decided for certain claim terms.

05:19:26   20           I analyzed the Wells Fargo Mobile Deposit system,

05:19:30   21   and I concluded and I'll show you all the detailed analysis

05:19:33   22   of this, that all the claim elements are present in the

05:19:37   23   Wells Fargo Mobile Deposit system.

05:19:39   24   Q.  Now, what does an expert in your shoes look at to

05:19:43   25   perform an expert infringement analysis?

05:19:45   1   A.  Okay.  Well, I -- first I experiment with the system if

05:19:50   2   I can.  And in this case, it was relatively easy since I --

05:19:54   3   I actually use this very app for depositing checks myself.

05:19:58   4        But then I signed a protective order that the

05:20:02   5   Court issued, and this gives me access to proprietary

05:20:07   6   documents, proprietary witness testimony, and, most

05:20:11   7   importantly, also just -- proprietary source code.  So I

05:20:16   8   looked at all of those things.

05:20:17   9   Q.  And have you used the Wells Fargo application before

05:20:19   10  you started working on this case?

05:20:21   11  A.  Yes, I had.  I -- in fact, I used it just a couple of

05:20:25   12  days ago.

05:20:26   13  Q.  As a Wells Fargo customer?

05:20:27   14  A.  Yes.  I'm a happy Wells Fargo customer.

05:20:30   15  Q.  What legal rules did you apply in your analysis?

05:20:33   16  A.  Okay.  So I applied, and you heard this already a

05:20:37   17  couple of times this morning, but the definition of what it

05:20:40   18  means to infringe, which is making, using, selling,

05:20:43   19  offering for sale, or importing into the United States any

05:20:47   20  patented invention without permission.

05:20:51   21  Q.  And how did you go about examining the two asserted

05:20:55   22  patents in this case?

05:20:55   23  A.  Well, you've heard some about patents and you've seen

05:21:00   24  some.  So, in fact, I believe you have copies of the

05:21:04   25  patents.  They are comprised of a cover page and that cover

05:21:08  1  page will list the inventors and when the patent is filed

05:21:10  2  and other aspects of -- of that, and then there's the

05:21:16  3  specification, and it's line numbered with columns, and

05:21:21  4  that's the description of the invention, and then there are

05:21:24  5  the claims.  And the claims are really the legal claim to

05:21:28  6  what the invention is.

05:21:30  7  Q.  And how did you use the claims of the invention in your

05:21:33  8  infringement analysis?

05:21:34  9  A.  Well, what I did was I looked at the claims.  Now,

05:21:37  10  there's only some of the claims asserted in this case, not

05:21:42  11  all of them.  And I looked at the Court definitions for

05:21:44  12  those terms that were in dispute.  The Court made a ruling

05:21:48  13  of what they need.

05:21:49  14         For any term that wasn't in dispute, I used the

05:21:52  15  ordinary meaning to one of the -- the way they say it is

05:21:56  16  one of skill in the art, in other words, someone that would

05:22:00  17  be of ordinary skill.

05:22:02  18         And then I compared the claim elements of -- what

05:22:06  19  I did was I took each claim element and I -- of the

05:22:09  20  asserted claims, and I looked in the Wells Fargo system to

05:22:11  21  see whether or not it was present, and if it was present, I

05:22:15  22  noted what the evidence is.

05:22:18  23  Q.  What types of infringement did you consider?

05:22:21  24  A.  And I think you've heard about this some already.

05:22:24  25  There's two kinds.  There's literal infringement, and

05:22:26  1   that's where all the claim elements are present.  And then

05:22:30  2   there's the Doctrine of Equivalents, which is all the claim

05:22:32  3   elements or their equivalents are present.

05:22:37  4   Q.  Did you consider evidence of Wells Fargo's knowledge or

05:22:40  5   intent to infringe?

05:22:41  6   A.  No, I did not.  You don't need knowledge or intent to

05:22:45  7   infringe, as you -- as you've already heard.

05:22:47  8   Q.  Now, how did you perform your literal infringement

05:22:50  9   analysis?

05:22:50  10  A.  So I'll go over this again, and I think you've already

05:22:53  11  seen this claim maybe once or twice before.

05:22:55  12          I will go through each element of this, and for

05:22:59  13  each element, I will show you where I found it in the Wells

05:23:04  14  Fargo mobile system.

05:23:08  15  Q.  And how did you go about your Doctrine of Equivalents

05:23:10  16  analysis?

05:23:10  17  A.  What I did was I applied this test, which is something

05:23:15  18  is insubstantially different if -- if it performs

05:23:20  19  substantially the same function in substantially the same

05:23:23  20  way to achieve substantially the same result.

05:23:27  21          Your Honor used the example of nails versus screws

05:23:31  22  in a table, for example.  They -- they do -- they achieve

05:23:35  23  substantially the same function, that is to fix the legs,

05:23:40  24  in substantially the same way, the way you would insert

05:23:43  25  them and the like, and they achieve the same result, the

05:23:47  1   legs don't fall off.

05:23:48  2   Q.  Could you give the jury a roadmap of the topics you'll

05:23:52  3   address in your testimony today?

05:23:53  4   A.  Sure.  So I'm going to start with the USAA's asserted

05:23:57  5   patents and talk some about that.  I know you've already

05:24:00  6   heard some, but I'm going to try to go in a little more

05:24:03  7   depth.  And then I'm going to go over the Wells Fargo

05:24:06  8   system that I found was infringing, and then I'll go

05:24:08  9   through an element-by-element analysis and give you all the

05:24:11  10   evidence I have.

05:24:13  11   Q.  Now, could you start by giving a brief overview of the

05:24:16  12   two asserted USAA patents?

05:24:19  13   A.  Yes.  So generally, these patents talk about a

05:24:21  14   processor that assesses image quality by criteria.  It

05:24:25  15   supplies corrective feedback to the user, move closer, tilt

05:24:29  16   the camera.  And then it automatically captures an image

05:24:35  17   once those criteria are passed.

05:24:38  18   Q.  And is there a term for those techniques used in the

05:24:40  19   industry?

05:24:41  20   A.  Yes.  So Mr. Saffici -- I believe this was just played,

05:24:48  21   he -- he commented that this was called auto capture.

05:24:51  22   Q.  Now, could you walk the jury through an example system

05:24:54  23   covered by the claims of the patents?

05:24:56  24   A.  Okay.  So here's an example system.  Now, this system

05:24:59  25   is in the specification.  So it's -- it's an example.  The

05:25:02  1  claims can cover other systems that aren't outlined in the

05:25:05  2  specification, but let's just go through it.

05:25:07  3       So it talks about a mobile device, and it goes on.

05:25:12  4  You see that No. 106, that's actually a cite to a figure so

05:25:15  5  that you can just sort of leave those out as you read this.

05:25:19  6  The mobile device may comprise a video source such as a

05:25:23  7  video camera, a web camera, or a video-enabled phone.  And

05:25:27  8  then it talks about a frame of a video may be obtained and

05:25:30  9  monitored with respect to the monitoring criteria.

05:25:34  10  Q.  Now, in the asserted patents, what happens after the

05:25:37  11  frame of the video is monitored?

05:25:39  12  A.  After it's monitored and it passes those criteria, that

05:25:42  13  means it's a good image and it then captures the imaging.

05:25:47  14  Q.  And what was the next step of your analysis?

05:25:49  15  A.  So, next, I looked at the operation of the Wells Fargo

05:25:52  16  system.

05:25:53  17  Q.  And so what exactly is the -- the Wells Fargo system

05:25:57  18  accused of infringement here?

05:25:58  19  A.  So there is an app you can download to your Android or

05:26:03  20  your iPhone in iOS, and this is a picture of it here.

05:26:09  21  Q.  And at a high level, what -- what does this Wells Fargo

05:26:13  22  application do?

05:26:13  23  A.  So in the upper right, you see those three lines.  You

05:26:17  24  select that to say pick the menu, and here's the menu.  It

05:26:21  25  says things like choose account summary, deposit checks,

05:26:21  1  transfer, and pay, et cetera.

05:26:29  2         Let's say we chose deposit checks.  What next

05:26:32  3  comes up is this screen.  And it says, okay, select the

05:26:34  4  deposit account.  Here I selected everyday checking.

05:26:39  5         Next you enter the deposit amount, and then you

05:26:44  6  choose one of these two buttons to take a picture of either

05:26:47  7  the front or the back of the check.

05:26:50  8         When you do that, this screen pops up where it

05:26:53  9  does that auto capture with feedback.  In this case, it's

05:26:56  10  saying get closer because you're too far away from the

05:26:59  11  check.

05:26:59  12         Once it has auto captured both images of the

05:27:03  13  check, then you have the option to deposit it, and once you

05:27:07  14  deposit it, then a confirmation message comes back from the

05:27:11  15  bank.

05:27:12  16  Q.  Now, did you prepare a video demonstration of the

05:27:16  17  process you just described?

05:27:17  18  A.  I did.  And so what you're going to see is I have an

05:27:22  19  actor holding a camera above the check, and what he does is

05:27:26  20  he's going to press, deposit checks.  He's going to enter

05:27:30  21  the amount of $5.00, and now he's going to select, okay,

05:27:35  22  front image of the check.

05:27:37  23         And you'll see here where it will say, you know,

05:27:40  24  get closer.  So he zooms closer.  And as soon as he gets a

05:27:46  25  good image, it snaps a picture.

05:27:47  1         And now he does the same procedure for the back of

05:27:52  2   the check.  Holds it up.  It says get closer, it says hold

05:28:01  3   steady, and then success, it snaps a picture of the back of

05:28:06  4   the check.

05:28:06  5   Q.  Now, at what point in the video the jury just saw was

05:28:12  6   the monitoring of video frames?

05:28:14  7   A.  The monitoring happened when you saw that live view.

05:28:17  8   That's when it's monitoring, and it's giving that real-time

05:28:20  9   feedback when it isn't passing the monitoring criteria.

05:28:24  10  Q.  And at what point in the video was the check image

05:28:28  11  captured?

05:28:28  12  A.  Well, that's that point where you see actually that

05:28:31  13  success level come up with the checkmark.  That's the point

05:28:33  14  where it captures the image.

05:28:34  15  Q.  Now, how did you come to learn what was happening under

05:28:37  16  the hood, so to speak?  How did you do a technical analysis

05:28:41  17  of the application that we just saw?

05:28:42  18  A.  Okay.  There's a couple of things I did.  But what I'm

05:28:46  19  going to talk about is source code.  And what source code

05:28:49  20  is, it's what I teach computer science students how to do.

05:28:53  21  It's really the set of instructions that tell a processor

05:28:56  22  what to do, and it's really the -- what makes the Wells

05:29:01  23  Fargo app do what it does.

05:29:03  24  Q.  And what is source code in -- in the context you looked

05:29:08  25  at it?  What source code did you look at?

05:29:09  1   A.  I looked at the source code of the Wells Fargo mobile

05:29:12  2   app itself.

05:29:13  3   Q.  Now, are there some different versions that you looked

05:29:15  4   at?

05:29:15  5   A.  Yeah, there were -- so remember, I signed that

05:29:19  6   protective order that gave me the right to look at their

05:29:21  7   proprietary code.  They were requested or required to

05:29:25  8   produce that code, and so they produced it on a computer in

05:29:29  9   a secure room at the Defendant's law offices in Dallas.

05:29:35  10  And they produced 18 copies of the application, 18

05:29:38  11  different versions, and six different versions of the

05:29:43  12  server side, the bank side code.

05:29:45  13       It's hundreds of thousands of lines of code, so

05:29:49  14  it's quite a bit that was produced.  I reviewed the code in

05:29:53  15  person in Dallas, Texas.

05:29:54  16  Q.  Did you have any assistance in your code review?

05:29:56  17  A.  I sure did.  As is customary, we hired a company who

05:30:02  18  have programmers, and these programmers went and they

05:30:05  19  cataloged everything.  They -- you know, this is that, this

05:30:09  20  is that, and then I went in and did my detailed analysis.

05:30:12  21  Q.  Now, did you have the opportunity, if you wanted to, to

05:30:14  22  review code outside of Dallas?  For example, print it out

05:30:18  23  on a piece of paper?

05:30:19  24  A.  Actually we did, yeah.

05:30:21  25  Q.  And I think you said you did some in-person review in

05:30:25   1   Dallas; is that right?

05:30:25   2   A.   Yeah, I spent about I think 35 to 40 hours in Dallas.

05:30:28   3   Q.   And why did you decide to review source code in person

05:30:32   4   in Dallas?

05:30:33   5   A.   You know, the thing -- you'll be going along and

05:30:36   6   there's this thing that you don't know where it is, and you

05:30:39   7   have to go get it and.  So that gofer back and forth takes

05:30:42   8   a long time.  So being in the hot seat and sitting there

05:30:46   9   and revealing it, is far faster than having to go back and

05:30:49  10   forth.

05:30:49  11   Q.   Do you teach analysis of source code to your students

05:30:54  12   at Georgia Tech?

05:30:54  13   A.   Oh, yes.

05:30:55  14   Q.   What would you tell your students about analyzing the

05:30:59  15   functionality of a software system in terms of reading the

05:31:01  16   code?

05:31:01  17   A.   Well, you know, I tell them it's important to analyze

05:31:04  18   all of the code that's relevant, and you have to go all the

05:31:07  19   way down until you understand things.  You don't ever

05:31:10  20   assume.  You go all the way down until you get to the bare

05:31:15  21   metal, is what we say.

05:31:18  22   Q.   There is an exhibit sticker in the bottom right of your

05:31:19  23   slide, Professor Conte, that says DTX-11.  Do you know what

05:31:21  24   that is?

05:31:21  25   A.   Yeah, that stands for Defendant's Exhibit No. 11.

05:31:24   1   Q.  And do you know what is in Defendant's Exhibit 11?

05:31:27   2   A.  What's in there is -- is all these source code files

05:31:30   3   that I reviewed.

05:31:31   4   Q.  And did you focus your review at any point on one

05:31:36   5   particular version of the Wells Fargo application?

05:31:39   6   A.  Yeah.  What I'm going to present is code from Version

05:31:43   7   3.7.1, which was the latest version of the app.

05:31:50   8   Q.  And why did you focus on Version 3.7.1?

05:31:53   9   A.  Well, that was a version that was the most developed.

05:31:55   10  But then I went back and I looked at all the other versions

05:31:58   11  and found the same functionality that I -- I found that

05:32:03   12  showed infringement.

05:32:05   13  Q.  And so is it your opinion that the functionality in

05:32:08   14  Version 3.7.1 is representative of the other application

05:32:13   15  versions?

05:32:14   16  A.  Yes, I'm sorry, I thought I -- yes, it's definitely

05:32:17   17  representative of the other versions.

05:32:18   18  Q.  Now, you said you had some assistance conducting your

05:32:22   19  review, right?

05:32:23   20  A.  Yes.

05:32:23   21  Q.  How did you -- since you were relying in part on

05:32:26   22  others, how did you satisfy yourself that you had seen all

05:32:28   23  the source code that you needed to see?

05:32:30   24  A.  Well, what you do, again, is you look at the code and

05:32:33   25  if there's anything you don't understand, you have to then

| | | |
|---|---|---|
| 05:32:36 | 1 | find -- that's in another file, you have to go find that |
| 05:32:40 | 2 | file.  You keep on going until, like I said, you get down |
| 05:32:42 | 3 | to the metal, so you're down to the basic thing. |
| 05:32:45 | 4 | Q.  Now, were you in the courtroom during opening |
| 05:32:48 | 5 | statements, Professor Conte? |
| 05:32:48 | 6 | A.  Yes, I was. |
| 05:32:49 | 7 | Q.  So you've heard some discussion of Mitek and Mitek |
| 05:32:52 | 8 | software? |
| 05:32:52 | 9 | A.  Yes. |
| 05:32:53 | 10 | Q.  Did you review any Mitek software in your source code |
| 05:32:56 | 11 | review? |
| 05:32:57 | 12 | A.  Yes, I did.  So Mitek -- a lot of the code, but not all |
| 05:33:05 | 13 | of the code, so some of the pieces of the application were |
| 05:33:09 | 14 | from Mitek source code files. |
| 05:33:11 | 15 | My understanding is that Wells Fargo worked in |
| 05:33:16 | 16 | collaboration with Mitek on their app. |
| 05:33:19 | 17 | And what I'm showing here is a memo from Mitek |
| 05:33:23 | 18 | giving a MiSnap.  That's the name of their -- their auto |
| 05:33:28 | 19 | capture -- certification report for Wells Fargo. |
| 05:33:30 | 20 | And it said:  Wells Fargo passed code review for |
| 05:33:34 | 21 | invocation, use, and termination of MiSnap.  Wells Fargo |
| 05:33:39 | 22 | develops their app internally, and developers were able to |
| 05:33:42 | 23 | send over the code snippets -- that means portions of the |
| 05:33:46 | 24 | code -- of the parts that handle MiSnap. |
| 05:33:49 | 25 | Q.  And so what did you learn from Plaintiff's Exhibit 487? |

05:33:53   1   A.  You learned a couple of things.  One thing you learned

05:33:56   2   is that Wells Fargo develops their own app.  And Wells

05:34:01   3   Fargo then works with MiSnap to guarantee that the portions

05:34:04   4   they're using -- I'm sorry, Mi -- Mitek -- the portions

05:34:10   5   they're using from Mitek are being used correctly.

05:34:14   6   Q.  Now, what is the next step in your analysis?

05:34:16   7   A.  Okay.  So let's get into the thick of it, I guess, the

05:34:19   8   element-by-element infringement analysis.

05:34:21   9   Q.  And can you give the jury an overview of the different

05:34:24   10  claims that you'll be addressing?

05:34:26   11  A.  Sure.  So we're going to look at the '571, Claims 1 to

05:34:33   12  6, 9, 12, and 13, and the '090, Claims 1 to 4, 7, and 10.

05:34:42   13          Now, that sounds like a lot, but it turns out that

05:34:46   14  the evidence that I'll present for Claim 1 of the '571

05:34:49   15  is -- helps with the rest of the claims.

05:34:51   16          So after we get done with that first claim, it's

05:34:53   17  going to be a lot easier as we go forward.

05:34:56   18  Q.  What was the first claim that you looked at?

05:34:59   19  A.  Okay.  So here it is, and I've put it in this -- this

05:35:02   20  table.

05:35:05   21  Q.  And so what are -- what are the boxes of this table?

05:35:10   22  Can you just orient the jury to the claim we're looking at

05:35:14   23  here?

05:35:14   24  A.  Oh, yes.  So the boxes here, we call, each are the

05:35:16   25  elements of the claim.

05:35:16  1   Q.  And what was the first claim element that you looked

05:35:19  2   at?

05:35:19  3   A.  It's a non-transitory computer-readable medium

05:35:22  4   comprising computer-readable instructions for depositing a

05:35:25  5   check that when executed by a processor causes the

05:35:30  6   processor to.

05:35:31  7         So let me break that down into pieces here.  There

05:35:35  8   is that computer-readable instructions executed by a

05:35:39  9   processor.  And then there's the for depositing a check.

05:35:43  10  Q.  And did you determine whether the Wells Fargo

05:35:46  11  application has computer-readable instructions executed by

05:35:50  12  a processor as spelled out in this claim element?

05:35:52  13  A.  Yes, I did.  That's -- that's a technical term for an

05:35:56  14  app.  So computer-readable instructions equals an app.  And

05:36:00  15  here what I'm showing you in Plaintiff's Exhibit 1035 is a

05:36:04  16  screenshot from the Wells Fargo website that instructs

05:36:09  17  Wells Fargo customers to download the app from the App

05:36:13  18  Store.

05:36:13  19  Q.  And how did you look at the depositing a check portion

05:36:17  20  of this element?

05:36:18  21  A.  Well, first, the Court gave us a definition of this.

05:36:22  22  So this is the first time we talked about a claim

05:36:26  23  construction.  So here it is.  Depositing a check in the

05:36:28  24  context of this claim means providing a check to a

05:36:32  25  depository in a form sufficient to allow money to be

05:36:35   1   credited to an account.

05:36:37   2   Q.  And does the Wells Fargo Mobile Deposit system capture

05:36:41   3   checks that can be deposited in this way?

05:36:43   4   A.  I can attest to that myself, but -- but also, Wells

05:36:48   5   Fargo produced documents with statistics.  And in PX-31,

05:36:52   6   you'll find statistics that show that over 94 percent of

05:36:56   7   their successful deposits use the auto capture feature.  So

05:37:02   8   that's showing that auto capture does indeed deposit

05:37:05   9   checks.

05:37:06   10   Q.  And so what did you ultimately conclude with respect to

05:37:10   11   the first element of '571 patent, Claim 1?

05:37:12   12   A.  So this is present.  So let's put a checkmark there.

05:37:17   13   Q.  And what is the next claim element that you looked at?

05:37:20   14   A.  So this is monitor an image of the check in the field

05:37:24   15   of view of a camera of a mobile device with respect to a

05:37:29   16   monitoring criterion using an image monitoring and capture

05:37:32   17   module of the mobile device.

05:37:34   18        So let's break that down.  We have mobile device

05:37:38   19   with a camera.  We have image monitoring and capture

05:37:42   20   module.  And we have monitoring an image of the check in

05:37:46   21   the field of view of the camera with respect to a

05:37:49   22   monitoring criterion.  So let's go through each one.

05:37:52   23   Q.  Now, did you also consider a definition from the Court

05:37:55   24   on mobile device?

05:37:57   25   A.  Yes, I did.  So the Court defined this as computing

05:38:01    1    device capable of being easily moved and that is controlled

05:38:04    2    by an operating system.  So that would include your

05:38:09    3    smartphone, for example.

05:38:10    4    Q.  Now, is the Wells Fargo system implemented on this type

05:38:17    5    of mobile device with a camera?

05:38:18    6    A.  Yes, it is.  And, in fact, here's a frequently asked

05:38:21    7    questions line from their website, and here it's answering

05:38:24    8    the question:  Hey, why don't I see the check deposit

05:38:28    9    option in the menu?

05:38:29   10           And it says:  Well, either you have your camera

05:38:31   11    turned off, or you forgot to give the app permission to use

05:38:35   12    your camera.

05:38:37   13           You know, when you launch an app the first time,

05:38:40   14    it will give you a box like what I'm showing here, saying

05:38:44   15    will you let the Wells Fargo app use your camera?  And if

05:38:47   16    you click, don't allow, then you won't even get that check

05:38:51   17    deposit option.

05:38:52   18    Q.  And so what's the next piece of the second claim

05:38:55   19    element that you looked at?

05:38:56   20    A.   Okay.  So let's go to image monitoring and capture

05:39:01   21    module.  And I've depicted that here.  It includes the

05:39:04   22    image sensor itself and the optics.  It includes the

05:39:08   23    processor in the phone with the memory, the Wells Fargo

05:39:12   24    app, and then the pieces of the iOS or Android operating

05:39:17   25    system that it calls in order to coordinate things.

05:39:19   1   Q.  And does that image monitoring and capturing module

05:39:25   2   doing the -- the monitoring with respect to criteria?

05:39:28   3   A.  Yes.

05:39:28   4   Q.  And so what's the next piece of this claim element that

05:39:32   5   you looked at?

05:39:32   6   A.  All right.  So this is, monitor an image of the check

05:39:36   7   in the field of view of a camera.  Let's -- let's stop it

05:39:39   8   there and just do that piece.

05:39:41   9        And so you saw this in the video.  In the video,

05:39:44  10   you saw the monitoring in the field of view of the camera

05:39:47  11   with that live view, the field of view being the live view

05:39:50  12   image.  And this doesn't show it that well.

05:39:52  13        The reason I put a red rectangle around the whole

05:39:55  14   thing is, if you look close, there's wood grain.  So this

05:39:58  15   is actually an overlay on top of the live view image.

05:40:01  16        And in the overlay, they -- they put other things,

05:40:04  17   like a question mark where you can choose, you know, give

05:40:07  18   me some help or the -- the thunderbolt is to turn on the --

05:40:11  19   the flashlight, for example.

05:40:12  20   Q.  And what is done with this preview image in the Wells

05:40:15  21   Fargo system?

05:40:16  22   A.  Well, Mr. Wood, who is a corporate representative of

05:40:23  23   Mitek, who's a software vendor to Wells Fargo, said that

05:40:29  24   the mobile app requests preview frames for evaluation.  And

05:40:34  25   so I'll use that term, "preview frame" or "preview image."

05:40:38   1   Q.  And does the Wells Fargo system monitor images with the

05:40:42   2   preview images with respect to monitoring criteria?

05:40:45   3   A.  It does.

05:40:46   4   Q.  And what is a -- what is a monitoring criteria or what

05:40:53   5   definition did you apply?

05:40:54   6   A.  So here's another case where the Court gave us a

05:40:57   7   definition.

05:40:57   8        So monitoring criterion -- note that sometimes

05:41:00   9   I'll say criteria, sometimes criterion.  The patent can't

05:41:04   10  decide whether to make it single or plural, so my

05:41:07   11  apologies -- is one or more features of a check image that

05:41:11   12  provide information about the suitability of the image to

05:41:14   13  represent the check.

05:41:17   14  Q.  Now, could you give some examples of monitoring

05:41:20   15  criteria that you considered?

05:41:21   16  A.  Yes.  So if you go into the patent specification where

05:41:25   17  it lists one of the ways to embody the patent, they give

05:41:30   18  you a list of things.  And I'm not going to have you read

05:41:32   19  that.  What I've done is on the left, I've created a table

05:41:35   20  of all the things it mentions on the right.

05:41:38   21        This last thing, MICR, that's -- that stands for

05:41:43   22  MICR, and that's kind of a weird term, but what -- I can't

05:41:48   23  get it to clear now.  Okay.  I give up.

05:41:51   24        What that is, is that funny number in the bottom

05:41:55   25  of your check that has the bank number and then the account

05:41:58  1   number.  And it's called MICR because the ink is actually

05:42:02  2   magnetic.  Of course, if you're doing it with your phone,

05:42:04  3   the fact that it's magnetic doesn't matter, but the special

05:42:07  4   shape of those characters is very distinctive.

05:42:11  5   Q.  Now, can you tell whether the Wells Fargo system uses

05:42:14  6   these monitoring criterion?

05:42:15  7   A.  Yes.  I did analysis of the software.  Here's our first

05:42:18  8   piece of software.  So what I'm showing on the left are

05:42:23  9   numbers.  These numbers aren't actually in the -- the code

05:42:26  10  file, but when I print it out, I have it printed out with

05:42:29  11  numbers so I can refer to things.

05:42:31  12          So this starts at Line 395, and it goes to 406.

05:42:34  13  And what I've done is I've highlighted the first two rows

05:42:40  14  in the table because that's what this code is doing.  It's

05:42:44  15  checking the max brightness and the min brightness, and

05:42:50  16  it's also checking the min low contrast value.

05:42:54  17  Q.  And in the course of your analysis of the Wells Fargo

05:42:57  18  system, did you determine whether they used any other

05:43:00  19  monitoring criteria?

05:43:00  20  A.  Yes, I did.  In fact, when I did and I looked in the

05:43:04  21  software, I found that each and every one of the monitoring

05:43:08  22  criteria that's used in the example in the patent is also

05:43:10  23  used in the Wells Fargo system.

05:43:13  24  Q.  And so what did you ultimately conclude with respect to

05:43:17  25  the second claim element, the monitoring claim element of

05:43:21   1   Claim 1 of the '571 patent?

05:43:22   2   A.   Okay.   That's present.   So we can -- we can check that

05:43:26   3   off.

05:43:28   4           MR. ROWLES:   Your Honor, may we approach?

05:43:30   5           THE COURT:   You may approach the bench.

05:43:31   6           (Bench conference.)

05:43:38   7           MR. ROWLES:   Your Honor --

05:43:38   8           THE COURT:   Let's wait until he's here.   Yes, what

05:43:41   9   is it?

05:43:41  10           MR. ROWLES:   Your Honor, I was wondering if this

05:43:44  11   is a natural stopping point.   I think we're about maybe

05:43:46  12   halfway through the presentation.   We're about to get into

05:43:47  13   a lengthy claim element discussion.   It's actually the only

05:43:50  14   disputed claim element.   It's going to take the bulk of the

05:43:53  15   remainder of the presentation to get through just that

05:43:56  16   claim element.

05:43:57  17           THE COURT:   Well, I had not intended to stop

05:43:59  18   before 6:00 or sometime thereafter.

05:44:09  19           MR. SHEASBY:   Your Honor --

05:44:10  20           THE COURT:   I'm open to suggestions.   I don't want

05:44:13  21   to break this --

05:44:15  22           MR. MELSHEIMER:   We don't object, Your Honor, for

05:44:18  23   what it's worth, but obviously it's up to the Court.

05:44:19  24           THE COURT:   Yeah, it's not a matter of breaking,

05:44:22  25   it's just a matter of trying to keep us on a track that

05:44:25  1  we'll get this case finished within the time I've told the

05:44:28  2  jury it would take.

05:44:29  3       MR. MELSHEIMER:  Your Honor, might I observe

05:44:32  4  something about that?  I'm quite confident we're going to

05:44:34  5  get this done.  We've looked at how long, even just today,

05:44:37  6  I think we've got -- we may well be putting a witness on

05:44:41  7  late tomorrow.  I mean, this thing is going to roll.

05:44:44  8       So I just observe that I don't think we're going

05:44:46  9  to have an issue getting it done with both sides have cut

05:44:52  10  back witnesses.  They've cut back a witness they said they

05:44:53  11  were going to call that they're not going to call.  I've

05:44:56  12  just observed that, for the Court's benefit.

05:44:58  13       THE COURT:  Does that sound right to you,

05:45:00  14  Mr. Sheasby?

05:45:01  15       MR. SHEASBY:  It does, Your Honor, we're ahead of

05:45:03  16  schedule.

05:45:03  17       THE COURT:  All right.  Then we'll stop early and

05:45:06  18  go home and watch the 7th game of the World Series.

05:45:12  19       MR. SHEASBY:  Thank you, Your Honor.

05:45:13  20       MR. MELSHEIMER:  Thank you, Your Honor.

05:45:14  21       (Bench conference concluded.)

05:45:14  22       THE COURT:  Ladies and gentlemen of the jury, I'm

05:45:15  23  advised by counsel that there's quite an additional length

05:45:19  24  of time with this witness on direct, and there is a lengthy

05:45:22  25  section that we're about to start that will take quite some

05:45:26  1   time to get through.

05:45:27  2          Knowing that it's always difficult to break a

05:45:30  3   witness in midtestimony, I'm not going to keep us up here

05:45:33  4   until 6:45 or 7:00 o'clock tonight to finish this witness

05:45:38  5   today.  So this is as good a point as any to break for the

05:45:41  6   evening.  So that's what we're going to do.

05:45:44  7          I'm going to ask you to close your notebooks and

05:45:46  8   leave them closed on the table in the jury room.  I'm going

05:45:49  9   to remind you that when you get home tonight, unless you

05:45:53  10  live alone, you're going to get a question as soon as you

05:45:55  11  walk in the door about what have you been up to today in

05:45:59  12  Federal Court in Marshall.

05:46:00  13         Just don't try to answer it.  Blame it on me.

05:46:05  14  Tell whoever asked that question that that very stern

05:46:10  15  federal Judge instructed you clearly not to try to answer

05:46:12  16  that question.

05:46:12  17         Follow all the instructions I've given you.  It's

05:46:14  18  not great weather out there.  So be safe driving home, and

05:46:18  19  we'll see you in the morning as close to 8:30 as possible,

05:46:20  20  to pick back up with Dr. Conte at that point.

05:46:25  21         With those instructions, ladies and gentlemen,

05:46:28  22  you're excused for the evening.

05:46:29  23              COURT SECURITY OFFICER:  All rise.

05:46:34  24         (Jury out.)

05:46:34  25              THE COURT:  You can step down, Dr. Conte.

05:46:58  1              THE WITNESS:  Thank you.

05:46:58  2              THE COURT:  Please be seated.

05:46:58  3              Counsel, I remind you of the discussion we had in

05:47:04  4    chambers earlier today.  I expect to see a more streamlined

05:47:09  5    and much more timely communication of any overnight

05:47:12  6    disputes to the Court so that we can raise the efficiency

05:47:16  7    of that process and not waste your time or the Court's

05:47:20  8    time.

05:47:20  9              I will also, before I bring the jury in in the

05:47:25  10   morning, expect a representative of each trial team to go

05:47:28  11   to the podium and read into the record those items from the

05:47:31  12   list of pre-admitted exhibits that have been used during

05:47:33  13   today's portion of the trial.

05:47:36  14             All right.  With that, are there any questions

05:47:38  15   from either Plaintiff or Defendant before we recess for the

05:47:41  16   evening?

05:47:42  17             MR. SHEASBY:  Nothing for the Plaintiff, Your

05:47:43  18   Honor.

05:47:43  19             MR. MELSHEIMER:  May it please the Court.

05:47:44  20   Nothing, Your Honor.  Thank you.

05:47:45  21             THE COURT:  All right.  I'll be in chambers by

05:47:48  22   7:30.  Have a good evening.  We stand in recess until

05:47:51  23   tomorrow morning.

05:47:53  24             MR. SHEASBY:  Thank you, Your Honor.

05:47:54  25             COURT SECURITY OFFICER:  All rise.

05:47:54   1          (Recess.)

         2

         3                    CERTIFICATION

         4

         5          I HEREBY CERTIFY that the foregoing is a true and

         6   correct transcript from the stenographic notes of the

         7   proceedings in the above-entitled matter to the best of my

         8   ability.

         9

        10

        11    /S/ Shelly Holmes                      10/30/19
             SHELLY HOLMES, CSR, TCRR              Date
        12   OFFICIAL REPORTER
             State of Texas No.: 7804
        13   Expiration Date: 12/31/20

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25