08:38:37

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   UNITED STATES AUTOMOBILE       )(
     ASSOCIATION
 4                                  )(    CIVIL ACTION NO.

 5   VS.                            )(    2:18-CV-245-JRG

 6                                  )(    MARSHALL, TEXAS
                                         OCTOBER 31, 2019
 7   WELLS FARGO BANK, N.A.         )(    8:40 A.M.

 8

 9                   TRANSCRIPT OF JURY TRIAL

10                       MORNING SESSION

11       BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                  UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14

15   FOR THE PLAINTIFF:

16
     JASON SHEASBY
17   ANTHONY ROWLES
     LISA GLASSER
18   IRELL & MANELLA
     1800 Avenue of the Stars
19   Suite 900
     Los Angeles, CA 90067-4276
20

21
     ROBERT CHRISTOPHER BUNT
22   PARKER, BUNT & AINSWORTH, PC
     100 East Ferguson
23   Suite 418
     Tyler, TX 75702
24

25
```

1   FOR THE DEFENDANT:

2

3   THOMAS M. MELSHEIMER
    M. BRETT JOHNSON
    MICHAEL A. BITTNER
4   J. TRAVIS UNDERWOOD
    WINSTON & STRAWN LLP
5   2121 North Pearl Street
    Suite 900
6   Dallas, TX 75201

7

8   E. DANIELLE T. WILLIAMS
    WINSTON & STRAWN LLP
    300 South Tyron Street
9   16th Floor
    Charlotte, NC 28202

10

11   MATTHEW R. MCCULLOUGH
    WINSTON & STRAWN LLP
12   275 Middlefield Road
    Suite 205
13   Menlo Park, CA 94025

14

15   JACK WESLEY HILL
    WARD, SMITH & HILL, PLLC
    P.O. Box 1231
16   1507 Bill Owens Parkway
    Longview, TX 75606

17

18

19   COURT REPORTER:      Shelly Holmes, CSR, TCRR
                          Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23

24   (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

25

<pre>
08:40:53   1                    P R O C E E D I N G S
08:40:53   2              (Jury out.)
08:40:54   3              COURT SECURITY OFFICER:  All rise.
08:40:54   4              THE COURT:  Be seated, please.
08:41:01   5              Are the parties prepared to read into the record
08:41:07   6    those items from the list of pre-admitted exhibits used
08:41:09   7    during yesterday's portion of the trial?
08:41:11   8              MR. BUNT:  Yes, Your Honor, Plaintiff is.
08:41:13   9              THE COURT:  Please proceed.
08:41:14  10              MR. BUNT:  Your Honor, yesterday, Plaintiff used
08:41:18  11    Plaintiff's Exhibit 2, Plaintiff's Exhibit 4, Plaintiff's
08:41:22  12    Exhibit 31, Plaintiff's Exhibit 36, Plaintiff's Exhibit
08:41:27  13    151, Plaintiff's Exhibit 199, Plaintiff's Exhibit 1035,
08:41:34  14    1035, Plaintiff's Exhibit 1061, and Plaintiff's Exhibit
08:41:39  15    1062.  And I don't know if the Defendants want to -- we
08:41:43  16    also used Defendant's Exhibit No. 11 yesterday, Your Honor.
08:41:47  17              THE COURT:  All right.  Is there any objection
08:41:49  18    from Defendant as to that rendition offered by Plaintiff?
08:41:55  19              MR. UNDERWOOD:  No objection, Your Honor.
08:41:56  20              THE COURT:  Do Defendants have a similar rendition
08:41:59  21    to read into the record?
08:42:00  22              MR. UNDERWOOD:  We do not.
08:42:01  23              THE COURT:  All right, thank you.  Is there
08:42:04  24    anything further, counsel, that we should take up outside
08:42:04  25    the presence of the jury before I bring them in and
</pre>

| | | |
|---|---|---|
| 08:42:08 | 1 | continue with Dr. Conte's testimony? |
| 08:42:08 | 2 | MR. SHEASBY:  Your Honor, there is only one issue. |
| 08:42:10 | 3 | Mr. Calman has a medical condition that requires him to |
| 08:42:12 | 4 | potentially put an eye drop into his eye at unforeseen |
| 08:42:17 | 5 | moments.  And so I don't know how you want to handle that. |
| 08:42:20 | 6 | I think Ms. Glasser is going to examine him and she has -- |
| 08:42:26 | 7 | for that. |
| 08:42:26 | 8 | THE COURT:  Is that something that should be |
| 08:42:27 | 9 | needed during his testimony? |
| 08:42:29 | 10 | MS. GLASSER:  It could well come up during his |
| 08:42:31 | 11 | testimony.  It comes on sort of without warning, and so we |
| 08:42:35 | 12 | were hoping that Your Honor could alert the jury in advance |
| 08:42:38 | 13 | that he does have a medical condition, and he may be |
| 08:42:41 | 14 | putting in eye drops during the testimony so that if, for |
| 08:42:44 | 15 | example, he starts doing it on cross they don't kind of |
| 08:42:49 | 16 | wonder, why is this going on? |
| 08:42:50 | 17 | THE COURT:  Defendant aware of this situation? |
| 08:42:51 | 18 | MR. MELSHEIMER:  I am.  I understand it is |
| 08:42:53 | 19 | increased during stress from what I understand, Your |
| 08:42:56 | 20 | Honor -- I'm joking.  We have no problem with the Court |
| 08:42:59 | 21 | instructing the jury about the eye drops or when it comes |
| 08:43:02 | 22 | up, or we certainly are not going to make an issue of it. |
| 08:43:04 | 23 | THE COURT:  All right.  Well, given that it's at |
| 08:43:08 | 24 | least possible, I'll tell the jury that it's possible that |
| 08:43:10 | 25 | he may do this, and if he does, it's because it's medically |

```
08:43:13   1  required.
08:43:14   2          MS. GLASSER:  Thank you very much, Your Honor.
08:43:15   3          THE COURT:  That will be fine.
08:43:16   4          All right.  I take it there's nothing further
08:43:18   5  then.
08:43:18   6          MR. SHEASBY:  Nothing further.
08:43:22   7          MR. MELSHEIMER:  Nothing further, Your Honor.
08:43:23   8          THE COURT:  Let's bring in the jury.
08:43:35   9          Counsel, you may go to the podium and get ready.
08:43:39  10          MR. ROWLES:  Yes, Your Honor.
08:43:41  11          COURT SECURITY OFFICER:  All rise.
08:43:43  12          (Jury in.)
08:43:43  13          THE COURT:  Welcome back, ladies and gentlemen.
08:43:57  14  Please have a seat.
08:43:58  15          But for the fact that the Astros lost the World
08:44:11  16  Series last night, it's good to see you, ladies and
08:44:13  17  gentlemen.  We'll continue where we left off yesterday, and
08:44:15  18  that's with the direct testimony of Dr. Tom Conte.
08:44:21  19          Mr. Rowles, you may continue.
08:44:23  20          MR. ROWLES:  Thank you, Your Honor.
08:44:23  21  THOMAS CONTE, PH.D., PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
08:44:23  22                  DIRECT EXAMINATION CONTINUED
08:44:24  23  BY MR. ROWLES:
08:44:24  24  Q.  Good morning, Professor Conte.
08:44:25  25  A.  Good morning.
```

08:44:26  1   Q.  Could you just remind the jury what claim limitation we

08:44:29  2   were discussing yesterday before we broke?

08:44:31  3   A.  We were discussing, if you go back, monitoring an image

08:44:40  4   of the check in the field of view of the camera.

08:44:42  5   Q.  And remind the jury what -- what is a preview frame,

08:44:47  6   what are we talking about here?

08:44:48  7   A.  A preview frame is a frame that's coming off in live

08:44:53  8   view.  We get 30 times per second, and Mr. Wood, who is

08:44:59  9   Mitek corporate representative -- remember, Mitek is the

08:45:02  10  software vendor for Wells Fargo -- also agrees that these

08:45:05  11  are preview frames.

08:45:06  12  Q.  Now, were you in the Court during opening statements,

08:45:10  13  Professor Conte?

08:45:10  14  A.  Yes, I was.

08:45:11  15  Q.  And so you heard some discussion of Mr. Wood then,

08:45:13  16  right?

08:45:13  17  A.  Yes, yes, I did.

08:45:14  18  Q.  Now, when you were doing your analysis, did you have

08:45:17  19  the deposition testimony of Mr. Wood available to you?

08:45:20  20  A.  Yes, I did.

08:45:22  21  Q.  Is it fair to say that there is some disagreement

08:45:25  22  between yourself and Mr. Wood about how the Wells Fargo

08:45:27  23  system captures check images?

08:45:30  24  A.  Yes.

08:45:31  25  Q.  With respect to the monitoring of preview images and

08:45:35   1   assessing criteria, is there any disagreement between you

08:45:38   2   and Mr. Wood?

08:45:38   3   A.  No, there isn't.  He agrees that there's software

08:45:43   4   monitors, preview frames, and assesses it by the criteria

08:45:47   5   to see if it's a good image.

08:45:49   6   Q.  Now, yesterday we looked at this list of monitoring

08:45:56   7   criteria.  Did Mr. Wood say anything about whether the

08:46:00   8   Wells Fargo system uses these monitoring criteria?

08:46:02   9   A.  Yes, he agreed they did.

08:46:04   10  Q.  Now, what's the next claim limitation that you looked

08:46:06   11  at?

08:46:06   12  A.  All right.  So this is capture the image of the check

08:46:10   13  with the camera when the image of the check passes those

08:46:17   14  monitoring criteria.  So the Court has construed this

08:46:20   15  phrase.  So let me read this first.

08:46:22   16          Capture the image of the check with the camera at

08:46:26   17  or after the moment the image of the check passes the

08:46:29   18  monitoring criterion.

08:46:29   19          So what the Court has done is replaced "when" with

08:46:35   20  "at or after the moment."

08:46:38   21  Q.  When you were reviewing source code and analyzing the

08:46:41   22  claims of the '571 patent, did you have the Court's

08:46:44   23  definition available to you?

08:46:45   24  A.  I did.

08:46:46   25  Q.  And did you apply any other definition or -- or change

08:46:50  1   any words around?

08:46:51  2   A.  I did not.

08:46:52  3   Q.  Could you explain to the jury how the capture process

08:46:58  4   works in the Wells Fargo system?

08:46:59  5   A.  Yes.  So what I've done -- we're going to talk about

08:47:02  6   software, but first I'm going to give you an over --

08:47:04  7   overview of how it works.  So I've prepared this diagram of

08:47:08  8   what I found.

08:47:09  9        And what happens is a preview frame comes in, then

08:47:15  10  it's analyzed according to that criteria.  Then there's a

08:47:19  11  decision point.  Does it pass or doesn't it?  Well, let's

08:47:25  12  say it doesn't pass.

08:47:26  13       What happens is the frame disappears, and it waits

08:47:29  14  for the next one to come in, again, 30th of a second.  So

08:47:33  15  every 30 times -- 30 times a second these are coming in.

08:47:36  16  Q.  And what happens in the Wells Fargo system if the image

08:47:40  17  passes the monitoring criterion?

08:47:44  18  A.  Okay.  Now, again, let's get to Step 2.  That's where

08:47:47  19  we analyze the monitoring criteria.  And then if it passes,

08:47:51  20  what it does is capture the check image, and I'll show you

08:47:56  21  where that happens.  And, again, that happens after you

08:47:58  22  pass the monitoring criteria.  So this is consistent with

08:48:01  23  the Court's claim construction, timing matters, the timing

08:48:05  24  matches the claim.

08:48:06  25  Q.  And what happens after Step 3 where you capture the

08:48:09  1  check image?

08:48:10  2  A.  After that, the -- the JPEG is sent to the bank, and

08:48:14  3  I'll show you where that happens, too.

08:48:17  4  Q.  Professor Conte, is it your opinion that the check

08:48:20  5  image is only captured in Step 4 when the image is

08:48:23  6  transmitted to a bank a thousand miles away?

08:48:27  7  A.  No.

08:48:28  8  Q.  Did you hear counsel for Wells Fargo make a statement

08:48:31  9  about that in opening statements?

08:48:32  10  A.  Yes, I heard counsel say that's my opinion.

08:48:34  11  Q.  And is that an accurate or inaccurate description of

08:48:37  12  your opinion on infringement?

08:48:38  13  A.  That's wholly inaccurate.

08:48:40  14  Q.  Could you describe for the jury how capturing an image

08:48:46  15  works in a typical phone camera application?

08:48:50  16  A.  Yes.  So if you start up your phone and just use it as

08:48:54  17  a camera, you'll see this preview image as you move it

08:48:57  18  around, and then what you do is you press the shutter

08:49:00  19  button when you like the image, and that's going to create

08:49:03  20  a JPEG.

08:49:04  21       Now, JPEG stands for Joint Photographers Experts

08:49:15  22  Group.  So this is a way to store images that was developed

08:49:18  23  by photographers in 1992, and it's there for digital

08:49:21  24  cameras.  And then that JPEG is saved locally.  Or if

08:49:25  25  you're like I do when I don't have much storage on my

08:49:29   1   phone, you save it to the cloud.

08:49:31   2   Q.  Now, in this typical phone camera scenario, at what

08:49:35   3   point is the image captured?

08:49:36   4   A.  It's captured when the user presses the shutter button

08:49:41   5   and it creates that JPEG.

08:49:43   6   Q.  And how does that compare to the capture process in the

08:49:46   7   Wells Fargo system?

08:49:47   8   A.  It's very similar, actually, except in the Wells Fargo

08:49:51   9   system, it waits until that monitoring criterion is passed,

08:49:55  10   and then it captures the image.  So, in essence, it's

08:49:59  11   pressing the shutter button for you.

08:50:02  12   Q.  And how does this capture process look on the Wells

08:50:05  13   Fargo application, to the user?

08:50:05  14   A.  Thank you.

08:50:06  15        Let's go back to that -- that video and you can

08:50:09  16   see how it works again.

08:50:10  17        Here it is, you see the actor is zooming in.  It

08:50:14  18   says, get closer, and then when it passes the monitoring

08:50:17  19   criterion, boom, it snaps the image.

08:50:20  20   Q.  Did you look at any source code for this capture

08:50:24  21   process?

08:50:25  22   A.  Yes, I did.

08:50:26  23   Q.  What source code did you look at?

08:50:28  24   A.  Okay.  So I looked at source code that was labeled

08:50:34  25   (void)captureOutput.  Now, what (void)captureOutput is,

08:50:42  1  it's the title of -- you can think of it as the title of a

08:50:44  2  book chapter or it's like a tab in your binder that you

08:50:47  3  have there where the tab might say the '571 patent.  That's

08:50:50  4  what this is saying.  Then you turn to the tab and you see

08:50:53  5  what the patent is.

08:50:54  6  Q.  Now, the jury has seen at least part of this line,

08:50:58  7  2278, before, in this trial, right?

08:50:59  8  A.  Yes, I believe Mr. Melsheimer used it in his opening

08:51:09  9  statement.

08:51:09  10  Q.  Now, what exactly does Line 2278 of the source code do

08:51:13  11  in the application?

08:51:14  12  A.  Nothing.  It's just the title of the chapter.  Nothing

08:51:20  13  is happening here.

08:51:21  14  Q.  And what happens in the capture output chapter?

08:51:25  15  A.  You see this runs from Lines 2279 to 2506, at 228 lines

08:51:31  16  of code.  And I'm going to walk you through what those

08:51:34  17  lines of code do.

08:51:34  18  Q.  So what's the first line of code we should start with?

08:51:40  19  A.  Okay.  Here it is.  And the piece I want to point out

08:51:44  20  here is the piece that I -- I've labeled sampleBuffer.

08:51:50  21  That's that preview image, that 30 frames per second,

08:51:53  22  that's one of those frames that's coming in, and that's

08:51:56  23  what the app is showing on your screen.  So that's why I've

08:51:59  24  circled it here.  I want you to remember that, preview

08:52:02  25  buffer is the preview frame.

08:52:05   1   Q.  And what is the source code --

08:52:06   2   A.  I'm sorry, sampleBuffer is the preview frame.

08:52:09   3   Q.  I apologize, Dr. Conte.

08:52:10   4   A.  Yes.

08:52:11   5   Q.  What does the application do with the preview frame?

08:52:13   6   A.  Well, let's go a little further down in the code.

08:52:18   7   Remember how I said that code is a list of instructions, so

08:52:20   8   we're going to go follow these in order.

08:52:23   9           Now, I'm jumping over a few that just tests for

08:52:26   10   some corner cases like, hey, the camera was still focusing

08:52:30   11   or things like that.  But after you pass this test, it

08:52:33   12   comes to this one.  And what I want to point out to you

08:52:35   13   here is it takes sampleBuffer and it performs analyzeFrame

08:52:43   14   on it.  So this is where it analyzes the frame according to

08:52:46   15   all those monitoring criterion to see if this is a good

08:52:50   16   check image.

08:52:50   17   Q.  And what happens after the preview frame is analyzed?

08:52:54   18   A.  Well, you see how it -- it -- over on the left here,

08:53:00   19   analyzeFrameResult, that's the answer to whether or not

08:53:03   20   this is a good frame.  Okay.  So let's see what happens to

08:53:06   21   that answer.

08:53:07   22           If you go a little further down in the code,

08:53:10   23   you'll find this test, and the test says if

08:53:15   24   analyzeFrameResult equals yes, that is saying what's going

08:53:19   25   to come later; what I'm going to describe later is what

08:53:22  1   happens after you pass the monitoring criterion.  So this

08:53:26  2   is the "at or after" right here.

08:53:30  3   Q.  So what does it mean for analyzeFrameResult to be yes?

08:53:36  4   A.  It means that it has passed the monitoring criterion.

08:53:39  5   Q.  And what would analyzeFrameResult be if the monitoring

08:53:44  6   criterion were not passed?

08:53:45  7   A.  No.

08:53:46  8   Q.  And so what happens after the monitoring criterion are

08:53:50  9   satisfied?

08:53:50  10  A.  Okay.  So this is a line a little further down.  And

08:53:56  11  this is setting something we call a flag where you sort of

08:54:00  12  raise a flag.

08:54:00  13        Now, you've got to understand, software has a lot

08:54:03  14  of different workers going to power it, all right?  And

08:54:06  15  because it has a lot of workers going in parallel, it wants

08:54:09  16  to tell the other workers what's going on.  Think of it

08:54:12  17  like a Post-it that you put it on your door, and this

08:54:15  18  Post-it says, I'm capturing the frame now.

08:54:18  19        The reason it does that is, if another worker

08:54:21  20  comes in with another frame, it says:  Ignore it.  I found

08:54:25  21  my good frame.  I'm capturing it now.

08:54:32  22  Q.  And is this is capturing an image flag set before the

08:54:39  23  monitoring criteria are passed?

08:54:39  24  A.  No.  This is only set after you pass the monitoring

08:54:42  25  criteria.

08:54:42  1    Q.  And so what happens next?

08:54:44  2    A.  All right.  Now, this is interesting.  So let me

08:54:46  3    explain some of the jargon here.  You see that UXP, that's

08:54:50  4    user experience.  And that UXPeventManager, that's a log

08:55:02  5    that it keeps of all the different things that happen when

08:55:02  6    a user is taking an image of a check.

08:55:05  7          In this case, what it does is it records the

08:55:06  8    elapsed time it took to capture the image, and it says

08:55:13  9    UXP_Capture_Time.

08:55:15  10          Now, I imagine Wells Fargo wants to know this

08:55:16  11    because it's taking too long to capture the image.  Maybe

08:55:17  12    they want to go back and tweak their -- their application.

08:55:19  13    If it takes you 25 seconds, it's probably the app needs to

08:55:27  14    get a little better.

08:55:28  15          So they capture that -- that information gets

08:55:31  16    packaged up with the image in that JPEG, and that's sent to

08:55:35  17    the bank.  And I'll show you again where that happens.

08:55:37  18    Q.  So is it your opinion, Professor Conte, that the time

08:55:40  19    of capture is recorded in Line 2374?

08:55:43  20    A.  Well, actually, it's the elapsed time.  It's how long

08:55:46  21    it took to do the capturing from when you started until

08:55:48  22    when the capture happens.

08:55:53  23    Q.  And so what happens after the -- the capture time is

08:55:55  24    recorded?

08:55:56  25    A.  Okay.  Let me point out this next line.  What it does

08:55:59  1  is it calls another worker, and this worker is called

08:56:03  2  StartedAutoCapture.  And what this worker does, this is the

08:56:09  3  guy that pops up that rectangle on your screen that says,

08:56:13  4  hey, success.

08:56:13  5       So when you see that rectangle, you've put the

08:56:17  6  capturing image flag on the door, you've recorded how long

08:56:20  7  it's -- it's taken to get to that point, and then you pop

08:56:24  8  up that rectangle.

08:56:25  9  Q.  And so what happens after the success message is

08:56:32  10  displayed?

08:56:32  11  A.  After the success message is displayed, that's when it

08:56:36  12  gets packaged up into a JPEG, and you see this

08:56:43  13  docCaptureResult.  That's the result.  It sets the result

08:56:45  14  to that JPEG.  So this is where it says:  Okay, the result

08:56:48  15  is the JPEG, the image is captured, it's in this JPEG.

08:56:51  16  Q.  And so is this the point in the code where the check

08:56:55  17  image is captured?

08:56:58  18  A.  Yes.

08:56:59  19  Q.  And is this before or after the monitoring criteria are

08:57:00  20  passed?

08:57:01  21  A.  It's after.  Like I showed you -- remember that "if"

08:57:04  22  statement, all of this happened after I put the Post-it on

08:57:08  23  the door, I recorded the time, I've popped up the

08:57:09  24  rectangle, and then I put it in a JPEG, and I say, okay,

08:57:12  25  this is the result.

08:57:13   1   Q.   Now, what happens to that check image JPEG after this

08:57:19   2   line of code?

08:57:19   3   A.   That check image JPEG then is going to be ultimately

08:57:25   4   when the user hits deposit, it's sent to a bank.

08:57:30   5   Q.   And is that the image that's going to be used to

08:57:32   6   deposit the check in the user's account?

08:57:34   7   A.   Yes.   That's the very image, yes.

08:57:36   8   Q.   What happens to the preview frame or sample buffer that

08:57:40   9   we were looking at previously?

08:57:41  10   A.   It's -- it disappears.

08:57:48  11   Q.   Professor Conte, could you -- could you summarize the

08:57:50  12   sequence of code that you just walked through?

08:57:52  13   A.   Yes.   So we went through a lot of code.   What I've done

08:57:55  14   is I've created a check list of all the steps.

08:57:58  15        So first, I showed you Line 2279.   That's where

08:58:05  16   that sample buffer came in, and you obtained the preview

08:58:09  17   frame.   And that's what that looked like.

08:58:11  18        Then I showed you where it analyzes that sample

08:58:13  19   buffer, and that's what that looked like.   And it generates

08:58:17  20   this analyzeFrameResult.

08:58:17  21        Then I showed you where it checks if it passes the

08:58:17  22   criterion, and that looks like this.   Now, I said -- and I

08:58:29  23   showed you things that happen after that point.

08:58:32  24        So first thing it does is it sets that capturing

08:58:36  25   flag.   It puts the Post-it on the door to tell the next

08:58:39 1  worker, hey, you know, buzz off, I'm working right now on

08:58:43 2  capturing this frame.  It records how long it took to get

08:58:48 3  to this point as capture time.  It shows that success

08:58:54 4  message that pops up on the screen using this worker called

08:58:59 5  StartedAutoCapture.

08:59:04 6      And then finally it captures that image by

08:59:06 7  creating a JPEG and then storing it as a result that

08:59:10 8  ultimately is going to get sent to the bank.

08:59:13 9  Q.  Now, did you look at any other materials other than

08:59:17 10 source code concerning the capture element?

08:59:19 11 A.  Yeah.  It's important also to look at the manuals that

08:59:21 12 the developers used -- that is, the people who use these

08:59:25 13 libraries to -- to create the application.  And here's one

08:59:29 14 of them.  This is called Mitek MiSnap SDK.  SDK stands for

08:59:36 15 software developers kit.  And this is the programmer's

08:59:41 16 guide.

08:59:42 17     So this is writing straight to the programmer

08:59:44 18 that's going to use this.  And it says:  Features.  Among

08:59:47 19 it's many features, Mitek MiSnap provides -- and then I've

08:59:52 20 gone to the second bullet -- real-time feedback to the user

08:59:56 21 until a suitable image is detected, at which point it is

08:59:59 22 automatically captured.

09:00:01 23     So that's saying it waits until a suitable image

09:00:04 24 is found, you pass the monitoring criterion, and then

09:00:09 25 automatically captures.  So that's consistent with what I

| | | |
|---|---|---|
| 09:00:12 | 1 | showed you in the code. |
| 09:00:13 | 2 | Q.  Professor Conte, have you used programmer's guides like |
| 09:00:18 | 3 | this in your every day work? |
| 09:00:19 | 4 | A.  I've used them.  I've written them.  I've taught |
| 09:00:22 | 5 | students and given students As and Fs on writing these |
| 09:00:25 | 6 | guides.  These are very, very important.  These are the -- |
| 09:00:28 | 7 | how you tell someone else how to use your code. |
| 09:00:32 | 8 | Q.  And this particular guide, Plaintiff's Exhibit 376, |
| 09:00:35 | 9 | who -- who was the target audience for this programmer's |
| 09:00:37 | 10 | guide? |
| 09:00:37 | 11 | A.  Target audience is Wells Fargo.  This is a programmer's |
| 09:00:41 | 12 | guide for someone building an application around Mitek. |
| 09:00:46 | 13 | Q.  Now, would the Wells Fargo programmer using the |
| 09:00:49 | 14 | programmer's guide have access to the source code that you |
| 09:00:52 | 15 | walked the jury through before? |
| 09:00:53 | 16 | A.  Not necessarily.  You see, Mitek will only send you |
| 09:00:59 | 17 | what we call a binary.  It's not the source code, but it's |
| 09:01:02 | 18 | just the raw machine instructions, just all the 1s and 0s. |
| 09:01:07 | 19 | Q.  So what would a Wells Fargo programmer rely on to |
| 09:01:11 | 20 | understand how the Wells Fargo system was actually working? |
| 09:01:14 | 21 | A.  Well, we rely on this programmer's guide.  That's why |
| 09:01:19 | 22 | it's called that. |
| 09:01:20 | 23 | Q.  Did you look at any other documents like this from |
| 09:01:23 | 24 | Mitek? |
| 09:01:24 | 25 | A.  Yes.  Here's a developer's guide.  That's essentially |

09:01:27  1   the same thing, and it goes through an example with the

09:01:30  2   different steps of -- of the Mitek software.

09:01:33  3          And here's a step I've pulled out.  It says:  Once

09:01:36  4   all conditions are met, MiSnap will automatically snap a

09:01:40  5   photo.  All conditions.  Pass the monitoring criterion,

09:01:46  6   okay?  This happens after.  But when is at or after?  This

09:01:51  7   happens after you pass the monitoring criterion, and it

09:01:53  8   snaps the image, and there's that rectangle we saw.

09:01:56  9   Q.  And is the developer's guide in Plaintiff's Exhibit

09:02:00  10  92 -- is this a later version of the MiSnap code than as

09:02:03  11  compared to Plaintiff's Exhibit 376?

09:02:05  12  A.  Yes, this is a little bit later version -- describing a

09:02:08  13  little bit later version of the code.

09:02:10  14  Q.  Did you consider any testimony from Mr. Wood or Mitek

09:02:16  15  about the accuracy of these programmer's guides and

09:02:19  16  developer's guides?

09:02:20  17  A.  Yes.  In fact, Mr. Wood was asked:  Are these guides

09:02:24  18  accurate?

09:02:24  19          And he said:  Well, we do our best.

09:02:26  20  Q.  Do you know if Mr. Wood said anything else on that

09:02:28  21  topic?

09:02:29  22  A.  I read his entire deposition, and later on he said:

09:02:33  23  Wait, they're inaccurate.

09:02:34  24  Q.  Having looked at the Mitek source code yourself, what's

09:02:37  25  your conclusion about the accuracy of these statements in

09:02:41  1  the developer's documents?

09:02:45  2  A.  For what I was concerned with, what relates to the

09:02:48  3  claims, the elements I was looking for, everything in the

09:02:50  4  developer's guides was accurate.  Maybe he's talking about

09:02:54  5  a missing comma or semicolon somewhere, but these are

09:02:59  6  accurate.

09:02:59  7  Q.  Did you look at any other materials from Mitek?

09:03:02  8  A.  Yes, I did.  Here's a marketing brochure they give out,

09:03:05  9  and look how they present it.  Capture an image of a check

09:03:10  10  in three easy steps.  Document is detected, and the image

09:03:14  11  sampled up to 30 frames per second.  So it's getting

09:03:17  12  that -- those preview frames in.

09:03:19  13        Then it says:  Document locked in.  That's when

09:03:21  14  you pass the monitoring criterion.  And then the image is

09:03:24  15  automatically captured.

09:03:27  16  Q.  When you were conducting your infringement analysis,

09:03:31  17  did you consider any potential counterarguments from Wells

09:03:36  18  Fargo?

09:03:36  19  A.  Yes, I did.  One thing that Wells Fargo argued is that

09:03:42  20  capture is not done with a camera because the claim

09:03:45  21  language says:  Capture with a camera.

09:03:49  22  Q.  And what's your response to that argument?

09:03:51  23  A.  Well, I think they're reading camera as just being the

09:03:54  24  sensor.  I mean, a digital camera has a sensor.  It has

09:03:57  25  optics.  It has a processor that reads information off the

09:03:59  1  sensor.  You have to have that or the image just sticks on

09:04:03  2  the sensor.  You've got to have something that reads it off

09:04:05  3  the sensor and captures it in JPEG.

09:04:08  4  Q.  And is this the same way that an ordinary smartphone

09:04:12  5  captures images with the camera?

09:04:14  6  A.  Yeah, this is exactly what your smartphone does.  You

09:04:17  7  open the camera app.  I mean, clearly you're running

09:04:20  8  something on the processor -- on the computer part of your

09:04:22  9  phone.

09:04:24  10  Q.  And so what do you ultimately make of -- of this

09:04:27  11  argument about capturing with a camera?

09:04:30  12  A.  Well, I think that Wells Fargo is wrong here.

09:04:35  13  Q.  And did you consider any other potential

09:04:38  14  counterarguments?

09:04:39  15  A.  Yeah.  The next thing Wells Fargo argues is, hey, wait,

09:04:44  16  capturing doesn't happen after the monitoring criteria are

09:04:48  17  passed.

09:04:49  18  Q.  And is this more or less what you heard from

09:04:51  19  Mr. Melsheimer during opening statements?

09:04:53  20  A.  That was the opening, yeah.

09:04:54  21  Q.  And so what is your response to -- to that argument?

09:04:58  22  A.  As I showed you, it contradicts Wells Fargo's source

09:05:03  23  code.  It contradicts the developer's manuals I showed you.

09:05:07  24          The preview frames are temporary, and they

09:05:11  25  disappear.  It's after you pass the monitoring criterion

09:05:15   1   that that JPEG is created, and that's the JPEG sent to the

09:05:21   2   bank.

09:05:21   3   Q.   Now, you say created.  At what point is the check image

09:05:26   4   that goes to the bank created?

09:05:28   5   A.   It's created after you pass the monitoring criterion.

09:05:31   6   Q.   And how do you know that?

09:05:32   7   A.   It's in the code.  This is a couple lines from the code

09:05:36   8   I just showed you.  And if you pass the monitoring

09:05:40   9   criterion, if the analyzed result is yes, then you create

09:05:44   10   that JPEG, and you set that as the capture result.

09:05:50   11   Q.   And so did you ultimately conclude that in the Wells

09:05:55   12   Fargo system, the check image is captured after the moment

09:06:00   13   the monitoring criteria are satisfied?

09:06:02   14   A.   Yes, it's captured after the moment the monitoring

09:06:06   15   criteria are satisfied.  I had multiple reasons to see

09:06:10   16   that.  It's a lot of weight on this side of the scale.

09:06:12   17   Q.   Did you also consider the Doctrine of Equivalents for

09:06:15   18   this claim limitation?

09:06:16   19   A.   Yes.  Just to be sure, I also applied the Doctrine of

09:06:19   20   Equivalents.

09:06:20   21        Now, remember, that is, something is

09:06:23   22   insubstantially different -- that nails versus screws, if

09:06:29   23   it passes this test.  It performs substantially the same

09:06:33   24   function in substantially the same way to achieve

09:06:37   25   substantially the same results.  Your legs don't fall off

09:06:44  1  your table.

09:06:45  2  Q.  How did you apply the Doctrine of Equivalents to the

09:06:46  3  capture element of the '571 patent?

09:06:48  4  A.  Well, let's go back to the element.  It says:

09:06:50  5  Capturing the image of the check with the camera when --

09:06:53  6  and the Judge construed that as at or after -- the image of

09:06:58  7  the check passes the monitoring criterion.  Okay?

09:07:02  8        Well, it's the same function either way.  You end

09:07:05  9  up with an image of the check, right.  What I showed you is

09:07:10  10  substantially the same way the check image to be produced

09:07:15  11  is -- let me say this exactly how I said it.  Check image

09:07:21  12  to be sent produced only after the monitoring criteria

09:07:26  13  passed.  And what's sent is what's created in that JPEG.

09:07:34  14  And you get substantially the same result.  Only images

09:07:38  15  that pass the monitoring criterion in Wells Fargo's

09:07:42  16  application are the ones that get sent to the bank.

09:07:45  17  Q.  Now, returning to your diagram, is it your opinion

09:07:53  18  that the check image capture happens in Step 3 of the

09:08:00  19  process you've illustrated?

09:08:00  20  A.  Yes, it is.  This is where you create that JPEG, like I

09:08:04  21  showed you, and it happens after Step 2 that if

09:08:08  22  analyzeResult equals yes, it happens after you pass the

09:08:10  23  monitoring criterion.

09:08:10  24  Q.  And if for some reason the creation of that JPEG

09:08:12  25  weren't considered captured, would it be equivalent?

| | | |
|---|---|---|
| 09:08:16 | 1 | A.  It would be equivalent.  So the Doctrine of Equivalents |
| 09:08:19 | 2 | would apply, and that element would be present in that |
| 09:08:23 | 3 | case. |
| 09:08:24 | 4 | Q.  Could you summarize for the jury the different evidence |
| 09:08:28 | 5 | that you considered for the capture element of the '571 |
| 09:08:32 | 6 | patent, Claim 1? |
| 09:08:33 | 7 | A.  All right.  We went through the source code and capture |
| 09:08:38 | 8 | happens after the monitoring criterion are satisfied.  You |
| 09:08:40 | 9 | saw that. |
| 09:08:40 | 10 | Went through the developer's and programmer's |
| 09:08:46 | 11 | guides, and they consistently say that capture happens |
| 09:08:50 | 12 | after you pass the monitoring criterion. |
| 09:08:53 | 13 | And then I showed you some witness testimony -- or |
| 09:08:55 | 14 | I talked about it -- that admitted that the processor is |
| 09:09:00 | 15 | part of the camera.  You can't have a digital camera |
| 09:09:04 | 16 | without a processor.  You can't use your camera on your |
| 09:09:06 | 17 | iPhone or your Android without launching the camera app |
| 09:09:09 | 18 | that runs on the processor. |
| 09:09:10 | 19 | And, also, I talked about the Doctrine of |
| 09:09:16 | 20 | Equivalents, that in this case, the screws equal the nails. |
| 09:09:21 | 21 | Q.  And so what did you ultimately conclude with respect to |
| 09:09:25 | 22 | the capture element of the '571 patent, Claim 1? |
| 09:09:28 | 23 | A.  For multiple reasons that I presented, this is present. |
| 09:09:32 | 24 | So we're going to put a checkmark there. |
| 09:09:35 | 25 | Q.  Now, what's the next claim element that you looked at? |

| | | |
|---|---|---|
| 09:09:38 | 1 | A.  All right.  This is providing the image of the check |
| 09:09:41 | 2 | from the camera to a depository via communication -- go |
| 09:09:47 | 3 | back, please -- via communication pathway between the |
| 09:09:51 | 4 | mobile device and the depository. |
| 09:09:53 | 5 |      Okay.  So let's unpack that.  This is you're going |
| 09:09:57 | 6 | to take that image of the check that passes the monitoring |
| 09:10:00 | 7 | criterion, you're going to send it to a depository.  That's |
| 09:10:02 | 8 | the bank.  And you're going to send it after -- can you go |
| 09:10:07 | 9 | back one more -- |
| 09:10:09 | 10 | Q.  My apology, Professor Conte. |
| 09:10:10 | 11 | A.  You're going to send it via communication pathway. |
| 09:10:14 | 12 | That's your cell phone network.  Or if you're on WiFi, |
| 09:10:17 | 13 | WiFi. |
| 09:10:18 | 14 | Q.  Now, does the Wells Fargo system provide the image of |
| 09:10:21 | 15 | the check to the depository in the way you described? |
| 09:10:22 | 16 | A.  Yes, it does.  So here's something from the app, some |
| 09:10:26 | 17 | more code, and you'll see up here is a comment from the |
| 09:10:29 | 18 | programmer.  Upload the front and the back check image. |
| 09:10:32 | 19 |      Now, what it does is it packages everything up |
| 09:10:35 | 20 | into something it calls body data.  And what I've outlined |
| 09:10:39 | 21 | here is something in the code that is doing something |
| 09:10:44 | 22 | called network request. |
| 09:10:44 | 23 |      What this -- this opens up connection and it's |
| 09:10:49 | 24 | kind of interesting how it does it.  You see URL, that's a |
| 09:10:53 | 25 | web address.  So it contacts the Wells Fargo server, in |

09:10:56   1   essence, through the web with a special web address.

09:11:01   2        And when it does that, it uploads this body data

09:11:05   3   that includes both the front and the back image and the

09:11:07   4   account you want to deposit it into and the amount you want

09:11:10   5   to deposit, along with other things like how long it took

09:11:13   6   to capture it and a bunch of other data.

09:11:16   7   Q.  And so is this source code uploading the captured JPEG

09:11:21   8   check images to the bank?

09:11:21   9   A.  It is.

09:11:22   10   Q.  And what does Wells Fargo do when it receives those

09:11:25   11   check images?

09:11:26   12   A.  All right.  So this is on the bank side, and what I've

09:11:28   13   highlighted here is it takes that body data that comes in

09:11:31   14   and it unpacks it and it pulls out the front check image

09:11:37   15   and the back check image, and, again, those are both as

09:11:39   16   JPEGs that it pulls them out.

09:11:42   17   Q.  And what happens after that?

09:11:42   18   A.  What happens after that is it does something called a

09:11:46   19   memo post.  And what a memo post is, is actually a deposit

09:11:52   20   transaction.  And you'll see here I've highlighted check

09:11:56   21   deposit amount and front image and back image.

09:12:01   22   Q.  And so memo post is how you get the actual money in

09:12:05   23   your bank account?

09:12:05   24   A.  Yeah, this means you get your money.

09:12:08   25   Q.  And so what happens on the user's phone at this point?

09:12:11  1   A.   After this happens, then the bank sends back an okay, I

09:12:16  2   did it to the mobile app.   And that's when this screen, the

09:12:19  3   confirmation screen pops up.   The bank actually sends back

09:12:22  4   a confirmation code number, and you see that at the bottom

09:12:26  5   here.

09:12:26  6   Q.   And so what did you conclude with respect to the last

09:12:29  7   claim element of Claim 1?

09:12:30  8   A.   That's also present, so let's put a checkmark there.

09:12:34  9   Q.   And so after looking at all these claim elements, what

09:12:38  10  did you conclude regarding Claim 1 of the '571 patent?

09:12:42  11  A.   So after a lot of analysis that we went through

09:12:46  12  yesterday and today, I concluded that Claim 1, all the

09:12:50  13  elements are present in Wells Fargo's mobile system, so

09:12:53  14  Wells Fargo infringes Claim 1 of the '571 patent.

09:12:57  15        Now, it also -- it infringes it both literally,

09:13:02  16  where I showed each and every element is present, and also

09:13:05  17  the Doctrine of Equivalents, where I showed, hey, it also,

09:13:11  18  in addition to literal infringement, if you take Wells

09:13:14  19  Fargo's non-infringement theory, even by the Doctrine of

09:13:17  20  Equivalents, the screws equal the nails.

09:13:20  21  Q.   And did you look at any other claims in the '571

09:13:25  22  patent?

09:13:25  23  A.   Yeah.   It looks like there's a lot to go through, but

09:13:27  24  here's the good news, we've done the heavy lifting so far.

09:13:31  25  So a lot of the evidence I just presented is going to make

| | | |
|---|---|---|
| 09:13:34 | 1 | going though the rest of the claims a lot easier. |
| 09:13:36 | 2 | I looked at Claims 2 and 3, 4, 5, and 6 -- we'll |
| 09:13:40 | 3 | go through them in these groups -- 9, and then 12 and 13. |
| 09:13:43 | 4 | Q.  And so let's look at Claims 2 and 3.  Can you describe |
| 09:13:47 | 5 | for the jury what is different in Claims 2 and 3 versus |
| 09:13:50 | 6 | Claim 1 that we just looked at? |
| 09:13:52 | 7 | A.  As you heard your Honorable Judge Gilstrap say, there's |
| 09:13:57 | 8 | this concept of a dependent claim.  That's a claim that |
| 09:14:01 | 9 | adds limitations to its parent claim.  2 and 3 are |
| 09:14:07 | 10 | dependent claims.  So 2 is dependent on Claim 1 that we |
| 09:14:10 | 11 | just covered.  The limitation it adds, I've highlighted |
| 09:14:14 | 12 | here, provide feedback, via the mobile device to a user of |
| 09:14:20 | 13 | the mobile device, regarding the image of the check. |
| 09:14:23 | 14 | So that's providing feedback.  Remember that, get |
| 09:14:26 | 15 | closer, hold steady. |
| 09:14:28 | 16 | Now, 3 is dependent on Claim 2.  So this is a |
| 09:14:36 | 17 | chain, Claim 1, Claim 2 dependent on 1, 3 dependent on 2. |
| 09:14:41 | 18 | And 3 adds to 2 that the feedback is provided if the image |
| 09:14:45 | 19 | fails to pass the monitoring criterion. |
| 09:14:46 | 20 | So -- and that's true, right?  It only shows the |
| 09:14:51 | 21 | feedback if you haven't passed.  After you pass, that's |
| 09:14:53 | 22 | when it snaps the picture and pops up that successful. |
| 09:14:59 | 23 | Q.  And did the Mitek documentation say anything about this |
| 09:15:02 | 24 | type of feedback? |
| 09:15:03 | 25 | A.  Yes, let's go back to that same document I talked about |

09:15:06  1  awhile ago where it says Mitek MiSnap provides real-time

09:15:10  2  feedback to the end user until a suitable image is

09:15:14  3  detected.  So that is Claim 2 and 3.  But we also saw that

09:15:17  4  when I analyzed the code.

09:15:19  5  Q.  Now, you mentioned get closer and hold steady.  Are

09:15:24  6  there other examples of feedback used by the Wells Fargo

09:15:28  7  system?

09:15:28  8  A.  Yes, it provides quite a few.  I cataloged them in my

09:15:34  9  report as I went through the code.  There's get closer, try

09:15:37  10  more light, try less light, center the front of the check,

09:15:44  11  center the back of the check.  We saw this hold steady if

09:15:49  12  you drank too much coffee.

09:15:51  13       Use a darker background, move farther away.  In a

09:15:56  14  couple of different cases it will say, reduce the angle.

09:15:59  15  That is if the slew angle or the rotation angle isn't

09:16:02  16  correct.

09:16:03  17       And then let's say you try to take a picture of

09:16:06  18  the check on your flowered tablecloth, it will say, use a

09:16:13  19  plain background because it can't find where the check is

09:16:15  20  in that background.

09:16:15  21  Q.  Now, what's the relationship between the feedback

09:16:17  22  messages that appear on the screen and the monitoring

09:16:21  23  criterion that are being looked at for the check image?

09:16:24  24  A.  So you'll see all the way on the left here I showed you

09:16:27  25  the monitoring criterion that corresponded to that

09:16:30   1   feedback.

09:16:30   2        So if you have low contrast, that's when it pops

09:16:33   3   up, this message use a darker background.  If you have --

09:16:36   4   if you don't pass minimum padding, that is, it wants a

09:16:40   5   certain amount of area around the check, it will say, hey,

09:16:43   6   back up.

09:16:44   7   Q.  And what do these different feedback messages look like

09:16:48   8   in the actual phone?

09:16:49   9   A.  So there are -- because there's multiple versions I

09:16:51   10  looked at, somewhere in the middle of this, the look and

09:16:55   11  feel of the app, is what we call it, changed.  So what's on

09:17:01   12  the right is the old look and feel where it will pop up the

09:17:05   13  message in a little bubble.  And then they switched to the

09:17:08   14  rectangles, which is what you see on the left, which is the

09:17:10   15  rectangles we saw earlier in the video yesterday.

09:17:14   16  Q.  Now, are these feedback messages provided before or

09:17:18   17  after the monitoring criteria are satisfied for a check

09:17:24   18  image?

09:17:24   19  A.  Provided before.

09:17:25   20  Q.  And why is that?

09:17:26   21  A.  Because after you don't need to provide anymore

09:17:29   22  feedback, you've captured the image.

09:17:31   23  Q.  And so the feedback is to help the user satisfy those

09:17:36   24  monitoring criterion?

09:17:37   25  A.  Exactly.

09:17:37   1   Q.   Now, what's the next set of claims in the '571 patent
09:17:42   2   that you looked at?
09:17:43   3   A.   All right.  So 4 adds to 3, and it says, the feedback
09:17:48   4   comprises instructions for the user to follow to obtain a
09:17:51   5   second image of the check, that is, it provides feedback to
09:17:56   6   take an image of the back of the check.  We saw that.
09:17:58   7        It says the feedback is provided visually in the
09:18:01   8   field of view.  Well, we saw that.  We had the field of
09:18:04   9   view, and it pops up that rectangle or that little red
09:18:07  10   bubble I showed you.
09:18:08  11        And then 6 says, capturing the image of the check
09:18:13  12   is performed automatically without user intervention.  And
09:18:16  13   that's what happens, right, this is the auto capture.  So
09:18:19  14   it captures the image of the check after it passes the
09:18:22  15   monitoring criterion.  User doesn't have to press a button
09:18:26  16   or do anything.
09:18:26  17   Q.   Do we need to look at any evidence other than what
09:18:29  18   you've already talked about to figure out if Wells Fargo
09:18:32  19   uses Claims 4, 5, and 6?
09:18:34  20   A.   No, we've already covered all the evidence, so luckily,
09:18:38  21   we don't have to go into any more code for this, and these
09:18:42  22   also are present in the Wells Fargo mobile app.
09:18:45  23   Q.   And what's the next claim that you looked at?
09:18:50  24   A.   Claim 9 is another independent claim.  So an
09:18:55  25   independent claim, again, it's a different description of

| | | |
|---|---|---|
| 09:19:00 | 1 | the invention.  It might have a slightly different take on |
| 09:19:02 | 2 | it. |
| 09:19:04 | 3 | What I've done here is I've highlighted things |
| 09:19:07 | 4 | where I would use the same evidence as I used to show |
| 09:19:11 | 5 | Claim 1.  So the non-transitory computer-readable medium, |
| 09:19:16 | 6 | you remember that, right?  And monitoring image of the |
| 09:19:20 | 7 | check in the field of view of the camera with respect to a |
| 09:19:22 | 8 | monitoring criterion.  Capture the image of the check using |
| 09:19:26 | 9 | the camera when the image of the check in the field of view |
| 09:19:30 | 10 | passes the monitoring criterion.  We spent a lot of time on |
| 09:19:33 | 11 | that.  And transmit the image of the check from the mobile |
| 09:19:37 | 12 | device to a deposit system.  We showed you that. |
| 09:19:39 | 13 | Q.  And is it your opinion that those claim limitations are |
| 09:19:45 | 14 | present in Claim 9 for the same reasons you described for |
| 09:19:48 | 15 | Claim 1? |
| 09:19:48 | 16 | A.  Yes, for the same mobile reasons I showed you in |
| 09:19:51 | 17 | Claim 1, these are present. |
| 09:19:52 | 18 | Q.  And what about the remainder of Claim 9? |
| 09:19:54 | 19 | A.  All right.  So there's, initialize a software object on |
| 09:19:59 | 20 | a mobile device operated by a user, the software object |
| 09:20:03 | 21 | configured to communicate with a camera. |
| 09:20:07 | 22 | Now, what's a software object?  That's a program. |
| 09:20:11 | 23 | Okay.  And then at the bottom, deposit system configured to |
| 09:20:14 | 24 | clear the check and deposit funds of the check into the |
| 09:20:17 | 25 | deposit account of the user. |

| | | |
|---|---|---|
| 09:20:19 | 1 | Q.  Now, does the Wells Fargo system initialize a software |
| 09:20:24 | 2 | object to communicate with the camera? |
| 09:20:25 | 3 | A.  Yes, it does. |
| 09:20:27 | 4 | Q.  And what about the deposit system that you deposit the |
| 09:20:31 | 5 | check into, does that ultimately clear the check and |
| 09:20:34 | 6 | deposit funds? |
| 09:20:34 | 7 | A.  Yeah, even though it wasn't required for Claim 1, I |
| 09:20:38 | 8 | showed you that part where it does that memo post, and |
| 09:20:41 | 9 | that's what this element is talking about. |
| 09:20:43 | 10 | Q.  So did you ultimately conclude that Claim 9 was also |
| 09:20:46 | 11 | present? |
| 09:20:46 | 12 | A.  Yeah, each and every element is present.  So the Wells |
| 09:20:52 | 13 | Fargo mobile app infringes Claim 9 of the '571 patent. |
| 09:20:55 | 14 | Q.  And what's the next set of claims that you looked at in |
| 09:20:59 | 15 | the '571 patent? |
| 09:21:00 | 16 | A.  Well, the next ones are -- call out certain criteria. |
| 09:21:06 | 17 | 12 calls out the monitoring criterion comprising light |
| 09:21:09 | 18 | contrast or light brightness of the image.  In fact, if you |
| 09:21:12 | 19 | remember, I showed you yesterday the actual code that does |
| 09:21:16 | 20 | that.  So it does actually do these. |
| 09:21:20 | 21 | I also found 13, the monitoring criterion |
| 09:21:22 | 22 | comprises skewing the image or warping the image.  I showed |
| 09:21:27 | 23 | you -- in fact, it shows you feedback if you skew or warp |
| 09:21:32 | 24 | it.  You know, it says:  Straighten the camera.  Or I think |
| 09:21:35 | 25 | it says:  Decrease the angle. |

09:21:38  1   Q.  And so what did you ultimately conclude with respect to

09:21:43  2   infringement of Claims 1 through 6, 9, 12, and 13 of the

09:21:46  3   '571 patent?

09:21:46  4   A.  So after all of the analysis I presented, I concluded

09:21:51  5   that the Wells Fargo mobile system infringes by a

09:21:56  6   preponderance of the evidence Claims 1 through 6, 9, 12,

09:22:01  7   and 13 of the '571 patent.

09:22:04  8   Q.  Now, what did you look at in the '090 patent?

09:22:08  9   A.  All right.  The '090 -- remember that Mr. Bueche

09:22:14  10  described this as the grandchild of the '571.  As the

09:22:19  11  grandchild, it -- it shares the same specification, it

09:22:23  12  shares the same inventors, but it has new claims.

09:22:26  13          So I looked at Claims 1 through 4, 7, and 10 of

09:22:31  14  this patent.

09:22:33  15  Q.  And why don't you describe Claim 1 of the '090 patent

09:22:38  16  to the jury?

09:22:38  17  A.  All right.  So Claim 1 has several different items

09:22:43  18  here.  You see a processor in communication with the image

09:22:47  19  capture device and presentation device, the processor

09:22:50  20  configured to.  I showed you there was a processor.  You

09:22:52  21  see a monitor -- a target document in the field of view of

09:22:56  22  the image capture -- whoops -- in the field of view of the

09:23:01  23  image capture -- image capture device with respect to a

09:23:08  24  monitoring criterion.  This -- control the presentation

09:23:14  25  device to present feedback information describing

09:23:17  1  instructions for satisfying the monitoring criterion, that

09:23:19  2  was the same as -- that's -- that's Claims 2 and 3 of the

09:23:22  3  '571.  That's that feedback information.

09:23:24  4       And determine whether the monitoring criterion is

09:23:26  5  satisfied based on the target document in the field of view

09:23:29  6  of the image capture device.  That's -- that's going to use

09:23:34  7  the same evidence we presented for Claim 1 of the '571.

09:23:37  8       And then when the monitoring criterion is

09:23:39  9  determined to be satisfied, control the image capture

09:23:43  10  device to capture an image depicting the target document in

09:23:48  11  the field of view of the image capture device.

09:23:50  12       So that's that capture element of Claim 1 that we

09:23:54  13  talked about.

09:23:56  14  Q.  So let me just step back a minute, Professor Conte.

09:23:59  15       Are you saying that some of these claim

09:24:04  16  limitations were already discussed essentially in the '571

09:24:06  17  patent?

09:24:06  18  A.  I'm saying that the evidence in the '571 patent is

09:24:10  19  sufficient to show that these claim elements are present,

09:24:13  20  as well.

09:24:13  21  Q.  And what about the first three elements of Claim 1, how

09:24:19  22  did you look at those?

09:24:20  23  A.  Well, this talks about an image capture device, a

09:24:24  24  presentation device, and a processor in communication with

09:24:27  25  the image capture device and the presentation device.

09:24:30    1    Q.  And did you find those in the Wells Fargo system?

09:24:32    2    A.  Yes.  In fact, the presentation device, for example, is

09:24:36    3    the screen of your -- your smartphone.  So each of these is

09:24:39    4    present in the Wells Fargo mobile app.

09:24:45    5    Q.  In the -- in the fourth claim element, it says:

09:24:49    6    Monitor a target document.  Is that different from the '571

09:24:52    7    patent?

09:24:52    8    A.  No, it's -- it's not different.  In fact, the -- it's

09:25:01    9    just using a more general term, "target document," instead

09:25:04   10    of check.

09:25:05   11    Q.  So in the '090 patent, it doesn't necessarily have to

09:25:09   12    be a check?

09:25:09   13    A.  That's right.  But if it is a check, it still infringes

09:25:14   14    Claim 1 of the '090.

09:25:15   15    Q.  So what did you ultimately conclude with respect to

09:25:18   16    infringement of Claim 1 of the '090 patent?

09:25:19   17    A.  Well, again, all the elements are present.  So Claim 1

09:25:25   18    of the '090 is infringed by the Wells Fargo system.

09:25:29   19    Q.  And what's the next set of claims in the '090 patent

09:25:32   20    that you looked at?

09:25:33   21    A.  So these talk about feedback.  Claim 2 adds:  Present

09:25:37   22    feedback information by displaying written instructions on

09:25:41   23    the display screen.

09:25:42   24            So those are those bubbles, or in the older

09:25:45   25    version, that -- that red pop-up.

| | | |
|---|---|---|
| 09:25:50 | 1 | Then 3 adds:  The written instructions request a |
| 09:25:54 | 2 | user to position the target document in the field of view, |
| 09:25:58 | 3 | such as center the front of the check or move back. |
| 09:26:01 | 4 | And 4, then, is to present the feedback |
| 09:26:06 | 5 | information when the monitoring criterion is determined to |
| 09:26:08 | 6 | not be satisfied. |
| 09:26:10 | 7 | Well, that's why you're presenting it.  That's |
| 09:26:12 | 8 | when Wells Fargo's app presents it is you don't pass the |
| 09:26:16 | 9 | monitoring criterion.  After you pass it, it stops, puts |
| 09:26:19 | 10 | the Post-it on the door, pops up that success with a check |
| 09:26:24 | 11 | box, packages up as a JPEG, and sends it to the bank. |
| 09:26:29 | 12 | Q.  And so did you conclude that Claims 2, 3, and 4 of the |
| 09:26:34 | 13 | '090 patent were present in the Wells Fargo system? |
| 09:26:35 | 14 | A.  Yes.  For all the evidence that we've already seen, |
| 09:26:38 | 15 | they're present in the Wells Fargo system.  And so Wells |
| 09:26:41 | 16 | Fargo infringes Claims 2, 3, and 4. |
| 09:26:46 | 17 | Q.  And what about Claim 7 and 10 of the '090 patent? |
| 09:26:50 | 18 | A.  All right.  Let's -- let's look at 7.  So 7 says: |
| 09:26:54 | 19 | Control the image capture device to capture the image |
| 09:26:57 | 20 | automatically upon determining the monitoring criterion. |
| 09:27:00 | 21 | We had a similar claim in the '571.  And just as |
| 09:27:06 | 22 | there, yes, it does this automatically.  The user doesn't |
| 09:27:09 | 23 | have to, after you pass the monitoring criterion, do |
| 09:27:12 | 24 | anything.  It goes boom. |
| 09:27:17 | 25 | And then 10 says:  Where the monitoring criterion |

09:27:19  1  comprises whether the corner image depicting the target

09:27:22  2  document is detectable.  And it does that, too.  It will

09:27:26  3  say, hey, move back because it can't find the corners.

09:27:32  4  Q.  And so what did you ultimately conclude with respect to

09:27:35  5  infringement of Claims 1 through 4, 7, and 10 of the '090

09:27:38  6  patent?

09:27:38  7  A.  So for all the information that we went through

09:27:41  8  yesterday and today, Claims 1 through 4, 7, and 10 are also

09:27:46  9  element-by-element present in the Wells Fargo system, so

09:27:50  10  Wells Fargo, preponderance of the evidence, in my opinion,

09:27:56  11  infringes the '090 patent.

09:27:58  12  Q.  Now, I'm going to return to something I think we saw

09:28:03  13  yesterday.  Could you describe for the jury what the chart

09:28:08  14  on your Slide 112 is showing?

09:28:10  15  A.  All right.  So these are all the different versions of

09:28:14  16  the software that were produced in Dallas.  And I looked

09:28:18  17  at -- and you saw Version 3.7.1.  And, by the way, all of

09:28:25  18  these are in the Defendant's Exhibit 11.  Remember, the

09:28:30  19  Defendant is who produced this code.

09:28:33  20  Q.  And so what conclusion did you reach with respect to

09:28:37  21  infringement of the '571 and '090 claims that you just

09:28:41  22  walked through for the other versions, the earlier versions

09:28:44  23  of the Wells Fargo application?

09:28:46  24  A.  Okay.  So I found that the same functionality was

09:28:52  25  present in the Android Version 3.7.  It was present in

```
09:28:56   1   Version 3.1.3 for both.  It was present in the Android
09:29:01   2   Version 3.1.1.
09:29:03   3         The same functionality was present in Version
09:29:09   4   2.3.8 for both.  The same functionality was present in
09:29:13   5   Version 2.3.7 for both.  The same functionality was present
09:29:17   6   in Version 2.3.6 for both.
09:29:21   7         The same functionality was present in Version
09:29:26   8   2.3.1 for both.  The same functionality was present in
09:29:29   9   Version 2.1.2 for both.  And the same functionality was
09:29:33  10   present in Version 2.0.6, even though they came out a
09:29:37  11   little different time, for both.
09:29:38  12   Q.  And so is it your opinion that all of the Wells Fargo
09:29:42  13   application versions you just referenced infringe the
09:29:46  14   asserted claims for the same reasons you discussed today
09:29:49  15   with respect to the 3.7.1 version?
09:29:53  16   A.  Yes, that's my opinion.
09:29:58  17   Q.  Now, when you were reviewing all these different
09:30:00  18   application versions, did you come across any differences
09:30:02  19   in how the functionality was implemented?
09:30:05  20   A.  Well, let's start at the bottom.  One difference that I
09:30:07  21   did not see is any difference in whether or not auto
09:30:10  22   capture was used.  Auto capture is present in all versions.
09:30:14  23         But what happened was, as you move forward in
09:30:17  24   time, Wells Fargo added more monitoring criteria and deeper
09:30:22  25   monitoring.  And they added more corrective feedback.
```

09:30:29    1    Q.   And so how did the monitoring criteria used in the

09:30:32    2    Wells Fargo system change over time?

09:30:33    3    A.   Well, here's all the examples called out in the patent

09:30:41    4    specification in the example system that the patent

09:30:44    5    specification describes.

09:30:46    6         When I looked at Versions 2.0.6 through 3.1.3, I

09:30:53    7    found almost all of these monitoring criteria were present.

09:30:57    8         When I moved on to Version 3.7.1, I found that

09:31:01    9    each and every one of them was present.  Mind you,

09:31:04   10    Version 2.0.6 to 3.1.3 are still monitoring the check with

09:31:10   11    respect to criteria.  They're still practicing the patent.

09:31:13   12    But over time, what they did was they added more, and I

09:31:16   13    imagine they added more, just to speculate, because they

09:31:19   14    wanted a better image.

09:31:20   15    Q.   And is Version 3.7.1 the current version of the Wells

09:31:25   16    Fargo application?

09:31:26   17    A.   It was the most recent version produced to me.

09:31:31   18    Q.   In other words, if you go to the App Store and download

09:31:34   19    it, that's what you get?

09:31:35   20    A.   I -- I haven't done that.  I believe that either you

09:31:38   21    get that or you get a later version, but I believe that's

09:31:41   22    what you get now.

09:31:42   23    Q.   Now, how has the corrective feedback changed over time?

09:31:45   24    A.   Well, over time, you -- up to Version 3.1.3 -- from

09:31:56   25    2.0.6 to 3.1.3, you would get these messages:  Get closer,

09:32:00  1  move farther away, reduce angle, try more light, try less

09:32:04  2  light.

09:32:05  3        And then starting in Version 3.7, they added to

09:32:09  4  that:  Center front of check, center back of check, use

09:32:12  5  darker background, use plain background.

09:32:19  6  Q.  And those new feedback messages, those come up when the

09:32:23  7  user is making a different kind of mistake?

09:32:26  8  A.  That's right.  When there's a different reason for not

09:32:30  9  passing the monitoring criteria.

09:32:31  10  Q.  To what extent can Wells Fargo customize what

09:32:36  11  monitoring criteria and feedback are used?

09:32:37  12  A.  In fact, they have full control here.  And this shows

09:32:42  13  you some portion of the Wells Fargo app where they're

09:32:48  14  configuring the MiSnap app to control certain parameters

09:32:51  15  about feedback and the criterion it uses.

09:32:55  16  Q.  Now, is there any option in the Wells Fargo system for

09:33:02  17  capturing check images other than auto capture?

09:33:04  18  A.  There is.  There's a shutter button provided, if you

09:33:07  19  want to use it.

09:33:08  20  Q.  And do you know how often Wells Fargo's customers use

09:33:11  21  that manual capture option?

09:33:13  22  A.  Well, when I averaged the data from -- I believe it was

09:33:19  23  2014 up through 2019, it was only 6 percent of the

09:33:25  24  successful checks use that manual feature.  The vast

09:33:29  25  majority -- 94 percent of the successfully deposited checks

09:33:33   1   use the auto capture feature.

09:33:35   2   Q.  And where did you get that data you referenced?

09:33:38   3   A.  I believe it was data that was presented during

09:33:45   4   Ms. Lockwood-Stein's deposition.  It's a large spreadsheet.

09:33:49   5   Q.  So this is data that Wells Fargo provided?

09:33:52   6   A.  Oh, yes, this is Wells Fargo's data in Plaintiff's

09:33:56   7   Exhibit 31.

09:33:57   8   Q.  Now, in the versions of the Wells Fargo application

09:34:02   9   that you reviewed source code for, what was the default

09:34:07   10  capture mode set to in the application?

09:34:10   11  A.  It was set to auto capture.  And so what I'm showing

09:34:14   12  here is the code that you could use if you wanted to change

09:34:18   13  that parameter.  Auto capture is when that mode is 2.

09:34:26   14  Q.  And so it -- would it be possible for Wells Fargo to

09:34:28   15  disable auto capture?

09:34:29   16  A.  Yes.  This is Mr. Makoto Jitodai who is an engineer at

09:34:36   17  Wells Fargo.  And he was asked:  Okay.  And so Wells Fargo

09:34:39   18  can change that one parameter to allow manual capture only

09:34:43   19  in the mobile deposit product; is that correct?

09:34:47   20      And he said:  That's correct on the iOS system.

09:34:50   21  Q.  Did he say anything about the Android system?

09:34:52   22  A.  And then he was asked the same question about Android,

09:34:55   23  and he said:  Yes, that's correct there too.

09:34:57   24      So all they've got to do is turn off the auto

09:35:00   25  capture feature and change this one thing.

09:35:02  1  Q.  Now, in the Wells Fargo application versions that you

09:35:05  2  reviewed, was the auto -- or was the capture mode, excuse

09:35:10  3  me, ever set to anything other than auto capture?

09:35:13  4  A.  No.

09:35:15  5  Q.  Thank you, Professor Conte.

09:35:19  6       MR. ROWLES:  Your Honor, I pass the witness.

09:35:21  7       THE COURT:  All right.  Cross-examination by the

09:35:22  8  Defendant.

09:35:24  9       MR. MELSHEIMER:  Thank you, Your Honor.

09:35:24  10      May I -- may my colleague approach the witness

09:35:27  11  with some witness binders?

09:35:29  12      THE COURT:  You have leave to approach the

09:35:30  13  witness.

09:35:35  14      MR. MELSHEIMER:  And we'll also provide those to

09:35:38  15  counsel, Your Honor.

09:35:38  16      THE COURT:  That's fine.

09:35:38  17                CROSS-EXAMINATION

09:35:56  18  BY MR. MELSHEIMER:

09:35:56  19  Q.  Good morning, Dr. Conte, how are you, sir?

09:35:59  20  A.  Good, how are you?

09:35:59  21  Q.  I'm well.  I want to start out by seeing if there are

09:36:02  22  some things you and I can agree about, all right?

09:36:04  23  A.  Okay.

09:36:05  24  Q.  So you did a report in this case, correct?

09:36:08  25  A.  Yes.

| | | |
|---|---|---|
| 09:36:08 | 1 | Q.  And you understood that it was very important that your |
| 09:36:10 | 2 | report contain all the opinions that you might have to |
| 09:36:13 | 3 | offer this jury, correct? |
| 09:36:15 | 4 | A.  Yes. |
| 09:36:17 | 5 | Q.  You made sure that your report was accurate, right? |
| 09:36:20 | 6 | A.  To the -- to the best of my abilities, I did. |
| 09:36:24 | 7 | Q.  Sure. |
| 09:36:24 | 8 | A.  I know there's some typos and other things, but to the |
| 09:36:27 | 9 | best of my ability. |
| 09:36:28 | 10 | Q.  I apologize.  I'm not criticizing you about any typos, |
| 09:36:31 | 11 | sir.  We won't talk about that today.  But you understood |
| 09:36:34 | 12 | that you wanted to get it right? |
| 09:36:35 | 13 | A.  Yes. |
| 09:36:35 | 14 | Q.  And because you wanted to give notice to Wells Fargo |
| 09:36:41 | 15 | what your opinions were about, for example, how the source |
| 09:36:44 | 16 | code worked, true? |
| 09:36:45 | 17 | A.  True. |
| 09:36:46 | 18 | Q.  Okay.  Now, you know there's someone named Dr. John |
| 09:36:51 | 19 | Villasenor who is going to testify on behalf of Wells |
| 09:36:54 | 20 | Fargo, correct? |
| 09:36:55 | 21 | A.  That's what I've heard. |
| 09:36:57 | 22 | Q.  And you understand that he's a highly qualified person |
| 09:37:01 | 23 | just like yourself that reads and understands code, right? |
| 09:37:05 | 24 | A.  I don't have any reason to doubt that. |
| 09:37:07 | 25 | Q.  Well, you've -- you've seen his report, right? |

| | | |
|---|---|---|
| 09:37:10 | 1 | A.  Yes. |
| 09:37:11 | 2 | Q.  You know that he's a professor at a very prestigious |
| 09:37:15 | 3 | university just like you are, right? |
| 09:37:17 | 4 | A.  Yes. |
| 09:37:17 | 5 | Q.  He teaches computer code and source code to students |
| 09:37:22 | 6 | just like you do, right? |
| 09:37:23 | 7 | A.  Yes. |
| 09:37:24 | 8 | Q.  He has a Ph.D. just like you do, right? |
| 09:37:28 | 9 | A.  Yes. |
| 09:37:28 | 10 | Q.  Okay.  And you don't have -- as you just told the jury, |
| 09:37:31 | 11 | you don't have any reason to believe that he's not |
| 09:37:34 | 12 | qualified, honest, or a reliable person just like you |
| 09:37:37 | 13 | believe yourself to be, true? |
| 09:37:38 | 14 | A.  I have no reason. |
| 09:37:39 | 15 | Q.  And it's fair, isn't it, sir, that you and |
| 09:37:43 | 16 | Dr. Villasenor have completely different views about some |
| 09:37:47 | 17 | of the key issues in this case, right? |
| 09:37:50 | 18 | A.  That's my understanding. |
| 09:37:52 | 19 | Q.  I mean, you understand that he's going to come and |
| 09:37:55 | 20 | testify later, because you've read his report, where he has |
| 09:37:58 | 21 | a different view than you do about how this source code |
| 09:38:02 | 22 | works, right? |
| 09:38:02 | 23 | A.  That's not quite my understanding, no. |
| 09:38:05 | 24 | Q.  Well, you understand that he believes or he will |
| 09:38:08 | 25 | testify that, for Wells Fargo, the Mitek software, the |

09:38:15  1  capturing occurs first and then the monitoring; you

09:38:18  2  understand that's what he's going to testify about?

09:38:20  3          MR. ROWLES:  Your Honor, I object.  He's asking

09:38:22  4  the witness to speculate about future testimony.

09:38:24  5          THE COURT:  I'll sustain that.

09:38:25  6  Q.  (By Mr. Melsheimer)  You know that in Mr. --

09:38:29  7  Dr. Villasenor's report, he takes the opposite position you

09:38:34  8  do about when the capturing occurs and when the monitoring

09:38:38  9  occurs; is that fair?

09:38:39  10         MR. ROWLES:  Your Honor, same -- same objection.

09:38:41  11  Dr. Villasenor's report was in rebuttal to Professor

09:38:44  12  Conte's.  This is just not part --

09:38:46  13         THE COURT:  If Professor Conte's read his report

09:38:48  14  and knows what's in it, then he can respond to the

09:38:51  15  question, and I assume he has.  So that's overruled.

09:38:54  16  A.  Could you repeat, I'm sorry.

09:38:56  17  Q.  (By Mr. Melsheimer)  Absolutely, sir.  You've read

09:38:59  18  Dr. Villasenor's report, right?

09:39:01  19  A.  I have.

09:39:01  20  Q.  You understand that he takes a different view than you

09:39:05  21  do about when capturing occurs and when monitoring occurs

09:39:10  22  in the Wells Fargo MiSnap product, fair?

09:39:13  23  A.  I'd agree with that, yes.

09:39:16  24  Q.  All right.  Now, sir, there -- you were asked some

09:39:22  25  questions on your direct examination about some things I

| | | |
|---|---|---|
| 09:39:26 | 1 | told the jury in opening statement; you remember that? |
| 09:39:30 | 2 | A.  Yes. |
| 09:39:30 | 3 | Q.  And one of the things I told them was what's your -- |
| 09:39:35 | 4 | what you were going to say capture was, right? |
| 09:39:37 | 5 | A.  I recall you -- no, I don't recall you saying what I |
| 09:39:42 | 6 | was going to say. |
| 09:39:43 | 7 | Q.  Well, do you recall me saying that I was going to |
| 09:39:47 | 8 | describe what the theory that USAA's expert was going to |
| 09:39:51 | 9 | offer about how capture works in the Mitek code? |
| 09:39:56 | 10 | A.  I recall you summarizing what you believed my theory |
| 09:40:00 | 11 | would be. |
| 09:40:00 | 12 | Q.  Okay.  And you know where I got that? |
| 09:40:03 | 13 | A.  No. |
| 09:40:04 | 14 | Q.  I got it from your report. |
| 09:40:07 | 15 | A.  Good. |
| 09:40:07 | 16 | Q.  All right, sir.  So let's -- can you look with me on -- |
| 09:40:11 | 17 | now, you have two binders in front of you.  We're not |
| 09:40:14 | 18 | supposed to block you or intimidate you.  There's a lot of |
| 09:40:17 | 19 | material there.  You may consult them, and I'm going to try |
| 09:40:20 | 20 | to direct you to the tabs of those binders when I have |
| 09:40:24 | 21 | questions about documents or other issues.  Is that fair? |
| 09:40:28 | 22 | A.  That's fair. |
| 09:40:29 | 23 | Q.  So I am now on your report, sir, which is in Tab 3 of |
| 09:40:38 | 24 | the binder listed as Volume 1.  Do you have that in front |
| 09:40:41 | 25 | of you, sir? |

| | | |
|---|---|---|
| 09:40:41 | 1 | A.  I do. |
| 09:40:42 | 2 | Q.  Okay.  And, in fact, if you go to Paragraph 412? |
| 09:40:49 | 3 | MR. MELSHEIMER:  Do we have this, Mr. Barnes? |
| 09:40:54 | 4 | A.  Give me a moment, sir. |
| 09:41:04 | 5 | Q.  (By Mr. Melsheimer) Absolutely, sir. |
| 09:41:05 | 6 | A.  Okay.  I'm there. |
| 09:41:06 | 7 | MR. ROWLES:  Your Honor, I object to the expert |
| 09:41:09 | 8 | report being published to the jury.  Certainly he can ask |
| 09:41:12 | 9 | questions of the witness about it, but it's not in |
| 09:41:14 | 10 | evidence. |
| 09:41:15 | 11 | THE COURT:  Is this for potential impeachment |
| 09:41:18 | 12 | purposes? |
| 09:41:20 | 13 | MR. MELSHEIMER:  It is, Your Honor. |
| 09:41:22 | 14 | THE COURT:  Overruled. |
| 09:41:23 | 15 | Q.  (By Mr. Melsheimer)  Now, sir, let me just direct you |
| 09:41:30 | 16 | to Paragraph 412.  Are you with me? |
| 09:41:39 | 17 | A.  Yes. |
| 09:41:39 | 18 | Q.  Now, one of the things that you were asked about in the |
| 09:41:43 | 19 | opening statement is I said that you, the expert for USAA, |
| 09:41:48 | 20 | was going to say that the capturing occurs when the JPEG |
| 09:41:53 | 21 | image is created and transmitted to a server somewhere |
| 09:42:00 | 22 | else.  Do you remember that? |
| 09:42:00 | 23 | A.  I remember you saying that, sir. |
| 09:42:03 | 24 | Q.  Okay.  And just pause for a second.  The servers that |
| 09:42:09 | 25 | we're talking about, those are Wells Fargo computers, |

09:42:12   1   right?

09:42:12   2   A.   That's my understanding, yes.

09:42:14   3   Q.   And those are servers that can be located really

09:42:17   4   anywhere in the country where Wells Fargo would store data

09:42:22   5   about checking, right?

09:42:23   6   A.   I'd assume so.

09:42:25   7   Q.   Well, I mean, those are -- those are separate, aren't

09:42:28   8   they, sir, from, for example, the storage that you have on

09:42:31   9   your cell phone, right?

09:42:32  10   A.   That's correct.

09:42:33  11   Q.   So the check image that is used in the mobile app ends

09:42:41  12   up being sent to another computer called a server where

09:42:46  13   it's stored, right?

09:42:47  14   A.   Yes.

09:42:53  15   Q.   Okay.   And you say in your report a JPEG check image is

09:43:01  16   created and transmitted via a communication network.   Do I

09:43:04  17   have that right?

09:43:06  18   A.   That's literally what I wrote.

09:43:07  19   Q.   To Wells Fargo's servers where the check image is

09:43:12  20   stored, correct?   Those are those servers you and I were

09:43:16  21   just talking about, right?

09:43:17  22   A.   That's right.

09:43:18  23   Q.   And then you say this -- you're referring to the

09:43:24  24   previous sentence, right?

09:43:26  25   A.   That's in -- imprecise.

09:43:28   1   Q.   This is the first -- am I reading it right?

09:43:35   2   A.   Again, you were imprecise in your premise.

09:43:37   3   Q.   Let me make sure we got the language right.

09:43:40   4         The first sentence says: A JPEG image is created

09:43:44   5   and transmitted, via communication network, correct?

09:43:48   6   A.   It says: A JPEG image is created and transmitted, via

09:43:55   7   communication network.

09:43:56   8   Q.   To Wells Fargo's servers?

09:43:59   9   A.   Comma, to Wells Fargo's servers.

09:44:01   10   Q.   Where the check image is stored, right?

09:44:02   11   A.   Where the check image is stored.

09:44:04   12   Q.   And then do you say, sir: This is the first -- and

09:44:09   13   only -- time that the check image is captured? Is that

09:44:14   14   what this sentence says?

09:44:15   15   A.   That's literally what the sentence says. I disagree

09:44:18   16   with your interpretation.

09:44:19   17   Q.   Well, I haven't said anything about my interpretation.

09:44:23   18   A.   You did. You said --

09:44:24   19         THE COURT: Gentlemen.

09:44:26   20         THE WITNESS: I'm sorry, Your Honor.

09:44:26   21         THE COURT: Questions and answers. We don't need

09:44:28   22   a conversation back and forth. Counsel will ask a

09:44:31   23   question, the witness will answer the question. That's how

09:44:34   24   this is done.

09:44:34   25         THE WITNESS: My apologies. My apologies, Your

09:44:39  1  Honor.

09:44:39  2  Q.  (By Mr. Melsheimer)  Let's see if we can get squared

09:44:41  3  away on this.  I read it correctly from your report,

09:44:44  4  correct?

09:44:44  5  A.  You read the words correctly.

09:44:46  6  Q.  And the words are what are in your report that you

09:44:49  7  wrote, correct?

09:44:50  8  A.  The words are what I wrote, and they're in my report.

09:44:54  9  Q.  You had ample opportunity to review and revise your

09:44:57  10  report in any way you wanted, correct?

09:44:59  11  A.  Up until when I submitted it, yes.

09:45:04  12  Q.  Up until you submitted it, no one said you couldn't

09:45:07  13  change anything or clarify something or modify it in any

09:45:10  14  way, correct?

09:45:11  15  A.  That's -- that's right.

09:45:14  16  Q.  You had the complete freedom to write and choose the

09:45:17  17  words that you wanted to convey the information you thought

09:45:20  18  was important, correct?

09:45:23  19  A.  Yes, I did, of course.

09:45:35  20  Q.  All right.  Let's see if there's a few other things

09:45:37  21  that you and I can agree upon, sir.

09:45:39  22         I want to see if we can agree on what these

09:45:45  23  patents in this case did not invent.  Are you with me?

09:45:50  24  A.  I will do my best to answer your question.

09:45:52  25  Q.  So these patents did not invent check deposit.  That's

09:45:57  1   been around for a long time.  Right?

09:45:59  2   A.  That's my understanding.

09:46:01  3   Q.  These patents did not invent mobile banking.  Mobile

09:46:07  4   banking has been around for a while.  True?

09:46:09  5   A.  Yeah, I didn't make a determination one way or another.

09:46:15  6   Q.  These patents did not invent check scanners, right?

09:46:21  7   A.  Again, I didn't make -- I wasn't asked to make a

09:46:23  8   determination of whether or not these patents invented

09:46:26  9   that.

09:46:26 10   Q.  Well, you know that check scanners that scanned in

09:46:30 11   information on checks and transmitted information, you know

09:46:32 12   that those have been around for a long time before these

09:46:34 13   patents, right?

09:46:35 14   A.  Sure.

09:46:37 15   Q.  I think we can agree that these patents did not invent

09:46:43 16   a new kind of smartphone, right?

09:46:44 17   A.  I -- I believe that's correct.

09:46:47 18   Q.  A new kind of camera?

09:46:50 19   A.  I believe that's correct.

09:46:51 20   Q.  Now, you, sir, are kind of what my mom used to call a

09:46:57 21   shutterbug.

09:46:59 22   A.  Excuse me?

09:46:59 23   Q.  You're kind of a -- well, you're kind of a camera guy,

09:47:03 24   aren't you?

09:47:03 25   A.  I didn't mention anything about that.

| | | |
|---|---|---|
| 09:47:05 | 1 | Q.  Well, I know you didn't mention anything about it.  But |
| 09:47:08 | 2 | I've -- I've done a little -- like a good student, I've |
| 09:47:10 | 3 | done my homework on you.  Aren't you kind of a camera |
| 09:47:14 | 4 | expert, or do I have that wrong? |
| 09:47:15 | 5 | A.  I'm not an expert on cameras.  I am an amateur |
| 09:47:21 | 6 | photographer. |
| 09:47:21 | 7 | Q.  That's what I'm talking about.  Okay.  So you are |
| 09:47:23 | 8 | someone that has an interest in cameras.  And you've |
| 09:47:24 | 9 | written about cameras in the past, haven't you, sir? |
| 09:47:25 | 10 | A.  Sure. |
| 09:47:26 | 11 | Q.  You have a blog where you talk about cameras and |
| 09:47:31 | 12 | photography, don't you? |
| 09:47:32 | 13 | A.  No, I don't have a blog. |
| 09:47:34 | 14 | Q.  Okay.  You've -- but you've written on photography and |
| 09:47:37 | 15 | cameras, true? |
| 09:47:37 | 16 | A.  I've participated in message boards, yes. |
| 09:47:40 | 17 | Q.  Thank you.  Not a new camera?  Not a new processor in |
| 09:47:44 | 18 | these patents, right? |
| 09:47:45 | 19 | A.  These patents do not disclose a new processor, that's |
| 09:47:51 | 20 | correct. |
| 09:47:51 | 21 | Q.  These patents don't disclose a new way of displaying |
| 09:47:55 | 22 | information, correct? |
| 09:47:57 | 23 | A.  I don't think that's quite accurate. |
| 09:47:59 | 24 | Q.  Well, they don't describe a new kind of, for example, |
| 09:48:06 | 25 | screen display device? |

```
09:48:08    1    A.  Device?

09:48:09    2    Q.  Yes.

09:48:10    3    A.  No, they do not.

09:48:12    4    Q.  And these patents did not -- do not purport to invent

09:48:19    5    any new hardware, true?

09:48:21    6    A.  I didn't analyze that one way or the other.

09:48:24    7    Q.  Well, do you think they did?

09:48:25    8    A.  I don't think so, no.

09:48:26    9    Q.  Okay.  So you've talked about -- a little bit in your

09:48:33   10    own direct examination about -- you're actually a user of

09:48:37   11    the Wells Fargo app?  Happily satisfied user, right?

09:48:41   12    A.  Yes, I -- I deposit checks with the Wells Fargo app to

09:48:45   13    my Wells Fargo account myself.

09:48:46   14    Q.  Well, you said, sir, I think, that you were a happy

09:48:49   15    customer.  I thought you said that.

09:48:51   16    A.  Yeah, I'm happy.

09:48:53   17    Q.  Okay.  All right.

09:48:53   18    A.  Thank you.

09:48:54   19    Q.  So you know that these patents -- so you are -- you've

09:48:58   20    been a user of mobile banking services, it sounds like?

09:49:02   21    A.  Yes, I have.

09:49:03   22    Q.  So you know that these patents didn't invent

09:49:07   23    features -- many of the features that are available in

09:49:10   24    mobile banking today, right?

09:49:12   25    A.  Yeah, I didn't analyze one way or the other.
```

| | | |
|---|---|---|
| 09:49:16 | 1 | Q.  Well, you didn't -- like, for example, you know that |
| 09:49:20 | 2 | these patents don't claim to have invented the ability to |
| 09:49:23 | 3 | check your account balance, right? |
| 09:49:25 | 4 | A.  No, they do not. |
| 09:49:27 | 5 | Q.  They don't claim to invent the ability to transfer |
| 09:49:31 | 6 | money between accounts on your cell phone, right? |
| 09:49:34 | 7 | A.  I wouldn't quite say that, no. |
| 09:49:38 | 8 | Q.  Well, you think that these patents do invent the |
| 09:49:40 | 9 | concept of transferring money from one account to another |
| 09:49:46 | 10 | on your cell phone? |
| 09:49:47 | 11 | A.  Now, that question I can answer.  No, they do not. |
| 09:49:50 | 12 | Q.  Okay.  I'll try to be more precise. |
| 09:49:53 | 13 | You agreed that these patents don't invent the |
| 09:49:57 | 14 | ability to report a lost or stolen debit or credit card? |
| 09:50:04 | 15 | A.  I did not see that in the spec.  I did not see that in |
| 09:50:09 | 16 | the claims. |
| 09:50:09 | 17 | Q.  Or to change your PIN -- some mobile apps you can |
| 09:50:12 | 18 | change your PIN.  These patents don't do that, right? |
| 09:50:17 | 19 | A.  I did not see that in the spec or the claims, no. |
| 09:50:19 | 20 | Q.  These patents don't address the idea of automatic bill |
| 09:50:22 | 21 | pay -- setting up an automatic bill pay on your cell phone, |
| 09:50:25 | 22 | right? |
| 09:50:25 | 23 | A.  I'm not sure of that. |
| 09:50:29 | 24 | Q.  Okay.  What about paying by credit card via your cell |
| 09:50:33 | 25 | phone, do these patents claim that? |

09:50:36  1  A.  I didn't see that in the specification or claims, no.

09:50:38  2  Q.  And you didn't talk about that with respect to any of

09:50:41  3  the testimony you've given today, right?

09:50:42  4  A.  I did not.

09:50:44  5  Q.  I've seen mobile banking apps that allow you to find

09:50:53  6  the nearest branch.  I didn't hear you talk about that in

09:50:56  7  your testimony, right?

09:50:56  8  A.  I did not.

09:50:57  9  Q.  Or mobile -- mobile apps that allow you to -- to find

09:51:03  10  an ATM.  Your -- your testimony didn't address that either,

09:51:06  11  did it, sir?

09:51:07  12  A.  It did not.

09:51:08  13  Q.  Or view -- or, for example, you don't claim that these

09:51:11  14  patents created the ability for a mobile bank customer to

09:51:15  15  view cleared checks on their cell phone, right?

09:51:20  16  A.  I didn't determine that one way or the other.

09:51:22  17  Q.  Or that the user of the -- of the mobile app could

09:51:26  18  apply for a new account, these patents don't talk about

09:51:29  19  that either, do they, sir?

09:51:30  20  A.  I didn't find that in the spec or the claims.

09:51:34  21  Q.  And just to be clear, you spent a lot of time looking

09:51:38  22  at this, right?

09:51:40  23  A.  Yes.

09:51:41  24  Q.  I mean, you're not someone that just is coming into

09:51:46  25  court without a lot of time spent on reviewing the claims,

09:51:49   1   the specifications, the source code, the documentation.

09:51:53   2   You spent hundreds of hours doing this, right?

09:51:56   3   A.   That's accurate.

09:51:57   4   Q.   So what I'm asking you, if you've looked for it or

09:52:01   5   found it, you say you didn't find it, I mean, you -- you

09:52:03   6   would be able to know if you'd found it, right?

09:52:05   7   A.   Yes.

09:52:08   8   Q.   These patents don't claim to invent fingerprint or face

09:52:19   9   ID that is a security mechanism that some banks have to

09:52:24   10   access accounts, right?

09:52:25   11   A.   Again, that is not in the specifications or the claims,

09:52:29   12   to my knowledge.

09:52:29   13   Q.   And, to your knowledge, these patents did not invent

09:52:34   14   the concept or idea of image analysis, analyzing an image?

09:52:38   15   A.   I don't think that's entirely correct.

09:52:40   16   Q.   Well, can we put it this way:  The ability to analyze

09:52:47   17   an image predates these patents, right?

09:52:49   18   A.   I'm sorry, your question is imprecise.  I can't quite

09:52:57   19   answer.

09:52:58   20   Q.   Okay.  There were capabilities that computers and

09:53:03   21   scanners had, before the USAA patents, to analyze images of

09:53:07   22   things, right?

09:53:07   23   A.   In general?

09:53:12   24   Q.   In general.

09:53:16   25   A.   Sure.

09:53:17  1   Q.  USAA did not invent in these patents the criterion for

09:53:23  2   analyzing check images, right?

09:53:26  3   A.  I wouldn't quite characterize that, no.

09:53:30  4   Q.  Well, you wouldn't, but let me just -- let me get at it

09:53:34  5   this way.  You understand that there are certain things

09:53:36  6   that have to be on a check for it to be processed by a

09:53:41  7   bank, correct?

09:53:41  8   A.  Yes.  I understand that from Mr. Calman.

09:53:44  9   Q.  And -- well, but you -- but you know that anyway,

09:53:52  10  right?  Not just from Mr. Calman.  You know that as just

09:53:54  11  a -- as a person who has written and deposited checks,

09:53:56  12  right?

09:53:56  13  A.  Well, yeah.  But Mr. Calman told me a lot more about

09:54:00  14  it.

09:54:00  15  Q.  Okay.  You understand that the kind of information that

09:54:03  16  banks need to see on a check image -- or let's back up.

09:54:09  17       The kinds of things that a bank needs to see on a

09:54:11  18  check -- I mean, those are just standard things that --

09:54:15  19  that neither USAA nor Wells Fargo invented, right?

09:54:20  20  A.  Yeah -- no, they didn't.

09:54:22  21  Q.  Right.  I mean, the things like the amount of the

09:54:27  22  check, the signature line, the -- the courtesy amount, the

09:54:30  23  address, the check number, all that stuff, that's not

09:54:33  24  something that -- that's something that all banks use

09:54:40  25  everywhere, true?

09:54:40  1   A.   Yes.

09:54:41  2   Q.   You talked a little bit about something called MICR,

09:54:46  3   and that's those funny -- I think you called them those

09:54:48  4   funny numbers on the check.   That -- it's magnetic image

09:54:53  5   character reading, correct?   Do I have that right --

09:54:57  6   recognition?

09:54:57  7   A.   Recognition, I think, it is.

09:54:59  8   Q.   Recognition, I'm sorry.   Magnetic image character

09:55:02  9   recognition, because as you pointed out, those -- those

09:55:05  10  funny symbols or numbers on our checks, that's actually

09:55:09  11  magnetic ink, right?

09:55:10  12  A.   I believe it was originally, yeah.

09:55:12  13  Q.   And that was because there were ways of reading those

09:55:18  14  by a magnetic reader?

09:55:20  15  A.   That's my understanding why -- I mean, why else would

09:55:23  16  they make it magnetic.

09:55:24  17  Q.   And that's not something that was invented in these

09:55:28  18  patents, right?

09:55:29  19  A.   No.

09:55:29  20  Q.   Indeed, you even pointed out that -- that image

09:55:32  21  checking generally -- the notion of taking an image of a

09:55:36  22  check instead of a physical check, that really the MICR is

09:55:40  23  not as important because that image is not being -- the

09:55:46  24  image of the check -- there's no use for the magnetic ink,

09:55:50  25  fair?

09:55:50   1   A.   I wouldn't quite characterize it that way.

09:55:56   2   Q.   Okay.  Well, the image of the check, when you take a

09:55:59   3   picture of it, you're not actually getting the magnet --

09:56:03   4   the magnetized symbols, are you, sir?

09:56:08   5   A.   Again, I wouldn't quite characterize it that way.

09:56:12   6   Q.   Okay.  Well, grade my paper on this.  What am I -- what

09:56:15   7   am I missing?

09:56:16   8   A.   Well, you aren't getting -- I mean, they're very

09:56:17   9   strangely shaped numbers, and that's to make them easily

09:56:21  10   readable by character recognition.

09:56:23  11   Q.   But the character reader doesn't read the magnetism; is

09:56:26  12   that right?

09:56:26  13   A.   That's -- okay.  Now you have an A.

09:56:29  14   Q.   Thank you.  Thank you.  I want to get more than one

09:56:31  15   from you, sir.

09:56:32  16   A.   Okay.  Keep on going.

09:56:33  17   Q.   All right.  Thank you.

09:56:34  18        THE COURT:  Let's go back to questions and

09:56:36  19   answers, gentlemen.  You don't need to start complimenting

09:56:39  20   each other.

09:56:39  21        THE WITNESS:  Yes, Your Honor.

09:56:44  22        MR. MELSHEIMER:  Thank you, Your Honor.

09:56:45  23   Q.   (By Mr. Melsheimer)  Now, we're talking about check

09:56:47  24   images, sir, and I want to get to that because you know

09:56:49  25   that there is something called Check 21, right?

09:56:53    1    A.   I know that from Mr. Calman, yes.

09:56:55    2    Q.   And -- well, I -- I -- I mentioned this or referred to

09:56:59    3    it generally in my opening statement.   Do you remember

09:57:02    4    that?

09:57:02    5    A.   Yes, but I knew it before from Mr. Calman.

09:57:04    6    Q.   Okay.   And Check 21 was a law that was passed after

09:57:10    7    9/11 that allowed images of checks to be used to clear and

09:57:19    8    be processed instead of the paper checks.   Do I have that

09:57:26    9    right?

09:57:26    10   A.   I believe that's a rough characterization of it.   It

09:57:28    11   was complicated, of course.

09:57:30    12   Q.   Very complicated, but there were rules set by those --

09:57:34    13   by that law that allowed check images -- images of paper

09:57:40    14   checks to take the place of physical paper checks, as a

09:57:44    15   general matter, right?

09:57:45    16   A.   That's my understanding, yes.

09:57:46    17   Q.   There was a standard that came out of that called the

09:57:55    18   X9 Standard.   Have you heard of that?

09:57:57    19   A.   Again, I've heard of that from Mr. Calman.

09:57:59    20   Q.   And the X9 Standard was not something that USAA came up

09:58:03    21   with, right?

09:58:04    22   A.   No.

09:58:04    23   Q.   That --

09:58:05    24   A.   That was an industry standard, I believe.

09:58:08    25   Q.   I apologize for cutting you off.

09:58:09   1          That standard was something that all the banks had

09:58:13   2   to follow if they wanted to use images to exchange among

09:58:19   3   and between banks for processing, as opposed to physical

09:58:23   4   paper checks, right?

09:58:25   5   A.   That's my understanding, yes.

09:58:27   6   Q.   Those standards which were set by law and by the

09:58:33   7   agreement of various banks, those standards involve things

09:58:39   8   like how clear the image has to be, correct?

09:58:41   9   A.   Yes, I believe that's correct.  I -- I -- again, I have

09:58:47   10   that here, but I don't recall all the different criteria.

09:58:50   11   Q.   And I'm not going to ask you about all of them.  But

09:58:53   12   just as a general matter, you know, there's standards like

09:58:56   13   what has to be visible, how visible it has to be, what

09:59:00   14   information has to be present before one bank will say,

09:59:05   15   yeah, I'll take that image and -- and accept it just like

09:59:08   16   it was a paper check.  Do I have that right?

09:59:10   17   A.   I believe that's correct, yes.

09:59:12   18   Q.   So when you showed the jury a minute ago those

09:59:28   19   different monitoring criterion -- you remember that chart

09:59:35   20   that had the different monitoring criterion?

09:59:36   21   A.   Yes.

09:59:37   22   Q.   And you said that Wells Fargo had added some additional

09:59:45   23   monitoring criterion to its mobile deposit application over

09:59:51   24   time, right?

09:59:51   25   A.   Yes, that's what I found.

09:59:53  1   Q.  Now, you're not suggesting there's anything wrong with

09:59:56  2   Wells Fargo adding new monitoring criterion, right?

09:59:58  3   A.  Not at -- no, of course, not.

10:00:00  4   Q.  Right.  Because that's just a function of making sure

10:00:04  5   that you get a useable image so it can actually go into the

10:00:11  6   banking system and be processed, right?

10:00:13  7   A.  Yes, that's the goal.

10:00:16  8   Q.  And those monitoring criterion, those aren't something

10:00:21  9   that the Plaintiff in this case invented, right?

10:00:23 10   A.  I would not characterize it that way.

10:00:27 11   Q.  Well, let me see if I can characterize it better for

10:00:30 12   you.

10:00:31 13        The monitoring criterion that are described in the

10:00:34 14   specification of the patent, those are things that are

10:00:37 15   well-known in the industry for determining when a check

10:00:43 16   image will be, in fact, useable, correct?

10:00:47 17   A.  I, again, wouldn't quite characterize them that way,

10:00:50 18   sorry.

10:00:51 19   Q.  All right.  You know that one of those criterion, for

10:00:55 20   example -- well, tell me, what is -- let's -- let's do it

10:00:59 21   this way.

10:01:00 22        What is one of the monitoring criterion that

10:01:02 23   you've identified?

10:01:04 24   A.  Skew angle.

10:01:05 25   Q.  Skew angle.  Okay.  So is that simply the angle of the

10:01:12    1   check in the picture?

10:01:13    2   A.  It's a little more complicated, but, generally, yes.

10:01:18    3   Q.  Okay.  And so that's something that I'm gathering that

10:01:21    4   if you -- if you have a picture of a check and it's, you

10:01:27    5   know, a skew, so to speak, it might not be readable or

10:01:31    6   processable by the bank, right?

10:01:32    7   A.  My understanding -- that isn't quite my understanding,

10:01:40    8   no, sir.

10:01:40    9   Q.  Well, tell me what it is.  Tell me what your

10:01:42   10   understanding is.

10:01:43   11   A.  My understanding is that that enhances the probability

10:01:45   12   of the bank to be able to process it, to minimize skewing.

10:01:49   13   Q.  To -- to -- oh, so to minimize the angle at which the

10:01:54   14   image is presented to the check -- presented to the bank,

10:02:00   15   that's something that will enhance the probability that the

10:02:03   16   check is good to go, right?

10:02:07   17   A.  That it will be deposited, yes.

10:02:09   18   Q.  Successfully deposited?

10:02:11   19   A.  I believe that's exactly what -- what the patent says.

10:02:14   20   Q.  Okay.  And, of course, that sort of thing is something

10:02:17   21   that all banks that do mobile deposit -- or that do imaging

10:02:23   22   have to be aware of, right?

10:02:25   23   A.  I haven't looked at other imaging systems, but I'd

10:02:29   24   assume that you wouldn't want aggressive skew.

10:02:31   25   Q.  Well, sir, again, and what I'm really getting at here

| | | |
|---|---|---|
| 10:02:34 | 1 | is these -- |
| 10:02:38 | 2 | MR. MELSHEIMER:  May I have one moment, Your |
| 10:02:40 | 3 | Honor? |
| 10:02:40 | 4 | THE COURT:  You may. |
| 10:02:50 | 5 | MR. MELSHEIMER:  Thank you, Your Honor.  While |
| 10:02:52 | 6 | we're -- while we're getting that -- oh, I think. |
| 10:02:56 | 7 | THE WITNESS:  No, not that one. |
| 10:02:57 | 8 | Q.  (By Mr. Melsheimer)  Is this the one you used, sir? |
| 10:02:59 | 9 | A.  No. |
| 10:03:00 | 10 | MR. MELSHEIMER:  I think this may be -- I |
| 10:03:04 | 11 | apologize, Your Honor.  If we might have just a moment. |
| 10:03:07 | 12 | Please, thank you. |
| 10:03:12 | 13 | Q.  (By Mr. Melsheimer)  But while we're -- while we're on |
| 10:03:14 | 14 | this, have you seen this slide before? |
| 10:03:15 | 15 | A.  Yes, I prepared it. |
| 10:03:16 | 16 | Q.  Okay.  So, I'm sorry, I thought I asked you is this one |
| 10:03:20 | 17 | of the ones you used.  Is it not one of the ones you showed |
| 10:03:23 | 18 | the jury? |
| 10:03:23 | 19 | A.  This is one of the ones that I showed the jury.  I |
| 10:03:26 | 20 | believe this isn't the one you're asking for. |
| 10:03:27 | 21 | Q.  You're trying to get ahead of me, sir. |
| 10:03:30 | 22 | A.  I shouldn't, but yes. |
| 10:03:31 | 23 | Q.  But in any event, these are some monitoring criterion |
| 10:03:34 | 24 | here on the left here, correct? |
| 10:03:36 | 25 | A.  Yes, they are. |

10:03:37  1   Q.  Low contrast, that means there's not the right

10:03:41  2   lighting, right?

10:03:44  3   A.  That's one way to interpret it.

10:03:47  4   Q.  Minimum padding, skew angle, rotation angle,

10:03:51  5   background, these are all things that you have to be aware

10:03:54  6   of in taking --

10:03:58  7            MR. MELSHEIMER:  If you could leave that up for

10:04:01  8   just a second.  I'm sorry.  Thank you, Mr. Barnes.

10:04:05  9   Q.  (By Mr. Melsheimer)  These are all things you'd have to

10:04:07  10  be aware of in taking an image of a check in any system,

10:04:12  11  right?  Whether it's a mobile system or whether you're

10:04:14  12  scanning in checks from your home office or whatever -- if

10:04:18  13  you -- to process an image, you have to be aware of things

10:04:21  14  like contrast and skew angle and things of that nature,

10:04:25  15  true?

10:04:25  16  A.  You would have to be aware of those items, yes.

10:04:51  17  Q.  PX-2.118 is -- so let's be clear, you said those

10:04:59  18  monitoring criterion are patented; is that what you said,

10:05:02  19  sir?

10:05:02  20  A.  No, that's not accurate.

10:05:03  21  Q.  Okay.  Well, that's what the slide says.

10:05:05  22  A.  The monitoring criteria -- the monitoring criteria

10:05:09  23  used -- patented monitoring criteria used, they're used.

10:05:13  24  The monitoring criteria are used.

10:05:15  25  Q.  Well, so I -- again, so it says more patented

| | | |
|---|---|---|
| 10:05:21 | 1 | monitoring criteria used.  That's what it says? |
| 10:05:23 | 2 | A.  I might have been imprecise giving the title. |
| 10:05:27 | 3 | Q.  Okay.  So and, again, I'm not fussing at you about |
| 10:05:30 | 4 | that, sir.  I just want to make sure you and I are |
| 10:05:33 | 5 | communicating. |
| 10:05:34 | 6 | A.  Sure. |
| 10:05:34 | 7 | Q.  So you acknowledge that the monitoring criteria on the |
| 10:05:39 | 8 | left-hand side, those aren't patented? |
| 10:05:41 | 9 | A.  I don't believe it was construed in this case, so, no. |
| 10:05:51 | 10 | Q.  And so what you're saying is, well, you know, you -- |
| 10:05:55 | 11 | you might have written something that turned out to be a |
| 10:06:00 | 12 | little imprecise or even incorrect, right?  It happens. |
| 10:06:03 | 13 | A.  No, that's not at all what I was saying. |
| 10:06:05 | 14 | Q.  Well, did you write this? |
| 10:06:07 | 15 | A.  I did. |
| 10:06:08 | 16 | Q.  We know that the things listed on the left, the |
| 10:06:14 | 17 | skewing, the warping, the corner detection, the MICR line |
| 10:06:17 | 18 | detection, let's focus just on that -- that one, sir. |
| 10:06:20 | 19 | The MICR line detection, okay?  MICR lines have |
| 10:06:27 | 20 | had to be detected and readed as long as there has been |
| 10:06:32 | 21 | MICR lines? |
| 10:06:33 | 22 | MR. ROWLES:  Your Honor, may we approach? |
| 10:06:34 | 23 | THE COURT:  Approach the bench. |
| 10:06:35 | 24 | (Bench conference.) |
| 10:06:44 | 25 | MR. ROWLES:  Your Honor, I feel that we're getting |

10:06:46  1  into issues of validity and whether these monitoring

10:06:50  2  criteria were known in the art, which is not relevant to

10:06:52  3  any of the issues remaining in the case.

10:06:54  4      THE COURT:  What is the relevance?

10:06:55  5      MR. MELSHEIMER:  Your Honor, first of all, it goes

10:06:56  6  to the scope of the -- the improvement of the invention

10:07:01  7  over the prior art, which is a hundred percent relevant to

10:07:04  8  Georgia-Pacific factors of damages.  So we're entitled to

10:07:07  9  bring out what these patents invented, what they didn't

10:07:10  10  invent, and what already existed.

10:07:12  11      He's put up a slide that says patented monitoring

10:07:16  12  criteria.  He's already said they're not patented.  I think

10:07:18  13  I'm entitled to explore that.  I'll move along, but I think

10:07:21  14  I'm entitled to ask a couple more questions along this

10:07:24  15  line.

10:07:24  16      THE COURT:  Well, we've spent a lot of time

10:07:26  17  talking about what the patents aren't.  Seems to me we

10:07:29  18  ought to be talking about what the patents are.

10:07:32  19      MR. MELSHEIMER:  We will do -- we will absolutely

10:07:33  20  be doing that, Your Honor, but I do believe --

10:07:35  21      THE COURT:  How much more cross timewise do you

10:07:38  22  think you have, Mr. Melsheimer?

10:07:38  23      MR. MELSHEIMER:  Completely or -- or on this -- on

10:07:41  24  this issue, Your Honor?

10:07:42  25      THE COURT:  No, completely.

10:07:44   1          MR. MELSHEIMER:  Oh, I think I have another -- an

10:07:46   2   hour or so, Your Honor, probably.

10:07:48   3          THE COURT:  Well, we're going to take a short

10:07:49   4   recess, and then when we come back, you can continue.

10:07:53   5          MR. MELSHEIMER:  And I'm going to be very

10:07:54   6   efficient, Your Honor.  I'm not trying to spend time.  I

10:07:57   7   know what the Court wants us to do.

10:07:59   8          THE COURT:  No, I'm not pushing you on your time,

10:08:02   9   and I'm not looking for any implication from you otherwise.

10:08:04   10          I just have had the jury in the box going on two

10:08:07   11   hours, and they need a recess.

10:08:09   12          MR. MELSHEIMER:  Oh, understood.

10:08:10   13          THE COURT:  And we're going to do that.

10:08:12   14          MR. MELSHEIMER:  Understood.

10:08:13   15          THE COURT:  There's merit to what both of you say.

10:08:19   16   This -- that's the problem in this area of the law.  There

10:08:22   17   are factual things that relate to more than one theory.

10:08:26   18   And while this relates to potentially invalidity, it may

10:08:30   19   also intersect with one or more of the Georgia-Pacific

10:08:32   20   factors.  But we have -- we have spent a lot of time on

10:08:38   21   this.  I'm going to let you follow up with one or two more

10:08:42   22   questions on this and then move on, once we come back from

10:08:45   23   recess.

10:08:46   24          MR. MELSHEIMER:  Your Honor, would you prefer I

10:08:47   25   just do that before the break so it's definitely done in a

10:08:50  1  minute or two?  I'm happy to do it that way if you'd

10:08:53  2  prefer.

10:08:53  3          THE COURT:  No, we'll just take a recess, and then

10:08:57  4  you can do it then.

10:08:58  5          MR. MELSHEIMER:  Okay.  Thank you, Your Honor.

10:08:58  6          THE COURT:  Thank you, counsel.

10:09:00  7          (Bench conference concluded.)

10:09:00  8          THE COURT:  Ladies and gentlemen, this examination

10:09:03  9  has considerable more time to go, and it's been over an

10:09:07  10  hour and a half since we started.  We're going on two

10:09:10  11  hours.  We're going to use this opportunity to take a short

10:09:12  12  recess.

10:09:13  13          If you will, simply leave your juror notebooks

10:09:16  14  closed and in your chairs.  Follow all the instructions

10:09:19  15  I've given you while you're on recess, including not to

10:09:22  16  discuss the case with each other, and we'll be back shortly

10:09:25  17  to continue.

10:09:26  18          The jury's excused for recess at this time.

10:09:30  19          COURT SECURITY OFFICER:  All rise.

10:09:30  20          (Jury out.)

10:25:21  21          THE COURT:  Court's in recess.

10:25:24  22          (Recess.)

10:25:24  23          COURT SECURITY OFFICER:  All rise.

10:25:25  24          THE COURT:  Be seated, please.

10:25:25  25          Counsel, before I bring the jury back in, I

| | | |
|---|---|---|
| 10:25:31 | 1 | reviewed the current state of affairs with regard to the |
| 10:25:35 | 2 | parties' proposed final jury instructions and verdict form. |
| 10:25:42 | 3 | I'm persuaded that the Court would benefit by a renewed |
| 10:25:46 | 4 | effort on the part of the parties.  I'm directing that you |
| 10:25:51 | 5 | jointly meet and confer and submit a revised and updated, |
| 10:25:57 | 6 | suggested final jury instruction and verdict form by noon |
| 10:25:58 | 7 | tomorrow. |
| 10:25:59 | 8 | All right.  Let's bring in the jury. |
| 10:26:26 | 9 | COURT SECURITY OFFICER:  All rise. |
| 10:26:27 | 10 | (Jury in.) |
| 10:26:28 | 11 | THE COURT:  Please be seated. |
| 10:26:31 | 12 | We'll continue with the Defendant's |
| 10:26:36 | 13 | cross-examination of the witness.  You may proceed, |
| 10:26:39 | 14 | counsel. |
| 10:26:39 | 15 | MR. MELSHEIMER:  May it please the Court, Your |
| 10:26:41 | 16 | Honor. |
| 10:26:41 | 17 | Q.  (By Mr. Melsheimer)  Mr. -- Dr. Conte, we were talking |
| 10:26:43 | 18 | about these so-called monitoring criteria that are |
| 10:26:46 | 19 | important in any sort of image processing, when we left. |
| 10:26:51 | 20 | Do you -- do you remember that? |
| 10:26:52 | 21 | A.  Yes, I do. |
| 10:26:52 | 22 | Q.  And, of course, that's going to be important whether -- |
| 10:26:55 | 23 | however the image is being captured.  Whether it's being |
| 10:26:58 | 24 | captured by manual capture or auto capture or scanned into |
| 10:27:02 | 25 | a scanner, these sorts of things are going to be important |

10:27:06  1  regardless.  Do I have that right?

10:27:13  2  A.  I wouldn't quite put it that way.

10:27:15  3  Q.  Well, certainly when you're taking an image of

10:27:18  4  something, whether -- however you're taking it, whether it

10:27:22  5  be auto, manual, or scanning it in, you have to make sure

10:27:25  6  you have the right brightness, correct?

10:27:27  7  A.  That's correct.

10:27:27  8  Q.  You have to make sure the thing is positioned correctly

10:27:30  9  in the frame, true?

10:27:30  10  A.  To some degree, yeah.

10:27:33  11  Q.  You have to make sure it's not skewed or warped?

10:27:36  12  A.  To some degree, yes.

10:27:38  13  Q.  I'm just reading from your chart here, sir.  You have

10:27:42  14  to have corner detection to make sure where sort of the

10:27:45  15  check or the image stops and the background starts, right?

10:27:48  16  A.  Correct.

10:27:50  17  Q.  And then we were talking just briefly before the break

10:27:53  18  about the MICR line, and I think you agreed with me that

10:27:57  19  that MICR is an old concept that's been on checks forever,

10:28:02  20  right?

10:28:02  21  A.  Yes, I believe it has.

10:28:03  22  Q.  And certainly it has -- still has some relevance to be

10:28:06  23  read in an image, correct?

10:28:10  24  A.  Yes, I believe it does.

10:28:11  25  Q.  But it's not relevant from the magnetic sense in an

| | | |
|---|---|---|
| 10:28:15 | 1 | image.  I think we agreed on that.  Right? |
| 10:28:17 | 2 | A.  Yes, I think we settled there. |
| 10:28:18 | 3 | Q.  All right.  So, sir, let me go to another area where I |
| 10:28:26 | 4 | think you and I will have some agreements.  And I -- it's |
| 10:28:30 | 5 | general principles of patent law, your understanding of |
| 10:28:32 | 6 | patent law.  Are you with me? |
| 10:28:34 | 7 | A.  Yes. |
| 10:28:34 | 8 | Q.  Okay.  So did you get a chance to see the video that |
| 10:28:42 | 9 | Judge Gilstrap played to the jury as part of the jury |
| 10:28:44 | 10 | selection process? |
| 10:28:45 | 11 | A.  No, I did not. |
| 10:28:47 | 12 | Q.  Have you ever looked at it? |
| 10:28:48 | 13 | A.  No, I have not. |
| 10:28:50 | 14 | Q.  Okay.  Well, let me ask you some questions about the |
| 10:28:52 | 15 | substance of it and see if that -- that -- those questions |
| 10:28:56 | 16 | comport with your understanding.  Are you with me? |
| 10:28:59 | 17 | A.  Yes. |
| 10:29:00 | 18 | Q.  All right.  So you can agree that the claims, as the |
| 10:29:07 | 19 | video said, are the most important part of the patent, |
| 10:29:11 | 20 | right? |
| 10:29:11 | 21 | A.  That's the property, yes. |
| 10:29:12 | 22 | Q.  The claims are what gives the public notice of the |
| 10:29:18 | 23 | boundaries of the invention, right? |
| 10:29:19 | 24 | A.  Yes. |
| 10:29:24 | 25 | Q.  You heard me say in opening, I think, that the claims |

| | | |
|---|---|---|
| 10:29:26 | 1 | are like the fence of the invention, right? |
| 10:29:29 | 2 | A.  I wouldn't quite put it that way, but okay. |
| 10:29:34 | 3 | Q.  Well, I'm asking you if you heard me say that? |
| 10:29:35 | 4 | A.  Yes, I heard you say that. |
| 10:29:37 | 5 | Q.  And is it -- are -- is it your understanding that it's |
| 10:29:41 | 6 | often that -- patent rights are often described as like |
| 10:29:46 | 7 | property rights where there are fences around various |
| 10:29:49 | 8 | people's different properties?  Have you heard that analogy |
| 10:29:52 | 9 | before? |
| 10:29:53 | 10 | A.  I heard that from you, sir. |
| 10:29:54 | 11 | Q.  You've never heard it before that? |
| 10:29:57 | 12 | A.  I heard it before, but I heard it from you. |
| 10:29:59 | 13 | Q.  Okay.  Now, you -- you also understand the concept that |
| 10:30:02 | 14 | once you get your claims, you can't change them, right? |
| 10:30:09 | 15 | A.  Correct. |
| 10:30:11 | 16 | Q.  You can't move the fence to a different piece of |
| 10:30:15 | 17 | property, to use my analogy, right? |
| 10:30:23 | 18 | A.  I'm not sure I agree with your analogy.  So maybe -- |
| 10:30:29 | 19 | I'm not -- |
| 10:30:29 | 20 | Q.  Okay.  Well, let me -- let me ask it a different way, |
| 10:30:33 | 21 | sir. |
| 10:30:33 | 22 | The claims define what the patent owner owns, |
| 10:30:36 | 23 | right? |
| 10:30:36 | 24 | A.  Correct. |
| 10:30:37 | 25 | Q.  And there's no doubt in your mind about that, because |

10:30:40  1   you seem like you're hesitating, and I want to make sure

10:30:43  2   that I'm getting it right.

10:30:46  3          The claims define what the patent owner owns,

10:30:48  4   true?

10:30:49  5          THE COURT:  Counsel, there's no need for you to

10:30:51  6   characterize before the jury how you perceive the witness's

10:30:55  7   answer to be.

10:30:56  8          MR. MELSHEIMER:  Yes, Your Honor.

10:30:56  9          THE COURT:  He -- that's just not proper.  So

10:30:59  10  cease -- cease doing that, please.  Ask your question

10:31:04  11  again.

10:31:04  12         MR. MELSHEIMER:  Let me -- let me ask my -- thank

10:31:06  13  you, Your Honor.

10:31:06  14  Q.  (By Mr. Melsheimer)  There's no doubt in your mind that

10:31:09  15  the claims define what the invention is, true?

10:31:12  16  A.  I'm an inventor of 40 patents, so I wouldn't quite

10:31:20  17  agree with that.

10:31:21  18  Q.  Okay.  So you think there's something else that defines

10:31:24  19  the invention -- the limits of the invention other than the

10:31:27  20  claims?

10:31:27  21  A.  I'm not saying that.

10:31:30  22  Q.  Okay.  I want to make sure I understand what you are

10:31:33  23  saying.

10:31:34  24         The claims define the invention.  Are we agreed on

10:31:37  25  that?

```
10:31:38    1  A.  Claims in light of the specification.

10:31:42    2  Q.  Well, if there's something in the specification that's

10:31:49    3  not in the claim -- are you with me?

10:31:52    4  A.  Yes.

10:31:53    5  Q.  The claim controls, right?

10:31:54    6  A.  That's true.

10:31:56    7  Q.  So, for example, if you had a specification that said

10:32:03    8  this invention could be A, B, C, and D, are you with me?

10:32:08    9  A.  Yes, sir.

10:32:08   10  Q.  And the claims said the invention is just B, C, and D,

10:32:17   11  you don't get to put A in the claim, do you, sir?

10:32:20   12  A.  Not in that patent.  There's a concept of continuation

10:32:31   13  and other things.

10:32:32   14  Q.  Right.  And -- that's a good point.  I want to make

10:32:35   15  sure we're clear about that.

10:32:37   16        So you could later, if you wanted to, go back and

10:32:40   17  add claims as long as they were -- as long as the new

10:32:44   18  claims were supported by the original specification.  Do I

10:32:48   19  have that right?

10:32:49   20  A.  Yes.

10:32:49   21  Q.  But you can't, in that patent, the single patent we're

10:32:54   22  talking about, you can't take something from the

10:32:57   23  specification and make it a claim element if it's not in

10:33:02   24  the claim itself.  Can we agree on that?

10:33:08   25        MR. ROWLES:  Your Honor, I object.  We're getting
```

10:33:10   1   into patent law principles at this point.

10:33:17   2        THE COURT:  I've given you a fair amount of

10:33:25   3   latitude here, Mr. Melsheimer.  These are all legal

10:33:27   4   concepts, and the Court is going to be the sole source of

10:33:31   5   instructing the jury on what the law is.

10:33:32   6        I'm going to allow -- I'm going to allow the

10:33:35   7   witness to either agree or disagree with this question, but

10:33:37   8   then we need to move on.  All right?

10:33:40   9   A.  I'm sorry, Mr. Melsheimer, can you ask that again?

10:33:42  10   Q.  (By Mr. Melsheimer)  I certainly can.

10:33:44  11        MR. MELSHEIMER:  Your Honor, might I ask the court

10:33:45  12   reporter to reread the last question so I don't just

10:33:48  13   summarize it?

10:33:48  14        THE COURT:  All right.  Let's do that.

10:34:05  15        (Court reporter read back the last question.)

10:34:05  16   A.  So I think that's imprecise in my understanding of the

10:34:08  17   law.  And, again, I'm not an attorney.

10:34:09  18   Q.  (By Mr. Melsheimer)  Well, can we agree that every word

10:34:16  19   in the claims is important?

10:34:17  20   A.  Yes.

10:34:17  21   Q.  And one of the words in the claims in this case is

10:34:22  22   "when," correct?

10:34:25  23   A.  Yes.

10:34:26  24   Q.  And, in fact, "when" is in every asserted claim in this

10:34:33  25   case, correct?

```
10:34:34   1   A.  I believe it is, yes.  Well, that's not accurate.
10:34:40   2   Every independent claim.
10:34:42   3   Q.  And because the dependent claims hinge on the
10:34:51   4   independent claims, it's, in effect, in all the claims.
10:34:54   5   Can we agree on that?
10:34:55   6   A.  Let me just check.  I've got the claims here.
10:34:59   7        It's in the three independent claims, yes.
10:35:24   8   Q.  So we're in agreement?
10:35:25   9   A.  I believe so.
10:35:27  10   Q.  Take a look at Volume 1, Tab 12, sir, which is the
10:35:33  11   Court's claim construction excerpt that is also in the jury
10:35:38  12   notebook at Pages 1 and 2.
10:35:47  13   A.  Okay.
10:36:06  14        MR. MELSHEIMER:  May I have a moment, Your Honor?
10:36:07  15        THE COURT:  Take a moment, counsel.
10:36:28  16   Q.  (By Mr. Melsheimer)  So in --
10:36:29  17        MR. MELSHEIMER:  Thank you, Your Honor.
10:36:29  18   Q.  (By Mr. Melsheimer)  So in Volume 1, Tab 12, sir --
10:36:33  19        MR. MELSHEIMER:  Go ahead and pull that up,
10:36:35  20   Mr. Barnes.
10:36:35  21   Q.  (By Mr. Melsheimer)  -- so these are the -- these are
10:36:37  22   the different terms.  And if you look at the very bottom,
10:36:45  23   we see the use of the word "when" in that claim -- in
10:36:48  24   Claim 6, correct?  And then in the Court's construction,
10:36:57  25   and "when" is --
```

```
10:37:00    1          MR. MELSHEIMER:  If you could pull that back up,
10:37:02    2   Mr. Barnes.  Thank you.
10:37:03    3   Q.  (By Mr. Melsheimer)  "When" is defined as at or after
10:37:14    4   the moment.  Do you see that, sir?
10:37:16    5   A.  Yes.
10:37:17    6   Q.  Okay.  And if we look at -- so capture has to be --
10:37:35    7   can't be before.  It has to be at or after.  Can we agree
10:37:41    8   on that?
10:37:42    9   A.  I wouldn't quite characterize it that way.
10:37:46   10   Q.  Well, the Court -- have you used the Court's -- have
10:37:49   11   you used the Court's construction of "when"?
10:37:52   12   A.  Religiously.
10:37:54   13   Q.  And can we agree that the Court's construction of
10:37:57   14   "when" is at or after?
10:37:58   15   A.  Yes.
10:37:59   16   Q.  The Court's construction is not before.  Can we agree
10:38:02   17   on that?
10:38:02   18   A.  The Court's construction is at or after.
10:38:05   19   Q.  Now, you understand that it's Wells Fargo's position
10:38:11   20   that it does not use the same timing as found in the patent
10:38:16   21   claims.  And I know you disagree with it, but you
10:38:19   22   understand that's the Wells Fargo position, correct?
10:38:20   23   A.  Yes, I understand that's their position.  That's a
10:38:26   24   little imprecise description, but yes.
10:38:28   25   Q.  And on direct, you took the jury through each and every
```

| | | |
|---|---|---|
| 10:38:35 | 1 | limitation of the various claims, right? |
| 10:38:36 | 2 | A.  Yes. |
| 10:38:36 | 3 | Q.  You did that because the Plaintiff bears the burden of |
| 10:38:41 | 4 | proof on each element, right? |
| 10:38:43 | 5 | A.  That was what I was instructed to do. |
| 10:38:45 | 6 | Q.  And you understand that meeting 95 percent of the |
| 10:38:52 | 7 | elements won't get it done; you have to meet all of them, |
| 10:38:57 | 8 | either literally or by equivalents, right? |
| 10:38:59 | 9 | A.  That's my understanding, yes. |
| 10:39:01 | 10 | Q.  And you heard my opening where I said, you know, a 95 |
| 10:39:06 | 11 | is an A, probably at Georgia Tech, but it's a 0 in a patent |
| 10:39:11 | 12 | case, right?  It's an F in a patent case? |
| 10:39:18 | 13 | A.  I'm not going to speculate about Georgia Tech's grading |
| 10:39:23 | 14 | scale. |
| 10:39:24 | 15 | Q.  95 is generally an A in life, but it's an F in a patent |
| 10:39:27 | 16 | case.  Can we agree on that? |
| 10:39:29 | 17 | A.  By F you mean -- |
| 10:39:31 | 18 | Q.  No infringement? |
| 10:39:32 | 19 | A.  No infringement?  Okay.  Yes. |
| 10:39:36 | 20 | Q.  All right.  You agree that to show infringement, USAA |
| 10:39:45 | 21 | has to rely on your analysis of the source code, right? |
| 10:39:49 | 22 | A.  That's my understanding, yes. |
| 10:39:51 | 23 | Q.  And something you said yesterday illustrates this well, |
| 10:39:57 | 24 | which is you described to the jury that you are a user of |
| 10:40:03 | 25 | the Wells Fargo app, right? |

10:40:05   1   A.   That's correct.

10:40:06   2   Q.   And being a user of that app, seeing what it looks like

10:40:11   3   and how it interacts with the user, that wasn't enough to

10:40:16   4   allow you to come into court and give an opinion on

10:40:20   5   infringement, correct?

10:40:22   6   A.   I wouldn't characterize it that way.

10:40:23   7   Q.   Well, you did not -- well, let's talk about how you

10:40:28   8   were hired in this case.  Are you with me?

10:40:30   9   A.   Yes.

10:40:30   10   Q.   You were hired by the lawyers for USAA?

10:40:36   11   A.   Yes.

10:40:37   12   Q.   And when --

10:40:38   13   A.   Actually --

10:40:39   14   Q.   They asked you to do -- did you understand you were

10:40:42   15   going to be doing ultimately an analysis of possible

10:40:46   16   infringement in this case?

10:40:50   17   A.   Yes.

10:40:51   18   Q.   And did you tell them when they contacted you, hey,

10:40:58   19   good luck.  I don't have to look at anything else because

10:41:02   20   I'm a user of the app, and I can tell you it infringes?

10:41:06   21   You didn't tell them that, did you?

10:41:08   22   A.   I don't recall telling them that, sir, no.

10:41:10   23   Q.   Because you know, don't you, that you have to look at

10:41:14   24   the source code to see how something works on the inside,

10:41:18   25   true?

| | | |
|---|---|---|
| 10:41:18 | 1 | A.  That's inaccurate, no. |
| 10:41:23 | 2 | Q.  You didn't have to look at the source code to determine |
| 10:41:25 | 3 | how this program worked? |
| 10:41:26 | 4 | A.  It was additional evidence, yes. |
| 10:41:27 | 5 | Q.  You did look at the source code, though, right? |
| 10:41:30 | 6 | A.  I did examine the source code in detail. |
| 10:41:34 | 7 | Q.  Okay.  You're good at reading it and writing it, |
| 10:41:37 | 8 | correct? |
| 10:41:37 | 9 | A.  I would like to think I am, yes. |
| 10:41:40 | 10 | Q.  Computers can only do what their source code tells them |
| 10:41:46 | 11 | to do, right? |
| 10:41:47 | 12 | A.  That's not quite accurate. |
| 10:41:48 | 13 | Q.  Well, a computer -- and let's take artificial |
| 10:41:52 | 14 | intelligence out of it, okay?  If I want my computer to |
| 10:41:57 | 15 | draw a picture of a red head on my screen, if that's in my |
| 10:42:01 | 16 | mind, but the source code or the program says to draw a |
| 10:42:05 | 17 | picture of a person with brown hair, what's the computer |
| 10:42:08 | 18 | going to draw? |
| 10:42:09 | 19 | A.  Well, in this scenario, I suppose the computer would |
| 10:42:14 | 20 | draw someone with brown hair. |
| 10:42:15 | 21 | Q.  Well, you suppose? |
| 10:42:16 | 22 | A.  Well, I don't have a lot of information about the |
| 10:42:19 | 23 | program here. |
| 10:42:21 | 24 | Q.  Well, let me give you some more information.  I want it |
| 10:42:25 | 25 | to be a person with red hair, in my mind.  Are you with me? |

| | | |
|---|---|---|
| 10:42:30 | 1 | A.  Yes, sir. |
| 10:42:30 | 2 | Q.  Okay.  The source code in the computer directs the |
| 10:42:35 | 3 | computer to draw a person with brown hair.  What color hair |
| 10:42:42 | 4 | is the person going to have? |
| 10:42:43 | 5 | A.  In this scenario, and what I understand of how you're |
| 10:42:48 | 6 | describing it, the person would have brown hair. |
| 10:42:50 | 7 | Q.  Because the code in that situation controls, right? |
| 10:42:53 | 8 | A.  I wouldn't describe it that way. |
| 10:42:55 | 9 | Q.  Well, you asked -- or USAA asked to see Mitek's auto |
| 10:43:01 | 10 | capture code in this case, correct? |
| 10:43:04 | 11 | A.  I don't believe that was the request, sir. |
| 10:43:08 | 12 | Q.  Well, did you look at some Mitek source code? |
| 10:43:10 | 13 | A.  Yes, extensively. |
| 10:43:11 | 14 | Q.  And there was also some Wells Fargo code, correct? |
| 10:43:15 | 15 | A.  That's correct. |
| 10:43:15 | 16 | Q.  So just let's take a minute to make sure we're -- we're |
| 10:43:18 | 17 | clear about how -- how this works. |
| 10:43:20 | 18 | THE COURT:  Counsel, approach the bench, please. |
| 10:43:29 | 19 | (Bench conference.) |
| 10:43:30 | 20 | THE COURT:  I'm concerned about Defendant's |
| 10:43:36 | 21 | repetitious statements that 90 percent is an F in patent |
| 10:43:41 | 22 | law.  There was a slide that was offered the first day we |
| 10:43:45 | 23 | met in chambers -- Mr. Melsheimer was not present -- where |
| 10:43:50 | 24 | Defendants proposed putting 90 percent and an F in red like |
| 10:43:57 | 25 | a grade on a test paper on a demonstrative, and I |

10:43:59  1   instructed both the F and the 90 percent to be taken off.

10:44:05  2   And --

10:44:05  3          MR. MELSHEIMER:  And I understood that, Your

10:44:06  4   Honor.

10:44:06  5          THE COURT:  And that was because I am concerned

10:44:10  6   that telling the jury that 90 percent precludes you from

10:44:13  7   finding an application of the Doctrine of Equivalents, that

10:44:16  8   it's a failing grade.  And you've said that repeatedly.

10:44:20  9          I'm instructing you, Mr. Melsheimer, not to make a

10:44:23 10   reference to 90 percent or some specific percentage or

10:44:29 11   success rate as either being or not being a passing grade

10:44:33 12   because I believe it's an inaccurate representation of what

10:44:37 13   the Doctrine of Equivalents requires, and I believe it

10:44:41 14   contradicts the instructions I've given the jury on what

10:44:43 15   the Doctrine of Equivalents is.

10:44:44 16          So I want to be clear, I do not want to hear F

10:44:49 17   grade, 90 percent, or anything like that now or anywhere

10:44:52 18   throughout the rest of the trial, including the closing.

10:44:55 19          MR. MELSHEIMER:  I'll do that, Your Honor.  Thank

10:44:59 20   you.

10:44:59 21          MR. ROWLES:  Thank you, Your Honor.

10:45:01 22          THE COURT:  All right.  Let's proceed.

10:45:02 23          (Bench conference concluded.)

10:45:03 24          THE COURT:  Let's proceed, please.

10:45:05 25          MR. MELSHEIMER:  Thank you.

10:45:05  1  Q.  (By Mr. Melsheimer)   Now, we were talking about the

10:45:09  2  different kinds of code associated with mobile deposit.

10:45:13  3  Are you with me?

10:45:14  4  A.  Specifically the Wells Fargo-produced code.

10:45:21  5  Q.  Well, we were talking about you had viewed some code

10:45:25  6  from Mitek, true?

10:45:26  7  A.  That's my understanding, yes.

10:45:29  8  Q.  You viewed also some Wells Fargo code?

10:45:34  9  A.  I viewed code integrated into the Wells Fargo

10:45:36  10  application.  It included Mitek code and Wells Fargo code.

10:45:39  11  Q.  And that's kind of the point I want to make sure we --

10:45:42  12  we clarify.

10:45:46  13        This -- the mobile deposit software involves code

10:45:50  14  that Wells Fargo wrote on its own, true?

10:45:52  15  A.  Yes.

10:45:54  16  Q.  It also involves code that it integrated that it got

10:45:59  17  from a company called Mitek, right?

10:46:02  18  A.  I would characterize it as a library, but, yes.

10:46:06  19  Q.  And the Wells Fargo code involves a lot of different

10:46:14  20  things that don't have anything to do with the issues that

10:46:16  21  we're here in court about today, right?

10:46:20  22  A.  Yeah, I did not evaluate the other areas.

10:46:22  23  Q.  And because you have to be able -- because we're

10:46:27  24  talking about, essentially, auto capture in a particular

10:46:32  25  way of a check for deposit, right?

```
10:46:35   1   A.  I wouldn't quite characterize it that way.

10:46:39   2   Q.  But that's the general subject matter, right?

10:46:42   3   A.  Auto capture is.

10:46:43   4   Q.  Right.  And there's a lot of other stuff that goes into

10:46:48   5   the Wells Fargo mobile banking application that doesn't

10:46:51   6   involve that, true?

10:46:52   7   A.  Yes.

10:46:53   8   Q.  So you had to look at, because of how the code was used

10:47:00   9   together, how the library was used together, you had to

10:47:03  10   look at both materials that you understood to have been

10:47:06  11   created by Mitek and then material that you understood to

10:47:10  12   have been created by Wells Fargo.  Do I have that right?

10:47:13  13   A.  That I understood -- I -- I didn't make a determination

10:47:17  14   of who created what, sir.

10:47:19  15   Q.  Okay.  But you know there's sort of the Wells Fargo

10:47:22  16   piece of the code and then the Mitek piece of the code; is

10:47:26  17   that accurate?

10:47:26  18   A.  Sir, this code was -- was produced to me as the

10:47:30  19   Wells Fargo application.

10:47:31  20   Q.  And you know that it receives some of that code from a

10:47:37  21   company called Mitek, fair?

10:47:38  22   A.  That's fair.

10:47:39  23   Q.  You personally spent many hours reviewing the code,

10:47:49  24   true?

10:47:49  25   A.  Yes.
```

| | | |
|---|---|---|
| 10:47:50 | 1 | Q.  But you had a lot of help, didn't you? |
| 10:47:52 | 2 | A.  I employed a team of two programmers.  I did not employ |
| 10:47:57 | 3 | them.  Let me be clear.  The attorneys for USAA employed |
| 10:48:03 | 4 | them. |
| 10:48:03 | 5 | Q.  And Wells Fargo made -- as the Defendant in this case, |
| 10:48:08 | 6 | Wells Fargo made that code available actually down the hall |
| 10:48:14 | 7 | from my office in Dallas; isn't that right? |
| 10:48:17 | 8 | A.  Was it?  Okay.  Thanks for providing coffee. |
| 10:48:20 | 9 | Q.  You're welcome.  You were there a couple of days -- |
| 10:48:24 | 10 | THE COURT:  Let me just stop.  I don't have any |
| 10:48:27 | 11 | problem with people being friendly in their conversation. |
| 10:48:30 | 12 | But these cute little comments just don't have any place in |
| 10:48:33 | 13 | a jury trial. |
| 10:48:34 | 14 | And I'm hearing them from both directions.  Let's |
| 10:48:37 | 15 | just have a straightforward question-and-answer session as |
| 10:48:40 | 16 | the Rules of Civil Procedure require.  Okay? |
| 10:48:43 | 17 | THE WITNESS:  Yes, Your Honor. |
| 10:48:44 | 18 | THE COURT:  That's what I expect.  Let's proceed. |
| 10:48:46 | 19 | Q.  (By Mr. Melsheimer)  You were only there for two days, |
| 10:48:53 | 20 | but, in fact, your reviewers -- or the reviewers that you |
| 10:49:00 | 21 | were working with -- let me rephrase that. |
| 10:49:03 | 22 | You were not there the whole time that your |
| 10:49:07 | 23 | reviewers were there, correct? |
| 10:49:09 | 24 | A.  I was not. |
| 10:49:10 | 25 | Q.  You came multiple occasions to review the source code |

| | | |
|---|---|---|
| 10:49:15 | 1 | in person, true? |
| 10:49:16 | 2 | A.  Yes. |
| 10:49:17 | 3 | Q.  You also knew that the reviewers were there working and |
| 10:49:21 | 4 | reviewing the source code when you were not there? |
| 10:49:24 | 5 | A.  I don't think that's an accurate description. |
| 10:49:26 | 6 | Q.  The reviewers were only there when you were there? |
| 10:49:29 | 7 | A.  No, that's not -- that's not true. |
| 10:49:32 | 8 | Q.  Okay.  There were reviewers that were -- that had been |
| 10:49:36 | 9 | hired by someone else that were there to review source |
| 10:49:39 | 10 | code, true? |
| 10:49:39 | 11 | A.  I think that's inaccurate. |
| 10:49:44 | 12 | Q.  What were the two gentlemen -- what were the two |
| 10:49:51 | 13 | gentlemen doing in the office when the source code was |
| 10:49:54 | 14 | produced, in your knowledge? |
| 10:49:55 | 15 | A.  They were sifting through it and cataloging it. |
| 10:50:02 | 16 | Q.  Sifting -- what was the other word you used? |
| 10:50:05 | 17 | A.  And cataloging. |
| 10:50:06 | 18 | Q.  Okay.  And cataloging.  Okay.  That's not reviewing? |
| 10:50:10 | 19 | A.  That's -- oh, I see, that will be minimally reviewing, |
| 10:50:15 | 20 | yes. |
| 10:50:16 | 21 | Q.  So they were sifting and cataloging, what you call |
| 10:50:20 | 22 | minimally reviewing, when you were not there, true? |
| 10:50:23 | 23 | A.  True. |
| 10:50:26 | 24 | Q.  Do you know how much time they spent doing that? |
| 10:50:30 | 25 | A.  I don't know the figure off the top of my head, but I'm |

```
10:50:35   1   sure it was more than a hundred hours.
10:50:36   2   Q.  You think you spent about 40 hours or so doing that, or
10:50:40   3   is it more than that?
10:50:41   4   A.  About 40 hours in Dallas.  That's -- that's about
10:50:45   5   accurate.
10:50:45   6   Q.  You have previously described the review of source code
10:50:52   7   as laborious.  Do you agree with that?
10:50:59   8   A.  Yes, it is.
10:50:59   9   Q.  It's laborious, and it -- let's break that apart.
10:51:03  10           It's laborious because it involves a line-by-line
10:51:07  11   review at times, true?
10:51:08  12   A.  I wouldn't characterize it that way.
10:51:13  13   Q.  Well, it reviews looking at lines of code, true?
10:51:17  14   A.  That's correct.
10:51:19  15   Q.  It -- it involves using your mental processes and your
10:51:24  16   knowledge to understand what that code is doing or meaning,
10:51:29  17   true?
10:51:30  18   A.  True.
10:51:33  19   Q.  And that's what you mean by laborious?
10:51:37  20   A.  I don't recall saying the word, but that -- it is
10:51:43  21   laborious.
10:51:44  22   Q.  Well, the code is what tells you how the processor
10:51:50  23   works; isn't that right?
10:51:52  24   A.  I wouldn't characterize it that way, no.
10:51:54  25   Q.  You don't view code as telling the processor how to
```

10:51:58  1  operate?

10:52:00  2  A.  That is a different -- code does tell the processor

10:52:08  3  what to do.

10:52:08  4  Q.  Okay.  So I said code tells the processor -- processor

10:52:13  5  how to work.  You -- you're more comfortable saying, code

10:52:17  6  tells the processor what to do.  Do I have that right?

10:52:21  7  A.  Yes.

10:52:21  8  Q.  And, in fact, if there is ever a dispute or a

10:52:44  9  disagreement between what someone might have said in a

10:52:47  10  descriptive document and the code, the code is going to

10:52:52  11  trump, correct?

10:52:54  12  A.  Hypothetically, yes.

10:52:55  13  Q.  Well, haven't you, in fact, testified to that very

10:53:00  14  statement before, sir?

10:53:04  15  A.  I don't recall testifying whether or not, but I would

10:53:15  16  say that if in the hypothetical the document didn't match

10:53:18  17  the code, then I would rely on the document -- I mean, the

10:53:21  18  code.

10:53:21  19  Q.  Sir, if you would, just so we're on the same page, if

10:53:27  20  you'd turn to Volume 2 of your binder, and go to Tab 16.

10:53:40  21        Do you recall testifying in a case in the federal

10:53:46  22  district -- the Western District of Wisconsin called

10:53:49  23  Wisconsin Alumni Research Foundation versus Apple Inc.?

10:53:56  24  A.  Yes, I do.

10:53:57  25  Q.  And if you could take a look, sir, at Page 219.  If you

10:54:12    1    look at Line 8.

10:54:14    2           Were you asked this question:  And you spent all

10:54:18    3    that time because -- are you with me, sir?

10:54:22    4    A.  Yes, sir, I am.

10:54:23    5    Q.  And you spent all that time because if there is a

10:54:25    6    dispute or disagreement between what someone might have

10:54:29    7    said in a descriptive document and the code, the code is

10:54:36    8    going to trump, correct?

10:54:38    9           And you said:  That's correct.

10:54:40   10           Did I read that correctly?

10:54:41   11    A.  You did.

10:54:42   12    Q.  So is it fair to say, sir --  to go on from there, that

10:54:47   13    the code -- you used the word trump.  So that means

10:54:51   14    overrules or controls?

10:54:52   15    A.  I didn't use that word, no.

10:54:54   16    Q.  Right.

10:54:55   17    A.  It was in the question.

10:54:57   18    Q.  I'm sorry.

10:54:57   19           The word trump means to you -- when something

10:55:04   20    trumps something else, it means it overrules it or controls

10:55:07   21    it; isn't that correct?

10:55:08   22    A.  That was my understanding, yeah.

10:55:09   23    Q.  And that's why you used that word because you wanted to

10:55:14   24    convey that meaning, true?

10:55:15   25    A.  No, I did not use that word.  That was in the question.

| | | |
|---|---|---|
| 10:55:17 | 1 | Q.  You agreed that it trumps, right? |
| 10:55:21 | 2 | A.  I did here today, yeah, sure. |
| 10:55:25 | 3 | Q.  And so the code would trump a descriptive document, |
| 10:55:30 | 4 | true? |
| 10:55:31 | 5 | A.  If there was a disparity, it would, yes. |
| 10:55:34 | 6 | Q.  The code would trump a comment in the code, would it |
| 10:55:38 | 7 | not? |
| 10:55:39 | 8 | A.  If there was a disparity, yes. |
| 10:55:41 | 9 | Q.  And let's be clear, that when we're talking about what |
| 10:55:45 | 10 | a comment in a code is, I think in some of the code you've |
| 10:55:50 | 11 | shown the jury, there are things called comments written, |
| 10:55:53 | 12 | true? |
| 10:55:53 | 13 | A.  That's correct. |
| 10:55:54 | 14 | Q.  Comments are not actual directions to the computer, but |
| 10:56:01 | 15 | are, in fact, directions to the programmer or the human |
| 10:56:06 | 16 | being reading the code, true? |
| 10:56:08 | 17 | A.  I wouldn't quite characterize it that way. |
| 10:56:11 | 18 | Q.  Comments inform or can inform -- or strike that. |
| 10:56:18 | 19 |     Comments can be written in computer code, and they |
| 10:56:22 | 20 | don't actually execute any instruction, fair? |
| 10:56:24 | 21 | A.  That's fair. |
| 10:56:25 | 22 | Q.  What is the purpose of comments? |
| 10:56:28 | 23 | A.  Comment is to help one programmer document for another |
| 10:56:32 | 24 | programmer, or sometimes yourself, what a particular piece |
| 10:56:38 | 25 | of code is doing. |

10:56:39  1   Q.  And if a comment is wrong, the code is going to trump,

10:56:46  2   right?

10:56:46  3   A.  The code is going to trump a comment, yes.

10:56:50  4   Q.  So if a comment says that this next section is going to

10:56:56  5   do A, B, and C, but the code actually describes and does D,

10:57:05  6   E, and F -- are you with me?

10:57:09  7   A.  Yes, in this hypothetical, I think I'm with you.

10:57:12  8   Q.  The code is going to do D, E, and F, not A, B, and C,

10:57:17  9   right?

10:57:17  10  A.  In this scenario, yes.

10:57:18  11  Q.  The code trumps, separate from comments -- I'm moving

10:57:32  12  to a different topic -- the code trumps written manuals

10:57:37  13  about the software, true?

10:57:37  14  A.  If there is a disparity, true.

10:57:41  15  Q.  And you've seen examples in your long career, have you

10:57:46  16  not, sir, where the manuals do not match up or do not align

10:57:50  17  exactly with the code?

10:57:51  18  A.  I have seen some examples in my long career, yes.

10:57:57  19  Q.  In those examples, it's the code that controls, not the

10:58:05  20  manuals, true?

10:58:05  21  A.  In those examples, true.

10:58:07  22  Q.  All right.  Let's see if we can agree on a few other

10:58:17  23  things, sir, about source code.

10:58:19  24          I think you said this on your direct examination,

10:58:24  25  but Wells Fargo doesn't actually get in the operation of

| | | |
|---|---|---|
| 10:58:30 | 1 | its application; it does not actually receive the Mitek |
| 10:58:35 | 2 | source code? |
| 10:58:39 | 3 | A.  That's my understanding, they do not. |
| 10:58:41 | 4 | Q.  That's something that, generally speaking, technology |
| 10:58:45 | 5 | companies keep secret, right? |
| 10:58:49 | 6 | A.  I wouldn't -- I wouldn't characterize it that way. |
| 10:58:55 | 7 | Q.  Well, let's see if you can characterize it this way. |
| 10:58:58 | 8 | Frequently, technology companies keep their source |
| 10:59:03 | 9 | code secret? |
| 10:59:05 | 10 | A.  I wouldn't even characterize it that way. |
| 10:59:11 | 11 | Q.  You don't think source -- okay.  So you think -- is |
| 10:59:14 | 12 | it -- is it your experience that every technology company |
| 10:59:18 | 13 | publishes its source code on the Internet? |
| 10:59:19 | 14 | A.  No, sir. |
| 10:59:20 | 15 | Q.  Many times there are security and other restrictions in |
| 10:59:30 | 16 | place on who gets to see source code, right? |
| 10:59:33 | 17 | A.  That, I would agree with, yes. |
| 10:59:34 | 18 | Q.  That was true in this very lawsuit, wasn't it? |
| 10:59:38 | 19 | A.  I don't know the specific security, but I agree they |
| 10:59:44 | 20 | did not receive the source code. |
| 10:59:46 | 21 | Q.  Well, didn't you have to sign an order or a promise to |
| 10:59:51 | 22 | keep the Mitek source code confidential outside the context |
| 10:59:54 | 23 | of this lawsuit? |
| 10:59:54 | 24 | A.  Yes, sir. |
| 10:59:57 | 25 | Q.  Because companies like Mitek want to keep their source |

11:00:05  1   code controlled and restricted to who gets to have access

11:00:07  2   to it, fair?

11:00:08  3   A.   I assume that's the reason.   But that sounds fair.

11:00:10  4   There are other reasons, usually.

11:00:12  5   Q.   There could be other reasons, but one reason is, is

11:00:15  6   that software companies may want to restrict access to

11:00:18  7   their source code just to prevent other people from finding

11:00:21  8   out about it?

11:00:21  9   A.   Sure.

11:00:31  10  Q.   Some more things we can agree with.   As I understand

11:00:34  11  it, isn't it true that each step in the source code will

11:00:38  12  generally be executed in the order in which it appears?

11:00:43  13  A.   That's generally true.   There are exceptions.

11:00:47  14  Q.   There are exceptions.   But can we agree that, generally

11:00:51  15  speaking -- and I understand there can be exceptions --

11:00:55  16  but, generally speaking, Line 1 will come first, Line 2

11:01:00  17  will come second, Line 3, and the code will be executed,

11:01:03  18  generally speaking, in that order?

11:01:09  19  A.   There's so many exceptions that -- yes, generally, it

11:01:14  20  will be executed, what we call sequentially.   But there's

11:01:19  21  many, many instances where you have a condition that

11:01:21  22  prevents it from being executed sequentially.   It goes

11:01:24  23  somewhere else.

11:01:24  24  Q.   There's complicated operations that are performed in

11:01:29  25  source code sometimes, and so what you're suggesting is

| | | |
|---|---|---|
| 11:01:33 | 1 | maybe it's sequential for a part, and then it may jump up |
| 11:01:36 | 2 | to something earlier or jump up to something later, |
| 11:01:38 | 3 | depending on what's happening? |
| 11:01:40 | 4 | A.  That's -- that's one example. |
| 11:01:43 | 5 | Q.  Okay.  And -- but here, when you went through the |
| 11:01:47 | 6 | source code on your direct examination, a lot of it was |
| 11:01:51 | 7 | sequential? |
| 11:01:53 | 8 | A.  Yes, it was. |
| 11:01:54 | 9 | Q.  It was in exactly, what I said at the beginning, which |
| 11:01:59 | 10 | is it goes in the order in which it's written, right, for |
| 11:02:02 | 11 | the examples you gave? |
| 11:02:04 | 12 | A.  Yes.  And that was my hesitation.  For the example I |
| 11:02:07 | 13 | went over, it does. |
| 11:02:09 | 14 | Q.  And you know that's the example that is what the trial |
| 11:02:14 | 15 | is about, right? |
| 11:02:15 | 16 | A.  Yes, sir. |
| 11:02:15 | 17 | Q.  Okay.  So I want to direct your attention to Volume 2 |
| 11:02:23 | 18 | at Tab 18.  And this DTX-11, which I believe is |
| 11:02:40 | 19 | pre-admitted. |
| 11:02:48 | 20 | Have you seen this before, sir? |
| 11:02:49 | 21 | A.  Yes.  This is the source code I reviewed for the jury. |
| 11:02:53 | 22 | Q.  Okay.  Thank -- okay. |
| 11:03:02 | 23 | MR. MELSHEIMER:  May I have one moment, Your |
| 11:03:04 | 24 | Honor? |
| 11:03:04 | 25 | THE COURT:  You may. |

11:03:08   1           MR. MELSHEIMER:  For the record, Your Honor, I

11:03:09   2   believe I may have said 11, and I meant to say DTX-611.

11:03:17   3           THE COURT:  So noted.

11:03:21   4   Q.  (By Mr. Melsheimer)  Now, we're going to publish the

11:03:23   5   first page of this, sir.  It's not the easiest thing to

11:03:25   6   read, but can you read it okay?  You have both a screen and

11:03:30   7   a hard copy, right?

11:03:30   8   A.  Yeah, I'm good.

11:03:32   9   Q.  All right.  So I wanted --

11:03:34   10          THE COURT:  Counsel -- counsel, approach the

11:03:35   11  bench, please.

11:03:43   12          (Bench conference.)

11:03:43   13          THE COURT:  Does the record in the courtroom need

11:03:46   14  to be sealed, or is there going to be source code in the

11:03:49   15  transcript that's going to become publicly available?

11:03:51   16          MR. MELSHEIMER:  You know --

11:03:52   17          THE COURT:  I'm asking you all.

11:03:53   18          MR. MELSHEIMER:  That's a good question.

11:03:54   19          MR. SHEASBY:  Your Honor, they did not request

11:03:56   20  sealing, so we assumed Mitek didn't care.

11:03:58   21          MR. BITTNER:  Mitek has not --

11:04:00   22          MR. MELSHEIMER:  They've not asked for it, Your

11:04:02   23  Honor.

11:04:02   24          THE COURT:  I just would rather ask now than find

11:04:05   25  out --

11:04:05  1            MR. MELSHEIMER:  I agree --

11:04:05  2            THE COURT:  -- the horse is out of the barn later.

11:04:08  3            MR. SHEASBY:  Your Honor, my concern is

11:04:09  4  Mr. Melsheimer just went through a long commentary about

11:04:12  5  how secret this code is, and he just published it in front

11:04:15  6  of the entire jury.  And so now to give him the benefit of

11:04:20  7  being able to take that back, strikes me as a concern.

11:04:21  8  Mitek's general counsel is in the room.  He, obviously,

11:04:24  9  hasn't raised any objection.  It's their obligation to do

11:04:26  10  so.

11:04:26  11           THE COURT:  My question was:  Do either Plaintiff

11:04:28  12  or Defendant wish to seal the record and the courtroom

11:04:31  13  before we go into this source code?  I hear no request.

11:04:34  14  Let's move on.

11:04:35  15           MR. MELSHEIMER:  Thank you, Your Honor.

11:04:36  16           (Bench conference concluded.)

11:04:41  17           THE COURT:  Let's proceed.

11:04:45  18  Q.  (By Mr. Melsheimer)  So I just want to focus on -- to

11:04:48  19  publish to the jury the first three lines of the code, sir.

11:05:00  20           MR. MELSHEIMER:  If you can pull it up,

11:05:02  21  starting -- go from 2278 to 2280, Mr. Barnes.  Is there a

11:05:08  22  way to obscure the rest of it?

11:05:11  23           THE TECHNICIAN:  Sure.

11:05:18  24  Q.  (By Mr. Melsheimer)  Dr. Conte, you've -- you've got

11:05:20  25  the whole exhibit there, but we're just going to be

11:05:22  1   publishing these -- these first three lines at this point.

11:05:26  2   But you're -- you're free to refer to anything else.  But

11:05:28  3   just a few questions so we can make we're all on the same

11:05:36  4   page.

11:05:36  5         2278 is the first line of code on that page,

11:05:38  6   correct?

11:05:40  7   A.  Yeah, that's accurate.

11:05:42  8   Q.  And in these first three lines, the word "capture," by

11:05:49  9   my count, appears five times.  In the first line 2278, it

11:05:54  10  says captureOutput.  Then there's -- and we're going to go

11:05:58  11  over these, sir.  I'm just counting up the words "capture."

11:06:03  12  Then there's AVCaptureOutput, then there's captureOutput,

11:06:03  13  and then the third line, 2280, there's captureConnection

11:06:14  14  and then captureSessionConnection.

11:06:18  15        So you agree that "capture" appears five times in

11:06:21  16  those lines of code, right?

11:06:23  17  A.  That word does, yes.

11:06:25  18  Q.  In the first part of the name of the function on 2278

11:06:29  19  is called captureOutput, right?

11:06:34  20  A.  It's actually (void)captureOutput.

11:06:39  21  Q.  Well, we're going to talk about what void means --

11:06:40  22  well, let's talk about what void means right now.

11:06:41  23  A.  Okay.  Sure.

11:06:43  24  Q.  Okay.  So void is actually a terminology that is part

11:06:48  25  of the Apple operating system, is it not, sir?

11:06:52   1   A.   That's incorrect.

11:06:53   2   Q.   Well, why don't you tell the jury what void means?

11:06:57   3   A.   Well, it's complicated, sir.  But void, in general,

11:07:01   4   means that this particular chapter isn't going to return --

11:07:07   5   oh, wow.  All right.  Pardon me.  It's not going to return

11:07:10   6   either an integer or a pointer to a region in memory as a

11:07:20   7   direct value.

11:07:24   8   Q.   Okay.  I'm going to try to help you unpack that for me,

11:07:33   9   sir.  All right?

11:07:34  10        So -

11:07:34  11        THE COURT:  I think we just moved from the

11:07:38  12   freshman level to the senior level.  Let's continue.

11:07:50  13   Q.   (By Mr. Melsheimer)  So --

11:07:50  14        MR. MELSHEIMER:  May I use this easel, Your Honor?

11:07:52  15        THE COURT:  How do you intend to use it, counsel?

11:07:55  16        MR. MELSHEIMER:  I was going to write some things

11:07:56  17   on it.

11:07:57  18        THE COURT:  If you'll pull it up even with the

11:07:59  19   front of the podium, that will be fine.

11:08:07  20        MR. MELSHEIMER:  May I -- may I stand here, Your

11:08:09  21   Honor?

11:08:09  22        THE COURT:  Yes, you may.

11:08:10  23   Q.   (By Mr. Melsheimer)  So void is a term that appears

11:08:17  24   before these other words in the -- in the source code,

11:08:21  25   correct?

| | | |
|---|---|---|
| 11:08:21 | 1 | A.  Other words in the function name. |
| 11:08:25 | 2 | Q.  In the -- right.  In this line? |
| 11:08:28 | 3 | A.  In this line. |
| 11:08:28 | 4 | Q.  I just want to orient ourselves to what we're talking |
| 11:08:32 | 5 | about here. |
| 11:08:32 | 6 | A.  Well, let's be clear.  This is the function |
| 11:08:36 | 7 | declaration, we call it. |
| 11:08:37 | 8 | Q.  Okay.  The function declaration is captureOutput? |
| 11:08:42 | 9 | A.  This is the beginning of the name -- this is the name |
| 11:08:45 | 10 | of that function.  Like I said, this is the name of a |
| 11:08:47 | 11 | chapter.  It's a name of a tab in a binder. |
| 11:08:49 | 12 | Q.  And what I heard you say is when this -- when this word |
| 11:08:54 | 13 | void appears, is it -- do I have this right, is that it's |
| 11:08:57 | 14 | telling what follows next that I don't want to get anything |
| 11:09:02 | 15 | back? |
| 11:09:02 | 16 | A.  No, that's not accurate. |
| 11:09:04 | 17 | Q.  Okay.  Let me compare it to something else.  Have you |
| 11:09:09 | 18 | seen this word "int"?  Is that a word that's used in your |
| 11:09:20 | 19 | world? |
| 11:09:20 | 20 | A.  Yeah, that means integer, so a whole number -- |
| 11:09:20 | 21 | Q.  So -- |
| 11:09:24 | 22 | A.  -- or a negative number. |
| 11:09:25 | 23 | Q.  -- if -- if integer precedes a function, does that mean |
| 11:09:29 | 24 | that the program is expecting something back, like a number |
| 11:09:32 | 25 | or sum or something of that nature? |

11:09:34  1  A.  So let me be precise.  It is saying that the direct

11:09:42  2  return value will be an integer value, but there could be

11:09:47  3  side effects that aren't in the direct return value.  So we

11:09:51  4  use void when there aren't specific direct return values

11:09:57  5  but instead there are other side effects.

11:09:59  6  Q.  But it doesn't -- maybe I can get at it this way.  Void

11:10:06  7  doesn't mean you ignore what comes next, right?

11:10:08  8  A.  No, it doesn't.

11:10:09  9  Q.  Okay.  So just -- because we see this word void in

11:10:14  10  Exhibit 611, and I just want to make it clear, it doesn't

11:10:17  11  mean that whatever follows is supposed to be ignored or

11:10:22  12  it's not important, right?

11:10:23  13  A.  It specific -- well, it's -- it's a little more precise

11:10:29  14  than that.

11:10:29  15  Q.  Well, let me ask it this way.

11:10:32  16       MR. MELSHEIMER:  Your Honor, can I -- can I move

11:10:33  17  this back?

11:10:34  18       THE COURT:  You may move it back.

11:10:36  19  Q.  (By Mr. Melsheimer)  We can agree that void doesn't

11:10:42  20  direct the computer to ignore what happens next, right?

11:10:48  21  A.  Doesn't direct the computer to avoid what happens next.

11:10:54  22  Q.  To ignore?

11:10:55  23  A.  Oh, I'm sorry.  So all -- none of this is code that's

11:11:01  24  executed by the computer right now.

11:11:02  25  Q.  The word void?

| | | |
|---|---|---|
| 11:11:03 | 1 | A.  No, the three lines we have here. |
| 11:11:06 | 2 | Q.  Okay.  And void means that -- let's make sure we're -- |
| 11:11:10 | 3 | let's make sure we're on the same page.  Void means -- |
| 11:11:15 | 4 | plain English, means what? |
| 11:11:16 | 5 | A.  It means that this -- when used -- this message, |
| 11:11:21 | 6 | actually, in Swift, which is Apple's language that's here, |
| 11:11:26 | 7 | it's sort of a hybrid between C++, Objective-C, and |
| 11:11:31 | 8 | Smalltalk.  This message that extends the class is going |
| 11:11:39 | 9 | to, when sent to an object, not return directly anything. |
| 11:11:47 | 10 | However, there can be side effects -- and we saw some of |
| 11:11:50 | 11 | those side effects today -- that do happen. |
| 11:11:52 | 12 | Q.  Is it fair that to say that these three lines of code |
| 11:11:59 | 13 | represent a message between Apple's iPhone software and the |
| 11:12:07 | 14 | Mitek MiSnap code? |
| 11:12:09 | 15 | A.  No, that's not fair. |
| 11:12:10 | 16 | Q.  Do these code lines allow the Apple operating system |
| 11:12:13 | 17 | and the MiSnap camera application to talk to each other? |
| 11:12:18 | 18 | A.  That's incomplete.  Imprecise. |
| 11:12:23 | 19 | Q.  What's missing? |
| 11:12:24 | 20 | A.  Well, the rest -- the other 225 lines. |
| 11:12:28 | 21 | Q.  Right.  But I'm talking about these three lines.  I |
| 11:12:31 | 22 | just want to understand that is there a protocol -- maybe |
| 11:12:35 | 23 | say it more generally. |
| 11:12:36 | 24 | Is there a protocol that programmers have to |
| 11:12:41 | 25 | follow when writing software for application in the Apple |

11:12:48   1   operating system?

11:12:48   2   A.   Yeah, we don't call it a protocol.   We call it an API

11:12:51   3   for application programmer interface.

11:12:53   4   Q.   Because -- maybe we can back off and make it more --

11:12:58   5   more simple.

11:12:59   6        The iPhone runs on something called iOS?

11:13:07   7   A.   That's right.

11:13:07   8   Q.   And that is the Apple operating system.   The Samsung

11:13:14   9   phone, for example, runs on something called the Android

11:13:17  10   operating system, right?

11:13:17  11   A.   A derivative of Android, yes.

11:13:24  12   Q.   And there are all kinds of apps -- I mean, we've

11:13:26  13   experienced this, right, there's all kinds of apps that you

11:13:29  14   can put on your phone, right?

11:13:31  15   A.   Yes.

11:13:31  16   Q.   Movie apps, restaurant apps, plane reservations,

11:13:37  17   whatever, and mobile banking apps, right?

11:13:40  18   A.   Yes.

11:13:40  19   Q.   And those apps are sometimes written by people at

11:13:44  20   Apple, right?

11:13:45  21   A.   Yes.

11:13:46  22   Q.   But sometimes they're written by other developers who

11:13:50  23   want to write software programs that will work on the Apple

11:13:56  24   iPhone, right?

11:13:58  25   A.   Yes.

11:13:58   1   Q.   And so, for example, the camera app is actually

11:14:05   2   something that comes with the iPhone when you buy it,

11:14:10   3   right?

11:14:10   4   A.   Yes, that's my understanding, yeah.

11:14:13   5   Q.   It's preloaded.

11:14:14   6   A.   I don't have an iPhone.  My wife does, but, yes.

11:14:17   7   Q.   And do you have an Android phone?

11:14:19   8   A.   I am a devout Android phone user, yes.

11:14:23   9   Q.   So same -- same principle, though, that -- that there

11:14:26   10  is -- there is some software applications that are

11:14:32   11  preloaded on to the Samsung phone, just like the iPhone?

11:14:35   12  A.   Yes.

11:14:35   13  Q.   And -- and so if somebody wants -- and, again, I want

11:14:40   14  to be very high level with you so I can understand it -- if

11:14:43   15  someone wants to write a program, an application program,

11:14:47   16  let's say I want to write an application that will keep

11:14:57   17  track of all of my favorite restaurants?

11:15:01   18  A.   Okay.

11:15:02   19  Q.   Okay.  And I wanted to write that in a way that would

11:15:05   20  work on the Apple iPhone, okay, I would have to follow

11:15:08   21  certain rules or APIs set by Apple to make sure that my

11:15:15   22  program would actually interface properly and work on the

11:15:20   23  iPhone.  Do I have that generally correct?

11:15:22   24  A.   Generally, you'd go to a developer's manual that would

11:15:25   25  develop -- define the SDK that would have the API in it,

11:15:29  1  and you would use that description, yes.

11:15:32  2  Q.  And if you don't have that information or knowledge,

11:15:38  3  you can't really write an application that you can be sure

11:15:43  4  will work the way you want it to work on the Apple iPhone,

11:15:48  5  right?

11:15:48  6  A.  That's correct.  The documentation is important.

11:15:51  7  Q.  And I guess what I'm trying to get at here, whether

11:15:55  8  it's my restaurant application or whether it's a game,

11:16:05  9  Candy Crush or some game on the phone, it has to work with

11:16:10  10  the pre-existing software in the operating system, true?

11:16:13  11  A.  Correct.

11:16:15  12  Q.  That's true with Wells Fargo's mobile banking

11:16:23  13  application, isn't it, as well?

11:16:26  14  A.  Yes.

11:16:26  15  Q.  It's one of those applications that is written for use

11:16:31  16  on a smartphone, and it can be downloaded to an iPhone or

11:16:36  17  it can be downloaded to an Android phone, right?

11:16:38  18  A.  That's right.

11:16:39  19  Q.  The software is different in both those operating

11:16:45  20  systems, right?

11:16:46  21  A.  That's right.

11:16:47  22  Q.  It's a little bit like -- again, tell me if I'm wrong,

11:16:50  23  but it's a little bit like a different language?

11:16:53  24  A.  I wouldn't describe it as a language.

11:16:55  25  Q.  Well, it's a different -- how would you describe it, a

| | | |
|---|---|---|
| 11:16:58 | 1 | different context, a different setting? |
| 11:17:00 | 2 | A.  I would describe it as living in a different country. |
| 11:17:03 | 3 | Q.  There you go.  Where they sometimes speak different |
| 11:17:06 | 4 | languages? |
| 11:17:06 | 5 | A.  And they have different protocols for doing things |
| 11:17:10 | 6 | and -- yeah. |
| 11:17:10 | 7 | Q.  Okay.  So the country of the Apple operating system is |
| 11:17:16 | 8 | different from the country of the Android operating system, |
| 11:17:18 | 9 | right? |
| 11:17:18 | 10 | A.  The two operating systems have different APIs. |
| 11:17:23 | 11 | Q.  And they're different -- to take your example, your |
| 11:17:27 | 12 | country example, you know, if you're in a country that |
| 11:17:30 | 13 | drives on the left-hand side of the road, you've got to |
| 11:17:32 | 14 | know that rule if you want to drive, right? |
| 11:17:34 | 15 | A.  Correct. |
| 11:17:35 | 16 | Q.  And if you want to write software for the Apple phone, |
| 11:17:38 | 17 | you've got to know the rules that Apple has set up, right? |
| 11:17:41 | 18 | A.  You have to look at the API manual, yes. |
| 11:17:44 | 19 | Q.  And the API manual is -- would you also refer to that |
| 11:17:50 | 20 | as developer documentation? |
| 11:17:51 | 21 | A.  Sure. |
| 11:17:51 | 22 | Q.  And I think that you -- I think that you relied or |
| 11:18:01 | 23 | looked at some of the Apple development -- development |
| 11:18:06 | 24 | manuals in connection with your study in this case, right? |
| 11:18:08 | 25 | A.  I did. |

11:18:08  1   Q.  And isn't it true that in that development manual, that

11:18:19  2   Apple tells developers, again, generally speaking, how to

11:18:24  3   write software code if you want to take a picture and do

11:18:30  4   something with it?

11:18:32  5   A.  I wouldn't characterize it that way.

11:18:34  6   Q.  Well, does it tell developers how to use the camera in

11:18:41  7   connection with other software programs?

11:18:44  8   A.  I would say the image sensor and optics, but, sure.

11:18:48  9   Q.  Because the image sensor and optics, and that's this

11:18:55  10  little thing right -- right here on the phone; right?

11:18:57  11  A.  Yeah, and what's below it.

11:18:59  12  Q.  What's below it.  And it's different places on

11:19:02  13  different phones, but, basically, that's what you're

11:19:03  14  talking about, the image sensor?

11:19:07  15  A.  And the optics, yeah.

11:19:08  16  Q.  And that is something that shows up on everyone's phone

11:19:13  17  in -- in its own way, whether it's an Apple or an Android,

11:19:16  18  they have their own way of having a camera -- the image

11:19:21  19  sensor interact with other parts of the phone, correct?

11:19:25  20  A.  Generally, yes.  The two operating systems have

11:19:28  21  different ways of accessing the image sensor.

11:19:31  22  Q.  But if you wanted to write a program that would do

11:19:38  23  something with the image sensor on an Apple phone, you'd

11:19:41  24  have to know the rules of how to do that, right?

11:19:43  25  A.  Right.

11:19:47  1   Q.  Same with an Android phone, right?

11:19:48  2   A.  Yes.

11:19:49  3   Q.  Those development manuals tell the developers how to go

11:19:54  4   about doing that, generally speaking, right?

11:19:58  5   A.  Yes.

11:20:00  6   Q.  They tell the developers -- to take your analogy of the

11:20:06  7   different countries, hey, over here, we drive on the

11:20:09  8   left-hand side of the road, so if you want to do something

11:20:11  9   with traffic, you need to keep that in mind, right?

11:20:18  10  A.  That's correct, in this scenario.

11:20:20  11  Q.  Now, take a look at, if you would, Volume 2, and we're

11:20:39  12  not publishing this to the jury, but just take a look at

11:20:44  13  Volume 2, Tab 20, sir.

11:20:52  14  A.  I'm there.

11:20:52  15  Q.  Now, this is something that you cite in your report, is

11:20:56  16  it not?

11:20:58  17  A.  Yes, I believe this is actually a public document, sir.

11:21:02  18  Q.  I'm sorry, I did -- I -- but you cite it in your

11:21:06  19  report, correct?

11:21:07  20  A.  Yes, I did.

11:21:07  21  Q.  And it's part of the developer's guide, is it not?

11:21:13  22  A.  It is.

11:21:14  23  Q.  And I just want to -- while we've got Exhibit 611 still

11:21:18  24  up, the first function there is captureOutput, right?

11:21:23  25  A.  The first function?

| | | |
|---|---|---|
| 11:21:29 | 1 | Q.  Right after void, it's captureOutput? |
| 11:21:33 | 2 | A.  That is the -- the identifier, yes. |
| 11:21:35 | 3 | Q.  Yeah, what do you call captureOutput there?  What do |
| 11:21:39 | 4 | you -- what's the word to use so you and I aren't confused? |
| 11:21:39 | 5 | A.  Method. |
| 11:21:40 | 6 | Q.  The first method is captureOutput? |
| 11:21:42 | 7 | A.  But that isn't quite accurate either. |
| 11:21:45 | 8 | Q.  Well, you just said it was method? |
| 11:21:47 | 9 | A.  Well, the full method name in Swift is quite a |
| 11:21:47 | 10 | mouthful.  It's captureOutput, dataOutput, sampleBuffer, |
| 11:21:53 | 11 | fromConnection. |
| 11:21:53 | 12 | Q.  You're reading that? |
| 11:21:54 | 13 | A.  Well, I can read it from either place, yeah. |
| 11:21:56 | 14 | Q.  No, but I mean you're reading it from the -- it's in |
| 11:22:00 | 15 | the Apple's developer's manual that we're about to talk |
| 11:22:02 | 16 | about, right? |
| 11:22:02 | 17 | A.  Yes. |
| 11:22:03 | 18 | Q.  And that is sort of -- you're saying captureOutput is |
| 11:22:08 | 19 | sort of shorthand for that mouthful? |
| 11:22:10 | 20 | A.  Yes. |
| 11:22:11 | 21 | Q.  Okay.  And this is something from Apple that tells a |
| 11:22:22 | 22 | programmer how to interact between the Apple iPhone and, in |
| 11:22:33 | 23 | this example, a video frame? |
| 11:22:35 | 24 | A.  Yes. |
| 11:22:36 | 25 | Q.  It says, notifies the delegate that a new video frame |

| | | |
|---|---|---|
| 11:22:46 | 1 | was written, that captureOutput, that method.  Do I have |
| 11:22:49 | 2 | the word right? |
| 11:22:51 | 3 | A.  Yes. |
| 11:22:51 | 4 | Q.  That that method notifies the delegate that a new video |
| 11:22:56 | 5 | frame was written.  Did I read that right? |
| 11:23:02 | 6 | A.  That's -- that's incorrect. |
| 11:23:03 | 7 | Q.  Well -- |
| 11:23:04 | 8 | A.  This is the delegate. |
| 11:23:06 | 9 | Q.  I'm sorry, my question was, did I read, notifies the |
| 11:23:11 | 10 | delegate that a new video frame was written, is that -- is |
| 11:23:14 | 11 | that what it says there? |
| 11:23:15 | 12 | A.  That's -- those are the literal words. |
| 11:23:21 | 13 | Q.  Okay.  Now, I want to break apart a couple of those |
| 11:23:25 | 14 | terms.  What's the delegate? |
| 11:23:27 | 15 | A.  So the delegate would be the code that's contained |
| 11:23:32 | 16 | within captureOutput, dataOutput, sampleBuffer, and |
| 11:23:40 | 17 | fromConnection. |
| 11:23:40 | 18 | Q.  Delegate, does the delegate have anything to do with |
| 11:23:45 | 19 | the Mitek code? |
| 11:23:46 | 20 | A.  Mitek writes their own delegate for captureOutput, |
| 11:23:54 | 21 | dataOutput, sampleBuffer and fromConnection. |
| 11:23:54 | 22 | Q.  So it's a mouthful I want to make sure you and I are |
| 11:23:57 | 23 | communicating. |
| 11:23:58 | 24 | A.  Let's just call it captureOutput for short, and that |
| 11:24:01 | 25 | will work. |

| | | |
|---|---|---|
| 11:24:02 | 1 | Q.  That'd be -- okay.  Thank you. |
| 11:24:04 | 2 | Is it true, sir, that delegation, as defined by |
| 11:24:08 | 3 | Apple, allows one piece of software to reference another |
| 11:24:11 | 4 | piece of software? |
| 11:24:12 | 5 | A.  I think reference is -- is a little incorrect. |
| 11:24:22 | 6 | Q.  What's the word you would use? |
| 11:24:23 | 7 | A.  I'd just say call. |
| 11:24:25 | 8 | Q.  Call.  So delegation is a way of saying if you want to |
| 11:24:30 | 9 | call another piece of software, this is how you do it? |
| 11:24:36 | 10 | A.  So this is where it gets a little fuzzy because Apple |
| 11:24:45 | 11 | is talking in terms of the language called Smalltalk where |
| 11:24:49 | 12 | the delegate here is actually captureOutput, and this is |
| 11:24:53 | 13 | saying this message tells captureOutput that a new video |
| 11:24:59 | 14 | frame was written. |
| 11:24:59 | 15 | Q.  And the -- the delegate here is the Mitek source code, |
| 11:25:11 | 16 | correct? |
| 11:25:11 | 17 | A.  Yes, the delegate is what's in this container; whatever |
| 11:25:18 | 18 | you pour in this container is the delegate. |
| 11:25:21 | 19 | Q.  It could be -- and I -- let me -- let me say it this |
| 11:25:24 | 20 | way.  It could be any sort of interaction.  It doesn't -- |
| 11:25:29 | 21 | it's not -- this isn't written -- the delegation concept |
| 11:25:32 | 22 | isn't something that's special to the camera, right? |
| 11:25:36 | 23 | A.  No.  You can -- so this is -- this is not special to |
| 11:25:41 | 24 | the camera.  You can replace certain standard parts of the |
| 11:25:44 | 25 | operating system by using delegation. |

11:25:46  1   Q.  And the way I understand this works, sir, and you tell

11:25:52  2   me if it's wrong, the Apple operating system engages the

11:25:58  3   video -- the image sensor, and then obtains a video frame

11:26:04  4   from that sensor?

11:26:09  5   A.  Yes.

11:26:09  6   Q.  And then that video frame is in the format of -- I

11:26:15  7   think of what you've called a -- not just you personally,

11:26:19  8   but it's what's called a bitmap?

11:26:21  9   A.  A bitmap or a YUV, yes.

11:26:24  10  Q.  Is a YUV the same thing as a bitmap?

11:26:27  11  A.  It's a special type of bitmap, but, yes.

11:26:30  12  Q.  And then this bitmap or YUV is put into a buffer by

11:26:39  13  Apple that the MiSnap software can access, right?

11:26:46  14  A.  Generally, yes.

11:27:27  15          (Pause in proceedings.)

11:27:27  16          MR. MELSHEIMER:  Thank you, Your Honor.  Thank you

11:27:28  17  for the pause.  I just needed to move on to something else.

11:27:32  18          THE COURT:  It's your time, counsel.

11:27:33  19          MR. MELSHEIMER:  Thank you.

11:27:33  20  Q.  (By Mr. Melsheimer)  Now, I want to understand what you

11:27:37  21  say the capture is in your infringement analysis.  Are you

11:27:45  22  with me?

11:27:46  23  A.  Yes.

11:27:47  24  Q.  Okay.  Now, you say that capture is not getting that

11:27:59  25  data from the image sensor and creating a bitmap?

11:28:08  1   A.   That's correct.

11:28:09  2   Q.   So you and I are on the same page.

11:28:17  3         When you open up your camera -- and let's just

11:28:21  4   talk about just a -- let's not talk about the app just yet,

11:28:24  5   but let's just talk about taking a picture.  Are you with

11:28:27  6   me?

11:28:27  7   A.   Yes.

11:28:35  8   Q.   Okay.  Actually, let's talk about the app.

11:28:38  9   A.   Okay.

11:28:38  10  Q.   When I open up the app, whether it's the Wells Fargo

11:28:43  11  app or any -- any kind of app, when I -- but let's -- let's

11:28:47  12  focus on the Wells Fargo app -- and I want to deposit a

11:28:50  13  check, I will hit a button that goes to that function, and

11:28:56  14  then it -- then it will engage the camera to take a picture

11:29:00  15  of the front and back of the check, right?

11:29:05  16  A.   Well, in the complicated process that we outlined, yes.

11:29:09  17  Q.   And I'm not -- I'm just trying to -- at a high level

11:29:12  18  for someone that uses it, I'm just trying to get to the

11:29:15  19  point where you and I can talk about what actually happens.

11:29:18  20  All right?

11:29:20  21        But the app is open.  You want to deposit -- you

11:29:23  22  can do many different things with the app, right?

11:29:25  23  A.   Yes.

11:29:26  24  Q.   Okay.

11:29:27  25  A.   Yes.

11:29:27  1  Q.  So you have to find a button that opens up the function

11:29:32  2  that allows you to deposit a check, right?

11:29:35  3  A.  Yes.

11:29:36  4  Q.  And when you do that, it will say, generally speaking,

11:29:41  5  take a picture of the front of the check and the back of

11:29:44  6  the check, right?

11:29:45  7  A.  I don't recall the exact words, but, okay, for the sake

11:29:49  8  of argument.

11:29:49  9  Q.  And you hold it over the check, right?

11:29:54  10  A.  Uh-huh.

11:29:54  11  Q.  And -- sorry, is that a yes?

11:29:57  12  A.  Yes, sorry.

11:29:57  13  Q.  And whether it's manual capture or auto capture --

11:30:03  14  we'll talk about that.  If it's manual capture, you have to

11:30:07  15  push the button, right?

11:30:08  16  A.  Yes.

11:30:09  17  Q.  If it's auto capture, it will take the picture without

11:30:13  18  pushing a button, right?

11:30:14  19  A.  Let's be precise.  It will capture the picture.

11:30:17  20  Q.  Okay.  Okay.  We're going to talk about that.  Oh, so

11:30:22  21  it is capturing the picture?

11:30:23  22  A.  It -- after it passes the monitoring criterion.

11:30:26  23  Q.  Well, let's -- let's just focus on what -- what

11:30:28  24  we're -- what we're talking about here.  So captures -- it

11:30:32  25  will say front of the check, and then it will say turn it

11:30:35   1   over, take the back of the check, and you'll have -- you'll

11:30:38   2   have an image in the app of the front of the check and the

11:30:41   3   back of the check, right?

11:30:42   4   A.  Are you saying presented to the user or --

11:30:48   5   Q.  Yeah, you as a user looking at it, you're going to see

11:30:51   6   a picture of the front of the check and the back of the

11:30:53   7   check, right?

11:30:53   8   A.  So it doesn't -- I'm sorry, after you -- can you be

11:31:00   9   specific of when -- when this happens?

11:31:02   10   Q.  We are hovering our -- our -- our camera over the

11:31:09   11   check, whether it's manual or auto capture, the picture of

11:31:13   12   the -- of the check, the front and back of the check shows

11:31:16   13   up on your phone?

11:31:16   14   A.  I wouldn't describe that as a picture.

11:31:19   15   Q.  Okay.

11:31:19   16   A.  That's a live view, I'd call it.

11:31:21   17   Q.  It's an image of the check, is it not, sir?

11:31:23   18   A.  It's straight off the image sensor.

11:31:28   19   Q.  Okay.  So you say when -- just to describe this for the

11:31:35   20   jury, and I want to make sure we're on the same page.

11:31:39   21        You say that what's shown in the app as the front

11:31:42   22   and back of the check is not a picture of the check?

11:31:48   23   A.  That isn't what I said, sir.

11:31:50   24   Q.  Okay.  What is shown in the app as the front and back

11:31:57   25   of the check?  Is it a -- just back it up.  Is it a cartoon

11:32:01   1   drawing?

11:32:01   2   A.   Come on, no.

11:32:03   3   Q.   It's a -- it's the image of the check, right?

11:32:06   4   A.   At what point are we speaking about?

11:32:09   5   Q.   Right when you engage the app and put your phone over

11:32:14   6   the -- over the check, what shows up in the app?

11:32:18   7   A.   It's that 30 frames per second preview image that you

11:32:22   8   get, and it's stored in -- it's called a CMSampleBufferRef

11:32:28   9   in Apple, and it's a sample buffer.

11:32:29   10   Q.   And it is an image?

11:32:31   11   A.   It is a transient image.

11:32:33   12   Q.   Okay.   Now, you say it's transient.   I want to talk --

11:32:36   13   we'll talk about that in a minute, but it's on your phone.

11:32:39   14   You can see it, right?

11:32:43   15   A.   For a brief second, yes.

11:32:44   16   Q.   You can see the front and back of it, right?

11:32:47   17   A.   I'm sorry, I -- I don't -- you're either looking at a

11:32:53   18   live view of the front or the back.   You don't see them

11:32:55   19   both at the same time.

11:32:56   20   Q.   I'm talking about after it's been captured, sir.

11:32:59   21   A.   That's a different scenario.   After it's been captured?

11:33:05   22   After it's been captured, then what you see is the success

11:33:08   23   pop up.   And actually the app will show you a reduced

11:33:13   24   thumbnail of it, but that image has been transcoded to a

11:33:17   25   JPEG which gets uploaded to the bank.

11:33:19  1   Q.  So you're saying that when I use -- when anyone uses

11:33:29  2   the app and the picture shows up, whether it's the front or

11:33:33  3   the back -- let's not get caught up in that -- that picture

11:33:37  4   is an image, and then it's later turned -- it's later

11:33:43  5   compressed into a JPEG?

11:33:44  6   A.  I wouldn't characterize it that way.

11:33:46  7   Q.  It later becomes a JPEG?

11:33:49  8   A.  I wouldn't quite characterize it that way either.

11:33:53  9   Q.  Well, at some point, you believe that the capture

11:33:57  10  process has occurred when the JPEG image is created and

11:34:01  11  compressed, right?

11:34:02  12  A.  Well, JPEG is a compressed image, so when it's created.

11:34:12  13  Q.  So buffer -- the word "buffer" is another -- is

11:34:15  14  describing something that's memory, right?

11:34:19  15  A.  Yeah, that's generally how this term is used here.

11:34:23  16  It's a -- it's a region of memory.

11:34:24  17  Q.  Now, you say it's volatile memory?

11:34:28  18  A.  Yes.

11:34:28  19  Q.  But it's still memory, right?

11:34:31  20  A.  Yeah.  Volatile memory means it's not going to hang

11:34:34  21  around long.

11:34:35  22  Q.  Well, it actually can hang around for quite a bit of

11:34:38  23  time even if it's in volatile memory; isn't that right,

11:34:42  24  sir?

11:34:42  25  A.  What's it -- I'm sorry --

```
11:34:45   1   Q.  Well, the image --

11:34:47   2   A.  Oh --

11:34:47   3   Q.  -- just because -- I'm sorry, let me --

11:34:50   4         THE COURT:  Let's make sure that one is finished

11:34:51   5   before the other starts to talk.  You all are bleeding over

11:34:58   6   each other, and that's not good for the jury's

11:35:00   7   understanding, it's not good for the record, it's not good

11:35:03   8   for the Court, so make sure there's some space between you.

11:35:07   9         Go ahead, counsel.

11:35:09  10   Q.  (By Mr. Melsheimer)  An image can exist in volatile

11:35:12  11   memory for quite awhile?

11:35:15  12   A.  Sure.  Eventually you have to do something with it or

11:35:21  13   it will disappear.

11:35:22  14   Q.  But I just want to make sure that you and I are on the

11:35:26  15   same page.  You're not saying that volatile memory means,

11:35:29  16   by definition, that the image that's in the buffer or the

11:35:31  17   volatile memory disappears in five seconds or 10 seconds or

11:35:35  18   anything like that; you're not saying that?

11:35:37  19   A.  Oh -- can we be specific?  You mean sampleOutput?

11:35:49  20   Q.  I'm talking about just the notion of volatile generally

11:35:49  21   that you described in your report.

11:35:50  22   A.  It depends.

11:35:52  23   Q.  Which is to say it doesn't mean that it automatically

11:35:55  24   disappears after a set period of time, right?

11:35:58  25   A.  Or it could.
```

| | | |
|---|---|---|
| 11:35:59 | 1 | Q.  It could but doesn't have to is my point. |
| 11:36:02 | 2 | A.  Sure. |
| 11:36:02 | 3 | Q.  Now, you say -- to go back to the "capture" phrase, you |
| 11:36:14 | 4 | say that capture is not turning light into a digital image? |
| 11:36:21 | 5 | A.  That's incorrect. |
| 11:36:22 | 6 | Q.  Well, I thought you said that capture didn't happen |
| 11:36:27 | 7 | until the JPEG was created? |
| 11:36:32 | 8 | A.  That's the point of commitment, so, yes, that's when it |
| 11:36:37 | 9 | happens. |
| 11:36:37 | 10 | Q.  Well, I want to make sure I understand your testimony, |
| 11:36:39 | 11 | sir.  And let's get back to Paragraph 412 of your report. |
| 11:36:43 | 12 | That's in Volume 1, Tab 3.  It's also up on the screen. |
| 11:36:59 | 13 | You say, a JPEG image is created and transmitted |
| 11:37:02 | 14 | via communication network to Wells Fargo's servers where |
| 11:37:05 | 15 | the check image is stored.  This is the first and only time |
| 11:37:10 | 16 | that the check image is captured.  Did I read that |
| 11:37:13 | 17 | correctly? |
| 11:37:13 | 18 | A.  You did. |
| 11:37:15 | 19 | Q.  Okay.  Now, there -- as I understand it, there are two |
| 11:37:18 | 20 | components to this.  First, there needs to be a JPEG file, |
| 11:37:25 | 21 | right? |
| 11:37:25 | 22 | A.  A JPEG format, yes. |
| 11:37:28 | 23 | Q.  And we can agree that when the image sensor takes the |
| 11:37:36 | 24 | image that it is -- it is not creating a JPEG file at that |
| 11:37:41 | 25 | moment.  It creates what you call a bitmap, right? |

11:37:44  1  A.   That's the raw data off the sensor.  It's not creating.

11:37:49  2  It's reading.

11:37:50  3  Q.   Well, the raw data off the sensor is everything that

11:37:53  4  goes into the picture, right?  It's millions or tens of

11:37:57  5  millions of pixels, right?

11:37:59  6  A.   I wouldn't characterize it that way.

11:38:01  7  Q.   Well, you would characterize it as the data or the

11:38:05  8  information from the sensor that the sensor is seeing in

11:38:09  9  its field of view, and it's creating -- you say it's

11:38:14  10  creating a bitmap from that sensor view, right?

11:38:18  11  A.   That isn't what I said.

11:38:20  12  Q.   Well, what's created first, the JPEG or the bitmap?

11:38:27  13  A.   The bitmap isn't created.  It's read.

11:38:31  14  Q.   Well, does the bitmap of a check exist before I put my

11:38:37  15  camera over it?

11:38:38  16  A.   At that point, the sensor doesn't have the data for the

11:38:43  17  check on it.

11:38:44  18  Q.   Because the bitmap is created when you put the camera

11:38:49  19  over the check, right?

11:38:51  20  A.   I wouldn't characterize it that way.

11:38:53  21  Q.   Well, Mr. -- Dr. Conte, you're not saying that there's

11:38:59  22  a -- there's a bitmap -- whether it's whatever you want to

11:39:03  23  call a YUV or any other kind of bitmap, you're not saying

11:39:09  24  there's a bitmap of a check before I put my phone over it

11:39:12  25  to view it, are you?

| | | |
|---|---|---|
| 11:39:15 | 1 | A.  That's not what I'm saying either. |
| 11:39:17 | 2 | Q.  Okay.  You're saying that the JPEG image that is |
| 11:39:21 | 3 | created and transmitted is something different from -- it's |
| 11:39:27 | 4 | a different form than the bitmap, true? |
| 11:39:30 | 5 | A.  It is a different form, yes. |
| 11:39:32 | 6 | Q.  Is it fair to say that the bitmap contains a lot more |
| 11:39:36 | 7 | information than the JPEG? |
| 11:39:37 | 8 | A.  I wouldn't go that far. |
| 11:39:43 | 9 | Q.  Well, the JPEG is a form of compression, right? |
| 11:39:46 | 10 | A.  Generally, yes. |
| 11:39:47 | 11 | Q.  And compression is what we do with images for various |
| 11:39:58 | 12 | purposes, right? |
| 11:40:01 | 13 | A.  Generally, yes. |
| 11:40:03 | 14 | Q.  Okay.  And so the JPEG -- JPEG is just one form of |
| 11:40:10 | 15 | compression, right? |
| 11:40:11 | 16 | A.  I wouldn't characterize it as that. |
| 11:40:13 | 17 | Q.  Well, it's -- it's one form of an image file? |
| 11:40:17 | 18 | A.  I wouldn't quite characterize it that way either. |
| 11:40:21 | 19 | Q.  What are the various forms of an image file, Dr. Conte, |
| 11:40:25 | 20 | besides JPEG? |
| 11:40:25 | 21 | A.  So that isn't what -- so what are the various forms? |
| 11:40:29 | 22 | There's many. |
| 11:40:29 | 23 | Q.  Is JPEG one of them? |
| 11:40:31 | 24 | A.  JPEG is an encoding used in -- in an image file -- |
| 11:40:36 | 25 | what's commonly used. |

11:40:37  1   Q.  What are the others?

11:40:39  2   A.  As I said, there are many.

11:40:40  3   Q.  Can you name one?

11:40:41  4   A.  Oh, wow, okay.  So each camera manufacturer has their

11:40:50  5   own proprietary image format that we generally call raw,

11:40:55  6   although each camera manufacturer gives it its own name.

11:41:02  7          For example, Nikon gives it a name of I think CR.

11:41:06  8   And then Canon gives it a different name and on and on.  So

11:41:13  9   there's a multitude of names for -- for this.  This is why

11:41:19  10  there's a standard for JPEG so that everybody can come

11:41:22  11  together.

11:41:22  12  Q.  So you say in Paragraph 412, the JPEG check image does

11:41:30  13  not exist only temporarily in RAM; you say that, right?

11:41:37  14  A.  Yes.

11:41:38  15  Q.  And you're saying that because it doesn't -- you're

11:41:45  16  saying before that point, when it's just the bitmap data

11:41:49  17  that's been read, as you would say, by the sensor, that

11:41:56  18  that is not the capture of an image because it --

11:42:00  19  A.  Not according -- not according to how the patent calls

11:42:03  20  it.

11:42:03  21  Q.  Because it just exists in what's called RAM or volatile

11:42:08  22  memory, right?

11:42:08  23  A.  There's many reasons that it's not the captured image.

11:42:16  24  Q.  Well, you go on to say -- you say, rather, it is

11:42:21  25  transmitted to Wells Fargo's servers for persistent storage

11:42:24   1   in the same way that the iPhone or Android camera captures

11:42:28   2   photos to the mobile device's Flash storage drive or

11:42:32   3   uploads them to the cloud for storage when using the

11:42:39   4   standard camera app -- application.  And then you say at

11:42:43   5   the bottom, the image is converted to a file that will be

11:42:46   6   stored permanently, right?

11:42:47   7   A.  Yes.

11:42:49   8   Q.  And because the image data exists in the camera --

11:42:57   9   excuse me, exists in this program in what you call volatile

11:43:01  10   memory, you say that's not captured?

11:43:04  11   A.  That isn't the reason I don't say it's captured.

11:43:08  12   Q.  That's one of the reasons you say?

11:43:09  13   A.  It's one of the reason, yes.

11:43:10  14        THE COURT:  Gentlemen, I've stopped you two or

11:43:12  15   three times, and I am going to insist that you break

11:43:16  16   between responding to a question and asking another

11:43:18  17   question.

11:43:20  18        You're jumping in before he finishes,

11:43:22  19   Mr. Melsheimer.

11:43:22  20        And, Dr. Conte, you're doing somewhat the same

11:43:26  21   thing.  I want there to be space between this dialogue.

11:43:30  22   And we're going to do it that way.  And I don't expect to

11:43:34  23   have to ask either of you again.  So let's proceed.

11:43:39  24        MR. MELSHEIMER:  Thank you, Your Honor.

11:43:40  25        THE WITNESS:  Thank you, Your Honor.

| 11:43:41 | 1 | Q.   (By Mr. Melsheimer)   One of the reasons why you say the |

11:43:41  1  Q.  (By Mr. Melsheimer)  One of the reasons why you say the

11:43:47  2  image is not captured when it is read by the image sensor

11:43:53  3  and the bitmap is created or read is because that

11:44:00  4  information is not stored in permanent memory?

11:44:09  5  A.  No, I wouldn't quite agree with that.

11:44:31  6  Q.  Which part of that do you disagree with?

11:44:33  7  A.  The image is ultimately going to be stored in permanent

11:44:45  8  memory, ultimately.  So the fact that it's in RAM or not,

11:44:52  9  temporary RAM is just -- the image that's in temporary RAM

11:45:03  10  disappears.  The image that gets encoded into the JPEG is

11:45:06  11  what, although it's in RAM, ultimately gets transmitted to

11:45:10  12  Wells Fargo's server and stored.

11:45:15  13  Q.  Well, that's what you say in Paragraph 412, isn't it?

11:45:17  14  A.  That's what I just -- I just summarized Paragraph 412.

11:45:22  15  Q.  Which is what your definition of capture is, which is

11:45:24  16  that the JPEG image created and transmitted -- read with

11:45:28  17  me -- the JPEG image created and transmitted, via

11:45:32  18  communication network to Wells Fargo's servers where the

11:45:36  19  check image is stored.  This is the first and only time

11:45:39  20  that the check image is captured.  That's what you wrote,

11:45:43  21  correct?

11:45:43  22  A.  That's what I wrote, yes.

11:45:46  23  Q.  That's what capture is to you, correct?

11:45:52  24  A.  That is not accurate.

11:45:58  25  Q.  Well, sir, you say with emphasis, this is the first --

11:46:04  1  you see that -- and only time that the check image is

11:46:09  2  captured.  So we know you're not saying the check image is

11:46:13  3  captured any other time because you say this is the only

11:46:17  4  time, correct?

11:46:19  5  A.  The time when the image is created is when it's

11:46:24  6  captured.  That's what I'm saying.  This refers to the JPEG

11:46:29  7  image is created.

11:46:30  8  Q.  But the JPEG image that's created is not the same thing

11:46:36  9  as the image file that is taken in from the image sensor

11:46:43  10  that creates the bitmap, is it, sir?

11:46:45  11  A.  I wouldn't characterize that that way, no.

11:46:48  12  Q.  Well, it's a different format, right?  It goes from the

11:46:53  13  bitmap to JPEG, correct?

11:46:57  14  A.  Correct.

11:46:58  15  Q.  It's there in bitmap, it's read by this sensor of the

11:47:04  16  camera, and there is a bitmap of that image read by the

11:47:11  17  image sensor, true?

11:47:12  18  A.  That's true.

11:47:14  19  Q.  And, sir, but you say that particular action of reading

11:47:23  20  the light being read by the image sensor, you're saying

11:47:26  21  that is not capture, right?

11:47:29  22  A.  I'm not -- that's not accurate.

11:47:35  23  Q.  Well, are you saying that when the image sensor is

11:47:42  24  activated, is that the right word?

11:47:45  25  A.  Sure.

| | | |
|---|---|---|
| 11:47:45 | 1 | Q.  When the image sensor is activated and the light is |
| 11:47:49 | 2 | taken in and whatever is in the view of that sensor is |
| 11:47:54 | 3 | taken in and read and there's a bitmap file created, are |
| 11:48:00 | 4 | you saying that is captured? |
| 11:48:04 | 5 | A.  Your description is not accurate as to the operation of |
| 11:48:08 | 6 | the phone or the application. |
| 11:48:09 | 7 | Q.  So I want to know -- so I can rely on your report, |
| 11:48:14 | 8 | right? |
| 11:48:14 | 9 | A.  Yes, sir. |
| 11:48:15 | 10 | Q.  Okay.  And you're not trying to change it or modify it |
| 11:48:18 | 11 | in any way, right? |
| 11:48:19 | 12 | A.  I stand behind it. |
| 11:48:20 | 13 | Q.  Okay.  So I want to just make sure I understand that is |
| 11:48:25 | 14 | it your, testimony, that when this image sensor is |
| 11:48:32 | 15 | activated and there is information taken in and that |
| 11:48:43 | 16 | information is basically light and -- correct, it's light, |
| 11:48:47 | 17 | isn't it? |
| 11:48:47 | 18 | A.  Yes, sir. |
| 11:48:49 | 19 | Q.  And when that light information is taken in and a |
| 11:48:54 | 20 | bitmap is created, are you saying that is capture, or are |
| 11:48:58 | 21 | you saying something else is capture? |
| 11:49:00 | 22 | A.  I'm saying the capture happens after the monitoring |
| 11:49:07 | 23 | criteria are passed. |
| 11:49:08 | 24 | Q.  That's a different issue that we're going to discuss in |
| 11:49:10 | 25 | a minute.  I'm talking about what you say the act of |

11:49:15  1  capture is.

11:49:17  2        Let me back up and say it a different way.

11:49:20  3        The Court in this case has not told us what

11:49:25  4  capture means, isn't that right?

11:49:28  5  A.  That's correct.

11:49:29  6  Q.  So unlike "when," which the Court has told us means at

11:49:36  7  or after, the Court has said capture just has its ordinary

11:49:41  8  meaning, right?

11:49:43  9  A.  Correct.

11:49:44  10  Q.  And when you say ordinary meaning, we all understand

11:49:49  11  that that means not just sort of a slang meaning but what

11:49:53  12  somebody that would understand, a person of ordinary skill

11:50:00  13  in this field would understand capture to be, right?

11:50:05  14  A.  That's correct.

11:50:06  15  Q.  And, in fact, sir, isn't it true that before coming

11:50:12  16  into court some years ago, that you have used the word

11:50:17  17  capture to refer to what happens at the image sensor?

11:50:26  18  A.  I don't recall one way or another if I used that in the

11:50:31  19  past.

11:50:32  20  Q.  Well, are you familiar with this book?

11:50:38  21  A.  Yes.

11:50:38  22  Q.  Okay.  It's called Computer Architecture, a

11:50:43  23  Quantitative Approach, written by Mr. -- Mr. Hennessy and

11:50:48  24  Mr. Patterson.  And it's a book about computer

11:50:51  25  architecture, right?

11:50:51  1   A.  That's correct.

11:50:52  2   Q.  Okay.  Now, you contributed a part to this book, didn't

11:50:56  3   you?

11:50:57  4   A.  I contributed an appendix.

11:50:59  5   Q.  Right.  And so we're clear, the appendix I've got is

11:51:04  6   actually in a -- in a DVD or CD, right?

11:51:07  7   A.  Many people contributed appendices to this book.  Yeah,

11:51:12  8   and it's big, so that's why they did that.

11:51:16  9   Q.  Understood.  And I'm not trying to -- I just want to

11:51:19 10   make sure that we're communicating that I can't read it in

11:51:21 11   the actual pages, but it's actually sort of in the back

11:51:25 12   here in a CD, along with many other worthwhile

11:51:29 13   contributions, right?

11:51:30 14   A.  I assume.

11:51:31 15   Q.  Okay.  And you've read that, haven't you?  You wrote

11:51:35 16   it, right?

11:51:35 17   A.  Yes.

11:51:36 18   Q.  Okay.  So let's take a look at -- it is in your binder

11:51:45 19   at Volume 2, Tab 21.  And the part I'm looking for, sir, is

11:52:04 20   Page D19.  Do you see that?  Case Study: Sanyo VPC-SX500

11:52:32 21   Digital Camera.  Do you see that?

11:52:35 22   A.  Yes.

11:52:35 23   Q.  And you say, sir -- and you're talking about taking

11:52:48 24   pictures here, right?

11:52:49 25   A.  This is actually not my writing.  They asked me to

11:52:51  1    integrate writing from other portions of the book.  So my

11:52:57  2    function in creating this appendix was to integrate

11:53:00  3    sections that had already been written in the book into an

11:53:04  4    embedded system section, and then add some blue text.

11:53:21  5    Q.   Let me ask you a question.  This is an appendix that

11:53:24  6    you were involved in helping create?

11:53:26  7    A.   Yes, I would describe it as being the editor of, but,

11:53:29  8    yes.

11:53:30  9    Q.   And just so we're clear for the jury's benefit, there's

11:53:34  10   actually a number of pages in this section which is

11:53:36  11   entitled embedded systems, right?

11:53:38  12   A.   That's correct.

11:53:39  13   Q.   And just so there's no confusion, that's you?

11:53:51  14   A.   Yeah, it says updated by.

11:53:53  15   Q.   Updated by Thomas Conte.  So you had a free reign to

11:53:59  16   take things out that you thought were inaccurate, right?

11:54:02  17   A.   Oh, yeah, I see what you're saying.  They didn't ask me

11:54:05  18   to do that.  I wouldn't say I had free rein.

11:54:07  19   Q.   Well, you wouldn't have put anything in there that you

11:54:10  20   thought was wrong that had your name on it, right?

11:54:12  21   A.   I -- of course, I wouldn't put anything that was wrong,

11:54:15  22   but also these aren't my words.

11:54:16  23   Q.   I understand, sir, but I just want to make sure we're

11:54:21  24   not arguing about something we don't need to be arguing

11:54:24  25   about.  This is something that you oversaw and created for

| | | |
|---|---|---|
| 11:54:30 | 1 | inclusion in the book Computer Architecture, a Quantitative |
| 11:54:39 | 2 | Approach, right? |
| 11:54:39 | 3 | A.  Yes, I want to be specific about my task though. |
| 11:54:42 | 4 | Q.  I'm not saying that you wrote every word of this, and |
| 11:54:44 | 5 | you want to make that clear.  You did not write every word |
| 11:54:47 | 6 | of this, true? |
| 11:54:48 | 7 | A.  That's correct.  Indeed, I didn't write the words on |
| 11:54:52 | 8 | Page D19. |
| 11:55:01 | 9 | Q.  How do you know that? |
| 11:55:01 | 10 | A.  Because I know the words I wrote. |
| 11:55:03 | 11 | Q.  When was the last time you looked at this? |
| 11:55:05 | 12 | A.  This was 2003 or '4. |
| 11:55:07 | 13 | Q.  Did you know I was going to ask you about it today? |
| 11:55:12 | 14 | A.  No, I didn't know you were going to ask me about it |
| 11:55:15 | 15 | today, but I remember what I write. |
| 11:55:17 | 16 | Q.  So did you review this in preparation for your |
| 11:55:19 | 17 | testimony? |
| 11:55:19 | 18 | A.  No. |
| 11:55:20 | 19 | Q.  Did you review this before you gave your report in this |
| 11:55:22 | 20 | case? |
| 11:55:22 | 21 | A.  No. |
| 11:55:23 | 22 | Q.  Did you review this before you gave your opinion on |
| 11:55:25 | 23 | what capture means? |
| 11:55:26 | 24 | A.  No. |
| 11:55:27 | 25 | Q.  But you wrote it or oversaw it -- strike that. |

| | | |
|---|---|---|
| 11:55:32 | 1 | You oversaw this report -- or this writing well |
| 11:55:37 | 2 | before you got involved in this lawsuit; isn't that right, |
| 11:55:40 | 3 | sir? |
| 11:55:40 | 4 | A.  Yes, I believe it was about 2003. |
| 11:55:42 | 5 | Q.  And you didn't get involved in this lawsuit until about |
| 11:55:45 | 6 | 15 years later? |
| 11:55:46 | 7 | A.  Yeah. |
| 11:55:46 | 8 | Q.  So what the text says, when a photographer takes a |
| 11:55:51 | 9 | picture, he first holds the shutter halfway so that the |
| 11:55:55 | 10 | microprocessor can take a light reading.  The |
| 11:55:59 | 11 | microprocessor then keeps the shutter open to get the |
| 11:56:06 | 12 | necessary light.  You and I were talking about light a |
| 11:56:08 | 13 | minute ago, right? |
| 11:56:09 | 14 | A.  Yes. |
| 11:56:09 | 15 | Q.  Which is captured by a CCD, which is called a charged |
| 11:56:14 | 16 | coupled device, right? |
| 11:56:16 | 17 | A.  Yes. |
| 11:56:17 | 18 | Q.  And it's captured as red, green, and blue pixels, true? |
| 11:56:23 | 19 | A.  Yes, that's describing the circuit. |
| 11:56:25 | 20 | Q.  Those are the primary colors that make up the world, |
| 11:56:30 | 21 | right? |
| 11:56:30 | 22 | A.  Of color addition, yes. |
| 11:56:32 | 23 | Q.  The CCD is a half inch, 30 -- 13 by 160 times 124 [sic] |
| 11:56:45 | 24 | pixel, progressive-scan chip.  And I don't want to skip |
| 11:56:58 | 25 | over this, sir, but -- capture? |

| | | |
|---|---|---|
| 11:57:12 | 1 | A.  Yes. |
| 11:57:12 | 2 | Q.  You then talk about -- the article then talks about the |
| 11:57:29 | 3 | next step as something separate from capture, and what is |
| 11:57:35 | 4 | the next step in this -- in this article, sir? |
| 11:57:41 | 5 | A.  The next step is to compress the image into a standard |
| 11:57:45 | 6 | format, such as JPEG, and store it to a removal of Flash |
| 11:57:51 | 7 | memory. |
| 11:58:06 | 8 | Q.  So in this article, at least, written 15 years before |
| 11:58:09 | 9 | you got involved in this lawsuit, the capture notion |
| 11:58:11 | 10 | happens first and compression happens second; isn't that |
| 11:58:14 | 11 | right, sir? |
| 11:58:14 | 12 | A.  It's not the same capture notion, no. |
| 11:58:19 | 13 | Q.  But it is the same word? |
| 11:58:22 | 14 | A.  Sure. |
| 11:58:23 | 15 | Q.  And, sir, if we go to your report, Volume 1, Tab 3? |
| 11:58:38 | 16 | A.  Give me a moment, I've got to -- |
| 11:58:40 | 17 | Q.  Yes, sir.  I'm going to need a moment, too. |
| 11:58:52 | 18 | THE COURT:  Approach the bench, counsel. |
| 11:58:57 | 19 | (Bench conference.) |
| 11:59:02 | 20 | THE COURT:  Is this book a pre-admitted exhibit, |
| 11:59:05 | 21 | or is this some type of impeachment? |
| 11:59:08 | 22 | MR. MELSHEIMER:  It's impeachment, Your Honor. |
| 11:59:09 | 23 | THE COURT:  All right.  It's 12:00 noon. |
| 11:59:12 | 24 | MR. MELSHEIMER:  Could I have another minute, Your |
| 11:59:15 | 25 | Honor, on this subject matter, and then we could break for |

11:59:17   1   lunch?

11:59:18   2        THE COURT:  I'm asking you how much more cross you

11:59:20   3   have?  You told me an hour when we broke, and you're going

11:59:24   4   on an hour and 40 or 50 minutes now.

11:59:27   5        MR. MELSHEIMER:  Your Honor, I hope I'm not the

11:59:29   6   first lawyer that's ever misstated the --

11:59:31   7        THE COURT:  You aren't, but that's why I'm asking

11:59:34   8   again.

11:59:34   9        MR. MELSHEIMER:  I understand, Your Honor.  So I

11:59:37  10   think I am going to need about another half-hour.

11:59:41  11        THE COURT:  All right.

11:59:42  12        MR. MELSHEIMER:  And I'm not just saying that to

11:59:44  13   get a break.  I'm saying that I think I can briefly cut it

11:59:47  14   back if I have some time to cut it back.

11:59:50  15        THE COURT:  Are you telling me you need another

11:59:52  16   question or two to finish this?

11:59:54  17        MR. MELSHEIMER:  I am, Your Honor.  If I could

11:59:55  18   indulge the Court, I would appreciate it.

11:59:57  19        THE COURT:  That will be fine.  Let's do that, and

11:59:59  20   then we'll break for lunch.

12:00:00  21        MR. MELSHEIMER:  Thank you, Your Honor.

12:00:01  22        (Bench conference concluded.)

12:00:04  23        THE COURT:  All right.  Let's proceed when you're

12:00:06  24   ready, counsel.

12:00:07  25   Q.  (By Mr. Melsheimer)  So if we can go to your report,

| | | |
|---|---|---|
| 12:00:10 | 1 | sir.  And if you'll go to Page 83 of your report.  Tell me |
| 12:00:41 | 2 | when you're there, sir. |
| 12:00:43 | 3 | A.  I'm there. |
| 12:00:44 | 4 | Q.  Oh, I apologize, Paragraph 83, Dr. Conte.  I wasn't |
| 12:00:49 | 5 | precise.  And especially the part on Page 38. |
| 12:01:03 | 6 | So just to set the context, sir.  This article |
| 12:01:06 | 7 | that you oversaw 15 years ago talks about capture being |
| 12:01:12 | 8 | separate from compression, right? |
| 12:01:17 | 9 | A.  I wouldn't characterize this as the same -- in the same |
| 12:01:23 | 10 | way. |
| 12:01:24 | 11 | Q.  But we can at least agree that capture is described, |
| 12:01:27 | 12 | and then something that's called the next step is |
| 12:01:30 | 13 | compression.  That's what the words are, right? |
| 12:01:33 | 14 | A.  That's what the words say, yes. |
| 12:01:35 | 15 | Q.  And it turns out, sir, that that's exactly the way you |
| 12:01:46 | 16 | describe it in Paragraph 83 of your report, isn't it? |
| 12:01:50 | 17 | A.  Can you point it out, I'm sorry? |
| 12:02:03 | 18 | Q.  Yes.  Page 38.  Go to the bottom, sir. |
| 12:02:10 | 19 | A.  Okay. |
| 12:02:11 | 20 | Q.  Mitek MiSnap on mobile device.  Do you see that? |
| 12:02:18 | 21 | A.  Yes. |
| 12:02:19 | 22 | Q.  That is what we're here talking about this week, true? |
| 12:02:23 | 23 | A.  That's part of what we're talking about, sir. |
| 12:02:26 | 24 | Q.  And you've got the steps laid out.  What's the first |
| 12:02:27 | 25 | step? |

| 12:02:27 | 1 | A.  Image capture. |
| 12:02:28 | 2 | Q.  What's the second step? |
| 12:02:30 | 3 | A.  IQA threshold checking. |
| 12:02:33 | 4 | Q.  That's image quality assessment, that's monitoring, |
| 12:02:36 | 5 | right? |
| 12:02:36 | 6 | A.  That's Mitek's word for it, yes. |
| 12:02:38 | 7 | Q.  And then JPEG processing, right? |
| 12:02:39 | 8 | A.  Yes.  These aren't a sequence, sir. |
| 12:02:43 | 9 | Q.  Sir? |
| 12:02:43 | 10 | A.  These are not a sequence, sir. |
| 12:02:45 | 11 | Q.  Let me ask you the question again, sir. |
| 12:02:51 | 12 |      MR. MELSHEIMER:  And I apologize to -- to the |
| 12:02:52 | 13 | Court for interrupting. |
| 12:02:53 | 14 | Q.  (By Mr. Melsheimer)  This is Paragraph 83 of your |
| 12:02:58 | 15 | report, right? |
| 12:02:59 | 16 | A.  That's correct. |
| 12:03:00 | 17 | Q.  You wrote this? |
| 12:03:02 | 18 | A.  Yes. |
| 12:03:03 | 19 | Q.  You chose the words for it, right? |
| 12:03:05 | 20 | A.  Yes. |
| 12:03:07 | 21 | Q.  And the words you chose and the sequence you chose was |
| 12:03:11 | 22 | capture, monitor, compress.  Those -- those are the words |
| 12:03:23 | 23 | on the page, sir, true? |
| 12:03:27 | 24 | A.  Those are the words on the page. |
| 12:03:31 | 25 |      MR. MELSHEIMER:  Your Honor, what I represented to |

12:03:32   1   the Court, this was the conclusion of this portion.

12:03:34   2          THE COURT:  All right.  Ladies and gentlemen,

12:03:36   3   we're going to break at this point for lunch.

12:03:39   4          I'm going to ask you to take your juror notebooks

12:03:43   5   with you to the jury room.  Lunch is there waiting for you.

12:03:45   6          Follow all the instructions I've given you,

12:03:47   7   including not to discuss the case among yourselves.  And

12:03:51   8   we'll try to reconvene somewhere in the neighborhood of

12:03:56   9   12:45 to 12:50.

12:03:58   10         With that, the jury is excused for lunch.

12:04:00   11         COURT SECURITY OFFICER:  All rise.

12:04:01   12         (Jury out.)

12:04:02   13         THE COURT:  Counsel, there were matters we

12:04:28   14   discussed in chambers this morning that I directed the

12:04:31   15   parties to continue to meet and confer on.  We're going to

12:04:35   16   break for lunch.

12:04:35   17         But in about roughly 30 minutes, I'd like a

12:04:38   18   representative from each side to update the Court on where

12:04:44   19   we are on those matters.

12:04:45   20         With that, we stand in recess.

12:04:47   21         COURT SECURITY OFFICER:  All rise.

12:04:48   22         (Recess.)

23

24

25

1                            CERTIFICATION

2

3            I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes_____            10/31/19_____
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25