```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3   UNITED STATES AUTOMOBILE      )(
     ASSOCIATION
 4                                 )(    CIVIL ACTION NO.

 5   VS.                           )(    2:18-CV-245-JRG

 6                                 )(    MARSHALL, TEXAS
                                         OCTOBER 31, 2019
 7   WELLS FARGO BANK, N.A.        )(    1:07 P.M.

 8

 9                   TRANSCRIPT OF JURY TRIAL

10                     AFTERNOON SESSION

11      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                 UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14

15   FOR THE PLAINTIFF:

16
     JASON SHEASBY
17   ANTHONY ROWLES
     LISA GLASSER
18   IRELL & MANELLA
     1800 Avenue of the Stars
19   Suite 900
     Los Angeles, CA 90067-4276
20

21
     ROBERT CHRISTOPHER BUNT
22   PARKER, BUNT & AINSWORTH, PC
     100 East Ferguson
23   Suite 418
     Tyler, TX 75702
24

25
```

```
 1   FOR THE DEFENDANT:

 2

 3   THOMAS M. MELSHEIMER
     M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

 8   E. DANIELLE T. WILLIAMS
     WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23

     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
01:07:00   1              P R O C E E D I N G S
01:07:00   2         (Jury out.)
01:07:25   3         COURT SECURITY OFFICER:  All rise.
01:07:28   4         THE COURT:  Be seated, please.
01:08:09   5         Counsel, I understand you're still talking about
01:08:16   6   the issues we discussed in chambers this morning.  We'll --
01:08:22   7   I'll circle back and see where you are on those during the
01:08:25   8   afternoon recess.
01:08:26   9         MR. SHEASBY:  If it pleases the Court, Your Honor,
01:08:29  10   yes.
01:08:29  11         THE COURT:  All right.  I'll do that.
01:08:31  12         All right.  Are we ready to continue?
01:08:33  13         MR. MELSHEIMER:  We are.
01:08:35  14         THE COURT:  Let's bring in the jury.
01:08:36  15         (Jury in.)
01:08:40  16         COURT SECURITY OFFICER:  All rise.
01:08:41  17         THE COURT:  Welcome back, ladies and gentlemen.
01:09:04  18   Please have a seat.
01:09:05  19         We'll continue with the Defendant's
01:09:10  20   cross-examination of Professor Tom Conte.
01:09:15  21         Mr. Melsheimer, you may continue.
01:09:17  22         MR. MELSHEIMER:  May it please the Court, Your
01:09:17  23   Honor.
01:09:17  24   THOMAS CONTE, PH.D., PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
01:09:17  25                CROSS-EXAMINATION CONTINUED
```

01:09:18   1   BY MR. MELSHEIMER:

01:09:18   2   Q.  Good afternoon, Dr. Conte.

01:09:20   3   A.  Good afternoon.

01:09:21   4   Q.  Let's return, if we can, to the claim language, sir,

01:09:27   5   and we're going to go to Claim 1 of the '571 patent.

01:09:29   6        Do you see it displayed in front of you, sir?

01:09:33   7   A.  I do.

01:09:34   8   Q.  And this is one of the independent claims that you

01:09:37   9   analyzed for infringement purposes, true?

01:09:40   10   A.  True.

01:09:41   11   Q.  There are some dependent claims that include this

01:09:48   12   claim, correct?

01:09:49   13   A.  Correct.

01:09:50   14   Q.  But we know that if there's an -- if there's -- if an

01:09:57   15   element is not satisfied in the independent claim, then, by

01:10:01   16   definition, there can't be infringement of the dependent

01:10:06   17   claim.  Do I have that right?

01:10:13   18   A.  I'm a little fuzzy on that, but I believe that's true.

01:10:15   19   Q.  So just to make sure we're on the same page, so my

01:10:19   20   question, I'll try to make it more precise.

01:10:21   21        If a claim element is missing in an infringement

01:10:26   22   analysis from the independent claim, then, by definition,

01:10:32   23   the dependent claim cannot be infringed, right?

01:10:36   24   A.  Generally, that's true, yes.

01:10:38   25   Q.  This claim is described in the very first words as

01:10:44  1  being software, right?

01:10:47  2  A.  Yes.

01:10:50  3  Q.  That's what the phrase, a non-transitory computerable

01:10:58  4  reader -- readable medium comprising computer-readable

01:11:02  5  instructions, that's essentially -- that's software code,

01:11:05  6  right?

01:11:05  7  A.  Yes.

01:11:06  8  Q.  That's one of the reasons why when you did your work in

01:11:10  9  this case, the first thing you studied and what you spent

01:11:20  10  the most time on was the source code, right?

01:11:21  11  A.  What I spent the most time on, yes.

01:11:23  12  Q.  Okay.  I mean, you looked at the claims, of course,

01:11:26  13  right, and you studied them?

01:11:29  14  A.  Yes.

01:11:29  15  Q.  Understood what the Court's definitions were, and then

01:11:32  16  you -- you threw yourself into the code with the help of

01:11:39  17  these two reviewers, who I think you told us before lunch

01:11:43  18  may have spent over a hundred hours, along with your 40

01:11:46  19  hours, looking at the source code to figure out how it

01:11:49  20  operated, right?

01:11:50  21  A.  So, generally, that's true.

01:11:56  22  Q.  Now, you -- you understand that the -- the argument

01:12:07  23  between the two sides here is the timing of capture, right?

01:12:09  24  A.  Yes, generally, I believe that's the -- one of the

01:12:16  25  issues.

| | | |
|---|---|---|
| 01:12:16 | 1 | Q.  Well, if you look up in your report, sir, on |
| 01:12:21 | 2 | Paragraph 420, you say -- tell me when you get there. |
| 01:12:27 | 3 | A.  You can start reading while I -- while I go. |
| 01:12:30 | 4 | Q.  It appears that Wells Fargo is arguing that in its |
| 01:12:34 | 5 | system, capture occurs earlier in the process.  Do you see |
| 01:12:40 | 6 | that? |
| 01:12:42 | 7 | A.  That was my understanding. |
| 01:12:44 | 8 | Q.  And that's still your understanding, right? |
| 01:12:48 | 9 | A.  My understanding is that -- now that Wells Fargo is |
| 01:12:53 | 10 | arguing, it just doesn't happen after. |
| 01:12:56 | 11 | Q.  And that's this -- this -- this "when" phrase, that's |
| 01:13:01 | 12 | the timing condition in the patent based on the word |
| 01:13:05 | 13 | "when," right? |
| 01:13:07 | 14 | A.  Correct. |
| 01:13:07 | 15 | Q.  And the Court has defined that to mean at or after, |
| 01:13:10 | 16 | right? |
| 01:13:10 | 17 | A.  Yes. |
| 01:13:14 | 18 | Q.  So the other thing I wanted to mention to you about |
| 01:13:17 | 19 | this claim, we've talked about this a little bit before |
| 01:13:19 | 20 | lunch, is that the capture is happening with the camera, |
| 01:13:27 | 21 | right? |
| 01:13:27 | 22 | A.  Yes. |
| 01:13:28 | 23 | Q.  There are slightly different terms used in the various |
| 01:13:34 | 24 | patent claims, but, effectively, the capture in all these |
| 01:13:39 | 25 | claims is happening with the camera using the camera.  It's |

01:13:43   1   that concept that the image is captured with the camera and

01:13:48   2   not something else, right?

01:13:51   3   A.   I need to check the claims, but I believe that's

01:13:54   4   accurate.

01:13:55   5   Q.   It's not -- and I'm not -- I'm not trying to be

01:14:00   6   sarcastic -- it's not capturing with the bank's server,

01:14:06   7   right?

01:14:06   8   A.   That's correct.

01:14:08   9   Q.   It may be that ultimately in the process, the checks

01:14:16   10  end up being stored on the server, true?

01:14:18   11  A.   That's correct.

01:14:20   12  Q.   But the capturing that these claims require has to

01:14:27   13  happen with the camera; do I have that right?

01:14:30   14  A.   That's what the claim says.

01:14:33   15  Q.   That's what we have to follow, as well, isn't it right,

01:14:38   16  sir, what the claims say?

01:14:39   17  A.   Yes.

01:14:40   18  Q.   Now, you were here for the opening statement -- let

01:14:54   19  me -- actually let me -- let me back up.  I want to get

01:14:59   20  back to this discussion we were having about memory,

01:15:05   21  non-volatile memory versus volatile memory.  Remember that

01:15:07   22  discussion we had?

01:15:08   23  A.   Yes.

01:15:09   24  Q.   There are two -- generally, there's two kinds of

01:15:14   25  memory, there's memory that's more permanent memory and

01:15:17   1   there's memory that's volatile memory.  Is that a fair way

01:15:20   2   of putting it?

01:15:21   3   A.  Generally, yes.

01:15:22   4   Q.  Sometimes called non-volatile or volatile, right?

01:15:27   5   A.  Right.

01:15:28   6   Q.  You and I had this conversation a little bit before

01:15:30   7   lunch that, you know, volatile memory doesn't mean that,

01:15:37   8   for example, if you have something on your phone and you

01:15:39   9   shake it, that the data is just going to disappear.  That's

01:15:43   10  not what volatile means, right?

01:15:45   11  A.  In general, that's true.

01:15:46   12  Q.  Okay.  And, in fact, you and I talked about that

01:15:51   13  volatile memory, something can exist in volatile memory for

01:15:55   14  an extended period of time or -- or it cannot, right?

01:16:01   15  A.  In certain situations, yes.

01:16:02   16  Q.  And I just wanted to make sure I was clear about this.

01:16:06   17  It's not that volatile memory necessarily means that

01:16:12   18  something is not going to be there for 10, 15, 20 minutes,

01:16:18   19  an hour, it could be in volatile memory for hours, and

01:16:21   20  still be volatile memory, right?

01:16:22   21  A.  Hypothetically, yes.

01:16:24   22  Q.  One of the things that separates volatile memory from

01:16:30   23  non-volatile memory, as I understand it, sir, is that

01:16:36   24  volatile memory, if the power source goes away, what's

01:16:42   25  stored in non-volatile memory will disappear; is that true?

| | | |
|---|---|---|
| 01:16:46 | 1 | A.  That's one scenario, yes. |
| 01:16:47 | 2 | Q.  There are other scenarios, but that is one, correct? |
| 01:16:52 | 3 | A.  Correct. |
| 01:16:53 | 4 | Q.  If it's non-volatile memory, what that means is that |
| 01:16:58 | 5 | the power goes away or goes down, and you plug it back in, |
| 01:17:04 | 6 | you still got the data there in memory, right? |
| 01:17:09 | 7 | A.  Again, that's one scenario. |
| 01:17:11 | 8 | Q.  And, for example, the -- your book -- the book that you |
| 01:17:16 | 9 | edited or oversaw the supplement for, that is something |
| 01:17:23 | 10 | that's stored on a -- on permanent memory in a CD, right? |
| 01:17:33 | 11 | A.  Correct, there's no power there. |
| 01:17:35 | 12 | Q.  Correct.  And so, in fact, whether -- I don't know if |
| 01:17:37 | 13 | this is a CD-ROM or a DVD, but in any event, both of those |
| 01:17:42 | 14 | are ways of storing things that are permanent, right? |
| 01:17:52 | 15 | A.  Generally I would agree. |
| 01:17:54 | 16 | Q.  And, of course, sir -- maybe you're hesitating for this |
| 01:17:58 | 17 | reason.  Of course you could, you know, heat this up or do |
| 01:18:02 | 18 | something to it that might disrupt the storage, but |
| 01:18:06 | 19 | generally speaking, something like a CD or a DVD is what we |
| 01:18:11 | 20 | would call permanent memory, right? |
| 01:18:13 | 21 | A.  That's one example. |
| 01:18:14 | 22 | Q.  The claims of these patents, the claims of these |
| 01:18:20 | 23 | patents do not contain the words volatile or non-volatile |
| 01:18:24 | 24 | memory, correct? |
| 01:18:24 | 25 | A.  The claims do not, no. |

01:18:28   1   Q.   The claims of these patents do not contain the word

01:18:35   2   JPEG, true?

01:18:35   3   A.   The claims do not.

01:18:36   4   Q.   You were here for the opening statement, correct?

01:18:58   5   A.   For most of it, yes.

01:19:01   6   Q.   And were you here for the Plaintiff's opening

01:19:06   7   statement?

01:19:06   8   A.   Yes.

01:19:07   9   Q.   So I'd like to put up a portion of that and ask you a

01:19:10  10   question about it.

01:19:14  11        MR. MELSHEIMER:   Mr. Barnes, do we have that

01:19:17  12   excerpt?

01:19:18  13        THE TECHNICIAN:   Yes.

01:19:29  14   Q.   (By Mr. Melsheimer)   So this was said by the counsel

01:19:30  15   for the Plaintiff, and it's describing, as I understand it,

01:19:36  16   what the Plaintiff's infringement theory is.

01:19:38  17        They obtain those images, they rapidly monitor

01:19:44  18   them to determine if they satisfy the criteria for machine

01:19:47  19   reading, and then they create a JPEG file when the frame

01:19:52  20   passes.

01:19:55  21        Did I read that correctly?

01:19:56  22   A.   That's what the transcript says, yes.

01:19:59  23   Q.   And then at the end there, it says:   That's what USAA

01:20:02  24   says is infringing.

01:20:04  25        Right?

```
01:20:06    1    A.   That's what it says, yes.

01:20:07    2    Q.   That's what you say is infringing?

01:20:09    3    A.   Yes.   This isn't quite as precise as I put it.

01:20:17    4    Q.   Well, now, you've said that a number of times in your

01:20:20    5    testimony, sir, when -- sometimes in response to my

01:20:23    6    questions about the words being -- not being precise,

01:20:26    7    right?

01:20:26    8    A.   Yes, I'm an engineer.

01:20:30    9    Q.   Of course.   And -- and, for example, that slide that

01:20:33   10    said Patented Monitoring Criteria, you said, well, that

01:20:36   11    really wasn't right because those criterions weren't

01:20:39   12    patented, remember that, at the way beginning of your

01:20:41   13    cross-examination?

01:20:41   14    A.   Yes, although, I think -- again, that was confusing

01:20:51   15    because of my understanding of patent law.

01:20:53   16    Q.   And there -- there have been some other observations

01:20:56   17    that you've made about precision and wording, including

01:21:00   18    some of your own wording, right?

01:21:01   19    A.   No, that's inaccurate.

01:21:05   20    Q.   So you haven't criticized some of your own wording

01:21:09   21    during your testimony in front of the jury; you haven't

01:21:11   22    criticized some of that in your previous writings as

01:21:15   23    imprecise?

01:21:18   24    A.   No, I have not.

01:21:19   25    Q.   Okay.   Let me put it this way, sir:   Can we at least
```

01:21:23   1  agree that precision in words is part of the reason why

01:21:30   2  we're here, right?

01:21:31   3  A.  Among many others, yes.

01:21:34   4  Q.  And in a patent case, precision in words are -- is

01:21:39   5  important, isn't it, sir?

01:21:40   6  A.  Yes.

01:21:41   7  Q.  We have to use -- in some instances, special

01:21:45   8  definitions, right?

01:21:46   9  A.  Yes.

01:21:48  10  Q.  And in some instances, we have to rely on the ordinary

01:21:52  11  meaning of people with skill in the field to tell us what

01:21:56  12  those words mean, correct?

01:21:58  13  A.  That's correct.

01:22:00  14  Q.  Now, can we agree that -- can we agree, sir, that the

01:22:20  15  word "obtain" -- the word "obtain" does not appear in any

01:22:29  16  of the patent claims asserted in this case?

01:22:37  17  A.  The word "obtain" does not, no, in the claims, no.

01:23:01  18         MR. MELSHEIMER:  You can take that down,

01:23:02  19  Mr. Barnes.

01:23:03  20  Q.  (By Mr. Melsheimer)  I want to talk a little bit about

01:23:07  21  the improvement in smartphone cameras over time and the

01:23:15  22  changes in the Mitek software.  Are you with me?

01:23:17  23  A.  Yes.

01:23:17  24  Q.  Can we -- so just to orient ourselves, the first of the

01:23:22  25  Plaintiff's patents was filed on -- in 2009, is that --

01:23:28  1    does that sound right?

01:23:29  2    A.  Yes.

01:23:29  3    Q.  And it was granted in 2015.  Does that sound right to

01:23:33  4    you?

01:23:34  5    A.  I believe so, yeah.

01:23:36  6    Q.  The first iPhone came out in 2007, right?

01:23:43  7    A.  Yes.

01:23:44  8    Q.  You know, though, that there were devices prior to the

01:23:49  9    smartphone that had what we would call some smartphone-type

01:23:54  10   capabilities, right?

01:23:55  11   A.  Yes.

01:23:56  12   Q.  Such as the BlackBerry, right?

01:23:59  13   A.  Yes.

01:24:00  14   Q.  And other devices that predate the 2007 introduction of

01:24:06  15   the iPhone, correct?

01:24:08  16        MR. ROWLES:  Your Honor, may we approach?

01:24:10  17        THE COURT:  Approach the bench, counsel.

01:24:16  18        (Bench conference.)

01:24:18  19        MR. ROWLES:  Your Honor, I feel we're getting

01:24:23  20   right back into the validity territory that you asked

01:24:25  21   counsel to move on from before lunch break.

01:24:27  22        MR. MELSHEIMER:  Not at all, Judge.

01:24:28  23        THE COURT:  Where are we going?

01:24:29  24        MR. MELSHEIMER:  They made a specific point that

01:24:31  25   one of our charge -- the timeline that we showed to the

```
01:24:35  1   jury was incorrect.  When I said that the first mobile
01:24:38  2   application was on a phone in 2007, Mr. Sheasby said to
01:24:46  3   their -- their very first witness, he said, well, that
01:24:49  4   can't be because the iPhone just came out in 2007.
01:24:51  5        And I'm just pointing out that that's not correct,
01:24:54  6   that there, in fact, were smartphones before that, and then
01:24:58  7   I'm done with this.  But that was the direct point that he
01:25:00  8   made, Judge.  I think I'm entitled to rebut it.
01:25:05  9        MR. ROWLES:  Right.  I think the cross-examination
01:25:08  10  of Mr. Bueche was the opportunity -- or recross, rather.
01:25:12  11       THE COURT:  But that didn't happen with this
01:25:15  12  witness, though, did it?  That happened with Bueche.
01:25:15  13       MR. MELSHEIMER:  I understand, Your Honor.  But
01:25:16  14  this witness -- I don't have to pick -- I can pick whatever
01:25:17  15  witness I want to illustrate a point.  I'm not impeaching
01:25:21  16  him with this.  I'm simply saying that what they tried to
01:25:24  17  argue with Mr. Bueche is incorrect.  That's all.
01:25:27  18       THE COURT:  All right.  Mr. Melsheimer, one more
01:25:29  19  question, and then move on.
01:25:30  20       MR. MELSHEIMER:  Thank you, Your Honor.
01:25:31  21       THE COURT:  Okay.  And do not go into validity.
01:25:33  22       MR. MELSHEIMER:  Your Honor, I've -- I'm not going
01:25:35  23  to.
01:25:36  24       THE COURT:  I'm just reminding you.
01:25:38  25       MR. MELSHEIMER:  Thank you.  Thank you, Your
```

01:25:39  1  Honor.

01:25:39  2          (Bench conference concluded.)

01:25:46  3          THE COURT:  All right.  Counsel, ask your next

01:25:48  4  question.

01:25:48  5  Q.  (By Mr. Melsheimer)  There were smartphones capable of

01:25:50  6  running apps before the iPhone, true?

01:25:53  7  A.  That's true.

01:25:57  8          THE COURT:  Let's move on.

01:25:58  9  Q.  (By Mr. Melsheimer)  Now, can we agree that the Mitek

01:26:03  10  software has changed over time?

01:26:08  11  A.  Yes.

01:26:08  12  Q.  And can we also agree that the smartphone technology,

01:26:14  13  including the camera technology, has changed from 2007 when

01:26:21  14  the iPhone was introduced and today?

01:26:24  15  A.  Yes.

01:26:25  16  Q.  The cameras have gotten a lot better, right?

01:26:30  17  A.  Among other things, yes.

01:26:31  18  Q.  The first iPhone didn't even have video, right?

01:26:34  19  A.  That's correct.

01:26:35  20  Q.  But now the cameras have very sophisticated video

01:26:41  21  capabilities that allow extremely high resolution images;

01:26:41  22  isn't that right?

01:26:49  23  A.  Yes, that's correct.

01:26:49  24  Q.  Are you aware whether or not Mitek's source code

01:27:16  25  changed over time to account for the greater capability of

| | | |
|---|---|---|
| 01:27:26 | 1 | the smartphone cameras? |
| 01:27:32 | 2 | A.  There is a portion of the code that changed.  It wasn't |
| 01:27:35 | 3 | relevant. |
| 01:27:37 | 4 | Q.  Okay.  So I want to make sure I understand your answer. |
| 01:27:43 | 5 | Was there -- are you aware whether the Mitek |
| 01:27:49 | 6 | source code changed over time, in part to account for the |
| 01:27:57 | 7 | expanded capabilities of the iPhone or smartphone cameras? |
| 01:28:03 | 8 | A.  Again, there was change.  It was not change that was |
| 01:28:07 | 9 | relevant to my analysis. |
| 01:28:09 | 10 | Q.  Okay. |
| 01:28:09 | 11 | MR. MELSHEIMER:  Your Honor, I'm going to object |
| 01:28:11 | 12 | as non-responsive because I don't think he's answering -- I |
| 01:28:15 | 13 | didn't ask him if it was relevant.  I was simply asking him |
| 01:28:18 | 14 | if it was changed to reflect the improved capabilities of |
| 01:28:22 | 15 | the camera.  I just would like to get an answer to that, if |
| 01:28:24 | 16 | possible. |
| 01:28:25 | 17 | THE COURT:  Well, you've gotten an answer, but he |
| 01:28:27 | 18 | did go beyond the answer that your question called for. |
| 01:28:31 | 19 | I'll sustain the objection that -- after the witness says |
| 01:28:34 | 20 | "there was change," the part about it wasn't relevant, |
| 01:28:38 | 21 | that's non-responsive. |
| 01:28:39 | 22 | Let's proceed. |
| 01:28:46 | 23 | MR. MELSHEIMER:  Your Honor, may I have just one |
| 01:28:48 | 24 | moment to consult with my co-counsel? |
| 01:28:51 | 25 | THE COURT:  You certainly may. |

```
01:29:02   1              (Pause in proceedings.)

01:29:02   2              MR. MELSHEIMER:  May it please the Court.

01:29:04   3         Thank you, Dr. Conte.

01:29:05   4         THE COURT:  You pass the witness, Mr. Melsheimer?

01:29:07   5         MR. MELSHEIMER:  Pass the witness, Your Honor.

01:29:09   6         THE COURT:  Is there redirect, Mr. Rowles?

01:29:12   7         MR. ROWLES:  Yes, Your Honor.

01:29:13   8         THE COURT:  Proceed with your redirect

01:29:18   9    examination, please, Mr. Rowles.

01:29:33  10              MR. ROWLES:  Thank you, Your Honor.

01:29:33  11                   REDIRECT EXAMINATION

01:29:34  12    BY MR. ROWLES:

01:29:34  13    Q.  Hello again, Dr. Conte.

01:29:38  14    A.  Hello.

01:29:40  15              MR. ROWLES:  Mr. Huynh, if I could get

01:29:42  16    Paragraph 83 of Professor Conte's report, please.

01:29:51  17    Q.  (By Mr. Rowles)  While this is coming up,

01:29:58  18    Professor Conte, do you recall being asked some questions

01:30:00  19    about a large table in Paragraph 83 of your report?  Do you

01:30:04  20    remember that?

01:30:04  21    A.  I do.

01:30:07  22    Q.  And --

01:30:11  23              MR. ROWLES:  And, Mr. Huynh, do we need a moment?

01:30:14  24         We might just need a moment, Your Honor.

01:30:22  25         Next, please -- next page, please, Mr. Huynh.
```

01:30:26  1    Q.  (By Mr. Rowles)  So, Professor Conte, you remember

01:30:28  2    answering some questions about this table in your expert

01:30:31  3    report, right?

01:30:33  4    A.  I do.

01:30:33  5    Q.  Now, I want to direct your attention to the very top of

01:30:37  6    the table with the column headings.  And can you tell me

01:30:40  7    what the column headings say?

01:30:41  8    A.  On the left it says:  Component.  And on the right, it

01:30:46  9    says:  Jobs Performed.

01:30:47  10   Q.  And now if we look at the row labeled Mitek MiSnap on

01:30:53  11   mobile device, do you see that, second from the bottom?

01:30:55  12   A.  Yes.

01:30:55  13   Q.  And so what is -- what are the jobs performed being

01:30:59  14   described in this row of the table?

01:31:00  15   A.  So this is defining -- this is listing the different

01:31:06  16   jobs that that module performs, including IQA threshold

01:31:13  17   checking, JPEG processing, image capture, corner tracking.

01:31:20  18   Q.  And are these bullet points sequential steps?

01:31:27  19   A.  Not at all.

01:31:30  20   Q.  Now, the fourth bullet there says:  Corners tracking.

01:31:30  21   Do you see that?

01:31:30  22   A.  Yes.

01:31:30  23   Q.  Does the Wells Fargo application do corner tracking or

01:31:34  24   corner detection at some point in the capture process?

01:31:36  25   A.  It does.  That's part of the analysis phase.

01:31:38   1   Q.   And what phase of the process does that have?

01:31:41   2   A.   That was that -- it happens after you -- I'm sorry.   It

01:31:49   3   happens -- after the preview image is received, that's when

01:31:51   4   you do that analyze frame on samplebuffer.

01:32:00   5   Q.   So it happens before the image is captured, fair?

01:32:03   6   A.   That's correct.

01:32:10   7          MR. MELSHEIMER:   Objection, leading, Your Honor.

01:32:10   8          THE COURT:   Sustained.

01:32:10   9          MR. MELSHEIMER:   Move that the answer be stricken.

01:32:11   10          THE COURT:   Restate the question, counsel.

01:32:13   11   Q.   (By Mr. Rowles)   Professor Conte, when does corners

01:32:15   12   tracking happen in the Wells Fargo app relative to the

01:32:18   13   capture of images?

01:32:19   14   A.   So it happens before the capture of images.   It's part

01:32:23   15   of the -- evaluating the monitoring criteria.   That's what

01:32:27   16   we saw.   And then that result, that's where that, if result

01:32:32   17   was yes, and then capture -- capture happens after that

01:32:36   18   where you put the -- the Post-it on the door and you record

01:32:40   19   the time and you pop up the rectangle saying success and

01:32:43   20   then you encode the JPEG.

01:32:48   21   Q.   And where is that bullet listed in this table?

01:32:50   22   A.   So you'll see image capture is the first bullet.   And

01:33:02   23   JPEG processing is the third bullet.   And IQA threshold

01:33:10   24   detection, monitoring criteria, that is the second bullet.

01:33:13   25   So these are not in order.   If I wanted them in order, I

01:33:16  1  would have numbered them and not used bullets.

01:33:18  2  Q.  Now, counsel asked you some questions about the JPEG

01:33:21  3  processing, right?

01:33:22  4  A.  Yes.

01:33:23  5  Q.  Let me ask this:  What -- you discussed in your direct

01:33:29  6  examination capture of a JPEG, correct?

01:33:32  7  A.  Yes.

01:33:32  8  Q.  Now, does anything happen to the JPEG check image after

01:33:38  9  it's captured in terms of processing?

01:33:40  10  A.  Yes.  You add extra metadata.

01:33:46  11  Q.  And did you discuss that metadata in your expert report

01:33:50  12  somewhere else?

01:33:50  13  A.  I did.

01:33:52  14  Q.  Could you turn in your notebook to Paragraph 253 of

01:33:56  15  your expert report?

01:34:03  16  A.  Here it is.

01:34:05  17  Q.  And -- and what -- what do you see at Paragraph 253?

01:34:09  18  A.  This is -- so I looked through each and every one of

01:34:14  19  the versions.  Here there's a key on the next page.

01:34:17  20  P means present in the version.  NP means not present.

01:34:23  21  U means version was unavailable to me.  C means commented

01:34:28  22  out.  UC means uncommented in version.  "A" means added

01:34:33  23  in -- in version.  And R means removed.

01:34:35  24        And what these are -- are that extra what we call

01:34:39  25  metadata added to the JPEG image.  This includes things

01:34:44  1  such as the capture time so that the Wells Fargo server can

01:34:48  2  see the time.

01:34:49  3  Q.  And does that metadata get added into the JPEG edit at

01:34:54  4  some point?

01:34:55  5  A.  It get -- it gets added into the JPEG right after

01:34:58  6  it's -- it's transcoded.

01:35:05  7          MR. ROWLES:  And, Mr. Huynh, if I could get

01:35:08  8  Slide 15, please?

01:35:25  9  Q.  (By Mr. Rowles)  Now, early -- earlier in your

01:35:27  10  cross-examination, you were asked a number of questions

01:35:29  11  about what the patent covers and does not cover.  Do you

01:35:32  12  recall that?

01:35:32  13  A.  Yes.

01:35:33  14  Q.  So could you summarize for the jury what the asserted

01:35:38  15  patents are about?

01:35:38  16  A.  So, again, these patents are about a processor

01:35:43  17  assessing -- assessing the image quality.  That's that

01:35:49  18  monitoring criterion.  It's about supplying corrected

01:35:53  19  feedback, move closer, hold steady.  And it's about once

01:35:58  20  you pass that monitoring criteria, then automatically

01:36:03  21  capturing an image when the criteria is satisfied.

01:36:05  22  Q.  And is that covered by the claims of the patents?

01:36:08  23  A.  Yes, each and every one of those is covered by the

01:36:11  24  claims of the patent.

01:36:17  25          MR. ROWLES:  Could you advance the slide,

| 01:36:19 | 1 | Mr. Huynh?  One more, please. |

01:36:19  1  Mr. Huynh?  One more, please.

01:36:21  2  Q.  (By Mr. Rowles)  Now, you discussed this portion of the

01:36:25  3  specification in the direction examination, correct?

01:36:29  4  A.  That's correct.

01:36:30  5  Q.  And you were asked some questions by Wells Fargo's

01:36:35  6  counsel, Mr. Melsheimer, about the word "obtain."  Do you

01:36:38  7  remember that?

01:36:39  8  A.  Yes.

01:36:39  9  Q.  And did you find the word "obtain" anywhere in the

01:36:43  10  patent specification?

01:36:45  11  A.  It is in the patent specification multiple times.  This

01:36:47  12  is one instance.

01:36:48  13  Q.  And so what -- excuse me, I didn't mean to cut you off,

01:36:50  14  Professor Conte.

01:36:51  15  A.  It's there in the next line, "obtained."

01:36:57  16  Q.  And so what -- what is obtaining a frame?  What part of

01:37:02  17  the invention is that describing?

01:37:03  18  A.  That's describing monitoring the image in the field of

01:37:14  19  view of the camera.

01:37:15  20  Q.  And does monitoring an image in the field of view of

01:37:21  21  the camera, does that appear in the claims of the patent?

01:37:23  22  A.  It does.

01:37:25  23       MR. ROWLES:  Can I get Slide 117, please,

01:37:28  24  Mr. Huynh?

01:37:29  25  Q.  (By Mr. Rowles)  Professor Conte, you were asked some

01:37:37  1  questions about this slide, as well.  Do you remember that?

01:37:38  2  A.  Yes.

01:37:38  3  Q.  And could you tell the jury what is the header in

01:37:42  4  the -- in the top of the far left column of this table?

01:37:47  5  A.  Monitoring criteria listed in the 5 -- in '571 patent.

01:37:52  6  Q.  And what does that mean?

01:37:53  7  A.  That means it's listed in the specification.

01:37:55  8  Q.  And are these examples of monitoring criteria described

01:38:01  9  in the claim or recited in the claim?

01:38:03  10  A.  The claim recites monitoring criteria.  The

01:38:07  11  specification gives this list.

01:38:08  12  Q.  And what are these monitoring criteria used for in the

01:38:12  13  Wells Fargo application?

01:38:14  14  A.  They're used to determine whether or not the check is

01:38:19  15  suitable for presenting to a depository.

01:38:23  16  Q.  Now, you were asked some questions about a bitmap in

01:38:27  17  comparison to a JPEG, at various points; do you remember

01:38:33  18  that?

01:38:33  19  A.  Yes.

01:38:33  20  Q.  And I think the example that was given was holding or

01:38:37  21  hovering a camera -- or the phone, excuse me, over a check

01:38:40  22  and a bitmap being read from an image sensor.  Do you

01:38:43  23  recall that discussion?

01:38:44  24  A.  Yes.

01:38:44  25  Q.  Now, in that example where you have a bitmap read from

01:38:51  1  the image sensor over a check, does the system know whether

01:38:54  2  the monitoring criteria are satisfied or not?

01:38:56  3  A.  No, not at that point.

01:38:59  4  Q.  And why is that?

01:38:59  5  A.  Because for each of those, once you obtain an image

01:39:06  6  that's being displayed, you have to then check the

01:39:10  7  monitoring criteria, that analyzeFrame:sampleBuffer.

01:39:16  8  Q.  And what about the JPEG image, does the system know

01:39:19  9  whether or not the JPEG image satisfies the monitoring

01:39:23  10  criteria?

01:39:23  11  A.  Yes, it does.  You don't create the JPEG image until

01:39:26  12  after you satisfy the monitoring criteria.

01:39:35  13        MR. ROWLES:  Mr. Huynh, if I could please get

01:39:46  14  Paragraph 412 from the expert report.

01:39:49  15  Q.  (By Mr. Rowles)  Now, you were asked a fair number of

01:39:51  16  questions about Paragraph 412 of your report, right,

01:39:55  17  Professor Conte?

01:39:55  18  A.  Yes.

01:39:55  19  Q.  And I want to direct your attention to the second full

01:39:58  20  sentence which begins:  A JPEG check image is created and

01:40:01  21  transmitted.  Do you see that?

01:40:03  22  A.  Yes.

01:40:03  23  Q.  Now, this is Paragraph 412 of the report, right?

01:40:07  24  A.  Yes.

01:40:09  25  Q.  Fair to say there are some other paragraphs in your

```
01:40:11    1   expert report, right?
01:40:12    2   A.   More than a couple.
01:40:13    3   Q.   Now, could you read -- could you turn in your book to
01:40:16    4   Paragraphs 251 and 252 for me?  And just let me know when
01:40:20    5   you're there.
01:40:33    6   A.   Yes, I'm there.
01:40:34    7   Q.   Now, is the concept of creating a JPEG check image and
01:40:39    8   transmitting a check image discussed elsewhere in your
01:40:42    9   report other than Paragraph 412?
01:40:44   10   A.   Yes, for example, in Paragraph 251.
01:40:48   11   Q.   And could you read that heading above Paragraph 251?
01:40:54   12   A.   Check image capture and preparation for transmission to
01:40:58   13   bank servers.
01:40:59   14   Q.   And so what is -- what is -- what did you describe in
01:41:02   15   Paragraph 251 of your expert report?
01:41:06   16   A.   So I describe that once the processor determines that
01:41:10   17   it's time to capture the check image to be used for
01:41:14   18   deposit -- I'm not going to lead you through all those
01:41:17   19   other sections -- the camera functionality controlled by
01:41:20   20   the processor then captures the check image.  Specifically,
01:41:24   21   the camera functionality creates a new color JPEG file,
01:41:29   22   transcoding the raw frame data obtained from the camera
01:41:32   23   sensor.
01:41:32   24   Q.   And what do you discuss in Paragraph -- in the next
01:41:36   25   paragraph, Paragraph 252?
```

01:41:38   1   A.   I then discuss that that JPEG becomes the check image

01:41:45   2   that is transmitted to the bank's server when the check

01:41:48   3   deposit is submitted, as I discussed in more detail

01:41:52   4   elsewhere in the report.

01:41:53   5   Q.   Do you see anything in Paragraph 251 that talks about

01:41:57   6   transmitting a JPEG or other check image to a bank server?

01:42:01   7   A.   No.

01:42:05   8   Q.   Professor Conte, were you in court yesterday afternoon

01:42:09   9   when Mr. Bueche testified and when some deposition videos

01:42:14  10   were played?

01:42:15  11   A.   Yes.

01:42:16  12   Q.   Let me ask this:  You're familiar with Mr. Saffici,

01:42:21  13   Wells Fargo's expert?

01:42:22  14   A.   Yes, I read his transcript -- deposition transcript.

01:42:26  15   Q.   So you've read the deposition transcript of Mr. Saffici

01:42:31  16   before yesterday?

01:42:31  17   A.   Yes.

01:42:35  18   Q.   And were you in court when the actual video of that

01:42:39  19   deposition was played?

01:42:39  20   A.   Yes, I was in court when it was played.

01:42:42  21         MR. ROWLES:  And, Mr. Huynh, if we could get

01:42:46  22   Page 147 of yesterday afternoon's trial transcript.

01:42:53  23   Q.   (By Mr. Rowles)  Mr. Melsheimer asked you some

01:42:54  24   questions about the plain and ordinary meaning of the word

01:42:58  25   capture.  Do you remember that?

01:42:59  1    A.  Yes.

01:42:59  2    Q.  And is the plain and ordinary meaning of the word

01:43:01  3    capture something that you applied when you did your

01:43:03  4    infringement analysis?

01:43:03  5    A.  Yes, I did.

01:43:08  6         MR. ROWLES:  And if we could highlight starting at

01:43:11  7    Line 9 down to Line 17, please?

01:43:13  8    Q.  (By Mr. Rowles)  And could you read that testimony from

01:43:21  9    Mr. Saffici's video testimony, please?

01:43:23  10   A.  Question:  You believe that it's covered by the claims

01:43:27  11   of the patent, correct, analyzing preview frames, making

01:43:31  12   decisions as to when the preview frames satisfy the

01:43:35  13   criteria, and then taking that frame that satisfies the

01:43:38  14   criteria.  Correct?

01:43:39  15        Answer:  Yes.  The alignment, the monitoring, and

01:43:43  16   the auto capture.

01:43:44  17        Question:  The answer to my question is yes,

01:43:48  18   correct?

01:43:48  19        Answer:  I believe that's -- that'd be correct.

01:43:52  20   Q.  Now, is the first part of that -- first question, is

01:43:56  21   that similar in any way to what the Wells Fargo system

01:44:00  22   does?

01:44:00  23   A.  Yes, in my detailed analysis, it's identical to what

01:44:03  24   the Wells Fargo system does.

01:44:04  25   Q.  Now, in terms of the meaning of capture in these

01:44:10   1   claims, does Wells Fargo's expert, Mr. Saffici, agree with

01:44:13   2   you or with Mr. Melsheimer?

01:44:17   3          MR. MELSHEIMER:  Objection, Your Honor.

01:44:21   4   Misleading -- I mean, objection, misstates the testimony.

01:44:25   5          THE COURT:  Overruled.

01:44:28   6   A.  He agrees with me.  He agrees that it's taking the

01:44:32   7   frame that satisfies the criteria.

01:44:36   8          MR. ROWLES:  Mr. Huynh, if you -- do you have the

01:44:38   9   excerpt of code from Lines 2278 to 20 -- I believe 2281

01:44:43   10  that was discussed?

01:44:45   11  Q.  (By Mr. Rowles)  While he gets that up, Professor

01:44:53   12  Conte, I want to ask you a little about source code.  You

01:44:55   13  discussed -- or Mr. Melsheimer asked you some questions

01:44:58   14  about your counterpart, so to speak, Dr. Villasenor.  Do

01:45:02   15  you remember that?

01:45:02   16  A.  Yes.

01:45:02   17  Q.  And -- and you -- I believe you said you reviewed

01:45:06   18  Mr. Villasenor's expert -- excuse me, Dr. Villasenor's

01:45:09   19  expert report in this matter, right?

01:45:11   20  A.  Yes, sir, I did.  I read it entirely.

01:45:13   21  Q.  Do you know whether or not Dr. Villasenor reviewed any

01:45:19   22  source code on the computers in Dallas, Texas?

01:45:23   23  A.  He did not.

01:45:25   24  Q.  And now -- now we have this line of code up.

01:45:31   25          Do you recall discussing these lines of code

01:45:34   1   starting at Line 2278?

01:45:35   2   A.   Yes.

01:45:37   3   Q.   And Mr. Melsheimer asked you some questions about

01:45:40   4   comments in code.   Do you recall that?

01:45:43   5   A.   Yes.

01:45:43   6   Q.   And a comment -- is a comment in code executed?

01:45:51   7   A.   No, a comment is not.

01:45:52   8   Q.   What about the code that we see here at Lines 2278

01:45:58   9   through 2280, is that code executed in the Wells Fargo

01:46:04   10  application?

01:46:04   11  A.   The code that contains this is executed in the Wells

01:46:11   12  Fargo application, but this is the title of that code.

01:46:15   13  It's not a comment, but it's like a comment.

01:46:19   14  Q.   So are Lines 2278 through 2280, specifically, are those

01:46:25   15  executed in the Wells Fargo application?

01:46:26   16  A.   They are -- the code below them is executed, but these

01:46:33   17  are not specifically executed, no.

01:46:35   18  Q.   You discussed some iPhone or iOS documentation.   Do you

01:46:42   19  recall that?

01:46:43   20  A.   Yes, I do.

01:46:43   21  Q.   And I think there was some discussion of a delegate or

01:46:46   22  delegation.   Do you recall that, generally?

01:46:48   23  A.   Yes.

01:46:48   24  Q.   In a -- in a standard iPhone camera application like

01:46:54   25  the one that comes preloaded on the phone, how are -- how

| | | |
|---|---|---|
| 01:46:59 | 1 | does the image capture process work? |
| 01:47:01 | 2 | A.  It works where the delegate will take the -- the image |
| 01:47:11 | 3 | and encode it into a JPEG file. |
| 01:47:14 | 4 | Q.  And how does that work in the Wells Fargo system? |
| 01:47:17 | 5 | A.  In the Wells Fargo system, the delegate first takes the |
| 01:47:22 | 6 | preview image, it analyzes it with |
| 01:47:28 | 7 | analyzeFrame:sampleBuffer.  If it passes that criteria, |
| 01:47:31 | 8 | then and only then does it encode it into a JPEG file. |
| 01:47:42 | 9 | MR. ROWLES:  Mr. Huynh, if we could have Slide 72, |
| 01:47:58 | 10 | please. |
| 01:47:58 | 11 | Q.  (By Mr. Rowles)  Professor Conte, you were asked a few |
| 01:48:00 | 12 | questions, I believe it was near the end of the |
| 01:48:02 | 13 | cross-examination, about changes in Mitek code over time. |
| 01:48:08 | 14 | Do you recall that? |
| 01:48:08 | 15 | A.  Yes. |
| 01:48:09 | 16 | Q.  Is any of the functionality that you discussed in your |
| 01:48:13 | 17 | direct examination, shown here on Slide 72, did that change |
| 01:48:17 | 18 | in any relevant part, over time? |
| 01:48:20 | 19 | A.  It did not. |
| 01:48:24 | 20 | Q.  And I think you made some reference to other code or |
| 01:48:28 | 21 | changes.  Do you generally remember that? |
| 01:48:31 | 22 | A.  Yes. |
| 01:48:31 | 23 | Q.  And did that code have any relevance to your |
| 01:48:35 | 24 | infringement analysis? |
| 01:48:36 | 25 | A.  No. |

01:48:37  1   Q.  And -- and why not?

01:48:39  2   A.  Well, because it was talking about other forms of

01:48:45  3   capture implemented by the Mitek software.

01:48:47  4   Q.  Now, Mr. Melsheimer asked you about the lines of code

01:48:52  5   starting at 2278, which we just saw an extra -- excerpt of,

01:48:58  6   right?

01:48:58  7   A.  Yes, yes.

01:48:59  8   Q.  Did Mr. Melsheimer ask you about any of the lines of

01:49:03  9   the code below that, 2323, 2326, and so on down to 2481?

01:49:09 10   A.  He did not.

01:49:15 11        MR. ROWLES:  Now, if we can get Slide 86, please.

01:49:22 12   Q.  (By Mr. Rowles)  I believe there was some discussion

01:49:24 13   about whether code trumps other pieces of information.

01:49:30 14   Generally remember that?

01:49:32 15   A.  Yes.

01:49:32 16   Q.  Now, I want to direct your attention to Step 3 in your

01:49:36 17   process diagram here.  Let me ask this:  The source code

01:49:44 18   that you described for capturing check images, where is

01:49:49 19   that source code executed in the process of the Wells Fargo

01:49:52 20   system?

01:49:54 21   A.  That's after you pass the analyze preview frame using

01:50:02 22   monitoring criteria, Step 2, that's in Step 3.

01:50:05 23        MR. ROWLES:  And if we could return to Slide 72,

01:50:09 24   please.

01:50:09 25   Q.  (By Mr. Rowles)  So having that process diagram in

| | | |
|---|---|---|
| 01:50:15 | 1 | mind, when does the code above the green box here, labeled |
| 01:50:21 | 2 | after monitoring criteria passed, when does that source |
| 01:50:26 | 3 | code execute in the Wells Fargo system? |
| 01:50:27 | 4 | A.  That code executes when a new preview frame comes in. |
| 01:50:31 | 5 | Q.  And the lines of code that are listed under the green |
| 01:50:34 | 6 | box, under after monitoring criteria passed, when do those |
| 01:50:42 | 7 | lines of code execute in the Wells Fargo system? |
| 01:50:43 | 8 | A.  Those lines execute if and only if the monitoring |
| 01:50:47 | 9 | criteria pass. |
| 01:50:50 | 10 | MR. ROWLES:  Nothing further.  Pass the witness, |
| 01:50:52 | 11 | Your Honor. |
| 01:50:52 | 12 | THE COURT:  Is there further cross-examination? |
| 01:50:54 | 13 | MR. MELSHEIMER:  Briefly, Your Honor.  May it |
| 01:50:56 | 14 | please the Court. |
| 01:50:56 | 15 | THE COURT:  You may proceed with your additional |
| 01:50:58 | 16 | cross-examination. |
| 01:50:58 | 17 | RECROSS-EXAMINATION |
| 01:50:59 | 18 | BY MR. MELSHEIMER: |
| 01:50:59 | 19 | Q.  Dr. Conte, you know who Mr. Saffici is, right? |
| 01:51:04 | 20 | A.  I -- I read the description of his job, yeah. |
| 01:51:07 | 21 | Q.  You know that he was not forming any infringement |
| 01:51:10 | 22 | analysis in this case, right? |
| 01:51:12 | 23 | A.  My understanding, I actually don't know his role in the |
| 01:51:17 | 24 | case.  I'm sorry. |
| 01:51:18 | 25 | Q.  Okay.  No one told you -- |

```
01:51:19   1           MR. ROWLES:  Your Honor, I think we need to
01:51:21   2   approach the bench.
01:51:21   3           THE COURT:  All right.  Approach the bench.
01:51:23   4           (Bench conference.)
01:51:35   5           THE COURT:  Yes.
01:51:36   6           MR. ROWLES:  First, Your Honor, he was their claim
01:51:38   7   construction expert, so his testimony is relevant to that.
01:51:41   8   But I worry that this is getting into the reason why he's
01:51:45   9   not here, which is that he was also a validity expert.
01:51:48  10           MR. MELSHEIMER:  Your Honor, they have injected
01:51:50  11   this guy into the infringement case.  It's totally
01:51:55  12   improper.  We objected to it.  They continue to do it.
01:51:58  13           They're now asking their infringement expert if he
01:52:02  14   agrees or disagrees with Mr. Saffici.  In fact, they said
01:52:06  15   does, Mr. Saffici agree with you?  So they're actually
01:52:09  16   getting him to read the mind of Mr. Saffici.  It's totally
01:52:12  17   improper.
01:52:13  18           We have to be able to establish, in fairness, that
01:52:15  19   this guy did not do an infringement analysis.  He did not
01:52:18  20   review the source code.  That's what Dr. Villasenor did.
01:52:22  21   And I'm not going to bring up what he did do, and I assume
01:52:25  22   this witness has been instructed not to bring it up.
01:52:28  23           But it would be really unfair if we didn't get to
01:52:30  24   point this out, given the shenanigans that are going on
01:52:34  25   with Mr. Saffici.
```

```
01:52:37   1              MR. ROWLES:  Your Honor, the only question --
01:52:37   2              THE COURT:  I haven't heard the word "shenanigans"
01:52:39   3    before, and you said that the Plaintiff has been unfairly
01:52:43   4    injecting this into the case.  I haven't heard you object
01:52:45   5    to anything they've injected into the case so far.
01:52:47   6              MR. MELSHEIMER:  Your Honor, we've objected
01:52:49   7    several -- we've objected several times.
01:52:52   8              THE COURT:  Are you talking about during the
01:52:54   9    trial, or are you talk about during pre-trial?
01:52:56   10             MR. MELSHEIMER:  During -- during pre-trial.  I
01:52:58   11   just objected that it was misleading and misstating his
01:53:02   12   testimony.  You overruled the objection.
01:53:04   13             We've talked about the issue of comparing the spec
01:53:07   14   to the accused product.  This is the mess -- and,
01:53:09   15   Your Honor, I'm just -- this is the potential of creating a
01:53:12   16   mess if we are -- we are not allowed to make these
01:53:16   17   corrections with this witness.  It's not fair to not let us
01:53:20   18   do that.
01:53:22   19             Obviously, Dr. Villasenor will have his own
01:53:24   20   opinions, but Mr. Saffici, everyone at this bench knows,
01:53:28   21   that that man did not offer a non-infringement -- a
01:53:31   22   non-infringement opinion.  Didn't happen.
01:53:34   23             MR. ROWLES:  Your Honor, we have --
01:53:35   24             THE COURT:  Let me hear from Mr. Rowles.
01:53:37   25             MR. ROWLES:  We have no problem with him
```

01:53:39  1   establishing that Mr. Saffici was not an infringement

01:53:41  2   expert.  However, he was a claim construction expert.

01:53:43  3        The question that was posed to Professor Conte had

01:53:46  4   to do with the plain and ordinary meaning of the word

01:53:48  5   "capture" to a person of ordinary skill in the art, which

01:53:51  6   is something that Mr. Saffici opined on.

01:53:53  7        So I think that we should be permitted to tell the

01:53:56  8   jury that he was a claim construction expert for Wells

01:53:58  9   Fargo if this is where we're going to go.

01:54:00  10        MR. MELSHEIMER:  Your Honor, the claim

01:54:01  11   construction is not the jury's job.  They're simply told

01:54:04  12   that you do that, and they don't get into that.  All that

01:54:07  13   would be -- to me would be unheard of to tell them

01:54:10  14   something like that.

01:54:11  15        All I want to establish is that this --

01:54:14  16   Your Honor, they're trying to show some expert we hired

01:54:18  17   said we infringe, and that's why we can't -- that's exactly

01:54:21  18   the point they're trying to make.  That's unfair.  You

01:54:24  19   shouldn't let them do that.  We should get an instruction

01:54:26  20   that says that's improper.

01:54:28  21        THE COURT:  Wait a minute.  Wait a minute.  You're

01:54:30  22   at the podium now.  They -- you know, you're back for

01:54:33  23   additional cross-examination.  And you're telling me that

01:54:38  24   during the redirect, they created this odor, as you put it,

01:54:44  25   that you had one objection that I overruled and that's the

01:54:47  1  source of all this odor that you're trying to correct?

01:54:50  2         MR. MELSHEIMER:  Your Honor, I'm entitled, I

01:54:51  3  believe, to make my own judgments about what's appropriate

01:54:54  4  to object versus what's appropriate to cross-examine a

01:54:56  5  witness on.

01:54:57  6         THE COURT:  You are, but you're not entitled to

01:54:59  7  sit there, not object, and then tell me when they get back

01:55:02  8  up to the podium they've created this horrible mess that I

01:55:05  9  now have to fix.

01:55:06 10         MR. MELSHEIMER:  Your Honor -- well, to be clear,

01:55:10 11  all I'm asking is that you let me inquire.  I'm not asking

01:55:15 12  for you to fix anything, actually.  I'm asking right now in

01:55:18 13  line with this objection that I be allowed to ask these

01:55:21 14  questions and clear this up, or else it will be an odor.

01:55:26 15         THE COURT:  Tell me precisely, Mr. Melsheimer,

01:55:29 16  what you're proposing to ask of this witness on cross.

01:55:31 17         MR. MELSHEIMER:  That he -- that he didn't do an

01:55:33 18  infringement analysis; that he wasn't an infringement

01:55:35 19  expert; that he didn't review all the source code; and that

01:55:38 20  he's never seen an infringement opinion from this witness

01:55:41 21  one way or the other.

01:55:42 22         THE COURT:  And you're talking about -- you're not

01:55:44 23  asking Professor Conte this about Professor Conte.  You're

01:55:48 24  asking Professor Conte this about who?

01:55:51 25         MR. MELSHEIMER:  Mr. Saffici, because Mr. Saffici

01:55:53  1    was brought up in the redirect.  That's the only reason

01:55:57  2    this is coming up.  And they asked him, Your Honor:  Does

01:56:02  3    Mr. Saffici agree with you and Wells Fargo?  That was my

01:56:05  4    objection.  But in any event, I think I can --

01:56:09  5          THE COURT:  You can ask the witness if his

01:56:12  6    understanding is that Mr. Saffici was not an infringement

01:56:16  7    expert and did not offer an infringement opinion.

01:56:18  8          MR. MELSHEIMER:  And did not review source code.

01:56:20  9          THE COURT:  No, those two questions.  I'll permit

01:56:23  10   that.  Because, quite honestly, I'm going to keep this

01:56:27  11   under -- I'm concerned that this will get out of hand if I

01:56:31  12   let you all do what you each think you need to do.

01:56:35  13          So I'm going to prescribe what you can do.  And in

01:56:37  14   light of what's happened so far, I'm going to permit the

01:56:40  15   Defendant to ask this witness to identify that Mr. Saffici

01:56:44  16   is not an infringement expert in this case and did not

01:56:48  17   offer a formal non-infringement opinion.  And then you're

01:56:51  18   going to -- then we're going to move on to something else.

01:56:54  19          MR. MELSHEIMER:  Understood, Your Honor.

01:56:54  20          THE COURT:  All right.  That's my ruling.

01:56:56  21          (Bench conference concluded.)

01:57:05  22          THE COURT:  Let's proceed.

01:57:06  23          MR. MELSHEIMER:  May it please the Court.

01:57:06  24   Q.  (By Mr. Melsheimer)  Dr. Conte, you know that

01:57:11  25   Mr. Saffici was not a non-infringement expert in this case

| | | |
|---|---|---|
| 01:57:14 | 1 | for Wells Fargo, correct? |
| 01:57:18 | 2 | A.  I -- I believe that's true. |
| 01:57:20 | 3 | Q.  And you know also, because he wasn't a non-infringement |
| 01:57:24 | 4 | expert for Wells Fargo, that he did not offer a |
| 01:57:29 | 5 | non-infringement opinion for Wells Fargo, true? |
| 01:57:31 | 6 | A.  I believe that's correct. |
| 01:57:36 | 7 | Q.  You were asked a question about Dr. Villasenor, whether |
| 01:57:44 | 8 | or not he reviewed the code in Dallas.  Do you remember |
| 01:57:49 | 9 | that question? |
| 01:57:50 | 10 | A.  Yes. |
| 01:57:50 | 11 | Q.  You weren't trying to suggest that he didn't review the |
| 01:57:53 | 12 | code, were you? |
| 01:57:54 | 13 | A.  I don't recall any indication in his report that he |
| 01:57:56 | 14 | did. |
| 01:57:57 | 15 | Q.  So is it your view -- |
| 01:57:59 | 16 | THE COURT:  Counsel, approach the bench. |
| 01:58:01 | 17 | (Bench conference.) |
| 01:58:10 | 18 | THE COURT:  Mr. Melsheimer, you specifically asked |
| 01:58:12 | 19 | me for permission to go into whether Mr. Saffici reviewed |
| 01:58:15 | 20 | the code when you were at the bench 30 seconds ago, and I |
| 01:58:18 | 21 | told you no.  And you just asked this witness that. |
| 01:58:21 | 22 | MR. MELSHEIMER:  Your Honor, I did not. |
| 01:58:23 | 23 | Respectfully, I asked Dr. Villasenor -- |
| 01:58:25 | 24 | THE COURT:  You said -- |
| 01:58:26 | 25 | MR. MELSHEIMER:  They made the point -- this was |

01:58:28  1   in direct response to a cross -- redirect question.  If I

01:58:31  2   said Saffici --

01:58:34  3          THE COURT:  You said "he" following all the

01:58:36  4   questions about Saffici.

01:58:37  5          MR. MELSHEIMER:  Well, Your Honor, I'll make it

01:58:38  6   very clear.  I was in no way -- I was trying to address

01:58:41  7   this point.

01:58:41  8          THE COURT:  Clarify it was not Saffici.

01:58:45  9          MR. MELSHEIMER:  I will do that.  I will do that.

01:58:48 10          (Bench conference concluded.)

01:58:51 11          THE COURT:  Let's proceed.  Restate your question,

01:58:53 12   counsel.

01:58:53 13          MR. MELSHEIMER:  May it please the Court.

01:58:54 14   Q.  (By Mr. Melsheimer)  Dr. Conte, my question's about

01:58:57 15   Dr. Villasenor.  Are you with me?

01:58:58 16   A.  Yes.

01:59:01 17   Q.  And your -- is it your testimony that Dr. Villasenor

01:59:05 18   did not review the source code in this case?

01:59:07 19   A.  I don't recall a section in his report where he said he

01:59:11 20   did.

01:59:12 21   Q.  You were shown some information from the specification

01:59:22 22   of the patent on your redirect examination?

01:59:25 23   A.  Yes.

01:59:25 24   Q.  You understand, don't you, that infringement -- that

01:59:30 25   someone cannot infringe the specification of a patent; it

01:59:34   1   has to be infringement of a claim of a patent?  You

01:59:37   2   understand that, right?

01:59:39   3   A.  Yes.

01:59:48   4   Q.  And with respect to exhibit -- the Paragraph 83 of your

01:59:59   5   report, sir, I just want to end with that.  You were asked

02:00:11   6   about this in your -- in your redirect examination.

02:00:19   7          MR. MELSHEIMER:  Your Honor, may I approach the

02:00:21   8   counsel table to get a highlighter?

02:00:23   9          THE COURT:  Yes, you may.

02:00:25   10  Q.  (By Mr. Melsheimer)  And I believe your testimony was

02:00:33   11  that it was not sequential?

02:00:36   12  A.  No.  My testimony was that these were not ordered

02:00:44   13  steps.  I'm an engineer.  Sorry.

02:00:47   14  Q.  So you view sequence as being something different from

02:00:52   15  the ordered steps.  I want to use your words.

02:00:54   16          Ordered -- you don't view these as ordered steps

02:00:57   17  is what you're telling the jury, right, but you don't

02:01:01   18  disagree --

02:01:03   19          THE COURT:  Well, let's let him answer your first

02:01:06   20  question before you ask the next question.

02:01:09   21          MR. MELSHEIMER:  I'm sorry, Your Honor.

02:01:10   22          THE COURT:  You asked him if he -- let's see.

02:01:12   23  Q.  (By Mr. Melsheimer)  You don't view these as ordered

02:01:14   24  steps, correct?

02:01:15   25  A.  That's correct.

| 02:01:15 | 1 | THE COURT:  Okay. |

02:01:16   2   Q.  (By Mr. Melsheimer)  But the first thing in your list

02:01:20   3   is image capture, right?

02:01:22   4   A.  Specifically, it's image capture, front and rear, auto

02:01:29   5   and manual capture modes.

02:01:30   6   Q.  And this thing on the bottom, corners tracking, do you

02:01:36   7   see that?

02:01:37   8   A.  Yes.

02:01:39   9   Q.  Are you saying that should go in IQA threshold checking

02:01:43  10   or somewhere else?

02:01:53  11   A.  When I wrote this, I put it as a separate feature.

02:01:57  12   Q.  But are you saying now, upon reflection, in front of

02:02:00  13   the ladies and gentlemen of the jury, that you believe that

02:02:02  14   corners tracking actually should be part of IQA threshold

02:02:06  15   checking?

02:02:06  16   A.  I wouldn't quite put it that way.

02:02:11  17   Q.  Where would you put it, sir?  Would you put it -- would

02:02:14  18   you put it No. 2, 2A, or 3?

02:02:17  19   A.  These are not sequential, sir.

02:02:24  20   Q.  Well, you would put it before IQA threshold checking,

02:02:28  21   right aligned with IQA threshold checking, or after IQ --

02:02:34  22   IQA threshold checking in this chart?

02:02:37  23   A.  These are not sequential, sir.  I wouldn't change the

02:02:41  24   order that I wrote these in because they're not sequential.

02:02:43  25   Q.  Where does corners tracking occur, sir, in the Mitek

```
02:02:49   1   auto snap -- auto capture -- that's a word salad.
02:02:54   2         Where does image -- where does corners tracking
02:03:00   3   occur in the Mitek MiSnap software, sir?
02:03:04   4   A.  In the iPhone version, it occurs in analyze frame.
02:03:14   5   Q.  Is that the same thing as IQA threshold check?
02:03:18   6   A.  IQA threshold checking was a Mitek, I believe, term for
02:03:24   7   aspects of monitoring criteria.
02:03:26   8   Q.  And is that the same thing as what you just described?
02:03:29   9   A.  No, it's not the same thing.
02:03:30  10   Q.  But those are the words that you used, IQA threshold
02:03:35  11   checking?
02:03:35  12   A.  Yes.
02:03:36  13   Q.  The source code you looked at had a title called
02:03:55  14   DevApp.  Do you recall that?
02:03:57  15   A.  I need to see it.  I'm sorry.
02:04:03  16   Q.  The version of the software you looked at was what's
02:04:07  17   called a DevApp version.  Do you know that or not?
02:04:11  18   A.  I don't recall it being called DevApp.
02:04:15  19   Q.  Do you have any understanding of what DevApp means?
02:04:18  20   A.  I would have to speculate.
02:04:21  21   Q.  I don't want you to do that.  Thank you, sir.
02:04:26  22         MR. MELSHEIMER:  Your Honor, pass the witness.
02:04:27  23         THE COURT:  All right.  Does the Plaintiff have
02:04:28  24   further redirect?
02:04:30  25         MR. ROWLES:  No, Your Honor.
```

| | | |
|---|---|---|
| 02:04:31 | 1 | THE COURT:  Then, Professor Conte, you may step |
| 02:04:32 | 2 | down. |
| 02:04:33 | 3 | THE WITNESS:  Thank you, sir. |
| 02:04:39 | 4 | THE COURT:  Plaintiff, call your next witness. |
| 02:04:41 | 5 | MS. GLASSER:  USAA calls Mr. Matthew Calman. |
| 02:04:47 | 6 | Your Honor, permission for Mr. Sheasby to assist |
| 02:04:52 | 7 | in the handing out of binders? |
| 02:04:53 | 8 | THE COURT:  That will be fine. |
| 02:04:55 | 9 | If you'll come forward and be sworn, sir. |
| 02:05:06 | 10 | (Witness sworn.) |
| 02:05:11 | 11 | THE COURT:  If you'll come around, sir, and have a |
| 02:05:13 | 12 | seat on the witness stand. |
| 02:05:14 | 13 | Mr. Calman, I understand you have a medical |
| 02:05:16 | 14 | condition that may require you to put an eyedrop in your |
| 02:05:18 | 15 | eyes from time to time? |
| 02:05:19 | 16 | THE WITNESS:  Yes, sir, that's correct. |
| 02:05:20 | 17 | THE COURT:  You have permission to do that if you |
| 02:05:22 | 18 | need to. |
| 02:05:23 | 19 | THE WITNESS:  Thank you. |
| 02:05:25 | 20 | MR. SHEASBY:  Your Honor, may I clear the binders? |
| 02:05:27 | 21 | THE COURT:  Yes, you may. |
| 02:05:54 | 22 | All right.  Ms. Glasser, you may proceed. |
| 02:05:57 | 23 | MS. GLASSER:  Thank you, Your Honor. |
| 02:05:57 | 24 | MATTHEW CALMAN, PLAINTIFF'S WITNESS, SWORN |
| 02:05:57 | 25 | DIRECT EXAMINATION |

```
02:05:57   1   BY MS. GLASSER:
02:05:57   2   Q.  Good afternoon, Dr. -- Mr. Calman.
02:06:00   3   A.  Good afternoon.
02:06:01   4   Q.  Could you please start by describing for us at a high
02:06:05   5   level your professional background?
02:06:07   6   A.  Sure.  I'm happy to.
02:06:09   7        So I began --
02:06:13   8   Q.  Let me pause you.  It looks like we're having a little
02:06:16   9   bit of an EV issue.
02:06:18  10        MS. GLASSER:  Mr. Huynh?
02:06:25  11        I'm so sorry, Your Honor.  Permission to approach
02:06:29  12   Mr. Huynh?
02:06:30  13        THE COURT:  Take a -- take a moment.  Let's get it
02:06:32  14   straight at the beginning.
02:07:09  15        MS. GLASSER:  Apologies to Your Honor and the
02:07:11  16   ladies and gentlemen of the jury.  We'll just go ahead and
02:07:13  17   manually advance them so we don't keep folks waiting.
02:07:16  18        THE COURT:  That will be fine.
02:07:19  19        MS. GLASSER:  May we please have the next slide?
02:07:22  20   Q.  (By Ms. Glasser)  Mr. Calman, could you please describe
02:07:24  21   for us an overview of your professional background?
02:07:26  22   A.  Sure.  Happy to.  So my name is Matthew Calman.  I
02:07:30  23   attended a couple of years of college at Carnegie-Mellon
02:07:32  24   University.  I was a math major for those years.  I didn't
02:07:36  25   graduate.  I went straight to work.  I was ready to go.
```

02:07:39  1          And I went to work in the financial services

02:07:41  2    industry.  Years later, I went back and got my MBA, my

02:07:46  3    Master's in business administration at Georgia State

02:07:50  4    University.

02:07:50  5    Q.  And let me pause you there.  Sir, did you receive any

02:07:53  6    academic honors while you were receiving your graduate

02:07:56  7    degree?

02:07:57  8    A.  I did.  I won the George J. Malanos Award for academic

02:08:05  9    excellence for being No. 1 in my class.

02:08:08  10   Q.  Would you please describe an overview of your industry

02:08:11  11   experience at Bank of America?

02:08:12  12   A.  So the bulk of my career was at Bank of America.  I was

02:08:15  13   there for 27 years in a variety of operations and

02:08:20  14   technology leadership roles.  I've highlighted two relevant

02:08:25  15   positions while I was at the bank.

02:08:27  16          The first, I was process design executive for what

02:08:33  17   was the image transformation -- transforming the bank's

02:08:37  18   paper traditional check processing to image processing.

02:08:42  19   And in doing that, I led a team with about 400

02:08:48  20   technologists and business analysts through all the aspects

02:08:52  21   of modifying our systems and our processes and procedures

02:08:54  22   to handle image instead of paper.

02:08:56  23   Q.  Sir, at that point in time, can you give us a sense,

02:09:01  24   how was check imaging done in the banking system?

02:09:06  25   A.  Well, thinking back, you have to imagine sort of check

02:09:11  1  factories.  We had almost two dozen processing centers at

02:09:15  2  Bank of America with hundreds and some with thousands of

02:09:19  3  workers operating specialized equipment, these large check

02:09:22  4  scanners, large trays full of checks, many, many, many

02:09:24  5  checks.

02:09:25  6       And these processing systems and machines would

02:09:27  7  run -- some machines ran as fast as a hundred thousand

02:09:31  8  documents per hour.  So, really, industrial scale equipment

02:09:34  9  in order to process the millions of checks we had to get

02:09:37  10 through every day.

02:09:38  11 Q.  Opposing counsel mentioned earlier today something

02:09:43  12 called Check 21, and we went through that pretty quickly.

02:09:48  13 Can you give us an overview of what is check 21 and what

02:09:52  14 was your involvement with that?

02:09:53  15 A.  So this was the law that was passed in 2003, and then

02:09:58  16 we had one year before it became effective in 2004 to do

02:10:01  17 this big image transformation that I was speaking of.

02:10:04  18      And what Check 21 did, essentially, was to allow

02:10:08  19 an image of a check to be the legal equivalent of the

02:10:12  20 original check.  So that -- kind of like email versus

02:10:15  21 postal mail.

02:10:17  22      And so instead of having to move these many

02:10:20  23 millions of checks per day all over the country, in some

02:10:23  24 cases by jet aircraft, private jets flying checks around,

02:10:27  25 we could now use the power of image to make those kinds of

02:10:33   1   transfers happen much, much quicker, much cheaper, and more

02:10:37   2   reliably.

02:10:38   3   Q.   What was your personal involvement in Check 21?

02:10:41   4   A.   So for me, it was all about implementation, and taking

02:10:47   5   these new rules and making them real, bringing that to life

02:10:52   6   with bank operations that ran on image instead of on paper.

02:10:56   7   Q.   Now, tell us about your roles starting in 2006 when you

02:11:04   8   shifted into the position of research and development

02:11:07   9   executive?

02:11:07   10   A.   So after a couple of years of work on this

02:11:10   11   implementation of check image, I became an R&D, or research

02:11:16   12   and development, executive at the bank.   And I ran gateway

02:11:20   13   innovation lab, which was a lab environment where we worked

02:11:22   14   to bring other new technologies that were just emerging,

02:11:25   15   just coming into existence and coming into use, and how

02:11:30   16   those might find their way into future products and apps

02:11:33   17   for the bank.

02:11:34   18        And so I've listed a couple here.   Biometrics, you

02:11:38   19   know, so you can use your thumb to unlock your phone.

02:11:41   20   Augmented reality.   And, in fact, my team built Bank of

02:11:45   21   America's first prototype for mobile deposit.

02:11:53   22   Q.   What time frame were you working on the mobile deposit

02:11:57   23   prototype?

02:11:57   24   A.   So that prototype in particular was at the end of 2008,

02:12:02   25   first few months of 2009.

02:12:04   1   Q.  And back at that time frame, was the prototype

02:12:09   2   successful from a commercial viability standpoint?

02:12:12   3   A.  At this point, the prototype was just primitive.  At

02:12:17   4   that time, really the common belief within the check

02:12:20   5   processing industry was that cell phones couldn't do that

02:12:23   6   sort of thing.  So this prototype proved in Bank of

02:12:27   7   America's test environment that you actually could capture

02:12:31   8   check images with a phone and get them all the way through

02:12:34   9   to successfully deposit.

02:12:37  10   Q.  And you said it wasn't commercially valuable -- viable.

02:12:41  11   Can you elaborate on why that was the case?

02:12:44  12   A.  Well, this was, again -- it was just a test system.  It

02:12:48  13   wasn't even a real app, per se.  It was just enough, just

02:12:52  14   enough to demonstrate that some images, not all of them,

02:12:56  15   but some images could be captured with a phone of the day,

02:13:00  16   and processed all the way through to deposit.

02:13:02  17   Q.  And did you ever work with the vendor, who's been

02:13:06  18   mentioned a few times here in the courtroom, called Mitek?

02:13:10  19   A.  We did.  Their software was involved in that primitive

02:13:14  20   prototype I mentioned.

02:13:15  21   Q.  Was that software manual capture at that time or auto

02:13:19  22   capture?

02:13:19  23   A.  Oh, it was manual capture.  We -- that was it.

02:13:25  24   Q.  When you left Bank of America in 2013, did Bank of

02:13:31  25   America yet have a commercially available auto capture

```
02:13:35   1   product?
02:13:35   2   A.   No, not yet.
02:13:37   3   Q.   Approximately how far behind USAA was the rest of the
02:13:44   4   industry at that time?
02:13:45   5   A.   Well, for -- certainly for Bank of America, we were
02:13:49   6   three years behind.  Bank of America didn't release its
02:13:52   7   manual capture solution until 2012.  And it wasn't -- as I
02:13:56   8   said, as you said, until after I left, that they even
02:14:00   9   released auto capture.
02:14:01  10   Q.   Did USAA have a reputation in the industry?
02:14:06  11   A.   Well, yes, they were the pioneer.  They invented this
02:14:10  12   whole -- this whole technology and capability to use a
02:14:14  13   smartphone to capture an image of a check of sufficient
02:14:17  14   quality to make it all the way through to deposit.
02:14:21  15   Q.   Now, sir, are you personally the inventor on any
02:14:25  16   patents?
02:14:25  17   A.   I am.
02:14:28  18   Q.   Approximately how many, if you know?
02:14:30  19   A.   I'm a named inventor on 96 issued U.S. patents.
02:14:36  20   Q.   Sir, you left Bank of America in 2013; is that right?
02:14:42  21   A.   That's right.
02:14:42  22   Q.   Are you employed today?
02:14:43  23   A.   Yes.  I have my own consultancy.  At that point, our
02:14:47  24   kids were grown and out of the house, and it seemed like a
02:14:50  25   good time to start my own thing.
```

| | | |
|---|---|---|
| 02:14:51 | 1 | Q.  What do you do as part of your consultancy? |
| 02:14:57 | 2 | A.  So I consult to U.S. and Canadian banks and banking |
| 02:15:03 | 3 | software companies on things like innovation. |
| 02:15:06 | 4 | Q.  Did USAA retain you to perform consulting work and |
| 02:15:10 | 5 | analysis in connection with this case? |
| 02:15:11 | 6 | A.  They did. |
| 02:15:12 | 7 | Q.  Are you being paid for your work on this case, sir? |
| 02:15:14 | 8 | A.  I am.  My customary rate for this work is 550 per hour. |
| 02:15:19 | 9 | Q.  Is that compensation in any way at all dependent on the |
| 02:15:22 | 10 | substance of your opinions or the outcome of this case? |
| 02:15:26 | 11 | A.  No, not at all. |
| 02:15:28 | 12 | MS. GLASSER:  Your Honor, USAA tenders Mr. Calman |
| 02:15:31 | 13 | as an expert on banking technology and operations. |
| 02:15:34 | 14 | THE COURT:  Is there objection? |
| 02:15:35 | 15 | MR. MELSHEIMER:  May it please the Court.  No |
| 02:15:37 | 16 | objection, Your Honor. |
| 02:15:37 | 17 | THE COURT:  All right.  Then the Court recognizes |
| 02:15:40 | 18 | this witness as an expert in those designated fields. |
| 02:15:42 | 19 | Continue, please. |
| 02:15:45 | 20 | MS. GLASSER:  Could we have the next slide, |
| 02:15:48 | 21 | please? |
| 02:15:48 | 22 | Your Honor, may I approach to receive the clicker? |
| 02:15:51 | 23 | THE COURT:  You may. |
| 02:15:52 | 24 | MS. GLASSER:  Thank you very much. |
| 02:16:11 | 25 | Q.  (By Ms. Glasser)  Did you form any opinions relating to |

02:16:14   1    the value of the USAA patents that are at issue in this

02:16:16   2    lawsuit?

02:16:16   3    A.  I did.  As we have on the slide, I had a couple of

02:16:23   4    assignments.  I was -- and opinions that resulted from that

02:16:26   5    work.

02:16:27   6            First, I've rendered my opinion on the

02:16:31   7    significance of auto capture and that it is a must-have

02:16:35   8    technology necessary for really any commercially viable

02:16:39   9    MRDC, or mobile remote deposit capture system.

02:16:45   10           And, as well, I was asked to do an apportionment

02:16:48   11   analysis, and what that means is I was asked to isolate the

02:16:53   12   value of the MRDC channel or system attributable solely to

02:16:59   13   the patented USAA auto capture portion.

02:17:04   14           And my conclusion -- and we'll talk through this,

02:17:06   15   of course -- but my conclusion was that at least 40 percent

02:17:10   16   of the total value of this new MRDC channel is attributable

02:17:15   17   to auto capture.

02:17:16   18   Q.  Before we get into the details of your opinions, what

02:17:20   19   sorts of information did you review in order to assess

02:17:24   20   those issues?

02:17:25   21   A.  So on the next slide, we've got a list.  I worked

02:17:30   22   through many different types of information.  Of course,

02:17:33   23   the USAA's asserted patents, number one, as well as system

02:17:39   24   documentation, business documents, both, you know, email

02:17:43   25   and presentations and those kinds of things, mobile deposit

02:17:48   1   data, the actual operational data that these systems report

02:17:52   2   themselves, testimony from other witnesses, industry

02:17:57   3   reports, marketing materials, as well as source code

02:18:02   4   alongside Dr. Conte.

02:18:04   5   Q.  Did you review testimony by any of the Wells Fargo

02:18:09   6   experts?

02:18:09   7   A.  I did.

02:18:10   8   Q.  And did you find that, at a high level, there were any

02:18:13   9   areas of agreement that you had with any of Wells Fargo's

02:18:17  10   experts?

02:18:18  11   A.  Yes, indeed.  And on this slide, we see Mr. Bill

02:18:23  12   Saffici, who I knew in the industry.  And we agree that the

02:18:27  13   patents-in-suit introduce autonomous monitor and corrective

02:18:34  14   feedback.  That's what these patents are all about.

02:18:36  15         Mr. Saffici and I agree that those are referred to

02:18:39  16   in the industry in jargon as auto capture.  That's what it

02:18:44  17   is.

02:18:44  18         And that the patents claim a technique to obtain

02:18:49  19   an image of sufficient quality that the deposit will be

02:18:51  20   successful in all those downstream systems.  And, again,

02:18:54  21   Mr. Saffici and I agree.

02:18:55  22   Q.  Focusing on that concept of having an image of

02:19:00  23   sufficient quality, could you explain for us, is there a

02:19:03  24   difference between what a human eye views as sufficient

02:19:08  25   quality for a check and what a machine processing it

02:19:12  1  ultimately will view as sufficient?

02:19:14  2  A.  Yes, indeed.  And you've heard this discussed before,

02:19:18  3  but I'll reaffirm that there is indeed a difference between

02:19:22  4  what a human can do in terms of looking at a document and

02:19:24  5  reading the information on a document versus what a

02:19:28  6  computer can do.

02:19:30  7        And it's not so easy for a human to know for sure

02:19:33  8  what's going to be readable by a computer, and there's

02:19:36  9  variations between people as to, you know, you may think

02:19:40  10  it's readable, I may not.  But a computer knows what a

02:19:44  11  computer can read.

02:19:45  12  Q.  What about between individual people, is there any

02:19:50  13  substantial variation between how easy or how hard it is

02:19:54  14  for individual people to capture useable check images?

02:19:58  15  A.  Oh, well, yes.  On the one hand, for some people, it's

02:20:03  16  really easy.  It's even fun to -- to do a check capture.

02:20:08  17        For other people, it's difficult -- even very

02:20:11  18  difficult to get the system to work for them.  There's

02:20:13  19  just -- people are different, and they use -- whenever

02:20:17  20  there's humans and technology coming together, it works

02:20:21  21  differently for each person.

02:20:22  22  Q.  And how does auto capture assist with that

02:20:26  23  differentiation between people?

02:20:27  24  A.  Well, the whole concept here is to improve or increase

02:20:32  25  the number of conforming images.  And so if we take the

02:20:36   1   human out of the equation, and we let the computer to

02:20:39   2   decide what a computer can read, it opens up access to the

02:20:43   3   mass market.

02:20:44   4        It means that instead of just those techies, you

02:20:47   5   know, who are really good at apps being the ones who can

02:20:50   6   use mobile remote deposit capture successfully, it means

02:20:53   7   everyone.  The mass market has a good chance of being

02:20:56   8   successful.

02:20:59   9   Q.  Now, turning to the next slide, I think this may have

02:21:02   10  been mentioned briefly during the openings, but can you

02:21:05   11  identify for the jury exactly what is this document along

02:21:09   12  with this exhibit number?

02:21:10   13  A.  So the yellow sticker, it's Plaintiff's Exhibit --

02:21:14   14  excuse me -- Plaintiff's Exhibit No. 5.  This is a two --

02:21:20   15  2017 industry benchmarking report comparing the top 15

02:21:25   16  banks and their mobile remote deposit capture solutions.

02:21:29   17  And this is by a specialty consulting firm named Futurion.

02:21:32   18  So you may have heard this Futurion report mentioned.

02:21:35   19  Q.  When you say the top 15 banks being the focus of this

02:21:38   20  particular study, how did this entity identify the 15?

02:21:43   21  A.  Sure.  Typically, this is the -- you know, big banks,

02:21:46   22  the size of their assets, the largest banks, as measured by

02:21:51   23  dollars and cents.

02:21:52   24  Q.  So not necessarily in terms of quality, but just total

02:21:55   25  number of deposits?

| | | |
|---|---|---|
| 02:21:56 | 1 | A.  Or asset size.  Total deposits in the bank. |
| 02:22:00 | 2 | Q.  Now, how does this 2017 industry report relate to what |
| 02:22:06 | 3 | you were describing about the difference between a human |
| 02:22:10 | 4 | and a machine's ability to determine sufficiency? |
| 02:22:17 | 5 | A.  This is just what I was talking about.  The major |
| 02:22:20 | 6 | impediment to mobile deposit is the inability to get a |
| 02:22:24 | 7 | clear picture.  We have to be able to see the information |
| 02:22:27 | 8 | on the face of the check in order for that image to be a |
| 02:22:30 | 9 | legal replacement for that original paper document. |
| 02:22:32 | 10 | And so if the major impediment is getting a good |
| 02:22:36 | 11 | picture, what auto capture did was alleviate that obstacle |
| 02:22:41 | 12 | and make it possible for many, many more people to be |
| 02:22:44 | 13 | successful with mobile remote deposit capture. |
| 02:22:45 | 14 | Q.  Did you have the opportunity to review any Wells Fargo |
| 02:22:50 | 15 | expert testimony on this specific issue? |
| 02:22:53 | 16 | A.  I did.  And, again, Mr. Saffici and I are in total |
| 02:22:56 | 17 | agreement that auto capture is widely acknowledged in the |
| 02:23:03 | 18 | industry as the foundation for a successful mobile |
| 02:23:07 | 19 | remote -- mobile check deposit system. |
| 02:23:09 | 20 | Q.  You mentioned earlier that some of the initial mobile |
| 02:23:15 | 21 | deposit systems were manual capture; is that right? |
| 02:23:17 | 22 | A.  Yes. |
| 02:23:17 | 23 | Q.  So why is it the case that today, auto capture is the |
| 02:23:22 | 24 | foundation for successful mobile deposit? |
| 02:23:24 | 25 | A.  Well, when mobile remote deposit capture first came out |

02:23:30  1   as a manual solution, it was successful.  It was even more

02:23:33  2   successful than expected.  But that performance wasn't

02:23:39  3   sustainable with the current technology of that day, with

02:23:42  4   manual only.  And that was for two reasons.

02:23:44  5          First, the error rates with that manual capture

02:23:54  6   solution were much worse than with traditional paper

02:23:55  7   processing or traditional image processing when you would

02:23:56  8   go to an ATM or go to a teller.

02:23:58  9          And, second, it was those early adopters.  It was

02:24:03  10  the tech savvy people who first started using it.  And in

02:24:06  11  order to expand beyond that small group, something had to

02:24:09  12  be done.

02:24:10  13         And so that something was auto capture.

02:24:15  14  Q.  Did USAA and its customers, its members, experience

02:24:23  15  these benefits that you've been describing, after the

02:24:26  16  technology was introduced in 2013?

02:24:28  17  A.  Yes, indeed.  Auto capture had a noticeable improvement

02:24:32  18  at USAA.

02:24:33  19  Q.  Have you seen any actual numerical data on whether the

02:24:37  20  patented auto capture technology increased acceptance rates

02:24:41  21  or otherwise stated, decreased failure rates at USAA?

02:24:46  22  A.  I did.

02:24:47  23  Q.  What are we looking at here?

02:24:48  24  A.  So on this slide, we're demonstrating that auto capture

02:24:53  25  significantly reduced the failure rate.

02:24:57  1          So on the left, April 2013, we have the full

02:25:01  2    month's performance on the iOS, the Apple app.  In the full

02:25:08  3    month before auto capture came along, USAA's members had a

02:25:11  4    15.97 percent failure rate, roughly 16 percent.

02:25:17  5          On the right, in the full month of June, after

02:25:21  6    auto capture was launched, those same users in iOS

02:25:26  7    experienced 9.31 percent.  And what changed in the middle?

02:25:31  8    Well, what changed was auto capture.  Auto capture came in.

02:25:34  9          And that's a -- but the difference between this

02:25:38  10   nearly 16 percent and this little more than 9 percent, the

02:25:42  11   difference there is 6.6 percentage points.

02:25:47  12          But keep in mind that's just the percentage

02:25:49  13   points.  The actual rate of failure decrease was 41.69

02:25:54  14   percent.  That's a big difference.

02:25:56  15   Q.  Sir, can you elaborate on that 41 percent term, how you

02:26:00  16   derived it, and how it relates to the impact on the actual

02:26:04  17   people, the customers?

02:26:05  18   A.  Sure.  And you're going to hear a lot of talk about

02:26:08  19   percentages today and -- and error rates and so forth.  But

02:26:11  20   to put it in human terms, think of a hundred users.  Before

02:26:17  21   auto capture, almost 16 people out of a hundred using the

02:26:20  22   app had errors.

02:26:23  23          After auto capture, it was much closer to about 9

02:26:27  24   people out of a hundred that were having errors.  That's

02:26:30  25   the difference in human terms, and that's a reduction of

02:26:34  1  about 42 percent between those 16 or so people and those

02:26:39  2  nine or so people out of each 100 that were having errors.

02:26:45  3  Q.  Now, why is it particularly relevant to focus on iOS,

02:26:50  4  the Apple operating system for this data point?

02:26:52  5  A.  Sure.  So at that point in time, three-quarters of the

02:26:58  6  USAA app users for MRDC were using iPhone.  Only

02:27:02  7  one-quarter were using Android.  And USAA released Android

02:27:07  8  a couple of months later.

02:27:09  9  Q.  Were there any other differences in terms of how

02:27:13  10  accessible calculations were on iOS versus on Android?

02:27:17  11  A.  Well, so this was in 2013.  And keep in mind that there

02:27:22  12  were a lot of Android phones then that just didn't run apps

02:27:25  13  as consistently the way that iPhones all sort of ran apps

02:27:31  14  consistently.  So there was some difference in the iOS

02:27:35  15  data, as compared to the Android data, based upon sort of

02:27:41  16  differences in the phones people were using at that time.

02:27:44  17  Q.  Were you able to obtain access in this litigation to

02:27:48  18  Wells Fargo's documents discussing Wells Fargo's failure

02:27:55  19  rates?

02:27:56  20  A.  Yes, I was.

02:27:56  21  Q.  Did Wells Fargo provide any information regarding what

02:28:00  22  its expectations were for how much auto capture would

02:28:05  23  decrease its failure rates?

02:28:06  24  A.  They did, yes.  So we know from several documents and

02:28:14  25  places in USAA -- excuse me, in Wells Fargo's history and

02:28:17  1  documents, that they expected this similar kind of

02:28:20  2  significant failure reduction.

02:28:23  3        So Mr. Ajami, who is a senior vice president at

02:28:27  4  Wells Fargo, anticipated a 75 to 90 percent increase in

02:28:31  5  success.  So to go from a 75 percent rate to 90 percent

02:28:36  6  after auto capture, and he promoted this in several

02:28:40  7  documents that we saw.

02:28:41  8        For example, we've got PX-489 here.  And you'll

02:28:45  9  see that's called a mobile roadmap.  Oftentimes inside

02:28:50  10  banks, a roadmap document is used to explain features that

02:28:53  11  are coming down the road.  Next couple of years, here's the

02:28:56  12  stuff we're going to add.  It's not ready yet, but it's

02:28:59  13  coming.

02:29:02  14        And in this page from July 20th of 2013, was

02:29:08  15  mobile deposit Phase 2, where it talked about auto capture

02:29:12  16  and what was auto capture?  Auto capture checks images --

02:29:17  17  check images when the good image is available instead of

02:29:20  18  the customer having to guess.

02:29:21  19        And the improved -- the expect -- their

02:29:24  20  expectation was to improve image take rates from 75 percent

02:29:27  21  to over 90 percent.  The same kind of before and after we

02:29:31  22  just looked at.

02:29:31  23  Q.  Based on the testimony of Wells Fargo witnesses and the

02:29:36  24  Wells Fargo documents you were given access to, did you

02:29:38  25  have an understanding or did you develop an understanding

02:29:41  1   of what Wells Fargo's goals were with respect to

02:29:46  2   introducing auto capture?

02:29:46  3   A.  Yes, I did.

02:29:50  4        So, again, we have Mr. Ajami expressing that --

02:29:54  5   that Wells Fargo knew they needed low failure rates.  Their

02:29:59  6   objective was to provide the most -- provide the simplest

02:30:03  7   experience possible and to provide the lowest rate of

02:30:06  8   exceptions and rejected checks.  That was the objective.

02:30:10  9   Q.  Now, did Wells Fargo also produce in the litigation its

02:30:14  10  data on actual acceptance and failure rates for manual

02:30:19  11  versus auto capture?

02:30:20  12  A.  Yes.  This was some of the operational data that I

02:30:22  13  mentioned earlier in that list of things I looked at.

02:30:26  14  Q.  And what was the source for the operational data that

02:30:30  15  you reviewed?

02:30:31  16  A.  So Ms. Lockwood-Stein was formerly designated by Wells

02:30:38  17  Fargo to be their corporate representative and testify on

02:30:42  18  the benefits of auto capture.  I relied upon the data she

02:30:47  19  provided and presented on MRDC failure rates.

02:30:51  20        So what we have below in PX-26 is the actual

02:30:56  21  source of where did this data come from that I relied upon.

02:31:00  22  And if you look at the second highlighted section, the

02:31:03  23  source of the data from Ms. Lockwood-Stein was from the

02:31:07  24  MRDC image scan stats summary dashboard in their Tableau

02:31:15  25  system.

02:31:15  1   Q.  And this slide also has highlighted the phrase "the

02:31:19  2   commercial importance of auto capture technology."  Could

02:31:22  3   you explain for the jury what was your understanding of

02:31:24  4   Ms. Lockwood-Stein's relationship to that topic?

02:31:26  5   A.  Well, the notion here is the importance in reducing the

02:31:32  6   error rates and the actual then performance of the system

02:31:36  7   in fulfilling that objective is provided through this data.

02:31:39  8   Q.  Do you have an understanding of whether or not

02:31:42  9   Ms. Lockwood-Stein was officially designated by Wells Fargo

02:31:46  10  to be its representative to provide the evidence on the

02:31:52  11  topic of commercial importance of auto capture?

02:31:56  12  A.  Yes.  So my understanding of a corporate representative

02:32:00  13  in a case like this is that Ms. Lockwood-Stein is not

02:32:03  14  speaking on behalf of herself, she's speaking as though --

02:32:07  15  on behalf of Wells Fargo as the entire corporation.

02:32:10  16  Q.  And the snippet from Exhibit 26 that's on your slide,

02:32:13  17  was that something that she actually provided on behalf of

02:32:15  18  Wells Fargo at her deposition?

02:32:20  19  A.  That's correct.  My understanding is the data was

02:32:22  20  provided as an exhibit during her depo.

02:32:24  21  Q.  What are we looking at on the next slide?

02:32:27  22  A.  Okay.  So what we have now is just one month's -- well,

02:32:31  23  just a snippet of the overall spreadsheet that was

02:32:34  24  provided.  And this was the -- you know, the verified data

02:32:38  25  from -- officially from Wells Fargo that represented the

02:32:41  1  system.

02:32:42  2          And during her deposition, Ms. Lockwood-Stein

02:32:46  3  explained a couple of these different modes, and I'll

02:32:49  4  explain that to you, as well.

02:32:50  5  Q.  Actually, before we get into walking through the

02:32:53  6  categories, what was the complete time period of data that

02:32:57  7  Ms. Lockwood-Stein provided on behalf of Wells Fargo?

02:33:00  8  A.  So the data sheet upon which I built my analysis ran

02:33:04  9  from 2017 through 2019.  And in there, there were a couple

02:33:12  10 of gaps.  And so as I'll discuss in a few minutes, I had to

02:33:19  11 do some compensation for that.

02:33:20  12 Q.  Did Wells Fargo formally provide through that process

02:33:22  13 any data for any other time frame beyond the 2017 to

02:33:27  14 partial year 2019 spreadsheet?

02:33:30  15 A.  No.  This -- this was the official data provided by

02:33:33  16 Ms. Lockwood-Stein as their corporate representative and

02:33:37  17 verified the source as having come from their Tableau

02:33:41  18 recordkeeping system.

02:33:41  19 Q.  Could you explain for us what are the data categories

02:33:45  20 that have been blown up on your slide?

02:33:48  21 A.  Sure.  And you're going to hear these terms used quite

02:33:52  22 a bit, I think, over the next hour or two.

02:33:55  23          We have three different modes.  If you look in

02:33:57  24 that first green box, it's titled MiSnap Status.  So within

02:34:02  25 the MiSnap function that does auto capture, there are three

02:34:06  1   modes.

02:34:07  2         The first mode is video, and as Ms. Lockwood-Stein

02:34:10  3   testifies above, video shows the acceptance rate for video,

02:34:15  4   which is auto capture.  So they're synonyms.  Video mode is

02:34:20  5   auto capture.

02:34:21  6   Q.  And what are the still and manual modes?

02:34:24  7   A.  So the MiSnap still mode and the MiSnap manual mode,

02:34:31  8   both of these describe when the user holds the phone over

02:34:34  9   the check and presses the button to take the picture.  It's

02:34:39  10  not the computer or the processor that determines when to

02:34:41  11  take the picture.  It's the human.  And that's what we mean

02:34:44  12  by manual or still.

02:34:45  13        And as you can see, if I may proceed, we've got

02:34:47  14  the next green box is the image scan passed rate.  In other

02:34:53  15  words, how many passed?  How many were good?  And the

02:34:57  16  video, you're seeing on this particular month of data for

02:35:01  17  iOS, it was 88.8 percent.  And you can see that the still

02:35:05  18  and manual modes, still was right at 69.99 percent, and

02:35:11  19  manual was 66.4 percent, but you can see they're roughly

02:35:15  20  the same.  Pretty equivalent.

02:35:17  21        And then the last column is the failed count, and

02:35:20  22  that's just the inverse of the pass.  You either pass or

02:35:25  23  you fail.  So 88.8 pass, 11.2 failed in the case of auto

02:35:31  24  capture.

02:35:31  25  Q.  So before we dig further into the numbers from the

02:35:35   1    spreadsheet, can you explain for us at a high level how do

02:35:39   2    these modes you just described, auto capture and manual,

02:35:42   3    actually look in the two parties, USAA and Wells Fargo's,

02:35:48   4    applications?

02:35:48   5          MR. MELSHEIMER:  Your Honor, may we approach?

02:35:50   6          THE COURT:  Approach the bench.

02:35:56   7          (Bench conference.)

02:36:04   8          THE COURT:  Yes, sir.

02:36:04   9          MR. MELSHEIMER:  May it please the Court.  I think

02:36:05  10    we're getting into an inappropriate comparison of the two

02:36:09  11    products.

02:36:11  12          MS. GLASSER:  Well, it's not inappropriate, but if

02:36:13  13    this is the time for the instruction, that makes perfect

02:36:16  14    sense.

02:36:16  15          MR. MELSHEIMER:  The issue here, of course, before

02:36:18  16    the Court is not the comparison of the products but the

02:36:21  17    comparison of the product to the patent, and this -- this

02:36:23  18    would only serve to confuse the jury.  It's inappropriate,

02:36:28  19    it's prejudicial.

02:36:28  20          THE COURT:  I'll give the instruction at this

02:36:30  21    point that we discussed in chambers.

02:36:32  22          MS. GLASSER:  Thank you, Your Honor.

02:36:33  23          MR. MELSHEIMER:  Thank you.

02:36:34  24          (Bench conference concluded.)

02:36:40  25          THE COURT:  Ladies and gentlemen of the jury, this

02:36:42  1  particular demonstrative slide and the testimony related to

02:36:45  2  it should not be considered for the issue of infringement.

02:36:49  3  It may be considered for other issues in the case.

02:36:52  4       Let's proceed.

02:36:54  5       MS. GLASSER:  Thank you, Your Honor.

02:36:55  6  Q.  (By Ms. Glasser)  Sir, could you please explain what

02:36:58  7  are we looking at here on this slide?

02:37:01  8  A.  Sure.  And if I may ask -- yes, thank you for moving

02:37:06  9  that --

02:37:06  10      THE WITNESS:  Thank you.

02:37:08  11 A.  So what we have on this slide is the USAA

02:37:11  12 Deposit@Mobile app on the left, and the Wells Fargo Mobile

02:37:14  13 Deposit app on the right.  And when the app begins

02:37:20  14 capturing in auto -- or begins operation in auto capture

02:37:24  15 mode, what you see are these live video frames, right?

02:37:27  16 And -- and you can tell it's live video because as you move

02:37:30  17 the phone around or you move the check around, you can see

02:37:32  18 it responding on the view screen the same as it is in -- in

02:37:36  19 real life.  Sort of in a strikingly similar way between the

02:37:40  20 two.

02:37:40  21      You'll also notice on the Wells Fargo side, in the

02:37:44  22 lower right corner is this little picture of a camera.  And

02:37:48  23 that's the actual manual button.  So that if the user wants

02:37:52  24 to, when they're holding the phone, they can tap their

02:37:55  25 finger on that little icon of the camera there, and that's

02:37:58    1   how they take a manual picture.

02:38:01    2   Q.  In the Wells Fargo application, do you have information

02:38:05    3   on approximately how often a user actually chooses to use

02:38:11    4   the manual capture?

02:38:12    5   A.  The -- the data shows that the successful deposits --

02:38:18    6   94 or 95 percent of the successful deposits come from auto

02:38:22    7   capture, and only 5 percent or so come from manual capture.

02:38:30    8   Q.  What are we looking at here?

02:38:32    9   A.  So I just put a couple of items on these lists of

02:38:37   10   real-time analysis of video frames for image quality.  It's

02:38:43   11   quite obvious from just a user's perspective that, for

02:38:47   12   instance, on positioning, if you're too far away from the

02:38:50   13   check, the app will pop up a little message that says, get

02:38:55   14   closer.  And as you get closer, it takes the picture.

02:38:58   15   Q.  What does that tell you?  What's the significance of

02:39:01   16   that when you're observing that as -- as a user?

02:39:03   17   A.  Well, so I note at the bottom, it's understandable just

02:39:06   18   from the use of the system that if a frame is not

02:39:08   19   acceptable, if it's not good, it's not going to capture.

02:39:11   20   It's discarded and it keeps gathering frames and giving you

02:39:17   21   feedback until it can get a good image.

02:39:20   22   Q.  Actually let's pause your presentation for a moment.

02:39:23   23            MS. GLASSER:  Could we call up Slide 99 from

02:39:27   24   Dr. Conte's presentation?

02:39:43   25   Q.  (By Ms. Glasser)  You were here for Dr. Conte's

02:39:46   1  examination?

02:39:46   2  A.   The vast majority of it, yes.

02:39:49   3  Q.   And there was some discussion during his presentation

02:39:56   4  about the various considerations that a machine may look to

02:40:01   5  or -- to determine whether a check is sufficient.  Do you

02:40:05   6  recall that?

02:40:05   7  A.   Those -- the list of monitoring criteria, yes.

02:40:30   8           MS. GLASSER:  I'm sorry, Slide 99, please.  Thank

02:40:35   9  you very much, Mr. Huynh.

02:40:36  10  Q.   (By Ms. Glasser)  Were you here in court when this

02:40:40  11  particular slide was shown on the cross-examination?

02:40:43  12  A.   I was.

02:40:44  13  Q.   And I wanted to ask you about the types of items on

02:40:47  14  this slide, the monitoring criterion.

02:40:51  15           First of all, to remind the jury at a high level,

02:40:54  16  where do the monitoring criterion come in, in the auto

02:40:59  17  capture method?

02:41:00  18  A.   So as -- as you've heard, as those frames are flipping

02:41:04  19  by, 30 frames per second or thereabouts, the processor is

02:41:08  20  doing all these different comparisons of the quality of the

02:41:11  21  image it sees in front of itself with what it knows are the

02:41:14  22  important criteria for making sure that check could be read

02:41:18  23  by other computers and successfully processed as a deposit

02:41:21  24  down the road.

02:41:22  25  Q.   And now when you as a banking executive back in the

| | | |
|---|---|---|
| 02:41:28 | 1 | days before auto capture were thinking about those types of |
| 02:41:31 | 2 | things, were they ever happening on the user's device? |
| 02:41:34 | 3 | A.  Well, no.  This was the break-through that USAA had. |
| 02:41:38 | 4 | Q.  So where did they happen in the time before we had this |
| 02:41:43 | 5 | invention? |
| 02:41:45 | 6 | A.  For all the years from the first image -- introduction |
| 02:41:48 | 7 | of image in the 1990s in check processing, or even '80s, |
| 02:41:53 | 8 | maybe, until USAA invented mobile remote deposit capture, |
| 02:41:59 | 9 | this was always done either on a server or on specialized |
| 02:42:03 | 10 | equipment -- |
| 02:42:03 | 11 | MR. MELSHEIMER:  Your Honor, Your Honor, |
| 02:42:05 | 12 | objection.  May we approach? |
| 02:42:06 | 13 | THE COURT:  Approach the bench. |
| 02:42:08 | 14 | (Bench conference.) |
| 02:42:18 | 15 | THE COURT:  Yes, sir. |
| 02:42:18 | 16 | MR. MELSHEIMER:  So, Your Honor, this is the issue |
| 02:42:19 | 17 | we've raised before about other patents.  He just said they |
| 02:42:23 | 18 | invented mobile remote deposit capture. |
| 02:42:27 | 19 | MS. GLASSER:  Oh, I can ask him to -- |
| 02:42:29 | 20 | MR. MELSHEIMER:  And that is not -- I'm sorry -- |
| 02:42:30 | 21 | THE COURT:  Let's finish and let's talk one at a |
| 02:42:32 | 22 | time. |
| 02:42:33 | 23 | MR. MELSHEIMER:  I'm sorry. |
| 02:42:34 | 24 | So I think it is inappropriate.  It was the |
| 02:42:37 | 25 | subject of a motion in limine excluding other patents and |

02:42:39   1   things of that nature.  And I just object to it and ask

02:42:42   2   that there be an instruction or a correction offered on the

02:42:45   3   record.

02:42:46   4          THE COURT:  What's the Plaintiff's response?

02:42:47   5          MS. GLASSER:  So he's talking about the

02:42:49   6   patents-in-suit.  I think it's clear.  I can get him to

02:42:52   7   clarify.  But this is --

02:42:53   8          THE COURT:  As long as he clarifies these are the

02:42:57   9   patents-in-suit, then I'll overrule the objection.

02:43:00   10          MS. GLASSER:  Yes, Your Honor.  Thank you.

02:43:01   11          THE COURT:  And you can certainly reraise it if

02:43:03   12   you think they get into the unasserted patents.  But we're

02:43:05   13   going to get it straight.  He's either talking about the

02:43:08   14   patents-in-suit, or he needs to not talk about unasserted

02:43:12   15   patents.

02:43:12   16          MS. GLASSER:  Yes, sir, yes, sir.  Thank you, Your

02:43:14   17   Honor.

02:43:14   18          (Bench conference concluded.)

02:43:18   19          THE COURT:  Let's proceed.

02:43:20   20   Q.  (By Ms. Glasser)  Sir, a point of clarification, when

02:43:22   21   you said before USAA invented mobile deposit, or words to

02:43:28   22   that effect, you were talking about the invention of auto

02:43:31   23   capture described in the patents-in-suit; is that right?

02:43:32   24   A.  Yes, ma'am.

02:43:34   25   Q.  Okay.  With that clarification, could you continue your

02:43:37   1   response describing to us how this was done previously?

02:43:41   2   A.   Sure.   So at Bank of America and throughout the

02:43:46   3   industry, conventional thinking was that image quality

02:43:49   4   analysis was done on an image quality analysis server or

02:43:54   5   within this specialized industrial equipment I mentioned

02:43:57   6   earlier.   The notion of doing it on a smartphone actually

02:44:01   7   was disbelieved at the time and was the motivation for

02:44:06   8   prototyping to show that it actually could be done.

02:44:14   9        MS. GLASSER:   If we could have Mr. Calman's

02:44:16  10   presentation back, please.

02:44:18  11   Q.   (By Ms. Glasser)   All right.   So in the USAA system, in

02:44:34  12   the Wells Fargo system, what happens if when those previews

02:44:39  13   are going by quickly, what happens if a frame does not meet

02:44:45  14   the required criteria?

02:44:48  15   A.   So this is another element that you've heard about in

02:44:51  16   the USAA and the Wells Fargo system that -- that if it

02:44:55  17   doesn't meet criteria, that feedback is given to the user

02:44:59  18   to help them understand what needs to be done to create a

02:45:03  19   better image.   To -- to allow the system to do its auto

02:45:11  20   capture.

02:45:12  21   Q.   All right.   So, ultimately, whether this proceeds

02:45:15  22   through the auto capture process or whether the user either

02:45:20  23   proceeds in that still mode or that manual mode, what

02:45:24  24   happens at the end?

02:45:25  25   A.   So at the end, what you have is what I call the deposit

02:45:30   1   input form.  It has a couple of different names.  But

02:45:33   2   essentially what you have are these little tiny -- they're

02:45:36   3   called thumbnail images, so it's sort of miniature pictures

02:45:40   4   of the check and the amount that the -- the user keyed in.

02:45:43   5   It's a, you know, $20.00 deposit, what have you, and the

02:45:46   6   checking account to which -- or the account to which I'm

02:45:49   7   depositing.

02:45:50   8          Only once those are all satisfied, does the

02:45:54   9   deposit button sort of light up and become active.  So if

02:45:57   10  you haven't gotten two good images and you haven't entered

02:46:02   11  your account and entered the amount, that button is grayed

02:46:06   12  out.  And no matter how hard you push it, it's not going to

02:46:09   13  work.

02:46:10   14         Both apps in the same way when those information

02:46:12   15  pieces are assembled and ready, only then does the deposit

02:46:14   16  button light up and the user pushes that button and that's

02:46:17   17  the actual submission to the bank.

02:46:20   18  Q.  Okay.  Going back to your analysis of the data, were

02:46:23   19  you able to analyze the complete data set provided by Wells

02:46:29   20  Fargo to determine on average whether there is a difference

02:46:33   21  between the failure rate through auto capture versus the

02:46:36   22  failure rate if someone is choosing the manual option?

02:46:40   23  A.  So I was able to use the official verified data from

02:46:44   24  Ms. Lockwood-Stein to compute the difference in performance

02:46:48   25  over that time frame, over that -- almost three-year time

02:46:52  1  frame between the manual capture mode at Wells Fargo and

02:46:54  2  the auto capture mode.

02:46:56  3        And what we see on the left is that -- some

02:47:00  4  slightly different values for manual and still, 32.45 for

02:47:05  5  manual, 28.59 for -- for still.  But together about an

02:47:11  6  average failure rate for manual modes of 30.52 percent, and

02:47:17  7  that compares to an auto capture average failure rate of

02:47:20  8  10.38 percent.

02:47:22  9        That's a decrease of two-thirds, and it explains

02:47:31  10  why auto capture is a must-have feature.  If I may, think

02:47:35  11  back to those hundred users.  Out of a hundred users using

02:47:38  12  manual capture, 30 percent were having problems.  Auto

02:47:41  13  capture, only 10 people or so, a little more, out of a

02:47:44  14  hundred were having the same kind of problems.  And so it's

02:47:47  15  a two-thirds decrease in rate of failure.

02:47:54  16  Q.  All right.  After you -- I'm sorry, is it possible for

02:48:02  17  you to clear that?  There's some purple on the screen.

02:48:06  18  A.  I've been watching the Judge.  Let's see if I can do

02:48:10  19  it.

02:48:10  20  Q.  Perfect, thank you.

02:48:10  21        THE COURT:  You can also do it from the podium,

02:48:14  22  counsel.

02:48:14  23        MS. GLASSER:  Oh.

02:48:14  24        THE COURT:  Let's proceed.

02:48:15  25        MS. GLASSER:  I should be doing it, thank you,

02:48:16  1   Your Honor.

02:48:16  2   Q.  (By Ms. Glasser)  After you did the calculation of

02:48:18  3   failure rate reduction, what was the next aspect of your

02:48:22  4   analysis?

02:48:22  5   A.  So no single operational measure like that failure rate

02:48:30  6   can tell you the whole story.  In order to understand and

02:48:33  7   do this apportionment analysis, you need to understand more

02:48:37  8   about the customer's experience over time with an app.  You

02:48:41  9   know, you can't just look at one single value to tell you

02:48:44  10  the answer to the question.

02:48:46  11        And so my next step was to look at the customer

02:48:51  12  experience over a 30-, 60-, and 90-day time frame.

02:48:55  13  Q.  Okay.  So walk us through that.  You initially

02:48:58  14  highlighted the failure rate data.  Now, what did you do

02:49:01  15  next with that data?

02:49:02  16  A.  Right.  So on this slide, it's -- it's really just a

02:49:05  17  summary of what I've just talked through.  Remember, USAA's

02:49:09  18  failure rate showed that before and after of a 41 percent

02:49:14  19  improvement.

02:49:14  20        I just talked through Wells Fargo's experience.

02:49:17  21  The difference between their system's performance for auto

02:49:22  22  capture and manual capture, a 66 percent improvement.

02:49:27  23        But as I said, that doesn't tell the whole story.

02:49:30  24  We need to look at more stuff.

02:49:31  25        And so I used some statistical analysis and a

02:49:34   1   computation called yield analysis, I'll talk about, to try

02:49:39   2   and understand, okay, what's it like for an actual person

02:49:42   3   using this app over a one, two, and three-month period of

02:49:46   4   time.

02:49:47   5   Q.  From a banking operations standpoint, why is it

02:49:52   6   important to look at that one, two, or three-month

02:49:55   7   experience rather than just a single point in time?

02:49:57   8   A.  Oh, sure.  It's -- so every day is different at a bank.

02:50:02   9   It -- it -- whether it's a day of a week or it's payday or

02:50:06   10  there was a three-day weekend or even weather, bad weather

02:50:11   11  can affect whether people are going to the branch or not,

02:50:13   12  every day of transactions are different.

02:50:15   13       And so it's just not right to look at one or two

02:50:19   14  or three days.  You have to look at the performance of a

02:50:21   15  system over one month or multiple months because people's

02:50:24   16  business cycles and personal transactions just vary so

02:50:27   17  much.

02:50:28   18  Q.  So what data did you use to perform this error free

02:50:36   19  one, two, three-month analysis?

02:50:36   20  A.  So I went back to the official verified data from

02:50:39   21  Ms. Lockwood-Stein.  And as I mentioned a few moments ago,

02:50:42   22  there were a couple of gaps in that data.  It just wasn't a

02:50:46   23  perfect datastream.  I understand there were some changes

02:50:49   24  in their recordkeeping methods through that time.

02:50:51   25       So what I was able to do was to find a span of 10

02:50:55   1   months from January of '18 through October of 2018 where

02:50:59   2   the data was clean.  It was good, and I could use it.

02:51:04   3   Q.  Can you describe for us, sir, what did you do with that

02:51:08   4   data?

02:51:08   5   A.  Okay.  So the data told us that, on average, Wells

02:51:13   6   Fargo customers make about two deposits with MRDC per

02:51:17   7   month.  That's two checks, right?  And each check -- in

02:51:22   8   order to deposit a check, you've got to do the front and

02:51:25   9   the back, so there's two scans for every deposit.

02:51:28   10           Using the performance numbers as error free

02:51:32   11   numbers that we looked at a moment ago, when you compute

02:51:35   12   that across for just about two deposits per month and two

02:51:39   13   sides per check, what you find is that over the course of a

02:51:44   14   30-day period or a one-month period, auto capture provides

02:51:48   15   61.17 percent of customers with an error free experience,

02:51:52   16   all's good, all's clean.

02:51:55   17           Whereas, manual capture customers -- those

02:51:58   18   customers who choose to push the button themselves, only

02:52:01   19   about 21.5 -- well, exactly 21.55 percent of the customers

02:52:07   20   get an error free experience.  And what that means is, on a

02:52:10   21   one-month basis, auto capture gives 2.84 times better

02:52:18   22   experience to customers in giving them error free

02:52:21   23   operation.

02:52:21   24   Q.  Well, what happens when you extend that analysis out to

02:52:24   25   the two-month time frame?

02:52:26   1   A.   Sure.   So two months now, it's two deposits per month.

02:52:30   2   Now, it's two months, four deposits, two sides per, and you

02:52:35   3   start to see the power of compounding here, right?

02:52:38   4         So now, over a two-month basis, 37.62 percent of

02:52:44   5   those auto capture using customers, they're getting error

02:52:47   6   free experience.   All smooth, no problems.

02:52:50   7         Now, only 4.36 percent of the people who choose to

02:52:53   8   do manual capture are getting no errors, and that's 8.63

02:52:59   9   times better for auto capture as compared to manual.

02:53:01  10   Q.   Briefly summarize for us what happens when you extend

02:53:05  11   it out to three months?

02:53:07  12   A.   Now, at this point, 90 days, as you imagine, 22.75

02:53:12  13   percent of auto capture, almost a quarter of the auto

02:53:14  14   capture customers, are still getting error free performance

02:53:17  15   over a full three-month period.

02:53:19  16         Not even 1 percent of manual capture customers

02:53:22  17   have been error free, meaning almost everybody -- 99 out of

02:53:26  18   a hundred customers using manual customer have had some

02:53:29  19   sort of error.   And that's more than 25 times better using

02:53:33  20   auto capture than using manual capture.

02:53:35  21   Q.   Now, when you describe customers going a month or two

02:53:39  22   months or three months with no errors, what types of errors

02:53:43  23   are we talking about?

02:53:44  24   A.   So it depends.   For some, in some cases, it's just a

02:53:49  25   matter of a couple of seconds, I need to take another set

02:53:53    1    of pictures, front and back, and things go through.

02:53:55    2          On the other hand, it may mean that that customer

02:53:58    3    just can't get their check deposited.  They can't get --

02:54:00    4    they can't make it happen with their phone, and they've got

02:54:02    5    to find another way to get that deposit made.  And that's a

02:54:05    6    problem for the customer, and that's a problem for the

02:54:08    7    bank, too.

02:54:08    8    Q.  Why is it a problem for the bank?

02:54:10    9    A.  Well, the bank -- they have a lot of expense in dealing

02:54:15    10   with these errors and in creating -- in sort of the

02:54:21    11   resolution processes when there's -- some of the types of

02:54:24    12   errors we're talking about.

02:54:25    13   Q.  Now, how did you go about translating all of this

02:54:30    14   analytical work that you've done into an apportionment of

02:54:33    15   value?

02:54:33    16   A.  So using the data that we've just accumulated, what we

02:54:39    17   can do is figure out what proportion of those error free

02:54:43    18   experiences are thanks to auto capture.

02:54:46    19         So, again, out of a hundred folk, on average, 79

02:54:52    20   percent or 79 people out of a hundred who've had an error

02:54:56    21   free experience, well, they have auto capture to thank for

02:54:58    22   that.  That's what auto capture does in terms of creating

02:55:02    23   error free experiences.

02:55:04    24         But, you know, like I said earlier, no single

02:55:07    25   number can tell the whole story.  Even a basketful of

02:55:13   1    numbers can't always tell you the full story.  There's

02:55:16   2    always other factors that go into creating a -- a -- the

02:55:19   3    difference between a model and real life, right?  There's

02:55:22   4    things you just don't know.

02:55:23   5          As I mentioned, it could be the geography, how

02:55:26   6    close am I to an ATM or a branch if I have to go there

02:55:31   7    instead?  You know, is it month end?  Do I really need this

02:55:34   8    money in this deposit?  Will I keep trying because I really

02:55:35   9    need the money, or is it just a, you know, $2.00 check from

02:55:38   10   my nephew.  It -- it all depends.

02:55:40   11         And because the model can't capture all those

02:55:43   12   things, it's very typical in my experience that you -- you

02:55:47   13   have the results of your model to account for all of those

02:55:52   14   unknowns.

02:55:52   15         So instead of the 79 percent, I took half and went

02:55:57   16   with a 40 percent apportionment factor because we just

02:56:01   17   don't know enough to be able to say for sure it's 79

02:56:05   18   percent.

02:56:05   19   Q.  How frequently in the banking industry have you seen

02:56:08   20   this approach employed of accounting for the unknowns by

02:56:13   21   conservatively reducing a projection by half?

02:56:17   22   A.  So I had nearly three decades in the banking business

02:56:21   23   doing operational forecasting and modelling and

02:56:24   24   understanding these kinds of things.  I used it for years.

02:56:27   25   It was a common practice.  And we even saw that Wells Fargo

02:56:32  1   used the same approach.

02:56:34  2   Q.  In addition to the calculations that you've presented

02:56:37  3   to the jury so far, did you identify any other insights

02:56:42  4   regarding the value to be properly apportioned to the

02:56:45  5   patented auto capture technology?

02:56:46  6   A.  So as I've said, no one answer or no one model can tell

02:56:52  7   you all the answers.  So I took another angle at this

02:56:57  8   question, and I looked at the impact of leadership --

02:57:00  9   mobile leadership on the growth of Wells Fargo's system and

02:57:04  10  how fast it grew.

02:57:06  11          And what I adopted was a well-known piece of

02:57:10  12  research and product in the industry called the Net

02:57:16  13  Promoter System.

02:57:16  14          Now, you may be familiar with Net Promoter System.

02:57:18  15  If you've ever gotten a survey that says, on a scale from 1

02:57:22  16  to 10, how likely are you to recommend our service to a

02:57:24  17  friend?  If you've ever seen a survey question like that,

02:57:29  18  that's Net Promoter System.  That's Net Promoter Score.

02:57:33  19  It's all about that one question.

02:57:35  20          So what Bain did is they looked across multiple

02:57:39  21  industries over a long period of time to understand the

02:57:42  22  impact of Net Promoter scores on growth.  And their insight

02:57:49  23  is that leaders in customer experience, companies with high

02:57:54  24  Net Promoter scores where lots of people would recommend

02:57:57  25  their service to a friend, experience more than two times

02:58:01  1  the growth factor -- the growth rate as their average

02:58:03  2  competitors.

02:58:06  3  Q.  So how does this insight from the Bain research -- the

02:58:12  4  Bain study, how does that provide you with insight into the

02:58:19  5  portion of value attributable to auto capture?

02:58:21  6  A.  So Bain teaches us that leaders in this Net Promoter

02:58:25  7  Score can expect more than two times growth over time as

02:58:28  8  compared to their competitors.

02:58:31  9       We knew by 27 -- 2017 -- and the Futurion report

02:58:35  10  backs this up -- that auto capture was a must-have feature.

02:58:40  11  It was necessary to be a leader.  And we've highlighted --

02:58:42  12  I've highlighted a line on the top that notes that Chase

02:58:46  13  Bank -- Chase Bank slipped from the top 10 because they

02:58:50  14  only had manual capture.  They couldn't maintain a

02:58:54  15  leadership position without auto capture.

02:58:56  16       And so when I put those two together, it helped me

02:59:01  17  to reforecast, well, what if -- what if Wells Fargo had not

02:59:04  18  launched auto capture and only had a manual capture

02:59:07  19  solution like Chase Bank?  And what I was able to do was

02:59:12  20  mathematically demonstrate with a model that 42 percent of

02:59:16  21  the growth that Wells Fargo had with their mobile remote

02:59:19  22  deposit capture system was thanks to auto capture.

02:59:25  23  Q.  Now, earlier, you mentioned that you used the data from

02:59:28  24  Wells Fargo's corporate representative that was supplied as

02:59:31  25  part of the litigation process; is that right?

02:59:33   1    A.  Yes, ma'am.

02:59:34   2    Q.  After you submitted your expert report in this matter,

02:59:38   3    did you see further information provided later by Wells

02:59:45   4    Fargo through one of its experts regarding failure data?

02:59:49   5    A.  I did.  This spreadsheet was referenced in

02:59:54   6    Dr. Villasenor's report.  This is the iOS sheet.  This is

02:59:59   7    the entirety of the data for iOS.  There was another

03:00:02   8    similar looking table for Android, but this is it.

03:00:06   9        And -- and what it contains are a couple of days

03:00:12  10    of data.  So you see at the top we've got May the 8th, and

03:00:15  11    we've got September the 5th, and we've got that data from

03:00:19  12    that day, May the 8th, and we've got a -- a data point from

03:00:25  13    September the 5th.

03:00:27  14    Q.  And you mentioned, I think, that this was all of the

03:00:31  15    data, apart from a similar spreadsheet on Android.  Are we

03:00:36  16    literally looking on this screen at all of the iOS data

03:00:39  17    that was identified by Dr. Villasenor for this point?

03:00:42  18    A.  That's right.  This is what I call point data or

03:00:45  19    point-in-time data.  This is not a series of days or months

03:00:49  20    or years worth of data.  This is just a snapshot of a

03:00:54  21    particular day before a change and a particular day, it

03:00:57  22    says here, after a MiSnap update.  So that's all it is.

03:01:01  23    Q.  In your experience in banking industry operations, is

03:01:05  24    single-day data helpful in performing analysis?

03:01:11  25    A.  Well, no.  As I mentioned before, this is just not how

03:01:15  1    it's done.  You -- you don't know what day -- well, we know

03:01:17  2    what day of the week it was.  We don't know what the

03:01:19  3    weather was that day.  We don't know was -- were there

03:01:22  4    paydays around there?  Was there -- were there other -- we

03:01:26  5    don't -- it's just a single day.

03:01:28  6             And because people's business cycles and

03:01:30  7    business's business cycles are all different, everybody's

03:01:33  8    different, we always, always look at 30, 60, 90, and even

03:01:38  9    longer time frames so we can smooth out all of those

03:01:41  10   differences between those days.  It's just not right to

03:01:44  11   pick one day and compare it to one other day.  It just

03:01:48  12   doesn't give you a valuable insight.

03:01:49  13   Q.  Understanding that your views on the data is that it's

03:01:53  14   not particularly helpful, did you nonetheless in an

03:01:56  15   abundance of caution construct a new model using the data

03:02:01  16   supplied by Mr. Villasenor?

03:02:04  17   A.  I did.  Excuse me for the eyedrops.  I did.

03:02:07  18   Q.  And actually, I misspoke for a moment.  This is Wells

03:02:10  19   Fargo data that was attached to Mr. Villasenor's report,

03:02:14  20   correct?

03:02:14  21   A.  Yes, ma'am.

03:02:14  22   Q.  And you did go ahead and run a model to see what it

03:02:19  23   would produce if you used this point in time, correct?

03:02:22  24   A.  I did.  And, as I said, this is not the official

03:02:25  25   verified data from Wells Fargo, nor do I agree that it's

03:02:29  1   appropriate to use this data for modelling.  Nevertheless,

03:02:34  2   I plugged that data into the exact same model that I showed

03:02:37  3   you earlier.

03:02:39  4        And using the May 8th manual capture rate data and

03:02:43  5   the Wells Fargo expectation for auto capture, 90 percent --

03:02:47  6   you recall they were expecting a 90 percent rate.  And, in

03:02:51  7   fact, they did get 90 percent rate.  That was what they --

03:02:54  8   their operational system was doing.

03:02:56  9        When I use this single point-in-time data, it just

03:02:58  10  still further confirms that auto capture at this point in

03:03:03  11  time was 1.7 times -- 78 times better at producing error

03:03:08  12  free customer experience.

03:03:09  13  Q.  Sir, taking together all of the different points of

03:03:17  14  analysis that you performed and described in your report,

03:03:19  15  what is your ultimate conclusion on how we quantify the

03:03:23  16  value of the auto capture patents?

03:03:25  17  A.  Right.  So to recap, we looked at error performance

03:03:29  18  data, we looked at customer experience data, we looked at

03:03:31  19  the Bain insights, we even confirmed it with this

03:03:37  20  extraneous supplemental data.  Everything comes down to my

03:03:42  21  opinion that at least 40 percent of the value of mobile

03:03:48  22  deposit is attributable to auto capture.

03:03:52  23  Q.  Thank you very much, sir.

03:03:54  24       MS. GLASSER:  I pass the witness.

03:03:55  25       THE COURT:  Counsel, approach the bench, please.

03:03:56   1          (Bench conference.)

03:04:04   2          THE COURT:  I'm going to give the jury a short

03:04:08   3   recess at this point.  You all take a couple minutes to

03:04:14   4   compare notes, and then let my law clerks know where we

03:04:19   5   stand on those disputes that we talked about this morning

03:04:22   6   that I carried.  Okay?

03:04:23   7          MR. MELSHEIMER:  Your Honor, we're probably going

03:04:24   8   to want to bring up an issue that's been raised by

03:04:27   9   Mr. Calman's testimony regarding some of these issues that

03:04:29  10   we've talked about at other banks and whether or not the

03:04:34  11   other banks used auto capture or manual capture, and we're

03:04:38  12   just going to want a minute to talk about that before we go

03:04:41  13   into cross-examination.

03:04:43  14          MS. GLASSER:  We had understood that was resolved

03:04:44  15   this morning; that you agreed you are not going to do that.

03:04:48  16          THE COURT:  You all talk, and I'll see you before

03:04:52  17   I bring the jury back in.

03:04:54  18          MR. MELSHEIMER:  Thank you, Your Honor.

03:04:57  19          (Bench conference concluded.)

03:04:57  20          THE COURT:  Ladies and gentlemen of the jury,

03:04:59  21   before the Defendant cross-examines Mr. Calman, we're going

03:05:03  22   to take a short recess.

03:05:05  23          You may simply leave your notebooks closed and in

03:05:08  24   your chairs.  Please follow all the instructions I have

03:05:11  25   given you about your conduct during the trial, including,

03:05:14   1   of course, not to discuss the case among yourselves and

03:05:15   2   we'll have you back in here shortly to continue.  The jury

03:05:23   3   is dismissed for recess.

03:05:26   4              COURT SECURITY OFFICER:  All rise.

03:05:47   5              (Jury out.)

03:05:47   6              THE COURT:  Counsel, take 10 minutes to consult

03:05:52   7   with each other about those issues that were left open from

03:05:55   8   our meeting this morning in chambers, and then see me in

03:05:57   9   chambers.  Court stands in recess.

03:06:02  10              COURT SECURITY OFFICER:  All rise.

03:06:03  11              (Recess.)

03:41:10  12              (Jury out.)

03:41:11  13              COURT SECURITY OFFICER:  All rise.

03:41:13  14              THE COURT:  Be seated, please.

03:41:13  15              All right.  Are you prepared to undertake

03:41:19  16   cross-examination, Mr. Melsheimer?

03:41:21  17              MS. GLASSER:  Your Honor, we have something to

03:41:23  18   address at sidebar, if we could, before we begin.

03:41:27  19              THE COURT:  All right.  Tell me what that is.

03:41:28  20              MS. GLASSER:  It has to do with the discussion in

03:41:31  21   chambers about the document to potentially be used during

03:41:33  22   the cross-examination.  We now have a copy of it.

03:41:37  23              THE COURT:  All right.

03:41:40  24              MS. GLASSER:  May we approach, or should we do it

03:41:42  25   in open court?  I'm concerned about doing it in front of

| | |
|---|---|
| 03:41:46 | 1 | the witness. |
| 03:41:46 | 2 | THE COURT:  Approach the bench. |
| 03:41:47 | 3 | (Bench conference.) |
| 03:41:57 | 4 | MS. GLASSER:  So we have the document now.  It's |
| 03:42:00 | 5 | not actually a statement of the witness at all.  This |
| 03:42:03 | 6 | witness never worked at Merrill Lynch.  The witness is |
| 03:42:07 | 7 | saying he got this from somebody named Pete Buchhop. |
| 03:42:13 | 8 | THE COURT:  I thought I asked you in chambers, |
| 03:42:15 | 9 | Mr. Melsheimer, if this was a direct statement of the |
| 03:42:17 | 10 | witness. |
| 03:42:17 | 11 | MR. MELSHEIMER:  It is his statement in his |
| 03:42:21 | 12 | report, Your Honor, that he prepared for RPX.  That is the |
| 03:42:24 | 13 | statement that he writes in his report and his findings.  I |
| 03:42:27 | 14 | don't know -- |
| 03:42:27 | 15 | THE COURT:  He included a statement from someone |
| 03:42:29 | 16 | else in his report is effectively what this looks like. |
| 03:42:34 | 17 | MR. MELSHEIMER:  I'm not sure if that's right or |
| 03:42:35 | 18 | not, Your Honor.  Actually -- but I'm happy to -- he wrote |
| 03:42:44 | 19 | that in his report.  Now, whether he'd say he didn't |
| 03:42:47 | 20 | believe it or someone else told him that, but that -- this |
| 03:42:50 | 21 | is his report that he authored. |
| 03:42:55 | 22 | MS. GLASSER:  And I think the report is a |
| 03:42:57 | 23 | significant overstatement.  Now that we've seen it, it's |
| 03:43:02 | 24 | kind of his initial findings of a couple of areas of things |
| 03:43:03 | 25 | that could be done and things that he looked at. |

03:43:06  1        And here he said he had an initial phone call of

03:43:09  2   this person.  There were a few more pages to it, too.

03:43:23  3        MR. MELSHEIMER:  I mean, he could say, you know, I

03:43:25  4   didn't -- I didn't believe that, but that's what this guy

03:43:28  5   told me.  I don't have -- I've never asked him about it,

03:43:30  6   Judge, so I don't know one way or the other.  But that is

03:43:33  7   the statement that --

03:43:34  8        THE COURT:  I see it.  I see it.  It's under

03:43:37  9   heading marked expert conversations for discussion with RPX

03:43:42  10  prior to contact.

03:43:43  11       Then it references Pete Buchhop, STA Group, former

03:43:53  12  colleague, tech fellow at Bank of America Merrill Lynch.

03:44:00  13       Then below it, without any attribution, it says,

03:44:00  14  principal developer of Merrill Lynch app first mobile

03:44:03  15  deposit app to automatically take a photo of a check for

03:44:09  16  image check deposit.

03:44:09  17       It's unclear that that is -- it appears, but it's

03:44:12  18  unclear that that's Mr. Buchhop's statement, and that

03:44:17  19  Mr. Calman included it in this report.

03:44:19  20       It could be Mr. Calman's characterization of his

03:44:23  21  conversation with Mr. Buchhop.  I don't know.  But it is

03:44:27  22  far from a direct statement clearly attributable to the

03:44:31  23  witness that is inconsistent with his testimony.

03:44:35  24       MR. MELSHEIMER:  Well, Your Honor, can I just say

03:44:38  25  it is attributable to the witness.  He wrote it.  He put it

03:44:41  1  together.  Now, it may be that he's got some layers of

03:44:44  2  hearsay about it.  But it is absolutely attributable to

03:44:47  3  him.  He put it in the report.

03:44:49  4          MS. GLASSER:  Also, it's not at all impeaching

03:44:51  5  because the testimony that he was trying to impeach was

03:44:54  6  that -- was that USAA was the pioneer in this industry.

03:44:59  7  USAA developed the first product back in 2006.  This

03:45:04  8  patent, of course, was conceived 2008.  So this doesn't

03:45:11  9  contradict this at all if he's saying --

03:45:14  10          THE COURT:  Please don't touch those.

03:45:15  11          MS. GLASSER:  Sorry, Your Honor.

03:45:16  12          THE COURT:  That's fine.  They just cause pain in

03:45:18  13  the ears of the court reporter.

03:45:20  14          MS. GLASSER:  Okay.  We don't want that.  So,

03:45:22  15  anyway, the bigger point is it's not his own statement, but

03:45:26  16  I don't think it would be impeaching, in any event.

03:45:28  17          MR. MELSHEIMER:  I think it goes to the weight of

03:45:30  18  the impeachment, Your Honor, the way they would explain it.

03:45:32  19  I don't think it goes to the -- including the notion that

03:45:36  20  he was repeating something someone else told him.  It's not

03:45:39  21  apparent from the face of the document that that's true.  I

03:45:41  22  don't know that that's true.  But --

03:45:44  23          MS. GLASSER:  The only way for him to try to

03:45:47  24  explain it is to go down this path of what was this

03:45:50  25  analysis he was doing for RPX -- this is actually clearly a

03:45:56  1   privilege document.

03:45:57  2        Maybe RPX decided to waive the privilege for

03:46:00  3   Mr. Melsheimer, but he's going to feel very, very

03:46:02  4   uncomfortable what it is he can talk about about that

03:46:05  5   analysis and what he can't.  He undoubtedly has an

03:46:09  6   agreement with RPX or their counsel regarding whatever this

03:46:12  7   work was that he did.

03:46:13  8        THE COURT:  How did this come to be in your hands,

03:46:16  9   Mr. Melsheimer?

03:46:16  10       MR. MELSHEIMER:  Your Honor, I'm not -- I

03:46:17  11  personally do not know.  I believe we got it through

03:46:22  12  someone at -- someone at Wells Fargo that had some

03:46:26  13  connection with RPX.  I honestly -- I don't want to give an

03:46:29  14  answer without having --

03:46:30  15       THE COURT:  I'm just asking what you know.

03:46:32  16       MR. MELSHEIMER:  I know we -- we have this in the

03:46:35  17  research we did about Mr. Calman.  I just -- I don't know

03:46:38  18  who provided us this document.

03:46:40  19       MS. GLASSER:  And Mr. Calman has -- they

03:46:43  20  represented Mr. Calman at one point in time.  So that's a

03:46:48  21  whole other layer of this.  Mr. Melsheimer, I think, put

03:46:52  22  him on at trial at one point or deposition.  So it's going

03:46:54  23  to be a whole web of confidential privileged information

03:46:57  24  that is not at all related to any issue in this case.

03:47:01  25       MR. MELSHEIMER:  Your Honor, I never represented

03:47:03   1   Mr. Calman.

03:47:04   2           THE COURT:  I'm not -- I'm not going to get into

03:47:06   3   any potential conflicts or breaches of confidentiality

03:47:10   4   agreements.  Those are between you all and whoever you may

03:47:13   5   have made those confidential commitments to.

03:47:21   6           MR. MELSHEIMER:  Well, I haven't made any, Your

03:47:21   7   Honor --

03:47:22   8           THE COURT:  I'm just not going to get into that.

03:47:26   9   In my mind, is this an appropriate document for

03:47:30  10   impeachment?

03:47:30  11           Mr. Melsheimer, I'm going to allow you to ask the

03:47:32  12   witness if he's familiar with this report and did he

03:47:37  13   include this statement in the report.

03:47:42  14           Now, he could say, that was not my statement.

03:47:44  15   That was somebody else's.  I put it in there for the

03:47:47  16   benefit of the client.  But you are only going to use this

03:47:50  17   one line that you've underlined here.

03:47:51  18           MR. MELSHEIMER:  That's right.  Your Honor, when

03:47:54  19   you said I can preface it by saying, you told the jury

03:48:00  20   earlier, that's the whole impeachment aspect of it.

03:48:02  21           THE COURT:  You can reference what he told the

03:48:04  22   jury earlier.

03:48:05  23           MR. MELSHEIMER:  Yes, sir.

03:48:06  24           THE COURT:  And then you can ask him about this,

03:48:08  25   but you cannot -- you cannot portray it as if he personally

03:48:11   1   said it because that's an issue that -- that's not clear

03:48:15   2   here.  It could be.  It may not be.  It is clear that he

03:48:19   3   included this statement in a report that he wrote.

03:48:22   4               MR. MELSHEIMER:  Okay.

03:48:22   5               THE COURT:  And he can respond to that, whether,

03:48:25   6   yes, I put it in there, but that doesn't mean I believed

03:48:27   7   it.  I didn't say it.  That wasn't me.  He can respond

03:48:30   8   however is appropriate.

03:48:31   9               MS. GLASSER:  And then that's the end of it; is

03:48:33   10  that right?

03:48:33   11              THE COURT:  And then that is the end of it.  We

03:48:35   12  move on.  Okay.

03:48:36   13              MS. GLASSER:  This is actually my copy.

03:48:38   14              MR. MELSHEIMER:  Oh, that's yours.  You can take

03:48:40   15  it.

03:48:40   16              (Bench conference concluded.)

03:48:40   17              THE COURT:  All right.  Let's bring in the jury,

03:48:42   18  please.

03:48:42   19              COURT SECURITY OFFICER:  All rise.

03:48:43   20              (Jury in.)

03:49:08   21              THE COURT:  Please be seated.

03:49:11   22              All right.  We'll proceed with cross-examination

03:49:17   23  of the witness by the Defendant.

03:49:19   24              MR. MELSHEIMER:  May it please the Court.

03:49:19   25                          CROSS-EXAMINATION

03:49:20   1   BY MR. MELSHEIMER:
03:49:20   2   Q.  Mr. Calman, good afternoon, sir.
03:49:22   3   A.  Good afternoon.
03:49:22   4   Q.  Let's see if there's some things you and I can agree
03:49:25   5   on.
03:49:26   6          You made a number of conclusions in this case
03:49:30   7   regarding the commercial value of what you call the
03:49:35   8   technology at issue, fair?
03:49:36   9   A.  Yes, sir.
03:49:38   10   Q.  And when you say the technology at issue, you are
03:49:42   11   talking about the technology claimed in the specific
03:49:46   12   patents in front of the jury, true?
03:49:48   13   A.  Yes, sir, auto capture.
03:49:50   14   Q.  You're not talking about some other technology, right?
03:49:54   15   A.  No.
03:49:56   16   Q.  You state that -- well, you just told us auto capture.
03:50:04   17   Now, you understand, though, sir, that the patents in this
03:50:08   18   case describe doing auto capture in a particular way, true?
03:50:14   19   A.  The patents describe what is called in the industry
03:50:20   20   auto capture.
03:50:21   21   Q.  And -- and -- and performing auto capture using the
03:50:27   22   specific set of steps, true?
03:50:29   23   A.  What is claimed in the patents, yes, sir.
03:50:32   24   Q.  And you're not saying and you're not telling the jury
03:50:36   25   that the patents claim manual capture, right?

03:50:40  1   A.   No, these patents are all about auto capture.

03:50:43  2   Q.   Auto capture with a specific set of steps as laid out

03:50:47  3   in the claims of the patent.  Can we agree on that?

03:50:50  4   A.   Patent claims describe auto capture, yes, sir.

03:50:55  5   Q.   Let me try this -- I just want to make sure you and I

03:50:58  6   are communicating.

03:51:00  7          The patent claims describe auto capture in a

03:51:02  8   specific set of steps that must be performed in the claims

03:51:06  9   of the patent; is that correct, sir?

03:51:09  10  A.   The claims describe auto capture, yes, sir.

03:51:16  11          MR. MELSHEIMER:  Your Honor, I will just -- I

03:51:18  12  would object as non-responsive because he's leaving off the

03:51:20  13  specific set of steps.  I don't think I'm getting an answer

03:51:23  14  to that.

03:51:24  15          THE COURT:  Ask your question again, counsel.

03:51:27  16  Q.   (By Mr. Melsheimer)  Mr. Calman, you understand that

03:51:32  17  auto capture, as described in these patents, the patent

03:51:35  18  claims, have a specific set of steps, true?

03:51:38  19  A.   Yes, sir.

03:51:41  20  Q.   And that's the technology you're talking about in terms

03:51:45  21  of your valuation, correct?

03:51:48  22  A.   Yes, that's right.

03:51:50  23  Q.   Now, you have told the jury that you think that

03:51:58  24  technology, the patent claims at issue, contributes a

03:52:03  25  certain percentage to the value of mobile deposit as a

03:52:06   1   whole to Wells Fargo.  Do I have that right?

03:52:11   2   A.  Yes.  I did an apportionment of auto capture as the

03:52:16   3   value it contributes to the new channel of mobile remote

03:52:20   4   deposit capture.

03:52:20   5   Q.  And -- and you say that the auto capture, as described

03:52:25   6   in the claims of these patents, is responsible for 40

03:52:29   7   percent of the entire value of remote -- mobile remote

03:52:36   8   deposit, right?

03:52:36   9   A.  Repeat that one more time.

03:52:41   10  Q.  It's your testimony that the auto capture, as defined

03:52:44   11  in the claims of these patents, is responsible for 40

03:52:48   12  percent of the value of the entire mobile remote deposit

03:52:57   13  system?

03:52:57   14  A.  Yes, that's correct.

03:52:58   15  Q.  Now, you do a number of calculations to get to that

03:53:02   16  valuation, don't you, sir?

03:53:03   17  A.  I did.

03:53:05   18  Q.  Okay.  Now, I want to talk about this idea, though,

03:53:09   19  that -- I want to talk about sort of the ultimate --

03:53:15   20         THE COURT:  Don't tell him what you want to talk

03:53:18   21  about.  Ask him a question.

03:53:19   22         MR. MELSHEIMER:  Thank you, Your Honor.  I was

03:53:21   23  pausing for a minute.

03:53:22   24  A.  I'm fine.  Please continue.

03:53:23   25  Q.  (By Mr. Melsheimer)  Okay.  You had decades of

03:53:28   1   experience in banking, true, sir?

03:53:30   2   A.   Yes, indeed.

03:53:31   3   Q.   Going way back to the 1980s, right?

03:53:35   4   A.   Yes, sir.

03:53:35   5   Q.   Started working in small banks and ended up working in

03:53:40   6   the largest bank in the United States, right?

03:53:43   7   A.   It was at that time, yes, sir.

03:53:46   8   Q.   Bank of America, right?

03:53:47   9   A.   That's the one.

03:53:48   10   Q.   Now, you became familiar in your experience at Bank of

03:53:52   11   America and, subsequently, with mobile deposit systems,

03:53:56   12   right?

03:53:56   13   A.   I did.

03:53:56   14   Q.   And mobile deposit is listed as one of the areas of

03:53:59   15   expertise in your resume; is that right?

03:54:02   16   A.   It is.

03:54:03   17   Q.   And to quote it, you say:  Mobile deposits, including

03:54:08   18   early development and testing of the technology,

03:54:12   19   deployment, and UI innovation.

03:54:15   20        Does that sound familiar?

03:54:16   21   A.   That's from my CV, yes, sir.

03:54:19   22   Q.   UI is user interface, right?

03:54:21   23   A.   Yes.   It's also sometimes called user experience, as

03:54:27   24   well.

03:54:27   25   Q.   User experience and user interface, that's how the

```
03:54:33   1   user, if you will, interacts with the particular
03:54:37   2   application, right?
03:54:38   3   A.   That's that human computer interface, that's right.
03:54:42   4   Q.   Whether you have to push buttons or touch things on the
03:54:48   5   screen and all that sort of stuff, that's -- that's what we
03:54:52   6   think of when we think of the user experience, right?
03:54:55   7   A.   User experience can be more than that, but it does
03:54:59   8   include those things you mentioned.
03:55:00   9   Q.   And so is it fair to say that you had a pretty good
03:55:06  10   understanding of mobile deposit systems when they were just
03:55:12  11   manual capture?
03:55:16  12   A.   Well, some of them, yes.
03:55:17  13   Q.   So -- and I want to -- so let's -- let's talk about
03:55:20  14   that.
03:55:21  15        When -- when manual capture is used, I think this
03:55:26  16   is clear, the user takes the phones, pushes the button, and
03:55:29  17   takes a picture of the check, right?  That's manual
03:55:33  18   capture?
03:55:34  19   A.   That's right.  The human decides when to take the
03:55:36  20   picture, and they push the button.
03:55:38  21   Q.   Now, once the picture is taken, there's a series of
03:55:44  22   steps that occurs, true?
03:55:47  23   A.   Sure.  Yeah, of course.
03:55:52  24   Q.   The image is transmitted to some servers, correct?
03:55:58  25   A.   At some point after the image is captured, it's sent to
```

| | | |
|---|---|---|
| 03:56:03 | 1 | a server, sure. |
| 03:56:04 | 2 | Q.  And a server is just a centralized computer, right? |
| 03:56:06 | 3 | A.  I think it's -- I can't entirely agree with that |
| 03:56:13 | 4 | description. |
| 03:56:14 | 5 | Q.  Well, a server is a dedicated or specialized computer |
| 03:56:18 | 6 | processor? |
| 03:56:21 | 7 | A.  In some cases, yes. |
| 03:56:23 | 8 | Q.  And the -- that image needs to get to the server |
| 03:56:29 | 9 | whether it was captured automatically or whether the user |
| 03:56:34 | 10 | had to push a button, right? |
| 03:56:37 | 11 | A.  It has to get to downstream systems in order to be able |
| 03:56:41 | 12 | to deposit, sure. |
| 03:56:42 | 13 | Q.  No matter how it was captured, right? |
| 03:56:47 | 14 | A.  To make a deposit, yes, sir. |
| 03:56:49 | 15 | Q.  Okay.  And, to your knowledge, there's not a different |
| 03:56:56 | 16 | server on the bank side for taking these images using |
| 03:57:03 | 17 | manual capture versus using auto capture? |
| 03:57:08 | 18 | A.  Are we talking about Wells Fargo? |
| 03:57:10 | 19 | Q.  Banking generally, sir. |
| 03:57:13 | 20 | A.  I think it depends. |
| 03:57:15 | 21 | Q.  Okay.  What about Wells Fargo? |
| 03:57:16 | 22 | A.  I didn't see any evidence of a separate server for |
| 03:57:23 | 23 | manual capture images or auto capture images, no. |
| 03:57:28 | 24 | Q.  And once it gets to the server, however it's gotten in |
| 03:57:32 | 25 | the system, whether it's manual or automatic, the server |

| | | |
|---|---|---|
| 03:57:36 | 1 | has to do some things to process the check, right? |
| 03:57:39 | 2 | A.  It depends. |
| 03:57:44 | 3 | Q.  Well, it has to perform some optical character |
| 03:57:48 | 4 | recognition, doesn't it? |
| 03:57:49 | 5 | A.  In some implementations, yes. |
| 03:57:54 | 6 | Q.  It has to be able to gather all the information that's |
| 03:58:00 | 7 | on the check and do -- do some things with it, right? |
| 03:58:03 | 8 | A.  Can you re -- say that one more time. |
| 03:58:09 | 9 | Q.  Well, when the check gets -- when the image of the |
| 03:58:14 | 10 | check gets to a ser -- gets to the server at the bank, that |
| 03:58:19 | 11 | processor, that computer hardware has to do some things to |
| 03:58:27 | 12 | get that check processed into the bank system, true? |
| 03:58:31 | 13 | A.  In general, I agree. |
| 03:58:36 | 14 | Q.  There has to be -- for example, on the server at the |
| 03:58:40 | 15 | bank, there has to be some image quality analysis, right? |
| 03:58:46 | 16 | A.  I think that depends. |
| 03:58:48 | 17 | Q.  Well, is it your testimony, sir, that all the image |
| 03:58:52 | 18 | quality analysis happens on the mobile phone or smart |
| 03:58:55 | 19 | device, or does some of it happen at the bank server |
| 03:58:59 | 20 | itself, or do you know? |
| 03:58:59 | 21 | A.  That all depends on configuration. |
| 03:59:04 | 22 | Q.  It can be the case that image quality analysis is |
| 03:59:09 | 23 | conducted at the bank-side server, true? |
| 03:59:12 | 24 | A.  Well, that's the traditional way it was always done |
| 03:59:16 | 25 | before USAA created auto capture. |

03:59:17  1   Q.  Sir, you just told the jury that you USAA created --

03:59:31  2   was the first to create auto capture?

03:59:34  3   A.  That's my belief, yes, sir.

03:59:36  4   Q.  Now, sir, isn't it true that before you were hired as

03:59:42  5   an expert in this case for USAA, back in 2017, you wrote a

03:59:51  6   report that contained a statement that someone else was the

03:59:58  7   first to develop a mobile app with auto capture of a check?

04:00:06  8   A.  I don't recall that.

04:00:07  9   Q.  Can you look, sir --

04:00:13  10        MR. MELSHEIMER:  Your Honor, may we approach the

04:00:14  11  witness with some binders?

04:00:16  12        THE COURT:  You may.

04:00:24  13        Opposing counsel has these, as well?

04:00:27  14        MS. GLASSER:  We do.

04:00:28  15        MR. MELSHEIMER:  Yes, Your Honor.

04:00:29  16        THE COURT:  All right.  Let's proceed.

04:00:30  17  Q.  (By Mr. Melsheimer)  I'd like you to look at Tab 18,

04:00:35  18  Mr. Calman.  And, again, without describing anything about

04:00:37  19  it, do you recognize Tab 18 as a report that you created in

04:00:43  20  October of 2017?

04:00:44  21  A.  There are three books.  Which book do you mean?

04:00:52  22  Q.  It's in the Calman Exhibit Book, Tab 18?

04:00:55  23  A.  Okay.  Just a moment.

04:01:03  24  Q.  Are you there, sir?

04:01:05  25  A.  I'm at Tab 18, yes, sir.

04:01:06  1  Q.  And do you see that?  Again, without saying anything

04:01:09  2  about what it is, would you -- would you -- do you

04:01:13  3  recognize that as a report that you prepared in October of

04:01:15  4  2017, right?

04:01:16  5  A.  It is dated October 2017.  And it does have the logo

04:01:25  6  from my company, yes, sir.

04:01:26  7  Q.  Okay.  And that is before you were hired as an expert

04:01:30  8  in this case by USAA, true?

04:01:32  9  A.  True.

04:01:35  10  Q.  And if you will turn to Page 4, sir.  And I just want

04:01:42  11  to publish one -- one-and-a-half lines to the -- to the

04:01:47  12  jury and to you, sir.

04:01:48  13         Didn't -- didn't you --

04:01:52  14         MS. GLASSER:  Your Honor, I had a different

04:01:54  15  understanding of the question he was going to ask.  May I

04:01:57  16  approach?

04:01:58  17         THE COURT:  Put the lines back on the screen,

04:02:00  18  please, so I can see them.

04:02:09  19         No, Ms. Glasser, have a seat.

04:02:10  20         MS. GLASSER:  Okay.

04:02:11  21         THE COURT:  Ask your question, Mr. Melsheimer.

04:02:15  22  Q.  (By Mr. Melsheimer)  In -- in -- back in October of

04:02:17  23  2017, sir, didn't you prepare a report that had this

04:02:23  24  statement in it with this language:  Principal developer on

04:02:27  25  Merrill Lynch app, comma, first mobile deposit app to

04:02:31  1   automatically take a photo of a check image -- of a check

04:02:35  2   for image check deposit.

04:02:38  3          Did I read that correctly?

04:02:39  4   A.  Yes, sir, but this isn't auto capture as we've been

04:02:43  5   discussing it.

04:02:44  6          THE COURT:  You can pull that down now.

04:02:58  7   Q.  (By Mr. Melsheimer)  So let's get back to sort of the

04:03:00  8   life of this check once it's gotten into the bank system.

04:03:04  9   All right?

04:03:04  10  A.  Okay.

04:03:05  11  Q.  And, again, whether it's gotten into the bank system by

04:03:09  12  manual capture or auto capture, these are what my questions

04:03:15  13  are to you, okay?

04:03:17  14  A.  Okay.

04:03:17  15  Q.  So the bank's -- the servers -- the checks show up on

04:03:26  16  the servers, and there has to be work done on the bank side

04:03:29  17  of things to process the check, right?

04:03:32  18  A.  Oh, sure.  Yes, of course.

04:03:34  19  Q.  And that work has to be done really no matter how the

04:03:41  20  check has made its way to the bank, right?

04:03:43  21  A.  Well, it depends on a lot of things, but stuff has to

04:03:47  22  be done in order to post and clear checks, sure.

04:03:50  23  Q.  Right.  Posting and clearing a check has to be done

04:03:53  24  whether it's captured manually on a mobile phone, whether

04:03:57  25  it's done with auto capture, one particular way or another

04:04:00  1   of doing that, or whether someone goes to an ATM and puts
04:04:05  2   the check in, or shows up at the bank and -- with the
04:04:09  3   check -- the paper check, right?
04:04:10  4   A.   So banks are obligated to process their customers'
04:04:14  5   deposits, absolutely.
04:04:15  6   Q.   And that is a -- a clearing -- that's called a clearing
04:04:19  7   process, right?
04:04:19  8   A.   Sometimes.
04:04:20  9   Q.   And you have to make -- the bank is going to make
04:04:27 10   entries in its systems about the amount of the check and
04:04:32 11   what account it's either going to or from and things of
04:04:36 12   that nature.   That's what's called clearing, right?
04:04:38 13   A.   That's not exactly right.
04:04:39 14   Q.   All right.   Let me say it a different way.
04:04:41 15   A.   Uh-huh.
04:04:42 16   Q.   The process of clearing a check involves typically --
04:04:47 17   or can involve more than one bank, right?
04:04:49 18   A.   Oh, if you're talking about clearing, it always
04:04:54 19   involves another bank.
04:04:54 20   Q.   Because in clearing, you might have a check written
04:04:58 21   from -- let's just take an example of me to you.   Let's say
04:05:01 22   I write you a check, and I use Wells Fargo or Chase.   And
04:05:05 23   let's say your -- your account is Bank of America, okay?
04:05:12 24   If I write you a check and you want it deposited in your
04:05:16 25   Bank of America account, no matter how you're going to

04:05:18  1   deposit it --

04:05:18  2   A.  Uh-huh.

04:05:19  3   Q.  -- okay, that check has to go through certain processes

04:05:24  4   at both my bank, right, and at your bank?

04:05:30  5   A.  Well, would be in the other order.  It would be at my

04:05:34  6   bank, and then it would be at your bank.  But that's sort

04:05:37  7   of right.

04:05:38  8   Q.  You would deposit it at your bank.  It would have to go

04:05:41  9   through the process.  There had to be -- make sure I have

04:05:43 10   money in my account to satisfy whatever check I've written

04:05:46 11   to you, right?

04:05:46 12   A.  Well, that wouldn't happen at my bank.

04:05:46 13   Q.  Well, but you --

04:05:48 14   A.  That would happen at your bank.

04:05:49 15   Q.  Sir, we're talking about the process.  The process is a

04:05:52 16   back-and-forth between those two banks, right?

04:05:54 17   A.  I wouldn't characterize it as back and forth, no, sir.

04:05:59 18   Q.  Would you characterize it as a process that involves

04:06:02 19   two banks?

04:06:04 20   A.  Yes, I think I said that for sure.

04:06:06 21   Q.  And the check clearing process is something that's been

04:06:09 22   known for decades, right?

04:06:12 23   A.  Oh, most definitely.

04:06:15 24   Q.  And, again, you have to clear checks no matter how they

04:06:18 25   get in the system, fair?  Or process checks no matter how

04:06:22   1   they get in the system, right?

04:06:23   2   A.  Yeah, like I said, banks are obligated to process their

04:06:26   3   customers' deposits.

04:06:28   4   Q.  Because they may not clear?

04:06:29   5   A.  That's definitely true.

04:06:32   6   Q.  Right, you might have a check where the person writes a

04:06:35   7   check, but they don't have enough in their account to cover

04:06:38   8   the check that you've deposited.

04:06:39   9       And then there will be some communication back

04:06:41  10   to -- if I've written that check, I'll find out from my

04:06:45  11   bank, hey, we can't honor this.  And you'll find out from

04:06:48  12   your bank that, hey, we can't credit you because this

04:06:52  13   person doesn't have the money.

04:06:53  14   A.  It's a really complex system, that's right.

04:06:56  15   Q.  All right, sir.  So let me talk about checks generally.

04:07:10  16   And let's -- let's go to your report, and I think you have

04:07:13  17   it there in your binder, sir, Section -- do you have your

04:07:19  18   report, sir?

04:07:19  19   A.  Yes, sir.

04:07:21  20   Q.  Okay.  Can you go to Paragraph 18A -- or Section 18A of

04:07:28  21   your report?

04:07:35  22   A.  Numeral 18A, yes, sir, I'm there.

04:07:38  23   Q.  And that's titled, I believe, The Importance of Mobile

04:07:41  24   Deposit to Wells Fargo?

04:07:41  25   A.  It is.

04:07:42  1   Q.  Okay.  And you say:  Having an effective mobile deposit

04:07:46  2   system is critical -- is of critical importance for Wells

04:07:52  3   Fargo in a competitive banking market, right?

04:07:54  4   A.  Yes, sir.

04:07:55  5   Q.  Okay.  Now, you don't say auto capture in that

04:07:57  6   sentence, do you, sir?

04:07:58  7   A.  No, I say an effective mobile deposit system.

04:08:02  8   Q.  Because mobile deposit system involves things other

04:08:07  9   than auto capture, true?

04:08:08  10  A.  An effective mobile deposit system does include auto

04:08:16  11  capture.

04:08:16  12  Q.  But it also involves other things, doesn't it, sir?

04:08:19  13  A.  Oh, yeah, that's the other 60 percent.

04:08:21  14  Q.  And you know that Wells Fargo previously had a mobile

04:08:26  15  deposit system that did not have auto capture, right?

04:08:28  16  A.  Definitely.

04:08:29  17  Q.  Now, one of the things that we -- that -- were you here

04:08:37  18  for the opening statement?

04:08:38  19  A.  The majority, yes, sir.

04:08:41  20  Q.  So one of the things that was discussed in the opening

04:08:44  21  was whether or not checks -- paper checks have the same

04:08:48  22  importance as they used to, right?

04:08:51  23  A.  I heard that mentioned, yes, sir.

04:08:53  24  Q.  And you agree -- and -- you agree that checks have been

04:09:02  25  of declining importance over the years, fair?

04:09:05   1    A.  No, I don't agree with that statement.

04:09:06   2    Q.  Well, sir, haven't you previously testified under oath

04:09:11   3    that -- that checks are a dying channel?

04:09:16   4    A.  I don't recall that testimony.

04:09:18   5    Q.  Okay.  Well, let's take a look at it, sir.

04:09:25   6            Take a look at your prior testimony binder, sir,

04:09:41   7    Tab 1.

04:09:45   8    A.  Yes, sir.

04:09:47   9    Q.  And if you would, sir, go to Page 131.

04:09:51   10   A.  Okay.

04:09:52   11   Q.  Tell me when you're there, sir.

04:10:04   12   A.  I'm at Page 131.

04:10:05   13   Q.  And if you look, sir, at the -- the -- the -- the

04:10:19   14   answer starting on Line 4, you talk about the payments

04:10:25   15   leadership council at the bank looks at payments in

04:10:29   16   general, which is really focused, again, on card and ACH.

04:10:34   17   Do you see that?

04:10:34   18   A.  I do.

04:10:35   19   Q.  And you say:  Check is a, you know, declining, dying

04:10:42   20   product, or dying channel.  Did I read that correctly, sir?

04:10:45   21   A.  That's the testimony as it appears.

04:10:47   22   Q.  And you said that back in 2007, right?

04:10:52   23   A.  That was the point of view, yes, sir.

04:10:54   24   Q.  Now, there were some projections made at Wells Fargo

04:11:08   25   about how successful mobile deposit would be when they

04:11:14  1   first implemented that product using the Mitek software,

04:11:17  2   fair?

04:11:21  3   A.  I wouldn't quite agree with that the way you said that,

04:11:24  4   but you're close.

04:11:24  5   Q.  Well, did you talk about some projections, sir, in your

04:11:30  6   report in Paragraph 514?

04:11:36  7   A.  I did talk about projections prior to the launch, yes,

04:11:39  8   sir.

04:11:39  9   Q.  Can you look at your report, sir, and Paragraph 514?

04:11:48  10  A.  514.  Oh, I'm sorry, Paragraph 514.

04:11:57  11  Q.  Paragraph 514, sir, I apologize.

04:12:01  12  A.  I was looking at page.  I'm there.

04:12:18  13  Q.  And here, I'm going to illustrate -- display for the

04:12:22  14  jury, if we would, the chart on Paragraph 514, sir.  This

04:12:28  15  is a -- this is a Wells Fargo document or Wells Fargo data

04:12:34  16  that shows both the actual mobile deposits versus forecast.

04:12:40  17  Are you with me?

04:12:40  18  A.  Yes, sir.

04:12:41  19  Q.  Okay.  So let's just take a look at what is shown in

04:12:44  20  here.  Now, this is -- this is data that actually goes up

04:12:53  21  to 2018, does it not, sir?

04:12:54  22  A.  Yes, sir.

04:12:59  23  Q.  And if you start -- and just to orient the jury,

04:13:02  24  there's different colors of the lines.  There was -- the

04:13:08  25  green is the forecast for the high side, the red is the

04:13:11  1  forecast for the median, and the purple is the forecast for

04:13:15  2  the low, and then the actual is the yellow.  Is that right?

04:13:20  3  A.  You got it right.

04:13:22  4  Q.  So it looks like to me, sir, that the actual mobile

04:13:29  5  deposits that were -- that were experienced at Wells Fargo

04:13:37  6  Bank quite exceeded the projections that they made back in

04:13:39  7  2012, right?

04:13:40  8  A.  Yes, indeed.

04:13:41  9  Q.  You know that it starts in 2012, this chart, because

04:13:47  10  that's when Wells Fargo started offering mobile -- the

04:13:52  11  mobile deposit app for people's smartphones, right?

04:13:57  12  A.  Well, that was the first year of the data table, and it

04:14:01  13  was also the year that they launched mobile deposit, that's

04:14:05  14  right.

04:14:05  15  Q.  No doubt -- I just -- just so we're clear, you're not

04:14:09  16  doubting that 2012 was the date that Wells Fargo launched

04:14:13  17  its mobile deposit app, are you, sir?

04:14:15  18  A.  No.

04:14:17  19  Q.  Okay.  And it looks like that for the year 2012, it's

04:14:25  20  not going straight up, but it's going up at about a

04:14:32  21  45-degree angle, would you say, maybe even a 60-degree

04:14:36  22  angle?

04:14:37  23  A.  Well, sir, this is annual full year data.  So you can't

04:14:40  24  use the angle or the -- any of the intermediate points.

04:14:45  25  You can only use the -- if you zoom back out you'll see the

| 04:14:48 | 1 | data table.  You can only use those full year figures.  So |
| 04:14:52 | 2 | I can't agree with your interpretation. |
| 04:14:53 | 3 | Q.  Well, sir, let's look at what's happening with the |
| 04:14:56 | 4 | line, though.  The line starts in 2012, and it's going up, |
| 04:15:01 | 5 | true? |
| 04:15:01 | 6 | A.  Again, it's -- it would be incorrect to interpret this |
| 04:15:09 | 7 | chart the way you are. |
| 04:15:10 | 8 | Q.  You don't think that mobile deposits were going up at |
| 04:15:17 | 9 | Wells Fargo in 2012? |
| 04:15:19 | 10 | A.  That's not what I'm saying, sir. |
| 04:15:21 | 11 | Q.  Okay.  So let me see if I can -- let's see if you -- |
| 04:15:24 | 12 | let's see if you and I can communicate better on this. |
| 04:15:27 | 13 |         This chart goes from 2012 to 2018, right? |
| 04:15:32 | 14 | A.  It contains annual values for each of those years, yes, |
| 04:15:36 | 15 | sir. |
| 04:15:36 | 16 | Q.  And it looks like from 2012 to 2013, there's a pretty |
| 04:15:45 | 17 | significant increase in mobile deposits? |
| 04:15:48 | 18 | A.  As I said, if you show the table along with the chart, |
| 04:15:51 | 19 | as it's depicted in Paragraph 514, you can see that's true |
| 04:15:54 | 20 | for all four lines, yes. |
| 04:15:58 | 21 |         MR. MELSHEIMER:  Let's back it up. |
| 04:16:00 | 22 | Q.  (By Mr. Melsheimer)  Is this what you want to look at, |
| 04:16:08 | 23 | sir? |
| 04:16:08 | 24 | A.  This is the data upon which that chart is built, yes, |
| 04:16:11 | 25 | sir. |

04:16:11  1  Q.  And just so we're clear, this data is plotted, if you

04:16:17  2  will, the data on the right is represented by the graphs on

04:16:23  3  the left, isn't that what's shown here, sir?

04:16:26  4  A.  Absolutely correct.

04:16:27  5  Q.  Okay.  And it shows that in 2012 the actual mobile

04:16:36  6  deposits were 1.6 million deposits, is that -- am I reading

04:16:41  7  that correctly?

04:16:41  8  A.  For the full year of 2012, it was 1,601,251, that's

04:16:49  9  right.

04:16:49  10  Q.  To be clear, and to be fair with you, sir, did -- we're

04:16:51  11  not saying that Wells Fargo even had the app for the

04:16:53  12  entirety of 2012, or do you know?

04:16:55  13  A.  It was not -- no, they did not have the app released to

04:17:00  14  the public for the full year of 2012, that's right.

04:17:03  15  Q.  So you said the full year, but it really measures --

04:17:09  16  whatever part of the year the app was available in 2012,

04:17:13  17  right?

04:17:13  18  A.  That's the total number of actual mobile deposits in

04:17:15  19  the year 2012.

04:17:20  20  Q.  And it's dramatically increased from 2012 to 2013, is

04:17:26  21  it not, sir?

04:17:27  22  A.  Well, for the full year of 2012, yes, as compared to

04:17:30  23  the full year of 2013, you bet.

04:17:32  24  Q.  And we know that in 2012, there was manual capture,

04:17:39  25  right?

04:17:39  1    A.   That's right.

04:17:39  2    Q.   We know in 2013, there was manual capture, correct?

04:17:44  3    A.   There was manual capture in every year of this chart.

04:17:46  4    Q.   Sir, in 2012 and 2013, there was only manual capture in

04:17:54  5    the Wells Fargo app, you know that, don't you?

04:17:56  6    A.   I do.

04:17:57  7    Q.   You know that it was only in May or so of 2014 that

04:18:08  8    Wells Fargo added the MiSnap feature to its mobile app,

04:18:14  9    correct?

04:18:14 10    A.   Yes, sir.

04:18:18 11    Q.   And, again, we can look at the data on the left -- or,

04:18:24 12    excuse me, on the right, and we can look on the chart on

04:18:27 13    the left and see what's happening with the actual mobile

04:18:32 14    deposits and then the projections, true?

04:18:34 15    A.   That's right.  You can see that after auto capture was

04:18:39 16    launched, that gap just got bigger and bigger and bigger.

04:18:45 17             MR. MELSHEIMER:  Objection, nonresponsive, Your

04:18:47 18    Honor.  Move to strike.

04:18:50 19             THE COURT:  Overruled.

04:18:51 20    Q.   (By Mr. Melsheimer)  What I -- what I see, sir, and I

04:18:56 21    agree with what you said about the increase, but can we

04:18:58 22    agree that between 2012 and 2013, there was about 16

04:19:08 23    million more mobile deposits year over year just using

04:19:15 24    manual capture, true?

04:19:16 25    A.   Well, as you pointed out, 2012 wasn't a full year.  So

04:19:19   1   you really can't compare 2012 to 2013, as though it was a

04:19:24   2   year over year increase because you don't have a full year

04:19:27   3   in 2012.

04:19:27   4   Q.  Well, we can't do that for 2014 either, can we, sir?

04:19:30   5   A.  It's apples and oranges.  I'm not sure I understand.

04:19:36   6   Q.  Sir, mobile deposit with auto capture wasn't offered

04:19:43   7   for the whole year of 2014 either, was it, sir?

04:19:46   8   A.  No, that's true.

04:19:48   9   Q.  Okay.  And, in fact, sir, can you agree with me that

04:19:58  10   the -- the -- what Wells Fargo experienced with manual

04:20:02  11   capture in 2013 was numbers that -- that it wasn't

04:20:13  12   projected to hit in the median or low forecast until 2017

04:20:19  13   or 2018, right?

04:20:24  14   A.  Yeah, the actual exceeded the high forecast by 26

04:20:29  15   percent, and that low forecast was just a half of the high

04:20:33  16   forecast, so it was even, you're right, later before that

04:20:37  17   low forecast would catch up.

04:20:40  18   Q.  Let's be clear, sir.  The actual numbers of mobile

04:20:42  19   deposit in 2013 were 17 million, right?

04:20:45  20   A.  17 --

04:20:45  21   Q.  17.6 million, true?

04:20:48  22   A.  Yes, sir.

04:20:48  23   Q.  And that wasn't forecasted under the median forecast

04:20:56  24   until 2017, that that kind of number, was it, sir?

04:21:01  25   A.  I can't disagree.  That's what the chart shows.

04:21:13   1   Q.   I want to talk to you about your Net Promoter Score,
04:21:26   2   sir.   You do a model called Net Promoter Score, and you
04:21:30   3   said that's all based on this notion of would you recommend
04:21:33   4   the services of this company to a friend.
04:21:36   5   A.   Okay.   So, A, it's not my Net Promoter Score.
04:21:40   6   Q.   It's your analysis?
04:21:41   7   A.   And, B, it's not my notion.   This is a well-accepted
04:21:45   8   industry model that's adopted by many companies around the
04:21:49   9   world.
04:21:49  10   Q.   I'm not criticizing it at all, sir.   I want -- it's --
04:21:53  11   it's in your report, right?
04:21:54  12   A.   Oh, yes, sir, Net Promoter System is in my report.
04:21:57  13   Q.   It's what -- it's a model that you, Matt Calman, adopt
04:22:02  14   and write about in your report, true?
04:22:04  15   A.   I wouldn't quite say it that way.
04:22:08  16   Q.   Is Net Promoter Score analysis contained within the
04:22:12  17   expert report of Matt Calman or is it not?
04:22:14  18   A.   I do reference insights from Bain's NPS system, for
04:22:21  19   sure.
04:22:21  20   Q.   And that is called Net Promoter, isn't it, sir?
04:22:24  21   A.   The system -- right.   "S" can mean system or score.
04:22:27  22   But NPS is Bain's model, and I did adopt insights from that
04:22:33  23   model, you bet.
04:22:34  24   Q.   And your model depends in part on Wells Fargo being a
04:22:41  25   leader in mobile banking, right?

| | | |
|---|---|---|
| 04:22:42 | 1 | A.  Yes. |
| 04:22:48 | 2 | Q.  But mobile banking is more than just mobile deposit, |
| 04:22:51 | 3 | right? |
| 04:22:51 | 4 | A.  Well, they were a leader in both. |
| 04:22:56 | 5 | Q.  Mobile banking is more than mobile deposit; isn't that |
| 04:23:03 | 6 | right, sir? |
| 04:23:03 | 7 | A.  Of course. |
| 04:23:04 | 8 | Q.  Mobile banking involves things like checking your |
| 04:23:09 | 9 | account balance, right? |
| 04:23:11 | 10 | A.  Yes. |
| 04:23:11 | 11 | Q.  Transferring money between accounts, right? |
| 04:23:14 | 12 | A.  Yes. |
| 04:23:14 | 13 | Q.  Paying bills, right? |
| 04:23:17 | 14 | A.  In some, yes. |
| 04:23:20 | 15 | Q.  None of those services involve depositing checks, do |
| 04:23:24 | 16 | they, sir? |
| 04:23:25 | 17 | A.  Not directly, no. |
| 04:23:27 | 18 | Q.  Now, sir, I want to take a look at something that you |
| 04:23:38 | 19 | cite in your report called The Mobile 2015 Roadmap.  This |
| 04:23:48 | 20 | is a Document 419, and I believe it's in your exhibit |
| 04:23:51 | 21 | binder, sir, at Tab 7. |
| 04:23:54 | 22 | A.  Just a second, please.  Okay.  The -- |
| 04:24:03 | 23 | Q.  I'm sorry, sir? |
| 04:24:05 | 24 | A.  I apologize. |
| 04:24:05 | 25 | Q.  Tab -- Tab 7 -- |

| | | |
|---|---|---|
| 04:24:07 | 1 | A.  Of -- |
| 04:24:08 | 2 | Q.  -- in the binder.  It's a Wells Fargo document entitled |
| 04:24:11 | 3 | Mobile 2015 Roadmap. |
| 04:24:13 | 4 | A.  This is the Calman exhibits binder? |
| 04:24:17 | 5 | Q.  Yes, sir. |
| 04:24:18 | 6 | A.  And tab number? |
| 04:24:20 | 7 | Q.  Tab No. 7. |
| 04:24:25 | 8 | A.  I'm there. |
| 04:24:25 | 9 | Q.  If you need to confirm, sir, it's referenced in your |
| 04:24:30 | 10 | report at Paragraph 496, but you -- do you remember looking |
| 04:24:33 | 11 | at this? |
| 04:24:34 | 12 | A.  Okay.  I'm at Paragraph 496, and I have PX-419; is that |
| 04:24:58 | 13 | correct? |
| 04:24:58 | 14 | Q.  Yes, sir. |
| 04:24:59 | 15 | A.  Okay. |
| 04:24:59 | 16 | Q.  So this is a -- a roadmap that Wells Fargo prepared for |
| 04:25:04 | 17 | its mobile banking operations, right? |
| 04:25:06 | 18 | A.  Oh, sorry, 496.  Here we go, okay.  Yeah, I'm there. |
| 04:25:18 | 19 | Q.  We're all looking at it.  Okay.  It's a mobile roadmap |
| 04:25:22 | 20 | as of 2015; isn't that right, sir? |
| 04:25:24 | 21 | A.  Yes, sir. |
| 04:25:24 | 22 | Q.  These are common -- you saw these kind of things when |
| 04:25:29 | 23 | you worked for Bank of America, didn't you? |
| 04:25:30 | 24 | A.  Saw them and created them, you bet. |
| 04:25:32 | 25 | Q.  These are sort of looking -- forward-looking documents |

04:25:37   1   about plans and -- and assessments of how the company is

04:25:40   2   doing in particular areas?

04:25:42   3   A.   They're internal use only.   Like I said earlier,

04:25:47   4   they're -- they talk about features that may or may not be

04:25:50   5   coming in the future.

04:25:51   6   Q.   And there's often discussion about how we can get

04:25:54   7   better, what can we do differently, what's working, things

04:25:58   8   of that nature, right?

04:25:59   9   A.   You bet.

04:26:00   10   Q.   And the first substantive page of the document talks

04:26:08   11   about the mobile channel, right?

04:26:11   12   A.   Talking about Page 1?   Yeah.

04:26:13   13   Q.   And I'm also displaying it, sir.

04:26:17   14   A.   Uh-huh.

04:26:17   15   Q.   And this talks about the mobile channel where it's got

04:26:20   16   the mobile website, which is wellsfargo.com, the mobile

04:26:26   17   app, the text banking, and then even tablet applications.

04:26:32   18   Do you see that?

04:26:32   19   A.   I do.

04:26:33   20   Q.   And those are all items of mobile banking that are not

04:26:38   21   specifically related to auto capture, correct, sir?

04:26:41   22   A.   I agree.   Oh, well, if I may, auto capture is included

04:26:50   23   in some of those.

04:26:51   24   Q.   Understood.   So I'm looking at a slide.   If you want to

04:27:00   25   look on Page 4, you can look in the -- in the -- in your

04:27:04  1  binder, the 2014/2015 Focus for Retail Mobile.  Do you see

04:27:09  2  that?

04:27:09  3  A.  I see it.

04:27:10  4  Q.  Now, retail banking, that's what we mean -- people

04:27:17  5  just -- ordinary people banking, as opposed to business

04:27:21  6  banking, right?  That's retail banking?

04:27:22  7  A.  I disagree.

04:27:23  8  Q.  So you think retail banking also includes business

04:27:26  9  banking?

04:27:26  10  A.  It does.

04:27:27  11  Q.  Okay.  So retail banking can include business banking

04:27:31  12  or consumer banking?

04:27:35  13  A.  Yes.

04:27:36  14  Q.  Well, I -- I mean, I want to get it straight from you,

04:27:39  15  sir.  Is -- is retail banking -- is that both consumer and

04:27:42  16  businesses?

04:27:43  17  A.  Yes, it is.

04:27:45  18  Q.  Okay.  What do we refer to when we're just talking

04:27:50  19  about non-business banking, i.e., just individual

04:27:53  20  consumers?  What's that called?

04:27:55  21  A.  When we're just -- can you rephrase?

04:27:58  22  Q.  What do we call it when we're just talking about

04:28:02  23  non-business customers, sir?

04:28:03  24  A.  I guess it depends.

04:28:09  25  Q.  Depends on what?

04:28:11  1   A.  So in my experience at Bank of America, consumer

04:28:14  2   banking was both individuals, like you and me, and what

04:28:19  3   were called small business and what was called small and

04:28:22  4   medium enterprise.

04:28:25  5        But at Bank of America, small business is any

04:28:27  6   business that makes less than $500 million a year.  So to

04:28:32  7   some people, that's not really small business, that's real

04:28:34  8   business.

04:28:35  9   Q.  Retail includes all of that at Wells Fargo, as far as

04:28:41 10   you know, right?

04:28:42 11   A.  Well, I don't know exactly how Wells Fargo makes

04:28:45 12   their -- their market segmentation, as it's called.

04:28:47 13   Q.  Well, let's take a look at some of the things that are

04:28:50 14   discussed in this roadmap, sir.

04:28:55 15        There's a mobile My Spending.  Do you see that?

04:28:59 16   A.  I do.

04:28:59 17   Q.  That's introducing PFM functionality to the mobile

04:29:03 18   experience by providing customers the ability to view their

04:29:06 19   spending in graphical form.  Do you see that?

04:29:08 20   A.  Yeah.  PFM is short for personal financial management.

04:29:12 21   Q.  That doesn't have anything to do with the auto capture

04:29:15 22   as described in these patents, does it, sir?

04:29:17 23   A.  No.

04:29:19 24   Q.  Something called Mobile IRT.  Do you see that, sir?

04:29:31 25   Mobile IRT is institutional retirement and trust

04:29:35  1   experience.  Do you see that?

04:29:37  2   A.  Yes, sir.

04:29:37  3   Q.  Is that like investments?

04:29:39  4   A.  I think it includes investments.

04:29:41  5   Q.  And that doesn't have anything to do with auto capture

04:29:43  6   as described in these patents, does it, sir?

04:29:45  7   A.  I wouldn't agree with that necessarily.

04:29:50  8   Q.  Well, is there anything on this slide that references

04:29:53  9   any form of auto capture or mobile deposit?

04:29:55  10  A.  I know at Bank of America, the Merrill Lynch app did

04:30:01  11  include mobile deposit.  So I don't know if Wells Fargo did

04:30:04  12  that, too, or not.

04:30:05  13  Q.  Sir, my question was:  Do you see anything on this

04:30:07  14  slide that rep -- that references mobile deposit or the

04:30:12  15  USAA form of auto capture?

04:30:13  16  A.  There are some icons at the bottom of the screen.  I

04:30:21  17  don't know what those do.  Well, it says:  The benefit is

04:30:28  18  to provide access to top features desired for mobile

04:30:32  19  access.  So I can't really tell.

04:30:34  20  Q.  Do you see the words "mobile deposit" or "auto capture"

04:30:38  21  on this slide, sir?

04:30:39  22  A.  Let me keep reading.  I don't see the words "auto

04:30:53  23  capture," but in two places, I see this notion of top

04:30:56  24  features desired for mobile access, and I just know how

04:31:00  25  much customers love mobile deposit.

| | | |
|---|---|---|
| 04:31:02 | 1 | Q.  Rewards Mobile Optimization.  Do you see that, sir, on |
| 04:31:08 | 2 | Page 7? |
| 04:31:08 | 3 | A.  I do. |
| 04:31:09 | 4 | Q.  Nothing about mobile deposit or auto capture here, is |
| 04:31:12 | 5 | there, sir? |
| 04:31:13 | 6 | A.  It's hard to read all the links, but I -- I don't see |
| 04:31:29 | 7 | it.  And there's some icons -- again, on this screenshot on |
| 04:31:32 | 8 | the right, it's really hard to see at the bottom, so I |
| 04:31:35 | 9 | can't be sure.  But, you're right, I don't see the words |
| 04:31:38 | 10 | "mobile deposit" or "auto capture" on here. |
| 04:31:39 | 11 | Q.  Well, isn't this talking about, sir, this idea of |
| 04:31:43 | 12 | having reward points and dealing with that in some way? |
| 04:31:48 | 13 | A.  Maybe you get rewards for doing mobile deposits. |
| 04:31:52 | 14 | Q.  You don't see that on the slide, do you, sir? |
| 04:31:55 | 15 | A.  Not specifically. |
| 04:32:02 | 16 | Q.  Travel Notifications? |
| 04:32:06 | 17 | A.  I'll just mention we did look at that kind of thing |
| 04:32:09 | 18 | when I was at Bank of America. |
| 04:32:14 | 19 |         I'm sorry, the next page? |
| 04:32:14 | 20 |         MR. MELSHEIMER:  I'm going to object to the answer |
| 04:32:18 | 21 | of, he looked at that kind of thing at Bank of America, as |
| 04:32:21 | 22 | nonresponsive, Your Honor. |
| 04:32:21 | 23 |         THE COURT:  I'll sustain that. |
| 04:32:23 | 24 | Q.  (By Mr. Melsheimer)  Travel Notifications, sir, you can |
| 04:32:24 | 25 | get -- enables customers to leverage mobile and online |

04:32:27   1   channel to inform Wells Fargo about their travel plans.

04:32:31   2   This will help customers avoid issues using their cards

04:32:35   3   while traveling.

04:32:36   4         Do you see that?

04:32:36   5   A.  I see that, yeah.

04:32:38   6   Q.  And we can go through, and we won't, but there's any

04:32:41   7   number of other things in this roadmap that are other

04:32:44   8   aspects of mobile banking, true?

04:32:47   9   A.  Oh, definitely.

04:32:51   10  Q.  Some of these are things that the bank is going to

04:32:54   11  implement.  Some of them are things the bank has

04:32:57   12  implemented.  And some of them are things the bank is

04:33:00   13  simply thinking about implementing, right?

04:33:03   14  A.  It all just depends.

04:33:31   15  Q.  Now, you were still at -- at -- you were still at Bank

04:33:35   16  of America in 2009, right?

04:33:36   17  A.  2009, definitely.

04:33:38   18  Q.  And when did Bank of America start offering mobile

04:33:44   19  deposit with manual capture?

04:33:49   20  A.  It was three years after USAA.  It was in 2012.

04:33:53   21  Q.  So is it fair -- was Bank of America the biggest bank

04:33:58   22  at that time in the country, sir?

04:34:00   23         THE COURT:  Counsel, approach the bench, please.

04:34:03   24         (Bench conference.)

04:34:09   25         THE COURT:  There's an order in limine that

04:34:12  1   prohibits talking about size of banks, and you've referred

04:34:15  2   to Bank of America twice as the biggest bank in America.

04:34:18  3   You're going to open a door I'm going to let the Plaintiffs

04:34:22  4   go through with regard to your client,

04:34:24  5   Mr. Melsheimer.

04:34:25  6        MR. MELSHEIMER:  I'll withdraw that.

04:34:26  7        THE COURT:  And I want to know why we're talking

04:34:28  8   about Bank of America.

04:34:29  9        MR. MELSHEIMER:  Just because there was a

04:34:30  10  suggestion that you couldn't do manual capture --

04:34:32  11       THE COURT:  I want to hear about Wells Fargo, not

04:34:34  12  Bank of America.

04:34:34  13       MR. MELSHEIMER:  Thank you, Your Honor.

04:34:35  14       MR. SHEASBY:  Thank you, Your Honor.

04:34:36  15       (Bench conference concluded.)

04:34:40  16       THE COURT:  Let's proceed.

04:34:41  17       MR. MELSHEIMER:  Thank you, Your Honor.

04:34:42  18  Q.  (By Mr. Melsheimer)  You were shown some pictures of

04:34:58  19  the Wells Fargo app as compared to the USAA app, in your

04:35:01  20  direct examination, sir.  Do you remember that?

04:35:04  21  A.  Left and right, yes, sir.

04:35:06  22  Q.  Yes, sir.  And you understand that those pictures

04:35:11  23  aren't relevant to the issue of patent infringement in this

04:35:14  24  case, right?

04:35:16  25  A.  Okay.  Can you explain?

04:35:19   1   Q.  Well, do you understand that the patents in this case

04:35:24   2   do not involve the -- how one program looks versus how

04:35:29   3   another program looks?  Do you understand that or not?

04:35:33   4   A.  Oh, well, the patents are not about the aesthetics.

04:35:37   5   They're about how the program -- how the system works.

04:35:39   6   Q.  How the code inside the smartphone operates, right?

04:35:42   7   A.  And the user experience that it creates.

04:35:45   8   Q.  Which could be auto capture or manual capture, as we've

04:35:50   9   been discussing, right?

04:35:51   10   A.  Well, the patents are all about auto capture.

04:35:53   11   Q.  Well, they are, sir.  Thank you for pointing that out.

04:35:56   12   And I'll add -- strike that.

04:35:57   13        You understand that the Wells Fargo application

04:36:01   14   here still do manual capture, correct?

04:36:05   15   A.  Today, yes, that's correct.

04:36:19   16        MR. MELSHEIMER:  May I have one moment, Your

04:36:21   17   Honor?

04:36:21   18        THE COURT:  You may.

04:36:54   19        MR. MELSHEIMER:  Apologize, Your Honor.

04:37:17   20   Q.  (By Mr. Melsheimer)  Can you look at Tab 8 of your

04:37:19   21   exhibit binder, sir?

04:37:20   22   A.  I'm there.

04:37:25   23   Q.  And this is a -- something called the Futurion Report,

04:37:34   24   correct?  It's been referred to as that?

04:37:36   25   A.  Yeah, I pointed out before, this is PX-No. 5.

04:37:39  1   Q.   PX-5, and it's called 2007 [sic] Mobile Deposit

04:37:44  2   Benchmark Report, Consumer Behavioral and Attitudinal

04:37:48  3   Research; do you see that?

04:37:48  4   A.   That's not correct, sir.

04:37:49  5   Q.   Consumer Behavioral and Attitudinal Research, it

04:37:56  6   doesn't say that?

04:37:56  7   A.   That part's correct.

04:37:58  8          THE COURT:   You said 2007, Mr. Melsheimer.

04:38:00  9   Q.   (By Mr. Melsheimer)   2017, I'm sorry, Mr. Calman.   2017

04:38:05 10   Mobile Deposit Benchmark Report, correct?

04:38:07 11   A.   Yes, sir.

04:38:08 12   Q.   Consumer Experience Rankings for the Top 15 Financial

04:38:12 13   Institutions; do you see that?

04:38:12 14   A.   Yes, indeed.

04:38:22 15   Q.   And what this report does, as I understand your

04:38:24 16   testimony and in reading it, it ranks 15 different banks'

04:38:29 17   mobile apps, right?

04:38:30 18   A.   This is a benchmark, yes.

04:38:32 19   Q.   And from 1 to 15, right?

04:38:36 20   A.   I don't recall if there was -- no, that's right.   Yes,

04:38:41 21   it was -- it was a ranking, that's right.

04:38:43 22   Q.   1 is the best, right?

04:38:45 23   A.   1 is the top rated, in this report, you bet.

04:38:49 24   Q.   15 is the lowest rated, right?

04:38:51 25   A.   Yes, sir.

04:38:52  1    Q.  So let's take a look at the different rankings here.

04:39:06  2    So -- and maybe let's make it easy, sir, by looking at

04:39:25  3    Page 21.  Do you see that?  Is that the rankings of the

04:39:37  4    various banks in the survey?

04:39:38  5    A.  It's titled Detailed Financial Institution Findings.

04:39:42  6    Q.  And Wells Fargo is ranked second?

04:39:44  7    A.  No. 2.

04:39:44  8    Q.  Okay.  And BB&T is ranked last, right?

04:39:52  9    A.  Yes, indeed.

04:39:53  10   Q.  Now, Regions Bank is almost last, they're second to

04:39:57  11   last, right?

04:39:57  12   A.  They are.

04:39:58  13   Q.  And you know they have auto capture, right?

04:40:00  14   A.  You can tell that by they have a green box in the

04:40:04  15   second to the last column with the auto capture function.

04:40:06  16   Q.  So you've got a bank near the bottom of the list,

04:40:10  17   Regions, that has auto capture, right, and you've got a

04:40:12  18   bank at No. 2, Wells Fargo, that also has auto capture,

04:40:16  19   right?

04:40:16  20   A.  That is correct.

04:40:18  21   Q.  Now, if you look at Page 48 of the report, sir, doesn't

04:40:35  22   it talk about the need to maintain manual capture?

04:40:40  23   A.  Would you like me to read the whole page, or is there a

04:40:45  24   place you want me to look?

04:40:47  25   Q.  Yeah, I'm going to just direct you to Page 48, and I'm

04:40:51  1  going to see if I can find that and display it for the

04:40:54  2  jury's benefit.

04:41:05  3       MR. MELSHEIMER:  Mr. Barnes, can you pull up

04:41:07  4  Page 48?

04:41:11  5  Q.  (By Mr. Melsheimer)  Can you see about in the middle of

04:41:31  6  the page, it's talking about --

04:41:33  7       MR. MELSHEIMER:  Let's actually go to Page 47

04:41:35  8  first so we can see what this is.

04:41:38  9  Q.  (By Mr. Melsheimer)  So this is a series of --

04:41:39  10       MR. MELSHEIMER:  Let's back up one more, if we

04:41:42  11  could.

04:41:44  12  Q.  (By Mr. Melsheimer)  This is something called

04:41:46  13  Definitions, Heuristics.  What's that, sir?

04:41:50  14  A.  Oh, this describes those different boxes we saw in the

04:41:54  15  chart.

04:41:54  16  Q.  Efficiency of use, clear terminology, match user

04:41:58  17  expectations, things like that?

04:42:01  18  A.  These are the categories that Futurion used in their

04:42:05  19  surveys, in their rankings we looked at.

04:42:08  20       MR. MELSHEIMER:  And if we go to Page 47.

04:42:12  21  Q.  (By Mr. Melsheimer)  Consistency and Standards,

04:42:12  22  Hierarchy and Context -- used to take that consistency,

04:42:16  23  sir.  It says:  Users should not have to wonder whether

04:42:20  24  different words, situations, or actions mean the same

04:42:23  25  thing.  Follow platform conventions, right?

04:42:25  1  A.  Yeah, you want to -- everywhere you see the same word

04:42:29  2  you want it to mean the same thing or work the same way.

04:42:31  3  Q.  Because that's going to enhance the overall user

04:42:35  4  satisfaction with the particular application, right?

04:42:37  5  A.  It definitely makes the application less difficult to

04:42:41  6  learn and clearer and more understandable.

04:42:43  7  Q.  So if a -- if a screen says, you know, push the button,

04:42:46  8  you ought to push the button as opposed to doing something

04:42:49  9  else, right?

04:42:49  10  A.  I don't agree with that example, but...

04:42:52  11  Q.  Well, users should not have to wonder whether different

04:42:56  12  words, situations, or actions mean the same thing.  Meaning

04:43:00  13  you ought to make it clear to people how the thing works,

04:43:03  14  right?

04:43:03  15  A.  Yes, or else they're going to have a hard time learning

04:43:07  16  how to use the app.  If a word means something different on

04:43:10  17  different pages or different activities, that's very

04:43:14  18  confusing.

04:43:14  19  Q.  Exactly.  So let's go to Page 48.

04:43:17  20  A.  Uh-huh.

04:43:17  21  Q.  And 48 --

04:43:19  22      MR. MELSHEIMER:  Sorry, back to 47 real quick, to

04:43:23  23  the bottom of the page.

04:43:24  24  Q.  (By Mr. Melsheimer)  Hierarchy and Context.  The

04:43:27  25  hierarchy and context should easily funnel the user through

04:43:31  1  their actions in order to reach their desired goal with no

04:43:34  2  confusion, right?

04:43:34  3  A.  You don't want users to get lost.

04:43:37  4  Q.  So, for example, the first one is:  User must be told

04:43:39  5  the daily cutoff time for deposits first, clearly displayed

04:43:43  6  at the beginning of the process, right?

04:43:44  7  A.  Well, this was the criteria that Futurion applied when

04:43:47  8  they did their ratings, that's right.

04:43:48  9  Q.  But they were looking to see whether the applications

04:43:52  10  had these features, right?

04:43:53  11  A.  I think that's right.

04:43:56  12  Q.  That was one of the things they were grading them on,

04:44:00  13  on, hey, is it clear to the user when the cutoff time is to

04:44:05  14  make a deposit?

04:44:05  15  A.  Well, yes and no.

04:44:12  16  Q.  Let's go to the second one.

04:44:16  17       The help option must be easy to identify.  So

04:44:19  18  that's -- we've all had that situation, right, sir?  You're

04:44:22  19  in a program and you want some help on how to use it.  And

04:44:26  20  the point is, hey, we're going to grade y'all on whether or

04:44:28  21  not your -- your -- your -- your application makes the help

04:44:33  22  option easy to identify, right?

04:44:34  23  A.  So the grading was at a higher level.  I think these

04:44:39  24  are examples of what they were looking for, but I follow

04:44:42  25  with what you're saying.

04:44:43   1   Q.  Users should be able to choose the account to which

04:44:47   2   they will deposit before entering the dollar amount.

04:44:52   3   That's another thing they were looking at, right?

04:44:54   4   A.  Yeah, I don't really agree with that philosophy, but

04:44:56   5   that is what they were grading on.

04:44:58   6   Q.  This is the Futurion document's grading principle, so

04:45:00   7   to speak, right?

04:45:02   8   A.  It's their rubric, it's their approach.

04:45:05   9   Q.  Photo tips should be easy to access?

04:45:09  10   A.  That's -- that's the fourth bullet on 48.

04:45:12  11   Q.  Okay.  And then, finally -- or the last one I want to

04:45:15  12   mention to you, sir, is the second to the bottom there.

04:45:18  13   Users should be able to manually capture an image of the

04:45:23  14   front and back of the check and have the app accept such

04:45:26  15   submissions.  Did I read that correctly?

04:45:29  16   A.  Yeah, you read that correctly, but as I say, I don't

04:45:31  17   agree necessarily with all of the philosophy here.

04:45:34  18   Q.  Understood, sir.  But can we at least agree that that

04:45:38  19   is describing what we've discussed as manual capture?

04:45:41  20   A.  Oh, that is -- yes, it says that exactly.  It's manual

04:45:46  21   capture.

04:45:46  22   Q.  And --

04:45:53  23           MR. MELSHEIMER:  May I have one moment, Your

04:45:55  24   Honor?

04:45:55  25           THE COURT:  You may.

| | | |
|---|---|---|
| 04:46:29 | 1 | Q.  (By Mr. Melsheimer)  Mr. Calman, thank you. |
| 04:46:31 | 2 | MR. MELSHEIMER:  Pass the witness, Your Honor. |
| 04:46:32 | 3 | THE COURT:  All right.  Is there redirect, |
| 04:46:34 | 4 | Ms. Glasser? |
| 04:46:34 | 5 | MS. GLASSER:  Yes, Your Honor. |
| 04:46:35 | 6 | MR. MELSHEIMER:  Just give me a second here. |
| 04:46:45 | 7 | THE COURT:  If neither of you counsel are going to |
| 04:46:47 | 8 | continue to use this easel, let's put it back where it was, |
| 04:46:49 | 9 | so it doesn't block that pathway, please? |
| 04:46:53 | 10 | MR. MELSHEIMER:  I will do that right now, |
| 04:46:55 | 11 | Your Honor, with the Court's permission. |
| 04:46:56 | 12 | THE COURT:  That will be fine. |
| 04:47:10 | 13 | All right.  Counsel, you may proceed with |
| 04:47:13 | 14 | redirect. |
| 04:47:13 | 15 | MS. GLASSER:  Thank you, Your Honor. |
| 04:47:13 | 16 | REDIRECT EXAMINATION |
| 04:47:13 | 17 | BY MS. GLASSER: |
| 04:47:16 | 18 | Q.  Did opposing counsel ask any questions at all about |
| 04:47:20 | 19 | your methodology for calculating the error free rates? |
| 04:47:25 | 20 | A.  I don't remember any questions about that. |
| 04:47:28 | 21 | Q.  All right.  Let's turn to a topic that he did ask you |
| 04:47:31 | 22 | about. |
| 04:47:32 | 23 | MS. GLASSER:  Could we have on the screen |
| 04:47:34 | 24 | Paragraph 390 from your report?  And actually if you could |
| 04:47:42 | 25 | continue on to the next page, please, the paragraph |

04:47:45   1   continues with that chart.

04:47:47   2   Q.  (By Ms. Glasser)  Is this a larger, more detailed

04:47:49   3   version of the chart from --

04:47:51   4            MS. GLASSER:  Actually go to the second part,

04:47:53   5   sorry.  Thanks so much.  It's a long paragraph.

04:47:56   6   Q.  (By Ms. Glasser)  Is this a longer and more detailed

04:47:58   7   version of the chart that Mr. Melsheimer showed you from

04:48:00   8   Paragraph 515?

04:48:01   9   A.  Yes.

04:48:06  10   Q.  All right.  And as you discussed with opposing counsel,

04:48:09  11   the rates go up year to year, correct?

04:48:11  12   A.  Yes, indeed.

04:48:14  13   Q.  Could you explain for us how the trend from 2012

04:48:20  14   through to 2018 supports your opinions regarding the

04:48:24  15   fundamental nature of auto capture?

04:48:25  16   A.  Sure.  So, I mean, we pointed out that that first year

04:48:29  17   the yellow line exceeded even the high estimate by 25

04:48:33  18   percent.  So it was bigger.  It was more -- as I said when

04:48:36  19   we talked earlier, it was more successful than even

04:48:39  20   anticipated.

04:48:40  21            Now, once auto capture came along, it wasn't just

04:48:45  22   a 25 percent boost; now it was 50, 75.  As I recall when

04:48:51  23   you get to the end, it's something like 250 percent higher

04:48:54  24   than the highest expectation once auto capture was part of

04:48:59  25   the game.

04:48:59  1        So, yes, Wells Fargo underestimated, and in 2013,
04:49:07  2  that was, you know, by 25 percent.  But that 25 percent
04:49:10  3  just got bigger and bigger and bigger once auto capture was
04:49:14  4  available.
04:49:14  5  Q.  When we look at the actual volumes from, say, the year
04:49:20  6  2017, the year of the Futurion Report, in your opinion,
04:49:23  7  could those levels have been sustainable without auto
04:49:27  8  capture?
04:49:27  9  A.  No, ma'am.
04:49:28  10  Q.  Why is that?
04:49:29  11  A.  Well, at scale, manual capture just creates too many
04:49:35  12  errors.  There's too much rework and there's too much
04:49:39  13  expense going on when you're now doing -- we're talking
04:49:43  14  2017, 61 million, 61-and-a-half million deposits.  If 30
04:49:49  15  percent of those have problems, that's just -- that's too
04:49:52  16  much.  It's not sustainable.
04:49:53  17  Q.  Thank you very much, sir.
04:49:55  18        THE COURT:  You pass the witness, counsel?
04:49:57  19        MS. GLASSER:  Pass the witness, thank you.
04:49:59  20        THE COURT:  Is there additional cross,
04:50:00  21  Mr. Melsheimer?
04:50:01  22        MR. MELSHEIMER:  There's not, Your Honor.
04:50:02  23        THE COURT:  All right.  You may step down,
04:50:04  24  Mr. Calman.
04:50:11  25        Counsel, approach the bench, please.

04:50:12  1          (Bench conference.)

04:50:23  2          THE COURT:  Plaintiff, who is your next witness?

04:50:26  3          MR. BUNT:  Mr. Weinstein.

04:50:27  4          THE COURT:  And you're going to put on the direct?

04:50:30  5          MR. BUNT:  Yes, Your Honor.

04:50:30  6          THE COURT:  What's your estimate of time for the

04:50:32  7  direct?

04:50:32  8          MR. BUNT:  About 45 to 50 minutes.

04:50:36  9          THE COURT:  Who's going to cross him?

04:50:37  10         MR. MELSHEIMER:  Wes Hill.

04:50:39  11         THE COURT:  Do you have any idea what his planned

04:50:42  12  cross is?

04:50:42  13         MR. MELSHEIMER:  About an hour.

04:50:44  14         THE COURT:  After Weinstein, what does the

04:50:47  15  Plaintiff have?

04:50:47  16         MR. SHEASBY:  We have some depo clips, Your Honor.

04:50:51  17         MR. MELSHEIMER:  20 minutes.

04:50:54  18         MR. SHEASBY:  Then we rest.

04:50:54  19         THE COURT:  Okay.

04:50:54  20         MR. SHEASBY:  I will say, on behalf of

04:50:56  21  Mr. Melsheimer, I think we're way ahead.  I think this is

04:50:59  22  going to go to the jury on Tuesday based on -- based on

04:51:02  23  where we're at.

04:51:03  24         THE COURT:  You're more optimistic than I am,

04:51:06  25  especially given the disagreements I've seen so far.  When

| | | |
|---|---|---|
| 04:51:09 | 1 | we get to the charge, I don't expect it to go very fast at |
| 04:51:13 | 2 | all. |
| 04:51:13 | 3 | MR. MELSHEIMER:  If you were in a Halloween mood, |
| 04:51:16 | 4 | though, Judge, you could let the people go trick or |
| 04:51:19 | 5 | treating earlier.  But we're prepared to go.  We're not |
| 04:51:22 | 6 | going to run out of stuff today, even if you go to 6:00 |
| 04:51:25 | 7 | o'clock. |
| 04:51:25 | 8 | THE COURT:  I would like to see if we can time it |
| 04:51:28 | 9 | so that the Plaintiff rests at the time I have to go to |
| 04:51:31 | 10 | Tyler tomorrow and that we have an even break.  And then |
| 04:51:34 | 11 | the Defendant can start Monday with their case-in-chief. |
| 04:51:36 | 12 | MR. MELSHEIMER:  I don't think there's any -- |
| 04:51:39 | 13 | well, hard to know, as you know.  I've been wrong on many |
| 04:51:43 | 14 | of my predictions, but I think that we will go into |
| 04:51:46 | 15 | tomorrow morning with the Plaintiff's case.  Whether we go |
| 04:51:50 | 16 | all the way to noon, that's what I don't know. |
| 04:51:55 | 17 | THE COURT:  All right.  This just was an estimate, |
| 04:51:56 | 18 | and I appreciate the input. |
| 04:51:58 | 19 | Let's go ahead and put his direct on. |
| 04:52:00 | 20 | MR. MELSHEIMER:  Will we be doing the cross, as |
| 04:52:02 | 21 | well, today, Your Honor, do you think? |
| 04:52:05 | 22 | THE COURT:  I don't know. |
| 04:52:05 | 23 | MR. MELSHEIMER:  Okay.  Thank you. |
| 04:52:07 | 24 | (Bench conference concluded.) |
| 04:52:10 | 25 | MR. SHEASBY:  Your Honor, with permission, may I |

04:52:11  1  clear binders and --

04:52:13  2           THE COURT:  Yes, please do.

04:52:22  3           While that's going on, Plaintiff, call your next

04:52:25  4  witness.

04:52:27  5           MR. BUNT:  Your Honor, we'd call Mr. Roy

04:52:33  6  Weinstein.

04:52:33  7           THE COURT:  If you'd come forward and be sworn,

04:52:35  8  Mr. Weinstein.

04:52:43  9           (Witness sworn.)

04:52:44  10          THE COURT:  Please have a seat on the witness

04:52:58  11  stand, sir.

04:53:18  12          MR. BUNT:  May it please the Court.

04:53:19  13          THE COURT:  You may proceed, Mr. Bunt.

04:53:21  14          MR. BUNT:  Thank you, Your Honor.

04:53:21  15          ROY WEINSTEIN, PLAINTIFF'S WITNESS, SWORN

04:53:21  16                   DIRECT EXAMINATION

04:53:22  17  BY MR. BUNT:

04:53:22  18  Q.  Please state your name for the jury.

04:53:24  19  A.  Roy Weinstein.

04:53:25  20  Q.  And can you tell the jury a little bit about yourself?

04:53:28  21  A.  I'm an economist.  I live in Los Angeles, California.

04:53:33  22  I'm married with two grown children and one grandchild.

04:53:37  23  Q.  And what do you do in California?

04:53:39  24  A.  I'm a managing director at an economic research and

04:53:45  25  consulting firm called Micronomics, which I co-founded back

04:53:50  1   in 1988.

04:53:50  2   Q.   And why are you here today, Mr. Weinstein?

04:53:53  3   A.   I'm here to talk about damages adequate to compensate

04:53:59  4   USAA for infringement of the patents-in-suit by Wells

04:54:05  5   Fargo.

04:54:05  6   Q.   Mr. Weinstein, we'll want to go over your analysis in

04:54:09  7   greater detail in a moment, but can you first provide the

04:54:12  8   jury with your conclusion as to the damages owed by Wells

04:54:15  9   Fargo to USAA?

04:54:16  10  A.   Yes.   I have concluded that damages adequate to

04:54:21  11  compensate for infringement of the two patents-in-suit for

04:54:25  12  the period December 15th, 2016, until November 4th, 2019,

04:54:32  13  are $299,757,000.00.

04:54:38  14  Q.   And can you summarize at a very high level how you

04:54:40  15  calculated those figures?

04:54:42  16  A.   Yes.   There are three steps to my calculation in -- in

04:54:51  17  summary.

04:54:53  18       First, I calculated the benefits obtained by

04:54:59  19  Wells Fargo in connection with its use of auto capture MRDC

04:55:06  20  during the damage period.   That's December of 2016 to

04:55:12  21  November 2019.   That was the first step.

04:55:16  22       The second step was to apportion those benefits

04:55:21  23  down just to the contribution of the two patents-in-suit.

04:55:26  24  And so that apportionment produced the second number here,

04:55:32  25  approximately $373 million, which reflects the contribution

04:55:38  1   of the patents-in-suit to auto capture MRDC.

04:55:44  2          The final step was to decide how that split should

04:55:49  3   be made with respect to the $373 million as between Wells

04:55:57  4   Fargo and USAA.  And that final step produced my ultimate

04:56:03  5   answer of $299 million to USAA in connection with the

04:56:10  6   inventions, and the balance to Wells Fargo.  And that is

04:56:16  7   based on Wells Fargo return on equity at roughly the damage

04:56:21  8   period time.

04:56:23  9   Q.  And what is it that enables you to be able to come up

04:56:27  10  with that figure?

04:56:27  11  A.  Well, I'm an economist.  And as an economist, I have

04:56:35  12  academic training in accounting and finance and those kinds

04:56:38  13  of issues.

04:56:39  14         But the other thing I would say is that one of the

04:56:43  15  prime subjects that economists study is -- is values in the

04:56:48  16  market -- that's roughly the fourth checkmark on this

04:56:51  17  chart -- how prices are determined, how products such as

04:56:58  18  intellectual property are valued in the market, the use of

04:57:03  19  benchmarks in order to measure values.

04:57:08  20         And so in -- in -- in reaching my conclusions

04:57:12  21  here, I rely on my training as an economist and my

04:57:14  22  experience over the years.

04:57:18  23  Q.  Mr. Weinstein, is your firm being compensated for the

04:57:21  24  work you've done on this case?

04:57:23  25  A.  Yes, the firm that I work for, Micronomics, receives

04:57:26   1   compensation for my time at the rate of $750.00 per hour.

04:57:30   2   Q.  Is it routine for experts like yourself and Wells

04:57:34   3   Fargo's experts to be compensated for the time spent

04:57:37   4   analyzing problems like this?

04:57:39   5   A.  Yes, sir.

04:57:39   6   Q.  Could you tell the jury about your educational

04:57:43   7   background?

04:57:43   8   A.  Yes.  I attended the Baruch College of City University

04:57:52   9   of New York and graduated with a Bachelor of Business

04:57:56  10   Administration degree back in 1964 with honors, in

04:58:00  11   economics.

04:58:00  12         From there, I went to the University of Chicago

04:58:03  13   and received a Master of Arts degree, also in economics.

04:58:06  14   Q.  Did you receive any honors and awards in connection

04:58:09  15   with your education?

04:58:11  16   A.  Yes, sir, I did.  If you go to the next slide, I had --

04:58:14  17   I had some awards at City College in connection with

04:58:19  18   academic performance.  And then at the University of

04:58:22  19   Chicago I received fellowships from Walgreen Foundation and

04:58:26  20   the U.S. Public Health Service.

04:58:28  21   Q.  And have you been honored, since leaving school, for

04:58:33  22   your work as a professional economist?

04:58:35  23   A.  I have.  Roughly 10 years ago I received what was

04:58:39  24   called the Career Achievement Award from the Business and

04:58:42  25   Economics Alumni Society at City College.  I was the first

04:58:47  1    recipient of that award, and I think there's been one

04:58:50  2    other.

04:58:50  3    Q.  Can you tell the jury some of the consulting clients

04:58:53  4    you've had over the course of your career?

04:58:56  5    A.  Yes.  Over my career, I've been engaged by companies

04:59:01  6    like eBay, Intel, Dell Computer, Halliburton.  In Los

04:59:08  7    Angeles, by the Rose Bowl Committee in connection with the

04:59:11  8    Rose Parade and the Rose Bowl to try and determine the

04:59:12  9    economic impact of those events on the surrounding

04:59:16  10   community.  So I've had lots of interesting clients over

04:59:19  11   the years.

04:59:19  12   Q.  Have you written or spoken about some of the work

04:59:22  13   you've done related to the subjects of patents and patent

04:59:25  14   damages, in the past?

04:59:26  15   A.  Yes, sir, I have.  The first article that I published

04:59:31  16   on the subject of patent damages was one that I prepared

04:59:35  17   back in 1988.  And it was published in the Journal of the

04:59:42  18   Patent and Trademark Office Society.  I subsequently

04:59:45  19   published articles in the Journal of Law & Technology and

04:59:48  20   the Federal Bar Circuit Journal.

04:59:52  21   Q.  And have you ever taught or given lectures on

04:59:52  22   determining the amount that should be paid for patent

04:59:59  23   infringement?

04:59:59  24   A.  Yes.  Over the years, I've been invited from time to

05:00:04  25   time to speak on the subject of how patent damages are

05:00:07   1   calculated and issues associated with those kinds of

05:00:11   2   calculations.  I've appeared before technologists in

05:00:14   3   Washington, D.C., on that subject and several times at an

05:00:16   4   annual conference held every November in Plano, Texas.

05:00:21   5        MR. BUNT:  Your Honor, at this time, we would

05:00:22   6   offer Mr. Roy Weinstein as an expert on the valuation of

05:00:27   7   intellectual property and the calculation of patent

05:00:29   8   damages.

05:00:29   9        THE COURT:  Is there objection?

05:00:31   10        MR. HILL:  No objection, Your Honor.

05:00:32   11        THE COURT:  The Court will recognize this witness

05:00:33   12   as an expert in those designated fields.

05:00:35   13        Proceed.

05:00:37   14        MR. BUNT:  Thank you, Your Honor.

05:00:37   15   Q.  (By Mr. Bunt)  So, Mr. Weinstein, what materials did

05:00:39   16   you consider in reaching your conclusions in this case?

05:00:42   17   A.  So I had -- I had access to three types of materials.

05:00:48   18   There were documents produced by USAA, documents produced

05:00:52   19   by Wells Fargo, and then other materials, which I gathered

05:00:56   20   on my own, at Micronomics.

05:00:59   21        And so in order to do the work that -- that I'll

05:01:02   22   be describing today, I had access to all those different

05:01:06   23   kinds of -- different kinds of materials and documents and

05:01:09   24   testimony.

05:01:10   25   Q.  What's your understanding of why patent rights are

05:01:14   1   important in the United States?

05:01:17   2   A.  Well, patent rights are extremely important in -- in

05:01:22   3   our country for the following reason:  By granting a

05:01:32   4   patent, what the government is doing is giving the

05:01:35   5   inventor, the patent owner, the rights to exclude anyone

05:01:38   6   else from using the invention without permission.  That's

05:01:42   7   what it means to have a patent.

05:01:44   8          And so if -- if -- if an entity invents something,

05:01:48   9   it has the sole right to use that unless it chooses to give

05:01:53  10   permission to someone else to use that patent.

05:01:59  11          And the idea here is to encourage innovation that

05:02:04  12   leads to inventions that can be used by the entities that

05:02:07  13   want permission to use them, as well as by consumers that

05:02:12  14   benefit ultimately from -- from those inventions and those

05:02:16  15   patents.

05:02:17  16   Q.  Is there a name for the agreements that are sometimes

05:02:20  17   reached between patentholders and entities that wish to

05:02:23  18   have access to their patents?

05:02:25  19   A.  Yes, sir, there is.  Those are called license

05:02:29  20   agreements.

05:02:29  21   Q.  And, typically, do those license agreements include

05:02:33  22   payment terms?

05:02:33  23   A.  They do.  And -- and the idea here is that the

05:02:37  24   inventor, the patentholder, gives permission to use its

05:02:44  25   invention in exchange for payment.

| | | |
|---|---|---|
| 05:02:46 | 1 | Q.  How do these license agreements come into existence? |
| 05:02:49 | 2 | A.  Typically, they come into existence through |
| 05:02:52 | 3 | negotiations.  If -- if someone has an invention and |
| 05:02:55 | 4 | someone else wants to use it, typically, what they do is |
| 05:02:59 | 5 | sit down across the table and negotiate for that |
| 05:03:04 | 6 | permission. |
| 05:03:05 | 7 | And the idea is, obviously, the patentholder would |
| 05:03:08 | 8 | like to get as much as it can for the invention.  And |
| 05:03:13 | 9 | the -- the licensee, the entity that wants permission, |
| 05:03:18 | 10 | would like to pay as little as possible.  So it's a |
| 05:03:21 | 11 | negotiation.  And they wind up someplace, if they can, with |
| 05:03:25 | 12 | a patent license. |
| 05:03:27 | 13 | Q.  In connection with your work in this case, how did you |
| 05:03:30 | 14 | go about determining what constitutes fair compensation to |
| 05:03:34 | 15 | USAA for use of the patents-in-suit? |
| 05:03:36 | 16 | A.  Well, I began with the patent statute, and the relevant |
| 05:03:44 | 17 | portion of that statute is shown here.  And what the |
| 05:03:47 | 18 | statute says is that if there's a finding of infringement, |
| 05:03:55 | 19 | the patentholder is entitled under that statute to |
| 05:04:01 | 20 | compensation that in no event is less than a reasonable |
| 05:04:06 | 21 | royalty for use made of the invention by the infringer. |
| 05:04:14 | 22 | So if I could paraphrase that very quickly.  The |
| 05:04:17 | 23 | payment that's to be made for infringement is to be based |
| 05:04:20 | 24 | on the use made by the infringer for the patents.  That's |
| 05:04:25 | 25 | what the statute says. |

05:04:26  1  Q.  And how does one determine damages adequate to

05:04:30  2  compensate for infringement?

05:04:32  3  A.  Well, that's -- that's actually an interesting

05:04:37  4  question.  And here's how it's done in this kind of

05:04:41  5  situation.

05:04:41  6       What you do is you put the parties together, and

05:04:44  7  that's what's depicted on this slide, and you have them

05:04:47  8  conduct what's called a hypothetical negotiation.  It's

05:04:50  9  called a hypothetical negotiation because it didn't

05:04:53  10  actually happen.  And so it's hypothetical.  But what you

05:04:58  11  do is you have them negotiate on -- for permission to use

05:05:04  12  the technology.

05:05:05  13       And so what we see here is USAA on one side of

05:05:09  14  this negotiating table, and it's offering the patented

05:05:13  15  technology to Wells Fargo -- that's why the arrow goes that

05:05:17  16  way -- in exchange for payment by Wells Fargo for use of

05:05:23  17  that technology.  And that's how that hypothetical

05:05:26  18  negotiation takes place.  Again, it's called hypothetical

05:05:28  19  because it didn't happen, which is why we're here today.

05:05:31  20       And the timing of -- of this hypothetical

05:05:38  21  negotiation is back before infringement began.  And so in

05:05:42  22  this case, it's March 2015.  And so if you think about

05:05:45  23  that, it's a hypothetical negotiation between the parties

05:05:49  24  for permission to use the technology in exchange for

05:05:52  25  payment at the time of infringement.

05:05:55  1   Q.  And does the question of whether Wells Fargo was

05:05:58  2   willfully infringing the patents come into play?

05:06:01  3   A.  No.  That has -- that has nothing to do with it,

05:06:04  4   whether or not they -- it was -- it was infringement that

05:06:08  5   was intentional or infringement that was by accident makes

05:06:13  6   no difference.  The idea here is to have this hypothetical

05:06:19  7   negotiation for rights to use the patent based on use made

05:06:24  8   by Wells Fargo of the patent.

05:06:27  9   Q.  Are there certain assumptions that economists have to

05:06:31  10  make for purposes of this hypothetical negotiation?

05:06:33  11  A.  Yes, sir, there are.

05:06:35  12  Q.  And what are those?

05:06:37  13  A.  And this -- this is another interesting part about this

05:06:42  14  hypothetical negotiation.

05:06:43  15       Both parties sitting at this negotiating table

05:06:47  16  agree that the patents are valid, that they are infringed,

05:06:51  17  and that they are enforceable.  They also understand the

05:06:55  18  need to reach an agreement that is -- at this hypothetical

05:07:01  19  negotiation neither side can get up and leave the table.

05:07:02  20  They have to get to the finish line and reach an agreement.

05:07:06  21       And the third aspect of this is something that's

05:07:10  22  very different from a real-world negotiation, which is

05:07:14  23  they -- they both understand the importance of the patents.

05:07:20  24  Back in March -- in 2015 at the time that the hypothetical

05:07:25  25  negotiation -- May of 2015, they haven't, in a sense they

05:07:31   1   have insight into the future importance of the patents,
05:07:35   2   and -- and they know it back then.  And that's information
05:07:37   3   that's available to them at this hypothetical negotiation.
05:07:41   4   Q.  Are these assumptions different from a real-world
05:07:44   5   negotiation?
05:07:44   6   A.  Yes, they are.  Obviously, in a real-world negotiation,
05:07:51   7   typically, the parties will negotiate about everything.
05:07:53   8   There may not be agreement about whether the patents are
05:07:56   9   valid or can be enforced or whether they're infringed.  And
05:07:59  10   certainly in a real-world negotiation, there's -- there's
05:08:03  11   not as much information about the future as there is in
05:08:07  12   this hypothetical negotiation.
05:08:09  13        But in the hypothetical negotiation, that -- that
05:08:12  14   first bullet point there about validity, infringement, and
05:08:15  15   enforceability, is off the table.  Both sides agree about
05:08:19  16   that for purposes of this framework, and they also have
05:08:24  17   this information about the ultimate value of the patents,
05:08:31  18   that is, the actual use made by Wells Fargo in this case
05:08:34  19   about the patents, even though the negotiation is before
05:08:36  20   that use takes place.
05:08:37  21   Q.  Now, you just identified certain assumptions that are
05:08:42  22   made as a part of the hypothetical negotiation.  Is there
05:08:44  23   anything else that you relied upon in forming your opinions
05:08:49  24   in this case?
05:08:49  25   A.  Yes.  So to reach my conclusions, I relied on, I guess,

05:08:53   1   two more things.  One is my training and experience in this
05:08:57   2   area having written and spoken about it for many years,
05:09:01   3   plus my training as an economist.  And the other thing that
05:09:06   4   I rely on is something that I'll get to very shortly in my
05:09:10   5   testimony, which is referred to as the Georgia-Pacific
05:09:12   6   factors.
05:09:13   7   Q.  Okay.  So did -- did Wells -- did USAA ask Wells Fargo
05:09:20   8   to license the remote deposit capture patents in this suit?
05:09:27   9        MR. BUNT:  If we can go to the next slide.
05:09:29   10  A.  Yes, sir.  So there actually was a real-world effort on
05:09:32   11  the part of USAA to obtain a license agreement with Wells
05:09:39   12  Fargo.
05:09:39   13       And what's on the screen now is a -- an email from
05:09:45   14  Ron Epstein, who represented USAA at the time in connection
05:09:47   15  with its licensing efforts, to individuals at Wells Fargo.
05:09:53   16  And this email is dated August of 2017.  And the snippet
05:09:58   17  that's on the screen references an effort to -- to license
05:10:10   18  USSA's -- USAA's technology to Wells Fargo back then.
05:10:16   19  Q.  (By Mr. Bunt)  Now, Mr. Weinstein, is mobile deposit,
05:10:19   20  which we've been referring to as MRDC, important to Wells
05:10:25   21  Fargo?
05:10:25   22  A.  I believe it is.
05:10:26   23  Q.  How do you know it's important to Wells Fargo?
05:10:29   24  A.  Well, I've been here for the trial and I heard the
05:10:29   25  testimony.  I've also had an opportunity to look at the

05:10:34    1   documents that I referenced before.  And there also are
05:10:40    2   quotations that I've had a chance to read in preparing
05:10:44    3   prior to today, and this is one from a Wells Fargo senior
05:10:50    4   vice president.
05:10:50    5        It's not -- it's not a direct quote, but it's a
05:10:55    6   paraphrase of his testimony wherein he talks about mobile
05:11:05    7   remote deposit capture as a table stakes capability.  And
05:11:10    8   what table stakes means in this context is, if you're going
05:11:14    9   to be in this space, you have to have it.  If you're going
05:11:18   10   to be doing it, you have to have this functionality.
05:11:20   11   Q.  Now, to be clear, is this lawsuit over MRDC, generally?
05:11:24   12   A.  No.  The lawsuit is about MRDC, but the focus of my
05:11:29   13   damages analysis is in connection with the auto capture
05:11:33   14   feature, the auto capture functionality.
05:11:36   15   Q.  And is this auto-capture-enabled MRDC important to
05:11:43   16   Wells Fargo?
05:11:43   17   A.  Yes, sir, it is.
05:11:44   18   Q.  What evidence have you seen of the importance of the
05:11:47   19   auto-capture-enabled MRDC to Wells Fargo?
05:11:50   20   A.  Well, this is a snippet of testimony, sworn testimony
05:11:57   21   by Mr. Saffici, who we've heard about before in this case.
05:12:02   22   And his -- the question and answer essentially stands for
05:12:07   23   the proposition that auto capture is widely accepted as the
05:12:12   24   foundation for successful MRDC.
05:12:17   25   Q.  And Mr. Saffici is one of Wells Fargo's experts?

05:12:20  1    A.  He's -- he's -- he was at one time, for sure, yes.

05:12:23  2    Q.  And did you find any evidence that Wells Fargo views

05:12:27  3    auto capture as essential?

05:12:29  4    A.  Yes, sir.

05:12:30  5    Q.  And what did you find?

05:12:32  6    A.  So this is more testimony from Mr. Ajami, who's a Wells

05:12:37  7    Fargo senior vice president, and he has no factual basis to

05:12:42  8    disagree with the statement that auto capture is a

05:12:47  9    must-have feature.  That's the top part of this slide.

05:12:51  10          And the bottom part is the -- from the Futurion

05:12:56  11   study in 2017 that we've seen before in this case, which

05:13:00  12   says that auto capture must now be treated as a must-have

05:13:05  13   feature across the financial services industry.  So it's

05:13:09  14   not -- it's not just banks like Wells Fargo.  It's other

05:13:16  15   banks and it's financial services generally speaking.

05:13:20  16   Q.  And the Plaintiff's exhibit on this, the Futurion

05:13:23  17   document at the bottom, is that PX-005?

05:13:25  18   A.  Yes, sir.

05:13:26  19   Q.  And what conclusion have you reached as to the

05:13:28  20   importance of auto capture?

05:13:29  21   A.  I've concluded that auto capture is essential for an

05:13:35  22   essential MRDC functionality.

05:13:39  23   Q.  So how did you go about calculating damages in this

05:13:43  24   case?

05:13:43  25   A.  All right.  So now, I used what are called the

05:13:49   1   Georgia-Pacific factors.

05:13:50   2   Q.  And what are those Georgia-Pacific factors?

05:13:53   3   A.  They can be thought of as a checklist.  It's a

05:13:56   4   checklist of things to consider in determining the -- the

05:14:00   5   value of the patents to the infringer, because, remember,

05:14:04   6   the statute contemplates benefits, use made by the

05:14:11   7   infringer of the patented technology.

05:14:14   8          And so Georgia -- the Georgia-Pacific factors come

05:14:18   9   from a former patent damage case, litigation case, and --

05:14:22  10   and -- and the Court in that case offered this checklist of

05:14:25  11   15 factors which the parties sitting at that negotiating

05:14:29  12   table having this hypothetical negotiation might think

05:14:32  13   about.  And the idea is if you have this checklist, it will

05:14:38  14   help you get to the right answer.

05:14:40  15   Q.  And are these Georgia-Pacific factors and the patent

05:14:47  16   statute that you showed the jury and the hypothetical

05:14:50  17   negotiation, are those used both by yourself and by Wells

05:14:53  18   Fargo's damage expert in this case?

05:14:54  19   A.  Yes, sir, we both have the identical framework.

05:14:57  20   Q.  And did you consider all 15 of these factors in

05:15:00  21   developing your reasonable royalty measure of damages?

05:15:03  22   A.  I did.  That said, in every case, some factors are --

05:15:10  23   turn out to be more important than others because some are

05:15:13  24   relevant in certain situations and not in others.

05:15:16  25          But I considered all 15, and we'll focus on those

05:15:22   1   that I found to be most relevant here.

05:15:24   2   Q.  So where did you begin?

05:15:25   3   A.  In this case, I began with Georgia-Pacific Factors 9

05:15:30   4   and 10, and I combined them because they both really talk

05:15:33   5   about the same thing.  They talk about that the benefits

05:15:39   6   and the advantages of the patents and in the context of

05:15:42   7   what those benefits are in this case to Wells Fargo.

05:15:48   8   Q.  Why did you start with those factors?

05:15:49   9   A.  Well, if you're going to talk about the value of an

05:15:55  10   invention, one of the things that would be important to

05:15:57  11   know is how does that invention benefit the entity that's

05:16:02  12   taking the license in this case?

05:16:06  13        If Wells Fargo is going to be required to pay for

05:16:10  14   using this technology, a good starting point in this

05:16:15  15   particular case is to examine the uses and the benefits

05:16:20  16   from those uses that Wells Fargo obtained, because the

05:16:26  17   payments are going to have to be based at some level on

05:16:29  18   that.

05:16:30  19   Q.  So what benefits did you find?

05:16:33  20   A.  Well, I found basically three kinds of benefits to

05:16:41  21   Wells Fargo.  And so in reaching my conclusion about

05:16:44  22   damages adequate to compensate for infringement, I thought

05:16:50  23   about what actual benefits did Wells Fargo get from using

05:16:54  24   those patents-in-suit, and there were three types.

05:16:57  25        They relate to cost savings that Wells Fargo

05:17:01   1   itself experienced by using these patents, also increased

05:17:07   2   profits that Wells Fargo obtained by using these patents,

05:17:12   3   and, finally, ecosystem benefits which relate to the brand

05:17:18   4   name and reputation value to Wells Fargo of having access

05:17:22   5   to this technology.

05:17:23   6   Q.  Can you describe each of those benefits to the jury?

05:17:26   7   A.  Sure.  And I can do that fairly quickly.

05:17:28   8        The cost-savings benefits relate to the fact that

05:17:32   9   it costs Wells Fargo less money to process a mobile deposit

05:17:39  10   than it does to process a deposit made with a teller at a

05:17:44  11   bank or at an ATM.

05:17:46  12        And so a mobile deposit allows Wells Fargo to save

05:17:50  13   money.  They're a cost-savings benefits.

05:17:54  14        In addition -- in addition, the availability of

05:17:59  15   successful mobile deposit program allows Wells Fargo to not

05:18:06  16   have as many bank branches as it otherwise would need.  And

05:18:10  17   since it costs money to build and maintain bank branches,

05:18:14  18   Wells Fargo saves money by virtue of the fact that

05:18:17  19   consumers use mobile deposits with auto capture.  That's

05:18:21  20   the cost-savings benefit.

05:18:22  21        The second benefit has to do with increased

05:18:26  22   profits.  Wells Fargo makes more money on mobile deposits

05:18:31  23   than it does on other kinds of deposits.  And so it

05:18:34  24   receives a benefit when consumers make mobile deposits.

05:18:38  25        And the third are these ecosystem benefits, which

| | | |
|---|---|---|
| 05:18:44 | 1 | Wells Fargo recognizes are associated with having a |
| 05:18:46 | 2 | successful mobile deposit program. |
| 05:18:51 | 3 | And so in deciding what those -- what the benefits |
| 05:18:54 | 4 | are, I looked at all three of those areas and ultimately |
| 05:19:00 | 5 | quantified them, because as the statute says, damages |
| 05:19:05 | 6 | should be related to use made of the invention by the |
| 05:19:13 | 7 | infringer. |
| 05:19:13 | 8 | Q.  And do these three benefits, these three categories of |
| 05:19:16 | 9 | benefits, overlap? |
| 05:19:17 | 10 | A.  No, they're separate.  They don't overlap. |
| 05:19:20 | 11 | Q.  Now, will you be telling the jury about the benefits of |
| 05:19:23 | 12 | MRDC, generally? |
| 05:19:24 | 13 | A.  Yes, sir, I will.  What I do is I will start with the |
| 05:19:30 | 14 | benefits of MRDC, generally, generally.  But since my |
| 05:19:37 | 15 | understanding and conclusion is that auto capture is |
| 05:19:42 | 16 | essential, table stakes, with respect to the successful |
| 05:19:47 | 17 | operation of MRDC, I will then apportion down from the MRDC |
| 05:19:53 | 18 | benefits to the contribution of auto capture to creating |
| 05:20:00 | 19 | those benefits so that damages are limited to the |
| 05:20:06 | 20 | contribution made by the patents. |
| 05:20:09 | 21 | Q.  So let's start with cost savings and go to the next |
| 05:20:14 | 22 | slide. |
| 05:20:15 | 23 | What evidence have you seen regarding the |
| 05:20:17 | 24 | cost-savings benefits of the patents-in-suit to Wells |
| 05:20:19 | 25 | Fargo? |

05:20:19   1   A.  This next slide relates to that first bullet point I

05:20:24   2   was talking about, cost savings.  It's a 2011 Wells Fargo

05:20:29   3   planning document, PX-415.

05:20:32   4           So, at that time, in this planning document at

05:20:36   5   Wells Fargo, it says within it:  The key benefits to

05:20:43   6   Wells Fargo include cost savings from moving deposits out

05:20:47   7   of the store -- the store in this context is the bank --

05:20:52   8   out of the bank and out of ATM channels.

05:20:55   9           And so Wells Fargo, back in 2011, recognized that

05:21:04   10  mobile remote deposit capture -- you can see that right

05:21:07   11  on the -- toward the top of the document itself -- would

05:21:09   12  provide those key benefits to Wells Fargo.

05:21:14   13  Q.  And did Wells Fargo study the potential impact of MRDC

05:21:18   14  on its costs?

05:21:19   15  A.  It did.  This is November 2010.  Again, it's -- it's

05:21:25   16  around the same period.  And you'll notice at the top, it

05:21:29   17  says:  MRDC offers Wells Fargo a lower cost channel for

05:21:35   18  deposits.

05:21:36   19          It's talking about the same thing that I've been

05:21:37   20  referencing.  It costs Wells Fargo less money -- less money

05:21:44   21  to process a mobile deposit than an ATM deposit or a

05:21:47   22  deposit with a teller.

05:21:49   23          And what this document says is, MRDC has the

05:21:52   24  potential to produce $99 million in savings over the next

05:21:55   25  three years -- just three years, $99 million in those kinds

05:22:00  1   of benefits.

05:22:01  2   Q.  And that document is PX-1069; is that correct?

05:22:04  3   A.  Yes, sir.

05:22:05  4   Q.  What other kinds of cost savings have you seen?

05:22:07  5   A.  The second part of the cost savings bullet that I

05:22:12  6   identified had to do with fewer branches and the savings

05:22:16  7   that's associated with -- with not needing as many branches

05:22:19  8   to process deposits.

05:22:21  9        So this is a 2015 Bank of America document, and it

05:22:24  10  says that its customers deposit 250,000 checks per day

05:22:32  11  through their mobile devices and that the Bank of America

05:22:36  12  would need an additional 650 banks to handle that kind of

05:22:43  13  deposit activity.

05:22:44  14  Q.  Now, that's Bank of America.

05:22:46  15        Can you tell the jury the number of mobile

05:22:49  16  deposits each day that Bank -- that Wells Fargo has in

05:22:52  17  comparison to Bank of America?

05:22:54  18  A.  Yes.  Wells Fargo has approximately 220,000 mobile

05:22:58  19  deposits a day, and I was able to calculate that number

05:23:01  20  from data produced to me by -- by Wells Fargo.

05:23:03  21        So they -- they both process an extraordinary

05:23:09  22  number of mobile deposits each day.

05:23:12  23  Q.  And that's PX-1003; is that correct?

05:23:15  24  A.  Yes, sir.

05:23:15  25  Q.  Now, you touched on the cost-savings benefits of the

05:23:21   1    patents-in-suit.  What was the next category of benefits

05:23:23   2    that you considered?

05:23:24   3    A.  So the second category has to do with these increased

05:23:29   4    profits, and the point here is that Wells Fargo recognized

05:23:32   5    that it makes more money on mobile deposits than it does on

05:23:35   6    other kinds of deposits.

05:23:37   7    Q.  What evidence did you see regarding increased profits

05:23:41   8    from Wells Fargo's use of the accused MRDC app?

05:23:44   9    A.  So this slide, which I believe reflects something that

05:23:54  10    Wells Fargo was aware of in around 2012, is the results of

05:23:57  11    a survey and a pilot study that Wells Fargo conducted.

05:24:00  12         And on the right, you can see that the conclusion

05:24:02  13    is that MRDC customers are about 45 percent more profitable

05:24:09  14    on an annualized basis to -- to Wells Fargo than customers

05:24:14  15    who don't make mobile deposits but actually have the app

05:24:18  16    anyway.

05:24:19  17         And you can see that by looking at the height of

05:24:22  18    the bar on the right.  It's about $217.50.  That's for MRDC

05:24:27  19    customers who made deposits, versus the $150.00 associated

05:24:32  20    with the reference group.  And this is basically Exhibit

05:24:35  21    PX-417.

05:24:36  22    Q.  And then there's a bullet point down at the bottom.

05:24:39  23    Can you read that for the jury?

05:24:40  24    A.  Yes.  The bullet point at the left says:  Mobile

05:24:44  25    deposit customers are one-and-a-half times more likely to

| | | |
|---|---|---|
| 05:24:47 | 1 | generate an annual profit of $2,000.00 and have higher |
| 05:24:51 | 2 | deposit balances. |
| 05:24:52 | 3 | Q.  And if the jury wants to look at that, that can be |
| 05:24:55 | 4 | found in Plaintiff's Exhibit No. 329; is that right? |
| 05:24:58 | 5 | A.  I believe so. |
| 05:24:59 | 6 | Q.  So did you see any other evidence on deposit profits? |
| 05:25:05 | 7 | MR. BUNT:  If we can go to the next slide. |
| 05:25:08 | 8 | A.  This slide is November 2010, and the interest -- it's |
| 05:25:16 | 9 | another Wells Fargo planning document in connection with |
| 05:25:21 | 10 | MRDC.  You can see that in the -- in the text of the |
| 05:25:24 | 11 | document. |
| 05:25:24 | 12 | And what's highlighted on the right is that MRDC |
| 05:25:30 | 13 | provides Wells Fargo with the benefit of 20 percent of new |
| 05:25:36 | 14 | deposits that come to Wells Fargo just by virtue of the |
| 05:25:39 | 15 | fact that it's offering this MRDC app, this option. |
| 05:25:43 | 16 | Q.  And is that PX-1069, for the jury's benefit? |
| 05:25:48 | 17 | A.  Yes, sir, it is. |
| 05:25:49 | 18 | Q.  And why is that -- that information important? |
| 05:25:52 | 19 | A.  Well, Wells Fargo, like -- like -- like all banks, |
| 05:25:56 | 20 | makes money on deposits.  That's -- that's one of the |
| 05:25:59 | 21 | businesses that they're in.  And so if they're going to get |
| 05:26:02 | 22 | 20 percent new deposits, that's a -- that's a big plus. |
| 05:26:05 | 23 | Q.  Now, you've discussed cost-savings benefits and |
| 05:26:07 | 24 | increased profits benefits.  Did you also investigate |
| 05:26:11 | 25 | ecosystem benefits? |

05:26:12   1    A.   I did.   That was the third bullet.   Ecosystem benefits

05:26:17   2    are the benefits to the bank, to Wells Fargo, by virtue of

05:26:21   3    having the ability to offer this functionality to its

05:26:25   4    customers.

05:26:25   5    Q.   And what evidence have you seen regarding the ecosystem

05:26:29   6    benefits to Wells Fargo?

05:26:31   7    A.   The -- the next slide, which is another Wells Fargo

05:26:37   8    planning document, this one done in 2011 with respect to

05:26:45   9    mobile remote deposit capture.   Talks about a primary

05:26:46   10   benefit to Wells Fargo, being brand positioning and

05:26:50   11   reputation.   Customers expect their financial institution

05:26:54   12   to provide this functionality.

05:26:56   13        And the other -- the other part that's -- that's

05:26:59   14   highlighted on this document is that customers listed

05:27:04   15   remote deposit as the number one pain point issue out of a

05:27:10   16   hundred.   So it was really important.   This functionality

05:27:13   17   was really important to customers.   And Wells Fargo is --

05:27:16   18   is aware back in 2011 of this importance.

05:27:20   19        MR. BUNT:   And, for the record, that's PX-14.

05:27:23   20   Q.   (By Mr. Bunt)   Did Wells Fargo also do internal studies

05:27:27   21   regarding the importance of MRDC with respect to customer

05:27:33   22   attention?

05:27:34   23   A.   Yes, sir.   This is another Wells Fargo study.   I

05:27:36   24   believe it was around 2012.   And it says that, on the

05:27:40   25   right, the highlighted portion:   MRDC customers are nearly

05:27:45   1   two times less likely to basically leave the bank.  It says

05:27:54   2   attrite.  It means leave the bank.

05:27:56   3   Q.  And is that PX-417?

05:27:58   4   A.  Yes, sir.

05:27:59   5   Q.  Did you find anything that would allow you to calculate

05:28:06   6   the ecosystem benefit provided by the accused MRDC app?

05:28:10   7   A.  Yes, I did.  I mentioned before that one of the things

05:28:13   8   economists do is they use benchmarks sometimes as a basis

05:28:18   9   for determining the value of goods or services or products.

05:28:22   10          And in this case, I feel like I had a good

05:28:28   11   benchmark for measuring the value of -- of the ecosystem

05:28:32   12   benefit to Wells Fargo, and that benchmark is -- is a

05:28:35   13   functionality called Zelle, Z-e-l-l-e.

05:28:37   14   Q.  And what is Zelle?

05:28:39   15   A.  Zelle is -- is a -- a way of -- of sending money

05:28:45   16   electronically instantly from one person to another.

05:28:48   17   Q.  And why did you think that this was a good benchmark?

05:28:51   18          MR. BUNT:  If we could go to the next slide.

05:28:53   19   A.  There -- there were really four reasons why I thought

05:28:59   20   that Zelle was a -- was a useful benchmark here.

05:29:03   21          First, it's -- it's recognized as being table

05:29:05   22   stakes, just as auto capture is in the -- in the financial

05:29:09   23   community.

05:29:10   24          It's free to consumers.  So when -- when a

05:29:14   25   consumer uses Zelle to transfer money from one account to

| | | |
|---|---|---|
| 05:29:17 | 1 | somebody somewhere else, the consumer doesn't pay.  The |
| 05:29:22 | 2 | banks pay, however. |
| 05:29:25 | 3 | And, finally, Zelle is recognized as providing |
| 05:29:29 | 4 | ecosystem benefits.  So it seemed like a good benchmark to |
| 05:29:34 | 5 | use for measuring that kind of benefit with respect to auto |
| 05:29:37 | 6 | capture. |
| 05:29:37 | 7 | Q.  And are you aware of any testimony confirming your |
| 05:29:41 | 8 | opinion that it's a good benchmark? |
| 05:29:44 | 9 | A.  Yes.  This is from Mr. Easley, an AVP at USAA, and he |
| 05:29:49 | 10 | talks about Zelle as -- as providing a comparable benefit |
| 05:29:52 | 11 | in reference to the ability to send money from one person |
| 05:29:56 | 12 | to another.  And describes that as an ecosystem benefit |
| 05:29:59 | 13 | with respect to access to money. |
| 05:30:03 | 14 | Q.  How much do banks pay for access to Zelle? |
| 05:30:07 | 15 | A.  Well, it varies.  There's trade press that suggests |
| 05:30:12 | 16 | that they pay between 50 and 75 cents for every |
| 05:30:16 | 17 | transaction, even though it's free to the consumer.  And |
| 05:30:23 | 18 | I've seen USAA documents that indicate that it pays as much |
| 05:30:27 | 19 | as 60 cents per transaction. |
| 05:30:29 | 20 | Q.  And who is this money paid to? |
| 05:30:31 | 21 | A.  It's paid to the -- the entities that essentially have |
| 05:30:34 | 22 | set up Zelle, and that's a consortium of banks.  And one of |
| 05:30:39 | 23 | the banks that receives those funds is actually Wells |
| 05:30:42 | 24 | Fargo. |
| 05:30:42 | 25 | Q.  Mr. Weinstein, do you have an opinion as to whether the |

05:30:44   1   50- to 75-cent figures represent a conservative estimate of

05:30:51   2   the ecosystem value of MRDC?

05:30:51   3   A.  Yes.  Actually I think -- I think 60 cents -- something

05:30:54   4   in that range is conservative.

05:30:56   5           MR. BUNT:  Can we go to the next slide, please?

05:30:58   6   A.  And it's conservative for a couple of reasons, at

05:31:05   7   least.  One is that, unlike auto capture, there are

05:31:11   8   alternatives to Zelle -- that is to say, there are other

05:31:14   9   ways of sending money from one person to another.

05:31:18   10          One that's pretty popular these days is Venmo.

05:31:22   11  And you can send money from one person to another using

05:31:26   12  Venmo.  Whereas I'm not aware of any alternative to auto

05:31:30   13  capture.

05:31:30   14          And, second, as -- as we've just seen, there are

05:31:33   15  cost savings to the banks associated with mobile deposits

05:31:36   16  and auto capture.

05:31:38   17          Zelle doesn't provide a cost savings, and so in

05:31:40   18  that sense, auto capture is providing additional benefits

05:31:44   19  that aren't present with Zelle, which means 60 cents could

05:31:47   20  be too low.

05:31:48   21          MR. BUNT:  Your Honor, may we approach the bench

05:31:50   22  for just a moment?

05:31:51   23          THE COURT:  You may.  Approach the bench, counsel.

05:31:53   24          (Bench conference.)

05:32:03   25          MR. BUNT:  Your Honor, it looks like some of the

05:32:05    1    jurors are falling asleep, which I understand completely

05:32:08    2    given this type of stuff.  Do you want to let them stretch

05:32:12    3    their legs for a minute or just keep trucking along?

05:32:15    4            THE COURT:  How much more have you got on your

05:32:17    5    direct?

05:32:17    6            MR. BUNT:  I've got like six more pages, so -- out

05:32:19    7    of 17.  So I've got probably 15, 20 minutes.

05:32:22    8            THE COURT:  I haven't seen anybody that looks like

05:32:24    9    they're going to sleep.  We'll pause, and I'll let

05:32:27   10    everybody on the jury stand up for a few minutes, and then

05:32:30   11    we'll sit back down.

05:32:30   12            MR. BUNT:  Thank you.

05:32:30   13            MR. MELSHEIMER:  We're fine with the sleeping,

05:32:30   14    Your Honor.

05:32:30   15            THE COURT:  Pardon?

05:32:31   16            MR. MELSHEIMER:  We have no objection to the

05:32:32   17    sleeping, Your Honor.

05:32:34   18            THE COURT:  Except when you're at the podium.  I

05:32:37   19    understand.

05:32:37   20            (Bench conference concluded.)

05:32:44   21            THE COURT:  Ladies and gentlemen, I'm not going to

05:32:45   22    recess, but we're all going to take 30 seconds and stand up

05:32:49   23    for a minute and stretch your legs, and then we're going to

05:32:53   24    sit back down.  So everybody all rise.

05:33:13   25            All right.  Be seated.

162

05:33:17  1            Counsel, let's continue.

05:33:18  2            MR. BUNT:   Thank you, Your Honor.

05:33:20  3   Q.  (By Mr. Bunt)  Mr. Weinstein, you've been talking about

05:33:22  4   Factors 9 and 10 of the Georgia-Pacific factors.   What's

05:33:25  5   the next Georgia-Pacific factor you considered?

05:33:28  6   A.   The next -- the next one I thought was relevant here is

05:33:33  7   Georgia-Pacific Factor 5, which relates to the commercial

05:33:37  8   relationship between the entities.   And in this case,

05:33:41  9   Wells Fargo and USAA.

05:33:43  10           And the significance of -- of Georgia-Pacific

05:33:47  11  Factor 5 is this.   If the entities that are negotiating for

05:33:52  12  a license compete with one another, then the licensor is

05:33:56  13  going to want more than if they don't compete.   And the

05:34:00  14  reason is that by providing that license, providing

05:34:05  15  permission to use the technology, it's essentially

05:34:07  16  impacting its own business.

05:34:09  17           It's giving that technology to the competitor.

05:34:12  18  It's not giving it away for free because it's going to get

05:34:18  19  paid.   But, generally, you don't like giving commercial

05:34:21  20  advantages that you believe you have to your competitor.

05:34:23  21           And so Georgia-Pacific 5 recognizes that fact.

05:34:29  22  And so it says that in these kind of hypothetical

05:34:33  23  negotiations, that's something that the parties are going

05:34:36  24  to be aware of.

05:34:37  25  Q.  Have you seen any evidence that USAA and Wells Fargo

05:34:40   1   compete directly with one another?

05:34:43   2   A.  Yes, sir, I have.

05:34:45   3        MR. BUNT:  Can we go to the next slide, please,

05:34:49   4   sir, Mr. Huynh?

05:34:49   5   A.  This next slide is -- is a Wells Fargo ad, and it's

05:34:53   6   obviously targeting military service.  And that's sort of a

05:35:01   7   core constituency of USAA.  And so you don't really need

05:35:08   8   much more than to say -- to recognize the fact that not

05:35:12   9   only are they banks, but Wells Fargo is targeting the

05:35:15   10  military for its customer base.  So they're -- they're

05:35:17   11  direct competitors.

05:35:18   12  Q.  And this is PX-1083?

05:35:20   13  A.  Yes, sir.

05:35:21   14  Q.  And have you considered the possibility that maybe

05:35:24   15  Wells Fargo might not need to use the USAA patents-in-suit?

05:35:27   16  A.  Yes, sir, I have.

05:35:29   17  Q.  And what did you conclude?

05:35:31   18  A.  Well, I concluded that they thought about trying to

05:35:34   19  find a way to avoid having to take a license from USAA, but

05:35:39   20  instead, doing it themselves perhaps.

05:35:45   21        MR. BUNT:  Can we have the next slide?  Yes,

05:35:48   22  thanks.

05:35:48   23  A.  So this is another Wells Fargo planning document, dated

05:35:52   24  2011, in which it's considering ways of developing its own

05:36:01   25  auto capture functionality.  And, among other things, the

05:36:05   1   document references how long it would take, 9 to 18 months,

05:36:09   2   and the fact that even after spending that time, the

05:36:12   3   technology they get might not be what they really needed.

05:36:15   4        And so what -- what this relates to is -- is -- is

05:36:21   5   the fact that if there's an alternative to taking a

05:36:26   6   license, the ability to use that alternative will limit how

05:36:31   7   much one would pay for that license, and here, what we see

05:36:34   8   is Wells Fargo considering that possibility, but not -- not

05:36:40   9   finding that to be a useful path to go down.

05:36:43   10  Q.   (By Mr. Bunt)   Did you have any information from

05:36:46   11  Mr. Calman about whether there were any commercially viable

05:36:48   12  alternatives to the patents-in-suit?

05:36:50   13  A.   Yes, sir, I did.

05:36:52   14  Q.   What did he say?

05:36:54   15  A.   Well, this is not --

05:36:55   16        MR. BUNT:   Let's go back to the previous slide, if

05:36:57   17  we could.

05:36:58   18  A.   Yeah, the Calman -- what Mr. Calman said is he was not

05:37:00   19  aware of any commercially viable non-infringing

05:37:04   20  alternatives.

05:37:05   21  Q.   (By Mr. Bunt)   And just for the jury's record, this is

05:37:07   22  PX-14, the document you were just showing the jury about

05:37:12   23  the unavailability of an internal RDC capability at Wells

05:37:19   24  Fargo?

05:37:19   25        MR. BUNT:   Now, let's go to the next slide,

05:37:21   1   please, sir.

05:37:22   2   Q.  (By Mr. Bunt)   What other evidence did you see that

05:37:24   3   there were no viable non-infringing alternatives to the

05:37:26   4   patents-in-suit?

05:37:26   5   A.  Well, apart from -- from what I just testified to about

05:37:30   6   Mr. Calman, there also was sworn testimony by Mr. Jitodai

05:37:34   7   at Wells Fargo who was their corporate representative; in

05:37:38   8   other words, he spoke and speaks for the company.

05:37:40   9          And he was asked about whether manual capture

05:37:46   10   option would -- would be a possible alternative, in the

05:37:51   11   sense that it would be sufficiently reliable.  And he

05:37:54   12   really couldn't say anything about the success rate

05:37:56   13   associated with -- with that option.

05:37:59   14          MR. BUNT:  Let's go to the next slide.

05:38:01   15   Q.  (By Mr. Bunt)  Can you briefly summarize the benefits

05:38:03   16   that you quantified?

05:38:04   17   A.  Yes.  So I talked about the three general types of --

05:38:11   18   of benefits associated with Wells Fargo's use of the

05:38:18   19   patents-in-suit.  And I did -- I did that because that's

05:38:22   20   what the statute says I should do, look at the benefits to

05:38:27   21   the infringer.

05:38:27   22          And I went ahead and quantified those benefits.

05:38:33   23   The cost-savings benefits are approximately $476 million;

05:38:37   24   the increased profits, $316 million; the ecosystem

05:38:45   25   benefits, $139 million, for a total of $932 million for the

05:38:50   1   damage period December 15th, 2016, to November 4th, roughly

05:38:55   2   the trial date right now, 2019.  And these are benefits

05:38:58   3   associated with auto capture-enabled MRDC.

05:39:05   4          MR. BUNT:  So let's go to the next slide.

05:39:07   5   Q.  (By Mr. Bunt)  And can you explain how you quantified

05:39:09   6   these specific benefits?

05:39:11   7   A.  Right.  So now we're going to go back and see where

05:39:14   8   those numbers came from.  And we start with the

05:39:16   9   cost-savings benefits.

05:39:18   10         And with respect to the cost-savings benefits,

05:39:19   11  we're talking about what's called channel optimization,

05:39:23   12  which has to do with the fact that it costs Wells Fargo

05:39:26   13  less money to process a mobile deposit than it does to

05:39:30   14  process a deposit made at an ATM or in the bank.

05:39:34   15         And what this slide depicts is information that

05:39:39   16  was provided by Wells Fargo on its actual costs associated

05:39:44   17  with processing deposits at each of the three channels that

05:39:49   18  are shown here.

05:39:52   19         And what I did is I looked at those costs,

05:39:55   20  tabulated them, and then calculated the cost savings

05:39:58   21  associated with mobile deposits relative to each of those

05:40:03   22  channels.  And the cost savings are shown at Lines 4 and 4.

05:40:09   23  You can calculate them right from -- right from this

05:40:11   24  demonstrative.

05:40:12   25  Q.  So, for example, if we go up to the 2018 column that

05:40:16  1   says Teller Check Only Deposit, that's -- what is that

05:40:21  2   telling the jury?

05:40:22  3   A.   That's what it cost Wells Fargo to process a check

05:40:26  4   that's deposited at the bank.

05:40:28  5   Q.   And then --

05:40:29  6   A.   $2.75.

05:40:30  7   Q.   -- and then the second line under 2018, what is that

05:40:36  8   cost?

05:40:36  9   A.   That's the $1.58 associated with processing an ATM

05:40:42  10  deposit.

05:40:42  11  Q.   And then this third one, what does that show?

05:40:44  12  A.   That's approximately 36 cents for a mobile deposit.

05:40:48  13  Q.   So the -- the cost savings you see here on Line 4,

05:40:51  14  that's the difference -- if you could just explain one more

05:40:57  15  time the difference between teller check and mobile

05:41:01  16  deposit.  Is that correct?

05:41:01  17  A.   Right.  Line -- Line 4 is -- is basically Line 1 minus

05:41:06  18  Line 3, teller minus mobile deposit, that's correct.

05:41:07  19  Q.   And then did you do that for each year of data that you

05:41:10  20  had from Wells Fargo?

05:41:11  21  A.   I did.  I did it for -- for -- for each year.  And

05:41:18  22  Wells Fargo provided information on the frequency of teller

05:41:21  23  deposits versus ATM documents.  So I took the information

05:41:25  24  that Wells Fargo provided and -- and made these kinds of

05:41:30  25  calculations.

05:41:30   1   Q.   And how did you use this information to come up with

05:41:34   2   total channel optimization cost savings?

05:41:38   3   A.   I did the math, took all that information, and when you

05:41:44   4   did this kind of calculation for the entire damage period,

05:41:49   5   the total damages associated with what's called channel

05:41:52   6   optimization, namely the cost savings associated with

05:41:56   7   mobile deposits, are $302 million.   That is the cost

05:42:01   8   savings that Wells Fargo obtained by virtue of mobile

05:42:06   9   deposits relative to ATMs and teller deposits.

05:42:12   10   Q.   And this exhibit that we're looking at is Plaintiff's

05:42:16   11   Exhibit 28; is that correct?

05:42:17   12   A.   Yes, sir.

05:42:17   13   Q.   Okay.   So can you tell us about the other category of

05:42:21   14   cost savings?

05:42:22   15            MR. BUNT:   Let's go to the next slide.   There we

05:42:24   16   go.

05:42:24   17   A.   So the second category that I mentioned was the fact

05:42:27   18   that with all these mobile deposits, the bank needs future

05:42:31   19   branches, and branches cost money to build.

05:42:36   20            So, again, I took -- I took information from Wells

05:42:41   21   Fargo which allowed me to determine the volume of mobile

05:42:44   22   deposits that would have been made with a teller after

05:42:48   23   subtracting out those 20 percent new deposits because they

05:42:52   24   get those anyway.   And so they -- they shouldn't be

05:42:54   25   included.   And that came to approximately 25, 26 million

05:43:02    1    mobile deposits in the number -- the year is 2018 -- for

05:43:08    2    that year.

05:43:12    3            Based on the number of checks a branch can process

05:43:15    4    in a -- in a given year, that comes to an additional 184

05:43:21    5    branches that are not needed by virtue of mobile deposits,

05:43:26    6    as opposed to the need for branches.

05:43:30    7            And at a construction cost of approximately just a

05:43:33    8    million -- a million five per branch, and that does not

05:43:37    9    include the land or the people but just -- just includes

05:43:41   10    the building and equipment, that is a savings from not

05:43:45   11    having to have those branches of $276 million to Wells

05:43:50   12    Fargo.

05:43:50   13            MR. BUNT:  So if we could go to the next slide.

05:43:53   14    Q.  (By Mr. Bunt)  So how did you calculate the capital

05:43:55   15    cost savings for this period of damages that we're talking

05:43:57   16    about, December 15th of 2016 up until trial?

05:44:01   17    A.  Right.  So the figures on the last slide amount to

05:44:07   18    75 cents per deposit in savings, and I multiplied that

05:44:12   19    times the number of mobile deposits during the damage

05:44:15   20    period so that the capital cost savings to Wells Fargo is

05:44:20   21    approximately $174 million.  That's just from not having to

05:44:24   22    build all these extra branches.

05:44:26   23    Q.  And so the second line, the total number of mobile

05:44:29   24    deposits from December 15th, 2016, until now, that's how

05:44:34   25    many?

05:44:34  1   A.   232 million.

05:44:38  2   Q.   Okay.  So could you describe to the jury how you

05:44:41  3   calculated total cost-savings benefits to Wells Fargo?

05:44:45  4   A.   So the total cost savings were the $302 million

05:44:50  5   associated with the fact that it costs less for Wells Fargo

05:44:55  6   to process a mobile deposit than an ATM or a teller

05:45:01  7   deposit, plus the capital cost savings of $174 million

05:45:06  8   associated with the fact that they don't need those extra

05:45:08  9   branches, producing a total cost savings of approximately

05:45:11  10  $476 million.

05:45:16  11  Q.   And then the third category -- or the second category

05:45:19  12  of benefits that you were looking at was increased profits;

05:45:23  13  is that correct?

05:45:23  14  A.   Yes, sir.

05:45:26  15       MR. BUNT:  And so let's go to the next slide.

05:45:30  16  Q.   (By Mr. Bunt)  How much here?

05:45:31  17  A.   Once again, for the damages period, the increased

05:45:35  18  profits made from mobile deposits are approximately $316

05:45:45  19  million.

05:45:45  20  Q.   And can you walk the jury how you came up with these

05:45:48  21  increased profits?

05:45:50  22       MR. BUNT:  Can you go to the next slide?

05:45:51  23  A.   So Wells Fargo provided information on average

05:45:57  24  profitability that it obtains from checking accounts.  That

05:46:03  25  information was provided by year, including all years in

05:46:09    1   the damages period.  So what I did is I took that

05:46:14    2   information, and the year that's shown here is 2018.  This

05:46:18    3   is just one year.  I took that information.

05:46:22    4        The average profit in that year, as provided by

05:46:25    5   Wells Fargo per checking account, was about $94.00.  14

05:46:30    6   percent of deposits were mobile deposits.  And so what I

05:46:37    7   did is multiply that 14 percent times the $94.00 average

05:46:43    8   profit in order to get profit attributed to mobile

05:46:47    9   deposits, $13.29.

05:46:50   10        The last step of this calculation was to multiply

05:46:54   11   that $13.29 times the number of mobile deposit accounts

05:46:59   12   that year, approximately 10.9 million, so that the profits

05:47:04   13   from mobile deposits in 2018 are $145 million to Wells

05:47:12   14   Fargo.

05:47:12   15        And then I do the same step for the other years in

05:47:15   16   the damage period, and total profits from mobile deposits

05:47:18   17   using that same methodology are approximately $316 million.

05:47:24   18   Q.  So let's turn to the last category of damages which are

05:47:30   19   the ecosystem benefits.  Can you explain to us how you

05:47:33   20   calculated those?

05:47:34   21   A.  Yes.  This is an easier calculation to describe.

05:47:41   22   Again, during the damage period, I used the same figures

05:47:44   23   for mobile deposits, 232 million mobile deposits, and both

05:47:51   24   I and Wells Fargo's damage expert, essentially, agree with

05:47:56   25   those numbers.  I took the east -- ecosystem benefit which

05:47:59   1   I believed to be 60 cents as a -- as a useful benchmark.

05:48:04   2          And when you do that 60-cent per deposit ecosystem

05:48:11   3   benefit, namely to brand name and reputation and deal with

05:48:14   4   the customers' pain points, the ecosystem benefits are

05:48:17   5   approximately $139 million.

05:48:21   6   Q.  So are the USAA patents responsible for all of the

05:48:27   7   benefits that you have just quantified?

05:48:30   8   A.  No, sir.

05:48:32   9   Q.  So how did you go about figuring out what was

05:48:36   10  attributable to the United -- to the USAA patents?

05:48:39   11  A.  Right.  As I said earlier, I start with the benefits

05:48:44   12  associated with MRDC, and that's what's shown on the

05:48:49   13  left-hand side of this slide.  And those are the figures

05:48:52   14  that I've been describing.

05:48:53   15         And then what I do is I apportion down to the

05:48:56   16  contribution of USAA's two patents-in-suit.  And based on

05:49:03   17  Mr. -- Mr. Calman's research, which we just heard about,

05:49:07   18  that apportionment rate conservatively, according to him,

05:49:12   19  is -- is 40 percent.

05:49:13   20         And so what I do is I take the MRDC patents from

05:49:19   21  auto-enabled MRDC benefits to Wells Fargo, and I multiply

05:49:25   22  that -- those benefits times the apportionment factor of

05:49:30   23  40 percent.  And so the benefits then that are attributable

05:49:35   24  to the patent-in-suit are shown on the right-hand side

05:49:39   25  of -- of this demonstrative, and they -- they amount to

05:49:44   1   $373 million, which you saw right at the beginning of my

05:49:48   2   testimony.  And those are the benefits that reflect the

05:49:51   3   contribution of the patents-in-suit to all of the benefits

05:49:57   4   associated with MRDC at Wells Fargo during the damage

05:50:02   5   period.

05:50:02   6   Q.  And are you aware of any evidence that supports

05:50:05   7   Mr. Calman's 40 percent apportionment factor?

05:50:11   8   A.  Yes.

05:50:11   9   Q.  And why do you use that as a figure, and do you believe

05:50:14  10   that to be a conservative estimate?

05:50:16  11            MR. BUNT:  Let's go to the next slide.

05:50:19  12   A.  I -- I do.  It's a conservative estimate for at least

05:50:23  13   the reasons that are summarized on this slide.  We saw

05:50:26  14   Mr. Saffici's testimony that auto capture is acknowledged

05:50:30  15   as the foundation for mobile check deposit successful;

05:50:38  16   Mr. Ajami's testimony that auto capture must be treated as

05:50:41  17   must-have feature; and that Futurion Report that basically

05:50:44  18   says if -- if mobile deposit doesn't work right, customers

05:50:50  19   are going to look for another bank.

05:50:52  20   Q.  (By Mr. Bunt)  So now that you've determined that 40

05:50:55  21   percent of the quantifiable benefits of the accused MRDC

05:50:59  22   system are attributable to the patents-in-suit, how did you

05:51:02  23   arrive at your final damages figure?

05:51:05  24   A.  Well, there's one more step.  Once you get to the point

05:51:09  25   that the patents-in-suit account for approximately $373

05:51:14   1   million in benefits to Wells Fargo, the final step involves
05:51:24   2   determining how that bundle of benefits is going to be
05:51:28   3   split at the hypothetical negotiation that we started with
05:51:31   4   between Wells Fargo and USAA.  And understand, as I said at
05:51:34   5   the beginning, at the hypothetical negotiation, one of the
05:51:37   6   things that the parties know is about the benefits that are
05:51:41   7   going to reflect use of the functionality by the infringing
05:51:47   8   entity.
05:51:48   9         And so they're aware of these $373 million in
05:51:53  10   benefits, and now the final step here is, well, where do
05:51:57  11   they wind up at the end of this hypothetical negotiation?
05:52:00  12   That's the last step.
05:52:02  13         MR. BUNT:  Mr. Huynh, can we have the next slide?
05:52:05  14   A.  Well, this final slide -- well, semifinal slide --
05:52:08  15   reflects my conclusion as to the output -- as to the
05:52:13  16   outcome of the hypothetical negotiation, only those
05:52:16  17   benefits.
05:52:16  18         The pie represents the $373 million in benefits,
05:52:20  19   and I've concluded that Wells Fargo would negotiate for its
05:52:26  20   return on equity, that is, the amount of money it makes on
05:52:30  21   the equity that it has at about the time of the
05:52:34  22   hypothetical negotiation, and that's approximately $73
05:52:39  23   million.  That way it's getting the same benefit from these
05:52:43  24   patents as it gets on its other amount.  All right.
05:52:46  25   Q.  (By Mr. Bunt)  How much would USAA receive of that $373

05:52:50  1  million?

05:52:50  2  A.   USAA gets the rest, roughly $299 million, and that's

05:52:55  3  the damage number that I've -- that I've ultimately

05:52:57  4  concluded would be the outcome of the hypothetical

05:53:01  5  negotiation.

05:53:01  6  Q.   So your final determination on the damages adequate to

05:53:05  7  compensate USAA for infringement of the patents-in-suit by

05:53:10  8  Wells Fargo is $299.8 million; is that correct?

05:53:13  9  A.   Yes, sir.

05:53:14  10  Q.   Thank you, sir.

05:53:15  11       MR. BUNT:   I'll pass the witness.

05:53:18  12       THE COURT:   Ladies and gentlemen, before the

05:53:21  13  Defendant cross-examines the witness, we're going to recess

05:53:23  14  for the evening.

05:53:24  15       We'll begin with the Defendant's cross-examination

05:53:26  16  of this witness tomorrow.

05:53:28  17       I'm going to ask you to close your notebooks and

05:53:32  18  leave them on the table in the jury room as you exit the

05:53:34  19  courthouse.

05:53:36  20       I'll remind you to follow all the instructions

05:53:38  21  that I've given you throughout the trial, including, of

05:53:41  22  course, as you would expect me to remind you, not to

05:53:43  23  discuss the case with anyone.

05:53:45  24       If you will attempt to be back tomorrow morning,

05:53:48  25  just as you did today -- we did not start quite at 8:30.

05:53:51   1   That's on our side of the fault, not yours, but we will try

05:53:54   2   to do better tomorrow.  And if you'll get here in time so

05:53:58   3   that you can be assembled and ready to go by 8:30, I would

05:54:00   4   appreciate it.

05:54:01   5          Have a good evening, ladies and gentlemen.  The

05:54:03   6   jury is excused for the evening at this time.

05:54:05   7          COURT SECURITY OFFICER:  All rise.

05:54:06   8          (Jury out.)

05:54:27   9          THE COURT:  Are either Plaintiff or Defendant

05:54:29   10  aware of anything that should be taken up before we recess

05:54:31   11  for the evening?

05:54:33   12         MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

05:54:34   13         MR. BUNT:  Yes, yes, there is something from the

05:54:36   14  Plaintiffs.

05:54:37   15         MR. SHEASBY:  Something for Plaintiffs, Your

05:54:40   16  Honor.

05:54:40   17         THE COURT:  You may step down, Mr. Weinstein.

05:54:43   18         THE WITNESS:  Thank you, sir.

05:54:44   19         MR. BUNT:  I know Your Honor instructed us to have

05:54:47   20  jury instructions to you by noon tomorrow, and I was hoping

05:54:51   21  to beg for the indulgence of the Court on behalf of

05:54:54   22  everybody here.  Would it be possible for us to have those

05:54:57   23  to you, say, by noon on Saturday instead?  The reason being

05:55:02   24  that I think we're going to have a lot more opportunity to

05:55:04   25  make headway tomorrow afternoon while the Court is at the

```
05:55:08   1   investiture proceeding, and I think we could get a more
05:55:12   2   polished product to you by Saturday.
05:55:14   3              THE COURT:  I gather the Defendant joins in that?
05:55:18   4              MR. HILL:  Yes, Your Honor.
05:55:19   5              MR. BUNT:  They threw me under the bus and told
05:55:22   6   me --
05:55:22   7              MR. MELSHEIMER:  We join enthusiastically,
05:55:26   8   Your Honor.
05:55:26   9              MR. SHEASBY:  I objected, Your Honor.
05:55:27  10              THE COURT:  Well, I'll move it from noon on Friday
05:55:30  11   to 5:00 p.m. on Friday, and I'll also instruct that, in
05:55:34  12   addition to filing a PDF with the clerk's office, you're to
05:55:38  13   email a Word version to my staff so that we'll have it in
05:55:42  14   Word form.
05:55:43  15         Is there anything else to take up before we
05:55:45  16   recess?
05:55:46  17              MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.
05:55:48  18              MR. MELSHEIMER:  Nothing -- nothing, Your Honor.
05:55:50  19   Thank you.
05:55:50  20              THE COURT:  All right.  We will read exhibits into
05:55:52  21   the record before I bring in the jury in the morning.
05:55:56  22              The Court stands in recess until tomorrow.
05:56:00  23              COURT SECURITY OFFICER:  All rise.
05:56:01  24              MR. SHEASBY:  Thank you, Your Honor.
          25              (Recess.)
```

1                        CERTIFICATION

2

3         I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                        10/31/19
      SHELLY HOLMES, CSR, TCRR                  Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25