07:52:56  1                IN THE UNITED STATES DISTRICT COURT
                          FOR THE EASTERN DISTRICT OF TEXAS
         2                       MARSHALL DIVISION

         3   UNITED STATES AUTOMOBILE      )(
             ASSOCIATION
         4                                 )(    CIVIL ACTION NO.

         5   VS.                           )(    2:18-CV-245-JRG

         6                                 )(    MARSHALL, TEXAS
                                                 NOVEMBER 1, 2019
         7   WELLS FARGO BANK, N.A.        )(    8:53 A.M.

         8

         9                  TRANSCRIPT OF JURY TRIAL

        10                     MORNING SESSION

        11      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

        12                UNITED STATES DISTRICT JUDGE

        13
             APPEARANCES:
        14

        15   FOR THE PLAINTIFF:

        16
             JASON SHEASBY
        17   ANTHONY ROWLES
             LISA GLASSER
        18   IRELL & MANELLA
             1800 Avenue of the Stars
        19   Suite 900
             Los Angeles, CA 90067-4276
        20

        21
             ROBERT CHRISTOPHER BUNT
        22   PARKER, BUNT & AINSWORTH, PC
             100 East Ferguson
        23   Suite 418
             Tyler, TX 75702
        24

        25

```
 1  FOR THE DEFENDANT:

 2
    THOMAS M. MELSHEIMER
 3  M. BRETT JOHNSON
    MICHAEL A. BITTNER
 4  J. TRAVIS UNDERWOOD
    WINSTON & STRAWN LLP
 5  2121 North Pearl Street
    Suite 900
 6  Dallas, TX 75201

 7
    E. DANIELLE T. WILLIAMS
 8  WINSTON & STRAWN LLP
    300 South Tyron Street
 9  16th Floor
    Charlotte, NC 28202
10
11  MATTHEW R. MCCULLOUGH
    WINSTON & STRAWN LLP
12  275 Middlefield Road
    Suite 205
13  Menlo Park, CA 94025

14
    JACK WESLEY HILL
15  WARD, SMITH & HILL, PLLC
    P.O. Box 1231
16  1507 Bill Owens Parkway
    Longview, TX 75606
17

18
    COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                       Official Court Reporter
                         United States District Court
20                       Eastern District of Texas
                         Marshall Division
21                       100 E. Houston
                         Marshall, Texas   75670
22                       (903) 923-7464

23
    (Proceedings recorded by mechanical stenography, transcript
24  produced on a CAT system.)

25
```

|          |     |                                                              |
|----------|-----|--------------------------------------------------------------|
| 08:53:32 | 1   | P R O C E E D I N G S                                        |
| 08:53:32 | 2   | (Jury out.)                                                  |
| 08:53:34 | 3   | COURT SECURITY OFFICER:  All rise.                          |
| 08:53:35 | 4   | THE COURT:  Be seated, please.                             |
| 08:53:45 | 5   | Are the parties prepared to read into the record           |
| 08:53:52 | 6   | the items from the list of pre-admitted exhibits used       |
| 08:53:55 | 7   | during yesterday's portion of the trial?                    |
| 08:53:56 | 8   | MR. BUNT:  Yes, Your Honor.                                |
| 08:53:57 | 9   | THE COURT:  Please proceed.                                |
| 08:54:01 | 10  | MR. BUNT:  The Plaintiffs used the following              |
| 08:54:03 | 11  | exhibits yesterday.  Plaintiff's Exhibit No. 5, Plaintiff's |
| 08:54:06 | 12  | Exhibit No. 14, Plaintiff's Exhibit 26, PX-28, PX-92,       |
| 08:54:15 | 13  | PX-162, PX-223, PX-329, PX-365, PX-376, PX-415, PX-417,      |
| 08:54:33 | 14  | PX-419, PX-487, PX-489, PX-1003, PX-1069, and PX-1083.       |
| 08:54:50 | 15  | THE COURT:  Any objection from Defendants?                 |
| 08:54:54 | 16  | MR. UNDERWOOD:  No objection, Your Honor.                  |
| 08:54:56 | 17  | THE COURT:  To Defendant -- does Defendant have a          |
| 08:54:58 | 18  | similar rendition to offer?                                 |
| 08:55:00 | 19  | MR. UNDERWOOD:  We do, Your Honor.  We would add           |
| 08:55:02 | 20  | that DTX-611 and DTX-160 were also used.                    |
| 08:55:07 | 21  | THE COURT:  All right.  Any objection to that from         |
| 08:55:10 | 22  | Plaintiff?                                                   |
| 08:55:10 | 23  | MR. BUNT:  No objection, Your Honor.                       |
| 08:55:11 | 24  | THE COURT:  All right.  Thank you, counsel.                |
| 08:55:14 | 25  | Mr. Weinstein -- Mr. Weinstein, I'm sorry, you may         |

| | | |
|---|---|---|
| 08:55:19 | 1 | return to the witness stand.  I remind you you remain under |
| 08:55:22 | 2 | oath, sir. |
| 08:55:23 | 3 | MR. HILL:  And, Your Honor, there was one issue I |
| 08:55:25 | 4 | neglected to bring up in chambers that I intended to.  I |
| 08:55:28 | 5 | had hoped to use an easel this morning and also use the |
| 08:55:32 | 6 | flip chart at some point. |
| 08:55:33 | 7 | THE COURT:  All right. |
| 08:55:33 | 8 | MR. HILL:  I was curious if I could go ahead and |
| 08:55:37 | 9 | put these in position -- I brought these around so -- |
| 08:55:41 | 10 | THE COURT:  That's fine, Mr. Hill. |
| 08:55:44 | 11 | MR. HILL:  Thank you. |
| 08:55:44 | 12 | THE COURT:  I'd rather you do it now so I can see |
| 08:55:44 | 13 | where you put it. |
| 08:55:44 | 14 | MR. HILL:  All right.  Do you want me to go ahead |
| 08:55:46 | 15 | and put the board on it, Your Honor?  Is this is this |
| 08:55:48 | 16 | acceptable where this is? |
| 08:55:49 | 17 | THE COURT:  Do you intend -- do you want the board |
| 08:55:52 | 18 | on it? |
| 08:55:52 | 19 | MR. HILL:  I'm going to go to the board straight |
| 08:55:55 | 20 | away and it will probably be up most of the examination. |
| 08:55:56 | 21 | THE COURT:  All right.  Then if you'd like to put |
| 08:55:57 | 22 | it up before the jury comes in, you can do that. |
| 08:56:21 | 23 | And you're welcome to stand in front of the board |
| 08:56:24 | 24 | or to the side of it as long as you observe the typical |
| 08:56:27 | 25 | arm's length rule. |

08:56:29  1        MR. HILL:  I'd also like to use the chart, Your

08:56:32  2  Honor.  Can I go ahead and advance it?

08:56:34  3        THE COURT:  Yes, you may.

08:56:40  4        And, Mr. Bunt, when he finishes with his cross,

08:56:43  5  let me know if you want to use either of these in your

08:56:46  6  redirect, and, if so, we'll leave them there.  If you

08:56:50  7  don't, we'll take them down.

08:56:51  8        MR. BUNT:  Thank you, Your Honor.

08:56:52  9        THE COURT:  That is assuming you'll have redirect.

08:56:56  10        MR. BUNT:  I'm guessing I will, Your Honor.

08:56:59  11        THE COURT:  All right.  Is there anything else

08:57:00  12  before we bring the jury in?

08:57:04  13        MR. HILL:  No, sir.

08:57:04  14        THE COURT:  Let's bring in the jury, please,

08:57:09  15  Mr. Johnston.

08:57:11  16        COURT SECURITY OFFICER:  All rise.

08:57:11  17        (Jury in.)

08:57:31  18        THE COURT:  Good morning, ladies and gentlemen of

08:57:32  19  the jury, welcome back.  Please have a seat.

08:57:35  20        I appreciate your being on time.  We're starting a

08:57:43  21  little late.  Those are -- that's because of housekeeping

08:57:45  22  matters I had to take up with counsel, but I appreciate you

08:57:48  23  being here as I asked.

08:57:50  24        When we recessed for the evening yesterday,

08:57:53  25  Mr. Roy Weinstein was on the witness stand.  And Plaintiffs

08:57:55    1    had finished their direct examination.  We'll proceed with

08:58:00    2    the Defendant's cross-examination.

08:58:01    3              Mr. Hill, you may proceed.

08:58:02    4              MR. HILL:  Thank you, Your Honor.  May it please

08:58:04    5    the Court.

08:58:04    6              Good morning, ladies and gentlemen.

08:58:04    7    ROY WEINSTEIN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

08:58:04    8                        CROSS-EXAMINATION

08:58:06    9    BY MR. HILL:

08:58:06   10    Q.  Mr. Weinstein, good morning.

08:58:08   11    A.  Good morning, sir.

08:58:09   12    Q.  It's good to see you.  Mr. Weinstein, I would like to

08:58:12   13    start out this morning by just orienting ourselves a little

08:58:15   14    bit with regard to the timeline.  You've seen this timeline

08:58:19   15    used earlier in the case, sir?

08:58:20   16    A.  Yes, sir, I have.

08:58:21   17    Q.  All right.  There's a few days in particular I'd like

08:58:23   18    to go over with you just to help us get our bearings for

08:58:27   19    some of the testimony that you've offered in the case.  Are

08:58:29   20    you with me, sir?

08:58:30   21    A.  Yes, sir.

08:58:30   22    Q.  All right.  So, Mr. Weinstein, you see we've got a

08:58:32   23    period of time here, and, notably, we've got this date in

08:58:35   24    2015, and that's when the patents -- the first patent in

08:58:40   25    this case to issue, the '571 patent, issued; do you

08:58:43  1  understand that, sir?

08:58:44  2  A.  I do.

08:58:44  3  Q.  And that was in March of 2015, correct?

08:58:47  4  A.  Yes, sir.

08:58:48  5  Q.  Now, so March of 2015 when that first patent issues,

08:58:52  6  you were testifying earlier about a date of a hypothetical

08:58:56  7  negotiation.  Do you recall that?

08:58:57  8  A.  I do, sir.

08:58:57  9  Q.  And what is the date of that hypothetical negotiation?

08:59:00  10  A.  That was date of first infringement, which is around

08:59:05  11  that time.

08:59:06  12  Q.  Around this time here?

08:59:07  13  A.  Yes, sir.

08:59:07  14  Q.  So when we're talking about this hypothetical

08:59:09  15  negotiation, we have to imagine that that went on in this

08:59:13  16  2015 time frame, correct?

08:59:15  17  A.  That's fair.

08:59:16  18  Q.  All right.  Now, a couple of other things about this

08:59:18  19  chart or material that I want to go over with you.  In

08:59:21  20  particular, I want to focus on when Wells Fargo first

08:59:26  21  launched its manual capture mobile deposit.  That was in

08:59:30  22  May of 2012.  Were you aware of that, sir?

08:59:33  23  A.  Yes, sir.

08:59:33  24  Q.  All right.  So in May of 2012, that is the first time

08:59:39  25  that Wells Fargo had any type of mobile deposit product.

08:59:45  1  You understand that, right?

08:59:45  2  A.  That's fair, sure.

08:59:47  3  Q.  And when we talk about mobile deposit products, there's

08:59:50  4  a lot of terms that have been used in this case, and I want

08:59:52  5  to make sure that we don't confuse those terms today.

08:59:56  6        Now, mobile deposit -- or -- is often referred to

09:00:01  7  as MRDC; is that right?

09:00:02  8  A.  Yes, sir.

09:00:03  9  Q.  And that stands for what, Mr. Weinstein?

09:00:06  10  A.  Mobile remote deposit capture.

09:00:08  11  Q.  Okay.  So if we just say the word MRDC, or mobile

09:00:13  12  deposit, that simply means the mobile deposit capability,

09:00:18  13  right?

09:00:18  14  A.  That's fair.

09:00:19  15  Q.  It doesn't mean auto capture, necessarily, does it?

09:00:22  16  A.  Sure.

09:00:22  17  Q.  It can be manual capture, that's MRDC?

09:00:27  18  A.  Yes, sir.

09:00:27  19  Q.  And manual capture, MRDC, we know, certainly existed in

09:00:34  20  May of 2012 when Wells Fargo released its own app using

09:00:38  21  mobile deposit, right?

09:00:38  22  A.  Yes, sir.

09:00:39  23  Q.  All right.  Now, in May of 2013, that's when Wells

09:00:46  24  Fargo decides to add Mitek auto capture, and then -- but

09:00:52  25  the product didn't actually come out at that time, did it?

09:00:54  1  A.  May have been a little later.

09:00:56  2  Q.  In fact, that was in May of 2014, right?

09:00:59  3  A.  Yes.

09:01:00  4  Q.  So in May of 2014, that's the first time we have a

09:01:04  5  Wells Fargo mobile app that has mobile deposit, MRDC, plus

09:01:14  6  the added feature of auto capture, correct?

09:01:17  7  A.  Yes, sir.

09:01:18  8  Q.  Now, you understand in this case, we believe there's

09:01:20  9  more than one kind of auto capture; do you understand that?

09:01:23  10  A.  I understand that's Wells Fargo's position, yes, sir.

09:01:25  11  Q.  And we believe that Wells Fargo uses a type of auto

09:01:30  12  capture that is different -- operates differently than the

09:01:37  13  type of auto capture process that USAA has patented in the

09:01:41  14  '571 patent?

09:01:41  15  A.  I understand that, yes, sir.

09:01:43  16  Q.  You understand that's our position?

09:01:45  17  A.  Sure.

09:01:46  18  Q.  Now, while we've got this -- this timeline up, let's

09:01:50  19  look at these periods here that go after 2015.

09:01:58  20       So 2017 is when the '090 patent issued, right?

09:02:00  21  A.  Yes, sir.

09:02:00  22  Q.  And so what that means, Mr. Weinstein, is that there

09:02:03  23  can be no infringement of this '090 patent until after it

09:02:06  24  came into existence, right?

09:02:07  25  A.  Yes, sir.

09:02:08   1   Q.   Can't infringe a patent that hadn't issued, can you?

09:02:10   2   A.   True.

09:02:11   3   Q.   So all of this time period here when there's no patent

09:02:15   4   protection in place, nobody can infringe these patents,

09:02:17   5   right?

09:02:17   6   A.   Yes, sir.

09:02:18   7   Q.   Not Wells Fargo, not any other bank in the country,

09:02:24   8   agreed?

09:02:24   9   A.   That's true.

09:02:25   10   Q.   Now, this lawsuit was filed in June of 2018; is that

09:02:31   11   your understanding?

09:02:32   12   A.   Yes, sir.

09:02:32   13   Q.   And while we've got this up here, I want to make clear

09:02:35   14   a couple of these earlier dates, too, that I know have been

09:02:38   15   discussed.

09:02:39   16        Now, in particular, we heard in opening statements

09:02:42   17   reference to the iPhone launching in June of 2007.  Do you

09:02:45   18   recall that?

09:02:46   19   A.   I do.

09:02:46   20   Q.   And there was some suggestion during the testimony of

09:02:51   21   Mr. Bueche that it was -- had been said that Wells Fargo

09:02:57   22   launched its iPhone app in July of 2007, and I believe the

09:03:01   23   comment was people thought that was impossible.  Do you

09:03:04   24   recall that?

09:03:05   25   A.   You know, I was here for the testimony.  I don't recall

09:03:08   1   that specifically.

09:03:09   2   Q.   All right.   Well, what I wanted to point out with this,

09:03:11   3   Mr. Weinstein, is that reference was made that this

09:03:14   4   timeline said that Wells Fargo launched its iPhone app in

09:03:19   5   '07.   That's not what it says, is it?

09:03:21   6   A.   What it says is July 2007, Wells Fargo launches mobile

09:03:28   7   app.

09:03:28   8   Q.   And you may have heard during Dr. Conte's testimony

09:03:31   9   yesterday, Mr. Weinstein, that there were, in fact, mobile

09:03:35  10   apps on mobile phones that predated the iPhone.   Do you

09:03:39  11   recall that?

09:03:39  12   A.   I was here for the testimony, yes, sir.

09:03:41  13   Q.   Okay.   So suggesting that you launched a mobile app

09:03:45  14   doesn't mean in July of 2007 -- doesn't mean you're saying

09:03:49  15   that's an iPhone app, does it?

09:03:51  16   A.   True.

09:03:51  17   Q.   All right.   Now, with those dates in mind,

09:03:59  18   Mr. Weinstein, I want to talk a little bit about what your

09:04:02  19   job in this case was with regard to your -- your damages

09:04:07  20   calculations, okay?

09:04:08  21   A.   Yes, sir.

09:04:09  22   Q.   Now, in particular, I want to talk about this

09:04:11  23   hypothetical negotiation exercise.   You mentioned the

09:04:17  24   hypothetical negotiation, right?

09:04:17  25   A.   I did.

09:04:18  1    Q.  And I want to make clear --

09:04:20  2           MR. BUNT:  Your Honor, if we're not going to be

09:04:21  3    using the demonstrative, can we take this down?

09:04:25  4           THE COURT:  I think you can take it down and put

09:04:26  5    it just in front of the --

09:04:29  6           MR. HILL:  Podium?

09:04:30  7           THE COURT:  -- podium.

09:04:32  8           MR. HILL:  Okay.  Thank you, Your Honor.  I may

09:04:33  9    make reference to it again in a few minutes, Your Honor.

09:04:36  10           THE COURT:  That's fine.  That way it will clear

09:04:40  11    everybody's line-of-sight with the jury.  You can leave the

09:04:46  12    easel there, Mr. Hill.

09:04:48  13           MR. HILL:  All right.

09:04:49  14    Q.  (By Mr. Hill)  Now, Mr. Weinstein, I'd like to talk

09:04:53  15    about this hypothetical negotiation that you mentioned.  In

09:04:56  16    particular, Mr. Weinstein, let's talk about it conceptually

09:05:00  17    of what it is.  So this isn't an actual negotiation that

09:05:04  18    occurred, correct?

09:05:04  19    A.  No, sir.

09:05:05  20    Q.  It's what we have to do -- it's what the jury has to do

09:05:08  21    in their mind to determine what the parties, had they sat

09:05:12  22    down in a room together in 2015, the date of the

09:05:15  23    hypothetical negotiation, and had they negotiated a license

09:05:20  24    between themselves, what would have been the result of

09:05:24  25    that.  Isn't that right?

```
09:05:26   1   A.  Yes, sir.
09:05:27   2   Q.  So, again, we're looking at March 2015, and we're going
09:05:30   3   to assume that USAA, Wells Fargo met, sat in a room, and
09:05:40   4   negotiated until they reached an agreement, correct?
09:05:44   5   A.  Yes, sir.
09:05:44   6   Q.  And they have to -- they do that negotiation in view of
09:05:54   7   all the facts, agree?
09:05:55   8   A.  Yes, sir.
09:05:56   9   Q.  So they're going to know in that negotiation what came
09:06:01  10   before the inventions that are in these patents, right?
09:06:03  11   A.  Yes, sir.
09:06:03  12   Q.  They're going to know the value of the mobile deposit
09:06:09  13   system, the MRDC system that pre-existed these patents.
09:06:14  14   They're going to know about all that value, aren't they?
09:06:16  15   A.  They will.
09:06:17  16   Q.  And they're going to have to try to put -- negotiate
09:06:20  17   and arrive at an agreement that respects only the value of
09:06:26  18   the invention that's actually contained in these patents,
09:06:29  19   right?
09:06:29  20   A.  Yeah.  You said respects.  That it accounts for the
09:06:35  21   value of the invention.  That -- that's fine, I agree with
09:06:37  22   that.
09:06:37  23   Q.  And so what our -- what our jury in this case has to do
09:06:40  24   in the context of that hypothetical negotiation idea,
09:06:42  25   Mr. Weinstein, is they have to put themselves in that room,
```

09:06:47  1  and they have to assume, based on all the evidence that

09:06:50  2  they're going to hear in this case, what would the parties

09:06:52  3  have agreed to based on everything we've seen about the

09:06:58  4  market and what existed and what came before.  You agree?

09:07:01  5  A.  And what came after, yes, sir.

09:07:03  6  Q.  And let me -- let's just be clear.  They only have to

09:07:09  7  perform that exercise if -- if they find that the patent is

09:07:16  8  infringed, correct?

09:07:17  9  A.  I agree with that, yes, sir.

09:07:18  10  Q.  Because if the jury decides that the patents aren't

09:07:21  11  infringed, if the jury, after hearing Wells Fargo's case --

09:07:26  12  which we haven't had a chance to put on yet -- once they

09:07:29  13  hear it, if they say, we believe the weight of the credible

09:07:33  14  evidence is such that the Plaintiff hasn't carried their

09:07:36  15  burden of proof to show us that these patents are

09:07:39  16  infringed, then they don't entertain this hypothetical

09:07:42  17  negotiation exercise, do they, sir?

09:07:44  18  A.  Correct.

09:07:44  19  Q.  And that's, in fact, a critical assumption that's built

09:07:50  20  into your report, isn't it, Mr. Weinstein?

09:07:52  21  A.  Yes.  If there's no infringement, there are no damages.

09:07:55  22  There has to be infringement to get to the hypothetical

09:07:59  23  negotiation stage.

09:07:59  24  Q.  And, Mr. Weinstein, you're not here to tell the jury

09:08:05  25  anything about the technical issues or the liability issues

09:08:08   1   on infringement, are you, sir?

09:08:10   2   A.   Correct.

09:08:11   3   Q.   Your task in this case was to assume, not weigh the

09:08:17   4   evidence, not consider the evidence of infringement or

09:08:20   5   non-infringement, and make your own conclusion about it,

09:08:23   6   your task was to simply assume that there was infringement.

09:08:28   7   Am I right?

09:08:29   8   A.   Yes, sir.

09:08:29   9   Q.   And I want to be clear about that.  Nothing about your

09:08:34   10   testimony or your report should suggest to the jury that

09:08:38   11   you have looked at any technical evidence or weighed any

09:08:42   12   evidence and reached a conclusion of your own about whether

09:08:45   13   these patents are infringed; isn't that right?

09:08:47   14   A.   That is correct, sir.  I assume they're infringed and

09:08:51   15   go from there.

09:08:52   16   Q.   And you didn't perform any way and you're not here

09:08:56   17   expressing any personal belief that you've looked at

09:09:00   18   evidence and decided infringement, are you, sir?

09:09:02   19   A.   Yes, sir, that's correct.

09:09:03   20   Q.   Now, let's talk about that hypothetical negotiation a

09:09:09   21   little more, Mr. Weinstein.

09:09:09   22        So at this hypothetical negotiation, the parties

09:09:14   23   would be negotiating over these two specific patents,

09:09:18   24   correct?

09:09:18   25   A.   Yes, sir.

09:09:18   1   Q.  And they would be looking at the fact that these
09:09:23   2   patents claim a specific way of performing auto capture.
09:09:27   3   You agree, sir?
09:09:28   4   A.  I do.
09:09:29   5   Q.  And they're not negotiating -- the parties in this
09:09:32   6   hypothetical negotiation, they're not negotiating the value
09:09:35   7   of mobile banking, generally, right?
09:09:40   8   A.  Well, they're -- they're -- they're negotiating over
09:09:44   9   the -- the contribution made by the -- by the patents.  And
09:09:49  10   to the extent that affects the value of mobile -- mobile
09:09:52  11   banking, that's a related concept.
09:09:56  12   Q.  Okay.  Well, but they're not trying to arrive in that
09:10:00  13   room at -- their conclusion of their negotiation is not
09:10:04  14   going to be a conclusion on the value of mobile banking, is
09:10:07  15   it?
09:10:07  16   A.  Well, ultimately, that's correct.  Ultimately, they
09:10:11  17   want to arrive at an amount that reflects fair payment for
09:10:17  18   use of the patented technology.
09:10:18  19   Q.  And the task in that hypothetical negotiation is not to
09:10:22  20   figure out the value of MRDC as a whole, is it?
09:10:26  21   A.  I don't quite agree with that, to the extent that
09:10:32  22   figuring that out may relate to how they get to their
09:10:35  23   conclusion about fair payment.
09:10:37  24   Q.  Well, let's say it this way:  The ultimate goal of that
09:10:41  25   negotiation, the ultimate decision they have to reach about

09:10:44  1  the value of these patents, that is not the same thing as

09:10:47  2  the value of MRDC, is it?

09:10:50  3  A.   That, I agree with, yes, sir.

09:10:51  4  Q.   And the same would be true, they wouldn't end that

09:10:58  5  negotiation by accepting the value of any particular part

09:11:00  6  of MRDC that may have come before, would they?

09:11:03  7  A.   True.   Their task as negotiators is to figure out the

09:11:09  8  contribution that Wells Fargo received from these patents.

09:11:12  9  Q.   And that means they can't -- they're not going to

09:11:17  10 agree -- those parties aren't going to agree that the

09:11:21  11 proper royalty in this case is the value of the respective

09:11:24  12 parts that make up MRDC, are they, sir?

09:11:26  13 A.   That's true.

09:11:27  14 Q.   And that's what the law calls an apportionment factor

09:11:31  15 or apportionment consideration; wouldn't you agree?

09:11:34  16 A.   We're getting close to apportionment, yes, sir.

09:11:36  17 Q.   So what we -- what they have to do -- part of the task

09:11:39  18 in that negotiation is they have to figure out, okay,

09:11:42  19 what's the cell phone itself worth?   What's the Internet

09:11:45  20 worth?   What's the processor worth?   What are the servers

09:11:48  21 worth?   What's the bank systems that clear these checks

09:11:51  22 worth?

09:11:52  23         And they have to try to separate what's the value

09:11:55  24 of manual deposit.   They have to try to separate all of

09:12:00  25 those unpatented features, those unclaimed features, those

09:12:04   1   things that existed before, and they have to try to

09:12:08   2   identify the specific value associated with this type of

09:12:19   3   auto capture that's been claimed by USAA, agree?

09:12:21   4   A.  I do.

09:12:22   5   Q.  And if we -- just to kind of give us a poor, I'm sure,

09:12:27   6   but a graphical representation of that, Mr. Weinstein, if

09:12:30   7   we have a whole -- we'll call that a whole -- a w-h-o-l-e,

09:12:41   8   okay -- the entirety of something --

09:12:41   9   A.  Yes, sir.

09:12:47   10  Q.  -- and we're going to call this MRDC -- and, again,

09:12:49   11  MRDC just means the mobile deposit system, right?

09:12:53   12  A.  Yes, sir.

09:12:53   13  Q.  All right.  Means manual.  It means all the stuff that

09:12:56   14  went into manual, all the back-end processing, all the

09:13:03   15  things that we know existed before these patents that

09:13:06   16  aren't these patents, right?

09:13:07   17  A.  Yes.

09:13:07   18  Q.  All right.  And so if that's the whole of MRDC, and we

09:13:11   19  know at some point in time auto capture was injected, we

09:13:15   20  have to figure out what portion of this whole auto capture

09:13:23   21  consists of, correct?

09:13:28   22  A.  That's true, yes, sir.

09:13:30   23  Q.  And that's what we're trying to value in this

09:13:32   24  hypothetical negotiation?

09:13:32   25  A.  That's correct.

09:13:53   1   Q.   Now, Mr. Weinstein, I'd like to put up a slide that you

09:13:57   2   used yesterday with the jury and talk about it a little bit

09:14:01   3   in the context of the hypothetical negotiation.

09:14:01   4           MR. HILL:   Can we see PDX-4.35, please?

09:14:14   5   Q.   (By Mr. Hill)   Now, Mr. Weinstein, do you recall

09:14:16   6   showing PDX-4.35 yesterday to the jury?

09:14:20   7   A.   I do.

09:14:21   8   Q.   In particular, Mr. Weinstein, I want to point out a

09:14:24   9   couple of things about this slide.

09:14:26  10           So this slide was your attempt to add up the value

09:14:31  11   of MRDC, correct?

09:14:32  12   A.   Yes, sir, that's the -- the first step.

09:14:35  13   Q.   And if we look at the title of the slide, though, this

09:14:38  14   says the Quantifiable Benefits of Auto-Capture MRDC.   Do

09:14:46  15   you see that right there --

09:14:46  16   A.   I do.

09:14:47  17   Q.   -- auto capture?

09:14:48  18           All right.   But I listened to your testimony

09:14:52  19   yesterday, Mr. Weinstein, and you were asked a direct

09:14:54  20   question by Mr. Bunt, and you answered it -- you answered

09:14:57  21   it straightforwardly.   I'd like to present that to you,

09:15:00  22   just so we're clear about what's on this slide.

09:15:02  23           So you were asked yesterday -- and we can show it

09:15:05  24   to the jury -- this is from your trial transcript from

09:15:13  25   yesterday:

09:15:13  1          So are the USAA patents -- and you were asked this

09:15:22  2   question in the context of the information on the slide we

09:15:25  3   were just looking at.

09:15:27  4          So are the USAA patents responsible for all of the

09:15:31  5   benefits that you have just quantified?

09:15:34  6          And your answer was:  No, sir.

09:15:37  7          You agree with that?

09:15:38  8   A.  Absolutely.

09:15:38  9   Q.  All right.  And so you were then asked:  So how did you

09:15:41  10  go about figuring out what was attributable to the

09:15:45  11  United -- to the USAA patents?

09:15:47  12         And you said:  Right.  As I said earlier, I start

09:15:52  13  with the benefits associated with MRDC, and that's what's

09:15:57  14  shown on the left-hand side of this slide.

09:15:59  15         Now, you had another slide later that contained

09:16:01  16  this same information.  That's what you were referring to?

09:16:03  17  A.  Yes, sir.

09:16:04  18  Q.  All right.

09:16:05  19         MR. HILL:  So let's go back to the P -- PDX-4.35,

09:16:11  20  please, Mr. Barnes.

09:16:13  21  Q.  (By Mr. Hill)  So just to be clear, we know from your

09:16:15  22  testimony yesterday, as you told us, this is not the

09:16:24  23  benefits associated with these patents, correct?

09:16:25  24  A.  Right.  That's -- that's the big circle that you drew.

09:16:28  25  Q.  And, in fact, we also know -- right, that's the big

09:16:35  1  circle that I drew here; is that what you're referring to?

09:16:37  2  A.  Right.  It includes the benefits.

09:16:38  3  Q.  All right.  And what we know is that you started with

09:16:40  4  the benefits associated with what was known before, which

09:16:44  5  is MRDC, correct?

09:16:44  6  A.  Yes, sir.

09:16:45  7  Q.  And that's what this number right here you say

09:16:49  8  represents?

09:16:49  9  A.  Correct.

09:16:50  10  Q.  All right.  I want to talk a little bit about that

09:16:53  11  number, and I also want to talk about how -- though the

09:16:56  12  slide calls this auto-capture-enabled MRDC, what this

09:17:00  13  really is -- is just the value of MRDC, agree?

09:17:07  14  A.  No.

09:17:11  15  Q.  Because this is the value that existed in the MRDC

09:17:13  16  system independent of auto capture, isn't it,

09:17:17  17  Mr. Weinstein?

09:17:17  18  A.  No, because -- because auto capture is in there during

09:17:20  19  this time period.

09:17:20  20  Q.  Well, let's -- let's talk about that a little bit.

09:17:22  21         I want to look, Mr. Weinstein, at some of the

09:17:36  22  documents that you reviewed with the jury in support of

09:17:38  23  your conclusion that this number you came up with included

09:17:41  24  the benefits of auto capture, okay?

09:17:44  25  A.  Sure.

09:17:45   1   Q.  And let's start out with -- you claimed there were

09:17:56   2   three components to that number.

09:17:58   3          MR. HILL:  Let's see 435 again, please,

09:18:01   4   Mr. Barnes.

09:18:04   5   Q.  (By Mr. Hill)  There were three components here, right,

09:18:15   6   one, two, three?  Did I get that correct?

09:18:19   7   A.  You did.

09:18:19   8   Q.  And those are the three components that you set out to

09:18:22   9   value which you say is the value of auto capture and MRDC

09:18:28   10   and which I say is just the value of MRDC.  You understand

09:18:33   11   that's the debate we're having this morning?

09:18:35   12   A.  I'm not having a debate.

09:18:35   13   Q.  Okay.

09:18:38   14   A.  I'm fine.  Thank you.

09:18:38   15   Q.  All right.  So let's look at this first category, cost

09:18:41   16   savings.

09:18:45   17          MR. HILL:  Mr. Barnes, can we see --

09:18:48   18   Q.  (By Mr. Hill)  I want to look at what you looked at to

09:18:51   19   arrive at your first category, what information you looked

09:18:53   20   at.

09:18:54   21          MR. HILL:  So let's take a look at PDX-4. --

09:19:01   22   4.19 -- 4.19, Mr. Barnes.

09:19:03   23   Q.  (By Mr. Hill)  Now, this, again, is another of the

09:19:05   24   slides that you showed the jury yesterday, correct?

09:19:07   25   A.  Yes, sir.

09:19:07  1    Q.  And I want to look specifically at what this

09:19:11  2    represents.  This is a Wells Fargo document, correct?

09:19:14  3    A.  It is.

09:19:16  4    Q.  It's in evidence as Plaintiff's Exhibit 415.  And let's

09:19:20  5    remember our timeline, Mr. Weinstein.

09:19:23  6          When did the first of these patents issue?

09:19:25  7    A.  2015.

09:19:28  8    Q.  Okay.  Well, this is a document from 2011, agree?

09:19:34  9    A.  Agree.

09:19:35  10   Q.  All right.  And this is a document that, frankly,

09:19:38  11   predates Wells Fargo's introduction of any type of capture?

09:19:45  12   A.  True.

09:19:46  13   Q.  Wells Fargo didn't even have mobile deposit of any kind

09:19:49  14   in 2011, did they?

09:19:50  15   A.  Right.  This is a planning document.

09:19:52  16   Q.  And, in fact, if we look all the way back to 2011,

09:19:57  17   nobody on earth had auto capture in 2011, did they?

09:20:01  18   A.  True.

09:20:01  19   Q.  And so in this document, Wells Fargo discusses cost

09:20:09  20   savings, and they're talking about key benefits to Wells

09:20:12  21   Fargo include cost savings from moving deposits out of the

09:20:15  22   store and the ATM channels.

09:20:18  23         Mr. Weinstein, we know that in 2011, this document

09:20:21  24   can only be discussing one thing, and that's something that

09:20:24  25   existed.  That would have been mobile deposit, MRDC,

```
09:20:30   1   correct?
09:20:30   2   A.  That's fair.  That's what the document is talking
09:20:33   3   about.
09:20:33   4   Q.  This document cannot show us anything about the value
09:20:37   5   of auto capture because auto capture didn't exist; isn't
09:20:37   6   that right?
09:20:41   7   A.  As far as this document is concerned, that's true.
09:20:44   8   Q.  Now, you heard yesterday -- well, I tell you what,
09:20:57   9   let's look at another document.  Let's look at another
09:21:00  10   document you pointed to in the context of cost savings,
09:21:03  11   okay?
09:21:03  12           MR. HILL:  Let's look at PDX-4.20, please,
09:21:07  13   Mr. Barnes.
09:21:09  14   Q.  (By Mr. Hill)  All right.  Here we have another
09:21:11  15   document that you pointed to as reflecting the value of,
09:21:14  16   you say, auto capture MRDC.  I say just MRDC.
09:21:21  17           What's the date of this document, Mr. Weinstein?
09:21:23  18   A.  November 2010.
09:21:25  19   Q.  And, again, this is another Wells Fargo document,
09:21:28  20   correct?
09:21:28  21   A.  It is.
09:21:29  22   Q.  And it's discussing, as it says in the part you've
09:21:33  23   highlighted here, MRDC, correct?
09:21:37  24   A.  Correct.
09:21:38  25   Q.  And, again, Plaintiff's Exhibit 1069, and if we look at
```

09:21:43  1   our timeline, we know the same is true for this document.

09:21:47  2   It's from a point in time when nobody on the planet had

09:21:51  3   auto capture?

09:21:52  4   A.  As far as I know, that's correct.

09:21:53  5   Q.  Certainly wasn't a commercial embodiment, it wasn't in

09:21:57  6   the market, was it, sir?

09:21:58  7   A.  That's a good way to put it.

09:22:00  8   Q.  And more specifically, Mr. Weinstein, what we know is

09:22:10  9   not only in this time period before the 2015 patent and

09:22:17  10  certainly before even USAA had come out with auto

09:22:20  11  capture -- you know, USAA didn't launch auto capture until

09:22:24  12  2013, you understand that, don't you, sir?

09:22:26  13  A.  I do.

09:22:26  14  Q.  We know that in that time frame before that, nobody was

09:22:34  15  using auto capture?

09:22:37  16  A.  As far as I know.

09:22:38  17  Q.  And more particularly we know that nobody was using

09:22:44  18  USAA's specific way of doing auto capture, right?

09:22:50  19  A.  As far as I know, that's true.

09:22:52  20  Q.  So what we have is a document from a point in time when

09:22:55  21  not only did USAA not have on the market its way, its

09:23:03  22  specific version of auto capture, nobody had another

09:23:07  23  version of auto capture out there either, did they?

09:23:08  24  A.  As far as I know, that's true.

09:23:10  25  Q.  So when they, in 2010, inside Wells Fargo, are

09:23:16   1   evaluating the potential of MRDC, they're evaluating the

09:23:20   2   potential of the world they know, aren't they?

09:23:23   3   A.   Sure.

09:23:23   4   Q.   And they're evaluating the potential of a mobile remote

09:23:30   5   deposit world, which at that point in time, all anybody had

09:23:34   6   ever seen was manual?

09:23:36   7   A.   Correct.

09:23:37   8   Q.   Now, Mr. Weinstein, I want to look at one other thing

09:23:47   9   you showed to indicate what you said was the cost savings

09:23:51  10   associated with MRDC.

09:23:56  11        MR. HILL:   I want to look at PDX-4.21, if we can.

09:24:01  12   Q.   (By Mr. Hill)   Yesterday, you made reference to this

09:24:04  13   information in the context of cost savings, agree?

09:24:06  14   A.   I did.

09:24:07  15   Q.   And this is Plaintiff's Exhibit 1003.   It's an excerpt

09:24:11  16   from a Bank of America document; isn't that true?

09:24:13  17   A.   Correct.

09:24:13  18   Q.   And the reason you put this up, Mr. Weinstein, is you

09:24:17  19   put it up to try to support a theory on cost savings you

09:24:22  20   gave where you told the jury that had Wells Fargo not had

09:24:30  21   auto capture available to it, USAA's specific way of auto

09:24:34  22   capture available to it, Wells Fargo would have had to

09:24:37  23   build, I don't know, a hundred plus more branches.   Do you

09:24:41  24   recall that?

09:24:42  25   A.   Well, I -- I didn't put it quite that way.   The number

| | | |
|---|---|---|
| 09:24:45 | 1 | is 184 branches that they didn't have to build because they |
| 09:24:49 | 2 | had the benefit of auto capture mobile deposit. |
| 09:24:53 | 3 | Q.  Now, I want to dig into that a little bit with this |
| 09:24:56 | 4 | document.  First off, this is Bank of America, right? |
| 09:24:58 | 5 | A.  It is. |
| 09:24:59 | 6 | Q.  This is Bank of America information? |
| 09:25:02 | 7 | A.  Correct. |
| 09:25:03 | 8 | Q.  We all agree Bank of America isn't Wells Fargo, right? |
| 09:25:06 | 9 | A.  We do. |
| 09:25:07 | 10 | Q.  But this is the information you used as your starting |
| 09:25:13 | 11 | point to suggest that part of the value of auto capture |
| 09:25:19 | 12 | MRDC, I say it's just MRDC, auto capture MRDC, would be |
| 09:25:28 | 13 | $276 million of extra building expense, correct? |
| 09:25:32 | 14 | A.  Well, as you said in your question, that's a starting |
| 09:25:34 | 15 | point.  That's correct. |
| 09:25:36 | 16 | Q.  But in your report, you actually present data for the |
| 09:25:39 | 17 | number of checks that Wells Fargo processes by mobile |
| 09:25:42 | 18 | deposit, don't you? |
| 09:25:43 | 19 | A.  I believe I do. |
| 09:25:45 | 20 | Q.  All right.  Let's -- let's -- |
| 09:25:46 | 21 | MR. HILL:  Let's take that down, Mr. Barnes. |
| 09:25:51 | 22 | Q.  (By Mr. Hill)  I want to look at some of that data.  Do |
| 09:25:53 | 23 | you have a copy of your report there with you, |
| 09:25:55 | 24 | Mr. Weinstein? |
| 09:25:55 | 25 | A.  If it's -- if it's in one of those notebooks, maybe. |

| | | |
|---|---|---|
| 09:25:59 | 1 | Q.  Those aren't my notebooks, so I can't -- I can't tell |
| 09:26:02 | 2 | you.  Those are the ones -- |
| 09:26:03 | 3 | A.  I didn't bring anything up here with me. |
| 09:26:07 | 4 | Q.  All right.  Will you look there and see if you have a |
| 09:26:09 | 5 | copy of your amended report, and also the schedules that go |
| 09:26:12 | 6 | with it, Mr. Weinstein? |
| 09:26:17 | 7 | A.  I do not believe there's a copy of -- |
| 09:26:20 | 8 | Q.  Okay. |
| 09:26:20 | 9 | MR. HILL:  Your Honor, may I approach and provide |
| 09:26:22 | 10 | the witness a portion of his report? |
| 09:26:24 | 11 | THE COURT:  You may. |
| 09:26:25 | 12 | MR. HILL:  Thank you. |
| 09:26:26 | 13 | THE COURT:  I assume opposing counsel has the same |
| 09:26:28 | 14 | thing.  I want to make sure everybody's looking on the same |
| 09:26:31 | 15 | piece of paper. |
| 09:26:40 | 16 | THE WITNESS:  Thank you, sir. |
| 09:26:42 | 17 | THE COURT:  All right.  Let's proceed. |
| 09:26:43 | 18 | Q.  (By Mr. Hill)  Now, Mr. Weinstein, in your report work |
| 09:26:46 | 19 | that you did in this case, you produced a document called |
| 09:26:48 | 20 | Supplemental Exhibit 9.  Do you recall that? |
| 09:26:51 | 21 | A.  I do. |
| 09:26:51 | 22 | Q.  And this Supplemental Exhibit 9 was your attempt to |
| 09:26:56 | 23 | show what you say are the branch construction cost savings |
| 09:27:00 | 24 | for Wells Fargo because of the use of USAA's specific |
| 09:27:10 | 25 | version of auto capture.  Do you understand? |

09:27:12  1    A.  I do.

09:27:14  2    Q.  And you agree that's what it represents?

09:27:18  3    A.  It's a starting point, yes, sir.

09:27:20  4    Q.  Now, if we look at supplemental Exhibit 9 where you did

09:27:32  5    your work -- we'll put it here in front of the jury --

09:27:44  6    here's what we see.  What you did was, is you calculated in

09:27:48  7    this column the number of mobile deposits, correct?

09:28:00  8    A.  Well, it's -- it's -- as it says, it's number of --

09:28:03  9    number of mobile deposits less new mobile deposits.

09:28:05  10   Q.  Right.  And --

09:28:07  11   A.  That's correct.

09:28:08  12   Q.  What you did from there is you calculated how many of

09:28:13  13   those deposits -- and, again, this isn't dollars.  These

09:28:16  14   are numbers, right, this is accounting?

09:28:18  15   A.  Yes, sir.

09:28:19  16   Q.  Okay.  You totaled up how many of those deposits you

09:28:24  17   said in any given year would have to be shifted to a

09:28:26  18   branch?

09:28:27  19   A.  Correct.  And that comes from Wells Fargo information

09:28:31  20   in Column 2, correct.

09:28:32  21   Q.  And -- and when we say shifted to a branch, you're

09:28:36  22   talking about teller deposits, aren't you?

09:28:38  23   A.  Yes, sir.

09:28:38  24   Q.  Walk into the bank, hand it to the person across the

09:28:41  25   counter?

| | | |
|--|--|--|
| 09:28:42 | 1 | A.  Yes, sir. |
| 09:28:42 | 2 | Q.  And if we take the highest year, let's just take the |
| 09:28:46 | 3 | highest year that you looked at, what year would that be? |
| 09:28:48 | 4 | A.  2018. |
| 09:28:49 | 5 | Q.  2018.  Okay.  So in 2018, you said there'd be, what is |
| 09:28:53 | 6 | that, roughly 26 million -- |
| 09:28:54 | 7 | A.  Correct. |
| 09:28:55 | 8 | Q.  -- of deposits -- |
| 09:28:56 | 9 | A.  Correct. |
| 09:28:59 | 10 | Q.  -- that because of the absence of the specific way that |
| 09:29:04 | 11 | USAA has claimed in its patents of doing auto capture that |
| 09:29:08 | 12 | people would have to -- if that wasn't available to Wells |
| 09:29:13 | 13 | Fargo, 26 million of those deposits would have to walk into |
| 09:29:16 | 14 | the bank and go across the counter, right? |
| 09:29:18 | 15 | A.  Correct. |
| 09:29:19 | 16 | Q.  All right.  I want to do a little math about that, |
| 09:29:26 | 17 | Mr. Weinstein.  Those checks aren't going to all hit one |
| 09:29:30 | 18 | branch, are they? |
| 09:29:31 | 19 | A.  No, they're going to hit -- hit multiple branches. |
| 09:29:34 | 20 | Q.  They're going to be distributed across Wells Fargo |
| 09:29:37 | 21 | branches, right? |
| 09:29:37 | 22 | A.  That's fair. |
| 09:29:39 | 23 | Q.  And how many working days are in a year, Mr. Weinstein? |
| 09:29:41 | 24 | A.  Well, there are 365 days in a year, but I guess I do 52 |
| 09:29:47 | 25 | weeks times maybe five days a week would be 260. |

09:29:52  1  Q.  I've always heard it was 251.  Is that a fair number to

09:29:57  2  go with?

09:29:57  3  A.  Close enough.

09:29:58  4  Q.  All right.  So if we have 251 days in a working year --

09:30:14  5  Mr. Weinstein, I've lost my marker.  I'm bad about that.

09:30:22  6          MR. HILL:  I apologize, Your Honor.

09:30:23  7          THE COURT:  Just find it and don't tell us about

09:30:24  8  it.

09:30:25  9  Q.  (By Mr. Hill)  All right.  We have -- you say

09:30:27  10  26 million checks are going to come over the counter in

09:30:32  11  '18, right?

09:30:32  12  A.  Yes, sir.

09:30:33  13  Q.  All right.  26 million, and there's 251 days in a

09:30:36  14  working year, right?

09:30:37  15  A.  I'm fine with that.

09:30:38  16  Q.  Do you know what that works out to?

09:30:44  17  A.  I don't.

09:30:45  18  Q.  Okay.  I had to use a calculator myself, Mr. Weinstein,

09:30:48  19  and I show it works out to 103,586.

09:31:05  20          And let's talk about what that would represent.

09:31:08  21  That would be the number -- oh, and I made a mistake here,

09:31:14  22  Mr. Weinstein.

09:31:16  23          This is the number of checks, right?  It's not a

09:31:20  24  dollar value?

09:31:21  25  A.  Right.  We agree with that.

09:31:22    1    Q.  Yeah, that's the number of checks.  My mistake.  That
09:31:26    2    would be the number of checks -- additional checks for 2018
09:31:32    3    under your model per day, per working day?
09:31:34    4    A.  Sure.
09:31:35    5    Q.  Because what we've got here is number of checks to
09:31:45    6    teller, and we divided that by working days, agree?
09:31:54    7    A.  Agree.
09:31:55    8    Q.  And so this would be checks per day.
09:32:03    9         Now, do you know how many branches Wells Fargo
09:32:08   10    has?
09:32:09   11    A.  Slips my mind.
09:32:13   12    Q.  You looked at that information --
09:32:14   13    A.  I did.
09:32:15   14    Q.  -- in the course of your work?  Does it refresh your
09:32:19   15    memory if I suggest to you, Mr. Weinstein, that it's about
09:32:22   16    5,500 branches nationwide?
09:32:23   17    A.  At least, yes, sir.
09:32:24   18    Q.  You don't quarrel with that number, do you?
09:32:27   19    A.  I don't.
09:32:28   20    Q.  Okay.  So we've got that many checks a day, and we're
09:32:31   21    going to distribute them across 5,500 branches.  Do you
09:32:42   22    know what that's going to give us?
09:32:43   23    A.  Not out of my head, no.
09:32:47   24    Q.  All right.  I did that with a calculator, too,
09:32:49   25    Mr. Weinstein, and it comes out to 18 -- some change.  So

09:32:53   1   we're going to call it 19, okay?  And that would be 19

09:32:58   2   checks per day per branch, right?

09:33:08   3   A.  It looks about right, yes, sir.

09:33:11   4   Q.  Okay.  So 19 checks per day per branch, agree?  Checks

09:33:23   5   per day per branch?

09:33:25   6   A.  Yeah, I accept your math.  That's fine.

09:33:29   7   Q.  How many hours in a working banking day?  We assume

09:33:33   8   eight hours?

09:33:33   9   A.  That's fair.

09:33:34  10   Q.  What's 19 divided by 8?

09:33:36  11   A.  So that is 2.375.

09:33:39  12   Q.  Okay.  So give or take two or three, we say divided

09:33:48  13   by -- this was divided by 8 hours, gives us two to three

09:34:00  14   extra checks per hour.

09:34:12  15        Math look right, Mr. Weinstein?

09:34:14  16   A.  I'm fine with your math.

09:34:15  17   Q.  Now, have you been in a local bank branch lately,

09:34:20  18   Mr. Weinstein?

09:34:20  19   A.  Well, if you mean local market, Texas, no, sir.  But

09:34:24  20   local for me is Los Angeles.

09:34:25  21   Q.  All right.

09:34:25  22   A.  And the answer there is yes.

09:34:29  23   Q.  Was it a busy place, or was it kind of slow?

09:34:32  24   A.  It's -- depends on which bank.  Some are definitely

09:34:37  25   kind of slow, and others, you have to wait in line.

09:34:40  1  Q.  Does it seem unreasonable, Mr. Weinstein, to think a

09:34:44  2  branch could handle two or three additional checks per

09:34:47  3  hour?

09:34:47  4  A.  Yeah, that -- that's certainly not unreasonable.  But

09:34:51  5  that's not the issue.

09:34:52  6  Q.  And, Mr. Weinstein, don't you think that before a bank

09:34:55  7  like Wells Fargo would spend $276 million building new

09:35:02  8  branches, they might do a capacity study?  Seem reasonable?

09:35:06  9  A.  Actually, they -- they have done capacity studies.  And

09:35:10  10  what they're doing is closing banks and reducing the number

09:35:15  11  of branches.

09:35:15  12  Q.  Because, frankly, they don't need that many branches to

09:35:19  13  service their customers at this point in time, do they?

09:35:21  14  A.  And that's why we're here.

09:35:23  15  Q.  And --

09:35:24  16       MR. HILL:  Objection, nonresponsive, Your Honor.

09:35:30  17  I move to strike the sidebar comment from Mr. Weinstein.

09:35:35  18       THE COURT:  I'll overrule that, Mr. Hill.  I don't

09:35:37  19  think it's non-responsive in light of your statement in the

09:35:40  20  form of a question.

09:35:42  21  Q.  (By Mr. Hill)  Mr. Weinstein, we know Wells Fargo is

09:35:47  22  not out there building new branches right now, correct?

09:35:50  23  A.  I -- I agree.  They're actually closing branches.

09:35:52  24  Q.  And we know with their existing branch infrastructure,

09:35:55  25  if we take the number of checks for a given year that you

09:35:59  1  say would have to go through that additional -- that

09:36:01  2  existing branch infrastructure, it works out to two to

09:36:04  3  three checks per hour?

09:36:06  4  A.   Yeah.  I'm fine with your math.

09:36:08  5  Q.   Now, you didn't do a capacity study as part of your

09:36:14  6  work in this case, did you, Mr. Weinstein?

09:36:15  7  A.   Well, I relied on -- on Wells Fargo's actual conduct in

09:36:19  8  that regard.  I didn't do my own.  I relied on Wells Fargo.

09:36:22  9  Q.   And, Mr. Weinstein, your math that you used to suggest

09:36:29  10  that this $276 million input should be made to your cost

09:36:33  11  savings portion of your report, your math on that -- your

09:36:38  12  calculation did not include an assumption that any of this

09:36:40  13  additional check traffic might go through the ATM channels,

09:36:43  14  did it?

09:36:44  15  A.   That's true.

09:36:46  16  Q.   So we don't know -- when you say 26 million checks

09:36:51  17  would have gone through a teller, we don't know that that's

09:36:55  18  true, do we?

09:36:55  19  A.   No, that's -- that's incorrect.  My math is based on

09:37:00  20  Wells Fargo's own information about the percentage of

09:37:02  21  deposits they get, ATM versus teller.

09:37:05  22  Q.   I didn't mean to cut you off, sir.

09:37:08  23  A.   I'm sorry.

09:37:08  24  Q.   So, Mr. Weinstein, in your 26 million, you did not take

09:37:12  25  account of how many of those checks would go through the

| 09:37:16 | 1 | ATM channel, did you, sir? |
| 09:37:17 | 2 | A.  That's incorrect. |
| 09:37:18 | 3 | Q.  Now, the other thing, Mr. Weinstein -- let me ask this: |
| 09:37:25 | 4 | You know, instead of building -- Wells Fargo as a company |
| 09:37:29 | 5 | might look at this additional check volume, two to three |
| 09:37:32 | 6 | per hour per branch, and think, you know, I bet we can |
| 09:37:35 | 7 | handle that.  Might conclude that.  Seem like a reasonable |
| 09:37:40 | 8 | conclusion, wouldn't it? |
| 09:37:41 | 9 | A.  There's no question that they could handle that |
| 09:37:46 | 10 | additional number of deposits.  The fact is, they don't |
| 09:37:48 | 11 | want to handle them in a bank. |
| 09:37:51 | 12 | Q.  And, Mr. Weinstein, another thing they might have |
| 09:37:55 | 13 | decided is, well, if we don't want to handle those things |
| 09:37:59 | 14 | through a bank -- as you say, we don't want to handle these |
| 09:38:03 | 15 | through a bank, then let's just use manual capture.  That |
| 09:38:11 | 16 | would take them out of the banking teller route, wouldn't |
| 09:38:14 | 17 | it? |
| 09:38:15 | 18 | A.  It would. |
| 09:38:15 | 19 | Q.  It would put them right back into the MRDC route, |
| 09:38:18 | 20 | wouldn't it? |
| 09:38:19 | 21 | A.  It would. |
| 09:38:19 | 22 | Q.  And the cost savings that come from the MRDC route |
| 09:38:22 | 23 | would accrue just the same in that manual capture context |
| 09:38:26 | 24 | as they do in that auto capture context, wouldn't they, |
| 09:38:34 | 25 | Mr. Weinstein? |

09:38:34   1   A.  No, sir, that's not correct.

09:38:36   2   Q.  Now, let's take a look, Mr. Weinstein -- so you don't

09:38:38   3   believe that Wells Fargo, rather than say let's spend

09:38:43   4   $276 million building branches, might say let's keep using

09:38:45   5   what we've been using that allows mobile deposit.  Let's

09:38:49   6   just do manual capture?

09:38:51   7   A.  Is there a question?

09:38:56   8   Q.  Yes, sir.

09:38:56   9   A.  What's the question?

09:38:57  10   Q.  The question is:  That could be a reasonable calculus

09:39:01  11   for Wells Fargo?

09:39:01  12   A.  That -- that's reasonable only if manual capture works

09:39:05  13   and is acceptable to consumers.

09:39:08  14   Q.  I'm going to put a pin in that, Mr. Weinstein.  That is

09:39:11  15   only reasonable if manual capture works.  That's what

09:39:16  16   you're saying?

09:39:16  17   A.  And is acceptable to consumers during the damage period

09:39:21  18   relative to the use of the patents-in-suit.

09:39:24  19   Q.  And, again, our damage period is when?

09:39:26  20   A.  December 2016 until roughly today.

09:39:31  21   Q.  So from here to here, right?

09:39:34  22   A.  I can't see where you're pointing.

09:39:37  23   Q.  Yes, sir, I apologize for that.  But for this period

09:39:39  24   you've indicated, December '16 through today?

09:39:42  25   A.  Yes, sir.

09:39:42   1    Q.  We'll come back to that, Mr. Weinstein.

09:39:46   2         Let's move on to the other category that you put

09:39:50   3    into your total.

09:39:51   4         Now, you put in --

09:39:53   5         MR. HILL:  Let's go back to PDX-4.35, please.

09:39:59   6    Q.  (By Mr. Hill)  The second category of cost -- so we've

09:40:07   7    covered the first category of cost savings is what we've

09:40:09   8    been talking about all this time, isn't it?

09:40:11   9    A.  Yes, sir.

09:40:12  10    Q.  All right.  We looked at the 2011 documents, and we've

09:40:15  11    looked at this cost to build branches, correct?

09:40:18  12    A.  Actually, it was -- it was a 2010 document and some

09:40:21  13    others.  We looked at what I'll call early planning

09:40:25  14    documents --

09:40:25  15    Q.  Okay.

09:40:25  16    A.  -- and some others.

09:40:27  17    Q.  Let's look at the next category, increased profits, and

09:40:31  18    let's, again, take a look -- not what "we" but what "you"

09:40:35  19    showed the jury yesterday regarding increased profits.

09:40:37  20    Okay, Mr. Weinstein?

09:40:38  21    A.  Yes, sir.

09:40:38  22    Q.  Let's start out in this context.  You showed the jury

09:40:48  23    Plaintiff's Exhibit 417.  Do you recall that?  Plaintiff's

09:40:54  24    Exhibit 417?

09:40:54  25         MR. HILL:  Let's get it up here on the screen if

09:40:56  1  we can, Mr. Barnes.

09:41:01  2  A.  Yes, sir, I remember that.

09:41:03  3  Q.  (By Mr. Hill)  You remember that document?

09:41:04  4  A.  I do.

09:41:05  5  Q.  And, in fact, let me just make sure so that --

09:41:18  6      MR. HILL:  I tell you what, can we see PDX-4.23,

09:41:24  7  Mr. Barnes?

09:41:25  8  Q.  (By Mr. Hill)  Here it is, as you showed it.  Look

09:41:27  9  familiar?

09:41:27  10  A.  It does.

09:41:28  11      MR. HILL:  Now, I don't know if we can do it in

09:41:30  12  this.  We may have to go back to the exhibit, Mr. Barnes.

09:41:32  13  I want to blow up this copyright date right here or make it

09:41:40  14  big enough --

09:41:40  15  A.  That date is 2009.

09:41:42  16  Q.  (By Mr. Hill)  It's blurry there, but you agree with

09:41:45  17  me, Mr. Weinstein, that's 2009?

09:41:46  18  A.  I agree that that's what it says there.

09:41:48  19  Q.  And this is a 2009 document, correct?

09:41:49  20  A.  I don't believe so, no, sir.  I think this document is

09:41:52  21  2012.  I understand the copyright date is 2009.

09:41:56  22  Q.  Okay.  Well, let's --

09:41:58  23  A.  But if you --

09:41:58  24  Q.  I'm sorry, I didn't mean to cut you off.

09:42:00  25  A.  I -- I don't think that the -- the date actually that

09:42:03  1  this information refers to is 2009.

09:42:05  2  Q.  So you believe it was 2012?

09:42:09  3  A.  I'm -- I'm reasonably confident of that, yes, sir.

09:42:10  4  Q.  All right.  Well, let's -- we'll assume it's 2012,

09:42:13  5  then.

09:42:14  6  A.  Okay.

09:42:14  7  Q.  What do we know about 2012, Mr. Weinstein?  What -- do

09:42:17  8  we know that 2012 was before the hypothetical negotiation

09:42:22  9  when these patents had issued?

09:42:24  10  A.  We do.

09:42:25  11  Q.  Do we know, Mr. Weinstein, that 2012 was before

09:42:31  12  Wells Fargo -- assuming maybe what part of 2012 -- was

09:42:34  13  before Wells Fargo had anything captured, we'll call it?

09:42:41  14  A.  What -- what -- what do you mean?

09:42:43  15  Q.  We didn't have mobile deposit?

09:42:46  16  A.  Well, that's actually not correct if you -- if you

09:42:51  17  understand this document.

09:42:51  18  Q.  You don't -- you believe Wells Fargo had mobile deposit

09:42:56  19  before the date that the testimony in the case has

09:43:00  20  indicated they had it in May of 2012?

09:43:02  21  A.  Well, this document is talking about a pilot study that

09:43:05  22  Wells Fargo conducted around 2012 in a couple of states

09:43:08  23  with respect to mobile deposit.

09:43:10  24  Q.  Okay.  Well, let's assume it is, then.  Let's assume

09:43:13  25  that it was at a point in 2012, this document, after we

09:43:16   1   were seeing at least some initial launch of mobile deposit,

09:43:20   2   so that they can do a pilot study.

09:43:23   3           Now, pilot studies may not be your commercial

09:43:25   4   launch, agree?

09:43:26   5   A.  Sure.

09:43:26   6   Q.  Could have been a limited test?

09:43:30   7   A.  Well, it was.  It -- it explains exactly what it was on

09:43:33   8   the document.

09:43:33   9   Q.  Okay.  So --

09:43:34   10  A.  And there's actually other information that explains

09:43:37   11  it, as well.

09:43:39   12  Q.  So this document was a limited test for exploring MRDC

09:43:42   13  in 2012?

09:43:43   14  A.  That's fair.

09:43:44   15  Q.  In 2012, nobody had auto capture?

09:43:49   16  A.  Correct.

09:43:49   17  Q.  This document does not value auto capture?

09:43:54   18  A.  It does not.

09:44:10   19          MR. HILL:  Let's take a look at PDX-4.24, please,

09:44:15   20  Mr. Barnes.

09:44:15   21  Q.  (By Mr. Hill)  This was another document that you

09:44:17   22  showed, Mr. Weinstein, in connection with your increased

09:44:21   23  profits presentation, do you recall?

09:44:23   24  A.  I do, sir.

09:44:24   25  Q.  This also is a -- I say also, this is a 2000 -- excuse

| | | |
|---|---|---|
| 09:44:28 | 1 | me -- '10 document, correct? |
| 09:44:32 | 2 | A.  It is. |
| 09:44:33 | 3 | Q.  Pre-auto-capture? |
| 09:44:34 | 4 | A.  Correct. |
| 09:44:35 | 5 | Q.  Pre-anything-capture for Wells Fargo? |
| 09:44:37 | 6 | A.  Pre -- pre-MRDC. |
| 09:44:42 | 7 | Q.  Okay.  Pre-mobile-deposit? |
| 09:44:44 | 8 | A.  Yes, sir. |
| 09:44:44 | 9 | Q.  And it is an attempt by Wells Fargo to investigate the |
| 09:44:52 | 10 | business case of whether MRDC made sense, right? |
| 09:44:56 | 11 | A.  I agree with that. |
| 09:44:57 | 12 | Q.  And at that point in time, Wells Fargo's looking at |
| 09:45:00 | 13 | MRDC mobile deposit.  And the only world people know at |
| 09:45:06 | 14 | that point is manual, agreed? |
| 09:45:08 | 15 | A.  Agreed. |
| 09:45:09 | 16 | Q.  This document does nothing to place value on auto |
| 09:45:14 | 17 | capture, does it, Mr. Weinstein? |
| 09:45:16 | 18 | A.  Certainly not in 2010, that's correct. |
| 09:45:20 | 19 |       MR. HILL:  Now, can we go back to PDX-4.35 -- |
| 09:45:26 | 20 | 4.35, Mr. Barnes? |
| 09:45:27 | 21 | Q.  (By Mr. Hill)  Okay.  So there we've talked about our |
| 09:45:31 | 22 | second category, which was increased profits.  Let's move |
| 09:45:34 | 23 | on now to our third category, which is ecosystem benefits. |
| 09:45:37 | 24 | That was your third category of -- of what you say are |
| 09:45:41 | 25 | quantifiable benefits of auto capture MRDC, and what I say |

09:45:46  1  is quantifiable benefits of just MRDC.  You understand?

09:45:50  2  A.  I understand.

09:45:52  3  Q.  Now, Mr. Weinstein, here what you showed the jury was

09:45:59  4  PDX-4.26?

09:46:01  5       MR. HILL:  4.26, I'm sorry, Mr. Barnes.

09:46:07  6  Q.  (By Mr. Hill)  Mr. Weinstein, what's the date of this

09:46:08  7  document?

09:46:09  8  A.  2011.

09:46:14  9  Q.  And we can see by its plain language that it is a

09:46:22  10  MRDC-targeted document, agreed?

09:46:23  11  A.  Agreed.

09:46:24  12  Q.  It was put out in a point in time, Mr. Weinstein, that

09:46:29  13  was a manual-capture-only world, agreed?

09:46:32  14  A.  Agreed.

09:46:35  15  Q.  And in the context of ecosystem benefits, you again

09:46:41  16  showed us in PDX-4.27, Plaintiff's Exhibit 417.  Do you

09:46:49  17  remember putting it up there again?

09:46:50  18  A.  I do.  This is a different panel from the left-hand

09:46:54  19  side that's blown up on the right.

09:46:56  20  Q.  But this is still the 2009 copyright date, that you say

09:47:00  21  2012 document that we discussed earlier, agreed?

09:47:03  22  A.  Well, it's a 2012 study.  It's a Wells Fargo 2012

09:47:08  23  study.

09:47:08  24  Q.  And -- and, Mr. Weinstein, this is a study that is

09:47:12  25  looking at MRDC customers who at that point in time didn't

09:47:22   1   know what auto capture even was, agreed?

09:47:23   2   A.  Agreed.

09:47:31   3            MR. HILL:  And what this -- if we look at

09:47:37   4   PDX-430 -- 4.33, Mr. Barnes.

09:47:40   5   Q.  (By Mr. Hill)  Yet another document you pointed out in

09:47:48   6   the context of ecosystem benefits.  This shows Plaintiff's

09:47:54   7   Exhibit 14.  And this document, again, pre-anything capture

09:47:59   8   for Wells Fargo, agreed?

09:48:01   9   A.  Agreed.

09:48:04   10  Q.  Pre-auto capture for anybody on earth, agreed?

09:48:07   11  A.  As far as I know.

09:48:10   12  Q.  And, Mr. Weinstein, this is a document discussing the

09:48:15   13  time to build an MRDC product, right?

09:48:18   14  A.  I believe so.

09:48:19   15  Q.  Not an auto capture product, MRDC product, right?

09:48:23   16  A.  I agree.

09:48:24   17  Q.  And there's a difference, you agree?

09:48:25   18  A.  There is a difference.

09:48:28   19  Q.  And, Mr. Weinstein, Wells Fargo made a business

09:48:36   20  decision based on this information to pursue an MRDC

09:48:42   21  system, a manual capture system, based on the business

09:48:49   22  information they knew about it as partly as reflected in

09:48:53   23  this document, right?

09:48:54   24  A.  That's fair.

09:48:54   25  Q.  And one of the approaches -- there were multiple

09:48:58   1   approaches available.  One of the approaches they debated

09:49:00   2   was maybe building their own system for mobile deposit,

09:49:04   3   agree?

09:49:04   4   A.  Yes, sir.

09:49:05   5   Q.  Discussed in this document, and they talk about how

09:49:08   6   much time that would take, and, you know, whether they

09:49:11   7   could support that kind of thing from a technology

09:49:14   8   standpoint, considering they're not a software company,

09:49:16   9   they're a bank.  Agree?

09:49:18  10   A.  Yes, sir.

09:49:19  11   Q.  And what we know is that Wells Fargo decided, instead,

09:49:24  12   to take the route of buying software from a vendor for

09:49:32  13   MRDC, don't we?

09:49:33  14   A.  I agree.

09:49:33  15   Q.  And that's what Wells Fargo ultimately decided to do

09:49:37  16   instead of build their own system, they decided, well,

09:49:41  17   these are available for sale from recognized sellers, we'll

09:49:48  18   go buy it from Mitek?  That's what happened factually,

09:49:54  19   correct?

09:49:54  20   A.  Correct.  They -- they did a deal with Mitek.

09:49:56  21   Q.  Now, one other item you mentioned in the context of

09:50:05  22   ecosystem benefits, Mr. Weinstein, is you talked about

09:50:07  23   Zelle.  Do you remember Zelle?

09:50:08  24   A.  I do, sir.

09:50:09  25   Q.  All right.  So in Paragraph 142 of your report,

09:50:13  1  Mr. Weinstein -- and I know you've got it there -- I'll

09:50:15  2  read you a portion of it.

09:50:17  3  A.  Just to be clear, I don't have it here.  You just gave

09:50:20  4  me the exhibit.

09:50:21  5  Q.  I'm so sorry.

09:50:23  6      MR. HILL:  Your Honor, may I approach and hand

09:50:24  7  Mr. Weinstein a copy of his report?

09:50:26  8      THE COURT:  You may.

09:50:34  9      THE WITNESS:  Thank you, sir.

09:50:43  10     MR. HILL:  You can take that down.

09:50:45  11 Q.  (By Mr. Hill)  Now, Mr. Weinstein, I'm looking at

09:50:49  12 Paragraph 142 of your report, and you state in there -- I

09:50:54  13 believe it's the last sentence of Paragraph 142, you state:

09:50:59  14 I note that it's not possible to quantify all the ecosystem

09:51:03  15 benefits to Wells Fargo from use of commercially viable

09:51:07  16 MRDC.

09:51:10  17 A.  You read that correctly.

09:51:11  18 Q.  You say that; you say that, I can't figure out, it's

09:51:16  19 not possible to quantify the ecosystem benefits of

09:51:19  20 commercially viable MRDC?

09:51:22  21 A.  No, that time you didn't read it correctly.

09:51:25  22 Q.  Well, what are you trying to say there?  I note that it

09:51:29  23 is not possible to quantify all of the ecosystem benefits

09:51:30  24 to Wells Fargo from use of commercially viable MRDC.  Did I

09:51:35  25 read it correctly that time?

09:51:37  1    A.  Yes, sir.

09:51:37  2    Q.  Now, you go on after that statement, Mr. Weinstein, to

09:51:41  3    discuss Zelle, don't you?

09:51:42  4    A.  I do.

09:51:43  5    Q.  All right.  Let's talk about Zelle a little bit.  You

09:51:45  6    go on to discuss Zelle because you're trying to use Zelle

09:51:49  7    as a substitute or as an alternative to look at to try to

09:51:55  8    evaluate ecosystem benefits, aren't you?

09:51:57  9    A.  Yes, sir.

09:51:58  10   Q.  And we know Zelle is a mobile banking app that allows

09:52:02  11   people to transfer money to each other, just account to

09:52:07  12   account, agree?

09:52:08  13   A.  In -- in different locations, yes, sir.

09:52:11  14   Q.  It's not a mobile deposit app, is it?

09:52:12  15   A.  No, sir.

09:52:13  16   Q.  Doesn't have anything to do with checks?

09:52:15  17   A.  Correct.

09:52:17  18   Q.  Not anything USAA invented?

09:52:20  19   A.  As far as I know.

09:52:22  20   Q.  Well, there's certainly -- you've seen no evidence of

09:52:24  21   that, have you?

09:52:25  22   A.  Absolutely no evidence.

09:52:26  23   Q.  In fact, you know that Zelle is a creation of a group

09:52:29  24   of several banks?

09:52:31  25   A.  Correct.

09:52:32  1   Q.  Including Wells Fargo and including others?

09:52:35  2   A.  Yes, sir.

09:52:35  3   Q.  And those banks got together, created a technology, and

09:52:39  4   they share it with themselves and the banking industry,

09:52:43  5   correct?

09:52:43  6   A.  Right.

09:52:45  7   Q.  Now, Zelle is faster than a check deposit because it

09:52:50  8   links directly to the sender and recipient's bank accounts,

09:52:57  9   you understand?

09:52:58  10  A.  If you mean the money gets there right away --

09:53:01  11  Q.  Yes, sir.

09:53:01  12  A.  -- that is my understanding, yes, sir.

09:53:03  13  Q.  There's no bank processing of check images or check

09:53:06  14  clearing that has to go on with Zelle?

09:53:09  15  A.  True.

09:53:09  16  Q.  Zelle doesn't require any imaging technology, does it?

09:53:13  17  A.  Correct.

09:53:13  18  Q.  Zelle has no limits on the amounts of how much a

09:53:16  19  customer can send or receive with regard to it, does it?

09:53:19  20  A.  I don't know that to be true in all cases.

09:53:21  21  Q.  But you know that there usually are limits on mobile

09:53:24  22  deposit amounts; you understand that?

09:53:26  23  A.  Sometimes there are, yes, sir.

09:53:30  24  Q.  And you know that banks also have several other

09:53:33  25  available alternatives for sending money digitally to

09:53:37  1  others these days, right?

09:53:40  2  A.  I agree with that.

09:53:40  3  Q.  Zelle only allows customers to transfer money that's

09:53:43  4  already in their bank account?

09:53:45  5  A.  Correct.

09:53:46  6  Q.  Not putting new money in; moving your current money

09:53:51  7  around?

09:53:51  8  A.  From one person to another, correct.

09:53:56  9  Q.  You agree with me, Mr. Weinstein, there are a laundry

09:54:01  10  list of differences between Zelle and mobile check deposit?

09:54:06  11  A.  Sure, there are differences.  My testimony was Zelle is

09:54:11  12  a useful benchmark.

09:54:13  13  Q.  And not only are there differences between Zelle and

09:54:19  14  mobile check deposit, there are even broader differences,

09:54:22  15  if we're talking about Zelle, compared to the USAA specific

09:54:27  16  method for auto capture, correct?

09:54:29  17  A.  Sure.

09:54:29  18  Q.  So, Mr. Weinstein, let's go back to PDX-4.35.

09:54:54  19      So now we have talked about the last of your three

09:54:57  20  categories, which were the ecosystem benefits you

09:54:59  21  calculated?

09:55:00  22  A.  Correct.

09:55:01  23  Q.  And, Mr. Weinstein, you say that the value of those

09:55:05  24  things that we just looked at are the value here of auto

09:55:15  25  capture MRDC.  Did I get that right?

09:55:17   1   A.   You did.

09:55:18   2   Q.   Mr. Weinstein, none of the documents that we just

09:55:21   3   looked at in support of your stated auto capture number

09:55:25   4   have anything to do with anything other than MRDC, do they,

09:55:33   5   sir?

09:55:33   6   A.   That's -- that's just not true.

09:55:36   7   Q.   And, more importantly, Mr. Weinstein, we know what you

09:55:45   8   told us yesterday on direct examination, which is, as I

09:55:55   9   said earlier, I start with the benefits associated with

09:55:58   10  MRDC.   That's not auto capture MRDC, as the evidence we've

09:56:02   11  just reviewed shows, is it, Mr. Weinstein?

09:56:05   12  A.   We start with the benefits associated with mobile

09:56:08   13  deposit, but during the damage period, it's auto capture

09:56:11   14  MRDC.

09:56:12   15  Q.   Now, Mr. Weinstein, let's talk again -- let's get us

09:56:26   16  back to where we started about that hypothetical

09:56:28   17  negotiation room, because, again, the jury has got to take

09:56:30   18  all this evidence into account to figure out what would

09:56:34   19  have happened in that room, correct?

09:56:35   20  A.   Yes, sir.

09:56:36   21  Q.   So let's go back to that room.   And we know, then, that

09:56:42   22  in that room, we're going to be talking about the value of

09:56:48   23  the specific contribution from the USAA specific method of

09:56:58   24  auto capture, agree?

09:57:00   25  A.   As taught in the patents, yes, sir.

09:57:03  1   Q.  So, Mr. Weinstein, we know in that room that Wells

09:57:10  2   Fargo as a rational actor is not going to agree to pay USAA

09:57:14  3   for benefits they are already receiving and cost savings

09:57:19  4   they are already receiving from MRDC that pre-existed, are

09:57:24  5   they, sir?

09:57:24  6   A.  They're only going to pay for benefits associated with

09:57:28  7   the value created from their use of the patents.

09:57:35  8   Q.  And we know that, from Mr. Calman's testimony

09:57:44  9   yesterday, looking at USAA's own numbers, even he and USAA

09:57:51  10  admit that when they switched from manual to auto capture,

09:57:58  11  they saw a 7 percent increase in check acceptance rate,

09:58:03  12  agree?

09:58:04  13  A.  I can't agree with that.  I'm not certain what you're

09:58:08  14  talking about.

09:58:08  15  Q.  Okay.  You don't recall Mr. Calman discussing the fact

09:58:11  16  that USAA's success with this showed that they went from an

09:58:16  17  84 percent acceptance rate with manual to a 91 percent

09:58:23  18  acceptance rate with auto capture after they first

09:58:26  19  introduced it?

09:58:26  20  A.  Thank you for that.  I do understand now.  And that was

09:58:29  21  part of his testimony on that subject, yes, sir.

09:58:31  22  Q.  And so if we look at that, Mr. Weinstein, 84 percent to

09:58:48  23  91 percent, that's a 7 percent delta, isn't it, or

09:58:55  24  difference?

09:58:55  25  A.  Viewed that way, that's correct, yes, sir.

09:59:00  1   Q.   Okay.   Well, let's look at it this way.   If we want to
09:59:04  2   do it as a percentage, what's the percentage of increase in
09:59:08  3   the success rate?
09:59:09  4   A.   So that would be 7 over 84.
09:59:12  5   Q.   That's right.   It would be.   So what you do if you want
09:59:16  6   to calculate the percentage increase and success rate, is
09:59:19  7   you divide 7, you divide it by 84, don't you?   And if you
09:59:25  8   divide 7 by 84, do you know what you get?
09:59:27  9   A.   You get something less than 10 percent.
09:59:32  10  Q.   You get roughly 8 percent, Mr. Weinstein.   That's what
09:59:38  11  you get.
09:59:38  12  A.   Yeah, I'm fine with that.
09:59:40  13  Q.   That's what USAA saw from the introduction of auto
09:59:46  14  capture, an 8 percent increase in acceptance rate.   You
09:59:51  15  don't quarrel with those numbers, do you?
09:59:54  16  A.   As I said here, I don't quarrel with any of that math.
09:59:57  17  Q.   Do you think that Wells Fargo as a rational actor is
10:00:01  18  going to sit in that room and pay $300 million, walk out of
10:00:06  19  that room having written a $300 million check for a product
10:00:13  20  that, at best, again -- you know, whether that's the actual
10:00:17  21  success rate is an open question in this case -- but a
10:00:21  22  product that, at best, improves the performance of MRDC by
10:00:25  23  8 percent?
10:00:27  24  A.   That's not the analysis Wells Fargo would do.   Wells
10:00:32  25  Fargo would be aware of the benefits, as I have calculated

| | | |
|---|---|---|
| 10:00:38 | 1 | them, and USAA would be, too. |
| 10:00:40 | 2 | Q.  Why can't Wells Fargo just use auto -- or, excuse me, |
| 10:00:44 | 3 | why can't Wells Fargo just not use any kind of auto |
| 10:00:46 | 4 | capture? |
| 10:00:46 | 5 | A.  Because consumers don't accept it.  It's clear during |
| 10:00:49 | 6 | the damage period, both from Wells Fargo's own -- own |
| 10:00:53 | 7 | witnesses and the public trade press, that during the |
| 10:00:56 | 8 | damage period, just using manual capture is not an |
| 10:01:00 | 9 | acceptive -- acceptable alternative. |
| 10:01:04 | 10 | Q.  Let's talk about that a minute. |
| 10:01:05 | 11 | The -- let's talk about this.  Let's assume you're |
| 10:01:10 | 12 | wrong, Mr. Weinstein, okay?  I'm not asking you to abandon |
| 10:01:13 | 13 | your opinion.  But for sake of argument, assume you're |
| 10:01:16 | 14 | wrong.  And let's assume that manual capture is, in fact, a |
| 10:01:21 | 15 | viable alternative and that there's proof of that, okay? |
| 10:01:27 | 16 | So if we assume that manual capture is a viable |
| 10:01:33 | 17 | alternative and Wells Fargo is sitting in that room knowing |
| 10:01:35 | 18 | that, hey, we can use manual capture, manual capture is a |
| 10:01:39 | 19 | viable alternative, then that cost to go back to manual |
| 10:01:46 | 20 | capture, it sets a cap on what they would ever pay in that |
| 10:01:51 | 21 | negotiation, doesn't it, Mr. Weinstein? |
| 10:01:52 | 22 | A.  It does, but Wells Fargo sitting in that room knows |
| 10:01:56 | 23 | absolutely positively that manual capture is not acceptable |
| 10:01:59 | 24 | to consumers at that time. |
| 10:02:01 | 25 | Q.  I understand that's your opinion.  But my purpose is to |

| | | |
|---|---|---|
| 10:02:04 | 1 | ask you, let's assume you're wrong and let's assume that |
| 10:02:09 | 2 | manual capture is, in fact, and the -- the evidence shows |
| 10:02:12 | 3 | and Wells Fargo has, you know, concluded in that |
| 10:02:16 | 4 | negotiation that manual capture is, in fact, a viable |
| 10:02:19 | 5 | alternative, it puts a cap on what they would ever pay |
| 10:02:23 | 6 | coming out of that room, doesn't it? |
| 10:02:24 | 7 | A.  Sure. |
| 10:02:25 | 8 | Q.  And we can agree, Mr. Weinstein, for Wells Fargo to go |
| 10:02:31 | 9 | to manual capture, it wouldn't cost them much at all, would |
| 10:02:35 | 10 | it?  They've done it before, right? |
| 10:02:38 | 11 | A.  Well, they -- they had done it before, that's true. |
| 10:02:49 | 12 | Q.  Mr. Weinstein, let's talk about a bank called Chase. |
| 10:02:57 | 13 | You've heard of Chase before? |
| 10:02:59 | 14 | A.  I have. |
| 10:03:00 | 15 | Q.  All right.  Mr. Weinstein, with regard to Chase, we've |
| 10:03:09 | 16 | seen some information in the case already about them, |
| 10:03:11 | 17 | haven't we, sir? |
| 10:03:12 | 18 | A.  Yes. |
| 10:03:14 | 19 | Q.  Let's look, for example -- you've seen Plaintiff's |
| 10:03:17 | 20 | Exhibit No. 7? |
| 10:03:22 | 21 | MR. HILL:  Can we get that, please? |
| 10:03:24 | 22 | Q.  (By Mr. Hill)  Have you seen this document before? |
| 10:03:27 | 23 | A.  I have. |
| 10:03:29 | 24 | Q.  Now, if we look at Plaintiff's Exhibit No. 7, this is a |
| 10:03:33 | 25 | 2011 Wells Fargo Bank document, right? |

10:03:36   1    A.  Yes.

10:03:36   2    Q.  And it was discussing MRDC?

10:03:40   3    A.  Correct.

10:03:41   4    Q.  And we know at that time that it's discussing manual

10:03:45   5    MRDC, right?

10:03:46   6    A.  Yes, sir.

10:03:48   7            MR. HILL:  And let's look at the next page, if we

10:03:51   8    can.  Keep going here, Mr. Barnes.  Continue.  Continue.

10:03:57   9    I'm looking for the table stakes slide, Mr. Barnes.  Here

10:04:02  10    we go.

10:04:03  11    Q.  (By Mr. Hill)  This is the portion of Plaintiff's

10:04:05  12    Exhibit 7, I believe the jury has been shown before.

10:04:08  13            Now, you may have discussed it in your own

10:04:10  14    presentation.  Did you, Mr. Weinstein?

10:04:11  15    A.  Well, I know I used the word "table stakes."

10:04:14  16    Q.  All right.

10:04:15  17            MR. HILL:  Can we get that back up?

10:04:20  18            I'm sorry, Your Honor, may I have a moment?

10:04:23  19            THE COURT:  You may have a moment.

10:04:34  20    Q.  (By Mr. Hill)  Now, Mr. Weinstein, we're getting the --

10:04:36  21    apparently, I have the unofficial version of that document.

10:04:41  22    We're getting the official version put back up.

10:04:43  23            But, Mr. Weinstein, what we see in that document

10:04:47  24    and what's been presented of it is that there's this

10:04:49  25    discussion of table stakes, right?

10:04:51  1   A.  That's true.

10:04:54  2   Q.  And let me see if I can find that in the context of

10:05:01  3   your slides.

10:05:15  4        What you put up in your slides was a Wells

10:05:20  5   Fargo -- a slide of a Wells Fargo witness who was making

10:05:23  6   reference to that, right?  Mr. Ajami?

10:05:29  7   A.  Well, that -- that's one of slides I put up, yes, sir.

10:05:32  8   Q.  And in his testimony he was discussing that document.

10:05:35  9   Do you recall that?

10:05:36  10  A.  I do.

10:05:36  11  Q.  And that document concerned Chase Bank, didn't it?

10:05:41  12  A.  It referenced Chase Bank, yes.

10:05:46  13  Q.  And the table stakes that it was referring to was that

10:05:48  14  by Chase launching in 2010 MRDC, Chase had made mobile

10:05:58  15  deposit table stakes for the industry?

10:05:59  16  A.  I think that's the sense you get from that document,

10:06:02  17  yes, sir.

10:06:02  18  Q.  And, again, that's in 2010, pre-auto capture,

10:06:07  19  pre-anything capture for Wells Fargo.  And based on that

10:06:10  20  view that, hey, this is important to the market, two years

10:06:13  21  later, Wells Fargo will have decided they're going to put

10:06:18  22  out mobile deposit, and they went and bought it from Mitek

10:06:21  23  and put it out.  Agreed?

10:06:22  24  A.  That's a summary.

10:06:23  25  Q.  All right.  Now, we know Chase introduced a mobile

| | | |
|---|---|---|
| 10:06:34 | 1 | remote deposit system in 2010, don't we, sir? |
| 10:06:37 | 2 | A.  Around that time, I believe. |
| 10:06:40 | 3 | Q.  And we know a little bit more about Chase in this case, |
| 10:06:42 | 4 | don't we, Mr. Weinstein? |
| 10:06:46 | 5 | MR. HILL:  Let's take a look at Plaintiff's |
| 10:06:47 | 6 | Exhibit 5. |
| 10:06:49 | 7 | Q.  (By Mr. Hill)  You recognize Plaintiff's Exhibit 5, |
| 10:06:53 | 8 | don't you, sir? |
| 10:06:54 | 9 | A.  I do. |
| 10:06:54 | 10 | Q.  Plaintiff's Exhibit 5 is a document you discussed in |
| 10:06:59 | 11 | your own direct examination, correct? |
| 10:07:01 | 12 | A.  Yes, sir. |
| 10:07:02 | 13 | Q.  This is an industry report by a company called |
| 10:07:06 | 14 | Futurion.  Did I get that right? |
| 10:07:08 | 15 | A.  You did. |
| 10:07:17 | 16 | Q.  Do you know anything about Futurion? |
| 10:07:18 | 17 | A.  Yes, it's published by a gentleman who's been engaged |
| 10:07:20 | 18 | in this industry for many years, and it's a financial |
| 10:07:23 | 19 | industry-type document. |
| 10:07:25 | 20 | Q.  Okay.  And it's a document you've relied on for your |
| 10:07:28 | 21 | work, correct? |
| 10:07:28 | 22 | A.  It's one of the documents I considered, yes, sir. |
| 10:07:32 | 23 | Q.  And this is a 2017 mobile deposit benchmark report -- |
| 10:07:37 | 24 | 2017, down here, right? |
| 10:07:38 | 25 | A.  2017, yes, sir. |

```
10:07:44    1    Q.  And it discusses --
10:07:46    2            MR. HILL:  If we can look at, let's see here,
10:07:51    3    Page 21, Mr. Barnes.
10:07:53    4    Q.  (By Mr. Hill)  It's got a chart in it.  We've seen this
10:07:55    5    chart already in evidence, haven't we, sir?
10:07:58    6    A.  We -- we did see it, yes, sir.
10:07:59    7    Q.  And what this chart does is provide findings on -- and
10:08:03    8    a ranking of the banks in the country, agree?
10:08:05    9    A.  Agree.
10:08:06   10    Q.  And what we see here, Mr. Weinstein, is they've got a
10:08:11   11    column right here where they evaluated which banks have
10:08:17   12    auto capture and which don't, agree?
10:08:19   13    A.  Agreed.
10:08:20   14    Q.  And the bank that we know in 2017 still, despite having
10:08:26   15    launched it in 2010, manual capture, that still uses manual
10:08:31   16    capture is who?
10:08:32   17    A.  Chase.
10:08:33   18    Q.  Chase.  So in 2017, Chase is still using manual
10:08:42   19    capture, right?
10:08:42   20    A.  Yes.  And this very report on an earlier page points
10:08:47   21    out that Chase has fallen down this very list because it
10:08:53   22    doesn't have auto capture.
10:08:54   23    Q.  Okay.  But we know in 2017 -- Chase started in 2010,
10:09:02   24    and they used manual capture this whole time, don't they,
10:09:06   25    all the way through 2017?
```

10:09:08   1   A.   Correct.

10:09:11   2   Q.   Mr. Weinstein, you understand that Chase is the second

10:09:20   3   largest bank in the country, don't you, sir?

10:09:23   4   A.   As far as I know, yes.  It's certainly a good bank.

10:09:25   5   Q.   Larger than Wells Fargo?

10:09:26   6   A.   Yes.

10:09:27   7   Q.   And so despite the fact that it only offered manual

10:09:32   8   capture for all this time period, including through the

10:09:39   9   date of the hypothetical negotiation, despite that fact,

10:09:45   10   it's the second largest bank in the country?

10:09:48   11   A.   And ranked 12th.

10:09:50   12   Q.   All right.  And they only offered mobile capture.  They

10:09:55   13   weren't going out of business, were they?

10:09:57   14   A.   No, sir.

10:09:58   15   Q.   Still had lots of customers?

10:10:01   16   A.   Correct.

10:10:02   17   Q.   And even though you may be ranked 12th, you probably

10:10:06   18   still have a lot of happy customers among your customer

10:10:08   19   base, don't you?

10:10:09   20   A.   Yes, sir.

10:10:10   21   Q.   Mr. Weinstein, there is no question in this case that

10:10:15   22   Chase proves that manual capture can be done at scale, is

10:10:20   23   there?

10:10:20   24   A.   That's just absolutely incorrect, given this very

10:10:29   25   report you're talking about.  Yes, they can do it at scale.

10:10:34   1   They can lose customer satisfaction, which is exactly what
10:10:37   2   the report says.
10:10:38   3   Q.  Mr. Weinstein, let's see if you can answer my question.
10:10:40   4   My question was, the fact that Chase did it all the way
10:10:47   5   through 2017 proves, contrary to what Mr. Calman said, that
10:10:52   6   a bank can deploy, technically and successfully, manual
10:10:57   7   capture at scale, doesn't it?
10:10:59   8   A.  No.  It can do it technically, yes.  It cannot do it
10:11:03   9   successfully.  And that's the conclusion of this report.
10:11:07   10  Q.  Chase certainly didn't shut down between 2010 and 2017
10:11:12   11  because it was having so many failures with its auto
10:11:15   12  capture system that it locked down the whole operation, did
10:11:20   13  it?
10:11:20   14  A.  Surely, it didn't shut down.  That's true.
10:11:24   15  Q.  And so to the extent the suggestion has been made to
10:11:28   16  this jury that if you use manual capture, there's just so
10:11:31   17  many failures, the whole house of cards comes crumbling
10:11:35   18  down, Chase proves that's just not true?
10:11:42   19  A.  I -- I've just given you my conclusions.
10:11:44   20  Q.  Were you here when Mr. Bueche took the stand and
10:11:45   21  said -- and I may have said auto capture then.  You know
10:11:48   22  I'm referring to manual capture when I'm referring to
10:11:51   23  Chase?
10:11:51   24  A.  I do.
10:11:52   25  Q.  You were here when Mr. Bueche took the stand?

10:11:54  1   A.  I was.

10:11:55  2   Q.  He told the jury:  Manual capture gums up the whole

10:11:59  3   works.  Do you recall that?

10:12:00  4   A.  He did not use those terms.  He said:  Manual capture

10:12:06  5   cannot be -- auto capture -- his testimony stands for

10:12:10  6   itself.  The jury was here.  I was here.

10:12:13  7   Q.  They claim manual capture couldn't be scaled.  Do you

10:12:24  8   recall that?

10:12:24  9   A.  He's talking about in the current period it could not

10:12:28  10  be scaled successfully.

10:12:29  11  Q.  2017 is not the currently period, sir?

10:12:31  12  A.  Yes, sir.  It is the current period.

10:12:32  13  Q.  It is the current period?

10:12:34  14  A.  Yes, sir.

10:12:34  15  Q.  And in 2017, the second largest bank in the country

10:12:37  16  used only manual capture?

10:12:38  17  A.  We've been through that.  Yes, it did.  And it -- it

10:12:45  18  lost in its rankings of consumer satisfaction.

10:12:49  19  Q.  Bank bigger than Wells Fargo successfully used manual

10:12:53  20  capture, and it didn't break the system, did it, sir?

10:12:56  21  A.  That is absolutely not what that report says.  There's

10:13:00  22  an earlier page in that report, might be Page 3 or Page 5,

10:13:06  23  which specifically says that Chase lost consumer

10:13:09  24  satisfaction because it specifically did not have auto

10:13:13  25  capture.

```
10:13:13   1   Q.  And, Mr. Weinstein, if we go back now to that
10:13:16   2   hypothetical negotiation room, okay, and we assume that
10:13:22   3   Wells Fargo, a rational actor in that room, based on all
10:13:26   4   the evidence, believes manual capture can be used in scale,
10:13:33   5   and if the jury in our case looks at that evidence and
10:13:37   6   decides that manual capture can be used at scale, that
10:13:41   7   switch to manual capture places a cap -- a finite cap on
10:13:48   8   what any rational actor would ever agree to voluntarily pay
10:13:54   9   sitting in that room, doesn't it, sir?
10:13:55  10   A.  Yes, I agree with that.
10:14:13  11            THE COURT:  Counsel, approach the bench.
10:14:15  12            MR. HILL:  Yes, sir, Your Honor.
10:14:19  13            (Bench conference.)
10:14:22  14            THE COURT:  How close are you to passing the
10:14:24  15   witness?
10:14:24  16            MR. HILL:  I've got probably a good 15 minutes or
10:14:27  17   so left, Your Honor.  We can take a break and probably
10:14:28  18   speed me up.
10:14:28  19            THE COURT:  We'll take a recess.
10:14:29  20            MR. HILL:  Thank you.
10:14:30  21            MR. MELSHEIMER:  Thank you, Your Honor.
10:14:31  22            (Bench conference concluded.)
10:14:33  23            THE COURT:  Ladies and gentlemen, we're going to
10:14:34  24   take a short recess at this time.
10:14:36  25            You may simply close and leave your notebooks in
```

| | | |
|---|---|---|
| 10:14:38 | 1 | your chairs. |
| 10:14:41 | 2 | Let me remind you to follow all the instructions |
| 10:14:44 | 3 | I've given you, including not to discuss the case with each |
| 10:14:46 | 4 | other.  We'll have you back shortly to continue. |
| 10:14:49 | 5 | With that, the jury's excused for recess. |
| 10:14:52 | 6 | COURT SECURITY OFFICER:  All rise. |
| 10:14:55 | 7 | (Jury out.) |
| 10:14:57 | 8 | THE COURT:  The Court stands in recess. |
| 10:26:31 | 9 | (Recess.) |
| 10:26:34 | 10 | (Jury out.) |
| 10:26:35 | 11 | COURT SECURITY OFFICER:  All rise. |
| 10:26:35 | 12 | THE COURT:  Let me ask our witness to return to |
| 10:26:38 | 13 | the witness stand.  Is he in the courtroom?  Somebody find |
| 10:26:42 | 14 | our witness. |
| 10:27:14 | 15 | Are we ready, counsel, or do we still have issues? |
| 10:27:17 | 16 | MR. HILL:  We have one issue, Your Honor. |
| 10:27:20 | 17 | MR. MELSHEIMER:  Just trying to get an exhibit |
| 10:27:23 | 18 | identified properly, Your Honor.  Thank you, Your Honor. |
| 10:27:27 | 19 | THE COURT:  Are you ready to proceed, Mr. Hill? |
| 10:27:28 | 20 | MR. HILL:  Yes, Your Honor. |
| 10:27:29 | 21 | THE COURT:  Let's bring in the jury, Mr. Johnston. |
| 10:27:39 | 22 | COURT SECURITY OFFICER:  All rise. |
| 10:27:40 | 23 | (Jury in.) |
| 10:27:41 | 24 | THE COURT:  Please be seated. |
| 10:27:59 | 25 | We'll continue with the Defendant's |

| | | |
|---|---|---|
| 10:28:04 | 1 | cross-examination of the witness. |
| 10:28:05 | 2 | You may proceed, Mr. Hill. |
| 10:28:06 | 3 | MR. HILL:  Thank you, Your Honor. |
| 10:28:07 | 4 | Q.  (By Mr. Hill)  Mr. Weinstein, let me, just to close out |
| 10:28:12 | 5 | on that hypothetical negotiation, ask you one other thing |
| 10:28:14 | 6 | about what goes on in that room. |
| 10:28:16 | 7 | What you're negotiating there is a bare patent |
| 10:28:21 | 8 | license, correct? |
| 10:28:21 | 9 | A.  Yes, sir. |
| 10:28:22 | 10 | Q.  And a bare patent license means all you're getting -- |
| 10:28:25 | 11 | all you're getting is the right to practice the specific |
| 10:28:31 | 12 | inventions in the specific patents licensed, correct? |
| 10:28:35 | 13 | A.  Yes, sir. |
| 10:28:35 | 14 | Q.  You're not getting other technology? |
| 10:28:37 | 15 | A.  Correct. |
| 10:28:37 | 16 | Q.  You're not getting any kind of infrastructure? |
| 10:28:41 | 17 | A.  Also true. |
| 10:28:42 | 18 | Q.  You're not getting any service for any kind of actual |
| 10:28:49 | 19 | tangible deliverable from the person that's granting the |
| 10:28:52 | 20 | license, are you? |
| 10:28:53 | 21 | A.  You're getting the right to use the patents-in-suit. |
| 10:28:57 | 22 | Q.  So all you're getting, if you will, is a permission |
| 10:29:00 | 23 | slip, right? |
| 10:29:01 | 24 | A.  A permission slip to use the patents-in-suit. |
| 10:29:04 | 25 | Q.  So you've still got to build your own thing, right? |

| | | |
|---|---|---|
| 10:29:08 | 1 | A.  True. |
| 10:29:09 | 2 | Q.  Buying that patent license doesn't hand you a |
| 10:29:14 | 3 | ready-to-go system? |
| 10:29:15 | 4 | A.  Correct. |
| 10:29:16 | 5 | Q.  Mr. Weinstein, I want to look at one other thing that |
| 10:29:20 | 6 | you've addressed in your direct examination yesterday. |
| 10:29:23 | 7 | MR. HILL:  Can we get PDX-4.12, please? |
| 10:29:33 | 8 | Q.  (By Mr. Hill)  Mr. Weinstein, you recall showing this |
| 10:29:46 | 9 | slide to the jury yesterday? |
| 10:29:47 | 10 | A.  Yes, sir. |
| 10:29:47 | 11 | Q.  This is a call-out of Defendant's Exhibit -- or, excuse |
| 10:29:55 | 12 | me, Plaintiff's Exhibit 162, and you've put a portion of it |
| 10:29:59 | 13 | on the screen here, haven't you? |
| 10:30:01 | 14 | A.  Yes, sir. |
| 10:30:01 | 15 | Q.  And if we actually look at Plaintiff's Exhibit 162 -- |
| 10:30:07 | 16 | MR. HILL:  And may I approach and hand |
| 10:30:10 | 17 | Mr. Weinstein a hard copy of it, Your Honor? |
| 10:30:12 | 18 | THE COURT:  You may. |
| 10:30:19 | 19 | Q.  (By Mr. Hill)  If we actually look at Plaintiff's |
| 10:30:21 | 20 | Exhibit 162, Mr. Weinstein, what -- what you have on the |
| 10:30:24 | 21 | slide here is, it says:  USAA asked Wells Fargo to license |
| 10:30:30 | 22 | in August of 2017.  Right?  That's the caption that you put |
| 10:30:35 | 23 | on it? |
| 10:30:36 | 24 | A.  Yes, sir. |
| 10:30:36 | 25 | Q.  And, again, we're talking here in 2017? |

10:30:41   1   A.   2017, yes, sir.

10:30:43   2   Q.   All right.   And it says that that's when this ask

10:30:46   3   occurred; that's when we were asked.

10:30:51   4        Mr. Weinstein, I've read this exhibit pretty

10:30:54   5   closely.   I'd ask that you show me in Exhibit 162 where

10:30:59   6   they asked.

10:31:04   7   A.   They're communicating --

10:31:12   8   Q.   Okay.

10:31:13   9   A.   They're communicating to Wells Fargo representatives an

10:31:19  10   interest in licensing USAA's patents.   That's right in the

10:31:25  11   section that's called out on the front page.

10:31:27  12   Q.   Well, you understand when parties -- parties often have

10:31:32  13   discussions about topics without a specific ask being made,

10:31:37  14   right?

10:31:37  15   A.   Sure.

10:31:37  16   Q.   Often you have preliminary discussions to try to

10:31:40  17   understand issues or understand what the topic may even be

10:31:44  18   about; would you agree?

10:31:45  19   A.   I do.

10:31:46  20   Q.   And if we look, Mr. Weinstein --

10:31:49  21        MR. HILL:   If we can get Plaintiff's Exhibit 162,

10:31:59  22   Mr. Barnes, the actual document.   Before we do that, before

10:32:03  23   we take this off the screen -- oops, I was too late.   Yes,

10:32:14  24   please.

10:32:26  25   Q.   (By Mr. Hill)   If we look at the part you've called out

| | | |
|---|---|---|
| 10:32:29 | 1 | here, Mr. Weinstein, that's dated in 2017, which is the |
| 10:32:32 | 2 | date that you put on there, okay; do we see that?  And it's |
| 10:32:37 | 3 | an email from a guy named Ron Epstein to -- to a gentleman |
| 10:32:42 | 4 | named Rob Glance; you see that? |
| 10:32:46 | 5 | A.  I do. |
| 10:32:47 | 6 | Q.  And Rob Glance is with Wells Fargo, correct? |
| 10:32:51 | 7 | A.  Yes, sir. |
| 10:32:52 | 8 | Q.  You know who Ron Epstein is? |
| 10:32:54 | 9 | A.  I do. |
| 10:32:55 | 10 | Q.  Who is Ron Epstein? |
| 10:32:56 | 11 | A.  Ron Epstein had been retained by USAA at least in |
| 10:33:02 | 12 | connection with -- during this time period in connection |
| 10:33:05 | 13 | with their efforts to license their technology. |
| 10:33:08 | 14 | Q.  So he's a lawyer, right? |
| 10:33:09 | 15 | A.  Yes, he is. |
| 10:33:10 | 16 | Q.  Okay.  And if we actually look at the page where this |
| 10:33:17 | 17 | portion of the email that you highlighted appears, I |
| 10:33:20 | 18 | believe that's going to be -- this is a multi-page email |
| 10:33:30 | 19 | string, isn't it, Mr. Weinstein? |
| 10:33:31 | 20 | A.  Yes, sir. |
| 10:33:35 | 21 | Q.  I believe this is going to be at Page 8. |
| 10:33:41 | 22 |         MR. HILL:  Bottom of Page 8, Mr. Barnes.  Let's go |
| 10:33:50 | 23 | down to the bottom. |
| 10:33:51 | 24 | Q.  (By Mr. Hill)  And there's where we see the part you |
| 10:33:53 | 25 | were just shown, correct? |

10:33:55   1   A.  Yes, sir.

10:33:55   2   Q.  And what it says here is:  Thank you for your openness

10:33:58   3   to share views regarding USAA's licensing efforts with

10:34:03   4   response -- with respect to remote deposit capture patents,

10:34:08   5   and per our conversation, they have information they want

10:34:13   6   to share with us.  Right?

10:34:20   7            MR. HILL:  If we scroll on to the next page.

10:34:25   8   Q.  (By Mr. Hill)  What they're doing here in this email

10:34:28   9   exchange, Mr. Weinstein, they're trying to agree upon terms

10:34:31  10   to hold discussions, aren't they?  And I'm on Page 9,

10:34:43  11   Mr. Weinstein.

10:34:43  12   A.  Yeah, I see it, thank you.

10:34:45  13   Q.  Okay.

10:34:46  14   A.  Yeah, they're trying to kind of set out the ground

10:34:48  15   rules for the conversations.

10:34:50  16   Q.  And these are the ground rules for the conversation

10:34:52  17   that they then want to have, the substantive conversation

10:34:54  18   they then want to have, right?

10:34:56  19   A.  That they didn't want to have?

10:34:58  20   Q.  No, that they do want to have.  They're try --

10:35:01  21   A.  That they do want to have, yes, sir.

10:35:03  22   Q.  They're trying to set out the ground rules for this

10:35:05  23   discussion they want to have?

10:35:06  24   A.  Yes, sir.

10:35:06  25   Q.  So they go on to agree to certain points or try to

| | | |
|---|---|---|
| 10:35:10 | 1 | agree to certain points, and the first is that the |
| 10:35:13 | 2 | communications concerning this, they say in Part 2 -- |
| 10:35:17 | 3 | MR. BUNT:  Your Honor, may we approach the bench |
| 10:35:19 | 4 | for a moment? |
| 10:35:19 | 5 | THE COURT:  Approach the bench. |
| 10:35:21 | 6 | (Bench conference.) |
| 10:35:29 | 7 | THE COURT:  Yes, Mr. Bunt? |
| 10:35:31 | 8 | MR. BUNT:  Your Honor, a portion that they're |
| 10:35:33 | 9 | holding up is the portion that was objected to during all |
| 10:35:37 | 10 | the pre-trial hearings about getting into 408-type |
| 10:35:41 | 11 | discussions, and we wouldn't be able to use it for |
| 10:35:43 | 12 | litigation purposes and stuff like that. |
| 10:35:45 | 13 | This all was dealt with before, and it wasn't |
| 10:35:47 | 14 | supposed to be gone into.  It was all supposed to have been |
| 10:35:51 | 15 | redacted out.  It was just supposed to be the notice |
| 10:35:53 | 16 | provision that was coming in. |
| 10:35:56 | 17 | MR. HILL:  Your Honor, this is their exhibit.  It |
| 10:35:58 | 18 | was our objection on 408 that you shouldn't let it in.  You |
| 10:36:02 | 19 | overruled our objection, and you did let it in.  They put |
| 10:36:04 | 20 | the exhibit in front of the jury.  I'm trying to discuss |
| 10:36:05 | 21 | their exhibit with their witness they used before the jury. |
| 10:36:08 | 22 | This is in evidence. |
| 10:36:10 | 23 | MR. SHEASBY:  Your Honor, this is an express |
| 10:36:12 | 24 | portion that discusses -- they're going to try to suggest |
| 10:36:14 | 25 | that USAA is breaking a deal by using this email. |

10:36:17   1          THE COURT:  Well, my question is, Mr. Bunt's
10:36:21   2   indicated that this was an unredacted document that the
10:36:24   3   Court ordered redacted when it admitted it, and Mr. Hill's
10:36:28   4   telling me that's not the case.  It can't be both ways.
10:36:31   5          Is this the correct document as pre-admitted by
10:36:34   6   the Court?
10:36:34   7          MR. SHEASBY:  Your Honor, my understanding is it's
10:36:37   8   not, that this document -- that we had an agreement that we
10:36:39   9   were not going to discuss any of the 408 --
10:36:41  10          THE COURT:  I'm not talking about an agreement.
10:36:43  11   I'm talking about the Court's ruling.
10:36:43  12          MR. SHEASBY:  No, no.  My understanding is your
10:36:45  13   order that we could not discuss the FRE 408 portions.  The
10:36:52  14   only thing that was coming in was the notice.
10:36:52  15          MR. HILL:  Your Honor, that's the point.  So they
10:36:54  16   got this in by you in pre-trial by telling you they were
10:36:58  17   going to use it to show -- this was the notice of the
10:36:59  18   patents for marking.
10:37:00  19          But what they did is they took their damage expert
10:37:03  20   and they put it on a slide and they said they asked us to
10:37:08  21   take a license.  Those will be on just a notice use.  And
10:37:08  22   so I get to show through their witness that, in fact, they
10:37:11  23   didn't ask us to take a license.  What they did is tried to
10:37:14  24   agree on terms to have discussions, and that's all this
10:37:17  25   email exchange shows.

10:37:19   1          MR. SHEASBY:  You can do that without publishing

10:37:21   2    the part that says.  This shall not be used for any other

10:37:24   3    purpose and it violates FRE 408.  So we can skip all beyond

10:37:28   4    this and not go over the controversial part by just not

10:37:32   5    publishing the email and because this says about you will

10:37:35   6    not use it for any other purpose, and there's going to be

10:37:38   7    an implication that we have acted improperly by using this

10:37:41   8    email.

10:37:42   9          MR. HILL:  Your Honor, you'll recall that was our

10:37:43   10   position at pre-trial is that we thought they were

10:37:43   11   contractually hamstrung -- that we thought they were

10:37:47   12   contractually hamstrung from using this exhibit.  They said

10:37:51   13   no.  And the Court ruled they weren't; that they could use

10:37:53   14   it and it was all coming in.

10:37:54   15         And this document is in evidence by the Plaintiff

10:37:57   16   with no redactions, and so I'm entitled to examine the

10:38:00   17   witness about it.

10:38:03   18         MR. SHEASBY:  Your Honor, if the proper redactions

10:38:07   19   were not made, that's my responsibility.  But this is

10:38:12   20   highly, highly toxic and inflammatory material.  It's

10:38:16   21   talking about FR -- FRE 408 which the Judge -- which the

10:38:21   22   jury does not know about.  This has no place in front of

10:38:23   23   the jury.

10:38:24   24         MR. HILL:  They shouldn't have worked so hard to

10:38:26   25   get it in, Judge.  They should have --

| | | |
|---|---|---|
| 10:38:27 | 1 | THE COURT:  All right.  All right.  Is it your |
| 10:38:31 | 2 | intention to use this particular page in its entirety, |
| 10:38:34 | 3 | Mr. Hill? |
| 10:38:34 | 4 | MR. HILL:  The portion that I have displayed, |
| 10:38:36 | 5 | which was here up.  And my point here, Your Honor, is to |
| 10:38:39 | 6 | show that this was parties trying to agree to have a |
| 10:38:41 | 7 | candid, confidential conversation; not a request to take a |
| 10:38:46 | 8 | license. |
| 10:38:47 | 9 | MR. SHEASBY:  You can do that without -- |
| 10:38:48 | 10 | MR. HILL:  The request to take a license factually |
| 10:38:52 | 11 | never occurred, we submit, because there was never an |
| 10:38:56 | 12 | actual offer made.  I'm, obviously, not going to get into |
| 10:38:57 | 13 | offers and that kind of thing.  But I'm entitled to show |
| 10:39:01 | 14 | that this is not what they purport it to be.  They put it |
| 10:39:04 | 15 | in evidence, pre-admitted -- |
| 10:39:06 | 16 | THE COURT:  If it's been pre-admitted without |
| 10:39:09 | 17 | redactions and if it's been used before the jury |
| 10:39:13 | 18 | heretofore, then it's in evidence. |
| 10:39:14 | 19 | MR. SHEASBY:  Your Honor, the document is in |
| 10:39:18 | 20 | evidence.  The statement or suggestion that USAA has acted |
| 10:39:23 | 21 | improperly by putting this document in evidence, which is |
| 10:39:28 | 22 | the purpose of that paragraph, is not a proper -- is not |
| 10:39:31 | 23 | something that should go before the jury. |
| 10:39:33 | 24 | And so I would -- if there was a mistake, a |
| 10:39:36 | 25 | mistake was made.  But the whole purpose of this was the |

10:39:40  1  Court ruled that it was properly used outside the

10:39:43  2  agreement.  And to now cast an aspersion on USAA that

10:39:47  3  they've acted improperly through this agreement is just --

10:39:50  4  it's -- it's very, very, very toxic to the jury.

10:39:54  5       THE COURT:  Tell me, Mr. Hill, what's your

10:39:57  6  intent -- what you're trying to get across with this.

10:40:00  7       MR. HILL:  Yes, Your Honor.  I haven't cast any

10:40:01  8  aspersions on this document.  And my point is not to say

10:40:04  9  that they breached their contract.

10:40:05  10      My point is to say that this was an attempt by

10:40:08  11  parties to have a candid, confidential conversation where

10:40:12  12  they openly discuss things without worries of future

10:40:17  13  repercussions.  That's what the parties were trying to

10:40:19  14  negotiate.

10:40:19  15      MR. SHEASBY:  This is not --

10:40:20  16      MR. HILL:  This is not an ask for a license.

10:40:21  17      MR. SHEASBY:  Your Honor, we'll stipulate to that.

10:40:24  18  You can give that instruction to the jury.

10:40:28  19      MR. MELSHEIMER:  Your Honor, this exhibit is in

10:40:30  20  evidence.

10:40:30  21      THE COURT:  I understand it's in evidence.

10:40:31  22      MR. MELSHEIMER:  If it's in evidence, you get to

10:40:33  23  use it for any purpose.  They didn't limit it.  This will

10:40:37  24  be going back on what we've done with every other exhibit.

10:40:39  25      THE COURT:  Well, Mr. Melsheimer, first of all,

10:40:42  1  these are the two lawyers who have this witness.  I'm going

10:40:45  2  to hear from them and not from everybody else.

10:40:47  3       Let me see it again.  Which part of this have you

10:41:07  4  got displayed or you intend to?

10:41:10  5       MR. HILL:  What I have, Your Honor, is right here,

10:41:11  6  this first part --

10:41:11  7       THE COURT:  Paragraphs -- Subparagraphs 1 and 2?

10:41:13  8       MR. HILL:  On then, also, 3, it says:  The

10:41:16  9  contents of any documents or other communications shall be

10:41:17  10  deemed kept strictly confidential.

10:41:22  11       MR. BUNT:  Your Honor, that serves no other

10:41:24  12  purpose than to show that we're somehow violating the

10:41:27  13  agreement.

10:41:30  14       MR. HILL:  Those are the facts, Your Honor.  We

10:41:34  15  are entitled to that.  They argued to get it in with

10:41:48  16  respect to their agreement, Your Honor.  They can't have it

10:41:51  17  both ways.

10:42:08  18       THE COURT:  Well, it's in evidence.  It's been

10:42:10  19  admitted without a redaction.  I'm not going to reopen

10:42:14  20  exhibits or try to impose a redaction that's not there now

10:42:19  21  in the middle of trial.

10:42:20  22       Rule 408 is still Rule 408, Mr. Hill.

10:42:24  23       MR. HILL:  Yes, sir.

10:42:25  24       THE COURT:  I don't expect you to try to tar and

10:42:28  25  feather the Plaintiff with some violation of a settlement

| | | |
|---|---|---|
| 10:42:31 | 1 | agreement before some -- you know, I -- I'm not going to |
| 10:42:37 | 2 | permit it to be used in express contravention of what |
| 10:42:41 | 3 | Rule 408 stands for. |
| 10:42:43 | 4 | MR. HILL:  Absolutely. |
| 10:42:44 | 5 | THE COURT:  But outside of that, it's free to be |
| 10:42:46 | 6 | used. |
| 10:42:46 | 7 | MR. HILL:  Thank you. |
| 10:42:47 | 8 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 10:42:47 | 9 | (Bench conference concluded.) |
| 10:42:51 | 10 | THE COURT:  Let's proceed. |
| 10:42:53 | 11 | MR. HILL:  Thank you, Your Honor. |
| 10:42:54 | 12 | Q.  (By Mr. Hill)  Mr. Weinstein -- |
| 10:42:55 | 13 | MR. HILL:  Can we have Exhibit 162, again, |
| 10:42:59 | 14 | Mr. Barnes, the section we were on? |
| 10:43:02 | 15 | Q.  (By Mr. Hill)  All right.  Mr. Weinstein, we were |
| 10:43:04 | 16 | looking at this document.  We had looked at the first two |
| 10:43:07 | 17 | pages, and, as I mentioned, these are terms that are being |
| 10:43:10 | 18 | discussed to have discussions, right? |
| 10:43:12 | 19 | A.  Yes, sir. |
| 10:43:12 | 20 | Q.  And the parties are trying to agree here on how they |
| 10:43:15 | 21 | can have a candid, confidential, open discussion, right? |
| 10:43:21 | 22 | A.  That's fair. |
| 10:43:22 | 23 | Q.  They're discussing how they can exchange documents |
| 10:43:26 | 24 | without those documents being used later, right? |
| 10:43:30 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 10:43:32 | 1 | MR. HILL:  If we can go -- scroll down some, |
| 10:43:35 | 2 | Mr. -- Mr. Barnes. |
| 10:43:38 | 3 | Q.  (By Mr. Hill)  They're discussing in Part 3 how they're |
| 10:43:40 | 4 | going to keep the contents of their discussions and their |
| 10:43:44 | 5 | correspondence confidential so that they can have open, |
| 10:43:48 | 6 | candid exchanges, right? |
| 10:43:49 | 7 | A.  Yes, sir. |
| 10:43:49 | 8 | Q.  And this is -- what the rest of this email string |
| 10:43:53 | 9 | shows, if we go back up to the next page, 8, 7, 6 -- emails |
| 10:43:58 | 10 | run back to front. |
| 10:44:00 | 11 | MR. HILL:  Let's not go that fast, Mr. Barnes. |
| 10:44:02 | 12 | Let's go to Page 6, for instance. |
| 10:44:05 | 13 | Q.  (By Mr. Hill)  What we see here is Wells Fargo's folks |
| 10:44:11 | 14 | and the people for -- the lawyer for USAA, they're having a |
| 10:44:15 | 15 | back-and-forth about these terms.  Do you see that? |
| 10:44:18 | 16 | A.  I do. |
| 10:44:19 | 17 | MR. HILL:  Let's go to the next page, Mr. Barnes, |
| 10:44:21 | 18 | 5. |
| 10:44:22 | 19 | Q.  (By Mr. Hill)  And the Wells Fargo folks are talking to |
| 10:44:28 | 20 | them, and they're discussing -- they're trying to iron out |
| 10:44:32 | 21 | these terms.  And they're talking about, you know, what |
| 10:44:35 | 22 | they're uncomfortable with.  Here are some steps forward. |
| 10:44:39 | 23 | Let's go back to the original proposal.  Let's find |
| 10:44:42 | 24 | alternative language, having this back-and-forth.  It's not |
| 10:44:47 | 25 | anybody just ignoring somebody, is it? |

10:44:49   1   A.   No, they're having a conversation about the terms.

10:44:52   2   Q.   And if we look at the dates as we go through, we see

10:44:55   3   this conversation is taking a little time?

10:44:59   4   A.   It is.

10:45:00   5   Q.   Move from August -- we're now to November.

10:45:03   6          MR. HILL:   Go to the next page, 4, please.

10:45:07   7   Q.   (By Mr. Hill)   Here we are, again, now in December,

10:45:10   8   still going back and forth on these terms.   And both sides

10:45:13   9   are suggesting changes and edits.   It's a two-way

10:45:17  10   conversation, agree?

10:45:18  11   A.    Agree.

10:45:19  12          MR. HILL:   And we go to Page 3.   Page 2.   Page 1.

10:45:29  13   Q.   (By Mr. Hill)   Ultimately, we see that they've agreed

10:45:32  14   on terms finally in February of 2018, and they start trying

10:45:39  15   to exchange some information.   Complex negotiations of this

10:45:45  16   sort over documents is not uncommon in the business world,

10:45:48  17   is it, sir?

10:45:49  18   A.   That's correct.

10:45:49  19   Q.   And they take a little time sometimes?

10:45:53  20   A.   Yes, sir.

10:45:53  21   Q.   And often the time just to iron out talks is short

10:46:00  22   compared to the time for them trying to iron out the

10:46:04  23   substantive differences, right?

10:46:05  24   A.   I'm not sure I understand your question, but -- but it

10:46:12  25   takes -- it takes time to iron out all of this.

10:46:15  1   Q.  And you agree with me, Mr. Weinstein, as we established

10:46:18  2   earlier on the timeline, USAA filed this lawsuit against

10:46:23  3   Wells Fargo in June of 2018?

10:46:25  4   A.  Yes, sir.

10:46:25  5   Q.  Did you find in the agreement, as you looked for it,

10:46:31  6   what we started with, to show me where they asked us to

10:46:35  7   take a license?

10:46:36  8   A.  Well, I don't know -- I don't see that specific

10:46:41  9   language, but, obviously, that's what this was about.

10:46:44  10  Q.  It's not in there, is it, Mr. Weinstein?  There's no

10:46:46  11  ask to take a license in Exhibit 162, is there, sir?

10:46:50  12  A.  That's true.

10:46:51  13  Q.  All right.  Let's talk about two last topics,

10:46:57  14  Mr. Weinstein.

10:46:57  15       I looked at your CV that you gave us timely when

10:47:01  16  we started this -- your expert report -- when you gave us

10:47:03  17  your expert report.  You have to tell us, under the rules,

10:47:07  18  work you've done the past four years, right?

10:47:11  19  A.  Yeah, I have to tell something about consulting

10:47:15  20  engagements and testimony in recent years, that's true.

10:47:17  21  Q.  And, Mr. Weinstein, I looked at that list that you gave

10:47:20  22  us, and you had -- by my account, you had 28 engagements on

10:47:28  23  it.  Sound right?

10:47:34  24  A.  That sounds about right.  I -- I don't see it in front

10:47:37  25  of me, but that sounds right.

10:47:38   1   Q.   Okay.

10:47:39   2   A.   I wouldn't be surprised.

10:47:41   3   Q.   And of those 28 engagements, Mr. Weinstein, I counted

10:47:44   4   up there -- you tell us whether you are working for

10:47:47   5   Plaintiff or Defendant for each of those, don't you, sir?

10:47:49   6   A.   Yes, sir, I do.

10:47:50   7   Q.   And if we look at those 28, 27 of the 28 are for the

10:47:55   8   Plaintiff, correct?

10:47:55   9   A.   That sounds right.

10:47:56  10   Q.   So in the last four years, you've testified almost

10:48:00  11   exclusively for Plaintiffs in lawsuits, correct?

10:48:03  12   A.   When I'm testifying, that's true, yes, sir.

10:48:05  13   Q.   And then last thing, Mr. Weinstein, you're being paid

10:48:08  14   for your work in this case, correct?

10:48:10  15   A.   No, my -- the company I work for, Micronomics, receives

10:48:17  16   compensation for my time, but I'm an employee.  I don't own

10:48:21  17   Micronomics.

10:48:21  18   Q.   Well, you're a -- you're a partner.  You have some

10:48:24  19   ownership in the company?

10:48:25  20   A.   No, sir, I have zero ownership.  I'm an employee.

10:48:28  21   Q.   But your time is not for free, correct?

10:48:30  22   A.   Correct.  My time is not for free.  The company that I

10:48:34  23   work for is compensated for my time.

10:48:35  24   Q.   And what rate does your company charge for your time,

10:48:38  25   Mr. Weinstein?

```
10:48:38   1   A.  $750.00 per hour.
10:48:40   2   Q.  And how many hours have you charged -- has your company
10:48:44   3   charged USAA for your work in this case?
10:48:46   4   A.  Well, up to October, it was about 125 hours, and there
10:48:54   5   have been a fair number of hours since then.
10:48:57   6   Q.  Okay.  And so what do you think is the total amount
10:49:00   7   your company is going to be owed by USAA for your work in
10:49:02   8   this case?
10:49:04   9   A.  Well, we'd have to do the math again, but it's probably
10:49:09  10   200 hours of me, times 750, would be $150,000.00, plus time
10:49:17  11   spent by my staff, so somewhere in the neighborhood of
10:49:23  12   200 -- $250,000.00 would be the charge to USAA by
10:49:29  13   Micronomics.
10:49:31  14   Q.  Thank you, Mr. Weinstein.
10:49:33  15          MR. HILL:  I'll pass the witness, Your Honor.
10:49:34  16          THE COURT:  Redirect, Mr. Bunt?
10:49:36  17          MR. BUNT:  Yes, Your Honor.
10:49:38  18          THE COURT:  Are you going to use these
10:49:39  19   demonstratives?
10:49:40  20          MR. BUNT:  I don't believe so, Your Honor.
10:49:42  21          THE COURT:  Then Mr. Hill needs to take them down.
10:50:06  22          You may proceed with your redirect.
10:50:08  23          MR. BUNT:  Thank you, Your Honor.
10:50:08  24                       REDIRECT EXAMINATION
10:50:10  25   BY MR. BUNT:
```

| | | |
|---|---|---|
| 10:50:10 | 1 | Q.  Good morning, Mr. Weinstein. |
| 10:50:11 | 2 | A.  Good morning. |
| 10:50:12 | 3 | Q.  Let's start where we left off.  Over the course of your |
| 10:50:15 | 4 | career, have you worked for both -- provided consulting |
| 10:50:19 | 5 | services for both Plaintiffs and Defendants in lawsuits and |
| 10:50:22 | 6 | in general litigation matters? |
| 10:50:24 | 7 | A.  Yes, sir, I have. |
| 10:50:27 | 8 | Q.  And you testified that the rate that you charge for |
| 10:50:31 | 9 | services -- that your company charges for services, is it |
| 10:50:36 | 10 | your understanding that Wells Fargo's damage expert also |
| 10:50:39 | 11 | charges for his time or his company charges for the time? |
| 10:50:43 | 12 | A.  Yes, sir. |
| 10:50:44 | 13 | Q.  Is that fairly standard in this industry? |
| 10:50:46 | 14 | A.  It is. |
| 10:50:47 | 15 | Q.  So if we could reorient ourselves, I'd like to go to |
| 10:50:52 | 16 | the timeline that was provided during the Plaintiff's |
| 10:50:56 | 17 | opening statement. |
| 10:50:57 | 18 |      MR. BUNT:  I believe this was Slide No. 19, |
| 10:51:01 | 19 | Mr. Huynh.  There we go. |
| 10:51:43 | 20 | Q.  (By Mr. Bunt)  So at the beginning of this, back in |
| 10:51:49 | 21 | August of 2009, we have USAA launching general -- first |
| 10:51:59 | 22 | generation MRDC.  Do you see that, sir? |
| 10:52:01 | 23 | A.  I do, sir. |
| 10:52:01 | 24 | Q.  And I believe there was a reference made the other day, |
| 10:52:05 | 25 | or possibly in -- in Mr. Hill's timeline, about 2008, Mitek |

10:52:14  1  announcing a first app.  Do you recall testimony from

10:52:17  2  Mr. Bueche regarding whether that Mitek app actually worked

10:52:21  3  at that point?

10:52:22  4  A.  You know, I was -- I was here for his testimony.  I

10:52:26  5  don't recall it specifically.

10:52:27  6  Q.  And then if we'll look on here, in August -- it's your

10:52:32  7  understanding that in August of 2009, USAA launched its

10:52:37  8  MRDC -- it's first generation MRDC system, correct?

10:52:42  9  A.  Yes, that's my understanding.

10:52:43  10  Q.  And then also in August of 2009, USAA filed its patents

10:52:51  11  for the -- the patents that are involved in this suit; is

10:52:54  12  that your understanding?

10:52:57  13  A.  Yes, sir, it is.

10:52:58  14          MR. HILL:  Objection, leading, Your Honor.

10:53:01  15          THE COURT:  Restate your question, Mr. Bunt.

10:53:03  16          MR. BUNT:  Sure.

10:53:04  17  Q.  (By Mr. Bunt)  When did USAA file for the

10:53:08  18  patents-in-suit?

10:53:08  19  A.  My recollection is that it was in 2009.

10:53:11  20  Q.  And then when was it that USAA actually launched its

10:53:17  21  auto capture Deposit@Mobile system?

10:53:21  22  A.  That was in 2013 --

10:53:23  23          MR. HILL:  Your Honor, may we approach?

10:53:24  24          THE COURT:  Approach the bench.

10:53:25  25          (Bench conference.)

10:53:31   1              MR. HILL:  I'm sorry, Your Honor.

10:53:31   2              And, Mr. Bunt.

10:53:32   3              Your Honor, but his co-counsel asked me to, he

10:53:35   4    would like me to obscure this demonstrative.

10:53:38   5              THE COURT:  We should turn it around.

10:53:40   6              One other thing while we're all up here -- let's

10:53:43   7    go off the record.

10:53:47   8              MR. HILL:  Yes, sir.

10:53:47   9              (Off-the-record discussion.)

10:53:49   10             THE COURT:  All right.  Let's go back on the

10:53:51   11   record.

10:53:51   12             (Bench conference concluded.)

10:54:06   13   Q.  (By Mr. Bunt)  And then, Mr. Weinstein, when was the

10:54:08   14   lawsuit filed in this case?

10:54:09   15   A.  June of 2018.

10:54:13   16   Q.  So there were some questions asked of you by Mr. Hill

10:54:16   17   at the beginning about the use of 2010, 2011, and 2012

10:54:24   18   documents during your direct examination yesterday.  Do you

10:54:27   19   recall those questions?

10:54:27   20   A.  I do.

10:54:28   21   Q.  Can you explain to us why did you use 2010 to 2012

10:54:34   22   documents for your explanation to the jury?

10:54:37   23   A.  I -- I considered those documents because it was during

10:54:40   24   that time period that Wells Fargo was confronting the need

10:54:48   25   to address the possibility of providing consumers with

10:54:53  1    MRDC.  And it's -- it's typical for companies to create

10:55:03  2    those kind of documents and do those kinds of studies in

10:55:06  3    advance of making decisions to launch new products like

10:55:09  4    MRDC.

10:55:11  5         So those are exactly the documents that I would

10:55:13  6    want to look at in order to get an idea as to what Wells

10:55:17  7    Fargo is -- is thinking about in connection with whether or

10:55:23  8    not it should provide this kind of functionality to its

10:55:26  9    customer base.

10:55:26 10    Q.  Now, do you recall in our direct examination yesterday

10:55:35 11    during the latter half -- the latter half of our

10:55:39 12    discussions, you actually walked the jury through the

10:55:41 13    calculations for damages?

10:55:46 14    A.  Yes, sir.

10:55:46 15    Q.  Did those damage numbers that you went through come

10:55:49 16    from the 2010 to 2012 time period, or do they come from a

10:55:55 17    different time period?

10:55:56 18    A.  No, the damage numbers reflect the benefits obtained by

10:56:06 19    Wells Fargo from using the patents beginning in 2016,

10:56:12 20    December 2016.  That is the damage period.

10:56:16 21    Q.  And then there were some questions asked of you earlier

10:56:20 22    about including things like cell phones, processors, bank

10:56:27 23    systems that clear checks, other ideas that may not be

10:56:30 24    attributable to these patents.  Are those -- are you

10:56:34 25    including those features in the damages that you say should

10:56:38  1   go to USAA?

10:56:39  2   A.  No, none of those features or those functionalities are

10:56:44  3   included in any way of the damages that I've calculated.  I

10:56:49  4   say that because the damages that I've calculated are

10:56:53  5   limited to the incremental contribution of the

10:56:57  6   patents-in-suit to the accused products here.  And the

10:57:08  7   results that I get are achieved after apportioning down by

10:57:13  8   that 40 percent figure that I testified to yesterday and

10:57:20  9   Mr. Calman testified to.

10:57:23  10          MR. BUNT:  Mr. Huynh --

10:57:23  11  A.  And that's a way of -- and let me just finish.  That's

10:57:27  12  a way of accounting for all of those multiple features.

10:57:30  13          MR. BUNT:  Mr. Huynh, could we go to

10:57:32  14  Mr. Weinstein's Demonstrative Slide No. 43 that we were

10:57:39  15  using yesterday?  Slide 43.

10:57:57  16  Q.  (By Mr. Bunt)  Is this the apportionment that you were

10:57:59  17  discussing a moment ago, Mr. Weinstein?

10:58:00  18  A.  Yes.  So the $932 million on the left reflects the

10:58:06  19  benefits associated with auto capture-enabled MRDC.

10:58:09  20  Q.  And the apportionment figure of 40 percent in the

10:58:13  21  middle, where did that number come from?

10:58:15  22  A.  That comes from the analyses conducted by Mr. Calman,

10:58:20  23  and so I used the results of those analyses to apportion

10:58:24  24  out all of the other kinds of features that contribute to

10:58:31  25  the $932 million so as to wind up with benefits that are

10:58:37  1  attributable to the patents-in-suit.

10:58:40  2          MR. BUNT:  And can we go to Slide No. 14,

10:58:43  3  Mr. Huynh?

10:58:45  4  Q.  (By Mr. Bunt)  What did Mr. Saffici have to say about

10:58:55  5  this value of the auto capture functionality that we're

10:58:57  6  discussing in this case?

10:58:58  7  A.  He said it's widely acknowledged as the foundation for

10:59:03  8  successful mobile check deposits.

10:59:06  9          MR. BUNT:  And then if we could go to Slide

10:59:08  10  No. 15.

10:59:10  11  Q.  (By Mr. Bunt)  And what did Mr. Ajami have to say about

10:59:14  12  this auto capture?

10:59:16  13  A.  He had no basis to disagree with the statement

10:59:23  14  contained in that Futurion Report that I was asked about

10:59:26  15  earlier today; that auto capture must now be treated as a

10:59:30  16  must-have feature.

10:59:31  17  Q.  Were you present for the opening statement that

10:59:36  18  Mr. Melsheimer gave yesterday [sic]?

10:59:38  19  A.  I was.

10:59:39  20          MR. BUNT:  Mr. Huynh, could you pull up

10:59:44  21  the afternoon transcript --

10:59:44  22  A.  The opening statement was maybe two days.

10:59:47  23  Q.  (By Mr. Bunt)  Two days, I apologize.

10:59:49  24          MR. BUNT:  Mr. Huynh, could you pull up the day

10:59:53  25  one afternoon transcript, Page 56, Lines 25 through

| | | |
|---|---|---|
| 10:59:58 | 1 | Page 57, Line 8? |
| 11:00:00 | 2 | Q.  (By Mr. Bunt)  So do you recall Mr. Melsheimer making a |
| 11:00:12 | 3 | comment that what USAA wanted to get rid of, and he held |
| 11:00:19 | 4 | out his hands, was they wanted to get rid of pushing the |
| 11:00:23 | 5 | button on the camera, and that's what's called auto |
| 11:00:25 | 6 | capture.  Do you recall that? |
| 11:00:26 | 7 | A.  I do. |
| 11:00:27 | 8 | Q.  And you've heard -- have you heard Mr. Hill refer |
| 11:00:31 | 9 | several times to the specific method, the specific auto |
| 11:00:38 | 10 | capture feature? |
| 11:00:38 | 11 | A.  Yes, sir. |
| 11:00:39 | 12 | Q.  And is that consistent -- this idea of just getting rid |
| 11:00:43 | 13 | of the pushing the camera button, is that consistent with |
| 11:00:47 | 14 | how Mr. Bueche described the value of the patented |
| 11:00:50 | 15 | technology? |
| 11:00:50 | 16 | A.  No. |
| 11:00:52 | 17 | Q.  What does the auto capture contribute to the whole MRDC |
| 11:00:58 | 18 | functionality? |
| 11:01:00 | 19 | A.  Well, it provides something to consumers that the |
| 11:01:05 | 20 | market is clearly insisting upon today, which is the |
| 11:01:10 | 21 | ability to easily effectuate a mobile deposit because the |
| 11:01:18 | 22 | functionality taught by the patents produces a successful |
| 11:01:25 | 23 | capture of -- of the -- of the check, which is what the |
| 11:01:30 | 24 | bank needs and what consumers are insisting upon. |
| 11:01:34 | 25 |         MR. BUNT:  Mr. Huynh, can we go to Mr. Weinstein's |

| | | |
|---|---|---|
| 11:01:37 | 1 | Slide No. 9? |
| 11:01:39 | 2 | Q.  (By Mr. Bunt)  Mr. Weinstein, is this the federal |
| 11:01:52 | 3 | statute that deals with damages in patent suits? |
| 11:01:54 | 4 | A.  Yes, sir. |
| 11:01:55 | 5 | Q.  And under this federal law that guides the Court and |
| 11:02:01 | 6 | the parties and experts like yourself and -- and |
| 11:02:07 | 7 | Dr. Gerardi, is the reasonable royalty based on the value |
| 11:02:10 | 8 | of the patent to USAA, or is it based on the value of the |
| 11:02:14 | 9 | patents to Wells Fargo? |
| 11:02:14 | 10 | A.  It's based on the value of the patents to Wells Fargo, |
| 11:02:19 | 11 | and that's why it says that payment should be for use made |
| 11:02:24 | 12 | of the invention by the infringer. |
| 11:02:31 | 13 |         MR. BUNT:  Let's turn to Slide No. 18 from your |
| 11:02:34 | 14 | presentation. |
| 11:02:39 | 15 | Q.  (By Mr. Bunt)  Does the value that you're considering |
| 11:02:41 | 16 | in this reasonable royalty analysis come from the benefits |
| 11:02:44 | 17 | that you discussed yesterday? |
| 11:02:47 | 18 | A.  Yes, sir. |
| 11:02:48 | 19 | Q.  And would you mind reorienting the jury as to what |
| 11:02:51 | 20 | those three benefits are? |
| 11:02:54 | 21 | A.  Sure.  The benefits are cost savings associated with |
| 11:03:00 | 22 | the fact that it costs Wells Fargo considerably less to |
| 11:03:06 | 23 | process a mobile deposit than it does to process a deposit |
| 11:03:09 | 24 | at the bank or by an ATM. |
| 11:03:12 | 25 |         It also produces cost savings for Wells Fargo that |

11:03:17   1   allows it to close branches and plan on closing additional

11:03:23   2   branches because of the growth of mobile deposits, such

11:03:31   3   that they don't need those branches anymore.  So those are

11:03:35   4   the cost selling -- saving elements.

11:03:38   5        The secondary has to do with increased profits

11:03:42   6   associated with mobile deposits that Wells Fargo makes.

11:03:45   7        And the third are the ecosystem benefits that they

11:03:48   8   get with respect to their brand name and reputation and the

11:03:52   9   fact that they can offer a product that consumers are

11:03:56   10  insisting upon.

11:03:59   11  Q.  So let's go to Slide No. 37 from your presentation.

11:04:02   12       I don't believe that there were questions asked of

11:04:05   13  you about the cost savings associated with moving from an

11:04:15   14  ATM or teller to mobile deposit, but there were some

11:04:18   15  questions raised about capital savings.  And can you remind

11:04:22   16  the jury what capital savings are?

11:04:24   17  A.  Yeah.  Those are savings associated with the fact that

11:04:28   18  Wells Fargo can serve as its customer base having fewer

11:04:32   19  branches, and that's consistent with the fact that they've

11:04:34   20  closed approximately 200 branches in the last year and have

11:04:38   21  published information indicating they plan to close 800

11:04:42   22  more branches.  And that's because of what mobile deposits

11:04:46   23  mean in terms of their ability to serve their current

11:04:50   24  customer base.

11:04:50   25  Q.  So there were some questions asked of you by Mr. Hill,

11:04:57    1    and he asked you to divide out the number of checks that

11:05:00    2    were being deposited in each branch and how many extra

11:05:04    3    checks that would be per teller, and I believe you said you

11:05:07    4    didn't disagree with the math.

11:05:08    5        Was there something else that you wanted to say

11:05:11    6    about that calculation that Mr. Hill was asking you about?

11:05:13    7    A.  Well, I think I've already -- I made the point.  The

11:05:17    8    point is clear, Bank of America is closing branches.  Wells

11:05:22    9    Fargo is closing branches.  Not only are they closing

11:05:25   10    branches, they're -- they're bragging about it in their

11:05:29   11    annual reports and in the trade press because what they're

11:05:33   12    doing is they're telling their shareholders that they're

11:05:36   13    serving their market better.  They're saving money by not

11:05:40   14    processing mobile deposits.  So that -- that's the point.

11:05:45   15        And with respect to this slide, what I did is I

11:05:48   16    took the information that was available, mostly from Wells

11:05:52   17    Fargo and then Bank of America, and was able to calculate a

11:05:57   18    minimum estimate of the amount of money that -- that is

11:06:02   19    being saved by virtue of the fact that the customer base

11:06:06   20    for Wells Fargo can be served with fewer branches, and that

11:06:12   21    was just the physical branch and the equipment in it.  It

11:06:16   22    didn't include land or the tellers or the administrators,

11:06:24   23    etc.  So there's a very significant savings here thanks to

11:06:28   24    mobile deposits.

11:06:28   25        MR. BUNT:  Mr. Huynh, can we go to Plaintiff's

11:06:30  1   Exhibit No. 14 and go to the third page, 14.3?  And could

11:06:37  2   we pull out the bullet point of Channel Optimization?  It's

11:06:43  3   under Secondary Benefits.

11:06:54  4   Q.  (By Mr. Bunt)  And, Mr. Weinstein, can you read that

11:06:57  5   first two sentences?

11:06:59  6   A.  It says:  Directional savings from redistributing

11:07:02  7   deposit transactions from more costly store/ATM channels.

11:07:08  8   Benefits include teller reallocation of resources when we

11:07:12  9   reach high enough volumes.

11:07:14  10  Q.  What does that tell you about the use of teller's time

11:07:17  11  if they have an adequate MRDC system?

11:07:19  12  A.  Well, it says that existing tellers would be freed up

11:07:28  13  to do other functions, rather than stand there and accept

11:07:32  14  deposits.

11:07:32  15  Q.  There were also some questions asked of you about the

11:07:39  16  last category of benefits, ecosystem benefits and Zelle.

11:07:44  17  Do you recall those questions, Mr. Weinstein?

11:07:45  18  A.  I do.

11:07:46  19  Q.  And I believe there was a suggestion that banks, like

11:07:52  20  Wells Fargo, share Zelle with other banks.  Do you recall

11:07:55  21  that statement?

11:07:58  22  A.  I'm not sure about the statement.  They don't share it.

11:08:01  23  There's a consortium of banks that provide it in exchange

11:08:06  24  for fees that banks like USAA have to pay that consortium

11:08:13  25  whenever there's a Zelle transaction.

11:08:14  1   Q.  And what is the ecosystem benefit of mobile deposit to

11:08:19  2   Wells Fargo?

11:08:20  3   A.  Well, when -- when banks like Wells Fargo provide more

11:08:30  4   services to customers, what they're doing is they're making

11:08:32  5   their bank more desirable.  So the ecosystem benefit in

11:08:35  6   this case is by -- is that by offering Zelle, for instance,

11:08:43  7   it encourages customers to bank with that bank because that

11:08:46  8   service is available.

11:08:47  9        And so I use an estimate of the fees charged by

11:08:51  10  this consortium of banks that include Wells Fargo when

11:08:58  11  Zelle is used as an estimate of the ecosystem benefit.

11:09:00  12  Q.  And does Zelle -- with the Zelle, are the features free

11:09:06  13  to the customers who are using it?

11:09:07  14  A.  Yes, sir.

11:09:09  15  Q.  Is the mobile deposit feature free to customers who are

11:09:13  16  using it?

11:09:14  17  A.  It is.

11:09:15  18  Q.  Do -- does Zelle and MRDC cost banks money to offer to

11:09:22  19  their customers?

11:09:25  20  A.  Yes, they do.

11:09:26  21  Q.  Do both Zelle and MRDC involve access to funds?

11:09:30  22  A.  Yes.

11:09:31  23  Q.  Are both Zelle and MRDC digital tools?

11:09:37  24  A.  They are.

11:09:37  25  Q.  Do both of them involve money movement?

11:09:41  1    A.  They do.

11:09:43  2    Q.  Do you have an opinion as to whether both of them drive

11:09:46  3    people or customers to apps?

11:09:48  4    A.  Yeah, they each contribute to bringing customers to

11:09:51  5    apps.  That's why they're provided.

11:09:53  6    Q.  And so just one final time, if you could explain what

11:10:01  7    your use of Zelle is, for the jury's purposes, for your

11:10:06  8    calculations?

11:10:06  9    A.  I -- I use an estimate of the cost that banks incur to

11:10:09  10   process a Zelle transaction, which is 60 cents.  That

11:10:15  11   provides banks with an ecosystem benefit which they

11:10:18  12   recognize as a benchmark for estimating the ecosystem

11:10:23  13   benefit that's provided to Wells Fargo in connection with

11:10:26  14   its use of the -- the patents-in-suit.

11:10:31  15   Q.  Mr. Weinstein --

11:10:36  16        MR. BUNT:  Actually, Mr. Huynh, could you turn to

11:10:38  17   Plaintiff's Exhibit No. 5, the first page?

11:10:46  18   Q.  (By Mr. Bunt)  Mr. Weinstein, can you identify this

11:10:48  19   document for the ladies and gentlemen of the jury?

11:10:50  20   A.  Yes.  This is the Futurion Report that I was asked

11:10:54  21   about during my cross-examination.  It's also a document

11:10:58  22   that I've seen before and relied on in connection with my

11:11:01  23   work.

11:11:01  24        MR. BUNT:  And let's take a look at the second

11:11:06  25   page of that document.

11:11:07   1   Q.  (By Mr. Bunt)  And do you see where it says "the bar

11:11:15   2   has risen"?

11:11:16   3              MR. BUNT:  Call that out.

11:11:17   4   A.  Yes.

11:11:18   5   Q.  (By Mr. Bunt)  And then if you could read -- well, just

11:11:20   6   read that first sentence, if you don't mind, after "the bar

11:11:24   7   has risen."

11:11:25   8   A.  It says:  The bar has risen with customer experience

11:11:30   9   rankings, shifting from 2016.  Wells Fargo climbed sixth

11:11:35   10  place last year to second place this year with an improved

11:11:38   11  user experience and great use of real-time capabilities,

11:11:42   12  while Chase slipped from the top 10 due to such areas as

11:11:48   13  manual capture.

11:11:48   14  Q.  So where was Chase before 2017 with its rankings?

11:11:56   15  A.  Well, we know from this that it was in the top 10.

11:12:00   16  Q.  And according to the author of Futurion, it slipped

11:12:04   17  from the top 10 due to areas such as what?

11:12:07   18  A.  Manual capture.

11:12:12   19              MR. BUNT:  And then if we could go to Plaintiff's

11:12:14   20  Exhibit No. 256.

11:12:17   21  Q.  (By Mr. Bunt)  And if you could tell the ladies and

11:12:22   22  gentlemen of the jury what we're looking at now?

11:12:24   23  A.  So this is the -- the same report -- Futurion Report,

11:12:27   24  except it's for the next year, 2018.  We've been looking at

11:12:30   25  the one for 2017.

11:12:31  1   Q.  So do you recall Mr. Hill asking you questions about

11:12:35  2   the fact that Chase was able to offer manual capture and do

11:12:40  3   fine with its business?

11:12:42  4   A.  I do.

11:12:44  5        MR. BUNT:  So let's take a look at the second page

11:12:47  6   of PX-256.2, and if we could go to the third paragraph.

11:13:01  7   A.  I see it.

11:13:01  8   Q.  (By Mr. Bunt)  Okay.  And does this say something about

11:13:06  9   Chase in this?

11:13:06  10  A.  Yes.  So this -- this report, which is 2018, a year

11:13:12  11  after the previous report, points out that Chase made what

11:13:17  12  are described as dramatic upgrades, including adding --

11:13:21  13  adding auto capture, which allowed it to leap from the

11:13:26  14  bottom third in 2017 to the top third, namely sixth place.

11:13:32  15  Q.  And to what did the Futurion author attribute that leap

11:13:36  16  to?

11:13:37  17  A.  The leap is attributed, at least in this sentence, to

11:13:43  18  Chase's addition of auto capture functionality.

11:13:48  19        MR. BUNT:  Mr. Huynh, could we go to Mr. Calman's

11:13:53  20  slides, No. PDX-3.8?

11:14:02  21  Q.  (By Mr. Bunt)  Mr. Weinstein, Mr. Hill was asking you

11:14:05  22  some questions about the difference that USAA experienced

11:14:09  23  in its failure rates before auto capture and after auto

11:14:13  24  capture.  Do you recall that -- that colloquy you had with

11:14:16  25  him?

11:14:19   1   A.   I do.

11:14:20   2   Q.   And he -- he drew up on the board that there was a

11:14:22   3   16 percent failure rate before, and then, afterwards, there

11:14:25   4   was a 9 percent failure rate.  Do you recall that?

11:14:28   5   A.   I do.

11:14:30   6   Q.   And does that discussion fully capture the value of the

11:14:38   7   auto capture, the 7 percent?

11:14:43   8   A.   Well, no, and as -- as was pointed out yesterday,

11:14:49   9   the -- the rate of failure actually increased by more than

11:14:56  10   41 percent, but it's -- it's all -- it's apparent from the

11:15:00  11   numbers themselves.

11:15:02  12            In other words, there's -- you go from 16 percent

11:15:06  13   failure rate to 9 percent failure rate.  And one way of

11:15:10  14   looking at that is a 7 percent change, but actually it's a

11:15:15  15   41 percent reduction in the failure rate.

11:15:16  16            MR. BUNT:  Can we see, Mr. Huynh, Plaintiff's

11:15:18  17   Exhibit No. 31, Page 11?

11:15:27  18   Q.   (By Mr. Bunt)  And, Mr. Weinstein, is this data that

11:15:29  19   was provided by Wells Fargo concerning auto capture and

11:15:34  20   manual rates of success and failure?

11:15:36  21   A.   Yes.

11:15:37  22   Q.   And if we take a look here at the -- up at the top,

11:15:43  23   September of 2018, you'll see there's a -- in the second

11:15:48  24   column, it says:  MiSnap video.  Do you see that?

11:15:50  25   A.   I do.

| | | |
|---|---|---|
| 11:15:51 | 1 | Q.  And it's your understanding that that's for auto |
| 11:15:54 | 2 | capture? |
| 11:15:54 | 3 | A.  Correct. |
| 11:15:54 | 4 | Q.  And then if we go over to the right-hand column, what |
| 11:15:57 | 5 | is the failure rate for auto capture in September of 2018? |
| 11:16:04 | 6 | A.  11 percent. |
| 11:16:04 | 7 | Q.  And then if we go down to the MiSnap manual rate, this |
| 11:16:10 | 8 | is -- is that Wells Fargo's manual capture? |
| 11:16:14 | 9 | A.  Yes, sir. |
| 11:16:14 | 10 | Q.  And then what is the failure rate for September 2018? |
| 11:16:23 | 11 | A.  35 percent. |
| 11:16:25 | 12 | Q.  And so the difference in failure and success rates |
| 11:16:31 | 13 | is -- is 11 percent failure for auto capture, and it's 35 |
| 11:16:35 | 14 | percent for manual? |
| 11:16:36 | 15 | A.  Yes, sir. |
| 11:16:36 | 16 | Q.  And then if we skip down to, let's say, September of |
| 11:16:43 | 17 | 2018 for the Android product, what is the auto capture |
| 11:16:48 | 18 | failure rate? |
| 11:16:49 | 19 | A.  It's about 12 percent. |
| 11:16:56 | 20 | Q.  And then if we go down to September 18 -- September |
| 11:17:01 | 21 | 2018, the MiSnap manual, what is the failure rate for that? |
| 11:17:05 | 22 | A.  38 percent. |
| 11:17:06 | 23 | Q.  Are there costs associated with these failure rates? |
| 11:17:11 | 24 | A.  Yes, there are.  There are costs to the banks. |
| 11:17:16 | 25 | Q.  And what are those costs? |

11:17:18   1   A.  Well, the failure rate means that the bank now has to

11:17:21   2   figure out all of the details associated with that mobile

11:17:26   3   deposit.  So it's got to get the -- the account numbers

11:17:29   4   correct, and it's got to get the amounts correct and the

11:17:32   5   parties correct.  And so that has had to now be done

11:17:35   6   manually at the bank, and that requires the bank to incur

11:17:40   7   costs.

11:17:41   8   Q.  Now, do you recall being asked questions implying that

11:17:44   9   Wells Fargo could just simply switch to the manual capture

11:17:48   10  system instead of using auto capture?

11:17:51   11  A.  Yes.

11:17:55   12       MR. BUNT:  Mr. Huynh, can we pull up Plaintiff's

11:17:58   13  Exhibit 1062?

11:18:00   14  Q.  (By Mr. Bunt)  Mr. Weinstein, when did USAA start --

11:18:33   15  it's okay.  Mr. Weinstein, we'll -- we'll just move on.

11:18:36   16       When is your recollection of when Wells Fargo --

11:18:39   17  I'm sorry, when USAA began marking its mobile applications

11:18:45   18  with its patent numbers?

11:18:47   19  A.  You know, as I sit here, I don't have that in mind.

11:18:49   20  Q.  Do you recall that number to be December of 2016?

11:18:53   21  A.  Yes.  I mean, that's the beginning of the damage

11:18:56   22  period, so for sure by then.

11:18:58   23  Q.  And then Mr. Hill asked you a number of questions about

11:19:03   24  a letter or email that --

11:19:06   25       MR. BUNT:  Let's go back to PX-1062.

11:19:18  1   Q.  (By Mr. Bunt)  So does this show that in December of

11:19:20  2   2016 --

11:19:21  3              MR. BUNT:  If we could go a little farther down.

11:19:22  4   A.  Got it.

11:19:24  5   Q.  (By Mr. Bunt)  -- 2000 -- December of 2016, that

11:19:27  6   Wells -- I apologize -- that USAA began marking its mobile

11:19:30  7   application with its patent numbers?

11:19:32  8   A.  I believe so.

11:19:33  9   Q.  And then did USAA reach out and email back and forth

11:19:41  10  with Wells Fargo back in August of 2017 about licensing?

11:19:45  11  A.  Yes.  We -- we looked at that earlier.

11:19:48  12  Q.  Did Wells Fargo take a license to the patents after

11:19:52  13  receiving those emails from USAA?

11:19:55  14  A.  No.

11:19:56  15  Q.  Did Wells Fargo turn off the auto capture functionality

11:20:01  16  after it received those letters?

11:20:02  17  A.  It did not.

11:20:03  18  Q.  During the past two years and two months, has Wells

11:20:11  19  Fargo removed auto capture from its app?

11:20:12  20  A.  Not as far as I know, no.

11:20:14  21  Q.  You understand that it claims it could switch to just

11:20:18  22  as good manual functionality; is that your understanding?

11:20:21  23  A.  Yes, sir.

11:20:21  24  Q.  Has it switched over to this just as good manual

11:20:25  25  functionality?

| | | |
|---|---|---|
| 11:20:25 | 1 | A.  No.  It offers auto capture. |
| 11:20:27 | 2 | Q.  In fact, has Wells Fargo released new versions of the |
| 11:20:34 | 3 | accused auto capture functionality since receiving USAA's |
| 11:20:37 | 4 | letter back in 2017? |
| 11:20:39 | 5 | A.  It has. |
| 11:20:41 | 6 | MR. BUNT:  I'll pass the witness. |
| 11:20:43 | 7 | Thank you, sir. |
| 11:20:44 | 8 | THE COURT:  Is there additional cross, Mr. Hill? |
| 11:20:46 | 9 | MR. HILL:  Briefly, Your Honor. |
| 11:20:47 | 10 | THE COURT:  Counsel, approach the bench. |
| 11:20:50 | 11 | Mr. Bunt and Mr. Hill will be adequate. |
| 11:20:57 | 12 | (Bench conference concluded.) |
| 11:20:57 | 13 | MR. HILL:  I know you've got to go, Judge. |
| 11:20:57 | 14 | THE COURT:  How long are you going to need? |
| 11:20:58 | 15 | MR. HILL:  If you give me five minutes, I think I |
| 11:21:00 | 16 | can wrap it up. |
| 11:21:01 | 17 | THE COURT:  That's fine.  Let's go. |
| 11:21:03 | 18 | (Bench conference concluded.) |
| 11:21:05 | 19 | THE COURT:  Let's proceed. |
| 11:21:06 | 20 | MR. HILL:  Thank you, Your Honor. |
| 11:21:06 | 21 | RECROSS-EXAMINATION |
| 11:21:08 | 22 | BY MR. HILL: |
| 11:21:08 | 23 | Q.  Mr. Weinstein, I want to just hit a couple of things |
| 11:21:11 | 24 | that you discussed there with Mr. Bunt. |
| 11:21:19 | 25 | First off, Mr. Weinstein, you were talking about |

11:21:22  1  some opening statement comments by Mr. Melsheimer.  I want

11:21:25  2  to put up the rest of some context of what he said there

11:21:28  3  about ways to do mobile deposit.

11:21:30  4       And he went ahead and told the jury, I believe,

11:21:34  5  that, you're going to learn in the evidence that there are

11:21:35  6  multiple ways to do -- excuse me, I said mobile deposit.

11:21:38  7  Ways to do auto capture, and the Plaintiff has a specific

11:21:42  8  invention they got dealing with auto capture, but that's

11:21:45  9  not the only way to do it.

11:21:46  10       You understand that's our position in the case,

11:21:49  11  correct?

11:21:49  12  A.  I do, sir.

11:21:50  13  Q.  And we didn't conceal that from anybody in opening

11:21:53  14  statement, did we?

11:21:54  15  A.  No.

11:21:54  16  Q.  All right.  Now, let's take a look, Mr. Weinstein, at

11:22:08  17  PDX-4.43, the document you were just discussing with

11:22:21  18  Mr. Bunt, correct?

11:22:21  19  A.  Yes, sir.

11:22:21  20  Q.  Now, Mr. Weinstein, this is a mathematical calculation.

11:22:26  21  If this number is wrong because it's overinflated, this

11:22:31  22  number is also wrong, isn't it?

11:22:33  23  A.  Yes, sir.

11:22:34  24  Q.  That's the nature of the math?

11:22:35  25  A.  Yes, sir.

| | | |
|---|---|---|
| 11:22:36 | 1 | Q.  And you can agree with me that the 40 percent being |
| 11:22:40 | 2 | suggested here is not the same -- certainly a lot larger |
| 11:22:46 | 3 | number than the 8 percent we talked about earlier, isn't |
| 11:22:49 | 4 | it? |
| 11:22:49 | 5 | A.  Sure. |
| 11:22:53 | 6 | MR. HILL:  All right.  We can take that down. |
| 11:22:56 | 7 | Q.  (By Mr. Hill)  And just to be clear, when Mr. Calman |
| 11:22:58 | 8 | suggested that there was a 41 percent decrease in failure |
| 11:23:03 | 9 | rate, let's be clear about what he was doing.  He was |
| 11:23:06 | 10 | taking the difference between the success rate -- they said |
| 11:23:10 | 11 | they were at 84 percent for success, they moved to 91 -- he |
| 11:23:14 | 12 | was taking the difference, 16 percent, and the difference, |
| 11:23:20 | 13 | 9 percent, and then calculating a percentage between those, |
| 11:23:23 | 14 | wasn't he? |
| 11:23:24 | 15 | A.  He was. |
| 11:23:25 | 16 | Q.  And so 8 percent is the mathematically correct |
| 11:23:29 | 17 | calculation of the improvement in success rate when USAA |
| 11:23:34 | 18 | moved from manual to auto, correct, sir? |
| 11:23:37 | 19 | A.  That -- that's one of the calculations. |
| 11:23:49 | 20 | Q.  Now, Mr. Melsheimer -- or, excuse me, Mr. Weinstein, |
| 11:23:51 | 21 | we -- we saw our timeline earlier. |
| 11:23:54 | 22 | MR. HILL:  Can we put our timeline up, just on the |
| 11:23:57 | 23 | screen, Mr. Barnes?  I won't pull the big board back out. |
| 11:24:01 | 24 | Q.  (By Mr. Hill)  This is our timeline we were looking at |
| 11:24:05 | 25 | earlier on the board.  Remind us one last time, |

11:24:09  1   Mr. Weinstein, what is the date of this hypothetical

11:24:12  2   negotiation?

11:24:12  3   A.  It's back around March of 2015.

11:24:17  4          MR. HILL:  I'll pass the witness, Your Honor.

11:24:19  5          THE COURT:  Redirect?

11:24:19  6          MR. BUNT:  Yes, Your Honor.

11:24:24  7          Mr. Huynh, could you pull up Mr. Weinstein's Slide

11:24:27  8   No. 43?

11:24:34  9          THE TECHNICIAN:  43?

11:24:35  10         MR. BUNT:  Yes, sir.

11:24:35  11                    REDIRECT EXAMINATION

11:24:40  12  BY MR. BUNT:

11:24:40  13  Q.  Mr. Weinstein, this is a slide you were just talking

11:24:42  14  about with Mr. Hill.

11:24:43  15  A.  Yes, sir.

11:24:44  16  Q.  On the left-hand side, you've listed out the benefits

11:24:47  17  of auto-capture-enabled MRDC; is that right?

11:24:50  18  A.  Yes, sir.

11:24:50  19  Q.  Are these numbers based on data that you received from

11:24:56  20  Wells Fargo?

11:24:57  21  A.  They're based on Wells Fargo data that I used to

11:25:01  22  calculate the benefits that Wells Fargo obtained.

11:25:05  23  Q.  And then based on the apportionment you -- the insight

11:25:11  24  you gained from Mr. Calman, as well as the testimony you

11:25:13  25  received from other folks, you apportioned by 40 percent;

| | | |
|---|---|---|
| 11:25:17 | 1 | is that correct? |
| 11:25:17 | 2 | A.  Yes, sir. |
| 11:25:17 | 3 | Q.  And that led you to the total of $373 million that we |
| 11:25:22 | 4 | see on the bottom right-hand corner of this document? |
| 11:25:25 | 5 | A.  That is correct. |
| 11:25:27 | 6 | MR. BUNT:  And then, Mr. Huynh, if we can go to |
| 11:25:29 | 7 | Slide 45. |
| 11:25:30 | 8 | Q.  (By Mr. Bunt)  Out of that $373 million, if you can |
| 11:25:38 | 9 | just remind the jury one last time, how did you attribute |
| 11:25:41 | 10 | that to USAA and to Wells Fargo? |
| 11:25:42 | 11 | A.  So the $373 million is the amount attributed solely by |
| 11:25:49 | 12 | the patents, and the final step is to distribute that at |
| 11:25:55 | 13 | the hypothetical negotiation between Wells Fargo and USAA. |
| 11:25:59 | 14 | And the way I -- I had distributed it was to give |
| 11:26:03 | 15 | Wells Fargo the same rate of return that it gets at the |
| 11:26:06 | 16 | time on its equity out of that entire pie.  And that makes |
| 11:26:13 | 17 | Wells Fargo completely whole, apart from the fact that it |
| 11:26:17 | 18 | gets all those other benefits that we looked at, so it's |
| 11:26:21 | 19 | the return on equity that I used to distribute the |
| 11:26:28 | 20 | 373 million between the two. |
| 11:26:29 | 21 | Q.  And the total damages to USAA would be how much? |
| 11:26:32 | 22 | A.  $299.8 million. |
| 11:26:34 | 23 | MR. BUNT:  I pass the witness.  Thank you, sir. |
| 11:26:37 | 24 | THE COURT:  Additional cross-examination? |
| 11:26:38 | 25 | MR. HILL:  I have one question left, Your Honor. |

| | | |
|---|---|---|
| 11:26:42 | 1 | THE COURT:  I can count to one. |
| 11:26:44 | 2 | MR. HILL:  I know that's always a risky commitment |
| 11:26:46 | 3 | to make, Judge. |
| 11:26:55 | 4 | Mr. Barnes, can we see the slide we just had up of |
| 11:26:58 | 5 | PDX exhibits with the damages calculation, the 40 percent |
| 11:27:03 | 6 | in the middle?  There we go. |
| 11:27:03 | 7 | RECROSS-EXAMINATION |
| 11:27:10 | 8 | BY MR. HILL: |
| 11:27:10 | 9 | Q.  Mr. Weinstein, if this number right here in the jury's |
| 11:27:17 | 10 | estimation is not the value of auto-capture-enabled MRDC |
| 11:27:22 | 11 | but is just the value of MRDC, it's the wrong number, isn't |
| 11:27:28 | 12 | it? |
| 11:27:29 | 13 | A.  No, sir, it's the right number. |
| 11:27:31 | 14 | MR. HILL:  Pass the witness, Your Honor. |
| 11:27:33 | 15 | MR. BUNT:  Nothing further. |
| 11:27:34 | 16 | THE COURT:  Further redirect? |
| 11:27:35 | 17 | MR. BUNT:  No, Your Honor. |
| 11:27:36 | 18 | THE COURT:  All right.  You may step down, |
| 11:27:38 | 19 | Mr. Weinstein. |
| 11:27:38 | 20 | THE WITNESS:  Thank you, sir. |
| 11:27:43 | 21 | THE COURT:  Counsel, approach the bench, please. |
| 11:27:52 | 22 | (Bench conference.) |
| 11:27:54 | 23 | THE COURT:  Two depositions, 15 minutes in length? |
| 11:28:02 | 24 | Does that finish your case-in-chief? |
| 11:28:04 | 25 | MR. SHEASBY:  It does not. |

| 11:28:05 | 1 | THE COURT:  Then we'll recess and reconvene on |
| 11:28:08 | 2 | Monday. |
| 11:28:09 | 3 | MR. SHEASBY:  Thank you, Your Honor. |
| 11:28:09 | 4 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 11:28:10 | 5 | (Bench conference concluded.) |
| 11:28:10 | 6 | THE COURT:  Ladies and gentlemen of the jury, I |
| 11:28:14 | 7 | told you during jury selection that we would not be able to |
| 11:28:18 | 8 | conduct the trial this afternoon.  The President has |
| 11:28:24 | 9 | nominated, and the Senate has confirmed, a new United |
| 11:28:28 | 10 | States District Judge for the Eastern District of Texas. |
| 11:28:32 | 11 | He will be sworn in this afternoon. |
| 11:28:34 | 12 | Every district judge, every magistrate judge, |
| 11:28:37 | 13 | every federal judge from Beaumont to Plano will be there. |
| 11:28:42 | 14 | I have to preside as the Chief Judge of the district.  So |
| 11:28:45 | 15 | that's why we're not going to be able to conduct the trial |
| 11:28:48 | 16 | this afternoon. |
| 11:28:48 | 17 | We're going to recess until Monday morning at this |
| 11:28:52 | 18 | juncture.  I'm going to ask you to take your notebooks and |
| 11:28:55 | 19 | leave them on the table, over the weekend, in the jury |
| 11:28:59 | 20 | room. |
| 11:29:00 | 21 | I'll remind you, please carefully and scrupulously |
| 11:29:05 | 22 | follow all the instructions I've given you, including not |
| 11:29:07 | 23 | to discuss or communicate in any way with anyone about |
| 11:29:12 | 24 | what's happened during this trial or anything related to |
| 11:29:15 | 25 | this case.  What you do with the rest of the afternoon is |

| | | |
|---|---|---|
| 11:29:18 | 1 | up to you.  I will plan to see you back Monday morning at |
| 11:29:22 | 2 | our usual time to start as close to 8:30 as possible.  And |
| 11:29:26 | 3 | we will proceed from there. |
| 11:29:27 | 4 | With that, ladies and gentlemen, you're excused |
| 11:29:29 | 5 | until Monday morning. |
| 11:29:31 | 6 | COURT SECURITY OFFICER:  All rise. |
| 11:29:56 | 7 | (Jury out.) |
| 11:29:56 | 8 | THE COURT:  Does Plaintiff have anything that |
| 11:29:58 | 9 | needs to be raised with the Court before we recess? |
| 11:30:00 | 10 | MR. SHEASBY:  Nothing for Plaintiffs, Your Honor. |
| 11:30:04 | 11 | MR. HILL:  No, sir, Your Honor. |
| 11:30:05 | 12 | MR. MELSHEIMER:  Save travels, Your Honor. |
| 11:30:07 | 13 | THE COURT:  All right.  Counsel, I'll be in |
| 11:30:08 | 14 | chambers by 7:30 Monday morning.  I encourage you to meet |
| 11:30:13 | 15 | and confer over any issues so that we can minimize any |
| 11:30:13 | 16 | disputes. |
| 11:30:14 | 17 | We took a lot of time today.  That's why we didn't |
| 11:30:17 | 18 | start at 8:30, but closer to 9:00 o'clock.  I am going to |
| 11:30:22 | 19 | try and insist that we do a more efficient job so that we |
| 11:30:26 | 20 | can start closer to 8:30 when we begin again next week. |
| 11:30:30 | 21 | With that, have a good weekend.  We stand in |
| 11:30:35 | 22 | recess until Monday morning. |
| 11:30:38 | 23 | COURT SECURITY OFFICER:  All rise. |
| | 24 | (Recess.) |
| | 25 | |

1                          CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4      correct transcript from the stenographic notes of the

5      proceedings in the above-entitled matter to the best of my

6      ability.

7

8

9       /S/ Shelly Holmes                        11/1/19
       SHELLY HOLMES, CSR, TCRR                   Date
10     OFFICIAL REPORTER
       State of Texas No.: 7804
11     Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25