```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                      MARSHALL DIVISION

3   UNITED STATES AUTOMOBILE      )(
    ASSOCIATION
4                                 )(   CIVIL ACTION NO.

5   VS.                           )(   2:18-CV-245-JRG

6                                 )(   MARSHALL, TEXAS
                                       NOVEMBER 4, 2019
7   WELLS FARGO BANK, N.A.        )(   8:32  A.M.

8

9                 TRANSCRIPT OF JURY TRIAL

10                    MORNING SESSION

11     BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12               UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15  FOR THE PLAINTIFF:

16
    JASON SHEASBY
17  ANTHONY ROWLES
    LISA GLASSER
18  IRELL & MANELLA
    1800 Avenue of the Stars
19  Suite 900
    Los Angeles, CA 90067-4276
20

21
    ROBERT CHRISTOPHER BUNT
22  PARKER, BUNT & AINSWORTH, PC
    100 East Ferguson
23  Suite 418
    Tyler, TX 75702
24

25
```

```
 1   FOR THE DEFENDANT:

 2

 3   THOMAS M. MELSHEIMER
     M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

 8   E. DANIELLE T. WILLIAMS
     WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

15   JACK WESLEY HILL
     WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas   75670
22                        (903) 923-7464

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
07:58:37    1              P R O C E E D I N G S
07:58:37
08:32:46    2          (Jury out.)

08:32:46    3          COURT SECURITY OFFICER:  All rise.

08:32:47    4          THE COURT:  Be seated, please.

08:34:17    5          Are the parties prepared to read into the record

08:34:36    6   those items from the list of pre-admitted exhibits used

08:34:39    7   during Friday's portion of the trial?

08:34:42    8          MR. BUNT:  Yes, Your Honor.

08:34:43    9          THE COURT:  Please proceed.

08:34:44   10          MR. BUNT:  There were two exhibits used on Friday,

08:34:49   11   that were Plaintiff's Exhibit No. 7 and Plaintiff's Exhibit

08:34:51   12   No. 256.  That was it.

08:34:52   13          THE COURT:  Any objection to that offering from

08:34:54   14   Defendant?

08:34:55   15          MR. UNDERWOOD:  No objection, Your Honor.

08:34:57   16          THE COURT:  Do Defendants have a similar offer to

08:35:00   17   make?

08:35:02   18          MR. UNDERWOOD:  We do not.

08:35:03   19          THE COURT:  All right.  Thank you, counsel.

08:35:05   20          Counsel, one thing we did not talk about in

08:35:07   21   chambers this morning that probably needs to be mentioned

08:35:10   22   and dealt with before I bring the jury in, there was trial

08:35:14   23   briefing filed in the case initiated by Defendant under

08:35:17   24   Docket No. -- Document No. 312 with a response filed by

08:35:23   25   Plaintiff at 313 regarding the issues of indicating that
```

08:35:32  1  only a thousand out of 6,000 banks use auto capture and the

08:35:38  2  remainder use manual capture and indicating a percentage

08:35:46  3  argument or improvement between manual and auto capture at

08:35:50  4  Chase.  And having read the briefing on both of those

08:35:53  5  issues from both the Plaintiff -- or Defendant -- moving

08:35:56  6  Defendant and the Plaintiff's perspective, the Court's

08:35:59  7  persuaded that neither of those are appropriate.  And both

08:36:05  8  of them risk confusion with the jury and have a higher

08:36:11  9  prejudicial value than they do a probative value.

08:36:13  10       So I am going to preclude the arguments raised in

08:36:22  11  the trial brief as noted.

08:36:30  12       Okay.  Am I correct, counsel, that we finished

08:36:34  13  last Friday when the Court recessed with Mr. Weinstein on

08:36:37  14  the stand and he has stepped down; is that correct?

08:36:39  15       MR. SHEASBY:  Your Honor, that is correct.

08:36:41  16       THE COURT:  Okay.  Give me an idea of what

08:36:43  17  Plaintiff's remaining witnesses will be.

08:36:45  18       MR. SHEASBY:  Yes, Your Honor.  There are going to

08:36:49  19  be four deposition plays -- five depositions plays,

08:36:52  20  Mr. Paul Rosati, Mr. Charles Oakes, Mr. Bharat Prasad,

08:36:59  21  Mr. Makoto Jitodai, and Mr. Jeff Easley and the total time

08:37:03  22  is approximately I would say one hour.

08:37:05  23       THE COURT:  All of these are video depositions?

08:37:08  24       MR. SHEASBY:  Yes, Your Honor.

08:37:08  25       THE COURT:  All right.  What will follow the video

| | | |
|---|---|---|
| 08:37:11 | 1 | depositions? |
| 08:37:11 | 2 | MR. SHEASBY:  The resting of our case, Your Honor. |
| 08:37:13 | 3 | THE COURT:  All right.  Who will be the |
| 08:37:18 | 4 | Defendant's first witness if their case-in-chief? |
| 08:37:21 | 5 | MR. MELSHEIMER:  May it please the Court, Your |
| 08:37:22 | 6 | Honor.  It will be Mr. Andrew Wood from Mitek. |
| 08:37:24 | 7 | THE COURT:  All right.  And estimate of the direct |
| 08:37:27 | 8 | time on Mr. Wood, Mr. Melsheimer? |
| 08:37:30 | 9 | MR. MELSHEIMER:  45 minutes to one hour, Your |
| 08:37:32 | 10 | Honor. |
| 08:37:32 | 11 | THE COURT:  Okay.  That's helpful.  Thank you, |
| 08:37:35 | 12 | counsel. |
| 08:37:35 | 13 | All right.  Let's bring in the jury, please. |
| 08:38:00 | 14 | COURT SECURITY OFFICER:  All rise. |
| 08:38:01 | 15 | (Jury in.) |
| 08:38:02 | 16 | THE COURT:  Welcome back, members of the jury. |
| 08:38:07 | 17 | Please have a seat. |
| 08:38:09 | 18 | As you will recall, we ended Friday's portion of |
| 08:38:17 | 19 | the trial with the testimony of Mr. Roy Weinstein. |
| 08:38:22 | 20 | Mr. Weinstein's testimony was completed at the time the |
| 08:38:24 | 21 | Court recessed on Friday, and we'll proceed with the |
| 08:38:27 | 22 | remainder of Plaintiff's case-in-chief and its subsequent |
| 08:38:33 | 23 | witnesses at this time. |
| 08:38:35 | 24 | Plaintiff, call your next witness. |
| 08:38:39 | 25 | MS. GLASSER:  Good morning.  May it please the |

08:38:41  1    Court.   USAA calls by video deposition Mr. Paul Rosati,

08:38:45  2    Wells Fargo's mobile deposit product manager.

08:38:49  3           THE COURT:  All right.  Proceed with this witness

08:38:50  4    by deposition.

08:38:51  5           (Videoclip played.)

08:38:56  6           QUESTION:  Can you state your full name for the

08:39:14  7    record?

08:39:14  8           ANSWER:  Paul Rosati.

08:39:15  9           QUESTION:  Where are you employed?

08:39:16  10          ANSWER:  Wells Fargo Bank.

08:39:17  11          QUESTION:  Sir, after Mobile Deposit 2.0 was

08:39:22  12   implemented by Wells Fargo in 2014, have there been any

08:39:32  13   additional modifications to the auto capture features on

08:39:41  14   the application?

08:39:43  15          ANSWER:  Can't speak to what Mitek did or didn't

08:39:46  16   do to auto capture.

08:39:48  17          QUESTION:  Sir, you are the product manager for

08:39:55  18   the mobile deposit capture system at Wells Fargo, correct?

08:40:05  19          ANSWER:  Yes.

08:40:05  20          QUESTION:  You don't know how the system works; is

08:40:09  21   that your testimony?

08:40:10  22          ANSWER:  You asked me the modifications to auto

08:40:14  23   capture, which is a Mitek product.

08:40:16  24          QUESTION:  How does the mobile capture deposit

08:40:25  25   system at Wells Fargo work from the time of the phone

08:40:29  1    hovering over the check image?

08:40:32  2            ANSWER:  It's not Wells Fargo functionality.  It's

08:40:36  3    auto capture and Mitek's product.

08:40:39  4            QUESTION:  You understand that the Wells Fargo

08:40:42  5    application is an application distributed by Wells Fargo,

08:40:46  6    correct?

08:40:47  7            ANSWER:  Yes.

08:40:48  8            QUESTION:  You understand that that application

08:40:49  9    has code on it, correct?

08:40:51  10           ANSWER:  Yes.

08:40:52  11           QUESTION:  It's your testimony that some of that

08:40:55  12   code is Mitek's code, correct?

08:40:57  13           ANSWER:  Yes.

08:40:58  14           QUESTION:  And you don't know how that application

08:41:02  15   works, correct?

08:41:04  16           ANSWER:  I don't.

08:41:05  17           QUESTION:  You are aware that USAA has a mobile

08:41:12  18   deposit capture system, correct?

08:41:15  19           ANSWER:  Yes.

08:41:15  20           QUESTION:  When did you become aware of USAA's

08:41:18  21   system?

08:41:19  22           ANSWER:  So USAA primarily came into play when we

08:41:23  23   were looking at multiple check capture.  Someone thought

08:41:28  24   they offered that capability.  And also when we were

08:41:32  25   looking at manual capture and we were looking at different

08:41:36  1  competitors' UI, USAA was included in that UI review.

08:41:40  2          QUESTION:  So let's unpack that.  "UI" refers to

08:41:46  3  user interface, correct?

08:41:49  4          ANSWER:  Yes.

08:41:50  5          QUESTION:  You joined the mobile product deposit

08:41:53  6  group at Wells Fargo in 2014, correct?

08:41:55  7          ANSWER:  Yes.

08:41:57  8          QUESTION:  You've been in that project for five

08:42:00  9  years, correct?

08:42:02  10         ANSWER:  The product manager for five years, yes.

08:42:05  11         QUESTION:  At some point after the date of joining

08:42:08  12  that product, your group examined the user interfaces that

08:42:13  13  USAA uses for its mobile check deposit system, correct?

08:42:18  14         ANSWER:  Specific to manual and auto capture and

08:42:23  15  specific to multiple check capture.

08:42:25  16         QUESTION:  Did you make Wells Fargo legal counsel

08:42:29  17  aware of the USAA press release announcing its licensing

08:42:35  18  program for mobile remote deposit capture?

08:42:39  19         ANSWER:  I don't recall.

08:42:40  20         QUESTION:  And to be clear for the record, you are

08:42:43  21  the manager of the remote deposit capture program for Wells

08:42:49  22  Fargo from the first quarter of 2014 through the present?

08:42:52  23         ANSWER:  Product manager, yes.

08:42:54  24         QUESTION:  Would it be fair to say that you've

08:42:58  25  been observing approximately a 10 percent year-over-year

08:43:02  1    growth in the frequency of deposit of checks through

08:43:05  2    images?

08:43:05  3              ANSWER:  We forecasted 10 percent growth for 2019.

08:43:08  4              QUESTION:  And in the past, have you seen that

08:43:10  5    same 10 percent growth year over year?

08:43:13  6              ANSWER:  We've seen 10 percent or more year over

08:43:17  7    year.

08:43:18  8              QUESTION:  Is there any point in time since you've

08:43:22  9    joined the program when you haven't seen 10 percent or more

08:43:26  10   growth year over year?

08:43:28  11             ANSWER:  No.

08:43:29  12             QUESTION:  Does anyone at Wells Fargo understand

08:43:30  13   how the auto capture function of remote deposit capture

08:43:35  14   works?

08:43:35  15             ANSWER:  I can't speak for anyone at Wells Fargo,

08:43:39  16   but I can speak for myself.

08:43:40  17             QUESTION:  Are you aware of anyone who has

08:43:44  18   familiarity with how the auto capture feature works?

08:43:47  19             ANSWER:  Mitek has ultimate authority on that.

08:43:50  20             QUESTION:  Sir, are you aware of anyone at Wells

08:43:53  21   Fargo who has familiarity with how the auto capture feature

08:43:56  22   works?

08:43:57  23             ANSWER:  No.

08:43:59  24             QUESTION:  Does Wells Fargo have the internal

08:44:03  25   capability of creating an alternative to its current auto

08:44:09   1   capture mobile system?

08:44:11   2          ANSWER:  I don't know.  I haven't looked into

08:44:14   3   that.

08:44:14   4          QUESTION:  One of the things -- can you think of

08:44:22   5   any technology at Wells Fargo that is comparable to mobile

08:44:25   6   check deposit?

08:44:25   7          ANSWER:  Nothing comes to mind.

08:44:28   8          QUESTION:  USAA is a financial services company

08:44:33   9   that serves the military and its family, fair?

08:44:36  10          ANSWER:  Yes.

08:44:37  11          QUESTION:  You understand that USAA has a bank,

08:44:41  12   correct?

08:44:41  13          ANSWER:  Yes.

08:44:42  14          QUESTION:  In other words, you understand that its

08:44:44  15   banking division, USAA is a competitor of Wells Fargo,

08:44:49  16   correct?

08:44:49  17          ANSWER:  Yes.

08:44:52  18          QUESTION:  You understand that this lawsuit is

08:44:54  19   about auto capture, correct?

08:44:54  20          ANSWER:  Yes.

08:44:55  21          QUESTION:  Do you have an understanding about how

08:44:57  22   the auto capture functionality on Wells Fargo's system

08:45:01  23   actually works?

08:45:01  24          ANSWER:  I don't have access to Mitek's source

08:45:07  25   code, no.

08:45:07   1           (Videoclip ends.)

08:45:08   2           THE COURT:  Does that complete this witness by

08:45:13   3   deposition?

08:45:14   4           MS. GLASSER:  It does, Your Honor.

08:45:15   5           THE COURT:  Call your next witness, please.

08:45:17   6           MS. GLASSER:  USAA calls by video deposition

08:45:23   7   Mr. Charles Oakes, retired USAA employee and inventor.

08:45:28   8           THE COURT:  Please proceed.

08:45:30   9           (Videoclip played.)

08:45:30  10           QUESTION:  Will you please state your name for the

08:45:36  11   record?

08:45:36  12           ANSWER:  Charles Oakes.

08:45:37  13           QUESTION:  And USAA is your current employer,

08:45:40  14   correct?

08:45:40  15           ANSWER:  No, I'm retired from USAA.

08:45:42  16           QUESTION:  When did you retire, sir?

08:45:44  17           ANSWER:  April 1st, 2016.  It's been over three

08:45:48  18   years.

08:45:48  19           QUESTION:  And what have you been doing in your

08:45:50  20   retirement?

08:45:51  21           ANSWER:  Playing golf, teaching golf.  I teach

08:45:55  22   junior golf at church, doing ministry work for my church.

08:46:01  23   I do a lot of reading and gardening and enjoying retirement

08:46:06  24   life.

08:46:07  25           QUESTION:  Prior to retiring on April 1st, 2016,

08:46:10   1   were you employed at USAA?

08:46:11   2          ANSWER:  Yes, I was.

08:46:12   3          QUESTION:  And how long prior to your retirement

08:46:16   4   had you been employed with USAA?

08:46:17   5          ANSWER:  I had been employed with USAA for 15

08:46:19   6   years.

08:46:20   7          QUESTION:  And what was your title when you were

08:46:21   8   asked to take over the Applied Research team?

08:46:23   9          ANSWER:  I was promoted to director of Applied

08:46:27   10   Research.  I believe it was the official title.

08:46:31   11          QUESTION:  So someone at USAA would have an

08:46:33   12   interest in -- in some area of the industry, correct?  And

08:46:37   13   they'd come to you and your team and say would you guys

08:46:41   14   look into this, is that a fair characterization?

08:46:43   15          ANSWER:  That is -- was one of the processes

08:46:44   16   associated with it.  We would get requests, and then we

08:46:46   17   would take a look at it.  Did it fit, should we do it?  We

08:46:51   18   would have to do kind of a cost analysis, how long would it

08:46:54   19   take.  And then the result of that would end up being a

08:46:58   20   white paper analysis.

08:47:00   21          QUESTION:  Would you look at what competitors in

08:47:02   22   the industry were doing?

08:47:03   23          ANSWER:  That wasn't our -- that wasn't our

08:47:06   24   mission, but in the analysis of the industry, we would take

08:47:08   25   a look at who were the leaders in the industry because

08:47:12  1  usually -- what I would call a sponsor, the sponsor that

08:47:16  2  requested it would ask who are the leaders in this industry

08:47:19  3  and what is the maturity of the industry.

08:47:22  4       QUESTION:  So part of your research would include

08:47:24  5  looking to see what companies were out there in that space

08:47:27  6  and analyzing what they were doing, correct?

08:47:31  7       ANSWER:  We would take a look at -- as far as what

08:47:36  8  was out there in the industry and what their maturity were

08:47:41  9  associated with whatever aspect we -- we were asked to look

08:47:44  10  at.

08:47:44  11       QUESTION:  So prior to that October 2006 email,

08:47:54  12  what, if any, work and research had USAA done on mobile

08:47:59  13  phones and their ability to take an image of a check?

08:48:02  14       ANSWER:  Again, we were -- we were looking at the

08:48:04  15  various phones that were available at that time to

08:48:06  16  determine what it was going to be able to take to be able

08:48:09  17  to capture an image and be able to control that image and

08:48:15  18  be able to pass it on.

08:48:16  19       QUESTION:  Did you attend that meeting in February

08:48:21  20  of 2008 with Mitek?

08:48:21  21       ANSWER:  Yes.

08:48:22  22       QUESTION:  And at the time did you have any reason

08:48:23  23  to dispute that?

08:48:24  24       ANSWER:  It was a mock-up.  It wasn't something

08:48:31  25  that he was showing that would process all the way through.

08:48:37  1   He never did say that it did process through.  He just took

08:48:40  2   a picture of a check, and it showed up on the screen.

08:48:42  3              QUESTION:  You didn't pay attention -- you didn't

08:48:45  4   really pay attention to what Mitek was doing in mobile

08:48:49  5   deposit one way or another; is that correct?

08:48:50  6              ANSWER:  Not to the extent of whether they had a

08:48:52  7   system or didn't really have a system.  It -- it really got

08:48:55  8   to the point that we needed to focus on our application

08:48:59  9   period and we needed to move forward.

08:49:01  10             QUESTION:  So you wouldn't know one way or another

08:49:04  11  how Mitek's system operates, correct?

08:49:06  12             ANSWER:  I don't have any idea how Mitek's system

08:49:09  13  works.

08:49:09  14             QUESTION:  And you wouldn't have -- you have no

08:49:10  15  idea what their system was doing, say, in 2013 or 2014?

08:49:13  16             ANSWER:  Not at all, no, sir.

08:49:15  17             QUESTION:  And sitting here today, do you have any

08:49:17  18  idea what Mitek's system does regarding mobile deposit?

08:49:20  19             ANSWER:  I don't know how their system works at

08:49:23  20  all.

08:49:23  21             QUESTION:  To be clear, you were focused on USAA's

08:49:26  22  system, correct?

08:49:27  23             ANSWER:  We were -- we were focused on getting to

08:49:27  24  the member the systems that we needed to develop and get

08:49:30  25  to -- to our membership.

08:49:32  1           QUESTION:  You wouldn't know whether or not Mitek

08:49:38  2   uses the same auto capture technology to capture an image

08:49:46  3   of a check as the auto capture technology claimed in your

08:49:51  4   patents-in-suit, correct?

08:49:52  5           ANSWER:  Again, I don't know anything about how

08:49:55  6   their system works at all.

08:49:57  7           QUESTION:  Do you have any understanding of how

08:50:02  8   Wells Fargo's mobile deposit system operates?

08:50:04  9           ANSWER:  I don't know anything about Wells Fargo's

08:50:07 10   system and how it operates at all.

08:50:09 11           QUESTION:  So you can't say one way or another

08:50:24 12   whether Wells Fargo and its mobile deposit system uses the

08:50:29 13   ideas claimed in any of the patents-in-suit, correct?

08:50:33 14           ANSWER:  Again, I -- I don't know how their system

08:50:35 15   operates at all.

08:50:36 16           QUESTION:  Did you participate in ANSI's standard

08:50:40 17   setting efforts regarding check deposit or check imaging?

08:50:44 18           ANSWER:  I did not participate in anything

08:50:47 19   associated with the standards body or ANSI.

08:50:50 20           QUESTION:  Do you know if anyone at USAA did?

08:50:53 21           ANSWER:  On the standards body?

08:50:55 22           QUESTION:  Uh-huh.

08:50:57 23           ANSWER:  Not to my knowledge, no.

08:51:01 24           QUESTION:  What do you understand USAA to have

08:51:04 25   invented --

08:51:04  1        ANSWER:  You're talking about this '571 patent?

08:51:06  2        QUESTION:  Which would include the '571?

08:51:07  3        ANSWER:  Primarily what was -- when we got to

08:51:12  4   this -- to this stage of mobile deposit, the check images

08:51:22  5   that we were processing -- beginning to increase greatly.

08:51:29  6   We knew way back when that little by little, as the

08:51:35  7   technology changed, we needed to be able to take advantage

08:51:38  8   of the technology, try to take as much of the work off of

08:51:42  9   the consumer in capturing an image associated with that.

08:51:47  10       So from -- from -- from this patent, what we

08:51:54  11  invented was really the autonomous capture of an image

08:51:58  12  without user having to take the picture, the monitoring of

08:52:04  13  the image, to clean it up, to make sure that it was going

08:52:09  14  to be able to pass back end processing, and -- and -- and

08:52:18  15  any type of corrective type of feedback -- again, back to

08:52:23  16  the consumer, because previously, our members were a little

08:52:30  17  bit tech -- tech savvy.  They knew how to use a device to

08:52:34  18  be able to capture or obtain the image, but as we grew our

08:52:38  19  base -- needed to grow our base, we needed to do more on

08:52:43  20  the front end to be able to ensure that the image was a

08:52:48  21  good image and the confidence level that we would be able

08:52:51  22  to pass it on.  Otherwise, the member is not going to use

08:52:56  23  it -- absolutely not going to use it.  It's going to be too

08:53:00  24  hard to use it.

08:53:02  25       So by -- by taking all of that burden off of the

08:53:06  1  member and use it -- basically automatic, that's really in

08:53:13  2  essence what -- what this invention calls for.

08:53:17  3  QUESTION:  So is it fair to say that the invention

08:53:22  4  in the 2009 patents, including the '571 patent, is an

08:53:28  5  invention related to autonomous or automatic capture of the

08:53:34  6  check image?

08:53:35  7  ANSWER:  The '57 -- you're talking about again the

08:53:40  8  '571, it's the autonomous -- there's several -- again, the

08:53:44  9  autonomous capturing -- really captures -- really obtaining

08:53:47  10  a frame because there's a raw feed of frames coming into

08:53:50  11  it.  And the various monitoring type of -- of checking the

08:53:55  12  image, is -- is it -- is it skewed?  You have to skew it.

08:54:01  13  Is it -- is the lighting proper, to try to take that all

08:54:04  14  off the member's hands.

08:54:07  15  And so -- and, then, again, you know, the -- the

08:54:09  16  corrective feedback of maybe tilting the cam -- the

08:54:15  17  camera -- the device a little bit to the left, to the

08:54:17  18  right, up and down to be able to catch that frame and to be

08:54:22  19  able to pass it on to -- again, have a higher confidence

08:54:26  20  level that it's going to pass the back end item process and

08:54:30  21  be deposited.

08:54:31  22  QUESTION:  Do you know when USAA launched its

08:54:43  23  Deposit@Mobile product?

08:54:44  24  ANSWER:  Are you talking about the auto capture?

08:54:46  25  QUESTION:  No, the -- the Deposit@Mobile product,

08:54:48  1   do you know when it was --

08:54:50  2           ANSWER:  Around the August 2009 time frame.

08:54:52  3           QUESTION:  Okay.  When the product launched, did

08:54:54  4   it have auto capture?

08:54:55  5           ANSWER:  When it launched in 2009, it did not have

08:55:00  6   the auto capture feature.

08:55:02  7           QUESTION:  And how long did USAA operate

08:55:05  8   Deposit@Mobile without auto capture?

08:55:06  9           ANSWER:  I believe that the development started on

08:55:13  10  the auto capture was around the 2011 time frame, and then

08:55:22  11  it was launched, I believe, in the 2013 time frame.

08:55:27  12          QUESTION:  So is it fair to say that for

08:55:30  13  approximately four years, USAA's Deposit@Mobile used manual

08:55:36  14  capture rather than auto capture?

08:55:37  15          ANSWER:  I'll try to answer it this way.  The

08:55:41  16  complexity -- the complexity associated with taking from

08:55:46  17  the way that the original Deposit@Mobile ran is there was

08:55:53  18  less work on the client, more work on the server side.  But

08:55:59  19  as the population grew as far as the use of it, the scaling

08:56:03  20  associated with that, that was not going to work.

08:56:08  21          So we moved the technology upfront on the device

08:56:13  22  itself to be able to capture the -- to -- to obtain the

08:56:18  23  frames in a raw feed, grab the frame, go through the

08:56:22  24  monitoring process at that point in time, that complexity

08:56:27  25  to do that was much more complex than it did as far as the

08:56:31  1  mobile and, of course, with the -- with the -- with the

08:56:36  2  scan itself.

08:56:37  3          The tech savvy people were less and less.  It was

08:56:41  4  more layman.  And trying to get the image in a way to be

08:56:46  5  able to process all the way through, that technology and

08:56:52  6  what we were trying to do was highly, highly complex.

08:56:56  7          So to be able to do that the right way took some

08:56:59  8  time to do that.

08:57:00  9          QUESTION:  Do you recall what the failure rates

08:57:03  10  were for USAA's Deposit@Mobile product when it was using

08:57:08  11  auto -- sorry, manual capture?

08:57:12  12          ANSWER:  I believe that the failure rates were

08:57:16  13  around the 15 to 16 percent, around that time -- those --

08:57:23  14  those numbers.  And if I remember right, it was reduced to

08:57:28  15  about a 9 or 10 percent --

08:57:31  16          QUESTION:  So --

08:57:32  17          ANSWER:  -- reduction of failure rates.

08:57:37  18          QUESTION:  -- the move from manual capture to auto

08:57:40  19  capture was a move from 15 or 16 percent failure to 9 or

08:57:47  20  10 percent failure, correct?

08:57:48  21          ANSWER:  The introduction of the -- of the auto

08:57:49  22  capture system, we showed where the failure rates reduced

08:57:51  23  from around 15 or 16 to 9 or 10, something like that.

08:57:56  24          QUESTION:  So approximately a 6 to 7 percent

08:57:59  25  decrease in failure rate, correct?

08:58:00 1          ANSWER:  On the failure rates, no, that would be
08:58:05 2  around -- if my math is right, about 40 percent.  If you go
08:58:11 3  from the success rates, you're talking about a 6 percent.
08:58:14 4  So I don't know if you're talking about success rates or
08:58:17 5  failure rates.
08:58:17 6          QUESTION:  So what's --
08:58:19 7          ANSWER:  The effective reduction is around 40, the
08:58:22 8  division -- as I understand the math.
08:58:24 9          QUESTION:  So --
08:58:25 10         ANSWER:  Which is a huge difference.
08:58:26 11         QUESTION:  If you go from 15 to 16 percent, you're
08:58:29 12 saying there was a 40 percent drop?
08:58:31 13         ANSWER:  Improvement --
08:58:34 14         QUESTION:  15 to 16 --
08:58:36 15         ANSWER:  40 percent improvement as far as failure
08:58:38 16 rates.
08:58:44 17         QUESTION:  So it's your testimony to the jury in
08:58:47 18 this case that you went from a 15 to 16 percent failure
08:58:53 19 rate, and you improved that by 40 percent?
08:58:56 20         ANSWER:  The difference -- the difference between
08:58:58 21 that is a 40 percent difference, and that's my -- maybe my
08:59:08 22 math is wrong.
08:59:09 23         QUESTION:  Let me go back to my question.  Do you
08:59:12 24 know one way or another whether the introduction of mobile
08:59:18 25 check deposit helped USAA get any new members that it did

08:59:22  1   not otherwise have?

08:59:23  2        ANSWER:  That, I -- I don't know.

08:59:24  3        QUESTION:  Do you have any belief as to whether or

08:59:26  4   not USAA's mobile deposit capability has helped USAA

08:59:35  5   increase its revenue?

08:59:36  6        ANSWER:  I don't have those numbers.  However,

08:59:41  7   based upon information that during the time that we were

08:59:45  8   launching mobile and going forward, we saw an increase of

08:59:52  9   products being taken out or -- or acquired by members that

08:59:59 10   started using the Deposit@Mobile.

09:00:02 11        So, in essence, did that -- did that increase the

09:00:06 12   revenue with the number of increases of deposits, meaning

09:00:13 13   that there's more dollars coming into the bank which then

09:00:16 14   more loans can be made that would generate revenue.  So the

09:00:21 15   exact numbers associated with that, I don't have those

09:00:23 16   exact numbers.  That would be something like Jeff Easley or

09:00:29 17   somebody like that would have that.

09:00:30 18        QUESTION:  So sitting here today you don't have

09:00:32 19   any concrete evidence as to whether or not USAA's mobile

09:00:36 20   app has helped USAA increase its revenue?

09:00:40 21        ANSWER:  I do not have those numbers.

09:00:42 22        QUESTION:  Has anyone suggested that USAA would

09:00:44 23   have lost members had it not been for the development of

09:00:48 24   its mobile app?

09:00:48 25        ANSWER:  I don't recall anyone saying that to me,

09:01:02   1   other than what I would say that if we did not develop the

09:01:10   2   mobile system or go further than that, then our members are

09:01:14   3   going to go somewhere else.

09:01:16   4        QUESTION:  Do you recall whether or not anybody

09:01:19   5   has ever suggested that to you, that but for the

09:01:22   6   development of USAA's mobile app, you would have lost

09:01:24   7   members?

09:01:25   8        ANSWER:  It's been so long, I just don't recall if

09:01:31   9   anybody told me that.

09:01:32  10        QUESTION:  The imaging of checks was done by banks

09:01:36  11   long before 2006, yes or no?

09:01:38  12        ANSWER:  The imaging of checks by banks prior to

09:01:42  13   2006 was done by banks.

09:01:45  14        QUESTION:  So yes?

09:01:46  15        ANSWER:  So USAA did not invent that part of

09:01:48  16   imaging.  We -- we were much further along in the

09:01:54  17   development of our product.

09:01:59  18        Again, being able to use most of the back-end

09:02:01  19   processing and the middle tier as far as the server, we

09:02:04  20   were much further along.  We were working primarily on

09:02:09  21   the -- on the -- on the mobile side.

09:02:11  22        So based upon the questions, based upon the

09:02:17  23   mock-up, they really didn't show us enough to make a

09:02:23  24   determination of how far or what -- they had anything

09:02:28  25   there.  So we were -- we were -- we felt that we upon were

09:02:31  1  much further along than what they presented because, again,

09:02:35  2  of the questions that they were asking us.

09:02:37  3          QUESTION:  You had some discussion with counsel

09:02:41  4  about some interactions with Mitek.  Do you remember that?

09:02:43  5          ANSWER:  Yes, sir.

09:02:43  6          QUESTION:  So let's talk first about an email you

09:02:47  7  were shown with someone at Mitek named Louise Steller, do

09:02:51  8  you remember that?

09:02:51  9          ANSWER:  Yes.  There was a couple of them.

09:02:54  10          QUESTION:  So let me ask you about the 2008

09:02:57  11  meeting.

09:03:00  12          ANSWER:  Okay.

09:03:00  13          QUESTION:  Mr. DeBello, you said, presented at

09:03:03  14  that meeting, right?

09:03:04  15          ANSWER:  Yes, sir, he did.

09:03:04  16          QUESTION:  What was your general impression --

09:03:07  17  well, let me ask, had you interacted with Mr. DeBello

09:03:10  18  before that February 2008 meeting?

09:03:12  19          ANSWER:  There was only one that I was in on a

09:03:16  20  phone call back in the 2009 time frame when we were having

09:03:24  21  some problems with our software.  I think he was on the

09:03:27  22  line.

09:03:31  23          QUESTION:  At the February 2008 meeting, did

09:03:34  24  Mr. DeBello ask any questions of you or the other folks at

09:03:37  25  the meeting?

| | | |
|---|---|---|
| 09:03:38 | 1 | ANSWER:  Yes, again, they wanted to come in and do |
| 09:03:43 | 2 | a presentation of -- of whatever they were saying they had. |
| 09:03:50 | 3 | So it was their dog and pony show.  It was their |
| 09:03:53 | 4 | presentation.  They start out by showing the presentation. |
| 09:03:57 | 5 | However, Mr. DeBello started asking more and more questions |
| 09:04:04 | 6 | about our products, about how we -- when I say "products," |
| 09:04:08 | 7 | how are we processing on our client, on the mobile device, |
| 09:04:13 | 8 | what kind of processing were we doing on the server.  And |
| 09:04:15 | 9 | so it was more of asking us questions about how our |
| 09:04:19 | 10 | applications run versus what they could possibly bring to |
| 09:04:24 | 11 | the table. |
| 09:04:26 | 12 | QUESTION:  By the time of this February 2008 |
| 09:04:28 | 13 | presentation, how far along was your team in its |
| 09:04:33 | 14 | development of what became Deposit@Mobile? |
| 09:04:36 | 15 | ANSWER:  We were much further along in the |
| 09:04:41 | 16 | development of our product.  Again, being able to use most |
| 09:04:47 | 17 | of the back-end processing and the middle tier, as far as |
| 09:04:50 | 18 | the server, we were much further along.  We were working |
| 09:04:53 | 19 | primarily on the -- on the mobile side. |
| 09:04:57 | 20 | So based upon the questions, based upon the |
| 09:05:03 | 21 | mock-up, they really didn't show us enough to make a |
| 09:05:08 | 22 | determination of how far or what -- they had anything |
| 09:05:13 | 23 | there.  So we were -- we -- we felt that we were much |
| 09:05:17 | 24 | further along than what they presented, because, again, of |
| 09:05:23 | 25 | the questions they were asking us. |

```
09:05:26   1           (Videoclip ends.)

09:05:26   2           THE COURT:  Does that complete this witness by

09:05:28   3   deposition?

09:05:29   4           MS. GLASSER:  It does, Your Honor.

09:05:30   5           THE COURT:  Call your next witness.

09:05:31   6           MS. GLASSER:  USAA calls Mr. Bharat Prasad,

09:05:37   7   inventor.

09:05:42   8           THE COURT:  Please proceed.

09:05:44   9           (Videoclip played.)

09:05:45  10           QUESTION:  Mr. Prasad, how are you today?

09:05:56  11           ANSWER:  I'm doing good.  Thank you.

09:05:57  12           QUESTION:  Does USAA claim to have invented the

09:06:00  13   concept of mobile check deposit?

09:06:03  14           ANSWER:  Mobile check deposit for us is

09:06:06  15   essentially taking the picture of a check, the front and

09:06:09  16   back of the check instrument, being able to deposit it into

09:06:13  17   an account with the end user -- in our case we call them a

09:06:17  18   member -- is -- or having with USAA, and that concept is

09:06:23  19   what we invented.

09:06:24  20           QUESTION:  You don't know what remotely capturing

09:06:27  21   an image of a check means?

09:06:28  22           ANSWER:  It could be anything like capturing from

09:06:30  23   an ATM, capturing from a check scanner at a teller, it

09:06:35  24   could be a check scanner at a branch near your home, it

09:06:38  25   could be a scanner in your home tied to a computer,  home
```

09:06:38  1  computer.  It could be a cellular phone that you carry,  a

09:06:43  2  mobile device that has ability to take a picture of a

09:06:47  3  check.

09:06:47  4       QUESTION:  Okay.

09:06:47  5       ANSWER:  So all of these are potentially remote

09:06:51  6  captures, including a webcam that might be on your

09:06:52  7  computer.

09:06:52  8       QUESTION:  And when I refer to remote capture of

09:06:55  9  the image of a check, I'm referring to all those things.

09:06:55 10       ANSWER:  Okay.

09:06:57 11       (Videoclip interrupted.)

09:06:57 12       THE COURT:  Can you turn up the volume please?

09:07:00 13       (Videoclip continued.)

09:07:00 14       QUESTION:  Will you agree with me that systems

09:07:03 15  existed for the remote capture of an image of a check for

09:07:04 16  transmission to a financial institution prior to your work

09:07:06 17  on these patents?

09:07:07 18       ANSWER:  Not all the systems.  Some of the systems

09:07:09 19  did.

09:07:09 20       QUESTION:  Okay.  So some of them did?

09:07:12 21       ANSWER:  Yes.

09:07:12 22       QUESTION:  So the answer to my question is yes,

09:07:15 23  systems existed for the remote capture of a check and

09:07:18 24  transition to a financial institution before your work on

09:07:20 25  these patents?

09:07:20  1          ANSWER:  Before we started working on these

09:07:22  2  patents, there was some systems that were allowing a remote

09:07:26  3  capture of a check to come into our financial institution.

09:07:28  4          QUESTION:  Are you aware of more than one way to

09:07:33  5  do mobile check deposit?

09:07:35  6          ANSWER:  I'm not aware.

09:07:36  7          QUESTION:  So the only way you know to do mobile

09:07:39  8  check deposit is the way that's described in these patents?

09:07:42  9          ANSWER:  Again, when you -- now you are referring

09:07:45 10  to the patents.  And that patent is the mobile check

09:07:47 11  deposit solution for an end user to be able to take a

09:07:50 12  picture of the check and deposit it into their account.

09:07:53 13          QUESTION:  And you're aware of no other way than

09:07:57 14  your way, as a technical solution, to do mobile check

09:08:01 15  deposit?

09:08:01 16          ANSWER:  Again, patents, concept-wise and

09:08:07 17  specification, layout, how it is done.  When you say

09:08:09 18  technical solution, the solution could be an

09:08:13 19  implementation, and multiple implementations can exist for

09:08:17 20  the same specification in the patents.

09:08:20 21          QUESTION:  Okay.  Are you aware of multiple

09:08:25 22  implementations for the performance of mobile check

09:08:26 23  deposit?

09:08:26 24          ANSWER:  Today in the market, there are several,

09:08:29 25  right?  And we see multiple deposit capture being used

| | | |
|---|---|---|
| 09:08:34 | 1 | commonly with multiple banks.  I'm sure that there are |
| 09:08:37 | 2 | different solution implementations of these concepts that |
| 09:08:41 | 3 | we invented in these patents.  So, yes, I am aware that |
| 09:08:45 | 4 | there could be another solution apart from USAA's that is |
| 09:08:49 | 5 | an implementation. |
| 09:08:49 | 6 | QUESTION:  And so mobile deposit capture can occur |
| 09:08:55 | 7 | differently than what's described in your patents, correct? |
| 09:08:58 | 8 | ANSWER:  Mobile deposit -- capture can be |
| 09:09:03 | 9 | implemented differently, but it has to be under the same |
| 09:09:08 | 10 | concepts. |
| 09:09:08 | 11 | QUESTION:  What do you know about the |
| 09:09:10 | 12 | functionality of the Wells Fargo accused product? |
| 09:09:10 | 13 | ANSWER:  I think I mentioned that before, the |
| 09:09:11 | 14 | ability for somebody to select an account, being able to |
| 09:09:14 | 15 | capture the picture of a check, front and back, and being |
| 09:09:18 | 16 | able to leverage some of the auto capture functionality |
| 09:09:23 | 17 | that they have to be able to do that seamlessly and being |
| 09:09:27 | 18 | able to submit that to an account for deposit. |
| 09:09:31 | 19 | QUESTION:  And so my question is do -- does USAA's |
| 09:09:44 | 20 | Deposit@Mobile product practice any of the claims of your |
| 09:09:47 | 21 | patents? |
| 09:09:47 | 22 | ANSWER:  Yes. |
| 09:09:47 | 23 | QUESTION:  It does? |
| 09:09:48 | 24 | ANSWER:  It does. |
| 09:09:48 | 25 | QUESTION:  Okay.  Does it practice all of the |

09:09:52   1   claims of your patents?

09:09:52   2         ANSWER:  It does, in my understanding.  Again, am

09:09:54   3   I allowed to refer back to the earlier response I gave you,

09:09:55   4   that I cannot interpret claims.  That is not my expertise.

09:10:00   5   But I can certainly talk to the specifications in the

09:10:03   6   patents.

09:10:04   7         QUESTION:  Okay.  All right.  So let's take a look

09:10:05   8   at -- we'll start with the '571 patent, Mr. Prasad.

09:10:05   9         ANSWER:  Okay.

09:10:10  10         QUESTION:  Okay.  And you didn't claim a system

09:10:12  11   that captures an image without regard to the monitoring

09:10:16  12   criteria and then later evaluates those images to determine

09:10:19  13   which image is best?

09:10:20  14         ANSWER:  That is not true.  So the monitoring

09:10:26  15   criteria does not need to happen only before a capture.

09:10:31  16   There could be any number of monitoring criteria that could

09:10:33  17   happen after the capture, too.

09:10:35  18         QUESTION:  But a monitoring criteria has to be

09:10:38  19   satisfied before capture --

09:10:40  20         ANSWER:  Yes, sir.

09:10:41  21         QUESTION:  -- to satisfy this claim?

09:10:43  22         ANSWER:  Yes, sir.  So there's a set of monitoring

09:10:45  23   criteria that has to be satisfied before we capture the

09:10:48  24   image for further processing.

09:10:50  25         QUESTION:  When we look at the patents that we've

09:10:52   1   examined today, which of these patents do you believe has

09:10:55   2   the most significant technical value?

09:10:57   3          ANSWER:  So if you look at --  we use to have a

09:11:05   4   Deposit@Home -- the ability for members to constantly

09:11:08   5   demand a better service, a better convenient way to deposit

09:11:14   6   checks, the need for reducing the failures that we are

09:11:17   7   seeing in our earlier solutions.  For me, the '571 patent

09:11:24   8   talks a lot about auto capture, which became critical to

09:11:30   9   our success, especially after we validated it in 2013.

09:11:34   10         QUESTION:  Okay.  So you think the '571 patent is

09:11:36   11   the most technologically valuable of the patents we've

09:11:41   12   talked about today?

09:11:42   13         ANSWER:  Again, I don't want to tie a patent to a

09:11:48   14   value, because if you see the specifications of earlier

09:11:54   15   patents to the '571 patent, you see a lot of the same

09:11:57   16   information existing.

09:11:59   17         So I wouldn't separate out the specification

09:12:04   18   components to identify anything in isolation for the '571

09:12:10   19   patent.  It is all built into the remote deposit capture

09:12:15   20   infrastructure.  But what I can tell you is from a

09:12:17   21   technical standpoint, auto capture was a huge leap

09:12:21   22   technically from a value perspective to be able to achieve

09:12:25   23   something that is absolutely necessary for us to keep our

09:12:28   24   members.

09:12:28   25         QUESTION:  Is USAA aware of how Mitek's Mobile

09:12:39  1   Deposit functions?

09:12:39  2          ANSWER:  When you say "functions," are you talking

09:12:41  3   about the inner workings?

09:12:43  4          QUESTION:  Yes.

09:12:44  5          ANSWER:  No, we're not.

09:12:46  6          QUESTION:  What is USAA's level of knowledge of

09:12:51  7   the function of Mitek's Mobile Deposit?

09:12:52  8          ANSWER:  USAA is only aware of what Mitek has

09:12:58  9   published in public, and there are some documents like

09:13:03  10  market analysis and other reports that talk about Mobile

09:13:10  11  Deposit, the term Mitek has, you know, released to its

09:13:12  12  customers.

09:13:13  13         QUESTION:  Agree?

09:13:15  14         ANSWER:  So you have to define what auto capture

09:13:18  15  means for the company at that point in time.

09:13:22  16         So are you saying auto capture with respect to

09:13:26  17  what's laid out in the claims of these patents?

09:13:28  18         QUESTION:  Yes.

09:13:29  19         ANSWER:  Okay.

09:13:42  20         QUESTION:  So you think every commercially

09:13:44  21  available implementation of auto capture on the market

09:13:54  22  today infringes USAA's patents, '571, '090?

09:14:02  23         ANSWER:  I'm not aware of every commercially

09:14:05  24  available solution out there for mobile check capture, but

09:14:13  25  what I understand is any mobile auto capture solution, auto

09:14:20  1   capture check solution that talks to the claims details in

09:14:27  2   these patents that we refer to would be infringing them, in

09:14:31  3   my opinion.

09:14:32  4        But I haven't done any infringement analysis, as

09:14:36  5   I'm not a legal person to do that.

09:14:39  6        QUESTION:  And -- and you said, paraphrasing

09:14:44  7   again, that Wells Fargo's implementation cannot be the same

09:14:46  8   implementation because we, USAA, haven't marketed ours to

09:14:52  9   anyone else.  Do you remember saying something like that

09:14:54  10  previously?

09:14:54  11       ANSWER:  Correct, so, yes.

09:14:58  12       QUESTION:  Let me -- so my question is, what did

09:14:59  13  you mean when you said that the Wells Fargo implementation

09:15:02  14  couldn't be the same as the USAA implementation?

09:15:04  15       ANSWER:  So I was trying to make a distinction

09:15:09  16  between technical -- technical solution and the

09:15:13  17  implementation.  So it is likely that different companies

09:15:20  18  could implement something by taking a technical solution as

09:15:24  19  the base and actually implementation could be code that

09:15:30  20  they create.

09:15:32  21       Now, what I meant earlier when I said it cannot be

09:15:36  22  is just that the code base or the code actually

09:15:37  23  implementing it within Wells Fargo is proprietary to their

09:15:44  24  system, and the code that we develop for implementing the

09:15:46  25  same solution within USAA is proprietary code to USAA.

| | | |
|---|---|---|
| 09:15:52 | 1 | QUESTION:  To your knowledge has USAA ever given |
| 09:15:58 | 2 | Wells Fargo access to USAA's source code for Deposit@Home |
| 09:16:00 | 3 | or Deposit@Mobile? |
| 09:16:00 | 4 | ANSWER:  I'm not aware of any of that. |
| 09:16:02 | 5 | QUESTION:  And to your knowledge has USAA ever |
| 09:16:03 | 6 | provided its source code for Deposit@Home or Deposit@Mobile |
| 09:16:07 | 7 | to any other bank for them to use to offer mobile deposit? |
| 09:16:13 | 8 | ANSWER:  I'm not aware of that. |
| 09:16:15 | 9 | QUESTION:  Have you personally seen any source |
| 09:16:17 | 10 | code for Wells Fargo's Mobile Deposit system? |
| 09:16:21 | 11 | ANSWER:  No, I have not. |
| 09:16:23 | 12 | (Videoclip ends.) |
| 09:16:23 | 13 | THE COURT:  Does that complete this witness by |
| 09:16:25 | 14 | deposition? |
| 09:16:26 | 15 | MS. GLASSER:  It does, Your Honor. |
| 09:16:27 | 16 | THE COURT:  Call your next witness. |
| 09:16:28 | 17 | MS. GLASSER:  USAA calls Mr. Makoto Jitodai, Wells |
| 09:16:38 | 18 | Fargo's corporate representative. |
| 09:16:39 | 19 | THE COURT:  By deposition? |
| 09:16:40 | 20 | MS. GLASSER:  By deposition video. |
| 09:16:42 | 21 | THE COURT:  Please proceed. |
| 09:16:43 | 22 | (Videoclip played.) |
| 09:16:44 | 23 | QUESTION:  Good morning, sir.  Can you state your |
| 09:16:48 | 24 | full name for the record? |
| 09:16:48 | 25 | ANSWER:  My full name is Makoto Scott Jitodai. |

| | | |
|---|---|---|
| 09:16:53 | 1 | QUESTION:  Sir, are you employed by Wells Fargo? |
| 09:16:56 | 2 | ANSWER:  Yes, I am. |
| 09:16:56 | 3 | QUESTION:  What is your position at Wells Fargo? |
| 09:16:58 | 4 | ANSWER:  I am a software systems architect at |
| 09:17:03 | 5 | Wells Fargo. |
| 09:17:03 | 6 | QUESTION:  Sir, have you been designated to speak |
| 09:17:05 | 7 | on behalf of Wells Fargo? |
| 09:17:06 | 8 | ANSWER:  I have been designated to speak on behalf |
| 09:17:09 | 9 | of Wells Fargo for the topics that I -- that I've seen. |
| 09:17:16 | 10 | QUESTION:  What non-infringing alternatives exist |
| 09:17:21 | 11 | to Wells Fargo's current mobile check deposit system? |
| 09:17:26 | 12 | ANSWER:  In reference to Wells Fargo's mobile |
| 09:17:32 | 13 | check deposit system, in terms of non-infringing |
| 09:17:35 | 14 | alternatives, there is a manual capture option. |
| 09:17:38 | 15 | QUESTION:  Do you know what the capture success |
| 09:17:44 | 16 | rate is with the manual capture system? |
| 09:17:46 | 17 | ANSWER:  I do not. |
| 09:17:46 | 18 | QUESTION:  Do you know if the capture rate for the |
| 09:17:49 | 19 | manual system is sufficiently high that it would even be |
| 09:17:57 | 20 | acceptable to consumers today? |
| 09:17:59 | 21 | ANSWER:  I cannot qualify anything about a success |
| 09:18:02 | 22 | rate for this.  I -- I -- I am here for -- I understand how |
| 09:18:04 | 23 | the components work together tailored. |
| 09:18:07 | 24 | QUESTION:  Okay. |
| 09:18:07 | 25 | ANSWER:  I cannot speak to that. |

09:18:09  1          QUESTION:  You can't tell me whether manual

09:18:11  2  capture would have sufficient acceptance rates to be

09:18:15  3  acceptable to customers, yes or no?

09:18:15  4          ANSWER:  No.

09:18:16  5          QUESTION:  And the -- the word that you -- that

09:18:21  6  you just spelled out, kMiSnapCaptureMode, that's a

09:18:26  7  parameter?

09:18:28  8          ANSWER:  That is correct.  That is a parameter

09:18:30  9  that Wells Fargo has been given to set for manual capture.

09:18:33  10         QUESTION:  Okay.  And so -- so Wells Fargo can

09:18:39  11 change that one parameter to allow for manual capture only

09:18:43  12 in the Mobile Deposit product; is that correct?

09:18:46  13         ANSWER:  That is correct, on the -- on the iOS

09:18:52  14 operating system.

09:18:52  15         QUESTION:  Is there a different parameter in

09:18:54  16 Android that Wells Fargo can set so that manual capture

09:19:00  17 occurs in MiSnap?

09:19:01  18         ANSWER:  Yes.

09:19:01  19         QUESTION:  And what is that parameter?

09:19:02  20         ANSWER:  Okay.  For the sake of the court

09:19:10  21 reporter, I will spell it out again.

09:19:11  22         On the Android side, there is a parameter that you

09:19:15  23 can set, MiSnap_Capture_Mode, and we set it to an

09:19:36  24 enumeration.  The enumeration, again, I will spell out,

09:19:48  25 MiSnap_Capture_Mode_MANUAL, which is the equivalent of 1.

09:20:11  1          QUESTION:  Did you speak with anyone else

09:20:13  2   regarding non-infringing alternatives?

09:20:17  3          ANSWER:  I spoke to Paul Rosati.

09:20:20  4          QUESTION:  What -- what did you learn from

09:20:22  5   Mr. Rosati?

09:20:22  6          ANSWER:  Let's see, from Paul Rosati, I learned

09:20:36  7   the estimated cost for conversion to manual capture.

09:20:39  8          QUESTION:  And to -- and do you know who

09:20:41  9   Mr. Rosati spoke with to obtain the cost information?

09:20:45  10         ANSWER:  Paul spoke -- spoke to development

09:20:48  11  managers, Devika Sabharwal, Kumaran Srimatha.  He also

09:20:55  12  spoke to QA James Silas and Monica Harvin.

09:20:59  13         QUESTION:  What area is Monica Harvin in?

09:21:02  14         ANSWER:  I believe she's in what's called digital

09:21:04  15  customer experience.

09:21:05  16         QUESTION:  Now, what estimated cost did Mr. Rosati

09:21:08  17  provide to you?

09:21:08  18         ANSWER:  111,760.

09:21:13  19         QUESTION:  Okay.

09:21:13  20         ANSWER:  111,760.

09:21:15  21         QUESTION:  Did Mr. Rosati provide a break-out for

09:21:19  22  that number?

09:21:20  23         ANSWER:  Yes, he did.

09:21:20  24         QUESTION:  And what -- what is the break-out for

09:21:23  25  that number?

| | | |
|---|---|---|
| 09:21:24 | 1 | ANSWER:  Okay.  The development cost is 65,280; |
| 09:21:32 | 2 | the quality assurance cost is 38,880, and the digital |
| 09:21:38 | 3 | experience design is 7,600. |
| 09:21:40 | 4 | QUESTION:  Okay.  And based on your preparation as |
| 09:21:44 | 5 | Wells Fargo's corporate representative, what is your |
| 09:21:46 | 6 | understanding of the cost for Wells Fargo to implement the |
| 09:21:52 | 7 | manual capture for Mobile Deposit? |
| 09:22:00 | 8 | ANSWER:  I think you already asked that.  The |
| 09:22:02 | 9 | estimated cost is 111,760 total. |
| 09:22:06 | 10 | (Videoclip ends.) |
| 09:22:07 | 11 | THE COURT:  Does that complete this witness by |
| 09:22:12 | 12 | deposition? |
| 09:22:13 | 13 | MS. GLASSER:  It does, Your Honor. |
| 09:22:14 | 14 | THE COURT:  Call your next witness. |
| 09:22:16 | 15 | MS. GLASSER:  USAA calls Mr. Jeffrey Easley, USAA |
| 09:22:24 | 16 | corporate representative by video deposition. |
| 09:22:27 | 17 | THE COURT:  Please proceed. |
| 09:22:28 | 18 | (Videoclip played.) |
| 09:22:28 | 19 | QUESTION:  Will you please state your name for the |
| 09:22:33 | 20 | record? |
| 09:22:33 | 21 | ANSWER:  Jeff Easley. |
| 09:22:34 | 22 | QUESTION:  And who is your current employer, |
| 09:22:39 | 23 | Mr. Easley? |
| 09:22:39 | 24 | ANSWER:  USAA. |
| 09:22:39 | 25 | QUESTION:  What is your current title at USAA? |

09:22:41  1        ANSWER:  Current title is assistant vice
09:22:46  2  president, governance risk compliance programs.
09:22:49  3        QUESTION:  You understand that this deposition is
09:22:52  4  being taken both in your capacity as an individual and in
09:22:58  5  your capacity as a representative of the corporation, USAA?
09:23:01  6        ANSWER:  I understand.
09:23:03  7        QUESTION:  When you say business case, you mean
09:23:06  8  making money, correct?
09:23:07  9        ANSWER:  Correct.
09:23:08  10       QUESTION:  So the more services your members use
09:23:10  11 with USAA, the more money USAA makes, correct?
09:23:13  12       ANSWER:  That is correct.  And with that money, we
09:23:15  13 use to drive more financial security, drive more services
09:23:19  14 that help them with -- with what they're doing.
09:23:22  15       So we also give quite a bit of money back to
09:23:26  16 members as it's a member-owned association, so what we --
09:23:30  17 what we don't need, if we're not improving or fixing
09:23:33  18 things, we're giving back to members through various
09:23:36  19 programs.
09:23:36  20       QUESTION:  If Mitek -- supposing Mitek was ready
09:23:40  21 to launch a beta of Mobile Deposit in February of 2008 with
09:23:47  22 not one, not two, but three banks, is it fair to say that's
09:23:52  23 some indication they were pretty far along in the process?
09:23:56  24       ANSWER:  I think my answer is -- my assessment was
09:23:58  25 they weren't ready.

| | | |
|---|---|---|
| 09:23:59 | 1 | QUESTION:  So at this time, USAA was actively |
| 09:24:03 | 2 | tracking the mobile offerings of its competitors, correct? |
| 09:24:09 | 3 | ANSWER:  Correct. |
| 09:24:10 | 4 | QUESTION:  And one of those competitors being |
| 09:24:12 | 5 | Wells Fargo? |
| 09:24:12 | 6 | ANSWER:  Correct. |
| 09:24:14 | 7 | QUESTION:  At this point, USAA knew that Wells |
| 09:24:16 | 8 | Fargo was offering text banking? |
| 09:24:18 | 9 | ANSWER:  Correct. |
| 09:24:19 | 10 | QUESTION:  Had a banking app? |
| 09:24:21 | 11 | ANSWER:  Yes. |
| 09:24:21 | 12 | QUESTION:  Had a mobile.com site? |
| 09:24:24 | 13 | ANSWER:  Yes. |
| 09:24:24 | 14 | QUESTION:  And you also do not know what the total |
| 09:24:28 | 15 | investment of Deposit@Mobile prior to November 2009 would |
| 09:24:32 | 16 | have been? |
| 09:24:32 | 17 | ANSWER:  Not specifically, no. |
| 09:24:37 | 18 | QUESTION:  What information are you prepared to |
| 09:24:40 | 19 | tell me today about the research and development costs |
| 09:24:45 | 20 | related to Deposit@Home? |
| 09:24:47 | 21 | ANSWER:  The information I have today is also in |
| 09:24:53 | 22 | my notes under Cost, first page of Exhibit 4. |
| 09:25:03 | 23 | So it's estimated that major development, |
| 09:25:06 | 24 | including research and development, occurred from 2004 to |
| 09:25:10 | 25 | 2013, a period of 10 years.  It's estimated we had 30 core |

| | | |
|---|---|---|
| 09:25:16 | 1 | engineers, plus a number of individuals outside of the IT |
| 09:25:20 | 2 | development teams working on all of our -- our RDC |
| 09:25:25 | 3 | solutions over that time period. |
| 09:25:29 | 4 | I have listed out a number of areas with |
| 09:25:33 | 5 | individuals involved in those development activities from |
| 09:25:39 | 6 | cash operations, bank systems developments, marketing |
| 09:25:45 | 7 | finance, corporate communications.  There's a list of maybe |
| 09:25:48 | 8 | 15 or so of these areas where individuals were involved |
| 09:25:53 | 9 | either in a development capacity or a business subject |
| 09:25:58 | 10 | matter expert to allow us to develop these products. |
| 09:26:01 | 11 | QUESTION:  Do you have any estimate today about |
| 09:26:05 | 12 | the R&D costs related to the auto capture feature claimed |
| 09:26:09 | 13 | in the asserted patents? |
| 09:26:10 | 14 | ANSWER:  I do not have estimates today. |
| 09:26:15 | 15 | QUESTION:  Do you know if it was in excess of |
| 09:26:20 | 16 | $50,000.00? |
| 09:26:21 | 17 | ANSWER:  To give it a comparison, projects lasting |
| 09:26:33 | 18 | one year with seven developers typically cost around a |
| 09:26:37 | 19 | million dollars of just IT spend, just for the developers. |
| 09:26:41 | 20 | QUESTION:  So you can't say whether it was |
| 09:26:44 | 21 | $50,000.00 more or less? |
| 09:26:45 | 22 | ANSWER:  Not without more detail. |
| 09:26:47 | 23 | QUESTION:  USAA also tracks whether each attempted |
| 09:26:52 | 24 | deposit is successful? |
| 09:26:54 | 25 | ANSWER:  Yes. |

| | | |
|---|---|---|
| 09:26:54 | 1 | QUESTION:  So using manual capture in April 2013, |
| 09:26:58 | 2 | USAA had a success rate of 84 percent, correct? |
| 09:27:08 | 3 | ANSWER:  Correct. |
| 09:27:08 | 4 | QUESTION:  And after the introduction of auto |
| 09:27:10 | 5 | capture, that improved to a success rate of 91 percent? |
| 09:27:16 | 6 | ANSWER:  That's what the data shows, yes. |
| 09:27:20 | 7 | QUESTION:  So you're looking at a 7 percent |
| 09:27:23 | 8 | increase, correct, in success? |
| 09:27:25 | 9 | ANSWER:  Well, percentage of increase. |
| 09:27:31 | 10 | QUESTION:  Of success increase, from approximately |
| 09:27:33 | 11 | 84 to approximately 91 -- |
| 09:27:33 | 12 | ANSWER:  Correct. |
| 09:27:34 | 13 | QUESTION:  -- that's 7 percent, correct? |
| 09:27:35 | 14 | ANSWER:  Correct. |
| 09:27:36 | 15 | QUESTION:  Prior to auto capture, USAA members |
| 09:27:38 | 16 | were experiencing an 84 percent success rate, correct? |
| 09:27:42 | 17 | ANSWER:  Correct. |
| 09:27:45 | 18 | QUESTION:  And your opinion is there's no value in |
| 09:27:49 | 19 | that 84 percent success rate? |
| 09:27:50 | 20 | ANSWER:  Not my opinion.  My point is we are in a |
| 09:27:56 | 21 | highly competitive environment where features like auto |
| 09:28:05 | 22 | capture literally have the -- the weight in terms of |
| 09:28:12 | 23 | whether or not members choose us for our bank and use that |
| 09:28:17 | 24 | feature, given they have that feature in many other places |
| 09:28:21 | 25 | now. |

09:28:21    1            QUESTION:  To be clear, for four years -- or

09:28:26    2    approximately four years from 2009 to 2013, USAA operated

09:28:32    3    mobile deposit without auto capture?

09:28:34    4            QUESTION:  Correct?

09:28:37    5            ANSWER:  So for approximately four years, your

09:28:41    6    members were positioning their phones and pressing a

09:28:44    7    button?

09:28:45    8            ANSWER:  Correct.

09:28:45    9            QUESTION:  Does USAA have any evidence that in

09:28:47   10    that four-year period where folks were pressing the button

09:28:51   11    in -- on USAA's mobile deposit app, that members left USAA

09:29:02   12    to go elsewhere because of the manual capture feature?

09:29:15   13            ANSWER:  Not that I'm aware of, and I'm also not

09:29:19   14    aware that there was a competitive offering in which to

09:29:22   15    leave us for.

09:29:24   16            QUESTION:  Has USAA done any analysis of whether

09:29:28   17    or not any increase in usage of a mobile deposit feature

09:29:37   18    was related to the auto capture feature versus other

09:29:40   19    environmental effects, such as larger adoption of mobile

09:29:44   20    phone usage?

09:29:46   21            ANSWER:  I don't believe we have that data broken

09:29:48   22    out at that level.

09:29:49   23            QUESTION:  Have you done any studies about whether

09:29:52   24    or not increased trends or increased usage of mobile

09:29:55   25    deposit was due to the introduction of the auto capture

09:29:58  1  feature versus other environmental factors such as general

09:30:02  2  increases in mobile phone use?

09:30:04  3      ANSWER:  Given I personally moved away around that

09:30:09  4  time or right after that time, I don't have that

09:30:13  5  information.  It's possible that we have done research on

09:30:17  6  that.

09:30:17  7      QUESTION:  And USAA would have been enjoying that

09:30:21  8  economic benefit of RDC from 2009 to 2013 as it was getting

09:30:28  9  deposits from its mobile deposit app that used mobile

09:30:33 10  cap -- that used manual capture, correct?

09:30:36 11      ANSWER:  As a competitive feature that attracted

09:30:40 12  checking account relationships and their balances that come

09:30:43 13  with the product, yes, correct.

09:30:45 14      QUESTION:  You've gone from 33 percent of members

09:30:48 15  having -- banking with you in 2009 to 39 percent?

09:30:53 16      ANSWER:  Correct.

09:30:54 17      QUESTION:  In 2018?

09:30:56 18      ANSWER:  Correct.

09:30:57 19      QUESTION:  But still approximately 61 percent of

09:31:01 20  your members do not have a banking account with USAA?

09:31:06 21      ANSWER:  A checking account.

09:31:08 22      QUESTION:  A checking account?

09:31:09 23      ANSWER:  Correct.

09:31:14 24      QUESTION:  And as of 2018, 61 percent of your

09:31:19 25  members do not have a checking account with USAA even

09:31:26  1   though USAA has introduced auto capture to its mobile

09:31:32  2   deposit product, correct?

09:31:32  3        ANSWER:  Yes, that 61 percent who do not bank with

09:31:41  4   us includes current product offerings in features.

09:31:48  5        QUESTION:  And so rephrased another way, even

09:31:51  6   though you now have auto capture in your mobile deposit

09:31:54  7   product, 61 percent of your members still don't bank with

09:31:56  8   you?

09:31:57  9        ANSWER:  Correct.

09:32:02  10       QUESTION:  And can you tell me, when USAA was

09:32:15  11  beginning the process of Mobile@Home and mobile deposit,

09:32:25  12  how did it allocate cost for capital developments?

09:32:31  13       QUESTION:  Capital developments are managed

09:32:37  14  through -- at that time a program management office was

09:32:43  15  allotted a certain amount of technology spend.  The

09:32:51  16  development area, at least the core in the beginning, was

09:32:58  17  run out of Ricky Burks' -- or at least led by Ricky Burks'

09:33:05  18  development teams, but it expanded to different development

09:33:08  19  teams through the years?

09:33:09  20       QUESTION:  When USAA was allocating money to

09:33:14  21  develop the Deposit@Home and Deposit@Mobile, did it break

09:33:16  22  down the allocations specifically between those two

09:33:22  23  different products or were they -- was money allocated just

09:33:25  24  to -- to both of those?

09:33:30  25       ANSWER:  Money was allocated to both of those.

| | | |
|---|---|---|
| 09:33:34 | 1 | QUESTION:  Are you familiar with the economic |
| 09:33:36 | 2 | benefits that USAA associates with remote deposit capture? |
| 09:33:42 | 3 | ANSWER:  Yes, I am familiar. |
| 09:33:44 | 4 | QUESTION:  Can you tell us generally what those |
| 09:33:46 | 5 | benefits are? |
| 09:33:47 | 6 | ANSWER:  We see five economic benefits.  Number |
| 09:33:55 | 7 | one, cost savings on check processing from channels like |
| 09:34:06 | 8 | check by mail costing $1.21 per deposit to remote deposit |
| 09:34:14 | 9 | capture, costing four cents per deposit. |
| 09:34:17 | 10 | Number two, we see capital investment savings in |
| 09:34:21 | 11 | avoiding the building and maintaining of branches to |
| 09:34:26 | 12 | attract and collect more deposits.  This is a traditional |
| 09:34:32 | 13 | banking model.  That's a -- a significant amount of capital |
| 09:34:35 | 14 | to build and maintain those. |
| 09:34:36 | 15 | QUESTION:  How does remote deposit capture, |
| 09:34:38 | 16 | whether it's by using mobile deposit or @Home deposit, how |
| 09:34:48 | 17 | does that allow the bank not to have additional branch |
| 09:34:52 | 18 | offices? |
| 09:34:52 | 19 | ANSWER:  So the traditional banking model, up and |
| 09:34:57 | 20 | to that point, still here today but certainly remote |
| 09:35:07 | 21 | deposit capture is an innovation that -- that addresses |
| 09:35:09 | 22 | this.  The traditional model is to open branches in |
| 09:35:19 | 23 | geographical areas, given customers bank with someone who's |
| 09:35:25 | 24 | in their neighborhood or has a physical presence, and the |
| 09:35:29 | 25 | branch, especially in those times, was the way in which |

09:35:31  1  banks attracted new customers and deposits that they

09:35:34  2  brought with them.  With remote deposit capture, that

09:35:43  3  untethered the ability to deposit a check from having to go

09:35:49  4  to a branch to do it.

09:35:52  5       QUESTION:  All right.  You mentioned savings

09:35:55  6  and -- and the not having to have branch offices.  What

09:35:58  7  other economic benefits are associated with remote deposit

09:36:03  8  capture?

09:36:03  9       ANSWER:  In the traditional -- well, in the

09:36:09  10  banking model generally, deposits that are brought to the

09:36:14  11  bank by our members serve as, you know, cheap, stable

09:36:28  12  funding sources for the bank's lending products, just like

09:36:33  13  any other bank.

09:36:34  14       So attracting deposits, especially without

09:36:41  15  spending a large amount of capital, goes into the cost of

09:36:45  16  those funds, which is what serves as the -- the cost of

09:36:50  17  what has been loaned out to members through credit cards

09:36:56  18  and/or bank loans.

09:36:58  19       And the difference between that cost and the

09:37:00  20  interest rate on the -- on the loans or the credit card is

09:37:05  21  what's known as a net interest margin, so that's another

09:37:09  22  economic benefit.

09:37:10  23       In this case, other banks have a cost of funds for

09:37:15  24  deposits, but the branch network is -- is a significant

09:37:20  25  cost of that.

09:37:21  1        In this case, not spending that capital brings the

09:37:25  2  cost of our funds to be lent out lower -- you know,

09:37:29  3  competitively lower.

09:37:30  4        QUESTION:  So if USAA does not have money that its

09:37:35  5  members are depositing for it to loan out, where does it go

09:37:40  6  to get money to loan out to other folks?

09:37:43  7        QUESTION:  Well, first of all, if -- if any bank

09:37:46  8  doesn't have deposits to loan, the financial regulators

09:37:50  9  would not be happy or not approve of that model.  That's

09:37:57 10  somewhat what happened in the banking crisis of 2008.

09:38:01 11        But alternatives to obtaining funds to lend would

09:38:10 12  come from loading -- you know, borrowing from the

09:38:16 13  Fed Reserve, borrowing from other banks.  The cost of that

09:38:21 14  would be significantly higher.

09:38:24 15        QUESTION:  What other economic benefits does USAA

09:38:27 16  associate with remote deposit capture?

09:38:28 17        ANSWER:  Another economic benefit is the ecosystem

09:38:36 18  in which a member who has a checking account with us is

09:38:42 19  likely to be introduced to other products that USAA offers.

09:38:49 20        So the checking relationship, as we refer to it,

09:38:55 21  means a member experiences USAA, and a service like remote

09:38:59 22  deposit capture is a very valuable service in terms of

09:39:04 23  convenience and time savings for members.  So that, as we

09:39:11 24  say internally, delightful experience leads to an interest

09:39:16 25  in other ways that USAA can provide financial services to

09:39:19   1   them.

09:39:19   2         So there's a path in -- which typically follows

09:39:22   3   the acquisition of a checking account where a member is

09:39:24   4   likely to pick up a savings account, an auto loan, or auto

09:39:32   5   insurance product or -- or a credit card product as part of

09:39:35   6   that relationship path.

09:39:37   7         Each of those products have their own financials

09:39:41   8   to them, so that's -- that's an economic benefit to USAA.

09:39:45   9         QUESTION:  Why was it important to USAA to develop

09:39:50   10  the remote deposit capture system in the first place?

09:39:55   11        ANSWER:  I think as a culture USAA, and certainly

09:40:04   12  I can speak for myself, is powered by facilitating

09:40:09   13  financial security for our members, the members of the

09:40:12   14  military and their families.  We seek to be the provider of

09:40:16   15  choice -- that's -- that's what we do -- motivated by those

09:40:21   16  who serve us.

09:40:27   17        In doing so, remote deposit capture is a very

09:40:34   18  innovative product.  Members received it extremely well.

09:40:41   19  And for us, it was very much tailored to their lifestyle,

09:40:46   20  their situations, meaning members of the military -- active

09:40:50   21  members of the military move quite a bit during their

09:40:53   22  service.  It's called a permanent change of station.  That

09:40:58   23  happens quite a bit in military families, and the whole

09:41:00   24  family is affected, not just the active military member.

09:41:05   25        So this was unique from our perspective in the

09:41:09    1    sense that we have a way of allowing them to bank wherever
09:41:12    2    they are anytime, anywhere, which is really suited to a
09:41:18    3    mobile military.
09:41:20    4         So that -- being the person involved in -- on the
09:41:25    5    business side and product leader creating these services,
09:41:28    6    that was a real motivation and energy source for us.
09:41:32    7         QUESTION:  So if USAA already had the remote
09:41:35    8    deposit capture system, why was it important to USAA to
09:41:39    9    also come up with an auto capture feature?
09:41:45   10         ANSWER:  We continue to improve the service year
09:41:50   11    over year.  As we saw, competitor banks enter with
09:42:01   12    offerings of their own.  It was more important to us to
09:42:05   13    achieve our mission to be a provider of choice to ensure
09:42:10   14    competitiveness -- competitiveness of the feature.
09:42:14   15         Competitiveness in this since is from a member's
09:42:18   16    perspective the ability -- the ease of use, the one time --
09:42:35   17    you know, and one attempt to put a check into view from a
09:42:37   18    digital device and have it deposited successfully.  From
09:42:42   19    the member's perspective, funds, you know, into their
09:42:45   20    account, that is the convenience that's at play here, as
09:42:48   21    compared to having to be in a place where there's a bank
09:42:53   22    branch to drive to, to hand that check to a teller.  And in
09:43:01   23    many cases, the funds may be available the next day, if not
09:43:05   24    days later.
09:43:06   25         So we continue to develop features around this

09:43:12   1   service to make it as simple, easy to use, and provide the

09:43:19   2   convenience of access to their deposit funds as possible.

09:43:25   3        QUESTION:  Do you have any view as to the value of

09:43:28   4   the auto capture feature?

09:43:32   5        ANSWER:  I do.

09:43:33   6        QUESTION:  What is that?

09:43:34   7        ANSWER:  We value it at about 40 percent of the

09:43:37   8   value of the product itself.  The basis for that is the 40

09:43:43   9   percent improvement we saw in success rates when we

09:43:49  10   introduced the feature, meaning we improve the likelihood

09:43:57  11   by 40 percent that the image of the check that we captured

09:44:01  12   for you would be captured and processed successfully.

09:44:07  13        To a member, that meant fewer times where we told

09:44:11  14   you there was a -- there was an error and we could not

09:44:13  15   process the image.

09:44:16  16        Again, back to what is the value of this, it's

09:44:19  17   convenience.  That was a huge increase in convenience for

09:44:23  18   members.

09:44:23  19        QUESTION:  Are you familiar with any comparable

09:44:27  20   license agreements that we can look to analyze the

09:44:31  21   ecosystem benefits that you discussed?

09:44:34  22        ANSWER:  Yes.  I would say a comparable licensing

09:44:39  23   agreement is our agreement with Zelle.

09:44:42  24        QUESTION:  Can you tell us what Zelle is?

09:44:44  25        ANSWER:  I can.  Zelle is, from a member's

09:44:50  1  perspective, a service offered to allow you to send money

09:44:55  2  to another person.  So that ecosystem benefit comparison is

09:45:08  3  as an access to money.  So if you need to get money to a

09:45:12  4  friend, family member, in this case, or another account you

09:45:16  5  have at another bank, this agreement with Zelle is a

09:45:19  6  service provided that gives you that access as a banking

09:45:26  7  member.

09:45:26  8       QUESTION:  Those economic benefits are not unique

09:45:29  9  to auto capture, correct?

09:45:30  10       ANSWER:  I would say auto capture is a competitive

09:45:37  11  feature that without it would cause benefits not to be

09:45:43  12  realized.

09:45:44  13       QUESTION:  But you are -- but USAA was realizing

09:45:47  14  those benefits long before the introduction of auto

09:45:49  15  capture, correct?

09:45:49  16       ANSWER:  Some amount of them, yes.

09:45:52  17       (Videoclip ends.)

09:45:52  18       THE COURT:  Does that complete this witness by

09:45:55  19  deposition?

09:45:56  20       MS. GLASSER:  It does, Your Honor.  However, the

09:45:58  21  parties have identified two audio visual errors, and with

09:46:03  22  the Court's permission, the parties jointly would request

09:46:06  23  to play those two right now.  They're from Mr. Prasad and

09:46:11  24  Mr. Rosati.

09:46:12  25       THE COURT:  Do Defendants concur with that?

| | | |
|---|---|---|
| 09:46:16 | 1 | MR. BITTNER:  Yes, Your Honor. |
| 09:46:16 | 2 | THE COURT:  All right.  Let's play these two short |
| 09:46:18 | 3 | corrections. |
| 09:46:20 | 4 | (Videoclip played.) |
| 09:46:21 | 5 | QUESTION:  So you have no basis to claim that |
| 09:46:23 | 6 | Wells Fargo has copied the code that USAA uses for its |
| 09:46:29 | 7 | product implementation, do you? |
| 09:46:31 | 8 | ANSWER:  So if you're talking about copying USAA's |
| 09:46:34 | 9 | code into Wells Fargo systems, I have no basis of that. |
| 09:46:39 | 10 | (Videoclip ends.) |
| 09:47:25 | 11 | (Videoclip played.) |
| 09:47:25 | 12 | QUESTION:  When did you become involved with the |
| 09:47:29 | 13 | Mobile Deposit project at Wells Fargo? |
| 09:47:30 | 14 | ANSWER:  Been a mobile deposit product manager for |
| 09:47:34 | 15 | about five years. |
| 09:47:35 | 16 | QUESTION:  So when did that start? |
| 09:47:38 | 17 | ANSWER:  Around Q1, 2014, when I got involved. |
| 09:47:42 | 18 | QUESTION:  So that was at about the time that |
| 09:47:47 | 19 | Wells Fargo -- let me ask the question. |
| 09:47:49 | 20 | You became a product manager responsible for |
| 09:47:51 | 21 | Mobile Deposit at Wells Fargo in the first quarter of 2014, |
| 09:47:55 | 22 | fair? |
| 09:47:56 | 23 | ANSWER:  Yes. |
| 09:47:57 | 24 | QUESTION:  And that was about the time that Wells |
| 09:47:59 | 25 | Fargo launched its Mobile Deposit 2.0 system, fair? |

```
09:48:03   1            ANSWER:  There was a project already underway when
09:48:06   2   I joined, yes.
09:48:07   3            QUESTION:  And that project was Mobile Deposit
09:48:10   4   2.0, fair?
09:48:11   5            ANSWER:  Phase 2, yes.
09:48:13   6            QUESTION:  And that project involved the
09:48:15   7   implementation of what's commonly known in the industry as
09:48:18   8   auto capture, fair?
09:48:19   9            ANSWER:  Yes.
09:48:20  10            (Videoclip ends.)
09:48:22  11       THE COURT:  All right.  Does this complete the
09:48:24  12   witnesses by deposition offered by Plaintiff?
09:48:27  13       MR. SHEASBY:  It does, Your Honor.
09:48:28  14       THE COURT:  All right.  Plaintiff, call your next
09:48:31  15   witness.
09:48:31  16       MR. SHEASBY:  Your Honor, at this time, USAA rests
09:48:35  17   its case-in-chief, subject to rebuttal.
09:48:38  18       THE COURT:  All right.  Ladies and gentlemen, the
09:48:40  19   Plaintiff has rested its case-in-chief.  We'll next proceed
09:48:44  20   with the Defendant's case-in-chief.
09:48:46  21            Before I ask Defendant to call their first
09:48:49  22   witness, we're going to take a short recess.
09:48:51  23            If you will simply close and leave your notebooks
09:48:54  24   in your chairs in the jury box, follow all the instructions
09:48:57  25   I've given you about your conduct throughout the trial,
```

| | | |
|---|---|---|
| 09:49:00 | 1 | including not to discuss the case with each other or anyone |
| 09:49:02 | 2 | else, we'll be back in here shortly to continue, and we'll |
| 09:49:05 | 3 | begin with the Defendant's first witness in their |
| 09:49:08 | 4 | case-in-chief. |
| 09:49:08 | 5 | The jury's excused for recess at this time. |
| 09:49:12 | 6 | COURT SECURITY OFFICER:  All rise. |
| 09:49:13 | 7 | (Jury out.) |
| 09:49:13 | 8 | THE COURT:  Counsel, I'll attempt to keep this |
| 09:49:35 | 9 | recess short. |
| 09:49:36 | 10 | The Court stands in recess. |
| 09:49:38 | 11 | COURT SECURITY OFFICER:  All rise. |
| 09:49:39 | 12 | (Recess.) |
| 09:49:39 | 13 | (Jury out.) |
| 09:49:39 | 14 | COURT SECURITY OFFICER:  All rise. |
| 09:53:10 | 15 | THE COURT:  Be seated, please. |
| 10:00:42 | 16 | All right.  Let's bring in the jury, please. |
| 10:01:51 | 17 | COURT SECURITY OFFICER:  All rise. |
| 10:02:05 | 18 | (Jury in.) |
| 10:02:05 | 19 | THE COURT:  Please be seated. |
| 10:02:18 | 20 | Plaintiff having rested its case-in-chief, |
| 10:02:27 | 21 | Defendant, call your next -- first witness. |
| 10:02:30 | 22 | MR. MELSHEIMER:  May it please the Court, Your |
| 10:02:33 | 23 | Honor.  Wells Fargo calls Mr. Andrew Wood, and he will be |
| 10:02:36 | 24 | examined by Mr. Michael Bittner. |
| 10:02:39 | 25 | THE COURT:  All right.  Mr. Wood, if you'll come |

| | | |
|---|---|---|
| 10:02:41 | 1 | forward and be sworn, please. |
| 10:03:03 | 2 | (Witness sworn.) |
| 10:03:03 | 3 | THE COURT:  Please come around, sir, have a seat |
| 10:03:05 | 4 | at the witness stand. |
| 10:03:06 | 5 | MR. BITTNER:  And, Your Honor, as Mr. Wood is |
| 10:03:09 | 6 | getting seated, I'm going to be using the easel.  May I go |
| 10:03:12 | 7 | ahead and move it forward? |
| 10:03:14 | 8 | THE COURT:  You may. |
| 10:03:22 | 9 | All right.  Ladies and gentlemen of the jury, I |
| 10:03:29 | 10 | need to instruct you before counsel begins their direct |
| 10:03:33 | 11 | examination that Mr. Andrew Wood is a fact witness.  He is |
| 10:03:37 | 12 | not an expert witness.  He is here to discuss how a certain |
| 10:03:43 | 13 | product works.  He is not here to discuss whether the |
| 10:03:48 | 14 | working of that product relates in any way to the |
| 10:03:52 | 15 | patents-in-suit or the asserted claims at issue. |
| 10:03:54 | 16 | All right.  With that, you may proceed with your |
| 10:03:56 | 17 | direct examination. |
| 10:03:57 | 18 | MR. BITTNER:  May it please the Court. |
| 10:03:57 | 19 | ANDREW WOOD, DEFENDANT'S WITNESS, SWORN |
| 10:03:57 | 20 | DIRECT EXAMINATION |
| 10:03:59 | 21 | BY MR. BITTNER: |
| 10:03:59 | 22 | Q.  Good morning, Mr. Wood.  Would you please introduce |
| 10:04:01 | 23 | yourself to the jury? |
| 10:04:02 | 24 | A.  Hi.  My name is Andrew Wood. |
| 10:04:06 | 25 | Q.  Where do you live? |

| 10:04:07 | 1 | A.  I live in San Diego, California. |
| 10:04:10 | 2 | Q.  Is this your first time in East Texas? |
| 10:04:12 | 3 | A.  No, it's not.  My wife has some family down in Alto. |
| 10:04:17 | 4 | It's about an hour and a half south -- southwest of here. |
| 10:04:20 | 5 | And I've been here a couple of times, once, when my first |
| 10:04:23 | 6 | son was born to introduce him to the family, and another |
| 10:04:26 | 7 | time to celebrate New Year's. |
| 10:04:29 | 8 | Q.  Where do you currently work? |
| 10:04:30 | 9 | A.  I work at Mitek Systems. |
| 10:04:33 | 10 | Q.  And what is your current position? |
| 10:04:35 | 11 | A.  Currently, I'm a staff software engineering manager. |
| 10:04:39 | 12 | Q.  Can we talk a little about your background? |
| 10:04:42 | 13 | A.  Yes, we may. |
| 10:04:43 | 14 | Q.  Where did you go to college, sir? |
| 10:04:45 | 15 | A.  I went to the University of California San Diego. |
| 10:04:50 | 16 | Q.  And what was your degree in? |
| 10:04:51 | 17 | A.  It was in computer science. |
| 10:04:55 | 18 | Q.  Why did you decide to get a degree or pursue a degree |
| 10:04:59 | 19 | in computer science? |
| 10:05:01 | 20 | A.  I was really into playing video games as a teenager, |
| 10:05:04 | 21 | and I wanted to learn how to build and develop video games. |
| 10:05:07 | 22 | Q.  And did you, indeed, develop video games after college? |
| 10:05:11 | 23 | A.  No, I did not. |
| 10:05:11 | 24 | Q.  What did you do instead? |
| 10:05:14 | 25 | A.  I started working with cell phones instead. |

| | | |
|---|---|---|
| 10:05:17 | 1 | Q.  And when did you first start working with cell phones? |
| 10:05:19 | 2 | A.  That was the summer of my junior year, so 2003. |
| 10:05:25 | 3 | Q.  Back in 2003, what kind of cell phones were you working |
| 10:05:28 | 4 | with? |
| 10:05:28 | 5 | A.  Those were those old flip phones. |
| 10:05:32 | 6 | Q.  Now, did you start working with these old flip phones |
| 10:05:35 | 7 | before or after the first iPhone was released? |
| 10:05:39 | 8 | A.  It was before.  The iPhone wasn't released for another |
| 10:05:44 | 9 | four years. |
| 10:05:45 | 10 | Q.  And what were you doing with flip phones -- cell phones |
| 10:05:48 | 11 | in the pre-iPhone days? |
| 10:05:50 | 12 | A.  Back then, I was writing apps for flip phones. |
| 10:05:54 | 13 | Q.  Is app short for application? |
| 10:05:59 | 14 | A.  Yes, that's right. |
| 10:05:59 | 15 | Q.  What is an app or application? |
| 10:06:01 | 16 | A.  An app or application is some software that runs on a |
| 10:06:06 | 17 | computer or on a phone. |
| 10:06:08 | 18 | Q.  What are some of the standard apps that run on today's |
| 10:06:12 | 19 | smartphones? |
| 10:06:12 | 20 | A.  You might have a maps app, text messaging app, Internet |
| 10:06:19 | 21 | browser app, the phone app to call people, a camera app, |
| 10:06:25 | 22 | photo gallery app, lots of things. |
| 10:06:28 | 23 | Q.  Let's go back to 2003 and your work with flip phones. |
| 10:06:33 | 24 | What are -- can you give the jury an example of an |
| 10:06:35 | 25 | application that you worked on back in those early flip |

10:06:38   1   phone days?

10:06:40   2   A.   Sure.  Our most popular application back then was a

10:06:45   3   searchable version of the King James Bible and the Spanish

10:06:48   4   version, as well, because back then, you couldn't access

10:06:51   5   the whole Internet on your phones.  You could only get a

10:06:56   6   small part of it, so people needed apps to get things that

10:06:59   7   they wanted.

10:07:00   8   Q.   What are some of the other apps that you developed back

10:07:02   9   then?

10:07:03   10   A.   We also developed a dictionary and a thesaurus app so

10:07:08   11   people could look up words on-the-go, as well.

10:07:08   12   Q.   All tolled, how long have you been working with

10:07:11   13   software development?

10:07:11   14   A.   Over 20 years, but 16 years professionally.

10:07:18   15   Q.   And how did you end up at Mitek?

10:07:22   16   A.   After flip phones, smartphones started getting more

10:07:26   17   popular.  I was interested in learning how to develop for

10:07:27   18   those.  I took some courses, did some training, and

10:07:29   19   eventually Mitek had an opening for a smartphone app

10:07:35   20   development.  I applied, and I was hired.

10:07:37   21   Q.   When you were hired at Mitek, were you focused on

10:07:43   22   programming for Android phones or for iPhones?

10:07:46   23   A.   It was Android.

10:07:47   24   Q.   What titles have you held during your time at Mitek?

10:07:50   25   A.   I started as an Android software engineer, and then I

| | | |
|---|---|---|
| 10:07:54 | 1 | was promoted to lead Android software engineer.  After |
| 10:07:59 | 2 | that, I was promoted to principal engineer for mobile |
| 10:08:04 | 3 | capture products. |
| 10:08:05 | 4 | Q.  Let me stop you there.  What do you mean by principal |
| 10:08:08 | 5 | engineer for mobile capture products? |
| 10:08:10 | 6 | A.  Well, it was a promotion.  I had been working |
| 10:08:14 | 7 | exclusively with Android, but I started to expand my role |
| 10:08:18 | 8 | and started working with iOS developers, as well, and tried |
| 10:08:22 | 9 | to bring our development efforts in line with each other. |
| 10:08:25 | 10 | Q.  So when you were promoted, did you start working with |
| 10:08:28 | 11 | both Android and iPhone platforms for Mitek software? |
| 10:08:32 | 12 | A.  Yes, that's correct. |
| 10:08:34 | 13 | Q.  And what is your title today? |
| 10:08:36 | 14 | A.  Today, I'm a staff software engineering manager. |
| 10:08:42 | 15 | Q.  Was that another promotion? |
| 10:08:44 | 16 | A.  Yes, it was. |
| 10:08:44 | 17 | Q.  And what does your current job today entail?  What are |
| 10:08:48 | 18 | your responsibilities at Mitek? |
| 10:08:49 | 19 | A.  Today, I manage two teams of software developers for |
| 10:08:56 | 20 | Android iOS and web that are building Mitek's software that |
| 10:09:03 | 21 | runs on smartphones. |
| 10:09:04 | 22 | Q.  And are you involved with Mitek's products today -- |
| 10:09:09 | 23 | Mitek software today for both Android and iPhone? |
| 10:09:14 | 24 | A.  Yes, I am. |
| 10:09:14 | 25 | Q.  And what product specifically have you been focused on |

10:09:19  1  during your time at Mitek?

10:09:20  2  A.  That's mainly MiSnap.

10:09:22  3  Q.  What is MiSnap?

10:09:23  4  A.  So MiSnap is some software that runs on a smartphone,

10:09:33  5  and it allows you to take pictures of a variety of

10:09:39  6  different documents for a variety of purposes.

10:09:41  7  Q.  Is MiSnap limited to check capture?

10:09:46  8  A.  No, it's not.

10:09:47  9  Q.  What else is MiSnap designed to do?

10:09:49  10  A.  Well, MiSnap can also take pictures of

10:09:53  11  government-issued IDs like driver's licenses or passports.

10:09:57  12  Q.  What's the purpose of that technology?  Why design

10:10:01  13  something to take pictures of government-issue IDs or

10:10:07  14  passports?

10:10:08  15  A.  That's for a different part of MiSnap that's used for a

10:10:11  16  Mobile Verify product.  And Mobile Verify let's you sign up

10:10:16  17  for new accounts online securely, and the bank or the

10:10:21  18  company needs to know that you are who you say you are, so

10:10:25  19  we need a picture of your ID.  We need to validate that

10:10:30  20  it's a real authentic ID.  We need to match that to your --

10:10:34  21  your selfie, your face.

10:10:35  22      And, conversely, if some hacker in China gets your

10:10:38  23  information, it'd make it hard for them to set up an

10:10:42  24  account in your name.  So Mobile Verify is protecting

10:10:46  25  against identity theft and fraud.

10:10:49  1    Q.  What are some companies that use Mobile Verify?

10:10:53  2    A.  Lots of companies, including PayPal, a number of banks

10:10:56  3    do, as well.

10:10:56  4    Q.  Let's return to mobile check deposit.  Other than

10:10:59  5    taking the image of the check, what else does MiSnap do in

10:11:04  6    the mobile check deposit process?

10:11:05  7    A.  That's it.  It just takes the -- the front and the back

10:11:09  8    image of the check.

10:11:10  9    Q.  Are you familiar with the terms "auto capture" and

10:11:13  10   "manual capture"?

10:11:14  11   A.  Yes, I am.

10:11:16  12   Q.  As you use it around the office, what do you understand

10:11:19  13   manual capture to mean?

10:11:22  14   A.  So for manual capture, the user takes their smartphone,

10:11:26  15   holds it over the check, and there's a button on the

10:11:29  16   screen.  When they're ready, they push that button, and

10:11:31  17   MiSnap takes a picture.

10:11:32  18   Q.  Do you know if there's more than one way to do manual

10:11:36  19   capture?

10:11:36  20   A.  Yes.  Yes, there is.

10:11:38  21   Q.  How do you know that?

10:11:40  22   A.  We have done it several ways at Mitek.

10:11:43  23   Q.  Okay.  As you use it around the office, what do you

10:11:47  24   understand auto capture to mean?

10:11:47  25   A.  Auto capture, you're going to hold your smartphone over

| | |
|---|---|
| 10:11:53 | 1 |
| 10:11:59 | 2 |
| 10:12:02 | 3 |
| 10:12:05 | 4 |
| 10:12:05 | 5 |
| 10:12:08 | 6 |
| 10:12:08 | 7 |
| 10:12:11 | 8 |
| 10:12:15 | 9 |
| 10:12:16 | 10 |
| 10:12:17 | 11 |
| 10:12:27 | 12 |
| 10:12:28 | 13 |
| 10:12:30 | 14 |
| 10:12:33 | 15 |
| 10:12:37 | 16 |
| 10:12:41 | 17 |
| 10:12:44 | 18 |
| 10:12:46 | 19 |
| 10:12:46 | 20 |
| 10:12:49 | 21 |
| 10:12:53 | 22 |
| 10:12:57 | 23 |
| 10:12:59 | 24 |
| 10:13:00 | 25 |

the -- the check, and it's going to automatically take the picture for you.  You don't have to push the button.

Q.  Do you know if there's more than one way to do auto capture?

A.  Yes, there is.

Q.  How do you know?

A.  We have done it several ways at Mitek.

Q.  How many different ways has Mitek done auto capture?

MR. SHEASBY:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(Bench conference.)

THE COURT:  Yes, counsel?

MR. SHEASBY:  In the pre-trial conference, Your Honor made clear that we would not have a discussion about any versions of Mitek software that were not accused of infringement in this case.  And I believe that Mr. Bittner is now going to ask about historical ways in which auto capture were done.  And that would violate your Court's instruction.

So he must first, I think, lay the foundation that he's to speak about the versions of auto capture that are in the accused versions that are before this Court.

THE COURT:  Mr. Bittner?

MR. BITTNER:  First, Mr. Wood doesn't know what the accused versions are.  There is an accused version,

10:13:04  1  2.0.6, which was identified by Dr. Conte as an accused

10:13:06  2  version which has these two ways I'm about to identify with

10:13:09  3  Mr. Wood in the code side-by-side, and that's going to come

10:13:12  4  out today.

10:13:12  5       MR. SHEASBY:  No, Your Honor, that's actually

10:13:14  6  incorrect.  The accused version of MiSnap that is used by

10:13:18  7  Wells Fargo does not implement this other -- what he's

10:13:21  8  referring to.  The only thing that's implemented by Wells

10:13:24  9  Fargo is the -- the version that Mr. Conte has been

10:13:28  10  discussing.

10:13:29  11       THE COURT:  Well, the witness may not know what

10:13:32  12  the accused products in the case are, but you do,

10:13:34  13  Mr. Bittner.  And you need to limit your questions to

10:13:37  14  accused products in the case.

10:13:38  15       MR. BITTNER:  And I'm limiting my question to

10:13:41  16  2.0.6, which had two different ways side-by-side of doing

10:13:45  17  it in the code.

10:13:46  18       MR. SHEASBY:  Your Honor, we didn't use the other

10:13:49  19  way of asserting.  So he's talking about a different

10:13:51  20  something in a code that Wells Fargo never implemented.

10:13:56  21       MR. BITTNER:  Your Honor's ruling on --

10:13:58  22       THE COURT:  You can address that on cross, as long

10:13:59  23  as he stays within the accused products, we're all right.

10:14:03  24       MR. BITTNER:  Yes, sir, and that will be clear.

10:14:07  25       THE COURT:  All right.  Let's proceed.

10:14:08  1        MR. SHEASBY:  Thank you, Your Honor.

10:14:09  2        (Bench conference concluded.)

10:14:11  3        THE COURT:  Let's proceed.

10:14:12  4  Q.  (By Mr. Bittner)  Mr. Wood, I want to direct your

10:14:18  5  attention to Version 2.0.6 of -- I'll ask you a question in

10:14:25  6  just a second.

10:14:25  7        Are you aware in Version 2.0.6 of MiSnap if there

10:14:31  8  are two versions of auto capture side-by-side in the code?

10:14:33  9  A.  Yes, there are.

10:14:35  10  Q.  Okay.  Does Mitek have different names for those two

10:14:40  11  versions?

10:14:41  12  A.  Yes, they do.

10:14:42  13  Q.  What is the first name of the first way that Mitek has

10:14:45  14  done auto capture?

10:14:45  15  A.  The original way was called video still capture mode.

10:14:50  16  Q.  And, Mr. Wood, what was the name of the second way of

10:15:18  17  doing auto capture?

10:15:19  18  A.  The new way was called video frame processing.

10:15:22  19  Q.  Mr. Wood, what led Mitek to switch from video still

10:15:47  20  capture to video frame processing?

10:15:51  21  A.  There were two main reasons for that.

10:15:54  22  Q.  And what was the first?

10:15:55  23  A.  The first reason was we got feedback from our

10:16:03  24  customers.  They were saying that MiSnap was returning lots

10:16:07  25  of blurry images of checks, and we needed to try to improve

10:16:12   1   that and make it better.

10:16:14   2          And then the second reason was, at that time, and

10:16:19   3   still today, phones are getting more powerful, the cameras

10:16:24   4   on those phones are getting more powerful, and the images

10:16:28   5   that MiSnap was using -- was analyzing, they were getting

10:16:32   6   bigger and better and had more detail in them, so we could

10:16:36   7   just use those directly instead of having to capture a new

10:16:39   8   image.

10:16:39   9   Q.   What is the main difference between video still capture

10:16:44  10   and video frame processing?

10:16:46  11   A.   The main difference is that both of these will be the

10:16:52  12   camera will capture an image, MiSnap will analyze it, and

10:16:56  13   video frame processing, the new way, it just returns that

10:17:01  14   image.   But in the old way, video still capture, it would

10:17:04  15   ask the camera to take a bigger high resolution photo, and

10:17:08  16   we stopped doing that with video frame processing.

10:17:11  17   Q.   I'm -- I'm going to return -- is it okay if we return

10:17:14  18   to auto capture and manual capture more generally?

10:17:17  19   A.   Yes.

10:17:18  20   Q.   Today, does MiSnap take pictures using auto capture or

10:17:22  21   manual capture?

10:17:23  22   A.   It can do both.

10:17:27  23   Q.   Who makes the decision whether MiSnap uses manual

10:17:32  24   capture or auto capture?

10:17:32  25   A.   That's up to the banks or the user to decide.

| | | |
|---|---|---|
| 10:17:37 | 1 | Q.  What decisions can the banks make? |
| 10:17:40 | 2 | A.  The banks can use just manual capture, they can use |
| 10:17:45 | 3 | just auto capture, or they can use some mixture of both. |
| 10:17:51 | 4 | Q.  What do you mean mixture of both, how can you mix |
| 10:17:55 | 5 | manual with auto? |
| 10:17:57 | 6 | A.  Well, I'm thinking of two ways for that. |
| 10:18:00 | 7 | Q.  What's the first? |
| 10:18:00 | 8 | A.  The first way is what I call -- what we call a time |
| 10:18:04 | 9 | out.  So if you're using auto capture and it's not working |
| 10:18:07 | 10 | and it's been 15, maybe 20 seconds, it'll time out.  MiSnap |
| 10:18:11 | 11 | will time out and let the user switch to manual capture |
| 10:18:15 | 12 | mode and push the button and take the picture.  So that's |
| 10:18:17 | 13 | one way. |
| 10:18:18 | 14 | Q.  Other than this time out way, what's the second way you |
| 10:18:20 | 15 | can mix auto capture with manual capture? |
| 10:18:23 | 16 | A.  The second way, it's like a hybrid way.  During auto |
| 10:18:31 | 17 | capture, some banks will still put the manual capture |
| 10:18:35 | 18 | button on the screen at the same time.  So if it's not |
| 10:18:38 | 19 | working or if the user is ready, they can push that button |
| 10:18:42 | 20 | and manually override and take a picture. |
| 10:18:46 | 21 | Q.  Do you know if Wells Fargo uses just auto, just manual, |
| 10:18:51 | 22 | or one of these mixtures that you've discussed? |
| 10:18:54 | 23 | A.  I do.  They use the mixture where it's the auto capture |
| 10:18:58 | 24 | hybrid with the manual capture override button. |
| 10:19:04 | 25 | Q.  I'd like to talk about -- strike that. |

10:19:07  1          I'd like to talk now about MiSnap's actual source

10:19:11  2   code, is that okay?

10:19:12  3   A.   Yes.

10:19:13  4   Q.   Mr. Wood, what is source code?

10:19:15  5   A.   Source code is a set of instructions that a software

10:19:22  6   developer or programmer or engineer writes, and those

10:19:28  7   instructions tell a computer or a phone what to do, how to

10:19:33  8   operate, how to behave.

10:19:37  9   Q.   Have you personally written source code before?

10:19:39  10  A.   Yes, I have, lots of it.

10:19:42  11  Q.   How long have you been writing source code?

10:19:46  12  A.   For over 20 years and 16 years professionally.

10:19:53  13  Q.   Are you generally familiar with the source code for

10:19:55  14  MiSnap?

10:19:56  15  A.   Yes, in general, I am.

10:19:57  16  Q.   How did the source code for MiSnap get written?  Did

10:20:01  17  one person sit down and write it all at once, or was it

10:20:04  18  something that happened over time?

10:20:05  19  A.   It wasn't just one person.  It's grown and improved

10:20:10  20  over time.

10:20:10  21  Q.   All tolled, how many developers have written MiSnap

10:20:23  22  source code?

10:20:23  23  A.   Ballpark, at least a dozen of us.

10:20:26  24  Q.   And how is it that multiple people can be writing the

10:20:30  25  same thing, how does that work in real life?

```
10:20:32   1    A.  They can be working on different parts of the source
10:20:35   2    code at the same time, or they can come in -- a developer
10:20:38   3    can come in months or years later and try to clean up the
10:20:42   4    code or try to fix a bug or need to add some new feature or
10:20:50   5    functionality, they'll come in and modify the code.
10:20:54   6    Q.  And are you familiar with the source code for Version
10:20:58   7    3.7.1 for iPhones of MiSnap?
10:21:00   8    A.  Yes, in general I am.
10:21:02   9         MR. BITTNER:  Mr. Barnes, can we get DTX-611.
10:21:08   10   Q.  (By Mr. Bittner)  Mr. Wood, what is DTX-611?
10:21:10   11   A.  This is some of the source code from MiSnap iOS for
10:21:16   12   iPhones, Version 3.7.1.
10:21:21   13   Q.  And are you familiar with these pages of code here in
10:21:24   14   DTX-611?
10:21:25   15   A.  Yes, I am.
10:21:26   16   Q.  If someone wasn't familiar with these pages like you
10:21:29   17   are, how would they be able to know that this is MiSnap
10:21:33   18   code for iPhone for Version 3.7.1?
10:21:37   19   A.  You can look at the very top two lines on the title,
10:21:44   20   after ForReview, we see MiSnap, iOS, so iPhones, 3.7.1
10:21:53   21   source -- so this is some of the source for iPhones for
10:21:57   22   Version 3.7.1 of MiSnap.
10:22:00   23   Q.  And we see the words ForReview here, what do those
10:22:07   24   mean?
10:22:07   25   A.  ForReview means after the lawsuit was filed, Mitek
```

10:22:11  1   gathered all the source code for lots of different versions

10:22:16  2   of MiSnap and provided that to USAA so they could try to

10:22:19  3   understand how it works.

10:22:22  4   Q.  Were you involved in collecting all the pages that were

10:22:25  5   provided in this case?

10:22:26  6   A.  Yes, I was.

10:22:26  7   Q.  On the second line we see here in the file directory

10:22:35  8   the word DevApp.

10:22:38  9          MR. BITTNER:  Mr. Barnes, can you highlight

10:22:42  10  DevApp?

10:22:42  11  Q.  (By Mr. Bittner)  What does that mean?

10:22:42  12  A.  DevApp means it's some of MiSnap's internal test code.

10:22:48  13  Q.  Is DevApp code that's actually used by Wells Fargo?

10:22:50  14  A.  No, it's not.

10:22:51  15  Q.  What would it say in place of DevApp if this were code

10:22:55  16  used by Wells Fargo?

10:22:57  17  A.  For Wells Fargo, it would say either MiSnap reference

10:23:01  18  app or MiSnap SDK.

10:23:04  19  Q.  Was that MiSnap SDK or MiSnap reference app code

10:23:10  20  provided to USAA?

10:23:11  21  A.  Yes, absolutely.

10:23:12  22  Q.  Since we have it here and since it's come up, is it

10:23:15  23  okay if we look at DTX-611?

10:23:18  24  A.  Yes, that's fine.

10:23:19  25  Q.  On a high level, what's happening on this first page of

| | | |
|---|---|---|
| 10:23:23 | 1 | code that we have here? |
| 10:23:24 | 2 | A.  At a high level, the iPhone camera has just captured |
| 10:23:28 | 3 | some output, 2278, captureOutput, and it has sent this to |
| 10:23:35 | 4 | MiSnap.  It's sending an image that was captured to MiSnap. |
| 10:23:39 | 5 | MiSnap takes that image and then it analyzes it and tries |
| 10:23:46 | 6 | to determine if it thinks it's a good image or not. |
| 10:23:49 | 7 | Q.  I want to break that down line-by-line, is that okay? |
| 10:23:54 | 8 | A.  Yeah, that's fine. |
| 10:23:56 | 9 | MR. BITTNER:  Let's start by looking at Lines 2278 |
| 10:23:59 | 10 | to 2280 if we can blow those up, Mr. Barnes. |
| 10:24:04 | 11 | Q.  (By Mr. Bittner)  Mr. Wood, what is happening here on |
| 10:24:06 | 12 | Line 2278? |
| 10:24:07 | 13 | MR. SHEASBY:  Your Honor, may we approach? |
| 10:24:10 | 14 | THE COURT:  Approach the bench. |
| 10:24:11 | 15 | (Bench conference.) |
| 10:24:22 | 16 | MR. SHEASBY:  Your Honor, at this point, he's |
| 10:24:23 | 17 | going to elicit testimony from Mr. Wood that the image is |
| 10:24:29 | 18 | captured when it's delivered to Mitek's software which is a |
| 10:24:33 | 19 | claim term in the patent, and I don't think that's |
| 10:24:36 | 20 | appropriate to do that in this context.  I also think it's |
| 10:24:40 | 21 | inappropriate because Mr. Wood was not able to provide this |
| 10:24:43 | 22 | exact testimony in his 30(b)(6) examination deposition. |
| 10:24:50 | 23 | MR. BITTNER:  Your Honor, Mr. Wood -- |
| 10:24:51 | 24 | THE COURT:  Wait a minute, what do you mean he was |
| 10:24:53 | 25 | not able to provide it in his deposition testimony? |

10:24:56   1          MR. SHEASBY:  I asked him, could you -- can you

10:24:58   2   identify for me the line of code where it says it's

10:25:00   3   captured before monitoring criteria, and he said he could

10:25:03   4   not.

10:25:05   5          MR. BITTNER:  I disagree.  He was never asked

10:25:06   6   about these lines of code.  He was asked about code later

10:25:09   7   on.  The deposition transcript portion that Mr. Sheasby is

10:25:15   8   referencing is where he's talking about when the camera

10:25:18   9   actually captures and Mr. Wood said that's going to be

10:25:21  10   proprietary Apple code.  This is the message back and

10:25:22  11   forth.

10:25:22  12          MR. SHEASBY:  I can get you the transcript

10:25:25  13   passage, Your Honor.

10:25:25  14          THE COURT:  That's not necessary.  If he's given a

10:25:28  15   prior inconsistent statement in his deposition and not able

10:25:31  16   to do something now he's able to do, you're free to attempt

10:25:35  17   to impeach him during cross-examination.

10:25:38  18          Also, you're free to elicit from him an admission

10:25:42  19   that the word "capture" here is not necessarily is the way

10:25:45  20   the Court's construed it in this lawsuit, the same thing

10:25:49  21   with "analyze."  All of that can be done on

10:25:51  22   cross-examination.  None of it rises to the level of me

10:25:54  23   limiting his direct testimony.

10:25:56  24          MR. SHEASBY:  I understand your instructions, Your

10:25:58  25   Honor, thank you.

| | | |
|---|---|---|
| 10:25:59 | 1 | MR. BITTNER:  Thank you, Your Honor. |
| 10:26:01 | 2 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 10:26:02 | 3 | (Bench conference concluded.) |
| 10:26:07 | 4 | THE COURT:  Let's proceed. |
| 10:26:08 | 5 | Q.  (By Mr. Bittner)  Mr. Wood, returning to Lines 2278 to |
| 10:26:12 | 6 | 2280 of DTX-611, what is happening here on Line 2278? |
| 10:26:17 | 7 | A.  So can I set the stage a little bit? |
| 10:26:22 | 8 | Q.  Please do. |
| 10:26:23 | 9 | A.  Okay.  So software talks to other software by sending |
| 10:26:28 | 10 | messages back and forth.  This is referring to -- 2278 to |
| 10:26:34 | 11 | 2280 is referring to a message that the iPhone's camera has |
| 10:26:39 | 12 | sent to MiSnap.  It's sending some captured output, it's |
| 10:26:45 | 13 | putting into the sampleBuffer, which is kind of like a box, |
| 10:26:49 | 14 | and it's sending that to MiSnap. |
| 10:26:52 | 15 | Q.  Let me see if we can break that down a little bit. |
| 10:27:05 | 16 | Did I hear you correctly, did you say this first |
| 10:27:12 | 17 | line that starts with (void) captureOutput is a message? |
| 10:27:18 | 18 | A.  It's part of the message,  yes. |
| 10:27:24 | 19 | Q.  Who is the message between? |
| 10:27:25 | 20 | A.  It's between the iPhone camera's software and MiSnap. |
| 10:27:31 | 21 | Q.  Mr. Wood, is this a one-way message or a two-way |
| 10:27:44 | 22 | message? |
| 10:27:44 | 23 | A.  It's essentially a one-way message. |
| 10:27:49 | 24 | Q.  How do you know that? |
| 10:27:50 | 25 | A.  I know that because of the -- the void at the beginning |

| | | |
|---|---|---|
| 10:27:56 | 1 | on Line 2278. |
| 10:27:57 | 2 | Q.  What does this word "void" tell you about this being a |
| 10:28:02 | 3 | one-way or a two-way message? |
| 10:28:06 | 4 | A.  Void means nothing, so when messages are sent back and |
| 10:28:09 | 5 | forth, you need to know what's in those messages.  So the |
| 10:28:14 | 6 | camera is sending MiSnap a sample buffer with an image in |
| 10:28:18 | 7 | it, and MiSnap is sending void or nothing back, so it's no |
| 10:28:25 | 8 | information going back to the camera. |
| 10:28:27 | 9 | Q.  Okay.  So the iPhone camera is sending what to MiSnap? |
| 10:28:30 | 10 | A.  Its captured output in a sample buffer. |
| 10:28:34 | 11 | Q.  And what is MiSnap sending back? |
| 10:28:41 | 12 | A.  Nothing. |
| 10:28:41 | 13 | Q.  Void? |
| 10:28:42 | 14 | A.  No information.  Yeah, void. |
| 10:28:45 | 15 | Q.  Now, Mr. Wood, who created these first three lines of |
| 10:28:53 | 16 | code? |
| 10:28:53 | 17 | A.  These referred to the three lines of code that Apple |
| 10:28:59 | 18 | software developers wrote.  And any app, including MiSnap, |
| 10:29:03 | 19 | if they want to receive these frames, they need to put |
| 10:29:06 | 20 | these three lines of code into their code. |
| 10:29:08 | 21 | Q.  So why does Mitek have three lines of code that Apple |
| 10:29:14 | 22 | created in MiSnap? |
| 10:29:15 | 23 | A.  Because MiSnap needs to -- actually, the camera has to |
| 10:29:22 | 24 | talk to MiSnap.  And in order to do that, Apple has said |
| 10:29:27 | 25 | you need to have these three lines.  Otherwise, it's not |

```
10:29:31    1    going to know where to send those messages to.
10:29:33    2    Q.  What about these three lines tells you that the Apple
10:29:38    3    camera is involved?
10:29:39    4    A.  On 2278, there's AVCaptureOutput.
10:29:46    5    Q.  What does AV stand for?
10:29:46    6    A.  2280, there's AVCaptureConnection.  Sorry, I didn't
10:29:46    7    mean to cut you off.
10:29:50    8    Q.  What does AV stand for?
10:29:51    9    A.  AV stands for audio/visual.  It's a prefix that Apple's
10:29:59   10    engineers use.  It's part of their AV foundation, and it
10:30:02   11    refers to audio/visual software, including the camera.
10:30:08   12    Q.  Mr. Wood, would it be accurate or inaccurate to say
10:30:12   13    that these three lines of code have no purpose here?
10:30:15   14    A.  That would be inaccurate.
10:30:16   15    Q.  Do you know what would happen if Mitek deleted these
10:30:23   16    three lines of code from this page?
10:30:26   17    A.  If we deleted those, this code wouldn't run.  And
10:30:30   18    technically, it wouldn't even run on a phone.
10:30:32   19    Q.  Where does MiSnap start analyzing the image capture
10:30:44   20    output that has been placed in the sample buffer?
10:30:47   21    A.  That's lower on the page.
10:30:50   22          MR. BITTNER:  Mr. Barnes, can we scroll down?
10:30:52   23    Q.  (By Mr. Bittner)  Do you know what line it's on,
10:30:54   24    Mr. Wood?
10:30:54   25    A.  2323.
```

| | | |
|---|---|---|
| 10:30:56 | 1 | MR. BITTNER:  Can we bring up Line 2323, |
| 10:30:58 | 2 | Mr. Barnes? |
| 10:30:59 | 3 | Q.  (By Mr. Bittner)  Mr. Wood, what is happening here in |
| 10:31:10 | 4 | Line 2323? |
| 10:31:11 | 5 | A.  On this line, there's a bit called analyzeFrame with a |
| 10:31:20 | 6 | sampleBuffer.  This is sending a message to some other |
| 10:31:25 | 7 | MiSnap code that's called analyzeFrame, and it's passing |
| 10:31:28 | 8 | that sampleBuffer, which had that image in it, to that |
| 10:31:34 | 9 | other MiSnap code. |
| 10:31:35 | 10 | Q.  In this version of the code and all versions of the |
| 10:31:37 | 11 | code since March 2015, will the code capture a new image if |
| 10:31:42 | 12 | that analysis turns up a good image and MiSnap decides to |
| 10:31:46 | 13 | use it? |
| 10:31:46 | 14 | A.  No, it will not. |
| 10:31:54 | 15 | MR. BITTNER:  Mr. Barnes, can we go to the next |
| 10:31:57 | 16 | page and pull up Line 2357 now? |
| 10:32:11 | 17 | Q.  (By Mr. Bittner)  Now, Mr. Wood, would it be accurate |
| 10:32:13 | 18 | or inaccurate to say that this is where an image is being |
| 10:32:16 | 19 | captured by the camera? |
| 10:32:17 | 20 | A.  That would be inaccurate. |
| 10:32:19 | 21 | Q.  What is happening in Line 2357? |
| 10:32:22 | 22 | A.  This is setting a variable to yes.  It's saying the |
| 10:32:28 | 23 | capture session is over.  And MiSnap is not going to |
| 10:32:31 | 24 | analyze any more frames. |
| 10:32:34 | 25 | Q.  Is Line 2357 unique to auto capture? |

```
10:32:37   1   A.  No, it's not.

10:32:39   2   Q.  How do you know that?

10:32:40   3   A.  You have to scroll up.  This code is indented.  There's

10:32:48   4   some code above it.  Yeah, 2341 to 2343.

10:32:53   5   Q.  And is -- what do those lines tell you about the line

10:32:55   6   we just looked at, Line 2357?

10:32:58   7   A.  It's saying that if any of these things are true, that

10:33:02   8   code down below is going to run.  So 2341 is saying if

10:33:06   9   we're in a manual override mode, or 2342, if we're in the

10:33:12  10   manual capture mode, or three, if we're in auto capture

10:33:16  11   mode, if any of those are true, we're going to execute that

10:33:19  12   same line of code.

10:33:21  13        MR. BITTNER:  Let's look now at Line 2374.

10:33:25  14   Mr. Barnes, can we blow that up?  Right at the bottom

10:33:43  15   there.

10:33:46  16   Q.  (By Mr. Bittner)  Mr. Wood, would it be accurate or

10:33:48  17   inaccurate to say that Line 2374 is where the camera is

10:33:54  18   capturing an image?

10:33:55  19   A.  That would be inaccurate.

10:33:56  20   Q.  What is happening at Line 2374?

10:34:00  21   A.  This is logging some of our UXP, our user experience,

10:34:06  22   and it's kind of like a stopwatch.  It's saying the capture

10:34:10  23   session is over.

10:34:10  24   Q.  Why do you track time for the capture session?

10:34:14  25   A.  If we have to debug an issue, like a customer has an
```

10:34:19   1   issue, we can't go around to everyone and ask what they

10:34:22   2   were doing at that time, so we track a lot of different

10:34:25   3   events.  We track when we show the tutorial screen to a

10:34:31   4   user, we track when they start up MiSnap, we track if

10:34:35   5   MiSnap couldn't find the document or if it was too dark in

10:34:38   6   the room or if it was just too dark on the screen.  And we

10:34:43   7   use that to try and reconstruct what was happening, what

10:34:46   8   the user was seeing.

10:34:48   9   Q.  Is what happens at Line 2374 unique to auto capture?

10:34:51  10   A.  No, it's not.

10:34:55  11   Q.  Do you track the same time for auto capture, manual

10:34:57  12   capture, and manual override?

10:35:01  13   A.  Yes, we do.

10:35:03  14        MR. BITTNER:  Okay.  Let's go to, Mr. Barnes, now

10:35:05  15   Line 2389.

10:35:16  16   Q.  (By Mr. Bittner)  Looking at Line 2389, Mr. Wood, would

10:35:19  17   it be accurate or inaccurate to say that this is where an

10:35:22  18   image is captured by the camera?

10:35:24  19   A.  That is inaccurate.

10:35:25  20   Q.  What is happening in Line 2389?

10:35:28  21   A.  In this line, this code is sending a message to some

10:35:32  22   other MiSnap code that's called

10:35:44  23   miSnapCaptureViewStartedAutoCapture:withRect.

10:35:46  24   Q.  Okay.  What does the part of the code called the

10:35:48  25   miSnapCaptureViewStartedAutoCapture, what does that do?

10:35:49  1   A.   That will play a little sound.   It will show an

10:35:53  2   animation on the screen.   And in auto mode, it's going to

10:35:58  3   draw the border around where the check was.

10:36:02  4   Q.   So miSnapCaptureViewStartedAutoCapture just plays an

10:36:09  5   animation?

10:36:10  6   A.   Essentially, yes.

10:36:11  7            MR. BITTNER:   Let's look at Lines 2479 to 2481

10:36:29  8   now.

10:36:34  9   Q.   (By Mr. Bittner)   And, Mr. Wood, would it be accurate

10:36:45  10  or inaccurate to say that what's -- that what's happening

10:36:47  11  in Lines 2479 to 2481 is where an image is being captured

10:36:53  12  with a camera?

10:36:54  13  A.   That is inaccurate.

10:36:54  14  Q.   What is happening here?

10:36:56  15  A.   So here, the image that was already captured is being

10:37:02  16  compressed.

10:37:03  17  Q.   What do you mean by compressed?

10:37:05  18  A.   Compressed means it's making it take up less space.

10:37:10  19  It's encoding it as a JPEG, and JPEGs are used on the

10:37:15  20  Internet for millions, maybe billions of images because

10:37:20  21  they take up less space, so --

10:37:23  22  Q.   Do you have -- do you have an example compression in

10:37:27  23  real life?

10:37:27  24  A.   Yeah.   You could think of it as like a space vacuum

10:37:33  25  bag.   You put your comforter inside and then you suck out

10:37:38   1   all the air, and what you're left with takes up less space.

10:37:42   2   You don't have a new comforter, but it takes up less space.

10:37:47   3   Q.   Now, I want to return to, Mr. Wood, the two ways of

10:38:05   4   auto capture we spoke about at the beginning of your

10:38:07   5   testimony.

10:38:07   6        DTX-611, which we just talked about, does that

10:38:10   7   operate using still video capture or video frame

10:38:13   8   processing?

10:38:13   9   A.   That one uses the new way, the video frame processing.

10:38:17  10   Q.   When did Mitek switch from still video capture to video

10:38:23  11   frame processing?

10:38:24  12   A.   That change was finalized in September 2014.

10:38:31  13   Q.   Have you seen code where both options, still video

10:38:35  14   capture and video frame processing, are shown side-by-side?

10:38:38  15   A.   Yes, I have.

10:38:40  16        MR. BITTNER:   Mr. Barnes, can we pull up DTX-11?

10:38:56  17   Now, Mr. Barnes, can we go to the bottom of 3565 and the

10:39:02  18   top of page 3566?   Oh, no, he's got it.   Okay.

10:39:14  19   Q.   (By Mr. Bittner)   Mr. Wood, what do we see here in

10:39:17  20   Lines 1496 to 1515?

10:39:22  21   A.   This is describing -- 1496, it says allow video frames.

10:39:27  22   This is describing the new way, the video frame processing.

10:39:31  23        MR. BITTNER:   Actually, Mr. Barnes, can we scroll

10:39:34  24   up to the very top of Page 3565 or the very top of Page

10:39:38  25   3566?

| | | |
|---|---|---|
| 10:39:39 | 1 | Q.  (By Mr. Bittner)   Mr. Wood, one question.   What version |
| 10:39:41 | 2 | of MiSnap is this? |
| 10:39:42 | 3 | A.   I can see in the middle here, it's MiSnap -- whoops -- |
| 10:39:47 | 4 | MiSnap iOS 2.0.6, so it's for iPhones, Version 2.0.6. |
| 10:39:57 | 5 | Q.   Okay.   Now, let me turn to the first question again. |
| 10:39:59 | 6 | What is happening in Lines 1496 to 1515? |
| 10:40:02 | 7 | A.   This is describing the video way -- the video frame |
| 10:40:05 | 8 | processing. |
| 10:40:05 | 9 | Q.   What we just discussed in DTX-611? |
| 10:40:08 | 10 | A.   Yes. |
| 10:40:09 | 11 | Q.   And we see in Lines 1504 and 1506, two comments. |
| 10:40:18 | 12 | A.   Uh-huh. |
| 10:40:18 | 13 | Q.   What do those mean to you? |
| 10:40:24 | 14 | A.   They're saying that we're going to send along the YUV |
| 10:40:30 | 15 | frame, which we know on 1506 is just the sample buffer |
| 10:40:31 | 16 | output, what the camera has already captured, instead of |
| 10:40:35 | 17 | capturing the photo quality image.   So we're not going to |
| 10:40:38 | 18 | capture a new high resolution photo like we did with video |
| 10:40:43 | 19 | still capture. |
| 10:40:43 | 20 | Q.   Okay.   And we -- let me ask you this question.   How do |
| 10:40:46 | 21 | you know that 1504 and 1506 are comments? |
| 10:40:49 | 22 | A.   They start with this //, and that is a comment.   It |
| 10:40:58 | 23 | means that the computer or the phone is going to ignore |
| 10:41:00 | 24 | them. |
| 10:41:01 | 25 | Q.   Why do MiSnap developers put comments in the code? |

10:41:04  1   A.  It's a good practice.  You can -- they would do that so

10:41:07  2   you could remember -- tell future developers or yourself

10:41:16  3   what that code is doing or maybe why it's doing that.

10:41:19  4   Q.  Now, what does the computer itself do with the comment

10:41:23  5   as it's going through this code and trying to execute it?

10:41:25  6   A.  It does nothing with it, it ignores it, and technically

10:41:34  7   the phone would never even see those comments.

10:41:35  8   Q.  Going down lower in the code to Line 1517, we see the

10:41:45  9   word "else if."

10:41:47  10  A.  Uh-huh.

10:41:47  11  Q.  What does "else if" mean?

10:41:49  12  A.  So "else if," self.photoOutput, if that second part is

10:41:57  13  true, that they have the "else if," then the code beneath

10:41:59  14  it is going to run.  If it's not true, then it's not going

10:42:01  15  to run.

10:42:02  16  Q.  Is "else if" a common instruction that source code

10:42:06  17  developers give to computers?

10:42:08  18  A.  Yeah, it's common.  You might have "if," "else if,"

10:42:14  19  "else."  I could give you an analogy.  It's like my son's

10:42:16  20  birthday is coming up this week.  He's turning four.  And

10:42:20  21  when I get home, my wife might give me a set of

10:42:23  22  instructions.  She might say, if there's a sheet cake, buy

10:42:28  23  the sheet cake, else if they have cupcakes, get the

10:42:35  24  cupcakes, else buy cookies.  So I'll come home with a sheet

10:42:40  25  cake or cupcakes or cookies, but not all three.  That's

10:42:46   1   just too much sugar.

10:42:48   2   Q.  What's going on under the "else if" in Lines 1519 to

10:42:54   3   1534?

10:42:54   4   A.  That is -- it's sending a message to the camera.  It's

10:43:01   5   calling this -- sending a message called capture still

10:43:07   6   image asynchronously from connection, so it's sending a

10:43:13   7   message to the camera to capture a new still image.

10:43:15   8   Q.  And, in particular, you're looking at 1534; am I

10:43:18   9   correct?

10:43:19   10   A.  Yeah, 1534.

10:43:20   11   Q.  And, again, remind the jury when Mitek switched from

10:43:24   12   the first way of doing things that we saw with DTX-611 and

10:43:30   13   the top of this page -- when did Mitek make the switch to

10:43:35   14   the DTX-611 and top way of doing things that we discussed

10:43:39   15   earlier?

10:43:39   16   A.  That was finalized in September 2014.

10:43:42   17   Q.  And before September 2014, which way would Mitek

10:43:46   18   operate?

10:43:46   19   A.  The old way, the first way, the video still capture.

10:43:52   20   Q.  And, again, what was the main reason why Mitek switched

10:43:57   21   from video still capture to video frame processing?

10:44:00   22   A.  There were two main reasons.  One was the feedback

10:44:04   23   about the blurry images, so we had to try something new.

10:44:07   24        And the second reason was that the phones on the

10:44:11   25   camera are getting more powerful, and those images that

10:44:14  1  they were analyzing were a lot bigger.  If you're familiar

10:44:17  2  with megapixels, they used to be less than half a

10:44:22  3  megapixel, and suddenly they were one megapixel or even two

10:44:25  4  megapixels, and we didn't need to capture a new high res

10:44:30  5  image.  We had one that was good already.

10:44:32  6  Q.  To your knowledge, was this change from the first way

10:44:35  7  to the second way related in any way to USAA?

10:44:38  8  A.  No, it was not.

10:44:39  9  Q.  Have you learned some Mitek documents after September

10:44:44  10  2014 and after this change that incorrectly describe how

10:44:48  11  MiSnap's auto capture works today?

10:44:50  12  A.  Yes, I have.

10:44:54  13      MR. BITTNER:  Let's look at PX-92.

10:44:57  14  Q.  (By Mr. Bittner)  Mr. Wood, what is PX-92?

10:45:01  15  A.  PX-92 is a developer's guide from MiSnap 3.1.

10:45:09  16  Q.  What do you mean by developer's guide?

10:45:12  17  A.  A developer's guide is a guide that we give to our

10:45:17  18  customers' developers, so the developers at banks, for

10:45:21  19  example, so that they know how to use MiSnap, how to

10:45:26  20  customize it, and how to receive the message -- the image

10:45:32  21  that MiSnap is going to give back to them.

10:45:35  22  Q.  Okay.

10:45:36  23      MR. BITTNER:  I want to look at Page 33 of this

10:45:38  24  document, Mr. Barnes.

10:45:41  25  Q.  (By Mr. Bittner)  And right there in the middle we see

10:45:43  1   the language:  Once all conditions are met, MiSnap will

10:45:46  2   automatically snap a photo.  Do you see that, Mr. Wood?

10:45:49  3   A.  Yes, I do.

10:45:50  4   Q.  Is that an accurate description of how the code

10:45:52  5   operates today?

10:45:53  6   A.  No, it's not.

10:45:54  7   Q.  Was this language accurate at some point?

10:45:57  8   A.  Yes, it was.

10:45:59  9   Q.  When?

10:46:00  10  A.  Prior to September 2014, it was accurate.

10:46:04  11  Q.  What version was Mitek using prior to September 2014?

10:46:10  12  A.  That was the first way, the video still capture.

10:46:13  13  Q.  Are there other documents where Mitek failed to update

10:46:17  14  its language after this change was made?

10:46:19  15  A.  There was a bunch of them, yeah.

10:46:22  16          MR. BITTNER:  Let's look at PX-376.

10:46:28  17  Q.  (By Mr. Bittner)  Mr. Wood, what is PX-376?

10:46:31  18  A.  This is a programmer's guide from Mitek Version 2.3.4.

10:46:39  19  Q.  What do you mean by programmer's guide?

10:46:42  20  A.  A programmer's guide is just like a developer's guide,

10:46:48  21  it's for the programmers at the bank.

10:46:50  22          MR. BITTNER:  Let's look at Page 5 of this

10:46:52  23  document and right there in the middle under 1.1, second

10:47:00  24  bullet point.

10:47:02  25  Q.  (By Mr. Bittner)  We see:  Until a suitable image is

| | | |
|---|---|---|
| 10:47:04 | 1 | detected at which point it automatically captures. |
| 10:47:06 | 2 | Do you see that, sir? |
| 10:47:07 | 3 | A.  Yes, I do. |
| 10:47:08 | 4 | Q.  Is this an accurate description of how the code |
| 10:47:11 | 5 | operates today? |
| 10:47:11 | 6 | A.  No, it's not. |
| 10:47:13 | 7 | Q.  Were these errors in the developer's guides and |
| 10:47:19 | 8 | programmer's guides ever brought to Mitek's attention? |
| 10:47:23 | 9 | A.  No, they weren't. |
| 10:47:24 | 10 | Q.  Did you personally hear any complaints about this? |
| 10:47:27 | 11 | A.  No, I did not. |
| 10:47:28 | 12 | Q.  Would you expect to hear such complaints? |
| 10:47:30 | 13 | A.  No, I wouldn't. |
| 10:47:31 | 14 | Q.  Why not? |
| 10:47:32 | 15 | A.  Because a programmer at a bank needs to know how to use |
| 10:47:38 | 16 | MiSnap, how to turn it on, how to customize it, and how to |
| 10:47:43 | 17 | get the image back from MiSnap.  It -- they don't need to |
| 10:47:48 | 18 | know how MiSnap internally works. |
| 10:47:51 | 19 | It's kind of like if you have a printer, you just |
| 10:47:56 | 20 | need to know how to turn it on and how to send something to |
| 10:47:59 | 21 | be printed and how to pick up your paper when you're done, |
| 10:48:01 | 22 | but you don't need to know how the printer is -- how the |
| 10:48:05 | 23 | gears are turning and feeding paper in and how it's |
| 10:48:08 | 24 | shooting ink onto the page.  You don't need to know how to |
| 10:48:11 | 25 | do that stuff.  And it's the same thing with the developers |

| | | |
|---|---|---|
| 10:48:13 | 1 | at banks.  They don't need to know that. |
| 10:48:16 | 2 | THE COURT:  Counsel, approach the bench, please. |
| 10:48:24 | 3 | MR. BITTNER:  Yes, Your Honor. |
| 10:48:28 | 4 | (Bench Conference.) |
| 10:48:28 | 5 | THE COURT:  Mr. Bittner, this witness just gave |
| 10:48:31 | 6 | opinion testimony about what people at banks need to know. |
| 10:48:34 | 7 | That's well outside of his personal knowledge.  And it |
| 10:48:40 | 8 | appears to me to cross squarely over the line that I |
| 10:48:42 | 9 | instructed you about this witness not giving opinion |
| 10:48:46 | 10 | testimony.  This is a computer programmer for Mitek.  How |
| 10:48:50 | 11 | he has personal knowledge of what people who work in banks |
| 10:48:54 | 12 | need to know, I don't understand. |
| 10:48:56 | 13 | MR. BITTNER:  I think he was just testifying as to |
| 10:48:59 | 14 | why this -- why in his knowledge this was never brought to |
| 10:49:01 | 15 | Mitek's attention.  It's not important for anyone -- and I |
| 10:49:11 | 16 | can -- I can ask him to clarify that he's not offering an |
| 10:49:14 | 17 | opinion about what banks know or what banks do. |
| 10:49:16 | 18 | THE COURT:  Well, it sounds like a clear inquiry |
| 10:49:19 | 19 | into an area that he would have no personal knowledge of |
| 10:49:22 | 20 | and is offering an opinion about. |
| 10:49:24 | 21 | MR. BITTNER:  I'll clarify that, and I'm moving |
| 10:49:26 | 22 | on.  I'm just going to ask him when he found out about |
| 10:49:28 | 23 | it -- |
| 10:49:29 | 24 | THE COURT:  Clarify it and move on. |
| 10:49:33 | 25 | MR. MELSHEIMER:  Thank you, Your Honor. |

```
10:49:34   1              (Bench conference concluded.)

10:49:34   2              THE COURT:  Let's proceed.

10:49:40   3   Q.  (By Mr. Bittner)  To be clear, Mr. Wood, you don't

10:49:42   4   know -- you don't have any personal knowledge and are not

10:49:45   5   expressing any opinions about what banks do or don't know,

10:49:48   6   correct?

10:49:48   7   A.  No, it's just my own opinion.

10:49:53   8   Q.  When were -- strike that.  When was --

10:49:57   9              MR. SHEASBY:  Your Honor, if it's opinion

10:50:01  10   testimony, then I move to strike it.

10:50:03  11              THE COURT:  Well, counsel, as I made clear, this

10:50:08  12   witness is not here to give opinions, his or anybody

10:50:12  13   else's.  He's here to talk about what he knows personally.

10:50:15  14   You want to attempt to clarify this testimony one more

10:50:18  15   time, Mr. Bittner?

10:50:21  16              MR. BITTNER:  Happy to do so, Your Honor.

10:50:23  17   Q.  (By Mr. Bittner)  Mr. Wood, you don't have any personal

10:50:26  18   knowledge of what banks do know or don't know, correct?

10:50:28  19   A.  I don't have personal knowledge of what they do.  I've

10:50:30  20   heard feedback from other people at Mitek --

10:50:32  21   Q.  When was this -- when was Mitek's failure --

10:50:32  22              THE COURT:  Just a minute, counsel.

10:50:34  23              MR. SHEASBY:  Your Honor, we renew objection, now

10:50:36  24   it's a hearsay objection.

10:50:42  25              THE COURT:  Ladies and gentlemen, I'm going to
```

10:50:44   1   instruct you to disregard this witness's testimony about

10:50:47   2   what he believes people at banks need to know to implement

10:50:51   3   this product.

10:50:52   4         Let's move on.

10:50:54   5         MR. BITTNER:  Yes, Your Honor.

10:50:55   6   Q.  (By Mr. Bittner)  Mr. Wood, when was the failure to

10:51:00   7   update Mitek's developer and programmer's guides brought to

10:51:04   8   your attention for the first time?

10:51:07   9   A.  That was during my deposition.

10:51:09   10  Q.  Is Mitek in the process of updating these documents

10:51:12   11  today?

10:51:13   12  A.  Yes, we are.

10:51:15   13  Q.  What is the most accurate way to know how MiSnap's

10:51:20   14  computer software works?

10:51:22   15  A.  You have to look at the source code.  The source code

10:51:25   16  is what the phone actually uses.

10:51:30   17  Q.  Now we've talked about Mitek's source code.  I just

10:51:34   18  want to talk about Mitek in general.

10:51:36   19        Mr. Wood, who is or what is Mitek?

10:51:39   20  A.  Mitek is a company that does a variety of products.

10:51:45   21  Q.  Where is Mitek based?

10:51:47   22        MR. SHEASBY:  Your Honor, objection as to

10:51:49   23  relevance.

10:51:52   24        MR. BITTNER:  Your Honor --

10:51:53   25        THE COURT:  Overruled.

```
10:51:55   1              MR. BITTNER:  Thank you.
10:51:56   2   Q.  (By Mr. Bittner)  Where is Mitek based?
10:51:58   3   A.  Mitek is based in San Diego, California.
10:52:01   4   Q.  Do you know how many employees Mitek has,
10:52:04   5   approximately?
10:52:04   6   A.  Over 500.  We've been growing.
10:52:07   7   Q.  And do you know how many customers all tolled Mitek
10:52:13   8   has?
10:52:16   9              MR. SHEASBY:  Your Honor, objection, relevance.
10:52:17  10              THE COURT:  I've given you some latitude and
10:52:20  11   you've exceeded it.  I'm going to sustain that objection.
10:52:24  12              MR. BITTNER:  Yes, Your Honor.
10:52:25  13   Q.  (By Mr. Bittner)  Mr. Wood, we've talked about a few
10:52:25  14   lines of DTX-11 today which was Version 2.0.6.  But I
10:52:25  15   actually have all of DTX-11 printed out here.  Mr. Wood,
10:52:25  16   what is -- I'm going to set it right here.  This is really
10:52:37  17   heavy.  Mr. Wood, what is DTX-11?
10:52:38  18   A.  That is a small part of the source code in this case.
10:52:44  19   Q.  Do you know how many pages of code are here in DTX-11?
10:52:49  20   A.  I've been told it's 4500.
10:52:53  21   Q.  If this is only a part of the code that was made
10:52:55  22   available, do you know how many pages of code was made
10:52:59  23   available in this case?
10:53:00  24   A.  Yeah, there's a lot of pages for MiSnap and all the
10:53:08  25   algorithms they run, we had Android and iOS, we had over a
```

| | | |
|---|---|---|
| 10:53:13 | 1 | dozen versions.  I'd estimate over a million pages of code. |
| 10:53:22 | 2 | Q.  Were you asked about MiSnap code during your |
| 10:53:25 | 3 | deposition? |
| 10:53:25 | 4 | A.  Yes, I was. |
| 10:53:26 | 5 | Q.  Did you prepare for your deposition? |
| 10:53:28 | 6 | A.  Yes, I did. |
| 10:53:29 | 7 | Q.  What did you do to prepare for your deposition? |
| 10:53:31 | 8 | A.  I reviewed source code from all those different |
| 10:53:34 | 9 | versions for Android and iOS to try and figure out how |
| 10:53:41 | 10 | MiSnap worked, how all the algorithms worked, how it had |
| 10:53:44 | 11 | changed over time, it was a lot. |
| 10:53:47 | 12 | Q.  How much time did you spend preparing for your |
| 10:53:52 | 13 | deposition? |
| 10:53:52 | 14 | A.  Including finding all that source code and reviewing |
| 10:53:56 | 15 | it, probably 150 hours, maybe. |
| 10:53:59 | 16 | Q.  Was it possible for you to memorize every line of code |
| 10:54:02 | 17 | before your deposition? |
| 10:54:03 | 18 | A.  No. |
| 10:54:06 | 19 | Q.  Had you specifically reviewed DTX-11 before it came up |
| 10:54:09 | 20 | in your deposition? |
| 10:54:11 | 21 | A.  DTX-611 or -- |
| 10:54:13 | 22 | Q.  611, sorry, 611? |
| 10:54:15 | 23 | A.  No, I had not. |
| 10:54:16 | 24 | Q.  Why not? |
| 10:54:17 | 25 | A.  I was reviewing -- that was for DevApp, and I was |

10:54:21  1  reviewing the source code that our customers would have

10:54:24  2  used.

10:54:24  3  Q.  Have you had a chance to review DTX-611 in greater

10:54:28  4  detail since your deposition?

10:54:30  5  A.  Yes, I have.

10:54:31  6  Q.  Once more, about how many pages of code did Mitek make

10:54:34  7  available in this case?

10:54:35  8  A.  Over a million pages of code.

10:54:38  9  Q.  Mr. Wood, based on your personal knowledge, did Mitek

10:54:41  10  take even a single line of code from USAA?

10:54:44  11  A.  No, we did not.

10:54:46  12         MR. BITTNER:  Pass the witness.

10:54:47  13         THE COURT:  Cross-examination.

10:55:03  14         Mr. Sheasby, are you going to use that easel

10:55:06  15  during your cross-examination?

10:55:08  16         MR. SHEASBY:  Just briefly, Your Honor, and then

10:55:09  17  I'll move it back.

10:55:10  18         THE COURT:  All right.  Let's proceed.

10:55:11  19         MR. SHEASBY:  May it please the Court.

10:55:11  20                   CROSS-EXAMINATION

10:55:14  21  BY MR. SHEASBY:

10:55:14  22  Q.  Good -- good morning, Mr. Wood.  We met before.

10:55:19  23  A.  Good morning.

10:55:19  24  Q.  I took your deposition, correct?

10:55:21  25  A.  That's correct, yeah.

10:55:22    1    Q.   Now, in your testimony to the ladies and gentlemen of
10:55:24    2    the jury, you indicated that you're an employee of Mitek,
10:55:27    3    fair?
10:55:27    4    A.   Yes, that's fair.
10:55:28    5    Q.   Before your deposition, you were -- you met with the
10:55:31    6    Wells Fargo's lawyers who are representing Wells Fargo in
10:55:33    7    this matter multiple times, correct?
10:55:37    8    A.   Yes, I met with them.
10:55:38    9    Q.   Multiple times?
10:55:39   10    A.   Yes.
10:55:40   11    Q.   And before your testimony today, you met with Wells
10:55:45   12    Fargo's lawyers multiple times, correct?
10:55:47   13    A.   Yes, that's correct.
10:55:48   14    Q.   They prepared you for your testimony, correct?
10:55:50   15    A.   I wouldn't say it that way.  We prepared.
10:55:55   16    Q.   You and Wells Fargo's lawyers jointly prepared for your
10:55:58   17    testimony, fair?
10:55:58   18    A.   Yeah, I'd say that's fair.
10:56:02   19    Q.   Now, sir, you're not an expert in this matter, correct?
10:56:07   20    A.   No, I'm not.
10:56:08   21    Q.   You didn't discuss Mr. Bueche's and USAA's patents at
10:56:15   22    all during your deposition in this matter, correct?
10:56:18   23    A.   No, we did not.
10:56:21   24    Q.   You didn't discuss it with -- with your counsel today;
10:56:24   25    is that correct?

| | | |
|---|---|---|
| 10:56:24 | 1 | A.  I did not. |
| 10:56:25 | 2 | Q.  You didn't talk about what concepts in the patent |
| 10:56:27 | 3 | that's at issue in this case mean in your testimony, |
| 10:56:30 | 4 | correct? |
| 10:56:30 | 5 | A.  No, I did not. |
| 10:56:31 | 6 | Q.  Now, looking at this demonstrative, you talked about |
| 10:56:44 | 7 | two different ways of doing auto capture, that was your |
| 10:56:46 | 8 | testimony to the jury, correct? |
| 10:56:47 | 9 | A.  Yes, that's right. |
| 10:56:48 | 10 | Q.  There's something called a video still capture mode; is |
| 10:56:53 | 11 | that correct? |
| 10:56:53 | 12 | A.  Yes, that's correct. |
| 10:56:54 | 13 | Q.  That's the old mode.  Wells Fargo doesn't use that |
| 10:56:58 | 14 | mode, correct? |
| 10:56:58 | 15 | A.  Not anymore, I agree. |
| 10:57:00 | 16 | Q.  There's the mode that's at issue in this case, which is |
| 10:57:03 | 17 | the video frame processing mode, correct? |
| 10:57:07 | 18 | A.  I imagine so. |
| 10:57:09 | 19 | Q.  That's the mode as far as you know that Wells Fargo |
| 10:57:13 | 20 | currently uses, correct? |
| 10:57:13 | 21 | A.  That's the one they're using today, yes, that's right. |
| 10:57:15 | 22 | Q.  And in the video frame processing mode, the automatic |
| 10:57:24 | 23 | capture occurs when good image is detected, correct? |
| 10:57:27 | 24 | A.  No, I disagree with that statement. |
| 10:57:28 | 25 | Q.  Okay.  So why don't we turn to the binder that your |

10:57:31  1   counsel brought up to you, which is DTX- -- in that binder

10:57:35  2   is a document called DTX-0381?

10:57:38  3   A.  Sorry, which binder?

10:57:41  4   Q.  It's the binder you brought up with you for your

10:57:43  5   testimony.

10:57:43  6   A.  Okay.

10:57:43  7   Q.  It says Direct of Andrew Wood.  It's a small binder.

10:57:49  8   This is what your counsel handed you, correct?

10:57:51  9   A.  I think it was already here.  I'm not sure.

10:57:54  10  Q.  And to be clear, this is a Mitek document, correct?

10:58:00  11  A.  Yes, yes, it is.

10:58:02  12  Q.  So why don't we go ahead and pull up DTX-381?

10:58:10  13        And why don't we go ahead and turn to Page 4 of

10:58:18  14  that document?  And on Page 4 of that document, do you see

10:58:26  15  the box at the top, it says video processing -- video frame

10:58:29  16  processing, correct?

10:58:30  17  A.  Yes.

10:58:30  18  Q.  And this is a Mitek document, and video frame

10:58:34  19  processing is the -- the form of operation that's at issue

10:58:39  20  in this court today, as far as you understand it; isn't

10:58:42  21  that correct, Mr. Wood?

10:58:44  22  A.  Yes, that's right.

10:58:45  23  Q.  And the document says:  Automatic capture when good

10:58:48  24  image is detected; do you see that, sir?

10:58:50  25  A.  Yes.

| | | |
|---|---|---|
| 10:58:51 | 1 | Q.  And you disagree with that, correct, sir? |
| 10:58:54 | 2 | A.  Yes. |
| 10:58:54 | 3 | Q.  Now, we -- you spoke about a number of other manuals |
| 10:59:31 | 4 | that have been produced by Mitek, correct, in your direct? |
| 10:59:37 | 5 | A.  Yes, I did. |
| 10:59:38 | 6 | Q.  And you said those manuals were inaccurate after |
| 10:59:45 | 7 | September of 2014, correct? |
| 10:59:48 | 8 | A.  I said the ones that were shown to me were inaccurate. |
| 10:59:52 | 9 | Q.  They became inaccurate after September 2014, correct? |
| 10:59:55 | 10 | A.  I don't know if the entire manuals, but those sections |
| 11:00:04 | 11 | I talked about were incorrect. |
| 11:00:06 | 12 | Q.  As of September '14? |
| 11:00:09 | 13 | A.  Yes, 2014. |
| 11:00:10 | 14 | Q.  September 2014.  So one of the manuals you showed the |
| 11:00:13 | 15 | jury was PX-0092; is that correct? |
| 11:00:16 | 16 | A.  Yes, that's correct. |
| 11:00:21 | 17 | MR. SHEASBY:  So why don't we pull that one up? |
| 11:00:24 | 18 | Q.  (By Mr. Sheasby)  And if we turn to the second page of |
| 11:00:27 | 19 | that document, that manual is dated 24 June 2016, correct? |
| 11:00:36 | 20 | A.  Yes, that's correct. |
| 11:00:37 | 21 | Q.  That's after September 2014, correct? |
| 11:00:40 | 22 | A.  Yes, it is. |
| 11:00:40 | 23 | Q.  And if you turn to Page 4 of that document, it says: |
| 11:00:49 | 24 | If the document is in focus, 4 corners are visible, it is |
| 11:00:54 | 25 | not overly slanted or rotated, and the document fills at |

| | | |
|---|---|---|
| 11:00:58 | 1 | least the minimum area required of the view finder.  Those |
| 11:01:01 | 2 | are examples of monitoring criteria, fair? |
| 11:01:05 | 3 | A.  Yes, that's fair. |
| 11:01:06 | 4 | Q.  It goes on to say, quote, then MiSnap will capture and |
| 11:01:10 | 5 | return an image. |
| 11:01:11 | 6 | Correct? |
| 11:01:11 | 7 | A.  Yes, it says that. |
| 11:01:13 | 8 | Q.  And that was the document that was produced after |
| 11:01:15 | 9 | September 2014, correct? |
| 11:01:16 | 10 | A.  Yes, that is correct. |
| 11:01:17 | 11 | Q.  That was produced when the -- the video frame mode was |
| 11:01:22 | 12 | solely in use, correct? |
| 11:01:23 | 13 | A.  Yes, I agree with that. |
| 11:01:33 | 14 | Q.  Okay.  And then let's go to PX-0376.  This is another |
| 11:01:36 | 15 | document that you showed the ladies and gentlemen of the |
| 11:01:37 | 16 | jury, correct? |
| 11:01:37 | 17 | A.  Yes, that's correct. |
| 11:01:38 | 18 | Q.  You told them it was inaccurate as of September 2014, |
| 11:01:43 | 19 | correct? |
| 11:01:43 | 20 | A.  Can you repeat the question? |
| 11:01:47 | 21 | Q.  You told them that this manual was inaccurate, correct? |
| 11:01:49 | 22 | A.  Inaccurate?  Those statements in it were inaccurate. |
| 11:01:52 | 23 | Q.  And that's because everything changed in September of |
| 11:01:54 | 24 | 2014, correct? |
| 11:01:55 | 25 | A.  In the code it changed, yes. |

| | | |
|---|---|---|
| 11:02:00 | 1 | Q.  Yes.  And this manual was dated November, 2014, |
| 11:02:05 | 2 | correct? |
| 11:02:05 | 3 | A.  Yes. |
| 11:02:06 | 4 | Q.  And that's after the code had changed, correct? |
| 11:02:10 | 5 | A.  Yes, it is. |
| 11:02:11 | 6 | Q.  And if we turn to Page 376.5 of that document, it |
| 11:02:17 | 7 | says -- |
| 11:02:17 | 8 | MR. SHEASBY:  No, let's go to Section 1.1, |
| 11:02:19 | 9 | Mr. Huynh. |
| 11:02:20 | 10 | Q.  (By Mr. Sheasby)  It says:  Real-time feedback to the |
| 11:02:24 | 11 | end user until a suitable image is detected at which point |
| 11:02:28 | 12 | it automatically captures and returns the image for |
| 11:02:30 | 13 | processing. |
| 11:02:31 | 14 | Correct? |
| 11:02:31 | 15 | A.  Yes, the document says that. |
| 11:02:33 | 16 | Q.  It's describing capture after analysis of the image, |
| 11:02:37 | 17 | correct? |
| 11:02:37 | 18 | A.  Yes, that's fair. |
| 11:02:38 | 19 | Q.  That's after September 2014, correct? |
| 11:02:41 | 20 | A.  Yes, that's correct. |
| 11:02:42 | 21 | Q.  And that's using the new video frame processing, the |
| 11:02:44 | 22 | method that's at issue in this case, correct? |
| 11:02:46 | 23 | A.  The source is, yes. |
| 11:02:48 | 24 | Q.  And Mitek's manual is describing that as capture after |
| 11:02:51 | 25 | analysis, correct? |

| | | |
|---|---|---|
| 11:02:52 | 1 | A.  The manual is saying that, yes. |
| 11:02:57 | 2 | Q.  The answer to my question is yes? |
| 11:02:59 | 3 | A.  Yes. |
| 11:03:00 | 4 | Q.  Now, you said that Mitek now knows -- well, you said |
| 11:03:16 | 5 | the manuals are -- are mistaken, and Mitek knows they're |
| 11:03:19 | 6 | mistaken, and they're trying to correct those mistakes, |
| 11:03:22 | 7 | correct? |
| 11:03:22 | 8 | A.  Yes, recent -- yes, we started doing that recently. |
| 11:03:32 | 9 | Q.  Okay.  So why don't we turn to Tab 23 in your binder? |
| 11:03:50 | 10 | A.  I don't understand Tab 23. |
| 11:03:51 | 11 | Q.  So there's three big binders next to you.  Look to your |
| 11:03:55 | 12 | left.  Right there. |
| 11:03:58 | 13 | A.  Okay. |
| 11:03:58 | 14 | Q.  And in those, there'll be a tab called 23.  By the way, |
| 11:04:18 | 15 | when I'm doing that, your deposition was taken on July |
| 11:04:21 | 16 | 17th, 2019, correct? |
| 11:04:23 | 17 | A.  That sounds correct. |
| 11:04:25 | 18 | Q.  Would you accept my representation on that? |
| 11:04:27 | 19 | A.  Sure, yeah. |
| 11:04:28 | 20 | Q.  Thank you.  So you're turning to Tab 21 [sic]? |
| 11:04:37 | 21 | MR. SHEASBY:  Why don't we go ahead and bring that |
| 11:04:39 | 22 | up on the screen.  I believe that's iX-0037? |
| 11:04:49 | 23 | Q.  (By Mr. Sheasby)  So this is a MiSnap for Android SDK |
| 11:04:54 | 24 | 3.5.x.  Do you see that? |
| 11:04:56 | 25 | A.  Yes, I do. |

| | | |
|---|---|---|
| 11:04:57 | 1 | Q.  And why don't we turn to Page 36 of this document. |
| 11:05:19 | 2 | MR. BITTNER:  Your Honor, may we approach? |
| 11:05:21 | 3 | THE COURT:  Approach the bench. |
| 11:05:28 | 4 | (Bench conference.) |
| 11:05:29 | 5 | MR. BITTNER:  I just want to know is this in |
| 11:05:32 | 6 | evidence.  It's been pre-admitted? |
| 11:05:34 | 7 | MR. SHEASBY:  It has not. |
| 11:05:35 | 8 | MR. BITTNER:  Well, the, I don't know for what |
| 11:05:37 | 9 | purpose it's being shown.  If it's for impeachment -- |
| 11:05:38 | 10 | MR. SHEASBY:  It's for impeachment. |
| 11:05:42 | 11 | MR. BITTNER:  Well, statement -- is he going to |
| 11:05:43 | 12 | develop something he's going to impeach him with? |
| 11:05:45 | 13 | THE COURT:  You're using this to potentially |
| 11:05:47 | 14 | impeach this witness? |
| 11:05:48 | 15 | MR. SHEASBY:  Yes, Your Honor. |
| 11:05:53 | 16 | MR. BITTNER:  Yeah, no foundation for impeachment. |
| 11:05:57 | 17 | THE COURT:  You're certainly entitled to use |
| 11:05:59 | 18 | something that's not pre-admitted for impeachment, but you |
| 11:06:01 | 19 | are going to need to show a prior inconsistency. |
| 11:06:04 | 20 | MR. SHEASBY:  Okay.  I'm happy to proceed that |
| 11:06:06 | 21 | way, Your Honor. |
| 11:06:06 | 22 | THE COURT:  All right. |
| 11:06:06 | 23 | (Bench conference concluded.) |
| 11:06:19 | 24 | THE COURT:  Let's proceed. |
| 11:06:35 | 25 | MR. SHEASBY:  Just give me one moment, Your Honor. |

| | | |
|---|---|---|
| 11:06:43 | 1 | Q. (By Mr. Sheasby)  If you can turn to Tab 27 -- Tab 27 |
| 11:06:50 | 2 | in your binder, Mr. Wood. |
| 11:07:21 | 3 | A. You say 27? |
| 11:07:22 | 4 | Q. I did. |
| 11:07:23 | 5 | A. Okay. |
| 11:07:24 | 6 | Q. Do you recognize Tab 27 in your binder, Mr. Wood? |
| 11:07:28 | 7 | A. Yes, I do. |
| 11:07:41 | 8 | Q. So if you turn to Page 6 of that binder, you would |
| 11:07:52 | 9 | agree that MiSnap adapts to the capabilities of the |
| 11:08:00 | 10 | device -- using the video stream capability of the device |
| 11:08:02 | 11 | to automatically capture images.  Key quality conditions |
| 11:08:05 | 12 | are analyzed first at the device level and measured against |
| 11:08:10 | 13 | expected thresholds to ensure optimal images are captured |
| 11:08:15 | 14 | before being sent to the mobile imaging server for further |
| 11:08:17 | 15 | processing. |
| 11:08:18 | 16 | That's how the MiSnap system works, correct? |
| 11:08:25 | 17 | A. Not entirely, no. |
| 11:08:28 | 18 | Q. Do you agree or disagree with that statement? |
| 11:08:30 | 19 | A. It's hard to say.  It's -- analyze first to ensure |
| 11:08:48 | 20 | optimal messages are captured.  It's very high level. |
| 11:09:04 | 21 | Yeah, in -- in general, it seems to describe MiSnap. |
| 11:09:09 | 22 | Q. Okay.  So -- so what -- you agree that that -- what I |
| 11:09:14 | 23 | just showed you is an accurate description of MiSnap's |
| 11:09:17 | 24 | system, correct? |
| 11:09:18 | 25 | A. Let me read it again, please. |

11:09:21  1        I disagree about the order of the things on the

11:09:47  2   page, but in general, it's somewhat correct.

11:09:50  3   Q.  Well, MiSnap provides real-time feedback to the end

11:09:55  4   user until a suitable image is detected at which point it

11:10:05  5   automatically captures and returns the image processing,

11:10:07  6   correct?

11:10:07  7   A.  You said:  And then it captures image.  No, that's not

11:10:12  8   correct.

11:10:13  9        MR. SHEASBY:  So I'd now like to publish iX-0038.

11:10:23 10   Q.  (By Mr. Sheasby)  So this is iX-0038.  This is MiSnap

11:10:26 11   for Android SDK 3.6.x and 3.7.x.  you were an Android

11:10:34 12   developer, if I remember correctly, Mr. Wood?

11:10:36 13   A.  Yes, that's correct.

11:10:38 14        MR. SHEASBY:  And let's turn to Page 6 of that

11:10:40 15   document.

11:10:40 16   Q.  (By Mr. Sheasby)  And it says:  Automatic capture and

11:10:46 17   integrated analysis.  And it describes the Mitek system as

11:10:51 18   MiSnap provides real-time feedback to the end user until a

11:10:54 19   suitable image is detected at which point it automatically

11:10:59 20   captures and returns the image for processing, correct?

11:11:02 21   A.  Yes, that's what the document says.

11:11:07 22   Q.  And that's totally incorrect under your sworn

11:11:11 23   testimony, correct?

11:11:11 24   A.  For the source code, yes, it's incorrect.

11:11:13 25   Q.  So whoever authorized or approved this manual was

| | | |
|---|---|---|
| 11:11:19 | 1 | mistaken, fair? |
| 11:11:20 | 2 | A.  I don't think that's a fair statement. |
| 11:11:26 | 3 | Q.  So whoever wrote this was accurate? |
| 11:11:28 | 4 | A.  It may have been accurate.  It depends on when it was |
| 11:11:35 | 5 | written. |
| 11:11:35 | 6 | Q.  Whoever modified this document was -- were they doing |
| 11:11:38 | 7 | it in a way that was accurate or inaccurate? |
| 11:11:40 | 8 | A.  If they changed this part, and I don't know, it would |
| 11:11:46 | 9 | be inaccurate. |
| 11:11:50 | 10 | Q.  Now, let's turn back to the first page of this |
| 11:11:53 | 11 | document.  This is the MiSnap for Android SDK 3.6.x and |
| 11:12:02 | 12 | 3.7.x, correct? |
| 11:12:04 | 13 | A.  Yes, I agree. |
| 11:12:04 | 14 | Q.  Sir, you were the last person to modify this document; |
| 11:12:04 | 15 | isn't that correct? |
| 11:12:08 | 16 | A.  No, I was not. |
| 11:12:09 | 17 | Q.  Okay. |
| 11:12:10 | 18 |       MR. SHEASBY:  Why don't we turn to iX-0052?  And |
| 11:12:18 | 19 | why don't we put that on the screen.  And why don't we pull |
| 11:12:22 | 20 | up MiSnap for Android SDK 3.6.x and 3.7.x? |
| 11:12:28 | 21 | A.  Uh-huh, that's fine. |
| 11:12:29 | 22 |       MR. SHEASBY:  And then why don't we also pull up |
| 11:12:32 | 23 | the modified part of the column, Mr. Wood [sic]? |
| 11:12:40 | 24 | Q.  (By Mr. Sheasby)  So we have just been reviewing the |
| 11:12:43 | 25 | last version of MiSnap for Android SDK 3.6.x and 3 .7.x, |

| | | |
|---|---|---|
| 11:12:51 | 1 | correct? |
| 11:12:51 | 2 | A.  That's correct. |
| 11:12:52 | 3 | Q.  You testified under oath that you were not the last |
| 11:12:56 | 4 | person to modify, correct?  That's what you told me. |
| 11:12:58 | 5 | A.  I was the last one -- not the last one to modify the |
| 11:13:00 | 6 | document, yes. |
| 11:13:01 | 7 | Q.  And on this document that I just showed you, iX-0032, |
| 11:13:06 | 8 | it says modified by you on March 13th, 2019, correct? |
| 11:13:09 | 9 | A.  That's not what it's saying.  That's incorrect. |
| 11:13:13 | 10 | Q.  Sir -- |
| 11:13:14 | 11 | MR. SHEASBY:  Your Honor, can you ask him to |
| 11:13:16 | 12 | answer the question directly, please? |
| 11:13:18 | 13 | THE COURT:  He did give you a direct answer, |
| 11:13:22 | 14 | Mr. Sheasby.  You can restate your question or ask another |
| 11:13:26 | 15 | one. |
| 11:13:26 | 16 | MR. SHEASBY:  I'm happy to do that, Your Honor. |
| 11:13:27 | 17 | Q.  (By Mr. Sheasby)  Mr. Wood, on this document, it lists |
| 11:13:30 | 18 | you as the modifier of the MiSnap for Android SDK 3.6.x and |
| 11:13:38 | 19 | 3.7.x as of March 13, 2019, correct? |
| 11:13:42 | 20 | A.  I disagree with that statement. |
| 11:13:54 | 21 | Q.  Okay.  Now, you said -- well, let's turn to another |
| 11:14:20 | 22 | document in your binder.  Why don't we look at -- why don't |
| 11:15:04 | 23 | we look at iX -- Tab 31 in your binder, which is iX0040? |
| 11:15:22 | 24 | A.  Could you repeat the tab, please? |
| 11:15:25 | 25 | Q.  Tab 31. |

11:15:27   1    A.   That's different.

11:15:35   2          MR. SHEASBY:   Actually let's take that down.   I've

11:15:39   3    changed my mind.   I want to go to Tab 34 in your binder.

11:16:09   4          So why don't we pull up that document, it's

11:16:15   5    iX0045.

11:16:16   6          MR. BITTNER:   Your Honor, may we approach?

11:16:17   7          THE COURT:   You may approach.

11:16:22   8          (Bench conference.)

11:16:28   9          MR. BITTNER:   Again, Your Honor, I don't think

11:16:30  10    this has been pre-admitted.   If he's going to impeach him

11:16:32  11    with this, he needs to first lay the foundation before

11:16:35  12    publishing it to the jury.

11:16:37  13          THE COURT:   Is this a pre-admitted document?

11:16:39  14          MR. SHEASBY:   I'm about to lay the foundation,

11:16:41  15    Your Honor.

11:16:41  16          THE COURT:   All right.   Lay the foundation.

11:16:43  17          (Bench conference concluded.)

11:16:51  18          THE COURT:   Let's proceed.

11:16:53  19    Q.   (By Mr. Sheasby)   Now, for the MiSnap iOS, which is the

11:16:59  20    Apple version 3.6 and 3.7.x, MiSnap provides real-time

11:17:05  21    feedback to the end user until a suitable image is detected

11:17:10  22    at which point it automatically captures and returns the

11:17:13  23    image for processing, correct?

11:17:16  24    A.   No, that's not correct.

11:17:18  25    Q.   Okay.

| | | |
|---|---|---|
| 11:17:19 | 1 | MR. SHEASBY:  So why don't we pull up on the |
| 11:17:23 | 2 | screen, Mr. Huynh, iX0045. |
| 11:17:31 | 3 | Q.  (By Mr. Sheasby)  This is the MiSnap for iOS 3.6 and |
| 11:17:36 | 4 | 3.7.x and it's the SDK, it says SDK, right? |
| 11:17:40 | 5 | A.  This is not the SDK. |
| 11:17:41 | 6 | Q.  It says SDK, correct, sir? |
| 11:17:43 | 7 | A.  This is a guide. |
| 11:17:43 | 8 | Q.  For SDK, correct, sir? |
| 11:17:45 | 9 | A.  That's correct. |
| 11:17:45 | 10 | Q.  And you told the ladies and gentlemen of the jury that |
| 11:17:48 | 11 | it's the SDK that -- that directs when the code said SDK, |
| 11:17:53 | 12 | that was the actual code, correct? |
| 11:17:55 | 13 | A.  I said that, but not about the docs. |
| 11:18:00 | 14 | Q.  For the code, correct? |
| 11:18:01 | 15 | A.  I said the code would say MiSnap SDK. |
| 11:18:06 | 16 | Q.  If it was the official code, correct? |
| 11:18:08 | 17 | A.  Yes. |
| 11:18:09 | 18 | Q.  And this is the manual for MiSnap SDK 3.6.x and 3.7.x, |
| 11:18:18 | 19 | correct? |
| 11:18:18 | 20 | A.  That's correct. |
| 11:18:18 | 21 | Q.  And if you turn to Page 5 of that document, in the |
| 11:18:34 | 22 | second col -- the second paragraph under automatic capture |
| 11:18:37 | 23 | and integrated image analysis, it says:  MiSnap provides |
| 11:18:43 | 24 | real-time feedback to the end user until a suitable image |
| 11:18:46 | 25 | is detected at which point it automatically captures and |

| | | |
|---|---|---|
| 11:18:50 | 1 | returns the imaging for processing.  Correct? |
| 11:18:55 | 2 | A.  The document says that, correct. |
| 11:18:59 | 3 | Q.  And it's your testimony that that is wrong, correct? |
| 11:19:03 | 4 | A.  That's correct. |
| 11:19:04 | 5 | Q.  And you realized it was wrong after I took your |
| 11:19:07 | 6 | deposition, correct? |
| 11:19:09 | 7 | A.  Yes, that's correct. |
| 11:19:10 | 8 | Q.  And you have made extreme efforts to -- to -- to |
| 11:19:15 | 9 | address this incorrect problem in the document, correct? |
| 11:19:21 | 10 | A.  I would disagree with that. |
| 11:19:23 | 11 | Q.  Oh, you haven't made efforts to address the |
| 11:19:26 | 12 | incorrectness of these documents? |
| 11:19:28 | 13 | A.  We haven't made extreme efforts to.  We have made |
| 11:19:30 | 14 | efforts. |
| 11:19:30 | 15 | Q.  You have made efforts to address the incorrectness of |
| 11:19:34 | 16 | these documents, correct? |
| 11:19:34 | 17 | A.  We started to, that's correct. |
| 11:19:35 | 18 | Q.  Now, you modified this document on September 3rd, 2019, |
| 11:19:44 | 19 | correct? |
| 11:19:44 | 20 | A.  I did not modify this document. |
| 11:19:48 | 21 | Q.  September 3rd, 2019 was after your deposition was |
| 11:19:54 | 22 | taken, correct? |
| 11:19:54 | 23 | A.  Yes, that's correct. |
| 11:20:03 | 24 | Q.  Why don't we turn to Tab 23 in your binder? |
| 11:20:07 | 25 | MR. SHEASBY:  Which is iX0053, Mr. Huynh. |

| | | |
|---|---|---|
| 11:20:11 | 1 | Q.  (By Mr. Sheasby)  So this is the MiSnap for iOS |
| 11:20:13 | 2 | documentation, correct? |
| 11:20:13 | 3 | A.  What tab, I'm sorry? |
| 11:20:17 | 4 | Q.  Tab 23. |
| 11:20:20 | 5 | A.  It's at the very end.  Okay. |
| 11:20:33 | 6 | Q.  And we were looking at the MiSnap iOS SDK for 3.6.x and |
| 11:20:41 | 7 | 3.7.x, correct? |
| 11:20:43 | 8 | A.  Yes, I believe so. |
| 11:20:44 | 9 | Q.  And you said that document was wrong, correct? |
| 11:20:46 | 10 | A.  Yes, I did. |
| 11:20:48 | 11 | Q.  You said you didn't modify the document, correct? |
| 11:20:52 | 12 | A.  That's correct. |
| 11:20:53 | 13 | Q.  And on this document, iX00 -- on this document, which |
| 11:20:59 | 14 | is iX0053, under modified, it lists your name September |
| 11:21:05 | 15 | 3rd, 2019, correct? |
| 11:21:06 | 16 | A.  It says modified, yes. |
| 11:21:07 | 17 | Q.  And it lists your name, correct? |
| 11:21:09 | 18 | A.  Yes, it does. |
| 11:21:09 | 19 | Q.  And it lists the date of September 13th, 2019, correct? |
| 11:21:14 | 20 | A.  Yes, it does. |
| 11:21:15 | 21 | Q.  Now, you showed the ladies and gentlemen of the jury |
| 11:21:38 | 22 | source code at DTX-611, correct? |
| 11:21:43 | 23 | MR. SHEASBY:  And let's pull that up, Mr. Huynh. |
| 11:21:46 | 24 | Q.  (By Mr. Sheasby)  Now, this is iOS source code that |
| 11:21:50 | 25 | you're walking the jury through, correct? |

| | | |
|---|---|---|
| 11:21:52 | 1 | A.  Yes, that's correct. |
| 11:21:53 | 2 | Q.  You didn't write this code, correct, sir? |
| 11:21:55 | 3 | A.  I did not write this code, correct. |
| 11:21:57 | 4 | Q.  And you -- you notice that it says DevApp in it, do you |
| 11:22:01 | 5 | see that? |
| 11:22:01 | 6 | A.  Yes, I do. |
| 11:22:02 | 7 | Q.  And in your testimony, you didn't identify a single |
| 11:22:05 | 8 | difference between the DevApp version of the code and any |
| 11:22:08 | 9 | other version of the code, correct? |
| 11:22:12 | 10 | A.  I only talked about the DevApp, correct. |
| 11:22:16 | 11 | Q.  Okay.  You didn't identify any difference between |
| 11:22:19 | 12 | DevApp version of the code and SDK version of the code as |
| 11:22:23 | 13 | to this portion of the code, correct? |
| 11:22:25 | 14 | A.  No, I didn't. |
| 11:22:27 | 15 | Q.  Thank you.  Now, you told the ladies and gentlemen of |
| 11:22:34 | 16 | the jury that you provided this source code to USAA, |
| 11:22:42 | 17 | correct? |
| 11:22:42 | 18 | A.  Yes, that's correct. |
| 11:22:44 | 19 | Q.  You provided the source code to Wells Fargo, to be |
| 11:22:48 | 20 | perfectly accurate, correct? |
| 11:22:52 | 21 | A.  Yeah, probably.  I gave it to counsel. |
| 11:22:55 | 22 | Q.  You gave it to the counsel who prepared you for your |
| 11:22:59 | 23 | testimony today, correct, sir? |
| 11:23:00 | 24 | A.  They didn't prepare me.  We prepared together. |
| 11:23:03 | 25 | Q.  Now, at your deposition, we talked about how the MiSnap |

11:23:20  1    video frame version, the version at issue in this case,

11:23:24  2    actually worked, correct?

11:23:28  3    A.  Are we talking about video frame processing?

11:23:31  4    Q.  You and I, we talked about that when we had our

11:23:34  5    deposition together in San Diego?

11:23:36  6    A.  That's one thing we talked about, yes.

11:23:38  7    Q.  It was in La Jolla, if you remember, sir?

11:23:41  8    A.  Yes, I do.

11:23:42  9    Q.  Now, in the MiSnap system that's at issue in this case,

11:23:47  10   MiSnap requests that preview frames be sent to it from the

11:23:52  11   camera functionality, correct?

11:23:53  12   A.  Yes, that's correct.

11:23:54  13   Q.  The camera sends a preview frame to MiSnap, correct?

11:23:58  14   A.  Yes, that's correct.

11:23:59  15   Q.  A certain number of preview frames will be analyzed for

11:24:03  16   image quality by the Mitek software, correct?

11:24:08  17   A.  It depends, but in general, I agree with that.

11:24:10  18   Q.  MiSnap receives preview frames from the camera's buffer

11:24:15  19   bound by the size of the buffer, correct?

11:24:16  20   A.  It receives frames from the camera.  I'm not sure what

11:24:25  21   you mean by the size of the buffer.

11:24:28  22   Q.  Why don't we turn to your deposition at Column 4, Lines

11:24:37  23   11 through 17?

11:24:39  24        MR. BITTNER:  Your Honor, objection.  Improper

11:24:41  25   impeachment.

11:24:45   1           THE COURT:  I'll overrule that objection at this

11:24:47   2   time.

11:24:48   3           Let's proceed, Mr. Sheasby.

11:24:53   4           MR. SHEASBY:  Sure.

11:24:54   5           Column 4, Lines 11 through 17, why don't we pull

11:24:59   6   that up, Mr. Huynh.

11:25:01   7   Q.  (By Mr. Sheasby)  Question:  Which is the way that

11:25:03   8   MiSnap operates is it takes preview images from the camera

11:25:08   9   buffer, correct?

11:25:08   10          Answer:  It receives preview frames from the

11:25:12   11  camera buffer bound by the size of that buffer.

11:25:16   12          Did I read your testimony correctly?

11:25:17   13  A.  Okay.  That's correct.

11:25:19   14  Q.  Does that refresh your recollection?

11:25:24   15  A.  Yes.

11:25:25   16  Q.  When MiSnap analyzes the preview frames, those are in

11:25:28   17  transitory memory, correct?

11:25:29   18  A.  Yes, that's correct.

11:25:31   19  Q.  They're preview frames, correct?

11:25:44   20  A.  Yes, that's correct.

11:25:45   21  Q.  Until the -- if the monitoring criteria are not

11:25:48   22  satisfied regarding that frame, that frame will disappear,

11:25:54   23  correct?

11:25:54   24  A.  Yes, I agree with that.

11:25:56   25  Q.  Now, if you remember at your deposition in La Jolla, I

11:26:03  1   gave you my phone, correct?

11:26:06  2   A.  Yes, I remember.

11:26:07  3   Q.  It was an iPhone, correct?

11:26:09  4   A.  Yes, that's correct.

11:26:10  5   Q.  And I asked you to take a picture of me, and we talked

11:26:14  6   about the preview images that occurs in the iPhone before

11:26:19  7   you press the shutter button, correct?

11:26:22  8   A.  Yes, I think we did.

11:26:23  9   Q.  And when it's showing you those preview versions of the

11:26:27  10  frame, that's not capturing, is it, Mr. Wood?

11:26:29  11  A.  That's -- the camera is capturing images, but it's not

11:26:33  12  the final capture in the iPhone app case.

11:26:37  13  Q.  Sir, when you're holding the phone and you're looking

11:26:42  14  at what's called the preview mode, it's a preview, it's not

11:26:47  15  capturing, correct?

11:26:50  16  A.  I disagree with that statement.

11:26:53  17  Q.  Okay.

11:26:53  18      MR. SHEASBY:  Let's turn to Column 66, Lines 23 to

11:26:56  19  67, Line 3 of your deposition.

11:27:05  20  A.  I can clear that up later.

11:27:07  21  Q.  (By Mr. Sheasby)  Question:  Now, I want you to do

11:27:12  22  something else.  Now I want you to hold the phone, it's

11:27:14  23  looking at what's called preview mode, correct?

11:27:17  24      Answer:  Yeah, it's showing -- it's not capturing.

11:27:21  25  It's a preview.

| | | |
|---|---|---|
| 11:27:24 | 1 | Was that your testimony, Mr. Wood? |
| 11:27:27 | 2 | A.  That was.  We were talking about manual capture at that |
| 11:27:31 | 3 | time. |
| 11:27:31 | 4 | Q.  Mr. Wood, when the camera was analyzing the preview |
| 11:27:37 | 5 | frames -- strike that. |
| 11:27:40 | 6 | Mr. Wood, in answer to my question, if you're |
| 11:27:43 | 7 | looking at what's called preview mode, you testified it's |
| 11:27:48 | 8 | not capturing, it's a preview.  That was your testimony, |
| 11:27:53 | 9 | correct, sir? |
| 11:27:53 | 10 | A.  At this point, yes. |
| 11:27:56 | 11 | Q.  So your testimony under oath during your deposition was |
| 11:28:03 | 12 | that when you're looking at the preview mode on a phone, |
| 11:28:08 | 13 | you testified that's not capturing, fair? |
| 11:28:12 | 14 | A.  That's not what I meant. |
| 11:28:14 | 15 | Q.  Sir, under oath, you testified that when you're looking |
| 11:28:22 | 16 | at the preview mode, that's not capturing, that was the |
| 11:28:25 | 17 | testimony you actually gave under oath, correct? |
| 11:28:27 | 18 | A.  At that point, I said that. |
| 11:28:29 | 19 | Q.  And you actually had an opportunity to correct your |
| 11:28:32 | 20 | deposition, correct? |
| 11:28:33 | 21 | A.  I don't know if I was or not. |
| 11:28:36 | 22 | Q.  Did you read your deposition after the fact? |
| 11:28:38 | 23 | A.  I did read it, yeah. |
| 11:28:39 | 24 | Q.  You didn't make corrections, correct? |
| 11:28:42 | 25 | A.  I didn't know how to. |

11:28:44   1   Q.  You didn't write me a letter saying I -- I made an

11:28:48   2   incorrect statement during my deposition, did you, sir?

11:28:50   3   A.  No, I did not.  I didn't know that was an option.

11:28:54   4   Q.  Did you tell your lawyers you had made an incorrect

11:29:01   5   statement in your deposition, sir?

11:29:02   6   A.  I don't remember.

11:29:05   7   Q.  Now, let me ask you another question, which is we

11:29:14   8   talked about the preview frames, the fact that they

11:29:20   9   disappear, correct, if there's not a satisfaction of image

11:29:23  10   quality analysis, correct?

11:29:24  11   A.  Yes, that's correct.

11:29:25  12   Q.  So you talked about the fact that MiSnap assesses

11:29:40  13   monitoring criteria of the preview frames before

11:29:44  14   determining whether it has passed, correct?

11:29:47  15   A.  Yes, I did.

11:29:55  16        MR. SHEASBY:  And why don't we go to Professor

11:29:57  17   Conte's Slide 117, Mr. Huynh?

11:30:02  18   Q.  (By Mr. Sheasby)  Now, you weren't here for the

11:30:16  19   testimony of Professor Conte.  You were outside of the

11:30:19  20   courtroom, correct?

11:30:21  21   A.  Yes, I was outside -- outside, yeah.

11:30:24  22   Q.  You heard about the testimony, though, correct, sir?

11:30:26  23   A.  No, I did not.

11:30:27  24   Q.  Okay.  Professor Conte described the monitoring

11:30:34  25   criteria that he believes were used in the Wells Fargo

11:30:37   1    systems, and he listed them with checkmarks in -- for

11:30:42   2    Versions 2.0.6 to 3.1.3, and then for Version 3.7.1.

11:30:49   3          You have no disagreement with his analysis of the

11:30:52   4    monitoring criteria that are used in the Wells Fargo

11:30:55   5    system, fair?

11:30:55   6    A.  I don't agree with all of these.

11:31:01   7    Q.  Okay.  Well, you do agree that --

11:31:04   8          MR. SHEASBY:  Let's take that down.

11:31:06   9    Q.  (By Mr. Sheasby)  You do agree that MiSnap analyzes the

11:31:11   10   brightness of the image, correct?

11:31:12   11   A.  Yes, I agree with that.

11:31:13   12   Q.  You analyze -- you agree that it analyzes the spacing

11:31:17   13   of the MICR characters, correct?

11:31:19   14   A.  Essentially, that's true, yes.

11:31:20   15   Q.  You agree that it analyzes corner detection, correct?

11:31:25   16   A.  Yes, it does.

11:31:26   17   Q.  It analyzes histograms for sharpness, correct?

11:31:30   18   A.  Yes, that's -- I agree.

11:31:31   19   Q.  You previously described these scores and thresholds as

11:31:36   20   monitoring criteria, correct?

11:31:36   21   A.  Yes, I did.

11:31:43   22   Q.  Now, we talked about the fact that MiSnap receives

11:31:47   23   preview images from the preview buffer, correct?

11:31:50   24   A.  Yes, that's correct.

11:31:52   25   Q.  These preview images are transitory, correct?

| | | |
|---|---|---|
| 11:31:55 | 1 | A.  Yes, they are. |
| 11:31:56 | 2 | Q.  They'll disappear if the monitoring criteria are not |
| 11:32:00 | 3 | satisfied, correct? |
| 11:32:05 | 4 | A.  Yes, I agree with that. |
| 11:32:06 | 5 | Q.  And the system that Wells Fargo analyzes -- uses |
| 11:32:12 | 6 | analyzes those preview images based on monitoring criteria, |
| 11:32:15 | 7 | correct? |
| 11:32:15 | 8 | A.  Yes, I agree with that. |
| 11:32:16 | 9 | Q.  And we talked about the fact that the frames will |
| 11:32:21 | 10 | disappear if monitoring criteria are not satisfied, fair? |
| 11:32:23 | 11 | A.  Yes, that's fair. |
| 11:32:24 | 12 | Q.  And then once the monitoring criteria are met, a JPEG |
| 11:32:29 | 13 | is created, correct? |
| 11:32:32 | 14 | A.  Yes, that's correct. |
| 11:32:33 | 15 | Q.  And then after the JPEG is created, there's additional |
| 11:32:38 | 16 | JPEG processing, correct?  The additional metadata, fair? |
| 11:32:44 | 17 | A.  Yes, there's some metadata, that's fair. |
| 11:32:54 | 18 |         MR. SHEASBY:  And why don't we turn to, Mr. Huynh, |
| 11:32:57 | 19 | Mr. Wood's cross-examination, Demonstrative Slide 1? |
| 11:33:03 | 20 |         THE COURT:  Counsel, approach the bench, please. |
| 11:33:06 | 21 |         (Bench conference.) |
| 11:33:13 | 22 |         THE COURT:  I've just been told the jury's lunch |
| 11:33:15 | 23 | has arrived.  How much additional cross time wise do you |
| 11:33:18 | 24 | think you have, Mr. Sheasby? |
| 11:33:19 | 25 |         MR. SHEASBY:  30 minutes, Your Honor, or less. |

| | | |
|---|---|---|
| 11:33:21 | 1 | THE COURT:  And then I assume you'll have |
| 11:33:24 | 2 | redirect, Mr. Bittner? |
| 11:33:25 | 3 | MR. BITTNER:  Yes, Your Honor. |
| 11:33:26 | 4 | THE COURT:  This may not be ideal, but we're going |
| 11:33:28 | 5 | to break for lunch at this juncture.  You told me 30 more |
| 11:33:32 | 6 | minutes? |
| 11:33:33 | 7 | MR. SHEASBY:  I could get it done in 15 if we can |
| 11:33:35 | 8 | get it all done before lunch. |
| 11:33:41 | 9 | MR. BITTNER:  I don't know how much redirect I'm |
| 11:33:45 | 10 | going to have.  I can't -- I can't commit to Your Honor -- |
| 11:33:47 | 11 | THE COURT:  I understand that.  I'm just trying to |
| 11:33:49 | 12 | get a ballpark idea. |
| 11:33:50 | 13 | MR. SHEASBY:  I think my preference, I think, we |
| 11:33:52 | 14 | can finish this witness before lunch. |
| 11:33:56 | 15 | MR. BITTNER:  I think that's incredibly ambitious. |
| 11:34:00 | 16 | THE COURT:  Well, I'll let you keep going with |
| 11:34:03 | 17 | your cross at least for the time being, okay? |
| 11:34:06 | 18 | MR. SHEASBY:  Thank you, Your Honor. |
| 11:34:07 | 19 | (Bench conference concluded.) |
| 11:34:19 | 20 | THE COURT:  All right.  Let's proceed. |
| 11:34:20 | 21 | Q.  (By Mr. Sheasby)  So we talked about the fact that the |
| 11:34:24 | 22 | system that Wells Fargo uses receives preview images from |
| 11:34:28 | 23 | the preview buffer, correct? |
| 11:34:28 | 24 | A.  Yes, that's correct. |
| 11:34:29 | 25 | Q.  And I put that on this demonstratives.  Do you see |

| | | |
|---|---|---|
| 11:34:33 | 1 | that, sir? |
| 11:34:34 | 2 | A.  Yes, I do. |
| 11:34:34 | 3 | Q.  We can all agree on that, correct? |
| 11:34:36 | 4 | A.  Yes. |
| 11:34:37 | 5 | Q.  Those preview images will disappear if the monitoring |
| 11:34:41 | 6 | criteria are not satisfied, correct? |
| 11:34:42 | 7 | A.  Yes, that's correct. |
| 11:34:43 | 8 | Q.  And then MiSnap analyzes those preview images based on |
| 11:34:46 | 9 | the monitoring criteria, correct, sir? |
| 11:34:49 | 10 | A.  Yes, that's correct. |
| 11:34:50 | 11 | Q.  And if the monitoring criteria are satisfied, a JPEG |
| 11:35:00 | 12 | file is created, correct? |
| 11:35:01 | 13 | A.  Not exactly.  I disagree -- disagree with file. |
| 11:35:21 | 14 | Q.  I'm happy to reask it.  Once the monitoring criteria |
| 11:35:24 | 15 | are met, a JPEG file is created, correct, sir? |
| 11:35:27 | 16 | A.  It's encoded as a JPEG, correct. |
| 11:35:30 | 17 | Q.  You testified previously that it was created, sir? |
| 11:35:33 | 18 | A.  At one point, but I usually refer to it as encoded. |
| 11:35:39 | 19 | Q.  Okay.  So why don't we go to -- |
| 11:35:41 | 20 | A.  It's more accurate. |
| 11:35:44 | 21 | Q.  -- why don't we go to Column 78, Lines 12 through 19 -- |
| 11:35:44 | 22 | MR. BITTNER:  Your Honor, may we approach? |
| 11:35:46 | 23 | THE COURT:  Approach the bench. |
| 11:35:51 | 24 | (Bench conference.) |
| 11:35:53 | 25 | MR. BITTNER:  Your Honor, he testified that's what |

11:35:56  1  he -- that -- that Mr. Sheasby's representation was

11:35:57  2  accurate, so there's no impeachment here.  He said:  Yeah,

11:36:01  3  that's what I said.  There's no impeachment.

11:36:06  4       THE COURT:  Where are you going with this, Mr.

11:36:08  5  Sheasby?

11:36:08  6       MR. SHEASBY:  He was waffling on -- on creating.

11:36:11  7  He said he normally doesn't use the word "create," and I'm

11:36:14  8  establishing that he uses the word "create" in his

11:36:18  9  deposition.

11:36:18  10       MR. BITTNER:  He already agreed he did.

11:36:21  11       THE COURT:  All right.  We need to move on.

11:36:22  12       (Bench conference concluded.)

11:36:30  13  Q.  (By Mr. Sheasby)  You previously testified that the

11:36:32  14  JPEG was created.  Those were your words, correct?

11:36:35  15  A.  I do think I said that at one time.

11:36:37  16  Q.  You said that in your deposition, correct?

11:36:39  17  A.  Correct.

11:36:40  18  Q.  You said it earlier today, correct?

11:36:42  19  A.  Probably, yes.

11:36:44  20  Q.  Okay.

11:36:44  21       MR. SHEASBY:  So why don't we put up the

11:36:46  22  demonstrative again?

11:36:48  23  Q.  (By Mr. Sheasby)  So other than the use of the word

11:36:52  24  "file" next to JPEG, you agree with these three bullet

11:36:54  25  points, correct?

| | | |
|---|---|---|
| 11:36:55 | 1 | A.  In general, I agree. |
| 11:36:58 | 2 | Q.  Now, I also now want to speak about what happens after |
| 11:37:08 | 3 | the monitoring criteria are passed. |
| 11:37:11 | 4 | MR. SHEASBY:  And let's go to Mr. Wood's Cross |
| 11:37:16 | 5 | Demonstrative No. 3. |
| 11:37:17 | 6 | THE COURT:  You can certainly ask questions about |
| 11:37:19 | 7 | it.  You're not going to speak about it. |
| 11:37:21 | 8 | MR. SHEASBY:  I apologize, Your Honor.  I withdraw |
| 11:37:23 | 9 | the question. |
| 11:37:23 | 10 | Let's pull up Mr. Wood's Demonstrative No. 3. |
| 11:37:29 | 11 | Q.  (By Mr. Sheasby)  So, Mr. Wood, you agree that after |
| 11:37:32 | 12 | the monitoring criteria are passed, Code Line 2357 is |
| 11:37:41 | 13 | executed, correct? |
| 11:37:42 | 14 | A.  Yes, I agree. |
| 11:37:44 | 15 | Q.  And that code line is setting a flag of capturing |
| 11:37:49 | 16 | image, correct? |
| 11:37:50 | 17 | A.  Yes, I -- that's fair. |
| 11:37:53 | 18 | Q.  And then after the monitoring criteria are passed, Line |
| 11:37:57 | 19 | 2374 is set, correct, sir? |
| 11:38:00 | 20 | A.  Yes, that's correct. |
| 11:38:01 | 21 | Q.  And that defines the capture time, correct? |
| 11:38:04 | 22 | A.  It says -- it's the capture session time, yeah. |
| 11:38:09 | 23 | Q.  And the session -- the capture session ends after the |
| 11:38:13 | 24 | monitoring criteria have passed, correct? |
| 11:38:17 | 25 | A.  The session ends afterwards, yes. |

| 11:38:19 | 1  | Q.  And then a message is sent in Lines 2389 that auto |
| 11:38:25 | 2  | capture has started, correct? |
| 11:38:26 | 3  | A.  Yes, that's correct. |
| 11:38:28 | 4  | Q.  And then in Lines 2481 something is saved in a file |
| 11:38:35 | 5  | called docCaptureResults? |
| 11:38:42 | 6  | A.  I don't know what you mean by saved. |
| 11:38:44 | 7  | Q.  Image is placed in a file called docCaptureResults, |
| 11:38:51 | 8  | correct? |
| 11:38:51 | 9  | A.  In memory, yes.  It's not saved. |
| 11:38:52 | 10 | Q.  An image is placed in docCaptureResults, correct? |
| 11:39:01 | 11 | A.  Yes, I -- no, no, I agree with that. |
| 11:39:03 | 12 | Q.  It's the JPEG, correct? |
| 11:39:04 | 13 | A.  Yes, it's the JPEG. |
| 11:39:05 | 14 | Q.  It's the JPEG that was created after the monitoring |
| 11:39:08 | 15 | criteria has been satisfied, correct? |
| 11:39:09 | 16 | A.  Yes, that's correct. |
| 11:39:11 | 17 | Q.  And then after that JPEG is created, ultimately, it |
| 11:39:14 | 18 | will be returned to the Wells Fargo app which will send it |
| 11:39:19 | 19 | to the Wells Fargo server, correct? |
| 11:39:21 | 20 | A.  MiSnap returns it back to the Wells Fargo app.  It's |
| 11:39:26 | 21 | out of our hands after that. |
| 11:39:27 | 22 | Q.  It's your basic understanding that it's returned to the |
| 11:39:31 | 23 | server, correct? |
| 11:39:31 | 24 | A.  In general, I agree.  But that's outside of MiSnap. |
| 11:39:37 | 25 | Q.  You have no basis to disagree with the fact that it |

11:39:43   1   would be returned to the server and saved permanently at

11:39:45   2   that point, correct?

11:39:46   3   A.   I have no idea about that.

11:39:50   4   Q.   Okay.   Now, you spoke about -- to be clear, you have no

11:39:53   5   idea what Wells Fargo does or does not know about the

11:39:57   6   operation of its version of MiSnap, correct?

11:40:04   7   A.   Sorry, I don't understand the question.

11:40:07   8   Q.   You haven't interviewed any Wells Fargo witnesses to

11:40:10   9   understand what they knew or didn't know about MiSnap,

11:40:13   10  correct?

11:40:13   11  A.   No, I haven't interviewed them.

11:40:15   12  Q.   Now, the code we've been looking at, the code that

11:40:18   13  actually does the obtaining of preview frames, the

11:40:23   14  monitoring of those preview frames, and the creation of a

11:40:26   15  JPEG in Android and in iOS, you did not write that code,

11:40:34   16  correct?

11:40:34   17  A.   I don't know what you mean by obtained there.

11:40:37   18  Q.   I'm happy to reask the question.   The code we've been

11:40:40   19  talking about, which is speaking about taking a preview --

11:40:45   20  strike that.

11:40:45   21        The code we've been talking about in which you are

11:40:50   22  receiving a preview image, analyzing it for monitoring

11:40:55   23  criteria, and then creating a JPEG for iOS and Android, you

11:41:00   24  did not create that code, correct, sir?

11:41:02   25  A.   For iOS, I didn't.   For Android, probably not.

11:41:09  1   Q.  Did you speak to the folks who created it?

11:41:12  2   A.  I don't know who created each line.

11:41:16  3   Q.  Did you ask them whether they were aware of Wells

11:41:19  4   Fargo -- strike that.

11:41:20  5        Did you ask them whether they were aware of USAA's

11:41:23  6   system when they wrote the code?

11:41:25  7   A.  No, I didn't ask them about that.

11:41:27  8   Q.  So when you testified to the jury that to your

11:41:33  9   knowledge, none of MiSnap's -- Mitek's conduct related to

11:41:36  10  USAA, you actually hadn't investigated by speaking to the

11:41:41  11  people who created the code that's at issue in this case,

11:41:45  12  fair?

11:41:46  13       MR. BITTNER:  Objection, Your Honor.  Misstates

11:41:49  14  testimony.

11:41:49  15       THE COURT:  Overruled.

11:41:51  16  A.  Those developers were not at MiSnap -- or Mitek

11:41:54  17  anymore.  I didn't speak to them.

11:41:56  18  Q.  (By Mr. Sheasby)  And you didn't speak to them about

11:41:58  19  what they knew about USAA, correct?

11:41:59  20  A.  No, I did not.

11:42:00  21  Q.  You didn't speak to them about whether they looked at

11:42:04  22  USAA's application, correct?

11:42:05  23  A.  No, I did not.

11:42:06  24  Q.  Did you do anything whatsoever other than -- strike

11:42:08  25  that.

11:42:09   1          Did you do anything whatsoever at any point in
11:42:12   2   time to investigate whether Wells Fargo and Mitek were
11:42:16   3   focused on USAA when the relevant code at issue in this
11:42:20   4   case was being created?
11:42:22   5   A.  In a way.  I looked at some of the really old code
11:42:29   6   from -- and saw where it came from -- from 2007, I think it
11:42:33   7   was, so I did some research.  But I did not talk to those
11:42:37   8   developers.
11:42:38   9   Q.  Well, we're not dealing with code from 2007, correct,
11:42:41  10   sir?
11:42:41  11   A.  I guess that's correct.
11:42:43  12   Q.  We're dealing with code that was created, under your
11:42:45  13   testimony, September 2014, correct?
11:42:47  14   A.  Yes.
11:42:48  15   Q.  And as of September 2014, you did nothing to
11:42:52  16   investigate whether the Mitek employees who created it had
11:42:55  17   access to USAA materials, correct?
11:42:57  18   A.  Oh, since September 2014?
11:43:00  19   Q.  No, no.  Let me withdraw the question and ask it this
11:43:03  20   way.
11:43:03  21          Did you do anything to investigate whether the
11:43:05  22   folks who wrote the code at issue in this case were aware
11:43:11  23   of USAA's systems?
11:43:12  24   A.  I -- since September 2014, you're saying?
11:43:26  25   Developers -- no, I didn't talk to those developers.

11:43:32  1   Q.   Okay.   Now, sir, because you don't have access to the

11:43:56  2   iOS operating system and because you haven't delved into

11:44:01  3   Android because you weren't instructed to do so, you can't

11:44:04  4   point me to any single document -- any single line of code

11:44:09  5   anywhere in the world that states that capture occurs

11:44:11  6   before the monitoring criteria are analyzed, correct?

11:44:14  7   A.   That's correct.

11:44:17  8          MR. SHEASBY:   I have no further questions, Your

11:44:19  9   Honor.   I pass the witness.

11:44:20  10         THE COURT:   All right.   Ladies and gentlemen,

11:44:24  11  before we proceed with the Defendant's redirect, we're

11:44:27  12  going to recess for lunch.

11:44:29  13         I'm going to ask you to take your juror notebooks

11:44:31  14  with you to the jury room, follow all the instructions I've

11:44:35  15  given you about your conduct throughout the trial,

11:44:38  16  including not to discuss the case with each other.   After

11:44:41  17  lunch, we'll proceed with any redirect testimony that the

11:44:45  18  Defendant may have with this witness.

11:44:47  19         With those instructions, the jury is excused for

11:44:49  20  lunch.

11:44:50  21         COURT SECURITY OFFICER:   All rise.

11:44:51  22         (Jury out.)

11:44:52  23         THE COURT:   Mr. Wood, you're clearly in the

11:45:20  24  middle of testifying.   We're breaking for lunch.   I'm

11:45:23  25  instructing you not to discuss your testimony over the

| | | |
|---|---|---|
| 11:45:25 | 1 | lunch break with Wells Fargo or any third party. |
| 11:45:29 | 2 | THE WITNESS:  I understand. |
| 11:45:29 | 3 | THE COURT:  All right.  We stand in recess for |
| 11:45:32 | 4 | lunch. |
| 11:45:32 | 5 | COURT SECURITY OFFICER:  All rise. |
| 11:45:33 | 6 | (Recess.) |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

2                                    CERTIFICATION

3

4          I HEREBY CERTIFY that the foregoing is a true and

5    correct transcript from the stenographic notes of the

6    proceedings in the above-entitled matter to the best of my

7    ability.

8

9

10    /S/ Shelly Holmes_____                    11/4/19____
     SHELLY HOLMES, CSR, TCRR                       Date
11   OFFICIAL REPORTER
     State of Texas No.: 7804
12   Expiration Date: 12/31/20

13

14

15

16

17

18

19

20

21

22

23

24

25