12:52:17

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

UNITED STATES AUTOMOBILE        )(
ASSOCIATION
                                )(    CIVIL ACTION NO.

VS.                             )(    2:18-CV-245-JRG

                                )(    MARSHALL, TEXAS
                                      NOVEMBER 4, 2019
WELLS FARGO BANK, N.A.          )(    12:52 P.M.


TRANSCRIPT OF JURY TRIAL

AFTERNOON SESSION

BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:


JASON SHEASBY
ANTHONY ROWLES
LISA GLASSER
IRELL & MANELLA
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276

ROBERT CHRISTOPHER BUNT
PARKER, BUNT & AINSWORTH, PC
100 East Ferguson
Suite 418
Tyler, TX 75702

```
 1   FOR THE DEFENDANT:

 2

 3   THOMAS M. MELSHEIMER
     M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

 8   E. DANIELLE T. WILLIAMS
     WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

15   JACK WESLEY HILL
     WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
 1              P R O C E E D I N G S
 2              (Jury out.)
 3          COURT SECURITY OFFICER:  All rise.
 4          THE COURT:  Be seated, please.
 5          All right.  Counsel, is there anything we need to
 6   take up before I bring the jury back in?
 7          MR. SHEASBY:  Your Honor, Plaintiffs have
 8   concurred with Defendant and we request that Mr. Wood be
 9   released so he can go back home after any
10   recross-examination I may have with him.
11          THE COURT:  We'll address that when he steps off
12   the witness stand.  Mr. Melsheimer?
13          MR. MELSHEIMER:  Your Honor, just two matters
14   briefly.  One, the Court will recall there was a question
15   of Mr. Wood on cross-examination about whether or not he
16   had -- knew what Dr. Conte had testified to or whether
17   anyone had told him about it.  I think it would be
18   appropriate, and I'm not casting any aspersions, but I
19   think it would be appropriate for the jury to be instructed
20   that under the rules of the Court, fact witnesses are not
21   permitted to hear anyone's testimony or be told about it or
22   be present for it lest there be in -- perhaps unintentional
23   implications that he was not as informed about the case as
24   he should be.  That would be my simple request.
25          THE COURT:  All right.  Do you have any objection
```

Timestamps (left column): 12:52:18, 12:52:18, 12:52:19, 12:52:25, 12:52:54, 12:52:57, 12:52:59, 12:53:03, 12:53:07, 12:53:09, 12:53:14, 12:53:14, 12:53:14, 12:53:17, 12:53:20, 12:53:24, 12:53:27, 12:53:32, 12:53:34, 12:53:37, 12:53:40, 12:53:47, 12:53:49, 12:53:52

| | | |
|---|---|---|
| 12:53:53 | 1 | to that, Mr. Sheasby? |
| 12:53:55 | 2 | MR. SHEASBY:  It's in the Court's gift, Your |
| 12:53:57 | 3 | Honor.  We don't have any strong view either way. |
| 12:53:59 | 4 | THE COURT:  All right.  I see no problem with |
| 12:54:03 | 5 | that, and I'll try and instruct the jury in that regard |
| 12:54:06 | 6 | when they come back in. |
| 12:54:08 | 7 | MR. MELSHEIMER:  Thank you.  May it please the |
| 12:54:09 | 8 | Court, Your Honor.  One other matter that is perhaps a |
| 12:54:12 | 9 | matter of clarification on the Court's ruling and I was |
| 12:54:14 | 10 | going to ask my partner, Mr. Johnson, to clarify this issue |
| 12:54:17 | 11 | about whether or not there's one other area that the Court |
| 12:54:20 | 12 | might permit us to go into while Mr. Wood is on the stand |
| 12:54:24 | 13 | related to the issues we briefed before the Court last |
| 12:54:27 | 14 | night. |
| 12:54:28 | 15 | MR. JOHNSON:  May it please the Court, Your Honor. |
| 12:54:30 | 16 | THE COURT:  Go ahead. |
| 12:54:30 | 17 | MR. JOHNSON:  We understand the Court's ruling on |
| 12:54:33 | 18 | the issues on the opening of the door briefing that was |
| 12:54:36 | 19 | done.  The Court was -- was playing that -- the witnesses |
| 12:54:43 | 20 | cannot refer to the fact that Mitek has 6,000 customers, |
| 12:54:46 | 21 | only a thousand of which use the auto capture feature.  We |
| 12:54:49 | 22 | wanted to obtain a ruling on whether or not witnesses |
| 12:54:52 | 23 | could, separate from raw numbers, could refer to the fact |
| 12:54:57 | 24 | that Mitek -- that of its customers, only 15 percent of |
| 12:55:02 | 25 | Mitek's customers use auto capture and the rest use manual, |

12:55:05  1  or if that was subject to the same ruling.

12:55:08  2  THE COURT:  Same ruling.  I mean, telling them

12:55:10  3  1,000 out of 6,000 or 15 percent is telling them the same

12:55:15  4  thing.  So that's excluded as well.

12:55:17  5  MR. JOHNSON:  Thank you, Your Honor.

12:55:17  6  THE COURT:  Okay.  Also, while I have you here,

12:55:21  7  I'm not exactly sure of the order, but at some point, I

12:55:24  8  know that Defendant's corporate representative,

12:55:29  9  Ms. Lockwood-Stein, is going to testify, and there are two

12:55:32  10  disputes that have arisen about demonstratives that she

12:55:37  11  would use during testimony.  I've looked at those, counsel,

12:55:42  12  since they came in overnight.  The -- these two

12:55:50  13  demonstratives, the one with the nice lady holding the flip

12:55:55  14  phone and the one with the advertisement and the stagecoach

12:55:57  15  at the top of it, the objections to those demonstratives

12:56:01  16  are overruled.  Those are permitted.

12:56:04  17  And then there's also a dispute about a slide that

12:56:10  18  Ms. Lockwood-Stein may have earlier indicated she didn't

12:56:13  19  know much about, but I think the argument is that she's

12:56:19  20  here during this trial as the corporate representative of

12:56:24  21  Wells Fargo and speaking for the company as opposed to

12:56:26  22  speaking for herself personally, she should be able to go

12:56:29  23  into.  I think that argument has merit.  That doesn't mean

12:56:33  24  she can't be cross-examined on what she doesn't know

12:56:36  25  personally, but I'm not going to preclude the use of that

12:56:38   1   exhibit with her just because she may not have complete

12:56:46   2   personal knowledge of it.  She is entitled to speak to it

12:56:49   3   as the corporate representative of Wells Fargo.  So that

12:56:51   4   objection is overruled, as well.

12:56:52   5           And those are the only two outstanding objections

12:56:55   6   that we didn't get to this morning regarding that witness.

12:56:58   7   I thought we would just get them out of the way quickly so

12:57:01   8   that we won't have to delay the trial process further when

12:57:04   9   we get to her being called as a witness.

12:57:06   10          MR. SHEASBY:  Thank you, Your Honor.

12:57:07   11          THE COURT:  Anything else we need to take up

12:57:09   12   before we bring the jury back in?

12:57:11   13          MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

12:57:13   14          MR. MELSHEIMER:  Nothing, Your Honor.

12:57:14   15          THE COURT:  Let's bring in the jury, Mr. Johnston.

12:57:18   16          You may return to the podium, Mr. Sheasby.

12:57:18   17          COURT SECURITY OFFICER:  All rise.

12:57:23   18          THE COURT:  Oh, you passed the witness.

12:57:24   19          MR. SHEASBY:  I did pass.

12:57:27   20          (Jury in.)

12:57:27   21          THE COURT:  Welcome back, ladies and gentlemen.

12:57:42   22   Please have a seat.

12:57:47   23          If you'll recall when we broke for lunch that

12:57:50   24   cross-examination had been completed by Plaintiff.  They

12:57:53   25   had passed the witness.  Now it's appropriate to see if

| | | |
|---|---|---|
| 12:57:57 | 1 | Defendants have redirect of this witness. |
| 12:57:59 | 2 | Mr. Bittner, do you have redirect? |
| 12:58:01 | 3 | MR. BITTNER:  We do, Your Honor. |
| 12:58:03 | 4 | THE COURT:  Proceed with your redirect |
| 12:58:05 | 5 | examination. |
| 12:58:05 | 6 | ANDREW WOOD, DEFENDANT'S WITNESS, PREVIOUSLY SWORN |
| 12:58:05 | 7 | REDIRECT EXAMINATION |
| 12:58:07 | 8 | BY MR. BITTNER: |
| 12:58:07 | 9 | Q.  Good afternoon, Mr. Wood. |
| 12:58:11 | 10 | A.  Good afternoon. |
| 12:58:12 | 11 | Q.  Do you recall the last question you were asked on |
| 12:58:17 | 12 | cross, asked you whether you could identify a single line |
| 12:58:20 | 13 | of code that says:  Capture occurs before monitoring |
| 12:58:25 | 14 | criteria are analyzed?  Do you recall that? |
| 12:58:27 | 15 | A.  Yes, I do. |
| 12:58:28 | 16 | Q.  You said you couldn't, right? |
| 12:58:29 | 17 | A.  During my deposition, yeah. |
| 12:58:32 | 18 | Q.  Okay.  Is there a single one line of code that performs |
| 12:58:35 | 19 | those functions? |
| 12:58:36 | 20 | A.  No, there's not. |
| 12:58:37 | 21 | Q.  Are those functions performed by multiple lines of |
| 12:58:40 | 22 | code? |
| 12:58:40 | 23 | MR. SHEASBY:  Your Honor, objection, leading. |
| 12:58:42 | 24 | THE COURT:  State your objection again, counsel. |
| 12:58:46 | 25 | MR. SHEASBY:  Objection, leading, Your Honor. |

| | | |
|---|---|---|
| 12:58:47 | 1 | THE COURT:  Sustained. |
| 12:58:48 | 2 | Q.  (By Mr. Bittner)  How many lines of code perform those |
| 12:58:52 | 3 | functions? |
| 12:58:52 | 4 | A.  Many lines of code. |
| 12:58:54 | 5 | Q.  Do you know if the words "monitoring criteria" appear |
| 12:58:59 | 6 | in MiSnap code? |
| 12:59:00 | 7 | A.  They do not. |
| 12:59:06 | 8 | MR. BITTNER:  Let's go back to 611, DTX-611. |
| 12:59:11 | 9 | Q.  (By Mr. Bittner)  Mr. Wood, does the word -- do the |
| 12:59:13 | 10 | words -- or does the word "capture" appear in MiSnap's |
| 12:59:15 | 11 | code? |
| 12:59:15 | 12 | A.  Yes, it does, multiple times. |
| 12:59:17 | 13 | Q.  Does the word "analyze" appear in MiSnap's code? |
| 12:59:21 | 14 | A.  Yes, it does. |
| 12:59:21 | 15 | Q.  Let's focus again on 2278.  What is occurring in Line |
| 12:59:28 | 16 | 2278, Mr. Wood? |
| 12:59:29 | 17 | A.  The iPhone camera software is sending capture output to |
| 12:59:37 | 18 | MiSnap here.  MiSnap is receiving it here. |
| 12:59:41 | 19 | Q.  And where is that capture output analyzed? |
| 12:59:45 | 20 | A.  Later, Line 2323. |
| 12:59:47 | 21 | Q.  So Line 2323?  Actually let me see that -- strike that. |
| 01:00:00 | 22 | Let me just ask this question. |
| 01:00:01 | 23 | What occurs first, the reception of capture output |
| 01:00:09 | 24 | from the phone or the analysis? |
| 01:00:11 | 25 | A.  The reception happens first, the capture output. |

01:00:21   1          MR. BITTNER:  Can I have the ELMO, please?

01:00:28   2   Q.  (By Mr. Bittner)  Mr. Wood, you recall being asked some

01:00:35   3   questions about this demonstrative during your

01:00:38   4   cross-examination?

01:00:39   5   A.  Yes, I do.

01:00:42   6   Q.  Do you recall going through each and every line of code

01:00:45   7   on this demonstrative during your direct?

01:00:48   8   A.  Just these four lines, yes.

01:00:52   9   Q.  Mr. Wood, would it be accurate or inaccurate to say

01:00:55   10  that capture of an image occurs with a camera in any of

01:01:00   11  these lines of code?

01:01:01   12  A.  That would be inaccurate.

01:01:09   13         MR. BITTNER:  Can we have DTX-381?  And let's go

01:01:24   14  to Page 4 of this document, Mr. Goodin.

01:01:28   15  Q.  (By Mr. Bittner)  Mr. Wood, do you recall being asked

01:01:31   16  some questions about Page 4 of DTX-381?

01:01:34   17  A.  Yes, I do.

01:01:35   18  Q.  Were you shown any other page of this document during

01:01:37   19  your cross-examination?

01:01:39   20  A.  Just this one.

01:01:43   21         MR. BITTNER:  Let's go to Page 3 right before

01:01:45   22  this.  And Mr. Goodin, if we can blow up Paragraph or --

01:01:52   23  Section 2, video frame processing.

01:01:54   24  Q.  (By Mr. Bittner)  Mr. Wood, what is described in the

01:01:59   25  first paragraph here under video frame processing?

01:02:02   1   A.   This is talking about with the video frame processing

01:02:09   2   feature, so it's talking about the new way that MiSnap was

01:02:12   3   doing auto capture.

01:02:13   4   Q.   And it says:  When MiSnap detects a useable image in

01:02:19   5   the video image feed, that exact image from the video feed

01:02:23   6   will be used.  Do you see that?

01:02:25   7   A.   Yes, I do.

01:02:26   8   Q.   Is that an accurate description of how video frame

01:02:32   9   processing works?

01:02:33   10   A.   Yes, that is.

01:02:33   11   Q.   Is that an accurate description of the (void) capture

01:02:37   12   output and analyzeFrame result code that we looked at just

01:02:41   13   a few moments ago?

01:02:44   14   A.   Yes, it is.

01:02:44   15   Q.   The next paragraph goes on to say in the prior version

01:02:48   16   of MiSnap a still camera image capture is initiated

01:02:54   17   immediately after detection, do you see that?

01:02:56   18   A.   Yes, I do.

01:02:56   19   Q.   Is that an accurate description of the old way of doing

01:03:00   20   things?

01:03:00   21           MR. SHEASBY:  Objection, leading.

01:03:05   22           THE COURT:  Sustained.

01:03:06   23   Q.   (By Mr. Bittner)  What does Paragraph 2 describe under

01:03:12   24   video still capture -- when it's describing video still

01:03:16   25   capture mode?

01:03:16   1   A.   In the second paragraph, it says:   This mode is

01:03:19   2   referred to as video still capture mode.   It's describing

01:03:23   3   the previous way, the old way where the still camera image

01:03:32   4   capture happens after analysis.

01:03:33   5   Q.   Remind -- remind me, when -- when was this switch made

01:03:38   6   by Mitek?

01:03:39   7   A.   That was finalized in September 2014.

01:03:41   8   Q.   After September 2014, which way did the code operate?

01:03:45   9   A.   The new way, the video frame processing way.

01:03:49  10   Q.   Was video still capture ever used after September 2014?

01:03:54  11   A.   No, it was not.

01:03:57  12        THE COURT:   Ladies and gentlemen, I'm going to

01:03:58  13   interrupt for just a minute.   I wanted to remind you that

01:04:02  14   Mr. Wood is a fact witness.   Consequently, he, like other

01:04:06  15   fact witnesses, are under the rule that was invoked at the

01:04:09  16   beginning of the trial where I instructed those who were

01:04:11  17   fact witnesses and not expert witnesses, they would need to

01:04:14  18   remain outside the courtroom until they were called to

01:04:17  19   testify.   He was asked on cross-examination about did he

01:04:21  20   remember certain prior testimony, and he said no to it.

01:04:24  21   The reason he said no was because under my instructions and

01:04:28  22   the application of the rule, he was outside the courtroom

01:04:31  23   as he should have been.   I just wanted to clarify that for

01:04:34  24   you.

01:04:35  25        Go ahead, Mr. Bittner.

| | | |
|---|---|---|
| 01:04:38 | 1 | MR. BITTNER:  Thank you, Your Honor. |
| 01:04:42 | 2 | We can take that down, Mr. Goodin. |
| 01:04:44 | 3 | Q.  (By Mr. Bittner)  Mr. Wood, do you recall being asked |
| 01:04:49 | 4 | about some additional Android and SDK manuals during your |
| 01:04:52 | 5 | cross-examination? |
| 01:04:53 | 6 | A.  Yes, I do. |
| 01:04:56 | 7 | MR. BITTNER:  And can I have the ELMO, please? |
| 01:04:58 | 8 | Q.  (By Mr. Bittner)  And do you recall being asked about |
| 01:05:10 | 9 | this document iX52 and this document, iX53? |
| 01:05:16 | 10 | A.  Yes, I do. |
| 01:05:17 | 11 | Q.  I heard you say that you were not the last one to |
| 01:05:19 | 12 | modify this, even though it says Andrew Wood on it. |
| 01:05:23 | 13 | A.  I wasn't -- |
| 01:05:24 | 14 | Q.  Why were you not -- why were you not the last one to |
| 01:05:26 | 15 | modify this? |
| 01:05:27 | 16 | A.  I wasn't the last one to modify the actual documents, |
| 01:05:32 | 17 | that's what I was trying to say.  I was the one that |
| 01:05:34 | 18 | uploaded copies.  We put all of our documentation on this |
| 01:05:41 | 19 | new portal, the Mitek customer support portal, and I |
| 01:05:43 | 20 | uploaded all the ones that we had so you can see I -- bring |
| 01:05:52 | 21 | it up a little bit -- MiSnap for iOS SDK 3.0, that's the |
| 01:05:57 | 22 | last one, March 13th, by Andrew, Wood, 3.1, March 13th by |
| 01:06:05 | 23 | Andrew Wood, 3.5, March 13th by Andrew Wood, and so on. |
| 01:06:05 | 24 | That's why I uploaded all of those, it doesn't mean that I |
| 01:06:08 | 25 | wrote that code or -- doesn't mean that I wrote that |

01:06:10   1    document, doesn't mean I modified that document.  It just

01:06:14   2    means that I uploaded it so our customers could access it.

01:06:17   3    Q.  Mr. Wood, when did you discover that Mitek's manuals

01:06:26   4    had not been -- or the description of how MiSnap works

01:06:30   5    within MiSnap manuals had not been updated between the two

01:06:33   6    versions we spoke about today?

01:06:34   7    A.  During my deposition.

01:06:37   8    Q.  Was that the first time you were aware of that issue?

01:06:39   9    A.  Yes, it was.

01:06:42   10   Q.  And is Mi -- is Mitek currently working to correct that

01:06:46   11   issue?

01:06:46   12   A.  Yes, we're currently working on that.

01:06:48   13   Q.  Do you recall being asked some questions on

01:06:57   14   cross-examination about your deposition where you were

01:06:59   15   asked to take a photo of yourself using an iPhone camera?

01:07:03   16   A.  Yes, I do.

01:07:04   17   Q.  Do you know how the camera app that Apple designs has

01:07:13   18   put on this phone works?

01:07:14   19   A.  I have a guess.

01:07:15   20   Q.  Okay.  But you don't know for certain?

01:07:17   21   A.  I don't know for certain.

01:07:17   22   Q.  Do you know how MiSnap works?

01:07:22   23   A.  Yes, I do.

01:07:24   24   Q.  Do you know if the way that the Apple camera app and

01:07:30   25   Mi -- strike that.

01:07:31  1          Do you know if the Apple camera app and MiSnap

01:07:36  2   operate the same way?

01:07:37  3          MR. SHEASBY:  Objection, Your Honor.  Foundation,

01:07:39  4   speculation.

01:07:40  5          THE COURT:  Sustained.

01:07:41  6   Q.  (By Mr. Bittner)  Is it okay if we focus on how MiSnap

01:07:44  7   operates in this case -- or today?

01:07:46  8   A.  Yes.

01:07:47  9   Q.  Can you walk the jury through again how MiSnap obtains

01:08:05  10  an image from the iPhone camera?

01:08:07  11  A.  So MiSnap earlier asks the camera software, send a

01:08:13  12  message, and told it to start sending MiSnap messages.

01:08:18  13          When the camera software has captured output, it

01:08:24  14  sends a message to MiSnap, MiSnap receives that message,

01:08:27  15  and that message contains that sample buffer, that preview

01:08:31  16  frame, that image.

01:08:32  17          Then MiSnap analyzes that image.  If it determines

01:08:38  18  it's good, it will return that back to the app.

01:08:44  19          MR. BITTNER:  Pass the witness.

01:08:45  20          THE COURT:  Further cross-examination,

01:08:47  21  Mr. Sheasby?

01:08:47  22          MR. SHEASBY:  Yes, Your Honor.

01:08:48  23          THE COURT:  Please proceed.

01:08:48  24                    RECROSS-EXAMINATION

01:09:05  25  BY MR. SHEASBY:

01:09:05   1   Q.  Good afternoon, Mr. Wood.

01:09:07   2   A.  Good afternoon.

01:09:08   3   Q.  Mr. Wood, Mitek wants to be as accurate - as close as

01:09:14   4   it can be in the developer guides we've been looking at

01:09:18   5   today, fair?

01:09:18   6   A.  Yes, we want to be, that's fair.

01:09:22   7   Q.  And so, for example, if you turn to Tab 5 in your

01:09:30   8   binder, which is PX-0094, and why don't we turn to Page 50

01:09:44   9   of that document, and you can tell Page 50 because it has

01:09:48   10  that PX-0094, and it has Page 50 at the bottom.  Tell me

01:09:55   11  when you're there, Mr. Wood.

01:09:56   12  A.  I'm there.  Thank you.

01:10:00   13          MR. SHEASBY:  And, Mr. Huynh, why don't we pull up

01:10:02   14  that middle --

01:10:03   15  Q.  (By Mr. Sheasby)  This manual says:  Once all

01:10:05   16  conditions are met, MiSnap will automatically snap a photo.

01:10:09   17          Do you see that, sir?

01:10:10   18  A.  Yes, I do.

01:10:11   19  Q.  And then below that it says:  Action buttons, such as

01:10:15   20  help, flash settings, and back, are removed at the point of

01:10:20   21  capture to prevent initiation of actions at the point of

01:10:24   22  capture.

01:10:24   23          Do you see that, sir?

01:10:25   24  A.  Yes, I do.

01:10:26   25  Q.  Now, on the source code, the action buttons, such as

| | | |
|---|---|---|
| 01:10:30 | 1 | help, flash settings, and back, are removed after the |
| 01:10:37 | 2 | monitoring criteria have been satisfied, correct? |
| 01:10:40 | 3 | A.  Yes, that is correct. |
| 01:10:41 | 4 | Q.  And you told me that you used the word "capture" |
| 01:10:48 | 5 | differently from how it's used in the Mitek documents, |
| 01:10:53 | 6 | correct? |
| 01:10:53 | 7 | A.  Yes, at one point, I did. |
| 01:10:56 | 8 | Q.  Well, sir, it was more than one point, correct? |
| 01:10:59 | 9 | A.  Yes, I did. |
| 01:11:01 | 10 | Q.  Multiple times during your deposition under oath, you |
| 01:11:04 | 11 | told me that you used the word "capture" differently from |
| 01:11:09 | 12 | how it's used in Mitek's developer guides, fair? |
| 01:11:12 | 13 | A.  Yes, I did. |
| 01:11:13 | 14 | Q.  And so it's fair for the jury, when they weigh the |
| 01:11:19 | 15 | evidence, to take into account the fact that you used the |
| 01:11:24 | 16 | word "capture" different from the Mitek guides, fair? |
| 01:11:27 | 17 | A.  I think that's fair. |
| 01:11:31 | 18 | Q.  Now, you said -- why don't we turn back to iX-32, and |
| 01:11:39 | 19 | that was the upload form.  I'll pull it up, as well, while |
| 01:11:42 | 20 | you're pulling it up -- iX-22 -- iX-22.  I'm sorry, I've |
| 01:12:02 | 21 | led you down the wrong path. |
| 01:12:04 | 22 | A.  It's okay.  I'm already in that binder. |
| 01:12:14 | 23 | MR. SHEASBY:  So why don't we pull up iX-0052, |
| 01:12:20 | 24 | Mr. Huynh? |
| 01:12:21 | 25 | Q.  (By Mr. Sheasby)  So these are the manuals, and you've |

01:12:24   1   noted that all of these manuals are uploaded so that anyone

01:12:27   2   can actually access them as long as they give you your

01:12:32   3   email address, correct?

01:12:33   4   A.  I think that's correct, yes.

01:12:35   5   Q.  Wells Fargo could have accessed them, correct?

01:12:37   6   A.  I believe so, yes.

01:12:40   7   Q.  In fact, you give your manuals to the folks who use

01:12:43   8   your MiSnap program, fair?

01:12:45   9   A.  Yes, we do.

01:12:46   10  Q.  And you said that when it says these were modified, it

01:12:50   11  didn't mean you wrote them, it meant that you uploaded

01:12:54   12  them, correct?

01:12:54   13  A.  Yes, that's correct.

01:12:56   14  Q.  Okay.  So would it shock you if I told you that every

01:13:00   15  single one of these manuals on this page describes MiSnap

01:13:05   16  as capturing after the monitoring criteria are satisfied?

01:13:09   17  A.  No, that wouldn't surprise me at all.

01:13:11   18  Q.  And you uploaded manuals that say that after your

01:13:15   19  deposition in July, correct?

01:13:19   20  A.  Some of them.

01:13:20   21  Q.  So you -- you uploaded a manual -- two manuals that are

01:13:24   22  going to say "capture after monitoring criteria" on August

01:13:27   23  27th, 2019, and October 24th, 2019.  That's after your

01:13:31   24  deposition, correct?

01:13:32   25  A.  Yes, that's correct.

01:13:32  1  Q.  And if we turn to Tab 23 in your binder, which is

01:13:39  2  iX-53, once again, would it shock you if I told you that

01:13:44  3  every single one of these manuals describes MiSnap as

01:13:51  4  capturing after the monitoring criteria are satisfied?

01:13:54  5  A.  It wouldn't surprise me at all.

01:13:56  6  Q.  And, in fact, you uploaded the vast majority of these

01:14:00  7  manuals -- let me withdraw that.

01:14:01  8      You uploaded the -- the majority of the manuals

01:14:04  9  that have that admission after your deposition was taken in

01:14:07  10  this case, fair?

01:14:08  11  A.  Yes, that's fair.

01:14:10  12  Q.  Okay.  And I have just two final questions.

01:14:13  13      Now, the JPEG file that's created after the

01:14:17  14  monitoring criteria are satisfied, that JPEG file doesn't

01:14:21  15  exist while the monitoring criteria are satisfied, correct?

01:14:25  16  A.  I would refer to it as JPEG format, and -- but --

01:14:31  17  Q.  So let me reask the question.  That's very fair.

01:14:34  18  A.  Okay.

01:14:34  19  Q.  The JPEG image that is sent to the server to be

01:14:37  20  permanently served -- stored, that's not created until

01:14:40  21  after the monitoring criteria are satisfied, fair?

01:14:42  22  A.  Yes, that's fair.

01:14:43  23  Q.  And one final question.  At any point in time Wells

01:14:47  24  Fargo has the absolute ability to disable auto capture if

01:14:50  25  it so chooses, correct?

| 01:14:52 | 1 | A.  Yes, they could. |
| 01:14:52 | 2 | Q.  They could literally type one number, and it can |
| 01:14:56 | 3 | disable auto capture whenever it wants, correct? |
| 01:14:58 | 4 | A.  Yes, they could. |
| 01:14:59 | 5 | Q.  And throughout this entire litigation, which you've |
| 01:15:04 | 6 | been involved in for some time on behalf of Wells Fargo, at |
| 01:15:07 | 7 | no point in time has Wells Fargo ever, ever, ever typed |
| 01:15:11 | 8 | that letter in to turn off auto capture, as far as you |
| 01:15:14 | 9 | know, correct, sir? |
| 01:15:14 | 10 | MR. BITTNER:  Objection, Your Honor.  Mr. Wood is |
| 01:15:17 | 11 | not here on behalf of Wells Fargo. |
| 01:15:20 | 12 | THE COURT:  That's true, but he can answer what he |
| 01:15:24 | 13 | knows within his own personal knowledge limited to whatever |
| 01:15:27 | 14 | that might be.  So overruled. |
| 01:15:27 | 15 | You may answer the question, sir. |
| 01:15:31 | 16 | A.  Would you repeat the question, please? |
| 01:15:31 | 17 | Q.  (By Mr. Sheasby)  Sure.  As far as you know, at no |
| 01:15:32 | 18 | point in time, ever, ever, ever, has Wells Fargo ever |
| 01:15:36 | 19 | pressed the button to turn off auto capture, fair? |
| 01:15:40 | 20 | A.  As far as I know, no. |
| 01:15:42 | 21 | Q.  Thank you for your time, Mr. Wood. |
| 01:15:45 | 22 | MR. SHEASBY:  I pass the witness, Your Honor. |
| 01:15:46 | 23 | THE COURT:  All right.  Is there additional |
| 01:15:48 | 24 | redirect, Mr. Bittner? |
| 01:15:50 | 25 | MR. BITTNER:  Two questions, Your Honor. |

01:15:51  1          THE COURT:  All right.

01:15:51  2                  REDIRECT EXAMINATION

01:15:53  3  BY MR. BITTNER:

01:15:53  4  Q.  Mr. Wood, as you use the word "capture" today, have you

01:15:58  5  used it consistent with the way it's used in the code?

01:16:02  6  A.  Yes, I have.

01:16:03  7  Q.  Between the code and the manuals, what determines how

01:16:06  8  the computer operates?

01:16:08  9          MR. SHEASBY:  Your Honor, objection, calls for

01:16:10  10  opinion testimony.

01:16:16  11          MR. BITTNER:  As developer --

01:16:17  12          THE COURT:  I think that's within his personal

01:16:19  13  knowledge.  I'll overrule that objection.

01:16:23  14  Q.  (By Mr. Bittner)  Let me restate my second question.

01:16:23  15          Between the code and the manuals, what controls

01:16:25  16  how the computer operates?

01:16:27  17  A.  Only the code controls how the computer or the phone

01:16:31  18  operates.

01:16:33  19          MR. BITTNER:  Pass the witness.

01:16:35  20          THE COURT:  Further cross?

01:16:37  21          MR. SHEASBY:  No further cross, Your Honor.

01:16:38  22          THE COURT:  All right.  You may step down,

01:16:40  23  Mr. Wood.

01:16:41  24          THE WITNESS:  Thank you.

01:16:41  25          THE COURT:  Is there a request to have this

| | | |
|---|---|---|
| 01:16:44 | 1 | witness excused? |
| 01:16:44 | 2 | MR. BITTNER:  There is.  Request he be excused. |
| 01:16:45 | 3 | MR. SHEASBY:  Yes, Your Honor. |
| 01:16:46 | 4 | THE COURT:  Sounds like a joint request, so I'll |
| 01:16:48 | 5 | grant it. |
| 01:16:49 | 6 | Mr. Wood, you're excused.  You're free to stay |
| 01:16:52 | 7 | with us, sir.  You're also free to leave. |
| 01:16:55 | 8 | THE WITNESS:  Thank you. |
| 01:16:55 | 9 | MR. SHEASBY:  Your Honor, may I clear binders? |
| 01:16:58 | 10 | THE COURT:  Yes.  And let's move this easel back |
| 01:17:05 | 11 | and turn it to a clean sheet, please. |
| 01:17:23 | 12 | Defendant, call your next witness. |
| 01:17:25 | 13 | MR. MELSHEIMER:  Your Honor, may it please the |
| 01:17:27 | 14 | Court.  Defendant, Wells Fargo, calls Dr. John Villasenor. |
| 01:17:31 | 15 | He will be examined by Mr. Wes Hill. |
| 01:17:34 | 16 | THE COURT:  All right.  Dr. Villasenor, if you'll |
| 01:17:37 | 17 | come forward and be sworn, please. |
| 01:17:44 | 18 | (Witness sworn.) |
| 01:17:50 | 19 | THE COURT:  Please come around, sir, have a seat |
| 01:17:52 | 20 | on the witness stand. |
| 01:18:05 | 21 | MR. HILL:  Thank you, Your Honor.  I'm clearing a |
| 01:18:08 | 22 | few things from the last examination. |
| 01:18:09 | 23 | THE COURT:  That's fine. |
| 01:18:10 | 24 | MR. SHEASBY:  Your Honor, may I assist?  It's my |
| 01:18:12 | 25 | stuff. |

| | | |
|---|---|---|
| 01:18:12 | 1 | THE COURT:  All right. |
| 01:18:13 | 2 | MR. SHEASBY:  Thank you. |
| 01:18:40 | 3 | THE COURT:  All right.  Mr. Hill, you may proceed |
| 01:18:43 | 4 | with your direct examination. |
| 01:18:46 | 5 | MR. HILL:  Thank you, Your Honor. |
| 01:18:46 | 6 | JOHN VILLASENOR, PH.D., DEFENDANT'S WITNESS, SWORN |
| 01:18:46 | 7 | DIRECT EXAMINATION |
| 01:18:46 | 8 | BY MR. HILL: |
| 01:18:46 | 9 | Q.  Good afternoon, Dr. Villasenor. |
| 01:18:48 | 10 | A.  Good afternoon. |
| 01:18:48 | 11 | Q.  Would you please introduce yourself to the jury, sir? |
| 01:18:51 | 12 | A.  My name is John Villasenor. |
| 01:18:52 | 13 | Q.  And what's your role in this case, Dr. Villasenor? |
| 01:18:55 | 14 | A.  I have been retained by Wells Fargo to express my |
| 01:18:59 | 15 | opinion regarding infringement. |
| 01:19:00 | 16 | Q.  And did you prepare demonstratives to assist in your |
| 01:19:03 | 17 | testimony here today, sir? |
| 01:19:04 | 18 | A.  Yes, I did.  And the first one of them is now on the |
| 01:19:07 | 19 | screen. |
| 01:19:07 | 20 | Q.  All right.  Will you tell us a little bit about |
| 01:19:10 | 21 | yourself, please? |
| 01:19:10 | 22 | A.  Well, I am a professor at UCLA, and I live in |
| 01:19:17 | 23 | California with my wife and two kids, although one of my |
| 01:19:21 | 24 | kids just went off to college so now I have one kid in the |
| 01:19:23 | 25 | house. |

01:19:24  1  Q.  Okay.  Can you tell us about your educational

01:19:26  2  background, Dr. Villasenor?

01:19:27  3  A.  I earned a Bachelor of Science degree in electrical

01:19:31  4  engineering from the University of Virginia in 1985, and

01:19:35  5  then after that I went to Stanford University where I

01:19:38  6  earned a master's degree and Ph.D. in electrical

01:19:42  7  engineering.

01:19:42  8  Q.  So have you a Ph.D. in electrical engineering, sir?

01:19:44  9  A.  Yes, sir, that's correct.

01:19:45  10  Q.  From Stanford?

01:19:46  11  A.  That's right.

01:19:47  12  Q.  Now, can we talk a little bit about your work history.

01:19:50  13  Can you tell us where you currently work?

01:19:52  14  A.  I'm a professor in the electrical engineering

01:19:55  15  department at UCLA.

01:19:57  16  Q.  Full professor?

01:19:58  17  A.  Yes, yes.

01:19:59  18  Q.  And can you tell us about other professional experience

01:20:02  19  you've had?

01:20:03  20  A.  Prior -- I've been at UCLA since 1992, and prior to

01:20:08  21  that, I was at the NASA Jet Propulsion Laboratory.

01:20:12  22  Q.  How long did you work there?

01:20:13  23  A.  I worked there for several years, about two years.

01:20:16  24  Q.  All right.  I see here on the screen you've got some

01:20:18  25  logos of various places.  Are these other areas where

01:20:22   1   you've had professional experience?

01:20:24   2   A.   These are other organizations I've had various

01:20:27   3   interactions with, yes.

01:20:28   4   Q.   Okay.   Can you tell me about other professional

01:20:30   5   experience you've had beyond the NASA Jet Propulsion Lab

01:20:35   6   and then your time as a professor at UCLA?

01:20:35   7   A.   For example, over the years I've done quite a bit of

01:20:38   8   work for the Department of Defense.   I've not been an

01:20:41   9   employee of the Department of Defense but they have funded

01:20:43  10   work that I've done, for example, in -- in image

01:20:48  11   processing.   For example, one project we had was figuring

01:20:52  12   out ways to identify targets in image scenes so you know

01:20:55  13   whether something is a military vehicle or a non-military

01:20:59  14   vehicle, for example.   That's one thing.

01:21:01  15   Q.   Are there any other DOD projects that you've worked on

01:21:05  16   you can tell us about?

01:21:06  17   A.   I've also worked on projects for DOD aimed at making --

01:21:11  18   making it possible for the military to communicate and have

01:21:15  19   electronic communications reliable even in very hostile

01:21:18  20   environments which is obviously a very important task.

01:21:21  21   Q.   And I see here as well you've got reference to the

01:21:24  22   Hoover Institution.   Can you tell us what the Hoover

01:21:27  23   Institution is and what your experience with that

01:21:30  24   organization is, sir?

01:21:31  25   A.   The Hoover Institution is a public policy think tank at

01:21:37  1  Stanford and so from that -- my capacity there, I've also

01:21:40  2  done quite a bit of work-related technology and also its

01:21:42  3  broader impact.  One example project that I did at Stanford

01:21:45  4  was Department of Homeland Security funded a project to

01:21:50  5  find ways to protect U.S. critical infrastructure from

01:21:54  6  potential attack, things like protecting the electrical

01:21:57  7  grid and things like that.

01:21:58  8  Q.  Now, you also mentioned here on -- on your

01:22:02  9  demonstrative the Brookings Institution, what is the

01:22:05  10  Brookings Institution?

01:22:06  11  A.  The Brookings Institution is a public policy think tank

01:22:11  12  in Washington, DC and in relation to Brookings I look at

01:22:13  13  some of the broader questions that technology is raising --

01:22:14  14  technology is really important but it's also really

01:22:16  15  important I think to look at some of the broader

01:22:18  16  implications these questions, things like privacy and

01:22:22  17  things like that.  So I do work for Brookings on those

01:22:26  18  questions.

01:22:26  19  Q.  All tolled, Dr. Villasenor, how long have you been

01:22:30  20  working with imaging systems, sir?

01:22:32  21  A.  I would say about a third of a century since the --

01:22:35  22  since the mid 1980s up through now.

01:22:37  23  Q.  Do you teach courses in image technologies?

01:22:40  24  A.  Yes, I do.  In fact, I created at UCLA in the

01:22:44  25  graduate -- in the electrical engineering department, I

| | | |
|---|---|---|
| 01:22:45 | 1 | created a two-course sequence that we have in image |
| 01:22:50 | 2 | processing, and I also created an undergraduate course in |
| 01:22:55 | 3 | digital image processing at UCLA. |
| 01:22:57 | 4 | Q.  Have you ever testified before, sir? |
| 01:22:58 | 5 | A.  Yes, I have. |
| 01:22:59 | 6 | Q.  And have you ever testified outside of the Court -- |
| 01:23:04 | 7 | courtroom setting? |
| 01:23:05 | 8 | A.  Yes, I have. |
| 01:23:05 | 9 | Q.  In what instances? |
| 01:23:07 | 10 | A.  I've testified I think it's five times before the U.S. |
| 01:23:11 | 11 | Congress. |
| 01:23:11 | 12 | Q.  And what type of issues have you testified about before |
| 01:23:14 | 13 | Congress? |
| 01:23:14 | 14 | A.  For example, privacy in light of advancing technologies |
| 01:23:19 | 15 | in the importance of protecting privacy, and also testified |
| 01:23:24 | 16 | about technologies for distributing music and video over |
| 01:23:27 | 17 | the Internet and what some of the frameworks for that |
| 01:23:30 | 18 | should be. |
| 01:23:30 | 19 | Q.  Do you have any patents of your own, sir? |
| 01:23:32 | 20 | A.  Yes, I do. |
| 01:23:33 | 21 | Q.  How many? |
| 01:23:33 | 22 | A.  I have about 20 issued U.S. patents that I'm the named |
| 01:23:40 | 23 | inventor or co-inventor on. |
| 01:23:42 | 24 | Q.  And what do your patents relate to generally? |
| 01:23:45 | 25 | A.  They relate -- some of them relate to digital image |

01:23:48  1  processing, some of them relate to communications and

01:23:51  2  security type functions.

01:23:54  3  Q.  Have you ever worked on any technology related to

01:23:56  4  banking?

01:23:57  5  A.  Yes, I have.

01:23:57  6  Q.  Now, have you ever -- in the banking context, what kind

01:24:04  7  of work have you done?

01:24:05  8  A.  I led a project at UCLA where we developed an app, a

01:24:09  9  mobile app for what we call "unbank" populations, it turns

01:24:13  10  out there's about two billion people in the world who don't

01:24:17  11  have access to the formal financial system, so one of the

01:24:21  12  areas that I've been very interested in is trying to find

01:24:25  13  mechanisms to get people access to banking services,

01:24:28  14  financial services, and so we developed an app at UCLA that

01:24:33  15  allowed people to engage with the financial system in a

01:24:37  16  more formal way than they otherwise would be able to do in

01:24:39  17  the country where they live.

01:24:39  18  Q.  Have you ever testified as an expert before,

01:24:42  19  Dr. Villasenor?

01:24:42  20  A.  Yes, I have.

01:24:43  21  Q.  And each time that you testify as an expert -- expert,

01:24:47  22  are you paid for your work working on the case?

01:24:50  23  A.  Yes, I'm paid for the time I spend on the case.

01:24:53  24  Q.  And are you being paid for your work in this case, sir?

01:24:55  25  A.  I'm being paid for my work in this case, that's right.

01:24:58   1   Q.  And what rate are you being compensated at for your

01:25:01   2   work on this case?

01:25:01   3   A.  I'm being paid at my rate of $800.00 an hour.

01:25:04   4   Q.  And about how many hours do you approximate you have

01:25:06   5   spent working on this case?

01:25:07   6   A.  My estimate is about -- about 150 is an estimate.

01:25:12   7   Q.  All right.  Do you know who William Saffici is, sir?

01:25:15   8   A.  I know who he is.  I don't know him personally but I

01:25:19   9   know who he is.

01:25:20   10   Q.  All right.  I want to show you a portion of USAA's

01:25:23   11   opening statement in this case, Dr. Villasenor, and ask you

01:25:29   12   a question.

01:25:30   13        THE COURT:  Dr. Villasenor, would you speak up a

01:25:32   14   little bit, please, sir.

01:25:33   15        THE WITNESS:  Oh, yes, yes, Your Honor.

01:25:35   16        THE COURT:  I don't think you need the mic any

01:25:36   17   closer.  You just need to raise your voice a little bit.

01:25:39   18        THE WITNESS:  Yes, Your Honor.

01:25:40   19        THE COURT:  Thank you.

01:25:40   20        Go ahead, Mr. Hill.

01:25:42   21        MR. HILL:  Thank you, Your Honor.

01:25:43   22   Q.  (By Mr. Hill)  Dr. Villasenor, I'm showing you a

01:25:47   23   portion of the opening statement, of USAA's opening

01:25:50   24   statement in this case.  Now you've -- you've either been

01:25:52   25   present or you have reviewed the transcript for the entire

01:25:55  1  trial; is that correct?

01:25:56  2  A.  That's correct.

01:25:56  3  Q.  Now, in opening statement it was said that Wells Fargo

01:25:59  4  has called a new expert to testify on their behalf, his

01:26:02  5  name is John Villasenor.  He's a professor at UCLA.  And

01:26:07  6  John Villasenor is going to say the exact opposite of what

01:26:14  7  William Saffici said.

01:26:15  8       Dr. Villasenor, is it true that you're a new

01:26:20  9  expert to try to fix something that Bill Saffici said?

01:26:20  10 A.  No, it's not.

01:26:21  11 Q.  You're not a new expert for infringement in this case?

01:26:25  12 A.  No, I am not.

01:26:26  13 Q.  Are you the only expert for infringement in this case?

01:26:28  14 A.  Yes, I'm the only -- only expert that Wells Fargo has

01:26:33  15 retained to look at the question of infringement.

01:26:34  16 Q.  Hadn't been another one?

01:26:39  17 A.  There has not been another expert on infringement.

01:26:42  18 Q.  Did Mr. Saffici examine the source code for the Wells

01:26:45  19 Fargo product or perform an infringement analysis, sir?

01:26:48  20 A.  No, he did not.

01:26:49  21 Q.  Was he retained for a different subject matter?

01:26:51  22 A.  Yes, he was.

01:26:53  23 Q.  So to the extent there's been any suggestion that you

01:26:55  24 were hired to replace him, sir; is that true?

01:26:58  25 A.  That's not --

| | | |
|---|---|---|
| 01:27:00 | 1 | THE COURT:  Just a minute.  You have an objection? |
| 01:27:02 | 2 | MR. SHEASBY:  Your Honor, may we approach briefly? |
| 01:27:04 | 3 | THE COURT:  Approach the bench. |
| 01:27:05 | 4 | (Bench conference.) |
| 01:27:11 | 5 | MR. SHEASBY:  Your Honor has instructed that we |
| 01:27:14 | 6 | flag for the Court when we believe a door has been opened. |
| 01:27:18 | 7 | The reference has been made to Mr. Saffici being retained |
| 01:27:21 | 8 | for some other purpose and I intend to -- |
| 01:27:22 | 9 | THE COURT:  Just a minute.  Mr. Melsheimer -- |
| 01:27:24 | 10 | MR. MELSHEIMER:  Excuse me, I'm sorry. |
| 01:27:25 | 11 | THE COURT:  I'd prefer you look at me rather than |
| 01:27:32 | 12 | what's on my law clerk's table. |
| 01:27:32 | 13 | MR. MELSHEIMER:  I was trying to get my ear |
| 01:27:32 | 14 | towards the Court, Your Honor, I'm sorry. |
| 01:27:34 | 15 | THE COURT:  Go ahead, Mr. Sheasby. |
| 01:27:34 | 16 | MR. SHEASBY:  And based on this I do want to flag |
| 01:27:36 | 17 | that I would like the Court's -- I would request the Court |
| 01:27:38 | 18 | to allow me to elicit from Mr. Villasenor that Mr. Saffici |
| 01:27:45 | 19 | was retained to do claim construction analysis in this case |
| 01:27:48 | 20 | and also to opine as to what a person of ordinary skill in |
| 01:27:51 | 21 | the art would understand these claims to mean. |
| 01:27:53 | 22 | THE COURT:  In other words, you're telling me that |
| 01:27:54 | 23 | they -- you believe the door has been opened to what |
| 01:27:58 | 24 | Mr. Saffici was retained for given the testimony that we've |
| 01:28:00 | 25 | just seen.  Defendants elicit -- |

```
01:28:03   1         MR. SHEASBY:  Except I'm not going to bring up
01:28:06   2   validity, only what a person of ordinary skill in the art
01:28:09   3   would understand the claims to mean.
01:28:09   4         MR. HILL:  Your Honor, there's the problem with
01:28:11   5   this request.  So Mr. Saffici was retained as a validity
01:28:15   6   expert.  Obviously the Plaintiff doesn't want that to be
01:28:17   7   said.  The portions of his testimony, though, that they
01:28:20   8   were discussing with him that they have shown this jury
01:28:22   9   that has given rise to this clarification we've had to make
01:28:26  10   with Mr. Villasenor was Mr. Saffici testifying about a
01:28:29  11   business card reader prior art system and how that -- how
01:28:35  12   he viewed it in light of claims.  Judge, that's the
01:28:38  13   validity case that they injected.  If we're going to tell
01:28:41  14   the jury that he was retained -- what other subjects he was
01:28:44  15   retained on, we ought to tell them.  But it ought to be
01:28:47  16   the -- all of the subjects he was retained on, why he was
01:28:51  17   having the discussion he was having that they've seen the
01:28:54  18   video of or we should leave it alone.
01:28:56  19         THE COURT:  I'll carry this request until I hear
01:28:58  20   the rest of your direct and you can approach again before
01:29:01  21   you begin your cross-examination.
01:29:04  22         MR. SHEASBY:  Thank you, Your Honor.
01:29:05  23         MR. HILL:  I can assure Your Honor that was the
01:29:05  24   last portion of questioning I had about Mr. Saffici.
01:29:08  25         THE COURT:  I'll carry it until I've heard all the
```

01:29:11  1   direct testimony.

01:29:12  2          MR. HILL:  Yes, sir.

01:29:18  3          (Bench conference concluded.)

01:29:19  4          THE COURT:  Let's proceed.

01:29:20  5   Q.  (By Mr. Hill)  Now, Dr. Villasenor, did Wells Fargo

01:29:24  6   Bank hire you to arrive at certain opinions in this case?

01:29:26  7   A.  No, they did not.

01:29:28  8   Q.  So if you thought that Wells Fargo infringed that would

01:29:32  9   have been the result of your -- your analysis and

01:29:34  10  examination in this case, would you have told us that?

01:29:36  11  A.  Absolutely.

01:29:37  12  Q.  Does your rate go up or down in this case based on the

01:29:40  13  testimony that you give here today?

01:29:42  14  A.  Not at all.

01:29:43  15  Q.  Does your rate or your retention in this case, does it

01:29:48  16  impact it in any way about what the jury ultimately does in

01:29:51  17  this case?

01:29:51  18  A.  Not at all.

01:29:52  19         MR. HILL:  Your Honor, at this time I would tender

01:29:55  20  Dr. Villasenor as an expert in electrical engineering and

01:29:58  21  imaging technologies.

01:29:59  22         THE COURT:  Is there objection?

01:29:59  23         MR. SHEASBY:  No objection, Your Honor.

01:30:00  24         THE COURT:  Then the Court will recognize this

01:30:02  25  witness as an expert in those designated fields.

01:30:04  1        Proceed, counsel.

01:30:08  2        MR. HILL:   Thank you, Your Honor.

01:30:12  3   Q.  (By Mr. Hill) Dr. Villasenor, at a high level what are

01:30:13  4   you here to tell the jury about today?

01:30:15  5   A.  I'm here to convey my opinion that Wells Fargo does not

01:30:18  6   infringe the claims of the patents at issue.

01:30:22  7   Q.  And what did you do to prepare to issue your opinions

01:30:24  8   in this case, Dr. Villasenor?

01:30:26  9   A.  Well, I read the patents, of course, the patents

01:30:30  10  containing the claims that are at issue here.  I also

01:30:34  11  reviewed the relevant portions of the source code, which is

01:30:38  12  what's actually running on the -- on the phones.  I spoke

01:30:42  13  with Mr. Andrew Wood, who the ladies and gentlemen of the

01:30:46  14  jury have recently heard from through his testimony.  And,

01:30:49  15  of course, I read the expert reports that were prepared by

01:30:55  16  Dr. Conte, as well as Mr. Calman.  And I reviewed the

01:30:58  17  documentation from Mitek.

01:30:59  18  Q.  And why do you say, Dr. Villasenor, that Wells Fargo

01:31:04  19  doesn't infringe the patents at issue in this case?

01:31:07  20  A.  Well, because the -- all -- all of the claims in the

01:31:12  21  two patents at issue here require a certain order.  And

01:31:15  22  that's shown on the left of this demonstrative.  And that

01:31:17  23  order is that under the claims, you have to monitor an

01:31:22  24  image, and then when these criteria are satisfied, then you

01:31:26  25  capture.

01:31:27  1          By contrast, in Wells Fargo's Mobile Deposit

01:31:33  2   system, there's a capture that occurs first, and only after

01:31:38  3   that capture has occurred is the analysis performed.  And

01:31:39  4   it's performed with something called MiSnap IQA, which you

01:31:44  5   can see on the demonstrative.

01:31:45  6   Q.  And, Dr. Villasenor, let's discuss that in a little

01:31:48  7   more detail.  What order of steps do the asserted patents

01:31:51  8   require?

01:31:52  9   A.  They require -- this is a -- a picture of Claim 1 of

01:31:57  10  the '571 patent, and there's one -- the claim elements

01:32:00  11  there that you can see highlighted, and the -- I'm just

01:32:03  12  going to read that claim element because that's the one

01:32:05  13  I'm -- I'm going to be focusing on.

01:32:07  14          Capture the image of the check with the camera

01:32:12  15  when the image of the check passes the monitoring

01:32:14  16  criterion.  And the word "when" has been construed by the

01:32:16  17  Court to mean at or after.

01:32:18  18          So there's a certain order that's required there.

01:32:20  19  You have to -- you have to do the capture at or after the

01:32:24  20  point in time when the image of the check pass -- passes

01:32:27  21  the monitoring criterion.

01:32:28  22  Q.  Now, in comparison, how do the Wells Fargo products

01:32:32  23  operate?

01:32:32  24  A.  Well, the Wells Fargo products operate by capturing

01:32:38  25  before the analysis so that is exactly the opposite of the

01:32:40    1    order that's required both in the language of the claim and

01:32:43    2    in the Court's construction.

01:32:44    3    Q.   And, Dr. Villasenor, we've heard about it some today,

01:32:47    4    this MiSnap.   What is MiSnap?

01:32:48    5    A.   MiSnap is Mi -- Mitek, the company's, name for this

01:32:55    6    software.

01:32:56    7    Q.   And what is MiSnap IQA?

01:32:59    8    A.   IQA is an acronym for image quality analysis, so that's

01:33:03    9    the -- the name for the software that performs the image

01:33:09   10    quality analysis.

01:33:10   11    Q.   Does Wells Fargo write the source code for MiSnap?

01:33:13   12    A.   No, it does not.

01:33:14   13    Q.   Why does it matter, Dr. Villasenor, for purposes of

01:33:17   14    this case that Wells Fargo does these steps in a different

01:33:20   15    order?

01:33:20   16    A.   It matters because the claims require the order shown

01:33:26   17    on the left of this demonstrative, and Wells Fargo, the

01:33:29   18    system, does it in the order that's different from what's

01:33:34   19    required by the claims.

01:33:34   20    Q.   Now, you mentioned earlier that part of the

01:33:36   21    investigation that you did here was you looked at the

01:33:39   22    source code; is that right?

01:33:39   23    A.   Yes, sir.

01:33:40   24    Q.   And tell us what source code is and why it's important,

01:33:43   25    please, sir.

01:33:44   1   A.  So source code is very important because it's what

01:33:48   2   instructs the computer or in this case the computer

01:33:51   3   processor in your phone what to do.  So if you want to know

01:33:54   4   what a computer is doing, then it's extremely important to

01:33:57   5   look at what the source code is doing because that's the --

01:33:59   6   that's the instruction.  It's sort of like the recipe.

01:34:03   7   Q.  Have you ever heard source code referred to as the DNA

01:34:06   8   of the computer program?

01:34:07   9   A.  I have heard that, yes.

01:34:08  10   Q.  Do you think that's an apt comparison?

01:34:10  11   A.  Yes, that can help illustrate the -- the central

01:34:13  12   portion -- central role, the source code.

01:34:16  13   Q.  Would you agree that if there's a conflict between

01:34:18  14   source code and product documentation, that the source code

01:34:21  15   trumps the product documentation?

01:34:23  16   A.  Absolutely, no question at all.

01:34:25  17   Q.  Did you talk to -- one of the things I saw you

01:34:28  18   mentioned in your research here or in your work is that you

01:34:31  19   talked to Mr. Wood.  Did I get that right?

01:34:33  20   A.  That's correct, I did.

01:34:34  21   Q.  Why did you talk to Mr. Wood?

01:34:36  22   A.  Trying to get as much information as -- as I can about

01:34:39  23   the product, and so he's somebody who has extensive

01:34:43  24   knowledge of how the source code was developed, so I spoke

01:34:46  25   with him, as well.

01:34:47  1   Q.  Did you hear Mr. Wood testify to the jury here today?

01:34:49  2   A.  Yes, I was in the room earlier today.

01:34:52  3   Q.  And is it your understanding that the source code

01:34:54  4   operates consistent with the testimony that Mr. Wood gave?

01:34:57  5           MR. SHEASBY:  Your Honor, objection.

01:34:59  6           THE COURT:  State your objection.

01:35:00  7           MR. SHEASBY:  Not in his report.

01:35:03  8           MR. HILL:  Your Honor, the witness is entitled to

01:35:04  9   comment on trial testimony he's observed.  That can't be in

01:35:08 10   his report.  It hadn't occurred yet.

01:35:13 11           MR. SHEASBY:  The deposition was available, Your

01:35:19 12   Honor.

01:35:19 13           THE COURT:  I'll overrule the objection.

01:35:25 14           You can answer the question, Dr. Villasenor.

01:35:27 15   A.  I'm sorry --

01:35:29 16           MR. HILL:  Do you recall the question?

01:35:30 17   A.  Yes, sorry.  Just for clarity, if you could ask again,

01:35:34 18   that would be appreciated.

01:35:34 19   Q.  I will.  I will.

01:35:35 20           Is your understanding of the source code

01:35:37 21   consistent with the testimony that you heard from Mr. Wood

01:35:39 22   here today?

01:35:39 23   A.  Yes, it is.

01:35:40 24   Q.  Now, can you provide us an overview at this point,

01:35:44 25   Dr. Villasenor, of how the Wells Fargo system actually

01:35:46    1   operates?

01:35:47    2   A.  So once it's launched, as is illustrated here, the

01:35:52    3   images are -- the video application is launched or the

01:35:58    4   preview application is launched and you're getting these

01:36:01    5   preview images, and they are -- they are captured by the

01:36:04    6   camera and then they're placed in memory -- what we

01:36:09    7   sometimes called volatile memory, in -- in the -- in the

01:36:12    8   phone.

01:36:13    9   Q.  Okay.  So the first step is the camera is capturing

01:36:16   10   these images?

01:36:17   11   A.  That's what I just said, that's right.  The first of it

01:36:20   12   is the camera is capturing the images, and in that process,

01:36:23   13   it's placing them in memory.

01:36:25   14   Q.  So tell me, Dr. Villasenor, why isn't the capture with

01:36:29   15   the camera some time later, like when these images are

01:36:33   16   stored miles away on a server?

01:36:35   17   A.  Well, that can't be the case because if you're storing

01:36:39   18   an image miles away, that means you already have -- you

01:36:41   19   must have captured the image first.  You can't store an

01:36:44   20   image you haven't captured miles away, so the capture is --

01:36:47   21   is what's shown here.

01:36:48   22   Q.  Okay.  So what does MiSnap do with the frames that it

01:36:50   23   captures with the camera?

01:36:51   24   A.  Well, those frames are -- are placed in -- in memory

01:36:55   25   and then subject to quality analysis.

01:36:57  1   Q.  Okay.  And let's talk about that memory you mentioned.

01:36:59  2   Is that the same thing as a buffer?

01:37:01  3   A.  Sometimes people refer to the memory as a buffer or a

01:37:05  4   memory buffer, but either way, it's -- it's a form of

01:37:08  5   memory, yes.

01:37:08  6   Q.  And is that -- could we call that a form of RAM, if you

01:37:13  7   will?

01:37:13  8   A.  RAM is R-A-M.  It stands for Random Access Memory.

01:37:18  9   It's yet another term that people sometimes use to -- to

01:37:21  10  describe this kind of memory.

01:37:23  11          So we can call it RAM.  We can call it memory.  We

01:37:25  12  can call it a buffer.  It's all referring to the same

01:37:28  13  thing.

01:37:28  14  Q.  Are all of those things just a temporary storage space

01:37:31  15  on a phone?

01:37:32  16          MR. SHEASBY:  Your Honor, objection.  Objection,

01:37:34  17  leading.

01:37:35  18          THE COURT:  Sustained.

01:37:37  19  Q.  (By Mr. Hill)  Dr. Villasenor, what are all those

01:37:39  20  things that you just described for me?

01:37:42  21  A.  Those are all varying terms for memory, which in this

01:37:46  22  case is -- is what we also call non-volatile memory, so

01:37:49  23  it's -- it's -- it's temporary in the sense that if you,

01:37:52  24  for example, turn off the power to the phone at that very

01:37:54  25  moment, then you'd lose the data.

01:37:56   1   Q.  Do the claims of these patents require or make any

01:38:00   2   distinction between volatile and non-volatile memory?

01:38:04   3   A.  No, they do not.

01:38:05   4   Q.  Now, what does the Wells Fargo product do next?  Once

01:38:08   5   we get this into the memory -- this memory structure, what

01:38:11   6   happens?

01:38:12   7   A.  So the -- once this -- the image has been captured and

01:38:15   8   is available, the IQA, the image quality analysis, is

01:38:19   9   performed.  And as you can see with this demonstrative,

01:38:24   10   it's either -- either the image passes or it doesn't.  It's

01:38:28   11   like a test where you either get a passing grade or a

01:38:31   12   failing grade, but there's nothing in between.  So the

01:38:33   13   software is looking for an image and trying to identify

01:38:36   14   whether -- whether the check image passes or not.

01:38:38   15   Q.  Okay.  And then --

01:38:39   16           MR. SHEASBY:  Your Honor, may we approach?

01:38:40   17           THE COURT:  You may.

01:38:46   18           (Bench conference.)

01:38:50   19           MR. SHEASBY:  Your Honor gave an express

01:38:57   20   instruction there would be no further reference to passing

01:38:58   21   or failing grades at any point in time in this trial.

01:39:01   22   Counsel just elicited it directly from -- from the witness,

01:39:03   23   and I don't believe it was unintentional.

01:39:07   24           MR. HILL:  Your Honor, that is a

01:39:08   25   mischaracterization.  The Court had referenced passing and

01:39:10  1  failing grades in the context of saying whether a claim was

01:39:14  2  met.  He's talking about the IQA analysis.  He says it

01:39:17  3  either passes or fails the IQA analysis.  That has nothing

01:39:24  4  to do with the prior subject where the Court had given us

01:39:25  5  instructions about how to characterize infringement and

01:39:28  6  so --

01:39:28  7       THE COURT:  Well, the prior instruction related to

01:39:32  8  what I considered to be an improper discussion of the

01:39:37  9  Doctrine of Equivalents, that 90 percent was a failing

01:39:39  10  grade when under the Doctrine of Equivalents, 90 percent

01:39:42  11  could be meeting that doctrine under the -- under

01:39:48  12  particular circumstances.  I don't see that he's going in

01:39:51  13  that direction with this, Mr. Sheasby.

01:39:55  14       MR. SHEASBY:  I understand.

01:39:55  15       THE COURT:  Although I remind Mr. Hill of the

01:39:57  16  prior instruction, and we don't want to go down that same

01:40:03  17  path in any way that could impact a clear understanding by

01:40:06  18  this jury of the Doctrine of Equivalents.

01:40:08  19       MR. HILL:  Absolutely, Your Honor.

01:40:09  20       MR. SHEASBY:  Thank you, Your Honor.

01:40:10  21       MR. HILL:  Not going there.  And just -- Your

01:40:12  22  Honor, for the record, too, my question to the witness was:

01:40:14  23  What happens next?  I wasn't asking him to talk about pass

01:40:18  24  or fail.  He just said passing or failing the IQA --

01:40:21  25       THE COURT:  My concern is we don't mischaracterize

01:40:25  1  the Doctrine of Equivalents.

01:40:26  2         MR. HILL:  Sure.  Won't do it.

01:40:27  3         (Bench conference concluded.)

01:40:28  4         THE COURT:  Let's proceed.

01:40:30  5         MR. HILL:  Thank you, Your Honor.

01:40:31  6  Q.  (By Mr. Hill)  Now, I'm -- I'm sorry, Dr. Villasenor.

01:40:35  7  You were describing for us this operation here, and you had

01:40:38  8  described the MiSnap IQA operation.  What was the next step

01:40:42  9  that was coming?

01:40:43  10  A.  So after -- after you decide whether the image is of

01:40:47  11  sufficient quality to be used or it's not, it's a binary

01:40:51  12  decision, then the -- when it has an image that is deemed

01:40:54  13  to be of sufficient quality, the checkmark, you can see

01:40:58  14  there, then it conveys that image to the Wells Fargo server

01:41:03  15  or ends up at the Wells Fargo server.  First it gets

01:41:06  16  conveyed to the rest of the software in the phone, and then

01:41:09  17  it goes to the Wells Fargo server.

01:41:10  18  Q.  Okay.  Now, the jury heard Dr. Conte talk about

01:41:14  19  different versions of MiSnap.  Do each of the MiSnap

01:41:17  20  versions follow the process that you just described here in

01:41:20  21  terms of their operation?

01:41:21  22  A.  Yes, they do.

01:41:23  23  Q.  Is the order of steps the same in each version of

01:41:27  24  MiSnap that you analyzed?

01:41:28  25  A.  Yes, it is.

01:41:31   1   Q.  Now, let's look at the source code, Dr. Villasenor.  I

01:41:38   2   want to show you Defendant's Exhibit 611, which I think the

01:41:40   3   jury has seen before.  Tell us what this is.

01:41:43   4   A.  So this is an important piece of a section of the

01:41:45   5   source code for this case, and this is the code that I'm

01:41:48   6   going to be using to help explain what happens when these

01:41:53   7   images are -- are analyzed.

01:41:59   8   Q.  Can you show the jury in the code, Dr. Villasenor,

01:42:04   9   where capture with the camera occurs as you just described?

01:42:09   10           MR. SHEASBY:  Your Honor, objection, outside the

01:42:11   11   scope of his report.

01:42:12   12           THE COURT:  What's the response, Mr. Hill?

01:42:12   13           MR. HILL:  Your Honor, it is within the report.

01:42:12   14   I'm happy to approach and show the Court specific sections

01:42:22   15   of the report that contain this analysis.

01:42:26   16           THE COURT:  Approach the bench, counsel.

01:42:26   17           (Bench conference.)

01:42:32   18           MR. HILL:  Your Honor, I'd also add this

01:42:36   19   demonstrative was objected to, and the Court's already

01:42:38   20   ruled on that.

01:42:50   21           Looking specifically at Paragraph 67 -- so, Your

01:42:53   22   Honor, here in the context of Paragraph 67,

01:42:54   23   Dr. Villasenor -- bottom of the page there, Dr. Villasenor

01:42:58   24   is discussing specifically the lines of code that are on

01:43:00   25   the screen and the functions that go on in those lines of

01:43:03  1  code.

01:43:09  2          MR. SHEASBY:  Your Honor, he --

01:43:12  3          MR. HILL:  I'll also give the Court additional

01:43:14  4  reference.  That's not the end.  Also, if the Court would

01:43:16  5  look at Paragraphs 105 to 106 and then 116 and 117.

01:43:21  6          THE COURT:  Just a minute, Mr. Hill.  Let's take

01:43:25  7  it a step at a time.  You said 105 and 106?

01:43:31  8          MR. HILL:  Yes, sir.

01:43:32  9          THE COURT:  Give me a minute.

01:43:58  10         What's your next reference?

01:43:59  11         MR. HILL:  116 to 117, Your Honor.

01:44:24  12         And in the context of 117, Your Honor, he

01:44:26  13  specifically describes how MiSnap always acquires an image

01:44:29  14  frame from the camera first and only after acquiring the

01:44:33  15  image frame performs IQA.

01:44:33  16         MR. SHEASBY:  Your Honor, may I be heard on this?

01:44:35  17         THE COURT:  You may.

01:44:35  18         MR. SHEASBY:  At no point in time does

01:44:38  19  Mr. Villasenor ever cite a line of source code and says

01:44:41  20  this is where capture occurs.  And, in fact, if you look at

01:44:43  21  Paragraph 67, he describes the acquisition of a frame.  He

01:44:47  22  never describes this line as capturing the code.  And at no

01:44:51  23  point in time does he ever describe -- in Paragraph 67,

01:44:51  24  Your Honor.

01:44:56  25         At no point in time does he ever describe this

01:44:58  1   line of code or any other line of code as being capturing.

01:45:02  2   I expressly asked him about this multiple times in his

01:45:04  3   deposition.  He never gave an answer.  And to now point to

01:45:09  4   source code and say this -- this is where capture occurs is

01:45:11  5   completely out.  He can certainly say that this line of

01:45:13  6   code is where the image is acquired, but nowhere in that

01:45:17  7   paragraph or any other paragraph does he say the image is

01:45:22  8   captured at these lines of codes.  And I believe he should

01:45:24  9   be held to his report.  This is a point of some sensitivity

01:45:26  10  with us, Your Honor.

01:45:27  11        MR. HILL:  Your Honor, it's fairly disclosed in

01:45:28  12  the report.  Dr. Villasenor has covered the code

01:45:30  13  discussion, and he opines in his opinion of where in the

01:45:34  14  code that the image is obtained here is captured into the

01:45:43  15  MiSnap process, as we've just heard described for the jury

01:45:46  16  earlier from Mr. Wood, listening to him describe how this

01:45:49  17  is the point of time where the image is initially obtained

01:45:53  18  by the MiSnap software for processing.

01:45:55  19        THE COURT:  Well, the cites you've referenced to,

01:45:59  20  Mr. Hill, seem to establish at a high level what the

01:46:01  21  witness is saying, but I don't see a specific indication in

01:46:07  22  these cites that this precise line of code is -- why the

01:46:17  23  image is captured before the monitoring is done -- whatever

01:46:21  24  you're trying to prove.

01:46:22  25        MR. SHEASBY:  And, Your Honor, in chambers the

01:46:26  1  Court allowed in these slides with the express reservation

01:46:29  2  that just because the slides were in does not mean he can

01:46:30  3  go beyond the scope of his report.  The entry of slides was

01:46:33  4  not in agreement as to whether any specific lines of code

01:46:37  5  was in his --

01:46:38  6      THE COURT:  Well, I'm going to find that tying a

01:46:40  7  specific line of code to the ultimate conclusion and saying

01:46:44  8  this is where this is said to do this is beyond the scope

01:46:48  9  of this report, although the witness can testify, as his

01:46:54  10  report reflects, that the order of events that Defendants

01:47:01  11  are urging is clearly set forth in his report.

01:47:09  12      The problem is tying a precise line of code to

01:47:12  13  that conclusion that the order of events is as you say they

01:47:18  14  are.  I don't see that connection.  That doesn't mean you

01:47:18  15  can't have this witness testify about his conclusions as to

01:47:23  16  what the order is.

01:47:23  17      MR. HILL:  Okay.

01:47:24  18      MR. SHEASBY:  Thank you, Your Honor.

01:47:31  19      (Bench conference concluded.)

01:47:31  20      THE COURT:  I'll sustain that objection.

01:47:33  21      Let's proceed.

01:47:36  22      MR. HILL:  Thank you, Your Honor.

01:47:37  23  Q.  (By Mr. Hill)  Now, Dr. Villasenor, looking at this

01:47:47  24  code, does MiSnap use the standard function captureOutput

01:47:54  25  to acquire image frames from the camera?

01:47:57   1   A.   Yes.   In fact, that's a function that's provided by

01:48:00   2   Apple so that applications can -- can get captured images

01:48:06   3   from the camera.

01:48:08   4   Q.   And once that frame is acquired, does the MiSnap

01:48:12   5   software call the analysis function later in the code?

01:48:17   6           MR. SHEASBY:   Your Honor, objection.

01:48:19   7           THE COURT:   State your objection.

01:48:20   8           MR. SHEASBY:   He's clearly calling out lines of

01:48:22   9   code on the slide after your instruction.

01:48:28   10          MR. HILL:   I'm happy to approach and show --

01:48:31   11  demonstrate this to the Court, if you'd like, Your Honor.

01:48:34   12          THE COURT:   Pull the slide down.

01:48:38   13          Approach the bench, counsel.

01:48:42   14          (Bench conference.)

01:48:48   15          MR. SHEASBY:   The demonstrative that he pulled up

01:48:50   16  said "capture image" and highlighted a particular line of

01:48:52   17  code that you just ruled he's not allowed to point to as

01:48:57   18  capture image.   It's the -- it's the exact opposite of what

01:48:58   19  he --

01:48:58   20          MR. HILL:   It's not, Your Honor.   It's the

01:49:00   21  demonstrative that you've ruled on, and I literally just

01:49:03   22  read him the first two sentences of Paragraph 67 and asked

01:49:06   23  him if that was right, and he's testifying exactly to

01:49:09   24  what's in his report.

01:49:10   25          MR. SHEASBY:   And it says "capture image" on the

01:49:12    1   demonstrative, which is exactly what he's not allowed to

01:49:15    2   elicit from this witness.  It's to a particular line of

01:49:18    3   code.

01:49:18    4          MR. HILL:  Your Honor, I think this demonstrates

01:49:20    5   the point from earlier.  What I'm asking this witness is

01:49:24    6   precisely what's in his report.  And that shows the fallacy

01:49:26    7   of the objection, Your Honor.

01:49:26    8          THE COURT:  If the demonstrative has been objected

01:49:30    9   to and survived and if you're reading a question directly

01:49:34   10   out of his report, I don't see a problem, okay?

01:49:38   11          MR. HILL:  Thank you, Your Honor.

01:49:38   12          THE COURT:  We're wasting a lot of time with these

01:49:41   13   objections.

01:49:42   14          Let's proceed.

01:49:44   15          (Bench conference concluded.)

01:49:46   16          THE COURT:  That objection is overruled.

01:49:48   17          Let's proceed.

01:49:49   18          MR. HILL:  Thank you, Your Honor.

01:49:51   19   Q.  (By Mr. Hill)  Now, Dr. Villasenor, is -- just to --

01:50:00   20   to -- I'm not sure where I left off.  Once that frame is

01:50:02   21   acquired, Dr. Villasenor, the MiSnap software calls the

01:50:06   22   analysis function; is that right?

01:50:08   23   A.  That's correct.

01:50:08   24   Q.  And that occurs after the frame in the first instance,

01:50:15   25   correct?

01:50:15  1   A.  After -- after the capture occurs, then the analysis is

01:50:20  2   performed.

01:50:21  3   Q.  And is that process similar for all versions of iOS,

01:50:25  4   Dr. Villasenor?

01:50:26  5   A.  It is.

01:50:27  6   Q.  Okay.  Can you -- you mentioned earlier, as well --

01:50:32  7           MR. HILL:  If we can go back to the demonstrative,

01:50:34  8   please, Mr. Goodin.

01:50:37  9   Q.  (By Mr. Hill)  You mentioned that analysis step?

01:50:42  10  A.  Yes.

01:50:44  11  Q.  And can you show us where that analysis step occurs?

01:50:47  12  A.  So in Line 2323, you can see that says analyzeFrame --

01:50:53  13  it actually says the word analyzeFrame twice, so I'm

01:50:56  14  looking at the second instance of that on the right-hand

01:50:58  15  side, it says analyzeFrame.  And that's where it's --

01:51:01  16  that's where it's telling the -- the code is telling the

01:51:04  17  computer to analyze the frame that was captured earlier and

01:51:08  18  determine whether it's sufficiently high quality to use

01:51:11  19  that image or not.

01:51:14  20          MR. HILL:  And if we can go back to the top of

01:51:16  21  this slide, Mr. Goodin.

01:51:18  22  Q.  (By Mr. Hill)  Those initial portions of the code that

01:51:21  23  we see there, Dr. Villasenor, Dr. Conte told the jury that

01:51:25  24  this section of the code doesn't do anything.  Do you agree

01:51:28  25  with that?

01:51:28   1   A.  I do not.

01:51:29   2   Q.  Can you tell us why you don't agree with that?

01:51:31   3   A.  This section of the code is absolutely critical.  If

01:51:34   4   you were to, for example, remove it, the code wouldn't work

01:51:38   5   anymore.  So that's -- it's simply -- in my opinion, it is

01:51:42   6   not an accurate assessment to suggest that it doesn't do

01:51:46   7   anything at all.  It plays a very important role.  Without

01:51:49   8   those lines, if you take -- take them out, the code would

01:51:52   9   not function.

01:51:53  10   Q.  And you mentioned the analysis step that we were

01:51:57  11   looking at --

01:51:59  12            MR. HILL:  Further down, Mr. Goodin, Line 2323.

01:52:03  13   Q.  (By Mr. Hill)  Can you tell us what's the timing of

01:52:07  14   those two steps, that first portion of the code versus this

01:52:08  15   portion?

01:52:08  16   A.  The thing at the top happens first.  And then after you

01:52:12  17   have -- the software has in hand the captured image, then

01:52:16  18   it can deliver the captured image to the analysis.

01:52:20  19   Q.  And --

01:52:21  20            MR. SHEASBY:  Objection, Your Honor.

01:52:22  21            THE COURT:  Approach the bench, counsel.

01:52:25  22            (Bench conference.)

01:52:31  23            MR. SHEASBY:  This is going to be a recurring

01:52:33  24   objection.  None of these lines of code are anywhere in his

01:52:37  25   report.  I don't want to continue to waste the Court's

01:52:37  1  time, but if he's going to march through lines of code that

01:52:40  2  are literally nowhere in his report, I don't know what else

01:52:42  3  to do.

01:52:42  4        MR. HILL:  Your Honor, my question that I just

01:52:44  5  asked was about the sequencing of this code, which -- he

01:52:47  6  knows this witness has looked at this code and examined it,

01:52:49  7  and the witness in the paragraphs --

01:52:51  8        THE COURT:  You're asking him about a sequencing

01:52:53  9  of events, and you're showing the jury source code.

01:52:56  10        MR. HILL:  I'm showing them a demonstrative, yes,

01:52:59  11  Your Honor.

01:52:59  12        THE COURT:  Yes, sir, and that demonstrative is --

01:53:00  13  is clearly source code.

01:53:02  14        MR. HILL:  It is.

01:53:02  15        THE COURT:  So if you're going to show the source

01:53:06  16  code and then talk about a sequencing of events, the

01:53:09  17  implication is it's the code that makes those events the

01:53:12  18  way you say they are.  But if there's not a discussion of

01:53:17  19  the code per se in the report saying these lines of code

01:53:21  20  are what make these things happen in this sequence of

01:53:25  21  events, then Plaintiff has a good objection.

01:53:27  22        MR. HILL:  Your Honor, there's --

01:53:28  23        THE COURT:  You can't just talk about the high

01:53:30  24  level sequencing, flash a screen full of source code up

01:53:34  25  there, and imply to the jury that that source code is what

01:53:37  1   makes those events happen that way if that's not discussed

01:53:41  2   in the report.

01:53:42  3          MR. SHEASBY:  And I don't want to continue to be

01:53:45  4   up here and try the Court's patience, but this is -- as

01:53:46  5   long as he uses that demonstrative, nothing on that

01:53:49  6   demonstrative, nothing on it, the lines of code in there

01:53:52  7   are in his report.

01:53:54  8          MR. HILL:  Your Honor, the sequence of functions

01:53:55  9   in the code are in his report.  He doesn't set it up by

01:53:59  10  line number because as we know, there's dispute in this

01:54:01  11  case about the line numbers generally because this is

01:54:04  12  DevApp code which we say isn't even our product code to

01:54:04  13  start with.

01:54:04  14         THE COURT:  Well --

01:54:09  15         MR. HILL:  They're reference points.

01:54:11  16         THE COURT:  -- let me make this clear.  No matter

01:54:13  17  what the prior objections are or what they have been, a

01:54:16  18  demonstrative is a jury aid to assist the witness with

01:54:20  19  their testimony.  If this demonstrative does not relate to

01:54:22  20  his testimony, it should not be used with him.

01:54:26  21         MR. HILL:  It does, Your Honor, in the sense that

01:54:28  22  it is the actual code functions he discusses in his report.

01:54:31  23  He doesn't call them out by line number, but he calls the

01:54:34  24  actual code function names.

01:54:36  25         MR. SHEASBY:  Your Honor, he doesn't do that, and

01:54:38    1    there's an easy solution to this.  If -- they can just do

01:54:41    2    it by referring to the code function names without pulling

01:54:44    3    up the lines of code.

01:54:46    4         The demonstrative is clearly -- is clearly being

01:54:48    5    used as a band aid for his failure to actually reference

01:54:53    6    lines of code in his report.  And so if they pull it down

01:54:55    7    and they just do it verbally, then there's no issue with

01:54:59    8    them having backfilled the report, Your Honor.

01:55:01    9         MR. HILL:  I guess my issue, Your Honor, is I

01:55:02   10    don't see a material difference between a witness saying

01:55:04   11    the line of code is captureOutput, didOutputSampleBuffer

01:55:09   12    from connection versus saying that's on Line 2278.  He's

01:55:13   13    just using it as a point of reference.  He's listed the

01:55:15   14    line of code.

01:55:15   15         THE COURT:  But Line 2278 is more than that.

01:55:19   16         MR. HILL:  It's -- it's actually not.

01:55:20   17         MR. SHEASBY:  Your Honor, we're not -- we're not

01:55:21   18    talking about Line 20 -- 2278.  We're talking about another

01:55:25   19    line of code, so he's pointing to the fact that he pointed

01:55:30   20    to that line of code.  I'm objecting to about another line

01:55:32   21    of code.  So the fact he has this line of code -- I just

01:55:34   22    truly believe this would go better if the demonstrative was

01:55:36   23    not used.  And if it's in his report, he can refer to the

01:55:40   24    file.

01:55:40   25         But he -- he did not march through the lines of

01:55:44  1  code in his report, and he refused to do it at his

01:55:47  2  deposition, and there's got to be something to that.  And I

01:55:50  3  hate to have to continue to be up here on this.

01:55:53  4          THE COURT:  Well, I'm -- I'm failing to see the

01:55:55  5  nexus between the demonstrative and the testimony.  And as

01:55:58  6  a demonstrative, if it doesn't have a clear nexus with the

01:56:01  7  testimony, it's an improper -- it's an improper use of the

01:56:04  8  demonstrative.

01:56:05  9          MR. HILL:  Okay.  I'll proceed with testimony,

01:56:06  10  Your Honor.

01:56:06  11          THE COURT:  All right.

01:56:07  12          (Bench conference concluded.)

01:56:11  13          THE COURT:  Let's proceed.

01:56:15  14          MR. HILL:  Thank you, Your Honor.

01:56:15  15          Will you take that down, Mr. Goodin?

01:56:20  16  Q.  (By Mr. Hill)  All right.  Dr. Villasenor, now, to --

01:56:23  17  how would you summarize the order of the capture with the

01:56:27  18  camera and the analysis steps in MiSnap's process for

01:56:31  19  capturing check images?

01:56:33  20  A.  So in -- in the MiSnap process, there's a capture that

01:56:36  21  occurs first, and then after that capture has occurred, the

01:56:41  22  captured image is then subjected to the quality analysis

01:56:43  23  that I explained earlier.

01:56:45  24  Q.  And does every version of the MiSnap software use this

01:56:50  25  order of steps?

| | | |
|---|---|---|
| 01:56:51 | 1 | A.  Yes, it does. |
| 01:56:52 | 2 | Q.  So in each version, the image is captured before -- |
| 01:56:57 | 3 | captured by the camera before it's analyzed? |
| 01:57:01 | 4 | A.  That's correct. |
| 01:57:01 | 5 | Q.  Now, let me ask, in your work in this case, did you |
| 01:57:06 | 6 | also look at Android code? |
| 01:57:07 | 7 | A.  Yes, I did. |
| 01:57:08 | 8 | Q.  And I want to show you just for identification, if we |
| 01:57:13 | 9 | can, Defendant's Exhibit 613. |
| 01:57:28 | 10 | MR. HILL:  Okay.  If you can just take a look at |
| 01:57:31 | 11 | that.  We can blow up maybe the top half. |
| 01:57:34 | 12 | Q.  (By Mr. Hill)  613, can you identify this as the |
| 01:57:37 | 13 | Android code? |
| 01:57:37 | 14 | A.  Yes, this is the Android code. |
| 01:57:39 | 15 | Q.  All right.  And you reviewed the Android code, as well, |
| 01:57:41 | 16 | in this case? |
| 01:57:42 | 17 | A.  Yes, I did. |
| 01:57:43 | 18 | Q.  Is it written in a different code language? |
| 01:57:46 | 19 | A.  It's a different language, that's right. |
| 01:57:49 | 20 | Q.  But are the functional steps and sequence the same for |
| 01:57:50 | 21 | purposes of capture and analysis as what we saw in the iOS |
| 01:57:53 | 22 | code? |
| 01:57:53 | 23 | A.  Yes, they are in the sense that in the Android code, as |
| 01:57:58 | 24 | in the Apple code, the capture occurs first, and then after |
| 01:58:01 | 25 | that, then the analysis of the captured image is performed. |

01:58:04  1   Q.   Is there any dispute between you and Dr. Conte about

01:58:07  2   how the Android code functions?

01:58:08  3   A.   As far as I'm aware, both of us agree that the image is

01:58:14  4   captured at the top and then analyzed, although I know he

01:58:19  5   has different opinions on infringement.

01:58:21  6   Q.   Now, what is your understanding of infringement,

01:58:23  7   turning to the infringement issue, Dr. Villasenor?

01:58:25  8   A.   Infringement is -- a patent claim is infringed if -- if

01:58:32  9   every element in the claim is met by the accused product,

01:58:36  10  either literally or under something called the Doctrine of

01:58:38  11  Equivalents.

01:58:39  12  Q.   And the -- does the order matter in the claims?

01:58:45  13  A.   The -- when a claim element requires something happen

01:58:49  14  in a particular order, then to infringe, the accused

01:58:52  15  product has to do it in that order.

01:58:55  16  Q.   And did the Court construe any of the terms that are at

01:58:57  17  issue in the patent claims in this case?

01:58:59  18  A.   Yes, it did.

01:59:00  19  Q.   And did you apply those constructions, sir?

01:59:03  20  A.   Yes, I did.

01:59:04  21  Q.   All right.

01:59:05  22        MR. HILL:   Let's take a look if we can at the '571

01:59:08  23  patent, Claim 1.

01:59:09  24        THE COURT:   Mr. Hill, could you slow down just a

01:59:11  25  little bit?

01:59:12   1        MR. HILL:  Yes, sir, Your Honor.

01:59:13   2        THE COURT:  Please do.  Thank you.  I want to make

01:59:15   3   sure the jury follows the questions and the answers.

01:59:18   4        MR. HILL:  Thank you, Your Honor.

01:59:19   5   Q.  (By Mr. Hill)  All right.  Dr. Villasenor, looking at

01:59:23   6   the '571 patent, Claim 1, in your opinion, does Wells Fargo

01:59:28   7   literally infringe this claim?

01:59:29   8   A.  No, Wells Fargo does not literally infringe this claim.

01:59:32   9   Q.  Why not?

01:59:33  10   A.  As I mentioned before, this claim, as construed by the

01:59:37  11   Court, requires that the capture occur when -- or, in other

01:59:43  12   words, at or after when the check -- at the moment when the

01:59:48  13   check passes the monitoring criterion.

01:59:50  14        And as I've explained in -- in the Wells Fargo

01:59:52  15   system, the capture occurs first, and subsequent to the

02:00:00  16   capture, the -- the analysis is performed to see whether

02:00:02  17   criteria are satisfied or not.  So it's exactly the

02:00:04  18   opposite of the order required not only by the claim

02:00:07  19   language but as construed by the Court.

02:00:10  20   Q.  You heard Mr. Wood's testimony earlier today.  Is it

02:00:14  21   consistent with this order that you've just described?

02:00:17  22   A.  Yes, it is.

02:00:18  23   Q.  In your opinion, does Wells Fargo literally infringe

02:00:21  24   Claim 1?

02:00:22  25   A.  No.

| | | |
|---|---|---|
| 02:00:22 | 1 | Q.  Now, I want to give you a chance to talk about |
| 02:00:25 | 2 | Dr. Conte's theory in this case. |
| 02:00:27 | 3 | What is Dr. Conte's theory regarding infringement? |
| 02:00:30 | 4 | A.  Dr. Conte appears to -- to contend that capture occurs |
| 02:00:37 | 5 | through the act of converting to a JPEG and then storing it |
| 02:00:42 | 6 | on the Wells Fargo server. |
| 02:00:45 | 7 | Q.  Okay.  And what's a server? |
| 02:00:46 | 8 | A.  A server is a computer that is run by something like a |
| 02:00:50 | 9 | company that provides services to somebody who might be |
| 02:00:53 | 10 | accessing that computer from a different place. |
| 02:00:55 | 11 | So, for example, when someone does a web search -- |
| 02:01:00 | 12 | Internet search, like a Google search, then there's a |
| 02:01:03 | 13 | computer that Google runs that's doing the computations to |
| 02:01:06 | 14 | tell you what search terms to -- what search things to |
| 02:01:08 | 15 | return to you, and then you're -- and then it appears on |
| 02:01:11 | 16 | your phone.  The computer that's doing the work and giving |
| 02:01:14 | 17 | you the information or when you're reading an online news |
| 02:01:14 | 18 | site or something, that's the server. |
| 02:01:15 | 19 | Q.  And did you review Dr. Conte's trial testimony, sir? |
| 02:01:18 | 20 | A.  Yes, I did. |
| 02:01:19 | 21 | Q.  I want to show you a portion of Dr. Conte's trial |
| 02:01:24 | 22 | testimony, and can you tell us what Dr. Conte agrees with |
| 02:01:29 | 23 | here? |
| 02:01:29 | 24 | A.  Yes.  And I'm going to read this, and just -- just for |
| 02:01:32 | 25 | context, I'm going to start at the end where it says:  Did |

| | |
|---|---|
| 02:01:35 | 1 |
| 02:01:38 | 2 |
| 02:01:41 | 3 |
| 02:01:46 | 4 |
| 02:01:50 | 5 |
| 02:01:53 | 6 |
| 02:01:56 | 7 |
| 02:01:59 | 8 |
| 02:02:00 | 9 |
| 02:02:03 | 10 |
| 02:02:05 | 11 |
| 02:02:07 | 12 |
| 02:02:08 | 13 |
| 02:02:15 | 14 |
| 02:02:18 | 15 |
| 02:02:21 | 16 |
| 02:02:26 | 17 |
| 02:02:26 | 18 |
| 02:02:30 | 19 |
| 02:02:31 | 20 |
| 02:02:36 | 21 |
| 02:02:39 | 22 |
| 02:02:42 | 23 |
| 02:02:45 | 24 |
| 02:02:47 | 25 |

1  I read that correctly?  And so what's happening here is the

2  attorney who's asking the question is reading from

3  Dr. Conte's report and -- the attorney says you say, and

4  then he goes into this quote:  A JPEG image is created and

5  transmitted via communication to Wells Fargo's server where

6  the check image is stored.  This is the first and only time

7  that the check image is captured.

8         That's the end of the quotation.

9         Then he says:  Did I read that correctly?

10        And Dr. Conte responds:  You did.

11  Q.  And what's your reaction to Dr. Conte's infringement

12  theory based on the server?

13  A.  I disagree because the claim requires capture with the

14  camera.  And the camera, of course, is in the phones, the

15  smartphone.  It's not miles away in the server.  So storing

16  the image at the server can't be -- can't be capturing the

17  image.

18  Q.  Now, Dr. Conte also talked about JPEGs and metadata.

19  Does any of that show infringement?

20  A.  Not -- not at all.  Converting an image to JPEG format

21  is -- is -- is not capturing because in order to create a

22  JPEG image, you had to have the image in the first place.

23  Otherwise, you couldn't turn it into the JPEG format.

24         And if you had it in the first place, that means

25  you already captured it.  So converting to JPEG in itself

02:02:51  1   can't be captured.

02:02:52  2   Q.  Did you also consider the other evidence that Dr. Conte

02:02:56  3   cited?

02:02:56  4   A.  Yes.

02:02:57  5   Q.  So I want to show you, in particular, Dr. Conte pointed

02:03:01  6   at --

02:03:02  7           MR. HILL:  If we can get our next slide,

02:03:05  8   Mr. Goodin.

02:03:06  9   Q.  (By Mr. Hill)  Dr. Conte pointed at several MiSnap

02:03:08  10  documents that used the word "capture" like this one shown

02:03:13  11  on his Slide PDX-2.73.  What's your opinion of the

02:03:19  12  significance of these documents?

02:03:20  13  A.  With respect to capture, these -- these documents are

02:03:22  14  not accurately representing what's happens in the code.

02:03:25  15  Q.  Now, I also want to show you PDX-2.72.  Do you recall

02:03:33  16  seeing this slide, as well, sir?

02:03:35  17  A.  Yes, I do.

02:03:36  18  Q.  Now, on this slide, Dr. Conte points to four things

02:03:39  19  that he says happened after the monitoring criteria are

02:03:43  20  passed.  Are any of those things captured?

02:03:46  21  A.  None of those things are captured.  None of them --

02:03:50  22  none of the four.

02:03:51  23  Q.  Do any of these four steps at the bottom involve the

02:03:56  24  camera?

02:03:56  25  A.  No, they don't.  The camera was used to get the image

02:03:59   1   in the first place, but all those four steps appear in the

02:04:03   2   code after the captured image has already been delivered to

02:04:08   3   the software.

02:04:09   4   Q.  So when does the -- the camera delivering the picture

02:04:17   5   itself to the software happen relative to the -- to the

02:04:20   6   monitoring in Dr. Conte's theory?

02:04:24   7   A.  I'm sorry, could you repeat the question?

02:04:26   8   Q.  Sure.  When does the -- the camera capturing the image

02:04:29   9   happen relative to the monitoring in Dr. Conte's theory?

02:04:33   10  A.  Well, the -- the capturing happens at the very top

02:04:36   11  here, which is before the monitoring.  Dr. Conte contends

02:04:39   12  that -- that capture happens later.  But that's not when it

02:04:44   13  actually happens.

02:04:45   14  Q.  Now -- so what is your final conclusion,

02:04:48   15  Dr. Villasenor, regarding whether Wells Fargo literally

02:04:50   16  infringes Claim 1 of the '571?

02:04:52   17  A.  Wells Fargo does not literally infringe Claim 1 of the

02:04:55   18  '571 patent.

02:04:55   19  Q.  Now, Dr. Conte also discussed the Doctrine of

02:05:00   20  Equivalents.  Do you recall that?

02:05:01   21  A.  Yes, I do.

02:05:02   22  Q.  And for the '571 patent, in your opinion, does Wells

02:05:06   23  Fargo infringe Claim 1 under the Doctrine of Equivalents?

02:05:08   24  A.  No, it does not.

02:05:09   25  Q.  What's your understanding of the Doctrine of

02:05:12  1  Equivalents, Dr. Villasenor?

02:05:13  2  A.  So the Doctrine of Equivalents, as it's been explained

02:05:15  3  to me -- I'm obviously not an attorney.  When you're

02:05:19  4  looking -- when I'm doing a -- an analysis of whether a

02:05:22  5  claim is met, you have to go element-by-element.  And the

02:05:24  6  element either has to be literally present or it has to be

02:05:28  7  present under the doctrine -- if it's not literally

02:05:31  8  present, you have to look -- see whether it's present under

02:05:34  9  the Doctrine of Equivalents.

02:05:34  10  Q.  Now, do you believe Wells Fargo's products infringe

02:05:37  11  under the Doctrine of -- of Equivalents?

02:05:38  12  A.  No, I do not.

02:05:39  13  Q.  And why do you say that?

02:05:41  14  A.  Well, my understanding is the Doctrine of

02:05:43  15  Equivalents -- for a claim element to be met under the

02:05:45  16  Doctrine of Equivalents, the accused product must perform

02:05:49  17  substantially the same function in substantially the same

02:05:52  18  way and achieve substantially the same result.

02:05:55  19       And that is not what occurs in the Wells Fargo

02:05:59  20  system.  So, for example, if we look at the same claim

02:06:04  21  element that I've been pointing at, the Court has construed

02:06:09  22  "when" to be at or after.  In other words, to meet this

02:06:11  23  claim element, you have to capture the image at or after

02:06:16  24  doing the monitoring check and finding that it -- it passes

02:06:20  25  the monitoring criterion.

02:06:22    1    And that's -- so that's the way -- you know, as I

02:06:25    2    mention, the function of the element and the way and the

02:06:28    3    result, so the way is to -- to capture -- in the claim

02:06:31    4    element is to do the -- the capture at or after this

02:06:34    5    monitoring is finished.

02:06:35    6        And in Wells Fargo's application, it's done

02:06:38    7    beforehand.  And so that's -- that's not equivalent.

02:06:41    8    That's a completely different way.

02:06:42    9    Q.  Now, Dr. Conte tried to use an analogy regarding

02:06:46    10   Doctrine of Equivalents that involved a nail and a screw

02:06:49    11   that the Court had mentioned in its preliminary

02:06:52    12   constructions.  Do you recall that, Dr. Villasenor?

02:06:54    13   A.  Yes, I do.

02:06:54    14   Q.  What's your reaction to that?

02:06:56    15   A.  I disagree with Dr. Conte's use of that analogy in

02:07:00    16   this -- in this sense.

02:07:01    17   Q.  Why do you say that?

02:07:02    18   A.  Well, because that's sort of -- in my view, using that

02:07:06    19   analogy -- the analogy itself is a good analogy in the

02:07:09    20   abstract, but as applied to this particular claim, it

02:07:13    21   doesn't make any sense because it's like taking the nail

02:07:16    22   and turning it backwards and hammer it in with the pointed

02:07:19    23   side -- you know, the hammer hitting the pointed side.

02:07:21    24   It's -- it's not the same way at all.  It's a completely

02:07:24    25   different way.

02:07:24   1          The order of operations in the Wells Fargo system

02:07:26   2   is the opposite of what's required by that claim element, I

02:07:31   3   mentioned.

02:07:32   4   Q.  So in conclusion, Dr. Villasenor, does Wells Fargo

02:07:34   5   infringe in your opinion Claim 1 of the '571 patent under

02:07:38   6   the Doctrine of Equivalents?

02:07:39   7   A.  No, it does not.

02:07:40   8   Q.  Now, let's talk about the other claims that are in the

02:07:44   9   '571 patent.

02:07:44  10          Claims 2 through 6 of the '571 patent are what are

02:07:50  11   known as dependent claims.  Does Wells Fargo infringe any

02:07:53  12   of those claims?

02:07:54  13   A.  No, it does not.  A dependent claim is -- also includes

02:07:59  14   the original claim from which it depends, and so if you

02:08:03  15   don't infringe the independent claim by definition you

02:08:07  16   can't infringe any of the dependent claims.  So since Wells

02:08:11  17   Fargo does not infringe Claim 1 of the '571 patent either

02:08:15  18   literally under the -- or under the Doctrine of

02:08:18  19   Equivalents, it cannot infringe any of the dependent

02:08:20  20   claims.

02:08:20  21   Q.  Dr. Villasenor, let's now turn to Claim 9 of the '571

02:08:25  22   patent if we can.

02:08:26  23          In your opinion, does Wells Fargo infringe this

02:08:27  24   claim?

02:08:28  25   A.  No, neither literally nor under the Doctrine of

02:08:32    1    Equivalents.

02:08:32    2    Q.   And why not?

02:08:34    3    A.   For exactly the same reasons I explained before.

02:08:40    4    Q.   Is the same limitation that we've discussed, this

02:08:43    5    capture the image of the check using the camera when the

02:08:47    6    image of the check is in the field of view passes the

02:08:52    7    monitoring criteria, does that same element also appear in

02:08:55    8    Claim 9?

02:08:56    9    A.   Yes, the language is nearly identical and is -- is

02:08:59   10    identical for the purposes of the issues I'm pointing out

02:09:02   11    here.  And so for the same reasons, there is no

02:09:05   12    infringement.

02:09:05   13    Q.   Now, Claims 12 and 13 are dependent claims that depend

02:09:08   14    on Claim 9.  Does Wells Fargo infringe any of those claims?

02:09:14   15    A.   No, for the same reason that I mentioned earlier.  9 is

02:09:18   16    the independent claim, and since the independent claim is

02:09:20   17    not infringed, then none of the dependent claims can be

02:09:24   18    infringed.

02:09:25   19    Q.   And that's true both literally or under the Doctrine of

02:09:28   20    Equivalents?

02:09:28   21    A.   Under both, that's correct.

02:09:29   22    Q.   Now, let's turn to the '090 patent, that's the second

02:09:34   23    patent in the case.

02:09:35   24         In your opinion, does Wells Fargo infringe any

02:09:38   25    claim of the '090 patent, Dr. Villasenor?

02:09:40  1   A.   No.

02:09:41  2   Q.   And what does Claim 1 of the '090 patent require?

02:09:45  3   A.   It's very similar -- again, the language is slightly

02:09:49  4   different, but you still have this requirement that the

02:09:53  5   capture is -- is occurring at or after satisfying the

02:09:59  6   monitoring criteria, and so for exactly the same reason I

02:10:02  7   explained earlier, this claim is not infringed.

02:10:05  8   Q.   Does Dr. Conte accuse the same things for the '090

02:10:08  9   patent as he did for the '571 patent?

02:10:09 10   A.   Yes, he makes the same infringement allegations as he

02:10:14 11   did for the '571 patent.

02:10:15 12   Q.   And what's your response here to Dr. Conte's

02:10:18 13   infringement analysis?

02:10:19 14   A.   I disagree, and I don't believe that there's

02:10:22 15   infringement either literally or under the Doctrine of

02:10:25 16   Equivalents.

02:10:25 17   Q.   And is the same explanation you gave with regard to the

02:10:31 18   '571 equally applicable here?

02:10:32 19   A.   Equally applicable, that's right.

02:10:33 20   Q.   Now Claims 2 through 4, 7, and 10 are dependent claims

02:10:37 21   that depend on Claim 1 of the '090 patent.   Does Wells

02:10:41 22   Fargo infringe any of those claims literally or under the

02:10:44 23   Doctrine of Equivalents?

02:10:44 24   A.   No, it does not, and exactly for the same reasons I

02:10:47 25   mentioned a moment ago.

02:10:49  1   Q.  Now, Dr. Villasenor, I want to change subjects just a

02:10:53  2   little bit.  I understand it's your opinion that Wells

02:10:55  3   Fargo does not infringe these patents.  Is that what we've

02:10:58  4   established?

02:10:58  5   A.  Correct.

02:10:59  6   Q.  If it were determined that a patent was infringed, does

02:11:04  7   Wells Fargo have any non-infringing alternatives to the

02:11:10  8   USAA patents?

02:11:10  9   A.  Yes, it does.

02:11:11  10  Q.  And would -- what would be that non-infringing

02:11:16  11  alternative?

02:11:16  12  A.  Well, I've already mentioned, I do not believe there's

02:11:19  13  infringement, but if infringement was nonetheless found to

02:11:23  14  be present, a non-infringing alternative would be to simply

02:11:25  15  disable the auto capture functionality and have it be

02:11:28  16  manual.  I think there is no dispute that manual capture

02:11:33  17  does not fall within the scope of these claims.

02:11:35  18  Q.  Would Wells Fargo be able to do that technically, to

02:11:38  19  make that technical change?

02:11:39  20  A.  Yes, they would.

02:11:40  21  Q.  And how do you know that, sir?

02:11:41  22  A.  Well, for example, the testimony of Mr.  Jitodai,

02:11:45  23  earlier in the trial today, he explained it would be

02:11:52  24  relatively straightforward -- quite straightforward

02:11:55  25  actually to make that change.

02:11:55  1   Q.  And is there any dispute that manual capture does not

02:11:58  2   infringe the patents?

02:11:59  3   A.  No, all of the asserted claims of these patents require

02:12:03  4   automatic capture.

02:12:04  5   Q.  Dr. Villasenor, just to tie things up here, what is

02:12:16  6   your overall opinion on the alleged infringement in this

02:12:20  7   case of the '571 and the '090 patents by the Wells Fargo

02:12:23  8   product?

02:12:23  9   A.  The Wells Fargo product does not infringe any of the

02:12:27  10  asserted claims of either patent, either literally or under

02:12:29  11  the Doctrine of Equivalents.

02:12:32  12          MR. HILL:  I'll pass the witness, Your Honor.

02:12:35  13          THE COURT:  All right.  Cross-examination by the

02:12:36  14  Plaintiff.

02:12:36  15          MR. SHEASBY:  Your Honor, with permission, may I

02:12:38  16  hand out binders?

02:12:40  17          THE COURT:  You may.

02:12:52  18          And those at counsel table may help Mr. Sheasby.

02:13:45  19          MR. SHEASBY:  Thank you, Your Honor.

02:13:47  20          THE COURT:  You may proceed, counsel.

02:13:47  21                  CROSS-EXAMINATION

02:13:49  22  BY MR. SHEASBY:

02:13:49  23  Q.  Good afternoon, Dr. Villasenor.

02:13:51  24  A.  Good afternoon.

02:13:51  25  Q.  We've met before?

| | | |
|---|---|---|
| 02:13:52 | 1 | A.  Yes. |
| 02:13:52 | 2 | Q.  I took your deposition? |
| 02:13:55 | 3 | A.  That's right. |
| 02:13:56 | 4 | Q.  Now, today we've been talking about digital cameras and |
| 02:14:05 | 5 | mobile devices, fair? |
| 02:14:06 | 6 | A.  Among other things, that's right, yes. |
| 02:14:09 | 7 | Q.  And you understand that in a mobile device camera, |
| 02:14:12 | 8 | there's a lens, correct? |
| 02:14:13 | 9 | A.  That's right. |
| 02:14:13 | 10 | Q.  There's also an image sensor, correct? |
| 02:14:16 | 11 | A.  Yes, that's correct. |
| 02:14:17 | 12 | Q.  There's one or more processors controlling the image |
| 02:14:20 | 13 | sensor, correct? |
| 02:14:21 | 14 | A.  There's typically some sort of very low capability |
| 02:14:25 | 15 | processor inside the camera module to help control the |
| 02:14:30 | 16 | sensor, that's right. |
| 02:14:30 | 17 | Q.  Well, to be precise, there's hardware controlling them, |
| 02:14:34 | 18 | whether it's one processor or multiple processors or |
| 02:14:37 | 19 | controllers, correct? |
| 02:14:38 | 20 | A.  I'm not sure I understand your question. |
| 02:14:41 | 21 | Q.  Sure.  Within the camera, there -- the camera module, |
| 02:14:45 | 22 | there's one or more processors controlling the image |
| 02:14:49 | 23 | sensor, correct? |
| 02:14:49 | 24 | A.  There has to be some -- some mechanism to control the |
| 02:14:53 | 25 | image sensor, to read data off the image sensor, that's |

02:14:58   1   right.

02:14:58   2   Q.   Well, to be precise, there's has to be one or more

02:15:02   3   processors, correct?

02:15:02   4   A.   There's often going to be a processor, a small

02:15:05   5   processor, but, yes, there will often be a processor there.

02:15:09   6   Q.   And you need a processor to read image data off an

02:15:12   7   image sensor, correct?

02:15:13   8   A.   Yes, you do.

02:15:14   9   Q.   And in the digital camera, there will also be access to

02:15:17   10  memory, correct?

02:15:18   11  A.   Yes.

02:15:22   12  Q.   And a camera on a mobile device will embody a camera

02:15:27   13  module which has a lens, an image sensor disposed below the

02:15:31   14  lens, circuitry for the access of the imagery sensor and

02:15:35   15  reading data off the image and some sort of memory,

02:15:39   16  correct?

02:15:39   17  A.   Typically, that would be right.

02:15:42   18  Q.   And you also have to have software structure for

02:15:44   19  controlling all those things, correct?

02:15:44   20  A.   To run a camera, yeah, you -- you need some software to

02:15:49   21  control its operation, that's right, in this sense, yes.

02:15:51   22  Q.   And you also need to have image processing

02:15:54   23  capabilities, correct?

02:15:54   24  A.   It depends on what the processor is being asked --

02:15:59   25  asked to do.  It could -- not necessarily.

02:16:01   1   Q.   Okay.   Well, let's go to your deposition, Line 68, 1

02:16:06   2   through 17.   And we'll pull it up on the screen.

02:16:10   3               MR. HILL:   Objection, Your Honor.   Improper

02:16:11   4   impeachment, one.   He's got to give the witness an

02:16:15   5   opportunity to confirm whether he's testified differently

02:16:18   6   in the past if he knows.   And, two, we're entitled to see

02:16:21   7   page and line so we can follow along before his display to

02:16:28   8   the jury.

02:16:29   9               THE COURT:   Well, I think you've been given the

02:16:32  10   page and lines, counsel, and it's not displayed to the jury

02:16:35  11   yet.

02:16:35  12               But I do agree, Mr. Sheasby, you've got to

02:16:38  13   confront the witness with it first and identify it as

02:16:41  14   accurate.

02:16:44  15   Q.   (By Mr. Sheasby)   Sir, did you testify differently

02:16:46  16   previously?

02:16:47  17   A.   Differently to what?

02:16:48  18   Q.   In your previous deposition, when I asked you the

02:16:51  19   question:   What are the elements of a camera on a mobile

02:16:55  20   device?   Did you testify it's a lens, an image sensor,

02:16:59  21   circuitry for access to the image sensor and reading data

02:17:04  22   off the image sensor as well as memory, software, and

02:17:08  23   various image processing capabilities?

02:17:11  24   A.   Probably.

02:17:12  25   Q.   A digital camera is optics, a sensor, a memory, and a

02:17:16  1  processor control of those features, correct?

02:17:18  2  A.  Generally, that would be right, yes.

02:17:21  3  Q.  Okay.  So the next thing that you made reference to in

02:17:33  4  your testimony was the standard way in which the Apple iOS

02:17:41  5  software obtains images?

02:17:43  6        MR. HILL:  Your Honor, I object again to this is

02:17:45  7  improper use of the deposition.  If he has a question to

02:17:48  8  ask the witness, he can ask the witness for an answer, but

02:17:51  9  he can't talk about what the next topic is in the

02:17:54  10  deposition that was discussed gratuitously.

02:17:57  11        THE COURT:  What is your response, Mr. Sheasby?

02:17:57  12        MR. SHEASBY:  Your Honor, I was speaking about his

02:18:00  13  earlier testimony today.

02:18:02  14        THE COURT:  You can certainly ask him questions

02:18:04  15  about his earlier testimony today.

02:18:05  16  Q.  (By Mr. Sheasby)  In your testimony earlier today to

02:18:08  17  the ladies and gentlemen of the jury, you referred to the

02:18:10  18  standard way in which the iOS software works in terms of

02:18:14  19  obtaining images, fair?

02:18:15  20  A.  I don't know if I used that term.

02:18:21  21  Q.  You used something approximating that term, sir?

02:18:24  22  A.  I don't recall.  I discussed the specific function name

02:18:29  23  that -- that you can use to get an image from an Apple

02:18:32  24  camera.

02:18:32  25  Q.  Okay.  And in general practice in the phones in dispute

| | | |
|---|---|---|
| 02:18:35 | 1 | in this case, when the shutter button is pressed, image |
| 02:18:38 | 2 | data is read off the sensor by the processor, the processor |
| 02:18:42 | 3 | converts that into a file, such as a JPEG, and that file |
| 02:18:47 | 4 | was stored persistently, correct? |
| 02:18:51 | 5 | A.  I'm sorry, when you say in the general case, can you |
| 02:18:54 | 6 | clarify what you mean? |
| 02:18:54 | 7 | Q.  In general practice, sir. |
| 02:18:56 | 8 | A.  I'm not sure what that means. |
| 02:18:58 | 9 | Q.  Okay. |
| 02:18:59 | 10 |       MR. SHEASBY:  Why don't we turn to Line 61, 12 |
| 02:19:03 | 11 | through 21 of your deposition? |
| 02:19:05 | 12 | Q.  (By Mr. Sheasby)  Do you have a copy of your deposition |
| 02:19:07 | 13 | in front of you, sir? |
| 02:19:08 | 14 | A.  If it's in one of these binders, yes, if it's not, no. |
| 02:19:11 | 15 |       MR. SHEASBY:  Just to be sure, may I approach, |
| 02:19:13 | 16 | Your Honor? |
| 02:19:13 | 17 |       THE COURT:  You may approach. |
| 02:19:25 | 18 | Q.  (By Mr. Sheasby)  So, in general, in the phones in |
| 02:19:31 | 19 | dispute in this case, when the shutter button is pressed, |
| 02:19:35 | 20 | image data is read off the sensor by the processor, a |
| 02:19:38 | 21 | processor converts that into a file such as a JPEG file, |
| 02:19:41 | 22 | and that file is stored persistently, correct? |
| 02:19:46 | 23 | A.  Yeah, that's my -- you can see the answer right there. |
| 02:19:49 | 24 |       MR. HILL:  Your Honor, this isn't impeachment.  I |
| 02:19:51 | 25 | don't know why the deposition is displayed. |

02:19:53   1           THE COURT:  Approach the bench, counsel.

02:19:55   2           (Bench conference.)

02:20:03   3           THE COURT:  Mr. Sheasby, you certainly have the

02:20:06   4   right to impeach the witness, but the Court's understanding

02:20:10   5   of the proper method to do that is to show the witness

02:20:16   6   their prior testimony, confirm that that's how they

02:20:18   7   testified at their deposition, ask them the question, and

02:20:21   8   then if they give you a different answer to what you have

02:20:26   9   refreshed their recollection with from the deposition, then

02:20:29  10   you can publish the deposition to show the jury that

02:20:32  11   they've answered it two different ways.

02:20:34  12           MR. SHEASBY:  I'm happy to proceed that way, Your

02:20:36  13   Honor.  Thank you for the instruction.

02:20:38  14           THE COURT:  Let's do it that way going forward.

02:20:40  15           (Bench conference concluded.)

02:20:43  16           THE COURT:  Let's proceed.

02:20:44  17   Q.  (By Mr. Sheasby)  Now, for the iPhone, there's

02:20:48  18   something called iCloud, correct?

02:20:50  19   A.  Yes -- well, it's the Apple -- it's not just the

02:20:55  20   iPhone, but Apple has iCloud, that's right.

02:20:57  21   Q.  It stores images on a server remotely, correct?

02:21:02  22   A.  Yes, that's right.

02:21:03  23   Q.  And if you press the button on your phone and that JPEG

02:21:09  24   file is stored in the iCloud server, that picture certainly

02:21:13  25   has been taken, correct?

| | | |
|---|---|---|
| 02:21:16 | 1 | A.  Yes, if -- under that particular scenario, that's true. |
| 02:21:22 | 2 | Q.  And you think all pictures are taken by the camera in |
| 02:21:26 | 3 | the sense that that's how pictures are acquired, correct? |
| 02:21:29 | 4 | A.  I'm not sure I understand the question. |
| 02:21:32 | 5 | Q.  Sir, you think all pictures are taken by the camera |
| 02:21:36 | 6 | because that is how pictures are acquired, fair? |
| 02:21:39 | 7 | A.  Pictures are taken by a camera, that's right. |
| 02:21:42 | 8 | Q.  All pictures are taken by a camera, correct? |
| 02:21:45 | 9 | A.  I guess I'm not -- I mean, I -- not quite sure what |
| 02:21:49 | 10 | you're asking.  A picture -- a camera takes a picture if |
| 02:21:52 | 11 | that's what you're asking. |
| 02:21:54 | 12 | Q.  Now, to be precise, when you have a camera in front of |
| 02:22:20 | 13 | you and you press the function -- the shutter button, the |
| 02:22:25 | 14 | JPEG function is called and a JPEG of that image is |
| 02:22:32 | 15 | created, correct? |
| 02:22:32 | 16 | A.  That's generally the case. |
| 02:22:40 | 17 | Q.  Now, you testified as to the operation of MiSnap, |
| 02:22:47 | 18 | correct? |
| 02:22:47 | 19 | A.  Yes. |
| 02:22:49 | 20 | MR. SHEASBY:  Mr. Huynh, can we have |
| 02:22:51 | 21 | Dr. Villasenor Cross-Demonstrative No. 2, please? |
| 02:22:58 | 22 | Q.  (By Mr. Sheasby)  And for the MiSnap system analyzer, |
| 02:23:05 | 23 | it obtains a representation of the image so that it is |
| 02:23:10 | 24 | pixel level data, and then it performs a series of image |
| 02:23:14 | 25 | processing steps -- a whole series of tests that it does to |

| | | |
|---|---|---|
| 02:23:18 | 1 | test each of the IQA features, correct? |
| 02:23:20 | 2 | A.  I'm sorry, in the MiSnap, is that what you're asking? |
| 02:23:23 | 3 | Q.  Yes, sir. |
| 02:23:24 | 4 | A.  Yes, it captures an image and then it -- |
| 02:23:27 | 5 | Q.  Sir, why don't you turn to Pages 144 -- 145, Lines 11 |
| 02:23:35 | 6 | through 23 of your deposition? |
| 02:23:40 | 7 | A.  I'm sorry, please repeat the page again. |
| 02:23:42 | 8 | Q.  Page 145, Lines 11 through -- 13 through 23. |
| 02:23:58 | 9 | A.  Yes. |
| 02:23:58 | 10 | Q.  You gave that answer; is that correct? |
| 02:24:00 | 11 | A.  Yes. |
| 02:24:01 | 12 | Q.  You did not use the word "capture" to describe the |
| 02:24:05 | 13 | access to the image, correct? |
| 02:24:06 | 14 | A.  In that particular answer, that's correct. |
| 02:24:08 | 15 | Q.  So to be clear, at your deposition testimony, you gave |
| 02:24:12 | 16 | a different answer that didn't use the word "capture," |
| 02:24:14 | 17 | correct? |
| 02:24:14 | 18 | A.  In that particular answer, that's correct. |
| 02:24:21 | 19 |         MR. SHEASBY:  Can we publish that for the jury? |
| 02:24:23 | 20 | Q.  (By Mr. Sheasby)  Question:  Can you describe for me |
| 02:24:27 | 21 | the process that occurs after the MiSnap analyzer obtains |
| 02:24:32 | 22 | images from the image sensor? |
| 02:24:35 | 23 |         My recollection is that it obtains a |
| 02:24:37 | 24 | representation of the image so that it has pixel level |
| 02:24:42 | 25 | data, and then it performs a series of image processing |

02:24:44    1    steps.

02:24:45    2            Do you see that, sir?

02:24:46    3    A.  Yes, I do.

02:24:47    4    Q.  And it goes on -- you make no reference to capture,

02:24:51    5    correct?

02:24:51    6    A.  That's right.

02:24:53    7    Q.  Okay.

02:24:53    8            MR. SHEASBY:  So let's pull that down and go back

02:24:56    9    to the demonstrative.

02:25:02   10    Q.  (By Mr. Sheasby)  So it'd be fair to say that for the

02:25:04   11    first line of that demonstrative, analyzer obtains a

02:25:07   12    representation of the images, that's consistent with the

02:25:09   13    deposition testimony you previously gave me, fair?

02:25:12   14    A.  It's consistent with the question I was responding to,

02:25:15   15    that's right.

02:25:16   16    Q.  Now, the next thing that the system does is that it

02:25:20   17    tests each of these IQA factors, correct?

02:25:25   18    A.  Yes, that's right.

02:25:25   19    Q.  And you heard Mr. Wood refer to those IQA factors as

02:25:30   20    monitoring criteria, correct?

02:25:31   21    A.  Yes, that's right.

02:25:32   22    Q.  You voiced no dispute with that, correct?

02:25:35   23    A.  I have no dispute with that.

02:25:37   24    Q.  And for the versions of the source code that we're

02:25:40   25    dealing with, after a decision has been made that the

02:25:44  1   monitoring criterion has been satisfied, the JPEG file is

02:25:47  2   created, additional data is encoded with that file, and

02:25:53  3   that file is passed to a module which transmits it to the

02:25:59  4   Wells Fargo server where it's going to be placed in

02:26:02  5   persistent memory, correct?

02:26:05  6   A.   That's right.

02:26:05  7   Q.   So it'd be fair to say that what I put on this

02:26:09  8   demonstrative, PDX- 10.2, is consistent with the testimony

02:26:13  9   that you gave me at your deposition, correct?

02:26:14  10  A.   With the caveat that I believe the image is captured

02:26:18  11  prior to the analysis, that's right.

02:26:20  12  Q.   Sir, the testimony that I -- you -- I have on this

02:26:24  13  slide is absolutely consistent with what you gave at the

02:26:27  14  deposition, correct?

02:26:28  15  A.   Yes, with the -- with that quote that you showed,

02:26:31  16  that's right.

02:26:31  17  Q.   Sure.  And, in fact, in the quote that I showed the

02:26:34  18  ladies and gentlemen of the jury, you made no reference

02:26:36  19  whatsoever at all to capture, fair?

02:26:39  20  A.   In that answer, that's right.

02:26:40  21  Q.   You said obtain, correct?

02:26:43  22  A.   That's right, yes.

02:26:44  23  Q.   And you're an experienced expert, correct, sir?

02:26:48  24  A.   Less experienced than some, but I have some experience.

02:26:52  25  Q.   Well, you've been an expert in dozens of cases,

02:26:55  1   correct, sir?

02:26:55  2   A.  Yes, but it's not my full-time position.

02:26:58  3   Q.  Sir, you know that after you take a deposition under

02:27:01  4   oath, you're given a copy of that deposition, correct?

02:27:04  5   A.  Yes, I do.

02:27:05  6   Q.  You were given a copy of your deposition, correct?

02:27:10  7   A.  Yes, sir, I was.

02:27:11  8   Q.  You were given an opportunity to make corrections in

02:27:15  9   that deposition, correct?

02:27:15  10  A.  Yes.

02:27:16  11  Q.  And you didn't cross out the word "obtain" and put the

02:27:19  12  word "capture" in changing your answer, correct?

02:27:22  13  A.  That is true.

02:27:29  14       MR. SHEASBY:  Now, let's turn to Villasenor

02:27:31  15  Demonstrative Page 3.

02:27:33  16  Q.  (By Mr. Sheasby)  Now, we already talked about that

02:27:46  17  after the monitoring criteria is satisfied, a JPEG file is

02:27:51  18  created, correct?

02:27:53  19  A.  That's correct.

02:27:53  20  Q.  Additional data is encoded, correct?

02:27:55  21  A.  Yes.

02:27:56  22  Q.  That file is transmitted to Wells Fargo's persistent

02:28:03  23  memory, correct?

02:28:03  24  A.  At the Wells Fargo's server, that's correct.

02:28:05  25  Q.  And that image that was transmitted to Wells Fargo's

02:28:09   1   server, that was obtained from the camera, correct?

02:28:11   2   A.   The original image came from the camera, yes.

02:28:15   3   Q.   Originally, that image came from the camera, correct?

02:28:19   4   A.   That's correct.

02:28:20   5   Q.   And that JPEG image -- strike that.

02:28:26   6        That JPEG file encoded as a -- as a JPEG, that

02:28:32   7   particular image does not exist until after the monitoring

02:28:37   8   criteria are satisfied, correct?

02:28:40   9   A.   I'm not sure what your question means.

02:28:42   10  Q.   Sure.  The JPEG -- we talked about the JPEG that's

02:28:46   11  created after the monitoring criteria are satisfied,

02:28:50   12  correct?

02:28:50   13  A.   Well, the -- the image exists, so I'm -- I disagree

02:28:54   14  with -- with the last bullet there.

02:28:56   15  Q.   So you disagree -- it's your testimony that the

02:28:59   16  particular image in that JPEG existed before the monitoring

02:29:03   17  criteria are satisfied, correct?

02:29:06   18  A.   Yes.  In other words -- well, I think I need to

02:29:09   19  understand the question.

02:29:10   20  Q.   Okay.  Well, let me ask it this way.  For the ladies

02:29:13   21  and gentlemen of the jury, the particular image encoded by

02:29:17   22  that JPEG file doesn't exist until after the monitoring

02:29:21   23  criteria have been satisfied?

02:29:22   24  A.   The file -- the file doesn't exist.  The JPEG format

02:29:25   25  doesn't exist, but the image was acquired earlier.

02:29:29   1   Q.  Okay.  So why don't you turn to Page 267, Lines 3

02:29:33   2   through 9, of your deposition?  And tell me when you've

02:29:42   3   read it, sir.

02:29:53   4          So in your deposition, your sworn testimony, you

02:29:55   5   said that the JPEG file, the actual JPEG file encoded as a

02:30:01   6   JPEG doesn't exist until after the monitoring criteria has

02:30:05   7   been satisfied for that particular image, correct?

02:30:07   8          MR. HILL:  Objection, Your Honor.  Improper

02:30:09   9   impeachment.  The line of deposition that Mr. Sheasby has

02:30:13  10   just called is consistent with what the witness just

02:30:16  11   answered.

02:30:20  12          MR. SHEASBY:  I'll re-ask the question, sir.

02:30:22  13   Q.  (By Mr. Sheasby)  For that particular image, you agree

02:30:25  14   that the JPEG file -- the actual JPEG file encoded as a

02:30:29  15   JPEG doesn't exist until after the monitoring criteria have

02:30:32  16   been satisfied?

02:30:32  17   A.  That's exactly -- that's exactly what I said just a

02:30:34  18   moment ago.

02:30:35  19   Q.  Okay.

02:30:35  20   A.  In other words --

02:30:36  21   Q.  Okay.  That's fine, sir.  So we all agree for that

02:30:41  22   particular --

02:30:41  23          THE COURT:  Just -- just a minute.

02:30:41  24          MR. HILL:  Objection, Your Honor.

02:30:42  25          THE COURT:  Mr. Hill.

02:30:43   1          MR. HILL:  He has cut off the witness who is

02:30:46   2   trying to answer his question.  I would ask that our

02:30:48   3   witness be allowed to provide his answer to the question

02:30:50   4   that was asked.

02:30:53   5          THE COURT:  Well, both of you need to make sure

02:30:55   6   the other one is finished before you continue.  I don't --

02:30:59   7   I don't really believe he cut him off, but nonetheless, we

02:31:03   8   need to make sure that everyone is clear with their answers

02:31:06   9   and their questions.

02:31:10   10         Are you prepared to move on, or do you have

02:31:13   11  additional questions about this segment of the deposition

02:31:15   12  testimony, Mr. Sheasby?

02:31:16   13         MR. SHEASBY:  Sure.  I'm just going to clear it

02:31:19   14  up.

02:31:19   15  Q.  (By Mr. Sheasby)  So we agree that the JPEG file for

02:31:24   16  that particular image, the JPEG that's encoded, doesn't

02:31:27   17  exist until after the monitoring criteria have been

02:31:30   18  satisfied, correct?

02:31:31   19  A.  The image exists, but the JPEG file does not until

02:31:34   20  after the JPEG is performed, but the image --

02:31:37   21  Q.  Well, sir --

02:31:38   22         THE COURT:  Hang on a minute.

02:31:39   23         Dr. Villasenor, he didn't ask you about the image.

02:31:42   24  He asked you about the JPEG.  You need to limit your

02:31:45   25  answers to the questions that are asked.  Mr. Hill is going

02:31:47   1   to get an opportunity to ask you additional follow-up

02:31:50   2   questions when Mr. Sheasby is finished.  So please be sure

02:31:53   3   that your answers conform to the question and don't go

02:31:57   4   beyond it.

02:31:57   5          THE WITNESS:  Yes, Your Honor.

02:31:58   6          THE COURT:  Ask the question one more time and

02:32:02   7   then we're going to move on, Mr. Sheasby.

02:32:02   8   Q.  (By Mr. Sheasby)  After the monitoring criteria, the

02:32:05   9   JPEG that has been encoded doesn't exist until after the

02:32:08  10   monitoring criteria have been satisfied, correct?

02:32:10  11   A.  That's correct.

02:32:11  12   Q.  Okay.

02:32:14  13          THE COURT:  Now let's move on.

02:32:16  14   Q.  (By Mr. Sheasby)  And then, of course, that JPEG form

02:32:26  15   is shipped off to Wells Fargo's servers where it's stored

02:32:29  16   in non-transient memory and it's subject to server side

02:32:33  17   processing, correct?

02:32:34  18   A.  That's right.

02:32:56  19          MR. SHEASBY:  Now, let's pull down the

02:32:58  20   demonstrative, Mr. Huynh.

02:32:59  21   Q.  (By Mr. Sheasby)  You agree that the frames obtained

02:33:14  22   from the camera's feed and the cropped gray scale prepared

02:33:22  23   frames that are used by CoreFlow as part of the monitoring

02:33:24  24   analysis in the MiSnap process are only temporary

02:33:28  25   representations of video data, correct?

02:33:30  1   A.   That's right.

02:33:30  2   Q.   These preview frames that are analyzed come from a

02:33:42  3   buffer, use local variables, confined in scope to the

02:33:46  4   MiSnap analysis and are not transmitted to the bank's

02:33:49  5   servers for use in deposit, correct?

02:33:53  6   A.   That's right.

02:33:54  7   Q.   The check image in the accused systems that's

02:33:59  8   transmitted to the bank is the JPEG image encoded with

02:34:05  9   metadata about the capture process, correct?

02:34:07  10  A.   Yes, it's the image form from the -- after the JPEG

02:34:12  11  conversion is performed.

02:34:21  12  Q.   And, in fact, the JPEG image does not even exist until

02:34:25  13  after the MiSnap analysis process has been completed and

02:34:29  14  all the monitoring criteria have been determined to be

02:34:33  15  satisfied, correct?

02:34:33  16  A.   I dis -- I disagree with that.

02:34:36  17  Q.   Okay.   Why don't you turn to Tab -- Tab 24 in your

02:34:43  18  binder?

02:34:57  19  A.   Yeah.

02:34:58  20  Q.   And why don't you turn to Page 246 to 247 of that

02:35:03  21  binder.   This is Professor Conte's report.

02:35:09  22  A.   Yes.

02:35:10  23  Q.   And you see in the last sentence of Paragraph 427 of

02:35:14  24  his report?

02:35:20  25  A.   Yes.

02:35:21  1   Q.  It says:  The JPEG image does not even exist until the

02:35:25  2   MiSnap analysis process is completed and all the monitoring

02:35:28  3   criteria have been determined to be satisfied, correct?

02:35:30  4   A.  That's right.

02:35:31  5   Q.  And you don't remember any specific disagreement with

02:35:36  6   that statement in your report, correct?

02:35:38  7   A.  I don't remember specifically disagreeing with that

02:35:41  8   statement, that's correct.

02:35:42  9   Q.  Now, you were not here for Professor Conte's testimony

02:35:59  10  live, but you read the transcript, correct?

02:36:02  11  A.  Correct.

02:36:03  12  Q.  In all the versions of MiSnap or the Wells Fargo system

02:36:14  13  that we're dealing with right now, they track a capture

02:36:17  14  time, correct?

02:36:18  15  A.  There's something called "capture time" that is

02:36:20  16  measured, that's correct.

02:36:21  17  Q.  And that capture time stops only after the image has

02:36:26  18  been converted to JPEG, correct?

02:36:28  19  A.  That's correct.

02:36:33  20  Q.  Now, there's also code in the Wells Fargo system that

02:36:47  21  tracks the progress of the auto capture process, correct?

02:36:55  22  A.  Yes.

02:36:55  23  Q.  In the Android app source code it's called

02:36:59  24  mHasCapturedAFrame, correct?

02:37:00  25  A.  I don't recall the specific function name right now.

02:37:04  1   Q.  Well, why don't we turn to Paragraph 426 of Professor

02:37:08  2   Conte's report?  That's on Page 246 of the tab you're in

02:37:11  3   front of.

02:37:15  4   A.  I'm sorry, which paragraph number?

02:37:17  5   Q.  I believe it's Paragraph 426, sir.

02:37:36  6   A.  Yes, I am at the right paragraph, I believe.  Yes, I

02:37:42  7   have it.

02:37:43  8   Q.  And Professor Conte says:  The "state machine" that

02:37:50  9   tracks the progress of the auto capture process in the

02:37:53  10  Android app source code is updated to the

02:37:56  11  mHasCapturedAFrame state only after all the monitoring

02:38:01  12  criteria has been satisfied and the JPEG image -- has been

02:38:07  13  satisfied and the check image JPEG for transmission to the

02:38:10  14  bank servers has been prepared, correct?

02:38:12  15  A.  You read that correctly, that's correct.

02:38:14  16  Q.  And you don't disagree with that, correct, sir?

02:38:17  17  A.  I haven't written about that specific line.

02:38:19  18  Q.  Well, sir, I asked you about the specific line at your

02:38:22  19  deposition, correct?

02:38:22  20  A.  I don't remember.

02:38:23  21  Q.  Why don't you turn to Page 259, 9 through 20 of your

02:38:28  22  deposition?

02:38:35  23  A.  Page 259, I'm sorry, which lines?

02:38:37  24  Q.  Lines 9 through 20.

02:38:39  25  A.  Yes, I see that.

02:38:42  1          MR. SHEASBY:  And why don't we put up

02:38:45  2    Demonstrative 6, Mr. Huynh?

02:38:46  3    Q.  (By Mr. Sheasby)  So in your deposition, I asked you

02:38:52  4    whether you disagreed with Professor Conte's view that the

02:39:00  5    code is updated to HasCapturedAFrame only after the

02:39:12  6    monitoring criteria has been satisfied and only after the

02:39:13  7    check image JPEG is created and you said you do not

02:39:14  8    disagree with that statement, correct?

02:39:16  9    A.  That's right.

02:39:19  10         MR. SHEASBY:  So why don't we go ahead and build

02:39:20  11   that?

02:39:21  12   Q.  (By Mr. Sheasby)  So for the ladies and gentlemen of

02:39:24  13   the jury, you do not disagree that in the Wells Fargo code,

02:39:28  14   it's updated to HasCapturedAFrame until only after the

02:39:38  15   monitoring criteria has been satisfied and the check image

02:39:40  16   JPEG has been created, correct?

02:39:40  17   A.  I agree with that -- that's what that variable --

02:39:43  18   that's how that variable is updated, that's correct.

02:39:46  19         MR. SHEASBY:  And why don't we go to Demonstrative

02:39:50  20   5.  Mr. Huynh, Demonstrative Page 5, please?

02:39:57  21   Q.  (By Mr. Sheasby)  You also don't disagree with

02:40:00  22   Professor Conte's conclusion that -- you also don't agree

02:40:12  23   with Professor Conte's conclusion that in the Wells Fargo

02:40:14  24   system, capture time is defined as the time after the image

02:40:21  25   has been converted to a JPEG, correct?

02:40:24  1   A.   I don't disagree with that conclusion, that's right.

02:40:28  2          MR. SHEASBY:   And let's have Demonstrative 4.

02:40:33  3   Q.   (By Mr. Sheasby)   You don't agree with -- disagree with

02:40:35  4   Professor Conte's conclusions that the frames obtained from

02:40:39  5   the camera's feed are only temporary representations of the

02:40:43  6   video data, correct?

02:40:43  7   A.   That's correct.

02:40:44  8   Q.   You don't disagree that they are only used for the

02:40:49  9   analysis process, correct?

02:40:49  10  A.   Well, they are used for analysis, but I don't agree

02:40:52  11  that they're only used for analysis.

02:40:54  12  Q.   You agree that they're used for analysis, correct?

02:40:56  13  A.   That's correct.

02:40:56  14  Q.   You agree that they're not transmitted to the bank's

02:41:00  15  servers for deposit, correct?

02:41:01  16  A.   Well, one of them will be.

02:41:04  17  Q.   Well, why don't we turn to Professor Conte's report

02:41:10  18  again.

02:41:11  19          THE COURT:   Approach the bench, counsel.

02:41:13  20          (Bench conference.)

02:41:19  21          THE COURT:   How much more cross do you expect to

02:41:23  22  have?

02:41:24  23          MR. SHEASBY:   A significant amount, Your Honor.

02:41:26  24          THE COURT:   We're going to take a recess at this

02:41:29  25  point.

02:41:30  1          (Bench conference concluded.)

02:41:30  2          THE COURT:  Ladies and gentlemen, this witness's

02:41:34  3  examination appears to be able to go on -- appears set to

02:41:38  4  be going on for a longer period of time than I'm prepared

02:41:43  5  to keep you.  You've been back from lunch nearly two hours.

02:41:46  6  We're going to take a recess at this point.  If you will

02:41:49  7  simply close your notebooks and leave them in your chairs,

02:41:52  8  follow all my instructions, including not to discuss the

02:41:55  9  case, and we'll be back shortly to continue.

02:41:57  10         The jury is excused for recess.

02:42:01  11         COURT SECURITY OFFICER:  All rise.

02:42:02  12         (Jury out.)

02:42:12  13         THE COURT:  Court stands in recess.

03:00:27  14         (Recess.)

03:00:29  15         (Jury out.)

03:00:30  16         COURT SECURITY OFFICER:  All rise.

03:00:33  17         THE COURT:  Be seated, please.

03:02:36  18         Are you prepared to continue your

03:02:41  19  cross-examination, Mr. Sheasby?

03:02:42  20         MR. SHEASBY:  I am, Your Honor.

03:02:43  21         THE COURT:  You may return to the podium.

03:02:45  22         MR. SHEASBY:  Thank you, Your Honor.

03:02:45  23         THE COURT:  Let's bring in the jury, please.

03:03:03  24         (Jury in.)

03:03:04  25         THE COURT:  Please be seated.

03:03:15   1          We'll continue with cross-examination of the

03:03:19   2    witness by the Plaintiff.

03:03:21   3          You may proceed, counsel.

03:03:22   4          MR. SHEASBY:  Thank you, Your Honor.

03:03:23   5          Mr. Huynh, may I have Slide 4, please?

03:03:26   6    Q.  (By Mr. Sheasby)  So, sir, you agree that the frames

03:03:39   7    are obtained from the camera's feed in the Wells Fargo's

03:03:42   8    system and are only temporary representations of the video

03:03:51   9    data, correct?

03:03:52   10   A.  That's correct.

03:03:52   11   Q.  You agree that they're used for the monitoring criteria

03:03:57   12   analysis process, correct?

03:04:01   13   A.  That's right.

03:04:02   14   Q.  And you also agree they're not transmitted to Wells

03:04:05   15   Fargo's persistent memory, correct?

03:04:08   16   A.  I don't agree with that.

03:04:10   17   Q.  Okay.  Why don't we turn to Tab 24, which is Professor

03:04:16   18   Conte's report, and why don't you go to Paragraph 427.

03:04:24   19   A.  Yes.

03:04:24   20   Q.  And Professor Conte says:  The frames are obtained from

03:04:29   21   the camera's feed and are only temporary representations of

03:04:32   22   the video data, correct?

03:04:34   23   A.  You read that correctly, yes.

03:04:36   24   Q.  He says that these frames come from a buffer, correct?

03:04:39   25   A.  Yes.

03:04:40  1   Q.  And he says that these frames are not transmitted to

03:04:43  2   the bank's servers for use and deposit, correct?

03:04:46  3   A.  That's what he wrote, yes.

03:04:48  4   Q.  And you don't have any disagreement with that second

03:04:55  5   sentence, do you, that the frames are not transmitted to

03:05:02  6   the bank's servers for use in deposit?

03:05:04  7   A.  Those frames are not transmitted in their form, yes.

03:05:08  8   Q.  And to be precise, you agree with Professor Conte that

03:05:12  9   the frames that are used for analysis are not transmitted

03:05:15  10  to the bank's servers, correct?

03:05:16  11  A.  Well, partially.

03:05:20  12  Q.  Okay.  Well, why don't you turn to Page 264, Lines 19,

03:05:25  13  of your deposition, and read to Page 265, Line 7?

03:05:40  14          Let me know when you've read it, sir.

03:05:47  15  A.  Yes.

03:05:47  16  Q.  And so you were asked about the second sentence in

03:05:52  17  Professor Conte's report, correct?

03:05:59  18  A.  Yes.

03:06:00  19  Q.  You were asked whether you state any disagreements with

03:06:03  20  that second sentence, correct?

03:06:06  21  A.  Yes.

03:06:06  22  Q.  And you admitted that you didn't state any

03:06:09  23  disagreements with Professor Conte's statement that the

03:06:13  24  image that is used for analysis is not transmitted to the

03:06:16  25  bank in your report, correct?

03:06:18  1   A.  That's right.

03:06:18  2   Q.  And you understand that the report was the time for you

03:06:22  3   to give your opinions, correct, sir?

03:06:26  4   A.  That was a time, yes.

03:06:28  5   Q.  You understand that the report was how I could

03:06:31  6   understand what opinions you're going to give to the jury,

03:06:35  7   correct?

03:06:35  8   A.  Yes.

03:06:36  9   Q.  We discussed your report extensively at your

03:06:41  10  deposition, correct?

03:06:41  11  A.  That's right.

03:06:42  12  Q.  You didn't tell me you changed your mind and you

03:06:45  13  disagree -- disagreed with Professor Conte's statement that

03:06:48  14  the image used for analysis is not transmitted to the bank,

03:06:53  15  correct, at your deposition -- you haven't said I suddenly

03:06:56  16  changed my mind, correct?

03:06:57  17  A.  That's correct.

03:06:58  18  Q.  You had an opportunity to review your deposition before

03:07:02  19  this trial, correct?

03:07:04  20  A.  That's right.

03:07:05  21  Q.  You had an opportunity to make corrections, correct?

03:07:07  22  A.  Yes.

03:07:07  23  Q.  You didn't say, Mr. Sheasby, or, Your Honor, I've

03:07:11  24  changed my mind, I now disagree with Professor Conte's

03:07:14  25  opinion that the images that are used for analysis are

| | | |
|---|---|---|
| 03:07:18 | 1 | never transmitted to the bank, correct? |
| 03:07:21 | 2 | A.   That's right. |
| 03:07:22 | 3 | Q.   Now, you told the ladies and gentlemen of the jury that |
| 03:07:31 | 4 | Professor Conte agrees with you that capturing is at the |
| 03:07:35 | 5 | beginning before the monitoring criteria, correct? |
| 03:07:38 | 6 | A.   I -- I think my whole answer is important, but that's |
| 03:07:41 | 7 | right, yes. |
| 03:07:42 | 8 | Q.   Okay.  Professor Conte actually doesn't agree with you, |
| 03:07:47 | 9 | correct? |
| 03:07:47 | 10 | A.   That's right.  I stated he has a different opinion on |
| 03:07:51 | 11 | infringement. |
| 03:07:51 | 12 | Q.   So to be clear for the ladies and gentlemen of the |
| 03:07:53 | 13 | jury, when you told them that Professor Conte believes that |
| 03:07:59 | 14 | capture is at the beginning, Professor Conte actually |
| 03:08:01 | 15 | believes that capture occurs when the JPEG has been |
| 03:08:05 | 16 | created, correct? |
| 03:08:06 | 17 | A.   That's what he believes, yes. |
| 03:08:08 | 18 | Q.   He doesn't believe that capture is in the beginning |
| 03:08:11 | 19 | like you, correct? |
| 03:08:12 | 20 | A.   Apparently not, that's right. |
| 03:08:14 | 21 | Q.   And so what you told to the jury was not accurate, |
| 03:08:18 | 22 | correct? |
| 03:08:18 | 23 | A.   That's not correct. |
| 03:08:20 | 24 | Q.   You told the jury that Professor Conte believes that |
| 03:08:22 | 25 | capturing is at the beginning before monitoring criteria, |

03:08:27   1   correct?

03:08:27   2   A.   That's -- that's not a correct interpretation of what I

03:08:31   3   said.

03:08:31   4   Q.   Okay.  So we can all agree, so there's no dispute,

03:08:34   5   Professor Conte does not believe that capturing is at the

03:08:37   6   beginning before the monitoring criteria, correct?

03:08:39   7   A.   Yes.  Dr. Conte and I have a different view on that

03:08:42   8   term.

03:08:42   9   Q.   And if the jury heard you say that -- that Professor

03:08:46  10   Conte agrees with you, you either didn't say it or it was a

03:08:49  11   misstatement, correct?

03:08:51  12   A.   Yes, that's -- that's correct.  I was trying to convey

03:08:55  13   that I think we agree on the function of the software.

03:08:58  14   Q.   But you do not agree on when capturing occurs, correct?

03:09:01  15   A.   That's correct.  We disagree on that.

03:09:13  16        MR. SHEASBY:  Let's go to PTX-002, Mr. Huynh.  And

03:09:20  17   let's go to Page 22.  And let's go to Column 5, Lines 45 to

03:09:33  18   50.  And let's go ahead and highlight the sentence:  A

03:09:45  19   frame of the video may be obtained and monitored with

03:09:49  20   respect to the monitoring criteria.

03:09:55  21        It's the second sentence, Mr. Huynh.

03:10:08  22   Q.   (By Mr. Sheasby)  Now, sir, although you were not

03:10:11  23   present in the courtroom, you understand that Mr. Bueche,

03:10:15  24   one of the inventors, testified about his patent.  This is

03:10:18  25   the '571 patent, correct?

| | | |
|---|---|---|
| 03:10:19 | 1 | A.  Yes, I've read his testimony. |
| 03:10:21 | 2 | Q.  You weren't present in the courtroom, though, correct? |
| 03:10:24 | 3 | A.  Correct. |
| 03:10:24 | 4 | Q.  And you understand that Professor Conte also testified |
| 03:10:27 | 5 | regarding the patent, although you were not in the |
| 03:10:29 | 6 | courtroom for it, correct, sir? |
| 03:10:30 | 7 | A.  Correct. |
| 03:10:44 | 8 | Q.  Now, the patent describes an embodiment in which video |
| 03:10:50 | 9 | frames are obtained from a video feed, correct? |
| 03:10:54 | 10 | A.  Yes. |
| 03:10:56 | 11 | Q.  And you describe "obtain" as meaning receive the |
| 03:11:00 | 12 | information from a video, correct? |
| 03:11:03 | 13 | A.  That's a reasonable description, yes. |
| 03:11:05 | 14 | Q.  And that's what the patent describes, correct? |
| 03:11:09 | 15 | A.  In part, yes. |
| 03:11:12 | 16 | Q.  And the thing that's doing the monitoring must get the |
| 03:11:21 | 17 | video or frame from somewhere upstream, correct? |
| 03:11:23 | 18 | A.  Correct. |
| 03:11:24 | 19 | Q.  And when you get the frame from the camera, of |
| 03:11:29 | 20 | necessity, this entails reading it from memory where it's |
| 03:11:33 | 21 | been placed, correct? |
| 03:11:34 | 22 | A.  Yes, that's right. |
| 03:11:37 | 23 | Q.  In order to obtain an image and analyze it for the |
| 03:11:44 | 24 | monitoring criteria is described -- as described from the |
| 03:11:47 | 25 | patent, you have to get it from some storage location, |

03:11:50  1    correct?

03:11:50  2    A.  Yes, that's true.

03:11:52  3    Q.  Now, in the patent, the patent uses the word "obtain"

03:11:54  4    as the first step in the monitoring process of video

03:12:00  5    frames, correct?

03:12:01  6    A.  I don't recall that being in the claims.

03:12:03  7    Q.  The specification, sir?

03:12:04  8    A.  The specification does -- does describe that, that's

03:12:07  9    right.

03:12:07  10   Q.  In other words, the claims use monitoring criteria,

03:12:10  11   correct?

03:12:10  12   A.  Yes.

03:12:10  13   Q.  And the patent describes obtaining a frame and then

03:12:14  14   analyzing it using monitoring criteria?

03:12:16  15              MR. HILL:  Objection, Your Honor.

03:12:18  16              THE COURT:  State your objection.

03:12:19  17              MR. HILL:  Your Honor, the question conflates the

03:12:22  18   claims with the specification.  This is effectively claim

03:12:25  19   construction now.

03:12:26  20              THE COURT:  What's your response, Mr. Sheasby?

03:12:28  21              MR. SHEASBY:  Your Honor, a person of ordinary

03:12:31  22   skill in the art reads the claims in light of the

03:12:33  23   specification.

03:12:37  24              MR. HILL:  That's not -- Your Honor, he is

03:12:40  25   importing material from the specification into the claims.

03:12:42  1  That is legally improper.  That's the import of his

03:12:44  2  question.

03:12:44  3          MR. SHEASBY:  Your Honor, I intend to establish

03:12:46  4  that Mr. Villasenor agrees that this embodiment is covered

03:12:49  5  by the claims of the patent.

03:13:03  6          THE COURT:  At this point, I'm going to overrule

03:13:05  7  the objection.  We'll follow this testimony a little

03:13:07  8  further.  You're free to raise at a future time if you

03:13:11  9  believe it's appropriate, Mr. Hill.

03:13:12  10         MR. HILL:  Thank you, Your Honor.

03:13:13  11  Q.  (By Mr. Sheasby)  Now, in the patent, obtaining is

03:13:16  12  different from capturing, correct?

03:13:17  13  A.  Yes, I believe that's the -- that's the case.

03:13:20  14  Q.  And the patent captures something separate and distinct

03:13:23  15  from obtaining and using it for monitoring, correct?

03:13:27  16  A.  That's right.

03:13:34  17  Q.  Now, you made reference to Mr. William Saffici,

03:13:39  18  correct?

03:13:39  19  A.  I was asked about Mr. William Saffici, that's correct.

03:13:43  20  Q.  And you said you knew Mr. William Saffici, correct?

03:13:46  21  A.  I said I knew who he was.  I don't know him personally.

03:13:49  22  Q.  And you represented to the jurors that you don't have

03:13:51  23  any disagreement with Professor -- Mr. -- Mr. Saffici,

03:13:55  24  correct?

03:13:55  25  A.  I represented that I don't have any disagreements that

03:13:59   1   I'm aware of right now.

03:14:01   2   Q.   Okay.   And you read the trial testimony before you were

03:14:06   3   here, correct?

03:14:06   4   A.   Yes.

03:14:07   5   Q.   And so you believe that live video feeds are covered by

03:14:10   6   the claims of the patent-in-suit, correct, sir?

03:14:12   7   A.   When you say they're covered, I'm sorry, what do you

03:14:14   8   mean?

03:14:14   9   Q.   You believe that live video feeds are covered or

03:14:19   10  encompassed by the claims of the patents-in-suit, correct?

03:14:23   11  A.   I believe you could practice the patent using a live

03:14:26   12  video feed, yes, that's right.

03:14:27   13  Q.   And you believe that analyzing preview frames -- oh, by

03:14:31   14  the way, before we go there --

03:14:32   15          MR. SHEASBY:   Let's go back to PX-2.23, and let's

03:14:41   16  go to Column 8, Lines 11 through 15.

03:14:45   17  Q.   (By Mr. Sheasby)   And you see that in Column 8, Lines

03:15:04   18  11 through 15 --

03:15:04   19          MR. SHEASBY:   Let's -- let's highlight Lines 11

03:15:07   20  through 15, Mr. Huynh.

03:15:09   21  Q.   (By Mr. Sheasby)   Now, sir, you agree that in the '571

03:15:15   22  patent, alignment is described as one of the tools that can

03:15:20   23  be used as part of the monitoring criteria, fair?

03:15:23   24  A.   This section talks about an alignment guide, but I

03:15:27   25  can't remember specifically whether this is in the -- where

03:15:30   1   within the patent it talks about criteria.  That may be the

03:15:34   2   case, I just can't see the whole context here.

03:15:37   3   Q.  Well, sir, you have the patent in front of you,

03:15:39   4   correct, sir?

03:15:39   5   A.  Yes, and I haven't looked at it right now.  Would you

03:15:42   6   like me to do that?

03:15:43   7   Q.  Yes.

03:15:44   8   A.  I'm sorry, where is -- I don't know where the patent

03:15:45   9   is.

03:15:51  10   Q.  I'll hand you a copy.

03:15:54  11        MR. SHEASBY:  May I approach, Your Honor?

03:15:55  12        THE COURT:  You may.

03:16:04  13   A.  I'm sorry, so just -- you would like me to review this

03:16:06  14   section of the patent?

03:16:07  15   Q.  (By Mr. Sheasby)  Sir, I'm asking you a question, and

03:16:09  16   you've read the patent many times, correct?

03:16:12  17   A.  Yes, that's right.

03:16:14  18   Q.  I'm asking you a very basic question.  Does the patent

03:16:16  19   describe the use of an alignment guide as part of things

03:16:18  20   such as checking edge distance to determine whether there's

03:16:24  21   skew?

03:16:24  22   A.  Oh, yeah.  Well, that's -- that's already in the

03:16:27  23   highlighted code.  That's -- yes -- the answer to the

03:16:29  24   question is yes.

03:16:30  25   Q.  And skew, of course, is one of the monitoring criteria

03:16:33   1   listed in the patents, correct?

03:16:34   2   A.  My recollection is, that -- that's correct, yes.

03:16:37   3   Q.  And you believe --

03:16:38   4          MR. SHEASBY:  Let's put that down now.

03:16:41   5   Q.  (By Mr. Sheasby)  Now, you believe that analyzing

03:16:43   6   preview frames, making decisions as to when those preview

03:16:48   7   frames satisfy the -- the criteria and then taking the

03:16:51   8   frame that satisfies the criteria is covered by the claims

03:16:55   9   of the patent, correct, sir?

03:16:56   10  A.  Depends on how that -- that -- that is interpreted.

03:17:01   11  Not necessarily.

03:17:02   12  Q.  Well, sir, Mr. Saffici believes that analyzing preview

03:17:07   13  frames, making decisions as to when the preview frames

03:17:10   14  satisfy the criteria and then taking the frame that

03:17:14   15  satisfies the criteria is covered by the claims of the

03:17:16   16  patent, correct?

03:17:16   17  A.  I don't recall specifically exactly what Mr. Saffici

03:17:19   18  said.

03:17:19   19  Q.  Why don't I refresh your recollection by pulling up his

03:17:23   20  deposition?

03:17:23   21          This is Volume 2, Page 1, Lines 35:25 to 36:8.

03:17:31   22          MR. HILL:  Objection, Your Honor.  May we

03:17:33   23  approach?

03:17:33   24          THE COURT:  Approach the bench.

03:17:33   25          (Bench conference.)

03:17:43  1          MR. HILL:  Your Honor, I don't know what he's

03:17:45  2   pulling up here, but if it's not part of the limited clips

03:17:48  3   that the Court has allowed for Mr. Saffici, it should not

03:17:50  4   be in front of the jury.

03:17:51  5          MR. SHEASBY:  It is part of the limited clips.

03:17:53  6          MR. HILL:  This was a full page of the deposition.

03:17:55  7   I don't know that this full page was designated before the

03:17:57  8   jury.

03:17:59  9          THE COURT:  Why is it necessary to republish

03:18:01 10   Mr. Saffici's deposition, rather than say to the witness:

03:18:05 11   If I represent to you that Mr. Saffici said X, would you

03:18:09 12   agree with that or not?

03:18:09 13          MR. SHEASBY:  I'm happy to do that if you would

03:18:11 14   prefer, Your Honor.

03:18:12 15          THE COURT:  I think that's a much safer path to

03:18:15 16   follow.

03:18:16 17          MR. SHEASBY:  Okay.

03:18:17 18          MR. HILL:  Thank you, Your Honor.

03:18:21 19          (Bench conference concluded.)

03:18:21 20          THE COURT:  Let's proceed.

03:18:22 21   Q.  (By Mr. Sheasby)  Sir, Mr. Saffici, I'm going to

03:18:24 22   represent to you, testified at trial that he believes

03:18:26 23   analyzing preview frames, making decisions as to when the

03:18:30 24   preview frames satisfy the monitoring criteria, and then

03:18:34 25   taking the frame that satisfies the criteria is covered by

03:18:36   1   the claims -- the claims of the patent.  Do you agree or

03:18:39   2   disagree with that?

03:18:39   3   A.  I disagree if he meant taking a frame that was already

03:18:46   4   present.  I agree if he meant going and capturing a new

03:18:50   5   frame with that same image in the view finder.  So I'm not

03:18:53   6   sure what was in his mind.

03:18:56   7   Q.  You didn't ask Mr. Saffici what was in his mind,

03:19:03   8   correct?

03:19:03   9   A.  Correct.

03:19:03   10  Q.  Now, Mr. Saffici was actually retained as an expert in

03:19:06   11  this matter before you were, correct, sir?

03:19:09   12  A.  Yes.

03:19:11   13  Q.  Mr. Saffici was retained many months before you were

03:19:17   14  retained, correct, sir?

03:19:19   15  A.  Yes.

03:19:21   16          MR. SHEASBY:  May I approach, Your Honor?

03:19:23   17          THE COURT:  Approach the witness or approach the

03:19:27   18  bench?

03:19:27   19          MR. SHEASBY:  Approach the bench, Your Honor.

03:19:29   20          THE COURT:  Approach the bench, counsel.

03:19:33   21          (Bench conference.)

03:19:35   22          MR. SHEASBY:  Your Honor, at this moment, I would

03:19:37   23  now like permission to elicit that Mr. Saffici was Wells

03:19:40   24  Fargo's claim construction expert by showing the witness

03:19:43   25  the claim construction declaration without publishing it to

03:19:46  1   the jury.

03:19:47  2        MR. HILL:  Your Honor, that's objectionable and

03:19:50  3   highly improper.  This Court in its claim construction

03:19:52  4   opinions even instructs parties that you can't talk about

03:19:55  5   what goes into the claim construction process.  That's not

03:19:58  6   a matter for a jury to hear or decide.

03:20:00  7        And then it opens the broader issue, Your Honor,

03:20:02  8   that if this can of worms is open, Mr. Saffici was in this

03:20:05  9   case for a purpose, and the analysis he was giving when he

03:20:09  10  gave this testimony they're so proud of was in the context

03:20:13  11  of a specific invalidity reference.  We ought to get to

03:20:16  12  unpack it if they're going to get to go there, Your Honor.

03:20:20  13       But the more prudent course is to keep this

03:20:23  14  exactly where the Court put it in pre-trial.  They got to

03:20:25  15  use the portions of Mr. Saffici that they had out.  They've

03:20:28  16  made more hay out of this than they probably should be able

03:20:32  17  to considering this is nothing other than an expert hired

03:20:34  18  for one purpose, an expert hired for the other, and the two

03:20:38  19  are on separate tracks.

03:20:39  20       So whether he was retained before Mr. Villasenor

03:20:42  21  is of no moment because it was on separate topics.  And

03:20:47  22  there's no reason this needs to be in front of the jury.

03:20:49  23       MR. SHEASBY:  Your Honor, we did not ask them to

03:20:51  24  bring up Mr. Saffici in Mr. Villasenor's testimony.  They

03:20:56  25  did it intentionally and consciously.  And I warned them

03:20:59  1   that if they're going to bring up the question of what

03:21:02  2   Mr. Saffici did in this case, it was going to open the

03:21:04  3   door, that he was retained to give a plain and ordinary

03:21:10  4   analysis of scope of the claims.

03:21:11  5         MR. HILL:  We didn't inject Mr. Saffici into this

03:21:14  6   trial.

03:21:14  7         THE COURT:  Well, we're not going to -- we're not

03:21:15  8   going to rehash who shot John here.  The issue before the

03:21:18  9   Court is what to do with Mr. Saffici.

03:21:21  10        I am not going to permit either side to go into

03:21:26  11  the fact that he was a former validity expert on behalf of

03:21:31  12  the Defendant.  It's clearly before the jury that he was an

03:21:37  13  expert for Wells Fargo in the case for some reason in the

03:21:39  14  past, and he's not here at the trial now.

03:21:49  15        I think the safest thing to do is I'm going to

03:21:53  16  allow the Plaintiff to indicate that Mr. Saffici was

03:21:55  17  previously retained to address issues of what a person of

03:21:59  18  ordinary skill would understand in relation to this case in

03:22:04  19  a high level, generic sense only without saying it any

03:22:08  20  differently than that.  And that will identify that he had

03:22:11  21  some purpose, without talking about validity, without

03:22:14  22  talking about anything else, and that will give the jury

03:22:17  23  some answer as to what he was in this case for.

03:22:21  24        MR. HILL:  Your Honor, can I make one other

03:22:22  25  comment about that?

| | | |
|---|---|---|
| 03:22:23 | 1 | THE COURT:  Yes, sir. |
| 03:22:24 | 2 | MR. HILL:  The reason -- Mr. Saffici was in the |
| 03:22:28 | 3 | case to offer testimony to the Court on claim construction. |
| 03:22:31 | 4 | And telling the jury that he was in the case for some claim |
| 03:22:35 | 5 | construction -- what a person of ordinary skill in the art |
| 03:22:38 | 6 | would understand suggests to them -- |
| 03:22:38 | 7 | THE COURT:  I'm not -- |
| 03:22:39 | 8 | MR. HILL:  -- that we didn't call him here.  We |
| 03:22:42 | 9 | can't -- we can't offer claim construction testimony -- |
| 03:22:44 | 10 | THE COURT:  I'm -- I'm not -- I'm not allowing Mr. |
| 03:22:47 | 11 | Sheasby to use the words "claim construction."  I'm merely |
| 03:22:51 | 12 | saying that he can represent to the jury that Mr. Saffici |
| 03:22:54 | 13 | was formerly in the case with regard to what a person of |
| 03:22:57 | 14 | ordinary skill would understand about the claims. |
| 03:23:01 | 15 | MR. SHEASBY:  Thank you, Your Honor. |
| 03:23:01 | 16 | THE COURT:  You are not to mention claim |
| 03:23:03 | 17 | construction.  You are not to mention validity.  I don't -- |
| 03:23:07 | 18 | I don't think the jury will have any real grasp of what |
| 03:23:10 | 19 | that phrase means.  I'm looking for a neutral way to |
| 03:23:13 | 20 | identify why he was here before and he's not here now |
| 03:23:16 | 21 | without going into these hot button issues of validity or |
| 03:23:21 | 22 | claim construction. |
| 03:23:22 | 23 | And I am expressly excluding any reference to the |
| 03:23:25 | 24 | jury connecting Mr. Saffici with the claim construction |
| 03:23:29 | 25 | process by use of the words "claim construction," |

03:23:32  1  "Markman," or anything of that nature.  And I'm excluding

03:23:36  2  any nexus being drawn between Mr. Saffici and the issues of

03:23:42  3  validity or invalidity of the claims.

03:23:44  4       But I think -- I think we have to give the jury

03:23:46  5  some explanation as to who he was and why he was in this

03:23:48  6  case before.  And I'm trying to craft in real-time during

03:23:53  7  the middle of the trial an answer that will basically mean

03:23:56  8  nothing to this jury --

03:24:00  9       MR. HILL:  Well, it begs the question --

03:24:00  10       THE COURT:  And yet answers the question.

03:24:01  11       MR. HILL:  -- it begs the question, if it means

03:24:02  12  nothing to them, do they need to hear it?

03:24:06  13       THE COURT:  They need to it if for no other

03:24:10  14  reason, Mr. Hill, than to say that that question has been

03:24:12  15  answered and we move on and we don't keep coming back to

03:24:15  16  this issue.

03:24:15  17       MR. SHEASBY:  Thank you, Your Honor.

03:24:16  18       THE COURT:  All right?  I expect my instruction to

03:24:18  19  be followed closely.

03:24:21  20       MR. SHEASBY:  Yes, Your Honor.

03:24:23  21       (Bench conference concluded.)

03:24:26  22       THE COURT:  Let's proceed.

03:24:27  23  Q.  (By Mr. Sheasby)  Sir, you understand that Mr. Saffici

03:24:30  24  was retained to find an analysis of what a person of

03:24:35  25  ordinary skill in the art would understand the plain and

03:24:38  1  ordinary meaning of the claims to be, fair?

03:24:39  2  A.  I think that's -- I think that's correct.  I wasn't

03:24:42  3  personally involved, but I've heard that.

03:24:44  4  Q.  Thank you, Mr. Villasenor.

03:24:47  5       Now --

03:24:51  6       THE COURT:  And it's Dr. Villasenor, counsel.

03:24:53  7       MR. SHEASBY:  Very sorry.

03:24:55  8  Q.  (By Mr. Sheasby)  Dr. Villasenor, I sincerely

03:24:59  9  apologize.  It was -- it was seven years and you earned it.

03:25:03  10       Now, you spoke -- I want to turn to your

03:25:25  11  demonstratives?

03:25:25  12       MR. SHEASBY:  Madam courtroom deputy, may I have

03:25:28  13  the ELMO machine?

03:25:30  14  Q.  (By Mr. Sheasby)  So this is a demonstrative that you

03:25:34  15  showed the jury, and you have this gray box that says

03:25:39  16  memory?

03:25:39  17  A.  That's correct.

03:25:39  18  Q.  And that's the buffer, correct?

03:25:41  19  A.  It's intended to symbolize that memory, that's right.

03:25:47  20  Q.  And it has five images in -- in the memory box,

03:25:51  21  correct?

03:25:51  22  A.  That's just an example, but in this picture, that's

03:25:54  23  right.

03:25:54  24  Q.  Now, in the MiSnap analysis, how many images are

03:25:59  25  present in the analyzer at any one time?

03:26:02  1   A.  I don't recall.

03:26:03  2   Q.  Do you know if the MiSnap analyzer actually hosts five

03:26:09  3   images?

03:26:10  4   A.  Well, this is meant to show time.  So I don't know how

03:26:15  5   many it stores at any one time.

03:26:16  6   Q.  Do you have any evidence whatsoever that the MiSnap

03:26:19  7   analyzer has five images in its temporary transient buffer

03:26:24  8   that it's analyzing?

03:26:25  9   A.  The No. 5, no, this is just an illustration.

03:26:28  10  Q.  So, for example, you didn't do the analysis as to

03:26:35  11  whether there was only one image in the temporary transient

03:26:38  12  buffer at any one time, correct?

03:26:40  13  A.  No, I didn't do that particular analysis for this

03:26:42  14  figure, no, that's right.

03:26:43  15  Q.  You didn't do an analysis for the case either, correct?

03:26:47  16  A.  Yeah, it's irrelevant for my opinion.

03:26:50  17  Q.  So if the jury were to look at this demonstrative and

03:26:52  18  suggest that there were five images in the transient

03:26:55  19  buffer, that's not your intention to suggest that, correct?

03:26:58  20  A.  No, my intention was to suggest a time sequence.

03:27:02  21  Q.  Sir, you -- you spoke about manual capture, correct?

03:27:08  22  A.  Yes.

03:27:08  23  Q.  Now, you're not asked to investigate whether it would

03:27:12  24  be commercially acceptable for consumers not to have auto

03:27:14  25  capture, correct?

03:27:15   1   A.   That's correct.

03:27:16   2   Q.   You have no opinion as to whether it would be

03:27:18   3   commercially viable for Wells Fargo not to offer auto

03:27:22   4   capture, correct?

03:27:23   5   A.   That's correct.

03:27:23   6   Q.   You were not in the courtroom last week, but you

03:27:33   7   understand that Mr. Calman testified, correct?

03:27:36   8   A.   Yes.

03:27:36   9   Q.   Mr. Calman provided a technical analysis as to what --

03:27:41  10   what portion of the auto capture MRDC product was partly

03:27:46  11   attributable to the patents-in-suit, correct?

03:27:50  12   A.   I don't know if it was a technical analysis, but he

03:27:52  13   provided opinions on that topic, yes.

03:27:58  14   Q.   He gave an analysis that he believed that 40 percent of

03:28:02  15   the MRDC system was attributable to the '571 and '090

03:28:08  16   patents, correct?

03:28:09  17   A.   I believe that was his conclusion, yes.

03:28:11  18   Q.   In your direct testimony today, you didn't provide any

03:28:15  19   opinions disagreeing with that, correct?

03:28:17  20   A.   That's correct.

03:28:17  21   Q.   You have the technical capability to do the same

03:28:20  22   analysis Mr. Calman did, correct?

03:28:21  23   A.   Yes.

03:28:22  24   Q.   You didn't do it, correct?

03:28:23  25   A.   I did what I was asked to do in this case.

03:28:26  1    Q.  And so as -- you were the only independent technical

03:28:29  2    witness who will testify on behalf of Wells Fargo, correct?

03:28:31  3    A.  As far as I'm aware, that's right.

03:28:33  4    Q.  And you did not do any analysis whatsoever disagreeing

03:28:36  5    with Mr. Calman's conclusion that 40 percent of the value

03:28:39  6    of auto capture -- of the value of mobile remote deposit

03:28:44  7    capture is represented by the '571 and '090 patents, fair?

03:28:47  8    A.  I was not asked to do that analysis.

03:28:49  9    Q.  And you didn't do it, correct?

03:28:50  10   A.  That's correct.

03:28:52  11   Q.  Now, the only limitation in all of the claims that

03:28:57  12   Professor Conte analyzed that you dispute is not present is

03:29:02  13   the capture after monitoring limitation, correct?

03:29:04  14   A.  I believe it's at or after, that's right.

03:29:06  15   Q.  In other words, you concede or you're not disputing

03:29:09  16   that every single other limitation in every single other

03:29:14  17   claims that are asserted in this case is met, correct?

03:29:17  18   A.  I have not disputed that, that's correct.

03:29:19  19   Q.  Thank you for your time, Dr. Villasenor.

03:29:23  20        MR. SHEASBY:  I pass the witness, Your Honor.

03:29:24  21        THE COURT:  Redirect, Mr. Hill?

03:29:27  22        MR. HILL:  Yes, Your Honor.  Thank you, Your

03:29:40  23   Honor.

03:29:41  24        THE COURT:  You may proceed.

03:29:45  25        MR. HILL:  Thank you, Your Honor.

| | | |
|---|---|---|
| 03:29:45 | 1 | <u>REDIRECT EXAMINATION</u> |
| 03:29:47 | 2 | BY MR. HILL: |
| 03:29:47 | 3 | Q.  Dr. Villasenor, I want to ask you a couple of items |
| 03:29:51 | 4 | that you covered with Mr. Sheasby.  First off, I'd like to |
| 03:29:51 | 5 | look at your deposition if you would.  Do you still have |
| 03:29:53 | 6 | that in front of you? |
| 03:29:53 | 7 | A.  I do. |
| 03:29:54 | 8 | Q.  You were asked if you recall about this use of the word |
| 03:29:56 | 9 | "obtains," do you recall that? |
| 03:29:58 | 10 | A.  Yes. |
| 03:29:58 | 11 | Q.  And, specifically, you were quizzed about an instance |
| 03:30:03 | 12 | in the deposition where you used the word "obtains," do you |
| 03:30:07 | 13 | recall that? |
| 03:30:08 | 14 | A.  I do. |
| 03:30:08 | 15 | Q.  All right.  I want to look at Page 145 of your |
| 03:30:12 | 16 | deposition at Lines 13 through 23.  Do you have it there in |
| 03:30:16 | 17 | front of you? |
| 03:30:17 | 18 | A.  Yes. |
| 03:30:18 | 19 | Q.  We're just going to read along here together. |
| 03:30:20 | 20 | A.  Okay.  Let me -- I need a moment to get to it.  Page |
| 03:30:26 | 21 | 145, is that what you said? |
| 03:30:28 | 22 | Q.  Yes, sir. |
| 03:30:29 | 23 | A.  I'm sorry, which lines, sir? |
| 03:30:31 | 24 | Q.  And it's Lines 13 through 23, I believe? |
| 03:30:33 | 25 | A.  Yes. |

03:30:34  1   Q.  Are those the lines that Mr. Sheasby showed you

03:30:36  2   earlier?

03:30:37  3   A.  Yes, they are.

03:30:38  4   Q.  And he asked -- I'll read the question:  Can you

03:30:41  5   describe for me the process that occurs after MiSnap

03:30:45  6   analyzer obtains images from the image sensor?  Will you

03:30:53  7   please read your answer, sir?

03:30:53  8   A.  My recollection is that it obtains a representation of

03:30:57  9   the image so that it has pixel level data and then it

03:30:59  10  performs a series of image processing steps to identify --

03:31:01  11  to do things like identify corner locations, et cetera.

03:31:04  12  Q.  Did he ask you the word "obtains" in his question?

03:31:07  13  A.  He did.

03:31:07  14  Q.  Did you repeat it in your answer?

03:31:09  15  A.  I did.

03:31:09  16  Q.  Is that some ah-ha moment?

03:31:15  17  A.  No.

03:31:16  18  Q.  Are you caught?

03:31:17  19  A.  No.

03:31:19  20  Q.  Well, you used the same word he did?

03:31:22  21  A.  That's true, I did.

03:31:25  22  Q.  Does that change the claims of the patent?

03:31:29  23  A.  It does not.

03:31:31  24  Q.  Does it rewrite them to say obtain and not capture?

03:31:31  25          MR. SHEASBY:  Your Honor, this is leading,

03:31:31  1  objection.

03:31:34  2          THE COURT:  Sustained as to leading.

03:31:34  3          MR. HILL:  Thank you, Your Honor.

03:31:36  4  Q.  (By Mr. Hill)  Does it rewrite the claims?

03:31:38  5  A.  It does not.

03:31:38  6  Q.  Does it change your opinion in any respect?

03:31:41  7  A.  Not at all.

03:31:43  8          MR. HILL:  Let's also look, if we can, Mr. Goodin,

03:31:47  9  at PDX-10.3.  It's one of the demonstratives we saw a few

03:31:51  10  minutes ago, if you have that handy.

03:31:56  11          THE TECHNICIAN:  No.

03:31:57  12          MR. HILL:  Let me see if I have it.

03:31:59  13          Your Honor, may I have just a moment to grab the

03:32:04  14  demonstrative?

03:32:05  15          THE COURT:  You may.  You may.

03:32:14  16          MR. SHEASBY:  Your Honor, with your permission,

03:32:16  17  may I pull it up for Mr. Hill?

03:32:18  18          MR. HILL:  That'd be very kind, Your Honor.

03:32:22  19          THE COURT:  All right.

03:32:24  20  Q.  (By Mr. Hill)  All right.  You recall seeing this

03:32:27  21  demonstrative earlier, Dr. Villasenor?

03:32:29  22  A.  I do.

03:32:29  23  Q.  Now, I noticed there are quotes around certain words

03:32:33  24  here.  You see those?

03:32:35  25  A.  I do.

03:32:36  1    Q.  Do you know why there are quotes around those words?

03:32:39  2    A.  I do.

03:32:39  3    Q.  Are those -- are those quoting you?

03:32:42  4    A.  Perhaps.  I don't know.  It wasn't explained to me.

03:32:45  5    Q.  Well, I would ask this.  Do you still have the patent

03:32:49  6    in front of you, sir?  I believe it was at Tab 2?  Or you

03:32:55  7    have a copy?

03:32:55  8    A.  I have a copy.

03:32:56  9    Q.  And our jurors also have a copy of the patent, I

03:32:59  10   believe.

03:33:00  11          Will you look at -- we'll start with '571, Claim

03:33:08  12   1.

03:33:08  13   A.  Yes, I have the claims page.

03:33:10  14   Q.  All righty.  Can you show me in '571, Claim 1, where

03:33:17  15   the word "created" appears?

03:33:26  16   A.  I was doing a quick eye scan here.  The word "created"

03:33:31  17   does not appear in Claim 1.

03:33:32  18   Q.  What about "persistent memory"?

03:33:34  19   A.  The phrase "persistent memory" does not appear in Claim

03:33:38  20   1.

03:33:38  21   Q.  Does -- do any of the claims of the patent address

03:33:42  22   memory structures at all?

03:33:43  23   A.  No, they do not.

03:33:44  24   Q.  Persistent or non-persistent, either one?

03:33:47  25   A.  Neither.

03:33:48   1   Q.  What about the word "obtained," where's that in Claim

03:33:51   2   1?

03:33:52   3   A.  Not present.

03:33:54   4   Q.  What about "exist until after the monitoring criteria

03:33:59   5   are satisfied"?  Where do I find that in the claims?

03:34:03   6   A.  You won't.

03:34:15   7   Q.  Now, you were also asked earlier about being able to

03:34:24   8   practice this patent with live video feeds.  Do you recall

03:34:28   9   that?

03:34:29   10   A.  I do.

03:34:30   11   Q.  And just to be clear, does that mean Wells Fargo

03:34:34   12   infringes?

03:34:35   13   A.  Not at all.

03:34:36   14   Q.  Can you please explain why you say that?

03:34:39   15   A.  To practice a patent, really you have to practice the

03:34:43   16   claim.  And to practice a claim, as I mentioned earlier,

03:34:47   17   the allegedly infringing product has to be found to meet

03:34:51   18   every single claim limitation.

03:34:54   19        And it is -- it is true that you could satisfy --

03:34:58   20   the video feed could be used to satisfy the monitoring

03:35:02   21   limitation, but -- but that alone -- just because you have

03:35:07   22   a video feed, that isn't enough to conclude that you

03:35:09   23   practice a patent.  That's not nearly enough.

03:35:12   24   Q.  Dr. Villasenor, what is Step 1 of the process that the

03:35:16   25   Wells Fargo product performs when it starts the MiSnap

03:35:24   1   function?

03:35:24   2   A.   The first thing it does after it's launched is to

03:35:27   3   capture an image.

03:35:28   4   Q.   That's Step 1?

03:35:30   5   A.   That's right.

03:35:31   6   Q.   And if capture an image is Step 2 -- Step 1, does it

03:35:37   7   change your opinion in this case because there's a clock

03:35:41   8   timer that runs after it that has the word "capture" in it?

03:35:44   9   A.   No, the -- the timer is completely irrelevant to the

03:35:47  10   fact of when that image is captured.

03:35:51  11   Q.   If capture the image is Step 1, does that disrupt the

03:35:55  12   sequence that's required by these claims?

03:35:57  13   A.   No, I mean, it's -- no -- well, the claim requires that

03:36:01  14   you capture after -- at or after the monitoring criteria is

03:36:05  15   satisfied.  So in that sense, yes, it's inconsistent

03:36:09  16   with -- if the first thing you do is capture before you

03:36:11  17   analyze, then you -- you can't possibly satisfy the claims.

03:36:14  18   Q.   Now, there was one other section of your deposition I

03:36:17  19   want to take -- take a look at while we've got it there in

03:36:21  20   front of you.  If you'll look at Page 264, please, sir.

03:36:28  21   And, in particular, if you'll look at Lines -- around Line

03:36:34  22   23 --

03:36:35  23   A.   Yes.

03:36:35  24   Q.   -- going on to the top of Page 265.  Do you recall

03:36:39  25   being asked about that by counsel for USAA during your

03:36:41   1   cross-examination?

03:36:42   2   A.  I do, yes.

03:36:43   3   Q.  And it seems that you wanted to offer an explanation

03:36:46   4   here.  Can you tell us the context of what you were being

03:36:49   5   asked --

03:36:49   6   A.  So to answer that, I have to go back to Dr. Conte's

03:36:53   7   report here, this -- this --

03:36:55   8   Q.  Okay.  And I apologize, Dr. Villasenor.  Let me finish

03:36:57   9   my question there, and I'll let you do that.

03:36:59   10          But what I want you to do is tell us the context

03:37:02   11   of what you were being asked, and tell me the rest of the

03:37:05   12   story that you wanted to tell.

03:37:06   13   A.  Yeah.  So the context I was being asked, I was being

03:37:10   14   asked about a particular paragraph in -- in Dr. Conte's --

03:37:15   15   Dr. Conte's report.  And the rest of the story that I

03:37:17   16   wanted to tell is that -- that the -- the -- the image

03:37:24   17   that's acquired, that's captured, if it passes the

03:37:28   18   criterion and all that, it is, in fact, transmitted to

03:37:31   19   the -- to the server, but it's first converted to this JPEG

03:37:34   20   format.

03:37:34   21          And so I was trying to explain that the thing that

03:37:38   22   is transmitted has been converted to this JPEG thing, but

03:37:41   23   it's still derived from the same image that was originally

03:37:45   24   captured in the system.

03:37:46   25   Q.  So is the image that's transmitted the same image that

03:37:50   1   was captured in Step 1?

03:37:51   2   A.  It is.  It's just been converted to a different format,

03:37:55   3   which is the JPEG format, but the conversion to JPEG itself

03:37:58   4   is not captured because, again, to do that conversion, you

03:38:02   5   had to have the image at the start.

03:38:03   6   Q.  Now, Dr. Villasenor, a comment was made about the fact

03:38:08   7   that you weren't here last Wednesday and Thursday.  Do you

03:38:10   8   recall that?

03:38:11   9   A.  That's correct.

03:38:12  10   Q.  Where were you, sir?

03:38:12  11   A.  I was in Washington, D.C.  I had been invited quite

03:38:17  12   awhile ago to be a speaker at an event -- artificial

03:38:21  13   intelligence and how to manage it.  It's a really important

03:38:24  14   topic.  And I think there were 250 people signed up to be

03:38:28  15   in the room, and I was informed there were about 1200

03:38:30  16   people in addition watching online when I was speaking, so,

03:38:35  17   you know, something like 1400 people, so I had -- I felt I

03:38:38  18   had an obligation to be present as I had committed to be.

03:38:42  19   Q.  Was that an event put on by the Brookings Institution?

03:38:46  20   A.  Yes, it was.  It was an event at the Brookings

03:38:47  21   Institution in Washington, D.C.

03:38:48  22   Q.  And you're a member or participant in the Brookings

03:38:49  23   Institution?

03:38:49  24   A.  Yeah, I'm what's called a non-resident senior fellow,

03:38:53  25   so it's an affiliation.  So I'm -- I'm with Brookings,

03:38:56   1   yeah.

03:38:56   2   Q.  Did you just think that it was more important to go do

03:38:59   3   that than to be here for your trial testimony?

03:39:03   4   A.  Of course -- of course not.  Absolutely not, no.

03:39:04   5   Q.  Then why you did you have this conflict on your

03:39:07   6   schedule?

03:39:07   7   A.  Originally I didn't think there was going to be a

03:39:09   8   conflict, but schedules change and things got moved around

03:39:12   9   a little bit and so I ended up with a conflict.

03:39:15  10   Q.  Dr. Villasenor, was this trial originally scheduled to

03:39:19  11   start today?

03:39:19  12   A.  No.  It was originally scheduled today, then it got

03:39:20  13   moved to a few days earlier.  So that's -- that's why I had

03:39:23  14   the conflict arise.

03:39:24  15   Q.  Thank you, sir.

03:39:24  16            MR. HILL:  Your Honor, I'll pass the witness.

03:39:27  17            THE COURT:  Additional cross-examination?

03:39:28  18            MR. SHEASBY:  Just briefly, Your Honor.

03:39:29  19            THE COURT:  All right.

03:39:29  20                         RECROSS-EXAMINATION

03:39:38  21   BY MR. SHEASBY:

03:39:38  22   Q.  Mr. Villasenor, the Wells Fargo system uses a video

03:39:44  23   stream where the user does not press any button to capture

03:39:48  24   the image but the software determines when to capture the

03:39:51  25   image, correct?

03:39:52  1  A.  It depends on whether it's working or not.  When auto

03:39:55  2  capture works, that -- that's right.

03:39:56  3  Q.  Now --

03:39:58  4  A.  But I said the capture is occurring all the time.

03:40:02  5  Q.  Sir, if you can just answer my question.

03:40:05  6  A.  I was.

03:40:05  7  Q.  The Wells Fargo system uses a video stream where the

03:40:09  8  user does not press any button to capture the image but the

03:40:12  9  software determines when to capture the image, fair?

03:40:15  10  A.  I think it's capturing the whole time, that's fair.

03:40:18  11  Q.  Sir, is -- is it possible for you to answer my

03:40:22  12  question --

03:40:22  13       THE COURT:  Mr. Sheasby, if you think the witness

03:40:24  14  is non-responsive, raise it with the Court.  Don't

03:40:26  15  direct -- don't direct instructions to the witness.

03:40:29  16       MR. SHEASBY:  I'm sorry, Your Honor.  I believe

03:40:30  17  this witness is non-responsive.

03:40:31  18       THE COURT:  I'll sustain that objection.

03:40:33  19       Dr. Villasenor, you need to answer the question

03:40:37  20  and limit your answers to the question.

03:40:38  21       Restate your question, Mr. Sheasby.

03:40:41  22  Q.  (By Mr. Sheasby)  Sir, in the Wells Fargo system, it

03:40:43  23  uses a video stream where the user does not press any

03:40:46  24  button to capture the image but the software determines

03:40:49  25  when to capture the image, correct?

| | | |
|---|---|---|
| 03:40:50 | 1 | A.  That's correct. |
| 03:40:51 | 2 | Q.  Now, sir, Professor Conte in his direct examination |
| 03:40:56 | 3 | spoke about going to Dallas to sit down and review the |
| 03:40:59 | 4 | source code files, correct? |
| 03:41:01 | 5 | A.  That's correct. |
| 03:41:01 | 6 | Q.  You reviewed the live source code, correct? |
| 03:41:04 | 7 | A.  He reviewed the live source code, yes, he did. |
| 03:41:07 | 8 | Q.  Now, at your deposition, when I asked you whether you |
| 03:41:10 | 9 | had reviewed the live source code, you said you hadn't, |
| 03:41:13 | 10 | correct? |
| 03:41:13 | 11 | A.  Correct. |
| 03:41:13 | 12 | Q.  The only lines of source code you reviewed were the |
| 03:41:16 | 13 | lines of source code that Dr. Conte attached to or |
| 03:41:19 | 14 | referenced in his report, correct? |
| 03:41:20 | 15 | A.  That's right. |
| 03:41:20 | 16 | Q.  You didn't read all the source code in this case, |
| 03:41:23 | 17 | correct? |
| 03:41:23 | 18 | A.  All of the source code, no, I didn't. |
| 03:41:25 | 19 | Q.  Okay.  And now, you were here when Mr. Jitodai |
| 03:41:28 | 20 | testified by video, correct? |
| 03:41:30 | 21 | A.  Yes. |
| 03:41:31 | 22 | Q.  In fact, you referenced him in your testimony, correct? |
| 03:41:34 | 23 | A.  Yes. |
| 03:41:34 | 24 | Q.  He testified that it would cost $111,000.00 for Wells |
| 03:41:38 | 25 | Fargo to turn off the auto capture system that's accused of |

03:41:42   1   infringement in this case, correct?

03:41:42   2   A.   That's my recollection, yes.

03:41:45   3   Q.   Wells Fargo has paid you over $120,000.00 to date,

03:41:49   4   correct, sir?

03:41:49   5   A.   Not yet.

03:41:49   6   Q.   You -- you're owed Wells Fargo -- Wells Fargo owed you

03:41:52   7   more than one $120,000.00, correct?

03:41:56   8   A.   When you add it all up, that will be correct.

03:42:00   9   Q.   So Wells Fargo paid you more money than it would cost

03:42:04   10  them to allegedly remove the infringed auto capture system

03:42:08   11  -- or will, correct?

03:42:08   12  A.   If the $111,000.00 number is correct, that's true.

03:42:14   13           MR. SHEASBY:   Thank you.   No further questions.

03:42:15   14           THE COURT:   Further redirect?

03:42:17   15           MR. HILL:   Yes, Your Honor.

03:42:17   16                   REDIRECT EXAMINATION

03:42:19   17  BY MR. HILL:

03:42:19   18  Q.   Dr. Villasenor, is there any portion of the source code

03:42:23   19  that you've seen referenced in any expert report for any

03:42:27   20  part of this trial that you think was -- is pertinent to

03:42:30   21  the question of infringement that you haven't already

03:42:32   22  reviewed?

03:42:33   23  A.   Not at all.

03:42:34   24  Q.   Have you had a full opportunity to review any and all

03:42:37   25  portions of the code that anyone has even remotely

```
03:42:41   1   suggested is important?
03:42:44   2   A.  Absolutely.
03:42:44   3   Q.  And, Dr. Villasenor, if someone wanted you to pay them
03:42:49   4   $300 million, would you spend a $100,000.00 to defend
03:42:55   5   yourself?
03:42:55   6           MR. SHEASBY:  Your Honor, object.  This is
03:42:56   7   argumentative, and it's leading.
03:42:58   8           THE COURT:  Sustained.
03:42:59   9           MR. HILL:  Thank you, Your Honor.  No further
03:43:00  10   questions.
03:43:00  11           THE COURT:  Further cross-examination.
03:43:01  12           MR. SHEASBY:  No further cross-examination, Your
03:43:03  13   Honor.
03:43:03  14           THE COURT:  Dr. Villasenor, you may step down.
03:43:05  15           THE WITNESS:  Thank you, Your Honor.
03:43:14  16           MR. ROWLES:  Your Honor, may we assist in clearing
03:43:17  17   binders?
03:43:19  18           THE COURT:  You may.
03:43:19  19           MR. SHEASBY:  Thank you.
03:43:43  20           THE COURT:  Is there a request that this witness
03:43:44  21   be excused?
03:43:45  22           MR. HILL:  Yes, Your Honor, there is.
03:43:46  23           THE COURT:  Any objection?
03:43:47  24           MR. SHEASBY:  Your Honor, Plaintiffs have no
03:43:49  25   objection.
```

03:43:50  1          THE COURT:  Dr. Villasenor, you are excused, which

03:43:52  2   means you're free to leave.  You're also free to stay, it's

03:43:55  3   up to you.

03:43:56  4          THE WITNESS:  Thank you, Your Honor.

03:43:56  5          THE COURT:  Defendant, call your next witness.

03:43:58  6          MR. MELSHEIMER:  May it please the Court.  At this

03:43:59  7   time, Your Honor, Wells Fargo calls Margo Lockwood-Stein,

03:44:05  8   corporate representative of Wells Fargo for this case.

03:44:06  9          THE COURT:  All right.

03:44:07  10         MR. MELSHEIMER:  She'll be examined by my partner,

03:44:12  11  Danielle Williams.

03:44:12  12         THE COURT:  If you'll come forward,

03:44:15  13  Ms. Lockwood-Stein, and be sworn.

03:44:28  14         (Witness sworn.)

03:44:29  15         THE COURT:  Please come around, ma'am, have a seat

03:44:31  16  on the witness stands.

03:44:40  17         MS. WILLIAMS:  Your Honor, may I approach with a

03:44:42  18  binder and slides, please?

03:44:43  19         THE COURT:  You may.

03:45:06  20         All right.  Ms. Williams, you may proceed with

03:45:09  21  your direct examination.

03:45:10  22         MS. WILLIAMS:  Thank you, Your Honor.  May it

03:45:10  23  please the Court.

03:45:10  24      MARGOT LOCKWOOD-STEIN, DEFENDANT'S WITNESS, SWORN

03:45:10  25                  DIRECT EXAMINATION

03:45:12   1   BY MS. WILLIAMS:

03:45:12   2   Q.  Good afternoon, will you please introduce yourself to

03:45:14   3   the jury?

03:45:14   4   A.  Sure.  Good afternoon, my name is Margo Lockwood-Stein.

03:45:17   5   Q.  Have you ever testified in Court before?

03:45:20   6   A.  No, I have not.

03:45:21   7   Q.  Will you please tell us a little bit about yourself?

03:45:24   8   A.  Sure.  I live in California.  And I've been married for

03:45:30   9   23 years, and I have two children, ages 16 and 14.  A boy

03:45:36   10  and a girl.

03:45:36   11  Q.  What do you like to do in your spare time?

03:45:39   12  A.  So both kids play soccer, so most of our time is spent

03:45:45   13  traveling to soccer tournaments and soccer games.

03:45:48   14  Q.  Where are you currently employed?

03:45:49   15  A.  I work for Wells Fargo.

03:45:50   16  Q.  What is your title?

03:45:51   17  A.  I'm a senior vice president of digital payments.

03:45:55   18  Q.  Will you please tell the jury a little bit about your

03:45:58   19  education?

03:45:58   20  A.  Yes.  I have my Bachelor's in political science from

03:46:18   21  Columbia University, I also attended the University of

03:46:18   22  Pennsylvania the Wharton School of Business and received my

03:46:18   23  MBA in new business development.  I also received my

03:46:20   24  master's in international business from the Lauder

03:46:23   25  Institute of the University of Pennsylvania in 1996.

03:46:26  1   Q.  After you finished graduate school, what did you do

03:46:29  2   next?

03:46:29  3   A.  I moved to California and I worked in the technology

03:46:34  4   sector.

03:46:34  5   Q.  Will you please describe for the jury the kinds of jobs

03:46:37  6   that you had in the technology sector when you moved to

03:46:41  7   California?

03:46:41  8   A.  Yes.  My first job was at Hewlett-Packard.  After that,

03:46:45  9   I worked for Charles Schwab in their online banking group.

03:46:49  10  Next I joined a start-up company called People PC that did

03:46:55  11  Internet services.  And after that, I worked for a company

03:46:58  12  called Vividence, another start-up that did web-based

03:47:03  13  research.

03:47:03  14  Q.  Generally, how would you describe what you did at those

03:47:06  15  technology companies?

03:47:07  16  A.  Generally, I describe it as online product management.

03:47:12  17  Q.  What do you mean by online product management?

03:47:15  18  A.  So online product management is responsible for

03:47:19  19  creating and managing online experiences.  At Charles

03:47:26  20  Schwab, it was an online bill payment product that I worked

03:47:29  21  on, and at People PC it was Internet services.

03:47:32  22  Q.  When did you join Wells Fargo?

03:47:34  23  A.  I joined Wells Fargo in December 2005.

03:47:37  24  Q.  In your nearly 14 years with Wells Fargo, have you

03:47:41  25  always -- actually let me ask you this.  What group do you

03:47:44   1   work in at Wells Fargo?

03:47:46   2   A.  I work in the digital group.

03:47:48   3   Q.  And in your nearly 14 years at Wells Fargo, have you

03:47:51   4   always worked in the digital group?

03:47:53   5   A.  Yes, I have.

03:47:54   6   Q.  What is the digital group?

03:47:56   7   A.  So the digital group is responsible for the online

03:48:01   8   banking and mobile banking services.  We provide these

03:48:06   9   services to individuals, consumers, and small businesses.

03:48:09   10  Q.  What are online banking services?

03:48:12   11  A.  Online banking services are one way that our customers

03:48:16   12  can access Wells Fargo's banking services using computers

03:48:23   13  instead of going to a branch or an ATM.

03:48:25   14  Q.  When did Wells Fargo first offer online banking

03:48:29   15  services?

03:48:30   16  A.  So Wells Fargo was the first bank to offer online

03:48:33   17  banking services in 1995.  In the beginning, you could just

03:48:37   18  look at your balances and look at your account activity,

03:48:41   19  but over time, we added more functionality, like

03:48:44   20  transferring money between your accounts, as well as

03:48:48   21  creating recurring online bill payments and more.

03:48:51   22  Q.  Will you please describe for us what we're seeing here

03:48:54   23  on the monitor?

03:48:55   24  A.  Yes.  This is an advertisement from when Wells Fargo

03:49:00   25  first launched its online banking services.

03:49:02  1  Q.  In your career at Wells Fargo, have you worked on any

03:49:06  2  online banking services?

03:49:07  3  A.  Yes, I have.

03:49:08  4  Q.  Will you please describe for the jury what some of

03:49:10  5  those services are?

03:49:11  6  A.  Yeah.  I have -- initially when I started at Wells

03:49:17  7  Fargo, I worked to make account statements online.  So

03:49:21  8  instead of getting the paper statements in the mail, you

03:49:24  9  could view them online.

03:49:26  10        After that, I worked on Wells Fargo's online tax

03:49:30  11  payment service for small business customers, and I also

03:49:35  12  worked on a product called desktop deposit for small

03:49:41  13  business customers.

03:49:42  14  Q.  What was desktop deposit?

03:49:44  15  A.  So desktop deposit was a remote deposit capture service

03:49:50  16  that allowed small business customers to deposit checks

03:49:52  17  from their home or business using a check scanner.  And

03:49:57  18  they could do this instead of visiting a branch or an ATM

03:50:00  19  to make their deposits.

03:50:02  20  Q.  When was desktop deposit available to Wells Fargo's

03:50:06  21  customers?

03:50:08  22  A.  So I don't recall specifically, but we were in the

03:50:11  23  final stage of rolling out when I joined the desktop

03:50:14  24  deposit team in October of 2008.

03:50:17  25  Q.  You mentioned mobile banking services.  What are mobile

03:50:21  1  banking services?

03:50:22  2  A.  So mobile banking services are another way that our

03:50:27  3  customers can access Wells Fargo's banking services using

03:50:31  4  their mobile phones.  And, again, this is instead of

03:50:36  5  visiting a branch or an ATM.

03:50:37  6  Q.  When did Wells Fargo first offer mobile banking

03:50:43  7  services?

03:50:43  8  A.  Wells Fargo first offered mobile banking services in

03:50:47  9  2007.

03:50:47  10  Q.  Were you here for Mr. Melsheimer's opening statement?

03:50:50  11  A.  Yes, I was.

03:50:51  12  Q.  And did you see the timeline that he used?

03:50:54  13  A.  Yes, I did.

03:50:55  14  Q.  Do you remember seeing that 2007 date on his timeline?

03:50:58  15  A.  I do.

03:50:59  16  Q.  Will you describe for us what we're seeing here on the

03:51:01  17  monitor?

03:51:02  18  A.  Yes.  This is an advertisement from when Wells Fargo

03:51:07  19  first launched its mobile banking services in 2007.  As you

03:51:11  20  could see, the customer is holding a flip phone, which was

03:51:15  21  popular at the time, the mobile banking services were

03:51:18  22  available on flip phones and BlackBerry phones.

03:51:22  23  Q.  During your career at Wells Fargo, have you worked on

03:51:25  24  any mobile banking services?

03:51:26  25  A.  I have.

03:51:27  1  Q.  Will you please tell the jury what some of those

03:51:29  2  services are?

03:51:30  3  A.  Well, I manage -- or my team and I manage the transfers

03:51:38  4  service that is available on mobile banking, wires, mobile

03:51:44  5  deposits, and the ability to make payments to your Wells

03:51:48  6  Fargo credit and loan accounts.

03:51:50  7  Q.  Have your responsibilities included the development of

03:51:55  8  software or source code?

03:51:57  9  A.  No, they do not.  We're on the business side.

03:52:00  10  Q.  And as of today, do you have responsibility for mobile

03:52:04  11  deposit?

03:52:05  12  A.  Yes, I do.

03:52:06  13  Q.  When did Wells Fargo first offer mobile deposit?

03:52:12  14  A.  Wells Fargo first offered mobile deposit in 2012.  We

03:52:16  15  started with a pilot roll-out.

03:52:20  16  Q.  Did Wells Fargo develop mobile deposit or did it get

03:52:25  17  that technology from another company?

03:52:27  18  A.  Wells Fargo purchased the mobile deposit software from

03:52:32  19  Mitek, an outside vendor.

03:52:34  20  Q.  At that time, how did Wells Fargo's customers access

03:52:39  21  mobile deposit?

03:52:40  22  A.  At that time, our customers used the mobile app, which

03:52:46  23  they downloaded from the App Store, and then from the

03:52:51  24  mobile app, they could make their mobile deposits.

03:52:53  25  Q.  Did the mobile app exist before mobile deposit?

03:52:57  1   A.  Yes, it did.  It was -- it was around probably for

03:53:01  2   three years before mobile deposits was launched.

03:53:04  3   Q.  Now, did Wells Fargo get any software or source code

03:53:08  4   from USAA for its mobile app?

03:53:10  5   A.  No, it did not.

03:53:12  6   Q.  At the time Wells Fargo first offered mobile deposit,

03:53:16  7   what was the form of capture for the service?

03:53:19  8   A.  When we first launched mobile deposit, we had manual

03:53:24  9   capture, so the customer took the picture by pressing the

03:53:29  10  button on the phone themselves.

03:53:30  11  Q.  Now, you mentioned earlier that in 2012, Wells Fargo

03:53:35  12  did a pilot.  What did you mean by that?

03:53:37  13  A.  So it's typical when we're rolling out new services

03:53:43  14  online to start with a smaller population of customers to

03:53:46  15  make sure everything is working.  So that was what we do.

03:53:51  16  We started with a smaller group of customers.

03:53:54  17  Q.  Did Wells Fargo record the results of the limited

03:53:59  18  roll-out in 2012?

03:54:00  19  A.  Yes, we did.

03:54:01  20  Q.  And did Wells Fargo report those results internally?

03:54:06  21  A.  Yes, we did.

03:54:08  22       MS. WILLIAMS:  May I have PX-329, please?

03:54:13  23  Q.  (By Ms. Williams)  Is this an example of the results as

03:54:15  24  they were reported?

03:54:16  25  A.  Yes, this is.

03:54:17  1  Q.  And do you remember whether Mr. Weinstein talked about

03:54:19  2  this document during his -- during his testimony?

03:54:24  3  A.  Yes, I do.

03:54:36  4      MS. WILLIAMS:  May we go to PX-329.2, please?

03:54:47  5  Q.  (By Ms. Williams)  Do you remember -- so we're looking

03:54:50  6  at part of this results of the pilot report-out.  Do you --

03:54:56  7  how many customers used mobile deposit in that early pilot

03:55:02  8  stage?

03:55:02  9  A.  So about 160,000 customers used mobile deposit during

03:55:06  10 the pilot.

03:55:07  11 Q.  And how many deposits were made during that pilot?

03:55:11  12 A.  Those customers made about 420,000 deposits during the

03:55:17  13 pilot.

03:55:18  14 Q.  How did Wells Fargo view the results of this pilot?

03:55:21  15 A.  We saw it as a very successful pilot.

03:55:25  16 Q.  And why is that?

03:55:26  17 A.  Because, as you could see here, we -- the transaction

03:55:31  18 volume was exceeding the forecast, and -- and we had some

03:55:36  19 other metrics or other research that we were doing as well

03:55:41  20 that was very positive.

03:55:43  21 Q.  For this pilot, was this manual capture?

03:55:48  22 A.  Yes.  This pilot was a manual capture pilot.  We did

03:55:54  23 not have auto capture.

03:55:54  24 Q.  Do you see on this slide where it says:  Image scan

03:55:58  25 success rate 76 percent?

03:56:00    1    A.   I do.

03:56:00    2    Q.   What does that mean?

03:56:02    3    A.   So that means that 76 percent of the time when

03:56:08    4    customers were submitting their deposits -- excuse me, when

03:56:14    5    they were capturing the images, that 76 percent of the time

03:56:21    6    the image was captured successfully.

03:56:23    7    Q.   I thought you just told us that Wells Fargo viewed this

03:56:27    8    initial pilot as successful.  So are you telling us that 76

03:56:30    9    percent success rate is successful?

03:56:34   10    A.   Yes, yes.

03:56:36   11    Q.   Why is that?

03:56:38   12    A.   Well, as part of the pilot, we did follow-up research

03:56:44   13    with our customers, and we also looked at how much they

03:56:49   14    deposited.  The feedback from customers was very positive.

03:56:53   15    The satisfaction was very high.

03:56:56   16           And also, when we looked at their behavior, we saw

03:57:00   17    that customers not only used the functionality once, but

03:57:03   18    they continued to use it more and more.

03:57:04   19    Q.   Based on the results of this pilot, what did Wells

03:57:08   20    Fargo do next?

03:57:08   21    A.   We made the decision to move forward with the full

03:57:17   22    roll-out.

03:57:18   23    Q.   And the full roll-out, was that with manual capture?

03:57:21   24    A.   Yes, that's correct.  It was -- we fully rolled out

03:57:24   25    with manual capture.

| | | |
|---|---|---|
| 03:57:25 | 1 | Q.  Did there come a time when Wells Fargo added auto |
| 03:57:29 | 2 | capture to mobile deposit? |
| 03:57:34 | 3 | A.  Yes. |
| 03:57:34 | 4 | Q.  When was that? |
| 03:57:34 | 5 | A.  We -- we added auto capture in 2014. |
| 03:57:39 | 6 | Q.  How did Wells Fargo add its version of auto capture to |
| 03:57:44 | 7 | mobile deposit? |
| 03:57:45 | 8 | A.  Well, as I mentioned before, we were working with Mitek |
| 03:57:50 | 9 | and getting their software for mobile deposits, and so we |
| 03:57:54 | 10 | just added the auto capture feature within Mitek called |
| 03:57:59 | 11 | MiSnap. |
| 03:58:03 | 12 | MS. WILLIAMS:  Your Honor, may I approach you -- |
| 03:58:05 | 13 | the bench? |
| 03:58:06 | 14 | THE COURT:  Approach the bench?  You may. |
| 03:58:09 | 15 | MS. WILLIAMS:  Yes, Your Honor. |
| 03:58:15 | 16 | (Bench conference.) |
| 03:58:16 | 17 | MS. WILLIAMS:  Your Honor -- |
| 03:58:17 | 18 | THE COURT:  Just a moment. |
| 03:58:18 | 19 | MS. WILLIAMS:  Yes, Your Honor. |
| 03:58:20 | 20 | THE COURT:  Get the entire committee up here.  Go |
| 03:58:23 | 21 | ahead, Ms. Williams. |
| 03:58:24 | 22 | MS. WILLIAMS:  Yes, Your Honor.  I have two |
| 03:58:25 | 23 | things. |
| 03:58:25 | 24 | I would like to ask this witness what they paid |
| 03:58:27 | 25 | for the additional auto capture feature from Mitek, and she |

03:58:31   1   will say that they did not pay anything other than what

03:58:37   2   they had already paid for -- to Mitek for mobile deposit.

03:58:39   3        MS. GLASSER:  Your Honor, this has been

03:58:41   4   specifically excluded.  This was one of the non-comparable

03:58:46   5   agreements.

03:58:47   6        THE COURT:  That's correct.  That objection --

03:58:49   7   that request is overruled.

03:58:51   8        MS. WILLIAMS:  Your Honor, while we're up here,

03:58:53   9   this is the witness that I'm going to ask about the

03:58:55  10   customer comments in the reviews that we discussed.  Your

03:59:00  11   Honor said that it was okay for -- you allowed us to go

03:59:03  12   into this testimony, but I needed to approach before I

03:59:05  13   asked any questions about it.

03:59:07  14        I'm going to ask her whether she looks at reviews

03:59:13  15   and readings as part of her normal -- normal business

03:59:16  16   responsibilities.  She's going to testify that she does.

03:59:19  17        She's going to give an overview of the comments

03:59:24  18   that she was seeing -- that she saw, complaints by

03:59:28  19   customers about the delay with auto capture and their

03:59:31  20   request to have the opportunity to have the manual option.

03:59:34  21   She's not going to quote any of the comments directly.  She

03:59:38  22   will just -- just generally describe -- describe what she

03:59:43  23   saw, what the trend was, and how it impacted her

03:59:46  24   decision-making.

03:59:47  25        So I just wanted to raise that for Your Honor.

03:59:51  1  Under the Court's instruction at the pre-trial conference,

03:59:53  2  you were -- you would allow us to go into it but not quote

03:59:56  3  the --

03:59:56  4          THE COURT:  These are the customer comments that

03:59:59  5  were characterized by Plaintiff as being cherry picked so

04:00:04  6  that they were all negative?

04:00:05  7          MS. GLASSER:  I think we don't object as long as

04:00:08  8  it's the one question and at a very high level that that's,

04:00:11  9  you know, why they reintroduced the manual option.  If it's

04:00:15  10  just the one Q&A, I think we would not --

04:00:17  11          THE COURT:  We're certainly not going to go into

04:00:20  12  specific comments from specific customers.

04:00:21  13          MS. WILLIAMS:  No, Your Honor.  And it is not

04:00:23  14  the -- it's not the -- she will not be addressing the

04:00:27  15  exhibit that she brought to her deposition, which is the

04:00:29  16  specific complaint that Plaintiff had, but will be

04:00:33  17  addressing the broader context of just generally receiving

04:00:36  18  and reviewing reviews and ratings from those apps from the

04:00:41  19  App Store.  So it will not be any of the specific comments

04:00:43  20  at all.

04:00:44  21          THE COURT:  All right.

04:00:45  22          MS. GLASSER:  Your Honor, I have a little bit of a

04:00:46  23  concern, though, that it's going to go into depth, in which

04:00:51  24  case we don't have an ability really to cross-examine.  If

04:00:54  25  it's just one Q&A, it seems like not an issue.  But if

04:00:58   1   there's some sort of a detailed description of the

04:01:01   2   comments, then there is an issue.

04:01:03   3           THE COURT:  She -- she can testify at a high level

04:01:05   4   about her overviewing of customer comments from the app at

04:01:12   5   a very high level.  And then without objection, I don't see

04:01:17   6   a problem with one question and one answer before you get

04:01:21   7   into the change from manual to auto capture.

04:01:24   8           MS. WILLIAMS:  Yes, Your Honor.  Thank you.

04:01:25   9           THE COURT:  Is that clear?

04:01:27   10          MS. GLASSER:  Thank you, Your Honor.

04:01:28   11          THE COURT:  All right.

04:01:29   12          (Bench conference concluded.)

04:01:41   13          THE COURT:  Let's proceed.

04:01:42   14          MS. WILLIAMS:  Thank you, Your Honor.

04:01:44   15  Q.  (By Ms. Williams)  When Wells Fargo added auto capture

04:01:47   16  in 2014, did Wells Fargo stop offering manual capture?

04:01:50   17  A.  Could you ask your question one more time, please?

04:01:53   18  Q.  Yes.  When Wells Fargo added auto capture, did Wells

04:01:56   19  Fargo stop offering manual capture?

04:01:57   20  A.  So when we added auto capture in 2014, we stopped

04:02:04   21  offering that original version of manual capture that we

04:02:07   22  had before, but we continued to offer a different -- well,

04:02:15   23  we -- but we started offering a different form of manual

04:02:18   24  capture.

04:02:18   25  Q.  Will you please describe for us what that different

04:02:20   1   form of manual capture was?

04:02:22   2   A.   Yes.   So we made auto capture the default.   So when the

04:02:30   3   customer started using mobile deposit, auto capture would

04:02:34   4   try to take the picture, but if it wasn't successful, then

04:02:40   5   the customer would be given the option to take the picture

04:02:44   6   manually after auto capture failed.

04:02:48   7   Q.   When you gained responsibility for mobile deposit, what

04:02:54   8   was your primary task for the service?

04:02:56   9   A.   So as with my other services and online and mobile

04:03:01  10   banking, my primary focus is on customer satisfaction and

04:03:05  11   creating excellent customer experiences.

04:03:08  12   Q.   How do you evaluate customer satisfaction in connection

04:03:12  13   with mobile deposit?

04:03:13  14   A.   So with mobile deposit, we evaluate satisfaction in two

04:03:19  15   ways.   First off, we survey customers on -- the bank runs

04:03:27  16   different surveys, but we also look specifically at

04:03:31  17   customers' feedback in the app stores.

04:03:34  18   Q.   What do you mean by customer feedback in the app

04:03:36  19   stores?

04:03:37  20   A.   So customers have the opportunity to write reviews and

04:03:45  21   rate apps in the app stores from Google and Apple and

04:03:53  22   Amazon.

04:03:53  23   Q.   How -- how do customers have -- or let me ask it this

04:03:58  24   way.

04:03:59  25           What's the rating scale?

| | | |
|---|---|---|
| 04:04:00 | 1 | A.  So the rating scale is from 1 to 5 with 1 being the |
| 04:04:05 | 2 | lowest rating, the worst. |
| 04:04:08 | 3 | Q.  Do you ever use these reviews and ratings in connection |
| 04:04:12 | 4 | with your responsibilities with mobile deposit? |
| 04:04:15 | 5 | A.  Yes, I do. |
| 04:04:16 | 6 | Q.  Have you looked personally at these reviews and ratings |
| 04:04:19 | 7 | in connection with mobile deposit? |
| 04:04:21 | 8 | A.  Yes, I have. |
| 04:04:22 | 9 | Q.  Do you rely on these reviews and ratings in making |
| 04:04:27 | 10 | recommendations for changes and developments in mobile |
| 04:04:31 | 11 | deposit? |
| 04:04:31 | 12 | A.  Yes, I do. |
| 04:04:32 | 13 | Q.  Does your review or analysis of these customer ratings |
| 04:04:36 | 14 | or reviews require any scientific or special training? |
| 04:04:41 | 15 | A.  No, it does not. |
| 04:04:41 | 16 | Q.  And would discussing these customer reviews help you |
| 04:04:44 | 17 | explain your testimony to the jury about any changes or |
| 04:04:47 | 18 | revisions that you recommended for mobile deposit? |
| 04:04:49 | 19 | A.  Yes, I believe so. |
| 04:04:50 | 20 | Q.  How often do you look at customer ratings and reviews |
| 04:04:53 | 21 | in connection with mobile deposit? |
| 04:04:54 | 22 | A.  So I look at the reviews on a weekly basis on mobile |
| 04:05:00 | 23 | deposit. |
| 04:05:00 | 24 | Q.  Excuse me. |
| 04:05:02 | 25 | When you're looking at the reviews and ratings, |

04:05:05  1   what are you looking for?

04:05:07  2   A.   So I'm -- I'm really looking for complaints about our

04:05:13  3   mobile deposit service, looking to see if I'm getting -- if

04:05:17  4   we're getting a lot of complaints about a specific issue.

04:05:22  5   Also, we'll be looking to see if we're -- have seen any

04:05:27  6   trends or improvements.

04:05:29  7   Q.   What do you do with the information that you learned

04:05:32  8   from these ratings and reviews from the app stores?

04:05:38  9   A.   Well, I think we use this information to make our

04:05:42  10  products better based on the customer feedback.

04:05:45  11  Q.   Will you please give the jury an -- an example of a

04:05:49  12  problem that you learned about through the ratings and

04:05:52  13  reviews that you ultimately addressed?

04:05:57  14  A.   Yes.  So in 2017, we were getting a lot of negative

04:06:04  15  customer reviews.  They felt that mobile deposit was taking

04:06:08  16  too long to capture the picture with auto capture, and they

04:06:13  17  wanted specifically to be able to take the picture

04:06:17  18  themselves.

04:06:18  19        So customers were asking for Wells Fargo to add

04:06:23  20  the ability to take the picture with the shutter button.

04:06:27  21  Q.   On the App Store's scale of 1 to 5 stars, what ratings

04:06:33  22  was Wells Fargo getting with mobile deposit?

04:06:35  23        MS. GLASSER:  Objection, Your Honor.  This is

04:06:37  24  going beyond the one question that was going to be asked.

04:06:40  25        THE COURT:  I'll sustain that objection.

04:06:49   1   Q.   (By Ms. Williams)   Did Wells Fargo view these

04:06:51   2   complaints as a significant issue?

04:06:53   3   A.   Yes, we did.

04:06:55   4   Q.   And what did Wells Fargo do in response?

04:06:59   5   A.   So in response, we looked at whether it would be

04:07:06   6   technically possible to add the ability to -- to take the

04:07:13   7   picture manually.   And we also looked at whether there were

04:07:20   8   other banks in the industry offering manual capture.

04:07:26   9        We were very interested in -- in adding this

04:07:29   10  manual capture back, but we needed to do some analysis

04:07:32   11  first.

04:07:33   12  Q.   You mentioned other banks.   What did you learn about

04:07:38   13  other banks at the time that you were evaluating whether to

04:07:42   14  add manual capture?

04:07:43   15       MS. GLASSER:   May we approach, Your Honor?

04:07:44   16       THE COURT:   Approach the bench.

04:07:47   17       (Bench conference.)

04:07:49   18       THE COURT:   There's a motion in limine on other

04:07:52   19  banks.   What's -- why would you want to go into that?

04:07:55   20       MS. WILLIAMS:   Your Honor, this is information

04:07:58   21  that I believe has already been addressed, and it's not

04:08:02   22  necessarily -- it's not about other banks.   She's just

04:08:04   23  going to testify that she analyzed what Chase was doing,

04:08:07   24  and it's already been -- it's already in evidence that --

04:08:10   25  and that Chase was offering manual capture at the time that

04:08:15  1  they were evaluating this.  And also, during the time of

04:08:18  2  the hypothetical negotiation, Chase was offering manual

04:08:20  3  capture.

04:08:20  4       So from her perspective, it was someone -- a peer

04:08:25  5  bank of -- of similar size and reach who was offering

04:08:33  6  manual capture, and so that is part of her analysis and

04:08:35  7  whether to change -- make the recommendation to add this

04:08:38  8  functionality back -- functionally into the app.

04:08:41  9       THE COURT:  What's Plaintiff's response?

04:08:42  10       MS. GLASSER:  Couple of concerns.  One, the

04:08:44  11  question did not seem to be directed just to Chase, but

04:08:48  12  even if it is limited to Chase, it's the same issue about

04:08:52  13  introducing other banks into the discussion.

04:08:55  14       MS. WILLIAMS:  Your Honor, may I -- I didn't mean

04:08:57  15  to interrupt.

04:08:57  16       THE COURT:  That's okay.

04:08:58  17       MS. WILLIAMS:  May I say one more thing?

04:09:02  18       Your Honor, the Plaintiff brought in the Futurion

04:09:04  19  Report.  The Futurion Report has a list of 15 banks in it.

04:09:08  20  They're the ones that injected what the other banks are

04:09:10  21  doing.

04:09:10  22       This witness looked at -- considered other banks

04:09:13  23  when they were making this decision.  This information is

04:09:16  24  already out there.  So she is saying I knew that Chase was

04:09:19  25  using manual capture, and I used it to inform my decision

04:09:21  1  to make the recommendation to add manual capture back into

04:09:27  2  mobile deposit.

04:09:28  3        So -- so the fact of Chase and what Chase is doing

04:09:30  4  is already in evidence because the Plaintiffs brought it

04:09:32  5  into evidence, and we should be allowed to discuss how

04:09:38  6  Wells Fargo used that information in making it's decision

04:09:38  7  on what to do with its app.

04:09:40  8        MS. GLASSER:  A couple of things.  I think that

04:09:42  9  the Defendant is the only one who published to the jury the

04:09:45  10  actual list of all 15 banks in that Futurion Report.  So

04:09:48  11  that was not something that the Plaintiffs had opened the

04:09:52  12  door to.  But the other thing that actually just is a

04:09:56  13  separate issue here, I don't know what foundations this

04:09:59  14  witness would possibly have to talk about.  She's speaking

04:10:02  15  about this like it was herself personally.  She wasn't even

04:10:05  16  working in this division prior to this time.  She has

04:10:09  17  testimony submitted to Your Honor this morning.  She was

04:10:11  18  out of mobile deposit until May of 2017.

04:10:14  19        THE COURT:  I understand that but she's the

04:10:16  20  corporate representative of the Defendant.  And you can

04:10:19  21  certainly cross-examine her about when this happened and

04:10:21  22  when she joined this area and when she testified about that

04:10:25  23  earlier on direct, she wasn't even there.  You can do all

04:10:28  24  that on cross.  I'm not going to preclude her from talking

04:10:33  25  about it on behalf of the corporate entity.

04:10:35   1           MS. GLASSER:  I guess my concern is we have no

04:10:36   2   idea what she's going to say about these other banks.  She

04:10:39   3   certainly didn't speak to it at her deposition because she

04:10:43   4   said she wasn't there, she didn't know.

04:10:44   5           MS. WILLIAMS:  Your Honor, she's only going to

04:10:46   6   talk about Chase, first of all.  Second of all, with regard

04:10:48   7   to the Futurion Report, it's not just the excerpts that

04:10:51   8   we're showing to the jury on the monitors.  That exhibit is

04:10:53   9   in because the Plaintiffs introduced it, so it is there for

04:10:57  10   the jury if they call for it to be back there.

04:10:57  11           THE COURT:  I understand the Futurion Report is

04:10:58  12   what it is, Ms. Williams, but that being what it is, I

04:11:07  13   don't see any probative benefit to dwelling on other banks.

04:11:12  14   We have -- we have got to focus this case on Wells Fargo.

04:11:16  15   It's the only named bank as a Defendant in this case.

04:11:19  16           And the more we talk about other banks, the more

04:11:24  17   risk of confusion with the jury we have.

04:11:26  18           I'm -- I will allow you to elicit from her that

04:11:32  19   the decision to reintroduce manual capture was a

04:11:36  20   combination of the negative reports she got from these

04:11:41  21   sources, be it the App Store or whatever comments that

04:11:47  22   you've already established, and she did verify that a

04:11:50  23   competitor bank, i.e., Chase, was using manual capture.

04:11:54  24   That's the only area I'm going to allow you to go into, and

04:11:58  25   I'm going to limit it to just that brief inquiry as to that

04:12:02  1  one bank.

04:12:03  2      MS. WILLIAMS:  Your Honor, may I have a moment?

04:12:05  3      THE COURT:  Seems you need one.

04:12:10  4      MS. WILLIAMS:  That's exactly what I was going to

04:12:12  5  ask.

04:12:12  6      Your Honor, to make sure that I limit her

04:12:14  7  testimony, would it be okay if I led her through this?  I

04:12:18  8  want --

04:12:18  9      THE COURT:  Well, I can't preclude the Plaintiff

04:12:23  10  from lodging a leading objection, but I'm going to hold

04:12:29  11  your feet to the fire on the scope, I'm telling you, okay?

04:12:33  12      MS. WILLIAMS:  Yes, Your Honor.

04:12:33  13      MS. GLASSER:  For clarification if they're going

04:12:34  14  to bring up Chase we need to bring up Chase in one or two

04:12:38  15  questions on cross.

04:12:39  16      THE COURT:  Well, then you'll need to approach,

04:12:42  17  because I am not going to make it open season on other

04:12:45  18  banks.  And I have some hesitancy about allowing you this

04:12:48  19  latitude, Ms. Williams.

04:12:50  20      MS. WILLIAMS:  Yes, Your Honor.

04:12:50  21      THE COURT:  I'm going to expect you to hew to the

04:12:52  22  line I've drawn for you very closely.

04:12:55  23      MS. WILLIAMS:  Yes, Your Honor.

04:12:56  24      THE COURT:  All right.  Let's proceed.

04:12:59  25      (Bench conference concluded.)

04:13:06   1              THE COURT:  Let's proceed.

04:13:06   2              MS. WILLIAMS:  Thank you, Your Honor.

04:13:07   3    Q.  (By Ms. Williams)  Ms. Lockwood-Stein, you mentioned

04:13:22   4    looking at others in the industry -- industry.  What bank

04:13:27   5    did you look at -- excuse me, what other bank did you look

04:13:29   6    at in the industry?

04:13:30   7    A.  We looked at Chase.

04:13:33   8    Q.  Was Chase offering manual capture at the time?

04:13:36   9    A.  Yes, they were.

04:13:37  10    Q.  And when was this?

04:13:42  11    A.  We were -- it was in 2017.

04:13:47  12    Q.  Were you here for the testimony of USAA's witnesses

04:13:53  13    where they were discussing about whether manual capture

04:13:56  14    could perform at scale?

04:14:00  15    A.  Yes, I was.

04:14:01  16    Q.  And what is your understanding of performing at scale?

04:14:06  17    A.  So my understanding of performing at scale would be,

04:14:10  18    you know, being able to manage extremely large volumes,

04:14:16  19    like for a bank the size of Wells Fargo or Chase.

04:14:20  20    Q.  Do you -- do you -- or do you agree or disagree that

04:14:26  21    manual capture can be performed at scale?

04:14:29  22    A.  I would agree that it can be performed at scale.

04:14:34  23    Q.  Now, can you describe for the jury how Wells Fargo

04:14:40  24    changed its mobile deposit service in response to the

04:14:46  25    customer reviews and ratings?

04:14:48  1   A.   Yes.   So as I mentioned before, the default for auto

04:14:56  2   capture -- excuse me, the default for Wells Fargo at the

04:15:01  3   time was auto capture, and basically we added a button on

04:15:06  4   the side of the screen -- and here you can see it on the

04:15:10  5   screen there -- so that the customer would have the

04:15:14  6   opportunity to take the picture themselves manually while

04:15:20  7   waiting for auto capture if it was taking a long time.

04:15:24  8   Q.   Is there a specific time that auto capture is supposed

04:15:27  9   to run?

04:15:27  10  A.   Auto capture has a limit of 20 seconds in the Wells

04:15:33  11  Fargo app, and after that, it times out.   So it could take

04:15:37  12  a maximum of 20 seconds.

04:15:39  13  Q.   So in response to the customer reviews and ratings,

04:15:45  14  Wells Fargo added this button that we see here on the

04:15:48  15  screen?

04:15:49  16  A.   That's right.

04:15:50  17  Q.   And what happened -- what -- as a result of Wells

04:15:57  18  Fargo's adding this manual capture option, what, if

04:16:05  19  anything, did you notice in the ratings and reviews on the

04:16:08  20  App Store?

04:16:09  21  A.   Well, after we implemented the button, we found that

04:16:14  22  the negative reviews and ratings about the, you know, slow

04:16:20  23  auto capture and the requests for being able to take the

04:16:22  24  picture themselves went away, and our overall rating

04:16:28  25  improved.

04:16:32  1  Q.  Does Wells Fargo track image acceptance rates for this

04:16:37  2  new manual -- or new in 2017 manual feature?

04:16:42  3  A.  Yes, we do.

04:16:46  4       MS. WILLIAMS:  And may we have PX-31, please?

04:16:49  5  Q.  (By Ms. Williams)  Is this an example of the image

04:16:54  6  acceptance rates Wells Fargo tracks?

04:16:56  7  A.  Yes, this is.

04:16:57  8  Q.  Did we see this document last week with Mr. Calman?

04:17:01  9  A.  Yes, we did.

04:17:01  10  Q.  All right.  Let's talk about this document.

04:17:03  11       What is the date range for this document?

04:17:09  12  A.  This document has data from January 2017 through May

04:17:16  13  2019.

04:17:18  14  Q.  And Ms. Lockwood-Stein, I'll just let you know --

04:17:21  15  there's -- I know I've got this up on the screen, but

04:17:24  16  there's a binder up there for you and it's got Exhibit 31

04:17:29  17  in there if you'd like to see a paper copy instead of this

04:17:32  18  on the screen.

04:17:33  19  A.  Thank you.

04:17:33  20  Q.  I see a column with a heading on it that says:  OS

04:17:37  21  Type.  Do you see that?

04:17:38  22  A.  I do.

04:17:39  23  Q.  What does that refer to?

04:17:40  24  A.  So the OS refers to the type of phone that's being

04:17:44  25  used.  So OS stands for operating system.  iOS refers to

04:17:52   1   the Apple operating system.  Android refers to the Android

04:17:58   2   operating system for, like, Samsung phones.

04:18:01   3   Q.  Okay.  And then I see another column here with the

04:18:04   4   heading MiSnap Status.  Do you see that?

04:18:08   5   A.  I do.

04:18:08   6   Q.  And do you see MiSnap video?

04:18:13   7   A.  Yes.

04:18:13   8   Q.  What does MiSnap video refer to?

04:18:17   9   A.  So MiSnap video refers to the auto capture that Wells

04:18:22   10  Fargo does with Mitek's MiSnap.

04:18:25   11  Q.  Do you see MiSnap still on PX-31?

04:18:28   12  A.  Yes.

04:18:29   13  Q.  And what -- what is MiSnap still?

04:18:37   14  A.  So MiSnap still refers to the manual capture ability

04:18:41   15  that I talked about after the 20 second time-out, and then

04:18:46   16  the customer -- so if auto capture fails essentially, then

04:18:50   17  the customer can take the picture manually, that's --

04:18:59   18  that's MiSnap still.

04:18:59   19  Q.  And there's a third -- third one there in the MiSnap

04:19:06   20  column, MiSnap manual.  What is MiSnap manual?

04:19:09   21  A.  MiSnap manual refers to the new manual option that we

04:19:14   22  added in response to the negative customer feedback where

04:19:19   23  you can take the picture manually from the outset.

04:19:24   24  Q.  Were you here when Dr. Conte testified?

04:19:27   25  A.  Yes, I was.

04:19:31    1          MS. WILLIAMS:  May we pull up his testimony,

04:19:34    2    please?  Thank you.

04:19:35    3    Q.  (By Ms. Williams)  Do you remember Mr. Conte testifying

04:19:39    4    that -- excuse me, do you remember Dr. -- excuse me.

04:19:41    5          Do you remember Dr. Conte testifying that Wells

04:19:48    6    Fargo's auto capture had a 94 percent success rate?

04:19:53    7    A.  I do.

04:19:54    8    Q.  Do you agree or disagree with Mr. -- excuse me, with

04:19:58    9    Dr. Conte's testimony?

04:19:59   10    A.  I disagree.

04:20:01   11    Q.  And why do you disagree?

04:20:04   12    A.  Because if we look at the rates in the document that I

04:20:12   13    have on my binder here --

04:20:16   14          MS. WILLIAMS:  May we have Exhibit 31, please?

04:20:20   15          THE WITNESS:  Thank you.

04:20:21   16    A.  -- you could see that we've never hit 94 percent.

04:20:25   17    Q.  (By Ms. Williams)  What is the highest auto capture

04:20:34   18    image -- excuse me.  What is the highest success rate for

04:20:37   19    auto capture for Apple?

04:20:38   20    A.  So for iOS, that's the iOS video row here, and the

04:20:44   21    highest we've had is 90.91 percent, and the lowest is 81.24

04:20:56   22    percent.  I'll note both the success for -- these rates

04:20:59   23    vary month-to-month.

04:21:00   24    Q.  And is the same true for Android video?

04:21:03   25    A.  Yes.

04:21:03  1  Q.  And so what is the highest rate that we see on

04:21:06  2  Exhibit 31 for auto capture?

04:21:07  3  A.  For Android, it's 90.75.

04:21:11  4  Q.  And what is the lowest?

04:21:13  5  A.  It's 72.88 percent.

04:21:25  6  Q.  So for the time period covered in PX-31, is it fair to

04:21:29  7  say that the auto capture success rate has varied

04:21:32  8  month-to-month?

04:21:33  9  A.  Yes, that's true.

04:21:34  10  Q.  Have you ever seen it reach 94 percent?

04:21:37  11  A.  No, I have not.

04:21:39  12  Q.  Have you ever seen it reach above 90 percent?

04:21:41  13  A.  Above 90 percent?  Slightly above, 90.91 percent and

04:21:54  14  90.75 percent were the highest.

04:21:56  15  Q.  Now, let's look at the acceptance rates for MiSnap

04:22:01  16  still.  How would you describe the acceptance rate for

04:22:06  17  MiSnap still?

04:22:06  18  A.  So for MiSnap still, the iOS highest rates are 84.2

04:22:17  19  percent and the lowest are 61.56 percent.  Again, these

04:22:21  20  vary month-to-month.

04:22:23  21  Q.  And is the same true for Android still?

04:22:25  22  A.  Yes.

04:22:26  23  Q.  And what is the highest that -- that Wells Fargo saw

04:22:29  24  during this time period for Android still?

04:22:32  25  A.  It's 80.37 percent.

04:22:35  1  Q.  And what is the lowest?

04:22:36  2  A.  62.3 percent.

04:22:38  3  Q.  Now, we also have the acceptance rates for the third

04:22:43  4  option, manual.  What is the highest that we've seen for

04:22:48  5  iOS manual?

04:22:50  6  A.  The highest we've seen is 80.08 percent.

04:22:54  7  Q.  And what is the lowest?

04:22:56  8  A.  52.34 percent.

04:23:01  9  Q.  And what about for Android manual?

04:23:04  10  A.  81.46 perfect is the highest.

04:23:06  11  Q.  Is what number?

04:23:07  12  A.  Is the highest.

04:23:08  13  Q.  And what about for the lowest?

04:23:11  14  A.  It's 57.13 percent.

04:23:13  15  Q.  Do the acceptance rates that you've just reviewed for

04:23:21  16  still and manual surprise you?

04:23:23  17  A.  No, they do not.

04:23:26  18  Q.  Please tell the jury why they don't surprise you?

04:23:30  19  A.  Well, I would expect for the acceptance rates for still

04:23:33  20  and manual to be lower than auto capture because they

04:23:43  21  are -- when using Wells Fargo's versions of manual capture,

04:23:49  22  it's usually because there's something wrong with either

04:23:52  23  the environment, you know, it's too dark or the check

04:23:54  24  itself, maybe it's torn or folded.  And so those rates are

04:24:02  25  coming from behind.  If it's -- if the conditions are good,

04:24:08   1   the auto capture will happen very quickly and -- and take

04:24:12   2   the picture.

04:24:13   3   Q.  Can you give us some examples of -- of what you mean?

04:24:17   4   A.  Yeah.

04:24:18   5   Q.  And let's start with -- let's start with -- I think we

04:24:20   6   have an example of a check.

04:24:26   7   A.  So --

04:24:27   8   Q.  Will you -- will you describe for us what we're seeing

04:24:29   9   here?

04:24:30  10   A.  Yes.  So here is an example of a check where it's --

04:24:35  11   it's folded.  And if you can see on the bottom left, it's

04:24:41  12   torn.  And so this is a check where it would fail auto

04:24:48  13   capture and the customer could still take the picture

04:24:50  14   manually.

04:24:51  15   Q.  And when the customer took the picture manually, would

04:24:54  16   it -- would it fail or would it be accepted?

04:24:58  17   A.  It would fail.

04:25:00  18   Q.  And so are you -- are you saying that -- that it's the

04:25:05  19   capture method that caused this check to fail, or is it

04:25:08  20   something else?

04:25:09  21   A.  It's something else.  In this case, this check is the

04:25:13  22   cause for it failing.

04:25:14  23   Q.  And do you have another example for us?

04:25:16  24   A.  Yes.

04:25:18  25   Q.  All right.  Describe what we're seeing here.

04:25:21  1  A.  So on this check, it's a little hard to see, but if you

04:25:24  2  look at the signature line on the right, the "Y" is -- is

04:25:34  3  obstructing those special numbers on the bottom of the

04:25:36  4  check that are critical for success.  And so because the

04:25:43  5  signature got in the way of that, those numbers, this check

04:25:46  6  also failed, and it would have failed auto capture and the

04:25:50  7  customer could still have taken the picture manually.

04:25:53  8  Q.  And once the customer took the picture manually, would

04:25:57  9  the check still fail?

04:25:58  10  A.  Yes, it would.

04:26:00  11  Q.  And what caused this check to fail, the method of

04:26:06  12  capture or a problem with the check itself?

04:26:08  13  A.  It's a problem with the check itself.

04:26:11  14  Q.  Now, you have heard USAA's witnesses testify that --

04:26:18  15  or, excuse me, compare the MiSnap still and the MiSnap

04:26:22  16  manual image acceptance rates to the MiSnap video rates in

04:26:27  17  PX-31.  Is that a reliable comparison?

04:26:30  18  A.  No, I don't think so.

04:26:31  19  Q.  Why not?

04:26:34  20  A.  I -- I think these are different rates.  They're --

04:26:42  21  they're apples -- they're not apples-to-apples comparisons.

04:26:47  22  As I mentioned before with the manual capture options,

04:26:55  23  they're already starting from behind.  And so those rates

04:26:59  24  are always going to be or generally going to be lower.  So

04:27:02  25  I don't think that you can compare the two.

04:27:05   1   Q.  And so when you -- when you say that the manual -- the

04:27:09   2   checks that fall into the manual -- or the still population

04:27:15   3   are starting out from behind, what do you mean by that?

04:27:19   4   A.  What I mean is that there is likely something wrong

04:27:24   5   with either the conditions for taking the picture or the

04:27:28   6   check itself because if everything was good, then auto

04:27:35   7   capture would have taken the picture very quickly -- in

04:27:37   8   maybe a split second.

04:27:39   9   Q.  And unless the environment changes or unless something

04:27:44   10  miraculously changes with the check, those conditions are

04:27:49   11  not going to work for manual or for still?

04:27:54   12  A.  That's right.

04:27:58   13  Q.  Ms. Lockwood-Stein, do you agree or disagree that it

04:28:10   14  costs Wells Fargo less for customers to deposit checks by

04:28:16   15  mobile deposit versus an ATM or a teller?

04:28:19   16  A.  Could you say your question one more time, please?

04:28:22   17  Q.  Yes.  Do you -- do you agree or disagree that it costs

04:28:28   18  Wells Fargo less when customers deposit their checks by

04:28:33   19  mobile deposit versus ATM or teller?

04:28:36   20  A.  I would agree.

04:28:38   21  Q.  Were you here for Mr. Calman and Mr. Weinstein's

04:28:42   22  testimony about the cost to Wells Fargo when -- when a

04:28:46   23  mobile deposit doesn't work?

04:28:48   24  A.  Yes, I was.

04:28:48   25  Q.  And we have Mr. Weinstein's testimony.

04:28:54   1        Is this the testimony you recall from

04:28:56   2   Mr. Weinstein?

04:29:01   3   A.  I'm just reading it.

04:29:03   4        Yes.  Yes, it is.

04:29:05   5   Q.  Is Mr. Weinstein right or wrong?

04:29:09   6   A.  So I disagree with Mr. Weinstein's statements.

04:29:14   7   Q.  Will you please tell us why you disagree with

04:29:17   8   Mr. Weinstein's statement?

04:29:19   9   A.  Well, basically for Wells Fargo, when a customer is

04:29:26  10   using mobile deposit and they attempt to capture the image

04:29:33  11   and the image capture fails, then that deposit is blocked.

04:29:41  12   It never gets submitted for mobile deposit.

04:29:46  13        And so what Mr. Weinstein's testimony talks about

04:29:51  14   is that, you know, after the mobile deposit happens, there

04:29:57  15   will be all these operational processes that have to occur

04:30:02  16   like correcting account numbers, getting amounts correct,

04:30:05  17   and things like that, and there's a lot of manual work.

04:30:09  18        But with Wells Fargo's experience, if that image

04:30:14  19   capture fails, then that mobile deposit is never submitted

04:30:19  20   and -- and never goes through that transaction process.

04:30:22  21   Q.  So if a mobile deposit is not -- not successful,

04:30:27  22   there's no transaction?

04:30:29  23   A.  That's right.  Unless the customer, you know, takes it

04:30:34  24   to the branch or the ATM.

04:30:35  25   Q.  But that would be a different transaction?

04:30:36   1   A.   That would be a completely different transaction.

04:30:39   2   Q.   But what you're saying is if a customer tries to use

04:30:43   3   mobile deposit and mobile deposit does not work for them,

04:30:47   4   there is no transaction?

04:30:49   5   A.   That's correct.

04:30:49   6   Q.   And what can the customer do if -- if they are not able

04:30:55   7   to deposit their check by mobile deposit?

04:30:58   8   A.   If they can't deposit it using mobile deposits, then

04:31:02   9   they can take it to the branch or the ATM.

04:31:06   10          MS. WILLIAMS:   May I have PX-5, please?

04:31:19   11          Your Honor, may I approach the witness to give her

04:31:21   12   an exhibit, please?

04:31:22   13          THE COURT:   You may approach the witness, counsel.

04:31:32   14          THE WITNESS:   Thank you.

04:31:33   15   Q.   (By Ms. Williams)   Let's talk about the -- the Futurion

04:31:41   16   Report that we've heard so much about over the last several

04:31:43   17   days.

04:31:44   18          Before this case, had you heard of Futurion?

04:31:47   19   A.   Yes, I have.

04:31:52   20   Q.   All right.   And if we look at this 2017 Futurion Study,

04:31:58   21   PX-5, what is this study?

04:32:04   22   A.   So this is a study that is performed by

04:32:09   23   Futurion.   It's an industry analyst.   And it's a ranking of

04:32:18   24   mobile deposit.

04:32:19   25   Q.   And if we look on the cover and we -- and we see it

| | | |
|---|---|---|
| 04:32:23 | 1 | says:  Customer experience rankings for 15 top financial |
| 04:32:28 | 2 | institutions. |
| 04:32:29 | 3 |       Do you see that? |
| 04:32:30 | 4 | A.  I do. |
| 04:32:31 | 5 | Q.  Are there only 15 financial institutions that use |
| 04:32:35 | 6 | mobile deposit? |
| 04:32:35 | 7 | A.  No, there are not. |
| 04:32:37 | 8 | Q.  But there are only 15 described in this report, |
| 04:32:41 | 9 | correct? |
| 04:32:41 | 10 | A.  That's right. |
| 04:32:42 | 11 | Q.  And if we look -- if we look at Page 21 of PX-5 -- |
| 04:32:52 | 12 | A.  Yes. |
| 04:32:53 | 13 | Q.  -- does this table show us the -- the list of 15 banks |
| 04:32:59 | 14 | that are included in that ranking? |
| 04:33:00 | 15 | MS. GLASSER:  Objection, Your Honor.  This is the |
| 04:33:02 | 16 | area that we discussed at sidebar. |
| 04:33:08 | 17 | THE COURT:  Approach the bench, counsel. |
| 04:33:10 | 18 | (Bench conference.) |
| 04:33:20 | 19 | THE COURT:  The last time you ladies were here, we |
| 04:33:23 | 20 | talked about Chase as being a very targeted one bank |
| 04:33:27 | 21 | variation from focusing on the Defendant, Wells Fargo. |
| 04:33:30 | 22 | Where are we going now, Ms. Williams? |
| 04:33:34 | 23 | MS. WILLIAMS:  I just want to confirm with her |
| 04:33:37 | 24 | that there are only 15 banks in this report, and just |
| 04:33:39 | 25 | because you're 1 of 15 on this report doesn't mean that |

04:33:41  1   you're going to fail.

04:33:45  2        THE COURT:  How is this not an attempt to bring

04:33:48  3   other unrelated banks into the calculus?

04:33:52  4        MS. WILLIAMS:  Your Honor, Mr. Calman testified

04:33:53  5   that this report indicated that if you were -- that if you

04:33:56  6   were ranked low on this report, that that meant that you

04:33:59  7   were going to fail.  And it was going to be a critical

04:34:03  8   attack on your company if you did not have auto capture.

04:34:06  9        And what -- this report is a ranking of 15 banks,

04:34:10  10  and that is it.  It is not a -- it's not a ranking of the

04:34:15  11  entire industry's use -- all the people who use mobile

04:34:19  12  deposit.  It's just 15 banks that they took out -- that

04:34:21  13  they took.

04:34:22  14       So if you're 1 of 15, it doesn't mean that

04:34:25  15  you're -- that you're going to fail.  If you're 15 one year

04:34:27  16  and 6th the other year, it doesn't matter.  That's all that

04:34:31  17  I'm going to elicit from this witness.

04:34:33  18       THE COURT:  Well, I mean, my recollection of this

04:34:36  19  exhibit is it's the 15 largest banks in the country, more

04:34:40  20  or less.

04:34:41  21       MS. WILLIAMS:  That's not true, Your Honor.  I'll

04:34:42  22  be happy to show it to you.

04:34:42  23       THE COURT:  Just anecdotally, it looks like it.

04:34:47  24       MS. WILLIAMS:  Your Honor, it is -- it is not the

04:34:48  25  top 15 banks in the country.  It is -- it --

04:34:50   1          THE COURT:  Well, it's certainly not the First

04:34:52   2   State Bank of Waskom, Texas, or some little tiny small bank

04:34:57   3   in rural East Texas.

04:34:59   4          MS. WILLIAMS:  That is correct, but it is not the

04:35:00   5   list of top 15 banks.  I mean, Bank of Santander is not top

04:35:03   6   15.

04:35:04   7          MS. GLASSER:  I'm completely losing the gist of

04:35:07   8   what the alleged relevance of this is.  It seems clear to

04:35:10   9   me there is absolutely no other purpose other than just to

04:35:16  10   continually -- continually get the names in existence of

04:35:18  11   other banks using different mobile deposit systems into the

04:35:20  12   record in front of this jury.

04:35:22  13          MS. WILLIAMS:  Your Honor, they had a witness go

04:35:25  14   through this report, and we should be entitled to go

04:35:27  15   through this report, as well.

04:35:28  16          THE COURT:  Well, but they had an expert witness

04:35:32  17   who offered opinions.  Do you have an expert witness that's

04:35:36  18   going to offer countervailing opinions, or do you just have

04:35:41  19   a corporate representative that wants to wave other banks

04:35:41  20   in front of the jury?  That's my question.  I mean, let's

04:35:42  21   compare apples-to-apples, Ms. Williams.

04:35:45  22          MS. WILLIAMS:  Thank you, Your Honor.  The -- the

04:35:48  23   answer to your question is she's testified that she knows

04:35:52  24   about the Futurion Study, and she knew about it before this

04:35:54  25   case.  She should be able to identify at a minimum that it

04:35:58  1   is a listing of 15 banks.  It is not a rating of the entire

04:36:05  2   industry.

04:36:05  3          MS. GLASSER:  I believe it's already in the record

04:36:07  4   that it's a listing of 15 banks.  I don't think this

04:36:11  5   witness has any foundation whether -- on behalf of all of

04:36:15  6   Wells Fargo or otherwise to be speculating about this, even

04:36:18  7   leaving aside the relevance of this --

04:36:22  8          THE COURT:  All right.  Let's bring this to a

04:36:24  9   close.

04:36:24  10          MS. WILLIAMS:  Yes, Your Honor.

04:36:25  11          THE COURT:  I'm not going to allow her to publish

04:36:27  12   all 15 of these banks simply to put them in front of the

04:36:30  13   jury as a corporate representative and not an expert

04:36:34  14   witness that's going to offer any countervailing analysis

04:36:39  15   as to how this was used in the Plaintiff's case-in-chief.

04:36:41  16          MS. WILLIAMS:  Yes, Your Honor.

04:36:43  17          THE COURT:  You've established that this report

04:36:44  18   covers only 15 banks.

04:36:46  19          MS. WILLIAMS:  Okay.  Yes, Your Honor.

04:36:47  20          THE COURT:  You need to move on.

04:36:49  21          MS. WILLIAMS:  Yes, Your Honor.

04:36:50  22          (Bench conference concluded.)

04:36:51  23          THE COURT:  Let's proceed.

04:37:04  24          MS. WILLIAMS:  Yes, Your Honor.

04:37:11  25   Q.  (By Ms. Williams)  Ms. Lockwood-Stein, you've been

04:37:30    1    sitting in the courtroom all through trial; is that

04:37:33    2    correct?

04:37:33    3    A.  Yes, that's correct.

04:37:34    4    Q.  I'd like to go next into some of the documents and

04:37:38    5    testimony from -- from USAA and ask you about those.

04:37:42    6          MS. WILLIAMS:  All right.  Let's start with

04:37:50    7    PDX-1.13.

04:37:53    8    Q.  (By Ms. Williams)  Do you recall seeing this document

04:37:56    9    during USAA's opening statement?

04:37:57   10    A.  I do.

04:37:58   11    Q.  What is this document?

04:37:59   12    A.  So this document is from January 2011 when Wells Fargo

04:38:06   13    was evaluating the possibility of offering mobile deposits.

04:38:15   14    Q.  Does PX-7 say anything about USAA's version of auto

04:38:23   15    capture as described in the patent claims in this case?

04:38:24   16    A.  It does not.

04:38:27   17    Q.  Are you familiar with a gentleman by the name of Paul

04:38:30   18    Rosati?

04:38:31   19    A.  Yes, I am.

04:38:33   20    Q.  Who is Paul Rosati?

04:38:35   21    A.  Paul Rosati is actually the product manager for mobile

04:38:39   22    deposits that works on my team.

04:38:41   23    Q.  Were you present in the courtroom when his testimony

04:38:44   24    was played earlier today?

04:38:46   25    A.  I was.

04:38:47  1          MS. WILLIAMS:   Were you also -- if I may have

04:38:53  2   PDX-1.38?

04:38:55  3   Q.  (By Ms. Williams)   Is that part of the testimony that

04:38:57  4   was played?

04:38:57  5   A.  Yes.

04:39:02  6   Q.  Do you see that he's answering a question about whether

04:39:05  7   his group examined the user interfaces that USAA uses for

04:39:09  8   its mobile check deposit system?

04:39:11  9   A.  Yes, I see that.

04:39:12  10  Q.  And you see that he answered:   Specific to manual and

04:39:16  11  auto capture and specific to multiple check capture.   Do

04:39:19  12  you see that?

04:39:19  13  A.  Yes, I do.

04:39:20  14  Q.  Does Mr. -- does the fact that Mr. Rosati was looking

04:39:26  15  at user interfaces as part of his role surprise you?

04:39:29  16  A.  No, it does not at all.

04:39:30  17  Q.  Why not?

04:39:31  18  A.  As part of our typical product management process, we

04:39:39  19  will look at other banks and other companies, user

04:39:45  20  interfaces, their screens, their publicly available

04:39:50  21  screens, to, you know, look at other companies that are

04:39:53  22  doing similar work in the area.

04:39:56  23  Q.  What do you mean by publicly available?

04:39:57  24  A.  So what I mean in this case is looking at the mobile

04:40:06  25  app screenshots.   So just like any other customer would log

04:40:12   1   in and look at the screens on the mobile app, we would look

04:40:17   2   at the screens for different banks on their mobile apps.

04:40:20   3   Q.  If I had a Wells Fargo app on my phone and I went to

04:40:27   4   mobile deposit, could I take a screenshot of that?

04:40:32   5   A.  Yes, you could.

04:40:33   6   Q.  If I had USAA's mobile app on my phone and went to

04:40:38   7   mobile deposit, could I take a screenshot of that?

04:40:40   8   A.  Yes, you could.

04:40:40   9   Q.  Do you have to have a special subscription to have

04:40:44   10  access to that?

04:40:45   11  A.  Well, you'll need to be a customer of the bank, but you

04:40:48   12  don't need any kind of special access.

04:40:55   13         MS. WILLIAMS:  All right.  Let's move on to

04:40:59   14  PDX-1.39.

04:41:00   15  Q.  (By Ms. Williams)  Ms. Lockwood-Stein, do you recall

04:41:03   16  seeing this exhibit during Plaintiff's opening statement?

04:41:05   17  A.  I do.

04:41:05   18  Q.  What is this document?

04:41:07   19  A.  So this document is from 2014, and it's a project

04:41:15   20  status meeting minutes.

04:41:18   21  Q.  And do you see there's a bullet there that says:  Paul,

04:41:22   22  find screenshots from USAA mobile app?

04:41:24   23  A.  I do.

04:41:25   24  Q.  Who is Paul?

04:41:26   25  A.  This is, again, Paul Rosati.

04:41:30   1    Q.   And does it --

04:41:31   2    A.   Product manager for mobile deposits.

04:41:35   3    Q.   Excuse me, I didn't mean to interrupt you.

04:41:37   4    A.   I was slow.

04:41:38   5    Q.   Are you surprised that Paul Rosati would be looking for

04:41:42   6    screenshots from the USAA mobile app?

04:41:45   7    A.   No, I'm not, and as I mentioned before, it's part of

04:41:49   8    our normal product management process to take a look at the

04:41:53   9    screenshots for other banks.

04:41:55  10    Q.   And when you look at the screenshots for other banks,

04:41:57  11    is there anything that you can learn about the

04:42:01  12    functionality of auto capture from looking at screenshots?

04:42:06  13    A.   I don't think so, but I'm not a technical person.

04:42:10  14    Q.   To your knowledge, you've not been able to see anyone's

04:42:13  15    source code or -- or anyone's -- anyone's source code from

04:42:17  16    looking at a screenshot?

04:42:20  17    A.   That's correct.

04:42:24  18         MS. WILLIAMS:  All right.  Let's go to PDX-1.43.

04:42:29  19    Q.   (By Ms. Williams)  Do you recognize this slide from

04:42:31  20    USAA's opening?

04:42:33  21    A.   I do.

04:42:34  22    Q.   What is this?

04:42:35  23    A.   These are screenshots of the USAA mobile app.

04:42:44  24    Q.   Do you know who Monica Harvin is?

04:42:47  25    A.   I do.

04:42:48  1    Q.  Who is Monica Harvin?

04:42:52  2    A.  Monica Harvin is one of the user experience design

04:42:56  3    managers at Wells Fargo.

04:42:58  4    Q.  What is a user experience design -- what do you mean by

04:43:05  5    user experience design?

04:43:06  6    A.  It's basically someone who works on the screens

04:43:10  7    themselves and -- and the designs, you know, figuring out

04:43:14  8    how big should the font be, where should the buttons be on

04:43:17  9    the page, what color should we use.

04:43:21  10   Q.  Does it surprise you that Ms. Harvin would be looking

04:43:25  11   at screenshots?

04:43:26  12   A.  No, it does not.  Similar to the product team, the user

04:43:33  13   experience team will frequently look at screenshots from

04:43:35  14   other banks and companies.

04:43:37  15   Q.  So when you say other banks and companies, not just

04:43:40  16   USAA?

04:43:41  17   A.  Right.

04:43:42  18   Q.  So is this part of the general market research that you

04:43:45  19   and your team do?

04:43:46  20   A.  Yes, it is.

04:43:48  21   Q.  How -- now, you -- you've been working -- you have been

04:43:55  22   working in product management for nearly 26 years; is that

04:44:04  23   right?

04:44:04  24   A.  23, yeah.

04:44:05  25   Q.  Okay.  So 23 years.  In your 23 years, what kinds of

04:44:10    1   market research have you always done?

04:44:13    2   A.  Yes.  Certainly for online product management, we

04:44:19    3   always take a look at the publicly available information on

04:44:26    4   other companies' websites and look at their user experience

04:44:30    5   and look at screenshots.  So, yeah, and not just our

04:44:35    6   competitors, we'll also look at industry leaders, like

04:44:39    7   Amazon.

04:44:41    8   Q.  Any others?

04:44:43    9   A.  Sure.  We -- we absolutely look at Bank of America,

04:44:47   10   Chase.

04:44:48   11   Q.  Let me hold you right there.

04:44:49   12   A.  Excuse me, sorry.

04:44:50   13   Q.  I meant to ask you any other -- not your competitors

04:44:55   14   but companies other than your competitors that you

04:44:58   15   typically look at?

04:44:59   16   A.  Oh, okay.  Sure.  Amazon, Apple, PayPal would be some

04:45:07   17   examples.

04:45:12   18          MS. WILLIAMS:  All right.  May we go to PDX4.23?

04:45:18   19   Q.  (By Ms. Williams)  Now, this is a slide from

04:45:19   20   Mr. Weinstein's presentation.  Do you remember this?

04:45:21   21   A.  Yes, I do.

04:45:24   22   Q.  All right.  Do you see where it says that MRDC

04:45:26   23   customers are more profitable than other customers?

04:45:31   24   A.  I do.

04:45:33   25   Q.  Does this document relate to auto capture or USAA's

04:45:39    1   specific form of doing auto capture in any way?

04:45:42    2   A.  No, it does not.

04:45:45    3   Q.  How do you know that?

04:45:48    4   A.  This document is from that limited roll-out period that

04:45:53    5   I talked about before when we first rolled out mobile

04:45:58    6   deposits.

04:45:58    7   Q.  In May 2012?

04:46:00    8   A.  In May 2012.  And at that time, all we had was manual

04:46:05    9   capture.  So this is not related to auto capture at all.

04:46:09   10            MS. WILLIAMS:  And let's go to PDX4.24, also from

04:46:13   11   Mr. Weinstein's presentation?

04:46:19   12   Q.  (By Ms. Williams)  Do you remember this slide?

04:46:20   13   A.  I do.

04:46:21   14   Q.  Now, it says that deposits will increase by 20 percent

04:46:24   15   with MRDC.  Do you know if this document relates to auto

04:46:29   16   capture?

04:46:29   17   A.  It does not.

04:46:34   18   Q.  Does it relate to USAA's specific form of auto capture?

04:46:37   19   A.  It does not.

04:46:38   20   Q.  How -- how do you know that?

04:46:39   21   A.  This document is from November 2010, before Wells

04:46:45   22   Fargo -- it was when we were investigating the possibility

04:46:48   23   of mobile deposits, so we didn't even have mobile deposits

04:46:52   24   at the time, much less even know about auto capture.

04:47:00   25            MS. WILLIAMS:  Your Honor, may I have a moment?

04:47:02   1          THE COURT:  You may.

04:47:10   2          Approach the bench, counsel.

04:47:13   3          (Bench conference.)

04:47:24   4          THE COURT:  Ms. Glasser?

04:47:29   5          Let me say this, counsel, everybody in this trial

04:47:32   6   is whispering too loud.  I'm very concerned about what the

04:47:36   7   jury hears and doesn't hear.  I hear whispering at the

04:47:40   8   defense table, I see Mr. Sheasby getting up and going over

04:47:42   9   to opposing counsel and having an

04:47:48  10   around-the-shoulder-whispering-ear conference when there's

04:47:50  11   an examination going on.  That needs to stop, okay?

04:47:53  12   There's plenty of time for y'all to talk to each other

04:47:56  13   without doing it in the middle of the trial in front of the

04:47:58  14   jury.

04:47:58  15          MR. MELSHEIMER:  Can we address something, Your

04:48:00  16   Honor, with the Court right now that Mr. Sheasby --

04:48:01  17          THE COURT:  I gather this comes from the last

04:48:03  18   conference you and he had in the middle of the trial that I

04:48:05  19   just talked about.

04:48:05  20          MR. MELSHEIMER:  Initiated by him, Your Honor, but

04:48:07  21   yes --

04:48:07  22          THE COURT:  I saw what happened.  What's the

04:48:08  23   issue?

04:48:08  24          MR. SHEASBY:  Your Honor, that's my

04:48:11  25   responsibility.  Could we take a brief break after the

04:48:13  1    direct?

04:48:14  2            THE COURT:  I was planning to anyway.

04:48:15  3            MR. SHEASBY:  Thank you, Your Honor.

04:48:16  4            THE COURT:  It's been an hour and 45 minutes since

04:48:19  5    the jury came back in.

04:48:20  6            MR. SHEASBY:  Thank you, Your Honor.

04:48:21  7            THE COURT:  Are you about to pass the witness?

04:48:23  8            MS. WILLIAMS:  Yes, immediately, Your Honor.

04:48:24  9            THE COURT:  And what's your anticipated

04:48:26  10   cross-examination time?

04:48:28  11           MS. GLASSER:  Maybe about 40 minutes.

04:48:31  12           THE COURT:  All right.  I'll let you pass the

04:48:33  13   witness and then we'll recess.

04:48:38  14           (Bench conference concluded.)

04:48:38  15           THE COURT:  Let's proceed.

04:48:41  16           MS. WILLIAMS:  Your Honor, I pass the witness.

04:48:42  17           THE COURT:  All right.  Defendants have passed the

04:48:44  18   witness.

04:48:44  19           Before we proceed with the Plaintiff's

04:48:48  20   cross-examination of Ms. Lockwood-Stein, ladies and

04:48:50  21   gentlemen, we're going to take a short recess.  If you will

04:48:54  22   close and leave your notebooks in your chairs, follow all

04:48:57  23   the instructions I've given you, including not to discuss

04:49:00  24   the case among each other.  We'll have you back shortly to

04:49:03  25   continue.  The jury is excused for recess.

| | | |
|---|---|---|
| 04:49:06 | 1 | COURT SECURITY OFFICER:  All rise. |
| 04:49:07 | 2 | (Jury out.) |
| 04:49:08 | 3 | THE COURT:  The Court stands in recess. |
| 04:49:30 | 4 | COURT SECURITY OFFICER:  All rise. |
| 04:49:31 | 5 | (Recess.) |
| 05:22:02 | 6 | (Jury out.) |
| 05:22:03 | 7 | COURT SECURITY OFFICER:  All rise. |
| 05:22:04 | 8 | THE COURT:  Be seated, please. |
| 05:22:16 | 9 | You're prepared to go forward with |
| 05:22:32 | 10 | cross-examination of the witness, Ms. Glasser? |
| 05:22:34 | 11 | MS. GLASSER:  Yes, Your Honor. |
| 05:22:35 | 12 | THE COURT:  Let's bring in the jury, please. |
| 05:22:39 | 13 | COURT SECURITY OFFICER:  All rise. |
| 05:22:40 | 14 | (Jury in.) |
| 05:23:01 | 15 | THE COURT:  Please be seated. |
| 05:23:02 | 16 | At the time of the recess, the Defendant had |
| 05:23:09 | 17 | passed the witness from direct to cross-examination of |
| 05:23:14 | 18 | Ms. Lockwood-Stein.  We'll now proceed with the Plaintiff's |
| 05:23:17 | 19 | cross-examination of the witness. |
| 05:23:18 | 20 | Ms. Glasser, you may proceed. |
| 05:23:20 | 21 | MS. GLASSER:  Thank you, Your Honor.  May it |
| 05:23:20 | 22 | please the Court. |
| 05:23:20 | 23 | CROSS-EXAMINATION |
| 05:23:22 | 24 | BY MS. GLASSER: |
| 05:23:22 | 25 | Q.  I'd like to start off actually with one of your |

05:23:25  1   demonstratives to clear up something you said about

05:23:28  2   Dr. Conte.

05:23:31  3           MS. GLASSER:   Madam courtroom deputy, may we

05:23:35  4   please have the ELMO?

05:23:36  5   Q.  (By Ms. Glasser)  All right.  And this is the slide

05:23:41  6   that you were shown with your counsel during your direct

05:23:44  7   examination, correct?

05:23:44  8   A.  Yes, that's correct.

05:23:45  9   Q.  And you were, in fact, in the courtroom when Dr. Conte

05:23:49  10  gave his testimony, correct?

05:23:51  11  A.  Yes,  I was.

05:23:51  12  Q.  All right.  When we look at the slide, what Dr. Conte

05:23:55  13  is saying is that when you look at all of the checks that

05:23:58  14  come through the Wells Fargo deposit system, the mobile

05:24:02  15  deposit system, and you count them up, fewer than 6 percent

05:24:06  16  of the checks that actually get through came through the

05:24:09  17  manual channel, whereas the vast majority, 94 percent of

05:24:14  18  them that are successfully deposited, came through the auto

05:24:19  19  capture channel, correct?

05:24:20  20  A.  I haven't done the math on that.  It sounds like --

05:24:27  21  I -- I couldn't say one way or the other, I haven't done

05:24:30  22  the math.

05:24:31  23  Q.  But you understand that when your counsel characterized

05:24:36  24  Dr. Conte's testimony as being about the acceptance rate of

05:24:38  25  auto capture, that wasn't what he was saying at all, was

05:24:41  1   it?

05:24:41  2   A.  I'd like to just take a look at the document.

05:24:44  3   Q.  Sure.  It's right on -- on your screen right in front

05:24:47  4   of you.  And what Dr. Conte testified was that he averaged

05:24:53  5   the data, you see that, you see where he says:  I averaged

05:25:05  6   the data?

05:25:06  7   A.  I don't.  Where is that, sorry?

05:25:09  8   Q.  In the --

05:25:09  9   A.  Oh, when I averaged the data?

05:25:11  10  Q.  Yes.

05:25:12  11  A.  Thanks.  Yeah.

05:25:13  12  Q.  And what he says is:  It was only 6 percent of the

05:25:16  13  success of the checks use that manual feature.

05:25:18  14          Do you see that?

05:25:19  15  A.  I see that.

05:25:20  16  Q.  And you have absolutely no factual basis to dispute

05:25:24  17  that, fair statement?

05:25:25  18  A.  I disagree.  I haven't run the numbers.

05:25:30  19  Q.  As you sit here now, you are not able to offer the jury

05:25:34  20  any factual basis to disagree with Dr. Conte's calculation,

05:25:41  21  correct?

05:25:41  22  A.  I couldn't say one way or the other whether it's the --

05:25:47  23  whether it's actuals or not.  But I don't have any

05:25:51  24  evidence, that's correct.

05:25:52  25  Q.  Okay.  And you don't have any evidence at all about

05:25:55  1   whether the testimony that Dr. Conte gave that's set forth

05:25:59  2   on the slide is correct; is that fair?

05:26:01  3   A.   That's true.   I do not have evidence.

05:26:03  4   Q.   And so to the extent that what the ladies and gentlemen

05:26:07  5   of the jury heard from you or from the Wells Fargo counsel,

05:26:12  6   to the extent they understood you or Wells Fargo's counsel

05:26:15  7   to be saying that Dr. Conte said something incorrect, they

05:26:20  8   shouldn't take away that impression; am I right?

05:26:26  9   A.   Well, I -- again, I really couldn't say one way or the

05:26:28  10  other because I haven't run the numbers.

05:26:30  11  Q.   Thank you.

05:26:40  12           Now, you gave quite a bit of testimony about

05:26:43  13  things that happened at Wells Fargo relating to mobile

05:26:46  14  deposit during the time frame 2010 all the way up through

05:26:49  15  the present, correct?

05:26:50  16  A.   Yes.

05:26:54  17  Q.   And you used the word "we" or "I" a fair number of

05:26:58  18  times during the testimony; is that right?

05:27:01  19  A.   I don't recall, but probably true, yes.

05:27:03  20  Q.   But the reality is that you do not have any personal

05:27:09  21  knowledge at all of the Wells Fargo mobile deposit program

05:27:15  22  from the time frame mid-May 2010 all the way up through the

05:27:21  23  middle of 2017, correct?

05:27:24  24  A.   I would disagree with that.

05:27:26  25  Q.   Between May 2010 and May 2017, you had no role and no

05:27:33  1   exposure to mobile remote deposit capture at Wells Fargo,
05:27:39  2   correct?
05:27:39  3   A.  That's correct.
05:27:40  4   Q.  You also gave some testimony about how the system works
05:27:46  5   in terms of exactly when or how the mobile deposit
05:27:52  6   application would recognize certain types of checks.  Do
05:27:54  7   you recall that?  You had a torn check, and you had some
05:27:59  8   other examples.
05:28:01  9   A.  Yes, I recall that.
05:28:05  10  Q.  And you speculated a little bit about whether and to
05:28:08  11  what extent folks using the manual capture option would
05:28:11  12  have different types of checks coming in than those who
05:28:14  13  used the auto capture; is that right?
05:28:17  14  A.  I disagree with that.
05:28:19  15  Q.  In fact, you don't have any technical background or
05:28:26  16  technical involvement with the mobile deposit product,
05:28:31  17  correct?
05:28:31  18  A.  That's correct.
05:28:32  19  Q.  You also had no involvement at all whatsoever at Wells
05:28:48  20  Fargo with mobile deposit at the time that the auto capture
05:28:50  21  product was released in 2014, correct?
05:28:54  22  A.  Could you clarify your question for me?
05:28:57  23  Q.  You had no involvement whatsoever with the launch of
05:29:03  24  the auto capture Wells Fargo product in 2014, correct?
05:29:05  25  A.  That's correct.

05:29:07   1    Q.   And so any testimony that you gave earlier today where

05:29:11   2    you implied that you had knowledge about decision-making at

05:29:15   3    Wells Fargo regarding the launch of auto capture, none of

05:29:18   4    that was based on your own personal knowledge, correct?

05:29:22   5    A.   That's correct.   As the corporate representative, I

05:29:24   6    talked to others on the team to get that information.

05:29:27   7    Q.   Because you didn't personally have any involvement in

05:29:32   8    developing Wells Fargo's Mobile Deposit product, correct?

05:29:34   9    A.   No, I would disagree with that.

05:29:42   10   Q.   Could you turn in your binder to your deposition

05:29:45   11   transcript?   It should be right at the front.

05:29:48   12   A.   Sure.   May I clarify one question?   When -- when you

05:30:00   13   said developing, do you mean building it or investigating

05:30:05   14   it?

05:30:05   15   Q.   You didn't develop --

05:30:07   16           THE COURT:   Just -- just a minute.   Just a minute.

05:30:08   17   Ms. Lockwood-Stein, it's not the witness's place to ask the

05:30:13   18   lawyer questions.   It's the lawyer's place to ask the

05:30:15   19   witness questions.   And if you're asked a question you

05:30:16   20   don't understand, the proper response is:   I don't

05:30:18   21   understand the question.   But not to ask her specifically

05:30:21   22   how to clarify that for you, all right?

05:30:23   23           THE WITNESS:   Yes.   Thanks, Your Honor.

05:30:24   24           THE COURT:   All right.

05:30:25   25           THE WITNESS:   Thank you.

05:30:26    1            THE COURT:  Let's proceed on that basis.

05:30:28    2    Q.  (By Ms. Glasser)  Ms. Lockwood-Stein, you did not

05:30:30    3    develop Wells Fargo's Mobile Deposit product, correct?

05:30:33    4    A.  I don't understand the question.

05:30:35    5    Q.  Let's go ahead and turn in your binder to your

05:30:39    6    deposition transcript at Page 27, Lines 6 through 12.  And,

05:30:44    7    in particular, at the answer at Lines 10 through 12.

05:30:52    8            Do you recall having your deposition taken under

05:30:55    9    oath?

05:30:55   10    A.  I do.  What lines are --

05:31:06   11    Q.  Lines 10 through 12.  Do you see where you testified:

05:31:07   12    I didn't develop Wells Fargo's Mobile Deposit product?

05:31:10   13    A.  That's correct.

05:31:11   14    Q.  And was the testimony given at your deposition correct?

05:31:15   15    A.  Yes, it was.

05:31:16   16    Q.  In fact, you don't even know who it was at Wells Fargo

05:31:21   17    who designed the auto capture product, fair statement?

05:31:25   18    A.  That's correct.

05:31:27   19    Q.  And you also don't know who the executives were who

05:31:32   20    made the decision to approve the launch of the auto capture

05:31:35   21    product, correct?

05:31:36   22    A.  That's correct.

05:31:37   23    Q.  You haven't offered and you haven't done any analysis

05:31:41   24    for the jury of what the value to Wells Fargo is in

05:31:45   25    monetary terms on the USAA patents at issue, correct?

05:31:51  1   A.  Can I -- I don't quite understand the question.

05:31:55  2   Q.  You haven't done any analysis for the jury of the value

05:32:00  3   to Wells Fargo of the USAA patents, correct?

05:32:03  4   A.  That's right.  I have not done an analysis of the

05:32:08  5   value.

05:32:09  6   Q.  You also talked a little bit about what the failure and

05:32:15  7   acceptance rates were for the auto capture product.  Do you

05:32:18  8   recall that?

05:32:18  9   A.  Yes, I do.

05:32:22  10  Q.  And is it fair to say that you didn't do any

05:32:25  11  investigation and you have absolutely no information about

05:32:28  12  what those rates were prior to 2017?

05:32:39  13  A.  That's correct.

05:32:40  14  Q.  But you were in this case formally designated by Wells

05:32:50  15  Fargo for two purposes, correct?

05:32:51  16  A.  I don't understand your question.

05:32:56  17  Q.  The first one is Wells Fargo was required in this case

05:33:01  18  to produce to USAA for use in the proceedings its actual

05:33:07  19  data on the commercial importance of auto capture.  You

05:33:12  20  recall that?

05:33:12  21  A.  Yes.

05:33:13  22  Q.  And the way that Wells Fargo purported to satisfy that

05:33:22  23  obligation was producing you at a deposition with that

05:33:25  24  document, Exhibit 31 that we looked at earlier, correct?

05:33:27  25  A.  Which one was Exhibit 31?

05:33:30  1   Q.  You can look in your binder if you like.  It's the one

05:33:33  2   that your counsel showed you with the acceptance and

05:33:35  3   failure rates for the product.

05:33:38  4   A.  Yes, that's correct.

05:33:40  5   Q.  And so you were the person who Wells Fargo put forward

05:33:45  6   to satisfy its obligation to provide complete, accurate,

05:33:49  7   and truthful information about what those failure and

05:33:54  8   success rates were, correct?

05:33:55  9   A.  Yes, that's correct.

05:33:56  10  Q.  And the other role in this case that you have is you're

05:34:00  11  actually the only witness testifying as an employee of

05:34:05  12  Wells Fargo, correct?

05:34:07  13  A.  No, I would disagree with that.

05:34:11  14  Q.  You're the only live witness here in the courtroom

05:34:14  15  sitting here with us and with the ladies and gentlemen of

05:34:16  16  the jury, correct?

05:34:16  17  A.  Yes, that's correct.

05:34:29  18  Q.  And you have the understanding from sitting here in the

05:34:31  19  courtroom and hopefully from prior understanding, as well,

05:34:31  20  that this is a patent infringement case, correct?

05:34:32  21  A.  Yes.

05:34:33  22  Q.  You understand that it is a very, very significant

05:34:36  23  patent case.  It's important to USAA, fair statement?

05:34:40  24  A.  Yes.

05:34:41  25  Q.  And you understand that there's a significant amount of

| | | |
|---|---|---|
| 05:34:45 | 1 | money at stake in this case? |
| 05:34:46 | 2 | A.  I do. |
| 05:34:50 | 3 | Q.  Now, you've known about USAA's patent claims for quite |
| 05:34:55 | 4 | awhile, correct? |
| 05:34:56 | 5 | A.  Yes, for some time. |
| 05:35:00 | 6 | Q.  And, nonetheless, even though you're the Wells Fargo |
| 05:35:05 | 7 | corporate representative and the one who testified about |
| 05:35:09 | 8 | commercial importance and the only person who's here for |
| 05:35:12 | 9 | the jury in person, you've actually done no analysis at all |
| 05:35:16 | 10 | as to whether Wells Fargo's systems use USAA's technology, |
| 05:35:24 | 11 | correct? |
| 05:35:24 | 12 | A.  Me personally? |
| 05:35:26 | 13 | Q.  Yes. |
| 05:35:27 | 14 | A.  I have not. |
| 05:35:29 | 15 | Q.  And you're the only one here, correct -- the only one |
| 05:35:35 | 16 | who's here from Wells Fargo? |
| 05:35:36 | 17 | A.  Yes, that's correct. |
| 05:35:37 | 18 | Q.  So there won't be any other employee or any officer of |
| 05:35:40 | 19 | Wells Fargo here sitting in the jury box [sic] telling the |
| 05:35:43 | 20 | jury anything about whether or not Wells Fargo actually |
| 05:35:47 | 21 | uses the USAA patents, correct? |
| 05:35:50 | 22 | A.  That's correct. |
| 05:35:51 | 23 | THE COURT:  You mean sitting on the witness stand. |
| 05:35:53 | 24 | They won't be sitting in the jury box. |
| 05:35:55 | 25 | MS. GLASSER:  Oh, my goodness.  Yes, let's hope |

05:35:58  1  not.

05:35:59  2          THE COURT:  Okay.

05:36:00  3          MS. GLASSER:  I mean, you know never, but...

05:36:06  4  Q.  (By Ms. Glasser)  And you were here not in the box but

05:36:07  5  at the table with the Wells Fargo lawyers when

05:36:13  6  Mr. Weinstein gave his presentation on damages; is that

05:36:16  7  correct?

05:36:16  8  A.  Yes, that's correct.

05:36:17  9  Q.  And you have the understanding that the statute -- the

05:36:20  10  patent statute enacted by Congress, what it requires is

05:36:24  11  that when a company infringes upon a patent, they are

05:36:27  12  required to pay for that use, correct?

05:36:29  13  A.  Yes.

05:36:32  14  Q.  You heard the testimony from Mr. Weinstein that USAA

05:36:36  15  has calculated the total value of mobile remote deposit to

05:36:41  16  Wells Fargo during the damages period at close to a billion

05:36:44  17  dollars.  Do you recall that?

05:36:45  18  A.  Yes, I heard that.

05:36:46  19  Q.  And you recall that the amount actually being sought in

05:36:49  20  damages is just under 300 million, correct?

05:36:52  21  A.  Yes, I recall that.

05:36:57  22  Q.  And you're aware that Wells Fargo -- actually the very

05:36:59  23  next witness in the case, Wells Fargo will be putting on an

05:37:02  24  expert who will be presenting the opposite side of that.

05:37:04  25  He'll be arguing that Wells Fargo should pay only about $12

05:37:08   1   million; is that correct?

05:37:09   2   A.   Yes, that's correct.

05:37:13   3   Q.   And you yourself have done no analytics, no analysis

05:37:18   4   about which of those numbers is correct; is that a fair

05:37:22   5   statement?

05:37:22   6   A.   Yes, that's correct.

05:37:22   7   Q.   You have heard Mr. Weinstein, as well as your own

05:37:29   8   lawyers for Wells Fargo, say that for damages, we should be

05:37:35   9   imagining a hypothetical negotiation between Wells Fargo

05:37:37   10   and between USAA in roughly the 2015 time frame, correct?

05:37:42   11   A.   Yes, I heard that.

05:37:44   12   Q.   And the lawyer for Wells Fargo, he made a couple of

05:37:49   13   statements suggesting that Bank of America was the largest

05:37:53   14   bank in the United States.  Do you recall that?

05:37:55   15   A.   I don't recall that specifically, but, yeah.

05:38:00   16   Q.   Well, to be clear, when we're talking about the period

05:38:03   17   of the hypothetical negotiation, this roughly 2015 time

05:38:07   18   frame, it was actually Wells Fargo that was the very

05:38:13   19   largest bank literally in the history of the banking

05:38:18   20   industry, correct?

05:38:18   21   A.   I couldn't say one way or the other.

05:38:23   22   Q.   Well, let's go ahead -- you're here speaking on behalf

05:38:28   23   of all of Wells Fargo, correct?

05:38:29   24   A.   Yes, that's right.

05:38:30   25   Q.   Let's look in your binder at -- there should be a tab

05:38:34   1   labeled iX-0073, probably towards the back.

05:38:47   2   A.  Yes, I can see it.

05:38:49   3   Q.  And if you look at that document and you turn to

05:38:58   4   Page -- let's see here, Page 5.

05:39:03   5           MS. GLASSER:  Let's not publish it yet.

05:39:09   6   Q.  (By Ms. Glasser)  And I'll direct your attention to the

05:39:12   7   third full paragraph on the page, are you with me?

05:39:15   8   A.  Yes, I am.

05:39:15   9   Q.  Do you see at the bottom -- and by the way, this is an

05:39:18  10   actual official Wells Fargo & Company Shareholder/Analyst

05:39:22  11   Call transcript, correct?

05:39:27  12   A.  Yes, it is.

05:39:27  13   Q.  And what Wells Fargo is telling its shareholders in

05:39:33  14   April of 2016 is last summer -- last summer being 2015,

05:39:42  15   correct?

05:39:42  16   A.  Yes.

05:39:43  17   Q.  We, Wells Fargo, became the most valuable bank ever in

05:39:50  18   the history of our industry, maybe excluding one or two

05:39:54  19   Chinese banks that are owned by the government, do you see

05:39:56  20   that?

05:39:57  21           THE COURT:  Just a minute, what is it,

05:39:59  22   Ms. Williams?

05:40:00  23           MS. WILLIAMS:  Objection, Your Honor.  May we

05:40:01  24   approach?

05:40:02  25           THE COURT:  Approach the bench.

05:40:03   1          (Bench conference.)

05:40:10   2          THE COURT:  I gather, Ms. Glasser, you're going to

05:40:15   3  say the Defendants have opened the door to all of this

05:40:18   4  about size of banks.

05:40:19   5          MS. GLASSER:  Yes, in following Your Honor's

05:40:21   6  guidance that since they had blown the door wide open, we

05:40:25   7  could make at least a brief mention of the fact that Wells

05:40:28   8  Fargo, what its relative size was in the market.

05:40:30   9          THE COURT:  Well, and you've made a brief mention

05:40:33  10  and going through the door once doesn't allow you to go

05:40:35  11  through it five times.

05:40:37  12          MS. GLASSER:  Understood, yes.

05:40:38  13          THE COURT:  Let's move on.

05:40:40  14          MS. GLASSER:  She hasn't answered the question yet

05:40:40  15  though.  Can I get the answer from the witness first before

05:40:43  16  I move on?

05:40:43  17          THE COURT:  You can get this question answered and

05:40:45  18  then move on.  I don't expect you to return to this topic.

05:40:48  19          MS. GLASSER:  Thank you, Your Honor.

05:40:49  20          (Bench conference concluded.)

05:40:51  21          THE COURT:  Let's proceed.

05:40:53  22  Q.  (By Ms. Glasser)  So you see there at the bottom of the

05:40:55  23  paragraph where the Wells Fargo document states:  Last

05:41:00  24  summer, we became the most valuable bank ever in the

05:41:03  25  history of our industry, maybe excluding one or two Chinese

05:41:08  1  banks that are owned by the government?

05:41:12  2  A.  I see that.

05:41:13  3  Q.  And does that refresh your recollection about the size

05:41:15  4  of Wells Fargo in the hypothetical negotiation time frame?

05:41:21  5  A.  It does.

05:41:36  6        MS. GLASSER:  All right.  Let's put up on the

05:41:38  7  screen PX-22.  Turning to the topic of the commercial

05:41:41  8  importance of auto capture.

05:41:43  9  Q.  (By Ms. Glasser)  And just I believe we went over this

05:41:45  10  earlier, but you are actually officially designated as the

05:41:49  11  witness on commercial importance of auto capture; is that

05:41:52  12  correct?

05:41:52  13  A.  Yes, that's correct.

05:41:54  14  Q.  And this -- there was actually a very brief time in

05:41:58  15  early 2010 that you did work on the mobile deposit program

05:42:01  16  at Wells Fargo, correct?

05:42:03  17  A.  Yes, that's right.

05:42:04  18  Q.  And we have located a document from that brief time

05:42:08  19  frame, and this is one that you worked on, correct?

05:42:09  20  A.  Yes, that's correct.

05:42:10  21  Q.  And you're actually listed as -- as the first author of

05:42:13  22  the document, correct?

05:42:15  23  A.  I am listed as the first author on this document.

05:42:20  24  Q.  And before we delve into the document in greater

05:42:23  25  detail, you showed the jury a picture of a 1995 desktop

05:42:28  1    computer and a flip phone?

05:42:48  2            THE COURT:  Do you need a moment, counsel?

05:42:51  3            MS. WILLIAMS:  Yes, Your Honor.  We do, may we

05:42:56  4    approach the bench?

05:42:57  5            THE COURT:  Approach the bench.  Approach the

05:43:00  6    bench, ladies.  If you're going to have a conversation,

05:43:04  7    have it up here with me, not in the middle of the

05:43:07  8    courtroom.

05:43:08  9            (Bench conference.)

05:43:09 10            MS. WILLIAMS:  Your Honor, we sent proposed

05:43:11 11    redactions to this document.

05:43:11 12            MS. GLASSER:  I'm not showing anything other than

05:43:11 13    the part that was already shown.

05:43:13 14            MS. WILLIAMS:  I understand that, Your Honor.  But

05:43:13 15    when we -- when we show documents in this courtroom, it can

05:43:16 16    be read into the record if it's properly redacted.

05:43:19 17            MS. GLASSER:  That's fine.  We can do that.  I

05:43:22 18    don't think there's an issue.

05:43:22 19            THE COURT:  So -- so the issue is are you going

05:43:25 20    to -- is this a pre-admitted exhibit?

05:43:27 21            MS. WILLIAMS:  Your Honor, with -- subject to the

05:43:30 22    instructions on the redactions, and redactions have been

05:43:32 23    circulated, and I -- I don't know that the document that

05:43:34 24    they're going to show has --

05:43:36 25            MS. GLASSER:  I am only going to show just the one

05:43:39  1   part that's been shown.

05:43:39  2           THE COURT:  Just a moment.

05:43:41  3           Do you have a fully redacted version of the

05:43:43  4   document with you?

05:43:44  5           MS. WILLIAMS:  Yes, Your Honor.

05:43:45  6           THE COURT:  Why don't you give that to

05:43:46  7   Ms. Glasser?

05:43:47  8           And, Ms. Glasser, why don't you use the ELMO with

05:43:53  9   it?

05:43:53  10          MS. GLASSER:  Sure.

05:43:54  11          THE COURT:  Let's proceed.  And, ladies, no more

05:43:56  12  discussions in the middle of the courtroom.  If you need to

05:43:59  13  talk, you come up here.

05:44:00  14          MS. GLASSER:  Understood.

05:44:01  15          (Bench conference concluded.)

05:44:13  16          MS. GLASSER:  I'll tell you what, while somebody

05:44:15  17  is tracking that down, I will move on to another question,

05:44:18  18  and I will come back to that specific one.  We may even be

05:44:25  19  able to do it without the document.  Oh, excellent, so we

05:44:31  20  can go ahead and put PX-22 back on the screen.  All right.

05:44:44  21  And if we could turn to Page 2 of the document.

05:45:00  22  Q.  (By Ms. Glasser)  Page 2 is actually a list of a number

05:45:02  23  of folks who you sent this document to back in the very

05:45:05  24  early days when Wells Fargo was thinking about mobile

05:45:07  25  deposit, correct?

05:45:07  1   A.  No, that's not entirely correct.

05:45:09  2   Q.  Did -- were there some folks on the list who did not

05:45:13  3   receive the document?

05:45:14  4   A.  I didn't send the document.

05:45:20  5   Q.  Okay.  Who did send the document?

05:45:21  6   A.  Typically, the project manager would route the document

05:45:26  7   for review.

05:45:27  8   Q.  Okay.  So roughly 20 folks or so received the document

05:45:31  9   from somebody at Wells Fargo, correct?

05:45:33  10  A.  Yes.

05:45:41  11       MS. GLASSER:  And if we could turn to Page 5 of

05:45:44  12  the document, and we could zoom in on the bottom to the

05:45:48  13  part, the key benefits to Wells Fargo, please.

05:45:52  14  Q.  (By Ms. Glasser)  And so what we see here is that from

05:45:57  15  the very, very beginning when mobile deposit was being

05:46:01  16  first considered at Wells Fargo, Wells Fargo recognized

05:46:04  17  that it could have key benefits, correct?

05:46:09  18  A.  That's right.  There were projected benefits at the

05:46:13  19  time.

05:46:13  20  Q.  And the key benefits included cost savings, correct?

05:46:19  21  A.  That's what's shown on the -- the document, that's

05:46:22  22  right.

05:46:22  23  Q.  And they also included that MRDC would improve

05:46:27  24  retention and share of wallet, correct?

05:46:31  25  A.  That was what was in the document and projected at the

05:46:34  1   time, yes.

05:46:35  2   Q.  And, in fact, Wells Fargo anticipated, as well, that

05:46:40  3   there would be a customer wow factor, that having this type

05:46:44  4   of technology would cause Wells Fargo to appear to be a

05:46:47  5   leadership -- or an innovator, a leadership in innovation

05:46:52  6   company in the eyes of its customers, correct?

05:46:54  7   A.  That's right.  That's what was projected at the time.

05:46:58  8   Q.  And this was projected way back in 2010, and ultimately

05:47:01  9   all of those things proved to be the case, correct?

05:47:05  10  A.  No, I would disagree.

05:47:06  11  Q.  Wells Fargo did enjoy substantial cost savings,

05:47:11  12  correct?

05:47:11  13  A.  I would agree that we had some cost savings because the

05:47:17  14  mobile deposit generally is cheaper than a branch and ATM,

05:47:20  15  yeah.

05:47:20  16  Q.  And by the same token, it certainly did increase share

05:47:23  17  of wallet, correct?

05:47:25  18  A.  No, I don't have any evidence of that.

05:47:30  19  Q.  No evidence one way or the other?

05:47:32  20  A.  Actually, I should correct that.  I -- I disagree,

05:47:38  21  yeah.

05:47:39  22  Q.  All right.  So you have -- you're agreeing that there

05:47:44  23  are substantial cost savings, but you are disagreeing that

05:47:50  24  that was no improvement in share of wallet, correct?

05:47:52  25  A.  That's correct.

05:47:52   1    Q.   One of Wells Fargo's key expectations in goals in
05:47:58   2    launching the auto capture version in 2014 was to reduce
05:48:04   3    failure rates, correct?
05:48:05   4    A.   Could you ask your question one more time?
05:48:08   5    Q.   One of Wells Fargo's key expectations and goals when it
05:48:12   6    launched the auto capture version at issue in this case was
05:48:16   7    to reduce failure rates, correct?
05:48:21   8    A.   You know, I couldn't say one way or the other on that.
05:48:25   9         MS. GLASSER:   Let's take a look at PX-489, please.
05:48:32  10    Q.   (By Ms. Glasser)   And I do appreciate you weren't
05:48:34  11    involved at this time, but you are testifying on behalf of
05:48:37  12    the company as a whole, correct?
05:48:38  13    A.   Yes, I am.
05:48:39  14    Q.   And the folks like Mr. Ajami, who were directly
05:48:43  15    involved, they are not going to be here on the stand; is
05:48:46  16    that right?
05:48:46  17    A.   That's right, not in person.
05:48:48  18    Q.   All right.
05:48:50  19         MS. GLASSER:   If we could turn to -- the Bates
05:48:53  20    number page at the bottom is 809.   It's probably Page 9.
05:49:02  21    Q.   (By Ms. Glasser)   And what we see there in the middle
05:49:12  22    of the screen -- by the way, the Mobile Deposit Phase 2,
05:49:17  23    that's another word for the auto capture, correct?
05:49:20  24    A.   Yes, that's the auto capture project.
05:49:22  25    Q.   And what we see there is that the expectation was

05:49:26   1   improving image take rates from 75 percent to over 90

05:49:32   2   percent, correct?

05:49:33   3   A.   That's what's on the page, yes.

05:49:35   4   Q.   And the other thing we see on the page is that the idea

05:49:37   5   of auto capture at Wells Fargo is that you will auto

05:49:41   6   capture the check images only when a good image is

05:49:44   7   available; do you see that?

05:49:46   8   A.   I see that on the page, yes.

05:49:53   9   Q.   And do you have any reason to dispute that Wells

05:49:56  10   Fargo's product does, in fact, capture the image only when

05:49:58  11   the system has determined that it's a good image?

05:50:01  12   A.   Yes, I do.

05:50:03  13   Q.   You have some technical background on that topic?

05:50:07  14   A.   I do not.

05:50:08  15   Q.   In terms of the image take rates, have you done any

05:50:16  16   investigation to see whether those take rates ultimately

05:50:18  17   came to pass?  In other words, did Wells Fargo actually

05:50:23  18   achieve that 90 percent that it thought it would achieve

05:50:26  19   with auto capture?

05:50:26  20   A.   Ask your question one more time, please.

05:50:33  21   Q.   Did Wells Fargo ultimately achieve its goal, what it

05:50:37  22   hoped to achieve by adding auto capture, the 90 percent

05:50:44  23   image take rate?

05:50:44  24   A.   The capture rates I'm familiar with are the capture

05:50:47  25   rates in the document that I've shared, and they -- they

05:50:54  1  really vary from month-to-month.

05:50:56  2  Q.  You're aware that they average out to just under 90

05:50:59  3  percent, correct?

05:50:59  4  A.  I haven't done the math, but -- but if you have, then

05:51:05  5  that's possible.

05:51:08  6  Q.  Well, let's go ahead, actually, and put up Mr. Calman's

05:51:12  7  slide where he goes through your data.  This is PX-18.

05:51:23  8         You were here in the courtroom when Mr. Calman

05:51:25  9  gave his testimony, correct?

05:51:27  10  A.  I was.

05:51:28  11  Q.  And you understand that Mr. Calman and all of USAA

05:51:33  12  relied upon your reputations at your deposition that

05:51:36  13  Exhibit 31 was the accurate source of failure and

05:51:41  14  acceptance data, correct?

05:51:43  15  A.  Yes.

05:51:44  16  Q.  And what Mr. Calman did is he analyzed the data, and he

05:51:49  17  determined that for the combination of the two manual

05:51:53  18  modes, there was a 30.52 percent average failure rate,

05:52:02  19  correct?

05:52:02  20  A.  Again, I -- I haven't run the numbers.  Could you

05:52:05  21  repeat what your question -- one more time?

05:52:09  22  Q.  Mr. Calman did run the numbers, and he identified that

05:52:12  23  the average failure rate for manual capture was 30.52

05:52:16  24  percent, correct?

05:52:17  25  A.  Again, I really couldn't say one way or the other.

05:52:23   1   Q.  Were you here in the courtroom, though?  Did you hear
05:52:26   2   Mr. Calman give that testimony?
05:52:27   3   A.  I -- I heard, yes, I heard Mr. Calman give the
05:52:29   4   testimony.
05:52:29   5   Q.  And you chose not to do any kind of double-checking of
05:52:34   6   Mr. Calman's numbers; is that right?
05:52:35   7   A.  I did not.
05:52:36   8   Q.  You have any basis at all to dispute that Mr. Calman's
05:52:40   9   conclusion that Wells Fargo's manual capture failure rate
05:52:44  10   averages 30.52 percent is incorrect in any respect?
05:52:54  11   A.  Again, I -- I haven't run the numbers, so I -- I can't
05:52:58  12   dispute.
05:52:59  13   Q.  And Mr. Calman ran the numbers, the numbers provided in
05:53:02  14   your spreadsheet, and he testified to this jury that the
05:53:05  15   average failure rate for the auto capture version of Wells
05:53:09  16   Fargo's product is 10.38 percent.  Do you recall that?
05:53:13  17   A.  I recall that.
05:53:14  18   Q.  And you chose not to run the numbers to check that
05:53:18  19   number either; is that right?
05:53:19  20   A.  That's right.
05:53:20  21   Q.  Do you have any basis at all to dispute that
05:53:25  22   Mr. Calman's 10.38 percent average failure rate for auto
05:53:30  23   capture is incorrect?
05:53:31  24   A.  Again, I can't say one way or the other.
05:53:34  25   Q.  As you sit here today, on behalf of all of Wells Fargo,

05:53:39  1   do you have any basis to dispute any of the facts that

05:53:42  2   Mr. Calman presented?

05:53:43  3   A.  Well, I disagree with the rate of failure rate

05:53:59  4   decreasing by 66 percent.  That's -- that's not how I -- I

05:54:05  5   view the data.  I look at the percent decrease or increase

05:54:12  6   in the image success rate.

05:54:13  7   Q.  So you -- you take the 30.52 percent, and you just

05:54:18  8   subtract the 10.3.  That's how you would do the math; is

05:54:23  9   that right?

05:54:23  10  A.  No.  I -- I -- I don't want to -- actually, I really

05:54:28  11  haven't done the analysis.  So I -- I probably couldn't say

05:54:32  12  one way or the other.

05:54:34  13  Q.  Okay.  So that was kind of what I was coming back to.

05:54:36  14  A.  Yeah.

05:54:36  15  Q.  I just want to know, do you have any basis at all, as

05:54:39  16  you sit here today, to dispute or disagree with any of the

05:54:42  17  numbers on Mr. Calman's slide or from his testimony?

05:54:45  18  A.  The only basis I have is referring to what I saw in

05:54:51  19  court while I was here, and I saw the Wells Fargo, you

05:54:58  20  know, legal team walk through the numbers, but in terms of

05:55:03  21  being able to walk you through them specifically myself,

05:55:07  22  that's not something that I'm prepared for.

05:55:09  23  Q.  And you --

05:55:10  24  A.  But I -- but I -- my basis would be to -- to really

05:55:15  25  defer to the experts that did run the numbers.

05:55:19   1   Q.   To Mr. Calman, correct?

05:55:20   2   A.   No, to the Wells Fargo team that ran the numbers.

05:55:23   3   Q.   Okay.  Well, you're not going to hear from anyone from

05:55:26   4   the Wells Fargo's legal team here running these numbers,

05:55:32   5   are you?

05:55:32   6   A.   Well, I heard Mr. Hill walk through the numbers during

05:55:38   7   his cross-examination.  And so I do believe that the Wells

05:55:43   8   Fargo legal team did run the numbers.

05:55:46   9   Q.   Okay.  And do you recall the instruction from the Court

05:55:50  10   that the words of the lawyers are not evidence?

05:55:58  11   A.   I did not.

05:56:00  12   Q.   Okay.  And so I want to ask you about the facts, just

05:56:02  13   the facts, the evidence, the documents that you pulled from

05:56:06  14   Wells Fargo.

05:56:06  15        Do you have any basis to dispute the numbers on

05:56:10  16   Mr. Calman's slide or his testimony?

05:56:11  17   A.   I personally do not have -- have information on that.

05:56:17  18        THE COURT:  Please make sure the jury hears your

05:56:20  19   answers, Ms. Lockwood-Stein.

05:56:23  20        THE WITNESS:  Yes, Your Honor.

05:56:25  21   Q.   (By Ms. Glasser)  Let's -- let's turn to the cost

05:56:27  22   savings information.

05:56:27  23        You do acknowledge that Wells Fargo has enjoyed

05:56:30  24   fairly substantial cost savings from the accused product,

05:56:33  25   correct?

| | | |
|---|---|---|
| 05:56:33 | 1 | A.  I do. |
| 05:56:34 | 2 | Q.  And so let's dig into that a little -- a little bit |
| 05:56:38 | 3 | more. |
| 05:56:40 | 4 | Were you here in court when Wells Fargo's counsel |
| 05:56:43 | 5 | stated a few times that -- that checks are not very |
| 05:56:48 | 6 | important or checks are of declining importance? |
| 05:56:51 | 7 | A.  I was. |
| 05:56:53 | 8 | Q.  Is that statement, that checks are not very important, |
| 05:56:56 | 9 | true from Wells Fargo's perspective? |
| 05:57:01 | 10 | A.  I think it depends on the situation. |
| 05:57:04 | 11 | Q.  Wells Fargo had more than 30 -- or 3 billion check |
| 05:57:12 | 12 | deposit transactions in the time frame encompassed by your |
| 05:57:15 | 13 | data, correct? |
| 05:57:18 | 14 | A.  Yes. |
| 05:57:18 | 15 | Q.  And when I say 3 billion, I'm not talking about |
| 05:57:23 | 16 | $3 billion, I'm talking about literally 3 billion checks, |
| 05:57:27 | 17 | correct? |
| 05:57:27 | 18 | A.  Yes. |
| 05:57:28 | 19 | Q.  Can we agree that the 3 billion checks are at least |
| 05:57:33 | 20 | somewhat important? |
| 05:57:35 | 21 | A.  Yes. |
| 05:57:36 | 22 | Q.  And, in fact, in the year 2018 alone, Wells Fargo |
| 05:57:44 | 23 | processed 60 million checks just through mobile deposit, |
| 05:57:50 | 24 | correct? |
| 05:57:50 | 25 | A.  Yes, that's approximately right. |

05:57:53   1   Q.  And one thing that is critically -- critically

05:57:57   2   important about Wells Fargo having this state of the art

05:58:01   3   auto capture system is that having a state of the art

05:58:05   4   mobile deposit system, it saves Wells Fargo money every

05:58:08   5   single time one of those checks gets successfully

05:58:12   6   deposited, correct?

05:58:14   7   A.  I agree with your statement, partially.  I think you

05:58:18   8   said a couple of different things there.

05:58:21   9   Q.  Well, let's -- let's dig into it a little bit more.

05:58:24   10         MS. GLASSER:  Could we put up on the screen PX-28?

05:58:32   11   Q.  (By Ms. Glasser)  And this was a document that you put

05:58:33   12   together and produced in this case, correct?

05:58:35   13   A.  Yes.  Yes, it is.

05:58:36   14   Q.  And so if we go to the 2018 column as an example, we

05:58:41   15   see that in 2018, in total costs, Wells Fargo incurred more

05:58:46   16   than $2.75 every single time a consumer deposited a check

05:58:53   17   at a teller; is that right?

05:58:54   18   A.  That's correct.

05:58:56   19   Q.  And when a consumer deposited a check through an ATM,

05:59:05   20   the number was $1.58?  A little bit more than that,

05:59:10   21   correct?

05:59:10   22   A.  That's correct.

05:59:11   23   Q.  So when we look at those compared to mobile deposit

05:59:15   24   which was about 35 cents, correct --

05:59:16   25   A.  Yes, that's right.

05:59:17  1   Q.  -- we can see that every single time a consumer is

05:59:21  2   depositing one of those 60 million checks in 2018, they're

05:59:26  3   saving Wells Fargo at least a dollar, correct?

05:59:29  4   A.  Yes, that's right.

05:59:30  5   Q.  And, in fact, they're -- it's most likely more than

05:59:33  6   that because the teller ones are quite a bit more

05:59:37  7   expensive, correct?

05:59:38  8   A.  Well, it depends on the split, but, yes, the teller

05:59:41  9   ones are definitely more expensive.

05:59:44  10  Q.  And so when we're talking about 60 million mobile

05:59:48  11  deposits per year, even just one or $2.00 per check, it

05:59:51  12  adds up to a pretty large number, correct?

05:59:54  13  A.  Yes, it does.

05:59:55  14  Q.  And, specifically, it adds up to somewhere between 60

05:59:59  15  and $120 million just for 2018, correct?

06:00:03  16  A.  Yes, that's correct.

06:00:10  17  Q.  Now, Wells Fargo, as a company, was aware of the USAA

06:00:45  18  asserted patents before USAA approached Wells Fargo in

06:00:57  19  2017, correct?

06:00:59  20  A.  Can I -- I don't quite understand your question.

06:01:02  21  Q.  You're aware that USAA approached Wells Fargo in 2017

06:01:08  22  to initiate licensing discussions, correct?

06:01:13  23  A.  Well, I'm aware that USAA approached Wells Fargo about

06:01:17  24  discussions in 2017, yes.

06:01:19  25  Q.  But Wells Fargo, as a company, was aware of the '571

| | | |
|---|---|---|
| 06:01:24 | 1 | and '090 patents even before USAA approached them, correct? |
| 06:01:32 | 2 | A.  You know, that's a -- a legal question, and I -- I will |
| 06:01:37 | 3 | admit I'm not familiar with the timeline for that. |
| 06:01:41 | 4 | Q.  On behalf of -- speaking here today on behalf of all of |
| 06:01:46 | 5 | Wells Fargo, do you know the date on which Wells Fargo |
| 06:01:50 | 6 | first became aware of the potential infringement of the |
| 06:01:54 | 7 | USAA patents? |
| 06:02:00 | 8 | A.  So I am not aware of the date that Wells Fargo became |
| 06:02:08 | 9 | aware of the patents. |
| 06:02:10 | 10 | Q.  And did you do anything to investigate that prior to |
| 06:02:14 | 11 | coming to Court here today to testify on behalf of the |
| 06:02:17 | 12 | company? |
| 06:02:17 | 13 | A.  I did not. |
| 06:02:19 | 14 | Q.  Now, let's take a look at one of the documents you |
| 06:02:37 | 15 | showed during your presentation with your Wells Fargo |
| 06:02:40 | 16 | counsel.  But I want to show the color version of it. |
| 06:02:44 | 17 |         MS. GLASSER:  This is PX-1182. |
| 06:02:49 | 18 | Q.  (By Ms. Glasser)  And this is a -- a version of the |
| 06:02:51 | 19 | same document that you went through with the Wells Fargo |
| 06:02:53 | 20 | lawyer, correct? |
| 06:02:55 | 21 | A.  Yes, that's correct. |
| 06:02:57 | 22 | Q.  And this is a document that at the bottom it says: |
| 06:03:02 | 23 | Confidential attorney's eyes only. |
| 06:03:06 | 24 |         Do you see that? |
| 06:03:07 | 25 | A.  I do. |

06:03:07  1   Q.  This is a document that USAA and the ladies and

06:03:10  2   gentlemen of the jury are seeing only because it was

06:03:14  3   produced from the confidential files of Wells Fargo during

06:03:16  4   this litigation, correct?

06:03:19  5   A.  Yes, that's correct.

06:03:21  6   Q.  And I think you said in your testimony that it -- it's

06:03:25  7   an ordinary thing for Wells Fargo to do this sort of

06:03:28  8   analysis of USAA products; is that correct?

06:03:33  9   A.  It's an ordinary part of our -- our job to look at,

06:03:38  10  yes, this kind of analysis of -- of USAA and other banks

06:03:42  11  and other companies, that's correct.

06:03:46  12        MS. GLASSER:  Could we take a look at the image

06:03:48  13  just right up on the top?  Just zoom in on that a little

06:03:52  14  bit.

06:03:52  15  Q.  (By Ms. Glasser)  And by the way, this red arrow,

06:03:55  16  that's not something that I added, that's actually in the

06:03:58  17  original document, correct?

06:03:58  18  A.  You know, I'm -- I'm not familiar with the original

06:04:01  19  document.

06:04:02  20  Q.  Okay.  Well, you see it has the Wells Fargo Bates

06:04:05  21  number in the bottom indicating it was produced by Wells

06:04:08  22  Fargo lawyers in this case, correct?

06:04:09  23  A.  Yes.  Yes, I do.

06:04:10  24  Q.  And what we see where that red arrow is pointing --

06:04:14  25        MS. GLASSER:  Maybe we could zoom in maybe just a

06:04:17  1  little bit more on that whole area.

06:04:19  2  Q.  (By Ms. Glasser)  As this confidential internal Wells

06:04:26  3  Fargo document, it has this red arrow, and you're not just

06:04:29  4  looking at the user interface of the product, correct,

06:04:33  5  you're actually looking at the portion of it that

06:04:35  6  identifies the '571 patent, correct?

06:04:38  7  A.  You know, I -- I couldn't say.  This was a document

06:04:41  8  that -- that Monica pulled, and so she might have just been

06:04:45  9  looking at the screenshot.  I just couldn't say.

06:04:47  10         THE COURT:  Ms. Lockwood-Stein, can you identify

06:04:50  11 this person by other than just first name?

06:04:54  12         THE WITNESS:  Oh, yes, Your Honor.

06:04:55  13         THE COURT:  And who is Monica?

06:04:56  14         THE WITNESS:  Ms. Harvin.

06:04:58  15         THE COURT:  Okay.  Thank you.  Let's please avoid

06:05:00  16 first names only.

06:05:01  17         THE WITNESS:  Yes, Your Honor.

06:05:02  18         THE COURT:  Let's continue, counsel.

06:05:03  19 Q.  (By Ms. Glasser)  You do recognize the number on the

06:05:08  20 screen as the '571 patent at issue in this case, correct?

06:05:10  21 A.  I do.

06:05:10  22 Q.  And this was the sort of thing that was ordinary for

06:05:13  23 Wells Fargo to look at in the ordinary course of business,

06:05:16  24 correct?

06:05:16  25 A.  I disagree with that.

06:05:19    1    Q.   I think earlier, you said you weren't surprised at all
06:05:21    2    to see this document; is that -- was that your earlier
06:05:25    3    testimony?
06:05:25    4    A.   Yes, that's correct.
06:05:26    5    Q.   And so it's not surprising in any way to you that the
06:05:29    6    USAA or that Wells Fargo engineers and design folks were
06:05:34    7    referencing and drawing red arrows on documents pointing at
06:05:39    8    the '571 patent, correct?
06:05:40    9    A.   Could you ask your question one more time?
06:05:43   10    Q.   It's not surprising in any way to you to see internal
06:05:48   11    Wells Fargo documents where the Wells Fargo engineers and
06:05:52   12    product design folks are drawing arrows pointing at the
06:05:58   13    '571 patent, correct?
06:05:59   14    A.   I disagree with the -- the premise.
06:06:04   15    Q.   You agree there's a red arrow pointing at the '571
06:06:07   16    patent, correct?
06:06:09   17    A.   I agree that there's a red arrow pointing at the
06:06:13   18    screen.   I -- I couldn't say what -- you know, specifically
06:06:17   19    the call-out was -- was pointing for.
06:06:20   20    Q.   And you appreciate this is the patent marking page.
06:06:24   21    You have to click on it when you're in the USAA
06:06:28   22    application, it pops up, and it notifies anybody looking at
06:06:31   23    it that the USAA Deposit@Mobile product practices the '571
06:06:35   24    patent, correct?
06:06:35   25    A.   Yes.

06:06:39  1   Q.  And from looking at documents like these, Wells Fargo

06:06:45  2   is aware of the '571 patent, correct?

06:06:47  3   A.  Well, now that I'm looking at the full document, what I

06:06:56  4   see is that the arrow is simply pointing that if you click

06:07:02  5   the button, it takes you to this next screen.  That's a

06:07:07  6   very standard way to illustrate the user experience flow.

06:07:14  7   Q.  And so what it's illustrating is that if you click on

06:07:18  8   that button, it will take you to the patent marking page,

06:07:21  9   correct?

06:07:21  10  A.  It takes you to this other screen that has various

06:07:27  11  things on the screen, including that patent marking, but

06:07:31  12  there's more there.

06:07:33  13         MS. GLASSER:  Your Honor, permission to approach

06:07:35  14  the table?

06:07:35  15         THE COURT:  Yes.

06:07:54  16  Q.  (By Ms. Glasser)  Were you here in court earlier today

06:07:57  17  when Mr. Wood said that using auto capture is purely up to

06:07:59  18  Wells Fargo?

06:08:00  19  A.  Yes, I was.

06:08:04  20  Q.  And you agree that if Wells Fargo didn't believe that

06:08:18  21  it was highly profitable to continue to use the auto

06:08:21  22  capture functionality, Wells Fargo could simply turn it

06:08:27  23  off, correct?

06:08:27  24  A.  I disagree with that statement.

06:08:30  25  Q.  Does Wells Fargo have the ability to flip the switch,

| | | |
|---|---|---|
| 06:08:36 | 1 | if you will, and cease use of the infringing technology? |
| 06:08:40 | 2 | A.  Yes, it does. |
| 06:08:42 | 3 | Q.  Thank you. |
| 06:08:43 | 4 | MS. GLASSER:  Pass the witness. |
| 06:08:45 | 5 | THE COURT:  Redirect? |
| 06:08:46 | 6 | MS. WILLIAMS:  Yes, Your Honor.  Thank you. |
| 06:08:46 | 7 | REDIRECT EXAMINATION |
| 06:08:50 | 8 | BY MS. WILLIAMS: |
| 06:08:50 | 9 | Q.  Ms. Lockwood-Stein, do you have a technical degree? |
| 06:09:15 | 10 | A.  I do not. |
| 06:09:16 | 11 | Q.  Do you have the ability by training or education to do |
| 06:09:19 | 12 | a technical comparison between the USAA patents or any of |
| 06:09:24 | 13 | the Wells Fargo -- or Wells Fargo's Mobile Deposit product? |
| 06:09:28 | 14 | A.  No, I do not. |
| 06:09:29 | 15 | Q.  Would you know how to calculate patent damages in this |
| 06:09:32 | 16 | case? |
| 06:09:32 | 17 | A.  No, I would not. |
| 06:09:34 | 18 | Q.  Is it any surprise to you that no one has asked you to |
| 06:09:37 | 19 | do a technical review or a damages analysis in this case? |
| 06:09:41 | 20 | A.  No, it's not surprising to me. |
| 06:09:43 | 21 | Q.  Has Wells Fargo hired qualified experts to look at the |
| 06:09:52 | 22 | technical issues in this case? |
| 06:09:54 | 23 | A.  Yes, it has. |
| 06:09:55 | 24 | Q.  So Wells Fargo looked to experts to inform its opinion |
| 06:09:59 | 25 | and not to a business person like you? |

06:10:04  1   A.  That's right.

06:10:04  2   Q.  And you were asked some questions about whether checks

06:10:11  3   are -- are a dying channel.

06:10:16  4           MS. WILLIAMS:  May I have the ELMO, please?

06:10:19  5   Q.  (By Ms. Williams)  This is Mr. Calman's testimony from

06:10:29  6   earlier in this trial.  And do you see he was asked the

06:10:32  7   question:  Well, sir, haven't you previously testified

06:10:35  8   under oath that checks are a dying channel?

06:10:38  9           And he said:  I don't recall that testimony.

06:10:40  10          Then he goes on to -- and you say -- the question

06:10:44  11  was:  Check is, you know, declining, dying product, or

06:10:49  12  dying channel.  Did I read that correctly, sir?

06:10:52  13          I'm sorry, let me back up with the question.

06:10:54  14          Do you understand that Mr. Calman testified that

06:10:57  15  checks are a dying channel?

06:10:59  16  A.  Yes, I do.

06:11:01  17  Q.  Did you hear him testify to that earlier this week -- I

06:11:04  18  mean, earlier during trial?

06:11:06  19  A.  I did.

06:11:06  20  Q.  Is that something that you've observed, a decline in

06:11:12  21  checks?

06:11:13  22  A.  It's -- it's something that we have discussed, the

06:11:17  23  decline in usage of checks.

06:11:18  24  Q.  Now, you were shown the USAA screenshots?

06:11:25  25          MS. WILLIAMS:  Mr. Goodin, may I have PDX-1.43?

| 06:11:44 | 1 | Q.  (By Ms. Williams)  All right.  Do you remember looking |
| 06:11:46 | 2 | at this during your direct examination? |
| 06:11:48 | 3 | A.  Yes, I do. |
| 06:11:49 | 4 | Q.  What is the date of this document? |
| 06:11:50 | 5 | A.  This document is from April 2018. |
| 06:11:56 | 6 | Q.  Was Wells Fargo sued by USAA in June 2018? |
| 06:11:59 | 7 | A.  Yes, that's right. |
| 06:12:00 | 8 | Q.  And you were also shown a document, PX-22. |
| 06:12:14 | 9 | MS. WILLIAMS:  May I have that, please, |
| 06:12:17 | 10 | Mr. Goodin? |
| 06:12:22 | 11 | Q.  (By Ms. Williams)  What is the date of this document? |
| 06:12:24 | 12 | A.  That's March 25th, 2010. |
| 06:12:27 | 13 | Q.  Are the benefits in this document specific to mobile |
| 06:12:37 | 14 | deposit or not? |
| 06:12:38 | 15 | A.  These -- the benefits in this document are the |
| 06:12:43 | 16 | projected benefits for mobile deposit at that time. |
| 06:12:46 | 17 | Q.  Are they specific to -- is there anything in this |
| 06:12:50 | 18 | document addressing projected benefits for auto capture? |
| 06:12:54 | 19 | A.  No, there is not. |
| 06:12:56 | 20 | Q.  Was a method of capture addressed in this document at |
| 06:13:00 | 21 | all? |
| 06:13:01 | 22 | A.  No, I -- I don't believe so. |
| 06:13:14 | 23 | MS. WILLIAMS:  Your Honor, I pass the witness. |
| 06:13:16 | 24 | THE COURT:  All right.  Further cross, |
| 06:13:18 | 25 | Ms. Glasser? |

| 06:13:19 | 1 | MS. GLASSER:  No further cross.  Thank you. |

06:13:19   1          MS. GLASSER:  No further cross.  Thank you.

06:13:20   2          THE COURT:  All right.  Ms. Lockwood-Stein, you

06:13:23   3   may step down.

06:13:24   4          Ladies and gentlemen of the jury, it is 13 minutes

06:13:40   5   after 6:00, according to my clock.  We're going to recess

06:13:44   6   for the day at this time.

06:13:44   7          I'm going to ask you to take your notebooks to the

06:13:47   8   jury room and leave them closed on the table there over

06:13:53   9   this evening.  I'm going to ask you to be assembled and

06:13:56  10   ready to go by 8:30 in the morning.  Let me remind you to

06:14:00  11   follow all the instructions I've given you about your

06:14:02  12   conduct in this case, including as you would expect me to

06:14:05  13   remind you not to discuss the case with anyone in any way.

06:14:08  14          Travel safely to your homes.  I will see you

06:14:11  15   tomorrow.  With that, the jury is excused for the evening.

06:14:14  16          COURT SECURITY OFFICER:  All rise.

06:14:21  17          (Jury out.)

06:14:21  18          THE COURT:  Be seated, please.

06:14:38  19          Counsel, according to my calculations, the

06:14:47  20   Plaintiff has three hours and 13 minutes remaining.  The

06:14:50  21   Defendant has two hours and 31 minutes remaining.

06:14:53  22          I understand that Defendants will next call in

06:15:00  23   their case-in-chief Mr. Gerardi.  Are there other witnesses

06:15:04  24   the Court should expect after Mr. Gerardi for the

06:15:09  25   Defendant?

06:15:09   1          MR. MELSHEIMER:  I don't believe so, Your Honor.

06:15:10   2     If there's something, we'll alert the Court but I don't

06:15:13   3     believe so.

06:15:13   4          THE COURT:  At this point you intend to close

06:15:15   5     after Mr. Gerardi?

06:15:16   6          MR. MELSHEIMER:  At this point, we do, Your Honor.

06:15:18   7          THE COURT:  What does the Plaintiff know at this

06:15:20   8     point, and again, I'm not asking for an absolute answer but

06:15:20   9     what does the Plaintiff know at this point about his

06:15:24   10    anticipated rebuttal case?

06:15:24   11         MR. SHEASBY:  Your Honor, Plaintiff anticipates

06:15:27   12    that it will call Mr. Ajami, and it may call Mr. Conte and

06:15:33   13    at -- as to damages experts, that will have to wait until

06:15:37   14    after Mr. Gerardi.

06:15:38   15         THE COURT:  All right.  Well, we're clearly going

06:15:41   16    to finish the evidence tomorrow.  My -- you know, I really

06:15:49   17    don't want to hear anymore sounds out of electronic devices

06:15:53   18    in this trial.  I just heard what sounded like an emergency

06:15:57   19    or Amber alert from somebody's device and there's another

06:16:02   20    beep or another tone.  I don't know if it's coming from the

06:16:04   21    tech people, I don't know if it's coming from the lawyers,

06:16:04   22    I don't know if it's coming from somebody in the gallery.

06:16:06   23    But I do not want to hear anymore sounds.  Thankfully, the

06:16:11   24    jury was out of the room when that happened that time.  But

06:16:15   25    it has happened repeatedly over the course of the trial.

06:16:19    1    And I don't know how to be any clearer that I consider

06:16:21    2    those unacceptable disruptions, so consider yourselves

06:16:25    3    warned.

06:16:25    4         It's clear we're going to finish the evidence on

06:16:32    5    Tuesday.  I would hope, depending on how the day goes, we

06:16:37    6    could take up and dispose of any motions under Rule 50(a),

06:16:42    7    and probably move toward the charge conference.  We'll just

06:16:46    8    have to see how the day goes.  I do not anticipate, unless

06:16:53    9    things move much quicker than it looks like they will now,

06:16:56    10   that we would be in a position to charge the jury any time

06:17:00    11   tomorrow.  It looks like that will wait until Wednesday.

06:17:03    12   We'll fine tune this process as we go, counsel.  That's why

06:17:06    13   I asked for the input that I did.

06:17:08    14        Are there questions from either Plaintiff or

06:17:09    15   Defendant before we recess for the evening?

06:17:12    16        MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.

06:17:13    17        THE COURT:  Anything from Defendant?

06:17:14    18        MR. MELSHEIMER:  May it please the Court.  Nothing

06:17:16    19   at this point, Your Honor.

06:17:17    20        THE COURT:  All right.  I'll be in chambers at

06:17:19    21   7:30 as usual.  I remind you, use your best efforts as you

06:17:25    22   meet and confer overnight regarding potential disputes or

06:17:28    23   disagreements.  Any that are surviving, we'll take up in

06:17:33    24   the morning.

06:17:33    25        Court stands in recess.

06:17:35  1          MR. SHEASBY:  Thank you, Your Honor.

06:17:36  2          COURT SECURITY OFFICER:  All rise.

06:17:37  3          (Recess.)

1                            CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7


8


9     /S/ Shelly Holmes                      11/4/19
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25