```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
2                        MARSHALL DIVISION

3    UNITED STATES AUTOMOBILE      )(
     ASSOCIATION
4                                  )(    CIVIL ACTION NO.

5    VS.                           )(    2:18-CV-245-JRG

6                                  )(    MARSHALL, TEXAS
                                         NOVEMBER 5, 2019
7    WELLS FARGO BANK, N.A.        )(    8:32 A.M.

8

9                     TRANSCRIPT OF JURY TRIAL

10                        MORNING SESSION

11       BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                  UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14

15   FOR THE PLAINTIFF:

16
     JASON SHEASBY
17   ANTHONY ROWLES
     LISA GLASSER
18   IRELL & MANELLA
     1800 Avenue of the Stars
19   Suite 900
     Los Angeles, CA 90067-4276
20

21
     ROBERT CHRISTOPHER BUNT
22   PARKER, BUNT & AINSWORTH, PC
     100 East Ferguson
23   Suite 418
     Tyler, TX 75702
24

25
```

```
 1  FOR THE DEFENDANT:

 2
    THOMAS M. MELSHEIMER
 3  M. BRETT JOHNSON
    MICHAEL A. BITTNER
 4  J. TRAVIS UNDERWOOD
    WINSTON & STRAWN LLP
 5  2121 North Pearl Street
    Suite 900
 6  Dallas, TX 75201

 7
    E. DANIELLE T. WILLIAMS
 8  WINSTON & STRAWN LLP
    300 South Tyron Street
 9  16th Floor
    Charlotte, NC 28202
10

11  MATTHEW R. MCCULLOUGH
    WINSTON & STRAWN LLP
12  275 Middlefield Road
    Suite 205
13  Menlo Park, CA 94025

14
    JACK WESLEY HILL
15  WARD, SMITH & HILL, PLLC
    P.O. Box 1231
16  1507 Bill Owens Parkway
    Longview, TX 75606
17

18
    COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                       Official Court Reporter
                         United States District Court
20                       Eastern District of Texas
                         Marshall Division
21                       100 E. Houston
                         Marshall, Texas  75670
22                       (903) 923-7464

23
    (Proceedings recorded by mechanical stenography, transcript
24  produced on a CAT system.)

25
```

```
                          P R O C E E D I N G S
08:32:15
08:32:15   2          (Jury out.)

08:33:07   3          COURT SECURITY OFFICER:  All rise.

08:33:10   4          THE COURT:  Be seated, please.

08:34:03   5          MR. SHEASBY:  Your Honor, one of our associates

08:34:05   6   just had to run out to the bathroom.  May I please get him

08:34:09   7   and bring him right back?

08:34:10   8          THE COURT:  Do we need him to read the items from

08:34:13   9   the list of pre-admitted exhibits into the record?

08:34:16  10          MR. SHEASBY:  Yes.

08:34:16  11          THE COURT:  Is that who you had lined up to do

08:34:18  12   that?

08:34:18  13          MR. SHEASBY:  No, Your Honor.  He's at -- it's

08:34:20  14   Mr. Rowles, I want him to be here for the jury.  I'm going

08:34:23  15   to go get him right now.

08:34:25  16          THE COURT:  Well, I'll wait to bring the jury in

08:34:28  17   if he's not back.  Have a seat, Mr. Sheasby.

08:34:30  18          Are the parties prepared to read into the record

08:34:33  19   the items from the list of the pre-admitted exhibits used

08:34:36  20   during yesterday's portion of the trial?

08:34:39  21          MR. BUNT:  Yes, Your Honor.

08:34:39  22          THE COURT:  Please proceed.

08:34:40  23          MR. BUNT:  Yesterday, Your Honor, the following

08:34:42  24   exhibits were used:  Plaintiff's Exhibit No. 22, PX-94,

08:34:56  25   PX-438, PX-1182, there were also impeachment exhibits,
```

08:35:03  1   iX-0037, iX-0038, iX-0045, iX-0052, iX-0053, and iX-0073,

08:35:18  2   and then there were some Defense Exhibits but I'll let

08:35:22  3   Mr. Underwood read those in.

08:35:24  4        THE COURT:  All right.  Do Defendants have any

08:35:26  5   objection to the rendition just offered by the Plaintiff?

08:35:30  6        MR. UNDERWOOD:  We do not, Your Honor.

08:35:31  7        THE COURT:  Do you have a similar rendition,

08:35:34  8   Mr. Underwood?

08:35:34  9        MR. UNDERWOOD:  We do.  We have DTX-001, DTX-003,

08:35:39  10  DTX-381, and DTX-613.

08:35:44  11       THE COURT:  Any objection to that, Mr. Bunt, for

08:35:48  12  Plaintiff?

08:35:48  13       MR. BUNT:  No, Your Honor.

08:35:54  14       MR. HILL:  Your Honor, may I inquire of just one

08:35:56  15  issue, and it's just lack of clarity on my part.

08:36:00  16       Mr. Bunt read in the impeachment exhibits that

08:36:05  17  were used yesterday.  I assume those are not being offered

08:36:07  18  into the record as substantive evidence.  They're just

08:36:09  19  being identified as having been used.

08:36:09  20       THE COURT:  I would assume that's true.

08:36:12  21       MR. BUNT:  I was actually offering them in as

08:36:14  22  evidence for the record, Your Honor.  They were published

08:36:16  23  to the jury, I believe, all of them were published to the

08:36:20  24  jury yesterday.

08:36:20  25       THE COURT:  Well, to the extent they were

08:36:21  1   published to the jury and there was dialog between counsel

08:36:28  2   and the witness, then that dialog is part of the transcript

08:36:31  3   and in the record.

08:36:41  4        MR. BUNT:  And with respect to the iX-37, 38, 45,

08:36:47  5   52 and 53, they were established as business records for

08:36:48  6   Mitek and they were certainly authenticated, as well.

08:36:51  7        THE COURT:  Well, it's never been the Court's

08:36:56  8   practice to include in this type of running record in

08:37:00  9   the -- or running accounting in the record of items from

08:37:05 10   the list of pre-admitted exhibits items that were not on

08:37:10 11   the list of pre-admitted exhibits that were used for

08:37:13 12   impeachment purposes only.  The purpose of this rendition

08:37:15 13   into the record each morning is to clarify in the record

08:37:19 14   what comes from the list that we took up during pre-trial

08:37:23 15   and the Court considered as to admissibility and designated

08:37:26 16   as pre-admitted exhibits from those that were actually used

08:37:30 17   during the trial before the jury and are a part of the

08:37:33 18   evidence they are to consider and admitted exhibits for

08:37:38 19   purposes of the trial.

08:37:38 20        I'm not going to -- I'm not going to change that

08:37:45 21   process to add impeachment exhibits that weren't considered

08:37:50 22   as a part of pre-trial, were not a part of the list of

08:37:53 23   pre-admitted exhibits that's been drawn from to be

08:37:57 24   identified by these renditions every morning before I bring

08:38:00 25   the jury in.

```
08:38:01    1              To the extent they were used during the trial
08:38:03    2    before the jury, the colloquies between Plaintiff --
08:38:09    3    between counsel and the witness are clearly in the record
08:38:12    4    as part of the transcript.  There's never an offer of the
08:38:19    5    impeachment document for admission when it's used.  And I
08:38:23    6    don't consider it to be a part of the record evidence in
08:38:28    7    the case.
08:38:29    8              MR. BUNT:  Thank you, Your Honor.  I understand
08:38:30    9    your ruling.
08:38:31   10              THE COURT:  Okay.  All right.
08:38:32   11              MR. HILL:  Thank you, Your Honor.
08:38:33   12              THE COURT:  All right.  We ended yesterday with
08:39:28   13    Ms. Lockwood-Stein.  Are Defendants prepared to call their
08:39:33   14    next witness?
08:39:33   15              MR. MELSHEIMER:  We are so prepared, Your Honor.
08:39:35   16              THE COURT:  All right.  Then let's bring in the
08:39:37   17    jury, Mr. Johnston.
08:40:04   18              COURT SECURITY OFFICER:  All rise.
08:40:05   19              (Jury in.)
08:40:06   20              THE COURT:  Good morning, and welcome back.
08:40:18   21    Please have a seat.
08:40:19   22              Defendant, call your next witness.
08:40:29   23              MR. MELSHEIMER:  May it please the Court, Your
08:40:34   24    Honor.  At this time Wells Fargo calls Mr. Chris Gerardi.
08:40:38   25              THE COURT:  All right.  Mr. Gerardi, if you'll
```

| | | |
|---|---|---|
| 08:40:41 | 1 | come forward and be sworn. |
| 08:40:50 | 2 | (Witness sworn.) |
| 08:40:50 | 3 | THE COURT:  Please come around, sir, have a seat |
| 08:41:00 | 4 | at the witness stand. |
| 08:41:01 | 5 | Do you have binders to distribute, Ms. Williams? |
| 08:41:07 | 6 | MS. WILLIAMS:  Yes, Your Honor, I do. |
| 08:41:09 | 7 | THE COURT:  You have leave to distribute them. |
| 08:41:12 | 8 | MS. WILLIAMS:  Thank you, Your Honor. |
| 08:41:32 | 9 | THE WITNESS:  Thank you. |
| 08:41:34 | 10 | MS. WILLIAMS:  Thank you. |
| 08:41:44 | 11 | THE COURT:  All right.  Counsel, you may proceed |
| 08:41:45 | 12 | with your direct examination of the witness when you're |
| 08:41:48 | 13 | ready. |
| 08:41:48 | 14 | MS. WILLIAMS:  Thank you, Your Honor.  May it |
| 08:41:48 | 15 | please the Court. |
| 08:41:48 | 16 | CHRIS GERARDI, DEFENDANT'S WITNESS, SWORN |
| 08:41:48 | 17 | DIRECT EXAMINATION |
| 08:41:50 | 18 | BY MS. WILLIAMS: |
| 08:41:50 | 19 | Q.  Good morning. |
| 08:41:52 | 20 | A.  Good morning. |
| 08:41:52 | 21 | Q.  Will you please introduce yourself to the jury? |
| 08:41:54 | 22 | A.  Sure.  I'm Chris Gerardi. |
| 08:41:57 | 23 | Q.  Mr. Gerardi, what is your role in this case? |
| 08:41:59 | 24 | A.  I've been asked to provide my opinion on the economic |
| 08:42:02 | 25 | damages should USAA prevail on its claims in this matter of |

08:42:06   1   infringement.

08:42:07   2   Q.  Did you prepare slides for us today to help illustrate

08:42:11   3   your opinions?

08:42:12   4   A.  Yes, I did.

08:42:13   5   Q.  Now, let's talk about what qualifies you to render

08:42:17   6   opinions in this case.

08:42:18   7           Will you please tell us what you do and where

08:42:20   8   you've worked?

08:42:21   9   A.  Sure.  Currently I'm a vice president with a company

08:42:25   10   called Charles River Associates.  We're an economic

08:42:28   11   consulting firm.  I provide a variety of economic,

08:42:33   12   financial, and accounting services to clients.  Prior to

08:42:35   13   Charles River Associates I was a senior managing director

08:42:38   14   at FTI Consulting for 16 years where I co-led the firm's

08:42:43   15   disputes in intellectual property practice.  And prior to

08:42:46   16   that I was a partner at KPMG, which is one of the world's

08:42:50   17   largest accounting and advisory services groups.

08:42:53   18   Q.  Now, before all of that experience, did you go to

08:42:56   19   school?

08:42:56   20   A.  Yes, I did.

08:42:57   21   Q.  Will you please tell us where you went to school?

08:42:59   22   A.  Sure.  I have my Bachelor's degree in economics from

08:43:02   23   University of Massachusetts at Dartmouth, and I have a

08:43:06   24   Master's degree in banking finance and money management

08:43:08   25   from Adelphi University which is a small school up in New

08:43:14   1   York.

08:43:14   2   Q.  During the course of your career, have you had

08:43:16   3   experience in calculating damages in patent cases like this

08:43:19   4   one?

08:43:19   5   A.  Yes, I have.  Over my career, I've worked on north of

08:43:24   6   75 patent matters involving a variety of different

08:43:28   7   industries working both for the Plaintiffs and Defendants.

08:43:31   8            THE COURT:  Just a minute, folks.  Mr. Gerardi,

08:43:33   9   you're going to have to slow down, and Ms. Williams, you're

08:43:36   10  going to have to slow down.  Okay?

08:43:39   11            MS. WILLIAMS:  Yes, Your Honor.

08:43:39   12            THE WITNESS:  Yes, Your Honor.

08:43:40   13            THE COURT:  All right.  Let's proceed on that

08:43:43   14  basis.

08:43:44   15  Q.  (By Ms. Williams)  Have any of those matters involved

08:43:45   16  the banking industry?

08:43:46   17  A.  Yes, they have, several.

08:43:48   18  Q.  Would you please describe that a little bit for the

08:43:49   19  jury?

08:43:49   20  A.  Sure.  So I worked on matters for Chase, Bank of

08:43:53   21  America, HSBC, Citibank, to name a few.

08:43:59   22  Q.  Has your -- has your work of your career involved

08:44:02   23  assisting companies in valuing intellectual property, like

08:44:06   24  patents and licensing those patents?

08:44:07   25  A.  Yes.  So outside of the context of litigation, I've

08:44:15    1    helped clients who are looking to monetize their

08:44:18    2    intellectual property.  I've helped them evaluate markets,

08:44:20    3    I've helped them evaluate and edit their financial

08:44:23    4    licensees and I've helped those clients evaluate what the

08:44:28    5    economics of those licenses may be if they were to enter

08:44:31    6    into some type of a licensing negotiation.

08:44:34    7    Q.  Have you been qualified as a damages expert previously?

08:44:37    8    A.  Yes.  I've testified in federal court, state court, and

08:44:43    9    international arbitrations for the work that I've done.

08:44:46   10    Q.  Is your -- is FTI being compensated for the work that

08:44:49   11    you have done on this case?

08:44:50   12    A.  Yes, they are.

08:44:51   13    Q.  What is the rate at which FTI is being compensated?

08:44:55   14    A.  Approximately $725.00 per hour.

08:45:00   15    Q.  How many hours have you spent on this case?

08:45:02   16    A.  Approximately 170, 175 hours.

08:45:06   17    Q.  Does your work -- does FTI's compensation in this case

08:45:10   18    depend on the outcome in any way?

08:45:12   19    A.  No, it does not.

08:45:16   20         MS. WILLIAMS:  Your Honor, we offer Mr. Gerardi as

08:45:19   21    an expert on the valuation of intellectual property and the

08:45:21   22    calculation of patent damages.

08:45:22   23         THE COURT:  Is there objection?

08:45:23   24         MR. SHEASBY:  No objection, Your Honor.

08:45:24   25         THE COURT:  Then Court will recognize this witness

| | | |
|---|---|---|
| 08:45:27 | 1 | as an expert in the designated fields. |
| 08:45:29 | 2 | Please continue. |
| 08:45:30 | 3 | MS. WILLIAMS:  Thank you, Your Honor. |
| 08:45:31 | 4 | Q.  (By Ms. Williams)  Mr. Gerardi, let's turn to the work |
| 08:45:33 | 5 | that you did in this case. |
| 08:45:34 | 6 | What were you asked to do? |
| 08:45:35 | 7 | A.  Three tasks.  One is to provide my own opinion -- my |
| 08:45:44 | 8 | affirmative opinion of what the damages would be in this |
| 08:45:46 | 9 | case for the claims at issue. |
| 08:45:48 | 10 | Second, was to provide my perspective of -- of the |
| 08:45:55 | 11 | positions presented by Mr. Weinstein, who you heard from |
| 08:45:59 | 12 | previously. |
| 08:45:59 | 13 | And, third, to provide some perspective of the |
| 08:46:03 | 14 | damages related aspects of Mr. Calman's testimony, as well. |
| 08:46:06 | 15 | Q.  Are you here to provide any opinion on infringement to |
| 08:46:08 | 16 | this jury? |
| 08:46:09 | 17 | A.  No, not at all. |
| 08:46:10 | 18 | Q.  To be clear, you don't have any opinion on whether |
| 08:46:13 | 19 | Wells Fargo infringes USAA's patents? |
| 08:46:16 | 20 | A.  No, I do not. |
| 08:46:20 | 21 | Q.  And you don't have any opinion as to whether Wells |
| 08:46:24 | 22 | Fargo's Mobile Deposit product does the specific USAA form |
| 08:46:26 | 23 | of auto capture? |
| 08:46:27 | 24 | A.  No, I do not. |
| 08:46:28 | 25 | Q.  And by providing your testimony to the jury today, are |

08:46:31   1   you suggesting in any way that Wells Fargo owes money to

08:46:33   2   USAA?

08:46:34   3   A.  No, I am not.

08:46:36   4   Q.  What materials did you consider in forming your

08:46:42   5   opinion?

08:46:42   6   A.  So I reviewed a number of documents produced by both

08:46:48   7   USAA and Wells Fargo.

08:46:51   8   Q.  And on this slide, do we see a listing of that

08:46:54   9   information?

08:46:54  10   A.  Yes, on the left-hand side of that slide.

08:46:57  11   Q.  Would you just highlight some of that information for

08:46:59  12   the jury?

08:47:00  13   A.  Sure.  So the documents produced by the parties, the

08:47:03  14   deposition transcripts that were of USAA and Wells Fargo's

08:47:08  15   witnesses, the expert reports that were produced by

08:47:11  16   Mr. Calman and Mr. Weinstein, publicly available

08:47:15  17   information that I've obtained.  I also relied upon my own

08:47:20  18   experience having worked on several patent matters

08:47:22  19   involving banks and payment-related processing,

08:47:26  20   intellectual property.

08:47:27  21          On the right side, I also interviewed several

08:47:30  22   people in forming my opinions, a number of folks from Wells

08:47:34  23   Fargo.  For example, Ms. Lockwood-Stein, who you heard from

08:47:36  24   yesterday.  And I also spent time with Dr. Villasenor

08:47:40  25   talking to him about the technical aspects of the case.

08:47:44  1  Q.  Why did you talk with Ms. Lockwood-Stein and

08:47:46  2  Dr. Villasenor?

08:47:47  3  A.  Part of my analysis is to really understand what the

08:47:51  4  intellectual property is at issue and how it relates and

08:47:55  5  how it's alleged to be used within Wells Fargo's systems.

08:47:58  6  And so I talked to Dr. Villasenor for that aspect of it

08:48:01  7  because he's -- he's the technical expert.

08:48:05  8          Another part of it is I needed to understand Wells

08:48:08  9  Fargo's business and the mobile remote deposit capture

08:48:11  10  system.  And -- and that is Ms. Lockwood-Stein's area of

08:48:14  11  responsibility, so I talked to her about that and the

08:48:19  12  documents that were produced in this matter so I can put

08:48:21  13  them in proper context.

08:48:23  14  Q.  Have you been with us during trial since the opening

08:48:27  15  statements?

08:48:27  16  A.  Yes, I have.

08:48:28  17  Q.  Before we go into the details of your opinions, would

08:48:31  18  you give us an overview of those?

08:48:33  19  A.  Sure.  I have three.  So, again, my job is to evaluate

08:48:37  20  what is the incremental benefit provided by the

08:48:42  21  patents-in-suit.  And so I know that Wells Fargo has a

08:48:48  22  manual capture remote deposit system that exists.  That's

08:48:54  23  already there.

08:48:54  24          My job is to evaluate what's the additional

08:48:56  25  benefits that Wells Fargo would have achieved by adding

08:49:00   1   auto capture to -- to that system.  And my analysis

08:49:02   2   indicates that that is no more than $12.5 million.

08:49:06   3          Second, based upon my review of -- of

08:49:10   4   Mr. Weinstein's work and listening to his testimony, I

08:49:14   5   don't think he's actually providing a value of the

08:49:17   6   incremental benefits of those patents.

08:49:19   7          And, third, listening to the testimony, reading

08:49:24   8   Mr. Calman's work, that 40 percent apportionment factor

08:49:28   9   that Mr. Weinstein is relying upon in my opinion, it's

08:49:30  10   just -- it's just wrong.

08:49:32  11   Q.  Now, Mr. Gerardi, while you were sitting in trial, did

08:49:37  12   you identify any agreements that you and Mr. Weinstein had?

08:49:42  13   A.  Oh, yes, there were several.  There were several.

08:49:46  14   Q.  Would you please walk us through the agreements?

08:49:48  15   A.  Sure.  So -- and Mr. Weinstein laid out the construct

08:49:52  16   for this hypothetical negotiation.

08:49:55  17          We both agree that a reasonable royalty is an

08:49:58  18   appropriate measure of damage.  We both agree that this

08:50:02  19   hypothetical -- hypothetical negotiation and assumptions

08:50:05  20   that go behind that hypothetical negotiation in terms of

08:50:09  21   the structure, what was known at the time, what was known

08:50:12  22   and what could be used in future events.  The date of that

08:50:17  23   hypothetical negotiation is March 2015, we both agree on.

08:50:20  24          Mr. Weinstein and I both use and we both consider

08:50:22  25   those Georgia-Pacific factors that he identified and talked

08:50:25  1  to you about as helping to inform our analyses and helping

08:50:29  2  us conduct that hypothetical negotiation.

08:50:33  3         And we both agree that the damage period for this

08:50:36  4  case is going to run from December 2016 through trial.  We

08:50:41  5  both, I believe, used November 4th as the date of our -- of

08:50:45  6  our analyses.  So December 15th, 2006, through November 4th

08:50:50  7  of -- of today.

08:50:51  8  Q.  Now, December '16 through November 4th, 2019, is just

08:51:01  9  under three years.  Do you agree with that?

08:51:02  10  A.  Yes, it's about 2.89 years.

08:51:05  11  Q.  Are there other areas that you agreed with

08:51:08  12  Mr. Weinstein?

08:51:10  13  A.  Yes, there are.

08:51:11  14  Q.  Will you please describe those for the jury?

08:51:14  15  A.  Sure.  And, again, this is a very important piece.

08:51:17  16  This is something that both Mr. Weinstein and I both agree

08:51:20  17  on.

08:51:22  18         Again, we're measuring the benefits attributable

08:51:24  19  to the patents-in-suit, and -- and so the benefits

08:51:28  20  attributable to the patents-in-suit and - and the proper

08:51:31  21  quantification of those benefits puts a cap on -- on what

08:51:34  22  the damages would be as to how we're calculating our

08:51:38  23  royalty opinion.

08:51:39  24  Q.  And does Mr. Weinstein -- is this the testimony from

08:51:43  25  Mr. Weinstein last week where he's indicating his agreement

08:51:46  1  with you on the cap?

08:51:47  2  A.  Yes, it is.  As you can see there, he's saying that the

08:51:51  3  switch to manual capture, it places a finite cap on what

08:51:56  4  the amount of the damages would be.

08:51:58  5  Q.  Now, as far as non-infringing alternatives, what would

08:52:02  6  you do to analyze that?

08:52:04  7  A.  So a couple of things, and if I could, maybe just to

08:52:08  8  reorient ourselves, the hypothetical negotiation that we

08:52:11  9  were looking at is going to occur here in the 2015 time

08:52:15  10  frame.

08:52:16  11      At that point in time, we knew that Wells Fargo

08:52:20  12  had over the course of three and a half years or so spent a

08:52:24  13  significant amount of time evaluating MRDC and that MRDC

08:52:30  14  was a manual capture MRDC because auto capture didn't exist

08:52:34  15  at that time.  And so we know that -- that Wells Fargo had

08:52:37  16  evaluated that, and Ms. Lockwood-Stein testified to some of

08:52:42  17  that, as well.

08:52:43  18      We also know at the time of the hypothetical

08:52:46  19  negotiation that Wells Fargo was already in the market

08:52:50  20  for -- for two years -- a little over two years, with a

08:52:53  21  working viable manual capture MRDC system.  And so that's

08:53:00  22  one -- or two pieces of evidence.

08:53:02  23      THE COURT:  Counsel, approach the bench, please.

08:53:05  24      (Bench conference.)

08:53:09  25      THE COURT:  I'm told by the courtroom deputy that

08:53:13  1  the monitors are not working at Plaintiff's counsel table;

08:53:17  2  is that correct?

08:53:17  3      MR. SHEASBY:  That's correct.  But we didn't want

08:53:19  4  to interrupt the examination, Your Honor.

08:53:20  5      THE COURT:  Well, I don't -- I mean, I assume this

08:53:22  6  is going to be a lengthy examination.  If we need to get

08:53:25  7  somebody in here and get them fixed, now is the time to do

08:53:27  8  it.

08:53:28  9      MR. SHEASBY:  I think we probably should.

08:53:29  10      THE COURT:  I mean, I would do the same thing if

08:53:31  11  they were not working at defense table.

08:53:33  12      MS. WILLIAMS:  Oh, of course, Your Honor.  Yes, of

08:53:35  13  course, by all means.

08:53:36  14      THE COURT:  All right.  I'll send the jury out for

08:53:40  15  just a few minutes.  The Court has an IT person on staff

08:53:44  16  here, and I assume you have an IT person.

08:53:47  17      MR. SHEASBY:  Yes, Your Honor.

08:53:48  18      THE COURT:  We'll get them in here and see if we

08:53:51  19  can get it fixed.

08:53:52  20      MR. SHEASBY:  Thank you.

08:53:52  21      MS. WILLIAMS:  Yes, Your Honor.  Thank you.

08:53:55  22      (Bench conference concluded.)

08:53:55  23      THE COURT:  Ladies and gentlemen, there's a

08:53:56  24  technical issue that's arisen that we need to take care of

08:54:00  25  that shouldn't take more than a few minutes, but I'm not

08:54:02   1   going to keep you in the courtroom or in the jury box while

08:54:05   2   that's done.

08:54:06   3        I'm going to ask you to retire to the jury room

08:54:09   4   for just a few minutes.  You can leave your notebooks in

08:54:11   5   your chairs, if you will.  Just close them.  Follow all my

08:54:14   6   instructions and don't discuss the case -- clearly not to

08:54:17   7   discuss the case among yourselves.  And hopefully in just a

08:54:21   8   few minutes we'll have you back in here.

08:54:23   9        The jury is excused to the jury room.

08:54:25   10        COURT SECURITY OFFICER:  All rise.

08:54:26   11        (Jury out.)

08:54:29   12        THE COURT:  All right.  I understand Plaintiff's

08:54:47   13   monitors are not working on their counsel table.  Let's see

08:54:51   14   if we can get them fixed, whoever your IT person is.  And

08:54:59   15   then the Court's IT person is on the way in.

08:55:01   16        We'll go off the record.

08:55:04   17        (Recess.)

08:55:53   18        THE COURT:  All right.  Let's go back on the

08:55:54   19   record.

08:55:55   20        Counsel, if you'll take your places.

08:55:57   21        Mr. Johnston, if you'll bring the jury back in.

08:56:01   22   It appears we now have the problem fixed.

08:56:21   23        COURT SECURITY OFFICER:  All rise.

08:56:21   24        (Jury in.)

08:56:27   25        THE COURT:  Thank you, ladies and gentlemen.

08:56:41  1  Please have a seat.

08:56:42  2      We'll continue with Defendant's direct examination

08:56:46  3  of Mr. Gerardi.

08:56:47  4      Ms. Williams, you may proceed.

08:56:50  5      MS. WILLIAMS:  Thank you, Your Honor.

08:56:51  6  Q.  (By Ms. Williams)  Mr. Gerardi, we were -- before we

08:56:53  7  broke, we were talking about manual capture and what forms

08:56:58  8  the basis of your belief that it is a non-infringing

08:57:02  9  alternative.

08:57:02  10      Will you please -- so what is it -- why do you --

08:57:06  11  why is it your opinion that it's a non-infringing

08:57:08  12  alternative?

08:57:08  13  A.  Sure.  So, again, just to pick up where we left off, we

08:57:13  14  can see that USAA -- I'm sorry, Wells Fargo was in the

08:57:17  15  market for two years prior to that.

08:57:20  16      And if you look at their expectations, these are

08:57:24  17  data -- I think we've seen some examples of this

08:57:28  18  previously -- Wells Fargo had initially back in this time

08:57:31  19  frame, 2009, '10, and '11, projected what they thought the

08:57:36  20  market was going to look like.

08:57:37  21      And if you look at the actual Wells Fargo

08:57:40  22  volume -- MRDC volume, a manual capture-only system, you

08:57:44  23  can see by 2013, they were significantly well above their

08:57:48  24  expectations.  And so they were putting through volume that

08:57:51  25  far exceeded what they thought was going to happen.  So

08:57:53  1  another indication that it was a viable alternative for

08:57:56  2  them.

08:57:59  3  Q.  Did you see anything else that -- that suggested to you

08:58:01  4  that manual capture was acceptable?

08:58:02  5  A.  Yes, I did.  We knew, again, at the time of the

08:58:09  6  hypothetical negotiation that Chase, second largest bank in

08:58:12  7  the country at the time, was in the market for five years

08:58:15  8  at that point in time performing manual capture MRDC.

08:58:18  9  Q.  And what about USAA, is there any information about

08:58:23  10  their use of manual capture that you considered?

08:58:26  11  A.  Sure.  Again, we knew at the time of the hypothetical

08:58:30  12  negotiation that USAA was in the market for approximately

08:58:32  13  four years with a viable, working manual capture MRDC

08:58:37  14  system.

08:58:38  15       So all those things would have been known prior to

08:58:40  16  the hypothetical negotiation that we're looking at.

08:58:43  17  Q.  So, at the time of the hypothetical negotiation, USAA

08:58:46  18  and Wells Fargo both would have known about Wells Fargo's

08:58:50  19  use of manual capture, Chase's use of manual capture, and

08:58:54  20  USAA's manual capture.  Do I understand that correctly?

08:58:57  21  A.  Yes, you do.

08:58:59  22  Q.  You've heard testimony while you've been sitting in

08:59:03  23  trial about -- from USAA contesting whether manual capture

08:59:09  24  could be performed at scale.  Do you -- do you have an

08:59:12  25  understanding of what "at scale" means?

08:59:13   1   A.  So I think in this context, "at scale" means are the

08:59:18   2   systems at or can be expanded to accommodate the volumes

08:59:22   3   that we're talking about or that were expected by the banks

08:59:25   4   at that time.

08:59:25   5          And so by looking, again, at USAA's own

08:59:30   6   experience -- I'm sorry, Wells Fargo's own experience, they

08:59:32   7   were expecting this; they got that.  You could see that

08:59:38   8   Chase was in the market, and as the second largest bank,

08:59:41   9   provides processing for a lot of checks.  They were doing

08:59:45  10   that at scale, as well.

08:59:46  11   Q.  Based on your review -- let me -- while you've been

08:59:51  12   here, you've also heard about the Futurion Report, correct?

08:59:54  13   A.  I have.

08:59:56  14   Q.  All right.  And -- and the Futurion Report says that

09:00:01  15   auto capture must now be treated as a must have feature

09:00:05  16   across all strata of the financial services industry.  Do

09:00:08  17   you remember that?

09:00:09  18   A.  I do remember that.

09:00:11  19   Q.  Okay.  And you've seen that in PX-5, correct?

09:00:14  20   A.  Yes, I have.

09:00:15  21   Q.  Now, how does that impact your analysis of whether

09:00:20  22   manual capture was an acceptable alternative to auto

09:00:25  23   capture?

09:00:25  24   A.  I've not seen any empirical data from the Futurion

09:00:33  25   Studies at all that would allow me, or I think anyone else,

| | | |
|---|---|---|
| 09:00:37 | 1 | to evaluate, to what extent a customer is going to come to |
| 09:00:41 | 2 | a bank or leave a bank, whether that bank has auto capture. |
| 09:00:43 | 3 | I haven't seen any of that empirical data in here at all. |
| 09:00:47 | 4 | I disagree with several of the points that are in |
| 09:00:57 | 5 | the Futurion Studies. |
| 09:00:58 | 6 | Q.  Has Wells Fargo made any business decisions with regard |
| 09:01:01 | 7 | to its Mobile Deposit product that you considered as part |
| 09:01:04 | 8 | of your analysis around manual capture? |
| 09:01:07 | 9 | A.  Yes, they have. |
| 09:01:08 | 10 | Q.  And what is that? |
| 09:01:09 | 11 | A.  Yesterday, you heard from Ms. Lockwood-Stein again that |
| 09:01:13 | 12 | after Wells Fargo introduced its auto capture in 2015 -- |
| 09:01:20 | 13 | 2000 -- yeah, that point in time, there were a number of |
| 09:01:23 | 14 | complaints.  There were a number of issues that came up |
| 09:01:27 | 15 | that Ms. Lockwood-Stein and others were aware of.  And they |
| 09:01:29 | 16 | made an informed business decision to reintroduce that |
| 09:01:34 | 17 | button that we see there back onto the screen to |
| 09:01:38 | 18 | accommodate or to address the concerns that were raised by |
| 09:01:42 | 19 | their customers that they wanted auto -- that they wanted |
| 09:01:47 | 20 | manual capture. |
| 09:01:47 | 21 | Q.  While you've been in trial or sitting in trial, have |
| 09:01:51 | 22 | you heard any witness for either side disagree that manual |
| 09:01:58 | 23 | capture does not infringe USAA's patents? |
| 09:02:00 | 24 | A.  No, I have not. |
| 09:02:03 | 25 | Q.  If the jury agrees that mobile deposit with manual |

09:02:12    1  capture is an acceptable alternative to auto capture, what

09:02:15    2  analysis did you do to calculate damages?

09:02:17    3  A.  So, again, my role is to evaluate the -- the addition

09:02:24    4  of value provided by auto capture over the pre-existing

09:02:32    5  mobile remote deposit system that's using manual capture.

09:02:36    6       So my analysis is to say what's the incremental

09:02:39    7  difference there.  And so I want to look at what's

09:02:41    8  happening up here at the MRDC level and evaluate what's

09:02:45    9  going on between auto capture and manual capture.

09:02:49   10  Q.  And you have up here on -- on your slide ATM and

09:02:55   11  teller.  Are -- are these other ways that checks get

09:02:58   12  deposited at Wells Fargo?

09:02:59   13  A.  Sure.  So, again, there's three primary ways an item or

09:03:03   14  a check gets into the bank.

09:03:04   15       One is through MRDC.  Second is going to be

09:03:09   16  through the ATM channel.  Third is going to be through the

09:03:13   17  teller channel.

09:03:14   18       And, again, I think it's important to recognize

09:03:16   19  that once those three items and those images are taken,

09:03:22   20  once they get sent into the system, everything that occurs

09:03:25   21  in that closet, everything that occurs in that back end,

09:03:29   22  it's all the same.  All those items being processed the

09:03:32   23  same, once they're entered into the system.

09:03:35   24  Q.  Is this information that the parties both would have

09:03:39   25  known at the time of the hypothetical negotiation?

09:03:41  1  A.  Yes, absolutely.

09:03:42  2  Q.  And why is it -- and to your knowledge, does USAA agree

09:03:48  3  with that?

09:03:48  4  A.  Yes, I understand they do.

09:03:52  5  Q.  And is this Mr. Bueche's testimony from earlier in the

09:04:00  6  trial?

09:04:00  7  A.  Yes.  So I was here, and Mr. Bueche did agree that

09:04:05  8  regardless of the capture method, whether it's MRDC, ATM,

09:04:11  9  or teller, once that item gets put to -- put into the

09:04:15  10  system, everything that goes on beyond in that door that I

09:04:19  11  had in the illustration is the same.

09:04:21  12  Q.  Well, describe for us when you're evaluating damages,

09:04:24  13  what is it that you're trying to value?

09:04:26  14  A.  So, again, you want to measure the incremental benefit.

09:04:31  15  What's the change between -- or what's the benefit that the

09:04:34  16  bank has received?

09:04:35  17       In this matter, I'm looking at the incremental

09:04:38  18  benefit or the additional benefit provided between the

09:04:42  19  manual capture process that the bank was already using and

09:04:46  20  not accused of infringing and the auto capture system that

09:04:48  21  is accused of infringement, and a specific method of auto

09:04:53  22  capture using USAA's patents.

09:04:54  23  Q.  Did Mr. Weinstein do the same analysis?

09:04:58  24  A.  No, he didn't.

09:04:59  25  Q.  All right.  We'll talk about that a little bit later.

09:05:02  1        Now, when you went to do your analysis of this

09:05:08  2   incremental benefit, where did you start?

09:05:10  3   A.  So I started with trying to evaluate what were the

09:05:14  4   acceptance rates.  And we've heard a lot of testimony the

09:05:17  5   last few days about manual capture and auto capture

09:05:20  6   acceptance rates or success rates.

09:05:23  7        And so I wanted to first evaluate and see what are

09:05:26  8   Wells Fargo's acceptance rates, both from a manual capture

09:05:29  9   standpoint and from an auto capture standpoint.

09:05:32  10  Q.  Where did you find the manual success rate information?

09:05:38  11  A.  So PX-31 was a document that Ms. Lockwood-Stein

09:05:43  12  presented to you yesterday -- yesterday is the starting

09:05:48  13  point from what I looked at and what I used.

09:05:52  14  Q.  And looking at PX-31, what data points from this

09:05:58  15  information that Wells Fargo provided did you use?

09:05:59  16  A.  So what you see on the screen primarily is a summation

09:06:03  17  of the information that I pulled out of PX-31.  And you can

09:06:08  18  see that we look at the still rates for both iOS and

09:06:12  19  Android.  We looked at the manual acceptance rates for iOS

09:06:16  20  and Android -- and I calculated that last column.  It's

09:06:19  21  called still and manual weighted average acceptance

09:06:22  22  rates -- for the period January of '17 through May '19.

09:06:26  23  And I used the period -- the data from January of 2018

09:06:31  24  which demonstrated a manual weighted average acceptance

09:06:36  25  rate of 81.17 percent.

09:06:37  1  Q.  Did you also find -- or look for success rates for auto

09:06:43  2  capture?

09:06:43  3  A.  Yes, I did.

09:06:45  4  Q.  Where did you -- where did you find that information?

09:06:49  5  A.  So, again, using Lockwood-Stein -- I'm sorry, PX-31,

09:06:54  6  same source, same document -- I used that source, as well.

09:06:58  7  Q.  And when you looked at PX-31, the information provided

09:07:02  8  by Wells Fargo, what did you determine?

09:07:04  9  A.  So, again, this is what you see is a summation of the

09:07:08  10  information I pulled out of PX-31.  I can see the auto

09:07:11  11  capture acceptance rates for both iOS, Apple, and the

09:07:16  12  Android systems.  And, again, I calculated that weighted

09:07:20  13  average auto capture acceptance rate, and that ranged

09:07:24  14  anywhere from 77.86 percent to 90.79 percent.

09:07:29  15  Q.  So for auto capture, you used a range?

09:07:31  16  A.  For auto capture, I used the actual data that Wells

09:07:36  17  Fargo experienced over that time period, that's correct.

09:07:38  18  Q.  And for manual capture, you picked 81.17 percent?

09:07:43  19  A.  Correct.

09:07:44  20  Q.  And if we look at the manual capture rates from -- from

09:07:48  21  PX-31 -- I mean, 81.17 percent looks like the highest

09:07:52  22  number you could have selected?

09:07:54  23  A.  It's not the highest, but it is close to the highest.

09:07:57  24  Q.  And why did you do that?

09:07:58  25  A.  So, again, remember Ms. Lockwood-Stein testified that

09:08:05 1   PX-31 represents the data that Wells Fargo observed, and

09:08:11 2   particularly the manual capture data that Wells Fargo

09:08:14 3   observed, after the item has already failed auto capture.

09:08:18 4         So -- so it's an artificially low representation

09:08:22 5   of what Wells Fargo would have experienced or expected to

09:08:27 6   have experienced at the time of this hypothetical

09:08:29 7   negotiation for a true manual capture system.

09:08:32 8         I used other data to corroborate that, but I used

09:08:36 9   that data, given the limitations of what's in PX-31.

09:08:40 10  Q.  Once you had the success rate for manual capture and

09:08:47 11  the success rate for auto capture from Wells Fargo's data,

09:08:51 12  what did you do next?

09:08:52 13  A.  So, again, the second thing I did is just to put it

09:08:55 14  into text in evaluating that.

09:09:00 15        So -- so what we can see here -- so for the period

09:09:04 16  in question, December '16 through -- through November '19,

09:09:08 17  we have a number of MRDC deposits, and it's 231.3 million

09:09:14 18  units or so.  That's in the second -- first column.

09:09:18 19        Mr. Weinstein and I agree on that number.  That's

09:09:21 20  not -- not something we dispute.

09:09:23 21        I looked at the manual capture -- I'm sorry, the

09:09:25 22  but for capture rates.  I'm going to use 81.17 percent

09:09:30 23  because I'm saying had Wells Fargo continued with its

09:09:34 24  manual capture MRDC system, that is the level of manual

09:09:40 25  capture acceptance rates they would have considered.  I

09:09:43   1   looked at the auto capture acceptance rates over time, and
09:09:46   2   I calculated the difference between those two, and if the
09:09:50   3   calculation of those -- the difference between those two
09:09:56   4   leads me to the additional number of checks that would need
09:10:00   5   to be processed manually if they didn't use auto capture.
09:10:03   6   So that comes up to 16.4 million units approximately.
09:10:13   7   Q.   Sorry.  Did you consider any other data in this step of
09:10:17   8   your analysis?
09:10:18   9   A.   Yes, I did.
09:10:19   10   Q.   Will you please tell us what you considered?
09:10:21   11   A.   So there were a number of pieces of information, and,
09:10:25   12   again, let's orient ourselves.  I'm back at the time of
09:10:28   13   this hypothetical negotiation, and I'm Wells Fargo and I'm
09:10:32   14   USAA, and I'm trying to understand what is an expected
09:10:37   15   manual capture acceptance rate.  And so we talked about
09:10:40   16   what I -- what I used from US -- Wells Fargo's perspective.
09:10:44   17          I know that in 2012, and the parties know that in
09:10:48   18   2012, USAA's manual capture success rate was 83.9 percent,
09:10:53   19   so approximately 84 percent.  They would also know that in
09:10:57   20   the first full year after going to auto capture, the
09:11:00   21   success rate was 87.3 percent.  So roughly a three and a
09:11:07   22   half, 4 point differential.
09:11:10   23   Q.   Now, we've heard about Mitek.  Did you consider any --
09:11:13   24   any information from Mitek during this part of your
09:11:16   25   analysis?

09:11:16  1   A.  Yes, I did.

09:11:17  2   Q.  What did you consider?

09:11:18  3   A.  So, again, Mitek -- and they're the provider of

09:11:23  4   these -- of these front-end systems -- Mitek's expectation

09:11:28  5   that adding auto capture would improve a customer's manual

09:11:34  6   capture experience by approximately 5 to 7 percent.

09:11:37  7   Q.  And you are -- you're referencing DTX-232?

09:11:41  8   A.  Oh, yes, my apologies, DTX-232.

09:11:49  9   Q.  During trial, have you heard any additional information

09:11:51  10  that you -- that supports your 81.17 percent?

09:11:55  11  A.  Yes, I have.

09:11:55  12  Q.  What is that?

09:11:56  13  A.  So the first thing we had was -- was Mr. Calman's

09:12:03  14  demonstrative PDX-3.9.  So he's looking at here  -- at two

09:12:09  15  points in time from USAA's experience from April 2013.  It

09:12:12  16  shows a 15.97 percent failure rate.  What that -- what that

09:12:16  17  means is there's an 84 percent acceptance rate.  And he's

09:12:21  18  showing a 9.31 percent failure rate when they went to auto

09:12:25  19  capture, which, again, translates to a 90, 91 percent

09:12:29  20  acceptance rate.  So the difference between those two, as

09:12:32  21  he states here, is a 6.6 percent differential in the

09:12:36  22  acceptance rates on moving from manual to auto.

09:12:39  23  Q.  Did Mr. Calman also talk about a DT -- DTX-160?

09:12:47  24  A.  Yes, I believe he did.

09:12:48  25  Q.  Let's look at that.  And what does this tell us about

09:12:52   1   manual acceptance rates?

09:12:53   2          MR. SHEASBY:  Your Honor, objection.  Outside of

09:12:55   3   the scope of his report.

09:12:56   4          THE COURT:  What's your response, Ms. Williams?

09:13:02   5          MS. WILLIAMS:  Your Honor, Mr. Calman testified to

09:13:04   6   DTX-160, at trial.  And so Mr. Gerardi is identifying that

09:13:09   7   to corroborate what he's already testified to.  In

09:13:12   8   addition, it is one of the documents that he reviewed in

09:13:16   9   connection with his report.

09:13:20   10         THE COURT:  The objection is overruled.

09:13:29   11   Q.  (By Ms. Williams)  Mr. Gerardi, Mr. Calman identified

09:13:32   12   DTX-160 during his testimony and talked about it.  How did

09:13:35   13   you -- what does this tell us about the 81.17 percent

09:13:39   14   manual acceptance rate?

09:13:40   15   A.  So what this document is, it's a document produced by

09:13:47   16   Wells Fargo at a point in time that shows that for the

09:13:50   17   period September 5th, they had a pre-MiSnap, so, again,

09:13:58   18   pre-auto capture acceptance rate of 20.48 percent -- I'm

09:14:04   19   sorry, failure rate.  So the acceptance rate is the inverse

09:14:08   20   of that.  So approximately 80 percent.

09:14:11   21          It shows that post-MiSnap, they had an 18.68

09:14:16   22   percent failure rate.  And so, again, that shows in their

09:14:21   23   own words roughly 6 percent improvement.  Limited data but

09:14:26   24   it shows that they were experiencing a 6 -- a 6 percent

09:14:31   25   improvement moving from manual capture to auto capture.

09:14:33  1   Q.  And this was in 2014?

09:14:38  2   A.  Yes, ma'am.  So, again, it was prior to the

09:14:42  3   hypothetical negotiation.

09:14:42  4   Q.  Did you hear any testimony from Mr. Bueche about

09:14:47  5   acceptance rates during trial?

09:14:49  6   A.  Yes, I did.

09:14:50  7   Q.  And what -- what did you hear about that?

09:14:52  8   A.  So Mr. Bueche explained that -- that in 2014, after

09:14:59  9   they launched part of their auto capture, they had a

09:15:04  10  failure, whatever happened, that during that time period

09:15:08  11  when auto capture was down, USAA experienced a failure rate

09:15:13  12  of 19 percent on a manual capture basis, and, again, the

09:15:17  13  inverse of that means that they had a manual success rate

09:15:20  14  of 81 percent.

09:15:22  15  Q.  All right.  So let's go back to Step 1.

09:15:25  16          Once you had -- once you had the -- the success

09:15:31  17  rate for manual capture and the success rate for auto

09:15:33  18  capture, what did you do with those numbers?

09:15:36  19  A.  Okay.  So, again, to orient ourselves again.  I have

09:15:41  20  16.4 million units that would have to be reintroduced into

09:15:45  21  Wells Fargo's system somehow.  Some of those units, the

09:15:50  22  user may have tried to use the MRDC again, and maybe after

09:15:54  23  the second or third or fourth time it went in.  I didn't

09:15:58  24  consider that.

09:15:58  25          I said, okay, those 16.4 million units are going

09:16:02  1  to come in either through the ATM channel or the teller

09:16:05  2  channel.  Wells Fargo produced data.  We could see that --

09:16:09  3  that approximately 46 percent of all those volumes came in

09:16:13  4  through the ATM channel -- it's like, 44 percent through

09:16:17  5  the ATM channel, 56 percent to the teller channel.  So

09:16:20  6  basically, I took those 16.4 million units, and spread them

09:16:24  7  across the ATM teller channels based upon Wells Fargo's

09:16:30  8  actual experience on those channels.

09:16:31  9  Q.  So what you're saying is 7.2 million checks that would

09:16:36  10  have been deposited by mobile deposit would be deposited by

09:16:43  11  ATM in the manual capture environment?

09:16:45  12  A.  Correct.

09:16:45  13  Q.  And 9.2 million checks would be deposited in -- by

09:16:50  14  teller if Wells Fargo were using manual capture over this

09:16:54  15  three-year time period that we're talking about?

09:16:57  16  A.  That's correct.

09:16:58  17  Q.  16.4 million checks, is that a lot?

09:17:04  18  A.  Relatively speaking, no, not at all.

09:17:08  19  Q.  Why do you say that?

09:17:09  20  A.  So, again, I think you have to put this into context.

09:17:12  21      For the period 2017 through the data I looked at,

09:17:16  22  beginning of 2019, Wells Fargo processed 273 million items

09:17:22  23  through their ATM channel, and they processed 344 million

09:17:27  24  items through their teller channel.  So these other

09:17:30  25  volumes, the 7.2 million and the 9.2 million, you're adding

09:17:35  1   maybe 2 percent volume to that existing infrastructure.

09:17:39  2   And so from that context, no, it's not significant.

09:17:42  3   Q.  Mr. Weinstein suggested that Wells Fargo was going to

09:17:45  4   have to build more branches to accommodate mobile deposit

09:17:52  5   volume.  Do you agree or disagree with that?

09:17:54  6   A.  Totally disagree with that.

09:17:55  7   Q.  Well, why do you disagree?

09:17:58  8   A.  So, again, I think you got to put this into context --

09:18:02  9   excuse me, I just moved that -- I think you've got to put

09:18:05  10  this into context.

09:18:06  11       Of the 16.4 million items we were just talking

09:18:10  12  about, I say 56 percent would have gone into the teller

09:18:13  13  channel.  So, again, 9.2 million checks would have gone

09:18:21  14  into that teller channel.  Over the roughly three years

09:18:26  15  we're talking about here for the damage period means that

09:18:26  16  3.1 million items would have gone to that check channel

09:18:29  17  per -- teller channel per year.

09:18:31  18       What does that mean?  There's 251 banking working

09:18:36  19  days during the course of the year.  That means you're

09:18:38  20  going to have 12,667 checks per day going into the

09:18:44  21  branches.

09:18:45  22       Wells Fargo has over 5,500 branches, and so

09:18:49  23  basically the math says you're going to put 2.3 checks per

09:18:53  24  day into a branch.  And so I -- I find it hard to -- to

09:18:58  25  imagine that Wells Fargo is going to build a new branch to

| | | |
|---|---|---|
| 09:19:01 | 1 | accommodate 2.3 additional checks a day. |
| 09:19:04 | 2 | Q.  Is it reasonable to think that Wells Fargo would pay |
| 09:19:08 | 3 | hundreds of millions of dollars to build new branches? |
| 09:19:11 | 4 | A.  Absolutely not. |
| 09:19:12 | 5 | Q.  All right.  Now, you talked about the additional checks |
| 09:19:14 | 6 | that would need to be deposited by teller, but what about |
| 09:19:18 | 7 | the ATM? |
| 09:19:19 | 8 | A.  So if we go through and perform the same analysis, the |
| 09:19:22 | 9 | same steps that I went through, the only difference here |
| 09:19:24 | 10 | being really the 44 percent that are coming in through ATM, |
| 09:19:32 | 11 | Wells Fargo has over 13,000 ATMs.  And so if you look at |
| 09:19:37 | 12 | that additional volume, we're talking three quarters of a |
| 09:19:40 | 13 | check per day that may have to be deposited into an ATM. |
| 09:19:44 | 14 | Q.  Now, we heard testimony that it is more expensive for |
| 09:19:47 | 15 | Wells Fargo to process checks through teller and ATM |
| 09:19:54 | 16 | instead of mobile deposit. |
| 09:19:56 | 17 | So when we talk about these 16.4 million checks |
| 09:20:00 | 18 | that need to go to another channel, what kind of cost is |
| 09:20:03 | 19 | Wells Fargo looking at incurring? |
| 09:20:05 | 20 | A.  Sure.  And I have a demonstrative to explain that. |
| 09:20:06 | 21 | So Wells Fargo, again, produced and we analyzed |
| 09:20:11 | 22 | the cost structures for ATM and teller processing. |
| 09:20:19 | 23 | Variable costs are costs that are going to change with |
| 09:20:21 | 24 | volume.  Fixed costs are fixed costs.  They're not going to |
| 09:20:27 | 25 | change with volume. |

09:20:28   1         So think about it.  If you have a bank and you pay

09:20:31   2    rent or a fixed cost for that branch, if you process two

09:20:34   3    more checks during that -- to that branch during that day

09:20:36   4    or during that year, you're not going to incur any more

09:20:41   5    fixed cost.  You're not going to incur any more rate from

09:20:41   6    that.

09:20:41   7         There's variable costs that are generally

09:20:45   8    associated with processing these items.  And the variable

09:20:46   9    costs for ATM transactions are listed here, and the

09:20:51   10   variable costs for teller tractions are listed here.

09:20:59   11        And so I applied those actual variable costs that

09:21:02   12   Wells Fargo incurred -- incurred in the ordinary course of

09:21:05   13   business, those incremental volumes.

09:21:07   14   Q.  What did you do -- how did you apply these numbers in

09:21:11   15   your analysis?

09:21:12   16   A.  So I think we have another demonstrative here.

09:21:14   17        So I looked at the total number of checks to be

09:21:18   18   added to the teller channel over the relative periods in

09:21:23   19   question.  I applied the actual variable costs of

09:21:27   20   processing those teller-related items and did the math and

09:21:31   21   came up with the additional costs, at least for the teller

09:21:34   22   channel of a little over $7 million.

09:21:37   23   Q.  And did you do the same calculation for ATM?

09:21:39   24   A.  I did.  So I looked at the ATM volume -- or the volume

09:21:44   25   that would have gone through the ATM channel, applied the

09:21:48  1  actual variable costs for those items, I come up with $4.7

09:21:52  2  million of additional expenses that the bank would have to

09:21:55  3  incur to process those items.

09:21:58  4  Q.  Now, were you done with your calculation and your

09:22:03  5  analysis once you got to the 7 million figure and the 4.7

09:22:07  6  million figure?

09:22:08  7  A.  No, I was not.

09:22:09  8  Q.  What did you do next?

09:22:10  9  A.  So the other thing I wanted to do is add something --

09:22:13  10  I'll call it customer experience.  When Wells Fargo moved

09:22:20  11  from manual capture to auto capture, it spent time

09:22:25  12  educating the consumer and doing other things to make it a

09:22:29  13  more user friendly experience for the customer.

09:22:32  14      I added expenses here.  Again, at the time of the

09:22:36  15  hypothetical negotiation, had Wells Fargo not moved from

09:22:39  16  its manual capture MRDC system, it potentially would have

09:22:45  17  incurred more expenses just to, again, improve the customer

09:22:49  18  experience over time.  So they're contin -- continuously

09:22:51  19  trying to improve the customer experience.

09:22:53  20      Based upon my discussions with Ms. Lockwood-Stein

09:22:55  21  and Mr. Rosati, I put in an estimate based upon three to

09:23:01  22  five additional types of projects that may have been

09:23:03  23  incurred, again, just to improve that customer experience

09:23:08  24  over time.  So I added that to the calculus.

09:23:10  25  Q.  And what is your total -- what did you determine that

09:23:14   1   Wells Fargo would be willing to pay as a part of this
09:23:17   2   hypothetical negotiation?
09:23:18   3   A.   So based upon the analysis that I've seen, Wells Fargo
09:23:23   4   was going to evaluate whether to stay with manual capture,
09:23:26   5   move to auto capture.   The most incremental benefit that it
09:23:31   6   would receive is approximately $12.5 million.   So
09:23:37   7   $12,496,736.00.
09:23:38   8   Q.   And in your opinion, is this $12.5 million the amount
09:23:47   9   Wells Fargo would pay for just -- for -- to USAA for
09:23:51  10   December 15th, 2016, through November 4th, 20 --
09:23:56  11   A.   Yes, that's --
09:23:57  12   Q.   -- 19?
09:24:00  13   A.   -- yes, that's correct.
09:24:03  14   Q.   So that's just for this roughly three-year period?
09:24:06  15   A.   That's correct.
09:24:07  16   Q.   And Mr. Weinstein is saying for that time period, that
09:24:13  17   Wells Fargo should pay $300 million?
09:24:13  18   A.   $299 million, so, yes, that's correct.
09:24:14  19   Q.   For that same three-year period?
09:24:15  20   A.   For that same three-year period.
09:24:20  21   Q.   Mr. Gerardi, I want to turn now to the -- the second
09:24:27  22   task that you were asked to -- to do in this case.   You
09:24:29  23   mentioned that there are areas where you and Mr. Weinstein
09:24:33  24   disagree.
09:24:37  25   A.   Correct.

09:24:37  1  Q.  All right.  So let's -- can you walk us through your

09:24:40  2  first area of disagreement with him?

09:24:41  3  A.  Sure.  And I think we have a demonstrative just to help

09:24:45  4  with that.

09:24:45  5       So, again, the -- the biggest area I have of

09:24:53  6  disagreement with Mr. Weinstein is -- is evidence relates

09:24:55  7  to a number of pieces of information that are coming from

09:25:00  8  2010, 2011, and Wells Fargo's evaluation of what they were

09:25:05  9  going to do to come into the MRDC market.  All those

09:25:11  10  evaluations, whether it's cost savings, whether it's

09:25:15  11  projected increases in total deposits, whether it's other

09:25:20  12  ecosystem benefits, are all predicated upon a manual

09:25:23  13  capture system.

09:25:23  14       So -- so he's not evaluating the incremental

09:25:26  15  benefits of auto capture.  He's looking at the benefits of

09:25:31  16  a -- of a manual deposit non-infringing system.  He's not

09:25:34  17  evaluating, again, the incremental benefit that may come

09:25:38  18  from the use of auto capture based upon USAA's patents.

09:25:43  19  Q.  But you did that analysis?

09:25:44  20  A.  Yes, that's the analysis I just walked through.

09:25:48  21  Q.  All right.  And so up -- up here on the -- up here on

09:25:51  22  the monitor, we see some of the presentations that

09:25:55  23  Mr. Weinstein relied on.  And is there anything in these

09:26:00  24  presentations that you saw that addressed auto capture?

09:26:02  25  A.  Absolutely none.

09:26:03   1   Q.   Is there anything in these presentations that

09:26:07   2   identifies the differences and the benefits from auto

09:26:11   3   capture?

09:26:11   4   A.   Absolutely none.

09:26:12   5   Q.   Were there other aspects of Mr. Weinstein's analysis

09:26:15   6   that you disagree with?

09:26:16   7   A.   Yes.

09:26:18   8   Q.   All right.   What is the next one?

09:26:19   9   A.   So, again, this goes to the -- to the issue of building

09:26:23   10   branches and -- and as they relate to mobile deposit.

09:26:29   11          Mr. Weinstein's analyses, as I understand it, is

09:26:33   12   saying that without MRDC, these items would have to go back

09:26:38   13   into the branch somehow.   He's, again, ignoring the fact

09:26:41   14   that manual capture MRDC is there.   And, again, he's

09:26:46   15   ignoring the capacity analyses that I just walked through

09:26:49   16   with you that a bank could still process these -- these

09:26:52   17   items through its existing channel.   Again, 5,500 branches

09:26:57   18   and 13,000 ATMs have the capacity to handle these

09:27:03   19   additional items.

09:27:03   20   Q.   But isn't Mr. Weinstein going a step further?   He's

09:27:06   21   saying that Wells Fargo wouldn't even offer mobile deposit

09:27:09   22   if auto capture wasn't available?

09:27:10   23   A.   Well, again, that goes back to what I said before.

09:27:14   24   He's ignoring the fact that MRDC is there.   He's saying if

09:27:17   25   it wasn't there, everything would have to go back into

09:27:20   1   manual or teller, even though we know Wells Fargo had an

09:27:24   2   existing, working, viable, manual deposit -- I'm sorry,

09:27:29   3   manual capture mobile deposit system.

09:27:31   4   Q.  Now, I -- I heard you say -- I just want to make sure

09:27:33   5   that I'm clear.  He's saying that everything would have to

09:27:35   6   go back into ATM or teller, right?

09:27:37   7   A.  Correct.

09:27:39   8   Q.  And completely ignoring mobile deposit with manual

09:27:44   9   capture?

09:27:44  10   A.  His analysis, as I understand it, assumes that that

09:27:48  11   channel just does not exist.

09:27:51  12           THE COURT:  Counsel, approach the bench, please.

09:27:52  13           (Bench conference.)

09:27:59  14           THE COURT:  Ms. Williams, if you're going to

09:28:02  15   testify, I'll put you on the witness stand.

09:28:05  16           MS. WILLIAMS:  Yes, Your Honor.

09:28:05  17           THE COURT:  You can't lead the witness like that.

09:28:07  18           MS. WILLIAMS:  Yes, Your Honor.

09:28:07  19           THE COURT:  Let's proceed.

09:28:08  20           (Bench conference concluded.)

09:28:15  21           THE COURT:  Let's proceed.

09:28:16  22           MS. WILLIAMS:  Yes, Your Honor.

09:28:17  23   Q.  (By Ms. Williams)  Mr. Gerardi, do you have other

09:28:22  24   disagreements with Mr. Weinstein's analysis?

09:28:24  25   A.  Yes, I do.

09:28:25   1   Q.   What is the next disagreement you have?

09:28:27   2   A.   So I've summarized some of these here.

09:28:31   3            One of the biggest items of Mr. Weinstein's

09:28:36   4   analysis, part of that billion dollars he was coming up

09:28:41   5   with, is the cost savings that would have come from channel

09:28:44   6   optimization costs.  And, again, he's saying that if Wells

09:28:48   7   Fargo did not have MRDC or auto capture MRDC, all those

09:28:54   8   items would have to go back into the channel, teller or

09:28:57   9   ATM, and be processed at a higher cost.  Remember, we

09:29:02   10   walked through those ATM or teller costs?

09:29:05   11            A, he's saying all those items would have gone

09:29:08   12   back into the ATM or teller channel.

09:29:10   13            B, he's using the fixed costs.  So he's not saying

09:29:15   14   that they're variable costs.  He's saying that they're

09:29:17   15   fixed costs.  So you would have to incur both fixed and

09:29:21   16   variable costs to process those.  In my analogy, he would

09:29:25   17   shut down the entire mobile deposit platform that Wells

09:29:28   18   Fargo had existing already.  So in his model, that doesn't

09:29:29   19   exist.

09:29:30   20            And the second point -- we talked about this

09:29:32   21   briefly -- is, again, he's ignoring that Wells Fargo had

09:29:36   22   5,500 branches and 13,000 ATMs and does not take into

09:29:43   23   consideration that those banks -- or those ATMs had the

09:29:46   24   capacity to process volume.  He's saying that they -- they

09:29:51   25   would have had to use 184 additional branches.  I don't see

09:29:54   1   that in the data.

09:29:55   2   Q.  At the time of the hypothetical negotiation, would

09:29:59   3   Wells Fargo and USAA have that information?

09:30:02   4   A.  Yes, they would.

09:30:03   5   Q.  And is it reasonable to think that -- that Wells Fargo

09:30:08   6   would rethink using manual capture?

09:30:11   7   A.  Well, of course.  In the face of that situation, of

09:30:16   8   course they would.

09:30:16   9   Q.  Now, you've mentioned the first two on -- on your

09:30:22   10   demonstrative here on Slide 32.

09:30:23   11        What are the other two disagreements that you have

09:30:26   12   with Mr. Weinstein?

09:30:27   13   A.  So, again, one of the other elements Mr. Weinstein

09:30:30   14   presents is that he believes that mobile remote deposit

09:30:37   15   capture is going to -- is going to provide for a 20 percent

09:30:41   16   increase in new customers to the bank.  So two things with

09:30:44   17   that.  That was an aspiration that was identified in a

09:30:48   18   2009/2010 document.

09:30:50   19        A, he didn't do anything to evaluate whether, in

09:30:55   20   fact, MRDC -- manual or auto -- did, in fact, account for a

09:31:01   21   20 percent increase in new customers to the bank.

09:31:04   22        But even the bigger issue is that 20 percent

09:31:08   23   expectation of new customer growth is based upon a manual

09:31:12   24   capture system.  And he didn't do anything to determine

09:31:14   25   whether it was an increase over that 20 percent to account

09:31:17  1   for the benefits of the patent-in-suit relative to what

09:31:21  2   Wells Fargo was expecting based upon a manual-only MRDC

09:31:25  3   system.

09:31:26  4   Q.  Now, your last point on here, Mr. Gerardi, addresses

09:31:30  5   Zelle.  What is your disagreement with Mr. Weinstein on his

09:31:34  6   use of Zelle?

09:31:36  7   A.  I've seen nothing in the data produced by Wells Fargo

09:31:42  8   that would allow me to evaluate at all whether there was

09:31:48  9   any ecosystem benefit attributable to MRDC, manual or auto.

09:31:52  10  Q.  And Mr. Weinstein acknowledged that he had difficulty

09:31:56  11  in evaluating that echo -- ecosystem benefit as well,

09:31:59  12  didn't he?

09:31:59  13  A.  He did.

09:32:00  14  Q.  And do you -- what is Zelle?

09:32:04  15  A.  So Velle -- Zelle is -- is a peer-to-peer payment

09:32:09  16  system.  I could go on my iPhone or device and send

09:32:14  17  somebody $10.00 without having to do anything else.  So

09:32:17  18  it's a method of -- of -- of moving money from one account

09:32:21  19  to another without having to go to a bank.

09:32:23  20  Q.  And is -- in your opinion, is Zelle a proper proxy for

09:32:31  21  mobile deposit with auto capture in this case?

09:32:33  22  A.  No, I don't think anything demonstrates that Zelle

09:32:37  23  has -- has comparability to the claims of the

09:32:40  24  patent-in-suit that we're talking about here.

09:32:44  25  Q.  Now, let's go on to your third set of opinions in this

09:32:49  1   case.

09:32:50  2          Can you -- you mentioned that you had -- that you

09:32:55  3   believed -- or it is your opinion that Mr. Calman's 40

09:32:59  4   percent allocation to auto capture is wrong.  Why is that

09:33:05  5   your opinion?

09:33:05  6   A.  So there's a couple of examples here that come through.

09:33:09  7   Let's first talk about this error-free customer experience

09:33:12  8   model.

09:33:12  9          As I understand it Mr. Calman is trying to measure

09:33:20  10  something that occurs over a process.  So there are steps

09:33:23  11  that occur.  And what is the error-free or the errors that

09:33:27  12  occur in a step in a process.  Here we're talking about a

09:33:30  13  one-step process, auto capture or manual capture.

09:33:32  14         And for that analysis, he's using the manual

09:33:37  15  capture success rates on PX-31 that represent only the

09:33:43  16  checks that already failed auto capture.  So if you think

09:33:46  17  about it for a second, there's three primary ways an image

09:33:50  18  is not going to be accepted on your phone.  It's either an

09:33:55  19  environmental error, the light is too light, too dark or

09:33:58  20  something.  The second could be a user error.  You're too

09:34:02  21  far away, too close, you're just not doing something from a

09:34:05  22  user perspective.  Or a third is it could be a problem with

09:34:09  23  the item itself.

09:34:10  24         And so the auto capture rates that Mr. Calman is

09:34:12  25  using, they're reflecting those three experiences.

09:34:18  1        The manual capture rates that he's measuring are

09:34:23  2   what happens after auto capture has already failed.  So if

09:34:25  3   auto capture has already failed for whatever those reasons,

09:34:29  4   he's measuring a manual capture rate that is already

09:34:34  5   defective because it's not -- it's already failing the auto

09:34:36  6   capture system.  So if auto capture fails for some reason,

09:34:38  7   there's a pretty good likelihood manual capture is going to

09:34:42  8   fail as well.

09:34:42  9        So I don't think that's an appropriate test or

09:34:45  10  appropriate analysis.

09:34:46  11       The second part of that is, though, Mr. Calman's

09:34:50  12  analyses says that as a result of that test or that

09:34:53  13  analysis, 80 percent of the benefits of -- of -- of auto

09:34:58  14  capture are coming -- of MRDC are coming from auto capture.

09:35:03  15  But, you know, there's other things that are happening

09:35:05  16  there so I'm going to cut it down to 40 percent.

09:35:07  17       If the test comes up with the result but you have

09:35:10  18  to then cut it down because other things are happening,

09:35:14  19  maybe the test or maybe the analysis wasn't proper to begin

09:35:17  20  with.

09:35:22  21  Q.  Was there another analysis that Mr. Calman used to

09:35:27  22  determine the 40 percent?

09:35:29  23  A.  Sure.  So, again, he's using this Net Promoter Score

09:35:35  24  model.  And, again, nothing in that Net Promoter Score

09:35:38  25  model is tied to the specific facts and circumstances in

09:35:41  1   this case.  It's more of an academic exercise.  And he

09:35:45  2   incorrectly assumes that the success of Wells Fargo's

09:35:48  3   mobile banking is the result of auto capture.

09:35:50  4        But as we've seen in some of these other documents

09:35:55  5   and things that I've seen, there's a whole multitude of

09:35:58  6   other reasons why Wells Fargo's mobile banking platform was

09:36:02  7   successful, and he's not giving any attribution to those

09:36:06  8   either.  He's not giving any attribution to any of those

09:36:09  9   other mobile banking attributes, other than auto capture.

09:36:13  10  Q.  During -- during openings, you were here for opening?

09:36:24  11  A.  Yes, I was.

09:36:25  12  Q.  Did you hear Mr. Melsheimer's opening?

09:36:28  13  A.  Yes, I did.

09:36:29  14  Q.  And what did you hear him say about -- about checks?

09:36:36  15  A.  Generally that checks over time are becoming less

09:36:39  16  important as a use of moving money -- of payments.

09:36:42  17  Q.  Did you hear Mr. Melsheimer at any time say that checks

09:36:46  18  were irrelevant?

09:36:47  19  A.  No, ma'am.

09:36:53  20  Q.  What did Mr. Calman say about checks?

09:36:57  21  A.  Well, I think there was some back and forth, and I

09:37:00  22  think ultimately, he admitted that in the prior testimony

09:37:05  23  back from 2007, and, again, I'm just stating, that checks

09:37:10  24  are declining.  They're a dying product.

09:37:14  25  Q.  And what does that tell us about what USAA and Wells

09:37:17   1   Fargo would have understood at the time of the hypothetical

09:37:21   2   negotiation?

09:37:21   3   A.   So, again, let's position ourselves.

09:37:25   4        We're in 2015.   We know -- we have data that

09:37:30   5   demonstrates that checks as -- as -- checks' use in the

09:37:34   6   economy have been declining precipitously.   And so as part

09:37:39   7   of that negotiation, you have to take into consideration

09:37:44   8   where is the future of checks going to be, am I willing to

09:37:47   9   pay $300 million for something that's becoming less and

09:37:51  10   less important in our economy.

09:37:52  11   Q.   Mr. Gerardi, did you -- let me show you our next slide,

09:37:56  12   please.

09:37:57  13        So this is DTX-174.   What is this?

09:38:00  14   A.   This is a study that's prepared by the Federal Reserve

09:38:06  15   Bank.   And, again, it shows non-cash payments over time.

09:38:10  16   And so for -- for this period we're looking at 2000 through

09:38:14  17   2017.   And as you can see over time, checks are really just

09:38:19  18   going down, and by 20 -- 2007, give or take, you know,

09:38:25  19   checks were overtaken by debit cards.   We've all seen --

09:38:32  20   use debit cards more and more, credit cards more and more,

09:38:39  21   ACH and -- Automated Clearing House transactions,

09:38:40  22   businesses and other -- and other more enterprises are

09:38:41  23   getting rid of checks early in the process, and you have a

09:38:44  24   rise of prepaid debit cards.   Gift cards are one of the

09:38:49  25   things that have a set amount of money on them that you can

| 09:38:51 | 1 | just go to the store and use. |

09:38:51  1   just go to the store and use.

09:38:52  2       So you can see over time, checks really are

09:38:54  3   declining as a medium but -- for payments in the economy.

09:38:58  4   And, again, that check has gone down since -- throughout

09:39:01  5   the entire period here.  So at the time of the

09:39:03  6   hypothetical, you're going to know that that's happened.

09:39:05  7   Q.  So DTX-174, what is that?

09:39:10  8   A.  DTX-174, again, it was a report produced by the Federal

09:39:18  9   Reserve Bank that demonstrates that the checks in our

09:39:19  10  economy are declining significantly over time.  And would

09:39:23  11  help inform, you know, the negotiators as to where checks

09:39:27  12  are going to be over time.

09:39:28  13  Q.  And is this something that both USAA and Wells Fargo

09:39:31  14  would have known at the time of the hypothetical

09:39:32  15  negotiation?

09:39:32  16  A.  Oh, sure.  This is a public document.  It's produced by

09:39:36  17  the Federal Reserve on a regular basis.

09:39:39  18  Q.  All right.  So -- so let's go back to the hypothetical

09:39:43  19  negotiation between the parties.

09:39:44  20       And you've talked about the Federal Reserve

09:39:49  21  information.  You've talked about the decline of checks.

09:39:51  22  You've talked about the information.  But over -- overall,

09:39:55  23  what does this information have -- what is its impact on

09:40:00  24  the hypothetical negotiation for USAA and Wells Fargo?

09:40:01  25  A.  It's going to put it into perspective, and it's going

09:40:06  1   to limit the amount that the banks -- that Wells Fargo is

09:40:08  2   going to consider to pay because of where this market is

09:40:10  3   and where it's going.

09:40:12  4   Q.  And so when you heard Mr. Weinstein testify earlier

09:40:15  5   that it was going to put a finite cap, do you agree or

09:40:19  6   disagree with that?

09:40:19  7   A.  Yes.  Again, I agree that the benefits attributable to

09:40:24  8   adding auto capture or the cost of staying with manual

09:40:28  9   capture, that's the analysis that I performed and walked

09:40:30  10  you through, again, it puts a cap on the damages.  And,

09:40:35  11  again, Mr. Weinstein and I agree that if manual capture is

09:40:37  12  a viable non-infringing alternative, that's the cap that's

09:40:40  13  going to be -- that's going to form the basis of that

09:40:44  14  royalty for that period of time that we're talking about.

09:40:46  15  Q.  And if Wells Fargo and USAA perform the hypothetical

09:40:50  16  negotiation, what is the -- what would Wells Fargo have

09:40:55  17  agreed to pay in your opinion?

09:40:57  18  A.  For the period in time that I've talked about, December

09:40:59  19  15th, 2016 through November 4th, 2019, $12.5 million.

09:41:05  20  Q.  Have you also calculated damages for the period

09:41:10  21  February 3rd, 2018 through trial?

09:41:12  22  A.  Yes, I have.

09:41:12  23  Q.  And what is that number?

09:41:13  24  A.  Approximately $10.5 million.

09:41:15  25  Q.  And have you calculated damages for the period June

```
09:41:19   1   7th, 2018 through trial?
09:41:21   2   A.  Yes, I have.
09:41:22   3   Q.  And what is that number?
09:41:23   4   A.  $9 million.
09:41:25   5   Q.  If the jury finds that Wells Fargo does not infringe
09:41:28   6   USAA's patent, what are the damages?
09:41:33   7   A.  Zero.
09:41:36   8          MS. WILLIAMS:  Your Honor, may I have a moment?
09:41:38   9          THE COURT:  You may.
09:41:49  10          MS. WILLIAMS:  Your Honor, may I approach, please?
09:41:52  11          THE COURT:  You may approach the bench, counsel.
09:41:58  12          (Bench conference.)
09:41:59  13          MS. WILLIAMS:  Your Honor, I would like to ask
09:42:01  14   Mr. Gerardi if -- if USAA has licensed its patents to
09:42:05  15   anyone else.  He'll say no.  And I just want to ask that
09:42:09  16   one question.
09:42:10  17          MR. SHEASBY:  Your Honor, you've already excluded
09:42:12  18   that question.  They were attempting to ask Mr. Weinstein
09:42:15  19   that, and you said that was improper because there were no
09:42:18  20   comparable license agreements in the case.
09:42:20  21          MS. WILLIAMS:  But the fact of whether USAA has a
09:42:22  22   licensing -- has been able to license these patents is a
09:42:26  23   factor that would have gone into that negotiation at the
09:42:29  24   hypothetical -- as part of the hypothetical negotiation,
09:42:32  25   Your Honor, under the Georgia-Pacific factors.
```

09:42:33 1          MR. SHEASBY:  That's section of Mr. Gerardi's

09:42:35 2   report has been fully excluded by the Court -- during the

09:42:42 3   motion process.

09:42:43 4          MS. WILLIAMS:  So we're not going to go into

09:42:45 5   the -- go into the licensing efforts in toto.  I'm just

09:42:50 6   going to ask him one question, has USAA licensed these

09:42:53 7   patents.

09:42:53 8          MR. SHEASBY:  And that's no longer in his report,

09:42:56 9   Your Honor.  That's been fully stricken.

09:42:57 10          THE COURT:  Well, we can't ask that one question

09:43:00 11   and walk away without developing the full context, and I

09:43:03 12   believe that would be improper in light of the striking

09:43:08 13   orders that the Court's done in pre-trial with regard to

09:43:11 14   his report.  So that request is overruled.

09:43:14 15          MR. SHEASBY:  Thank you, Your Honor.

09:43:15 16          MS. WILLIAMS:  Thank you, Your Honor.

09:43:16 17          (Bench conference concluded.)

09:43:25 18          MS. WILLIAMS:  Your Honor, I pass the witness.

09:43:27 19          THE COURT:  All right.  Cross-examination.

09:43:28 20          MR. SHEASBY:  Yes, Your Honor.  May I approach

09:43:29 21   with binders?

09:43:30 22          THE COURT:  You may.

09:43:31 23          MR. SHEASBY:  Thank you.

09:43:31 24                    CROSS-EXAMINATION

09:43:56 25   BY MR. SHEASBY:

| | | |
|---|---|---|
| 09:43:56 | 1 | Q.  Good morning, Mr. Gerardi. |
| 09:43:57 | 2 | A.  Good morning. |
| 09:43:58 | 3 | Q.  I -- I've laid a binder next to your desk.  I may ask |
| 09:44:07 | 4 | you about that. |
| 09:44:07 | 5 | We've met before? |
| 09:44:09 | 6 | A.  Yes, we have. |
| 09:44:10 | 7 | Q.  We met at your deposition? |
| 09:44:12 | 8 | A.  Yes. |
| 09:44:13 | 9 | Q.  Now, you agree that for the damages period at issue in |
| 09:44:20 | 10 | this case, there were approximately 231 million checks that |
| 09:44:33 | 11 | were successfully deposited using the auto capture system |
| 09:44:35 | 12 | that's accused of infringement in this case? |
| 09:44:36 | 13 | A.  That were deposited through the MRDC system, yes, |
| 09:44:40 | 14 | that's correct. |
| 09:44:40 | 15 | Q.  No, sir, they were deposited using -- actually using |
| 09:44:44 | 16 | auto capture, correct? |
| 09:44:45 | 17 | A.  That's correct. |
| 09:44:45 | 18 | Q.  So for the ladies and gentlemen of the jury, 231 |
| 09:44:50 | 19 | million checks successfully deposited using auto capture |
| 09:44:54 | 20 | MRDC, fair? |
| 09:44:56 | 21 | A.  I would agree with that. |
| 09:44:57 | 22 | Q.  Now, sir, you're not a software engineer, fair? |
| 09:45:05 | 23 | A.  That's correct. |
| 09:45:07 | 24 | Q.  You don't build or evaluate mobile check applications, |
| 09:45:11 | 25 | correct? |

| | | |
|---|---|---|
| 09:45:11 | 1 | A.   That's correct. |
| 09:45:12 | 2 | Q.   You're not an expert in check imaging or even document |
| 09:45:16 | 3 | imaging, correct? |
| 09:45:17 | 4 | A.   That's fair. |
| 09:45:18 | 5 | Q.   And though you've referenced previous bank experience, |
| 09:45:21 | 6 | you have no experience whatsoever in commercial mobile |
| 09:45:25 | 7 | remote deposit capture industry before you were paid to be |
| 09:45:29 | 8 | an expert by Wells Fargo, correct? |
| 09:45:31 | 9 | A.   That's fair. |
| 09:45:34 | 10 | Q.   No experience in the subject matter of this case, |
| 09:45:41 | 11 | commercial MRDC industry, before being hired by Wells |
| 09:45:45 | 12 | Fargo, fair? |
| 09:45:46 | 13 | A.   Commercial MRDC, that's fair. |
| 09:45:51 | 14 | Q.   Now, because you don't have a technical background, you |
| 09:46:01 | 15 | actually spoke to a technologist in this case, correct? |
| 09:46:04 | 16 | A.   If you're referring to Dr. Villasenor, yes. |
| 09:46:08 | 17 | Q.   I am.  Dr. Villasenor, the technical individual, |
| 09:46:12 | 18 | correct? |
| 09:46:12 | 19 | A.   Yes. |
| 09:46:12 | 20 | Q.   You relied on him for technical opinions, correct? |
| 09:46:15 | 21 | A.   Yes. |
| 09:46:16 | 22 | Q.   One of the predicates that you asked the ladies and |
| 09:46:21 | 23 | gentlemen of the jury to rely on is that manual capture |
| 09:46:25 | 24 | would be a commercially viable non-infringing alternative, |
| 09:46:29 | 25 | fair? |

09:46:29  1   A.   That is one of the predicates that I cited, yes.

09:46:33  2   Q.   In fact, you mentioned it many times in your direct

09:46:36  3   examination, fair?

09:46:38  4   A.   I did.

09:46:38  5   Q.   And it was Mr. -- Dr. Villasenor who told you that

09:46:44  6   manual capture is a commercially viable non-infringing

09:46:46  7   alternative, fair?  He told you that?

09:46:48  8   A.   He was one of the people that told me that, yes.

09:46:51  9   Q.   If I could get -- Dr. Villasenor told you that manual

09:46:58  10  capture is a commercially viable non-infringing

09:47:01  11  alternative, correct?

09:47:02  12  A.   I believe he told me it was a technically

09:47:06  13  non-infringing alternative.  I don't know if I said he

09:47:08  14  gave -- he said it was commercially viable.

09:47:10  15  Q.   So why don't we turn to your deposition, Page 16, Lines

09:47:15  16  8 through 12?

09:47:21  17          Question:  So I -- so I actually just --

09:47:25  18          MS. WILLIAMS:  Objection, Your Honor.

09:47:27  19  Q.   (By Mr. Sheasby)  So --

09:47:28  20          THE COURT:  What's your objection, counsel?

09:47:29  21          MS. WILLIAMS:  If he -- he should not be

09:47:31  22  displaying this to the jury, Your Honor.

09:47:33  23          MR. SHEASBY:  Your Honor, I'm impeaching him right

09:47:35  24  now.

09:47:35  25          MS. WILLIAMS:  It's improper impeachment, Your

09:47:40   1   Honor.

09:47:40   2        MR. SHEASBY:  I'm going to show a contradictory

09:47:44   3   statement from his deposition.

09:47:44   4        THE COURT:  I -- I understand.  You need to -- you

09:47:46   5   need to give the witness an opportunity to refresh his

09:47:48   6   recollection and confirm that was his testimony, and then

09:47:50   7   if he -- if he confirms that's his testimony after it being

09:47:55   8   refreshed, then you're entitled to show the prior

09:47:58   9   inconsistent statement.

09:47:59  10        MR. SHEASBY:  So we'll go to Column 6 -- Page 16,

09:48:03  11   Lines 8 through 12.

09:48:03  12   A.  I'm sorry, where in my binder am I referring to?

09:48:08  13   Q.  (By Mr. Sheasby)  That's your deposition, sir.  It's

09:48:09  14   your first tab, I believe.

09:48:12  15   A.  I'm sorry, which page, please?

09:48:14  16   Q.  Page 16, Lines 8 through 12.

09:48:30  17   A.  Yes, that's what I stated.

09:48:32  18        MR. SHEASBY:  So why don't we publish that now.

09:48:34  19        MS. WILLIAMS:  Objection, Your Honor.  He just --

09:48:36  20   he just agreed to it.

09:48:41  21        MR. SHEASBY:  Your Honor, he just agreed to

09:48:42  22   something that was different from what he had previously --

09:48:45  23        THE COURT:  I'll allow -- I'll allow counsel to

09:48:47  24   publish the deposition testimony.

09:48:50  25   Q.  (By Mr. Sheasby)  Question:  So I actually just need

09:48:53   1   precision.  So, one, Dr. Villasenor told you that it's his

09:48:58   2   opinion that manual capture is a commercially acceptable

09:49:04   3   non-infringing alternative, fair?

09:49:06   4          Answer:  Yes.

09:49:08   5          Did you give that testimony under oath,

09:49:09   6   Mr. Gerardi?

09:49:10   7   A.  Oh, yes, I did.

09:49:12   8   Q.  And you told the ladies and gentlemen of the jury, even

09:49:16   9   though you're not a technologist, that manual capture is a

09:49:19  10   commercially viable non-infringing alternative, fair?

09:49:22  11   A.  I did.

09:49:24  12   Q.  Now, in reality, Dr. Villasenor was not asked to

09:49:29  13   investigate whether it would be commercially acceptable for

09:49:35  14   consumers not to have auto capture, correct?

09:49:37  15   A.  I don't know the extent of his opinion on that.

09:49:41  16   Q.  Well, why don't I refresh your recollection.  If you

09:49:44  17   turn to --

09:49:46  18          MR. SHEASBY:  Why don't we put up the Villasenor

09:49:50  19   deposition at 101, 8 through 14?

09:49:50  20          MS. WILLIAMS:  Objection, Your Honor, improper

09:49:52  21   impeachment.

09:49:52  22          THE COURT:  We're going to follow the same

09:49:54  23   protocol that I've outlined.

09:49:57  24          MS. WILLIAMS:  Your Honor, this isn't the

09:49:59  25   witness's own statement.

09:50:00  1          MR. SHEASBY:  It's not impeachment, Your Honor.

09:50:01  2   It's refreshing a recollection.

09:50:02  3          THE COURT:  Then what's your objection,

09:50:06  4   Ms. Williams?

09:50:07  5          MS. WILLIAMS:  Your Honor, you do not show

09:50:09  6   information that is used to refresh the witness's

09:50:12  7   recollection to the jury.

09:50:14  8          THE COURT:  Counsel, approach the bench.

09:50:26  9          (Bench conference.)

09:50:27  10         THE COURT:  First of all, tell me what you're

09:50:28  11  trying to do.

09:50:29  12         MR. SHEASBY:  Dr. Villasenor admitted that he gave

09:50:32  13  no opinion whatsoever on whether there's a commercially

09:50:34  14  viable non-infringing alternative.

09:50:36  15         THE COURT:  And how are you attempting to

09:50:39  16  establish that information?

09:50:40  17         MR. SHEASBY:  I'm going to show it from his sworn

09:50:43  18  deposition testimony.

09:50:46  19         THE COURT:  And you're asking this witness to

09:50:48  20  either agree or disagree as to what Dr. Villasenor did or

09:50:51  21  didn't admit to?

09:50:52  22         MR. SHEASBY:  No, I'm just asking -- I'm

09:50:55  23  refreshing his recollection that Dr. Villasenor testified

09:50:57  24  that he hadn't done this analysis, which is inconsistent

09:51:00  25  with his representation that Dr. Villasenor told him he had

09:51:03  1   done this analysis.

09:51:04  2          I can do it through a trial transcript, but it

09:51:08  3   seems to me we can -- I mean, this is the exact same

09:51:10  4   testimony I elicited at trial.

09:51:14  5          THE COURT:  Well, if you're going to ask this

09:51:16  6   witness if he heard Dr. Villasenor testify and then you're

09:51:19  7   going to show him Dr. Villasenor's prior testimony, that's

09:51:23  8   fine.  But showing him an affidavit or some prior

09:51:28  9   declaration, I have a problem with that.

09:51:29  10         MR. SHEASBY:  It's just deposition testimony, Your

09:51:31  11  Honor.

09:51:31  12         THE COURT:  Well, deposition testimony is an

09:51:35  13  out-of-court statement.

09:51:37  14         Ms. Williams, what's your position on all this?

09:51:39  15         MS. WILLIAMS:  Our position is that it's improper

09:51:42  16  for him to use the deposition to impeach this witness.  If

09:51:46  17  he wants to refer to the --

09:51:49  18         THE COURT:  Yeah, he can't impeach this witness

09:51:51  19  with a statement that's not attributable to him.

09:51:55  20         MS. WILLIAMS:  Yes.

09:51:55  21         THE COURT:  It's not impeachment.  You're just

09:51:57  22  trying to establish that apparently he's wrong in your

09:52:02  23  opinion, Mr. Sheasby, about what Dr. Villasenor did or

09:52:05  24  didn't tell him.

09:52:06  25         MR. SHEASBY:  That's correct, Your Honor.

| | | |
|---|---|---|
| 09:52:07 | 1 | MS. WILLIAMS:  But if there's -- excuse me. |
| 09:52:09 | 2 | THE COURT:  Go ahead. |
| 09:52:13 | 3 | MS. WILLIAMS:  I'm sorry.  But if there's trial |
| 09:52:14 | 4 | testimony from Dr. Villasenor, then he can reference that |
| 09:52:17 | 5 | here.  But going into the deposition of Dr. Villasenor is |
| 09:52:20 | 6 | not the proper way to establish that -- |
| 09:52:22 | 7 | THE COURT:  And -- and I agree with that, Mr. |
| 09:52:23 | 8 | Sheasby. |
| 09:52:23 | 9 | MR. SHEASBY:  Your Honor, it's the exact same |
| 09:52:25 | 10 | testimony. |
| 09:52:25 | 11 | THE COURT:  I don't care. |
| 09:52:25 | 12 | MR. SHEASBY:  So may I have a moment to -- |
| 09:52:27 | 13 | THE COURT:  There's a difference between |
| 09:52:27 | 14 | deposition testimony and live trial testimony. |
| 09:52:29 | 15 | MR. SHEASBY:  May I have a moment to get the trial |
| 09:52:31 | 16 | testimony? |
| 09:52:31 | 17 | THE COURT:  Yes, sir, you may have a moment. |
| 09:52:36 | 18 | MS. WILLIAMS:  Thank you, Your Honor. |
| 09:52:36 | 19 | (Bench conference concluded.) |
| 09:53:01 | 20 | THE COURT:  Let me know when you've found what |
| 09:53:03 | 21 | you're looking for, Mr. Sheasby. |
| 09:53:04 | 22 | MR. SHEASBY:  Thank you, Your Honor. |
| 09:53:42 | 23 | Mr. Huynh, can we have yesterday's PM transcript |
| 09:53:47 | 24 | at Page 108? |
| 09:54:02 | 25 | Q.  (By Mr. Sheasby)  Now, Mr. Gerardi, you have previously |

09:54:05   1   testified under oath that Dr. Villasenor had told you that

09:54:12   2   manual capture was a commercially viable non-infringing

09:54:15   3   alternative, correct?

09:54:15   4   A.  Yes.

09:54:16   5   Q.  At trial, Dr. Villasenor was asked the question,

09:54:24   6   question:  Now, you're not asked to investigate whether it

09:54:27   7   would be commercially acceptable for consumers not to have

09:54:31   8   auto capture, correct?

09:54:34   9   A.  I'm sorry, which line are you on?

09:54:36  10   Q.  I'm on Line 23.

09:54:37  11   A.  Got you.  That's what he stated.

09:54:44  12   Q.  And his answer was:  That's correct.

09:54:45  13   A.  Yes.

09:54:46  14   Q.  And then he was asked:  You have no opinion as to

09:54:49  15   whether it would be commercially viable for Wells Fargo not

09:54:53  16   to offer auto capture, correct?

09:54:58  17   A.  That's what he's testified to, yes.

09:55:01  18   Q.  And his answer is:  That's correct?

09:55:06  19   A.  As I stated, yes, that's what he stated.

09:55:09  20   Q.  So -- so you told the ladies and gentlemen of the jury

09:55:12  21   that manual capture was a commercially viable

09:55:16  22   non-infringing alternative, correct?

09:55:17  23   A.  I did.

09:55:18  24   Q.  You're not a technologist, correct?

09:55:19  25   A.  I'm not a technologist.

09:55:20   1   Q.  You told the ladies and gentlemen of the jury that you

09:55:21   2   relied on a technologist whose name was Dr. Villasenor to

09:55:25   3   help you, correct?

09:55:26   4   A.  To help me, yes.

09:55:27   5   Q.  You told under oath in your deposition that

09:55:32   6   Dr. Villasenor told that you manual capture was a

09:55:34   7   commercially viable non-infringing alternative, correct?

09:55:37   8   A.  I did.

09:55:38   9   Q.  Dr. Villasenor said the exact opposite at his -- at his

09:55:44  10   trial -- his trial testimony.  He has no opinion whatsoever

09:55:47  11   on whether it would be commercially viable, correct?

09:55:50  12   A.  On the commercially viable aspect, that's correct.

09:55:54  13   Q.  And, Mr. Gerardi, you're an experienced expert,

09:56:00  14   correct?

09:56:00  15   A.  I've testified in court.

09:56:01  16   Q.  It's fair for the ladies and gentlemen of the jury to

09:56:04  17   compare the statements and representations you made to me

09:56:08  18   under oath in your deposition with Dr. Villasenor's

09:56:13  19   testimony under oath at trial, correct?  It's fair for them

09:56:16  20   to balance those two?

09:56:17  21   A.  Oh, absolutely.  Absolutely.

09:56:18  22   Q.  Now, sir, you gave some opinions about the importance

09:56:43  23   of auto capture in this case, correct?

09:56:49  24   A.  In part, yes.

09:57:06  25   Q.  And you heard testimony from Mr. Saffici earlier in

09:57:32  1   this case that the patents are what is referred to in the
09:57:36  2   industry as auto capture, correct?
09:57:38  3   A.  Are you referring to his video deposition?
09:57:41  4   Q.  Yes, sir.
09:57:43  5   A.  Yes, I heard that.
09:57:44  6   Q.  He said that the patents-in-suit introduce autonomous
09:57:48  7   monitoring and corrective feedback, correct?
09:57:51  8   A.  I don't remember the specific words that he stated.
09:57:54  9   Q.  But he did say that they claim what's referred to in
09:57:58  10  the industry as auto capture, correct?
09:57:59  11  A.  I believe that's what he stated.
09:58:02  12  Q.  Now, you also heard testimony from Mr. Rosati, correct?
09:58:05  13  A.  Yes.
09:58:06  14  Q.  And Mr. Rosati testified that Wells Fargo implemented
09:58:10  15  what is known in the industry as auto capture, correct?
09:58:13  16  A.  Correct.
09:58:14  17  Q.  And Wells Fargo's corporate representative, Mr. Ajami,
09:58:27  18  you've read his deposition testimony, correct?
09:58:29  19  A.  A while ago, yes.
09:58:31  20  Q.  And Mr. Ajami, who was the executive responsible for
09:58:36  21  the implementation of auto capture, he testified that he
09:58:40  22  had no factual basis to disagree that auto capture must now
09:58:44  23  be treated as a must-have feature across all strata of the
09:58:50  24  financial services industry, correct?
09:58:53  25  A.  I don't remember the specific words, but I believe

09:58:58  1  something akin to that is correct.

09:58:59  2  Q.  He was shown the same Futurion Report that you showed

09:59:03  3  to the ladies and gentlemen of the jury, correct?

09:59:06  4  A.  Again, I don't recall what was shown to him at his

09:59:09  5  deposition, sir.

09:59:10  6  Q.  You recollect that he testified that auto capture must

09:59:14  7  now be treated as a must-have feature across all strata of

09:59:19  8  the financial services industry, correct?

09:59:22  9  A.  Again, I read his deposition, sir, a long time ago.  I

09:59:25  10  don't recall the specific words that he used.

09:59:27  11  Q.  Would it be fair to say that in your testimony to the

09:59:31  12  ladies and gentlemen of the jury, you did not discuss with

09:59:32  13  them any of Mr. Ajami's testimony?

09:59:35  14  A.  No, I didn't mention Mr. Ajami in the context of any of

09:59:44  15  the things that I mentioned to the jury.

09:59:45  16  Q.  Now, you stated that for the Futurion 2017 Mobile

10:00:06  17  Deposit Benchmark Report, you showed a slide on that to the

10:00:09  18  ladies and gentlemen of the jury, correct?

10:00:09  19  A.  Yes, I did.

10:00:10  20  Q.  And you said that there was no empirical data

10:00:15  21  supporting the conclusions in that report, fair?

10:00:18  22  A.  Yes.

10:00:19  23  Q.  But the report was based on consumer attitudinal and

10:00:28  24  behavioral data from surveying 1,044 consumers in July of

10:00:37  25  2017, correct?

10:00:38  1   A.  I believe that's what it states but that data was not

10:00:42  2   part of the study itself.

10:00:44  3   Q.  Sir, the report said that it was based on consumer

10:00:47  4   attitudinal and behavioral data as the result of surveying

10:00:52  5   1,044 consumers in July 2017, correct?

10:00:55  6   A.  That's what is stated in the report.

10:00:57  7   Q.  And it also states that working with digital strategy

10:01:00  8   and design agency Comrade, live deposit accounts were

10:01:00  9   accessed for each of the 15 financial institutions during

10:01:03  10  July and August of 2017, with all such ratings provided by

10:01:10  11  Comrade's user experience designers, correct?

10:01:13  12  A.  You're providing a specific quote, so I need to see the

10:01:16  13  document just to confirm that quote, please?

10:01:18  14  Q.  Sure.  Why don't you turn to Tab 4 in your binder, this

10:01:23  15  is PX-005, Page 6 and 7.

10:01:38  16          MR. SHEASBY:  And why don't we go ahead and

10:01:39  17  publish those since it's pre-admitted?

10:01:47  18  Q.  (By Mr. Sheasby)  So -- just so the record is clear,

10:01:50  19  this is the Futurion 2017 Report, correct?

10:01:53  20  A.  Yes, it is.

10:01:53  21  Q.  You told the ladies and gentlemen of the jury that

10:01:55  22  you -- there was no empirical data supporting its

10:01:58  23  conclusions, correct?

10:01:59  24  A.  Correct.

10:01:59  25  Q.  And there's a two-page discussion of its methodology,

| | | |
|---|---|---|
| 10:02:03 | 1 | correct? |
| 10:02:03 | 2 | A.  There's a discussion of the methodology, that's |
| 10:02:05 | 3 | correct. |
| 10:02:05 | 4 | Q.  Yeah.  And you didn't address that issue with the jury, |
| 10:02:08 | 5 | correct? |
| 10:02:08 | 6 | A.  I'm sorry, which issue, sir? |
| 10:02:12 | 7 | Q.  The methodology that's described in the Futurion |
| 10:02:17 | 8 | Report, fair? |
| 10:02:18 | 9 | A.  Yeah, I didn't discuss the methodology with the jurors, |
| 10:02:23 | 10 | that's correct. |
| 10:02:23 | 11 | Q.  Now, you also talked about some calculations that you |
| 10:02:33 | 12 | did using data provided by Ms. Lockwood-Stein, correct? |
| 10:02:38 | 13 | A.  Yes. |
| 10:02:39 | 14 |      MR. SHEASBY:  And why don't we pull up your |
| 10:02:42 | 15 | Demonstrative Slide 14?  Go one more, I think, Mr. Huynh. |
| 10:02:54 | 16 | Perfect. |
| 10:02:55 | 17 | Q.  (By Mr. Sheasby)  So for the ladies and gentlemen of |
| 10:02:59 | 18 | the jury, for your hypothetical negotiation, you took the |
| 10:03:06 | 19 | manual capture rate of 81.7 [sic] percent, correct, that's |
| 10:03:12 | 20 | what you used as the manual capture rate in your |
| 10:03:14 | 21 | calculations, fair? |
| 10:03:15 | 22 | A.  For the but for manual capture rate that I used, yes, |
| 10:03:20 | 23 | that's fair. |
| 10:03:21 | 24 | Q.  And that was a date in January 2018, correct? |
| 10:03:25 | 25 | A.  That's the date this 81.17 came from, that's fair. |

10:03:29   1   Q.  And you didn't pick January '17 when the rate was 65.62

10:03:37   2   percent for your calculation, correct?

10:03:39   3   A.  No, I did not.

10:03:40   4   Q.  You didn't pick July '17 when the rate was 58.62

10:03:45   5   percent, correct?

10:03:47   6   A.  That's correct.

10:03:47   7   Q.  You didn't pick July -- August '18 when the rate was

10:03:54   8   65 percent, correct?

10:03:56   9   A.  That's correct.

10:03:56   10  Q.  You picked the highest rate that you could find on this

10:04:02   11  demonstrative in front of you, correct?

10:04:05   12  A.  Yes, and may I explain why?

10:04:07   13  Q.  You may if you give me one moment.

10:04:10   14       Now, I want to explore down into the use of the

10:04:17   15  January '18, 81.17 date which is the highest number you

10:04:23   16  could possibly have chosen.  And please turn to Tab 12 in

10:04:28   17  your binder, which is PX-0031.

10:04:30   18  A.  I'm sorry, tab?

10:04:32   19  Q.  Tab 12 in your binder, which is PX-0031.

10:04:48   20  A.  Okay.

10:04:48   21  Q.  Now, this is data that Ms. Lockwood-Stein presented,

10:04:55   22  correct?

10:04:55   23  A.  Yeah, she discussed PX-0031.

10:04:57   24  Q.  Well, she didn't discuss it, she actually brought it to

10:05:02   25  her deposition, correct?

10:05:03   1    A.  Oh, yes, yes, she did.

10:05:05   2    Q.  And, in fact, when she brought it to her deposition,

10:05:08   3    she listed it under the topic number of the value of auto

10:05:16   4    capture, correct?  This is the document she had listed

10:05:19   5    under her agenda items as to the value of auto capture,

10:05:24   6    fair?

10:05:24   7    A.  Oh, I don't know which items it was responsive to in

10:05:27   8    her deposition.

10:05:28   9    Q.  Okay.  We'll dig into that first.

10:05:31  10    A.  Okay.

10:05:32  11    Q.  So let's go to Tab 27 in your binder.

10:05:40  12            MR. SHEASBY:  And why don't we pull up PX-0026?

10:05:48  13    Q.  (By Mr. Sheasby)  So PX-0026 is the notes that

10:05:54  14    Ms. Lockwood-Stein brought into her -- brought -- brought

10:05:57  15    in with her to her deposition, correct?

10:06:01  16    A.  I believe so.

10:06:02  17            MR. SHEASBY:  And why don't we pull up Topic 1.

10:06:08  18    Q.  (By Mr. Sheasby)  It says all facts relating to the

10:06:10  19    impact of the accused instrumentalities on Wells Fargo's

10:06:13  20    customer retention, customer acquisition, advertising, and

10:06:20  21    sale of other products or services.  Correct?

10:06:22  22    A.  That's what it states, yes.

10:06:24  23    Q.  And the -- what she listed under that is image

10:06:28  24    acceptance rates, do you see that?

10:06:29  25    A.  I do.

10:06:30    1    Q.   And the image acceptance rates document that she's

10:06:33    2    referring to was that PX-0 -- that PX-document we were just

10:06:38    3    looking at, correct, that was PX-31, correct?

10:06:41    4    A.   Yes, I believe that to be the case.

10:06:44    5    Q.   Now, PX-31 has a large number of acceptance rates from

10:06:48    6    it for both manual and auto capture, correct?

10:06:51    7    A.   Yes, it does.

10:06:52    8            MR. SHEASBY:   And why don't we actually turn to

10:06:57    9    January 2018, which I believe is on Page 7 and 8 of that

10:07:03   10    document, Mr. Huynh.   So let's just level set.   Why don't

10:07:12   11    we pull up January '18.   This is the Android data, and I

10:07:16   12    believe on the previous page, Mr. Huynh, you will find the

10:07:20   13    iOS data?

10:07:22   14            THE WITNESS:   Excuse me.

10:07:30   15    Q.   (By Mr. Sheasby)   So just to level set, this is the

10:07:35   16    source of the data that you used for your 81 percent,

10:07:38   17    correct?

10:07:38   18    A.   Yes.

10:07:41   19    Q.   And if you see the -- for instance, in iOS, the video

10:07:54   20    rate of success was 90 percent in January 2018.   Do you see

10:07:59   21    that, sir?

10:07:59   22    A.   I do.

10:08:00   23    Q.   Now, there is also a MiSnap manual number, correct?

10:08:03   24    A.   For iOS, yes.

10:08:06   25    Q.   That's 80.8 (sic) percent, correct?

```
10:08:08   1   A.   For January of '18, yes, it is.
10:08:13   2   Q.   Now, that's not a failed auto capture, the manual
10:08:16   3   still -- the manual number is the number where the folks
10:08:19   4   just take the picture, correct?
10:08:20   5   A.   It's the -- it's the people that take the picture
10:08:27   6   before auto capture has a chance to finish its application.
10:08:30   7   Q.   Sure.  And auto capture, it will -- it has a 20 second
10:08:34   8   period of time before auto capture will -- will -- will log
10:08:37   9   out, correct?
10:08:38   10  A.   That's my understanding.
10:08:41   11  Q.   And we heard from Mr. Calman that it's three frames per
10:08:46   12  second, correct?
10:08:47   13  A.   I don't remember the frames per second, sir.
10:08:50   14  Q.   Okay.  Now, what you did is you took the iOS manual
10:08:56   15  rate from January 2018, the iOS still rate from January
10:09:03   16  2018, and then you added the Android manual rate and the
10:09:08   17  Android still rate, correct, to get your 81 percent?
10:09:12   18  A.   Yes, I believe that's the case.
10:09:15   19  Q.   Now, you're an economist, correct?
10:09:18   20  A.   Yes.
10:09:18   21  Q.   And as an economist, you believe it's important to
10:09:21   22  fully explore the relevant data, correct?
10:09:24   23  A.   Yes.
10:09:25   24  Q.   And you'll see that in January of 2018, the -- there
10:09:33   25  were 553,000 iOS checks deposited through something called:
```

| | | |
|---|---|---|
| 10:09:38 | 1 | MiSnap unknown.  Do you see that, sir? |
| 10:09:40 | 2 | A.  Yes, I do. |
| 10:09:48 | 3 | Q.  There were more checks deposited through MiSnap unknown |
| 10:09:51 | 4 | than were deposited through MiSnap still and manual.  Take |
| 10:09:54 | 5 | that back.  There were only a few more checks deposited in |
| 10:09:58 | 6 | MiSnap still and manual than were deposited in MiSnap |
| 10:10:01 | 7 | unknown, correct? |
| 10:10:02 | 8 | A.  Based upon that month, yes. |
| 10:10:05 | 9 | Q.  And you did absolutely nothing whatsoever in your |
| 10:10:08 | 10 | report to explain to the ladies and gentlemen of the jury |
| 10:10:09 | 11 | what MiSnap unknown were, correct? |
| 10:10:12 | 12 | A.  Correct, I didn't explain what MiSnap unknown was. |
| 10:10:16 | 13 | Q.  And so you don't know if MiSnap unknown was more manual |
| 10:10:20 | 14 | capture failures, correct? |
| 10:10:21 | 15 | A.  Again, it's unknown. |
| 10:10:24 | 16 | Q.  It's unknown because you didn't examine it, correct, |
| 10:10:26 | 17 | sir? |
| 10:10:26 | 18 | A.  Well, no, I did ask in the context of my reviewing this |
| 10:10:31 | 19 | document what that was, and I was advised that it was |
| 10:10:35 | 20 | unknown. |
| 10:10:36 | 21 | Q.  Who -- who -- who advised you of that, sir? |
| 10:10:39 | 22 | A.  I don't recall who it was specifically.  We spoke to |
| 10:10:45 | 23 | somebody at Wells Fargo about this data. |
| 10:10:49 | 24 | THE COURT:  Let me -- let me interrupt for just a |
| 10:10:52 | 25 | minute.  At this juncture, ladies and gentlemen, we're |

10:10:54   1   going to take a short recess, and you can simply close your

10:10:58   2   notebooks and leave them in your chairs.  Follow all the

10:11:00   3   instructions that I've given you, and we'll be back in here

10:11:03   4   shortly to continue.  The jury is excused for recess.

10:11:06   5           COURT SECURITY OFFICER:  All rise.

10:11:07   6           (Jury out.)

10:24:32   7           (Recess.)

10:24:33   8           COURT SECURITY OFFICER:  All rise.

10:24:34   9           THE COURT:  Be seated, please.

10:24:34  10           Are you prepared to continue, Mr. Sheasby?

10:24:43  11           MR. SHEASBY:  I am, Your Honor.

10:24:44  12           THE COURT:  You may return to the podium.

10:24:47  13           Let's bring in the jury, Mr. Johnston.

10:24:52  14           COURT SECURITY OFFICER:   All rise.

10:25:16  15           (Jury in.)

10:25:16  16           THE COURT:  Please be seated.

10:25:29  17           We'll continue with the Plaintiff's

10:25:33  18   cross-examination of the witness.

10:25:35  19           You may continue, Mr. Sheasby.

10:25:38  20   Q.  (By Mr. Sheasby)  We were looking at PX-031, correct?

10:25:42  21   A.  Yes, sir.

10:25:42  22   Q.  And we're talking about the fact that for your

10:25:46  23   81 percent manual capture rate, you chose the January 2018

10:25:51  24   date, correct?

10:25:52  25   A.  That's correct.

10:25:52  1  Q.  It's the highest date for manual capture on your

10:25:55  2  demonstrative, correct?

10:25:57  3  A.  Yes, that's correct.

10:25:59  4  Q.  And that date has this category of unknown MiSnap

10:26:06  5  events, correct?

10:26:07  6  A.  Correct.

10:26:08  7  Q.  And the rate -- the failure rate in those unknown

10:26:11  8  MiSnap events is incredibly high, correct?

10:26:16  9  A.  Well, it's 41.89 percent.

10:26:20  10  Q.  Is that the failure rate or the success rate, sir?

10:26:23  11  A.  I'm sorry, yeah, correct, that's the success rate so it

10:26:26  12  would be the inverse.

10:26:27  13  Q.  The failure rate is between 60 and 67 percent, correct?

10:26:31  14  A.  For those unknown items, that's correct.

10:26:32  15  Q.  And those unknown items are unknown, they're unknown by

10:26:37  16  you, correct?

10:26:37  17  A.  Correct.

10:26:38  18  Q.  They're unknown to the jury, correct?

10:26:40  19  A.  Correct.

10:26:42  20  Q.  Now, those are the only two entries, in fact, that's

10:26:45  21  the only -- only one of two months in this entire

10:26:48  22  Lockwood-Stein data in which there is unknown auto capture

10:26:55  23  information with these extremely high rates of failure,

10:26:57  24  correct?

10:26:57  25  A.  I would have to look through the data and research that

| | | |
|---|---|---|
| 10:27:00 | 1 | specifically but without looking through the data -- |
| 10:27:04 | 2 | Q.  Please go ahead. |
| 10:27:05 | 3 | THE COURT:  Let's make sure each of you finish |
| 10:27:07 | 4 | talking before the other one jumps in, please. |
| 10:27:10 | 5 | And to the extent you can slow down, Mr. Sheasby, |
| 10:27:12 | 6 | that would be helpful. |
| 10:27:13 | 7 | MR. SHEASBY:  Yes, Your Honor. |
| 10:27:23 | 8 | Q.  (By Mr. Sheasby)  And to guide you, I believe the only |
| 10:27:25 | 9 | unknown events are in December 2017 and January 2018? |
| 10:27:30 | 10 | A.  I'm sorry, could you repeat those dates again? |
| 10:27:45 | 11 | Q.  Yes.  So I believe December 7 -- December 2017 is the |
| 10:27:52 | 12 | other months that have these very large unknown failure |
| 10:27:56 | 13 | rates with unknown reasons, correct? |
| 10:28:01 | 14 | A.  Well, there's several months with unknowns.  But, yes, |
| 10:28:07 | 15 | December '17 does have a -- a higher rate.  But there are |
| 10:28:11 | 16 | several months that have unknown data in there, as well. |
| 10:28:14 | 17 | Q.  The December and January -- December 2017 and the |
| 10:28:19 | 18 | January 2018 dates are the times when there's these very |
| 10:28:22 | 19 | large number of checks being deposited through something |
| 10:28:25 | 20 | called unknown in which there's these very significant |
| 10:28:33 | 21 | failure rates, correct? |
| 10:28:38 | 22 | A.  Based upon my quick review, that appears to be the |
| 10:28:55 | 23 | case. |
| 10:28:56 | 24 | Q.  Now, you didn't need -- |
| 10:28:58 | 25 | MR. SHEASBY:  Why don't we pull those numbers |

| | | |
|---|---|---|
| 10:29:00 | 1 | down, Mr. Huynh?  And why don't we put back up PX -- why |
| 10:29:05 | 2 | don't we put up -- pull up iX-0032.10? |
| 10:29:12 | 3 | Q.  (By Mr. Sheasby)  So this is Schedule 7 to your report, |
| 10:29:16 | 4 | and you see there's the still and manual weighted averages |
| 10:29:19 | 5 | that you used on the right-hand corner.  Do you see that? |
| 10:29:22 | 6 | A.  I do. |
| 10:29:23 | 7 | Q.  Now, you could have chosen any date in this line, |
| 10:29:33 | 8 | right, because you only chose one month for your |
| 10:29:35 | 9 | calculation, correct?  You chose January 2018, correct? |
| 10:29:39 | 10 | A.  I did, for the reasons I explained before. |
| 10:29:43 | 11 | Q.  You chose January 2018, which has the highest |
| 10:29:48 | 12 | acceptance rates for manual to present your numbers to the |
| 10:29:52 | 13 | jury, correct? |
| 10:29:53 | 14 | A.  Has the highest -- has the highest weighted average, |
| 10:29:56 | 15 | correct. |
| 10:29:56 | 16 | Q.  That's the month in which there's these large number of |
| 10:30:00 | 17 | unknown MiSnap failures that no one knows the reason for, |
| 10:30:06 | 18 | correct? |
| 10:30:06 | 19 | A.  That has the highest number of unknowns -- I don't know |
| 10:30:11 | 20 | if anybody knows the reason, but not that I'm aware of. |
| 10:30:14 | 21 | Q.  You don't know? |
| 10:30:15 | 22 | A.  Correct. |
| 10:30:16 | 23 | Q.  I don't know? |
| 10:30:16 | 24 | A.  Correct. |
| 10:30:16 | 25 | Q.  The jury doesn't know? |

| | | |
|---|---|---|
| 10:30:17 | 1 | A.  Correct. |
| 10:30:18 | 2 | Q.  And yet that was the single month with the highest |
| 10:30:25 | 3 | manual rate that you thought it was appropriate to use with |
| 10:30:30 | 4 | the jury, fair? |
| 10:30:31 | 5 | A.  For the reasons I explained to you previously, that's |
| 10:30:34 | 6 | fair. |
| 10:30:34 | 7 | Q.  So you would agree that when the jury goes back and |
| 10:30:39 | 8 | deliberates and thinks about your credibility, they're |
| 10:30:43 | 9 | entitled to consider the fact that you chose the highest |
| 10:30:48 | 10 | number from one month during the period for the manual |
| 10:30:51 | 11 | rate, correct? |
| 10:30:51 | 12 | A.  I would hope that they would take into consideration |
| 10:30:54 | 13 | that and all the other data and information that I |
| 10:30:56 | 14 | presented to them that corroborated or supported my use of |
| 10:31:00 | 15 | that number. |
| 10:31:01 | 16 | MR. SHEASBY:  Your Honor, I believe that answer |
| 10:31:03 | 17 | was non-responsive. |
| 10:31:11 | 18 | THE COURT:  I'll sustain that objection. |
| 10:31:14 | 19 | Ask the question again. |
| 10:31:15 | 20 | Q.  (By Mr. Sheasby)  Sir, when the ladies and gentlemen of |
| 10:31:18 | 21 | the jury go to deliberate and think about your credibility, |
| 10:31:22 | 22 | they're entitled to consider the fact that you selected for |
| 10:31:25 | 23 | the manual capture success rate the highest manual capture |
| 10:31:31 | 24 | rate in the month of the highest unknown failures, fair? |
| 10:31:34 | 25 | A.  That's the data that I used, that's correct. |

| | | |
|---|---|---|
| 10:31:40 | 1 | Q.  And they're allowed to consider that fact, fair? |
| 10:31:42 | 2 | A.  Absolutely. |
| 10:31:42 | 3 | Q.  They're allowed to consider the fact that there was all |
| 10:31:46 | 4 | this unknown failure dates in that month of January 2018, |
| 10:31:50 | 5 | correct? |
| 10:31:50 | 6 | A.  Yes. |
| 10:31:50 | 7 | Q.  They're allowed to consider the fact that you didn't |
| 10:31:51 | 8 | disclose that to them -- |
| 10:31:51 | 9 |         THE COURT:  Slow down, Mr. Sheasby. |
| 10:31:53 | 10 | Q.  (By Mr. Sheasby)  They're allowed to consider the fact |
| 10:31:55 | 11 | that you didn't disclose it to them in your direct |
| 10:31:57 | 12 | examination, correct? |
| 10:32:00 | 13 | A.  The unknown capture -- yes, that's correct. |
| 10:32:03 | 14 | Q.  Now, I want to turn to -- |
| 10:32:20 | 15 |         MR. SHEASBY:  Mr. Huynh, can we turn to Trial Date |
| 10:32:23 | 16 | 10/31/19, beginning at 145, Line 11? |
| 10:32:33 | 17 |         THE TECHNICIAN:  Page number? |
| 10:32:36 | 18 |         MR. SHEASBY:  Page 145, Mr. Huynh. |
| 10:32:40 | 19 | Q.  (By Mr. Sheasby)  So you mentioned early that |
| 10:32:44 | 20 | Mr. Saffici, Wells Fargo's expert, testified by deposition, |
| 10:32:47 | 21 | correct? |
| 10:32:47 | 22 | A.  Yes, he did. |
| 10:32:48 | 23 | Q.  Mr. Saffici testified that you agree that the |
| 10:32:53 | 24 | patents-in-suit introduced autonomous monitoring and |
| 10:32:56 | 25 | corrective feedback techniques? |

| | | |
|---|---|---|
| 10:32:59 | 1 | Answer:  Yes. |
| 10:33:03 | 2 | Correct? |
| 10:33:03 | 3 | A.  That's what he stated, yes. |
| 10:33:05 | 4 | Q.  You have no basis to disagree with Mr. Saffici and you |
| 10:33:08 | 5 | didn't in your direct examination, correct, sir? |
| 10:33:08 | 6 | A.  I'm sorry, your question? |
| 10:33:09 | 7 | Q.  You didn't disagree with Mr. Saffici's opinion in your |
| 10:33:12 | 8 | direct examination, correct, sir? |
| 10:33:15 | 9 | A.  No, I did not. |
| 10:33:16 | 10 | Q.  Now, Mr. Saffici also testified that you agreed that |
| 10:33:22 | 11 | those -- referring to those features of the patent, are |
| 10:33:26 | 12 | referred to in the industry as auto capture, correct? |
| 10:33:28 | 13 | A.  That's correct. |
| 10:33:29 | 14 | Q.  And he said:  I agree with that. |
| 10:33:31 | 15 | Correct? |
| 10:33:31 | 16 | A.  Yes. |
| 10:33:32 | 17 | Q.  This was Wells Fargo's expert, correct? |
| 10:33:35 | 18 | A.  This is Mr. Saffici's testimony. |
| 10:33:37 | 19 | Q.  And Mr. Saffici is a Wells Fargo expert, correct? |
| 10:33:39 | 20 | A.  I believe so, yes. |
| 10:33:42 | 21 | Q.  And he said he agreed that the USAA patents claim what |
| 10:33:49 | 22 | the industry refers to as auto capture. |
| 10:33:51 | 23 | And you voiced no disagreement with that in your |
| 10:33:54 | 24 | direct examination, correct, sir? |
| 10:33:55 | 25 | A.  That's correct. |

| | | |
|---|---|---|
| 10:33:56 | 1 | Q.  And Mr. Saffici also agreed, and he doesn't dispute, |
| 10:34:02 | 2 | that Wells Fargo -- strike that. |
| 10:34:05 | 3 | Mr. Saffici, Wells Fargo's expert, testified that |
| 10:34:08 | 4 | he doesn't dispute that auto capture is widely acknowledged |
| 10:34:12 | 5 | as the foundation for a successful mobile check deposit. |
| 10:34:17 | 6 | Do you see that, sir? |
| 10:34:18 | 7 | A.  I see what you're highlighting, yeah. |
| 10:34:22 | 8 | Q.  Now, you do disagree with that, correct, sir? |
| 10:34:25 | 9 | A.  Yes, I do. |
| 10:34:26 | 10 | MR. SHEASBY:  Your Honor, may I approach? |
| 10:34:28 | 11 | THE COURT:  Approach the bench or approach -- |
| 10:34:30 | 12 | MR. SHEASBY:  Yes, sir, approach the bench, Your |
| 10:34:32 | 13 | Honor. |
| 10:34:32 | 14 | THE COURT:  Counsel, you may approach the bench. |
| 10:34:33 | 15 | (Bench conference.) |
| 10:34:40 | 16 | THE COURT:  Going forward, please tell me where |
| 10:34:43 | 17 | you want to go. |
| 10:34:43 | 18 | MR. SHEASBY:  I apologize.  I've done it twice, |
| 10:34:45 | 19 | Your Honor.  I'm sorry. |
| 10:34:46 | 20 | THE COURT:  What's the issue? |
| 10:34:47 | 21 | MR. SHEASBY:  Your Honor, I would now seek |
| 10:34:49 | 22 | permission from the Court to establish that Mr. Saffici is |
| 10:34:53 | 23 | a 34-year industry veteran in the banking industry with |
| 10:34:57 | 24 | significant remote deposit capture experience. |
| 10:34:59 | 25 | THE COURT:  And how would you plan to do that with |

10:35:01  1   this witness?

10:35:01  2          MR. SHEASBY:  By showing him a portion of his

10:35:03  3   expert report without publishing it to the jury that solely

10:35:07  4   relates to his experience and nothing else.

10:35:10  5          THE COURT:  Showing this witness a portion of --

10:35:12  6          MR. SHEASBY:  Mr. Saffici's expert report where he

10:35:14  7   describes his experience.  I will not publish it --

10:35:21  8          THE COURT:  What's -- what's the response?

10:35:22  9          MS. WILLIAMS:  We object to that.  I mean, it's

10:35:24  10  not within this witness's personal knowledge.  And there

10:35:26  11  was an opportunity for them to play that information with

10:35:29  12  Mr. Saffici's deposition, and that's been already

10:35:32  13  addressed.

10:35:32  14         THE COURT:  I -- I agree with that.  I'm going to

10:35:34  15  sustain the objection.

10:35:35  16         MR. SHEASBY:  Thank you, Your Honor.

10:35:35  17         (Bench conference concluded.)

10:35:47  18         THE COURT:  Let's proceed.

10:35:57  19         MR. SHEASBY:  Mr. Huynh, can we turn to the next

10:35:59  20  page?

10:36:04  21  Q.  (By Mr. Sheasby)  Mr. Saffici testifies that he

10:36:09  22  considered himself an expert in the field of remote deposit

10:36:13  23  capture, correct, sir?

10:36:14  24  A.  That's what he stated here.

10:36:17  25  Q.  This is Wells Fargo's expert, correct, sir?

| | | |
|---|---|---|
| 10:36:20 | 1 | A.  Apparently. |
| 10:36:21 | 2 | Q.  You, on direct examination, did not tell the ladies and |
| 10:36:27 | 3 | gentlemen of the jury that you're an expert in the field of |
| 10:36:30 | 4 | remote deposit capture, correct, sir? |
| 10:36:31 | 5 | A.  I think I was asked the question, but I'm not an expert |
| 10:36:35 | 6 | in remote deposit capture. |
| 10:36:36 | 7 | Q.  So for the ladies and gentlemen of the jury, |
| 10:36:39 | 8 | Mr. Saffici, Wells Fargo's expert, testified under oath |
| 10:36:42 | 9 | that he's an expert in the field of remote deposit capture, |
| 10:36:47 | 10 | correct? |
| 10:36:47 | 11 | A.  That's what he stated here. |
| 10:36:48 | 12 | Q.  You testified under oath that you're not an expert in |
| 10:36:51 | 13 | the field of remote deposit capture, correct? |
| 10:36:53 | 14 | A.  Correct. |
| 10:36:54 | 15 | Q.  Mr. Saffici testified that -- |
| 10:37:03 | 16 | MR. SHEASBY:  Let's go back above, Mr. Huynh, to |
| 10:37:06 | 17 | the previous page. |
| 10:37:07 | 18 | Q.  (By Mr. Sheasby)  Mr. Saffici testified that auto |
| 10:37:13 | 19 | capture is widely acknowledged as the foundation for |
| 10:37:15 | 20 | successful mobile deposit.  Under oath, he agreed to that? |
| 10:37:20 | 21 | A.  That's what he stated here. |
| 10:37:22 | 22 | Q.  He's Wells Fargo -- Wells Fargo's remote deposit |
| 10:37:25 | 23 | capture expert, correct, sir? |
| 10:37:26 | 24 | A.  I don't know the extent of what his specific role was. |
| 10:37:31 | 25 | Q.  But one thing we know for sure is that you are not |

10:37:34   1   Wells Fargo's remote deposit capture expert, correct,

10:37:37   2   Mr. Gerardi?

10:37:37   3   A.  No, sir, I'm the damages expert.

10:37:39   4          MR. SHEASBY:  You can take that down, Mr. Huynh.

10:37:59   5          Now, why don't we turn to Calman Demonstrative

10:38:02   6   Slide 18, Mr. Huynh?

10:38:04   7   Q.  (By Mr. Sheasby)  Now, Mr. Calman actually went through

10:38:19   8   the process of calculating the averages for the data that

10:38:24   9   Ms. Lockwood-Stein prepared, correct?

10:38:29  10   A.  No, no, this is saying source to the Ajami deposition

10:38:39  11   testimony.  So I need to see if that was the document he

10:38:43  12   was referring to.

10:38:43  13   Q.  Sir, you were here for his testimony, correct?

10:38:45  14   A.  I was.

10:38:45  15   Q.  You understood that he was testifying about the

10:38:47  16   Lockwood-Stein data, correct?

10:38:48  17   A.  I don't recall that specifically.

10:38:52  18   Q.  You don't recall Mr. Calman's testimony regarding the

10:38:55  19   Lockwood-Stein data, sir?

10:38:56  20   A.  Oh, I do recall his testimony about the Lockwood-Stein

10:38:59  21   testimony.  I just don't know if that's what he used

10:39:01  22   specifically for these numbers.

10:39:02  23   Q.  Okay.  In your direct examination, did you find any

10:39:07  24   dispute -- did you make any dispute whatsoever with the

10:39:13  25   number that the average manual capture failure rate on the

| | | |
|---|---|---|
| 10:39:17 | 1 | Lockwood-Stein data that you use is 30.52 percent? |
| 10:39:25 | 2 | A.  I don't know if I can answer that without looking at my |
| 10:39:28 | 3 | data and performing my calculations.  I can't say one way |
| 10:39:31 | 4 | or the other. |
| 10:39:32 | 5 | Q.  So -- just so we're clear, you've relied on the |
| 10:39:36 | 6 | Lockwood-Stein data to present your analysis to the jury, |
| 10:39:38 | 7 | correct? |
| 10:39:38 | 8 | A.  Yes.  That's one piece of evidence, yes. |
| 10:39:41 | 9 | Q.  You selected one month for that analysis, that's the |
| 10:39:44 | 10 | manual capture rate, correct? |
| 10:39:45 | 11 | A.  For the reasons I explained, that's correct. |
| 10:39:47 | 12 | Q.  The highest month, correct? |
| 10:39:48 | 13 | A.  For the reasons I've explained, that's correct. |
| 10:39:51 | 14 | Q.  And you didn't tell the ladies and gentlemen of the |
| 10:39:52 | 15 | jury what would be the average manual capture failure rate |
| 10:39:55 | 16 | if you would have averaged all the data in the |
| 10:39:57 | 17 | Lockwood-Stein data, correct? |
| 10:39:58 | 18 | A.  That's not -- not something I presented, that's |
| 10:40:01 | 19 | correct. |
| 10:40:01 | 20 | Q.  And so if the ladies and gentlemen of the jury want to |
| 10:40:03 | 21 | know what averages are in the document, they're going to |
| 10:40:06 | 22 | have to turn someplace else other than you; isn't that |
| 10:40:09 | 23 | correct, Mr. Gerardi? |
| 10:40:11 | 24 | A.  Again, that's not something I presented. |
| 10:40:24 | 25 |        MR. SHEASBY:  Let's turn to PDX-4.9, Mr. Huynh. |

10:40:37  1   Q.   (By Mr. Sheasby)   Sir, you were here in Mr. Weinstein's

10:40:42  2   direct examination; is that correct?

10:40:44  3   A.   Yes, I was.

10:40:44  4   Q.   Mr. Weinstein put up the damages statute that governs

10:40:48  5   damages in a patent case, correct?

10:40:49  6   A.   Yes, he did.

10:40:50  7   Q.   You agree that the jury is obligated to -- to award

10:40:57  8   no -- in no event less than a reasonable royalty, correct?

10:40:59  9   A.   In no event -- no event less than a reasonable royalty

10:41:03  10  for the use made of the invention, that's correct.

10:41:05  11  Q.   And to be clear, what the jury should focus on is the

10:41:09  12  use and benefit that Wells Fargo obtains from the

10:41:12  13  invention, correct?

10:41:12  14  A.   For the specific use of the invention, that's correct.

10:41:14  15  Q.   Now, the jury will hear that under a preponderance of

10:41:21  16  the evidence standard, correct?

10:41:22  17  A.   That's a legal issue, so I'm not going to say yes or

10:41:27  18  no, but I believe that to be the case.

10:41:28  19  Q.   Do you know -- what standard did you apply to determine

10:41:32  20  damages in this case?

10:41:33  21  A.   What standard?   Again, I looked to determine what the

10:41:38  22  damages were based upon the analyses that I performed.

10:41:41  23  Q.   You didn't apply the preponderance of the evidence

10:41:43  24  standard?

10:41:45  25          MS. WILLIAMS:   Objection, Your Honor.

| | | |
|---|---|---|
| 10:41:46 | 1 | THE COURT:  What's your objection? |
| 10:41:48 | 2 | MS. WILLIAMS:  This witness has no foundation to |
| 10:41:50 | 3 | be able to answer this question.  He's already testified |
| 10:41:53 | 4 | that he doesn't have a legal background, and Your Honor is |
| 10:41:56 | 5 | going to instruct the jury about the weight here -- the |
| 10:41:58 | 6 | burden that is supposed to be applied and the weight that's |
| 10:42:01 | 7 | supposed to be given to the evidence. |
| 10:42:02 | 8 | THE COURT:  Well, he can ask the witness if he |
| 10:42:05 | 9 | applied the preponderance standard.  And if the witness |
| 10:42:05 | 10 | says he did, he did.  If he says he didn't or if he says I |
| 10:42:08 | 11 | don't know.  He can answer the question. |
| 10:42:10 | 12 | MS. WILLIAMS:  Yes, Your Honor. |
| 10:42:10 | 13 | THE COURT:  Overruled. |
| 10:42:11 | 14 | Q.  (By Mr. Sheasby)  Please answer the question. |
| 10:42:12 | 15 | A.  So based upon that legal construct, yes, I believe I |
| 10:42:17 | 16 | applied the preponderance of the evidence. |
| 10:42:18 | 17 | Q.  But I thought you just told me you didn't know what |
| 10:42:24 | 18 | preponderance of the evidence was? |
| 10:42:24 | 19 | A.  I said I wasn't trying to interpret that for a legal |
| 10:42:27 | 20 | standard, but yes, I applied the evidence and put weight |
| 10:42:33 | 21 | that I believed to be quoted in the documents and the |
| 10:42:34 | 22 | information I've seen. |
| 10:42:34 | 23 | Q.  Do you know what the preponderance of the evidence |
| 10:42:35 | 24 | standard is? |
| 10:42:35 | 25 | A.  Balance of the evidence. |

10:42:37  1   Q.  And do you know if the evidence tips ever so slightly

10:42:41  2   in favor of Plaintiff what the result is?

10:42:43  3   A.  I believe that would be a preponderance of the

10:42:45  4   evidence.  But, again, I'm not rendering a legal

10:42:48  5   interpretation of that.

10:42:49  6          THE COURT:  All right.  We've gotten into this

10:42:50  7   legal issue enough.  Let's move on.

10:42:52  8          MR. SHEASBY:  Thank you, Your Honor.

10:42:53  9   Q.  (By Mr. Sheasby)  Now, there are two types of

10:42:56  10  infringements being asserted in this case, there's

10:42:59  11  infringement under the literal standard, correct?

10:43:01  12  A.  That's my understanding, yes.

10:43:02  13  Q.  There's also infringement under the Doctrine of

10:43:05  14  Equivalents standard, correct?

10:43:05  15  A.  That's my understanding.

10:43:08  16  Q.  And the same amount of damages apply under either,

10:43:16  17  correct?

10:43:16  18  A.  I believe it's a legal issue, but I'm not -- I'm not

10:43:22  19  making a distinction between whether it's an infringement

10:43:26  20  under direct or literal infringement.

10:43:28  21  Q.  In other words, there's no Doctrine of Equivalents

10:43:30  22  discount, correct?  If the patent is infringed literally

10:43:33  23  under the Doctrine of Equivalents in your analysis, you

10:43:36  24  agree that the same amount of damages should be applied,

10:43:38  25  fair?

| | | |
|---|---|---|
| 10:43:38 | 1 | A.  Fair. |
| 10:43:40 | 2 | Q.  Now, in the hypothetical negotiation, the patent is |
| 10:43:46 | 3 | assumed valid, enforceable and infringed, correct, sir? |
| 10:43:49 | 4 | A.  That's correct. |
| 10:43:51 | 5 | Q.  And so if the jurors think infringement is a close |
| 10:43:56 | 6 | case, when they turn to damages, they must assume that the |
| 10:44:01 | 7 | patent is infringed, valid, and enforceable, correct? |
| 10:44:06 | 8 | A.  In the context of preparing my analyses, I have to |
| 10:44:10 | 9 | assume for damages to be awarded, that the patent is found |
| 10:44:13 | 10 | to be valid, enforceable, and infringed. |
| 10:44:16 | 11 | Q.  And you agree that's the same analysis -- you believe |
| 10:44:19 | 12 | that's the same analysis the jury should do, fair? |
| 10:44:22 | 13 | A.  Again, in considering damages, you don't get to damages |
| 10:44:27 | 14 | unless there's infringement, and so I'm presenting my |
| 10:44:30 | 15 | analysis with the assumption that the patents are valid, |
| 10:44:35 | 16 | enforceable, and infringed. |
| 10:44:36 | 17 | Q.  Now, you agree that the patents are quite valuable, |
| 10:44:51 | 18 | correct, sir? |
| 10:44:52 | 19 | Strike that. |
| 10:44:53 | 20 | You agree that some patents are quite valuable, |
| 10:44:57 | 21 | correct, sir? |
| 10:44:57 | 22 | A.  Are you talking about in a general context, sir? |
| 10:45:00 | 23 | Q.  Yes, sir. |
| 10:45:01 | 24 | A.  Yes. |
| 10:45:01 | 25 | Q.  And you agree some patents are worth hundreds of |

10:45:04  1  millions of dollars, correct, sir?

10:45:05  2  A.  They absolutely could be, in a general sense.

10:45:09  3  Q.  Now, as part of the hypothetical negotiation, the

10:45:14  4  parties will consider the benefit Wells Fargo received from

10:45:17  5  the technology, correct, sir?

10:45:19  6  A.  That's the predicate that I've used in my analysis,

10:45:22  7  yes.

10:45:23  8        MR. SHEASBY:  And let's pull up PDX-4 -- let's --

10:45:29  9  let's pull up PDX-4.18, Mr. Huynh.

10:45:33  10  Q.  (By Mr. Sheasby)  Mr. Weinstein identified three types

10:45:43  11  of damages, cost savings, increased profits, and ecosystem

10:45:47  12  benefits, correct?

10:45:49  13  A.  That's my understanding, yes.

10:45:51  14  Q.  You attribute no ecosystem benefit to auto capture

10:45:55  15  MRDC, correct?

10:45:57  16  A.  For the reasons that I've explained, that's correct.

10:45:59  17  Q.  You attribute no value whatsoever to the increased

10:46:04  18  profits from auto capture MRDC, correct, sir?

10:46:06  19  A.  In the context of my analyses, that's correct.

10:46:11  20  Q.  Why don't we turn to PDX -- PX-7, which is Tab 25 in

10:46:20  21  your binder.

10:46:33  22        MR. SHEASBY:  And why don't we turn the page,

10:46:38  23  Mr. Huynh, to Page 11?

10:46:46  24  Q.  (By Mr. Sheasby)  So Wells Fargo's documents identify a

10:46:57  25  number of primary benefits to Wells Fargo of MRDC, correct?

10:47:05  1  A.  These expectations -- they're aspirations for MRDC,

10:47:10  2  correct.

10:47:10  3  Q.  Channel optimization, that's another name for cost

10:47:14  4  savings, correct?

10:47:14  5  A.  Yes.

10:47:14  6  Q.  Deposit balance growth, that's about how MRDC can

10:47:18  7  increase profits, correct?

10:47:19  8  A.  How MRDC could potentially increase profits, that's

10:47:24  9  correct.

10:47:24  10  Q.  And brand positioning reputation, that's about how --

10:47:27  11  that relates to what some might call as the ecosystem

10:47:34  12  effect, correct, sir?

10:47:35  13  A.  In a general construct, yes.

10:47:37  14      MR. SHEASBY:  And so let's pull that down.

10:47:38  15  Q.  (By Mr. Sheasby)  And to be clear, you didn't assign

10:47:41  16  any in your analysis -- in your damage analysis, you didn't

10:47:44  17  assign any ecosystem benefit based on the patents-in-suit,

10:47:47  18  correct?

10:47:47  19  A.  No, and may I explain?

10:47:50  20  Q.  Sir, the answer -- you may.  I'll get right back to it.

10:47:58  21      You also didn't assign any value to any -- to

10:48:02  22  the -- to the auto capture patents based on any profits

10:48:05  23  that may have been created by MRDC, correct, sir?

10:48:07  24  A.  That were created by MRDC?  No, that's correct.

10:48:10  25  Q.  Yes.  Now, one of the other --

```
10:48:14   1  A.  That were created by auto capture, that's correct.

10:48:15   2  Q.  No, sir, I was actually asking you a different

10:48:21   3  question.

10:48:21   4       In your damages analysis, you didn't consider any

10:48:24   5  profits that were generated by MRDC, correct?

10:48:26   6  A.  I would disagree with that.

10:48:31   7  Q.  So you agree that MRDC has generated profits, correct,

10:48:36   8  sir?

10:48:36   9  A.  I would agree that looking at MRDC and the benefits of

10:48:42  10  moving from manual capture to auto capture would

10:48:44  11  potentially increase profits because it has lower costs of

10:48:49  12  processing.

10:48:50  13  Q.  You didn't -- you didn't explore any profits associated

10:48:53  14  with deposit growth or increased spending by the customer,

10:48:57  15  correct?

10:48:57  16  A.  Of those two specific items?  No, I did not.

10:48:59  17  Q.  Okay.  Now, you also criticized Mr. Calman's discussion

10:49:05  18  of the 40 percent value that he attributed as a technical

10:49:09  19  matter to auto capture, correct?

10:49:10  20  A.  I criticized his use of the 40 percent that he's

10:49:17  21  attributing to auto capture.

10:49:19  22  Q.  Now, you did not ask -- ask Dr. Villasenor to render an

10:49:23  23  opinion as to whether Mr. Calman's assessment that

10:49:27  24  40 percent of the value of MRDC is auto capture, correct?

10:49:30  25  A.  No, I did not.
```

| | | |
|---|---|---|
| 10:49:31 | 1 | Q.  You did not ask Mr. Villasenor, any other technologist |
| 10:49:36 | 2 | anywhere in the world, to analyze from a technical |
| 10:49:40 | 3 | perspective Mr. Calman's analysis, correct? |
| 10:49:43 | 4 | A.  That's fair. |
| 10:49:43 | 5 | Q.  You did not ask Mr. Saffici, correct? |
| 10:49:45 | 6 | A.  No, I did not. |
| 10:49:46 | 7 | Q.  You did not ask any Wells Fargo technologist, correct? |
| 10:49:50 | 8 | A.  Wells Fargo technologist?  No, I did not. |
| 10:49:53 | 9 | Q.  From a technical perspective in terms of technical |
| 10:49:57 | 10 | components, you are not qualified to evaluate the impact of |
| 10:50:02 | 11 | auto capture on MRDC, correct, sir? |
| 10:50:07 | 12 | A.  From a technical perspective in terms of the -- the |
| 10:50:14 | 13 | mechanical and -- and software/hardware parts of the |
| 10:50:19 | 14 | system, no, I am not. |
| 10:50:20 | 15 | Q.  Sir, from a technical perspective in terms of technical |
| 10:50:24 | 16 | components, you are not qualified to evaluate the impact of |
| 10:50:28 | 17 | auto capture on MRDC, yes or no? |
| 10:50:33 | 18 | A.  In that definition of technical, that's correct. |
| 10:50:37 | 19 | Q.  Now, Mr. Calman performed some analysis in which he |
| 10:51:07 | 20 | concludes that auto capture, if it was turned off, it would |
| 10:51:15 | 21 | be unaccessible -- unacceptable to consumers, correct? |
| 10:51:18 | 22 | A.  I have a general understanding, yes, that's correct. |
| 10:51:21 | 23 | Q.  You're not an expert in mobile remote deposit capture, |
| 10:51:25 | 24 | correct, sir? |
| 10:51:25 | 25 | A.  In terms of the technical aspects of it, no. |

10:51:28  1  Q.  You said previously you're not an expert in mobile

10:51:34  2  remote deposit capture, correct, sir?

10:51:35  3  A.  That's correct.

10:51:35  4  Q.  And you didn't ask any technologist, anyone who is an

10:51:41  5  expert in mobile remote deposit capture, such as

10:51:44  6  Mr. Villasenor who is independent in this case, whether

10:51:46  7  Mr. Calman was correct or incorrect, fair?

10:51:48  8  A.  From a technical perspective, that's correct.

10:51:50  9          MR. SHEASBY:  Your Honor, I pass the witness.

10:51:52  10          THE COURT:  All right.  Is there redirect,

10:51:54  11  Ms. Williams?

10:51:55  12          MS. WILLIAMS:  Yes, Your Honor.

10:51:56  13          THE COURT:  All right.  Proceed with your redirect

10:51:58  14  examination.

10:51:58  15          MS. WILLIAMS:  Thank you, Your Honor.

10:51:58  16                    REDIRECT EXAMINATION

10:51:59  17  BY MS. WILLIAMS:

10:51:59  18  Q.  Mr. Gerardi, counsel for USAA discussed your opinion on

10:52:17  19  the commercial viability of manual capture as a

10:52:19  20  non-infringing alternative.  Is this an analysis -- kind of

10:52:22  21  analysis that you've done before?

10:52:24  22  A.  Oh, yes, scores of times.

10:52:25  23  Q.  And what is the technical expert's role in that kind of

10:52:31  24  analysis?

10:52:31  25  A.  The technical expert's role to me is to help me

10:52:34  1  understand the technological aspects of it.  My role as the
10:52:40  2  damages expert is to analyze the economics and the
10:52:44  3  financial business side of it.
10:52:45  4  Q.  Is that why you talked to Dr. Villasenor?
10:52:48  5  A.  Yes, again to understand the technical aspects of the
10:52:50  6  product.
10:52:50  7  Q.  Did he have to offer a formal report or opinion to have
10:52:54  8  the discussion with you about whether manual capture was
10:52:59  9  not infringing?
10:53:00  10  A.  No, he did not.
10:53:02  11  Q.  Is there any real disagreement that manual capture does
10:53:05  12  not infringe?
10:53:06  13  A.  I don't think there is, no.
10:53:07  14  Q.  Is there any disagreement that it is technologically
10:53:17  15  feasible to do manual capture?
10:53:20  16  A.  No.  Again, I think we've seen that Wells Fargo has
10:53:24  17  actually deployed and working with and had a fully
10:53:28  18  operational mobile deposit -- or mobile remote deposit
10:53:31  19  capture system using manual capture.
10:53:33  20  Q.  And what is your role in the analysis of determining
10:53:41  21  commercial acceptance of a non-infringing alternative?
10:53:44  22  A.  Again, is to evaluate the economics and the business
10:53:47  23  aspects of one system versus the other.
10:53:49  24  Q.  And in this case, why did you determine that manual
10:53:55  25  capture is commercially acceptable?

10:53:57  1   A.  Oh, for the reasons that we talked about previously.  I
10:54:01  2   can see that Wells Fargo spent several years evaluating
10:54:07  3   this type of system and made an informed decision and spent
10:54:11  4   a lot of money to come to the market with a manual capture
10:54:15  5   remote deposit system.  And they, in fact, deployed that
10:54:17  6   system in the market, so it -- it worked.  It exceeded
10:54:20  7   their expectations.
10:54:21  8          And so from an economic perspective, that, to me,
10:54:25  9   indicates that there was an acceptable product that was
10:54:27  10  viable and that was workable.
10:54:29  11  Q.  You were asked some questions about Mr. Ajami's
10:54:32  12  testimony, do you recall that?
10:54:35  13  A.  Yes.
10:54:35  14  Q.  In -- in any of the testimony that you've reviewed from
10:54:38  15  Mr. Ajami, have you ever heard him talk about USAA's
10:54:43  16  version of auto capture as part of his statement related to
10:54:49  17  the Futurion Report?
10:54:49  18  A.  No.
10:55:04  19          MS. WILLIAMS:  May we have PX-31, please?
10:55:11  20  Q.  (By Ms. Williams)  Mr. Gerardi, you were asked a number
10:55:17  21  of questions about -- about PX-31 in your selection of
10:55:24  22  81.17 percent as the manual capture acceptance rate.  Why
10:55:30  23  did you feel comfortable using 81.17 percent even with the
10:55:40  24  line item of MiSnap unknowns?
10:55:42  25  A.  I couldn't hear -

10:55:42  1   Q.  Excuse me?

10:55:42  2   A.  I couldn't hear the last part of your sentence, I'm

10:55:44  3   sorry.

10:55:44  4   Q.  Oh.  You were asked a number of questions about PX-31.

10:55:49  5   A.  Yes.

10:55:50  6   Q.  And why did you feel comfortable using the data at

10:55:54  7   PX-31 in arriving at 81.17 percent even with the MiSnap

10:56:00  8   unknown line item in that January 2018 section of the --

10:56:05  9   PX-31?

10:56:06  10  A.  Because the unknown means I got unknown.  We just don't

10:56:09  11  know what it is, and there's no way for me to determine how

10:56:12  12  that affected auto, how that affected the other manuals or

10:56:17  13  not.  So I just -- I had no reason to base -- to use that

10:56:23  14  in my calculus.

10:56:24  15  Q.  Did you look at other information to corroborate the

10:56:28  16  81.17 percent?

10:56:28  17  A.  Oh, yes.  We discussed several of those pieces of

10:56:31  18  corroborating evidence previously.

10:56:32  19  Q.  And what are those?

10:56:33  20  A.  Oh, you have USAA's performance with its manual

10:56:40  21  capture.  There were US -- Wells Fargo's -- so we have it

10:56:45  22  here.  USAA's manual acceptance rate.  There was the MiSnap

10:56:51  23  information that did -- that identified the expected

10:56:55  24  improvement going from manual to auto capture.  There was

10:56:57  25  this document from USAA.

```
10:57:00   1        Again -- I'm sorry, just go back if we could,
10:57:02   2   please, once.  Again, clearly demonstrating for that period
10:57:06   3   of time, USAA's manual capture success rate and the
10:57:11   4   difference.
10:57:13   5        THE WITNESS:  Next, please.
10:57:14   6   A.  And, again, based upon US -- Wells Fargo's own
10:57:17   7   experience for that limited time period, again, they had
10:57:21   8   approximately an 80 percent acceptance rate there.  And a 6
10:57:26   9   percent improvement there.
10:57:27  10        And Mr. Bueche's testimony that USAA experienced
10:57:31  11   an 81 percent manual capture rate when their auto capture
10:57:36  12   system didn't work.
10:57:38  13   Q.  (By Ms. Williams)  Did you look at this 81.17 percent
10:57:41  14   in isolation?
10:57:42  15   A.  Oh, no, not at all.
10:57:47  16        MS. WILLIAMS:  May we have PX-7, please?
10:57:53  17   Q.  (By Ms. Williams)  Do you recall reviewing this
10:57:58  18   document with counsel for USAA?
10:58:00  19   A.  Yes, I do.
10:58:00  20   Q.  What's the date of this document?
10:58:02  21   A.  January 2011.
10:58:04  22   Q.  Was auto capture used in January 2011?
10:58:09  23   A.  No, it was not.
10:58:10  24   Q.  Was the form of capture being considered as part of
10:58:15  25   this review in January 2011?
```

10:58:19   1   A.   It was manual capture.

10:58:23   2   Q.   Is -- is there anything that you saw in this report

10:58:26   3   that links the benefits to auto capture?

10:58:29   4   A.   No, not at all.

10:58:32   5   Q.   At the time of the benefits described in this document,

10:58:37   6   what was the form of capture available?

10:58:40   7   A.   Again, it would have been manual capture MRDC.

10:58:53   8           MS. WILLIAMS:   Your Honor, may I have a moment?

10:58:55   9           THE COURT:   You may.

10:59:09  10           MS. WILLIAMS:   Thank you, Your Honor.

10:59:10  11           May we go back to PX-31, please?

10:59:13  12   Q.   (By Ms. Williams)   Counsel for USAA showed you that

10:59:23  13   there are -- highlighted for you that there are lower

10:59:25  14   numbers in PX-31 for MiSnap still and MiSnap manual.   Do

10:59:30  15   you recall that?

10:59:30  16   A.   I do.

10:59:32  17   Q.   And why didn't you rely on those low numbers in

10:59:37  18   determining what the acceptance rate would be in your

10:59:41  19   analysis for manual capture?

10:59:42  20   A.   I'm sorry, could you repeat your question?

10:59:45  21   Q.   Why didn't you rely on the lower rates in PX-31 to

10:59:50  22   determine your manual acceptance rate?

10:59:52  23   A.   So, again --

10:59:53  24           MR. SHEASBY:   Your Honor, I object.   Outside the

10:59:56  25   scope of the report.

10:59:56  1          THE COURT:  What's your response, Ms. Williams?

10:59:59  2          MS. WILLIAMS:  I'm sorry, I didn't hear the

11:00:00  3  objection.

11:00:00  4          THE COURT:  Well, apparently, people are not

11:00:02  5  hearing very well in here.

11:00:04  6          The objection was that the question calls for

11:00:08  7  testimony that's beyond the scope of this expert's report.

11:00:11  8          MS. WILLIAMS:  That is not -- I disagree, Your

11:00:13  9  Honor.  I can provide you with the -- the section number.

11:00:18  10          THE COURT:  All right.  Please do so.

11:00:33  11          Counsel, approach the bench, please.

11:00:35  12          (Bench conference.)

11:00:41  13          MS. WILLIAMS:  Your Honor, he's already testified

11:00:43  14  as to why the rates are lower, and he has -- he has in --

11:00:55  15  one of his paragraphs in his report, he discusses this

11:00:58  16  conversation that he had with Ms. Lockwood-Stein and her

11:01:01  17  testimony about what the compromise major is of the MiSnap

11:01:06  18  manual and the MiSnap still and why that they are

11:01:10  19  artificially low.  And he's already testified to that on

11:01:14  20  direct, Your Honor, without objection, and it is in his

11:01:16  21  report.

11:01:16  22          MR. SHEASBY:  That was in the section of his

11:01:17  23  report that was stricken.  I didn't make the objection

11:01:20  24  previously.  I think it was a different question.

11:01:22  25          THE COURT:  The question -- the issue before me

11:01:24  1  now is Mr. Sheasby's objection goes to your question,

11:01:29  2  Ms. Williams, which is why didn't you use the lower

11:01:32  3  percentage numbers reflected in this PX-31.  If there's a

11:01:35  4  section in his report where he discusses PX-31 and explains

11:01:39  5  why he used the high end of the numbers and not the low end

11:01:43  6  of the numbers, then I need to see that.

11:01:45  7          MS. WILLIAMS:  So, Your Honor, with Your Honor's

11:01:48  8  instruction or order at the pre-trial conference, he was

11:01:51  9  instructed to use PX-31 for the manual capture number.  And

11:01:55  10  so he -- and so that is -- at the pre-trial conference, you

11:02:02  11  indicated or you asked counsel for USAA if there was going

11:02:05  12  to be any objection about that number -- about the

11:02:08  13  information in the report going forward, and he indicated

11:02:10  14  that there wasn't going to be.

11:02:12  15          So --

11:02:13  16          THE COURT:  This is not an objection as to PX-31.

11:02:17  17          MS. WILLIAMS:  Uh-huh.

11:02:18  18          THE COURT:  It's an objection that based on PX-31,

11:02:21  19  did this witness, Mr. Gerardi, discuss in his report the --

11:02:26  20  the use or rationale not to use the lower end of the

11:02:31  21  numbers reflected in PX-31 than the higher end, which he

11:02:35  22  did use.

11:02:36  23          MS. WILLIAMS:  Yes, Your Honor.

11:02:37  24          THE COURT:  That's the question.  Is that in his

11:02:39  25  report?

11:02:39  1          MS. WILLIAMS:  Yes, Your Honor.  He described Ms.

11:02:41  2  Lockwood -- his conversations with Ms. Lockwood-Stein and

11:02:45  3  her testimony about --

11:02:46  4          THE COURT:  Show me.

11:02:47  5          MS. WILLIAMS:  Yes, Your Honor.

11:02:49  6          MR. SHEASBY:  Your Honor, that was the section

11:02:50  7  stricken --

11:02:51  8          THE COURT:  Well, let's see -- let her identify

11:02:55  9  the section, and then we'll determine if it's a live part

11:02:59 10  of the report.

11:03:00 11          MS. WILLIAMS:  Just bear with me, Your Honor.

11:03:00 12          MR. SHEASBY:  I'll help you with -- -

11:03:03 13          THE COURT:  No, Mr. Sheasby, it's not your job to

11:03:03 14  help her look.

11:03:23 15          If I need to send the jury out and give you time

11:03:25 16  to put this at your table and look through it, I will.

11:03:28 17  That's what I talked about in pre-trial, why these kind of

11:03:31 18  objections are so problematic.

11:03:33 19          If you can find it quickly, Ms. Williams, that's

11:03:35 20  great.  If you can't, I don't want to disadvantage you by

11:03:39 21  not giving you time to look.

11:03:42 22          MS. WILLIAMS:  Yes, Your Honor.

11:03:42 23          May I please have a minute to look, Your Honor?

11:03:44 24          THE COURT:  Yes.  I'll send the jury out, and you

11:03:46 25  go to your counsel table and look at it.

| | | |
|---|---|---|
| 11:03:50 | 1 | MS. WILLIAMS:  Yes, Your Honor.  Thank you. |
| 11:03:52 | 2 | (Bench conference concluded.) |
| 11:03:52 | 3 | THE COURT:  Ladies and gentlemen, this may take |
| 11:03:53 | 4 | some additional time.  I'm not going to require that you |
| 11:03:56 | 5 | sit in the jury box during this process. |
| 11:03:59 | 6 | So you may close your notebooks and retire to the |
| 11:04:02 | 7 | jury room.  I'll have you back in here as quickly as |
| 11:04:06 | 8 | possible once I've covered this with counsel.  Follow all |
| 11:04:09 | 9 | the instructions I've given you, including not to discuss |
| 11:04:11 | 10 | the case among yourselves. |
| 11:04:13 | 11 | The jury should retire to the jury room. |
| 11:04:17 | 12 | COURT SECURITY OFFICER:  All rise. |
| 11:04:18 | 13 | (Jury out.) |
| 11:04:19 | 14 | THE COURT:  Be seated, please. |
| 11:04:42 | 15 | While the jury is out of the jury room, I'll |
| 11:05:00 | 16 | take -- or out of the courtroom, rather, I'll take this |
| 11:05:03 | 17 | opportunity to update counsel. |
| 11:05:05 | 18 | Plaintiff has 2 hours and 20 minutes remaining. |
| 11:05:07 | 19 | Defendant has 1 hour and 25 minutes remaining. |
| 11:05:17 | 20 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 11:05:18 | 21 | MR. SHEASBY:  Thank you, Your Honor. |
| 11:07:48 | 22 | MS. WILLIAMS:  Your Honor, may we approach? |
| 11:07:49 | 23 | THE COURT:  There's no need to.  The jury is not |
| 11:07:53 | 24 | in the courtroom. |
| 11:07:53 | 25 | MS. WILLIAMS:  Oh, yes, Your Honor. |

| | | |
|---|---|---|
| 11:07:54 | 1 | THE COURT:  Tell me what you have, Ms. Williams. |
| 11:07:56 | 2 | MS. WILLIAMS:  So in Paragraph 143 and in 2 -- |
| 11:08:10 | 3 | 143, he discusses his criticisms.  And then also -- or, |
| 11:08:15 | 4 | excuse me, he discusses his criticisms of the data that |
| 11:08:18 | 5 | Mr. Calman relied on. |
| 11:08:21 | 6 | And then also talks about the reliance on the |
| 11:08:27 | 7 | manual and still mode in Paragraph 263. |
| 11:08:32 | 8 | THE COURT:  Is there anything specific in his |
| 11:08:33 | 9 | report that identifies why he did not use the lower numbers |
| 11:08:38 | 10 | reflected on PX-31 in place of the higher number that he's |
| 11:08:43 | 11 | testified to? |
| 11:08:44 | 12 | MS. WILLIAMS:  Not -- not in the way that Your |
| 11:08:48 | 13 | Honor has phrased it, but in the context of criticizing |
| 11:08:52 | 14 | Mr. Calman's reliance on those numbers, there is.  But I'm |
| 11:08:56 | 15 | happy to withdraw the question, Your Honor, and ask another |
| 11:08:58 | 16 | one. |
| 11:08:58 | 17 | THE COURT:  Well, your question was specifically |
| 11:09:01 | 18 | targeted to PX-31 which you had put on the screen -- |
| 11:09:01 | 19 | MS. WILLIAMS:  Yes, Your Honor. |
| 11:09:04 | 20 | THE COURT:  -- at your instruction.  And unless -- |
| 11:09:07 | 21 | unless there's a clear discussion of this exhibit, |
| 11:09:10 | 22 | establishing why this witness chose to use the high end of |
| 11:09:13 | 23 | the numbers reflected on this exhibit as opposed to the low |
| 11:09:16 | 24 | end, then I'll have -- I'll sustain the objection, or you |
| 11:09:20 | 25 | can withdraw the question. |

```
11:09:21   1              MS. WILLIAMS:  I'll withdraw the question, Your
11:09:23   2   Honor.
11:09:23   3              THE COURT:  All right.  I'm going to bring the
11:09:24   4   jury back in.  I think they're entitled to know the
11:09:26   5   resolution of this.  So you should withdraw the question
11:09:29   6   once the jury is back in the box.
11:09:31   7              MS. WILLIAMS:  Yes, Your Honor.
11:09:31   8              THE COURT:  All right.  All right.  Let's bring
11:09:40   9   the jury back.
11:09:49  10              (Off the record discussion.)
11:09:55  11              THE COURT:  And I'll charge this time consumed in
11:10:05  12   this process to the Defendant.
11:10:14  13              COURT SECURITY OFFICER:  All rise.
11:10:15  14              (Jury in.)
11:10:15  15              THE COURT:  Please be seated.
11:10:34  16              Ms. Williams, it's my understanding that you wish
11:10:43  17   to withdraw the question that led to the objection by Mr.
11:10:46  18   Sheasby?
11:10:47  19              MS. WILLIAMS:  Yes, Your Honor.
11:10:48  20              THE COURT:  The question is withdrawn.  Ask your
11:10:51  21   next question.
11:10:52  22              MS. WILLIAMS:  Thank you, Your Honor.
11:10:56  23   Q.  (By Ms. Williams)  Mr. Gerardi, counsel for USAA
11:10:58  24   discussed with you that Mr. Calman's opinion that manual
11:10:58  25   capture is not accepted -- is not acceptable.  Do you
```

| | | |
|---|---|---|
| 11:11:01 | 1 | remember that? |
| 11:11:01 | 2 | A.  I do. |
| 11:11:01 | 3 | Q.  Now, are you an expert in the economic acceptability in |
| 11:11:05 | 4 | the market of technology? |
| 11:11:06 | 5 | A.  I'm an expert in evaluating the -- the market for |
| 11:11:12 | 6 | technology, yes. |
| 11:11:12 | 7 | Q.  By looking at consumer behavior in the market, what did |
| 11:11:15 | 8 | you conclude about whether the market would accept manual |
| 11:11:19 | 9 | capture as an alternative to the manual MRDC system -- |
| 11:11:23 | 10 | excuse me, auto capture system? |
| 11:11:24 | 11 | A.  As I explained previously, it already had.  I mean, |
| 11:11:30 | 12 | Wells Fargo already had an existing manual deposit |
| 11:11:34 | 13 | remote -- manual capture remote deposit system in place, |
| 11:11:34 | 14 | and it was successful at that point in time. |
| 11:11:37 | 15 | Q.  Would the parties at the hypothetical negotiation know |
| 11:11:41 | 16 | this information and consider it? |
| 11:11:43 | 17 | A.  Absolutely. |
| 11:11:43 | 18 | Q.  You were asked some questions about Doctrine of |
| 11:11:49 | 19 | Equivalents and direct infringement.  Do you recall those |
| 11:11:51 | 20 | questions? |
| 11:11:51 | 21 | A.  Yes, I do. |
| 11:11:53 | 22 | Q.  And so if -- if the jury doesn't find that there is |
| 11:11:57 | 23 | infringement by Wells Fargo, what are the damages in this |
| 11:12:00 | 24 | case? |
| 11:12:00 | 25 | A.  Zero. |

| | | |
|---|---|---|
| 11:12:01 | 1 | Q.  And if the jury doesn't find that there's infringement |
| 11:12:04 | 2 | under the Doctrine of Equivalents, what are the damages in |
| 11:12:07 | 3 | this case? |
| 11:12:08 | 4 | A.  Zero. |
| 11:12:10 | 5 | MS. WILLIAMS:  Your Honor, I pass the witness. |
| 11:12:13 | 6 | THE COURT:  All right.  Is there additional |
| 11:12:15 | 7 | cross-examination? |
| 11:12:16 | 8 | MR. SHEASBY:  Your Honor, Plaintiff have no |
| 11:12:17 | 9 | further questions of this witness. |
| 11:12:18 | 10 | THE COURT:  Then, Mr. Gerardi, you may step down. |
| 11:12:21 | 11 | THE WITNESS:  Thank you, sir. |
| 11:12:24 | 12 | MR. MELSHEIMER:  Your Honor, may we approach |
| 11:12:25 | 13 | briefly on a housekeeping matter? |
| 11:12:27 | 14 | THE COURT:  Approach the bench. |
| 11:12:29 | 15 | (Bench conference.) |
| 11:12:49 | 16 | THE COURT:  Let's talk into these microphones, |
| 11:12:51 | 17 | please. |
| 11:12:51 | 18 | MR. MELSHEIMER:  Yes, Your Honor.  So we're -- |
| 11:12:53 | 19 | we're prepared to rest our evidence, Your Honor, subject to |
| 11:12:56 | 20 | an offer of proof about some previously excluded evidence |
| 11:12:59 | 21 | and testimony.  But I assume we'll be allowed to do that -- |
| 11:13:05 | 22 | THE COURT:  Outside the presence of the jury. |
| 11:13:06 | 23 | MR. MELSHEIMER:  -- outside the presence of the |
| 11:13:08 | 24 | jury, of course.  Your Honor, the only issue, the reason |
| 11:13:10 | 25 | why I'm up here is because there was a brief filed at 6:00 |

11:13:14  1  o'clock this morning arguing that something Dr. Villasenor

11:13:17  2  had said had opened the door to an instruction from the

11:13:22  3  Court.  I guess I'm a little concerned that -- first of

11:13:26  4  all, that objection was -- there was no objection raised

11:13:28  5  during his testimony to that --

11:13:30  6          THE COURT:  Let me stop you, Mr. Melsheimer.  I

11:13:32  7  haven't thoroughly reviewed it since it only came in this

11:13:36  8  morning, but my understanding, it goes to the issue of what

11:13:39  9  the Court will instruct the jury on as a part of its

11:13:43  10  charge; is that correct?  Is that the request that it be

11:13:45  11  included in the charge?

11:13:46  12          MR. SHEASBY:  Yes, Your Honor.  It's purely a

11:13:48  13  legal issue for the charge.

11:13:49  14          MR. MELSHEIMER:  It is, Your Honor, except that

11:13:53  15  I -- if the Court -- well, our concern is --

11:13:56  16          THE COURT:  I'm not going to take up

11:13:58  17  charge-related issues right now.

11:14:00  18          MR. MELSHEIMER:  Well, Your Honor, I understand

11:14:02  19  that.  I'm not asking you to.

11:14:03  20          THE COURT:  Okay.

11:14:04  21          MR. MELSHEIMER:  All I'm saying is we were

11:14:05  22  prepared to rest our case.  If there's going to be a change

11:14:08  23  in what the parties are anticipating and have long

11:14:10  24  anticipated about what the jury is going to be told, you

11:14:14  25  know, Dr. Villasenor has been released.  I guess we could

11:14:17  1   try to go get him back here to clarify or explain his

11:14:20  2   testimony.  That's the concern I'm raising with the Court

11:14:23  3   is that --

11:14:24  4          THE COURT:  Here's -- here's my short answer,

11:14:26  5   Mr. Melsheimer.  The Court's not going to be compelled to

11:14:30  6   address what it is or isn't going to include in its charge

11:14:35  7   before you rest your case so that you'll know what you need

11:14:38  8   or don't need to put on in evidence.  That's not the way it

11:14:41  9   works.  You choose what to put before the jury just as the

11:14:45  10  Plaintiff will choose what if anything to put in his

11:14:48  11  rebuttal case, and then when all the evidence is in for the

11:14:51  12  first time, the Court will take up based on that evidence

11:14:55  13  what the Court believes is an appropriate and fair charge

11:14:58  14  to the jury will be.  But I'm not going to be put in a

11:15:01  15  position of having to say yes or no now on an issue related

11:15:05  16  to what's appropriate for the charge so you can feel better

11:15:06  17  or worse about what evidence you've put on or not put on.

11:15:09  18         MR. MELSHEIMER:  Your Honor, I'm not -- I'm not

11:15:11  19  making this point well.  And I apologize.

11:15:14  20         THE COURT:  That's the way it seems to me.

11:15:16  21         MR. MELSHEIMER:  We're not trying to put you in

11:15:18  22  any kind of position to do that.

11:15:19  23         What I'm suggesting is, is that, for example, the

11:15:22  24  charge that they want, to me, would argue for us to be able

11:15:26  25  to offer some evidence from the prosecution history if the

11:15:31   1   Court excluded specifically the Graham reference where they

11:15:35   2   distinguish their patent over Graham by saying there was a

11:15:38   3   timing condition in the order of steps mattered.  So if

11:15:42   4   that instruction was going to go in, which I don't think it

11:15:45   5   should, I know we're not arguing it, but we --

11:15:48   6          THE COURT:  Well, that's exactly what you're

11:15:50   7   doing, you're arguing it right now.

11:15:51   8          MR. MELSHEIMER:  We do have evidence -- I guess I

11:15:53   9   will say this, Your Honor, we will proffer the evidence

11:15:56   10  from the prosecution history that the Court has excluded

11:15:58   11  with respect to this Graham reference, and I'm happy to put

11:16:03   12  that in an offer of proof if that's a --

11:16:05   13         THE COURT:  You can put whatever in your offer of

11:16:08   14  proof that you want to put outside the presence of the

11:16:10   15  jury, but I'm not going to tell you, because I don't know

11:16:12   16  at this point without having studied it further, whether

11:16:15   17  there's any merit to what this trial brief was filed at

11:16:18   18  6:00 a.m. this morning or not.

11:16:19   19         MR. MELSHEIMER:  Understood.  Understood, Your

11:16:21   20  Honor.

11:16:21   21         THE COURT:  And I'm not going to take up the

11:16:23   22  charge piecemeal while the Defendant is still in its

11:16:26   23  case-in-chief, okay?

11:16:28   24         MR. MELSHEIMER:  Okay.  Understood, Your Honor.

11:16:30   25         THE COURT:  All right?

| | | |
|---|---|---|
| 11:16:30 | 1 | MR. SHEASBY:  Thank you, Your Honor. |
| 11:16:31 | 2 | (Bench conference concluded.) |
| 11:16:40 | 3 | THE COURT:  Defendant, call your next witness. |
| 11:16:41 | 4 | MR. MELSHEIMER:  May it please the Court, Your |
| 11:16:42 | 5 | Honor.  At this time, Defendant, Wells Fargo, rests its |
| 11:16:45 | 6 | case. |
| 11:16:45 | 7 | THE COURT:  All right.  Ladies and gentlemen, the |
| 11:16:51 | 8 | Defendant has rested its case-in-chief. |
| 11:16:53 | 9 | Does Plaintiff have a rebuttal case to offer? |
| 11:16:58 | 10 | MR. SHEASBY:  Your Honor, at this time, Plaintiff |
| 11:17:02 | 11 | calls Wells Fargo's executive Armin Ajami in its rebuttal |
| 11:17:04 | 12 | case by deposition. |
| 11:17:04 | 13 | THE COURT:  Proceed with your rebuttal witness by |
| 11:17:08 | 14 | deposition. |
| 11:17:08 | 15 | MR. SHEASBY:  Thank you, Your Honor. |
| 11:17:13 | 16 | (Videoclip played.) |
| 11:17:18 | 17 | QUESTION:  Sir, can you state your full name for |
| 11:17:20 | 18 | the record? |
| 11:17:20 | 19 | ANSWER:  Sure, Armin Ajami. |
| 11:17:23 | 20 | QUESTION:  Where are you employed, sir? |
| 11:17:24 | 21 | ANSWER:  Wells Fargo. |
| 11:17:26 | 22 | QUESTION:  When did you begin to work for Wells |
| 11:17:29 | 23 | Fargo? |
| 11:17:29 | 24 | ANSWER:  2004. |
| 11:17:30 | 25 | QUESTION:  What is your current position at Wells |

| | | |
|---|---|---|
| 11:17:32 | 1 | Fargo. |
| 11:17:32 | 2 | ANSWER:  I am a strategic planning manager. |
| 11:17:35 | 3 | QUESTION:  So to be clear, you don't recall if you |
| 11:17:37 | 4 | were aware that USAA had launched a mobile check deposit |
| 11:17:44 | 5 | system at the time you were planning on launching one for |
| 11:17:49 | 6 | Wells Fargo, is that your testimony? |
| 11:17:51 | 7 | ANSWER:  At the time -- yeah, I just -- I don't |
| 11:17:54 | 8 | remember.  I know we found out about it later.  I don't |
| 11:17:56 | 9 | know at the time, when they were about to make a decision |
| 11:17:59 | 10 | to start looking at it in late 2009, whether USAA was in |
| 11:18:04 | 11 | the market or not. |
| 11:18:05 | 12 | QUESTION:  Sir, Wells Fargo examined USAA's mobile |
| 11:18:11 | 13 | check deposit application while it was designing its |
| 11:18:14 | 14 | system, yes or no? |
| 11:18:14 | 15 | ANSWER:  Again, can you defined "examined"? |
| 11:18:20 | 16 | Because what I'm saying is, we looked at the user |
| 11:18:23 | 17 | experience, so if that's your definition of examined, then |
| 11:18:26 | 18 | that's fine.  But I don't know what you mean by examined. |
| 11:18:27 | 19 | QUESTION:  Sir, under user experience, you mean |
| 11:18:30 | 20 | the operation of the app, correct? |
| 11:18:32 | 21 | ANSWER:  No.  No, it's the flow, the user |
| 11:18:35 | 22 | experience is how -- how the customer interacts with the |
| 11:18:38 | 23 | application. |
| 11:18:40 | 24 | QUESTION:  You've looked at the USAA's mobile |
| 11:18:43 | 25 | check deposit application, correct? |

11:18:44    1          ANSWER:  The application itself?  I don't recall.

11:18:48    2    We either got information through a third party, they had

11:18:52    3    publicly available information, or if it was available --

11:18:55    4    if someone had to have access to USAA's -- someone had to

11:19:00    5    have an account at USAA to see the USAA experience.  That's

11:19:04    6    why I don't recall if someone actually did that, or we just

11:19:06    7    got it through the publicly available information that was

11:19:10    8    already out there and released through third parties.

11:19:12    9          QUESTION:  You talked to Mitek about the USAA

11:19:14   10    system, fair?

11:19:15   11          ANSWER:  No, we did not talk to Mitek directly

11:19:17   12    about USAA's system.

11:19:18   13          QUESTION:  Why did you use the word "directly"?

11:19:20   14          ANSWER:  I don't know.  We didn't talk to Mitek

11:19:25   15    about USAA.

11:19:25   16          QUESTION:  But you wanted people who used mobile

11:19:29   17    banking to continue to utilize ATMs and stores for check

11:19:35   18    deposits; is that correct?

11:19:36   19          ANSWER:  Our position -- our view -- our viewpoint

11:19:41   20    was customers should choose whatever channel they want to

11:19:45   21    choose that's most convenient for them.  Some people are

11:19:48   22    going to want to come into stores and branches, visit the

11:19:52   23    ATM.  For some people self-service using a digital channel

11:19:55   24    like mobile makes the most sense.  So ultimately, it's a

11:20:00   25    customer choice.  We weren't forcing or incenting anyone to

11:20:03  1  use a mobile solution.

11:20:04  2      QUESTION:  You told your managers that your

11:20:08  3  competitors embrace a mobile check deposit and made it,

11:20:14  4  quote, a table stakes capability, correct?

11:20:18  5      ANSWER:  Correct, yeah.

11:20:20  6      QUESTION:  You had very particular criteria for

11:20:22  7  choosing the type of mobile deposit system you were going

11:20:25  8  to use, fair?

11:20:26  9      ANSWER:  That's fair.

11:20:27  10     QUESTION:  You wanted one that was going to

11:20:28  11  provide the simplest experience possible, correct?

11:20:31  12     ANSWER:  That's correct.

11:20:31  13     QUESTION:  You wanted one that would provide the

11:20:33  14  high -- the lowest rate of exceptions and rejected checks,

11:20:39  15  correct?

11:20:39  16     ANSWER:  I think -- yes, I think generally

11:20:40  17  speaking, yes.

11:20:41  18     QUESTION:  Document, Exhibit 2, this business

11:20:44  19  strategy presentation on mobile check deposit was something

11:20:48  20  that evolved over a number of years, correct?

11:20:50  21     ANSWER:  It did.

11:20:51  22     QUESTION:  And in this document that evolved over

11:20:53  23  a number of years that you sent to your managers, the first

11:20:57  24  working mobile check deposit system that you identify in

11:20:59  25  this document to your managers was USAA's system, fair?

11:21:07  1          ANSWER:  Sir, you said first working mobile

11:21:10  2   deposit system?

11:21:11  3          QUESTION:  Yes.

11:21:12  4          ANSWER:  I mean, the first one we knew of was

11:21:16  5   Mitek's solution that they had and they were talking about,

11:21:19  6   as a vendor trying to sell it --

11:21:19  7          QUESTION:  Sure.

11:21:21  8          ANSWER:  -- to banks, right?  That's -- that's

11:21:23  9   what we knew of.  USAA definitely showed up.  So was it the

11:21:26  10  first one?  I don't know.

11:21:27  11         QUESTION:  And you also needed to make it highly

11:21:31  12  accurate.  In other words, part of seamlessness is not just

11:21:34  13  that it's easy for the customer to use.  Part of it is that

11:21:37  14  you get images of sufficient quality such that they can be

11:21:41  15  legally deposited, fair?

11:21:43  16         ANSWER:  I think that's fair.

11:21:45  17         QUESTION:  And those were both extremely high

11:21:47  18  priorities for you, fair?

11:21:48  19         ANSWER:  They were definitely high properties.

11:21:51  20         QUESTION:  In fact, seamlessness and success are

11:21:54  21  the two highest priorities that you were focused on --

11:21:58  22         ANSWER:  You know, that's a good --

11:21:58  23         QUESTION:  -- in terms of the quality of the

11:22:00  24  system?

11:22:00  25         ANSWER:  That's a good question, I don't know if I

11:22:02   1   would actually say it that way.  I would say the risk

11:22:05   2   component of the solution, not just the check acceptance

11:22:09   3   risk of the image but actually the new risk of the mobile

11:22:14   4   solution was going to introduce in the marketplace was

11:22:16   5   actually the No. 1 issue we were --

11:22:18   6        QUESTION:  That's the fraud risk?

11:22:19   7        ANSWER:  That's the fraud risk.  I mean --

11:22:22   8        QUESTION:  And it turns out that there is

11:22:24   9   essentially negligible fraud risk associated with mobile

11:22:28   10  check deposit, right?

11:22:28   11       ANSWER:  No, I wouldn't -- I would not agree with

11:22:30   12  that.  There is fraud risk associated with it, and we were

11:22:33   13  -- we're seeing like a duplicate deposit, right?  So --

11:22:37   14       QUESTION:  The Wells Fargo 2.0 mobile capture

11:22:41   15  system, you told your executives there was going to be an

11:22:45   16  increase in check capture success from 75 percent to

11:22:49   17  90 percent, correct?

11:22:50   18       ANSWER:  Yes, that was our projection, to get to

11:22:53   19  90 percent.

11:22:53   20       QUESTION:  And that was -- and that system that

11:22:57   21  you embraced, the Wells Fargo 2.0 system, was an auto

11:23:02   22  capture system, correct?

11:23:04   23       ANSWER:  It was an auto capture system.

11:23:06   24       QUESTION:  And by auto capture system, that means

11:23:09   25  there was autonomous assessment of the quality of the image

11:23:14   1   by the system, correct?

11:23:18   2           ANSWER:  That's a good question.  There -- I'm not

11:23:23   3   100 percent sure how it worked under the covers.

11:23:25   4           QUESTION:  In other words --

11:23:26   5           ANSWER:  Yeah.

11:23:26   6           QUESTION:  -- when you were making the decision to

11:23:29   7   embrace auto capture for your mobile deposit system in

11:23:33   8   2013, you based that on the assessment that you would be

11:23:35   9   able to go from a 75 percent success rate --

11:23:39  10           ANSWER:  Right.

11:23:40  11           QUESTION:  -- to a 90 percent success rate?

11:23:43  12           ANSWER:  That was one of the -- that was

11:23:45  13   definitely one of the features that was prominent in that

11:23:49  14   project.

11:23:49  15           QUESTION:  You have no factual basis to disagree

11:23:52  16   with the Futurion statement that auto capture must now be

11:23:55  17   treated as a must-have feature across all strata of the

11:23:56  18   financial services industry, correct?

11:23:57  19           ANSWER:  Yeah, I don't think I have any.

11:24:00  20           QUESTION:  Now, I want to talk about the benefits

11:24:09  21   that are associated with mobile check deposit capture.

11:24:14  22           ANSWER:  Uh-huh.

11:24:14  23           QUESTION:  One of the benefits that's associated

11:24:16  24   with mobile check deposit capture is if you're successful

11:24:20  25   at capturing the check image, it's cheaper to deposit using

11:24:26  1   mobile check deposit for Wells Fargo than via an ATM or a

11:24:32  2   bank teller, fair?

11:24:35  3        ANSWER:  Yes, we looked at all channels, and it

11:24:39  4   was cheaper -- the marginal cost was cheaper for mobile

11:24:43  5   deposit.

11:24:43  6        QUESTION:  If you can answer my question yes or

11:24:46  7   no.  As of January of 2011, your best estimate that you

11:24:55  8   were telling to your managers was if you were able to

11:25:00  9   successfully deposit an image using mobile capture, it

11:25:03  10  would cost you 46 cents.  And if you couldn't do that, it

11:25:06  11  would be 82 cents through an ATM or $2.55 through a teller.

11:25:12  12        ANSWER:  Yes.

11:25:13  13        QUESTION:  You told your superiors that there was

11:25:16  14  a dramatic shift in check deposit behavior after mobile

11:25:22  15  deposit adoption, correct?

11:25:23  16        ANSWER:  There was -- yes, there was a dramatic

11:25:27  17  shift in check deposit behavior by the people who adopted

11:25:30  18  the service.

11:25:31  19        QUESTION:  You told your superiors that over a

11:25:34  20  very, very short period of time --

11:25:36  21        ANSWER:  Uh-huh.

11:25:37  22        QUESTION:  -- there was a 15 percent decrease in

11:25:41  23  ATM usage and a 9 percent decrease in teller usage among

11:25:45  24  folks who use mobile check deposit.

11:25:47  25        ANSWER:  Who adopted it.  Yeah, I believe those

11:25:50  1   numbers are correct.

11:25:51  2        QUESTION:  And those -- behavior shifting

11:25:56  3   continued over time, correct?  It didn't plateau there.

11:26:00  4        ANSWER:  That's a good question.  It plateaued at

11:26:08  5   some point.  It didn't go to zero.  I think what we did

11:26:11  6   see, people continued to use all three channels, again,

11:26:14  7   based on whatever is convenient for the customer.  But the

11:26:14  8   folks who did adopt mobile deposit, their incidence rate

11:26:14  9   and their time for using the ATM and there were checks that

11:26:23  10  were deposited --

11:26:23  11       THE REPORTER:  I'm sorry.

11:26:25  12       ANSWER:  The folks who adopted mobile deposit,

11:26:28  13  their usage of the ATM and teller line decreased over time,

11:26:32  14  and it did plateau at some point.  I think you're referring

11:26:35  15  to some study we did, but I think if you looked at it

11:26:39  16  longer term, it didn't -- it didn't drop to zero, right,

11:26:42  17  their usage of ATM or tellers.  It stopped at a certain

11:26:45  18  percentage.

11:26:46  19       QUESTION:  When you're making the analysis for

11:26:48  20  mobile check deposit, one of the benefits you considered is

11:26:51  21  that it would grow the amount of deposits, correct?

11:26:54  22       ANSWER:  It was -- it was one of the benefits we

11:26:55  23  considered.

11:26:57  24       QUESTION:  When Wells Fargo was making the

11:27:00  25  decision -- the business decision to launch mobile deposit,

11:27:03  1  it concluded that a successful mobile check deposit capture

11:27:10  2  would be 20 cents and that an ATM would be more than double

11:27:15  3  the cost and that a teller would be more than 10 times the

11:27:18  4  cost.  That was the basis under which it was making the

11:27:21  5  decision, fair?

11:27:22  6  ANSWER:  At this time, May 2011, that's what we

11:27:27  7  were talking about.  It may have been updated before a

11:27:30  8  final decision was made because we didn't launch the

11:27:33  9  product until May 2012, one year later.  So this may have

11:27:38  10  evolved.

11:27:39  11  So when the final decision was made, it may have

11:27:43  12  been a different number, I don't know.  But at this time,

11:27:46  13  in May 2011, is the number we were working with.  This was

11:27:49  14  the assumption.

11:27:50  15  QUESTION:  So if you were to give your best

11:27:53  16  testimony to the jury as to what was the cost differential

11:27:58  17  that Wells Fargo was viewing when it made the decision to

11:28:00  18  launch, it would be 20 cents for successful mobile check

11:28:04  19  capture, it would be more than double the cost for an ATM,

11:28:08  20  and be more than 10 times the cost for a teller deposit,

11:28:15  21  correct?

11:28:15  22  ANSWER:  Well, according to this document, that's

11:28:17  23  what we're saying.  And I'm not aware of anything else

11:28:19  24  after this --

11:28:19  25  QUESTION:  Okay.

11:28:19  1          Answer:  -- that we've seen.

11:28:20  2          QUESTION:  So your views of the benefits of mobile

11:28:24  3   check deposit are, one, decrease in deposit costs, correct?

11:28:28  4          ANSWER:  Correct.

11:28:30  5          QUESTION:  Two, an expansion in deposits via an

11:28:35  6   expansion in customers, correct?

11:28:36  7          ANSWER:  Potential -- we sort of listed it as a

11:28:39  8   potential expansion.

11:28:40  9          QUESTION:  And that's -- and then, third, would be

11:28:42  10  what we're describing as this ecosystem effect, which it's

11:28:48  11  not just that they're depositing more money with you folks

11:28:50  12  but they're buying other products and services from you?

11:28:52  13         ANSWER:  Potentially right.  You deepen a

11:28:53  14  relationship with the customer.  You earn their business.

11:28:54  15         QUESTION:  When Wells Fargo employs mobile check

11:28:58  16  deposit --

11:28:58  17         ANSWER:  Yeah.

11:28:59  18         QUESTION:  -- it saves money, and it redeploys

11:29:02  19  that money to other areas of its business?

11:29:05  20         ANSWER:  I think that's fair to say.  Yeah, it

11:29:07  21  saves money and we're -- we apply those savings, right?

11:29:12  22         QUESTION:  So as Wells Fargo's representative, you

11:29:16  23  can confirm that there were multiple communications by

11:29:20  24  USAA's representatives to Wells Fargo before this lawsuit

11:29:22  25  was filed, correct?

11:29:23  1          ANSWER:  Yes, there is email, in-person meetings,

11:29:28  2  phone calls.

11:29:28  3          QUESTION:  And the Wells Fargo lawyers who

11:29:30  4  received those communications were aware of the patents in

11:29:34  5  this case, correct?

11:29:36  6          ANSWER:  They were aware of the patents that USAA

11:29:41  7  claims once USAA made the claim.  They may -- they made a

11:29:49  8  broad announcement, right?  USAA made a broad announcement

11:29:53  9  about patents they had in this space, publicly, and they

11:29:56 10  were aware of that at that time.

11:29:58 11          QUESTION:  So as Wells Fargo's corporate

11:30:01 12  representative, you're testifying that on multiple

11:30:04 13  occasions before Wells Fargo launched its product, Wells

11:30:08 14  Fargo employees attended public presentations, industry

11:30:13 15  conferences where USAA was discussing its Mobile@Deposit

11:30:20 16  product?

11:30:20 17          ANSWER:  Yes.  Yeah.

11:30:21 18          QUESTION:  Do you have data on whether mobile

11:30:27 19  check deposit has increased or decreased purchases or use

11:30:31 20  of other services and products at Wells Fargo.

11:30:33 21          ANSWER:  Right.  So do we have data on mobile

11:30:44 22  deposit, has it increased use -- purchase of other

11:30:48 23  products?  I think -- I think the answer is no.  No, I

11:31:00 24  think the only time we looked at anything was -- it was a

11:31:06 25  general sort of advanced analytics research on the early

11:31:11   1   adopter of mobile deposit, what they looked like, was it --

11:31:14   2            THE REPORTER:  I just missed a word.

11:31:17   3            THE WITNESS:  Sure.

11:31:18   4            THE REPORTER:  Was a general sort of --

11:31:21   5            ANSWER:  What we looked at was a general sort of

11:31:24   6   profile of -- of the early adopters of mobile deposit once

11:31:28   7   we launched, similar presentations which you showed earlier

11:31:35   8   with the -- the channel usage, the ATM and mobile and the

11:31:41   9   teller line.  And in that research, we just looked at -- to

11:31:46  10   see, like, how many accounts do the early adopters have

11:31:50  11   with Wells Fargo versus people that didn't adopt.

11:31:52  12            So it's not exactly what you're asking for, but

11:31:55  13   we -- it was in the analysis.  It was a general figure of

11:31:59  14   who was adopting the product.  And typically, it was people

11:32:04  15   who were really engaged with the bank already are the ones

11:32:07  16   who were using the product.

11:32:09  17            I don't think there was anything else as far as --

11:32:14  18   anything about cross-selling or acquiring other products

11:32:16  19   after mobile deposit usage.

11:32:18  20            QUESTION:  And you also know that mobile check

11:32:23  21   deposit is a table stakes requirement in today's banking

11:32:28  22   environment, fair?

11:32:29  23            ANSWER:  Mobile deposit as a whole?  Yeah, it's

11:32:32  24   now been established -- definitely it's table stakes.

11:32:36  25            QUESTION:  And you also know that mobile deposit

11:32:39  1  is a way of making your customers stickier and more engaged

11:32:44  2  with you, fair?

11:32:45  3          ANSWER:  I think mobile deposit is one of many

11:32:48  4  ways we try to engage customers.

11:32:50  5          QUESTION:  Sir, in your presentations to

11:32:53  6  executives in 2011 and 2013, you quoted customers who said

11:32:58  7  they're going to leave Wells Fargo if we don't offer --

11:32:58  8          ANSWER:  Sure.

11:33:02  9          QUESTION:  -- mobile check database, correct?

11:33:03  10         ANSWER:  Correct.  And we get that all the time

11:33:06  11  for a lot of features.  We don't know if they actually do

11:33:08  12  or not, but it was bubbling up as a service people wanted

11:33:11  13  to have.

11:33:11  14         QUESTION:  It was not bubbling up.  It was the No.

11:33:15  15  1 pain point among your customers in the mobile space when

11:33:20  16  you launched the feature.

11:33:23  17         ANSWER: Right.

11:33:23  18         (Videoclip ends.)

11:33:24  19         THE COURT:  Does that complete this witness by

11:33:27  20  deposition?

11:33:27  21         MR. SHEASBY:  It does, Your Honor.

11:33:28  22         THE COURT:  All right.  Plaintiffs, call your next

11:33:32  23  rebuttal witness.

11:33:32  24         MR. SHEASBY:  Your Honor, Plaintiff, USAA, rests

11:33:35  25  its rebuttal case.

| 11:33:36 | 1 | THE COURT:  All right.  Thank you. |

11:33:38  2        Ladies and gentlemen of the jury, that means you

11:33:51  3  have now heard all the evidence in this case.

11:33:53  4        There are certain matters I need to take up with

11:33:55  5  counsel outside of your presence, and I suspect they will

11:34:00  6  take the majority of the rest of the day.

11:34:02  7        The good news is, that means lunch is waiting for

11:34:06  8  you in the jury room.  And after lunch, you're free to

11:34:09  9  leave.  As a matter of fact, if you'd rather not eat lunch

11:34:13  10  in the jury room and leave immediately, you may.  Or you

11:34:16  11  may take it with you.  It's up to you.  I'm not going to

11:34:18  12  require your presence this afternoon or into the evening.

11:34:23  13  You're going to have the rest of the day off.

11:34:25  14        I am, however, going to ask you to be back in the

11:34:27  15  morning ready to go at the usual time that we've started

11:34:29  16  all week, which is 8:30.

11:34:32  17        Be sure, as you leave today, that you continue to

11:34:35  18  follow all the instructions I've given you about your

11:34:39  19  conduct.  We are getting close to the end, and it is as

11:34:43  20  important now as it was Day 1 that you make sure that you

11:34:47  21  don't communicate with anyone in any way about the case,

11:34:50  22  including the eight of you.

11:34:52  23        I anticipate that when you're here in the morning,

11:34:56  24  the Court will be in a position to begin by giving you its

11:35:00  25  final jury instructions, which is often called the Court's

11:35:04  1   charge to the jury.

11:35:05  2        Following my final instructions to you, I

11:35:09  3   anticipate that the lawyers for both Plaintiff and

11:35:11  4   Defendant will then present their closing arguments.  And

11:35:17  5   when you've heard closing arguments from counsel, then I

11:35:19  6   will instruct you to retire and deliberate on the verdict

11:35:23  7   form that will be presented to you.

11:35:24  8        Once you get to the jury room to begin your

11:35:27  9   deliberations, then things shift, and you go from not being

11:35:33  10  able to discuss the case with each other to being required

11:35:36  11  to discuss the case and the evidence that you've heard with

11:35:39  12  each other in light of my instructions and the questions in

11:35:42  13  the verdict form in an attempt to answer those questions

11:35:46  14  unanimously.

11:35:47  15       So please leave your juror notebooks on the table

11:35:50  16  in the jury room as you leave.  You're welcome to stay for

11:35:53  17  lunch.  I leave that completely up to you.  Otherwise,

11:35:56  18  you're excused for the remainder of the day, and I will see

11:35:59  19  you in the morning.

11:36:00  20       The jury is excused at this time.

11:36:01  21       COURT SECURITY OFFICER:  All rise.

11:36:03  22       (Jury out.)

11:36:29  23       THE COURT:  Be seated, please.

11:36:30  24       Am I to understand that Defendants care to make an

11:36:37  25  offer of proof outside the presence of the jury?

11:36:39  1         MR. MELSHEIMER:  Yes, Your Honor.  And with the

11:36:42  2   Court's permission, Ms. Marcom and Mr. McCullough are going

11:36:50  3   to read in the offer of proof.

11:36:51  4         THE COURT:  How long do you anticipate that will

11:36:52  5   take?

11:36:52  6         MR. MELSHEIMER:  Five to ten minutes at most, Your

11:36:55  7   Honor.

11:36:55  8         THE COURT:  All right.  If you're prepared, let's

11:36:56  9   get that done now.

11:36:58  10         MR. MELSHEIMER:  Thank you, Your Honor.

11:36:59  11         THE COURT:  Defendant may now proceed to make its

11:37:00  12   offer of proof for the record.

11:37:01  13         MS. MARCOM:  May it please the Court.  Kate Marcom

11:37:17  14   for Wells Fargo.

11:37:18  15         THE COURT:  Please proceed, Ms. Marcom.

11:37:20  16         MS. MARCOM:  Pursuant to Rule 103 of the Federal

11:37:20  17   Rules of Evidence, Defendant, Wells Fargo Bank, tenders its

11:37:23  18   offer of proof regarding certain excluded evidence and

11:37:26  19   states as follows.

11:37:27  20         THE COURT:  If you will please slow down as you

11:37:30  21   read.

11:37:30  22         MS. MARCOM:  Wells Fargo offered evidence relating

11:37:32  23   to the cost to Wells Fargo to implement auto capture.

11:37:35  24   Specifically, Wells Fargo offered the testimony of Wells

11:37:38  25   Fargo employee Mr. Ajami, who testified during his

11:37:41   1   deposition that Wells Fargo paid no additional cost for the

11:37:45   2   licensee for auto capture.

11:37:46   3         THE COURT:  And, again, I'm going to ask you to

11:37:47   4   slow down.

11:37:48   5         MS. MARCOM:  Sorry.  Sorry, Your Honor.

11:37:50   6         And that while there was an amendment to Wells

11:37:55   7   Fargo's licensing agreement with Fiserv for the MRDC auto

11:37:58   8   capture feature, there was no charge for it.

11:38:00   9         The Court excluded this testimony prior to trial,

11:38:03  10   starting on November 4th, 2019.

11:38:05  11         Wells Fargo offered the deposition testimony of

11:38:09  12   USAA employee Mr. Prasad, who testified that USAA was aware

11:38:13  13   that Wells Fargo used Mitek's Mobile Deposit Solution

11:38:17  14   around the 2011 to 2012 time frame.  Mr. Prasad also

11:38:23  15   testified that Claim 1 of the '571 patent requires capture

11:38:26  16   of the image after the monitoring criteria has been

11:38:30  17   satisfied and that the '571 patent talks about monitoring

11:38:33  18   an image and having a set of monitoring criteria it looks

11:38:37  19   to for the image to pass and then captures the image.

11:38:40  20         The Court excluded this testimony prior to trial,

11:38:43  21   starting November 4th, 2019.

11:38:45  22         In its trial brief regarding USAA's opening the

11:38:49  23   door to evidence relating to other banks filed at Document

11:38:53  24   No. 312 in this case, Wells Fargo offered evidence

11:38:56  25   regarding the use of manual capture and auto capture by

11:38:59  1   other banks, including deposition testimony of Mitek

11:39:03  2   employees, Mr. Price and Mr. Fernandez.

11:39:08  3          Mr. Price's deposition testimony would have

11:39:09  4   established that it would be approximately 6100 financial

11:39:14  5   institutions deploying Mitek's MRDC software, fewer than

11:39:18  6   1,000 use auto capture.

11:39:20  7          Mr. Fernandez would have testified from his

11:39:22  8   firsthand knowledge that when Chase implemented auto

11:39:25  9   capture in 2018, it experienced a 3 percent improvement in

11:39:29  10  image acceptance rates.

11:39:30  11         Evidence would have also been offered that Chase,

11:39:32  12  using manual capture, accomplished over 20 million deposits

11:39:34  13  per quarter during the relevant time period of the

11:39:38  14  hypothetical negotiation and thereafter.

11:39:39  15         The Court denied Wells Fargo's trial brief on the

11:39:42  16  record on November 4th, 2019.

11:39:45  17         THE COURT:  Ms. Marcom, please slow down.

11:39:47  18         MS. MARCOM:  I'm sorry, Your Honor.

11:39:49  19         THE COURT:  I know it's hard when you're reading,

11:39:51  20  but it's important that you slow down.

11:39:53  21         MS. MARCOM:  Yes, Your Honor.

11:39:54  22         Prior to trial, Wells Fargo had offered additional

11:39:57  23  deposition testimony of Mr. Price which the Court excluded

11:39:59  24  on the record during the pre-trial conference dated October

11:40:03  25  28th, 2019.

11:40:03   1          The offered testimony related to the purchase

11:40:07   2     price for the MiSnap auto capture product, including that

11:40:11   3     for almost all of the 1,000 Mitek customers that use

11:40:16   4     MiSnap, there are no charges associated with MiSnap.

11:40:18   5          Mr. Price also testified that only nine or 10

11:40:23   6     companies pay Mitek directly for MiSnap, and that those

11:40:25   7     companies pay between 20 and $40,000.00 per year.

11:40:29   8          During the pre-trial conference held on October

11:40:33   9     17th, 18th, and 21st, 2019, Wells Fargo offered multiple

11:40:38  10     pieces of evidence that were excluded by the Court.

11:40:40  11          Wells Fargo offered evidence relating to the

11:40:45  12     prosecution history regard -- regarding representations to

11:40:49  13     the Patent Office made by USAA which are relevant to a

11:40:52  14     number of issues, including Georgia-Pacific Factors 9 and

11:40:57  15     10.

11:40:57  16          Specifically, Wells Fargo offered evidence that in

11:41:01  17     the prosecution of the '571 patent, USAA acknowledged

11:41:05  18     Graham as a means for capturing images automatically that

11:41:09  19     differed from the specific method of auto capture claimed

11:41:12  20     in the asserted patents.

11:41:13  21          The Court excluded evidence relating to the

11:41:16  22     prosecution history in its decision to grant Plaintiff's

11:41:19  23     Motion in Limine No. 4.

11:41:20  24          Wells Fargo offered evidence regarding customer

11:41:25  25     satisfaction with and specific customer reviews of Wells

11:41:29  1  Fargo's Mobile Deposit product, which the Court excluded in

11:41:33  2  its decision to grant Plaintiff's Motion in Limine No. 7.

11:41:36  3      The evidence would have been introduced through

11:41:40  4  Ms. Margot Lockwood-Stein, who would have testified that

11:41:43  5  she and her team review customer comments received by Wells

11:41:47  6  Fargo relating to the mobile application and specifically

11:41:50  7  for the Mobile Deposit product.

11:41:52  8      Ms. Lockwood-Stein would testify that she and her

11:41:56  9  team used those customer reviews to analyze what customers

11:41:58  10 like and dislike about the product and to make decisions to

11:42:02  11 improve the customer experience and the product.

11:42:04  12     The offered evidence would have included such

11:42:08  13 example comments as:  The auto capture feature never works

11:42:11  14 no matter how steady I try to be and give me the ability to

11:42:15  15 manually capture the image without messing with the

11:42:17  16 automatic capture.  It totally screws up the experience.

11:42:21  17     This evidence would have been offered to show the

11:42:24  18 effect the comments had on Wells Fargo and how it motivated

11:42:28  19 Wells Fargo to make changes to the product, including the

11:42:31  20 decision to add the option for the customer to elect to

11:42:34  21 capture the image manually instead of by auto capture.

11:42:38  22     Wells Fargo offered evidence relating to Mitek

11:42:41  23 customers and their experiences implementing auto capture,

11:42:45  24 which the Court excluded in its decision to grant

11:42:47  25 Plaintiff's Motion in Limine No. 8.

11:42:49  1       The evidence would have been introduced through

11:42:51  2   Mr. Fernandez who would have testified from his firsthand

11:42:56  3   knowledge that when Chase implemented auto capture in 2018,

11:42:58  4   it experienced a 3 percent improvement in image acceptance

11:43:02  5   rates.

11:43:02  6       Mr. Fernandez would have also testified regarding

11:43:05  7   the rates that Santander and other Mitek customers

11:43:10  8   experienced when implementing auto capture.

11:43:12  9       Wells Fargo offered evidence related to Wells

11:43:17  10  Fargo's contracts with Fiserv and Carreker through the

11:43:17  11  accused systems and that Wells Fargo paid no additional

11:43:21  12  money when it received auto capture capability from its

11:43:25  13  vendor.

11:43:25  14       The Court excluded this evidence in its decision

11:43:27  15  to grant Plaintiff's Motion in Limine No. 10.

11:43:30  16       Wells Fargo offered evidence relating to patents

11:43:33  17  that Mitek owns in the mobile deposit capture space which

11:43:38  18  the Court excluded in granting Plaintiff's Motion in Limine

11:43:40  19  No. 2.

11:43:41  20       Wells Fargo offered evidence of USAA's licensing

11:43:45  21  efforts and the fact that no other bank has taken a license

11:43:49  22  to USAA's patents, which is relevant to Georgia-Pacific

11:43:52  23  Factor 3, 4, and 15 and the hypothetical negotiation

11:43:57  24  between the parties.

11:43:57  25       Specifically, Wells Fargo offered evidence

11:44:01  1  relating to USAA's discussions with third-party banks and

11:44:05  2  the views of those third-party banks regarding USAA's

11:44:08  3  patents.

11:44:09  4      Wells Fargo offered evidence that USAA sent

11:44:13  5  hundreds of letters to financial institutions in 2017

11:44:16  6  regarding its patent portfolio and invited recipients to

11:44:20  7  take a license to its patents.

11:44:22  8      Wells Fargo offered -- also offered evidence that

11:44:25  9  not one recipient of the letters had taken a license to

11:44:29  10  USAA's patents.

11:44:30  11      Wells Fargo offered statements from recipients of

11:44:33  12  the letters reflecting that the recipients questioned the

11:44:39  13  patentability and value of the technology.  Wells Fargo

11:44:41  14  sought to introduce this evidence through the opinion of

11:44:42  15  its damages expert, Mr. Gerardi.

11:44:44  16      The Court excluded this portion of Mr. Gerardi's

11:44:47  17  report during a pre-trial conference on October 18th, 2019.

11:44:49  18      For the reasons stated on the record at the

11:44:52  19  pre-trial conferences, in open court, and in written

11:44:56  20  submissions, the foregoing evidence should have been

11:44:59  21  admitted into evidence.

11:45:00  22      Wells Fargo tenders this offer of proof and

11:45:02  23  describes the excluded evidence for the purpose of

11:45:04  24  compiling a complete evidentiary record.

11:45:07  25      In addition, Wells Fargo will make an offer of

11:45:09  1  proof regarding certain exhibits offered by Wells Fargo and

11:45:13  2  excluded by the Court during the pre-trial conference held

11:45:16  3  on October 21st, 2019, which Wells Fargo will file

11:45:20  4  separately on the docket and attach copies of the excluded

11:45:26  5  exhibits.

11:45:26  6        Thank you.

11:45:26  7        THE COURT:  Does that complete your offer of

11:45:28  8  proof?

11:45:29  9        MS. MARCOM:  Yes, Your Honor.

11:45:29 10        THE COURT:  All right.

11:45:30 11        MR. MELSHEIMER:  Thank you, Your Honor, for your

11:45:32 12  courtesies.

11:45:32 13        THE COURT:  All right.  Counsel, we're going to

11:45:34 14  recess for lunch.  I'm going to reconvene at 1:30.

11:45:41 15        At 1:30, I will take up motions under Federal Rule

11:45:47 16  of Civil Procedure 50(a) that either Plaintiff or Defendant

11:45:48 17  care to offer.

11:45:49 18        Let me just say this to you.  In a recent trial at

11:45:53 19  this juncture, I had a lawyer for one of the parties show

11:45:57 20  up and read a 35-page motion that they had prepared.  I do

11:46:03 21  not anticipate listening to lawyers read 35-page motions at

11:46:08 22  1:30.

11:46:09 23        I anticipate hearing succinct and targeted oral

11:46:14 24  presentation as to the underlying substantive issues you

11:46:17 25  may choose to raise under the rule.

11:46:19   1        So with that, we stand in recess until 1:30.

11:46:24   2        MR. MELSHEIMER:  May I ask one point of

11:46:26   3   clarification, Your Honor, about the -- are we then going

11:46:28   4   to move into the charge conference after -- I just want to

11:46:31   5   get a sense of --

11:46:32   6        THE COURT:  After -- after I hear and deal with

11:46:34   7   motions under Rule 50(a), as I indicated earlier, during

11:46:38   8   pre-trial, I then intend to take up an informal charge

11:46:41   9   conference in chambers to discuss the areas of disagreement

11:46:44  10   on your latest submissions.  After I've had the benefit of

11:46:49  11   fulsome input and discussion from all parties through their

11:46:53  12   counsel, I will take the time I believe necessary to factor

11:46:57  13   that in, and I will generate what I believe to be the

11:47:00  14   appropriate and proper final jury instruction and verdict

11:47:04  15   form.  I will deliver that to counsel, provide you an

11:47:07  16   opportunity to review it.  It should not take long because

11:47:12  17   you will all know where the points are of disagreement that

11:47:15  18   we talked about in the informal charge conference, and then

11:47:18  19   I will conduct a formal charge conference on the record

11:47:21  20   where either party may offer whatever objections for the

11:47:24  21   benefit of their client they feel that their client's

11:47:28  22   interest requires.

11:47:29  23        After we've completed the formal charge

11:47:32  24   conference, then we'll be prepared first thing in the

11:47:35  25   morning to bring in the jury.  I will give them my final

11:47:38   1   instructions, and you will present your closing arguments.

11:47:40   2   I do not anticipate that we'll be prepared or ready for

11:47:43   3   closing arguments before tomorrow morning.

11:47:46   4          MR. MELSHEIMER:  Understood, Your Honor.

11:47:46   5          THE COURT:  Also, those of you that are going to

11:47:49   6   present closing arguments are not required to participate

11:47:53   7   in the informal or formal charge conference as long as that

11:47:58   8   is adequately staffed by your co-counsel.  You're entitled

11:48:02   9   to use the intervening time to prepare for your closing

11:48:04   10  arguments tomorrow.

11:48:05   11         Do we know at this point who will be presenting

11:48:07   12  the closing arguments for the respective parties?  I assume

11:48:11   13  you will for the Defendant.

11:48:12   14         MR. MELSHEIMER:  Yes, Your Honor.  Actually,

11:48:14   15  with -- with the Court's permission, Mr. Hill and I were

11:48:18   16  going to divide up the time we have been allotted by the

11:48:22   17  Court.

11:48:22   18         THE COURT:  All right.  What about for Plaintiff?

11:48:23   19         MR. SHEASBY:  Your Honor, Mr. Bunt and I will also

11:48:26   20  be jointly speaking with your permission.

11:48:29   21         THE COURT:  Well, you -- you four gentlemen are

11:48:32   22  not required to be here this afternoon if you would rather

11:48:36   23  use the intervening time for preparation purposes, and as

11:48:40   24  long as these matters are adequately staffed -- and there's

11:48:44   25  no doubt in my mind we have enough lawyers to cover

11:48:47  1    everything.  If you want to be here and participate, you're

11:48:51  2    certainly welcome.

11:48:54  3         I would say during the informal charge conference,

11:48:57  4    this is often an opportunity for the younger lawyers to

11:49:00  5    have a participatory role, and I encourage you to include

11:49:04  6    all the members of your trial teams that are not preparing

11:49:07  7    for closing arguments in the informal charge conference.

11:49:10  8         With that, we stand in recess until 1:30.

11:49:12  9         COURT SECURITY OFFICER:  All rise.

         10    (Recess.)

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes                     11/5/19
    SHELLY HOLMES, CSR, TCRR               Date
10  OFFICIAL REPORTER
    State of Texas No.: 7804
11  Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25