```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   UNITED STATES AUTOMOBILE      )(
     ASSOCIATION
 4                                 )(    CIVIL ACTION NO.

 5   VS.                           )(    2:18-CV-245-JRG

 6                                 )(    MARSHALL, TEXAS
                                         NOVEMBER 6, 2019
 7   WELLS FARGO BANK, N.A.        )(    8:38 A.M.

 8

 9                    TRANSCRIPT OF JURY TRIAL

10      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

11                 UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13

14   FOR THE PLAINTIFF:

15
     JASON SHEASBY
16   ANTHONY ROWLES
     LISA GLASSER
17   IRELL & MANELLA
     1800 Avenue of the Stars
18   Suite 900
     Los Angeles, CA 90067-4276
19

20
     ROBERT CHRISTOPHER BUNT
21   PARKER, BUNT & AINSWORTH, PC
     100 East Ferguson
22   Suite 418
     Tyler, TX 75702
23

24

25
```

```
 1  FOR THE DEFENDANT:

 2

    THOMAS M. MELSHEIMER
 3  M. BRETT JOHNSON
    MICHAEL A. BITTNER
 4  J. TRAVIS UNDERWOOD
    WINSTON & STRAWN LLP
 5  2121 North Pearl Street
    Suite 900
 6  Dallas, TX 75201

 7

    E. DANIELLE T. WILLIAMS
 8  WINSTON & STRAWN LLP
    300 South Tyron Street
 9  16th Floor
    Charlotte, NC 28202
10

11  MATTHEW R. MCCULLOUGH
    WINSTON & STRAWN LLP
12  275 Middlefield Road
    Suite 205
13  Menlo Park, CA 94025

14

    JACK WESLEY HILL
15  WARD, SMITH & HILL, PLLC
    P.O. Box 1231
16  1507 Bill Owens Parkway
    Longview, TX 75606
17

18
    COURT REPORTER:     Shelly Holmes, CSR, TCRR
19                      Official Court Reporter
                        United States District Court
20                      Eastern District of Texas
                        Marshall Division
21                      100 E. Houston
                        Marshall, Texas  75670
22                      (903) 923-7464

23

    (Proceedings recorded by mechanical stenography, transcript
24  produced on a CAT system.)

25
```

```
08:38:40    1                    P R O C E E D I N G S

08:38:40    2              (Jury out.)

08:38:40    3              COURT SECURITY OFFICER:  All rise.

08:38:41    4              THE COURT:  Be seated, please.

08:53:58    5              Are the parties prepared to read into the record

08:54:07    6    any items from the list of pre-admitted exhibits used

08:54:10    7    during yesterday's portion of the trial?

08:54:15    8              Please proceed, Mr. Bunt.

08:54:16    9              MR. BUNT:  Yes, Your Honor.  The Plaintiff did not

08:54:18   10    introduce any exhibits yesterday.

08:54:20   11              THE COURT:  All right.  Let me hear from Defendant

08:54:23   12    in a similar vein.

08:54:26   13              MR. UNDERWOOD:  The Defendants used DTX-174 and

08:54:30   14    DTX-232.

08:54:31   15              THE COURT:  Any objection to that rendition from

08:54:34   16    Plaintiff?

08:54:35   17              MR. BUNT:  No, Your Honor.

08:54:36   18              THE COURT:  All right.  Thank you, counsel.

08:54:37   19              Let me remind everybody present before I bring the

08:55:18   20    jury in, I don't want any distractions or interruptions.  I

08:55:22   21    just heard another device make some kind of a noise out

08:55:26   22    there.  I've heard that sporadically throughout the trial.

08:55:29   23    If you can't keep your device silent, get up and take it

08:55:33   24    out of the courtroom right now.  If this happens while my

08:55:37   25    instructions or closing arguments take place, there are
```

08:55:39  1    going to be consequences.

08:55:40  2         I also don't want anybody in the gallery getting

08:55:44  3    up, moving around, shuffling papers, whispering, leaving

08:55:49  4    the courtroom.  This is the most serious part of an

08:55:52  5    inherently serious process.  And I expect the highest level

08:55:57  6    of decorum as I instruct the jury and as counsel make their

08:56:03  7    closing arguments.  I want to be completely clear about

08:56:06  8    that.

08:56:06  9         All right.  Let me ask counsel, is there anything

08:56:12  10   you're aware of that we need to take up before I bring in

08:56:14  11   the jury and give them my final instructions?

08:56:16  12        MR. SHEASBY:  Nothing from the Plaintiffs, Your

08:56:19  13   Honor.

08:56:19  14        MR. MELSHEIMER:  May it please the Court.  Nothing

08:56:20  15   from the Defendant, Your Honor.

08:56:21  16        THE COURT:  And I trust counsel that are going to

08:56:23  17   present closing that no one is going to be dragging easels

08:56:24  18   around or putting up boards or doing anything other than

08:56:28  19   arguing from the screen or the overhead projector; is that

08:56:33  20   correct?

08:56:33  21        MR. SHEASBY:  That is correct for Plaintiffs, Your

08:56:35  22   Honor.

08:56:35  23        MR. MELSHEIMER:  That is correct, Your Honor.

08:56:36  24        THE COURT:  All right.  Let's bring in the jury,

08:56:39  25   please, Mr. Johnston.

08:56:56  1              COURT SECURITY OFFICER:  All rise.

08:56:59  2              (Jury in.)

08:57:00  3              THE COURT:  Good morning, ladies and gentlemen.

08:57:08  4    Please be seated.

08:57:16  5              Ladies and gentlemen of the jury, you've now heard

08:57:18  6    all the evidence in this case, and I will now instruct you

08:57:22  7    on the law that you must apply.

08:57:29  8              Each of you are going to have your own printed or

08:57:32  9    written copy of these final jury instructions that I'm

08:57:34  10   about to give you orally.  You'll have that copy to take

08:57:37  11   with you to the jury room when you retire to deliberate.

08:57:40  12             Consequently, if you want to make written notes

08:57:42  13   now, you are free to, but I want you to understand you'll

08:57:45  14   have your own written copies of these instructions to look

08:57:48  15   at once you get to the jury room.

08:57:49  16             It's your duty to follow the law as I give it to

08:57:54  17   you.  On the other hand, ladies and gentlemen, and as I've

08:57:58  18   previously said, you, the jury, are the sole judges of the

08:58:02  19   facts in this case.

08:58:04  20             Do not consider any statement that I have made

08:58:07  21   over the course of the trial or make during these

08:58:09  22   instructions as an indication to you that the Court has any

08:58:13  23   opinion about the facts in this case.

08:58:16  24             You're about to hear closing arguments from the

08:58:20  25   attorneys for the parties.  Statements and arguments of the

08:58:24  1   attorneys, I remind you, are not evidence, and they are not

08:58:29  2   instructions on the law.  They're intended only to assist

08:58:34  3   the jury in understanding the evidence and the parties'

08:58:37  4   contentions.

08:58:38  5         A verdict form has been prepared for you, and you

08:58:43  6   will take this with you to the jury room during your

08:58:47  7   considerations and deliberations, and when you've reached a

08:58:53  8   unanimous decision as to the verdict, you'll have your

08:58:56  9   foreperson fill in your answers reflecting those unanimous

08:58:59  10  decisions in the verdict form.  The foreperson should date

08:59:04  11  it and should sign it, and then advise the Court Security

08:59:07  12  Officer that you have reached a verdict.

08:59:08  13        Answer each question in the verdict form from the

08:59:15  14  facts as you find them to be.  Do not decide who you think

08:59:18  15  should win this case and then answer the questions to reach

08:59:21  16  that result.

08:59:21  17        Again, your answers and your verdict must be

08:59:26  18  unanimous.

08:59:28  19        Now, in determining whether any fact has been

08:59:31  20  proven in this case, you may, unless otherwise instructed,

08:59:35  21  consider the testimony of all the witnesses, regardless of

08:59:38  22  who may have called them, and you may consider the effect

08:59:42  23  of all the exhibits received and admitted into evidence,

08:59:45  24  regardless of who may have produced or presented them.

08:59:48  25        You -- you, the jury, are the sole judges of the

08:59:54   1   credibility of each and every witness and the weight and

08:59:56   2   effect to be given to all the evidence in this case.

09:00:00   3           As I've told you previously, the attorneys in this

09:00:04   4   case are acting as advocates for their competing parties

09:00:09   5   and their competing claims, and they have a duty to object

09:00:12   6   when they believe evidence is offered that should not be

09:00:15   7   admitted under the rules of the Court.

09:00:17   8           In the case when the Court has sustained an

09:00:22   9   objection to a question addressed to a witness, you are to

09:00:26   10   disregard that question entirely, and you may not draw any

09:00:30   11   inferences from its wording or speculate about what the

09:00:33   12   witness would have said if the Court had allowed them to

09:00:36   13   answer the question.

09:00:37   14           On the other hand, if an objection to a question

09:00:42   15   has been overruled by the Court, then you are to treat the

09:00:46   16   answer to the question and the question itself just as if

09:00:49   17   no objection had ever been made, like any other question

09:00:53   18   and answer.

09:00:54   19           Now, at times over the course of the trial, it's

09:00:58   20   been necessary for the Court to talk to the lawyers, either

09:01:01   21   here at the bench outside of your hearing, or by asking you

09:01:05   22   to retire to the jury room outside of the courtroom.

09:01:09   23           This happens during a trial, as it did in this

09:01:13   24   trial, because there are things that arise that do not

09:01:16   25   involve the jury.  You should not speculate, ladies and

09:01:18  1  gentlemen, about what was said during these discussions

09:01:22  2  that took place outside of your presence.

09:01:24  3       Now, there are two types of evidence that you may

09:01:29  4  consider in properly finding the truth as to the facts in

09:01:32  5  this case.  One is direct evidence, such as the testimony

09:01:36  6  of an eyewitness.  The other is indirect or circumstantial

09:01:39  7  evidence, that is, the proof of a chain of circumstances

09:01:45  8  that indicates the existence or nonexistence of certain

09:01:49  9  other facts.

09:01:49 10       As a general rule, you should know that the law

09:01:53 11  makes no distinction between direct evidence and

09:01:57 12  circumstantial evidence but simply requires that you, the

09:02:01 13  jury, find the facts based on all the evidence presented,

09:02:05 14  both direct and circumstantial.

09:02:06 15       Now, the parties may have stipulated or agreed to

09:02:14 16  some facts in this case.  And when lawyers for both sides

09:02:17 17  stipulate as to the existence of a fact, you must, unless

09:02:20 18  otherwise instructed, accept that stipulation as evidence

09:02:23 19  and regard that fact as proven.

09:02:24 20       Also, certain testimony in this case has been

09:02:28 21  presented to you through depositions.  A deposition is the

09:02:33 22  sworn recorded answers to questions asked to a witness in

09:02:37 23  advance of the trial.  If a witness cannot be present to

09:02:43 24  testify in person, then the witness's testimony may be

09:02:48 25  presented under oath in the form of a deposition.  And as I

09:02:52  1  told you earlier, ladies and gentlemen, the attorneys

09:02:55  2  representing the parties in this case questioned these

09:02:58  3  deposition witnesses under oath before the trial began.

09:03:02  4       At that time, a court reporter was present.  The

09:03:05  5  witnesses were sworn and placed under oath.  And both

09:03:09  6  sides, through their counsel, had an opportunity to

09:03:12  7  question those deposition witnesses.

09:03:14  8       Also, you should understand that those portions of

09:03:19  9  those depositions presented to you during the trial are

09:03:24  10  entitled to the same consideration by you and should be

09:03:29  11  considered by the jury just as if the witness was present

09:03:32  12  and testified in person.

09:03:33  13       You should also know that as to the portions of

09:03:37  14  those depositions presented to you during the trial, both

09:03:40  15  sides had an equal opportunity to contribute to the

09:03:44  16  portions of the testimony that have been played in open

09:03:47  17  court.

09:03:47  18       Accordingly, you should judge the credibility and

09:03:51  19  importance of deposition testimony to the best of your

09:03:57  20  ability, just as if the witness had appeared in person and

09:03:59  21  testified from the witness stand in open court.

09:04:02  22       Now, while you should consider only the evidence

09:04:06  23  in this case, ladies and gentlemen, you should understand

09:04:09  24  that you are permitted to draw such reasonable inferences

09:04:14  25  from the testimony and exhibits as you feel are justified

09:04:19  1   in the light of common experience.

09:04:20  2        Let me say this another way.  You may make

09:04:26  3   deductions, ladies and gentlemen, and reach conclusions

09:04:29  4   that reason and common sense lead you to draw from the

09:04:32  5   facts that have been established by the testimony and the

09:04:36  6   evidence in this case.  However, you should not base your

09:04:43  7   decision on any evidence not presented by the parties in

09:04:46  8   open court during the trial.

09:04:47  9        Now, unless I instruct you otherwise, you may

09:04:50  10  properly determine that the testimony of a single witness

09:04:58  11  is sufficient to prove any fact even if a greater number of

09:05:01  12  witnesses have testified to the contrary, if after

09:05:04  13  considering all the evidence you believe that single

09:05:06  14  witness.

09:05:06  15       When knowledge of a technical subject might be

09:05:10  16  helpful to the jury, a person who has special training and

09:05:14  17  experience in that technical field, called an expert

09:05:17  18  witness, is permitted to state his or her opinions on those

09:05:25  19  technical matters to the jury.  However, ladies and

09:05:28  20  gentlemen, you are not required to accept those opinions.

09:05:33  21  As with any other witness, it's solely up to you to decide

09:05:37  22  who you believe and who you don't believe and whether or

09:05:39  23  not you want to rely on the testimony of any witness.

09:05:41  24       Now, certain exhibits have been shown to you

09:05:47  25  during the trial that were illustrations.  We call these

types of exhibits demonstrative exhibits or sometimes simply demonstratives for short.

Demonstrative exhibits are a party's depiction, picture, or model describing something involved in the trial.  If your recollection differs from the demonstratives, then you should rely on your recollection. Demonstrative exhibits are sometimes called jury aids.  The demonstrative itself, ladies and gentlemen, is not evidence but the witness's testimony during which the demonstrative is used is evidence.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof. You will apply the burden of proof in this case called the preponderance of the evidence.

The Plaintiff in this case, USAA, has the burden of proving patent infringement by a preponderance of the evidence.  USAA also has the burden of proving willful patent infringement by a preponderance of the evidence. Finally, USAA has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

This burden of proof, the preponderance of the

09:07:27  1  evidence, is not to be confused by you with any other

09:07:30  2  burden of proof.  I suspect you've all heard of a different

09:07:35  3  burden of proof called beyond a reasonable doubt.  Beyond a

09:07:39  4  reasonable doubt is the burden of proof applied in a

09:07:41  5  criminal case.  It has absolutely no application whatsoever

09:07:45  6  in a civil case like this.  And you may have also heard of

09:07:49  7  another burden of proof called clear and convincing

09:07:52  8  evidence.  This, too, has no application in this case.

09:07:56  9       Now, in determining whether any fact has been

09:08:00  10  proven by a preponderance of the evidence, you may, unless

09:08:05  11  otherwise instructed, consider the stipulations of the

09:08:07  12  parties, the testimony of all the witnesses, regardless of

09:08:11  13  who called them, and all the exhibits that have been

09:08:14  14  received into evidence during the course of the trial,

09:08:19  15  regardless of who may have produced them.

09:08:21  16       Now, as I did at the beginning of this case, I'm

09:08:27  17  going to give you a summary of each side's contentions and

09:08:30  18  then I'm going to provide you with detailed instructions on

09:08:34  19  what each side must prove to win on its contentions.

09:08:37  20       As I told you previously, this case concerns two

09:08:40  21  United States patents.  Those are U.S. Patent No. 8,977,571

09:08:47  22  and U.S. Patent No. 9,818,090, which you've consistently

09:08:54  23  heard referred to throughout this trial as the '571 patent

09:08:58  24  and the '090 patent.

09:08:58  25       And I will refer to them as the patents-in-suit.

09:09:05  1   They may also be referred to in these instructions as the

09:09:09  2   asserted patents.

09:09:09  3          Now, the Plaintiff, USAA, seeks money damages from

09:09:14  4   Wells Fargo, the Defendant, for allegedly infringing the

09:09:17  5   patents-in-suit by making, using, selling, or offering for

09:09:24  6   sale in the United States Wells Fargo's Mobile Deposit

09:09:27  7   system, which I may refer to in these instructions as the

09:09:33  8   accused product.

09:09:33  9          USAA contends that Wells Fargo's accused product

09:09:37  10  infringes the following claims:  Claims 1 through 6, Claim

09:09:41  11  9, and Claims 12 through 13 of the '571 patent; and Claims

09:09:47  12  1 through 4, Claim 7, and Claim 10 of the '090 patent.

09:09:51  13         These claims are sometimes referred to

09:09:55  14  collectively as the asserted claims.

09:09:59  15         USAA has alleged that the accused product

09:10:03  16  infringes the asserted claims either literally or through

09:10:07  17  the Doctrine of Equivalents.

09:10:10  18         USAA also alleges that Wells Fargo's infringement

09:10:13  19  is and has been willful.

09:10:17  20         USAA seeks damages in the form of a reasonable

09:10:21  21  royalty for Wells Fargo's alleged infringement.

09:10:23  22         Wells Fargo denies that its accused product

09:10:30  23  infringes the asserted claims of the '571 and the '090

09:10:35  24  patents.

09:10:36  25         Wells Fargo further denies USAA's allegation that

09:10:39  1   it willfully infringed any claim of the asserted patents,

09:10:45  2   and Wells Fargo denies that it owes USAA any damages in

09:10:50  3   this case.

09:10:50  4        Now, ladies and gentlemen, it's your job to decide

09:10:55  5   whether USAA has proven by a preponderance of the evidence

09:10:59  6   that Wells Fargo has infringed any of the asserted claims.

09:11:03  7   If you decide that any claim of the asserted patent has

09:11:08  8   been infringed, you then will need to decide whether that

09:11:11  9   infringement was willful and what amount of money damages,

09:11:15  10  if any, should be awarded to USAA to compensate it for that

09:11:20  11  infringement.

09:11:20  12       As I've already told you, you will not be asked to

09:11:26  13  decide issues as to the validity of the asserted patents,

09:11:30  14  and you should draw no inference one way or another from

09:11:33  15  the fact that you are not going to be asked to decide

09:11:36  16  issues of validity in this case.

09:11:37  17       I'm now going to instruct you on a number of

09:11:41  18  establish facts.  You -- you must take these facts as true

09:11:46  19  when deciding the issues in this case.

09:11:47  20       (1) USAA is the record assignee and owner of the

09:11:55  21  '571 and the '090 patents;

09:11:56  22       (2) the '571 patent was filed for on August the

09:12:01  23  21st, 2009, and it issued on March the 10th, 2015, by the

09:12:07  24  United States Patent and Trademark Office;

09:12:09  25       (3) the '090 patent was filed for on December the

09:12:17  1   28th, 2016, and issued on November the 14th, 2017, by the

09:12:23  2   United States Patent and Trademark Office.  The '090 patent

09:12:27  3   has an effective filing date of August the 21st, 2009;

09:12:31  4        (4) the asserted claims of the '090 patent are

09:12:36  5   Claims 1 through 4, 7, and 10;

09:12:39  6        (5) the asserted claims of the '571 patent are

09:12:44  7   Claims 1 through 6, 9, and 12 and 13;

09:12:48  8        (6) USAA's mobile remote deposit product, called

09:12:59  9   Deposit@Mobile, practices the claims of the asserted

09:13:01  10  patents.

09:13:01  11       Now, before you decide many of the issues in this

09:13:05  12  case, you'll need to understand the role of the patent

09:13:08  13  claims.

09:13:09  14       Patent claims are the numbered sentences at the

09:13:12  15  end of the patent.  The claims are important because it's

09:13:16  16  the words of the claims that define what the patent covers.

09:13:20  17  The figures and the text in the rest of the patent provide

09:13:25  18  a description and/or examples of the invention, and they

09:13:28  19  provide a context for the claims.

09:13:31  20       But, ladies and gentlemen, it is the claims that

09:13:34  21  define the breadth of the patent's coverage.  Each claim is

09:13:38  22  effectively treated as if it were a separate patent, and

09:13:43  23  each claim may cover more or may cover less than any other

09:13:47  24  claim.

09:13:48  25       Therefore, what a patent covers, in turn, depends

09:13:51  1   on what each of its claims covers.

09:13:53  2        You first need to understand what each claim

09:14:00  3   covers in order to decide whether or not there is

09:14:01  4   infringement of that claim.  And the first step is to

09:14:04  5   understand the meaning of the words used in the patent

09:14:07  6   claim.

09:14:09  7        Now, the law says that it is my role to define the

09:14:13  8   meaning of the words used in the claims, but it is your

09:14:18  9   role to apply my definitions to the issues that you are

09:14:21 10   asked to decide in this case.

09:14:23 11        Accordingly, and as I've explained to you at the

09:14:27 12   beginning of the case, I have determined the meanings of

09:14:30 13   certain words used in the asserted claims, and I have

09:14:34 14   provided these definitions to you in your juror notebooks.

09:14:37 15        You must accept my definitions of those words as

09:14:41 16   used in the claims as being correct, and it is your job to

09:14:47 17   take these definitions that I have supplied and apply them

09:14:50 18   to the issue of infringement and the other issues in the

09:14:53 19   case.

09:14:53 20        You should disregard any evidence presented at the

09:14:58 21   trial which contradicts or is inconsistent with the

09:15:02 22   constructions and definitions that I have given you.

09:15:05 23        For any words used in the claims that I have not

09:15:08 24   construed or defined, you are to use the plain and ordinary

09:15:11 25   meaning of that term as understood by a person having

09:15:16  1  ordinary skill in the art at the time of the invention.

09:15:19  2       My interpretation of the claim terms should not be

09:15:23  3  taken by you as an indication that I have a view regarding

09:15:27  4  issues of infringement, willfulness, or damages.  The

09:15:32  5  decisions regarding those issues, ladies and gentlemen, are

09:15:34  6  yours alone to make.

09:15:36  7       I'll now explain to you how a claim defines what

09:15:40  8  it covers.

09:15:41  9       A claim sets forth in words a set of requirements.

09:15:46  10  Each claim sets forth its requirements in a single

09:15:50  11  sentence.  If a product satisfies each of these

09:15:53  12  requirements in that sentence, then it is covered by and

09:15:58  13  infringes the claim.

09:16:00  14       There can be several claims in a patent.  A claim

09:16:04  15  may be narrower or broader than another claim by setting

09:16:08  16  forth more or fewer requirements.  The coverage of a patent

09:16:12  17  is assessed on a claim-by-claim basis.

09:16:14  18       In patent law, the requirements of a claim are

09:16:19  19  often referred to as the claim elements or the claim

09:16:22  20  limitations.  For example, ladies and gentlemen, a claim

09:16:26  21  that covers the invention of a table may recite a tabletop,

09:16:32  22  four legs, and nails that secure the legs to the tabletop.

09:16:36  23  In this example, the tabletop, the legs, and the nails are

09:16:40  24  each separate limitations or elements of the claim.

09:16:44  25       Now, the beginning portion or the preamble of a

09:16:48   1   claim often uses the word "comprising."  The word

09:16:51   2   "comprising," as used in the preamble, means including or

09:16:55   3   containing.  And when "comprising" is used in the preamble

09:16:58   4   of a claim, the product that includes all the limitations

09:17:02   5   or element of the claim, as well as additional elements, is

09:17:07   6   covered by the claim.

09:17:09   7          For example, a claim to a table comprising a

09:17:14   8   tabletop, legs, and nails would be infringed by a table

09:17:17   9   that includes a tabletop, legs, and nails even if the table

09:17:25   10  also includes wheels to go on the ends of the legs.

09:17:27   11         Similarly, when a patent claims a process

09:17:30   12  comprising several steps, an accused process will infringe

09:17:35   13  that claim if it performs each of those steps, even if the

09:17:40   14  accused product performs additional steps.

09:17:44   15         For example, a claim to a process for building a

09:17:47   16  table -- table comprising sanding the tabletop and legs,

09:17:52   17  arranging the legs along the tabletop, and nailing the legs

09:17:55   18  on to the tabletop would be infringed by a process of

09:18:00   19  sanding the tabletop and legs, arranging the legs along the

09:18:05   20  tabletop, and nailing the legs on to the tabletop even if

09:18:08   21  the process also includes additional steps, such as

09:18:13   22  painting the tabletop and the legs.

09:18:16   23         When a product contains or performs all the

09:18:19   24  requirements of a claim, the claim is said to cover that

09:18:22   25  product, and that product is said to fall within the scope

09:18:26   1   of that claim.  In other words, a claim covers a product

09:18:31   2   where each and every element and limitation is present in

09:18:34   3   that product.

09:18:36   4        If a product is missing even one limitation or

09:18:39   5   element of a claim, the product is not covered by that

09:18:43   6   claim.  If the product is not covered by that claim, ladies

09:18:48   7   and gentlemen, the product does not infringe that claim.

09:18:50   8        Now, there are two types of patent claims,

09:18:56   9   independent claims and dependent claims.  This case

09:19:00  10   involves both independent claims and dependent claims.

09:19:03  11        An independent claim does not refer to any other

09:19:06  12   claim in the patent.  An independent claim sets forth all

09:19:09  13   the requirements that must be met in order to be covered by

09:19:13  14   the claim.  It's not necessary to look at any other claim

09:19:17  15   to determine what an independent claim covers.

09:19:20  16        On the other hand, a dependent claim does not by

09:19:25  17   itself recite all the elements of the claim but refers to

09:19:28  18   another claim or claims or some of its requirements.  In

09:19:33  19   this way, it depends from or is referred or refers to the

09:19:38  20   other claim or claims.

09:19:40  21        The law considers a dependent claim to incorporate

09:19:44  22   all the requirements of the claim or claims from which it

09:19:49  23   refers or from which it depends, as well as the additional

09:19:52  24   claims set forth in -- in the dependent claim itself.

09:19:59  25        To determine what a dependent claim covers, it's

09:20:02  1   necessary to look at both the dependent claim and any other

09:20:06  2   claim or claims to which it refers or from which it

09:20:10  3   depends.  And a product that meets all the requirements of

09:20:14  4   both the dependent claim and the claim or claims to which

09:20:17  5   it refers or from which it depends is covered by that

09:20:22  6   dependent claim.

09:20:23  7         I'll now instruct you on the specific rules that

09:20:27  8   you must follow to determine whether USAA has proven that

09:20:31  9   Wells Fargo has infringed the asserted claims.

09:20:32  10        To prove infringement, USAA must persuade you that

09:20:38  11  it is more likely than not that Wells Fargo has infringed

09:20:43  12  the asserted claims.

09:20:45  13        If a person makes, uses, sells, or offers for sale

09:20:52  14  within the United States or imports into the United States

09:20:56  15  a product that is covered by a patent claim without the

09:20:57  16  patent owner's permission, that person is said to infringe

09:20:59  17  the patent.

09:21:00  18        Now, in reaching your decision on infringement,

09:21:03  19  ladies and gentlemen, keep in mind that only the claims of

09:21:08  20  a patent can be infringed.  You must compare the asserted

09:21:12  21  claims of the asserted patents using my definitions for

09:21:16  22  particular claim elements or language when I have provided

09:21:19  23  such definitions, or if I have not provided a definition,

09:21:24  24  the plain and ordinary meaning of the words as they would

09:21:26  25  have been understood by a person of ordinary skill in the

09:21:30  1  art to the accused product to determine whether or not

09:21:33  2  there is infringement.

09:21:34  3       You should not compare the accused product with

09:21:39  4  any specific example set out in the patent or with the

09:21:43  5  patent owner's commercial products or with the prior art in

09:21:46  6  reaching your decision on infringement.

09:21:53  7       Again, the only proper comparison is between the

09:21:55  8  language of the asserted claims and the accused product.

09:21:57  9       As I've reminded you during the trial, the only

09:22:02  10  correct comparison is between the accused product and the

09:22:05  11  language of the asserted claims themselves.  You must reach

09:22:07  12  your decision as to each assertion of infringement based on

09:22:12  13  my instructions about the meaning and the scope of the

09:22:15  14  claims, the legal requirements for infringement, and the

09:22:18  15  evidence presented to you by both of the parties.

09:22:21  16       The issue of infringement, ladies and gentlemen,

09:22:25  17  is assessed on a claim-by-claim basis with each patent.

09:22:30  18  Therefore, there may be infringement as to a particular

09:22:33  19  claim within a patent, even if there is no infringement as

09:22:37  20  to another claim within the patent.

09:22:40  21       I'll now instruct you on the specific rules that

09:22:43  22  you should follow to determine whether the Plaintiff, USAA,

09:22:46  23  has proven that the Defendant, Wells Fargo, has infringed

09:22:50  24  one or more of the patent claims involved in this case.

09:22:53  25       In order to prove infringement of a patent claim,

09:22:58  1   USAA must show by a preponderance of the evidence that the

09:23:04  2   accused product includes each requirement or limitation of

09:23:09  3   the claim, either literally or under the Doctrine of

09:23:11  4   Equivalents.

09:23:13  5        In order to literally infringe a patent claim, the

09:23:17  6   accused product must include or perform each and every

09:23:21  7   element of the claim.  Thus, in determining whether Wells

09:23:26  8   Fargo infringes USAA's asserted claims, you must determine

09:23:29  9   if the accused product contains or performs each and every

09:23:34  10  element recited in a claim in the asserted patent.

09:23:38  11       A claim element is literally present if it exists

09:23:43  12  in or is performed by the accused product as it is

09:23:50  13  described in the claim language either as I have explained

09:23:53  14  it to you or if I did not explain it, according to the

09:23:57  15  plain and ordinary meaning as understood by one of ordinary

09:23:59  16  skill in the art.

09:23:59  17       If an accused product, ladies and gentlemen, does

09:24:02  18  not literally infringe the claim, there can still be

09:24:07  19  infringement if the Plaintiff, USAA, proves that the

09:24:11  20  accused product satisfies the claim under the Doctrine of

09:24:15  21  Equivalents.

09:24:16  22       Under the Doctrine of Equivalents, an accused

09:24:19  23  product infringes a claim if it performs steps or contains

09:24:24  24  elements corresponding to each requirement of the claim

09:24:27  25  that are equivalent to, even though not literally met, by

09:24:31  1  the accused product.

09:24:32  2      You may find that a step or element is equivalent

09:24:36  3  to a requirement of a claim that is not literally met if a

09:24:41  4  person, having ordinary skill in the field of technology of

09:24:44  5  the patent, would have considered the differences between

09:24:47  6  them to be insubstantial, or would have found that the

09:24:54  7  structure performs substantially the same function in

09:24:56  8  substantially the same way to achieve substantially the

09:24:59  9  same result as the requirements of that claim limitation.

09:25:02  10      In order to prove that an accused product meets a

09:25:09  11  limitation under the Doctrine of Equivalents, USAA must

09:25:15  12  prove the equivalency to the claim element by a

09:25:18  13  preponderance of the evidence.

09:25:21  14      Now, you heard reference at times throughout the

09:25:25  15  trial that the -- that "90 percent (or 95 percent) is an F

09:25:30  16  in patent law."  That's not a correct statement of the law

09:25:34  17  regarding the Doctrine of Equivalents.  There is no

09:25:37  18  specific percentage requirement, whether it's 90 percent,

09:25:41  19  95 percent, or any other percentage to satisfy the Doctrine

09:25:46  20  of Equivalents.  Rather, in determining infringement under

09:25:49  21  the Doctrine of Equivalents, you should apply the

09:25:52  22  instructions that I have just given you.

09:25:54  23      However, none of this alters the fact that all of

09:25:58  24  the elements of a claim must be present either literally or

09:26:02  25  under the Doctrine of Equivalents for that claim to be

09:26:05  1   infringed.  If even a single element of a claim is neither
09:26:09  2   literally present in the accused product nor present under
09:26:14  3   the Doctrine of Equivalents, then you must find that the
09:26:19  4   accused product does not infringe the claim.
09:26:21  5        A -- a patent can be infringed even if the alleged
09:26:26  6   infringer did not have knowledge of the patent and without
09:26:31  7   the infringer knowing that its conduct constitutes
09:26:35  8   infringement of the patent.  A patent may also be infringed
09:26:38  9   even though the accused infringer believes in good faith
09:26:41  10  that its conduct is not infringement of the patent.
09:26:46  11       In this case, USAA contends that Wells Fargo
09:26:50  12  willfully infringed its patents.  If you decide that Wells
09:26:55  13  Fargo has infringed, then you must go on and separately
09:26:59  14  address the additional issue of whether or not Wells
09:27:02  15  Fargo's infringement was willful.
09:27:05  16       USAA must prove willfulness by a preponderance of
09:27:11  17  the evidence.  In other words, you must determine whether
09:27:13  18  it is more likely than not true that Wells Fargo willfully
09:27:17  19  infringed.  You may not determine that the infringement was
09:27:21  20  willful just because Wells Fargo knew of the asserted
09:27:25  21  patents and infringed them.
09:27:28  22       However, you may find that Wells Fargo willfully
09:27:30  23  infringed if you find that it acted egregiously, willfully,
09:27:36  24  or wantonly.  You may find Wells Fargo's actions were
09:27:40  25  egregious, willful, or wanton if it acted in reckless or

09:27:46  1  callous disregard of or indifference to the rights of USAA.

09:27:48  2       A Defendant is indifferent to the rights of

09:27:51  3  another when it proceeds in disregard of a high or

09:27:51  4  excessive danger of infringement that was known to it or

09:28:01  5  was apparent to a reasonable person in its position.

09:28:05  6       You're to determine -- your determination

09:28:06  7  regarding willfulness should incorporate the totality of

09:28:09  8  the circumstances based on all of the evidence presented

09:28:12  9  during the trial.  Willfulness can be established by

09:28:18  10  circumstantial evidence.

09:28:19  11       Now, several times in my instructions I referred

09:28:24  12  to a person of ordinary skill in the field of the

09:28:26  13  invention.  It's up to you to decide, ladies and gentlemen,

09:28:29  14  the level of ordinary skill in the field of the invention.

09:28:32  15       In deciding what is the level of ordinary skill,

09:28:36  16  you should consider all the evidence introduced during the

09:28:39  17  trial including:

09:28:43  18       (1)  the levels of education and experience of the

09:28:47  19  inventors and other persons working in the field;

09:28:49  20       (2)  the types of problems encountered in the

09:28:54  21  field;

09:28:54  22       (3)  The rapidity with which innovations are made;

09:28:54  23  and

09:29:01  24       (4)  the sophistication of the technology.

09:29:04  25       If you find that Wells Fargo has infringed any of

09:29:08  1  the asserted claims, you must then consider the proper

09:29:12  2  amount of damages, if any, to award to USAA.

09:29:15  3      I will now instruct you about the measure of

09:29:18  4  damages, however, by instructing you on damages, ladies and

09:29:20  5  gentlemen, I am not suggesting which party should win this

09:29:23  6  case on any issue.  If you find that Wells Fargo has not

09:29:31  7  infringed any of these asserted claims, then USAA is not

09:29:33  8  entitled to any damages.  If you award damages, they must

09:29:39  9  be adequate to compensate USAA for any infringement of the

09:29:45  10  asserted claims that you may find.  You must not award USAA

09:29:48  11  more damages than are adequate to compensate for the

09:29:55  12  infringement, nor should you include any additional amount

09:29:57  13  for the purpose of punishing Wells Fargo.

09:29:59  14      The patent laws specifically provide that damages

09:30:02  15  for infringement may not be less than a reasonable royalty.

09:30:09  16  USAA has the burden to establish the amount of its damages

09:30:13  17  by a preponderance of the evidence.  In other words, you

09:30:14  18  should award only those damages that USAA establishes that

09:30:19  19  it more likely than not suffered as a result of Wells

09:30:23  20  Fargo's infringement of the asserted claims.

09:30:28  21      While USAA is not required to prove the amount of

09:30:31  22  its damages with mathematical precision, it must prove them

09:30:34  23  with reasonable certainty.  USAA is not entitled to damages

09:30:39  24  that are remote or speculative.

09:30:42  25      A reasonable royalty, ladies and gentlemen, is the

09:30:44  1   amount of royalty payment that a patent holder and an
09:30:49  2   alleged infringer would have agreed to in a hypothetical
09:30:55  3   negotiation taking place at a time immediately prior to
09:30:57  4   when the infringement first began.
09:30:59  5        In considering this hypothetical negotiation, you
09:31:04  6   should focus on what the expectations of the patentholder
09:31:08  7   and the alleged infringer would have been had they entered
09:31:13  8   into an agreement at that time and had they acted
09:31:15  9   reasonably in their negotiations.
09:31:17  10       In determining this, you must assume that both
09:31:22  11  parties believed the asserted claims were valid and
09:31:26  12  infringed and that both parties were willing to enter into
09:31:30  13  an agreement.
09:31:30  14       The reasonable royalty that you determine must be
09:31:34  15  a royalty that would have resulted from the hypothetical
09:31:39  16  negotiation and not simply a royalty that either party
09:31:41  17  would have preferred.
09:31:42  18       The law requires that any damages awarded to USAA
09:31:49  19  correspond -- correspond to the value of the alleged
09:31:53  20  inventions within the accused products, as -- as distinct
09:31:57  21  from other unpatented features of the accused product or
09:32:00  22  other factors, such as marketing or advertising or Wells
09:32:06  23  Fargo's size or market position.  This is particularly true
09:32:09  24  where the accused product has multiple features and
09:32:12  25  multiple components not covered by the patent or whether

09:32:16  1  the accused product works in conjunction with other

09:32:19  2  non-patented items.  Therefore, the amount you find as

09:32:23  3  damages must be based on the value attributable to the

09:32:26  4  patented technology.

09:32:27  5        In determining a reasonable royalty, you should

09:32:32  6  consider all the facts known and available to the parties

09:32:35  7  at the time the infringement began.  You may also consider:

09:32:39  8        (1)  the royalties received by a patentee for the

09:32:43  9  licensing of the patent-in-suit, proving or tending to

09:32:46  10  prove an established royalty.

09:32:48  11        (2)  the rates paid by the licensee for the use of

09:32:52  12  other patents comparable to the patent-in-suit.

09:32:55  13        (3)  the nature and scope of the license, as

09:32:59  14  exclusive or non-exclusive; or as restricted or

09:33:03  15  non-restricted in terms of territory or with respect to

09:33:07  16  whom the manufactured product may be sold.

09:33:09  17        (4)  the licensor's established policy and

09:33:12  18  marketing program to maintain its patent monopoly by not

09:33:16  19  licensing to others the use of the invention or by granting

09:33:19  20  licenses under special conditions designed to preserve that

09:33:23  21  monopoly.

09:33:23  22        (5)  the commercial relationship between licensor

09:33:27  23  and licensee such as whether they are competitors in the

09:33:31  24  same territory, in the same line of business, or whether

09:33:37  25  they are inventor and promoter.

09:33:39  1          (6)   the effect of selling the patented specialty

09:33:48  2    in promoting sales of other products of the licensee; that

09:33:48  3    existing value of the invention to the licensor as a

09:33:51  4    guarantor of sales of its non-patented items and the extent

09:33:54  5    of such derivative or convoyed sales.

09:33:56  6          (7)   the duration of the patent and the term of

09:34:01  7    the license.

09:34:02  8          (8)   the established profitability of the product

09:34:05  9    made under the patent, its commercial success, and its

09:34:09  10   current popularity.

09:34:10  11         (9)   the utility and advantages of the patent

09:34:16  12   property over the old modes or devices, if any, that had

09:34:19  13   been used for working out similar results.

09:34:23  14         (10)   the nature of the patented invention, the

09:34:26  15   character of the commercial embodiment of it as owned and

09:34:29  16   produced by the licensor, and the benefits to those who

09:34:32  17   have used the invention.

09:34:34  18         (11)   the extent to which the infringer has made

09:34:39  19   use of the invention and any evidence probative of the

09:34:43  20   value of that use.

09:34:44  21         (12)   the portion of the profit or of the selling

09:34:48  22   price that may be customary in the particular business or

09:34:52  23   in comparable businesses to allow for the use of the

09:34:56  24   invention or analogous inventions.

09:34:59  25         (13)   the portion of the realizable profit that

09:35:03  1   should be credited to the invention as distinguished from

09:35:06  2   non-patented elements, the manufacturing process, business

09:35:10  3   risks, or significant features or improvements added by the

09:35:14  4   infringer.

09:35:14  5           (14)   the opinion of qualified experts.

09:35:18  6           (15)   the amount that a licensor (such as USAA)

09:35:23  7   and a licensee (such as Wells Fargo) would have agreed upon

09:35:28  8   at the time the infringement began if both had been

09:35:31  9   reasonably and voluntarily trying to reach an agreement.

09:35:36  10  That is, the amount which a prudent licensee, who desired,

09:35:39  11  as a business proposition, to obtain a license to

09:35:42  12  manufacture and sell a particular article embodying the

09:35:46  13  patented invention, would have been willing to pay as a

09:35:49  14  royalty and yet be able to make a reasonable profit and

09:35:53  15  which amount would have been acceptable to a prudent

09:35:56  16  patentee who was willing to grant a license.

09:35:59  17          Now, ladies -- ladies and gentlemen, no one of

09:36:04  18  these factors is dispositive, and you can and should

09:36:08  19  consider all the evidence that's been presented to you in

09:36:11  20  this case on each of these factors.

09:36:13  21          You may also consider any other factors that in

09:36:16  22  your minds would have increased or decreased the royalty

09:36:22  23  Wells Fargo would have been willing to pay and that the

09:36:24  24  patent owner, USAA, would have been willing to accept if

09:36:28  25  both had been acting as normally prudent business people.

09:36:35   1          A reasonable royalty is the minimum amount of

09:36:39   2   compensation but not the only form of compensation.  You

09:36:41   3   are permitted to consider all the benefits conferred to

09:36:44   4   Wells Fargo through its infringement of the asserted

09:36:48   5   patents, including evidence of cost savings that Wells

09:36:52   6   Fargo has achieved through the use of the asserted patents,

09:36:55   7   as well as evidence of additional profits and other

09:36:58   8   benefits.  A reasonable royalty can exceed the profits

09:37:02   9   expected by the patentee.

09:37:06   10         In determining a reasonable royalty, you may also

09:37:08   11   consider evidence concerning the availability or lack

09:37:11   12   thereof of non-infringing alternatives to the patented

09:37:16   13   invention.  You may compare the patented invention to

09:37:21   14   non-infringing alternatives to determine the value of the

09:37:24   15   patented invention, including the utility and advantages of

09:37:27   16   the patent over the old modes or devices, if any, that had

09:37:32   17   been used to achieve similar results.

09:37:34   18         Now, as I've already told you, you must not award

09:37:40   19   USAA any additional amount for the purpose of punishing

09:37:44   20   Wells Fargo or setting an example.

09:37:46   21         Additionally, ladies and gentlemen, you must not

09:37:49   22   consider USAA's allegation of willfulness in considering

09:37:54   23   damages.  Consideration of willfulness is entirely separate

09:37:58   24   from the question of damages.  You may not increase damages

09:38:02   25   because you find willfulness or decrease damages because

09:38:05  1    you did not find willfulness.

09:38:08  2         I will take your decision regarding willfulness

09:38:12  3    into account later.

09:38:13  4         Now, in calculating damages, you must consider

09:38:16  5    whether or not USAA marked its own products that practice

09:38:20  6    the asserted patents by placing on or within these products

09:38:24  7    the word "patent" or "pat." and the asserted patent

09:38:30  8    numbers.

09:38:31  9         If you find USAA failed to properly mark its

09:38:34 10    products, then you may only award damages to USAA for

09:38:39 11    infringement that occurred after the date USAA gave actual

09:38:42 12    notice to Wells Fargo that USAA believed Wells Fargo was

09:38:49 13    infringing the asserted patents.  It will be up to you to

09:38:52 14    determine when such notice occurred.

09:38:54 15         The earliest date from which you may award USAA

09:39:00 16    damages for infringement of the '571 patent is December the

09:39:03 17    15th, 2016.  The earliest date from which you may award

09:39:08 18    USAA damages for infringement of the '090 patent is

09:39:12 19    November the 14th, 2017.

09:39:16 20         Now, with these instructions, ladies and

09:39:18 21    gentlemen, we'll proceed to hear closing arguments from the

09:39:22 22    attorneys in this case.

09:39:25 23         Plaintiff -- Plaintiff's counsel may present their

09:39:28 24    first closing argument.

09:39:28 25         MR. BUNT:  Thank you, Your Honor.

09:39:29   1           THE COURT:  Would you like a warning on your time,

09:39:31   2   Mr. Bunt?

09:39:32   3           MR. BUNT:  Yes, Your Honor.  Could we have a

09:39:34   4   warning when Mr. Sheasby and I have used 20 minutes?

09:39:37   5           THE COURT:  You may.

09:39:38   6           Proceed with your closing argument, please.

09:39:41   7           MR. BUNT:  Thank you, Your Honor.

09:39:42   8           Good morning, ladies and gentlemen.  I want to

09:39:44   9   begin by thanking you for your service here over this past

09:39:47  10   week.

09:39:48  11           I know that we've asked you to be away from your

09:39:52  12   families and from your jobs and your other

09:39:56  13   responsibilities, and I know that we have presented a lot

09:39:58  14   of information to you over the last week.

09:40:00  15           We lawyers sometimes forget that we have been

09:40:02  16   working on this case for almost a year and a half, but

09:40:05  17   we're asking you to digest all of this information in the

09:40:09  18   space of just five or six days.

09:40:11  19           I know you've paid careful attention, and I just

09:40:14  20   want to say thank you on behalf of USAA and the whole team.

09:40:19  21           If I could have Slide No. 1, Mr. Huynh.

09:40:22  22           You just heard Judge Gilstrap's instructions.  One

09:40:26  23   of the things that he told you is that you are the sole

09:40:31  24   judges of the credibility and believability of all the

09:40:34  25   witnesses.  And, likewise, you are the sole judge of the

09:40:39   1   weight to give that evidence.

09:40:40   2           And I'd like to take a moment to discuss

09:40:42   3   credibility for just a moment.  And I'd like to note a few

09:40:47   4   examples of how Wells Fargo's credibility has been strained

09:40:52   5   throughout this trial.

09:40:54   6           One of the first things that you heard Wells Fargo

09:40:57   7   say in their opening statement was that USAA's invention

09:41:01   8   was not auto capture.

09:41:05   9           But you'll recall that you heard the testimony

09:41:08  10   from Mr. Bill Saffici, Wells Fargo's own expert, and he

09:41:16  11   testified that the patent-in-suit introduced autonomous

09:41:18  12   monitoring and corrective feedback, and he agreed that

09:41:22  13   those are referred to in the industry as auto capture.

09:41:24  14           You also recall the testimony from Mr. Bueche,

09:41:28  15   USAA's inventor, who testified the same way.

09:41:33  16           And then you heard the testimony from Mr. Rosati,

09:41:38  17   Wells Fargo's mobile deposit manager, who did not say that

09:41:40  18   Wells Fargo was using some special kind of remote deposit

09:41:44  19   or a different kind of remote deposit.  What he told you

09:41:49  20   was that Wells Fargo's accused product was using what is

09:41:52  21   commonly known in the industry as auto capture, the same

09:41:57  22   thing that Mr. Saffici had said was what USAA had come up

09:42:00  23   with.

09:42:00  24           If I could go to Slide No. 4.

09:42:04  25           Another statement you heard from opening statement

09:42:09  1   was that paper checks are becoming less important.  And, in

09:42:14  2   fact, you heard Mr. Gerardi say this quite a bit just

09:42:18  3   yesterday.

09:42:19  4          But you'll recall that Ms. Lockwood-Stein

09:42:21  5   testified, and she stated that Wells Fargo has processed 3

09:42:27  6   billion checks during the time frame that Wells Fargo has

09:42:33  7   been operating the Mobile Deposit -- 3 billion paper

09:42:39  8   checks.  That's how unimportant this is to Wells Fargo.

09:42:42  9          You've also heard from Mr. Wood.

09:42:46  10          If I could have the next slide.

09:42:47  11          And you'll recall that Mr. Wood works at Mitek.

09:42:52  12   You'll recall that he's not an expert in this case, and he

09:42:55  13   never ever analyzed the patent claims in this case.

09:42:57  14          Now, I don't ascribe any ill will to Mr. Wood.  He

09:43:03  15   seemed like a nice fellow, but I want you to recall that

09:43:07  16   Wells Fargo is Mitek's customer, and USAA did not make

09:43:12  17   Mr. Wood come to this trial.  Mr. Wood came because Wells

09:43:17  18   Fargo told him to.

09:43:18  19          Now, at his deposition, when he was giving sworn

09:43:23  20   testimony, Mr. Wood was asked this question by Mr. Sheasby,

09:43:26  21   and you can see it on your screens.

09:43:29  22          Now, I want you to hold the phone, it's looking at

09:43:32  23   what's called preview mode, correct?

09:43:34  24          And his answer:  Yeah, it's showing -- it's not

09:43:38  25   capturing.  It's a preview.

09:43:41   1          That was his sworn testimony when he gave his

09:43:43   2   deposition.

09:43:44   3          But when he came here and got on the stand after

09:43:46   4   he had come all the way from California at the request of

09:43:49   5   his customer, Wells Fargo, and after he'd had a chance to

09:43:54   6   prepare with Wells Fargo's team for his testimony, what did

09:43:56   7   he say when asked this exact same question?

09:43:59   8          Mr. Sheasby said:  When you're holding the phone

09:44:02   9   and looking at what's called the preview mode, it's a

09:44:05  10   preview, it's not capturing, correct?

09:44:08  11          But the other day on the stand he said:  I

09:44:11  12   disagree with that statement.

09:44:12  13          The exact opposite of what he said in his

09:44:14  14   deposition.

09:44:14  15          There was something else that Mr. Wood said.  You

09:44:18  16   recall that Mr. Sheasby showed him a number of Mitek

09:44:22  17   manuals.

09:44:22  18          And if you want to take a look at those when you

09:44:25  19   go back to the jury room, you can request those by number.

09:44:28  20   They were PX-92, PX-376, PX-381.

09:44:35  21          These manuals are things that Mitek sends their

09:44:40  22   software -- they're software development manuals that they

09:44:43  23   send out to their customers.  And these manuals explain how

09:44:49  24   their system works, and these manuals describe Mitek's

09:44:55  25   system as capturing after analysis.  Monitor first, then

09:45:00   1   capture.

09:45:01   2        But what did you hear from Mr. Wood when he came

09:45:04   3   in here?  He told you that you should just ignore what

09:45:08   4   those manuals have to say.  He said that according to him,

09:45:12   5   those manuals are wrong.  The old manuals are wrong.  The

09:45:17   6   new manuals are wrong.  The manuals that he's uploaded

09:45:22   7   since he took his deposition, they're all wrong.  When it

09:45:25   8   says monitor first, capture next, he says that's just

09:45:31   9   wrong.

09:45:31  10        As His Honor has pointed out, it's up to you to

09:45:34  11   decide whether that makes sense.

09:45:35  12        Now, one thing that Mr. Wood did say that I took

09:45:39  13   special note of, and I recall that he tried to walk us back

09:45:43  14   after lunch during his redirect examination, but on

09:45:47  15   cross-examination, he was asked:  You can't point me to any

09:45:51  16   single document -- any single line of code anywhere in the

09:45:56  17   world that states capture occurs before the monitoring

09:46:00  18   criteria are analyzed, correct?

09:46:02  19        His answer:  That's correct.

09:46:04  20        Now, there's one other issue I want to point

09:46:09  21   out -- if we could have the next slide -- I think you'll

09:46:12  22   recall hearing in the opening statement -- I'm sorry, go

09:46:17  23   back, Mr. Huynh, to the last slide.

09:46:22  24        You'll hear in the opening statement -- you'll

09:46:29  25   recall hearing in the opening statement that a 90 is an A

| | | |
|---|---|---|
| 09:46:32 | 1 | in school but patent infringement it's an F.  You're going |
| 09:46:36 | 2 | to have Judge Gilstrap's instructions.  As he told you, |
| 09:46:40 | 3 | you'll have them back in the jury room with you, and you |
| 09:46:43 | 4 | can look at those and see exactly where he said that is not |
| 09:46:47 | 5 | the law for Doctrine of Equivalents.  That is not the law. |
| 09:46:51 | 6 | Wells Fargo began its opening statement by talking |
| 09:46:54 | 7 | about some simple things that we all learned as kids, |
| 09:46:59 | 8 | things like putting your socks on before your shoes, |
| 09:47:04 | 9 | washing your hands before you eat, saying please before -- |
| 09:47:11 | 10 | before you ask for something.  Things about timing matters. |
| 09:47:14 | 11 | And that's important, but USAA believes that there |
| 09:47:16 | 12 | are some more fundamental matters that we all learned or |
| 09:47:20 | 13 | should have learned as young children.  Values like don't |
| 09:47:26 | 14 | take things that don't belong to you.  Values like if you |
| 09:47:30 | 15 | do something wrong, own up to it and take responsibility. |
| 09:47:33 | 16 | Values like words matter, and we need to hold people to |
| 09:47:37 | 17 | their words. |
| 09:47:38 | 18 | I ask that you consider these things as you go |
| 09:47:42 | 19 | back with your deliberations. |
| 09:47:44 | 20 | And with that, I'll pass this off to Mr. Sheasby. |
| 09:47:47 | 21 | Thank you very much. |
| 09:47:48 | 22 | MR. SHEASBY:  May it please the Court. |
| 09:47:54 | 23 | When I was called to jury duty, a question I asked |
| 09:48:00 | 24 | myself repeatedly was why me?  And it's my expectation |
| 09:48:06 | 25 | throughout these last seven days, you've asked yourself |

09:48:09   1   that question many, many times.

09:48:10   2           This has been a burden on you personally.  For

09:48:14   3   many of you it's been a burden on you financially, and the

09:48:17   4   question has to be asked, why you?

09:48:20   5           Well, there are two answers.  The first answer is

09:48:23   6   because it has to be you because that's what our

09:48:28   7   Constitution says.  And, in fact, in the beginning of our

09:48:31   8   Constitution, what it says is that we, the people, create

09:48:35   9   justice.

09:48:36  10           You are here to deliver justice.  It's always had

09:48:41  11   to be us because that's what our founders intended.

09:48:45  12           Mr. Huynh, can I have the slides, please?

09:48:48  13           The second question is why is USAA here.  USAA is

09:48:56  14   made up of 12.4 million armed services members and their

09:49:01  15   families.

09:49:02  16           The system that was created in this case was

09:49:04  17   created to serve them because they live throughout the

09:49:09  18   world, and many of them live paycheck to paycheck.  Their

09:49:13  19   hard-earned money was spent to create this technology, and

09:49:16  20   USAA is not going to allow what was described by Wells

09:49:21  21   Fargo's corporate representative as the largest bank in

09:49:24  22   history to just take the technology.  It's our members'

09:49:29  23   money, and we're entitled to decide who gets to use it and

09:49:32  24   who doesn't get to use it.

09:49:33  25           Now, you've heard the Court's standard of proof

09:49:38  1   instructions, and the standard of proof instruction is

09:49:41  2   preponderance of the evidence.  And so on every issue, if

09:49:45  3   the scales tip just slightly for USAA, we prevail.  Those

09:49:50  4   are the rules you must follow, you're obligated to follow.

09:49:55  5   If the scales tip just slightly, USAA prevails.

09:49:59  6         We're going to talk about three issues -- the same

09:50:01  7   three issues we spoke about throughout the trial.

09:50:04  8         The first is infringement.  Under infringement,

09:50:06  9   there are two types of infringement.  There's literal

09:50:09  10  infringement, but there's also Doctrine of Equivalents

09:50:11  11  infringement.

09:50:12  12        And I want to ask yourself how much time

09:50:15  13  Dr. Villasenor, Wells Fargo's expert in this case, spent on

09:50:19  14  Doctrine of Equivalents.  And the answer is he spent almost

09:50:23  15  no time.

09:50:23  16        And I would submit to you there's a reason why he

09:50:27  17  failed to fairly engage the question of equivalence in this

09:50:30  18  case, which is a powerful doctrine that you must apply.

09:50:34  19        There's only one disputed claim element in the

09:50:37  20  entire case.  Every single other claim element was

09:50:40  21  admitted.  Every single one.

09:50:42  22        Now, when we go to the claims, one of the things

09:50:45  23  that Professor Conte did -- and I'd actually like Professor

09:50:48  24  Conte to stand right now.  He was from the Georgia

09:50:48  25  Institute of Technology.

09:50:53  1          Thank you, Professor Conte.

09:50:54  2          And he taught us about the claims, and he taught

09:50:56  3   us about the source code.  And if you look at the claims,

09:51:00  4   you'll see that they talk about source code instructions

09:51:02  5   "comprising."  And that word is very, very important.  In

09:51:06  6   fact, it's so important, you're probably going to want to

09:51:09  7   underline it in your patent.

09:51:10  8          And the reason why it's so important is because

09:51:12  9   what comes below that claim are things that must be

09:51:16 10   present.  You must monitor an image.  You must capture an

09:51:19 11   image.  You must provide the image.

09:51:22 12          But the word "comprising" is a very powerful legal

09:51:25 13   meaning, and it's on Page 9 of your jury instructions,

09:51:28 14   which you'll be given, and you can read.  Page 9 of your

09:51:32 15   jury instructions.  "Comprising" is a powerful legal word

09:51:35 16   which means if you have more than what's listed, you're

09:51:39 17   still infringing.  In other words, if Wells Fargo monitors,

09:51:44 18   if Wells Fargo captures, if Wells Fargo transmits, the fact

09:51:48 19   that it also does other things is not a defense to

09:51:51 20   infringement.

09:51:52 21          So how does this play out?  Well, let's talk about

09:51:56 22   how it plays out with the claim.  The claim refers to

09:51:59 23   comprising.  It refers to monitoring, capturing, and

09:52:01 24   providing.  And they dispute the capturing limitation.

09:52:06 25   They dispute that they capture after monitoring.  It's a

09:52:08  1   very nuanced word game, but that's the argument.

09:52:12  2          Well, what did Professor Conte point out?  Well,

09:52:16  3   he pointed out that the first thing that has to occur is

09:52:19  4   you have to obtain an image.

09:52:20  5          And if you remember on cross-examination of

09:52:24  6   Mr. Villasenor and then on redirect by their counsel,

09:52:26  7   Mr. Villasenor said the word "obtain" is not in the patent.

09:52:30  8   That was said multiple times through the trial.

09:52:32  9          But it's not the right law.  The word "obtain"

09:52:36 10   doesn't need to be in the patent claims because the patent

09:52:38 11   claims say "comprising."

09:52:39 12          As long as you analyze a preview frame, which

09:52:43 13   there's no dispute that that's covered by the patent, and I

09:52:47 14   don't think you'll hear any dispute whatsoever from

09:52:49 15   Defendants that analyzing a preview frame is an example of

09:52:53 16   monitoring an image, capturing a check image, then

09:52:58 17   transmit.  The fact that you have to first obtain an image

09:53:01 18   to monitor it, that's just common sense.

09:53:05 19          How are you going to monitor an image if you don't

09:53:08 20   obtain it first?  That's exactly what the specification

09:53:10 21   teaches you to do, and it's what that powerful "comprising"

09:53:14 22   language allows and teaches.

09:53:16 23          You can't get away from our claim just because you

09:53:19 24   obtain a preview image first and then monitor it.  That's

09:53:22 25   encompassed by the broad claim.

09:53:24  1     Mr. Villasenor agreed that those preview frames

09:53:28  2  that are obtained are only temporary representations of the

09:53:32  3  video.  How can something that's temporary and will

09:53:35  4  disappear be captured?  That's Wells Fargo's argument.

09:53:39  5     Mr. Villasenor admitted that after the monitoring

09:53:44  6  criteria are satisfied, only then is the JPEG created.

09:53:48  7     Now, there's something very nuanced here.  Wells

09:53:53  8  Fargo and Mr. Villasenor are going to argue to you that

09:53:55  9  creating a JPEG is not capturing an image.  That's the

09:53:59  10  essence of their argument.  That's the exact opposite of

09:54:02  11  what he testified to under oath.

09:54:05  12     What Wells Fargo does by creating that JPEG from

09:54:09  13  the preview image is exactly what you do when you have the

09:54:12  14  camera in front of you, you're looking at preview images,

09:54:15  15  and then you press capture.

09:54:17  16     Creating a JPEG is how a digital camera captures.

09:54:23  17  That's what Mr. -- Dr. Villasenor said.

09:54:25  18     Now, another interesting fact, an important fact,

09:54:29  19  for terms that are not construed, you must apply the plain

09:54:32  20  and ordinary meaning.

09:54:38  21     The plain and ordinary meaning in this case was

09:54:44  22  not assessed by Dr. Villasenor.  If you'll remember,

09:54:47  23  Dr. Villasenor never once talked about what the plain and

09:54:50  24  ordinary meaning of terms were.

09:54:52  25     There was another expert who did that.  That

09:54:54   1   expert was Mr. Saffici.  Mr. Saffici was an RDC veteran.

09:54:59   2   He was an expert in RDC.

09:55:02   3        And Dr. Villasenor acknowledged that he was

09:55:03   4   retained by Wells Fargo to analyze the plain and ordinary

09:55:07   5   meaning of the claim terms, what the claims cover.

09:55:09   6        And he admitted something incredibly important.

09:55:13   7   He admitted that analyzing preview frames, making decisions

09:55:17   8   as to when those preview frames satisfy the criteria, and

09:55:20   9   then taking that frame that satisfies the criteria is

09:55:23  10   covered by the claims of the patent.

09:55:26  11        So counsel for Wells Fargo has repeatedly said:

09:55:29  12   Mr. Saffici is not Wells Fargo's non-infringement expert.

09:55:34  13   Of course he's not their non-infringement expert, because

09:55:37  14   he admits that the system they use is exactly covered by

09:55:44  15   the claims of the patent.  Of course he's not their

09:55:46  16   non-infringement expert.

09:55:46  17        Now, he also said in this express issue when

09:55:49  18   counsel for Wells Fargo said, well, obtain is not in the

09:55:52  19   patent, he expressly admitted that taking a frame of a

09:55:56  20   video, obtaining it from the video and then monitoring it

09:56:00  21   is an embodiment not just in the specification of the

09:56:02  22   patent but it's covered by the claims of the patent.

09:56:06  23        Mr. Wood, the source code.  When he was actually

09:56:12  24   pressed on the meaning of the source code lines, he

09:56:14  25   acknowledged it.  Before the monitoring criteria, you

09:56:17  1  analyze preview frames.  Those preview mode -- looking at

09:56:22  2  preview frames is not capturing.  And then after the

09:56:26  3  monitoring criteria are satisfied, only then does capture

09:56:29  4  occur.

09:56:30  5       Dr. -- Dr. Conte gave a detailed analysis of

09:56:36  6  Doctrine of Equivalents.  It was essentially not joined by

09:56:39  7  Dr. Villasenor.

09:56:39  8       Now, I want you to consider the following exhibits

09:56:44  9  if you have any questions about infringement.  PX-92.33,

09:56:52  10  PX-94.6, PX-376.5, PX-223.8.

09:57:00  11       Those are the manuals in which again and again and

09:57:06  12  again Mitek admits that a capture is after the monitoring

09:57:10  13  criteria are satisfied.

09:57:12  14       The next issue I'm going to talk to you about is

09:57:14  15  willful infringement.

09:57:17  16       Now, you're -- you were instructed by the Court

09:57:21  17  that you may not compare the USAA system and the Wells

09:57:25  18  Fargo system for purposes of infringement.  And that is

09:57:28  19  absolutely the case.

09:57:29  20       But the Court also instructed you that for

09:57:33  21  purposes of willful infringement, you can consider all the

09:57:35  22  evidence in the record.  You can consider all of it.

09:57:38  23       And one of the most powerful evidences in the

09:57:41  24  record for the purposes of willful infringement:  Was Wells

09:57:44  25  Fargo reckless?  Was there reckless disregard?  Is the

09:57:49  1   striking similarity between Wells Fargo's system and USAA's

09:57:52  2   system?

09:57:53  3        Now, remember, USAA's system practices the

09:57:56  4   patents.  Wells Fargo concedes that USAA's system practices

09:58:01  5   the patents, and the system that Wells Fargo created does

09:58:04  6   the exact same thing that USAA's system does.  And you

09:58:09  7   don't have to take my word for it.  Mr. Wood said it

09:58:13  8   himself.

09:58:13  9        Now, what also is clear from the record and what's

09:58:18  10  transparently clear from the record is that this wasn't

09:58:23  11  accidental.  They had access to our app.  We found

09:58:29  12  screenshots from the app, from them actually using the app,

09:58:32  13  and we found screenshots that shows that they knew the app

09:58:35  14  was covered by our patent.

09:58:38  15        The next issue I want to discuss is damages.  One

09:58:53  16  of the things that is incredibly important in this case is

09:58:57  17  to separate out what is in dispute from what isn't in

09:59:02  18  dispute.  Now, in terms of the incredible value of mobile

09:59:08  19  remote deposit capture, I would submit to you that there is

09:59:10  20  not substantial dispute about that.  It's generally

09:59:13  21  conceded that mobile remote deposit capture is an

09:59:20  22  incredible and powerful tool for banks.  It saves them

09:59:24  23  money, it delights customers, it's transformative.

09:59:28  24        The question and the point of dispute is how much

09:59:30  25  of that value can be attributed to auto capture?  That's a

09:59:35    1    principal dispute, and the question needs to be answered.

09:59:45    2    I believe that the record will show that the answer to that

09:59:48    3    question is $373 million was attributed to the auto capture

09:59:54    4    system.

09:59:54    5            THE COURT:  20 minutes have been used, counsel.

09:59:56    6            MR. SHEASBY:  Two other issues, keep in mind that

09:59:59    7    patents can be incredibly valuable and can be worth

10:00:02    8    hundreds of millions of dollars.  What seems like vast sums

10:00:07    9    to you and I is common in the patent space when two major

10:00:11   10    companies are challenged on an issue.

10:00:13   11            And in this case, as Ms. Lockwood-Stein said,

10:00:20   12    we're dealing with the largest bank in history.  231

10:00:24   13    million checks are successfully deposited.

10:00:27   14            And this is the most important thing, the critical

10:00:30   15    question for you to answer is what portion of the vast

10:00:33   16    value of auto capture -- the vast value of MRDC relates to

10:00:38   17    auto capture.  Mr. Gerardi tried to tell you he knew the

10:00:41   18    answer.  And his answer was, oh, it's almost nothing

10:00:45   19    because we can switch to manual at any time.  And he said

10:00:48   20    that under oath, and he said as support for that that

10:00:52   21    Dr. Villasenor told him so.  But Dr. Villasenor didn't tell

10:00:55   22    him that.  Dr. Villasenor had no opinion on that.  The only

10:00:59   23    evidence in the record from Wells Fargo's experts as to the

10:01:02   24    value of auto capture is from Mr. Saffici who says it's the

10:01:09   25    foundation.

10:01:09  1        I will now speak to you after Defendant's closing.

10:01:13  2   Thank you, ladies and gentlemen.

10:01:13  3        THE COURT:  Defendant may now present its closing

10:01:15  4   argument to the jury.

10:01:17  5        Would you like a warning on time used,

10:01:20  6   Mr. Melsheimer?

10:01:20  7        MR. MELSHEIMER:  Yes, I would, Your Honor.  I

10:01:22  8   would like a warning when I've used 21 minutes.

10:01:27  9        THE COURT:  All right.  You may proceed.

10:01:33 10        MR. MELSHEIMER:  Good morning.  I want to start

10:01:34 11   like everyone else by thanking you for your time.  Jury

10:01:37 12   service is important.  We know it's an inconvenience for

10:01:40 13   you, and we appreciate you being here and paying such close

10:01:43 14   attention.

10:01:43 15        We also agree that patent disputes are important

10:01:48 16   but they're important not simply for the reason that the

10:01:51 17   Plaintiff has suggested to you.  They're important because

10:01:55 18   it's critical to defend one's self against wrongful claims

10:02:03 19   of patent infringement.  Imagine if you were sitting in

10:02:07 20   your home that you'd lived in for several years and a

10:02:09 21   neighbor down the street came up and said this is my home.

10:02:13 22   Oh, and by the way, not only is it not your home, you owe

10:02:16 23   me $300 million in rent.

10:02:19 24        I think you'd do the exact same thing that we've

10:02:23 25   done, which is said you're wrong, and I'll see you in

10:02:28   1   court.  And that's why we're here.  We're here, as I've

10:02:32   2   said in the beginning, to prove to you that we don't use

10:02:35   3   any of the patents that USAA has asserted in this case.  We

10:02:39   4   haven't taken any of their technology and we don't owe them

10:02:45   5   any money, and I think you've seen that in the evidence.

10:02:47   6           And I'm going to start with the evidence.  I'm

10:02:49   7   going to start with the evidence, because I told you at the

10:02:51   8   beginning that we would bring you the evidence.  And what

10:02:54   9   did we bring you?  What was the first witness we brought

10:02:57   10  you?

10:02:58   11          A gentleman from Mitek named Andrew Wood.  Now,

10:03:02   12  Mr. Wood was a software engineer.  He grew up wanting to be

10:03:07   13  a software developer.  He supervised a team of developers

10:03:10   14  that wrote the MiSnap source code which is at issue in this

10:03:14   15  case.  And he came here and he explained it to you in some

10:03:17   16  detail.

10:03:19   17          We asked him, is there more than one way to do

10:03:23   18  auto capture?  And this is important.  The Plaintiff in

10:03:26   19  this case has tried to suggest to you that they've cornered

10:03:29   20  the market on auto capture, that there's only one way to do

10:03:33   21  it, and it's their way.

10:03:35   22          Well, that's not true.  The evidence has shown, as

10:03:37   23  you heard from Mr. Wood, that there are multiple ways to do

10:03:40   24  auto capture because they have done it multiple ways in

10:03:44   25  their own software.

10:03:46  1          Let me show you a timeline that summarizes what

10:03:49  2   Mr. Wood told you and some other evidence in the case.

10:03:53  3          First, we know that in May of 2012, Wells Fargo

10:03:58  4   launched the manual remote deposit product.  In May of

10:04:05  5   2014, Wells Fargo added this auto capture feature that

10:04:08  6   Mitek offers called MiSnap.

10:04:13  7          Now, we also know from Mr. Wood that in September

10:04:16  8   of 2014, Mitek changed the auto capture method to a capture

10:04:24  9   first method, then monitoring, because of improved camera

10:04:29  10  quality which I'll explain in a minute.

10:04:32  11         So from September 2014 on, Mitek's software was

10:04:36  12  doing what's called video frame processing, before they had

10:04:41  13  done what he called video still capture, and finally note

10:04:45  14  that the first patent in this case, the first Plaintiff

10:04:51  15  patent in this case, the '571, did not issue until March of

10:04:54  16  2015.

10:04:54  17         Now, why did they make the change in the Mitek

10:04:59  18  code in September of 2014?  And by the way, no one's

10:05:02  19  disputed this.  There's been no witness or suggestion that

10:05:06  20  this code wasn't changed, that what Mr. Wood told you

10:05:09  21  wasn't accurate.  He's the person that knows the code and

10:05:13  22  supervises the code writers.

10:05:15  23         And we asked him, what was the main reason?

10:05:18  24         And he said there were two reasons.  One is that

10:05:21  25  we were getting feedback that some of the images in the old

10:05:23   1   way we were doing auto capture were blurry.  And then, two,

10:05:27   2   the second reason was that phone cameras were better.  And

10:05:32   3   this is also in our own experience from using phones.  We

10:05:35   4   know that the cameras on phones have gotten better over

10:05:39   5   time, and Mitek wanted to take advantage of that.  We

10:05:44   6   didn't need to capture a high res image.  We had one that

10:05:50   7   was good already.

10:05:51   8        So what did Mr. Wood come in here and do?  He went

10:05:54   9   in and explained from Defendant's Exhibit 611, and you can

10:05:57  10   ask for this.  This is the code.  This is the code that he

10:05:59  11   walked through starting with code lines 2278, 2279, and

10:06:06  12   2280.  That is the captureOutput, the AVCaptureOutput, and

10:06:16  13   then much later in the code 2322, many lines down, that's

10:06:18  14   where they do the analysis.

10:06:19  15        Now, they just suggested to you, well, we asked

10:06:23  16   Mr. Wood and he couldn't point to a single line of code.

10:06:26  17   Folks, because he pointed to multiple lines of code.  He

10:06:29  18   showed you how the code worked.  He showed you what that

10:06:33  19   first code was doing, the capturing, and he showed you

10:06:36  20   later on in the code when it was doing the monitoring or

10:06:38  21   the analysis.

10:06:39  22        Now, let's go back to the chronology for a moment.

10:06:46  23        Remember in the old way that Mr. Wood explained to

10:06:49  24   you was called video still capture where they didn't

10:06:52  25   capture first in the old way.  And he told you that the

10:06:57  1   manuals described the old way, and they were accurate at

10:06:59  2   one time, but he also told you that they hadn't been

10:07:03  3   updated to reflect what -- the change that had occurred in

10:07:09  4   September of 2014.  Now, you just heard from the Plaintiff

10:07:14  5   that those manuals are so important.  But that's not what

10:07:17  6   their expert told you.  Their expert told you that what's

10:07:19  7   important is the code.

10:07:21  8        Dr. Conte says if you've got a conflict between

10:07:25  9   the manuals and the code, you look at the code because the

10:07:29  10  code trumps any descriptive document.  The source code

10:07:34  11  controls how this software works, not how someone says it

10:07:39  12  works, not what a manual says.  But, remember, the only

10:07:43  13  person with personal knowledge of the source code that came

10:07:46  14  into court and took an oath was Andrew Wood.  Andrew Wood

10:07:54  15  told you that, he told you how it worked, and he showed

10:07:54  16  you, not one line, the specific lines of code in

10:07:58  17  Exhibit 611.

10:07:58  18        Now, let's return to that code.  What does he say?

10:08:01  19  At a high level, the iPhone camera has just captured some

10:08:05  20  output, 2278, captureOutput, and has sent this to MiSnap.

10:08:13  21  It's sending an image that was captured to MiSnap.  Mitek

10:08:17  22  takes that image and then it analyzes it and tries to

10:08:19  23  determine if it thinks it's a good image or not.

10:08:22  24        Folks, that's capturing, then monitoring.

10:08:24  25  Capturing then monitoring.  That's a different way than

| | | |
|---|---|---|
| 10:08:27 | 1 | what these patent claims describe.  That's the new way. |
| 10:08:31 | 2 | It was confirmed by Dr. Villasenor who was asked: |
| 10:08:36 | 3 | Hey, you heard Mr. Wood.  Is your understanding of the code |
| 10:08:39 | 4 | consistent with what you heard from him? |
| 10:08:40 | 5 | He says:  Yes, it is. |
| 10:08:42 | 6 | Then he went -- Dr. Villasenor went and compared |
| 10:08:47 | 7 | the patent claims to the Wells Fargo products. |
| 10:08:50 | 8 | So on the left-hand side, you've got the patent |
| 10:08:52 | 9 | claims, the '571, 1 to 6, 9, 12, and 13; the '090, Claims 1 |
| 10:08:59 | 10 | to 4, 7 to 10 [sic]. |
| 10:09:03 | 11 | They do two things.  They -- one, they monitor the |
| 10:09:05 | 12 | image.  That's the first thing they do in the patent |
| 10:09:07 | 13 | claims, and then they capture. |
| 10:09:08 | 14 | Now, Dr. Villasenor told you quite plainly, that's |
| 10:09:12 | 15 | not what the Wells Fargo products do.  The Wells Fargo |
| 10:09:17 | 16 | products operate by capturing before the analysis. |
| 10:09:20 | 17 | So that is exactly the opposite of the order |
| 10:09:24 | 18 | that's required by both the language of the claim and in |
| 10:09:29 | 19 | the Court's construction. |
| 10:09:29 | 20 | Now, folks, again and again in this trial and in |
| 10:09:34 | 21 | the time I have with you, we're going to focus you on the |
| 10:09:38 | 22 | claim language because Judge Gilstrap has told you time and |
| 10:09:41 | 23 | again in these instructions, the claims are important |
| 10:09:45 | 24 | because it is the words of the claims that define what a |
| 10:09:48 | 25 | patent covers. |

10:09:49    1          This is important.  The figures and the text in

10:09:54    2    the rest of the patent provide a description and/or

10:09:57    3    examples, but it is the claims that define the breadth of

10:10:00    4    the patent coverage, not anything else.

10:10:02    5          Only the claims can be infringed.  You don't look

10:10:06    6    at the specification and say, that's patent infringement.

10:10:09    7    You look at the words of the claims.

10:10:12    8          And he also told you that you cannot -- for

10:10:15    9    infringement, you cannot compare the accused product with

10:10:19   10    anything in the specifications, nor can you compare the

10:10:24   11    patent owner's product.

10:10:26   12          So when they try to show you their product, they

10:10:29   13    can have any kind of a product they want to.  That's not

10:10:31   14    the analysis.  You have to compare the words of the claim,

10:10:35   15    the order of those words, and you compare that to what

10:10:40   16    Wells Fargo does.  And as Dr. Villasenor told you, we do it

10:10:43   17    just the opposite.

10:10:44   18          It's true, it's not 90 or 95 percent, as the Court

10:10:48   19    has instructed you.  It's all the elements of the claims

10:10:52   20    must be present.  Not some, not most, not many.  They all

10:10:56   21    have to be present whether it's literal infringement or the

10:11:01   22    Doctrine of Equivalents.  And if one element is missing

10:11:05   23    under any theory of infringement, there's no patent

10:11:09   24    infringement.

10:11:09   25          That is why we've brought you back to the claims.

10:11:15  1   MiSnap does not capture at or after.  The patents are

10:11:20  2   monitor/capture.  MiSnap is capture, then monitor.

10:11:25  3           Claim 1 of the '090, at or after the monitoring

10:11:31  4   criterion are satisfied, then you capture.  That's the

10:11:35  5   claims.  That's the exact opposite of what the Mitek

10:11:41  6   product in the Wells Fargo system does.

10:11:42  7           The Plaintiff brought you a lot of evidence to try

10:11:44  8   to confuse the issues and suggest things that were not

10:11:48  9   accurate.  They brought you the inventor, and you might

10:11:52  10  think the inventor would be an important witness.

10:11:55  11          But Mr. Bueche, when he was asked:  You didn't

10:11:58  12  talk about the claims during your testimony, did you?

10:12:00  13          The information I provided came from the

10:12:04  14  specifications.

10:12:05  15          What do we know from Judge Gilstrap's

10:12:08  16  instructions?  You can't infringe the specifications.  You

10:12:10  17  have to look at the language of the claims and compare them

10:12:14  18  to the product.

10:12:14  19          Now, what did they bring you?  What's their

10:12:17  20  evidence?

10:12:18  21          Now, they started out their opening statement

10:12:20  22  attacking things that we had said.  They didn't start out

10:12:23  23  showing you what their evidence was.  What was the proof

10:12:28  24  that they brought you?  And I submit to you, they did not

10:12:31  25  bring you the greater weight of the credible evidence on

10:12:35   1   what they have to prove.

10:12:36   2          First, they tried to expand their patents beyond

10:12:41   3   the claims.

10:12:43   4          Remember Mr. Calman's testimony.  I asked him this

10:12:47   5   question.

10:12:47   6          Back in October of 2017, didn't you prepare a

10:12:50   7   report that had this statement:  Principal developer on

10:12:55   8   Merrill Lynch app, comma, first mobile deposit app to

10:12:59   9   automatically take a photo of a check image -- of a check

10:13:03  10   for image check deposit.  Did I read that correctly?

10:13:06  11          And he said:  Yes, sir, but this isn't auto

10:13:10  12   capture as we've been discussing it.

10:13:11  13          What is the only thing that can mean?  That

10:13:14  14   there's other kinds of auto capture.  He says Merrill Lynch

10:13:17  15   had the first kind of auto capture, and that's different

10:13:19  16   from what he says he's talking about here.

10:13:22  17          They also tried to point to you to the app and

10:13:27  18   what the app looked like and the fact that we had pictures

10:13:31  19   of their app in our files.

10:13:34  20          Mr. Bueche was asked:  Are you saying the website

10:13:37  21   gave you information about the operation of the Wells Fargo

10:13:40  22   product, that we had information on our website about how

10:13:45  23   our product worked?

10:13:47  24          He said:  Yes, it described how auto capture

10:13:51  25   worked.

10:13:51  1          But then when he got on the stand, he had to
10:13:55  2  admit, that's not true.
10:13:56  3          Did you feel like the website gave you an
10:14:01  4  understanding of the technical operation of the Wells Fargo
10:14:03  5  product?
10:14:03  6          It had no insight into the technical operation of
10:14:07  7  the product.
10:14:07  8          And the technical operation, folks, is the source
10:14:10  9  code.  That's why we brought you Mr. Wood, who had great
10:14:13  10  personal knowledge of that code.
10:14:14  11          They did bring you one infringement expert, not --
10:14:20  12  they brought you Dr. Conte.  And I'm going to submit to you
10:14:23  13  that his theory was not based on the claim language, and it
10:14:29  14  simply made no sense.  This is what he told you in
10:14:32  15  Paragraph 412 of his report:
10:14:34  16          A JPEG image is created and transmitted via
10:14:38  17  communication network to Wells Fargo's servers where the
10:14:42  18  check image is stored.  This is the first and only time
10:14:46  19  that the check image is captured in the Wells Fargo system.
10:14:51  20          This is what he's talking about.  So there's got
10:14:55  21  to be a JPEG image, it's -- and it's got to be transmitted
10:14:58  22  to Wells Fargo's servers.  That's what he says is captured.
10:15:00  23          Now, that doesn't make any sense at all.  We asked
10:15:07  24  Dr. Conte:  Does JPEG have anything to say about
10:15:11  25  infringement?

10:15:13    1        And he says:  No.  Converting an image to JPEG is

10:15:16    2   not capturing because in order to create a JPEG image, you

10:15:20    3   have to have something to convert in the first place.  You

10:15:25    4   have to have an image or some data or something to convert.

10:15:28    5   You have to have something that you've captured before you

10:15:31    6   can convert it.

10:15:32    7        Mr. Wood told you the same thing.  You can't

10:15:35    8   compress something without having it.  You can't compress

10:15:40    9   something that you haven't already captured.

10:15:42   10        Of course, the patent claims say nothing about

10:15:45   11   JPEG.  We asked Dr. Conte this.  The patent claims say

10:15:51   12   nothing about volatile or non-volatile memory.

10:15:55   13        Remember, this is his story that he gives.  He

10:15:57   14   says:  Well, yeah, it's on the camera, but it's not really

10:16:01   15   captured until it's sent to the server.  Could be a hundred

10:16:04   16   or a thousand miles away where it's kept in permanent

10:16:07   17   memory or non-volatile memory.

10:16:10   18        But the claims of the patents don't contain the

10:16:12   19   words "volatile" or "non-volatile" memory.  They don't.

10:16:16   20        He also tried to make this point about obtain.

10:16:19   21   You just heard it from counsel for the Plaintiff.  Obtain

10:16:22   22   is not in the claims of the patent either.  And, of course,

10:16:24   23   we know that the claims say nothing about storing

10:16:28   24   information on a server as being part of capture.

10:16:31   25        Ladies and gentlemen, Dr. Conte's theory was so

10:16:39  1   absurd and nonsensical, that he couldn't even keep it

10:16:42  2   straight himself.

10:16:43  3           What did he say in his report?  This is Paragraph

10:16:47  4   83.  How did he lay it out?  Image capture first, threshold

10:16:51  5   checking second.  Folks, that's capture, and thresh -- IQA

10:16:57  6   is image quality analysis.

10:17:00  7           And he tried to say, well, that wasn't the order I

10:17:03  8   meant.  That wasn't what I intended.  Folks, the order is

10:17:07  9   the most important thing in this case.  You've heard about

10:17:09  10  it from Day 1.  This man paid to write and analyze this.

10:17:13  11  He couldn't get his own theories straight because it's

10:17:17  12  plain as day that what Mitek does is capture first and then

10:17:22  13  analyze, which is exactly the way he put it.

10:17:25  14          And, of course, he couldn't really explain the

10:17:27  15  code to you like Mr. Wood did.

10:17:29  16          And the code that you saw in 611, the first three

10:17:40  17  lines there, 2278, 2279, 2280 are captured.

10:17:45  18          And by the way, remember, you see that "void"

10:17:47  19  language.  Remember what Dr. Conte told you, that doesn't

10:17:50  20  mean nothing happens there.  That doesn't mean ignore it.

10:17:53  21  It means something is happening.  And what's happening, I

10:17:55  22  submit to you, is capture is happening in those first lines

10:17:59  23  of 611, captureOutput, AVCaptureOutput, and the analysis is

10:18:10  24  occurring much later in the code.

10:18:11  25          I want to talk briefly about smoke screens that

10:18:16  1   you've heard in the case and I think are distractions from

10:18:19  2   the truth and distractions from the proof that we aren't

10:18:22  3   infringing any patents and we aren't doing their version of

10:18:23  4   auto capture.

10:18:23  5         First, Mr. Saffici.  You heard about him over and

10:18:25  6   over again.  Let me tell you some things that will not be

10:18:28  7   disputed.  He did not analyze infringement.  He never ever

10:18:32  8   compared the claims of the patent to the Wells Fargo

10:18:37  9   product.  They have never shown you that.  It never

10:18:41 10   happened.  They never played it.  It did not happen.  He

10:18:44 11   never did the analysis that Dr. Villasenor did and that

10:18:48 12   you're going to have to do.

10:18:49 13         And the language that he used, what they played

10:18:52 14   for you involved language that did not include the claim

10:18:58 15   language that we're talking about here.  Only

10:19:00 16   Dr. Villasenor performed the non-infringement --

10:19:04 17   non-infringement analysis that is critical in this case.

10:19:07 18         Another smoke screen is this notion that, well,

10:19:13 19   it's close enough.  Because we don't have literal

10:19:15 20   infringement maybe -- yeah, maybe you've got us on that

10:19:20 21   ordering of the steps.  Maybe -- maybe your product

10:19:22 22   captures first instead of monitors, but it's close enough

10:19:26 23   because of this doctrine called the Doctrine of

10:19:29 24   Equivalents, which the Judge has charged you on.

10:19:32 25         Folks, that is not horseshoes or hand grenades.

10:19:38  1  That is not an excuse to not prove all the elements.

10:19:41  2      The Judge tells you none of this alters the fact

10:19:43  3  that all of the elements of a claim must be present.  All

10:19:48  4  of the elements must be present whether it's literal

10:19:52  5  infringement or Doctrine of Equivalents.

10:19:53  6      And I submit to you that there's simply no way

10:19:58  7  that you could conclude when the Mitek/Wells Fargo system

10:20:02  8  is capture, then analyze, and the patents are analyze, then

10:20:07  9  capture, that's not equivalent.  That's a substantial

10:20:12  10  difference.  It's not the same way of doing it.  It doesn't

10:20:15  11  have all the elements, and, therefore -- therefore, there's

10:20:19  12  no infringement under either theory.

10:20:22  13      The final smoke screen I want to talk about is

10:20:28  14  this notion of these screenshots.  This is Plaintiff's

10:20:31  15  Exhibit 1182.

10:20:32  16      You heard over and over again that in April of

10:20:35  17  2018, there were screenshots of the app that USAA had found

10:20:42  18  at Wells Fargo.

10:20:43  19      Now, first of all, we've been told from the Court

10:20:47  20  again and again, you don't look at their product and

10:20:50  21  compare it to the Wells Fargo/Mitek product for

10:20:54  22  infringement.  You look at their claims and compare it to

10:20:58  23  the product.  And we know that shows there's no

10:21:00  24  infringement.

10:21:00  25      But even their own witnesses have to admit that

10:21:05  1  this is not relevant.  I asked Mr. Calman:  Do you

10:21:10  2  understand that the patents in this case do not involve how

10:21:13  3  one program looks versus how another program looks?  Do you

10:21:19  4  understand that, Mr. Calman?

10:21:21  5       And he said:  Well, yeah, the patents are not

10:21:25  6  about the aesthetics.  They're about how the program -- how

10:21:29  7  the system works.

10:21:31  8       And you know how the system works not from how the

10:21:37  9  pictures look, not from what the manuals say, but from the

10:21:43  10  source code.

10:21:44  11       Dr. Conte admits the source code trumps.  Mr. Wood

10:21:48  12  is the only person that testified with personal knowledge

10:21:51  13  of the source code.  And Dr. Villasenor showed you how the

10:21:56  14  Mitek/Wells Fargo system does not align literally or with

10:22:02  15  equivalents with the claim language.  And that means

10:22:04  16  there's no infringement.

10:22:05  17       So as I said last week, we've all heard the phrase

10:22:13  18  "timing is everything."  That's true sometimes in life, and

10:22:18  19  it's true all the time in these patents.  And because

10:22:23  20  timing is everything, because order matters, and it's the

10:22:29  21  claims that matter, we don't infringe the '090 or the '571,

10:22:36  22  any of the patents in the case.

10:22:37  23       I'm going to yield the balance of my time to my

10:22:41  24  colleague, Mr. Hill.  Thank you.  Thank you for the time

10:22:44  25  and attention that you've devoted to this case.

| | | |
|---|---|---|
| 10:22:52 | 1 | THE COURT:  You may proceed, Mr. Hill. |
| 10:22:53 | 2 | MR. HILL:  Thank you, Your Honor. |
| 10:22:54 | 3 | Good morning, ladies and gentlemen. |
| 10:22:56 | 4 | You have just heard Mr. Melsheimer review with you |
| 10:23:00 | 5 | the evidence that we have proved in this case that |
| 10:23:05 | 6 | establishes that Wells Fargo Bank's product does not |
| 10:23:10 | 7 | infringe these patents, that the Plaintiff in this case has |
| 10:23:12 | 8 | not carried their burden of proof, burden of proof, not |
| 10:23:16 | 9 | hope, not suggestion, proof. |
| 10:23:20 | 10 | Now, I want to walk you through the verdict form |
| 10:23:23 | 11 | that you guys are going to see here in a little while -- |
| 10:23:26 | 12 | that you folks are going to see here in a little while from |
| 10:23:29 | 13 | the Court.  It's got specific questions that you're going |
| 10:23:32 | 14 | to have to answer, and in the context of that verdict form, |
| 10:23:35 | 15 | I want to cover a few of the other issues that are in the |
| 10:23:37 | 16 | case. |
| 10:23:38 | 17 | Now, as I mentioned, the Plaintiff, the Plaintiff, |
| 10:23:40 | 18 | USAA, has to prove by a preponderance of the evidence the |
| 10:23:46 | 19 | greater weight of the credible evidence.  They have to |
| 10:23:52 | 20 | prove that Wells Fargo has infringed. |
| 10:23:54 | 21 | As you've heard, Wells Fargo Bank's Mitek software |
| 10:24:00 | 22 | captures the image and then analyzes it.  Thus, USAA cannot |
| 10:24:04 | 23 | prove infringement of every element of any claim literally |
| 10:24:11 | 24 | or under the Doctrine of Equivalents. |
| 10:24:12 | 25 | And as the Court has told you, all elements of the |

10:24:18    1    claim must be present.

10:24:18    2            Ladies and gentlemen, that is the first question

10:24:21    3    of the verdict form you're going to see.  We suggest to you

10:24:24    4    that the answer to Question 1 is no, is no.  They have not

10:24:30    5    proven by a preponderance of the evidence infringement in

10:24:32    6    this case.

10:24:32    7            Now, folks, if you answer no to Question 1, you

10:24:37    8    don't even get to Question 2, but because it's in the

10:24:40    9    Court's verdict form, I have to discuss it with you.  So

10:24:43   10    we're going to move on to Question 2.

10:24:45   11            It asks:  Did USAA prove -- again, prove by a

10:24:52   12    preponderance of the evidence that Wells Fargo has

10:24:54   13    willfully infringed any of the asserted claims, if you have

10:25:00   14    found them infringed?

10:25:02   15            Ladies and gentlemen, as Mr. Melsheimer just

10:25:04   16    explained to you, our product -- our auto capture product

10:25:10   17    had been on the market for over a year before USAA even

10:25:16   18    obtained a patent that's in this case.  We had it out

10:25:20   19    before they had patented technology.

10:25:23   20            Ladies and gentlemen, you've also seen that we

10:25:26   21    demonstrated to you why we don't infringe, why experts that

10:25:30   22    we have consulted have advised us you don't infringe.

10:25:35   23    Folks, that alone, those two facts alone defeat

10:25:40   24    willfulness.  They defeat willfulness.  We were proceeding

10:25:44   25    as a legitimate business should by going out and paying

10:25:49  1  for -- buying from a legitimate venture the services and

10:25:52  2  the technology that we needed to use and putting that on

10:25:56  3  the market.  And we did it before USAA ever even had a

10:25:59  4  patent in this space.

10:26:00  5       They have to show for purposes of willfulness that

10:26:06  6  we did something wantonly or egregiously.  Folks, all we

10:26:11  7  did is fairly compete.

10:26:12  8       They want to make noise about copying.  They want

10:26:16  9  to suggest to you based on these screenshots that don't

10:26:20  10  tell you anything about the source code that we had copied

10:26:22  11  their product somehow.  But, folks, if we look at the clips

10:26:25  12  from their own witnesses, Mr. Bueche, he had to admit

10:26:29  13  there's no evidence of copying in this case.

10:26:32  14       Mr. Prasad, another inventor on the patent, he had

10:26:40  15  to admit there's no evidence of copying in this case.

10:26:43  16       And ladies and gentlemen, they put an exhibit in

10:26:45  17  evidence that tells you exactly what you need to know about

10:26:49  18  how Wells Fargo took their claims seriously and tried to

10:26:52  19  discuss them with USAA.  They put in Plaintiff's Exhibit

10:26:55  20  162.  They suggested to you it said something it didn't.

10:26:58  21  You'll have a chance to examine it in the jury room.  What

10:27:01  22  you will see is that we tried to investigate and have a

10:27:04  23  discussion with USAA, and before that discussion could

10:27:12  24  conclude, we were sued.

10:27:13  25       Ladies and gentlemen, the third question on the

10:27:19   1   verdict form deals with damages.  I want to go there now.

10:27:22   2        Now, again, this question asks:  What amount of

10:27:27   3   money has USAA proven -- proven by a preponderance of the

10:27:33   4   evidence, not hoped for, not suggested to you, what have

10:27:37   5   they proven by the credible weight of the evidence?

10:27:41   6        Ladies and gentlemen, I would suggest to you they

10:27:43   7   haven't proven anything because you don't answer this

10:27:45   8   question if you find no infringement.  We believe the

10:27:48   9   answer to this question is zero and that we don't infringe,

10:27:52   10   and that's why it's zero.

10:27:53   11       But, ladies and gentlemen, I want you to consider

10:27:56   12   what USAA is saying here because what they say in the

10:28:01   13   damages context I think tells you a lot more about them

10:28:07   14   than it does anything else in the case.

10:28:09   15       They are asking you, if you look at this question

10:28:12   16   on the verdict form, they are asking you for $300 million

10:28:17   17   for the time period of December 2016 through trial,

10:28:23   18   resulting from infringement through the date of trial.  I

10:28:29   19   don't know if they ever really made that clear to you in

10:28:31   20   the presentation of the evidence.  They said $300 million.

10:28:34   21   It may have taken you aback.  But did they emphasize that

10:28:38   22   that's $300 million only for three years' use of these

10:28:42   23   patents?  Think about that.  Think about that.

10:28:49   24       They were bashful to draw that out, to make clear

10:28:53   25   to you that they're talking about $300 million for just the

10:28:59  1   past three years.

10:29:01  2        Folks, it's unreasonable on its face.  It's

10:29:05  3   unreasonable on its face.

10:29:06  4        And it's particularly unreasonable considering

10:29:10  5   that Mr. Weinstein had to admit in his testimony that the

10:29:15  6   availability of manual capture as an alternative, as a

10:29:20  7   non-infringing alternative, that availability caps the

10:29:23  8   damages.  It caps the damages.

10:29:26  9        And as Mr. Gerardi calculated appropriately, if

10:29:29  10  you look at the actual value of not all of MRDC, that's

10:29:33  11  what they're trying to do.  They're trying to grab this

10:29:37  12  historical value of mobile deposit generally and they're

10:29:40  13  trying to take credit for it and say that's what we're owed

10:29:45  14  for just this three-year period.  Folks, they didn't invent

10:29:48  15  that, they aren't entitled to that, and what Mr. Weinstein

10:29:52  16  was admitting here is that Mr. Gerardi's calculation of

10:29:56  17  what -- if you have a non-infringing substitute, what the

10:29:59  18  amount is, that serves as a cap at that hypothetical

10:30:02  19  negotiation.

10:30:02  20       Mr. Weinstein had to show you that no bank gets

10:30:10  21  great benefit out of these patents.  Wells Fargo gets no

10:30:13  22  great benefit out of this technology that they claim that

10:30:17  23  we're using.  Because what he had to show you was that all

10:30:20  24  it would amount to is a few checks per branch per day.

10:30:24  25  Folks, no bank is ever going to pay $300 million, what USAA

10:30:28  1    is asking for in this case, for a few checks per branch per

10:30:32  2    day for a three-year period.

10:30:34  3            They tried to put in front of you this shell game

10:30:41  4    consistently where they would suggest to you the value of

10:30:44  5    total mobile deposit and try to conflate that with their

10:30:48  6    narrow auto capture invention.  Their narrow invention of

10:30:51  7    the difference between this or just this.  That's what

10:30:56  8    their patents cover.

10:30:57  9            And so they tried to show you testimony from Wells

10:31:00  10   Fargo witnesses.  You remember the deposition even

10:31:02  11   yesterday they were -- they were adding with Mr. Ajami's

10:31:06  12   deposition, a Wells Fargo employee who they repeatedly

10:31:10  13   asked about is mobile deposit table stakes?  Does mobile

10:31:14  14   deposit have this great big value?  And, of course, he said

10:31:17  15   yes.  He's not talking about their invention.  But that's

10:31:20  16   what they're trying to capitalize on.

10:31:25  17           Folks, their own inventor had to admit to you that

10:31:30  18   what they're asking is unfair.  We asked Mr. Bueche:

10:31:36  19   Mr. Bueche, would it be unfair for USAA to come to court

10:31:42  20   and try to get money for things that these patents didn't

10:31:45  21   invent?

10:31:45  22           And he conceded the point.

10:31:48  23           Ladies and gentlemen, Wells Fargo has built its

10:31:55  24   success fairly and by the hard work of its employees and by

10:31:58  25   lawfully building its technologies or lawfully buying its

10:32:04   1   technologies from vendors who sell them.

10:32:07   2         Folks, our Constitution protects more than just

10:32:11   3   patents as the Plaintiffs would suggest to you.  It

10:32:14   4   protects the freedom to compete lawfully.

10:32:17   5         That's what Wells Fargo is standing up for in this

10:32:19   6   case, ladies and gentlemen, the freedom to compete lawfully

10:32:23   7   by doing the right thing of buying what it is you want to

10:32:26   8   use in your business, but then when you're accused

10:32:30   9   wrongfully of infringing a patent and unreasonable demands

10:32:34  10   are made upon you for money at a courthouse.  You stand up

10:32:37  11   to that.  And that's what we've done here.

10:32:40  12         Folks, you've seen the evidence, you've heard the

10:32:43  13   requirements of the law, and now we ask that you as jurors

10:32:48  14   do what you took an oath to do, which is to render justice,

10:32:53  15   to consider all of the facts, and we ask that after

10:32:57  16   considering all the credible evidence that you stop this

10:33:00  17   overreach and that you return a verdict in favor of Wells

10:33:05  18   Fargo.

10:33:05  19         I thank you for your time and we thank you for

10:33:08  20   your attention.  And we look forward to your verdict.

10:33:10  21         Thank you, Your Honor.

10:33:12  22         THE COURT:  Plaintiff may now present its final

10:33:14  23   closing argument.  You have 18 minutes and 33 seconds

10:33:18  24   remaining, Mr. Sheasby.  Would you like a warning on your

10:33:21  25   time?

10:33:22  1          MR. SHEASBY:  I would like a warning at seven

10:33:25  2     minutes, Your Honor.

10:33:25  3          THE COURT:  Seven minutes remaining or seven

10:33:27  4     minutes used?

10:33:28  5          MR. SHEASBY:  Seven minutes remaining.

10:33:29  6          THE COURT:  All right.  I will warn you, proceed.

10:33:31  7          MR. SHEASBY:  The patents in this case were filed

10:33:33  8     in 2009.  Wells Fargo did not launch its system until after

10:33:38  9     USAA launched its mobile remote deposit capture system.

10:33:42  10    USAA was first, and Wells Fargo had an obligation under the

10:33:44  11    law to remove itself from our property when the United

10:33:50  12    States Patent Office granted us a patent in 2015.

10:33:52  13          Let's go to Slide 47.

10:33:55  14          One of the things that USAA is really focused on

10:34:07  15    in this case is evidence, and what you'll see is the

10:34:11  16    following:

10:34:12  17          Wells Fargo was speaking about the fact that Mitek

10:34:17  18    had two versions of auto capture, and it had a video

10:34:22  19    capture mode, which was the old mode before 2014, and then

10:34:26  20    it had a new mode called video frame processing.  That's

10:34:29  21    the mode that's at issue in this case, and what video frame

10:34:32  22    processing is, they say, is not auto capture.

10:34:34  23          Well, the manuals say something different, because

10:34:37  24    that mode after 2014, if you look at the manual, it says

10:34:42  25    automatic capture when good image is detected.  The exact

10:34:46   1   operation of the claim language.

10:34:47   2           Let's have Slide 40.

10:34:48   3           Now, US -- Wells Fargo is basing the vast majority

10:34:57   4   of their infringement case on the word of Mr. Wood, but

10:35:00   5   there's something interesting about Mr. Wood.  Not only was

10:35:03   6   he not an expert, not only did he not analyze the patent,

10:35:07   7   he admitted something incredibly important.  He admitted

10:35:10   8   that whatever use he's making of the word capture, it's

10:35:13   9   different from how the Mitek manuals use it, and obviously

10:35:16  10   it's not how the patent uses it because he hasn't read the

10:35:21  11   patent.

10:35:21  12           So Wells Fargo put someone on the stand without

10:35:24  13   reading the patent who has some secret definition of the

10:35:27  14   word "capture," which he didn't tell you and he didn't tell

10:35:30  15   me and is different from his company's, and they're trying

10:35:33  16   to use that to establish non-infringement.

10:35:34  17           Let's go to Slide 40.

10:35:36  18           Let's go to Slide 46, excuse me.

10:35:43  19           The idea that the manuals stopped being released

10:35:47  20   after they changed their system has no connection to

10:35:50  21   reality.  Mr. Wood admitted multiple times that after his

10:35:55  22   deposition, Mitek continued to release manuals establishing

10:35:59  23   infringement.

10:35:59  24           Let's go to Slide 38.

10:36:00  25           This is, I think, one of the most important

10:36:06    1    aspects of the case, which is Professor Conte promised that

10:36:10    2    he would teach you, and they're very, very focused on this

10:36:13    3    beginning of the code.

10:36:14    4          And what Professor Conte says and what he taught

10:36:16    5    is that it was the beginning of a chapter, and it was

10:36:20    6    telling you what's going to happen in this chapter.  And

10:36:22    7    now, was it absolutely the case that in this chapter,

10:36:26    8    (void) captureOutput the end result of that is the capture,

10:36:30    9    but you have to get to the end of the chapter.

10:36:32   10          Let's have Slide 39.

10:36:35   11          Professor Conte explained to you what's in this

10:36:40   12    chapter before the monitoring criteria -- let's build it

10:36:44   13    all, Mr. Huynh -- before the monitoring criteria, there is

10:36:47   14    obtaining a preview frame, next, please, there is analyzing

10:36:53   15    the frame using criteria, there is check if the frame

10:36:59   16    passes this criteria, and then after the monitoring

10:37:03   17    criteria, there's capture.  That's what the -- the story in

10:37:08   18    the chapter tells you, and that's what establishes

10:37:11   19    infringement.

10:37:11   20          Let's have Slide 32, please.

10:37:19   21          I keep coming back to Wells Fargo's plain and

10:37:28   22    ordinary meaning expert who described the exact system that

10:37:31   23    is at issue in this case as infringing.  And Mr. Villasenor

10:37:37   24    admitted he doesn't disagree with that.

10:37:38   25          Can we have Slide 25?

10:37:40  1        What Mr. Villasenor admitted is what Wells Fargo's

10:37:47  2   counsel described as some absurd theory is exactly how

10:37:51  3   digital cameras capture.  Digital cameras capture an image

10:38:00  4   by creating a JPEG.  That's exactly what Wells Fargo does.

10:38:01  5        Let's have Slide 30, please.

10:38:04  6        This answers the question of infringement.  The

10:38:07  7   plain and ordinary meaning of the term covers the system at

10:38:11  8   issue in this case.

10:38:12  9        Now, one of the things that was very important to

10:38:14  10  me was the discussion of Doctrine of Equivalents.  And

10:38:18  11  Professor Conte gave detailed evidence on Doctrine of

10:38:21  12  Equivalents.  He actually marked through -- he actually

10:38:27  13  marched through each of the elements of the Doctrine of

10:38:29  14  Equivalents, and let's look at those.

10:38:30  15       Let's go to Slide 42.

10:38:32  16       He analyzed whether it's substantially the same

10:38:35  17  function.

10:38:35  18       Let's go to Slide 43.

10:38:38  19       He analyzed whether it's substantially the same

10:38:41  20  way.

10:38:42  21       And let's go to Slide 44.

10:38:45  22       He analyzed whether it's substantially the same

10:38:47  23  result.

10:38:47  24       And one of the things that was so interesting

10:38:49  25  about the argument you just heard is argument is not

| | | |
|---|---|---|
| 10:38:52 | 1 | evidence.  Ask yourself this following question:  Did Wells |
| 10:38:56 | 2 | Fargo's counsel point to you any piece of evidence, any |
| 10:38:58 | 3 | piece of evidence anywhere in the world that says that what |
| 10:39:02 | 4 | Wells Fargo do -- does is not equivalent?  Not argument, |
| 10:39:06 | 5 | evidence. |
| 10:39:09 | 6 | He did not. |
| 10:39:11 | 7 | Let's go to Slide 52. |
| 10:39:17 | 8 | I want to talk briefly about willfulness.  And |
| 10:39:20 | 9 | Wells Fargo's counsel said:  Well, how can we possibly have |
| 10:39:23 | 10 | willfully infringed since we only got the screenshots in |
| 10:39:28 | 11 | 2018? |
| 10:39:30 | 12 | But that's not what the evidence shows.  The |
| 10:39:33 | 13 | evidence shows that there was a continued pattern of access |
| 10:39:38 | 14 | of USAA's mobile application for years and years and years. |
| 10:39:42 | 15 | This is a memo.  This is PX-0438, in which Paul |
| 10:39:50 | 16 | Rosati is being asked to go and pull passages from the USAA |
| 10:39:57 | 17 | application from 2014. |
| 10:40:00 | 18 | Let's go to Slide 53. |
| 10:40:01 | 19 | Mr. Rosati admitted it under oath.  He admitted |
| 10:40:09 | 20 | that he went to the USAA mobile application to find |
| 10:40:14 | 21 | examples of how auto capture worked. |
| 10:40:16 | 22 | Let's go to Slide 64. |
| 10:40:20 | 23 | When you think about damages in this case, you |
| 10:40:28 | 24 | need to think about the scope.  There are 231 billion [sic] |
| 10:40:32 | 25 | checks that have been successfully deposited over this |

10:40:34  1   three-year period using the infringing technology.

10:40:38  2           And Wells Fargo's counsel made a big point of

10:40:45  3   evidence that this is only damages for three years.  And

10:40:48  4   he's absolutely right.  There's no shock about it.  It was

10:40:51  5   shown in the first slide in our opening.  It was shown

10:40:53  6   throughout Mr. Weinstein's deposition -- testimony, and

10:40:58  7   I'll say it now, it's for only three years.

10:41:01  8           Wells Fargo never has to pay another cent to USAA

10:41:06  9   ever, ever, ever.  And they only have to do one thing.

10:41:12  10  They have to flip the switch.  And they have chosen not to.

10:41:18  11          They chose not to after we marked our own product

10:41:21  12  in 2016.  They chose not to after we approached them in

10:41:25  13  August of 2018.  They chose not to after we sent them a

10:41:31  14  chart showing why they infringed in 2019.  They chose not

10:41:34  15  to when we brought this lawsuit.  And to this day, this

10:41:38  16  technology which they say is so worthless, turn it off.  If

10:41:43  17  it's worthless, turn it off.

10:41:45  18          Let's go to Slide 64 -- no, let's go to Slide 67.

10:41:53  19  We've talked about the incredible importance of theory

10:41:59  20  of -- that manual capture is a non-infringing alternative.

10:42:03  21  But at -- ultimately, in this case, it's facts that matter.

10:42:07  22  It's not argument.

10:42:08  23          Mr. Jitodai, who is Wells Fargo's corporate

10:42:11  24  representative, he was authorized to speak on behalf of

10:42:15  25  Wells Fargo on the question of whether manual capture was a

10:42:21   1   non-infringing alternative.

10:42:23   2         Question:  You can't tell me whether manual

10:42:26   3   capture would have sufficient acceptance rates to be

10:42:28   4   acceptable to customers?

10:42:30   5         Answer:  No.

10:42:32   6         Dr. Villasenor, question:  You have no opinion as

10:42:42   7   to whether it would be commercially viable for Wells Fargo

10:42:45   8   not to offer auto capture, correct?

10:42:48   9         Answer:  That's correct.

10:42:50  10         Let's go to Slide 69.

10:42:55  11         Mr. Saffici, who testified that he was an expert

10:43:03  12   in remote deposit capture, said auto capture was essential.

10:43:08  13         So did Mr. Ajami, the senior VP at Wells Fargo,

10:43:12  14   the person who actually launched auto capture.

10:43:14  15         In his deposition, under oath, he was asked the

10:43:17  16   question:  You have no factual basis to disagree with the

10:43:21  17   Futurion statement that auto capture must now be treated as

10:43:26  18   a much-have -- must-have feature?

10:43:28  19         Answer:  Yeah, I don't think I have any.

10:43:30  20         And if he did have something after the fact, he

10:43:33  21   could have come here and said it to you, and he didn't.

10:43:36  22         Let's go to Slide 71.

10:43:42  23         One of the factors that you're going to have to

10:43:45  24   consider when weighing damages is the expectations of the

10:43:48  25   parties.  And, in fact, it's listed in your jury

10:43:51  1   instructions that you have to consider the expectations of

10:43:54  2   the parties.

10:43:54  3          What are the expectations of the parties here?

10:43:57  4   You heard the deposition of Mr. Easley.  Mr. Easley

10:44:01  5   actually has a very similar position in terms of title to

10:44:07  6   Ms. Lockwood-Stein.  And when he took his -- when his

10:44:10  7   deposition was taken, he went into great detail listing the

10:44:13  8   value of the technology to USAA, listing how important it

10:44:16  9   was to them, in saying:  For USAA, we view auto capture as

10:44:22  10  40 percent of the value of the MRDC system as a whole.

10:44:26  11  That was his sworn testimony.

10:44:27  12         Now, Wells Fargo's executives, and there are many

10:44:32  13  of them, had every opportunity to join the issue -- every

10:44:37  14  opportunity whatsoever.  You didn't hear sworn testimony

10:44:41  15  from one Wells Fargo executive challenging USAA's position,

10:44:47  16  not one.

10:44:48  17         You also didn't hear that testimony from any

10:44:52  18  technical witness.

10:44:53  19         Let's go to Slide 60 -- 76.

10:44:56  20         What you heard it from was Mr. Gerardi.  Now,

10:45:03  21  Mr. Gerardi may be a fine economist, but a technologist, he

10:45:11  22  is not.

10:45:11  23         THE COURT:  Seven minutes remaining.

10:45:13  24         MR. SHEASBY:  A person who can analyze the

10:45:14  25  differences and importance of technology is someone else.

| | | |
|---|---|---|
| 10:45:15 | 1 | That's Mr. Saffici, the RDC expert. |
| 10:45:19 | 2 | Mr. Gerardi admitted he's not an expert in remote |
| 10:45:23 | 3 | deposit capture. |
| 10:45:23 | 4 | Why is someone who's not an expert in remote |
| 10:45:26 | 5 | deposit capture telling you how much auto capture is worth? |
| 10:45:29 | 6 | How does that make any sense whatsoever?  The answer to the |
| 10:45:33 | 7 | question is because Wells Fargo's expert in remote deposit |
| 10:45:36 | 8 | capture, Mr. Saffici, says it's the foundation.  And by |
| 10:45:39 | 9 | saying it's the foundation, he, of course, couldn't |
| 10:45:42 | 10 | possibly come here to support Wells Fargo's position. |
| 10:45:45 | 11 | Let's have Slide 77. |
| 10:45:48 | 12 | Ultimately, the facts will show that MRDC itself |
| 10:45:56 | 13 | is incredibly valuable technology.  And there have been |
| 10:46:01 | 14 | debates around the side.  The idea that Wells Fargo has |
| 10:46:04 | 15 | generated a billion dollars, given its vastness, from use |
| 10:46:08 | 16 | of MRDC over the last three years is really not an |
| 10:46:12 | 17 | incredibly disputed fact.  In fact, Mr. Ajami concedes it's |
| 10:46:18 | 18 | -- it's table stakes. |
| 10:46:19 | 19 | Let's go to the next slide. |
| 10:46:20 | 20 | The idea that we're asking for $300 million for |
| 10:46:23 | 21 | three years is also not shocking.  Ms. Lockwood-Stein |
| 10:46:25 | 22 | admitted that they saved between 60 and $120 million each |
| 10:46:31 | 23 | year through MRDC.  And that's right in the range of what |
| 10:46:36 | 24 | Mr. Weinstein has indicated. |
| 10:46:37 | 25 | Next slide. |

10:46:38   1          So the question is:  If MRDC is so incredibly
10:46:48   2   valuable, what portion of it is attributed to auto capture?
10:46:52   3          Now, the Constitution has vested extraordinary
10:46:56   4   power in your hands.  But there is wise restraint on that
10:47:00   5   power, and it's called the facts.  And the only facts --
10:47:05   6   let's have the next slide, Slide 80.
10:47:08   7          The only facts in the record from someone who's
10:47:11   8   qualified to give you that testimony is from Mr. Calman.
10:47:14   9   I'd like Mr. Calman to stand right now.
10:47:16  10          Mr. Calman told you that the auto capture
10:47:18  11   technology is worth 40 percent of the value of the MRDC.
10:47:20  12          If there is other qualified technical testimony
10:47:25  13   disputing that fact in the record, I have not found it.
10:47:31  14   And it certainly didn't come from Mr. Gerardi, who is not a
10:47:37  15   technologist.
10:47:37  16          Let's have Slide 81.
10:47:40  17          If you apply the 40 percent analysis, you reach
10:47:43  18   $373 million.  That's applying Mr. Calman's undisputed
10:47:52  19   facts.
10:47:52  20          Next slide, please.
10:47:53  21          But that is only a small portion of the $932
10:48:03  22   million that is at issue in this case.
10:48:04  23          Next slide, please.
10:48:05  24          Even through 330 -- over $300 million has been
10:48:09  25   generated solely by auto capture, Mr. Weinstein -- and I'd

10:48:13   1   like Mr. Weinstein to stand now -- didn't say we get to

10:48:17   2   keep all of that.  He did an analysis of a negotiation.

10:48:19   3   And you know what he did?  He said that in the negotiation,

10:48:23   4   Wells Fargo could keep $73 million of the profits that it's

10:48:28   5   generated solely attributed to auto capture from its acts

10:48:32   6   of infringement.

10:48:32   7          Ladies and gentlemen of the jury, if you award

10:48:38   8   less than $299 million when this case is done, Wells

10:48:42   9   Fargo's lawyers will call back to San Francisco and say:

10:48:45  10   We did it.  We made money above our profits by acting and

10:48:50  11   breaking the law.

10:48:50  12          That's what will happen if you award less than

10:48:55  13   $299 million.

10:48:56  14          Next slide, please.  Let's go to Slide 87 -- 88.

10:49:05  15          About 13 years ago this month in October of 2006,

10:49:15  16   Mr. Charles Oakes, who is the first head of Applied

10:49:18  17   Research, sent this excited email saying:  We have

10:49:24  18   deposited a check using a digital camera.  And 13 years

10:49:27  19   later the cycle was closed.  He was the first director of

10:49:31  20   Applied Research.

10:49:32  21          You've heard about Mr. Bueche who was the next

10:49:35  22   director of Applied Research.

10:49:38  23          This is two generations of research at USAA.  This

10:49:44  24   is more than a decade's worth of toil.  This is the money

10:49:49  25   of our members in the armed services.  This case, this

10:49:56  1  decade of research, USAA's members, we are in your hands.

10:50:08  2  It's all in your hands.

10:50:09  3       Ladies and gentlemen of the jury, thank you for

10:50:12  4  your time.

10:50:17  5       THE COURT:  Ladies and gentlemen of the jury, I'd

10:50:22  6  now like to provide you with a few final instructions

10:50:25  7  before you begin your deliberations.

10:50:26  8       You must perform your duty as jurors without bias

10:50:31  9  or prejudice as to any party.  The law does not permit you

10:50:36  10  to be controlled by sympathy, prejudice, or public opinion.

10:50:41  11       All parties expect that you will carefully and

10:50:43  12  impartially consider all the evidence, follow the law as I

10:50:48  13  have given it to you, and reach a just verdict regardless

10:50:51  14  of the consequences.

10:50:52  15       Answer each question in the verdict form from the

10:50:56  16  facts as you find them to be in this case, following the

10:51:00  17  instructions that the Court has included.

10:51:03  18       Do not decide who you think should win and then

10:51:06  19  answer the questions accordingly.  I remind you, ladies and

10:51:09  20  gentlemen, your answers and your verdict in this case must

10:51:12  21  be unanimous.

10:51:12  22       You should consider and decide this case as a

10:51:17  23  dispute between persons of equal standing in the community,

10:51:21  24  equal worth, and holding the same or similar stations in

10:51:26  25  life.  This is true in patent cases between corporations,

10:51:29  1  partnerships, or individuals.

10:51:30  2        A patent owner is entitled to protect its rights

10:51:34  3  under the laws of the United States, and this includes

10:51:38  4  bringing a suit in a United States District Court for money

10:51:42  5  damages for infringement.

10:51:43  6        The law recognizes no distinction among types of

10:51:47  7  parties.  All corporations, partnerships, other

10:51:50  8  organizations stand equal before the law regardless of

10:51:54  9  their size and regardless of who owns them, and they are to

10:51:57  10  be treated as equals.

10:51:58  11        Now, when you retire to the jury room to

10:52:01  12  deliberate on your verdict, as I've told you, you'll each

10:52:04  13  have a copy of these final jury instructions that I'm

10:52:07  14  giving to take with you.

10:52:09  15        If during your deliberations you desire to review

10:52:12  16  any of the exhibits which the Court has admitted into

10:52:15  17  evidence during the trial, you should advise me by a

10:52:19  18  written note delivered to the Court Security Officer and

10:52:23  19  signed by your foreperson.  And I will send that exhibit or

10:52:26  20  those exhibits to you.

10:52:27  21        Once you retire, you should first select your

10:52:31  22  foreperson and then conduct your deliberations.

10:52:34  23        If you recess during your deliberations, follow

10:52:37  24  all the instructions the Court has given you about your

10:52:41  25  conduct during the trial.

10:52:43  1      After you have reached your unanimous verdict,

10:52:46  2  your foreperson is to fill out those unanimous answers in

10:52:50  3  the form of the verdict reflecting your unanimous

10:52:54  4  decisions.

10:52:54  5      You are not to reveal your answers until such time

10:52:58  6  as you are discharged as jurors unless otherwise directed

10:53:01  7  by me.  And you must never disclose to anyone, not even to

10:53:05  8  me, your numerical division on any question.

10:53:08  9      Any notes that you've taken over the course of the

10:53:11  10 trial are aids to your memory only.  If your memory should

10:53:18  11 differ from your notes, then you should rely on your memory

10:53:20  12 and not your notes.  The notes are not evidence.

10:53:23  13     A juror who has not taken notes should rely on his

10:53:27  14 or her own independent recollection of the evidence and

10:53:29  15 should not be unduly influenced by the notes of other

10:53:32  16 jurors.  Notes are not entitled to any greater weight than

10:53:35  17 the recollection or impression of each juror about the

10:53:38  18 testimony.

10:53:38  19     If you want to communicate with me at any time

10:53:43  20 during your deliberations, you should give a written

10:53:47  21 message or a question written and signed by your jury

10:53:50  22 foreperson to the Court Security Officer who will bring it

10:53:55  23 to me.  I will then respond as promptly as possible, either

10:53:58  24 in writing or by having you brought back into the courtroom

10:54:01  25 where I can address you orally.

10:54:03  1          I will always first disclose to the attorneys in

10:54:06  2  the case your question and my response before I answer any

10:54:09  3  question.

10:54:09  4          After you've reached a verdict and I've discharged

10:54:14  5  you from your responsibilities as jurors, you are not

10:54:19  6  required to talk with anyone about your service in the

10:54:21  7  case.  On the other hand, at that point, you will be

10:54:25  8  completely free to talk with anyone about your service in

10:54:28  9  the case.  That decision at that time, ladies and

10:54:30  10  gentlemen, will be yours and yours alone.

10:54:32  11          I'll now hand eight copies of these final jury

10:54:37  12  instructions and one clean copy of the verdict form to the

10:54:40  13  Court Security Officer who will deliver it to you in the

10:54:43  14  jury room.

10:54:44  15          Ladies and gentlemen of the jury, you may now

10:54:54  16  retire to deliberate upon your verdict.  We await your

10:54:58  17  decision.

10:54:59  18          COURT SECURITY OFFICER:  All rise.

10:55:17  19          (Jury out.)

10:55:18  20          THE COURT:  Counsel, you are welcome to wait for

10:55:25  21  the jury's verdict here in the courtroom or in the

10:55:27  22  courthouse.  If you choose to be elsewhere, do not be far

10:55:31  23  away in case we receive a question or when a verdict is

10:55:35  24  returned.

10:55:35  25          Pending either a question from the jury or the

| | | |
|---|---|---|
| 10:55:38 | 1 | return of a verdict, we stand in recess. |
| 10:55:45 | 2 | MR. SHEASBY:  Thank you, Your Honor. |
| 10:55:46 | 3 | COURT SECURITY OFFICER:  All rise. |
| 10:55:47 | 4 | (Recess.) |
| 12:11:32 | 5 | (Jury out.) |
| 12:11:33 | 6 | COURT SECURITY OFFICER:  All rise. |
| 12:11:34 | 7 | THE COURT:  Be seated, please. |
| 12:12:13 | 8 | Counsel, the Court has received the following note |
| 12:12:21 | 9 | from the jury.  I'll read it to you verbatim. |
| 12:12:29 | 10 | PX-0014 |
| 12:12:32 | 11 | PX-0417 |
| 12:12:36 | 12 | PX-1069 |
| 12:12:38 | 13 | Below that, November 6th, 2019, signed Charles |
| 12:12:42 | 14 | Harris. |
| 12:12:42 | 15 | And if I recall correctly, Mr. Harris was Juror |
| 12:12:45 | 16 | No. 8. |
| 12:12:45 | 17 | I take this to be a request for the Court to send |
| 12:12:50 | 18 | these three exhibits to the jury in the jury room.  I've |
| 12:12:56 | 19 | prepared the following response: |
| 12:12:59 | 20 | Members of the jury, in response to your note, |
| 12:13:01 | 21 | please find attached the following, PX-14, PX-417, and |
| 12:13:07 | 22 | PX-1069. |
| 12:13:08 | 23 | And given the specificity within the note, I've |
| 12:13:13 | 24 | taken the liberty of pulling those three exhibits from the |
| 12:13:17 | 25 | Court's file. |

| | | |
|---|---|---|
| 12:13:18 | 1 | Is there any objection to the Court sending these |
| 12:13:21 | 2 | three exhibits with the written response I've read to you |
| 12:13:24 | 3 | to the jury? |
| 12:13:25 | 4 | MR. SHEASBY:  No objections from Plaintiff, Your |
| 12:13:28 | 5 | Honor. |
| 12:13:28 | 6 | MR. HILL:  No objection, Your Honor. |
| 12:13:29 | 7 | THE COURT:  All right.  I'll sign the response |
| 12:13:39 | 8 | from the Court, and I'll hand these three exhibits with |
| 12:13:42 | 9 | that signed response to the Court Security Officer and |
| 12:13:44 | 10 | direct him to deliver them to the jury. |
| 12:13:53 | 11 | I'll hand the original note, which I'm marking in |
| 12:13:57 | 12 | the upper right corner with a 1, to the courtroom deputy |
| 12:14:01 | 13 | for inclusion in the documents in this case. |
| 12:14:04 | 14 | And, counsel, I have an extra Xerox copy of the |
| 12:14:10 | 15 | note and an extra Xerox copy of my response, which I'll |
| 12:14:14 | 16 | leave with the courtroom deputy.  Once I leave the bench, |
| 12:14:17 | 17 | if you'd like to have these copies, you may get them from |
| 12:14:20 | 18 | her. |
| 12:14:20 | 19 | That being done, and pending either another note |
| 12:14:26 | 20 | or the return of a verdict, the Court stands in recess. |
| 12:14:35 | 21 | COURT SECURITY OFFICER:  All rise. |
| 12:14:37 | 22 | (Recess.) |
| 12:59:31 | 23 | (Jury out.) |
| 01:02:20 | 24 | COURT SECURITY OFFICER:  All rise. |
| 01:02:22 | 25 | THE COURT:  Be seated, please. |

01:02:28  1          Counsel, we received a second note from the jury.

01:02:36  2          I'll read it to you.  It reads as follows:

01:02:44  3          We need a document that shows how Mr. Weinstein

01:02:49  4   arrived at his monetary figures for damages, for cost

01:02:55  5   savings, increased profit, and ecosystem benefits.  We

01:02:59  6   don't remember the document number.

01:03:02  7          It's dated today's date, and signed by Charles

01:03:06  8   Harris as our foreperson.

01:03:08  9          I will mark the note as No. 2 for identification

01:03:12  10  and deliver it to the courtroom deputy at this time.

01:03:14  11         Counsel, while you were assembling, I made a quick

01:03:19  12  review of the listed exhibits in the case.  I'm persuaded

01:03:25  13  the reason the jury can't remember the number is there is

01:03:28  14  no such exhibit.

01:03:31  15         I remember Mr. Weinstein's testimony with multiple

01:03:34  16  demonstratives, but I don't think anything that addresses

01:03:37  17  their area of inquiry can be traced to a single admitted

01:03:43  18  exhibit.

01:03:43  19         I certainly would welcome and solicit any input

01:03:46  20  from counsel if you feel differently or if you agree with

01:03:49  21  that.

01:03:50  22         MR. SHEASBY:  Your Honor, may it please the Court.

01:03:51  23         I understand that they referenced the word

01:03:54  24  "exhibit," but, of course, there is direct testimony in the

01:03:58  25  record on this subject.  And I would respectfully request

01:04:01   1   that the passages from Mr. Weinstein's testimony, which are

01:04:03   2   the equivalent evidence, be provided to the jury.

01:04:07   3          THE COURT:  Well, I've told the jury throughout

01:04:12   4   this trial that the transcript of the testimony would not

01:04:14   5   be available for them to consider during their

01:04:17   6   deliberations.  I've told them the transcript is prepared

01:04:24   7   in case there is an appeal of the decision from this Court

01:04:27   8   to a higher Court.

01:04:29   9          I'm not about to reverse myself and send in part

01:04:33  10   of the trial transcript that's been produced through the

01:04:34  11   real-time process that but for real-time would not have

01:04:36  12   even begun to be transcribed at this point.

01:04:40  13          I do have a proposed response to the members of

01:04:42  14   the jury, and I'd like to read it to counsel, and then get

01:04:45  15   your reactions.

01:04:46  16          Members of the jury, in response to your second

01:04:52  17   note, Mr. Weinstein used several demonstratives during his

01:04:55  18   testimony as he testified and gave opinions on damages.

01:04:58  19   The Court is not aware of an exhibit admitted into evidence

01:05:02  20   which specifically addresses your request.  While

01:05:05  21   demonstratives are not evidence, the testimony of a witness

01:05:07  22   using a demonstrative to aid them in giving their testimony

01:05:11  23   is evidence.  You will have to rely on your memories of

01:05:14  24   Mr. Weinstein's -- Weinstein's testimony regarding his

01:05:19  25   opinions as to damages and the basis for those opinions.

01:05:21   1          Anybody object to me sending that response to the

01:05:25   2   jury?

01:05:25   3          MR. SHEASBY:  Your Honor, one part of concern that

01:05:27   4   I had is you're not aware of any exhibits relating to

01:05:30   5   Mr. Weinstein's opinions.  There are, of course, exhibits

01:05:33   6   that do support his opinions.

01:05:36   7          With respect, would you just give the end of the

01:05:37   8   instruction that says that you are entitled to rely on his

01:05:40   9   testimony as evidence?  There's some slight subtext of

01:05:45  10   aspersion that inhabits here.  I don't think it was

01:05:49  11   intentional, but that's how they may interpret it.

01:05:53  12          THE COURT:  Well, what I meant to say,

01:05:55  13   Mr. Sheasby, was that as to the area they have specifically

01:05:58  14   requested in their note, I'm not aware of any exhibits that

01:06:01  15   directly address that inquiry.  And if you are, please tell

01:06:06  16   me.  I'm not.

01:06:07  17          MR. SHEASBY:  No, because it was opinion

01:06:09  18   testimony.  So, of course, there would be no exhibits.  I

01:06:11  19   guess I was just respectfully submitting -- without --

01:06:15  20   would think it would be possible just to say there's no

01:06:17  21   exhibits, but you may rely on his testimony and

01:06:20  22   demonstrative exhibits -- there's no single exhibit that

01:06:24  23   summarizes his calculations, but you may rely on his

01:06:27  24   testimony.

01:06:28  25          THE COURT:  Well, then the response deleting that

01:06:32  1    second sentence would read:  In response to your second

01:06:35  2    note, Mr. Weinstein used several demonstratives during his

01:06:39  3    testimony as he testified and gave opinions on damages.

01:06:43  4    While demonstratives are not evidence, the testimony of a

01:06:46  5    witness using a demonstrative to aid them in giving their

01:06:50  6    testimony is evidence.  You'll have to rely on your

01:06:52  7    memories of Mr. Weinstein's testimony regarding his

01:06:55  8    opinions as to damages and the basis for those opinions.

01:06:59  9         Does that cure your area of concern?

01:07:01  10         MR. SHEASBY:  It does, Your Honor.  Thank you.

01:07:02  11         THE COURT:  Do Defendants have any concern about

01:07:04  12   this response?

01:07:04  13         MR. MELSHEIMER:  I don't believe so, Your Honor.

01:07:07  14   I'm not sure I -- I -- if you would mind reading it from

01:07:11  15   the beginning again just so we could hear it all the way

01:07:16  16   through.

01:07:16  17         THE COURT:  All right.  I have it on my laptop

01:08:07  18   here at the bench.  I'll read it to you as I have it.  It

01:08:13  19   reads as follows from the beginning:

01:08:15  20         Members of the jury, in response to your second

01:08:18  21   note, Mr. Weinstein used several demonstratives during his

01:08:23  22   testimony, as he testified and gave opinions on damages.

01:08:27  23   While demonstratives are not evidence, the testimony of a

01:08:30  24   witness using a demonstrative to aid them in giving their

01:08:33  25   testimony is evidence.  You will have to rely on your

01:08:38   1   opinions -- excuse me, you'll have to rely on your memories

01:08:40   2   of Mr. Weinstein's testimony regarding his opinions as to

01:08:43   3   damages and the basis for those opinions.

01:08:45   4        Does either party have a problem with me sending

01:08:51   5   that written response to the jury?

01:08:53   6        MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

01:08:54   7        MR. MELSHEIMER:  My only concern, Your Honor, is

01:08:56   8   I'm not - not sure it answers the question that they asked.

01:08:59   9   They asked for an exhibit, and --

01:09:00  10        THE COURT:  Well, I had an earlier sentence in

01:09:02  11   here that said I don't find that such an exhibit exists,

01:09:07  12   but I had an objection from Plaintiff.

01:09:09  13        MR. MELSHEIMER:  Right.  I'm just now getting the

01:09:10  14   chance to -- I'm now responding to that.  I think to me,

01:09:11  15   obviously, Your Honor has got the discretion, but to me,

01:09:14  16   the most important thing about the questions is that we

01:09:18  17   answer them, and if you don't answer it and then you

01:09:21  18   provide some additional information, I think there's a risk

01:09:24  19   of confusion.

01:09:25  20        So I think we ought to answer the question and

01:09:29  21   then if you -- that additional information is to me

01:09:31  22   surplusage, but I don't -- I don't think it's -- I don't

01:09:35  23   think it's problematic.

01:09:43  24        MR. SHEASBY:  Your Honor, what if we said there's

01:09:46  25   no one exhibit that summarizes his opinions?  The only

01:09:57  1  concern I have is I don't want it to be suggested that

01:10:01  2  there was an exhibit that supported his opinions.  That was

01:10:12  3  my only concern.

01:10:12  4        MR. MELSHEIMER:  I don't want to interrupt the

01:10:13  5  Court while you're thinking, Judge.

01:10:20  6        THE COURT:  I'll try again, and I'm trying to go

01:10:45  7  the second mile to get input from both sides in hopes that

01:10:49  8  we can reach a point where no one has any discomfort with

01:10:54  9  my response, understanding it's not a negotiation at the

01:10:57  10  end of the day.  I'll eventually just give the response I

01:11:00  11  think the note calls for.

01:11:02  12        MR. SHEASBY:  I understand, Your Honor.

01:11:04  13        THE COURT:  Here's what I have in the current

01:11:06  14  iteration of the response, and I'll read it for the benefit

01:11:08  15  of counsel.

01:11:09  16        Members of the jury, in response to your second

01:11:11  17  note, Mr. Weinstein used several demonstratives during his

01:11:15  18  testimony as he testified and gave opinions on damages.

01:11:18  19  Neither the parties nor the Court are aware of a single

01:11:23  20  exhibit admitted which specifically addresses your request.

01:11:27  21  While demonstratives are not evidence, the testimony of a

01:11:30  22  witness using a demonstrative to aid them in giving their

01:11:33  23  testimony is evidence.  You will have to rely on your

01:11:36  24  memories of Mr. Weinstein's testimony regarding his

01:11:38  25  opinions as to damages and the basis for those opinions.

01:11:43  1          MR. MELSHEIMER:  Your Honor, I would object to

01:11:45  2  anything after "while demonstratives."  I don't -- I

01:11:48  3  don't -- that seems to be adding something that they

01:11:50  4  haven't asked about, and, of course, it's the Plaintiff's

01:11:53  5  burden to point out the evidence and to point out things.

01:11:56  6  It seems like --

01:11:57  7          THE COURT:  I've already instructed them,

01:11:59  8  Mr. Melsheimer, that demonstratives are not evidence, but

01:12:00  9  the testimony of a witness using a demonstrative is

01:12:03  10  evidence.  I'm just merely repeating a portion of my final

01:12:06  11  instruction to them.

01:12:08  12          MR. SHEASBY:  Your Honor, I think we'd be fine

01:12:10  13  with that with one request, that there be no single exhibit

01:12:14  14  that summarizes all of his opinions.

01:15:02  15          THE COURT:  Mr. Sheasby, if you and Mr. Melsheimer

01:15:06  16  would approach, I'll hand you a written draft of the note

01:15:09  17  as I have it now.  I will take five minutes and let the two

01:15:13  18  of you consult, and then I'll see if you have an agreement

01:15:17  19  as to a response the Court should send the jury.

01:15:20  20          Barring an agreement, I intend to send this

01:15:24  21  response to the jury.

01:15:24  22          MR. SHEASBY:  Thank you.

01:15:25  23          MR. MELSHEIMER:  Thank you.

01:15:26  24          THE COURT:  The Court stands in recess.

01:15:28  25          COURT SECURITY OFFICER:  All rise.

```
01:15:29    1              (Recess.)

01:24:58    2              (Jury out.)

01:24:59    3          COURT SECURITY OFFICER:  All rise.

01:25:00    4          THE COURT:  Be seated, please.

01:25:21    5          Is there any unanimity among counsel as to the

01:25:28    6   contents of this written response?

01:25:29    7          MR. SHEASBY:  Plaintiffs does not object to the

01:25:32    8   response, Your Honor.

01:25:32    9          MR. MELSHEIMER:  Your Honor, I understand you're

01:25:33   10   giving this, if we don't agree, I maintain my objection to

01:25:38   11   the text that starts "as I have told you," but I understand

01:25:42   12   the Court's going to give this instruction.

01:25:43   13          THE COURT:  So your -- your objection,

01:25:44   14   Mr. Melsheimer, is that that is duplicative, or what's the

01:25:47   15   legal basis of your objection?

01:25:48   16          MR. MELSHEIMER:  The legal basis is it's

01:25:50   17   unnecessary, and it is repeating instructions that are

01:25:55   18   already in the Court's instruction directing them to

01:25:59   19   something that's already in there, and it goes beyond the

01:26:01   20   question.  That's -- that's my --

01:26:03   21          THE COURT:  All right.

01:26:03   22          MR. MELSHEIMER:  That's my form objection.  Thank

01:26:06   23   you, Your Honor.

01:26:06   24          THE COURT:  All right.

01:26:09   25          MR. MELSHEIMER:  But I understand, we don't want
```

01:26:11   1   to waste any more time about this.

01:26:14   2          THE COURT:  All right.  For the record, I'm going

01:26:39   3   to read the response, which I've signed and which I will

01:26:42   4   send in by the Court Security Officer to the jury.

01:26:44   5          This is entitled Response to Note No. 2 dated

01:26:50   6   November the 6th, 2019.  Below that, it begins as follows.

01:26:55   7          Members of the jury, in response to your second

01:26:57   8   note, Mr. Weinstein used several demonstratives during his

01:27:01   9   testimony as he testified and gave opinions on damages.

01:27:04  10   Neither the parties nor the Court are aware of any single

01:27:08  11   exhibit which specifically addresses your written request

01:27:10  12   as set forth in your second note to the Court.  As I have

01:27:14  13   told you, while demonstratives are not evidence, the

01:27:16  14   testimony of a witness using a demonstrative to aid them in

01:27:20  15   giving their testimony is evidence.  Accordingly, you will

01:27:23  16   have to rely upon your memories of Mr. Weinstein's

01:27:26  17   testimony regarding his opinions as to damages and the

01:27:29  18   basis for those opinions.

01:27:30  19          I'll hand a signed version of this to the Court

01:27:35  20   Security Officer and direct her to deliver it to the jury.

01:27:37  21          I'll also deliver a signed copy of the same to the

01:27:40  22   courtroom deputy for inclusion in the papers of this case.

01:27:47  23          Pending either another note from the jury or the

01:27:54  24   return of a verdict, we stand in recess.

01:28:02  25          COURT SECURITY OFFICER:  All rise.

01:28:02   1            MR. SHEASBY:  Thank you, Your Honor.

01:28:04   2            (Recess.)

02:03:03   3            (Jury out.)

02:03:06   4            COURT SECURITY OFFICER:  All rise.

02:03:07   5            THE COURT:  Please be seated.

02:04:10   6            Counsel, I've received the following note from the

02:04:23   7   jury delivered by the Court Security Officer.  It reads as

02:04:27   8   follows:

02:04:28   9            We have reached a verdict.

02:04:30   10           It's dated today's date, November the 6th, 2019.

02:04:34   11   And it's signed by Charles Harris.

02:04:36   12           I'll hand this note to the courtroom deputy for

02:04:39   13   the inclusion in the documents related to this case.

02:04:43   14           I will also tell, counsel, that when that note was

02:04:45   15   brought to me by the Court Security Officer, she advised

02:04:48   16   that the jury requested a clean copy of the verdict form,

02:04:51   17   and I gave her a clean copy of the verdict form, which she

02:04:54   18   took back to the jury.  I instructed her to have the

02:04:57   19   earlier version torn up and thrown away.

02:05:01   20           So I expect they will bring a clean copy of the

02:05:05   21   verdict form into the courtroom without any interlineations

02:05:11   22   or any corrections.  I thought it was easier to send a

02:05:15   23   clean copy of the verdict form for that purpose to them

02:05:18   24   than to have them bring in the form with an interlineation

02:05:22   25   or correction on the face of the verdict form.  I'm simply

| | | |
|---|---|---|
| 02:05:26 | 1 | disclosing that to you. |
| 02:05:27 | 2 | All right.  Is there anything that we need to take |
| 02:05:29 | 3 | up before I bring in the jury and receive the verdict? |
| 02:05:32 | 4 | Anything from the Plaintiff? |
| 02:05:33 | 5 | MR. BUNT:  No, Your Honor. |
| 02:05:34 | 6 | THE COURT:  Anything from the Defendant? |
| 02:05:35 | 7 | MR. MELSHEIMER:  No, Your Honor. |
| 02:05:36 | 8 | THE COURT:  I'll remind those present that the |
| 02:05:39 | 9 | Court does not expect any outbursts or audible comments one |
| 02:05:45 | 10 | way or the other once I read the verdict.  I'll expect the |
| 02:05:50 | 11 | same decorum that's been maintained throughout the trial. |
| 02:05:54 | 12 | All right.  If you'll bring in the jury, please. |
| 02:05:56 | 13 | COURT SECURITY OFFICER:  All rise. |
| 02:05:57 | 14 | (Jury in.) |
| 02:05:58 | 15 | THE COURT:  Please be seated. |
| 02:06:21 | 16 | Mr. Harris, it's my understanding that you are the |
| 02:06:28 | 17 | foreperson of the jury; is that correct? |
| 02:06:30 | 18 | THE FOREPERSON:  Yes, Your Honor. |
| 02:06:31 | 19 | THE COURT:  Has the jury reached a unanimous |
| 02:06:33 | 20 | verdict? |
| 02:06:33 | 21 | THE FOREPERSON:  We have, Your Honor. |
| 02:06:34 | 22 | THE COURT:  Would you hand the completed verdict |
| 02:06:36 | 23 | form to the Court Security Officer who will bring it to me? |
| 02:06:39 | 24 | Ladies and gentlemen of the jury, I'm about to |
| 02:07:26 | 25 | announce your verdict at this time into the record.  I'm |

02:07:29  1  going to ask each one of you to listen particularly

02:07:32  2  carefully because after I've announced the -- the verdict

02:07:37  3  publicly and into the record, I'm going to ask each of you

02:07:40  4  if this is your verdict, so that we can confirm on the

02:07:43  5  record that it is, in fact, the unanimous decision of all

02:07:45  6  eight members of the jury.

02:07:47  7       Turning to the verdict form and proceeding to Page

02:07:54  8  4 where the first question posed to the jury is found.

02:08:00  9       Question No. 1, did USAA prove by a preponderance

02:08:04  10  of the evidence that Wells Fargo infringed any of the

02:08:06  11  asserted claims?

02:08:07  12       The answer is:  Yes.

02:08:09  13       Turning to Page 5 wherein Question 2 of the

02:08:15  14  verdict form is found.

02:08:18  15       Question 2, did USAA prove by a preponderance of

02:08:21  16  the evidence that Wells Fargo willfully infringed any of

02:08:25  17  the asserted claims that you found were infringed?

02:08:28  18       The answer is:  Yes.

02:08:30  19       Turning to Page 6 where the third and final

02:08:35  20  question presented to the jury is found.

02:08:37  21       Question 3:  What sum of money, if any, paid now

02:08:41  22  in cash has USAA proven by a preponderance of the evidence

02:08:45  23  would compensate USAA for its damages resulting from

02:08:49  24  infringement through the day of trial?

02:08:50  25       The jury's answer in dollars and cents is $200

02:08:56   1   million.

02:08:57   2          Turning to Page 7, which is the final page of the

02:09:04   3   verdict form, I find that it is dated with today's date,

02:09:07   4   November the 6th, 2019, and it's signed by Mr. Charles

02:09:10   5   Harris as foreperson of the jury.

02:09:12   6          Ladies and gentlemen of the jury, let me poll you

02:09:18   7   at this time to make sure that this verdict, as I've read

02:09:21   8   it into the record, is the unanimous decision and verdict

02:09:23   9   of all eight members of the jury.

02:09:25  10          If this is your verdict as I have read it, would

02:09:29  11   you please stand.

02:09:30  12          (Jury polled.)

02:09:36  13          THE COURT:  Thank you, ladies and gentlemen.

02:09:38  14   Please be seated.

02:09:39  15          Let the record reflect that all eight members of

02:09:43  16   the jury immediately rose and stood in response to the

02:09:47  17   Court's question to poll the jury.  I find that this is the

02:09:50  18   unanimous verdict of all eight members of the jury.

02:09:52  19          Ladies and gentlemen, this now completes the trial

02:09:54  20   of this case.  From the very beginning, I've instructed you

02:09:58  21   many times about not discussing this case or communicating

02:10:02  22   about it in any way until you retired to deliberate and

02:10:07  23   only then to discuss it among yourselves.

02:10:09  24          I'm now releasing you from that obligation and all

02:10:12  25   your obligations as jurors.  I'm discharging you from your

02:10:17  1  responsibility as jurors in this case.  This means you're

02:10:19  2  free to talk about your jury service with anyone that you

02:10:22  3  would like to.  This also means you're free not to talk

02:10:24  4  about your jury service with anyone of your choosing.  The

02:10:28  5  choice is yours 100 percent.

02:10:30  6      I will explain to you that the practice and custom

02:10:33  7  in this court going back at least 30 years, because it's

02:10:37  8  the way it was when I started practicing law, was that when

02:10:40  9  the jury returned a verdict and left the courthouse, the

02:10:45  10  lawyers could position themselves on the front sidewalk so

02:10:49  11  that if the jury wanted to stop and talk to them, they

02:10:52  12  could do so.

02:10:53  13      But the lawyers are prohibited from initiating

02:10:55  14  conversation with you.  As you leave the building and exit

02:11:00  15  the front doors, if you see any of the lawyers and if you

02:11:03  16  want to stop and talk about your service, I'm sure they

02:11:06  17  would be happy to hear any comments you have.  You are not

02:11:10  18  required to do that.  And if it is your choice not to stop

02:11:14  19  and discuss the case and your service with -- your service

02:11:17  20  as jurors in this case, then all you have to do is simply

02:11:21  21  walk straight past them, go to your vehicles, do whatever

02:11:24  22  you want to do.  They will not stop you.  They will not

02:11:27  23  initiate a conversation with you.

02:11:28  24      Also, I want you to know that recently, I've

02:11:32  25  started an additional practice in this regard.  I've asked

02:11:36   1   for and gotten a representative cell phone number from a

02:11:40   2   lawyer for each the Plaintiff and for the Defendant.  I'm

02:11:44   3   going to give you those cell phone numbers in a few

02:11:47   4   minutes.  You can take them with you if you want them.  You

02:11:51   5   don't have to take them with you.  But if over the next

02:11:54   6   week or several weeks you would prefer to initiate a

02:11:57   7   conversation by calling one or more of these lawyers on a

02:12:00   8   cell phone, you'll have a cell phone number for both

02:12:03   9   Plaintiff and Defendant that you can use for that purpose.

02:12:05  10   You're under no obligation to do that.

02:12:07  11          And if no one -- if anyone related in this case

02:12:11  12   never hears from you again, that will be perfectly fine.

02:12:14  13   It is your choice 100 percent.  I want to make that clear

02:12:18  14   to you.

02:12:19  15          Also, ladies and gentlemen, I want to let you know

02:12:23  16   how much the Court appreciates your service in this case.

02:12:27  17   You have each rendered very real and important public

02:12:30  18   service.  You have done your duty as Americans to uphold

02:12:35  19   the guarantees of our Constitution, specifically the

02:12:39  20   Seventh Amendment and its guarantee of the right to a jury

02:12:43  21   trial in a civil dispute such as this one.  You've each

02:12:47  22   sacrificed to be here.  And what you've done is worthy of

02:12:50  23   recognition and appreciation and thanks.

02:12:53  24          I speak for everyone in this courtroom -- I'm

02:12:57  25   confident I speak for everyone in this courtroom when I say

02:12:59   1   all of us appreciate and value what you've done by serving

02:13:03   2   as jurors in this case.  I have watched you throughout this

02:13:06   3   trial.  You have paid close and careful attention from the

02:13:09   4   very beginning until right now as I'm speaking to you.

02:13:15   5   There's never been a point when I noticed any of you not

02:13:17   6   focused, not listening, not carefully paying attention,

02:13:22   7   many of you taking copious notes throughout the process.

02:13:27   8   You have each done your duty and you are each to be proud

02:13:31   9   and to be thanked for what you've done.

02:13:33   10          I have a practice since I've been on the bench and

02:13:35   11   it involves me asking you a favor, and that is, though I've

02:13:38   12   discharged you as jurors, I'm going to request that as a

02:13:41   13   personal favor to me when you get up in a moment that

02:13:44   14   instead of leaving the courtroom, you go back into the jury

02:13:46   15   room and let me come into the jury room for just a moment.

02:13:50   16          I'd like the privilege of shaking each of your

02:13:53   17   hands, and telling you face-to-face how much the Court

02:13:57   18   appreciates the service that you've rendered as jurors in

02:13:59   19   this case.

02:14:00   20          I promise I will not keep you long.  But I think

02:14:03   21   what you've done warrants that kind of personal thanks and

02:14:07   22   expression of appreciation on behalf of the Court.  If you

02:14:12   23   would do me that favor, I would very much appreciate it.

02:14:15   24          As I said, ladies and gentlemen, you are

02:14:17   25   discharged as jurors.  And I will see you in the court --

02:14:21  1    in the jury room in just a moment.

02:14:25  2              COURT SECURITY OFFICER:  All rise.

02:14:26  3              (Jury out.)

02:14:26  4              THE COURT:  For the record, I will hand the

02:14:32  5    verdict form to the courtroom deputy.

02:14:33  6              Counsel, this completes the trial of this case.

02:14:39  7    The Court accepts the jury's verdict, and you are excused.

02:14:42  8              MR. SHEASBY:  Thank you, Your Honor.

02:14:43  9              MR. MELSHEIMER:  Thank you, Your Honor.

02:14:48  10             COURT SECURITY OFFICER:  All rise.

02:14:48  11             (Court adjourned.)

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    11/6/19
     SHELLY HOLMES, CSR, TCRR             Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25